# IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

_____

### JULIE A. SU,
Acting Secretary of Labor, United States Department of Labor,

*Plaintiff - Appellee,*

v.

### MEDICAL STAFFING OF AMERICA, LLC, d/b/a Steadfast Medical Staffing, a limited liability company; LISA ANN PITTS, individually and as owner and officer of the aforementioned company,

*Defendants - Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT NORFOLK

_____

### JOINT APPENDIX - VOLUME I OF V
### (Pages 1 - 682)

_____

Abram J. Pafford
Francis J. Aul
MCGUIREWOODS, LLP
Black Lives Matter Plaza
888 16th Street, NW
Washington, DC 20006
202-857-1725
apafford@mcguirewoods.com
faul@mcguirewoods.com

Anne W. King
U. S. DEPARTMENT OF LABOR
Office of the Solicitor
200 Constitution Avenue, NW
Room N-2716
Washington, DC 20210
202-663-4699
king.anne.w@dol.gov

*Counsel for Appellants*

*Counsel for Appellee*

# TABLE OF CONTENTS

## VOLUME I OF V

Page

District Court Docket Sheet [2:18−cv−00226−RAJ−LRL] ....................................... 1

Complaint
    Filed May 2, 2018 [Dkt. 1] ...................................................................48

Transcript of Trial Proceedings - Day 1
Before the Honorable Raymond A. Jackson
    On August 31, 2021 [Dkt. 312] ............................................................53

    COURTNAY HOPE DRAUGHN
        Direct by Examination by Ms. Lewis .....................................74
        Cross-Examination by Ms. Rust .............................................95
        Redirect Examination by Ms. Lewis .....................................105

    YETUNDE TAYLOR
        Direct Examination by Mr. Seifeldein ...................................106
        Cross Examination by Ms. Rust.............................................129

    CHRISTOPHER RYAN HOPSON
        Direct Examination by Ms. Jones .........................................137
        Cross-Examination by Ms. Rust ............................................154
        Redirect Examination by Ms. Jones ......................................151

    SAUDIA BOYKINS
        Direct Examination by Mr. Seifeldein ...................................165
        Cross-Examination by Ms. Rust ............................................180
        Redirect Examination by Mr. Seifeldein ...............................186

    ROXANNE ADAMS
        Direct Examination by Ms. Lewis .........................................188
        Cross-Examination by Ms. Rust ............................................206
        Redirect Examination by Ms. Lewis .....................................218

DAWN M. WOOTEN
 Direct Examination by Mr. Seifeldein ....................................222
 Cross-Examination by Ms. Rust .......................................... 239

Transcript of Trial Proceedings - Day 2
Before the Honorable Raymond A. Jackson
 On September 1, 2021 [Dkt. 313] ....................................... 245

JOHNESE JONES
 Direct Examination by Ms. Lewis .......................................247
 Cross-Examination by Ms. Rust .......................................... 260
 Redirect Examination by Ms. Lewis....................................264

ASHLEY MEGGIE
 Direct Examination by Ms. Lewis .......................................266
 Cross-Examination by Ms. Rust .......................................... 275

KIMBERLY BELLAMY
 Direct Examination by Mr. Seifeldein ....................................279
 Cross-Examination by Ms. Rust .......................................... 290
 Redirect Examination by Mr. Seifeldein................................ 294

TERESA MOREY (Via ZoomGov.com)
 Direct Examination by Ms. Lewis .......................................297
 Cross-Examination by Ms. Rust ..........................................306

TATIANNA CANADY
 Direct Examination by Ms. Jones .......................................312
 Cross-Examination by Ms. Rust ..........................................326
 Redirect Examination by Ms. Jones....................................329

COURTNEY TURNER (Via ZoomGov.com)
 Direct Examination by Ms. Jones .......................................333

TYWANN WHITE
 Direct Examination by Ms. Lewis .......................................340

Transcript of Trial Proceedings - Day 3
Before the Honorable Raymond A. Jackson
On September 2, 2021 [Dkt. 314] ....................................................................358

CHANTELLA SMITH
   Direct Examination by Ms. Jones ........................................361
   Cross-Examination by Ms. Rust ..........................................373
   Redirect Examination by Ms. Jones......................................377

ANDREA TIRADO
   Direct Examination by Ms. Lewis ........................................382
   Cross-Examination by Ms. Rust ..........................................398
   Redirect Examination by Ms. Lewis......................................401

ERICA JOHNSON
   Direct Examination by Mr. Seifeldein ...................................413
   Cross-Examination by Mr. Jewett.........................................440
   Redirect Examination by Mr. Seifeldein.................................459
   Recross-Examination by Mr. Jewett ......................................465

DAVID RAWLINGS
   Direct Examination by Mr. Seifeldein ...................................467
   Cross-Examination by Mr. Jewett.........................................487
   Redirect Examination by Mr. Seifeldein.................................501

ROBERTO MELENDEZ
   Direct Examination by Ms. Lewis ........................................502
   Cross-Examination by Ms. Rust ..........................................515
   Redirect Examination by Ms. Lewis......................................520

YAOZU XIONG (Via ZoomGov.com)
   Direct Examination by Ms. Lewis ........................................523
   Cross-Examination by Ms. Rust ..........................................541
   Redirect Examination by Ms. Lewis .....................................5554

Transcript of Trial Proceedings - Day 4
Before the Honorable Raymond A. Jackson
On September 3, 2021 [Dkt. 315] ........................................................................ 560

LISA PITTS
Direct Examination by Ms. Lewis ....................................................... 565
Cross-Examination by Mr. Jewett......................................................... 606
Redirect Examination by Ms. Lewis..................................................... 616
Recross-Examination by Mr. Jewett ..................................................... 621

CHRISTINE KIM
Direct Examination by Ms. Jones ........................................................ 626
Cross-Examination by Ms. Rust .......................................................... 653
Redirect Examination by Ms. Jones...................................................... 658

PEYTON LEX
Direct Examination by Ms. Jones ........................................................ 670
Redirect Examination by Ms. Jones...................................................... 679

## <u>VOLUME II OF V</u>

Transcript of Trial Proceedings - Day 5 (Morning Session)
Before the Honorable Raymond A. Jackson
    On September 7, 2021 [Dkt. 316] ....................................................................... 683

    PENNY CLARK
        Direct Examination by Ms. Rust......................................................... 687
        Cross-Examination by Ms. Lewis ...................................................... 696
        Redirect Examination by Ms. Rust ..................................................... 702

    NAPOLEAN ALSTON
        Direct Examination by Ms. Rust......................................................... 705
        Cross-Examination by Ms. Lewis ...................................................... 720
        Redirect Examination by Ms. Rust ..................................................... 732

    TAWANDA HALL
        Direct Examination by Mr. Siegrist ..................................................... 735
        Cross-Examination by Ms. Jones ......................................................... 745

    DASELINE HALL (Via ZoomGov.com)
        Direct Examination by Mr. Siegrist ..................................................... 750
        Cross-Examination by Ms. Lewis ...................................................... 768
        Redirect Examination by Mr. Siegrist................................................... 777

Transcript of Trial Proceedings - Day 5 (Afternoon Session)
Before the Honorable Raymond A. Jackson
    On September 7, 2021 [Dkt. 313] ....................................................................... 786

    CHRISTINE LEE KIM
        Direct Examination by Ms. Rust......................................................... 790
        Cross-Examination by Ms. Jones ......................................................... 846
        Redirect Examination by Ms. Rust ..................................................... 861

    RACHARLOTTE LEE COATES
        Direct Examination by Ms. Rust......................................................... 864
        Cross-Examination by Mr. Seifeldein ................................................... 875
        Redirect Examination by Ms. Rust ..................................................... 890

Transcript of Trial Proceedings - Day 6
Before the Honorable Raymond A. Jackson
   On September 8, 2021 [Dkt. 318] ........................................................ 901

      LESLIE BOONE (Via ZoomGov.com)
         Direct Examination by Ms. Rust ........................................... 903
         Cross-Examination by Mr. Seifeldein .................................. 912

      DIXIE DeLUTIS (Via ZoomGov.com)
         Direct Examination by Ms. Rust ........................................... 932
         Cross-Examination by Ms. Lewis ........................................ 937
         Redirect Examination by Ms. Rust ..................................... 943

      LISA PITTS
         Direct Examination by Mr. Jewett ....................................... 950
         Cross-Examination by Ms. Lewis ...................................... 1047
         Redirect Examination by Mr. Jewett ................................. 1103

Transcript of Trial Proceedings - Day 7
Before the Honorable Raymond A. Jackson
   On September 9, 2021 [Dkt. 319] ...................................................... 1113

      JOHN BREDEHOFT
         Direct Examination by Mr. Jewett ..................................... 1115
         Cross-Examination by Mr. Seifeldein .............................. 1137
         Redirect Examination by Mr. Jewett ............................... 1169

Memorandum Opinion and Order Entered
   Entered January 14, 2022 [Dkt. 324] .............................................. 1185

Judgment in a Civil Case Entered
   Entered January 14, 2022 [Dkt. 325] .............................................. 1216

Notice of Appeal Filed
   Filed March 14, 2022 [Dkt. 332] ..................................................... 1217

# **VOLUME III OF V**

Attachments and Exhibits to Consent Notice of Filing
of Certain Exhibits for Purposes of Appeal
 Filed August 17, 2022 [Dkt. 356]:

Att. 1:    Alvaro Mazuera Deposition Transcript [Dkt. 356-1] ................ 1220

Att. 2:    Zira Technologies 30(b)(6) Deposition Transcript
           [Dkt. 356-2] ................................................................................. 1526

Ex. PX-10:  Staffing Agreements Between Steadfast and Facilities
            (Excerpts of Exhibit) [Dkt. 356-3]......................................... 1692

Ex. PX-11:  Facility Invoices (Excerpt of Exhibit) [Dkt. 356-4].............. 1781

Ex. PX-12:  Summary Exhibit - Facilities Steadfast Contracts
            (Excerpt of Exhibit) [Dkt. 356-5] ......................................... 1786

Ex. PX-16:  ADP Employee Change Report (Excerpt of Exhibit)
            [Dkt. 356-6] .......................................................................... 1787

Ex. PX-25:  Agreement for Independent Contractor Services
            (Excerpts of Exhibit) [Dkt. 356-7]......................................... 1793

Ex. PX-26:  Steadfast Applications (Excerpts of Exhibit)
            [Dkt. 356-8] .......................................................................... 1831

Ex. PX-37:  Timesheet Reminder Memos (Excerpts of Exhibit)
            [Dkt. 356-9] .......................................................................... 1839

Ex. DX-41:  Steadfast Memo - Advisory Atlantic Shores
            [Dkt. 356-10] ........................................................................ 1848

Ex. DX-42:  Steadfast Memo - Be on Time [Dkt. 356-11] ........................ 1849

Ex. DX-44:  Steadfast Memo - No Sleeping in Rooms [Dkt. 356-12]....... 1850

Ex. DX-46:  Steadfast Memo - Be on Time [Dkt. 356-13] ........................ 1851

PX-34 Gmail - Next Day Pay Memo ........................................................1852

DX-50 Memo re Thanksgiving Holiday Pay.............................................1853

DX-58 - Memo re CNA and LPN Needs (155830292.1).........................1854

DX-59 - Memo re CNA and Nurse Needs (155830293.1).......................1857

**VOLUME IV OF V**

Defendants' Response to Plaintiff's Motion to Revise the Court's Order
Filed March 20, 2020 [Dkt. 247]....................................................... 1859

Joint Pretrial Order
Filed March 21, 2021 [Dkt. 261]...................................................... 1865

Notice of Filing Tenth Revised Schedule a In Steadfast II
Filed August 25, 2021 [Dkt. 287]..................................................... 1918

    Ex.1:  Tenth Revised Schedule A [Dkt. 287-1] 1924

Plaintiff's Supplemental Proposed Findings of Fact and Conclusions of Law
Filed November 3, 2021 [Dkt. 321] ................................................. 1953

Defendants' Motion for Relief in Connection with Plaintiff's
Trial Exhibit Px-21, And Opposition to Plaintiff's March 11
"Updated Back Wage Computations"
Filed March 13, 2022 [Dkt. 331]...................................................... 1981

    Att. 1:    Memorandum of Points and Authorities [Dkt. 331-1] ............... 1985

    Ex. 1:    Steadfast March 6 letter to DOL [Dkt.  331-2]........................... 2002

    Ex. 2    Attachment A to March 6 letter [Dkt. 331-3].............................. 2006

    Ex. 3:    Attachment B to March 6 letter [Dkt. 331-4] ............................. 2010

    Ex. 4:    Attachment C to March 6 letter [Dkt. 331-5] ............................. 2013

    Ex. 5:    March 8-10 counsel email exchange [Dkt. 331-6] ...................... 2015

    Ex. 6:    W-2 employee corrections [Dkt. 331-7]...................................... 2019

    Ex. 7:    Sample packets re: PX-21 errors [Dkt. 331-8] ........................... 2023

Defendants' Reply Brief in Support of Motion for Relief In
Connection with Plaintiff's Trial Exhibit Px-21, And Opposition to
Plaintiff's March 11 "Updated Back Wage Computations"
    Filed April 4, 2022 [Dkt. 337].......................................................... 2059

       Ex.1:      Spreadsheet [Dkt. 337-1] .............................................. 2080

       Ex. 2:     Sampling Breakdown [Dkt. 337-2].............................. 2081

       Ex.3:      Plaintiff's Answers and Objections to Defendants' First Set
                     Of Request Interrogatories [Dkt. 337-3]..................... 2082

       Ex.4:      Plaintiff's Second Supplemental Answers and Objections To
                     Defendants' First Set of Interrogatories [Dkt. 337-4] ................ 2099

Defendants' Opposition to Plaintiff's "Motion for Entry of Updated Order"
    Filed July 28, 2022 [Dkt. 350].......................................................... 2110

       Ex.1:      July 28 letter to DOL [Dkt. 350-1] .............................................2123

Order Reimposing Injunction
    Filed September 7, 2023 [Dkt. 395] .................................................. 2135

Notice of Appeal (interlocutory)
    Filed November 3, 2023 [Dkt. 404] .................................................. 2144

Order
    Filed November 30, 2023 [Dkt. 410] ................................................ 2147

Memorandum Opinion and Order Denying relief re PX21
    Filed December 7, 2023 [Dkt. 411]................................................... 2149

Updated Order and Judgment
    Filed December 8, 2023 [Dkt. 412]................................................... 2160

Amended Final Judgment
    Filed December 11, 2023 [Dkt. 413].................................................. 2167

Amended Notice of Appeal
    Filed December 11, 2023 [Dkt. 415].................................................. 2169

**VOLUME IV OF V**

PX-21 Wage Transcription and Computation Sheets.............................................2172

PX-22 Summary of Back Wage Computations.......................................................2782

APPEAL,FLSA,LEAD

# U.S. District Court
## Eastern District of Virginia - (Norfolk)
## CIVIL DOCKET FOR CASE #: 2:18-cv-00226-RAJ-LRL

| | |
|---|---|
| Su, Secretary of Labor, United States Department of Labor v. Medical Staffing of America, LLC et al | Date Filed: 05/02/2018 |
| Assigned to: District Judge Raymond A. Jackson | Date Terminated: 01/14/2022 |
| Referred to: Magistrate Judge Lawrence R. Leonard | Jury Demand: None |
| Case in other court: Kirsten Hancock, 22-01290 | Nature of Suit: 710 Labor: Fair Standards |
| 4CCA Case Manager Jeffrey S. Neal, 23-02176 | Jurisdiction: U.S. Government Plaintiff |
| 4CCA Case Manager Jeffrey S. Neal, 23-02284 | |
| Cause: 29:201 Fair Labor Standards Act | |

**Plaintiff**

| | | |
|---|---|---|
| **Julie A. Su** | represented by | **Mohamed Elnour Seifeldein** |
| *Acting Secretary of Labor, United States Department of Labor* | | U. S. Department of Labor |
| | | Office of the Solicitor |
| | | 201 12th Street South |
| | | Suite 401 |
| | | Arlington, VA 22202 |
| | | 703-778-6841 |
| | | Fax: 703-562-7709 |
| | | Email: seifeldein.mohamed.e@dol.gov |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Avni Amin** |
| | | U. S. Department of Labor |
| | | Office of the Solicitor |
| | | 201 12th St South |
| | | Suite 401 |
| | | Arlington, VA 22202 |
| | | NA |
| | | (202) 693-9393 |
| | | Fax: (202) 693-9392 |
| | | Email: amin.avni.j@dol.gov |
| | | *TERMINATED: 08/09/2019* |
| | | *PRO HAC VICE* |
| | | |
| | | **Chervonti Jones** |
| | | U. S. Department of Labor |
| | | Office of the Solicitor |

**JA1**

201 12th St South
Suite 401
Arlington, VA 22202
NA
(202) 693-9393
Fax: (202) 693-9392
Email: jones.chervonti.j@dol.gov
*TERMINATED: 11/29/2023*
*PRO HAC VICE*

**Karen M. Barefield**
Department of the Labor
Office of the Solicitor
201 12th street south
Suite 401
Arlington, VA 22202-5450
201-693-9371
Fax: 202-693-9392
Email: barefield.karen@dol.gov
*TERMINATED: 05/13/2019*

**LaShanta Harris**
United States Department of Labor
201 12th Street South
Suite 401
Arlington, VA 22202
NA
(202) 693-9351
Fax: (202) 693-9392
Email: harris.lashanta@dol.com
*TERMINATED: 05/13/2019*
*PRO HAC VICE*

**Ryma Naje Lewis**
US Department of Labor
Regional Solicitor's Office
201 12th Street South
Suite 401
Arlington, VA 22202
202-693-9393
Fax: 202-693-9392
Email: lewis.ryma@dol.gov
*TERMINATED: 11/29/2023*

**Plaintiff**

**U.S. Department of Labor**               represented by   **Mohamed Elnour Seifeldein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JA2**

**Defendant**

**Medical Staffing of America, LLC**              represented by   **Abram John Pafford**
*a limited liability company*                                      McGuireWoods LLP
*doing business as*                                               888 16th Street N.W.
Steadfast Medical Staffing                                       Suite 500
                                                                 Black Lives Matter Plaza
                                                                 Washington, DC 20006
                                                                 202-857-1725
                                                                 Fax: 202-828-3350
                                                                 Email: apafford@mcguirewoods.com
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **V. Kathleen Dougherty**
                                                                 McGuireWoods LLP (Norfolk)
                                                                 101 W Main St
                                                                 Suite 9000
                                                                 Norfolk, VA 23510-1655
                                                                 Email: vkdougherty@mcguirewoods.com
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Aaron Daniel Siegrist**
                                                                 Pierce McCoy, PLLC
                                                                 101 W. Main Street
                                                                 Suite 101
                                                                 Norfolk, VA 23510
                                                                 804-956-7260
                                                                 Fax: 757-257-0387
                                                                 Email: asiegrist@piercemccoy.com
                                                                 *TERMINATED: 02/11/2022*

                                                                 **Christopher D. Davis**
                                                                 Davis Law, PLC
                                                                 555 Belaire Avenue
                                                                 Suite 340
                                                                 Chesapeake, VA 23320
                                                                 757-410-2293
                                                                 Fax: 757-257-8614
                                                                 Email: chris@davislawplc.com
                                                                 *TERMINATED: 08/30/2021*

                                                                 **John M. Bredehoft**
                                                                 Kaufman & Canoles PC (Norfolk)
                                                                 150 W Main St
                                                                 Suite 2100
                                                                 PO Box 3037
                                                                 Norfolk, VA 23510
                                                                 (757) 624-3000
                                                                 Fax: 888-360-9092

**JA3**

Email: jmbredehoft@kaufcan.com
*TERMINATED: 01/24/2019*

**Joshua Lee Jewett**
Pierce McCoy, PLLC
101 W. Main Street
Suite 101
Norfolk, VA 23510
(757) 216-0226
Email: jjewett@piercemccoy.com
*TERMINATED: 10/13/2022*

**Julia Amato Rust**
Pierce McCoy, PLLC
101 W. Main Street
Suite 101
Norfolk, VA 23510
(757) 216-0226
Fax: (757) 257-0387
Email: jrust@williamsmullen.com
*TERMINATED: 10/13/2022*

**Patrick Hugh O'Donnell**
Kaufman & Canoles PC
150 W Main St
PO Box 3037
Norfolk, VA 23510
(757) 624-3305
Fax: (757) 624-3169
Email: phodonnell@kaufcan.com
*TERMINATED: 08/16/2021*

**Robert William McFarland**
McGuireWoods LLP
101 W Main St
Suite 9000
Norfolk, VA 23510-1655
757-640-3700
Fax: 757-640-3701
Email: rmcfarland@mcguirewoods.com
*ATTORNEY TO BE NOTICED*

**Sharon Kerk Reyes**
Kaufman & Canoles PC (Norfolk)
150 W Main St
Suite 2100
PO Box 3037
Norfolk, VA 23510
(757) 624-3000
Fax: 888-360-9092

**JA4**

Email: skreyes@kaufcan.com
*TERMINATED: 01/24/2019*

**Defendant**

**Lisa Ann Pitts**                     represented by    **Abram John Pafford**
*individually and as owner and officer of*              (See above for address)
*the aforementioned company*                            *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Aaron Daniel Siegrist**
                                                        (See above for address)
                                                        *TERMINATED: 02/11/2022*

                                                        **Christopher D. Davis**
                                                        (See above for address)
                                                        *TERMINATED: 08/30/2021*

                                                        **John M. Bredehoft**
                                                        (See above for address)
                                                        *TERMINATED: 01/24/2019*

                                                        **Joshua Lee Jewett**
                                                        (See above for address)
                                                        *TERMINATED: 10/13/2022*

                                                        **Julia Amato Rust**
                                                        (See above for address)
                                                        *TERMINATED: 10/13/2022*

                                                        **Robert William McFarland**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Sharon Kerk Reyes**
                                                        (See above for address)
                                                        *TERMINATED: 01/24/2019*

                                                        **V. Kathleen Dougherty**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Consolidated Defendant**

**Lisa Ann Pitts**                     represented by    **Abram John Pafford**
*indivdually and as owner and officer of the*           (See above for address)
*aforementioned company*                                *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Aaron Daniel Siegrist**
                                                        (See above for address)
                                                        *TERMINATED: 02/11/2022*

**JA5**

**Christopher D. Davis**
(See above for address)
*TERMINATED: 08/30/2021*

**Joshua Lee Jewett**
(See above for address)
*TERMINATED: 10/13/2022*

**Julia Amato Rust**
(See above for address)
*TERMINATED: 10/13/2022*

**V. Kathleen Dougherty**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Consolidated Defendant**

**Medical Staffing of America, LLC**                represented by     **Abram John Pafford**
*a limited liability company doing business*                          (See above for address)
*as Steadfast Medical Staffing*                                       *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

**Aaron Daniel Siegrist**
(See above for address)
*TERMINATED: 02/11/2022*

**Christopher D. Davis**
(See above for address)
*TERMINATED: 08/30/2021*

**Joshua Lee Jewett**
(See above for address)
*TERMINATED: 10/13/2022*

**Julia Amato Rust**
(See above for address)
*TERMINATED: 10/13/2022*

**Patrick Hugh O'Donnell**
(See above for address)
*TERMINATED: 08/16/2021*

**V. Kathleen Dougherty**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Consolidated Plaintiff**

**Eugene Scalia**                                    represented by     **Eugene Scalia**
*Acting Secretary of Labor, United States*                            PRO SE

**JA6**

*Department of Labor*

**Chervonti Jones**
(See above for address)
*TERMINATED: 11/29/2023*
*PRO HAC VICE*

**Ryma Naje Lewis**
(See above for address)
*TERMINATED: 11/29/2023*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/02/2018 | 1 | COMPLAINT against Medical Staffing of America, LLC, Lisa Ann Pitts, filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit)(epri) (Entered: 05/02/2018) |
| 05/14/2018 | 2 | Motion to appear Pro Hac Vice by LaShanta Harris and Certification of Local Counsel Dominique V. Sinesi by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Barefield, Karen) (Entered: 05/14/2018) |
| 05/15/2018 | | Notice of Correction re 2 Motion to appear Pro Hac Vice by LaShanta Harris and Certification of Local Counsel Dominique V. Sinesi : The signature block on the document does not match the filing user's login. Certification of local counsel should reflect the counsel of record listed on the application. Counsel should refile the motion with the corrected information. (tlev, ) (Entered: 05/15/2018) |
| 05/15/2018 | 3 | Motion to appear Pro Hac Vice by LaShanta Harris and Certification of Local Counsel Karen Barefield by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Barefield, Karen) (Entered: 05/15/2018) |
| 05/16/2018 | 4 | ORDER granting 3 Motion for Pro hac vice for LaShanta Harris as to R. Alexander Acosta, Secretary of Labor, United States Department of Labor. Signed by Chief District Judge Rebecca Beach Smith on 05/16/18. (tlev, ) (Entered: 05/16/2018) |
| 06/01/2018 | 5 | Waiver of re 1 Complaint *Service of Process* by Medical Staffing of America, LLC, Lisa Ann Pitts (Klinedinst, Arlene) (Entered: 06/01/2018) |
| 06/04/2018 | 6 | WAIVER OF SERVICE Returned Executed as to Medical Staffing of America, LLC and Lisa Ann Pitts. (Attachments: # 1 Letter)(jrin) (Entered: 06/04/2018) |
| 07/11/2018 | 7 | Financial Interest Disclosure Statement (Local Rule 7.1) by Medical Staffing of America, LLC, Lisa Ann Pitts. (Bredehoft, John) (Entered: 07/11/2018) |
| 07/11/2018 | 8 | *Defendants'* ANSWER to 1 Complaint by Medical Staffing of America, LLC, Lisa Ann Pitts.(Bredehoft, John) (Entered: 07/11/2018) |
| 07/11/2018 | | Refer for 16(b) (jrin) (Entered: 07/11/2018) |
| 07/11/2018 | 9 | NOTICE of Appearance by Sharon Kerk Reyes on behalf of Medical Staffing of America, LLC, Lisa Ann Pitts (Reyes, Sharon) (Entered: 07/11/2018) |
| 07/12/2018 | 10 | RULE 26(f) PRETRIAL ORDER: Rule 16(b) Scheduling Conference set for 7/31/2018 at 10:00 AM in Norfolk. Signed by Magistrate Judge Robert J. Krask on July 12, 2018. (sche) (Entered: 07/12/2018) |

**JA7**

| 07/30/2018 | | Scheduling Conference reset for 7/31/2018 at 02:00 PM in Norfolk - Clerk's Office before Chief District Judge Rebecca Beach Smith. (time change only). (sche) (Entered: 07/30/2018) |
|---|---|---|
| 07/31/2018 | | Scheduling Conference - Rule 16b held on 7/31/2018. (sche) (Entered: 07/31/2018) |
| 08/01/2018 | 11 | Order Rule 16(b) Scheduling Order - Pursuant to the Rule 16(b) Conference it is ordered that the Final Pretrial Conference is set for 1/25/2019 at 10:30 AM in Norfolk. Bench Trial is set for 2/12/2019 at 11:00 AM in Norfolk. Signed by Chief District Judge Rebecca Beach Smith on July 31, 2018. (sche) (Entered: 08/01/2018) |
| 11/13/2018 | 12 | Joint MOTION to Amend the Scheduling Order by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Barefield, Karen) (Entered: 11/13/2018) |
| 11/13/2018 | 13 | Memorandum in Support re 12 Joint MOTION to Amend the Scheduling Order filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Barefield, Karen) (Entered: 11/13/2018) |
| 11/13/2018 | 14 | ORDER granting 12 Motion to Amend. Amended Scheduling Order to follow. Signed by Chief District Judge Rebecca Beach Smith on 11/13/2018. (jrin) (Entered: 11/13/2018) |
| 11/14/2018 | 15 | Amended Rule 16(b) Scheduling Order - Pursuant to the Joint Motion to Amend the Scheduling Order filed on November 13, 2018, the court amends the trial schedule as follows: it is ordered that the Final Pretrial Conference is reset for 5/3/2019 at 11:00 AM in Norfolk. Bench Trial is reset for 5/21/2019 at 11:00 AM in Norfolk. Signed by Chief District Judge Rebecca Beach Smith on November 13, 2018. (sche) (Entered: 11/14/2018) |
| 01/03/2019 | 16 | Motion to appear Pro Hac Vice by Avni Amin and Certification of Local Counsel Karen Barefield by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Barefield, Karen) (Entered: 01/03/2019) |
| 01/04/2019 | | Notice of Correction re 16 Motion to appear Pro Hac Vice by Avni Amin and Certification of Local Counsel Karen Barefield: The document is not signed by the applicant attorney. The filing user has been directed to refile the motion with the ink signature of the foreign attorney, and to refrain from duplicate payment of the filing fee.(bpet, ) (Entered: 01/04/2019) |
| 01/07/2019 | 17 | Motion to appear Pro Hac Vice by Avni Amin and Certification of Local Counsel Karen Barefield by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Barefield, Karen) (Entered: 01/07/2019) |
| 01/08/2019 | 18 | ORDER granting 17 Motion for Pro hac vice for Avni Amin as to R. Alexander Acosta, Secretary of Labor, United States Department of Labor. Signed by District Judge Rebecca Beach Smith on 1/8/19. (tlev, ) (Entered: 01/09/2019) |
| 01/18/2019 | 19 | MOTION for Protective Order by Medical Staffing of America, LLC, Lisa Ann Pitts. (Reyes, Sharon) (Entered: 01/18/2019) |
| 01/18/2019 | 20 | Memorandum in Support re 19 MOTION for Protective Order filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Reyes, Sharon) (Entered: 01/18/2019) |

JA8

| 01/23/2019 | | Minute Entry for proceedings held before Magistrate Judge Robert J. Krask:Telephone Conference held on 1/23/2019. (cdod, ) (Entered: 01/23/2019) |
|---|---|---|
| 01/24/2019 | 21 | ORDER the defendants indicated that they will not oppose a Motion to Withdraw as counsel on their behalf; it is DIRECTED that Ms. Pitts new counsel will need to notice an appearance in the case by January 29, 2019. If new counsel has not noticed an appearance in the case by January 29, 2019, Ms. Pitts was ORDERED to file a notice outlining the efforts taken to obtain newcounsel.Signed by Magistrate Judge Robert J. Krask on 01/24/2019. (tamarm) (Entered: 01/24/2019) |
| 01/25/2019 | 22 | MOTION to Withdraw as Attorney by Medical Staffing of America, LLC, Lisa Ann Pitts. (Bredehoft, John) (Entered: 01/25/2019) |
| 01/25/2019 | 23 | Memorandum in Support re 22 MOTION to Withdraw as Attorney filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Bredehoft, John) (Entered: 01/25/2019) |
| 01/29/2019 | 24 | NOTICE of Appearance by Joshua Lee Jewett on behalf of Medical Staffing of America, LLC, Lisa Ann Pitts (Jewett, Joshua) (Entered: 01/29/2019) |
| 01/29/2019 | 25 | NOTICE by Medical Staffing of America, LLC, Lisa Ann Pitts *Retention of Replacement Counsel* (Bredehoft, John) (Entered: 01/29/2019) |
| 01/29/2019 | 26 | MOTION for Extension of Time to Complete Discovery by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Proposed Order)(Barefield, Karen) (Entered: 01/29/2019) |
| 01/29/2019 | 27 | Memorandum in Support re 26 MOTION for Extension of Time to Complete Discovery filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Barefield, Karen) (Entered: 01/29/2019) |
| 01/30/2019 | | MOTIONS REFERRED to Magistrate Judge Krask. 26 MOTION for Extension of Time to Complete Discovery (jrin) (Entered: 01/30/2019) |
| 01/31/2019 | | Set Hearings Telephone Conference set for 2/1/2019 at 12:00 PM in Norfolk Judges Chamber before Magistrate Judge Robert J. Krask. (cdod, ) (Entered: 01/31/2019) |
| 02/01/2019 | 28 | Response to Motion re 22 MOTION to Withdraw as Attorney filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Barefield, Karen) (Entered: 02/01/2019) |
| 02/01/2019 | 29 | Memorandum in Support re 28 Reply to Motion filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Barefield, Karen) Modified document linkage on 2/4/2019 (jrin). (Entered: 02/01/2019) |
| 02/01/2019 | 30 | Opposition to 19 MOTION for Protective Order filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Proposed Order)(Barefield, Karen) (Entered: 02/01/2019) |
| 02/01/2019 | 31 | Memorandum in Support re 30 Opposition filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Barefield, Karen) Modified document linkage on 2/4/2019 (jrin). (Entered: 02/01/2019) |
| 02/01/2019 | 32 | ORDER. Plaintiffs motion is GRANTED IN PART, and plaintiffs discovery deadline is extended to March 4, 2019. All other deadlines established in the amended Rule 16(b) scheduling order, ECF No. 15, remain in effect. Signed by Magistrate Judge Robert J. Krask on 1/24/2019. (jrin) (Entered: 02/01/2019) |

**JA9**

| 02/04/2019 | | Notice of Correction re 29 Memorandum in Support, 31 Memorandum in Support. Document number 29 and 31 were linked to the wrong docket entries. No further action is required at this time, the Clerk's Office has corrected the error. For future filings, response and replies to motions do not require a separate memorandum in support. (jrin) (Entered: 02/04/2019) |
|---|---|---|
| 02/07/2019 | 33 | REPLY to Response to Motion re 19 MOTION for Protective Order filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Jewett, Joshua) (Entered: 02/07/2019) |
| 02/08/2019 | | MOTIONS REFERRED to Magistrate Judge Krask. 19 MOTION for Protective Order (jrin) (Entered: 02/08/2019) |
| 02/12/2019 | 34 | ORDER granting 22 Motion to Withdraw as Attorney.. Signed by District Judge Rebecca Beach Smith on 2/12/2019. (jrin) (Entered: 02/12/2019) |
| 02/13/2019 | 35 | NOTICE of Appearance by Julia Amato Rust on behalf of Medical Staffing of America, LLC, Lisa Ann Pitts (Rust, Julia) (Entered: 02/13/2019) |
| 02/13/2019 | 36 | Request for Hearing by Medical Staffing of America, LLC, Lisa Ann Pitts re 19 MOTION for Protective Order (Rust, Julia) (Entered: 02/13/2019) |
| 02/14/2019 | 37 | NOTICE of Appearance by Christopher D. Davis on behalf of Medical Staffing of America, LLC, Lisa Ann Pitts (Davis, Christopher) (Entered: 02/14/2019) |
| 02/20/2019 | | Telephone Conference re 19 Motion for Protective Order set for 2/20/2019 at 11:00 AM w/OCR in Norfolk Judges Chamber before Magistrate Judge Robert J. Krask. (lwoo) (Entered: 02/20/2019) |
| 02/20/2019 | 38 | ORDER granting in part and denying in part 19 Motion for Protective Order. See Order for details. Signed by Magistrate Judge Robert J. Krask on 2/20/2019. (jrin) (Entered: 02/20/2019) |
| 02/26/2019 | 39 | First MOTION to Compel R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Proposed Order)(Barefield, Karen) (Entered: 02/26/2019) |
| 02/26/2019 | 40 | Memorandum in Support re 39 First MOTION to Compel filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F) (Barefield, Karen) (Entered: 02/26/2019) |
| 02/28/2019 | | Minute Entry for proceedings held before Magistrate Judge Robert J. Krask:Telephone Conference held regarding deposition dispute on 2/28/2019. Avni Amin represented plaintiff. Christopher Davis represented defendant. (jjon) (Entered: 02/28/2019) |
| 03/01/2019 | 41 | ORDER. The Court ORDERED that any challenge of this Order must be filed by noon on March 4, 2019. Any response thereto is due by 5:00 p.m. on March 6, 2019, and any reply by 5:00 p.m. on March 7,2019. See Order for details. Signed by Magistrate Judge Robert J. Krask on 3/1/2019. (jrin) (Entered: 03/01/2019) |
| 03/04/2019 | 42 | MOTION to Vacate *THE COURTS FEBRUARY 28, 2019 ORDER* by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Proposed Order)(Barefield, Karen) (Entered: 03/04/2019) |
| 03/04/2019 | 43 | Memorandum in Support re 42 MOTION to Vacate *THE COURTS FEBRUARY 28, 2019 ORDER* filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, |

| | | |
|---|---|---|
| | | # 5 Exhibit, # 6 Exhibit)(Barefield, Karen) (Entered: 03/04/2019) |
| 03/04/2019 | 44 | MOTION to Compel *Production of Certain Documents Redacted or Withheld* by Medical Staffing of America, LLC, Lisa Ann Pitts. (Rust, Julia) (Entered: 03/04/2019) |
| 03/04/2019 | 45 | Memorandum in Support re 44 MOTION to Compel *Production of Certain Documents Redacted or Withheld* filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Rust, Julia) (Entered: 03/04/2019) |
| 03/04/2019 | 46 | MOTION to Compel *Deficient Discovery Responses and Overrule Objections* by Medical Staffing of America, LLC, Lisa Ann Pitts. (Rust, Julia) (Entered: 03/04/2019) |
| 03/04/2019 | 47 | Memorandum in Support re 46 MOTION to Compel *Deficient Discovery Responses and Overrule Objections* filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Rust, Julia) (Entered: 03/04/2019) |
| 03/04/2019 | 48 | AFFIDAVIT in Support re 42 MOTION to Vacate *THE COURTS FEBRUARY 28, 2019 ORDER* filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Barefield, Karen) (Entered: 03/04/2019) |
| 03/05/2019 | 49 | ORDER. It is hereby ORDERED that the deadline for filing responses to each of these motions (ECF no. 39, 44, and 46) is 5:00 p.m. on March 8, 2019, and the deadline for filing replies to the motions is 5:00 p.m. on March 11,2019. Signed by Magistrate Judge Robert J. Krask on 3/5/2019. (jrin) (Entered: 03/05/2019) |
| 03/06/2019 | 50 | Memorandum in Opposition re 42 MOTION to Vacate *THE COURTS FEBRUARY 28, 2019 ORDER* filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Davis, Christopher) (Entered: 03/06/2019) |
| 03/07/2019 | 51 | Reply to 42 MOTION to Vacate *THE COURTS FEBRUARY 28, 2019 ORDER* filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Barefield, Karen) (Entered: 03/07/2019) |
| 03/08/2019 | | MOTIONS REFERRED to Magistrate Judge Krask 42 MOTION to Vacate *THE COURTS FEBRUARY 28, 2019 ORDER* (jrin) (Entered: 03/08/2019) |
| 03/08/2019 | 52 | Opposition to 44 MOTION to Compel *Production of Certain Documents Redacted or Withheld* filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Exhibit)(Barefield, Karen) (Entered: 03/08/2019) |
| 03/08/2019 | 53 | Opposition to 46 MOTION to Compel *Deficient Discovery Responses and Overrule Objections* filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Barefield, Karen) (Entered: 03/08/2019) |
| 03/08/2019 | 54 | Memorandum in Opposition re 39 First MOTION to Compel filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Davis, Christopher) (Main Document 54 replaced on 3/11/2019) (dcou, ). (Entered: 03/08/2019) |
| 03/11/2019 | | MOTIONS REFERRED to Magistrate Judge Krask. 42 MOTION to Vacate *THE COURTS FEBRUARY 28, 2019 ORDER* (jrin) (Entered: 03/11/2019) |

**JA11**

| | | |
|---|---|---|
| 03/11/2019 | 55 | Reply to Motion re 39 First MOTION to Compel filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Barefield, Karen) (Entered: 03/11/2019) |
| 03/11/2019 | 56 | RESPONSE in Support re 44 MOTION to Compel *Production of Certain Documents Redacted or Withheld* filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Attachments: # 1 Exhibit A)(Rust, Julia) (Entered: 03/11/2019) |
| 03/11/2019 | 57 | RESPONSE in Support re 46 MOTION to Compel *Deficient Discovery Responses and Overrule Objections* filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Rust, Julia) (Entered: 03/11/2019) |
| 03/13/2019 | 58 | MOTION for Sanctions by Medical Staffing of America, LLC, Lisa Ann Pitts. (Davis, Christopher) (Entered: 03/13/2019) |
| 03/13/2019 | 59 | Memorandum in Support re 58 MOTION for Sanctions filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Davis, Christopher) (Entered: 03/13/2019) |
| 03/14/2019 | 60 | Request for Hearing by Medical Staffing of America, LLC, Lisa Ann Pitts re 44 MOTION to Compel *Production of Certain Documents Redacted or Withheld*, 46 MOTION to Compel *Deficient Discovery Responses and Overrule Objections* (Rust, Julia) (Entered: 03/14/2019) |
| 03/15/2019 | 61 | ORDER. The DOL's motion to compel discovery (ECF No. 39) is DENIED, and defendants' motions to compel discovery (ECF Nos. 44, 46) are GRANTED in part and DENIED in part. The request for a hearing, ECF No. 60, is DENIED. See Order for details. Signed by Magistrate Judge Robert J. Krask on 3/15/2019. (jrin) (Entered: 03/15/2019) |
| 03/20/2019 | 62 | Declaration re 42 MOTION to Vacate *THE COURTS FEBRUARY 28, 2019 ORDER* by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Barefield, Karen) (Entered: 03/20/2019) |
| 03/26/2019 | 63 | ORDER. The Court FINDS that the Department of Labor's need for confidentiality outweighs the defendants' need for the identities of those who gave statements, in light of the fact that the redacted statements have been produced, and the identities of the informants testifying at trial will soon be disclosed to defendants. Accordingly, the Motion to Vacate (ECF no. 42) is GRANTED. Signed by Magistrate Judge Robert J. Krask on 3/26/2019. (jrin) (Entered: 03/26/2019) |
| 03/27/2019 | | Set Deadlines/Hearings Telephone Conference set for 3/29/2019 at 02:00 PM in Norfolk Judges Chamber before Magistrate Judge Robert J. Krask. (jjon) (Entered: 03/27/2019) |
| 03/27/2019 | 64 | Withdrawal of Motion by Medical Staffing of America, LLC, Lisa Ann Pitts re 58 MOTION for Sanctions (Jewett, Joshua) Modified docket text on 3/28/2019 (jrin). (Entered: 03/27/2019) |
| 03/28/2019 | 65 | Notice of Correction re 64 NOTICE. Document number 64 was filed using the wrong docket event. The "Withdrawal of Motion" event was incorrectly filed as "Notice." The clerk's office staff corrected this error. No further action is required at this time. (jrin) (Entered: 03/28/2019) |

**JA12**

| | | |
|---|---|---|
| 03/29/2019 | 66 | MOTION for Reconsideration re 61 Order on Motion to Compel,,,,, by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Barefield, Karen) (Entered: 03/29/2019) |
| 03/29/2019 | 67 | Memorandum in Support re 66 MOTION for Reconsideration re 61 Order on Motion to Compel,,,,, filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Barefield, Karen) (Entered: 03/29/2019) |
| 03/29/2019 | 68 | ORDER. Following the consideration of counsel's arguments, the Court ORDERED the DOL to submit unredacted copies of employee interview statements and reduce employee interview statement DOL 284-87 to typewritten form. The Court further DENIED defendants' motion to compel the production of documents. See Order for details. Signed by Magistrate Judge Robert J. Krask on 3/29/2019. (jrin) (Entered: 04/01/2019) |
| 04/01/2019 | 69 | ORDER. The Court did consider the defendants' delay in notifying the DOL about the invoices. The DOL has made no new arguments in the motion for reconsideration that were not included in the original motion to compel. Accordingly, the DOL's motion for reconsideration is DENIED (ECF no. 66). Signed by Magistrate Judge Robert J. Krask on 4/1/2019. (jrin) (Entered: 04/01/2019) |
| 04/04/2019 | 70 | ORDER. The Court has reviewed the documents and FINDS the redactions are appropriate with one exception. If the informant's privilege applies to this sentence for some reason not apparent in the document, the DOL should contact the magistrate courtroom deputies at (757) 222-7222 no later than noon on April 8,2019,If a conference call has not been scheduled as directed above, the DOL is ORDERED to produce the transcription of DOL 284-87 to defendants, Medical Staffing of America, LLC, doing business as Steadfast Medical Staffing, and Lisa Pitts, by noon on April 8,2019, with this sentence unredacted. See Order for details. Signed by Magistrate Judge Robert J. Krask on 4/4/2019. (jrin) (Entered: 04/04/2019) |
| 04/23/2019 | 71 | Emergency MOTION to Compel *Disclosure of Trial Witnesses and Underacted Witness Statements* by Medical Staffing of America, LLC, Lisa Ann Pitts. (Davis, Christopher) (Entered: 04/23/2019) |
| 04/23/2019 | 72 | Memorandum in Support re 71 Emergency MOTION to Compel *Disclosure of Trial Witnesses and Underacted Witness Statements* filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Davis, Christopher) (Entered: 04/23/2019) |
| 04/24/2019 | 73 | ORDER. Plaintiff R. Alexander Acosta, Secretary of Labor, United States Department of Labor ("the DOL") is hereby ORDERED to file a response to the motion (ECF no. 71) no later than noon on April 25,2019, and defendants are ORDERED to reply to the response no later than noon on April 26, 2019. Signed by Magistrate Judge Robert J. Krask on 4/24/2019. (jrin) (Entered: 04/24/2019) |
| 04/25/2019 | 74 | Opposition to 71 Emergency MOTION to Compel *Disclosure of Trial Witnesses and Underacted Witness Statements* filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Exhibit A)(Barefield, Karen) (Entered: 04/25/2019) |
| 04/25/2019 | 75 | REPLY to Response to Motion re 71 Emergency MOTION to Compel *Disclosure of Trial Witnesses and Underacted Witness Statements* filed by Medical Staffing of |

| | | |
|---|---|---|
| | | America, LLC, Lisa Ann Pitts. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Davis, Christopher) (Entered: 04/25/2019) |
| 04/26/2019 | | Telephone Conference set for 4/26/2019 at 03:00 PM in Norfolk Judges Chamber before Magistrate Judge Robert J. Krask. (lwoo) (Entered: 04/26/2019) |
| 04/26/2019 | 76 | ORDER. The Court GRANTED IN PART and DENIED IN PART the motion to compel (ECF no. 71). See Order for details. Signed by Magistrate Judge Robert J. Krask on 4/26/2019. (jrin) (Entered: 04/26/2019) |
| 04/29/2019 | 77 | MOTION PLAINTIFFS MOTION TO APPEAR AT PRETRIAL CONFERENCE WITHOUT LOCAL COUNSEL by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Proposed Order)(Barefield, Karen) (Entered: 04/29/2019) |
| 04/29/2019 | 78 | Memorandum in Support re 77 MOTION PLAINTIFFS MOTION TO APPEAR AT PRETRIAL CONFERENCE WITHOUT LOCAL COUNSEL filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Barefield, Karen) (Entered: 04/29/2019) |
| 04/29/2019 | 79 | MOTION for Summary Judgment by Medical Staffing of America, LLC, Lisa Ann Pitts. (Jewett, Joshua) (Entered: 04/29/2019) |
| 04/29/2019 | 80 | Memorandum in Support re 79 MOTION for Summary Judgment filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13)(Jewett, Joshua) (Entered: 04/29/2019) |
| 04/30/2019 | 81 | ORDER. Upon consideration of Plaintiff's Motion to Appear at Pretrial Conference without Local Counsel (ECF no. 77), it is hereby ORDERED that Plaintiffs motion is GRANTED. Signed by Magistrate Judge Robert J. Krask on 4/30/2019. (jrin) (Entered: 04/30/2019) |
| 05/03/2019 | 82 | TRANSCRIPT of proceedings (motions) held on 4-26-2019, before Judge Robert J. Krask, Court Reporter/Transcriber Jody Stewart, Telephone number 757-222-7071. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the court reporter/ transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 6/3/2019. Redacted Transcript Deadline set for 7/3/2019. Release of Transcript Restriction set for 8/1/2019.**(stewart, jody) (Entered: 05/03/2019) |
| 05/03/2019 | | Minute Entry for Final Pretrial Conference held on 5/3/2019. before Magistrate Judge Robert J. Krask. Avni Amin appeared on behalf of Plaintiff; Christopher Davis appeared on behalf of Defendants. (lwoo) (Entered: 05/07/2019) |
| 05/06/2019 | 83 | ORDER. Plaintiff is ORDERED to file the motion regarding certain communications between counsel for defendants and potential witnesses by 5:00 p.m. on May 7, 2019, defendants are ORDERED to file a response to the motion no later than 5:00 p.m. on May 9, 2019, and plaintiff is ORDERED to file a reply no later than May 10, 2019. |

**JA14**

| | | Signed by Magistrate Judge Douglas E. Miller on 5/6/2019. (jrin) (Entered: 05/06/2019) |
|---|---|---|
| 05/06/2019 | 84 | Joint Pretrial Statement. Signed by Magistrate Judge Robert J. Krask on 5/3/2019. (jrin) (Entered: 05/06/2019) |
| 05/07/2019 | 85 | MOTION for Protective Order by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Proposed Order)(Barefield, Karen) (Entered: 05/07/2019) |
| 05/07/2019 | 87 | Memorandum in Support re 85 MOTION for Protective Order filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Barefield, Karen) (Entered: 05/07/2019) |
| 05/07/2019 | 88 | Reply to 84 Pretrial Statement (Exhibits and Witness Lists) filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Barefield, Karen) (Entered: 05/07/2019) |
| 05/07/2019 | 89 | Emergency MOTION for Sanctions by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Proposed Order)(Barefield, Karen) (Entered: 05/07/2019) |
| 05/07/2019 | 90 | Memorandum in Support re 89 Emergency MOTION for Sanctions filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Barefield, Karen) (Entered: 05/07/2019) |
| 05/09/2019 | 91 | Memorandum in Opposition re 85 MOTION for Protective Order filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit Decl. Julia Rust, # 4 Exhibit Decl. Christopher Davis)(Davis, Christopher) (Entered: 05/09/2019) |
| 05/09/2019 | 92 | Emergency MOTION for Extension of Time to File Response/Reply as to 79 MOTION for Summary Judgment by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Proposed Order)(Barefield, Karen) (Entered: 05/09/2019) |
| 05/09/2019 | 93 | Memorandum in Support re 92 Emergency MOTION for Extension of Time to File Response/Reply filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Barefield, Karen) (Entered: 05/09/2019) |
| 05/10/2019 | 94 | MOTION to Substitute Attorney *Karen Barefield and LaShanta Harris* by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Proposed Order Proposed Order)(Lewis, Ryma) (Entered: 05/10/2019) |
| 05/10/2019 | 95 | Memorandum in Opposition re 92 Emergency MOTION for Extension of Time to File Response/Reply as to 79 MOTION for Summary Judgment filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Jewett, Joshua) (Entered: 05/10/2019) |
| 05/10/2019 | | MOTIONS REFERRED to Magistrate Judge Krask 94 MOTION to Substitute Attorney *Karen Barefield and LaShanta Harris* (jrin) (Entered: 05/10/2019) |

| 05/10/2019 | 96 | ORDER. Plaintiff's emergency motion to extend time to respond to defendants' motion for summary judgment, ECF No. 92, is DENIED. Signed by Magistrate Judge Douglas E. Miller on 5/10/2019. (jrin) (Entered: 05/10/2019) |
|---|---|---|
| 05/10/2019 | 97 | Objection to 76 Order on Motion to Compel filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Exhibit A)(Barefield, Karen) (Entered: 05/10/2019) |
| 05/10/2019 | 98 | REPLY to Response to Motion re 85 MOTION for Protective Order filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Barefield, Karen) (Entered: 05/10/2019) |
| 05/13/2019 | | MOTIONS REFERRED to Magistrate Judge: Robert J. Krask. 85 MOTION for Protective Order (clou) (Entered: 05/13/2019) |
| 05/13/2019 | 99 | ORDER of Substitution of Counsel re 94 MOTION to Substitute Attorney Karen Barefield and LaShanta Harris. See order for details. Copies distributed to all counsel. Signed by Magistrate Judge Robert J. Krask on 5/13/2019. (clou) (Entered: 05/13/2019) |
| 05/13/2019 | | Set Deadlines as to 85 MOTION for Protective Order , 89 Emergency MOTION for Sanctions . Motion Hearing for 5/15/2019 at 10:00 AM in Norfolk Mag Courtroom 1 before Magistrate Judge Robert J. Krask. (cdod, ) (Entered: 05/13/2019) |
| 05/13/2019 | 100 | ORDER - No later than 9:00 a.m. on May 14, 2019, plaintiff is DIRECTED to show cause why plaintiffs emergency motion for sanctions, ECF No. 89 , should not be struck as untimely filed. See order for specific details. Copies distributed as directed. Signed by Magistrate Judge Robert J. Krask on 5/13/2019. (clou ) (Entered: 05/13/2019) |
| 05/13/2019 | 101 | Response to 100 Order to Show Cause, filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Lewis, Ryma) (Entered: 05/13/2019) |
| 05/13/2019 | 102 | Opposition to 79 MOTION for Summary Judgment filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W)(Lewis, Ryma) (Entered: 05/13/2019) |
| 05/13/2019 | 103 | EXHIBIT *Revised Schedule A* re 1 COMPLAINT by R. Alexander Acosta, Secretary of Labor, United States Department of Labor.. (Lewis, Ryma) (Entered: 05/13/2019) |
| 05/14/2019 | 104 | Memorandum in Opposition re 89 Emergency MOTION for Sanctions filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Davis, Christopher) (Entered: 05/14/2019) |
| 05/14/2019 | | Reset Deadlines as to 85 MOTION for Protective Order , 89 Emergency MOTION for Sanctions . Motion Hearing set for 5/15/2019 at 10:30 AM in Norfolk Mag Courtroom 1 before Magistrate Judge Robert J. Krask. (cdod, ) (Entered: 05/14/2019) |

| 05/14/2019 | 105 | MOTION for Leave to File *for leave to file an Addendum to Plaintiffs Opposition to Defendants Motion for Summary Judgment* by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Proposed Order Proposed Order)(Lewis, Ryma) (Entered: 05/14/2019) |
|---|---|---|
| 05/14/2019 | 106 | Memorandum in Support re 105 MOTION for Leave to File *for leave to file an Addendum to Plaintiffs Opposition to Defendants Motion for Summary Judgment* filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Exhibit Exhibit A)(Lewis, Ryma) (Entered: 05/14/2019) |
| 05/14/2019 | 107 | Proposed Findings of Fact by Medical Staffing of America, LLC, Lisa Ann Pitts. (Davis, Christopher) (Entered: 05/14/2019) |
| 05/14/2019 | 108 | Proposed Findings of Fact by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Lewis, Ryma) (Entered: 05/14/2019) |
| 05/15/2019 | 109 | REPLY to Response to Motion re 89 Emergency MOTION for Sanctions filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Lewis, Ryma) (Entered: 05/15/2019) |
| 05/15/2019 | 110 | ORDER granting in part and denying in part 85 Motion for Protective Order; granting in part and denying in part 89 Emergency Motion for Sanctions. See order for details. Copies distributed to all counsel. Signed by Magistrate Judge Robert J. Krask on 5/15/2019. (clou) (Entered: 05/15/2019) |
| 05/15/2019 | 111 | Minute Entry for proceedings held before Magistrate Judge Robert J. Krask:Motion Hearing held on 5/15/2019 re 89 Emergency MOTION for Sanctions filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor, 85 MOTION for Protective Order filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. Matter came on for hearing on plaintiffs motions for protective order (#85) and motion for sanctions (#89). Present were Avni Amin and Ryma Lewis on behalf of the plaintiff, as well as Oscar Hampton, Regional Solicitor and Samantha Thomas, Associate Regional Solicitor. Also present were Christopher Davis and Joshua Jewett on behalf of the defendants. Court hears argument and explanations from counsel. Rulings made on the record. Both motions are granted in part and denied in part. The Court will enter an order. Court adjourned. (Tape #FTR.) (cdod, ) (Entered: 05/16/2019) |
| 05/16/2019 | | Set Deadlines/Hearings Telephone Conference set for 5/16/2019 at 02:00 PM in Norfolk Judges Chamber before Magistrate Judge Robert J. Krask. (jjon) (Entered: 05/16/2019) |
| 05/16/2019 | 112 | MOTION for Electronic Device Application by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Lewis, Ryma) (Entered: 05/16/2019) |
| 05/16/2019 | | Notice of Correction re 112 MOTION for Electronic Device Application. Filing user was notified the Personal Electronics Device Policy form is not submitted to the court as a motion. Filing user was requested to submit the form without alteration as directed by the Personal Electronics Device Policy. (clou) (Entered: 05/16/2019) |
| 05/16/2019 | 113 | NOTICE by Medical Staffing of America, LLC, Lisa Ann Pitts *OF INTENT NOT TO PURSUE DEFENDANTS MOTION FOR SUMMARY JUDGMENT* (Davis, Christopher) (Entered: 05/16/2019) |

**JA17**

| | | |
|---|---|---|
| 05/16/2019 | 114 | ORDER - Plaintiff's motion for leave to file an addendum is DENIED as MOOT 105 . Signed by Magistrate Judge Robert J. Krask on 5/16/19. (afar) (Entered: 05/16/2019) |
| 05/16/2019 | 115 | Emergency MOTION to Strike 103 Exhibit *Amended Schedule A* by Medical Staffing of America, LLC, Lisa Ann Pitts. (Jewett, Joshua) (Entered: 05/16/2019) |
| 05/16/2019 | 116 | Memorandum in Support re 115 Emergency MOTION to Strike 103 Exhibit *Amended Schedule A* filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Jewett, Joshua) (Entered: 05/16/2019) |
| 05/17/2019 | 117 | ORDER; Plaintiff is ORDERED to file a response to the emergency motion to strike no later than noon on May 17, 2019, and defendants are ORDERED to file a reply no later than 3:00 p.m. on May 17,2019. Signed by Magistrate Judge Robert J. Krask on 5/17/2019. (dcou, ) (Entered: 05/17/2019) |
| 05/17/2019 | 118 | Memorandum in Support re 115 Emergency MOTION to Strike 103 Exhibit *Amended Schedule A [CORRECTED MEMO]* filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Jewett, Joshua) (Entered: 05/17/2019) |
| 05/17/2019 | | Status Conference set for 5/21/2019 at 11:00 AM in Norfolk Courtroom 1 before District Judge Rebecca Beach Smith. Bench trial date of May 21, 2019, removed from the calendar (Status Conference to be held instead). (sche) (sche) (Entered: 05/17/2019) |
| 05/17/2019 | 119 | NOTICE by Medical Staffing of America, LLC, Lisa Ann Pitts (Rust, Julia) (Entered: 05/17/2019) |
| 05/17/2019 | 120 | MOTION for Extension of Time to File Response/Reply *to ECF 115 and 116* by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Proposed Order Proposed Order)(Lewis, Ryma) (Entered: 05/17/2019) |
| 05/17/2019 | 121 | Memorandum in Support re 120 MOTION for Extension of Time to File Response/Reply *to ECF 115 and 116* filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Lewis, Ryma) (Entered: 05/17/2019) |
| 05/17/2019 | 122 | ORDER. It is ORDERED that the Motion (ECF no. 120) is hereby GRANTED, and that Plaintiff R. Alexander Acosta, Secretary of Labor, United States Department of Labor shall submit his response by May 20, 2019 at 9:00 a.m. Defendants reply, if any, shall be filed by May 20, 2019 at 5:00 p.m. Signed by Magistrate Judge Robert J. Krask on 5/17/2019. (clou) (Entered: 05/17/2019) |
| 05/17/2019 | 123 | ORDER re 119 NOTICE filed by Medical Staffing of America, LLC, Lisa Ann Pitts: The Court ORDERS that the deadlines for filing fee requests and responses outlined in the orders entered April 26, 2019, and May 15, 2019, are terminated. See ECF Nos. 76, 110. Signed by Magistrate Judge Robert J. Krask on 5/17/2019. (dcou, ) (Entered: 05/17/2019) |
| 05/17/2019 | 124 | MOTION Clarification, and in the Alternative Reconsideration re NOTICE by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Proposed Order Proposed Order)(Lewis, Ryma) (Entered: 05/17/2019) |

**JA18**

| | | |
|---|---|---|
| 05/17/2019 | 125 | Memorandum in Support re 124 MOTION Clarification, and in the Alternative Reconsideration re NOTICE filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Lewis, Ryma) (Entered: 05/17/2019) |
| 05/17/2019 | 126 | NOTICE *OF RELEASE OF DEFENDANTS TRIAL SUBPOENAS* by Medical Staffing of America, LLC, Lisa Ann Pitts (Davis, Christopher) (Entered: 05/17/2019) |
| 05/20/2019 | 127 | Opposition to 115 Emergency MOTION to Strike 103 Exhibit *Amended Schedule A* filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Lewis, Ryma) (Entered: 05/20/2019) |
| 05/20/2019 | 128 | REPLY to Response to Motion re 115 Emergency MOTION to Strike 103 Exhibit *Amended Schedule A* filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Jewett, Joshua) (Entered: 05/20/2019) |
| 05/21/2019 | 129 | Status Conference held on 5/21/2019 before District Judge Rebecca Beach Smith: Ryma Lewis and Avni Amin present on behalf of the Plaintiff. Christopher Davis, Joshua Jewett, and Julia Rust present on behalf of the Defendants. Comments of the Court regarding possible conflicts of interest (see Court's exhibit 1 on bottom of minutes) and resetting the trial. The Court also addressed 124 Emergency Motion for Clarification. Court took a short recess for counsel to confer. Counsel for the Plaintiff requested that the Court recuse herself based upon conflicts outlined. The Court concurred and will issue an order of disqualification. The Court directed the clerk to have the case randomly reassigned to another district judge. Court adjourned. (Court Reporter Jody Stewart.)(lhow) (Entered: 05/21/2019) |
| 05/21/2019 | | Case reassigned to District Judge Raymond A. Jackson. Chief District Judge Rebecca Beach Smith no longer assigned to the case. (jrin) (Entered: 05/21/2019) |
| 05/21/2019 | 130 | ORDER DIRECTING the Clerk to randomly assign the case for a Bench Trial to another District Judge. The Court DIRECTS counsel to give the newly assigned District Judge a realistic estimated length for the Bench Trial, as the original estimate is not accurate. Signed by District Judge Rebecca Beach Smith on 5/21/2019. (jrin) (Entered: 05/21/2019) |
| 05/21/2019 | 131 | MOTION for Leave to File *Sur-reply* by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Proposed Order)(Lewis, Ryma) (Entered: 05/21/2019) |
| 05/21/2019 | 132 | Memorandum in Support re 131 MOTION for Leave to File *Sur-reply* filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Exhibit A)(Lewis, Ryma) (Entered: 05/21/2019) |
| 05/24/2019 | 133 | By filing a document entitled Revised Schedule A on May 13, 2019, ECF No. 103, plaintiff sought to more than quadruple the number of potential beneficiaries of its lawsuit against defendants. The original Schedule A to the complaint filed on May 2, 2018, specifically identified 84 persons, ECF No. 1-2, as well as current and former employees presently unknown to plaintiff, ECF No. 1 at 4, as potential beneficiaries of plaintiffs suit to recover back wages and liquidated damages. Although not accompanied by a motion or any explanation for the filing, subsequent filings confirm that the Revised Schedule A now seeks to expand the prior listing to 389 persons. See, e.g., ECF No. 127. The filing, however, occurred without leave of Court or the |

**JA19**

| | | |
|---|---|---|
| | | defendants consent. See Fed. R. Civ. P. 15(a)(2). It also occurred just eight days before the previously scheduled May 21, 2019 trial, after the close of discovery, and after the final pretrial conference and the issuance of a final pretrial order in which plaintiff made no reference to any expansion of potential beneficiaries or any proposed amendment of the complaint. Therefore, the filing is procedurally improper. Accordingly, defendants motion to strike (ECF No. 115) is GRANTED. Due to the removal of the case from the trial calendar and any possible statute of limitation implications, see 29 U.S.C. § 216(c); EEOC v. Gilbarco, Inc., 615 F.2d 985, 990 n.5 (4th Cir. 1980), should plaintiff seek to amend the complaint, any such motion and supporting memorandum shall be filed not later than June 3, 2019. Signed by Magistrate Judge Robert J. Krask on 05/24/2019.(Krask, Robert) (Entered: 05/24/2019) |
| 05/24/2019 | 134 | ORDER finding as moot 131 Motion for Leave to File Sur-Reply. Signed by Magistrate Judge Robert J. Krask on 05/24/2019. (Krask, Robert) (Entered: 05/24/2019) |
| 06/07/2019 | 135 | Objections to Magistrate Judge's Ruling or Recommendation re 133 Order on Motion to Strike filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Lewis, Ryma) Modified on 6/28/2019 (bpet, ) (Entered: 06/07/2019) |
| 06/21/2019 | 136 | Opposition to 135 Objection, filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Davis, Christopher) (Entered: 06/21/2019) |
| 06/27/2019 | 137 | Reply to 136 Opposition filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B)(Lewis, Ryma) (Entered: 06/27/2019) |
| 08/06/2019 | 138 | MOTION to Withdraw as Attorney *Avni Amin* by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Proposed Order Proposed Order)(Lewis, Ryma) (Entered: 08/06/2019) |
| 08/07/2019 | 139 | ORDER: The parties in the above-styled case are awaiting a trial to be scheduled. Accordingly, it is ORDERED that the parties shall conduct a settlement conference with the Magistrate Judge on or before September 15, 2019. Signed by District Judge Raymond A. Jackson on 8/7/2019. (dcou, ) (Entered: 08/07/2019) |
| 08/13/2019 | 140 | Motion to appear Pro Hac Vice by Chervonti Jones and Certification of Local Counsel Ryma Lewis by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Lewis, Ryma) (Entered: 08/13/2019) |
| 08/13/2019 | | Settlement Conference set for 9/9/2019 at 09:30 AM in Norfolk Judges Chamber before Magistrate Judge Robert J. Krask. (lwoo) (Entered: 08/13/2019) |
| 08/14/2019 | 141 | Settlement Conference Order - A Settlement Conference is set for 9/9/2019 at 9:30 a.m. SEE ORDER FOR DETAILS. Signed by Magistrate Judge Robert J. Krask on 8/14/19. (afar) (Entered: 08/14/2019) |
| 08/15/2019 | 142 | ORDER granting 140 Motion for Pro hac vice for Chervonti Jones as to R. Alexander Acosta, Secretary of Labor, United States Department of Labor. Signed by District Judge Raymond A. Jackson on 8/15/19. (tlev, ) (Entered: 08/15/2019) |

**JA20**

| 08/15/2019 | 143 | MOTION Expedited Telephonic Status Conference by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Proposed Order Proposed Order)(Lewis, Ryma) (Entered: 08/15/2019) |
|---|---|---|
| 08/15/2019 | 144 | Memorandum in Support re 143 MOTION Expedited Telephonic Status Conference filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Lewis, Ryma) (Entered: 08/15/2019) |
| 08/16/2019 | 145 | ORDER directing Counsel to contact Magistrate Courtroom Deputies to schedule a short telephone conference call with Court to be held on August 16, 2019 or August 19, 2019. Signed by Magistrate Judge Robert J. Krask on 08/16/2019. (bboy, ) (Entered: 08/16/2019) |
| 08/16/2019 | | Set Hearings Telephone Conference set for 8/16/2019 at 03:00 PM in Norfolk Judges Chamber before Magistrate Judge Robert J. Krask. (cdod, ) (Entered: 08/16/2019) |
| 08/16/2019 | | Reset Hearings: Bench Trial reset for 2/18/2020 at 10:00 AM in Norfolk Courtroom 4 before District Judge Raymond A. Jackson. (ptom, ) (Entered: 08/16/2019) |
| 08/16/2019 | 146 | ORDER - DENYING Plaintiff's emergency motion for an expedited telephonic status conference and request to stay the settlement conference and associated deadlines. Signed by Magistrate Judge Robert J. Krask on 8/16/19. (afar) (Entered: 08/19/2019) |
| 09/09/2019 | | Settlement Conference held on 9/9/2019 before Magistrate Judge Robert J. Krask (lwoo) (Entered: 09/09/2019) |
| 09/10/2019 | 148 | ORDER directing the Clerk to reassign this matter to an alternate U.S. Magistrate Judge as the undersigned conducted a settlement conference in this case. Signed by Magistrate Judge Robert J. Krask on 09/09/2019. (bboy, ) (Entered: 09/10/2019) |
| 09/10/2019 | | Case Reassigned to Magistrate Judge Lawrence R. Leonard. Magistrate Judge Robert J. Krask no longer assigned to the case. (bboy, ) (Entered: 09/10/2019) |
| 09/11/2019 | 149 | MEMORANDUM OPINION AND ORDER- The Secretary's Objection 135 is DENIED. See Memorandum Opinion and Order for details. Signed by District Judge Raymond A. Jackson on 09/10/2019. Copies distributed as directed 09/11/2019. (bboy, ) (Entered: 09/11/2019) |
| 12/20/2019 | 150 | MOTION for Summary Judgment by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Proposed Order Proposed Order)(Lewis, Ryma) (Entered: 12/20/2019) |
| 12/20/2019 | 151 | Memorandum in Support re 150 MOTION for Summary Judgment *(Exh A-F)* filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Exhibit Index, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F)(Lewis, Ryma) (Entered: 12/20/2019) |
| 12/20/2019 | 152 | NOTICE by R. Alexander Acosta, Secretary of Labor, United States Department of Labor re 151 Memorandum in Support, *Exhibit G-O* (Attachments: # 1 Exhibit G, # 2 Exhibit H, # 3 Exhibit I, # 4 Exhibit J, # 5 Exhibit K, # 6 Exhibit L, # 7 Exhibit M, # 8 Exhibit N, # 9 Exhibit O)(Lewis, Ryma) (Entered: 12/20/2019) |
| 12/20/2019 | 153 | NOTICE by R. Alexander Acosta, Secretary of Labor, United States Department of Labor re 151 Memorandum in Support, *Exhibit P-Q* (Attachments: # 1 Exhibit P, # 2 Exhibit Q)(Lewis, Ryma) (Entered: 12/20/2019) |

**JA21**

| | | |
|---|---|---|
| 12/20/2019 | 154 | NOTICE by R. Alexander Acosta, Secretary of Labor, United States Department of Labor re 151 Memorandum in Support, *Exhibits R-V* (Attachments: # 1 Exhibit R, # 2 Exhibit S, # 3 Exhibit T, # 4 Exhibit U, # 5 Exhibit V)(Lewis, Ryma) (Entered: 12/20/2019) |
| 12/22/2019 | 155 | Emergency MOTION for Extension of Time to File Response/Reply as to 151 Memorandum in Support, 150 MOTION for Summary Judgment by Medical Staffing of America, LLC, Lisa Ann Pitts. (Attachments: # 1 Proposed Order)(Rust, Julia) (Entered: 12/22/2019) |
| 12/23/2019 | | MOTION REFERRED to Magistrate Judge Lawrence R. Leonard: 155 Emergency MOTION for Extension of Time to File Response/Reply as to 150 MOTION for Summary Judgment. (bpet, ) (Entered: 12/23/2019) |
| 12/23/2019 | 156 | Memorandum in Opposition re 155 Emergency MOTION for Extension of Time to File Response/Reply as to 151 Memorandum in Support, 150 MOTION for Summary Judgment filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Proposed Order Proposed Order)(Lewis, Ryma) (Entered: 12/23/2019) |
| 12/23/2019 | 157 | NOTICE by R. Alexander Acosta, Secretary of Labor, United States Department of Labor re 150 MOTION for Summary Judgment *Amended Notice of Submission of Exhibits* (Attachments: # 1 Exhibit A through F, # 2 Exhibit G though O)(Lewis, Ryma) (Entered: 12/23/2019) |
| 12/23/2019 | 158 | NOTICE by R. Alexander Acosta, Secretary of Labor, United States Department of Labor re 150 MOTION for Summary Judgment *Amended Notice of Submission of Exhibits* (Attachments: # 1 Exhibit P through Q, # 2 Exhibit S through W)(Lewis, Ryma) (Entered: 12/23/2019) |
| 12/23/2019 | 159 | NOTICE by R. Alexander Acosta, Secretary of Labor, United States Department of Labor re 150 MOTION for Summary Judgment *Amended Notice of Submission of Exhibits* (Attachments: # 1 Exhibit R)(Lewis, Ryma) (Entered: 12/23/2019) |
| 12/30/2019 | 160 | ORDER granting 155 Emergency MOTION for Extension of Time to File Response/Reply. See order for details. Copies distributed to all counsel. Signed by Magistrate Judge Lawrence R. Leonard on 12/30/2019. (clou) (Entered: 12/30/2019) |
| 01/02/2020 | 161 | Request for Hearing by R. Alexander Acosta, Secretary of Labor, United States Department of Labor re 150 MOTION for Summary Judgment (Lewis, Ryma) (Entered: 01/02/2020) |
| 01/10/2020 | 162 | ORDER: The Court finds that consolidation of Steadfast I and Steadfast II is appropriate. Both actions are before the same district and involve the same parties and subject matter. Accordingly, Steadfast II is hereby consolidated with Steadfast I. Signed by District Judge Raymond A. Jackson on 01/09/2020. (bboy, ) (Entered: 01/10/2020) |
| 01/10/2020 | 163 | MOTION in Limine *to Exclude Evidence of Industry Standard at Trial* by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Proposed Order Proposed Order)(Lewis, Ryma) (Entered: 01/10/2020) |
| 01/10/2020 | 164 | Memorandum in Support re 163 MOTION in Limine *to Exclude Evidence of Industry Standard at Trial* filed by R. Alexander Acosta, Secretary of Labor, United States |

**JA22**

| | | |
|---|---|---|
| | | Department of Labor. (Lewis, Ryma) (Entered: 01/10/2020) |
| 01/10/2020 | 165 | MOTION in Limine *to Exclude Wanda Cooper from Testifying at Trial* by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Proposed Order Proposed Order)(Lewis, Ryma) (Entered: 01/10/2020) |
| 01/10/2020 | 166 | Memorandum in Support re 165 MOTION in Limine *to Exclude Wanda Cooper from Testifying at Trial* filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Lewis, Ryma) (Entered: 01/10/2020) |
| 01/10/2020 | 167 | NOTICE by R. Alexander Acosta, Secretary of Labor, United States Department of Labor re 164 Memorandum in Support *Exhibit A* (Attachments: # 1 Exhibit A)(Lewis, Ryma) (Entered: 01/10/2020) |
| 01/15/2020 | 168 | Joint MOTION for Expedited Telephonic Status Conference by Eugene Scalia. (Attachments: # 1 Proposed Order Proposed Order)(Lewis, Ryma) (Entered: 01/15/2020) |
| 01/15/2020 | 169 | Memorandum in Support re 168 Joint MOTION for Expedited Telephonic Status Conference filed by Eugene Scalia. (Lewis, Ryma) (Entered: 01/15/2020) |
| 01/17/2020 | 172 | Telephone Conference before District Judge Raymond A. Jackson held on 1/17/2020. Attorneys Ryma Lewis and Chervonti Jones appeared on behalf of the plaintiffs. Attorneys Julia Rust and Joshua Jewett appeared on behalf of the defendants. Upon the joint request of counsel, Court will allow an additional 60 days for discovery and continues the trial to April 21, 2020 at 10:00 a.m. in Norfolk. Court will permit plaintiff to file a supplemental motion for summary judgment once new discovery is completed. Court to prepare an order. (ptom, ) Modified on 1/21/2020 (ptom, ). (Entered: 01/17/2020) |
| 01/17/2020 | 170 | Memorandum in Opposition re 150 MOTION for Summary Judgment filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit)(Rust, Julia) (Entered: 01/17/2020) |
| 01/17/2020 | 171 | Objection to 150 MOTION for Summary Judgment *Evidence Pursuant to Rule 56(C)* filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Rust, Julia) (Entered: 01/17/2020) |
| 01/21/2020 | 173 | MOTION to Compel by Eugene Scalia. (Attachments: # 1 Proposed Order Proposed Order)(Lewis, Ryma) (Entered: 01/21/2020) |
| 01/21/2020 | 174 | Memorandum in Support re 173 MOTION to Compel filed by Eugene Scalia. (Lewis, Ryma) (Entered: 01/21/2020) |
| 01/22/2020 | 175 | Order Amending Rule 16(b) Scheduling Order - Given good cause, the trial in this matter has been continued. Bench Trial set for 4/21/2020 at 10:00 AM in Norfolk. Final Pretrial Conference set for 4/9/2020 at 09:00 AM in Norfolk. The parties are to schedule a settlement conference with a Magistrate Judge of this court on or before the Final Pretrial Conference. (See order for specifics). Signed by District Judge Raymond A. Jackson on 1/21/20 & filed on 1/22/20. (ptom, ) (Entered: 01/22/2020) |
| 01/22/2020 | 176 | TRANSCRIPT of proceedings (Motion hearing) held on 5-15-2019, before Judge Robert J. Krask, Court Reporter/Transcriber Jody Stewart, Telephone number |

**JA23**

|  |  |  |
|---|---|---|
|  |  | 757-222-7071. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/21/2020. Redacted Transcript Deadline set for 3/23/2020. Release of Transcript Restriction set for 4/21/2020.(stewart, jody) (Entered: 01/22/2020)** |
| 01/23/2020 | 177 | REPLY to Response to Motion re 150 MOTION for Summary Judgment filed by Eugene Scalia. (Attachments: # 1 Exhibit Exhibit Index, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3)(Lewis, Ryma) (Entered: 01/23/2020) |
| 01/24/2020 | 178 | RESPONSE to Motion re 163 MOTION in Limine *to Exclude Evidence of Industry Standard at Trial* filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Jewett, Joshua) (Entered: 01/24/2020) |
| 01/24/2020 | 179 | RESPONSE to Motion re 165 MOTION in Limine *to Exclude Wanda Cooper from Testifying at Trial* filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Jewett, Joshua) (Entered: 01/24/2020) |
| 01/28/2020 | 180 | Request for Entry of Default as to *Steadfast II* by Eugene Scalia. (Attachments: # 1 Exhibit Declaration Jones)(Lewis, Ryma) (Entered: 01/28/2020) |
| 01/28/2020 | 181 | MOTION for Leave to File *Answer and Affirmative Defenses* by Medical Staffing of America, LLC, Lisa Ann Pitts. (Attachments: # 1 Exhibit A, # 2 Proposed Order) (Jewett, Joshua) (Entered: 01/28/2020) |
| 01/28/2020 | 182 | Memorandum in Support re 181 MOTION for Leave to File *Answer and Affirmative Defenses* filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Jewett, Joshua) (Entered: 01/28/2020) |
| 01/28/2020 | 183 | Memorandum in Opposition re 180 Request for Entry of Default as to *Steadfast II* filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Jewett, Joshua) (Entered: 01/28/2020) |
| 01/29/2020 | 184 | ORDER striking (150) Motion for Summary Judgment in case 2:18-cv-00226. The Court has granted the parties leave to file any motion for summary judgment of no more than forty (40) pages in the consolidated cases of Steadfast I and Steadfast II. Signed by District Judge Raymond A. Jackson on January 29, 2020. Associated Cases: 2:18-cv-00226-RAJ-LRL, 2:19-cv-00475-RAJ-LRL (Entered: 01/29/2020) |
| 01/29/2020 | 185 | ORDER granting (181) Motion for Leave to File in case 2:18-cv-00226-RAJ-LRL Signed by District Judge Raymond A. Jackson on January 29, 2020. Associated Cases: 2:18-cv-00226-RAJ-LRL, 2:19-cv-00475-RAJ-LRL (Entered: 01/29/2020) |
| 01/29/2020 | 186 | Reply to Motion re 165 MOTION in Limine *to Exclude Wanda Cooper from Testifying at Trial* filed by Eugene Scalia. (Lewis, Ryma) (Entered: 01/29/2020) |
| 01/30/2020 | 187 | REPLY to Response to Motion re 163 MOTION in Limine *to Exclude Evidence of Industry Standard at Trial* filed by Eugene Scalia. (Lewis, Ryma) (Entered: 01/30/2020) |

**JA24**

| 01/30/2020 | 188 | ANSWER *to "Steadfast II" Complaint (2:19-cv-475)* filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Rust, Julia) Modified text on 1/30/20 (bpet, ) (Entered: 01/30/2020) |
| --- | --- | --- |
| 01/31/2020 | | MOTIONS REFERRED to Magistrate Judge Lawrence R. Leonard: 163 MOTION in Limine *to Exclude Evidence of Industry Standard at Trial*, 165 MOTION in Limine *to Exclude Wanda Cooper from Testifying at Trial*. Motions no longer referred to Judge Jackson. (bpet, ) (Entered: 01/31/2020) |
| 01/31/2020 | 189 | Withdrawal of Motion by Eugene Scalia re 173 MOTION to Compel (Lewis, Ryma) (Entered: 01/31/2020) |
| 02/25/2020 | 190 | Joint MOTION to Amend/Correct 175 Order Rule 16(b) Scheduling Order, by Medical Staffing of America, LLC, Lisa Ann Pitts. (Jewett, Joshua) (Entered: 02/25/2020) |
| 02/25/2020 | 191 | Memorandum in Support re 190 Joint MOTION to Amend/Correct 175 Order Rule 16(b) Scheduling Order, filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Jewett, Joshua) (Entered: 02/25/2020) |
| 02/26/2020 | | MOTIONS REFERRED to Magistrate Judge: Lawrence R. Leonard. 190 Joint MOTION to Amend/Correct 175 Order Rule 16(b) Scheduling Order, (bboy, ) (Entered: 02/26/2020) |
| 02/27/2020 | 192 | NOTICE by Medical Staffing of America, LLC, Lisa Ann Pitts re 190 Joint MOTION to Amend/Correct 175 Order Rule 16(b) Scheduling Order, *Submission of Proposed Order* (Attachments: # 1 Proposed Order)(Jewett, Joshua) (Entered: 02/27/2020) |
| 03/03/2020 | 193 | ORDER denying 190 Joint Motion to Amend /Correct 175 Order Rule 16(b) Scheduling Order. Signed by Magistrate Judge Lawrence R. Leonard on 03/02/2020. (bboy, ) (Entered: 03/03/2020) |
| 03/10/2020 | 194 | NOTICE of Appearance by Aaron Daniel Siegrist on behalf of Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts (Siegrist, Aaron) (Entered: 03/10/2020) |
| 03/12/2020 | | Set/Reset Hearings: Settlement Conference set for 4/8/2020 at 09:30 AM in Norfolk Judges Chamber before Magistrate Judge Douglas E. Miller. (jjon) (Entered: 03/12/2020) |
| 03/13/2020 | 195 | Settlement Conference Order. Settlement Conference scheduled at 9:30 a.m. on April 08, 2020; memorandum due by noon on April 6, 2020. Signed by Magistrate Judge Douglas E. Miller on 03/13/2020. (bboy, ) (Entered: 03/13/2020) |
| 03/13/2020 | 196 | MOTION for Summary Judgment by Medical Staffing of America, LLC, Lisa Ann Pitts. (Jewett, Joshua) (Entered: 03/13/2020) |
| 03/13/2020 | 197 | Memorandum in Support re 196 MOTION for Summary Judgment filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12)(Jewett, Joshua) (Entered: 03/13/2020) |
| 03/17/2020 | 198 | MOTION to Compel *and Overrule Objections* by Eugene Scalia. (Attachments: # 1 Proposed Order Proposed Order)(Lewis, Ryma) (Entered: 03/17/2020) |

**JA25**

| 03/17/2020 | 199 | Memorandum in Support re 198 MOTION to Compel *and Overrule Objections* filed by Eugene Scalia. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Lewis, Ryma) (Entered: 03/17/2020) |
| --- | --- | --- |
| 03/17/2020 | 200 | NOTICE by Eugene Scalia re 162 Order, *Steadfast II Revised Schedule A* (Attachments: # 1 Exhibit Schedule A)(Lewis, Ryma) (Entered: 03/17/2020) |
| 03/18/2020 | 201 | ORDER denying 163 Motion in Limine. The Court FINDS that evidence of Defendants' compliance with industry standard should not be per se excluded. Therefore, Plaintiffs Motion in Limine to exclude evidence of industry standard, ECF No. 163, is DENIED. Signed by Magistrate Judge Lawrence R. Leonard on 03/18/2020. (bboy, ) (Entered: 03/18/2020) |
| 03/18/2020 | 202 | ORDER granting 165 Motion in Limine. The Court FINDS that Attorney Cooper's testimony is irrelevant and should be excluded at trial. Therefore, Plaintiffs Motion in Limine to exclude the testimony of Wanda Cooper, ECF No. 165, is GRANTED. Signed by Magistrate Judge Lawrence R. Leonard on 03/18/2020. (bboy, ) (Entered: 03/18/2020) |
| 03/18/2020 | | Telephone Conference before District Judge Raymond A. Jackson held on 3/18/2020. (ptom, ) (Entered: 03/18/2020) |
| 03/18/2020 | 203 | MOTION for Summary Judgment by Eugene Scalia. (Attachments: # 1 Proposed Order Proposed Order)(Lewis, Ryma) (Entered: 03/18/2020) |
| 03/18/2020 | 204 | Memorandum in Support re 203 MOTION for Summary Judgment filed by Eugene Scalia. (Attachments: # 1 Exhibit Index, # 2 Exhibit A through C, # 3 Exhibit D1 through D8)(Lewis, Ryma) (Entered: 03/19/2020) |
| 03/19/2020 | 205 | NOTICE by Eugene Scalia re 203 MOTION for Summary Judgment *Exhibits D9 through E* (Attachments: # 1 Exhibit D9 through D12, # 2 Exhibit D13 through D16, # 3 Exhibit E)(Lewis, Ryma) (Entered: 03/19/2020) |
| 03/19/2020 | 206 | NOTICE by Eugene Scalia re 203 MOTION for Summary Judgment *of Submission of Exhibits F through Y* (Attachments: # 1 Exhibit F through K, # 2 Exhibit L and M, # 3 Exhibit N and O, # 4 Exhibit P through R, # 5 Exhibit S and T, # 6 Exhibit V through Y, # 7 Exhibit U)(Lewis, Ryma) (Entered: 03/19/2020) |
| 03/19/2020 | 207 | NOTICE of Appearance by Ryma Naje Lewis on behalf of Eugene Scalia (Lewis, Ryma) (Entered: 03/19/2020) |
| 03/19/2020 | 208 | MOTION Motion for Adverse Inference against Defendants Good Faith Defense or, alternatively, Exclude from Trial any and all evidence regarding any advice Defendants received from attorney Arlene Klinedinst by Eugene Scalia. (Attachments: # 1 Proposed Order Proposed Order)(Lewis, Ryma) (Entered: 03/19/2020) |
| 03/19/2020 | 209 | Memorandum in Support re 208 MOTION Motion for Adverse Inference against Defendants Good Faith Defense or, alternatively, Exclude from Trial any and all evidence regarding any advice Defendants received from attorney Arlene Klinedinst filed by Eugene Scalia. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Lewis, Ryma) (Entered: 03/19/2020) |
| 03/19/2020 | 210 | NOTICE of Appearance by Mohamed Elnour Seifeldein on behalf of R. Alexander Acosta, Secretary of Labor, United States Department of Labor (Seifeldein, Mohamed) (Entered: 03/19/2020) |

**JA26**

| 03/19/2020 | 211 | NOTICE by Eugene Scalia re 203 MOTION for Summary Judgment *Exhibit S* (Attachments: # 1 Exhibit S)(Lewis, Ryma) (Entered: 03/19/2020) |
| --- | --- | --- |
| 03/23/2020 |  | MOTIONS REFERRED to Magistrate Judge: Lawrence R. Leonard. 198 MOTION to Compel *and Overrule Objections* (bboy, ) (Entered: 03/23/2020) |
| 03/23/2020 | 212 | ORDER re 198 MOTION to Compel *and Overrule Objections* filed by Eugene Scalia. Defendant is DIRECTED to file a response to this Motion by Wednesday, March 25, 2020. Any Reply by Plaintiff must be filed by March 26, 2020. Signed by Magistrate Judge Lawrence R. Leonard on 03/23/2020. (bboy, ) (Entered: 03/23/2020) |
| 03/24/2020 | 213 | ORDER re 208 Motion for Adverse Inference against Defendants. Defendant is DIRECTED to file a response to this motion by Friday March 27, 2020. Any reply by Plaintiff must be filed by March 30, 2020. Signed by Magistrate Judge Lawrence R. Leonard on 03/24/2020. (bboy, ) (Entered: 03/24/2020) |
| 03/25/2020 | 214 | Memorandum in Opposition re 198 MOTION to Compel *and Overrule Objections* filed by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Rust, Julia) (Entered: 03/25/2020) |
| 03/26/2020 | 215 | Declaration re 214 Memorandum in Opposition, *by Christine Kim* by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts. (Rust, Julia) (Entered: 03/26/2020) |
| 03/26/2020 | 216 | REPLY to Response to Motion re 198 MOTION to Compel *and Overrule Objections* filed by Eugene Scalia. (Attachments: # 1 Exhibit Exhibit Index, # 2 Exhibit I through P)(Lewis, Ryma) (Entered: 03/26/2020) |
| 03/26/2020 | 217 | NOTICE by Eugene Scalia re 216 Reply to Response to Motion *Exhibits A through H* (Attachments: # 1 Exhibit A through H)(Lewis, Ryma) (Entered: 03/26/2020) |
| 03/27/2020 | 218 | ORDER re 198 MOTION to Compel. The parties are therefore ORDERED to contact the Magistrate Courtroom Deputies at (757) 222-7222 within three business days to schedule a telephone hearing on or before April 17,2020. See Order for details. Signed by Magistrate Judge Lawrence R. Leonard on 03/27/2020. (bboy, ) (Entered: 03/27/2020) |
| 03/27/2020 | 219 | Memorandum in Opposition re 208 MOTION Motion for Adverse Inference against Defendants Good Faith Defense or, alternatively, Exclude from Trial any and all evidence regarding any advice Defendants received from attorney Arlene Klinedinst filed by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts. (Rust, Julia) (Entered: 03/27/2020) |
| 03/30/2020 | 220 | ORDER re 198 MOTION to Compel, VACATING 218 Order. The Court will not schedule a hearing of any type until circumstances warrant. The parties are encouraged to continue working together to narrow the areas of disagreement, and to advise the Court should their negotiations result in mooting the Motion. Signed by Magistrate Judge Lawrence R. Leonard on 03/30/2020. (bboy, ) (Entered: 03/30/2020) |
| 03/30/2020 | 221 | Reply to Motion re 208 MOTION Motion for Adverse Inference against Defendants Good Faith Defense or, alternatively, Exclude from Trial any and all evidence regarding any advice Defendants received from attorney Arlene Klinedinst filed by Eugene Scalia. (Lewis, Ryma) (Entered: 03/30/2020) |

**JA27**

| 03/31/2020 | | MOTIONS REFERRED to Magistrate Judge: Lawrence R. Leonard. 208 MOTION Motion for Adverse Inference against Defendants Good Faith Defense or, alternatively, Exclude from Trial any and all evidence regarding any advice Defendants received from attorney Arlene Klinedinst (bboy, ) (Entered: 03/31/2020) |
|---|---|---|
| 04/01/2020 | 222 | Objection to 202 Order on Motion in Limine, filed by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts. (Attachments: # 1 Memorandum of Law, # 2 Cooper Dep., # 3 Steadfast Dep., # 4 Pitts Dep.)(Siegrist, Aaron) (Entered: 04/01/2020) |
| 04/07/2020 | 223 | NOTICE by Eugene Scalia re 162 Order, *Steadfast II Revised Schedule A* (Attachments: # 1 Exhibit A)(Lewis, Ryma) (Entered: 04/07/2020) |
| 04/07/2020 | 224 | MOTION for Leave to File *to Supplement His Motion for Adverse Inference Against Defendants Good Faith Affirmative Defense, or in the Alternative Motion In Limine to Exclude Any and All Evidence Regarding Advice Received from Attorney Arlene Klinedinst* by Eugene Scalia. (Attachments: # 1 Proposed Order Proposed Order) (Lewis, Ryma) (Entered: 04/07/2020) |
| 04/07/2020 | 225 | Memorandum in Support re 224 MOTION for Leave to File *to Supplement His Motion for Adverse Inference Against Defendants Good Faith Affirmative Defense, or in the Alternative Motion In Limine to Exclude Any and All Evidence Regarding Advice Received from Attorney Arlene Klined filed* by Eugene Scalia. (Attachments: # 1 Exhibit Exhibit A)(Lewis, Ryma) (Entered: 04/07/2020) |
| 04/08/2020 | 226 | ORDER denying 224 Motion for Leave. Signed by Magistrate Judge Lawrence R. Leonard on 04/08/2020. (bboy, ) (Entered: 04/08/2020) |
| 04/08/2020 | 227 | MEMORANDUM OPINIION AND ORDER: Plaintiff's Motion, ECF No. 208, is GRANTED in part, and Defendants are ORDERED to disclose, within fourteen days of the date of this Order, all communications between them and attorneys Cooper, Klinedinst and Bredehoft regarding the subject matter at issue here, i.e. thedecision to classify the nurses as independent contractors and the propriety of that decision. This must include all communications and advice from the attorneys on this subject, and all communications and information provided to the attorneys by Defendants upon which the attorneys based their advice.Signed by Magistrate Judge Lawrence R. Leonard on 4/8/20. (afar, ) (Entered: 04/08/2020) |
| 04/15/2020 | 228 | Opposition to 222 Motion Re: Objections to Magistrate Judge *Order Granting Plaintiffs Motion in Limine to Exclude Testimony of Wanda Cooper* filed by Eugene Scalia. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Lewis, Ryma) (Entered: 04/15/2020) |
| 04/15/2020 | 229 | Memorandum in Opposition re 203 MOTION for Summary Judgment filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Errata 16)(Jewett, Joshua) (Entered: 04/15/2020) |
| 04/17/2020 | 230 | NOTICE by Eugene Scalia re 220 Order, *of Outstanding Discovery Deficiencies* (Lewis, Ryma) (Entered: 04/17/2020) |

**JA28**

| 04/21/2020 | 231 | REPLY to Response to Motion re 203 MOTION for Summary Judgment filed by Eugene Scalia. (Attachments: # 1 Exhibit Index, # 2 Exhibit AA to CC, # 3 Exhibit D17 to DD)(Lewis, Ryma) (Entered: 04/21/2020) |
| --- | --- | --- |
| 04/21/2020 | 232 | NOTICE by Eugene Scalia re 231 Reply to Response to Motion *Exhs. EE; HH; D17,18; S-2, 3, 4, 5;T3* (Attachments: # 1 Exhibit EE, # 2 Exhibit HH to T3)(Lewis, Ryma) (Entered: 04/21/2020) |
| 04/21/2020 | 233 | NOTICE by Eugene Scalia re 231 Reply to Response to Motion *Exhs. FF and GG* (Attachments: # 1 Exhibit GG, # 2 Exhibit FF)(Lewis, Ryma) (Entered: 04/21/2020) |
| 04/24/2020 | 234 | Memorandum in Opposition re 196 MOTION for Summary Judgment filed by Eugene Scalia. (Attachments: # 1 Exhibit Index, # 2 Exhibit A through C, # 3 Exhibit D1 to D8)(Lewis, Ryma) (Entered: 04/24/2020) |
| 04/24/2020 | 235 | NOTICE by Eugene Scalia re 234 Memorandum in Opposition *Exhibits D9 to D12* (Attachments: # 1 Exhibit D9 to D12)(Lewis, Ryma) (Entered: 04/24/2020) |
| 04/24/2020 | 236 | NOTICE by Eugene Scalia re 229 Memorandum in Opposition, *of Submission of Exhibits D13 to D16, F to K, L to O, P to T* (Attachments: # 1 Exhibit D13 to D16, # 2 Exhibit F to K, # 3 Exhibit L and M, # 4 Exhibit N and O, # 5 Exhibit P and R, # 6 Exhibit S to T)(Lewis, Ryma) (Entered: 04/24/2020) |
| 04/24/2020 | 237 | NOTICE by Eugene Scalia re 234 Memorandum in Opposition *of Submission of Exhibits AA,CC, EE, FF, II, W, and Y* (Attachments: # 1 Exhibit AA, CC, and EE, # 2 Exhibit FF and II, # 3 Exhibit W to Y)(Lewis, Ryma) (Entered: 04/24/2020) |
| 04/27/2020 | 238 | NOTICE by Eugene Scalia re 234 Memorandum in Opposition *Submission of Exhibits D17 and D18* (Attachments: # 1 Exhibit Exh D17 and D18)(Lewis, Ryma) (Entered: 04/27/2020) |
| 04/28/2020 | | Set/Reset Hearings as to 198 Plaintiff's MOTION to Compel *and Overrule Objections* and 230 Plaintiffs Notice of Outstanding Discovery Deficiencies: Motion Hearing set for 5/8/2020 at 10:00 AM in Norfolk Mag Courtroom 1 via Zoom before Magistrate Judge Lawrence R. Leonard. (jjon) (Entered: 04/28/2020) |
| 04/30/2020 | 239 | REPLY to Response to Motion re 196 MOTION for Summary Judgment filed by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts. (Siegrist, Aaron) (Entered: 04/30/2020) |
| 05/01/2020 | 240 | NOTICE of Appearance by Patrick Hugh O'Donnell on behalf of Medical Staffing of America, LLC, Medical Staffing of America, LLC (O'Donnell, Patrick) (Entered: 05/01/2020) |
| 05/01/2020 | 241 | Financial Interest Disclosure Statement (Local Rule 7.1) by Medical Staffing of America, LLC, Medical Staffing of America, LLC. (O'Donnell, Patrick) (Entered: 05/01/2020) |
| 05/07/2020 | | Set/Reset Hearings: Settlement Conference RESET for 6/15/2020 at 09:30 AM in Norfolk REMOTE before Magistrate Judge Robert J. Krask. (jjon) (Entered: 05/07/2020) |
| 05/08/2020 | 242 | Minute Entry for proceedings held before Magistrate Judge Lawrence R. Leonard: Motion Hearing held on 5/8/2020. The matter came before the Court for a motion hearing via Zoom on 198 Plaintiff's Emergency Motion to Compel and 230 Plaintiff's Notice of Outstanding Discovery Deficiencies. Ryma Lewis, Chervonti Jones, Leah |

| | | |
|---|---|---|
| | | Williams and Mohamed Seifeldein present for Plaintiff. Christopher Davis and Joshua Jewett present for Defendants. Argument by Mohamed Seifeldein, Christopher Davis, Ryma Lewis and Leah Williams heard. Comments and questions by the Court. The Court made rulings on the record. The Court is to issue an Order. Zoom hearing adjourned. (Court Reporter Jody Stewart.)(jjon) (Entered: 05/08/2020) |
| 05/08/2020 | 243 | Second Settlement Conference Order. Settlement Conference scheduled at 9:30 a.m. on June 15, 2020; memorandum due by noon on June 8, 2020. SEE ORDER FOR DETAILS. Signed by Magistrate Judge Robert J. Krask on 05/08/2020. (bboy, ) (Entered: 05/08/2020) |
| 05/08/2020 | 244 | ORDER granting in part 198 Motion to Compel. Defendants are ORDERED to supplement their discovery responses as directed by 5/22/20. Signed by Magistrate Judge Lawrence R. Leonard on 5/8/20. (bpet, ) (Entered: 05/08/2020) |
| 05/20/2020 | 245 | MOTION for Reconsideration re 244 Order on Motion to Compel by Eugene Scalia. (Attachments: # 1 Proposed Order for Reconsideration)(Lewis, Ryma) (Entered: 05/20/2020) |
| 05/20/2020 | 246 | Memorandum in Support re 245 MOTION for Reconsideration re 244 Order on Motion to Compel filed by Eugene Scalia. (Lewis, Ryma) (Entered: 05/20/2020) |
| 06/03/2020 | 247 | RESPONSE in Opposition re 245 MOTION for Reconsideration re 244 Order on Motion to Compel filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Jewett, Joshua) (Entered: 06/03/2020) |
| 06/09/2020 | 248 | REPLY to Response to Motion re 245 MOTION for Reconsideration re 244 Order on Motion to Compel filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Lewis, Ryma) (Entered: 06/09/2020) |
| 06/11/2020 | 249 | ORDER: The Secretary's Motion to Revise 245 is GRANTED, and the Court will issue, contemporaneously with this Order, an Amended Order resolving the Secretary's Emergency Motion to Compel 198 , which addresses the reasonable expenses request. Signed by Magistrate Judge Lawrence R. Leonard on 06/11/2020. (bboy, ) (Entered: 06/11/2020) |
| 06/11/2020 | 250 | AMENDED ORDER: The Secretary's Emergency Motion to Compel, 198 is GRANTED in part, and Defendants are ORDERED to supplement their discovery responses as delineated herein no later than May 22, 2020. The Secretary's request for fees and costs is DENIED. SEE ORDER FOR DETAILS. Signed by Magistrate Judge Lawrence R. Leonard on 06/11/2020. (bboy, ) (Entered: 06/11/2020) |
| 06/15/2020 | | Minute Entry for proceedings held before Magistrate Judge Robert J. Krask: Settlement Conference held on 6/15/2020. (jjon) (Entered: 06/15/2020) |
| 07/23/2020 | 251 | ORDER: Plaintiff's Motion for Summary Judgment 203 is DENIED. Defendants' Motion for Summary Judgment 196 is also DENIED. Signed by District Judge Raymond A. Jackson on 07/23/2020. (bboy, ) (Entered: 07/23/2020) |
| 09/02/2020 | 252 | NOTICE by Eugene Scalia re 1 Complaint *of Filing Third Revised Schedule A* (Attachments: # 1 Exhibit Schedule A)(Lewis, Ryma) (Entered: 09/02/2020) |
| 10/08/2020 | 253 | ORDER: It is ORDERED that the Rule 16(b) Scheduling Order and any related orders shall be amended to reflect the following dates: A bench trial shall commence on April 13, 2020, at 10:00 a.m. at Norfolk. A final pretrial conference shall be conducted on March 10, 2021, at 10:0 a.m. at the courthouse in Norfolk. SEE ORDER FOR |

**JA30**

| | | DETAILS. Signed by District Judge Raymond A. Jackson on 10/07/2020. (bboy, ) (Entered: 10/08/2020) |
|---|---|---|
| 10/08/2020 | [254](#) | ORDER. Bench Trial set for 4/13/2021 at 10:00 AM in Norfolk before District Judge Raymond A. Jackson. Final Pretrial Conference set for 3/10/2021 at 10:00 AM. Signed by District Judge Raymond A. Jackson on 10/7/20 & filed on 10/8/20. (ptom, ) (Entered: 10/08/2020) |
| 12/01/2020 | [255](#) | ORDER denying [222](#) Motion Re: Objections to Magistrate Judge's Ruling or Recommendation. Signed by District Judge Raymond A. Jackson on 12/1/2020. (tamarm, ) (Entered: 12/02/2020) |
| 01/08/2021 | [256](#) | NOTICE by Eugene Scalia re [1](#) Complaint *of Filing Fourth Revised Schedule A* (Attachments: # [1](#) Exhibit A)(Lewis, Ryma) (Entered: 01/08/2021) |
| 02/12/2021 | [257](#) | NOTICE by R. Alexander Acosta, Secretary of Labor, United States Department of Labor re [1](#) Complaint *Fifth Revised Schedule A* (Attachments: # [1](#) Exhibit Schedule A) (Lewis, Ryma) (Entered: 02/12/2021) |
| 02/17/2021 | | Set Hearings: Settlement Conference set for 3/2/2021 at 01:30 PM in Norfolk Remote before Magistrate Judge Robert J. Krask. (cdod, ) (Entered: 02/17/2021) |
| 02/19/2021 | [258](#) | Third Settlement Conference Order. All parties and their lead counsel are required to appear before the undersigned via Zoomgov remote proceedings' for a settlement conference at 1:30 p.m. on March 2, 2021. The parties must submit a brief memorandum of five pages or less directly to the chambers of the undersigned (do not file in the clerk's office) by noon on February 23, 2021. Signed by Magistrate Judge Robert J. Krask on 2/19/2021. (tamarm, ) (Entered: 02/19/2021) |
| 02/19/2021 | [259](#) | MOTION to Withdraw *as Counsel of Record* by Medical Staffing of America, LLC, Medical Staffing of America, LLC. (Attachments: # [1](#) Exhibit 1)(O'Donnell, Patrick) (Entered: 02/19/2021) |
| 03/01/2021 | [260](#) | ORDER regarding pretrial conference set for 3/10/2021 (See Order for specifics.) Signed by Magistrate Judge Lawrence R. Leonard on 3/1/2021. (tamarm, ) (Entered: 03/01/2021) |
| 03/02/2021 | | Settlement Conference held on 3/2/2021. before Magistrate Judge Robert J. Krask. (lwoo) (Entered: 03/02/2021) |
| 03/10/2021 | [261](#) | JOINT PRETRIAL ORDER. Signed by Magistrate Judge Lawrence R. Leonard on 3/10/2021. (tamarm, ) (Entered: 03/10/2021) |
| 03/10/2021 | [262](#) | ORDER - Plaintiff is ORDERED to narrow its witness list and disclose to Defendants the identities of the specific nurse witnesses it plans to call at trial no later than March 30, 2021. Plaintiff shall also file that list with the Court. (See Order for further information.) Signed by Magistrate Judge Lawrence R. Leonard on 3/10/2021. (tamarm, ) (Entered: 03/10/2021) |
| 03/17/2021 | [263](#) | NOTICE by Medical Staffing of America, LLC re [1](#) Complaint *Sixth Revised Schedule A* (Attachments: # [1](#) Exhibit A)(Lewis, Ryma) (Entered: 03/17/2021) |
| 03/17/2021 | [264](#) | Brief in Support to [261](#) Pretrial Order *PX-5* filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # [1](#) Exhibit A)(Lewis, Ryma) (Entered: 03/17/2021) |

| 03/17/2021 | 265 | Brief in Support to 261 Pretrial Order *Regarding Exhibit PX-5* filed by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts. (Siegrist, Aaron) (Entered: 03/17/2021) |
|---|---|---|
| 03/18/2021 | 266 | Supplement to Pretrial Order. Signed by Magistrate Judge Lawrence R. Leonard on 3/18/21. (dbra) (Entered: 03/18/2021) |
| 03/24/2021 | 267 | MOTION for Electronic Device Application by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Lewis, Ryma) Modified on 3/29/2021; document removed; emailed Courtroom Deputy) (tamarm, ). (Entered: 03/24/2021) |
| 03/26/2021 | 268 | MOTION in Limine by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts. (Siegrist, Aaron) (Entered: 03/26/2021) |
| 03/26/2021 | 269 | Memorandum in Support re 268 MOTION in Limine filed by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts. (Attachments: # 1 Proposed Order)(Siegrist, Aaron) (Entered: 03/26/2021) |
| 03/28/2021 | 270 | Joint MOTION Remote Testimony by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Attachments: # 1 Proposed Order Remote Testimony)(Lewis, Ryma) (Entered: 03/28/2021) |
| 03/28/2021 | 271 | Memorandum in Support re 270 Joint MOTION Remote Testimony filed by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. (Lewis, Ryma) (Entered: 03/28/2021) |
| 03/29/2021 | | Notice of Correction re 267 MOTION for Electronic Device Application by R. Alexander Acosta, Secretary of Labor, United States Department of Labor. Attorney notified that this document should not be e-filed; notified Courtroom Deputy of the request.(tamarm, ) (Entered: 03/29/2021) |
| 03/30/2021 | 272 | *Supplement to Joint Pretrial Statement:* Witness List by Martin J. Walsh. Associated Cases: 2:18-cv-00226-RAJ-LRL, 2:19-cv-00475-RAJ-LRL(Lewis, Ryma) (jhie, ). (Entered: 03/30/2021) |
| 03/31/2021 | 273 | ORDER granting 270 Motion for Remote Testimony by Non-Parties. (See Order for specifics.) Signed by District Judge Raymond A. Jackson on 3/31/2021. (tamarm, ) (Entered: 03/31/2021) |
| 03/31/2021 | | Telephone Conference before District Judge Raymond A. Jackson held on 3/31/2021. (ptom, ) (Entered: 03/31/2021) |
| 04/06/2021 | 274 | Proposed Findings of Fact by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts. (Rust, Julia) (Entered: 04/06/2021) |
| 04/06/2021 | 275 | Proposed Findings of Fact by Martin J. Walsh. (Lewis, Ryma) (Entered: 04/06/2021) |
| 04/08/2021 | | Reset Hearings: Bench Trial reset for 8/31/2021 at 10:00 AM in Norfolk Courtroom 4 before District Judge Raymond A. Jackson. (ptom, ) (Entered: 04/09/2021) |
| 04/09/2021 | 276 | RESPONSE in Opposition re 268 MOTION in Limine filed by Martin J. Walsh. (Lewis, Ryma) (Entered: 04/09/2021) |
| 04/11/2021 | 277 | EXHIBIT *A* by Martin J. Walsh.. (Attachments: # 1 Exhibit A)(Lewis, Ryma) (Entered: 04/11/2021) |

| 04/15/2021 | 278 | RESPONSE in Support re 268 MOTION in Limine filed by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts. (Siegrist, Aaron) (Entered: 04/15/2021) |
|---|---|---|
| 04/16/2021 | | MOTIONS REFERRED to Magistrate Judge: Leonard. 268 MOTION in Limine (tamarm, ) (Entered: 04/16/2021) |
| 05/18/2021 | 279 | ORDER denying 268 Motion in Limine. Signed by Magistrate Judge Lawrence R. Leonard on 5/18/2021. (tamarm, ) (Entered: 05/18/2021) |
| 06/17/2021 | 280 | NOTICE by Martin J. Walsh re 1 Complaint *of Filing Seventh Revised Schedule A* (Attachments: # 1 Exhibit A)(Lewis, Ryma) (Entered: 06/17/2021) |
| 07/27/2021 | 281 | NOTICE by Martin J. Walsh re 1 Complaint *of Filing Eighth Revised Schedule A* (Attachments: # 1 Exhibit A)(Lewis, Ryma) (Entered: 07/27/2021) |
| 08/05/2021 | 282 | NOTICE by Martin J. Walsh *of Filing Ninth Revised Schedule A* (Attachments: # 1 Exhibit A)(Lewis, Ryma) (Entered: 08/05/2021) |
| 08/10/2021 | 283 | Pretrial Statement (Exhibits and Witness Lists) by Martin J. Walsh. (Lewis, Ryma) (Entered: 08/10/2021) |
| 08/16/2021 | 284 | ORDER GRANTING MOTION TO WITHDRAW AS COUNSEL OF RECORD re 259 Motion to Withdraw. Patrick H. O'Donnell is granted leave to withdraw as counsel for Medical Staffing of America. Signed by District Judge Raymond A. Jackson on 8/16/2021. (tamarm, ) (Entered: 08/16/2021) |
| 08/16/2021 | | Telephone Conference before District Judge Raymond A. Jackson held on 8/16/2021. (ptom, ) (Entered: 08/16/2021) |
| 08/21/2021 | 285 | MOTION to Withdraw as Attorney *and Memorandum in Support* by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts. (Attachments: # 1 Proposed Order Ex. 1)(Davis, Christopher) Modified on 8/23/2021 - document removed per attorney's request. Refiled at ECF #286. (tamarm, ). (Entered: 08/21/2021) |
| 08/21/2021 | 286 | Amended MOTION to Withdraw as Attorney *and Memorandum in Support* by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts. (Attachments: # 1 Proposed Order Exhibit 1)(Davis, Christopher) (Main Document 286 replaced on 8/25/2021) (tamarm, ). (Attachment 1 replaced on 8/25/2021) (tamarm, ). (Entered: 08/21/2021) |
| 08/25/2021 | 287 | NOTICE by Martin J. Walsh re 1 Complaint *of Filing Tenth Revised Schedule A* (Attachments: # 1 Exhibit Schedule A)(Lewis, Ryma) (Entered: 08/25/2021) |
| 08/26/2021 | 292 | MOTION to Quash *Defendants' Subpoena for Wage and Hour Investigator Alvaro Mazuera* by Martin J. Walsh. (Attachments: # 1 Proposed Order to Quash WHI Mazuera Subpoena)(Lewis, Ryma) (Entered: 08/26/2021) |
| 08/26/2021 | 293 | Memorandum in Support re 292 MOTION to Quash *Defendants' Subpoena for Wage and Hour Investigator Alvaro Mazuera* filed by Martin J. Walsh. (Lewis, Ryma) (Entered: 08/26/2021) |
| 08/26/2021 | 294 | NOTICE by Martin J. Walsh re 261 Pretrial Order *of Substitution of the Wage and Hour Investigator Alvaro Mazuera* (Lewis, Ryma) (Entered: 08/26/2021) |

| 08/26/2021 | 295 | Pretrial Statement (Exhibits and Witness Lists) by Martin J. Walsh. (Lewis, Ryma) (Entered: 08/26/2021) |
| 08/27/2021 | 297 | Response to 283 Pretrial Statement (Exhibits and Witness Lists) filed by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts. (Siegrist, Aaron) (Entered: 08/27/2021) |
| 08/27/2021 | 298 | Response to 294 NOTICE filed by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts. (Siegrist, Aaron) (Entered: 08/27/2021) |
| 08/27/2021 | 299 | RESPONSE to Motion re 292 MOTION to Quash *Defendants' Subpoena for Wage and Hour Investigator Alvaro Mazuera* filed by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts. (Siegrist, Aaron) (Entered: 08/27/2021) |
| 08/30/2021 | 300 | ORDER granting 286 Motion to Withdraw as Attorney. Attorney Christopher D. Davis terminated. Signed by District Judge Raymond A. Jackson on 8/30/2021. (tamarm, ) (Entered: 08/30/2021) |
| 08/31/2021 | 301 | BENCH TRIAL (Day #1) before District Judge Raymond A. Jackson held on 8/31/2021. Attorneys Ryma Lewis, Mohamed Seifeldein and Chervonti Jones appeared on behalf of the plaintiff. Attorneys Julia Rust and Joshua Jewett appeared on behalf of the defendants. Defendant Lisa Pitts present. Opening statements heard. Plaintiff presented evidence - witnesses sworn and testified. Exhibits admitted. Objections heard and rulings made on the record. Court adjourned until Wednesday, September 1, 2021 at 1:00 p.m. (Court Reporter Jody Stewart, OCR.)(ptom, ) (Main Document 301 replaced on 9/3/2021) (ptom, ). (Entered: 09/01/2021) |
| 08/31/2021 | | Set Hearings: Bench Trial continued to 9/1/2021 at 01:00 PM in Norfolk Courtroom 4 before District Judge Raymond A. Jackson. (ptom, ) (Entered: 09/01/2021) |
| 09/01/2021 | 302 | BENCH TRIAL (Day #2) before District Judge Raymond A. Jackson held on 9/1/2021. Court and counsel appeared pursuant to adjournment last evening. Plaintiff continued presentation of evidence - witnesses sworn and testified. Exhibits admitted. Objections heard and rulings made on the record. Court advises the parties of the procedure for witnesses that do not show up pursuant to a subpoena. Bench Trial continued to 9/2/2021 at 10:00 AM in Norfolk Courtroom 4 before District Judge Raymond A. Jackson. (Court Reporter Carol Naughton, OCR.) (Court Hours: 1:00 - 4:50)(ptom, ) (Main Document 302 replaced on 9/3/2021) (ptom, ). (Entered: 09/02/2021) |
| 09/02/2021 | 303 | NOTICE by Martin J. Walsh *Offer of Proof - Employee Witnesses* (Lewis, Ryma) (Entered: 09/02/2021) |
| 09/02/2021 | 304 | BENCH TRIAL (Day #3) before District Judge Raymond A. Jackson held on 9/2/2021. Court and counsel appeared pursuant to adjournment last evening. Plaintiff continued presentation of evidence - witnesses sworn and testified. Exhibits admitted. Objections heard and rulings made on the record. Court adjourned until Friday, September 3, 2021 at 10:00 a.m. Bench Trial continued to 9/3/2021 at 10:00 AM in Norfolk Courtroom 4 before District Judge Raymond A. Jackson. (Court Reporter Carol Naughton, OCR.) (Court Hours: 10:00 - 5:05) (Lunch: 12:50 - 2:25)(ptom, ) (Entered: 09/03/2021) |

**JA34**

| | | |
|---|---|---|
| 09/03/2021 | 305 | BENCH TRIAL (Day #4) before District Judge Raymond A. Jackson held on 9/3/2021. Court and counsel appeared pursuant to adjournment last evening. Plaintiff continued presentation of evidence - witnesses sworn and testified. Exhibits admitted. Objections heard and rulings made on the record. Plaintiff rests. Court adjourned until Tuesday, September 7, 2021 at 10:00 a.m. Bench Trial continued to 9/7/2021 at 10:00 AM in Norfolk Courtroom 4 before District Judge Raymond A. Jackson. (Court Reporter Carol Naughton, OCR.) (ptom, ) (Entered: 09/03/2021) |
| 09/06/2021 | 306 | NOTICE by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts re 261 Pretrial Order *Supplement Regarding Designations of Investigator Alvaro Mazuera's Deposition* (Siegrist, Aaron) (Entered: 09/06/2021) |
| 09/06/2021 | 307 | NOTICE by Martin J. Walsh re 297 Response, 306 NOTICE *of Filing Objections to Defendants' Deposition Designations and Plaintiff's Counter-Designation* (Attachments: # 1 Exhibit A)(Lewis, Ryma) (Entered: 09/06/2021) |
| 09/06/2021 | 308 | Memorandum *in Further Support of Injunctive Relief* filed by Martin J. Walsh. (Lewis, Ryma) (Entered: 09/06/2021) |
| 09/07/2021 | 309 | BENCH TRIAL (Day #5) before District Judge Raymond A. Jackson held on 9/7/2021. Attorneys Ryma Lewis, Mohamed Seifeldein, and Chervonti Jones appeared on behalf of the plaintiff. Attorneys Julia Rust, Joshua Jewett, and Aaron Siegrist appeared on behalf of the defendants. Defendants presented evidence witnesses sworn and testified. Exhibits admitted. Objections heard and rulings made on the record. Court adjourned until Wednesday, September 8, 2021 at 10:00 a.m. Bench Trial continued to 9/8/2021 at 10:00 AM in Norfolk Courtroom 4 before District Judge Raymond A. Jackson. (Court Reporter Carol Naughton, OCR (a.m.) / Paul McManus, OCR (p.m.) )(ptom, ) (Entered: 09/08/2021) |
| 09/08/2021 | 310 | BENCH TRIAL (Day #6) before District Judge Raymond A. Jackson held on 9/8/2021. Court and counsel appeared pursuant to adjournment last evening. Defendants continued presentation of evidence - witnesses sworn and testified. Exhibits admitted. Objections heard and rulings made on the record. Court adjourned until Thursday, September 9, 2021 at 10:00 a.m. Bench Trial continued to 9/9/2021 at 10:00 AM in Norfolk Courtroom 4 before District Judge Raymond A. Jackson. (Court Reporter Carol Naughton, OCR.)(ptom, ) (Main Document 310 replaced on 9/9/2021) (ptom, ). (Entered: 09/09/2021) |
| 09/09/2021 | 311 | Bench Trial (Day #7) before District Judge Raymond A. Jackson completed on 9/9/2021. Court and counsel appeared pursuant to adjournment last evening. Defendants continued presentation of evidence - witness sworn and testified.Exhibits admitted. Objections heard and rulings made on the record. Defendants rest. Court DIRECTS parties to order the transcript and to file a supplemental proposed finding or fact and conclusions of law, no more than 30 pages, within 30 days of the filing of the transcripts. (Court Reporter Carol Naughton, OCR.)(ptom, ) (Main Document 311 replaced on 9/9/2021) (ptom, ). (Additional attachment(s) added on 9/9/2021: # 1 Witness List, # 2 Exhibit List) (ptom, ). (Entered: 09/09/2021) |
| 10/04/2021 | 312 | TRANSCRIPT of proceedings (Day 1 of Trial) held on 8-31-2021, before Judge Raymond A. Jackson, Court Reporter/Transcriber Jody Stewart, Telephone number 757-222-7071. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made** |

| | | |
|---|---|---|
| | | remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 11/3/2021. Redacted Transcript Deadline set for 12/6/2021. Release of Transcript Restriction set for 1/3/2022.(stewart, jody) (Entered: 10/04/2021) |
| 10/04/2021 | 313 | TRANSCRIPT of proceedings (Bench Trial - Day 2) held on 09-01-2021, before Judge Raymond A. Jackson, Court Reporter/Transcriber Carol Naughton, Telephone number,757-222-7073. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 11/3/2021. Redacted Transcript Deadline set for 12/6/2021. Release of Transcript Restriction set for 1/3/2022.(naughton, carol) (Entered: 10/04/2021)** |
| 10/04/2021 | 314 | TRANSCRIPT of proceedings (Bench Trial - Day 3) held on 09-02-2021, before Judge Raymond A. Jackson, Court Reporter/Transcriber Carol Naughton, Telephone number,757-222-7073. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 11/3/2021. Redacted Transcript Deadline set for 12/6/2021. Release of Transcript Restriction set for 1/3/2022.(naughton, carol) (Entered: 10/04/2021)** |
| 10/04/2021 | 315 | TRANSCRIPT of proceedings (Bench Trial - Day 4) held on 09-03-2021, before Judge Raymond A. Jackson, Court Reporter/Transcriber Carol Naughton, Telephone number,757-222-7073. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 11/3/2021. Redacted Transcript Deadline set for 12/6/2021. Release of Transcript Restriction set for 1/3/2022.(naughton, carol) (Entered: 10/04/2021)** |
| 10/04/2021 | 316 | TRANSCRIPT of proceedings (Bench Trial - Day 5 - Morning Session) held on 09-07-2021, before Judge Raymond A. Jackson, Court Reporter/Transcriber Carol Naughton, Telephone number,757-222-7073. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public** |

**JA36**

| | | |
|---|---|---|
| | | without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 11/3/2021. Redacted Transcript Deadline set for 12/6/2021. Release of Transcript Restriction set for 1/3/2022.(naughton, carol) (Entered: 10/04/2021) |
| 10/04/2021 | 317 | TRANSCRIPT of Bench Trial Proceedings held on 09/07/2021, Afternoon Session, before Judge Raymond A. Jackson, Court Reporter/Transcriber Paul McManus, Telephone number 757-222-7077. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 11/3/2021. Redacted Transcript Deadline set for 12/6/2021. Release of Transcript Restriction set for 1/3/2022.(mcmanus, paul) (Entered: 10/04/2021)** |
| 10/04/2021 | 318 | TRANSCRIPT of proceedings (Bench Trial - Day 6) held on 09-08-2021, before Judge Raymond A. Jackson, Court Reporter/Transcriber Carol Naughton, Telephone number,757-222-7073. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 11/3/2021. Redacted Transcript Deadline set for 12/6/2021. Release of Transcript Restriction set for 1/3/2022.(naughton, carol) (Entered: 10/04/2021)** |
| 10/04/2021 | 319 | TRANSCRIPT of proceedings (Bench Trial - Day 7) held on 09-09-2021, before Judge Raymond A. Jackson, Court Reporter/Transcriber Carol Naughton, Telephone number,757-222-7073. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 11/3/2021. Redacted Transcript Deadline set for 12/6/2021. Release of Transcript Restriction set for 1/3/2022.(naughton, carol) (Entered: 10/04/2021)** |
| 10/27/2021 | 320 | Subpoena(s) Returned (tamarm, ) (Entered: 10/28/2021) |
| 11/03/2021 | 321 | Proposed Findings of Fact by Martin J. Walsh. (Lewis, Ryma) (Entered: 11/03/2021) |

| | | |
|---|---|---|
| 11/03/2021 | 322 | Proposed Findings of Fact by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts. (Jewett, Joshua) (Entered: 11/03/2021) |
| 12/22/2021 | 323 | ORDER finding as moot 292 Motion to Quash. Additionally, any issues regarding Zira Technologies are moot. Signed by District Judge Raymond A. Jackson on December 22, 2021. (Entered: 12/22/2021) |
| 01/14/2022 | 324 | MEMORANDUM OPINION AND ORDER - the Court FINDS Defendant liable for failing to pay overtime and maintain pay records in accordance with the FLSA. Accordingly, JUDGMENT IS ENTERED FOR PLAINTIFF, and Defendants are ENJOINED from committing further violations of the FLSA. Plaintiff is ORDERED to provide the Court with an updated calculation of back pay and liquidated damages within 60 days of the date of this opinion. Defendants are ORDERED to cooperate with Plaintiff by providing Plaintiff with all information necessary for compliance with this order. Signed by District Judge Raymond A. Jackson on 1/13/2022. (tamarm, ) (Entered: 01/14/2022) |
| 01/14/2022 | 325 | JUDGMENT ENTERED FOR PLAINTIFF and Defendants are ENJOINED from committing further violations of the FLSA. Signed by Clerk on 1/14/2022. (tamarm, ) (Entered: 01/14/2022) |
| 01/31/2022 | 326 | MOTION to Withdraw as Attorney by Medical Staffing of America, LLC, Lisa Ann Pitts. (Siegrist, Aaron) (Entered: 01/31/2022) |
| 02/01/2022 | | Notice of Correction re 326 MOTION to Withdraw as Attorney. A brief is required to be filed according to Local Rule 7(f). Also, please attach a Proposed Order to the brief for the Court's consideration. (tamarm, ) (Entered: 02/01/2022) |
| 02/09/2022 | 327 | MOTION to Withdraw as Attorney by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts. (Attachments: # 1 Proposed Order Exhibit 1)(Siegrist, Aaron) (Entered: 02/09/2022) |
| 02/11/2022 | 328 | ORDER granting 327 Motion to Withdraw as Attorney. Attorney Aaron Daniel Siegrist terminated. Signed by District Judge Raymond A. Jackson on 2/11/2022. (tamarm, ) (Entered: 02/11/2022) |
| 03/11/2022 | 329 | NOTICE by Martin J. Walsh re 324 Memorandum Opinion,, *Updated Back Wage Computations* (Attachments: # 1 Exhibit A)(Lewis, Ryma) (Entered: 03/11/2022) |
| 03/13/2022 | 330 | NOTICE of Appearance by Abram John Pafford on behalf of Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts (Pafford, Abram) (Entered: 03/13/2022) |
| 03/13/2022 | 331 | MOTION for Relief in Connection with Plaintiff's Trial Exhibit PX-21 errors and time to review ECF No. 329 & ECF 329-1 by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Exhibit Steadfast March 6 letter to DOL, # 3 Exhibit Attachment A to March 6 letter, # 4 Exhibit Attachment B to March 6 letter, # 5 Exhibit Attachment 6 to March 6 letter, # 6 Exhibit March 8-10 counsel email exchange, # 7 Exhibit W-2 employee corrections, # 8 Exhibit Sample packets re: PX-21 errors)(Pafford, Abram) Modified text on 3/15/2022 (tamarm, ). (Entered: 03/13/2022) |
| 03/14/2022 | 332 | NOTICE OF APPEAL as to 325 Judgment, 324 Memorandum Opinion,, by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa |

**JA38**

| | | |
|---|---|---|
| | | Ann Pitts. Filing fee $ 505, receipt number AVAEDC-8290417. (Rust, Julia) (Entered: 03/14/2022) |
| 03/16/2022 | 333 | Transmission of Notice of Appeal to US Court of Appeals re 332 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (tamarm, ) (Entered: 03/16/2022) |
| 03/17/2022 | 334 | USCA Case Number 22-1290; Case Manager Kirsten Hancock for 332 Notice of Appeal filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (tamarm, ) (Entered: 03/18/2022) |
| 03/28/2022 | 335 | Opposition to 331 MOTION Correction of PX-21 errors and time to review ECF No. 329 & ECF 329-1 filed by Martin J. Walsh. (Attachments: # 1 Proposed Order)(Lewis, Ryma) (Entered: 03/28/2022) |
| 04/01/2022 | 341 | Transcript Order Acknowledgment from USCA re 332 Notice of Appeal : Court Reporter/Transcriber Jody Stewart; Status Conference 05/21/2019, Motion Hearing: 05/08/2020; deadline 06/07/2022.(22-1290) (epri, ) (Entered: 04/12/2022) |
| 04/04/2022 | 336 | NOTICE of Appearance by V. Kathleen Dougherty on behalf of Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts (Dougherty, V.) (Entered: 04/04/2022) |
| 04/04/2022 | 337 | REPLY to Response to Motion re 331 MOTION Correction of PX-21 errors and time to review ECF No. 329 & ECF 329-1 filed by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Pafford, Abram) (Entered: 04/04/2022) |
| 04/07/2022 | 338 | NOTICE by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts re 331 MOTION Correction of PX-21 errors and time to review ECF No. 329 & ECF 329-1 *Notice of Filing of Oversized Exhibit* (Attachments: # 1 Attachment A - Letter, # 2 Attachment - 338-2 Slip Sheet)(Pafford, Abram) (Entered: 04/07/2022) |
| 04/07/2022 | 339 | Letter from Abram Pafford enclosing flash drive re 338 Notice of Filing of Oversized Exhibit [338-2] (Attachments: # 1 Enclosure)(tamarm, ) (Entered: 04/08/2022) |
| 04/08/2022 | 340 | ORDER deferring ruling on 331 Motion for Relief in Connection with Plaintiff's Trial Exhibit PX-21. On March 14, 2022, the Defendant appealed the Judgment in this case to the United States Court of Appeals for the Fourth Circuit. The Court finds it in the interest of judicial economy to defer action on this motion until the Fourth Circuit responds to the Notice of Appeal. Signed by District Judge Raymond A. Jackson on April 8, 2022. (Jackson, Raymond) (Entered: 04/08/2022) |
| 04/12/2022 | 342 | Request for Hearing by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts re 331 MOTION Correction of PX-21 errors and time to review ECF No. 329 & ECF 329-1 (Pafford, Abram) (Entered: 04/12/2022) |
| 04/20/2022 | 343 | Objection to 342 Request for Hearing, filed by Martin J. Walsh. (Seifeldein, Mohamed) (Entered: 04/20/2022) |
| 06/06/2022 | 344 | TRANSCRIPT of proceedings for dates of 5-21-2019, before Judge Rebecca Beach Smith, re 332 Notice of Appeal, 341 Transcript Order Acknowledgment from USCA, 333 Transmission of Notice of Appeal to 4CCA, 334 USCA Case Number Court |

**JA39**

| | | |
|---|---|---|
| | | Reporter/Transcriber Jody Stewart, Telephone number 757-222-7071. **NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov.** *Does this satisfy all appellate orders for this reporter? n* **Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 7/6/2022. Redacted Transcript Deadline set for 8/8/2022. Release of Transcript Restriction set for 9/5/2022.(stewart, jody) (Entered: 06/06/2022)** |
| 06/06/2022 | 345 | TRANSCRIPT of proceedings for dates of 5-8-2020, before Judge Rebecca Beach Smith, re 332 Notice of Appeal, 341 Transcript Order Acknowledgment from USCA, 333 Transmission of Notice of Appeal to 4CCA, 334 USCA Case Number, 344 Appeal Transcript,,,, Court Reporter/Transcriber Jody Stewart, Telephone number 757-222-7071. **NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov.** *Does this satisfy all appellate orders for this reporter? y* **Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 7/6/2022. Redacted Transcript Deadline set for 8/8/2022. Release of Transcript Restriction set for 9/5/2022. (stewart, jody) (Entered: 06/06/2022)** |
| 07/14/2022 | 346 | MOTION for Entry of Updated Order re 324 Memorandum Opinion,, by Martin J. Walsh. (Attachments: # 1 Proposed Order Proposed Order)(Lewis, Ryma) (Entered: 07/14/2022) |
| 07/14/2022 | 347 | Memorandum in Support re 346 MOTION for Entry of Updated Order re 324 Memorandum Opinion,, filed by Martin J. Walsh. (Lewis, Ryma) (Entered: 07/14/2022) |
| 07/28/2022 | 348 | MOTION for Bond by Martin J. Walsh. (Attachments: # 1 Proposed Order Bond)(Lewis, Ryma) (Entered: 07/28/2022) |
| 07/28/2022 | 349 | Memorandum in Support re 348 MOTION for Bond filed by Martin J. Walsh. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Lewis, Ryma) (Entered: 07/28/2022) |
| 07/28/2022 | 350 | Memorandum in Opposition re 346 MOTION for Entry of Updated Order re 324 Memorandum Opinion,, filed by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts. (Attachments: # 1 Exhibit 1 (July 28 letter to DOL))(Pafford, Abram) (Entered: 07/28/2022) |
| 08/05/2022 | 351 | REPLY to Response to Motion re 346 MOTION for Entry of Updated Order re 324 Memorandum Opinion,, filed by Martin J. Walsh. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Lewis, Ryma) (Entered: 08/05/2022) |
| 08/05/2022 | 352 | MOTION to File Out of Time re 351 Reply to Response to Motion by Martin J. Walsh. (Attachments: # 1 Proposed Order to file Reply Brief Out of Time)(Lewis, Ryma) |

**JA40**

| | | |
|---|---|---|
| | | (Entered: 08/05/2022) |
| 08/05/2022 | 353 | Memorandum in Support re 352 MOTION to File Out of Time re 351 Reply to Response to Motion filed by Martin J. Walsh. (Lewis, Ryma) (Entered: 08/05/2022) |
| 08/08/2022 | | MOTION REFERRED to Magistrate Judge Lawrence R. Leonard: 352 MOTION to File Out of Time re 351 Reply to Response to Motion (bpet, ) (Entered: 08/08/2022) |
| 08/09/2022 | 354 | ORDER granting 352 Motion to File Out of Time. Plaintiff's 351 Reply brief is deemed timely filed. Signed by Magistrate Judge Lawrence R. Leonard on 8/9/22. (bpet, ) (Entered: 08/09/2022) |
| 08/11/2022 | 355 | RESPONSE in Opposition re 348 MOTION for Bond filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Pafford, Abram) (Entered: 08/11/2022) |
| 08/17/2022 | 356 | NOTICE by Medical Staffing of America, LLC, Lisa Ann Pitts re 332 Notice of Appeal, 311 Bench Trial - Completed,, *Consent Notice of Filing of Certain Exhibits for Purposes of Appeal* (Attachments: # 1 Alvaro Mazuera Deposition Transcript, # 2 Zira Technologies 30(b)(6) Deposition Transcript, # 3 Exhibit PX-10, # 4 Exhibit PX-11, # 5 Exhibit PX-12, # 6 Exhibit PX-16, # 7 Exhibit PX-25, # 8 Exhibit PX-26, # 9 Exhibit PX-37, # 10 Exhibit DX-41, # 11 Exhibit DX-42, # 12 Exhibit DX-44, # 13 Exhibit DX-46)(Pafford, Abram) (Entered: 08/17/2022) |
| 08/17/2022 | 357 | REPLY in Support re 348 MOTION for Bond filed by Martin J. Walsh. (Lewis, Ryma) Modified text from "Response" to "Reply" on 8/17/2022 (bpet, ) (Entered: 08/17/2022) |
| 08/17/2022 | 358 | NOTICE by Martin J. Walsh re 357 Response in Support of Motion *of Filing Exhibit A* (Attachments: # 1 Exhibit A)(Lewis, Ryma) (Entered: 08/17/2022) |
| 10/10/2022 | 359 | MOTION to Withdraw as Attorney by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts. (Attachments: # 1 Proposed Order to Withdraw)(Rust, Julia) (Entered: 10/10/2022) |
| 10/13/2022 | 360 | ORDER granting 359 Motion to Withdraw as Attorney. Attorney Joshua Lee Jewett and Julia Amato Rust and the law firm of Pierce McCoy, PLLC are granted leave to withdraw as counsel of record for Defendants, Medical Staffing of America, LLC, d/b/a Steadfast Medical Staffing and Lisa Ann Pitts.. Signed by District Judge Raymond A. Jackson on 10/13/22. (lbax, ) (Entered: 10/13/2022) |
| 10/19/2022 | 361 | ORDER of USCA granting Motion to Withdraw filed by Joshua Lee Jewett and Julia Rust re 332 Notice of Appeal filed by Medical Staffing of America, LLC, Lisa Ann Pitts [22-1290] (dbra, ) (Entered: 10/19/2022) |
| 12/20/2022 | 362 | MEMORANDUM OPINION AND ORDER re ECF No. 348 Motion for Bond. Plaintiff's Motion is DENIED. Signed by District Judge Raymond A. Jackson on 12/20/2022. (dbra, ) (Entered: 12/20/2022) |
| 12/22/2022 | 363 | ORDER - Defendants are ORDERED to SHOW CAUSE within thirty days as to whether they should be sanctioned for allegedly continuing to violate the Court's January 14, 2022 Order. Signed by District Judge Raymond A. Jackson on 12/22/2022. (dbra, ) (Entered: 12/22/2022) |
| 01/23/2023 | 364 | Response to 363 Order to Show Cause filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Attachments: # 1 Exhibit 1)(Pafford, Abram) (Entered: 01/23/2023) |

| | | |
|---|---|---|
| 01/24/2023 | | Notice of Correction re 364 The address on the document does not match the filings user's account in CM/ECF. The filing user has been notified to update their account information via PACER. (Vpea) (Entered: 01/24/2023) |
| 02/06/2023 | 365 | Response to 364 Response *TO DEFENDANTS RESPONSE TO THE COURTS DECEMBER 22, 2022 SHOW CAUSE ORDER* filed by Martin J. Walsh. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Seifeldein, Mohamed) (Entered: 02/06/2023) |
| 02/15/2023 | | Set Hearings: Show Cause Hearing set for 3/2/2023 12:00 PM in Norfolk Mag Courtroom 1 before District Judge Raymond A. Jackson. (ptom, ) (Entered: 02/15/2023) |
| 02/22/2023 | 366 | MOTION for Leave to File *Reply* by Medical Staffing of America, LLC, Lisa Ann Pitts. (Pafford, Abram) (Entered: 02/22/2023) |
| 02/22/2023 | 367 | Memorandum in Support re 366 MOTION for Leave to File *Reply* filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Attachments: # 1 Exhibit A)(Pafford, Abram) (Entered: 02/22/2023) |
| 02/28/2023 | 368 | Memorandum in Opposition re 366 MOTION for Leave to File *Reply* filed by Martin J. Walsh. (Attachments: # 1 Proposed Order)(Seifeldein, Mohamed) (Entered: 02/28/2023) |
| 03/01/2023 | 369 | NOTICE of Appearance by Robert William McFarland on behalf of Medical Staffing of America, LLC, Lisa Ann Pitts (McFarland, Robert) (Entered: 03/01/2023) |
| 03/02/2023 | 370 | Show Cause Hearing before District Judge Raymond A. Jackson held on 3/2/2023. Attorneys Mohamed Seifeldein and Chervonti Jones appeared on behalf of the plaintiff. Attorneys Kathleen Dougherty, Abram Pafford, and Robert McFarland appeared on behalf of the defendants. Comments of the Court. Arguments of counsel heard. Defendants to provide the auditors complete final report to the Plaintiff and file with the court within 14 days. The Plaintiff shall file a response 14 days thereafter. Court GRANTS Defendants 366 Motion for leave to file a reply. Court will issue an order as to contempt after receipt of the report and response. Court adjourned. (Court Reporter Carol Naughton, OCR.)(ptom, ) (Entered: 03/02/2023) |
| 03/02/2023 | | ORAL ORDER GRANTING 366 Motion for Leave to File a Reply. Entered by District Judge Raymond A. Jackson on 3/2/23. (ptom, ) (Entered: 03/02/2023) |
| 03/03/2023 | 371 | TRANSCRIPT of proceedings (Show Cause Hearing) held on 03-02-23, before Judge Raymond A. Jackson, Court Reporter/Transcriber Carol Naughton, Telephone number, 757-222-7073. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 4/3/2023. Redacted Transcript Deadline set for 5/3/2023. Release of Transcript Restriction set for 6/1/2023.(naughton, carol) (Entered: 03/03/2023)** |

| 03/13/2023 | 372 | Reply to 364 Response *(Pursuant to March 2, 2023 Oral Order Granting 366 Motion for Leave to File a Reply)* filed by Medical Staffing of America, LLC, Medical Staffing of America, LLC, Lisa Ann Pitts, Lisa Ann Pitts. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Pafford, Abram) (Entered: 03/13/2023) |
| --- | --- | --- |
| 03/14/2023 | 373 | Consent MOTION for Extension *of Time to File Auditor Reports* by Medical Staffing of America, LLC. (Attachments: # 1 Proposed Order)(McFarland, Robert) (Entered: 03/14/2023) |
| 03/15/2023 | 374 | ORDER GRANTING 373 Motion for Extension of Time to File Auditor Reports. It is ORDERED that Defendants' auditor's report shall be provided to Plaintiff and filed with the Court on or before March 23, 2023, and is further ORDERED that Plaintiff's response will be filed on or before 4/13/23. Signed by District Judge Raymond A. Jackson & filed on 3/15/23. (ptom, ) (Main Document 374 replaced on 3/15/2023) (ptom, ). (Main Document 374 replaced on 3/15/2023) (ptom, ). (Entered: 03/15/2023) |
| 03/23/2023 | 375 | STRICKEN ON 4/27/23 PURSUANT TO ORDER AT ECF 384 EXCEPT THE AUDITOR'S REPORT AT ECF [375-1] NOTICE by Medical Staffing of America, LLC re 363 Order to Show Cause, 370 Show Cause Hearing,, (Attachments: # 1 Exhibit A - Auditor's Report, # 2 Exhibit B - Show Cause Hearing Transcript) (McFarland, Robert) Modified Text on 4/27/2023 (afar). (Entered: 03/23/2023) |
| 04/05/2023 | 376 | MOTION to Strike 375 NOTICE *Defendants' Second Unauthorized Surreply* by U.S. Department of Labor. (Attachments: # 1 Proposed Order)(Seifeldein, Mohamed) (Entered: 04/05/2023) |
| 04/05/2023 | 377 | Memorandum in Support re 376 MOTION to Strike 375 NOTICE *Defendants' Second Unauthorized Surreply* filed by U.S. Department of Labor. (Seifeldein, Mohamed) (Entered: 04/05/2023) |
| 04/11/2023 | 378 | Consent MOTION for Extension *of time* by U.S. Department of Labor. (Attachments: # 1 Proposed Order)(Seifeldein, Mohamed) (Entered: 04/11/2023) |
| 04/12/2023 | 379 | ORDER granting for good cause shown 378 Motion for Extension of Time to File Plaintiff's back wages update report until April 20, 2023. Signed by District Judge Raymond A. Jackson on April 12, 2023. (Entered: 04/12/2023) |
| 04/19/2023 | 380 | RESPONSE in Opposition re 376 MOTION to Strike 375 NOTICE *Defendants' Second Unauthorized Surreply* filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Attachments: # 1 Exhibit 1)(McFarland, Robert) (Entered: 04/19/2023) |
| 04/20/2023 | 381 | NOTICE by Medical Staffing of America, LLC, Lisa Ann Pitts re 375 NOTICE *of Modification of Defendants' Auditor's Report (Agreed)* (McFarland, Robert) (Entered: 04/20/2023) |
| 04/20/2023 | 382 | NOTICE by U.S. Department of Labor *SECOND UPDATED BACK WAGE COMPUTATIONS NOTICE* (Attachments: # 1 Exhibit)(Seifeldein, Mohamed) (Entered: 04/20/2023) |
| 04/25/2023 | 383 | REPLY to Response to Motion re 376 MOTION to Strike 375 NOTICE *Defendants' Second Unauthorized Surreply* filed by U.S. Department of Labor. (Seifeldein, Mohamed) (Entered: 04/25/2023) |

**JA43**

| | | |
|---|---|---|
| 04/27/2023 | 384 | ORDER: The Court STRIKES Defendants' Notice of Submission ECF 375 except the Auditor's report ECF [375-1]. Signed by District Judge Raymond A. Jackson on 4/26/2023. (afar) (Entered: 04/27/2023) |
| 05/12/2023 | 385 | MOTION to Strike *Plaintiff's Claim for Liquidated Damages* by Medical Staffing of America, LLC, Lisa Ann Pitts. (McFarland, Robert) (Entered: 05/12/2023) |
| 05/12/2023 | 386 | Memorandum in Support re 385 MOTION to Strike *Plaintiff's Claim for Liquidated Damages* filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (McFarland, Robert) (Entered: 05/12/2023) |
| 05/26/2023 | 387 | Memorandum in Opposition re 385 MOTION to Strike *Plaintiff's Claim for Liquidated Damages* filed by U.S. Department of Labor. (Seifeldein, Mohamed) (Entered: 05/26/2023) |
| 05/31/2023 | 389 | Unpublished Authored Opinion of USCA re 332 Notice of Appeal [22-1290](Vpea) (Entered: 06/05/2023) |
| 05/31/2023 | 390 | USCA JUDGMENT as to 332 Notice of Appeal filed by Medical Staffing of America, LLC, Lisa Ann Pitts. In accordance with the decision of this court, the judgment of the district court is vacated. This case is remanded to the district court for further proceedings consistent with the court's decision.This judgment shall take effect upon issuance of this court's mandate in accordance with Fed. R. App. P. 41. (Vpea) (Entered: 06/05/2023) |
| 06/01/2023 | 388 | REPLY to Response to Motion re 385 MOTION to Strike *Plaintiff's Claim for Liquidated Damages* filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (McFarland, Robert) (Entered: 06/01/2023) |
| 06/20/2023 | 391 | ORDER: The Court ORDERS both parties in the above-styled case to file supplemental briefs regarding Plaintiff's entitlement to injunctive relief under the four-factor test outlined in eBay Inc. v. MercExchange, LLC, 547 U.S. 388 (2006). The parties shall file these memoranda within THIRTY (30) DAYS of this Order. Signed by District Judge Raymond A. Jackson on 6/20/2023. (afar) (Entered: 06/20/2023) |
| 07/20/2023 | 392 | Memorandum *Supplemental Brief Regarding Injunctive Relief* to 391 Order, filed by Medical Staffing of America, LLC. (Pafford, Abram) (Entered: 07/20/2023) |
| 07/20/2023 | 393 | Memorandum *SUPPLEMENTAL BRIEF REGARDING INJUNCTIVE RELIEF* to 391 Order, filed by U.S. Department of Labor. (Seifeldein, Mohamed) (Entered: 07/20/2023) |
| 07/24/2023 | 394 | USCA Mandate re 332 Notice of Appeal. The judgment of the court, entered May 31, 2023, takes effect today. This constitutes the formal mandate of this court. (22-1290) (epri, ) (Entered: 07/25/2023) |
| 09/07/2023 | 395 | ORDER- Plaintiff's Motion is GRANTED. The Court finds that a permanent injunction is needed to prevent continued violations of the Act. See Order for details. Copies distributed as directed. Signed by District Judge Raymond A. Jackson on 9/7/2023. (Vpea) (Entered: 09/07/2023) |
| 10/01/2023 | 396 | First MOTION FOR AN UPDATED ORDER AND FINAL JUDGMENT by U.S. Department of Labor. (Attachments: # 1 Proposed Order)(Seifeldein, Mohamed) (Entered: 10/01/2023) |

**JA44**

| | | |
|---|---|---|
| 10/01/2023 | 397 | Memorandum in Support re 396 First MOTION FOR AN UPDATED ORDER AND FINAL JUDGMENT filed by U.S. Department of Labor. (Seifeldein, Mohamed) (Entered: 10/01/2023) |
| 10/09/2023 | 398 | First MOTION for Extension of Time to File Response/Reply as to 396 First MOTION FOR AN UPDATED ORDER AND FINAL JUDGMENT by Medical Staffing of America, LLC. (Attachments: # 1 Exhibit A (Oct. 5-6 emails w/DOL)) (Pafford, Abram) (Entered: 10/09/2023) |
| 10/11/2023 | 399 | ORDER taking under advisement 398 Motion for Extension of Time to File Response/Reply re 398 First MOTION for Extension of Time to File Response/Reply as to 396 First MOTION FOR AN UPDATED ORDER AND FINAL JUDGMENT . As requested in the Motion 398 , the court grants an expedited briefing schedule to resolve the request for extension. The Department of Labor shall file any brief opposing the extension request by 5pm on October 12. No reply is necessary, and the court will resolve the request for extension by gavel order on October 13. Signed by Magistrate Judge Douglas E. Miller on October 11, 2023. (Miller, Douglas) (Entered: 10/11/2023) |
| 10/12/2023 | 400 | Opposition to 398 First MOTION for Extension of Time to File Response/Reply as to 396 First MOTION FOR AN UPDATED ORDER AND FINAL JUDGMENT filed by U.S. Department of Labor. (Seifeldein, Mohamed) (Entered: 10/12/2023) |
| 10/13/2023 | 401 | ORDER granting in part and denying in part 398 Motion for Extension of Time to File Response/Reply re 398 First MOTION for Extension of Time to File Response/Reply as to 396 First MOTION FOR AN UPDATED ORDER AND FINAL JUDGMENT . Defendant's response to the Motion for an Updated Order and Final Judgment 396 shall be due on October 19, 2023. Any reply shall be filed no later than October 29, 2023. Signed by Magistrate Judge Douglas E. Miller on October 13, 2023. (Miller, Douglas) (Entered: 10/13/2023) |
| 10/19/2023 | 402 | RESPONSE in Opposition re 396 First MOTION FOR AN UPDATED ORDER AND FINAL JUDGMENT filed by Medical Staffing of America, LLC. (Attachments: # 1 Exhibit 1 (MSA Aug. 19 2022 email to DOL))(Pafford, Abram) (Entered: 10/19/2023) |
| 10/30/2023 | 403 | REPLY to Response to Motion re 396 First MOTION FOR AN UPDATED ORDER AND FINAL JUDGMENT filed by U.S. Department of Labor. (Seifeldein, Mohamed) (Entered: 10/30/2023) |
| 11/03/2023 | 404 | NOTICE OF INTERLOCUTORY APPEAL as to 395 Order, by Medical Staffing of America, LLC, Lisa Ann Pitts. Filing fee $ 505, receipt number AVAEDC-9204465. (Pafford, Abram) (Entered: 11/03/2023) |
| 11/03/2023 | 405 | Transmission of Notice of Appeal to US Court of Appeals re 404 Notice of Interlocutory Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (Attachments: # 1 Notice of Appeal)(Vpea) (Entered: 11/08/2023) |
| 11/16/2023 | 406 | USCA Case Number 23-2176 4CCA Case Manager Jeffrey S. Neal for 404 Notice of Interlocutory Appeal filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Vpea) (Entered: 11/16/2023) |
| 11/20/2023 | 407 | First MOTION to Withdraw as Attorney by U.S. Department of Labor. (Attachments: # 1 Proposed Order)(Seifeldein, Mohamed) (Entered: 11/20/2023) |

**JA45**

| 11/20/2023 | | Telephone Conference before District Judge Raymond A. Jackson held on 11/20/2023. (bap, ) (Entered: 11/21/2023) |
|---|---|---|
| 11/29/2023 | 408 | MEMORANDUM OPINION AND ORDER. The Court's Show Cause Order (ECF No. 363 ) is DISMISSED. Signed by District Judge Raymond A. Jackson on 11/29/23. (jhie, ) (Entered: 11/29/2023) |
| 11/29/2023 | 409 | ORDER granting 407 Motion to Withdraw as Attorney. it is so ORDERED, Upon consideration of Plaintiff's Motion to Withdraw the Appearance of Chervonti Jones and Ryma Lewis, the Court hereby GRANTS Plaintiffs Motion. Signed by District Judge Raymond A. Jackson on 11/29/2023. (Vpea) (Entered: 11/29/2023) |
| 11/30/2023 | 410 | ORDER re 385 MOTION to Strike *Plaintiff's Claim for Liquidated Damage.* IT IS SO ORDERED, Defendants' Motion to Strike is DENIED AND DISMISSED FOR MOOTNESS. (ECF No. 385). Copies distributed as directed 11/30/23. Signed by District Judge Raymond A. Jackson on 11/30/2023. (Vpea) (Entered: 11/30/2023) |
| 12/07/2023 | 411 | MEMORANDUM OPINION AND ORDER denying 331 MOTION for Relief in Connection with Plaintiff's Trial Exhibit PX-21. Signed by District Judge Raymond A. Jackson on 12/7/23. (jhie, ) (Entered: 12/07/2023) |
| 12/08/2023 | 412 | MEMORANDUM OPINION AND ORDER re 396 Motion for an Updated Order and Final Judgment. Plaintiff's Motion for an Updated Order and Final Judgment is GRANTED in part and DENIED in part, ECF No. 396. See Order for details. Copies distributed as directed 12/8/2023. Signed by District Judge Raymond A. Jackson on 12/8/2023. (Vpea) (Entered: 12/08/2023) |
| 12/11/2023 | 413 | AMENDED FINAL JUDGMENT- It is hereby ORDERED that, A total judgment of $9,346,663.23 in back wages and liquidated damages, with interest, be and is entered, jointly and severally, against Defendants Medical Staffing of America, LLC d/ b/a/ Steadfast Medical Staffing ("Steadfast") and Lisa Ann Pitts, in favor of the PLAINTIFF and against the DEFENDANTS under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 207. It is further ORDERED that Defendants Steadfast and Lisa Ann Pitts, its officers, agents, employees, and attorneys, and other persons who are in active conceit or participation with them are restrained and enjoined from future violations of the FLSA. See Order for Details. Copies distributed as directed 12/11/23. Signed by District Judge Raymond A. Jackson on 12/11/2023. (Vpea) (Entered: 12/11/2023) |
| 12/11/2023 | 414 | NOTICE by Medical Staffing of America, LLC, Lisa Ann Pitts re 412 Order on Motion for Miscellaneous Relief,,, *Notice of Appeal* (Pafford, Abram) (Entered: 12/11/2023) |
| 12/11/2023 | 415 | NOTICE OF APPEAL as to 413 Order,,, 412 Order on Motion for Miscellaneous Relief,,, by Medical Staffing of America, LLC, Lisa Ann Pitts. Filing fee $ 605, receipt number AVAEDC-9259686. (Pafford, Abram) (Entered: 12/11/2023) |
| 12/13/2023 | 416 | Transmission of Notice of Appeal to US Court of Appeals re 415 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (Attachments: # 1 Notice of Appeal)(Vpea) (Entered: 12/13/2023) |
| 12/13/2023 | 417 | USCA Case Number [23-2284] 4CCA Case Manager Jeffrey S. Neal for 415 Notice of Appeal filed by Medical Staffing of America, LLC, Lisa Ann Pitts. (Vpe) (Entered: 12/19/2023) |

**JA46**

| 12/19/2023 | 418 | ORDER of USCA as to 332 Notice of Appeal filed by Medical Staffing of America, LLC, Lisa Ann Pitts. The court consolidates Case No. 23-2176 and Case No. 23-2284. Entry of appearance forms and disclosure statements filed by counsel and parties to the lead case are deemed filed in the secondary case. [23-2284] (Vpea ) (Entered: 12/19/2023) |
|---|---|---|

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/30/2024 11:23:41 | | |
| **PACER Login:** lantagne92 | **Client Code:** | |
| **Description:** Docket Report | **Search Criteria:** | 2:18-cv-00226-RAJ-LRL |
| **Billable Pages:** 30 | **Cost:** | 3.00 |

**JA47**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| R. ALEXANDER ACOSTA, )<br>SECRETARY OF LABOR, )<br>UNITED STATES DEPARTMENT OF LABOR, )<br> )<br> Plaintiff, )<br> )<br> v. )<br> )<br>MEDICAL STAFFING OF AMERICA, LLC, a limited )<br>liability company,  d/b/a STEADFAST MEDICAL )<br>STAFFING, and LISA ANN PITTS, individually and as )<br>owner and officer of the aforementioned company, )<br> )<br> Defendants. )<br> ) | Civil Action No.   2:18cv226 |

**COMPLAINT**

Plaintiff, R. Alexander Acosta, Secretary of Labor, United States Department of Labor

("Plaintiff") brings this action to enjoin MEDICAL STAFFING OF AMERICA, LLC, a limited

liability company, d/b/a STEADFAST MEDICAL STAFFING, and LISA ANN PITTS,

individually and as an owner and officer of the aforementioned company (collectively,

"Defendants"), from violating the provisions of Sections 7, 11(c), 15(a)(2), and 15(a)(5) of the

Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201, *et seq.* ("the Act"), and for a

judgment against Defendants in the total amount of back wage compensation found by the Court

to be due to any of the employees of Defendants pursuant to the Act and an equal amount due to

the employees of Defendants in liquidated damages.

1.      Jurisdiction of this action is conferred upon the Court by Section 17 of the Act, 29

U.S.C. § 217, and by 28 U.S.C. §§ 1331 and 1345.

2.      Defendant MEDICAL STAFFING OF AMERICA, LLC, d/b/a STEADFAST

MEDICAL STAFFING ("Steadfast"), is a limited liability company duly organized under the

**JA48**

laws of the Commonwealth of Virginia, with a registered office at 5750 Chesapeake Boulevard, Norfolk, Virginia 23513. Defendant is engaged in a medical staffing services business at the same address, within the jurisdiction of this Court.

3.      Defendant Lisa Ann Pitts is the president and owner of the limited liability company identified in Paragraph II and resides at 488 Fieldstone Glen Way, Virginia Beach, Virginia 23454. Lisa Pitts has directed employment practices and has directly or indirectly acted in the interest of Steadfast in relation to their employees at all times relevant herein, including recruiting new workers; hiring and firing workers; negotiating with healthcare organizations; and determining the positions, schedules, and rates of pay available to those workers Steadfast retains. At all times relevant herein, Lisa Pitts has been responsible for making, keeping, and preserving records of Steadfast's workers, including accurately recording regular work hours and pay separately from overtime work hours and pay.

4.      The business activities of Defendants, as described herein, are and were related and performed through unified operation or common control for a common business purpose and constitute an enterprise within the meaning of Section 3(r) of the Act.

5.      At Steadfast, Defendants have employed and are employing employees in and about their places of business in the activities of an enterprise engaged in commerce or in the production of goods for commerce, including providing staffing services for businesses located across state lines. The enterprise has had an annual gross volume of sales made or business done in an amount not less than $500,000.00. Therefore, the employees of Steadfast are employed in an enterprise engaged in commerce or in the production of goods for commerce within the meaning of Section 3(s)(1)(A) of the Act.

6.      Defendants willfully violated the provisions of Sections 7 and 15(a)(2) of the Act by employing individuals, including certified nursing assistants ("CNAs"), licensed practical nurses ("LPNs"), and registered nurses ("RNs"), in an enterprise engaged in commerce for workweeks longer that those prescribed in Section 7 of the Act without compensating said individuals for employment in excess of the prescribed hours at rates not less than one and one-half times their regular rates. Therefore, Defendants are liable for the payment of unpaid overtime compensation and an equal amount of liquidated damages under Section 16(c) of the Act.

For example: During the period of August 18, 2015, through June 9, 2017 ("relevant period"), Defendants improperly classified individuals, including CNAs, LPNs, and RNs, as independent contractors and thereby failed to compensate those individuals who worked over 40 hours in a workweek one and one-half times their regular rate. Although many such individuals worked for more than 40 hours in a given week, these individuals did not receive time and one-half their regular rate for their overtime hours.

7.      Defendants violated the provisions of Sections 11(c) and 15(a)(5) of the Act in that Defendants failed to make, keep, and preserve adequate and accurate records of their employees, which they were to maintain as prescribed by the regulations issued and found at 29 C.F.R. Part 516. Specifically, Defendants failed to accurately record overtime hours and compensation. 29 C.F.R. § 516.2(a)(9).

WHEREFORE, cause having been shown, the Secretary prays for judgment against Defendants providing the following relief:

(1)      For an injunction issued pursuant to Section 17 of the Act permanently enjoining and restraining Defendants, their officers, agents, servants, employees, and those persons in

active concert or participation with Defendants who receive actual notice of any such judgment, from violating the provisions of Sections 7, 11(c), 15(a)(2) and 15(a)(5) of the Act; and

(2)       For judgment pursuant to Section 16(c) of the Act finding Defendants liable for unpaid overtime compensation due to certain of Defendants' current and former employees listed in the attached Schedule A for the relevant period at Steadfast, and for an equal amount due to certain of Defendants' current and former employees in liquidated damages. Additional amounts of back wages and liquidated damages may also be owed to certain current and former employees of Defendants listed in the attached Schedule A for violations continuing after June 9, 2017, and may be owed to certain current and former employees presently unknown to the Secretary for the period covered by this Complaint; or

(3)       In the event liquidated damages are not awarded, for an injunction issued pursuant to Section 17 of the Act restraining Defendants, their officers, agents, employees, and those persons in active concert or participation with Defendants, from withholding the amount of unpaid minimum wages and overtime compensation found due Defendants' employees and prejudgment interest computed at the underpayment rate established by the Secretary of the Treasury pursuant to 26 U.S.C. § 6621.

FURTHER, Plaintiff prays that this Honorable Court award costs in his favor, and an order granting such other and further relief as may be necessary and appropriate.

Respectfully submitted,

Kate S. O'Scannlain
Solicitor of Labor

Oscar L. Hampton III
Regional Solicitor

/s/Karen Barefield
Karen Barefield
Attorney
Bar No. 42572
Office of the Regional Solicitor
201 12th Street South
Arlington, VA 22202-5450
Phone (202) 693-9370
Fax (202) 693-9392
Barefield.karen@dol.gov


/s/ LaShanta R. Harris
LaShanta R. Harris
Office of the Regional Solicitor
*appearing pro hac vice*
Telephone No. 202-693-9351
Facsimile No.  202-693-9392
Harris.LaShanta@dol.gov

U.S. DEPARTMENT OF LABOR

Attorneys for Plaintiff

**JA52**

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                        Norfolk Division

 3
    - - - - - - - - - - - - - - - - - -
 4                                       )
    MARTIN J. WALSH, Secretary of        )
 5  Labor, United States Department      )
    of Labor,                            )
 6                                       )
            Plaintiff,                    )
 7                                       )    CIVIL ACTION NO.
    v.                                   )    2:18cv226
 8                                       )
    MEDICAL STAFFING OF AMERICA,         )
 9  LLC, doing business as              )
    STEADFAST MEDICAL STAFFING           )
10  And                                  )
    LISA ANN PITTS, individually         )
11  and as owner and officer of the     )
    aforementioned company,              )
12                                       )
            Defendant.                    )
13  - - - - - - - - - - - - - - - - - -

14
                   TRANSCRIPT OF PROCEEDINGS
15
                           DAY 1
16
                     Norfolk, Virginia
17
                     August 31, 2021
18

19
    BEFORE:  THE HONORABLE RAYMOND A. JACKSON
20           United States District Judge

21
    APPEARANCES:
22
            UNITED STATES DEPARTMENT OF LABOR
23          By:  Ryma N. Lewis
                 Chervonti Jones
24               Mohamed E. Seifeldein
                 Oscar Hampton, III
25               Counsel for the Plaintiff
```

1

2    APPEARANCES CONT'D:

3

4

              PIERCE McCOY, PLLC
5             By:  Joshua L. Jewett
                   Julia A. Rust
6                  Counsel for the Defendants

7

8

9                        **I N D E X**

10   **PLAINTIFF'S**
     **WITNESSES**            **DIRECT**   **CROSS**   **REDIRECT**   **RECROSS**
11
     COURTNAY HOPE DRAUGHN    22        43       53         --
12   YETUNDE TAYLOR           54        77       --         --
     CHRISTOPHER RYAN         85        102      109        --
13   HOPSON
     SAUDIA BOYKINS           113       128      134        --
14   ROXANNE ADAMS            136       154      166        --
     DAWN M. WOOTEN           170       187      --         --
15

16   **DEFENDANT'S**
     **WITNESSES**            **DIRECT**   **CROSS**   **REDIRECT**   **RECROSS**
17

18   NONE

19

20

21

22

23

24

25

1                        **E X H I B I T S**

2

3       **PLAINTIFF'S**
        **NO.**                                              **PAGE**
4
        PX53-002                                             58
5       PX25-001                                             63
        PX25-002                                             63
6       PX25-003                                             63
        PX25-004                                             63
7       PX25-005                                             63
        PX53-01                                              69
8       PX32                                                 75
        PX26-1                                               88
9       PX26-2                                               88
        PX26-3                                               88
10      PX26-22                                              116
        PX26-23                                              116
11      PX26-24                                              116
        PX25-16                                              118
12      PX25-17                                              118
        PX25-18                                              118
13      PX26                                                 173

14

15      **DEFENDANT'S**
        **NO.**                                              **PAGE**
16
        NONE
17

18

19

20

21

22

23

24

25

4

```
 1              (Hearing commenced at 10:32 a.m.)

 2              THE CLERK:  Martin J. Walsh, Secretary of Labor,

 3    United States Department of Labor, versus Medical Staffing of

 4    America, LLC, a Limited Liability Company, doing business as

 5    Steadfast Medical Staffing and Lisa Ann Pitts, individually

 6    and as owner and officer of the aforementioned company, in

 7    civil action 2:18cv226 and consolidated case 2:19cv475.

 8              Ms. Lewis, is the plaintiff ready to proceed?

 9              MS. LEWIS:  Yes.  Good morning, Your Honor.  Ryma

10    Lewis on behalf of the Department of Labor with co-counsel

11    Mohamed Seifeldein and Chervonti Jones.  Also appearing in

12    the courtroom today is the regional solicitor of the

13    Department of Labor, Oscar Hampton.

14              THE COURT:  Thank you.

15              THE CLERK:  Ms. Rust, are the defendants ready to

16    proceed?

17              MS. RUST:  Yes, Defendants are ready.  Julia Rust

18    on behalf of the defendants, along with my co-counsel,

19    Joshua Jewett.

20              THE COURT:  Counsel, thank you very much.  At this

21    juncture, if you wish to make an opening statement, you may

22    do so.

23              MS. LEWIS:  May I approach the lectern?

24              THE COURT:  You may.  I think I will issue this

25    instruction.  For purposes of trying to speak, if you're
```

**JA56**

1   fully vaccinated, you can pull down the mask enough to talk,

2   but when you leave, we want you to kind of wipe down the

3   microphone and the area.

4           MS. LEWIS:  Do I need to turn this on?

5           THE COURT:  It's already on.

6           MS. LEWIS:  Okay.  Can I turn to face you?  This

7   is --

8           THE COURT:  You can.

9           MS. LEWIS:  Thank you.  Good morning, Your Honor.

10  When you know better, you do better, as so goes the old

11  adage.  You do better by treating your employees with the

12  integrity and respect they deserve.  You do better by paying

13  employees the compensations they have earned without excuses

14  or delay.  You do better by complying with the law.

15          But here the evidence will show that Lisa Pitts,

16  the 203(b) employer under the act, the sole owner and CEO of

17  Medical Staffing of America, doing business as Steadfast

18  Medical, the individual who is responsible for the

19  day-to-day operations of Steadfast, including determining

20  the rate and method of pay, hiring and firing of employees,

21  and developing payroll policies, failed to do better.

22          She failed to do better by refusing to pay time and

23  a half to her nurses, her employees, the individuals who

24  have been providing critical and acute care to patients at

25  medical facilities each workweek in excess of 40 hours per

1    workweek since at least August 18, 2015.

2            Although she knew better from the Department of

3    Labor's investigation, which looked at her record and

4    informed her that her compensation of records and practices

5    were in violation of the act, she failed to do better by

6    intentionally providing misinformation about her obligations

7    to pay overtime, although she knew better after speaking to

8    other temporary staffing agencies that the nurses must be

9    classified as employees under the act because they, too,

10   have been subject to investigation, audits, and findings and

11   misclassification.  Indeed, the evidence will show that

12   defendants are subject to the act.  Lisa Pitts is

13   unquestionably a 203(b) employer as defined by the act.

14           There is an employer/employee relationship between

15   defendants and the nurses employed to provide temporary

16   medical personnel services at contracted facilities; that

17   defendants have repeatedly and willfully refused to properly

18   compensate their employees, the nurses, for the work they

19   have performed for defendants and are entitled to be paid

20   time and a half for overtime hours worked over 40 rather

21   than straight time since at least August 18, 2015; and that

22   defendants did not make, keep, or preserve daily and weekly

23   hours worked by their employees between August 18, 2015, and

24   August 22nd, 2016; and that defendants failed to accurately

25   report total premium pay for overtime hours and total

1    additions to her deductions from wages paid each pay period.

2            You will hear from a number of current and former

3    employees who will testify regarding their experience

4    working at the express direction, control, and supervision

5    of Lisa Pitts who is undoubtedly a 203(b) employer under the

6    act.  They will confirm that defendants took a series of

7    calculated, intentional steps in directing their work with

8    the employee/employer relationship.

9            For example, you will hear how the nurses' and

10   CNAs' only opportunity for profits and loss depended on the

11   defendants permitting and making work opportunities

12   available for them.  In fact, a number of nurses, and the

13   facilities will confirm the same during their testimony,

14   that defendants prohibited their employees, the nurses, from

15   scheduling directly with the contracted client facilities

16   without Lisa Pitts' express approval and/or knowledge.

17           You will also hear from several employees who will

18   detail the level of control defendants exercised over them

19   by relaying conduct expectations which were regularly

20   communicated in writing, and defendants' discipline policy,

21   both explicit and *ad hoc* to ensure uniformity of the company

22   values of character and integrity.

23           These employees will confirm, with the weight of

24   evidence, leads to no doubt but to conclude that the nurses,

25   which defendants contend are independent contractors, are,

1    in fact, employees entitled to over 180,000 hours of

2    overtime equating to 3.4 million in back wages that

3    defendants have refused to pay since August 18, 2015.

4    Defendants cannot meet their burden by proving by clear and

5    convincing evidence that the nurses are independent

6    contractors under the act.

7           After hearing from the employees, you will hear

8    testimony from the contracted facilities, which defendants

9    have contracted with over the years.  These facilities will

10   likewise confirm that defendants have known of their

11   obligation to control, supervise, and pay their employees.

12   These facilities will detail the scheduling process and how

13   defendants enforce the non-solicitation and buyout placement

14   (b) clauses which in most cases began at $2,000.

15          These various mechanisms of oversight indisputably

16   demonstrates defendants' knowledge that the nursers were

17   their employees, they had a monetary, vested interest as

18   their employees, and were subject to the act.  The

19   facilities will also detail that in the terms of their

20   contract, defendants have not only an explicit obligation to

21   comply with the act but actual knowledge of the same.

22   Again, another opportunity that defendants have known better

23   but have failed to do better.

24          Such evidence invariably undermines any arguments

25   the defendants are not subject to the act.  You will also

9

1    hear plain and substantial factual evidence which confirms

2    what the act already mandates; liquidated damages are

3    required here.

4          Defendants will not be able to meet their burden of

5    proving the affirmative defense of good faith, which is the

6    only exception to the rule regarding liquidated damages.

7    Other local and national agencies will testify that they had

8    discussions with Defendant Pitt from the nursing agency

9    business model, including how they hire nurses, schedule

10   nurses, supervise nurses, and pay nurses.

11         Such evidence will confirm that the defendants knew

12   that the healthcare facilities they worked at required

13   Steadfast defendants to comply with the act and that

14   defendants' misclassification of nurses was an unlawful

15   strategy to depress lawful competition.

16         The evidence will show that defendants had actual

17   notice that they needed to do better.  It's anticipated that

18   defendants will acknowledge that these employees are an

19   integral part of Steadfast.  Defendants will acknowledge,

20   through their deposition testimony and other documentary

21   evidence, that but for the nurses' work, the company would

22   cease to exist and their gross revenue in 2006/2015 would

23   not have exceeded $37 million.

24         During the same period they undercompensated their

25   workers, their employees by 3.4 million.  Yet, with these

```
 1    acknowledgements through Lisa Pitts' 203(b) employer
 2    testimony, defendants will attempt to meet their burden of
 3    proving the affirmative defense of good faith that the
 4    scheduled individuals are independent contractors rather
 5    than employees by arguing that although they recruited,
 6    hired, trained on HIPAA and abuse and sexual harassment,
 7    require nurses to enter non-compete designed shifts that
 8    contracted facilities and paid nurses directly from their
 9    bank account on established regular payday and in many cases
10    the next day.
11            Defendants did not control these employees, and,
12    therefore, the nurses are not employees under the broad
13    reach definition of the act.  However, such arguments should
14    be unavailing and viewed evidence of the admissions of an
15    employer that has known better, an employer that cannot meet
16    the burden of good faith that adopted with subjective good
17    faith and objective reasonableness.  This is not an employer
18    that is simply trying to stay afloat, but, rather, an
19    employer that is taking advantage of hardworking first
20    responders, nurses.
21            As such, should the Court decide with us, not just
22    because we want you to but because there is a wrong that has
23    occurred, and the law requires that the evidence be viewed
24    through the lens of the act which requires employers to pay
25    a fair day's pay for a fair day's work.
```

```
 1              The law mandates that an employer who knowingly
 2   violates the law must make those employees whole and
 3   compensate those employees for the hardship caused by the
 4   employer's harm by paying mandatory liquidated damages in
 5   amounts equal to the unpaid compensation.
 6              Indeed, the act's very purpose and the evidence
 7   will show that this very type of behavior perpetuates
 8   economic and professional inequality.  The defendants knew
 9   of their obligation under the act but did not move to comply
10   with those dictates.
11              Defendants took advantage of the position they were
12   in.  They broke the covenant that governs the basic tenets
13   of an employer/employee relationship.  As the employer is
14   scheduling employees, defendants knew of their obligation,
15   responsibility to pay overtime.  They simply chose not to
16   pay their employees; yet, in some cases billed facilities at
17   a premium rate when the employees the company relied upon to
18   determine the business that they owned of 40 hours in a
19   workweek and in some cases 112 hours or more.  That is
20   unconscionable.
21              Defendants cannot show that they had reasonable
22   grounds for believing that its actions were not a violation
23   of the law.  Rather, the evidence will show that the
24   defendants had been well aware of their obligation to pay
25   overtime.  But because the law did not suit them, defendants
```

1 | chose to ignore the law.  Defendants were advised by at
2 | least two of their former attorneys that its classification
3 | of nurses was at best questionable but certainly
4 | problematic.
5 |        Both of those attorneys counseled defendants
6 | regarding its hiring practices, the non-compete agreement,
7 | and the level of control and oversight Lisa Pitts, the
8 | 203(d) owner, exercised over her nurses.
9 |        Both attorneys advised defendants on
10 | changes defendants should make to its management and
11 | compensation practices to be in compliance with the act.
12 | But despite this advice, defendants continued to fail to do
13 | better.  Defendants failed to take any steps to comply with
14 | the law.
15 |        Rather, defendants ignored the advice, and as
16 | recently as January 2021, have taken an ostrich-like
17 | approach to its responsibilities to comply with the law by
18 | implementing technology which provides a mechanism to
19 | monitor and avoid violating the FLSA.
20 |        The defendants deliberately disabled the feature
21 | within the technology.  Undoubtedly, defendants know better.
22 | Here the violations of the act are not just egregious
23 | because defendants failed to pay overtime, while forcing
24 | over 37 million in revenue since at least 2013, while
25 | shortchanging their employees by 3.4 million overtime

```
 1    compensation, but they are egregious because this is an

 2    employer who has known better.

 3            The evidence you will receive at trial is concrete

 4    and will leave no room to conclude that defendants have

 5    willfully violated Section 7 and 11 of the act and that

 6    defendants cannot meet their burden by proving by clear and

 7    convincing evidence that the Schedule A workers are

 8    independent contractors rather than employees.

 9            Defendants have known better.  They have taken the

10    right of property of another, stolen the wages of nurses and

11    CNAs who have selfishly dedicated their service to a company

12    to be improperly compensated.  Defendants will not be able

13    to show that they had a good faith defense to these simple

14    FLSA requirements.  Defendants have violated the act.

15            Thank you, Your Honor.

16            THE COURT:  Thank you.  I think you have to wipe

17    down the microphone.

18            MS. LEWIS:  Yes.

19            THE COURT:  Thank you.

20            MS. LEWIS:  Thank you.

21            MR. JEWETT:  May it please the Court.

22            THE COURT:  Mr. Jewett.

23            MR. JEWETT:  Ms. Lewis, members of the Department

24    of Labor.  Steadfast is a registry.  At its core, the

25    company matches nurses in a database who are seeking as
```

1    -needed work with healthcare facilities seeking as-needed

2    nursing services.

3         For more than 40 years the Department of Labor has

4    maintained a position that a company that facilitates this

5    matchmaking service between clients and between workers is a

6    registry and not an employer under the Fair Labor Standards

7    Act.

8         On July 13th, 2018, the Department of Labor

9    published field assistance bulletin 2018-4.  This is two

10   months after the Department of Labor filed this lawsuit.  In

11   that publication, here is what the Department of Labor told

12   the public, "Consistent with the wage and hour division's

13   longstanding position, a registry that simply facilitates

14   matches between clients and caregivers -- even if the

15   registry also provides certain other services, such as

16   payroll services -- is not an employer under the FLSA."

17        So the question in this case is straightforward.

18   Does Steadfast facilitate or control?  Is Steadfast at the

19   core of its model in the business of facilitating matches

20   between facilities and nurses or is Steadfast in the

21   business of controlling the manner in which the nurses

22   practice nursing, setting, controlling their schedules, and

23   preventing them from obtaining other work?

24        Now, the department has also sued Lisa Pitts

25   personally.  She has a compelling story which she will

```
1    briefly explain to the Court when we call her as a witness
2    in our case.  She was a runaway teenager.  She graduated
3    high school with a third grade -- on a third grade reading
4    level.  She worked as an LPN for 20 years, and at the time
5    she began thinking about starting a business, she was
6    working long hours that were controlled by her healthcare
7    employer.  No flexibility.  She was a single mother with
8    four children.
9           Sir, she had this vision to start a registry with
10   this idea of flexibility, the freedom to schedule in mind.
11   So she had a business license, but she didn't have a
12   computer in those days, so a friend gave her one, and she
13   got her first break on a contract.  She was initially turned
14   down in the interview to get the contract, but a kind
15   gentleman, who happened to be The Director of Nurses for the
16   facility, called her afterwards and gave her a break, and so
17   she started Steadfast with one contract, three nurses with
18   this vision of flexibility and independence in mind for the
19   nurses who were to take shifts through this registry.
20          Now, the Court's going to hear us refer to
21   Steadfast throughout this trial as a registry, but I'd like
22   to take just a few moments to explain what a registry
23   actually is.
24          THE COURT:  Don't waste your time.  The Court
25   already knows, but you can move on.
```

```
 1          MR. JEWETT:  Understood, Your Honor.  Understood.
 2   So the way the scheduling works through the registry is a
 3   healthcare facility contacts Steadfast, typically in an
 4   e-mail, and then Steadfast sends out a communication blast
 5   to the nurses on database, and the nurses are free to accept
 6   shifts or not accept shifts, but to them there are
 7   variations in the way the scheduling works, but that is sort
 8   of the core model.  That is the core of the Steadfast
 9   registry model.
10          What the evidence is going to show in this case is
11   a little bit about the nurse staffing industry.  The
12   hospitals, the nursing homes, the evidence will show that
13   they don't just have contracts with Steadfast exclusively.
14   They also have contracts with other staffing agencies who
15   are basically Steadfast competitors.
16          The evidence is also going to show that the nurses
17   who take shifts at a Steadfast registry, they also take
18   shifts in these other staffing agencies, Steadfast
19   competitors, and the nurses also work full-time jobs as W-2
20   employees with other hospitals and nursing homes.  So it's a
21   classic registry model that falls right in line with these
22   notions of flexibility and freedom that independent
23   contractors enjoy.
24          Now, the important question is this:  How does this
25   model fit within the Fourth Circuit economic realities?  The
```

```
 1   Fourth Circuit hasn't issued a decision on a registry model
 2   yet.  I won't go through the factors.  The important point,
 3   of course, is that the Fourth Circuit has emphasized that
 4   the first factor, the degree of control factor, is the most
 5   important factor for our evaluation.
 6           The Court's going to hear lots of evidence in this
 7   trial on this control factor, mostly from the Department of
 8   Labor, and their strategy, we think, is going to be sort of
 9   be death by a thousand cuts, lots of volume, along with a
10   volume of information.  But at the end of the day, through
11   their evidence, we submit that there are three questions,
12   three critical questions for this case that The Department
13   cannot answer.
14           The first question is this:  Are the nurses free to
15   set their own schedules or does Steadfast set the schedules
16   for them?  If you're an employee, your employer sets your
17   schedule for you Monday through Friday, 9 to 5 or whatever
18   it is.  You're not free.  You're independent.  Here is the
19   second question:  Are nurses free to work for other
20   employers, such as healthcare facilities, or other agencies?
21   An employer is not going to allow an employee to go to their
22   competitor to do the exact same thing while the employee is
23   still working for the company.  Not how it works.
24           If you're an independent contractor, you get to do
25   that.  You have independence to do things like that.  There
```

1    is a third question:  Does Steadfast control the manner in

2    which the nurses nurse, the manner in which they practice

3    nursing, or do the nurses practice nursing without

4    Steadfast's input?  That might be the most important

5    question in the case, according to the Fourth Circuit.

6            The evidence that the Court is going to hear on

7    these factors is that Steadfast provides no training, no

8    orientation, no handbook, no policy manual, no how-to guide,

9    nor performance evaluations, no corrective actions, no

10   supervision.  Steadfast does not provide an actual place for

11   nurses to work.  Steadfast does not provide equipment, and

12   it does not set the nurse's schedules.

13           At the same time, the evidence will also show that

14   the nurses do set their own schedules.  They are free to

15   accept other clients' shifts.  They are free to work as

16   little or as much as they wish, and they work the nurse

17   independently without direction of supervision from

18   Steadfast on how to nurse.  They work directly for the

19   healthcare facilities as W-2 employees, and they take shifts

20   with competing agencies.

21           Now, it's interesting that in The Department's

22   opening statement, it doesn't address any of those factors,

23   and they're critical factors for the case.  The Department's

24   case, we think, is going to hinge on a few things, as

25   Ms. Lewis summarized in her opening.  They are going to call

 1    the healthcare facilities' corporate representatives in

 2    these healthcare facilities who either have or used to have

 3    contracts with Steadfast, and these corporate

 4    representatives are going to point to the language of these

 5    long contracts that were prepared by their attorneys, and

 6    they're going to say, "Look at all these requirements that

 7    we have, that Steadfast has to supervise these employees."

 8    But the language of the contract is not part of the

 9    six-factor test.

10          In fact, the Courts have been very clear that what

11    matters in the economic realities test is the reality of how

12    the relationship works.  How do things operate when boots

13    are on the ground, when people are talking, e-mailing,

14    calling and nursing.

15          We think they are also going to call Steadfast

16    competitors in here to talk about the industry standard.

17    These are the very people who stand to benefit if Steadfast

18    loses this case.  There is a pending motion on these

19    witnesses, but we would trust the Court, even if they do get

20    to present evidence, the Court wouldn't give their testimony

21    a whole lot of weight.

22          Primarily, the Department of Labor is going to

23    present evidence through anecdotes of nurses.  There is

24    going to be some stories the Court is going to hear.

25    Ms. Pitts is a competitor.  She hustles.  She has contracts

1    to honor, and you don't build a successful business by

2    sitting on your hands and letting things happen.

3         When it comes to these stories the Court's going

4    the hear during this trial, we would ask the Court to

5    consider two questions about them.  The first is this:  Are

6    all 800 or so nurses who take shifts in Steadfast registry

7    responsible people, that the core of being an independent

8    contractor is personal responsibility.  Nobody sets your

9    schedule for you.  You have to keep track of it.  If you

10   show up to a hospital and you commit a bad act, the hospital

11   doesn't give you progressive discipline.  They just tell you

12   to leave, they put you on a do-not-return list, and they

13   replace you.

14        The reality is that, and the Court is going to hear

15   this, some of these stories that some of these nurses can be

16   irresponsible, and when that happens at a hospital, what the

17   hospitals do is they put the nurse on a do-not-return list,

18   and Ms. Pitts, to honor the contract, has to communicate

19   that to the nurse.

20        Here is the second question we ask the Court to

21   consider when it hears the anecdotal stories from the

22   Department of Labor.  Is that sufficient to meet The

23   Department's burden of proof in this case?  The Fourth

24   Circuit is clear that in an independent contractor case, the

25   burden is on the plaintiff to establish the existence of an

```
 1    employment relationship in the first instance.

 2           So the Court might hear 3, 5, 20 -- we are not

 3    sure -- anecdotes from the Department of Labor from

 4    Steadfast nurses, but that's out of 800, 900 nurses, that's

 5    1 to 2 percent.  On trial in this case is the Steadfast

 6    registry model.  What's not on trial is the stories of a

 7    handful of nurses, and are we prepared to say that a handful

 8    of anecdotes is sufficient to collapse the entire registry

 9    model on behalf of another 800 nurses?  It's our position

10    that it's not.

11           THE COURT:  Well, how many would you suggest they

12    call?  A handful 60, 70, 80, 100?  Never mind.  Continue.  I

13    shouldn't have suggested that.

14           MR. JEWETT:  Your Honor, let me conclude by going

15    back to the three questions I asked earlier.  We don't think

16    The Department is going to address these questions.  Are the

17    nurses free to set their own schedules?  Are the nurses free

18    to work directly for healthcare facilities and competing

19    agencies?  Does Steadfast control the manner in which the

20    nurses nurse?

21           We don't believe The Department can address those

22    questions because evidence doesn't exist to address them,

23    and it doesn't exist because when Lisa Pitts started this

24    company, she started it with a vision of flexibility and

25    independence in mind how nurses could take shifts at the
```

```
 1   registry.
 2          The very first question I asked the Court in the
 3   beginning of my opening was whether Steadfast controls or
 4   facilitates.  The overwhelming evidence is that the
 5   Steadfast model facilitates matches.  They don't control,
 6   and without control, the nurses can't be enjoined into an
 7   employment relationship with a company it did not ask for
 8   because of the Department of Labor prosecution.
 9          Thank you, Your Honor.
10          THE COURT:  Thank you.  You may call your first
11   witness.
12          MS. LEWIS:  Thank you, Your Honor.  Ms. Courtnay
13   Draughn Hope.
14          May I approach the podium when he is done?
15          (Witness was sworn.)
16          COURTNAY HOPE DRAUGHN, called by the Plaintiff,
17   having been first duly sworn, was examined and testified as
18   follows:
19                      DIRECT EXAMINATION
20   BY MS. LEWIS:
21   Q.  Good morning.  May you please state your name for the
22   record and spell your last name.
23   A.  Courtnay Hope Draughn, D-r-a-u-g-h-n.
24   Q.  Are you familiar with Steadfast Medical?
25   A.  Yes, ma'am.
```

**JA74**

```
 1    Q.   And how are you familiar with that company?
 2    A.   I worked there for a little less than two years.
 3    Q.   Do you have any ownership interest in Steadfast?
 4    A.   No, ma'am.
 5    Q.   What type of services does Steadfast provide?
 6    A.   Sending nurses and CNAs out into the field to pick up
 7    shifts at various facilities like nursing homes or hospitals
 8    or jails.
 9    Q.   And what type of nurses are -- does Steadfast employee?
10    A.   As far as the nurses, it was LPNs and RNs and then there
11    were CNAs as well.
12    Q.   When you worked at Steadfast, what was your job title?
13    A.   It started off as a call center agent and then
14    transitioned the titles to account manager.
15    Q.   And who transitioned the title?
16    A.   Lisa Pitts.
17    Q.   Who was your supervisor?
18    A.   Lisa Pitts.
19    Q.   What were your job duties and responsibilities?
20    A.   My -- I would get the staffing needs from the various
21    facilities and match up LPNs and RN facilities to make sure
22    that we had the correct person to fill the shift.
23    Q.   If you had a new nurse that came in, what would you do
24    for the new nurses?
25    A.   The new nurses, I would take a look at their credentials,
```

**JA75**

```
 1    make sure everything was valid, the nursing license, CPR,
 2    first aid, and a copy of their I.D., and make sure everything
 3    was valid and current.  Then I would then take those nursing
 4    credentials and see what availability I had for -- you know,
 5    as far as the nursing title.  Then once a week make -- they
 6    would send me a text message of their availability for the
 7    week, and I would fill those shifts and tell them where they
 8    are going to be working.
 9    Q.  What if you had an established nurse?
10    A.  With the established nurse, they need to send me those
11    text messages on Mondays, and then I would then reply with
12    their shifts, what their week was going to be.
13    Q.  Can you describe your day-to-day activities within the
14    company.
15    A.  My day-to-day activities, we would come in in the
16    morning, confirm the shifts for everyone who was going to be
17    working second shift and take care of any additional needs
18    the facility would give us for a second or third shift, if
19    there was, verify anyone who wanted to work second shit.  We
20    would then move to anyone going to work at 7:00 p.m., repeat
21    the same thing, confirming those shifts, making sure the
22    facilities weren't adding or taking away any shifts, then
23    transition into confirming night shift as well.
24    Q.  So what were your interactions like with the nurses?
25    A.  Um, I talk to my nurses a lot.  I would make sure that
```

1    they were available for those shifts that they gave me and

2    making sure that all their credentials were still up to date

3    and that could fill the role I was asking them to do.

4    Q.  And how frequently would you be in touch with the nurses

5    you were responsible for?

6    A.  Definitely weekly if not daily.

7    Q.  And how were you paid?  Hourly or salary?

8    A.  Salary.

9    Q.  And how much were you paid per hour?

10   A.  $12 an hour.

11   Q.  What was your work schedule?

12   A.  It was supposed to be 10 to 6, but at least definitely

13   stayed later most of the time up to 10-hour days.

14   Q.  So approximately how many hours a week did you work?

15   A.  Anywhere between 48 and 54.

16   Q.  And what days of the week did you work?

17   A.  Monday through Friday and every other Saturday day, and

18   that would then most of the time include every other whole

19   weekend taking the phones home.

20   Q.  Okay.  I'm sorry.  It's a little low.  Can you say the

21   last part of what you said.  Speak up a little bit.

22   A.  If I wasn't taking the phones home for the weekend for

23   all the calls.

24   Q.  Okay.  Were you able to take lunch breaks?

25   A.  No, ma'am.

Draughn, C. - Direct                                              26

```
 1   Q.  Did you work hours in which you were uncompensated?

 2   A.  Yes, ma'am.

 3   Q.  When did that occur?

 4   A.  That would occur on the on-call schedule.  There was a

 5   flat rate, but we would still be expected to work the

 6   whole -- about an 18-hour day.

 7   Q.  And so how much were you paid when you worked on call?

 8   A.  On call, during the week, the overnight was $100, on the

 9   weekends it was 125.

10   Q.  So was this amount prevalent to your regular hourly rate?

11   A.  Absolutely not.

12   Q.  And how do you figure that math out?

13   A.  It was an 18-hour day, and so it would come out to be

14   about $5.40 an hour.

15   Q.  Given your position and familiarity with the office, how

16   is the business organized?

17   A.  The business is organized, there is an office that

18   actually has two parts; business office and the call center.

19   And then we have the nurses and CNAs out in the field.

20   Q.  Okay.  Within the office, you said there is two sides.

21   Can you tell me about those two sides.

22   A.  So there was the business office side where the actual

23   human resources, on-boarding, payroll, and things of that

24   nature were done on that side, well the business office side.

25   I worked in the call center side where we actually talked to
```

```
 1   the nurses on that weekly or daily basis and talked with the
 2   facilities on a daily basis about matching up those needs.
 3   Q.  And then you said the other side, the people who worked
 4   in the field.  What's the field?
 5   A.  The field would be what we consider to be the nursing
 6   homes, hospitals, jails, and those facilities where the
 7   actual shift work was done.
 8   Q.  Okay.  And so who worked in the field?
 9   A.  The nurses and CNAs.
10   Q.  So what was Ms. Pitts' role and involvement in Steadfast?
11   A.  Lisa is very, very, very hands-on, has to approve
12   everything.  There was -- the word that I would use to
13   describe it is micromanaging.
14   Q.  Within the office was there someone who managed payroll?
15   A.  Christine Kim.
16   Q.  And who was responsible for processing and reviewing
17   invoices to the facilities?
18   A.  Christine and Lisa did that.
19   Q.  Who established the work schedule for office, for the
20   office side?
21   A.  Lisa Pitts.
22   Q.  And what about the field?
23   A.  We did that as account managers, but Lisa approved each
24   and every one.
25   Q.  How are the nurses recruited?
```

```
 1    A.   Traditionally through word of mouth.  We -- Lisa would

 2    occasionally run an ad on Craig's List if there was a

 3    specific need in a specific area, but generally it was word

 4    of mouth.

 5    Q.   Can you describe the hiring process.

 6    A.   They would -- if the nurse was local and able to come to

 7    the office, they would come in and bring those credentials

 8    that we spoke about, fill out an application.  Then they were

 9    sent out to do the drug screen.  Then they would come back to

10    the office to take a picture for I.D. photo.

11    Q.   Okay.  And if they weren't local was there a different

12    process?

13    A.   Slightly different, yes, ma'am.

14    Q.   What is that?

15    A.   They would -- the application was received via fax or

16    e-mail, so they would fill that out remotely.  We would then

17    direct -- well, they were then directed to a drug testing

18    facility in their area, and when they took their drug test

19    and the badge was made off the picture that they submitted,

20    and they received that in the mail.

21    Q.   Were you familiar with the independent contractor

22    agreement that nurses -- that were part of the -- were you

23    familiar with the independent contractor agreement?

24    A.   Yes, ma'am.

25    Q.   And were their agreements part of the application?
```

Draughn, C. - Direct                                              29

```
 1   A.  Yes, ma'am.

 2   Q.  Were the agreements always acknowledged and signed?

 3   A.  No, ma'am.

 4   Q.  If not -- if they weren't signed, what would happen?

 5   A.  Lisa would sign them.

 6   Q.  Okay.  And how do you know that?

 7   A.  I have seen her do it.

 8   Q.  Who set and determined the rates of pay for the nurses

 9   and CNAs?

10   A.  Lisa Pitts.

11   Q.  And how were nurses compensated, on an hourly or salary

12   basis?

13   A.  Hourly.

14   Q.  And how were those rates set?

15   A.  Lisa set those rates.

16   Q.  Okay.  When were they set?

17   A.  They were set -- Lisa would let me know -- let all of us

18   in the office know what the rate was going to be for the

19   facility, and it was written at the top of each staffing

20   sheet what the rate was.

21   Q.  Was there ever ambiguity or question about the rates that

22   the nurses would be paid?

23   A.  The standard rate, no, ma'am.  There was -- there was a

24   standard rate and so that it was impossible to miss at the

25   top of the sheet.
```

1   Q.  Were nurses permitted to discuss their compensations with

2   each other?

3   A.  No, ma'am, absolutely not.

4   Q.  And how do you know?

5   A.  Lisa would absolutely forbid that and have an absolute

6   fit if she found out someone had done that.

7   Q.  And what happened if somebody did?

8   A.  Most of the time she would remove them from the schedule

9   for a while.

10  Q.  Were nurses permitted to discuss the compensations with

11  the facilities?

12  A.  Absolutely not.  No, ma'am.

13  Q.  And why not?

14  A.  Because Lisa felt that that was something the nurse or

15  CNA was going behind her back, and she would then take them

16  off the schedule for a while there as well.

17  Q.  Going behind their back to do what?

18  A.  To make a better deal with the facility.

19  Q.  And how do you know that?

20  A.  Many, many times and have listened to the discussions

21  many times.

22  Q.  And so what would happen if Lisa found out that the

23  nurses had tried to discuss their compensations with the

24  facilities directly?

25  A.  She would then take them off the schedule for a while.

```
 1    Q.  Are you aware of the non-solicitation clauses in
 2    Steadfast's contracts with the facilities?
 3    A.  Yes, ma'am.
 4    Q.  What is the non-solicitation clause?
 5    A.  The non-solicitation clause addressed how long -- if a
 6    nurse or CNA tried to go to work directly for a facility that
 7    we staffed instead of staffing through Steadfast.
 8    Q.  Did you have any involvement in monitoring the
 9    non-solicitation clause as in your position at Steadfast?
10    A.  My part in that was that Lisa always expected me to know
11    where anyone -- where any of my nurses were working.  I was
12    to keep track of, if they picked up another job, whether it
13    was at another facility or was another staffing agency, I was
14    always expected to know where they were working.
15    Q.  So was the non-solicitation clauses enforced?
16    A.  Yes.
17    Q.  How were they enforced?
18    A.  Lisa had some sort of formula that determined how long
19    the nurse had been working for Steadfast and how long we had
20    been staffing that particular facility, and then she would
21    come up with the number to buy out the contract with the
22    facility.
23    Q.  Did you or other of the staff negotiate rates of pay with
24    employees when scheduling?
25    A.  No, ma'am.
```

Draughn, C. - Direct                                           32

```
 1   Q.  Why not?
 2   A.  If it was a set rate that reflected what was at the top
 3   of the staffing sheet, that was the set rate.  However, if
 4   you were one of Lisa's favorite nurses that she favored and
 5   they knew what their special rate was, there was no need to
 6   discuss that.  They knew what their special rate was going to
 7   be regardless of shift and regardless of facility, they knew
 8   what their special rate was.
 9   Q.  For the people who didn't have a special rate, you said
10   there was a regular rate.  Were there ever instances in which
11   those people could get a special rate or a different amount?
12   A.  So what would happen was, she wouldn't negotiate the
13   change in the rate that's listed at the top of the sheet.
14   She would give them a bonus, and that would impact their
15   hourly rate, and we were instructed to not work out how that
16   math would impact the hourly rate, just offer them the bonus.
17   Q.  So just to be clear, who would set that bonus amount?
18   A.  Lisa did.
19   Q.  And was it a set amount for the bonus?
20   A.  No, ma'am.  It would vary.
21   Q.  Was the bonus a lump sum or an hourly rate?
22   A.  A lump sum.
23   Q.  Okay.  Did Steadfast ever pay overtime to the nurses and
24   CNAs?
25   A.  No, ma'am.
```

JODY A. STEWART, Official Court Reporter

**JA84**

```
 1    Q.  And did any nurses ever complain to you that they were
 2    not paid overtime?
 3    A.  Quite frequently, yes, ma'am.
 4    Q.  And what would your response be?
 5    A.  I was told to give them the response that they were
 6    independent contractors, and that was what -- that was part
 7    of what the independent contractor was, that there is no
 8    overtime rate.
 9    Q.  Who told you to provide them that response?
10    A.  Lisa Pitts.
11    Q.  Did any nurses ever complain that they weren't paid for
12    all hours worked?
13    A.  Yes, ma'am.
14    Q.  And how often did this happen?
15    A.  On a weekly basis.
16    Q.  And what would your response be to those complaints?
17    A.  They would have to direct them to Lisa or Christine for
18    resolution.
19    Q.  Do you know whether defendants withheld funds from
20    nurses' paychecks for garnishments as independent
21    contractors?
22    A.  Yes, ma'am.
23    Q.  And who did they withhold garnishments from?
24    A.  Two nurses come to mind:  Felicia Banks Cooper and
25    Shavonne Brochman come to mind.
```

```
 1   Q.  And how do you know about these two instances?
 2   A.  Ms. Banks -- well, both of them came in to confront and
 3   question Lisa about them, and they were quite upset.
 4   Q.  Tell me about -- what about Ms. Banks Cooper and that
 5   issue?
 6   A.  Ms. Banks Cooper had a garnishment as it related to a
 7   car, and Lisa took the money -- was withholding the money
 8   from her paycheck, and then Ms. Banks Cooper found out when
 9   she returned to court that the garnishment hadn't been paid
10   on.
11   Q.  Do you know how this was ultimately resolved?
12          MS. RUST:  Actually, I'm going to object to the
13   line of questioning regarding the withholding of
14   garnishment.  That has no bearing on the classification of
15   the nurses as contractor or employee, so it's not relevant.
16   It wouldn't have anything to do with their overtime wages.
17          THE COURT:  Your response.
18          MS. LEWIS:  Your Honor, it absolutely has to do
19   with the classification as independent contractors versus
20   employees.  The employees can have wages garnished.
21   Independent contractors cannot.
22          THE COURT:  Objection overruled.
23   BY MS. LEWIS:
24   Q.  What happened with Ms. Brockman?
25   A.  Ms. Brockman had a garnishment as it related to some
```

Draughn, C. - Direct                                              35

```
 1    furniture, and it was the same scenario.  She found out that
 2    the garnishment hadn't been paid on with the court.
 3    Q.  And when did these two instances that you're aware of
 4    occur?
 5    A.  These happened in my last three months of employment with
 6    Steadfast.
 7    Q.  So we had talked a bit earlier about your job duties and
 8    responsibilities.  Can you tell me a bit, how were the nurses
 9    provided assignments?
10    A.  When they would provide me with that text message or
11    e-mail for their availability for the week, I would then
12    respond to them with what shifts I needed them to fulfill and
13    where.
14    Q.  Were nurses permitted to contact the facilities directly
15    to set their own schedules?
16    A.  Absolutely not.
17    Q.  And what would happen if the nurses did that?
18    A.  They were taken off the schedule for a while.
19    Q.  Who would take them off the schedule?
20    A.  Lisa Pitts.
21    Q.  Were nurses allowed to employee another nurse with the
22    same nursing titles, complete a shift that Steadfast was
23    compensating them to complete?
24    A.  Absolutely not.
25    Q.  Why not?
```

```
 1   A.  Because if -- there was two reasons for that:  Because
 2   the facility would sometimes hesitate to pay if the name that
 3   I deemed them did not match the name of the person who showed
 4   up to fulfill the shift.  So that would be an issue as far as
 5   billing.  And then if it was a nurse that Lisa had taken off
 6   the schedule for a while, then Lisa did not want that nurse
 7   to work regardless.
 8   Q.  So who decided how many days a week a nurse or CNA could
 9   work?
10   A.  Lisa approved the final schedule.
11   Q.  When swifts were offered, could a nurse refuse or decline
12   to take an assignment or shift?
13   A.  That was highly frowned upon.
14   Q.  And what -- why would that -- what happened?
15   A.  Because Lisa felt like that that was -- if you gave the
16   availability, then you work where you say -- where we say
17   you're going to work.
18   Q.  So there was an established expectation?
19   A.  Yes, ma'am.
20   Q.  And who established this policy and procedure with
21   respect to, you know, notifying availability and scheduling
22   the same way one would provide a schedule and say I can work
23   this way?
24   A.  Well, I established my own system of organization with
25   it, but it was how Lisa had it set up.
```

```
 1    Q.  Okay.  So if a nurse didn't work the schedule that they
 2    had relayed to you as a scheduler, and they declined shifts,
 3    was it disciplinary the action of removing them from the
 4    schedule?
 5    A.  Yes, ma'am.
 6    Q.  If a nurse had a scheduling conflict, did the defendants
 7    permit the nurses of another nurse with the same nursing
 8    title without Steadfast's approval?
 9    A.  Absolutely not.
10    Q.  And why not?
11    A.  For those same reasons about matching up the names on the
12    schedule, as well as that nurse may be out of favor, and Lisa
13    may have felt like someone that Lisa had taken off the
14    schedule for a while.
15    Q.  If a nurse started at a client site but had to leave due
16    to an illness, were they required to notify Steadfast?
17    A.  Absolutely, yes, ma'am.
18    Q.  And why is that?
19    A.  Because Lisa needed to know if there was a way of
20    establishing something from the shifts, and also she needed
21    to know how that would impact the money that she was
22    anticipating of getting from that shift.
23    Q.  So if a nurse did that, what would happen?
24    A.  She was going to be taken off the schedule.
25    Q.  Were you expected to have nurses on standby?
```

Draughn, C. - Direct                                                    38

```
 1    A.  Absolutely.  You would fulfill -- expectation was to

 2    fulfill 100 percent of the facilities' needs and then have an

 3    extra person or two.

 4    Q.  And who established this practice as policy?

 5    A.  Lisa Pitts.

 6    Q.  Who decided which facilities the nurse would work at in a

 7    given week?

 8    A.  Well, that would be decided by a few factors; their

 9    nursing qualifications, of course.  They would need to match

10    the right person with the right, you know -- with the right

11    needs, and then also if the nurses is not in -- you know, in

12    or out of favor at the moment.

13    Q.  Okay.  Did Steadfast maintain a list of nurses which were

14    not permitted to work at certain facilities?

15    A.  Yes, ma'am, we absolutely did.

16    Q.  And what was that list referred to as?

17    A.  The DNR list, which stood for do not return.  That was

18    done by each facility.  So it was listed at the bottom of the

19    staffing sheet.

20    Q.  Were there other notes that were kept with respect to

21    nurses and their ability -- the ability for you as a staffer

22    be able to schedule them?

23    A.  Yes, ma'am.  Lisa kept notes in the phones' as to any

24    type of transgression a nurse may have submitted.

25    Q.  Were nurses required to submit time sheets?
```

**JA90**

```
 1   A.   Absolutely, yes, ma'am.

 2   Q.   When?

 3   A.   It was -- we ask that they do it after each shift, but

 4   definitely on a weekly basis.

 5   Q.   And to whom were they required to submit time sheets?

 6   A.   To ultimately to Christine Kim.

 7   Q.   Did Steadfast communicate behavior expectations to nurses

 8   in the field at any point during employment?

 9   A.   Yes.

10   Q.   And what were those expectations?

11   A.   Punctuality is key because that would be how -- that was

12   done out at the shift, you know.  You want to have the person

13   there for the entire time of the shift.

14   Q.   Were there any other expectations?

15   A.   There was the expectation of completing all of your

16   documentation and doing all of what's called your MARS and

17   TARS so that you wouldn't have to go back and complete

18   anything later.

19   Q.   And what are MARs and TARs for -- that's not in the

20   medical field?

21   A.   The MARs are the medication administration record and the

22   TARs is the treatment administration record.

23   Q.   And was that -- you said that was an expectation of

24   Steadfast?

25   A.   Yes, ma'am.
```

```
 1   Q.  If these behavior expectations were not met, what would
 2   happen?
 3   A.  Um, first they would have to find ways to get the nurse
 4   to finish that documentation, because, of course, that has to
 5   be done for the facility, and then there would be a question
 6   of Lisa would let them go anywhere else for a while.
 7   Q.  Okay.  Would Lisa communicate with the nurses when
 8   behavior expectations were not met?
 9   A.  Yes, ma'am.
10   Q.  And how would she communicate with them?
11   A.  Mostly screaming.  There was a lot of -- sometimes they
12   would do it over -- she would have that session over the
13   phone, and sometimes she would actually call the person in.
14   Q.  When would she call the person in and on what occasions
15   would that happen?
16   A.  Usually the first offense she would just kind of take
17   note of, and sometimes, depending upon what they did, of
18   course, she would just kind of take note of -- by the second
19   or third offense, they are definitely going to have to have a
20   one-on-one with her about what happened.
21   Q.  Were you ever involved in any of the discipline of any of
22   the nurses or CNAs?
23   A.  Yes, ma'am.
24   Q.  Do you recall any by name in which you were involved that
25   the discipline -- the discipline nurses?
```

**JA92**

```
 1   A.  Off the top of my head, there was a nurse named Jeralin
 2   Robinson and Jeralin was a very good nurse.  I mean, she did
 3   her shift, and she did all of the expected work as she was
 4   supposed to, never had any complaints about her work.  But
 5   Jeralin had some confidentiality and different issues, and
 6   sometimes would over social media, and Lisa called her into
 7   the office after one offense and just absolutely let her have
 8   it.
 9   Q.  And were you part of that discussion?
10   A.  Normally, the only thing I would view on these types of
11   sessions, is I would present what the facilities said, the
12   factual basis of what the facility said this, this, and this
13   happened, and then Lisa took over the discussion from there.
14   Q.  And were these discussions disciplinary in nature?
15   A.  Yes, ma'am.
16   Q.  What would be the disciplinary outcome of these
17   conversations besides being yelled at?
18   A.  Lisa would determine how long to take the nurse off the
19   schedule.
20   Q.  Did Lisa Pitts hire and fire nurses and CNAs?
21   A.  Hiring, yes, but she would try to avoid using the word
22   "fire."
23   Q.  And what is it that she did then?
24   A.  She would end the relationship, or we won't be staffing
25   you anymore, or there is no need for you to call with your
```

Draughn, C. - Direct                                              42

```
 1   availability anymore.  She would say something ambiguous like
 2   that.
 3   Q.  So based upon your previous work experience, was this
 4   firing?
 5   A.  Yes, ma'am.
 6   Q.  Okay.  Do you recall any nurses by names in which -- that
 7   you know were fired by Steadfast?
 8   A.  Christina Evans comes to mind.
 9   Q.  I'm sorry.  I interrupted.  Tell me about Ms. Evans.
10   A.  Christina Evans had some accusations of drug diversion,
11   actually quite a few in the short time that she worked for
12   Steadfast, and when I received the report from the facility
13   or get that message from the facility that, you know, there
14   was that drug diversion issue, and they did not want her to
15   come back, of course, I would have to relay that to Lisa.
16           Lisa let it go the first three or four times, and
17   then we got to a point Ms. Evans just didn't have anywhere
18   else to send her and so Lisa told her not to call anymore
19   with her availability, and we would end the relationship with
20   her.
21   Q.  Any other examples that you're aware of, personally aware
22   of that the nurses that were fired?
23   A.  Not that I can think of off the top of my head, no,
24   ma'am.
25   Q.  If a nurse was injured at a facility, was the nurse
```

 1 | required to notify Steadfast?
 2 | A.  Yes, ma'am.
 3 | Q.  And why?
 4 | A.  Lisa said it was a workman's comp issue.
 5 | Q.  And if those worker's compensation issue arose, who would
 6 | be responsible for handling the claim and the process?
 7 | A.  Lisa took that whole process over.
 8 | Q.  Were you aware of any injuries that resulted in worker's
 9 | compensation claims against Steadfast?
10 | A.  The one that comes out to my mind is Tramia Hardy.  She
11 | got a needle stick.
12 | Q.  And do you know how that was ultimately resolved?
13 | A.  Lisa took that issue.  She took care of that workman's
14 | comp.
15 |         MS. LEWIS:  No further questions for this witness,
16 | Your Honor.
17 |         THE COURT:  Cross-examination.  Ladies and
18 | gentlemen, we will take a break at some point here.  Let's
19 | take it in between this cross and the next witness.
20 |                         CROSS-EXAMINATION
21 | BY MS. RUST:
22 | Q.  Good morning or afternoon, Ms. Draughn.  My name is Julia
23 | Rust.  I'm an attorney for Steadfast and Ms. Pitts in this
24 | case.  You only ever worked in the call center, right?  You
25 | did not work on Steadfast registry?

```
 1   A.   No, ma'am.

 2   Q.   Sorry?

 3   A.   I did not work on the registry.

 4   Q.   Okay.  Thank you.  And when you worked in the call

 5   center, you say you were supervised by Lisa, right?

 6   A.   Yes, ma'am.

 7   Q.   And she supervised your performance of your job duties?

 8   A.   Yes, ma'am.

 9   Q.   How you actually handled your job duties, did she look

10   over your shoulder?  Did she tell you what to do?

11   A.   Every day, yes, ma'am.

12   Q.   And were you required to work these shifts that Steadfast

13   set for you?

14   A.   When you say these shifts, do you mean the 10 to 6?

15   Q.   Yeah.  Did Steadfast set your schedule, your work

16   schedule, right?

17   A.   Yes.

18   Q.   And you were required to show up for the work schedule

19   that they set for you, right?

20   A.   Yes.

21   Q.   And if you failed to show up for your shift or if you

22   were late, would you be reprimanded?

23   A.   Yes.

24   Q.   And if you wanted to take time off, were you required to

25   submit a time off request form?
```

```
 1    A.  Yes, ma'am.
 2    Q.  And you were reprimanded on several occasions for failing
 3    to show up or finishing your shift; is that right?
 4    A.  No.
 5    Q.  No?
 6    A.  No.
 7    Q.  You never received any written reprimand from Steadfast?
 8    A.  Not for failing to show up for my shift, no, ma'am.
 9    Q.  Did you receive a written reprimand for not completing
10    your shift?
11    A.  No.
12    Q.  Did you receive any written reprimand?
13    A.  She reprimanded me for taking too many sick days.
14    Q.  For taking too many sick days?
15    A.  Uh-huh.
16    Q.  Those were the only reprimands you received?
17    A.  That's the only thing I could think of.
18    Q.  Permission to approach to show the witness a document.
19          THE COURT:  Okay.  Do you want to impeach the
20    witness?  I think you would have to mark the document for
21    identification.
22          MS. RUST:  I was going to use it to refresh her
23    recollection first.  Then I'm happy to admit it.
24          THE COURT:  Even to refresh recollection, you have
25    to have the document marked.  Ms. Thompson will give you a
```

```
 1    number.
 2            MS. LEWIS:  Your Honor, if I may see whatever
 3    document she is handing the witness.
 4            THE COURT:  Absolutely.  Let her mark it first.
 5    What number are you putting on there?
 6            THE CLERK:  DX200.
 7            THE COURT:  All right.  DX200 for identification
 8    may be shown to the witness.  You are requiring her to view
 9    that document, then ask her any questions she has.
10            THE WITNESS:  I've never seen this.
11            THE COURT:  No, I said wait for her questions.
12            THE WITNESS:  I'm sorry.
13    BY MS. RUST:
14    Q.  Have you reviewed both of these pages or did you just
15    review one of them?
16            Let's start with the one that's dated October 10th,
17    2018.  Have you seen this document before?
18    A.  This one, yes.
19    Q.  Okay.  The document dated October 10th, 2018, you've seen
20    this document before?
21    A.  Yes.
22    Q.  Okay.  And the second page, the document dated January
23    21st, 2019, have you seen that document?
24    A.  No.
25    Q.  The one titled "Employee final notice"?
```

1   A.  Yeah, I never seen it before.

2   Q.  Okay.  Let's look at the one dated October 10th.  It

3   says -- I'll read it.  Tell me if I'm reading it correctly,

4   "No problem, no show for work 10-9-2018, reprimand concerning

5   communication relating to work and return to work,

6   understands that responsible for account prior to leaving,

7   however, an emergency left but discussed will openly

8   communicate for future events"?

9            THE COURT:  The question was, you were shown those

10  documents to fresh your recollection, but she is supposed to

11  read it, and then you're supposed to ask has your

12  recollection been refreshed, and then read what you just

13  read.  So the question on the floor was, does the document

14  refresh her recollection with whether she has ever been

15  reprimanded?

16           MS. RUST:  Thank you, Judge.  Since we were

17  admitting them, but I'm happy to stick with that.

18           THE COURT:  The documents for recollection are not

19  admitted.  They are not admissible.  They are for

20  recollection only, refreshing recollection.

21  BY MS. RUST:

22  Q.  Okay.  So let me back up.  Does the document dated 10-10,

23  did you read that through to yourself, and does that refresh

24  your recollection as to whether you've ever received a

25  reprimand?

```
 1    A.  But it has been edited, so, no.  This was not like this.
 2    No.  This is an edited.
 3    Q.  Okay.  So are you saying you -- it's still your position
 4    that you've never been reprimanded for relating to showing up
 5    or leaving work --
 6    A.  So this was a day when I left early, but it didn't say
 7    all of this when I signed it.  There is stuff that's been
 8    added to this since I signed it.  So this document I've never
 9    seen.
10    Q.  So did you receive a reprimand relating to you leaving
11    work early that day?
12    A.  At the time when I signed it, it was not labeled
13    reprimand, so, no, ma'am, I did not.  It was not labeled as
14    reprimand.  This was not here.  And this is not here labeling
15    it as a no call/no show, so, no, ma'am, I did not receive
16    this reprimand, no.
17    Q.  Okay.  But there was at least a discussion from either
18    Lisa or Christine at Steadfast regarding you leaving work
19    early that day?
20    A.  Correct.
21    Q.  Before your shift ended?
22    A.  Correct.
23    Q.  And did they imply that it was disciplinary nature of
24    that discussion?
25    A.  No.
```

```
 1    Q.  Okay.  And the second page, the one dated January 21st,
 2    2019, does this refresh your recollection as to whether
 3    you've ever received a written reprimand regarding your
 4    attendance at work?
 5    A.  Ask the question again.
 6    Q.  Okay.  Then after you read through this second page dated
 7    January 21st, does it refresh your recollection as to whether
 8    you've ever received a reprimand from Steadfast regarding
 9    your attendance at work?
10    A.  So the same thing.  This has been edited.  So, no, I did
11    not receive this document at all, no, ma'am.
12    Q.  Okay.  And is that your signature at the bottom?
13    A.  Yes, it is.  But my name is spelled wrong at the top, so
14    I think I'd recognize my name is spelled right.
15    Q.  All right.  I want to talk to you about a few things that
16    you discussed with Ms. Lewis on your testimony.  So you
17    discussed scheduling shifts for the nurses, right?  You
18    weren't able to schedule a shift for a nurse unless they sent
19    you their availability, right?
20    A.  Traditionally, that was how I liked to operate.
21    Q.  Okay.  You talked about how there was a rate set for each
22    facility, right?  You said it was posted?
23    A.  Uh-huh.
24    Q.  Okay.  And you said on your -- during your testimony it
25    was set by Lisa, right?
```

```
 1    A.  Yes.
 2    Q.  But Lisa provided the rate that the facility agreed to
 3    pay for that, is that right, to you?
 4    A.  The rate that the facility agreed to pay?
 5    Q.  I mean, let me rephrase that.  It wasn't a good question.
 6    The rate that you would see posted for a shift, that
 7    information was provided to you or wherever it was posted by
 8    Lisa --
 9    A.  Uh-huh.
10    Q.  -- right?
11    A.  Yes, ma'am.
12    Q.  And were you involved in negotiating Steadfast contracts
13    with facilities?
14    A.  No, ma'am.
15    Q.  And did you -- okay.  You also discussed being able to --
16    you were discussing some special rates and some bonuses that
17    you could offer the nurses; is that right?
18    A.  Uh-huh, yes, ma'am.
19    Q.  And you were not aware of whether the facilities approved
20    Lisa to offer those bonuses, are you?
21    A.  No, ma'am.
22    Q.  Okay.
23              THE COURT:  Waiting on you, Ms. Rust.
24              MS. RUST:  Sorry, Judge.  Just reviewing some
25    notes.
```

Draughn, C. - Cross                                              51

```
 1   BY MS. RUST:
 2   Q.  You talked about the DNR list as well, and you said that
 3   the DNR was determined or a facility would let Steadfast know
 4   whether they did not want a nurse to return to their
 5   facility; is that right?
 6   A.  Correct.
 7   Q.  In fact, you would rely or you said at least on some
 8   occasion you were involved in relaying the information from
 9   the facility that the facility would provide to Steadfast
10   regarding an issue, right?
11   A.  Yes.
12         MS. LEWIS:  Objection, form, Your Honor,
13   mischaracterizes the testimony.
14         THE COURT:  All right.  You can rephrase the
15   question and still ask it.
16   BY MS. RUST:
17   Q.  Okay.  You said in your testimony that you would get a
18   report from the facility, right?
19   A.  Yes, ma'am.
20   Q.  And that the facility wanted to DNR that nurse?
21   A.  Yes.
22   Q.  Okay.  So you talked about Christina Evans, right?
23   A.  Yes.
24   Q.  And in her situation she was DNR'd from multiple
25   facilities; is that right?
```

```
 1    A.  Yes, ma'am.
 2    Q.  And to the point where there were no more facilities that
 3    Steadfast had contracts with that they could schedule her
 4    with, right?
 5    A.  Yes.
 6    Q.  Okay.  So in each of those instances the facility DNR'd
 7    her?
 8    A.  Yes.
 9    Q.  So Steadfast didn't have any available contracts that she
10    could work shifts on, right?
11            MS. LEWIS:  Objection, form, Your Honor.
12    Evidence -- that information was not previously presented in
13    testimony.
14            THE COURT:  That evidence what?
15            MS. LEWIS:  Was not previously produced in
16    testimony, so evidence not in -- testimony -- not in
17    evidence.
18            THE COURT:  Okay.  Your response to that?
19            MS. RUST:  I can rephrase, perhaps.
20    BY MS. RUST:
21    Q.  At the facilities that you could schedule Ms. Evans at,
22    every one of them had DNR'd her; is that right?
23    A.  Of my facilities.
24    Q.  Okay.
25    A.  But there were other facilities that I did not staff that
```

```
 1    she could have gone to.
 2    Q.  Okay.  And then you said that Steadfast was in the
 3    business of sending nurses to facilities in the field, right?
 4    A.  Yes.
 5    Q.  So with respect to if a nurse did not show up or couldn't
 6    finish the shift, you said you were supposed to have a nurse
 7    on standby, right?
 8    A.  Yes, ma'am.
 9    Q.  And that's because it was -- Steadfast was in the
10    business of sending nurses to fill the shifts to these
11    facilities, right?
12    A.  Yes.
13              MS. RUST:  Okay.  I have no further questions.
14              THE COURT:  Redirect?
15              MS. LEWIS:  Very briefly.
16              THE COURT:  Always in the scope of what she's
17    asked.
18              Okay.
19                      REDIRECT EXAMINATION
20    BY MS. LEWIS:
21    Q.  Just very brief question with respect to the firing, the
22    severing of the relationship.  For Ms. Evans, the
23    relationship was severed because she posed a consistent
24    liability; is that correct?
25    A.  Correct.
```

```
 1          MS. LEWIS:  No further questions.

 2          THE COURT:  All right.  We will take a 15-minute

 3   break.

 4          First of all, may this witness be permanently

 5   excused?

 6          MS. LEWIS:  My apologies for not asking permission

 7   to move.  Yes, she may, Your Honor.

 8          THE COURT:  All right, ma'am.  You may be

 9   permanently excused.  Step down.

10          We will take a 15-minute break, come back and

11   continue.

12          (Witness excused.)

13          (Recess from 11:43 a.m. to 12:00 p.m.)

14          THE COURT:  You may call your next witness.

15          MR. SEIFELDEIN:  We call Yetunde Taylor.

16          THE COURT:  Who did you say you were calling?

17          MR. SEIFELDEIN:  Ms. Yetunde Taylor.

18          (Witness was sworn.)

19          YETUNDE TAYLOR, called by the Plaintiff, having

20   been first duly sworn, was examined and testified as

21   follows:

22                       DIRECT EXAMINATION

23   BY MR. SEIFELDEIN:

24   Q.  Good afternoon, ma'am.  Can you hear me?

25   A.  Good afternoon, sir.
```

```
 1    Q.   Can you state your full name for the Court, please?

 2    A.   Yetunde Taylor.

 3    Q.   Can you spell your last name?

 4    A.   T-a-y-l-o-r.

 5    Q.   All right.  Are you familiar with Steadfast Medical

 6    Staffing?

 7    A.   Yes.

 8    Q.   What type of services does Steadfast Medical Staffing

 9    provide?

10    A.   An LPN, nursing, healthcare.  Healthcare.

11    Q.   They provide healthcare services?

12    A.   Yes, sir.

13    Q.   Were you employed by Steadfast Medical Staffing?

14    A.   Yes.

15    Q.   What was your job title?

16    A.   I was a registered nurse.

17    Q.   A registered nurse?

18    A.   Yes, sir.

19    Q.   When did you start working for Steadfast?

20    A.   In around October through November 2017.

21    Q.   Did you have to fill out an application to work for

22    Steadfast?

23    A.   Yes.

24    Q.   Where did you get the application from?

25    A.   Through an e-mail.
```

```
 1    Q.  And who sent you the e-mail?

 2    A.  Ms. Pitts.

 3              THE COURT:  Ma'am, I know you have a mask on but

 4    you will have to speak a little louder.

 5              THE WITNESS:  I'm sorry.

 6    BY MR. SEIFELDEIN:

 7    Q.  Who did you say sent it?

 8    A.  Lisa Pitts.

 9    Q.  Lisa Pitts?

10    A.  Yes.  From Steadfast.

11    Q.  Let me direct your attention to Plaintiff's Exhibit 53,

12    Page 2.  Do you recognize this document?

13    A.  Yes.

14    Q.  When was it sent to you?

15    A.  March -- I'm trying to look.  25 September 2017.

16    Q.  What is it?  What is this document?

17    A.  It's an obligation for -- it's application to PDS.

18    Q.  Do you recognize your e-mail in there from the 2 section?

19    Can you go to Page 2, please.

20    A.  Yes.

21    Q.  I'm sorry.  Excuse me.  Page 2.  002.

22              Ms. Taylor, at the bottom do you recognize your

23    e-mail address?

24    A.  Yes.

25    Q.  Okay.  And is it YetundeTaylor@Yahoo.co.uk?
```

```
 1    A.  Yes, please.
 2    Q.  And in the front section do you recognize that e-mail
 3    address, says, Apps.Steadfast@Gmail.com?
 4    A.  Yes.
 5    Q.  Is that the e-mail address that you received this
 6    document from?
 7    A.  Yes, please.
 8    Q.  Is this document -- what document did you receive on this
 9    application?
10    A.  It contains the application form.
11    Q.  An application form?
12    A.  Uh-huh.
13    Q.  Do you see the body of this e-mail?  Do you recognize it,
14    first of all?
15    A.  Yes, sir.
16    Q.  And did Steadfast send you a 36-page application to fill
17    out as part of your hiring process?
18    A.  Yes.
19    Q.  And was there a document attached to this e-mail?
20    A.  Yes.
21            MR. SEIFELDEIN:  And for Your Honor, I'd like to
22    admit that one first, PX53-02.
23            THE COURT:  Any objection?
24            MS. RUST:  No.
25            THE COURT:  Hearing no objection, the document has
```

 1   been admitted.  This is Exhibit number?

 2           MR. SEIFELDEIN:  PX53-002.

 3           (Plaintiff's Exhibit PX53-002 received in evidence.)

 4           THE COURT:  Okay.

 5           MR. SEIFELDEIN:  Thank you, Your Honor.

 6   BY MR. SEIFELDEIN:

 7   Q.  All right.  And if we click on that application, is it a

 8   true and accurate representation of the attachment that was

 9   sent to you?

10   A.  Can you repeat that?

11   Q.  Let me direct your attention to PX26-025.  Do you

12   recognize this document?

13   A.  Yes.

14   Q.  All right.  Is this the application that was attached to

15   the e-mail you just looked at?

16   A.  Yes.

17   Q.  Is this a true and accurate representation of that

18   application that you received?

19   A.  Yes.

20           MR. SEIFELDEIN:  Your Honor, I'd like to move

21   PX26-025 to 035 into evidence.

22           THE COURT:  Was the document that you just

23   referenced attached to the e-mail that you first admitted?

24           MR. SEIFELDEIN:  That's correct, Your Honor.

25           THE COURT:  Didn't they have a single number, the

```
 1   letter plus the attachment?

 2          MR. SEIFELDEIN:  I'm sorry?

 3          THE COURT:  Didn't the e-mail have an attachment,

 4   wasn't that one document?

 5          MR. SEIFELDEIN:  Yes.  That is an e-mail.

 6          THE COURT:  So you didn't need to separately

 7   introduce the attachment because you identified the

 8   document, and she said she identified the attachment, so you

 9   don't need another case number.  It all comes in under the

10   one we admitted.

11          MR. SEIFELDEIN:  It hasn't been shown, Your Honor,

12   but I understand.

13   BY MR. SEIFELDEIN:

14   Q.  Did you fill out the application, Ms. Taylor?

15   A.  Yes, I did.

16          MS. RUST:  I'm sorry.  Before you go, can you

17   address how many pages in Exhibit 26?  Is it all of it?

18          MR. SEIFELDEIN:  PX26, Your Honor, 025 through 035.

19   BY MR. SEIFELDEIN:

20   Q.  And you filled this application out, Ms. Taylor?

21   A.  Yes, sir, I did.

22   Q.  After you completed this application did you speak with

23   anyone at Steadfast?

24   A.  Yes.

25   Q.  Who did you speak with?
```

```
 1   A.   Ms. Lisa Pitts, L-i-s-a P-i-t-t-s.

 2   Q.   What did she speak to you about?

 3   A.   She said that I need to complete the application form.

     She asked me to complete all the application form.

 5   Q.   Okay.  And after you spoke with Ms. Pitts and you

 6   completed the application form, were there any questions that

 7   Ms. Pitts asked you?

 8   A.   She said, after she reviewed the application form, and I

 9   will have to do some drug tests, and also she is expecting an

10   application to go through and then through the process.

11           MS. RUST:  I couldn't make out what she said.

12           THE COURT:  Repeat.

13           THE WITNESS:  And she said I need to do some drug

14   test, drug test.  She was -- sent something to me, and she

15   would give me information of where to go and take my blood,

16   drug test.

17   BY MR. SEIFELDEIN:

18   Q.   And you performed that drug test?

19   A.   Yes, sir.

20   Q.   And listened to directions?

21   A.   Yes, sir.

22   Q.   And who hired you?

23   A.   Lisa Pitts.

24   Q.   Okay.  And were you paid on an hourly or a salary basis?

25   A.   Hourly.
```

```
 1   Q.  Okay.  How much were you paid an hour?

 2   A.  $14 an hour.

 3   Q.  As a registered nurse were you able to negotiate a

 4   different rate of pay with Ms. Pitts?

 5   A.  No, not at that point.

 6   Q.  Okay.  Did you try to negotiate?

 7   A.  Yes.

 8   Q.  And what did she say to you?

 9   A.  She said that's the amount she's paying everybody.

10   Q.  And who set that amount rate for you?

11   A.  Ms. Lisa Pitts.

12   Q.  As part of your application, were you required to sign an

13   agreement?

14   A.  Yes.

15   Q.  Okay.  Let me direct your attention to PX25 beginning

16   with Page 1 through Page 5.  Do you recognize this document,

17   Ms. Taylor?

18   A.  Yes, sir.

19   Q.  I want you to look at Page 4 of 5 of that document, the

20   signature.  Is that your signature?

21   A.  Yes.

22   Q.  Okay.  Go to the following page, please.

23           Is that your information there?

24   A.  Yes.

25   Q.  And this is a document that you signed, correct, as part
```

 1  of your application?

 2  A.  Yes.

 3  Q.  Let me direct your attention to Page 3, Paragraph 8, the

 4  non-competition clause there.  Do you see it?

 5  A.  Yes.

 6  Q.  Okay.  When you worked for Steadfast, was there an

 7  instance when you wanted to work for another agency and

 8  Ms. Pitts prevented you from doing so?

 9  A.  Yes.

10  Q.  Could you tell me about that.

11  A.  Um, she said if I work for another agency, and I will be

12  fired, and I will be blacklisted.

13  Q.  I'm sorry?

14  A.  I'll be prevented from working for any DOC.

15  Q.  What did you understand by that?

16  A.  That I would not be able to work for another agency

17  except her.

18  Q.  All right.  Was there an agency trying to recruit you?

19  A.  Yes.

20  Q.  Do you recall that agency?

21  A.  Yes.

22  Q.  Tell me about what happened when you talked to Ms. Pitts

23  about it.

24  A.  She said I will be blacklisted, or I'll be fired, and

25  then I would not be able to work.  That's what she told me, I

1    wouldn't be able to work for any DOC.

2    Q.  And did you believe her?

3    A.  Yes.

4    Q.  Were you given the option by Steadfast and Lisa Pitts to

5    be classified as an employee or independent contractor?

6    A.  I was classified as an independent contractor, but I was

7    treated like I'm an employee because she set the salary and

8    where -- when I'm supposed to work, where I'm supposed to be

9    working.  She took application from everything.  I was

10   treated like -- well, like an employee.

11          MR. SEIFELDEIN:  Your Honor, like to admit PX25-001

12   through Page 5.

13          THE COURT:  Any objection?  Hearing no objection

14   it's admitted.

15          (Plaintiff's Exhibit PX25-001 through PX25-005

16   received in evidence.)

17          MS. RUST:  Sorry.  I only -- PX version you sent

18   us, PX-25, the numbers are not adding up.  But my only

19   objection is the PDF copies of Plaintiff's exhibit that they

20   had provided to our office, the page numbers are not lining

21   up.  So, for example, PX-25, Page 1 that is -- it says,

22   "Both file of a lot of independent contractor agreements,"

23   but the first one is not for Ms. Yetunde as indicated on the

24   documents on the screen here.

25          THE COURT:  Do you have the document that's on the

```
 1    screen, whether it's formatted the same way, do you have it?
 2            MS. RUST:  I would have it in this PDF somewhere
 3    that's 816 pages that they sent me.
 4            THE COURT:  Okay.  If the document is pulled up on
 5    your screen now, and you can see fully what he has shown
 6    her; is that correct?
 7            MS. RUST:  Yes.
 8            THE COURT:  And you can see that Paragraph 8?
 9            MS. RUST:  Yes.
10            THE COURT:  So that's something you all need to
11    discuss over the lunch hour, but they provided you the
12    document, just not formatted the way it is there?
13            MS. RUST:  Yes.
14            MR. SEIFELDEIN:  Your Honor, we have provided the
15    paper copy which should be consistent with that.  We
16    provided three copies to the firm.
17            THE COURT:  You provided copies?
18            MR. SEIFELDEIN:  That's correct, Your Honor.
19            MS. RUST:  Yes.  So I just -- all I want to point
20    out for the record is that we got some digital copies with
21    some of their exhibits back when we were doing the pretrial
22    order.  We got paper copies of all of their exhibits
23    yesterday, which encompassed at least six binders, probably
24    5,000 pages.
25            So to the extent there is a difference in pages as
```

```
 1    what we were provided with at the pretrial conference, I

 2    just want to point that out for the record so that there

 3    might be some confusion on finding page numbers.

 4            THE COURT:  All right.  Your objection is noted.

 5    The document is admitted.  Let's move on.

 6            MR. SEIFELDEIN:  Thank you, Your Honor.

 7    BY MR. SEIFELDEIN:

 8    Q.  Ms. Taylor, let me direct your attention to Plaintiff's

 9    Exhibit 32-18.  Do you recognize this document, Ms. Taylor?

10    A.  Yes.

11    Q.  What is it?

12    A.  It's the HIPAA --

13    Q.  Pardon me?

14    A.  It's the -- substance abuse policy and procedure

15    substance abuse.

16    Q.  So it's a document that you received from Steadfast along

17    with the application, correct?

18    A.  Yes.

19    Q.  Okay.  And this -- did Steadfast provide you with

20    in-service training?

21    A.  No.

22            MS. RUST:  Objection.  Foundation.

23            THE COURT:  Wait a minute.  Your objection, you

24    need to stand up and tell me what's your objection.

25            MS. RUST:  I'm going to object as to foundation.
```

```
 1   She didn't testify as to this training that she received.
 2              THE COURT:  This is a totally, this is a new
 3   question to the witness that he's asking her.
 4              MR. SEIFELDEIN:  That's correct.
 5              THE COURT:  Objection overruled.
 6   BY MR. SEIFELDEIN:
 7   Q.  Did Steadfast provide in-service training to you?
 8   A.  No.  That is through this documentation that we are to
 9   complete everything.  I didn't have any training.
10   Q.  So what sort of training through this documentation did
11   Steadfast provide, and take your time looking at it.  Let's
12   begin with PX-32 Page 4 through 6.
13   A.  HIPAA, H-I-P-A-A, participant training guide.
14   Q.  Okay.  Then if you could scroll down to the next session,
15   Ms. Lewis.  As part of the hiring and this training that was
16   provided to you by Steadfast, do you have to complete the
17   HIPAA training module test?
18   A.  Yes.
19   Q.  Was that required by Pitts and Steadfast?
20   A.  Yes.
21   Q.  If we go to Page 8 of the same document.
22              Did Steadfast provide you with substance abuse
23   training?
24   A.  Yes.
25   Q.  And is this the document that Steadfast provided you for
```

```
 1   training for substance abuse?

 2   A.  Yes.

 3   Q.  If you go to Page 11, did Steadfast provide you with

 4   sexual harassment training?

 5   A.  Yes.

 6   Q.  And is this the training that Steadfast provided to you?

 7   A.  Yes.

 8   Q.  Did Steadfast provide you with abuse and neglect training

 9   as well?

10   A.  Yes.

11   Q.  And is this the document that provided that?

12   A.  Yes.

13   Q.  Let me direct your attention again to 53-01, the

14   September 28th e-mail.  Do you see that document?

15   A.  Yes.

16   Q.  Were you required to complete time sheets?

17             THE COURT:  Wait a minute.  Hold on a second,

18   counsel.

19             MR. SEIFELDEIN:  Yes, sir.

20             THE COURT:  Is this a new document you're directing

21   her attention to?

22             MR. SEIFELDEIN:  Document has multiple e-mails.

23             THE COURT:  53 what?

24             MR. SEIFELDEIN:  53-01, a September 28th e-mail.

25             THE COURT:  Okay.  So you may continue.  Want to
```

```
 1    make sure that it's clear it's a new document, something she
 2    recognizes.
 3              MR. SEIFELDEIN:  Yes, Your Honor.
 4    BY MR. SEIFELDEIN:
 5    Q.  Were you required to complete time sheets?
 6    A.  Yes.
 7    Q.  And is this the e-mail that Steadfast sent to you saying
 8    you have to complete time sheets?
 9    A.  Yes.
10    Q.  And within this e-mail did Steadfast send you a copy of
11    the time sheets?
12    A.  Yes.  They did.
13    Q.  And how often were you required to submit time sheets to
14    Steadfast?
15    A.  Weekly.
16    Q.  Weekly?
17    A.  Yes.
18    Q.  Who told you you were required to submit these time
19    sheets?
20    A.  Ms. Pitts.
21    Q.  Ms. Taylor, did you ever work more than 40 hours in a
22    workweek?
23    A.  Yes.
24    Q.  How often did you work more than 40 hours in a workweek?
25    A.  Weekly, every week.
```

1    Q.  Every week?

2    A.  Uh-huh, yes.

3    Q.  On average approximately how many hours did you work each

4    day?

5    A.  12 hours.

6    Q.  12 hours.

7            THE COURT:  Before you go too far, this document,

8    53-01, what's the status?  Are you admitting this document

9    or what are you doing?

10           MR. SEIFELDEIN:  Yes, Your Honor.  The document has

11   been admitted.

12           THE COURT:  The document has not been admitted.

13           MR. SEIFELDEIN:  Understand, Your Honor.  Would

14   like to admit it, then, 53-01.

15           THE COURT:  All right.  Then, hearing no objection

16   53-01 will be admitted.

17           (Plaintiff's Exhibit PX53-01 received in evidence.)

18   BY MR. SEIFELDEIN:

19   Q.  What range were you paid per hour when you worked over 40

20   hours in a week?

21   A.  $14 an hour.

22   Q.  Is that the same as your regular rate?

23   A.  Yes.

24   Q.  Did you ever receive time and a half for hours worked

25   over 40 hours in a workweek?

1    A.   No.

2    Q.   Did you ever speak with anyone from Steadfast or with

3    Ms. Pitts about not receiving overtime?

4    A.   Yes.

5    Q.   And what was said to you?

6    A.   I spoke to Ms. Pitts about not being paid overtime, and

7    also many times I worked Christmas, public holidays like

8    Christmas, New Years, Thanksgiving, and I wasn't paid over --

9    the -- one time and a half.  So I spoke to her, and she told

10   me that the DOC doesn't pay holiday, that she just pay the

11   flat rate, which was $14 an hour, and that is how much she's

12   paying me.

13   Q.   I understand.  Were you required to provide a notice to

14   Steadfast if you weren't -- if you were not available to

15   work?

16   A.   Yes.

17   Q.   Okay.  All right.  Look at this same document we are

18   looking at -- I'm sorry, PX-53, Page 3, an e-mail dated

19   December 4th, 2007.  Is this a document that Steadfast, Lisa

20   Pitts, sent you requiring you to provide a notice if you're

21   not available to work?

22   A.   Yes.

23   Q.   And who were you required to provide the notice to?

24   A.   Lisa.

25   Q.   And how far ahead in advance did you have to provide this

Taylor, Y. - Direct                                                    71

```
 1  notice?
 2  A.  At least -- two hours before your work time.
 3  Q.  Okay.  And this is if you're running late?
 4  A.  Yes.
 5  Q.  What about if you weren't going to be working, for taking
 6  time off, did you have to provide a notice as well?
 7  A.  Yes.
 8  Q.  And did you have -- how often did you have to file a
 9  notice in advance?
10  A.  Maybe a week.
11  Q.  And who told you that you needed to provide this notice?
12  A.  Lisa.
13          THE COURT:  Keep your voice up.
14          THE WITNESS:  Lisa Pitts, sir.
15  BY MR. SEIFELDEIN:
16  Q.  Was there times when you tried to provide a notice to
17  Ms. Pitts?
18  A.  Yes.
19  Q.  Did Steadfast or Lisa Pitts accept your notice when you
20  tried to take off, provide that notice?
21  A.  No.
22  Q.  Okay.  What was the response from Ms. Pitts or Steadfast?
23  A.  She said you can't take any time off, or you can't
24  take -- you can't call out because if you call off, you are
25  going to get fired.
```

**JA123**

```
 1    Q.  Did you end up working?

 2    A.  Yes.

 3    Q.  And why did you end up working when she told you that you

 4    were fired?

 5    A.  Because there -- because I'm a single mom.  At that time

 6    I was a single mom, and my eldest was at VCU studying

 7    accounting.  I'm also having my last child is son as of

 8    today, so I was the only one taking care of them at that

 9    time.

10    Q.  You needed to work?

11    A.  Yes.

12    Q.  Directing your attention to the same document, 53-01, an

13    e-mail dated Monday, October 2nd, 2017, at 9:54.  Do you see

14    that?

15    A.  Yes.

16    Q.  Did Steadfast provide you with a badge?

17    A.  Yes.

18    Q.  Page 1.  And did Steadfast ask you which address they

19    should send the badge to?

20    A.  Yes.

21    Q.  Did the badge that Steadfast send you have the name of

22    the company on it?

23    A.  Yes.

24    Q.  Which company name was on the badge?

25    A.  So Steadfast Medical.
```

Taylor, Y. - Direct                                                73

```
1    Q.  Were you required to wear the badge when Steadfast sent
2    you to facilities to work?
3    A.  Yes.
4    Q.  If you had a scheduling conflict, Ms. Taylor, did
5    Steadfast allow you to send another nurse in your place?
6    A.  I'm sorry.  That has never been a discussion to me.  I
7    was never made aware of that so...
8    Q.  Were you allowed to employ another nurse to complete a
9    shift that Steadfast compensated you for?
10   A.  That --
11           MS. RUST:  Objection.
12           THE WITNESS:  That never been discussion.
13           THE COURT:  Wait a minute.  There is an objection.
14   You have to wait and let the Court listen at what the
15   objection is.
16           MS. RUST:  Objection, asked and answered.
17           MR. SEIFELDEIN:  It has not.  That was a different
18   question.  The previous question was if you had a scheduling
19   conflict did Steadfast Medical Staffing allow you to send
20   another RN.  This one is were you allowed to employ another
21   RN to complete a shift that Steadfast has assigned you.
22           THE COURT:  Objection overruled.
23   BY MR. SEIFELDEIN:
24   Q.  I'll repeat the question again, Ms. Taylor.  Were you
25   allowed to employ another registered nurse to complete a
```

Taylor, Y. - Direct                                                      74

1   shift that Steadfast assigned to you?

2   A.   No.  That has never been a discussion.

3   Q.   Were you allowed to have another individual assist you in

4   the shift that Steadfast assigned you to?  Could you bring

5   someone with you to assist you?

6   A.   No.  That has never been a discussion.  I was never made

7   aware of that, never, uh-uh.

8   Q.   Who determined where you worked for opportunities at

9   Steadfast?

10  A.   Ms. Pitts and also the facility like the DOC that I'm

11  working, the facility.

12  Q.   And how do you know about these shifts from Steadfast?

13  A.   From Lisa or the facility.

14  Q.   Okay.  So would Steadfast call you?

15  A.   Yes.

16  Q.   Would you negotiate, once you were completed the shift or

17  assignment, when you were assigned the shift, would you

18  negotiate your rate of pay with the facility directly?

19  A.   No.  It's never a discussion.

20  Q.   Okay.  And who would?

21  A.   Lisa.

22  Q.   After you were placed at a facility, were you interviewed

23  to work by the facility?

24  A.   No.

25  Q.   Other than your hourly rate from Steadfast, did you

**JA126**

```
 1   receive any profits?

 2   A.  No.  No.

 3   Q.  Who paid you for the services that you provided on behalf

 4   of Steadfast?

 5   A.  Steadfast.

 6   Q.  If you did not receive pay from Steadfast, could your

 7   ability to meet your financial obligations be compromised?

 8   A.  Yes.

 9   Q.  Did Ms. Pitts ever threaten you?

10   A.  Yes.

11   Q.  And what happened?

12   A.  Many times, she would just -- anything I tried -- if I

13   tried to say anything she just -- you need to listen,

14   Ms. Taylor.  You need to go right now or else you be fired,

15   and you'll be blocked from working in any DOC.

16           MR. SEIFELDEIN:  Your Honor, I believe we

17   admitted -- excuse me -- PX32.

18           THE COURT:  Okay.  Then there is no objection, PX32

19   will be admitted.

20           MR. SEIFELDEIN:  Thank you.

21           (Plaintiff's Exhibit PX32 received in evidence.)

22   BY MR. SEIFELDEIN:

23   Q.  Ms. Taylor, do you have any ownership in Steadfast?

24   A.  No.

25   Q.  Are you a manager, director of the business Steadfast?
```

Taylor, Y. - Direct                                              76

```
 1   A.  No.
 2   Q.  Do you own a percentage of Steadfast?
 3   A.  No.
 4   Q.  Ever since you left Steadfast have you received any back
 5   wages for the overtime hours that you worked?
 6   A.  No.
 7           MR. SEIFELDEIN:  No further questions for this
 8   witness.
 9           THE COURT:  The Court has a question before
10   cross-examination.  How long did you work for Steadfast and
11   when?
12           THE WITNESS:  I can't remember the date, but there
13   was a time that I work for them, and then I left and worked
14   for another agency, but I was still on the register, and
15   then I was working, came back again.  I can't remember
16   specifically, but it was in between those period like
17   October to November 2017 to April 20, 2019.  But in between,
18   you know, there was stuff, but I can't remember when because
19   it's been a long time.
20           THE COURT:  I thought I heard you say something
21   about 2017.
22           THE WITNESS:  Yes.  That is when I started working
23   for them.
24           THE COURT:  Started 2017.  Thank you very much.
25           THE WITNESS:  Thank you, sir.
```

```
 1            THE COURT:  Cross-examination.
 2                         CROSS-EXAMINATION
 3   BY MS. RUST:
 4   Q.  Hi, Ms. Taylor.  My name is Julia Rust.  I'm an attorney
 5   for Steadfast and Ms. Pitts.  You said that Steadfast was in
 6   the business of healthcare services?
 7   A.  Yeah, nursing, healthcare nursing.
 8   Q.  Are you aware of whether any nursing services are
 9   provided at Steadfast's office?
10   A.  No.  I don't know anything.  I have never been to the
11   office so I don't even know.
12   Q.  Okay.  You've never been to the office?
13   A.  No.
14   Q.  Okay.  And we went over some training forms.  Those --
15   you never received any in-service training from Steadfast,
16   right?
17   A.  I've never been yet in a room environment to receive any
18   type of nothing, except that, just showed you, just completed
19   in my own home.  I have never been anywhere.
20   Q.  Okay.  So the forms that we looked at are the only
21   information you received from Steadfast --
22   A.  Yes.
23   Q.  -- on those topics?
24   A.  Yes.
25   Q.  Okay.  And when you -- you said earlier you complained
```

```
 1   about not being paid a holiday rate; is that right?
 2   A.   Yes.
 3   Q.   And Lisa, tell me if I'm wrong, you said Lisa told you
 4   that the facility doesn't pay a holiday rate, right?
 5   A.   I said I complained to Ms. Lisa that I have not been paid
 6   for Christmas holidays, Thanksgiving holidays, any kind of
 7   holidays, and also I wasn't paid overtime.  Like when I was
 8   over 40 hours, I was never paid overtime.  So I complained to
 9   her, and she told me that DOC, means The Department of
10   corrections, paid only a flat rate of $14 an hour, and that
11   is the amount she paid me, that they never paid overtime of
12   something for me working overtime or working holidays.
13   That's what she told me, uh-huh.
14   Q.   So it was based on what the facility, the DOC, would
15   agree to pay?
16   A.   I don't know, but she had the discussion with DOC.  I
17   don't know what she had with DOC, but that's what she told
18   me.  I don't know.
19   Q.   Okay.  And did you -- you scheduled shifts directly
20   through the facility at times; is that right?
21   A.   No.  Because, like -- I would see it on the paper, you
22   know.  They have the -- for the whole month, they may have
23   the names written, but then Lisa provided it to me, the
24   information that this is -- she would call me and tell me
25   this is the days I'm working.
```

```
 1    Q.  Now, you said earlier on your direct that you would learn

 2    of shifts either through Lisa or the facility?

 3    A.  Yes, because it comes like -- the whole month may be

 4    there, like in a diary or -- like a calendar.  People's name

 5    maybe be overwritten, you know, from Monday people's name,

 6    Tuesday, you know, just --

 7    Q.  I understand.

 8    A.  -- for everybody to see.

 9    Q.  I understand.  So isn't it true that you would have

10    conversations with the scheduler at the facility, for

11    example, on a correctional and pick up shifts directly

12    through the facility's scheduler?

13    A.  No.  That come from Lisa.

14    Q.  After?

15    A.  Because we work hand in hand, so it comes from -- I can

16    see in the diary, calendar, that it comes from Lisa.  Lisa

17    has to talk to me, that these are the days you are working,

18    but all the calendar is open to everybody.  Everybody can

19    see.  So you don't -- everybody can see the calendar, that,

20    you know, everybody comes and see who is working on this day

21    and this day, that is what I'm trying to tell you, uh-huh.

22    Q.  Okay.  You said you would work hand in hand with the

23    facility; is that what you said?

24    A.  No, I work hand in hand with Lisa.

25    Q.  With Lisa on your availability --
```

1    A.   Yes.

2    Q.   -- and your schedule?

3    A.   Yes.   Everybody knows when everybody supposed to be

4    working.   Like Monday, everybody's name is written so you can

5    always -- everybody can see --

6    Q.   I understand.

7    A.   -- who is working.

8    Q.   And did you -- you said that you worked on and off of

9    Steadfast registry, right?

10   A.   No.   I worked two times with them.

11   Q.   What was that?

12   A.   I worked two times with Lisa.

13   Q.   Okay.   So let me clarify.   When the judge asked you when

14   you were working, you said on and off between 2017 and 2019?

15   A.   Yes.   In between those times -- months there was a month

16   that I worked for another agent, but I can't remember.

17   Q.   Okay.   And then you came back to Steadfast registry?

18   A.   No.   I was always with Steadfast, too.   I was never

19   pulled out of working with Steadfast.   If I want to work, I

20   can.   I want to work so I was never off.

21   Q.   Okay.   So you could tell Steadfast when you wanted to

22   work, and you were allowed to work for another registry,

23   right?

24   A.   No, I wasn't allowed.

25   Q.   But you did work for another registry?

**JA132**

1    A.  I never told her, she never asked me, so I didn't, you

2    know -- because there was a threat already that if I worked

3    with another agency, I will be fired.

4    Q.  But you did work for another agency, right?

5    A.  Yes.

6    Q.  Okay.  And didn't you have problems getting paid from

7    that other agency?

8    A.  A problem getting paid?  No.  There was no discussion

9    about being paid.  What do you mean?

10        MR. SEIFELDEIN:  Your Honor, this is outside of the

11   scope of direct, and it's not relevant.

12        THE COURT:  Objection overruled.

13   BY MS. RUST:

14   Q.  So let me go back to the question.  Didn't you have

15   problems getting paid from that other agency at one point?

16   A.  There was never discussion --

17        MR. SEIFELDEIN:  Your Honor, objection.

18        THE WITNESS:  No discussion.

19        THE COURT:  Wait a minute.  Don't answer when he is

20   saying object.

21        MR. SEIFELDEIN:  Assumes facts not in evidence.

22        MS. RUST:  I'm on cross.  I can ask her leading

23   questions.

24        THE COURT:  Yeah, you can ask her leading

25   questions, of course, as long as it has some relevance to

1    what's going on.  The Court permitted her to ask the

2    question about work for other agencies, but you were trying

3    to link through her direct testimony the fact that she was

4    exercising certain conduct indicative of being an employee,

5    and this whole question she is asking here goes to the

6    opposite direction, potentially.  So the Court overrules

7    your objection.

8           Let's see can we get through this now.  Ms. Taylor,

9    make your answers as short and clear as possible.

10          THE WITNESS:  Yes, sir.

11          THE COURT:  If there needs to be some follow-up,

12   let the counsel ask you a follow-up question, that way we

13   avoid this going backward and forwards and getting lost in

14   everything here.

15   BY MS. RUST:

16   Q.  Okay.  When you worked at a facility through Steadfast

17   registry, was there -- there was never anyone from Steadfast

18   on site at that facility with you; is that correct?

19   A.  Can you repeat that?

20   Q.  Of course.  When you would take a shift at a facility

21   through Steadfast registry, there was never anyone from

22   Steadfast at the facility on site with you, right?

23   A.  I can't understand what you mean somebody from Steadfast.

24   Q.  Sure.  So was Lisa Pitts ever on site with you during --

25   A.  Oh, no.

Taylor, Y. - Cross                                               83

 1  Q.  Was Christine Kim ever on site with you during one of
 2  your shifts?
 3  A.  No.  No.
 4  Q.  And what -- you received a degree to become an RN; is
 5  that correct?
 6  A.  Yes.
 7  Q.  Did Steadfast contribute to that education in any way?
 8  A.  No.
 9  Q.  Have you ever been DNR'd by a facility?
10  A.  No.
11  Q.  Okay.  And as an RN you're subject to certain regulations
12  set by the Virginia Board of Nursing; is that right?
13  A.  Yes.
14  Q.  And those regulations would set the scope of your
15  practice; is that correct?
16  A.  Yes.
17  Q.  And you've never received any equipment from Steadfast
18  other than a badge; is that correct?
19  A.  Yes.
20  Q.  Actually, did you receive the badge that you were talking
21  about with --
22  A.  Yes.  Yes.  Yes.
23  Q.  Okay.  And in order to take a shift for the facility, you
24  have to have an active RN license; is that right?
25  A.  Yes.

**JA135**

```
 1   Q.  And do you bring your own equipment to a facility for a
 2   shift, any of your own equipment?  Do you bring a stethoscope
 3   or a blood pressure cuff?
 4   A.  Yes.
 5   Q.  Okay.  Has Steadfast ever provided you with a blood
 6   pressure cuff or a stethoscope?
 7   A.  No.
 8   Q.  Are those equipment and tools required to do your job at
 9   a facility?
10   A.  Yes.
11   Q.  Okay.  And if those -- if you forgot your blood pressure
12   cuff, for instance, would you likely get one from the
13   facility during your shift?
14   A.  Yes.
15   Q.  Okay.  And if you didn't have an active and current
16   nursing license, would you be able to take a shift at the
17   facility?
18   A.  No.
19   Q.  Okay.  And you have never been involved in any of
20   Steadfast's negotiations with the facilities over the
21   Steadfast facility's contracts; is that correct?
22   A.  No.
23   Q.  So you've never been involved in Steadfast --
24   A.  No.
25   Q.  -- or discussion of the rate of pay of the facility?
```

```
 1   A.   No, no, no, no.

 2            MS. RUST:  Okay.  No further questions.

 3            THE COURT:  Any redirect?

 4            MR. SEIFELDEIN:  Yes.  Yes, Your Honor.

 5            No, we don't, Your Honor.

 6            THE COURT:  May the witness be permanently excused?

 7            MR. SEIFELDEIN:  Yes, Your Honor, she may.

 8            THE COURT:  You may step down.

 9            MR. SEIFELDEIN:  Thank you, Ms. Taylor.

10            (Witness excused.)

11            THE COURT:  Your next witness.

12            MR. SEIFELDEIN:  Your Honor, calling Christopher

13   Hopson.

14            THE COURT:  Okay.

15            (Witness was sworn.)

16            CHRISTOPHER RYAN HOPSON, called by the Plaintiff,

17   having been first duly sworn, was examined and testified as

18   follows:

19                      DIRECT EXAMINATION

20   BY MS. JONES:

21   Q.   Mr. Hopson, could you please spell and state your name

22   for the record.

23   A.   Christopher Ryan Hopson, C-h-r-i-s-t-o-p-h-e-r

24   H-o-p-s-o-n.

25   Q.   And are you familiar with Steadfast Medical Staffing?
```

1   A.  Yes, I am.

2   Q.  And, to your knowledge, what type of services does

3   Steadfast provide?

4   A.  Basic nursing needs for long-term care.

5   Q.  And were you employed or are you currently employed by

6   Steadfast?

7   A.  Yes, I am currently employed.

8   Q.  Okay.  And what is your job title?

9   A.  Licensed practical nurse.

10  Q.  And when did you start working for Steadfast?

11  A.  2016.

12  Q.  And during that time frame did you ever work for any

13  other agency?

14  A.  Yes, I did.

15  Q.  And why did you work any other agencies?

16  A.  I just tried to balance out nursing in general.

17  Q.  And when did you start working for other agencies?  Was

18  it at the same time that you began working for Steadfast?

19  A.  Yes, it was at the same time.

20  Q.  What other agent do you work for in addition to

21  Steadfast?

22  A.  First Choice.

23  Q.  Are there any differences in your work for Steadfast and

24  First Choice?

25  A.  No, it's the same title, pretty much I do the same thing.

```
 1   Q.  Are there any differences in the compensation?
 2   A.  Yeah.  The difference in the compensation is one reason
 3   why I chose Steadfast.  They pay a little bit more in
 4   compensation.
 5   Q.  Are there any differences in compensation in terms of
 6   overtime between First Choice and Steadfast?
 7   A.  Yes.  First Choice pays overtime and Steadfast doesn't
 8   pay overtime.
 9   Q.  And what kind of company is First Choice?
10   A.  It's the same, nursing staffing agency.
11   Q.  Okay.  I want to talk a little bit about your work with
12   Steadfast.  If you recall, how did you begin working for
13   Steadfast?  How did you apply?
14   A.  It was a walk-in.  I did an application.
15   Q.  Okay.  And if I could direct your attention to
16   Plaintiff's Exhibit 26 on Page 1.  Was this the -- an
17   example, could you please go through the first three pages.
18   A.  Yes.
19   Q.  Mr. Hopson, do you recognize this document?
20   A.  Yes, I do.
21   Q.  And is this a copy of the application you completed when
22   you began working for Steadfast?
23   A.  Uh-huh.
24   Q.  And based upon this application, what information were
25   you required to provide when you began working for Steadfast?
```

1    A.  If I recall at the time, I do believe my Social Security

2    card and -- I do want to say I did get a background check.

3    That's pretty much -- and also my nursing license and my CPR

4    certification.

5    Q.  Just to clarify, in terms of the application, what

6    information did this application require you to provide?

7    A.  Just the document that I've given.

8    Q.  Did it require you to provide your name?

9    A.  Yes.

10   Q.  Did it require you to provide references?

11   A.  Yes.

12   Q.  Did it require you to provide an address?

13   A.  Yes.

14        MS. JONES:  Your Honor, I'd like to move to admit

15   Plaintiff's Exhibit 26, Page 1 through 3, Mr. Hopson's

16   employment application process into evidence.

17        THE COURT:  Any objection to Plaintiff's Exhibit

18   26, Pages 1 through 3?

19        MS. RUST:  No objection.

20        THE COURT:  The document will be admitted.

21        (Plaintiff's Exhibits 26-1 to 3 received in

22   evidence.)

23   BY MS. JONES:

24   Q.  You indicated that you were required to provide documents

25   in addition to the application, and you mentioned a CPR card.

1    What other documents are you required to provide?

2    A.   I believe that's all.

3    Q.   Did you mention a Social Security card and a license --

4    and a nursing license?

5    A.   Uh-huh.  Yes.

6    Q.   And do you recall if you were required to complete any

7    tax forms when you began working for Steadfast?

8    A.   No, not when I began working with Steadfast.

9    Q.   Okay.  To your knowledge, were there any taxes taken out

10   of your paycheck for Steadfast?

11   A.   No, there's no taxes taken out.

12   Q.   And after you submitted your application and submitted

13   those additional forms, were you interviewed by anyone at

14   Steadfast?

15   A.   Yes.  I was interviewed by Lisa.

16   Q.   By Lisa.  And do you recall what type of questions were

17   asked in that interview?

18   A.   Yes.  She did ask pretty much a general history on my

19   nursing and my background and the job that I was previously

20   working at before.

21   Q.   Okay.  And were you asked about your availability to

22   work?

23   A.   Yes.

24   Q.   And so after your job interview, were you hired to work

25   with Steadfast?

1    A.  Yes, I was.

2    Q.  And do you recall who hired you to work as an LPN for

3    Steadfast?

4    A.  Lisa hired me to work as an LPN for Steadfast.

5    Q.  Okay.  And are you paid an hourly rate or a salary basis

6    for working at Steadfast?

7    A.  Hourly rate.

8    Q.  And how much are you paid per hour?

9    A.  In the beginning or now?

10   Q.  You can tell me -- let's start with the beginning.

11   A.  In the beginning it started off around $25 an hour, and

12   now it's around 40 an hour.

13   Q.  And is there any reason why your compensation has changed

14   throughout the three years that you've been working there?

15   A.  I think the changes with nursing, you know, as far as the

16   COVID goes and stuff like that kind of changed the pay over

17   time.

18   Q.  Okay.  And other than COVID is there any reason that your

19   hourly rate would vary?

20   A.  I believe it depends on sometimes the location.  If I go

21   to Richmond sometimes, it will be a little bit more, you

22   know, pay in compensation.

23   Q.  So if you have to travel farther to a facility, you may

24   be paid a higher hourly rate?

25   A.  Yes.  Yes.

```
 1    Q.  And are you able to negotiate a different hourly rate?
 2    A.  Yes.
 3    Q.  And who do you negotiate that rate with?
 4    A.  Lisa.
 5    Q.  Do you ever negotiate that hourly rate with the
 6    facilities?
 7    A.  No.
 8    Q.  Okay.  So ultimately who is in charge of determining what
 9    you receive for each hour worked?
10    A.  Lisa.
11    Q.  And with regards to your working relationship, are you
12    able to structure your relationship directly with the
13    facilities or do you do that through Steadfast?
14    A.  I do that through Steadfast.
15    Q.  And were you given the option to be classified as an
16    independent contractor or an employee?
17    A.  No.  Immediately once I started working with Steadfast,
18    it's always been under a 1099 contractor.
19    Q.  And were you ever given the option to be classified -- I
20    mean, strike that.
21        Do you know what's required to be considered an
22    independent contractor?
23    A.  I do know as far as an independent contractor, the
24    research I did do is there is no taxes to be taken out.  We
25    do pay the employer tax, and also doing further research, we
```

**JA143**

```
 1    also are due overtime, time and a half.
 2    Q.  You say you're due overtime and time and a half?
 3    A.  Yeah, as a 1099 contractor.
 4    Q.  Okay.  But does Steadfast pay you time and a half --
 5    A.  No.
 6    Q.  -- for overtime hours worked?
 7    A.  No.
 8    Q.  So since your employment with Steadfast have you ever
 9    owned your own business?
10    A.  No.
11    Q.  Have you ever advertised your healthcare in any way?
12    A.  No.
13    Q.  Okay.  And I want to talk a little bit about your -- how
14    you keep track of time.  So how do you keep track of time at
15    the facilities that you work at?  Are you required to submit
16    time sheets?
17    A.  Yes.
18    Q.  And how often are you required to submit those time
19    sheets?
20    A.  Every week we have to submit our time sheets.
21    Q.  I'm sorry, what's the last part?
22    A.  Every week we have to submit our time sheets.
23    Q.  And who -- go ahead.
24    A.  Weekly, we have to submit them weekly to be paid.
25    Q.  Okay.  Who do you submit those time sheets to?
```

1   A.  To the payroll e-mail.

2   Q.  And is it the payroll e-mail at the facility or with

3   Steadfast?

4   A.  It's with Steadfast.

5   Q.  Who told you that you were required to submit those time

6   sheets?

7   A.  Our -- Lisa did.

8   Q.  And you indicated that you had to submit the time sheets

9   in order to be paid, so if you don't submit a time sheet, are

10  there issues with being paid by Steadfast?

11  A.  Yes.

12  Q.  I want to talk a little bit about your work schedule.

13  What is your work schedule like when working with Steadfast?

14  A.  Originally, when I first started working with Steadfast,

15  I would do a lot of overtime, double shifts, other night

16  shifts, a little bit under 40 hours a week.

17  Q.  Now, when you say double shift, how many hours is that?

18  A.  16 hours in a day.

19  Q.  16 hours a shift.  How often would you do those double

20  shifts with Steadfast?

21  A.  Sometimes in the beginning I will do them three or four

22  days in a row.

23  Q.  And in the times that you did those double shifts, how

24  many hours would you work in a workweek?

25  A.  I'd say between 68 and 74 hours, I would say around

**JA145**

1    there.

2    Q.  So based upon that schedule would you work more than 40

3    hours in a workweek?

4    A.  Yes.

5    Q.  And how is your schedule determined?

6    A.  Oh, I can -- a few ways.  I'll reach out to the scheduler

7    that we had on the on-call.

8    Q.  When you say you reach out to the scheduler or the

9    on-call, is that the scheduler on call at Steadfast?

10   A.  Yes.

11   Q.  And what happens after you contact the scheduler or the

12   on-call person at Steadfast?

13   A.  We just pretty much confirm our shifts through the text

14   message.  So, say, for example, I -- say I work Tuesday,

15   Thursday and Friday, I do 73s, I submit them over to them, or

16   they will let me know what they have in the text message and

17   just say confirm, that's all.

18   Q.  So Steadfast will let you know the facilities that are

19   available for you to work for?

20   A.  Yes.

21   Q.  And in the instances when you worked those 60 hours per

22   workweek, how were you compensated for those hours that you

23   worked?

24   A.  I had a direct deposit.

25   Q.  Were you paid your -- were you paid time and a half or

```
 1    were you paid straight time for those hours worked over 40 in
 2    that workweek?
 3    A.   It was straight time.
 4    Q.   And just to clarify, did you ever receive time and a half
 5    for any hours worked over 40 in a workweek?
 6    A.   No.
 7    Q.   And if you decided to take a shift but you weren't able
 8    actually -- but you weren't able to actually complete that
 9    shift or work the shift, were you required to give notice to
10    Steadfast?
11    A.   Yes.
12    Q.   And who were you required to give notice to?
13    A.   The same on-call number.
14    Q.   And about how much notice were you required to give?
15    A.   Call in two hours.
16    Q.   And if you were running late for a shift, would you have
17    to give notice to anyone?
18    A.   Yes.
19    Q.   And who would you have to give notice to?
20    A.   The on-call.
21    Q.   And would that be the on-call for Steadfast or the
22    facility?
23    A.   For Steadfast.
24    Q.   Okay.  During your employment with Steadfast, have you
25    ever incurred any costs or expenses as a nurse?
```

1    A.   Could you repeat that?

2    Q.   Absolutely.  During the time that you worked for

3    Steadfast, have you incurred any costs or expenses?

4    A.   Oh, yes.

5    Q.   And what type of expenses or costs have you incurred?

6    A.   Gas, mileage.  Sometimes I travel out to the Richmond

7    area and stuff, and that's pretty much gas mileage is what I

8    incur.

9    Q.   Have you ever incurred a hotel expense or anything like

10   that?

11   A.   No.

12   Q.   So if you were interested in a placement Steadfast had

13   available, how would you find out about that opportunity?

14   A.   I'll call the on-call.

15   Q.   And so who determines where you work for Steadfast?

16   A.   The scheduler.

17   Q.   And I know that you said that there were -- there were

18   calls and texts, but are the available shifts presented in

19   any other way outside of the calls and the texts?

20   A.   No.  That's how they are presented.

21   Q.   And once you are at a facility for your assignment, are

22   you able to negotiate that hourly rate with the facility?

23   A.   No.

24   Q.   And do you know who negotiates the hourly rate with the

25   facility?

```
 1    A.  I believe Lisa negotiates it.  I'm not sure who

 2    negotiates it.

 3    Q.  But is -- is it someone at Steadfast?

 4    A.  Yes, it's Steadfast.

 5    Q.  And so after you go to the facility, I recall you stating

 6    that you were interviewed by Lisa.  Are you also interviewed

 7    by anyone at the facility that you're placed to work?

 8    A.  No.

 9    Q.  And do you communicate with the facilities you work at

10    directly to establish your schedule?

11    A.  No.  We are supposed to accept our schedule through

12    Steadfast.

13    Q.  I'm sorry?

14    A.  We are supposed to establish our schedule through

15    Steadfast.

16    Q.  So other than your hourly rate do you receive any other

17    profits from Steadfast?

18    A.  No.

19    Q.  Okay.  And who pays you for the services that you render

20    at the facilities on behalf of Steadfast?

21    A.  You say who pays for the services?  Who pays me for the

22    services?

23    Q.  Yes.

24    A.  Steadfast pays me for the services.

25    Q.  If you don't receive your paycheck from Steadfast, would
```

 1   that impact your ability to meet your financial obligations?

 2   A.   Yes.

 3   Q.   And do you have any ownership interest in Steadfast?

 4   A.   No.

 5   Q.   Other than being an LPN for Steadfast, are you a manager

 6   or any other director for Steadfast?

 7   A.   No.

 8   Q.   And so what type of equipment do you use as an LPN to

 9   complete your job duties?

10   A.   Stethoscope, blood pressure cuff, heart rate monitor.

11   Q.   And are those tools of the trade that every nurse has in

12   their possession?

13   A.   Oh, no.  We have to purchase those ourself.

14   Q.   And is that standard practice across the profession?

15   A.   Yes, it is.  It's a benefit if the facilities have the

16   actual machine.

17   Q.   When you receive the facility assignment from Steadfast,

18   do you have to have any other additional equipment or

19   supplies beyond the tools that you just mentioned?

20   A.   My uniforms.

21   Q.   And your uniform?

22   A.   Uh-huh.

23   Q.   But if there is something like a wheelchair or a bed, are

24   you required to provide those?

25   A.   No.

```
 1   Q.  So who would provide those items?
 2   A.  I believe -- depending on the setting, if it's a
 3   long-term care, because that's the section I worked in, the
 4   facility will have those beds and wheelchairs available.
 5   Q.  Are you required to hold or maintain a license to be a
 6   practicing LPN in Virginia?
 7   A.  Yes.
 8   Q.  And is this license required regardless of the facility
 9   that you are assigned to work for?
10   A.  Yes.
11   Q.  And as an LPN what other types of services that you
12   provide when you're placed at the facility?
13   A.  Rehab services, basic nursing care.  Those are the
14   services I provide.
15   Q.  And do you provide these types of services as an LPN
16   regardless of the facility that you're placed to work?
17   A.  Yes.  Depending on the facility, yes, those are the
18   services I provide.
19   Q.  And is the same level of skill required to complete those
20   tasks?
21   A.  Yes.
22   Q.  And when your assignment ends at a facility, does
23   Steadfast provide you a new placement?
24   A.  Yes.
25   Q.  When you're at the different facilities that Steadfast
```

```
 1   has placed you to work, are you required to wear a name
 2   badge?
 3   A.  Yes.
 4   Q.  What company name is on that name badge?
 5   A.  Steadfast.
 6   Q.  To your knowledge, does Steadfast Medical Staffing
 7   provide any other services other than what you mentioned at
 8   the beginning of your testimony?
 9   A.  Not to my knowledge.
10   Q.  I recall you say that you received straight time for the
11   overtime hours that you worked.  Did you ever complain about
12   not receiving time and a half for overtime?
13   A.  Yes, I did.
14   Q.  And to whom did you complain to?
15   A.  To the payroll person, Christine.
16   Q.  And what did they say about overtime compensation?
17   A.  Well, Christine told me that overtime is not due to me
18   because I'm a 1099 contractor, and I explained to her that
19   when I did my research, you know, I found out that, you know,
20   as an independent contractor, I am due time and a half, and
21   pretty much that was our conversation and conflict that we
22   had.
23   Q.  And do you recall when you had that conversation with
24   Christine?
25   A.  You say when do I recall it?
```

1  Q.  Do you recall the date or the time frame in which you had

2  that conversation?

3  A.  I don't recall the exact date that I had that

4  conversation with her.

5  Q.  Okay.  And to date have you ever received any back wages

6  for the overtime that you've worked?

7  A.  No.

8  Q.  And currently are you paid overtime for the overtime

9  hours that you work working with Steadfast?

10 A.  No.

11 Q.  And I recall you saying that you had a background check.

12 Did you have a drug test also when you began employment with

13 Steadfast?

14 A.  I don't recall having a drug screen, to be honest, in

15 2016.  I don't recall having a drug screen.

16        MS. JONES:  I have no further -- just one further

17 question.

18 BY MS. JONES:

19 Q.  You indicated that you did research.  What research did

20 you do in terms of independent contractor?

21 A.  Well, I searched online because originally when -- when

22 someone tells you -- when you come from a W-2 background, and

23 you're used to getting time and a half, and then your whole

24 job description changes to an independent contractor, it's

25 told to you that an independent contractor doesn't receive

1   time and a half, it kind of puts a little confusion in your

2   mind.

3           So even after I was working in the hours I was

4   working, whether it was a year or so later I -- I did my

5   research.  I looked online.  I looked up independent

6   contractor, 1099, and I looked up to see if independent

7   contractors are due overtime, and during my research, looking

8   up seeing it, we were due overtime.  That's when I just

9   reached out.

10          MS. JONES:  All right.  I have no further

11  questions, Your Honor.

12          THE COURT:  We will take up cross-examination after

13  lunch.  We will be in recess until 2:30.

14          During your break do not discuss your testimony

15  with anybody.

16          All right.

17          (Luncheon recess from 1:02 p.m. to 2:30 p.m.)

18          THE COURT:  You may commence cross-examination.

19          MS. RUST:  Thank you, Your Honor.

20                      CROSS-EXAMINATION

21  BY MS. RUST:

22  Q.  Hello, Mr. Hopson.

23  A.  Hey.  How you doing?

24  Q.  My name is Julia Rust.  I'm an attorney for Steadfast and

25  Ms. Pitts.  So I want to ask you a couple of questions about

```
1    what you discussed on your direct exam.  You talked about

2    your time sheets.  So when you finish a shift at a facility,

3    before you leave do you get somebody from the facility to

4    sign off on that time sheet; is that right?

5    A.  That's correct.

6    Q.  And is that just a -- for the facility to confirm, hey,

7    yes, you worked these hours here?

8    A.  That's correct.

9    Q.  Okay.  And you -- have you been successful when you have

10   asked for a higher pay rate for a certain shift before?

11   A.  Yes.  Yes.

12   Q.  I think you mentioned in your direct that when you're

13   traveling a distance, you can usually get paid more; is that

14   right?

15   A.  That's correct.

16   Q.  Are there other instances when you can get paid more, for

17   example, if it's a last-minute need?

18   A.  Yes, there is.

19   Q.  You can negotiate a higher rate for that shift?

20   A.  Yes, you can -- or it could be like a hundred-dollar

21   bonus or something along those lines.

22   Q.  Okay.  So either a higher hourly rate or some kind of

23   bonus?

24   A.  That's correct.

25   Q.  And is that because the facility agrees to that higher
```

1    rate or that bonus?

2            MR. JEWETT:  Objection, speculation.

3            THE COURT:  Sustained.

4    BY MS. RUST:

5    Q.  To the extent -- are you aware of whether the facility

6    has to agree --

7            MR. JEWETT:  Objection, same, speculation.

8            THE COURT:  No, I think you can rephrase your

9    question, if you know whether.

10   BY MS. RUST:

11   Q.  Yes.  Do you know whether the facility has to approve

12   your request for a higher pay rate or bonus for a shift?

13   A.  No, I do not.

14   Q.  You do not know?

15   A.  No.

16   Q.  Okay.  So if you want to make more per shift, could you

17   just prioritize, selecting shifts that are farther away where

18   you can get paid a higher rate for traveling a distance?

19   A.  Yes, you can.

20   Q.  Okay.  So you mentioned also that you worked for another

21   agency, First Choice, right?

22   A.  That's correct.

23   Q.  And you like to balance your hours between the agencies?

24   A.  That's correct.

25   Q.  Could you work for even a third agency at the same time

```
 1   if you wanted?
 2   A.   Yes, I can.
 3   Q.   So if you can work for as many agencies as you want at
 4   the same time?
 5   A.   That's correct.
 6   Q.   And can you -- do you typically decide which shifts you
 7   want to pick up with what agencies?
 8   A.   Yes, I do.
 9   Q.   And you can say, okay, I want to work more shifts with
10   Steadfast this week and more shifts with First Choice next
11   week, is that an option you have?
12   A.   That's correct.
13   Q.   So when you're on multiple registries, that gives you
14   more options --
15   A.   Uh-huh.
16   Q.   -- for work, right?
17   A.   Yes.
18   Q.   Does it give you more flexibility with the options you
19   have, too?
20   A.   Yes.
21   Q.   And are you aware -- let's see.  Do you know, only if you
22   know, do you know if First Choice and Steadfast both have
23   contracts with the same facility?
24   A.   I'm not aware of that.
25   Q.   Okay.  So when you are setting up your schedule between
```

```
 1   the different registries, do you just tell one registry when
 2   you're available or just pick up whichever shift you want at
 3   one and then go to the other one?
 4   A.  That's correct.
 5   Q.  So if, for example, if Steadfast went out of business
 6   tomorrow, you could just sign up with another agency?
 7   A.  That's correct.
 8   Q.  And you would be able to take shifts with that other
 9   agency?
10   A.  That's correct.
11   Q.  So you could maintain a full schedule or as much of a
12   schedule as you want?
13   A.  Yes.
14   Q.  Do you have a facility you prefer going to?
15   A.  Not in particular.
16   Q.  Okay.  Do you have some facilities you don't like going
17   to?
18   A.  No, I don't.
19   Q.  Are there facilities that you've chosen not to go back to
20   for one reason or another?
21   A.  There have been.
22   Q.  Okay.  So when you call -- for example, if you call
23   Steadfast and say, what -- you know, what's available, they
24   give you a couple of facilities that have some shifts open,
25   if you don't really like any of those facilities, you can
```

 1    say --
 2            THE COURT:  I think this is calling for speculation
 3    here, what he would do with future events.  So rephrase it.
 4            MS. RUST:  Let me rephrase, of course.
 5            THE COURT:  If it's something that you can get out
 6    without calling for speculation.
 7            MS. RUST:  Understood.  I think we can rephrase
 8    that.
 9            THE COURT:  Okay.
10    BY MS. RUST:
11    Q.  So in the past, have you called -- well, we have already
12    talked about that.  You've called Steadfast and said, here is
13    my availability, what facilities do you have; is that right?
14    A.  That's correct.
15    Q.  And has there been an instance in the past where they
16    have said, here is a couple of options, and you just declined
17    for whatever reason to take any of those shifts?
18    A.  Yes.
19    Q.  Okay.  And when you're on site at a facility, is anyone
20    from Steadfast ever on site?
21    A.  Yes.  There are staff workers there.  Are you saying are
22    there Steadfast employees also at the location I'm at; is
23    that what you're asking?
24    Q.  Fair question.  Let me be more specific.  So I'm not
25    talking about other nurses, LPNs or RNs, but, for example,

| 1 | has Lisa Pitts ever been on site at a facility with you? |
| 2 | A.  No. |
| 3 | Q.  Has Christine Kim ever been on site at a facility with |
| 4 | you? |
| 5 | A.  No. |
| 6 | Q.  And has anybody from the front desk at Steadfast, to your |
| 7 | knowledge, been on site at a facility with you? |
| 8 | A.  No. |
| 9 | Q.  And Steadfast has never told you how to practice nursing, |
| 10 | right? |
| 11 | A.  Could you ask that question again? |
| 12 | Q.  Of course. |
| 13 |         THE COURT:  Wait a minute.  Let's figure out |
| 14 | something here.  Don't ever ask the lawyer a question.  You |
| 15 | can't do that.  You can say you do not understand but don't |
| 16 | ask the lawyer questions, do anything, okay. |
| 17 |         THE WITNESS:  All right, Your Honor. |
| 18 |         THE COURT:  Let's continue. |
| 19 |         MS. RUST:  Thank you, Your Honor. |
| 20 | BY MS. RUST: |
| 21 | Q.  So as an LPN, has Steadfast ever told you, for example, |
| 22 | how to take somebody's blood pressure? |
| 23 | A.  No. |
| 24 | Q.  Have they ever told you how to perform any of your |
| 25 | duties, your nursing duties? |

1    A.  No.

2            MS. RUST:  And have you -- okay.  I have no further

3    questions.  Thank you very much.

4            THE COURT:  Redirect.

5            MS. JONES:  Yes, Your Honor.

6                        REDIRECT EXAMINATION

7    BY MS. JONES:

8    Q.  Mr. Hopson, I just have a few follow-up questions.  You

9    indicated that you work for other staffing agencies,

10   specifically First Choice.  Does that company pay you

11   overtime?

12   A.  Yes.

13   Q.  But Steadfast pay you overtime?

14   A.  No.

15   Q.  I want to talk a little bit, if I could, about the

16   research that you did you mentioned previously.  Do you know

17   the factors to be considered independent contractor?

18   A.  You say do I have the documents?

19   Q.  Do you know the factors to be considered an independent

20   contractor?

21           THE COURT:  Then let's leave something to the

22   future Court.  The Court will have to decide whether one is

23   an employee or independent contractor.  It doesn't matter

24   what a witness's definition may be.  So the Court doesn't

25   find it appropriate to ask any witness about what are the

1    indicia of an independent contractor.  You just ask them

2    about their duties, and the Court has to decide as a matter

3    of law what's an independent contractor here and what's an

4    employee.  So both counsel been getting into that.  Don't

5    get into it.  That's a Court decision, a legal decision.

6              MS. JONES:  Okay, Your Honor.  I'll move on.

7    BY MS. JONES:

8    Q.  In regard to the bonuses, is that a lump sum or is that

9    incorporated into your hourly pay when you travel to the

10   farther facilities?

11   A.  So it's separate from the hourly pay.  So say, you know,

12   work 40 hours a week, some say it's 600, throwing a number

13   out there.  It would be -- your final paycheck will be 600

14   plus the additional hundred dollars so it will be $700.

15   Q.  So would that bonus be based upon the need of Steadfast

16   for you having to drive farther than a normal facility that

17   you work for?

18   A.  Yes.  It would be based off the need at like a

19   short-term -- a short-term need, they will say, I will give

20   you a $50 bonus or, you know, a hundred-dollar bonus,

21   whatever the case bonus will be for that particular, that is

22   what they will offer you.

23   Q.  I want to talk a little bit about the time sheet.

24   Opposing counsel asked you if the time sheet had to be signed

25   by the facility.  But even though it's signed by the

```
 1    facility, you still turn it into Steadfast?
 2    A.  That's correct.
 3    Q.  And is it just to confirm that you actually work at the
 4    facility?
 5    A.  That's correct.
 6              MS. JONES:  No further questions, Your Honor.
 7              THE COURT:  May the witness be permanently excused?
 8              MS. JONES:  Yes, Your Honor.
 9              MS. RUST:  Yes.
10              THE COURT:  All right, sir.  You may step down.
11    You're permanently excused.
12              (Witness excused.)
13              THE COURT:  Next witness.
14              MS. LEWIS:  Your Honor, if I may, with respect to
15    housekeeping sort of where we are in terms of time, the
16    secretary indicates having approximately four more witnesses
17    today.  We will not run into this, you know, issue with
18    witnesses moving forward, but I did just want to apprise the
19    Court in terms of where we are in terms of --
20              THE COURT:  You have approximately four more
21    witnesses?
22              MS. LEWIS:  Yes.  I apologize that we are short
23    today because, as I indicated, and we talked about, we do
24    have a lot.
25              THE COURT:  Uh-huh.
```

```
 1              MS. LEWIS:  But we weren't sure when we were going
 2    to get started, these are hourly workers, but we will have
 3    plenty for you tomorrow.
 4              THE COURT:  Well, then we are going to start
 5    tomorrow at 1:00.
 6              MS. LEWIS:  Right.  And we are going to have
 7    plenty.
 8              THE COURT:  Let's see where we go today.  You know
 9    the Court hates to run out of witnesses.
10              MS. LEWIS:  Don't I know it, Your Honor.  So thank
11    you.
12              THE COURT:  Call your next witness.
13              MS. LEWIS:  Dawn Wooten.  She is remote.
14              THE CLERK:  Your Honor, the video control shut down
15    so I have to bring it back up.  I may have to call back.
16              THE COURT:  Okay.  Little technical difficulties,
17    so we will wait a little longer.
18              MS. LEWIS:  Okay.  I was going to say because we
19    have another in-person witness we can call while we get it
20    going, if that would -- if you just wanted to wait.
21              THE COURT:  Bring in the in-person witness.
22              MR. SEIFELDEIN:  I call Ms. Boykins, Saudia
23    Boykins.
24              (Witness was sworn.)
25              SAUDIA BOYKINS, called by the Plaintiff, having
```

```
 1   been first duly sworn, was examined and testified as

 2   follows:

 3                       DIRECT EXAMINATION

 4   BY MR. SEIFELDEIN:

 5   Q.  Good afternoon, Ms. Boykins.

 6   A.  Hi.

 7   Q.  Can you state your full name for the record and spell it,

 8   please.

 9   A.  Saudia Boykins.

10   Q.  Speak up.

11   A.  Saudia Boykins.

12   Q.  Can you spell it.

13   A.  S-a-u-d-i-a B-o-y-k-i-n-s.

14   Q.  Are you familiar with Steadfast Medical Staffing?

15   A.  Yes.

16   Q.  What type of service does Steadfast provide?

17   A.  Nursing; CNAs, LPNs and RNs.

18   Q.  To whom?  To whom do they provide these services?

19   A.  Excuse me?

20   Q.  To whom does Steadfast provide these services?

21   A.  To the various nursing homes that I know of.

22   Q.  Were you employed by Steadfast?

23   A.  Yes.

24   Q.  And when did you start working for Steadfast?

25   A.  2017.
```

**JA165**

```
 1    Q.   Are you currently working for Steadfast?

 2    A.   Yes.

 3    Q.   And have you been employed by Steadfast since 2017?

 4    A.   Yes.

 5    Q.   And what is your job title?

 6    A.   CNA.

 7    Q.   Have you worked for any other agencies during the time

 8    you worked for Steadfast?

 9    A.   No.

10    Q.   How did you apply to work for Steadfast?

11    A.   By in person, by application.

12    Q.   And how did you find out about Steadfast?

13    A.   My sister told me about it.

14    Q.   Okay.  I'm going to direct your attention to Plaintiff's

15    Exhibit 26, beginning on Page 22 through Page 24.  Pull that

16    up and look at it, please.

17         Do you recognize this document?

18    A.   Yes.

19    Q.   Okay.  Is that the application you filled out?

20    A.   That's my handwriting, yes.

21    Q.   And did you provide references in support of this

22    application?  If you can look at the screen.

23    A.   I think so.  It's been awhile.

24    Q.   Well, you have the application right there, look at the

25    screen see if that --
```

```
 1   A.   Okay.   Okay.   Yeah, I see it.
 2   Q.   You did provide references?
 3   A.   Yes.
 4   Q.   Were you required by Steadfast to provide any other
 5   document?
 6   A.   I had to have my TB skin test and a CPR and my nursing
 7   license, driver's license.   I think that's all.
 8   Q.   After you submitted your application to Steadfast, did
 9   you meet with anyone at Steadfast?
10   A.   Yes.
11   Q.   Who did you meet with?
12   A.   I think I met with -- if I'm not mistaken, her name was
13   Lucy.
14   Q.   Okay.   And did Lucy ask you some questions about your
15   application?
16   A.   I'm not sure.   I don't think so.
17   Q.   Did she ask you --
18   A.   She might have.
19   Q.   I understand.   Did she ask you about your availability?
20   A.   Yes.
21   Q.   When you submitted the application and after you spoke
22   with Lucy, who hired you?
23   A.   Steadfast.
24   Q.   Okay.   And when you were hired, were you paid on an
25   hourly or a salary?
```

Boykins, S. - Direct                                          116

```
1    A.   Hour.
2    Q.   Hourly.  Were you able to negotiate a different pay rate
3    for your hourly rate?
4    A.   No, sir.
5    Q.   And who set the rate of pay for you?
6    A.   Steadfast.
7    Q.   As part of your application were you required to sign an
8    agreement?
9    A.   Agreement?
10   Q.   Yes.  I'm sorry, independent contract agreement?
11   A.   I'm not really sure.
12   Q.   All right.
13   A.   I can't remember.
14        MR. SEIFELDEIN:  Sure.  Before I ask my next
15   question, Your Honor, Plaintiff would like to admit
16   Plaintiff's Exhibit 26, Pages 22 through 24.
17        THE COURT:  Any objection?
18        MS. RUST:  No.
19        THE COURT:  Document will be admitted, number 26,
20   Pages 22 through 24.
21        (Plaintiff's Exhibits 26-22 to 26-24 received in
22   evidence.)
23   BY MR. SEIFELDEIN:
24   Q.   If I could direct your attention to Plaintiff's Exhibit
25   25, Page 16 through 17.  Do you recognize this document,
```

**JA168**

1  beginning from the first page?

2  A.  Yes.

3  Q.  And you signed this document?

4  A.  I did.  That's my writing.

5  Q.  Is that your signature right there?

6  A.  Yes.

7  Q.  And is this your information on the following page as

8  well?

9  A.  Yes.

10 Q.  Were you able to structure the terms of your work

11 relationship with the facility directly?

12 A.  No.

13 Q.  Who did you structure work relationship with?

14 A.  Steadfast.

15 Q.  Were you required to maintain your own malpractice or

16 liability insurance by Steadfast?

17 A.  No, sir.

18 Q.  Were you required to maintain workman's compensation

19 insurance by Steadfast?

20 A.  No, sir.

21 Q.  Were you required to submit time sheets?

22 A.  Yes.

23 Q.  Okay.  And who required you to submit these time sheets?

24 A.  Steadfast.

25 Q.  How often were you required to submit the time sheets?

```
 1    A.   Every week.

 2    Q.   And who told you you were required to submit these time

 3    sheets?

 4    A.   Steadfast.

 5         MR. SEIFELDEIN:  Your Honor, I'd like to admit

 6    Plaintiff's Exhibit 25, Pages 16 through 17 -- I'm sorry,

 7    through 18.

 8         THE COURT:  Any objection?

 9         MS. RUST:  No objection.

10         THE COURT:  Document will be admitted.

11         (Plaintiff's Exhibits 25-16 to 25-18 received in

12    evidence.)

13    BY MR. SEIFELDEIN:

14    Q.   Did you set your schedule directly with the facilities?

15    A.   No.  I set it through Steadfast.

16    Q.   Why did you set your schedule through Steadfast, not the

17    facility?

18    A.   Did you say why didn't I?

19    Q.   Why did you set your schedule with Steadfast and not the

20    facility?

21    A.   I don't work for the facility.  I work for Steadfast.

22    Q.   And have you ever tried to set up your schedule with the

23    facility, and, if so, what did they do?

24    A.   Say that again.  I'm sorry.

25    Q.   Did you ever try to set your schedule with the facility?
```

1    If so, what did they do?

2    A.  I think I did that one time when I first started, but

3    they told me that you have to go through the agency.

4    Q.  Steadfast?

5    A.  Steadfast, yes.

6    Q.  Once you were scheduled with the facility, would you call

7    to let the facility know that you were coming?

8    A.  No.

9    Q.  Who would do that?

10   A.  Steadfast.

11   Q.  Did you ever turn down a shift that Steadfast offered

12   you?

13   A.  Yes.

14   Q.  Okay.  And what was Steadfast's response when you turned

15   down a shift?

16   A.  Do you mean what would they say?

17   Q.  Yes.  When you did turn down that shift, what did

18   Steadfast do?

19   A.  Well, they would -- well, they would be the scheduler

20   there I would talk to and they would say okay.

21   Q.  When you turned down shifts did Steadfast continue to

22   offer you shifts?  Was there a different response?

23   A.  There are sometimes when, if I didn't do a shift, all of

24   a sudden my future shifts that I would have, I would lose

25   them.

```
 1   Q.  You would lose them.  How would you lose them?  How would
 2   you find out about losing future shifts when you canceled the
 3   shifts?
 4   A.  That they canceled me.  I've had a lot of cancellations.
 5   Q.  And Steadfast would do that?
 6   A.  Yes.
 7   Q.  Okay.  Did you observe any Steadfast employees who turned
 8   down shifts?
 9   A.  Yes.
10   Q.  And how did Steadfast respond to that?
11   A.  Almost the same thing, I mean, they would lose -- you
12   would lose shifts.
13   Q.  Did you view that as some sort of discipline or
14   punishment?
15   A.  After once or twice, I started to feel like, yeah, they
16   were doing that because, you know, I turned down or whatever.
17   Q.  Did you ever work more than 40 hours in a workweek for
18   Steadfast?
19   A.  Yes, I did.
20   Q.  And on average approximately how many hours did you work
21   each day?
22   A.  Oh, goodness, um, there have been times I -- anywhere
23   from 16 to 18, sometimes 19 in one shift.
24   Q.  And when you say 16 to 18, is that a double shift that
25   you worked?
```

1    A.  Yes.

2    Q.  And what is a double shift, I'm sorry?

3    A.  3:00 to 11:00, 11:00 to 7:00, but there were times where

4    even at 7:00, after I do that double, I will still be there

5    till maybe 9:00 or 10:00 in the morning.

6    Q.  The double shift is essentially working back-to-back

7    shifts?

8    A.  Yes.

9    Q.  And when you worked those double shifts and more than 40

10   hours in a workweek, what rate of pay did you get per hour?

11   A.  I started out at 17, but during the COVID it was 35.

12   Q.  When you work with more than 40 hours in a workweek, does

13   Steadfast pay you time and a half or straight time?

14   A.  Just straight.

15   Q.  Did Steadfast ever pay you time and a half when you

16   worked more than 40 hours in a workweek?

17   A.  No, sir.

18   Q.  Did you ever complain to Steadfast about not being paid

19   time and a half when you work over 40 hours in a workweek?

20   A.  I asked about it once, but I was told that they didn't do

21   overtime, so I didn't -- I just left it alone.

22   Q.  Was that by Lucy?

23   A.  Yes.

24   Q.  Were you required to provide a notice to Steadfast if you

25   were not available to work?

Boykins, S. - Direct                                              122

```
 1   A.  Well, they would want you to call them, yes.
 2   Q.  Okay.  And how far in advance would you have to call
 3   them?
 4   A.  They would -- they would like at least two hours.
 5   Q.  Two hours?
 6   A.  As far as I remember.
 7   Q.  And who told you that you need to call within that
 8   two-hour window?
 9   A.  I believe it was Lucy.
10   Q.  And Lucy worked for Steadfast; is that correct?
11   A.  She did.
12   Q.  If you had a scheduling conflict, did Steadfast allow you
13   to send another CNA in your place?
14   A.  No, sir.
15   Q.  Were you allowed to employ another CNA to complete a
16   shift that Steadfast compensated you to complete?
17   A.  No, sir.
18   Q.  Were you allowed to have other individuals assist you in
19   the performance of services for which Steadfast compensated
20   you for?
21   A.  No, sir.
22   Q.  Okay.  Were you allowed to assign your shift to another
23   CNA without Steadfast approval, another CNA that worked for
24   Steadfast?
25   A.  No, sir.
```

**JA174**

```
 1    Q.  So if you were interested in working those shifts you

 2    talked about earlier, how did you find out about them?

 3    A.  I would call Steadfast and tell them, ask them do they

 4    have any doubles, if I want to do them.

 5    Q.  And would Steadfast also call you with their available

 6    shifts?

 7    A.  At times they have.

 8    Q.  Okay.  Now, once you schedule by Steadfast, and you were

 9    sent to the facility, would you negotiate how much would be

10    paid with the facility?

11    A.  No, sir.

12    Q.  And what did you do -- I'm sorry, why not?

13    A.  I'm not employed for the -- with the facility.

14    Q.  So who would negotiate your rate of pay with the

15    facility, as far as you know?

16    A.  Steadfast.

17    Q.  Did Steadfast allow you to negotiate -- I'm going to

18    rephrase my question.  When you were paid those straight

19    times for the overtime hours you received, was your check

20    constant or did it vary from time to time?

21    A.  It varied.

22    Q.  It varied?  Did it vary depending on the hours you

23    worked?

24    A.  Yes, sir.

25    Q.  Your check was not a fixed amount?
```

**JA175**

1    A.  Right.

2    Q.  Okay.  Once you arrived at the facility, were you

3    interviewed by the facility?

4    A.  No, sir.

5    Q.  The facility just -- you went in and started working?

6    A.  Yes.  If I'm on that schedule.

7    Q.  Thank you.  So did you communicate with the facility

8    itself that you worked at to establish your schedule once you

9    were there?

10   A.  Say that again.

11   Q.  Did you communicate with the facility directly to

12   establish your schedule?

13   A.  No, sir.

14   Q.  Did Steadfast provide you with a badge?

15   A.  Yes.

16   Q.  Did the badge have the name of the company on it?

17   A.  Yes.

18   Q.  What was the name of the company on the badge that

19   Steadfast provided you?  Oh, you have it?

20   A.  Steadfast Medical.

21   Q.  Would you show it to the Court, please.

22   A.  (Complied.)

23   Q.  What did this badge signify to you?

24   A.  CNA.

25   Q.  And what else, in your relationship with Steadfast?

1    A.   Independent contractor.

2    Q.   I'm sorry?

3    A.   That's what I was told I was.

4    Q.   Steadfast told you you were that?

5    A.   Independent contractor, yes.

6    Q.   Okay.  And you don't know the difference between

7    independent contractor and employee, correct?

8    A.   No.

9    Q.   Other than your hourly rate, did you receive -- well, did

10   you receive any profit when you worked for Steadfast?

11   A.   No, sir.

12   Q.   If you did not receive -- who paid you for the services

13   that you provided for Steadfast?

14   A.   Steadfast.

15   Q.   Okay.  And if you didn't receive a payment for the

16   services you provided for Steadfast, would your ability to

17   meet your financial obligations be compromised?

18   A.   Absolutely.

19   Q.   How so?

20   A.   I wouldn't have the money, yeah.

21   Q.   You've got to pay the bills?

22   A.   Yes.  Don't work, you don't get paid.

23   Q.   That's right.  Do you have an ownership in Steadfast?

24   A.   No.

25   Q.   Are you an officer, manager, or director of Steadfast?

```
 1    A.  No, sir.

 2    Q.  Were you ever?

 3    A.  No, sir.

 4    Q.  Okay.  As a CNA, what type of equipment do you need to

 5    complete your job duties?

 6    A.  Thermometer, blood pressure machine, the O2, and like the

 7    basic clean linen and stuff like that.

 8    Q.  When you received the facility assignment from Steadfast,

 9    did you have to purchase this equipment?

10    A.  No, sir.

11    Q.  Now, were you required to hold a license to work as a

12    CNA?

13    A.  Yes.

14    Q.  Is this license required regardless of which facility you

15    worked at?

16    A.  Yes.

17    Q.  As a CNA, generally, what type of service do you provide?

18    A.  Take care of the residents, give them their basic, you

19    know, the care, and make sure that they're ready for their,

20    like, dialysis when they have to go out, and, you know, make

21    sure that they are fed and clean and just take care of them,

22    medical care that they need, yeah, within reason.

23    Q.  And do you provide this type of services that you just

24    described regardless of which facilities Steadfast sends you

25    to?
```

1    A.  Yes.

2    Q.  And is this the same level of skills that required from

3    all CNAs?

4    A.  Yes, sir.

5    Q.  Okay.  Earlier you talked about you complained to

6    Steadfast once about not receiving time and a half; is that

7    correct?

8    A.  Yes, sir.

9    Q.  Uh-huh.  And why didn't you ask about it a second time?

10   A.  Why didn't I?

11   Q.  Right.

12   A.  Because I was told that they didn't do time and a half.

13   Q.  Okay.  And you are still working for Steadfast but have

14   you received any back wages from prior years working over 40

15   hours in a workweek?

16   A.  No, sir.

17   Q.  Do you receive overtime now?

18   A.  No, sir.

19          MR. SEIFELDEIN:  No further questions, Your Honor.

20          THE COURT:  Cross.  Are you concerned at all the

21   fact that you are here testifying that you may not get any

22   more work from Steadfast?

23          THE WITNESS:  I hope not, but, you know, I -- I

24   haven't really thought about it really --

25          THE COURT:  What did you say?

```
 1            THE WITNESS:  I said I'm not -- I don't know.  I'm
 2   not really concerned.
 3            THE COURT:  Thank you.  Cross-examination.
 4                         CROSS-EXAMINATION
 5   BY MS. RUST:
 6   Q.  Good afternoon, Ms. Boykins.
 7   A.  Hi.
 8   Q.  My name is Julia Rust.  I'm an attorney for Steadfast and
 9   Lisa Pitts.  I'm going to ask you a couple of questions about
10   what you discussed on your direct.  So let's go over a few
11   things.  First, are you -- you're licensed in Virginia and
12   North Carolina; is that right?
13   A.  Yes.
14   Q.  Do you work shifts in both states?
15   A.  Yes, I do.
16   Q.  So do you go back and forth?
17   A.  Yes.
18   Q.  And are you able to choose the facilities that you want
19   to work in based on which state you want to be in?
20   A.  It depends.  I would call them and ask what they have.
21   If I feel like doing North Carolina, I'll ask about North
22   Carolina.
23   Q.  Okay.
24   A.  And if there's nothing there, then I'll do Virginia.
25   Q.  Okay.  But if there is an opportunity in North Carolina,
```

```
 1   and that's where you want to be, that is what you will take;
 2   is that right?
 3   A.  Yes.
 4   Q.  Okay.  So you have the flexibility to work in the
 5   locations where you want to be; is that right?
 6   A.  Yes.
 7   Q.  Okay.  Are there any facilities that you particularly
 8   like going to?
 9   A.  Well, I like most of them that I've been to.  There is
10   one or two -- there is one that I really particularly like,
11   yeah.
12   Q.  Okay.  And do you -- so if you call Steadfast and you
13   asked what's available, and there is a shift at that
14   facility, will you choose that one over other options?
15   A.  I'll ask about that, and if they have it, I'll take it,
16   but if not, then I'll go another direction.
17   Q.  Okay.  And are there facilities you have not particularly
18   enjoyed working at?
19   A.  There's one, but I go anyway because I have a job to do.
20   Q.  Okay.  That's fair.  And if you called Steadfast and
21   asked for available facilities and that was the only one
22   available, would you be able to decide if you wanted to go
23   back to that facility or not?
24   A.  I would take it because I have to work.
25   Q.  Okay.  So the money is important enough to you you will
```

**JA181**

1   take it?

2   A.  Yes.

3   Q.  Okay.  When you -- you talked about picking up double

4   shifts.  The long hours working double shifts or if your

5   shifts run longer than what you were scheduled for, that's,

6   in your experience, pretty typical in your industry?

7   A.  Yes.

8   Q.  So the facility that you mentioned you particularly liked

9   going to, you've been there a bunch of times; is that right?

10  A.  Yes.

11  Q.  Are you -- so you're familiar with the personnel at the

12  facility?

13  A.  Not all of them, just one in particular, yeah.

14  Q.  Okay.  Does that person handle any scheduling?

15  A.  Yes.  She does now.  At the time she didn't, but now she

16  does, yeah.

17  Q.  So were you able to communicate to her directly when

18  you're already there working about any upcoming opportunities

19  and pick up some shifts with her directly?

20  A.  No, ma'am.  No.

21  Q.  Okay.  Is that because you just haven't -- that

22  conversation hasn't come up?

23  A.  I have to go through Steadfast.  I can't just ask them.

24  Q.  Okay.  So has the facility -- the facility ever called

25  you when they had an -- well, the facility ever called you

```
 1   for any reason to pick up a shift?

 2   A.   They have.

 3   Q.   Okay.  Have you -- you mentioned on your direct exam that

 4   you have not worked for other agencies?

 5   A.   That's right.

 6   Q.   Have you applied or tried to work for other staffing

 7   agencies?

 8   A.   No, I haven't.

 9   Q.   Could you?  You could apply to another registry if you

10   wanted, right?

11   A.   Yes.

12   Q.   Okay.  We went over Exhibit PX26, which was your

13   application, and Mr. Seifeldein asked you some questions

14   about your references.  Do you have any idea whether

15   Steadfast called those references?

16   A.   I have no idea.

17   Q.   Okay.

18   A.   I don't know.

19   Q.   He asked you also about your time sheets, and you said

20   you submit them weekly?

21   A.   Yes.

22   Q.   Just to clarify, you're only required to submit time

23   sheets in a week if you worked that week; is that right?

24   A.   Only if I worked, yes.

25   Q.   And when you work a shift at a facility, does some --
```

```
 1    someone from the facility have to sign off on that time sheet
 2    for you?
 3    A.  Yes.
 4    Q.  Is that so that they can confirm you actually worked
 5    those hours?
 6    A.  That's right.
 7    Q.  So the time sheet you submit to Steadfast has to have a
 8    facility signature on it?
 9    A.  That's right.
10    Q.  Okay.  You mentioned also -- you were talking about how
11    your rate, when you first started, was around $17 an hour,
12    and it has gone up to $35 an hour, right?
13    A.  During COVID, yes.
14    Q.  During COVID?
15    A.  Yes.
16    Q.  And that's because the need for people in your industry
17    was higher, is that right, your knowledge?
18         MR. SEIFELDEIN:  Objection, Your Honor, calls for
19    speculation.
20         THE COURT:  Sustained.
21    BY MS. RUST:
22    Q.  And you mentioned when you were picking -- about picking
23    up shifts, you would -- when you're interested in picking up
24    some shifts, you said that you would call Steadfast, right?
25    A.  Yes.
```

```
 1   Q.  And you would request available shifts that were double

 2   shifts; is that right?

 3   A.  If I felt like doing double, yes.

 4   Q.  If you were up to it?

 5   A.  Yes.

 6   Q.  And you said at times they have call you, Steadfast has

 7   called you?

 8   A.  They have, yes.

 9   Q.  Okay.  Would you say more often than not you called

10   Steadfast to request available shifts?

11   A.  Kind of even, I think.

12   Q.  And when you were on site at a facility, has anyone from

13   Steadfast been on site with you?

14   A.  Can you say that again?  I'm sorry.

15   Q.  Yeah, sure.  So when you've worked at a shift at a

16   facility, are you aware whether anyone from Steadfast has

17   ever been on site at that facility with you?

18   A.  No.

19   Q.  So Steadfast hasn't ever observed you performing your

20   duties as a CNA on site, right?

21   A.  Right.

22          MS. RUST:  Okay.  I have no further questions.

23   Thank you very much.

24          THE COURT:  Thank you.

25          MR. SEIFELDEIN:  Briefly, Your Honor.  I apologize,
```

1    Your Honor.

2                        REDIRECT EXAMINATION

3    BY MR. SEIFELDEIN:

4    Q.  Ms. Boykins, briefly, when Steadfast calls you for shifts

5    or you call them, you don't know what they have; is that

6    correct?

7    A.  That's right.

8    Q.  You only know what they offer you?

9    A.  Right.

10   Q.  So you wouldn't know, for example, they have another

11   facility that you want to work at if they don't present it to

12   you, correct?

13   A.  Yes.

14   Q.  You only know what Steadfast offers?

15   A.  Right.

16   Q.  Okay.  So Ms. Rust asked you about an instance one time

17   where a facility called you for a shift?

18   A.  They didn't exactly call me.  I was there already, and

19   they asked me can I stay, or they say can you come tomorrow.

20   Now, would you be available tomorrow or something like that.

21   Q.  Did you notify Steadfast?

22   A.  Yeah.

23   Q.  And why did you notify Steadfast?

24   A.  You say why do I call them?

25   Q.  Why did you notify Steadfast if the facility asked you to

Boykins, S. - Redirect                                         135

```
 1    come the next day?
 2    A.  Well, a lot of times -- well, the time that they asked me
 3    I didn't do it anyway so...
 4    Q.  Right.
 5    A.  I didn't -- I didn't pick up because most likely I
 6    believe I was already scheduled somewhere else --
 7    Q.  Okay.
 8    A.  -- when they had asked me.
 9    Q.  Okay.  Along with working at the facilities and going to
10    the time sheets, Ms. Rust asked you whether it was -- the
11    time sheet requires the signature of the facility, and you
12    said yes.  Who do you have to send that time sheet to?
13    A.  E-mail it to Steadfast.
14    Q.  Okay.  And once you e-mail to Steadfast, were you paid
15    for those hours that you worked by Steadfast?
16    A.  Yes.
17    Q.  Did you -- were you paid by the facilities?
18    A.  No.
19    Q.  Did you submit them to the facility, the time sheets?
20    A.  No.
21    Q.  And just -- who set the rate of pay for you, the rate
22    that you received?
23    A.  Steadfast.
24            MR. SEIFELDEIN:  No further questions.
25            THE COURT:  May the witness be permanently excused?
```

```
 1              MR. SEIFELDEIN:  The witness may.

 2              THE COURT:  You may step down.

 3              (Witness excused.)

 4              THE COURT:  Okay.  What we are going to do, is we

 5   can get the witness, we will be taking a break at 4:00, give

 6   us an opportunity to try to recall her and straighten things

 7   out at that time.  So call another in-person witness if you

 8   have one.

 9              MS. LEWIS:  Ms. Roxanne Adams.

10              (Witness was sworn.)

11              ROXANNE ADAMS, called by the Plaintiff, having been

12   first duly sworn, was examined and testified as follows:

13                          DIRECT EXAMINATION

14   BY MS. LEWIS:

15   Q.  Good afternoon, Ms. Adams.

16   A.  Good afternoon.

17   Q.  Are you familiar with Steadfast Medical -- I'm sorry,

18   before we get there, can you please state your name, spelling

19   your last name for the record.

20   A.  Roxanne Adams.  My last name is spelled A-d-a-m-s.

21   Q.  Are you familiar with Steadfast Medical?

22   A.  Yes, ma'am.

23   Q.  And how are you familiar?

24   A.  I used to be employed by Steadfast Medical Staffing.

25   Q.  Okay.  When were you -- when was that?
```

```
1    A.  I can't recall the exact date.  I was employed when she
2    first opened up and then again the second time, I want to say
3    an approximate date probably again in 2016.
4    Q.  Okay.  You said the first time she opened up.  Was
5    Steadfast a different kind of business when you first worked
6    for her?
7    A.  No, ma'am, it was the same.
8    Q.  Okay.  What was your job title?
9    A.  First time it was licensed practical nurse; the second
10   time around was registered nurse.
11   Q.  Okay.  Did you have a supervisor when you worked at
12   Steadfast?
13   A.  Yes, ma'am.
14   Q.  And who was your supervisor?
15   A.  The scheduler and Lisa.
16   Q.  How were you supervised?
17   A.  Could you repeat that question again?
18   Q.  Sure.  You said you had two supervisors, Lisa and the
19   scheduler.  How did they supervise you?
20   A.  As in, say, in the -- what was available to work, when
21   should we work, sending us e-mails on what should we be doing
22   while we are out in the field working, just basically giving
23   us like queues of what should we be doing while we are out in
24   the field, what shouldn't we be doing while we are out in the
25   field, to watch a call-out, to, you know, try to do your best
```

```
 1   you can do while you're out in the field.
 2   Q.  Okay.  How much were you paid per hour when you worked at
 3   Steadfast?
 4   A.  The second time around, $40 an hour.
 5   Q.  And who set that rate?
 6   A.  Steadfast.
 7   Q.  Did you ever receive time and a half, overtime for the
 8   hours you worked?
 9   A.  No, ma'am.
10   Q.  Were you able to change the rate of pay with the facility
11   that Steadfast placed you at directly?
12   A.  No, ma'am.
13   Q.  Other than the hourly pay rate, did you receive any
14   profits beside the hourly rate that was predetermined by
15   Steadfast?
16   A.  Repeat that again.
17   Q.  Other than the rate that Steadfast set, did you receive
18   any other money from Steadfast?  Did you receive any profits
19   from the business that --
20   A.  No profits from the business, but, um, I did do some home
21   health, and it was almost like a different rate.
22   Q.  Okay.  So who paid you for the care that you provided,
23   Steadfast or the facilities?
24   A.  Steadfast.
25   Q.  Were you required to complete time sheets?
```

Adams, R. - Direct                                              139

```
 1    A.  Yes, ma'am.
 2    Q.  Who did you submit the time sheets to?
 3    A.  I submitted the time sheets into a e-mail address.
 4    Q.  And how often were you required to submit the time
 5    sheets?
 6    A.  Weekly.
 7    Q.  And how many hours did you normally work a week?
 8    A.  My amount of hours is I worked -- I mostly traveled the
 9    second half of my employment with Steadfast, so I usually
10    probably worked about 112 hours every week, but I only worked
11    two weeks on and two weeks off.
12    Q.  Okay.  I just want to make sure.  You said 112 hours a
13    week?
14    A.  Yes, ma'am.  I used to work 16 hours per day seven days a
15    week for two weeks straight.
16    Q.  Okay.  And so you regularly worked 40 hours a week during
17    the time you worked at Steadfast; is that right?
18    A.  Repeat that.
19    Q.  So you worked more than 40 hours during the time that you
20    worked there?
21    A.  Yes, ma'am, I did.
22    Q.  Are you familiar with next-day pay?
23    A.  Yes, ma'am, I am.
24    Q.  What is that?
25    A.  It is something that Steadfast offered for you to get
```

1    next-day pay, but I never -- just to get, I never did it.

2    Q.  So you said they offer it.  How would you go about, if

3    you did use it, how would you go about taking advantage of

4    it?

5    A.  You would let them know that you wanted next-day pay.

6    You submit your time sheet, and this is just from other

7    employees.  I never did it.  You never got next-day pay.  It

8    was always the next -- the day after, and it was a percentage

9    of the pay.

10   Q.  Okay.  So what was that fee amount that they would charge

11   for doing it?

12   A.  6 percent of the pay.

13   Q.  What was your regular payday since you didn't do next-day

14   pay?

15   A.  Every Friday.

16   Q.  Did you have issues with your paycheck?

17   A.  No, ma'am.

18   Q.  Were your paychecks on time?

19   A.  Not all the time.

20   Q.  So is that a problem with your paycheck?

21   A.  It's a problem if you complain about it.

22   Q.  Okay.  Fair enough.  Were you given the option to be

23   classified as an independent contractor or an employee?

24   A.  No, ma'am.

25   Q.  When you worked at Steadfast, did you own your own

```
 1    business?

 2    A.  No, ma'am.

 3    Q.  Advertise the healthcare that you provided in any

 4    independent way?

 5    A.  No, ma'am.

 6    Q.  Were you required to maintain your own malpractice or

 7    liability insurance?

 8    A.  No, ma'am.

 9    Q.  Were you required to maintain your own workers'

10    compensation insurance?

11    A.  No, ma'am.

12    Q.  Were you allowed to employ or have other individuals

13    assist you in the performance of your services for which

14    Steadfast paid you to complete?

15    A.  No, ma'am.

16    Q.  Were you allowed to assign your shifts to other RNs

17    without Steadfast's approval?

18    A.  No, ma'am.

19    Q.  Where do you presently work?

20    A.  Essential Medical Staffing.

21    Q.  Okay.  And how long have you been in that position?

22    A.  A year.

23    Q.  Okay.  And did you -- was that your position -- let me

24    ask this:  When did you stop working at Steadfast?

25    A.  March of 2020.
```

Adams, R. - Direct                                              142

```
 1    Q.   And then when did you start working at Essential?

 2    A.   April of 2020.

 3    Q.   And what is your job title there at Essential?

 4    A.   Basically, I'm the finance manager.

 5    Q.   Okay.  What kind of services do they provide?

 6    A.   It's a medical staffing agency, so we provide basically

 7    the same type of a service.  We provide them -- we send RNs,

 8    LPNs, CNAs, RNAs to different nursing homes, jails, long-term

 9    care facilities.

10    Q.   So the same thing Steadfast does?

11    A.   Yes, ma'am.

12    Q.   And what is your job duties and responsibilities there?

13    A.   I make sure that when our money is collected, make sure

14    the invoices are sent out, make sure that we are in

15    compliance with everything that needs to be in compliance

16    with in reference to the finances.

17    Q.   Do you have any involvement in scheduling the nurses?

18    A.   Yes, ma'am, sometimes.

19    Q.   What do you do in support of that effort?

20    A.   Because we are not a large company, so we all have to

21    help out with -- if -- when the facility sends us hours, we

22    put the hours out for the nurses or LPNs and RNs, CNAs to

23    pick up, and they will call us and say, well, hey, I may want

24    this shift or I may want that shift.  You call the facility,

25    you get that shift confirmed.  We let them know that their
```

**JA194**

```
 1   shift is confirmed, and they go to work.
 2   Q.  Is that the same thing that you used to get work through
 3   Steadfast?
 4   A.  Sometimes, yes, ma'am.
 5   Q.  Does Essential pay overtime when the nurses work over 40
 6   hours in a workweek?
 7   A.  Yes, ma'am.
 8   Q.  Are the nurses at Essential required to hold and maintain
 9   licenses to be practicing in Virginia?
10   A.  Yes, ma'am.
11   Q.  And then based upon the type of license you hold, does
12   that dictate the type of care the nurse can provide?
13   A.  Yes, ma'am.
14   Q.  Are time sheets required for Essential nurses?
15   A.  Yes, ma'am.
16   Q.  Is that the same or different from Steadfast?
17   A.  The same.
18   Q.  Are time sheets created by Essential or the facilities?
19   A.  Essential.
20   Q.  And is that the same or different than Steadfast?
21   A.  It's the same.
22   Q.  Does Essential require the facility to sign the time
23   sheets?
24   A.  Yes, ma'am.
25   Q.  And is that the same or different from Steadfast?
```

**JA195**

1    A.  It's the same.

2    Q.  If there is an issue with an Essential nurse at a

3    facility, does the facility contact Essential?

4    A.  Yes, ma'am.

5    Q.  And is that the same or different from Steadfast?

6    A.  It's the same.

7    Q.  Does Essential set the rate of pay for nurses that are

8    offered shifts?

9    A.  Yes, ma'am.

10   Q.  And is that the same or different from Steadfast?

11   A.  It's the same.

12   Q.  Does Essential provide an opportunity for nurses to

13   negotiate the rate of pay before taking an assignment?

14   A.  Yes, ma'am.

15   Q.  Is that the same or different from Steadfast?

16   A.  That's different.

17   Q.  How so?

18   A.  You --

19   Q.  And how is it different from Steadfast?

20   A.  You didn't negotiate your pay.  Your rate was $40, and

21   that's what you got, $40.  If your rate was 30, that's what

22   you got, $30.

23   Q.  Has Essential been subject to an audit or investigation

24   regarding its compliance with the act, the Fair Labor

25   Standards Act?

Adams, R. - Direct                                                      145

```
 1   A.  Yes, ma'am.

 2   Q.  When was that?

 3   A.  The approximate -- it's an approximate, around August of

 4   last year.

 5   Q.  And what happened?

 6   A.  We were misclassifying our employees, and we were -- we

 7   kind of based our company off of thinking that they were

 8   independent contractors, and what we found out was during the

 9   compliance, that it really is a fine line between being an

10   independent contractor and not being an independent

11   contractor.  So what happened with us was we complied.  They

12   gave us -- they told us what we needed to do.  We needed to

13   pay back -- back wages for overtime.  We paid all our back

14   wages, and then from there forward, that day on, we had to

15   pay overtime for all hours made after 40 hours.

16   Q.  Have any of Ms. Pitts' attorneys contacted you?

17   A.  Yes, ma'am.

18   Q.  How many?

19   A.  Three.

20   Q.  How have they contacted you?

21   A.  Telephone.

22   Q.  Have you received correspondence through any other means

23   from them?

24   A.  Yes, ma'am.  I received two subpoenas with two -- two

25   hundred dollar checks, and that's it.
```

**JA197**

```
 1   Q.  Okay.  You indicated --
 2   A.  I'm sorry.  E-mail.  Excuse me.
 3   Q.  You've mentioned that they contacted you by phone.
 4   Approximately how many times did they contacted you by phone?
 5   A.  I can't go back to the -- well, in the beginning it was a
 6   lot more than in recent.  In the beginning they were
 7   contacting me more frequent than in recent -- than now.  So
 8   it was like probably when the case first started.
 9   Q.  Okay.  And what was the nature of the conversation?
10   A.  As I can recall, the nature of the conversation was just
11   talking about what the answers -- asking me questions, just
12   almost similar questions to what you're asking me, and me --
13   me giving answers, but I was never really told exactly why.
14   So I just went along with it.  I was still employed by
15   Essential -- I mean, by Steadfast Medical Staffing.
16   Q.  So to clarify, when they were contacting you at the
17   beginning, you were still working for Steadfast at that
18   point --
19   A.  Yes, ma'am.
20   Q.  -- is that correct?
21   A.  Yes, ma'am.
22   Q.  And did they ever tell you what this matter was about?
23   A.  No, ma'am.
24   Q.  Were you ever provided any documents explaining what the
25   case was about?
```

```
 1    A.  No, ma'am.
 2          MS. LEWIS:  Your Honor, the Court's brief
 3    indulgence.  I need to grab something.
 4    BY MS. LEWIS:
 5    Q.  I'm going to show you a document and let me know if this
 6    refreshes your recollection.  Do you recognize this document?
 7    A.  No, ma'am.
 8    Q.  Did they ever provide you this document?
 9    A.  No, ma'am.  Only document I was provided was the answers
10    to my questions.
11    Q.  So that was the initial contact, you said about four
12    years ago, so it was about 2019.  So in 2020 and '21, they
13    never gave you that notice; is that correct?
14    A.  No, ma'am.  That is correct, yes, ma'am.  I never got
15    this document.
16    Q.  So you weren't aware what this case was about?
17    A.  In the beginning, I was not aware.  But after everybody
18    started talking about it, I was made aware by other
19    employees, never by the attorney or the owner.
20    Q.  Did Steadfast attorneys provide you with a statement to
21    sign?
22    A.  Yes, ma'am.
23    Q.  Do you know who prepared that statement?
24    A.  They asked me questions.  As for me knowing who typed
25    them up, no, ma'am, I do not.
```

```
 1   Q.  Do you know, who did you speak to who asked you questions
 2   then?
 3   A.  Yes, ma'am.
 4   Q.  What is that individual's name?
 5   A.  Christopher.
 6   Q.  Okay.  And did he ask you to sign the statement?
 7   A.  Yes, ma'am.
 8   Q.  I direct your attention to what's going to come up as
 9   Plaintiff's 5-53/54.  Do you recognize this document?
10   A.  Yes, ma'am.
11   Q.  What is it?
12   A.  It was the questions that I was asked during our
13   conversation on the phone.
14   Q.  If you could scroll to the bottom, please.  Is that your
15   signature at the bottom of the document?
16   A.  Yes, ma'am, it is.
17   Q.  Is that statement an accurate reflection of the
18   statements you provided to the Steadfast attorneys?
19   A.  Not all of them.
20   Q.  Okay.  I want to direct your attention to Paragraph 4.
21   And if you'd just take a moment to review it.  And you just
22   look up at me when you're done.
23        Is there anything misleading or inaccurate in that
24   paragraph?
25   A.  Yes, ma'am.
```

```
 1    Q.   What is it?
 2    A.   Steadfast didn't hire me.  That's not how it works.
 3    Q.   You can go on.  I'm sorry to interrupt.
 4    A.   "I'm just on the registry, and I work when I want to.
 5    They can't fire me either."
 6    Q.   Those statements are inaccurate?
 7    A.   They are inaccurate, yes, ma'am.
 8    Q.   What's the reality?
 9    A.   The reality was I was actually hired by Steadfast, and if
10    I did something wrong, you can get fired.
11    Q.   What about the assignment part?  Is there anything
12    inaccurate or misleading about that?
13    A.   Well, they tell you a lot of assignments.  You can pick
14    them up if you want to, but you most likely were persuaded to
15    pick up assignments that you didn't want because sometimes
16    they will tell you that's all that I have.  So if you wanted
17    to work, you worked overtime.
18    Q.   Directing your attention now to Paragraph 5.  If you
19    would take a moment to review that paragraph and look up at
20    me when you're done.
21         Is there anything misleading or inaccurate in that
22    paragraph?
23    A.   Yes, ma'am.
24    Q.   What is it?
25    A.   Misleading, um, "I don't have to get permission to take
```

```
 1    time off."  You do have to let them know that you're taking
 2    time off and ask for time off.  You're not allowed to call
 3    the facility.  You had to call Steadfast, if you're running
 4    late or if you wanted to call off, you had to call Steadfast.
 5    Q.  Well, what would happen if you called the facility?
 6    A.  You'd get in trouble.  You'd get an e-mail, so forth,
 7    saying, "Don't call the facilities.  Call us.  Let us know
 8    that you're calling off or that you're canceling the shift."
 9    Q.  Directing your attention to Paragraph 8.  If you'd take a
10    moment to review that and look up at me when you're done.
11         Is there anything misleading or inaccurate in this
12    paragraph?
13    A.  Yes, ma'am.
14    Q.  And what is it?
15    A.  "They never tell us how to do my job.  Sometimes when you
16    work a shift a new facility -- at a new facility, the
17    facility will have Steadfast relay some of the facility's
18    policies or instructions to us.  But Steadfast doesn't
19    supervise me, only the facility supervises what I do."
20         The facility never supervises us.  If anything goes
21    on in the facility, they call Steadfast, and Steadfast let us
22    know that we have done something wrong, may it be that we
23    have been DNR'd, or whatever, but we never get anything like
24    that from the facility itself.
25    Q.  Directing your attention to Paragraph 10, if you could
```

```
1    take a moment to review that and look up at me when you're

2    done.

3           Is there anything misleading or inaccurate in this

4    paragraph?

5    A.  Only the part that says, "Steadfast only pays me what the

6    facility approves."  I have no idea what the facility

7    approves.

8    Q.  And last one, Paragraph 12.  If you take a moment, it's a

9    little bit longer, and look up at me when you're done.

10          Is there anything misleading or inaccurate in that

11   paragraph?

12   A.  Yes, ma'am.  You can try to negotiate, but you never

13   get -- you never negotiate your rate.

14   Q.  And why is that?

15   A.  Well, she's really stern about what she's going to pay

16   you, and that's what it's going to be.  But you can try to

17   negotiate.

18   Q.  So that's your signature at the bottom of this page?

19   A.  Yes, ma'am, it is.

20   Q.  Why did you sign this statement if it was inaccurate?

21   A.  At the time I signed the statement because I was still

22   employed by Steadfast.  I believed in my company that I was

23   working for.  I believed that I was never being wronged by

24   the company.  I was afraid of losing my job.  I needed my

25   job.  I was afraid of being retaliated against, because in
```

Adams, R. - Direct                                                    152

```
 1    that scenario you do, you would be -- you -- she would take
 2    your hours.  She would take your hours from you.  You won't
 3    be getting paid.  If I don't work, I don't get paid, so my
 4    bills don't get paid, so I signed it.
 5    Q.  So you were scared of not -- of losing your job?
 6    A.  Yes, of being retaliated against.
 7    Q.  Have you heard of any other employees being retaliated
 8    against for not signing statements?
 9    A.  I've heard other employees --
10            MS. RUST:  Objection.
11            THE COURT:  Sustained.  Calls for hearsay.
12    BY MS. LEWIS:
13    Q.  How did you feel when you were contacted by her attorneys
14    no less than four times?
15    A.  I don't understand the question.
16    Q.  Sure.  You indicated that Steadfast, defendant's
17    attorneys contacted you a number of times.
18    A.  Uh-huh.
19    Q.  How did that make you feel when they continued to contact
20    you?
21    A.  Well, when it continued, and it was so many different
22    ones, you feel a little pressure.
23    Q.  So after you signed this statement, did you prepare any
24    other statements?
25    A.  There was another statement after this statement.
```

```
 1    Q.   How many others?
 2    A.   One other one after this statement that one of her other
 3    attorneys collected, and I signed.
 4    Q.   Was that statement different than this statement?
 5    A.   It was a lot different, yes, ma'am.
 6    Q.   What was different about it?
 7    A.   It's just a little -- the terminologies that I used was a
 8    little different.  It was a little bit more accurate.
 9    Q.   Okay.  Well, you pointed out a number of things in
10    inquiries that most of these paragraphs that were different.
11    So was it the terminology or was it your experiences that
12    were reflected differently?
13    A.   It was more truthful.
14    Q.   And so why did the statement change?
15    A.   Because it wasn't accurate.  It wasn't the truth.  I
16    mean, I felt that I had to tell the truth, and then with a
17    lot of -- how could I put this?  Some of her attorneys were a
18    little bit more nicer than the others.  They weren't as pushy
19    and as demanding as saying this is what, you know, we want
20    you to say.  So that second statement, which I don't know
21    where it is, it was a little more truthful.
22    Q.   Were you still working at Steadfast at the time that you
23    prepared the second statement?
24    A.   Yes, ma'am, I was.
25    Q.   How long was it between you left Steadfast and you
```

```
 1    started at Essential that you submitted that statement?  Was
 2    there a long period of time between when you were leaving and
 3    going to your next job?  In other words, did you have
 4    immediate future prospects of other employment?
 5    A.  No, ma'am.  No, ma'am.
 6    Q.  Okay.  Have you had any discussions with Lisa about this
 7    matter?
 8    A.  Only one.
 9    Q.  Okay.  What was discussed?
10    A.  The only thing that she ever mentioned to me about this
11    case was, "I'm not supposed to be telling you this.  Thank
12    you.  You're the reason why the case was pushed back because
13    one of the judges was partial to you."  That was it.
14    Q.  Have you received any back wages from Steadfast Medical
15    for the hours you worked over 40?
16    A.  Excuse me?
17    Q.  Have you received any back wages or compensation?
18    A.  No, ma'am.
19            MS. LEWIS:  I have no further questions of this
20    witness.
21            THE COURT:  Cross.  I think they are trying to get
22    your attention before you sit down.
23            MS. LEWIS:  I'm sorry.  Excuse me.  May I?
24            THE COURT:  You may.  Cross-examination.
25                        CROSS-EXAMINATION
```

```
 1   BY MS. RUST:
 2   Q.  Hi, Ms. Adams.
 3   A.  Hello.
 4   Q.  All right.  So you are an owner at Essential Medical
 5   Staffing; is that right?
 6   A.  No, ma'am.
 7   Q.  Just the finance manager?
 8   A.  Yes, ma'am.
 9   Q.  No ownership?
10   A.  No, ma'am.
11   Q.  Okay.  At Essential Medical Staffing, when you first --
12   let me ask you this:  I think you said Essential Medical
13   Staffing you've been with them since April 2020; is that
14   right?
15   A.  Correct.
16   Q.  And is that when the company first started?
17   A.  No, ma'am.
18   Q.  When did it first start?
19   A.  It first started February 3rd, 2020.
20   Q.  Okay.  So two months after it opened is when you started?
21   A.  Correct.
22   Q.  Okay.  When you first joined Essential Medical Staffing
23   you said that they were originally classifying the nurses as
24   1099 contractors, right?
25   A.  Correct.
```

```
 1   Q.  And is -- were you involved in the decision to classify

 2   as contractors?

 3   A.  Yes, ma'am.

 4   Q.  Okay.  And is that based on your experience in the

 5   industry?

 6   A.  That's based off only my experience at Steadfast Medical

 7   Staffing.

 8   Q.  Okay.  And Essential Medical Staffing would not have

 9   reclassifying its nurses to W-2s but for the FLSA

10   investigation or audit; is that true?

11            MS. LEWIS:  Objection.

12            THE WITNESS:  Would you please repeat that

13   question.

14            THE COURT:  No.  No.  No, no, no.  There is an

15   objection to that question.  Calls for speculation.

16   BY MS. RUST:

17   Q.  If you know the answer --

18            THE COURT:  It calls for her to speculate.  Still

19   speculation.  So objection still is sustained to that

20   approach to the question.

21            MS. RUST:  Okay.  May I try to rephrase one more

22   time?

23            THE COURT:  If you are asking her about what

24   Essential would have done if A, B, C had been done, then it

25   is still speculation.
```

1          MS. RUST:  Okay.

2   BY MS. RUST:

3   Q.  Prior to the FLSA audit or investigation, prior to that

4   are you aware whether Essential Medical Staffing intended or

5   was planning to re-classify its nurses --

6          MS. LEWIS:  Objection.

7          MS. RUST:  -- at that time?

8          MS. LEWIS:  Objection.  Calls for speculation, also

9   lacks foundation because, remember, she started in April of

10  2020.

11         THE COURT:  All right.  Sustained.

12         MS. RUST:  She said she was involved in the

13  decision for classification, though.

14         THE COURT:  At what point, though?  So that's the

15  problem we are having here.  I think we need to leave this

16  alone, something else.

17         MS. RUST:  Of course.

18  BY MS. RUST:

19  Q.  So since -- when -- just for timeline purposes, tell me

20  when Essential Medical Staffing re-classified its nurses to

21  W-2 employees.

22  A.  We went through this process starting in August.

23  Q.  Of this year?

24  A.  Last year.

25  Q.  Last year?  And you said your -- well, I'll skip that.

```
 1    So Steadfast -- as the finance manager at Essential Medical

 2    Staffing, would you view Steadfast Medical Staffing as a

 3    competitor of Essential Medical Staffing?

 4    A.  I would hope it wouldn't be competitors, but that's the

 5    question, yes.

 6    Q.  Okay.  Well, you're in the same industry; is that true?

 7    A.  It's the same industry, and there are multiple other

 8    agencies in the same industry as well.

 9    Q.  Of course.

10    A.  So we are all competitors, yes, you can say.

11    Q.  Does Essential Medical Staffing have contracts with

12    facilities that, to your knowledge, Steadfast also has

13    contracts with?

14    A.  I have no idea who Steadfast has contracts with.

15    Q.  Okay.  When you were working on Steadfast registry, you

16    said that, during your direct exam, you mentioned that your

17    supervisors were the schedulers and Lisa, right?

18    A.  Correct.

19    Q.  And the extent of that supervision was talking about your

20    availability to work and to do your best in the field; is

21    that right?

22          MS. LEWIS:  Objection, Your Honor, misstates and

23    mischaracterizes her testimony.  She listed at least six

24    things.

25          THE COURT:  Can you rephrase it to include
```

```
 1   everything.
 2   BY MS. RUST:
 3   Q.  When you described the supervision at Steadfast, were you
 4   supervised in other ways beyond discussing your availability
 5   to work and doing your best in the field?
 6   A.  Yes, ma'am.
 7   Q.  Okay.  And did it relate to submitting time sheets in a
 8   timely manner?
 9   A.  Yes, ma'am.
10   Q.  Okay.  And did it relate to just being generally
11   professional in the field?
12   A.  Yes, ma'am.
13   Q.  Okay.  When you were on site at a facility, was Lisa
14   Pitts ever on site with you?
15   A.  She's come on site before when we were on site, yes,
16   ma'am.
17   Q.  When you were working a shift through Steadfast, you've
18   seen Lisa Pitts on site at a facility?
19   A.  Yes, ma'am.
20   Q.  Since 2017, is that when you said you started at
21   Steadfast?
22   A.  No, ma'am.  I couldn't recall the exact date I started.
23   I started two separate occasions.  I started there when she
24   first opened, and then again I started the second time
25   around -- it was around 2016.
```

```
 1   Q.  Right.  Thank you for the clarification.  So since the
 2   second time around, have you observed Lisa Pitts on site at
 3   the facilities while you were taking a shift?
 4   A.  Yes, ma'am.
 5   Q.  Was she working there?
 6   A.  No, ma'am.
 7   Q.  Was she there for a medical reason?
 8   A.  No, ma'am.
 9   Q.  Was she there to supervise you?
10   A.  She came into the facility so we can have a meeting on
11   the facility property in reference to us making sure we turn
12   our time sheets in, making sure we are clocking in and out on
13   time, yes, ma'am.
14   Q.  And did you schedule that meeting with Lisa?
15   A.  No, ma'am.
16   Q.  So when the meeting was scheduled between facility and
17   Lisa?
18   A.  I have no idea how that meeting was scheduled.  I was
19   only present at the meeting.
20   Q.  Okay.  So it was -- Lisa was visiting the facility to
21   discuss issues with the facility, to your knowledge?
22            MS. LEWIS:  Objection, Your Honor.  Misstates the
23   testimony.
24            THE COURT:  Sustained.  She said --
25            MS. RUST:  Fair enough.
```

```
 1              THE COURT:  -- at the facility.

 2              MS. RUST:  That's fair.

 3   BY MS. RUST:

 4   Q.  Let me ask you this:  Has Lisa Pitts ever supervised you

 5   while you took someone's blood pressure?

 6   A.  No, ma'am.

 7   Q.  She ever supervise you while you were administering care

 8   to a patient at a facility?

 9   A.  Could you re --

10              THE COURT:  Well, don't ask her a question.  Just

11   don't.  If you don't understand the question, just say you

12   don't understand.

13              THE WITNESS:  I don't understand that question.

14   BY MS. RUST:

15   Q.  Okay.  Lisa Pitts has never supervised you while you were

16   providing nursing services at a facility; is that right?

17   A.  I don't understand the line of questioning.  It's

18   confusing.  I'm sorry.

19   Q.  I can move on.  You talked about your hours.  Tell me if

20   this is wrong, but you said you had traveled, and you liked

21   to set it up as two weeks on and two weeks off; is that

22   right?

23   A.  Yes, ma'am.

24   Q.  And was that because that schedule -- let me rephrase

25   that.  That scheduling was your preference; is that right?
```

```
 1    A.  That scheduling, I'm going to say -- I mean, I traveled
 2    because I thought that was all that was -- they had, because
 3    I was told that, you know, this is what we have.  But there
 4    were facilities closer to my home, but I just did not get
 5    placed in those facilities as often as I would if I traveled.
 6    Q.  Okay.  So there were more opportunities available at
 7    facilities that were a further distance, is that right, to
 8    your knowledge, what you were made aware of that was
 9    available?
10    A.  To my knowledge.
11    Q.  Okay.  And you chose to take enough shifts that you would
12    work significant hours, you said over a hundred hours a week
13    sometimes, right?
14    A.  Correct.
15    Q.  Okay.  And so if you wanted to -- if you chose facilities
16    closer to home, is it true that it might be difficult for you
17    to get the quantity of hours you wanted?
18    A.  I was not given the choice to choose the facilities that
19    was closer to my home.
20    Q.  Because you wanted more hours, right?
21    A.  Incorrect.
22    Q.  Okay.  So you still picked --
23    A.  It was because I was one of the ones that would travel.
24    Q.  Okay.  So you agreed to travel for shifts so that you
25    could get the number of hours that you wanted and the
```

 1   schedule, two weeks on/two weeks off-type schedule; is that

 2   right?

 3   A.  I'm not understanding the way you're wording the

 4   question.

 5   Q.  That's okay.  You worked on other registries before?

 6   A.  Yes, ma'am.

 7   Q.  Did you work on them the same time that you were working

 8   at Steadfast registry?

 9   A.  Yes, ma'am.

10        MS. LEWIS:  Objection, Your Honor.  Outside the

11   scope of direct.

12        THE COURT:  Sustained.  Another thing.  The Court's

13   been listening at it for some time now, and the fact that

14   something different happened at another registry is not all

15   that relevant to this Court's fact finding.  It's what

16   happened at Steadfast, whether it complied with the Fair

17   Labor Standards Act, no matter what they were doing at the

18   other registry.  So for the future, just be aware of that.

19        MS. RUST:  Understood.  Thank you, Your Honor.

20   BY MS. RUST:

21   Q.  Okay.  So you talked a little bit about what -- you

22   talked quite a bit about this declaration that you signed in

23   May of -- or, excuse me, April of 2019, the one that

24   Ms. Lewis showed you?

25   A.  Yes, ma'am.

```
 1   Q.  You said in your testimony that before you signed that
 2   statement in April, you had not received that notice from the
 3   Court, which was the first document she sent you; is that
 4   right?
 5   A.  Correct.  I had not received that, and I still haven't to
 6   this day received that form I just saw.
 7   Q.  And is that because the notice from the Court was dated
 8   in May of 2019, after you signed the declaration?  Is that
 9   why you did not receive it before you signed the declaration?
10   A.  I have no idea why I did not receive it.
11   Q.  Okay.  So you had an opportunity to read through the
12   statement before you signed it; is that right?
13   A.  Did I read through the statement before I signed it?
14   Q.  Yes.
15   A.  No, ma'am, I did not.
16   Q.  You did not read the statement?
17   A.  No, ma'am, I did not.  That is the honest answer.  I did
18   not.
19   Q.  Okay.  But you signed it.  That was your signature,
20   right?
21   A.  Correct.
22   Q.  Okay.  So you received a copy of that statement, right,
23   and then you elected not to read it, and you signed it; is
24   that correct?
25   A.  No, ma'am.  The lawyer called on the phone.  We went over
```

 1   the questions.  They typed it up.  He sent it to me.  I did

 2   not sign it for the first couple of days.  They kept calling

 3   me telling me I needed to sign it, I needed to turn it in.

 4   I'm still employed by Steadfast Medical Staffing.  I was

 5   afraid of my job, so I signed it.  I didn't read it at that

 6   particular time.  Later on, I did read it.  After I read it,

 7   another attorney called me, and I changed some of my answers.

 8   That's the way it went.

 9            THE COURT:  I don't know how many questions you

10   have, Ms. Rust, but we will take a 15-minute break, and you

11   can come back and finish up with this witness.

12            (Recess from 3:59 p.m. to 4:17 p.m.)

13            THE COURT:  You may continue.

14            MS. RUST:  Thank you, Your Honor.  I just have a

15   few more brief questions.

16   BY MS. RUST:

17   Q.  Ms. Adams, just continuing on with some questions

18   regarding the declaration that you signed, the one that was

19   dated April 19th, 2019.  You said on your direct that you

20   spoke with several attorneys, several Steadfast attorneys; is

21   that right?

22   A.  Correct.

23   Q.  Do you recall whether any of those attorneys were female?

24   A.  I can't -- only one that I can tell you the name of that

25   I spoke with a lot more than the others is Christopher, I

1   think his last name.  I'm not sure -- I don't even want to

2   say it.

3   Q.  That's okay.  You don't have to answer if you don't

4   remember.  You spoke with several different attorneys from

5   our team; is that right?

6   A.  Correct.

7   Q.  And one of them may have been female?  You don't

8   remember?

9   A.  I can't recall.

10  Q.  Okay.  And do you recall, when you received this

11  statement before you signed it, do you recall one of the

12  attorneys going over this statement with you on the phone?

13  A.  No, ma'am, I can't recall that verbatim we went over each

14  individual line and tell what it says, no, ma'am.

15  Q.  So you don't recall an attorney reading paragraph by

16  paragraph with you asking for your approval in each

17  paragraph?

18  A.  No, ma'am.

19          MS. RUST:  Okay.  I have no further questions.

20          THE COURT:  May the witness be permanently excused?

21          MS. LEWIS:  Brief redirect, Your Honor.

22          THE COURT:  Oh, okay.  Brief.

23          MS. LEWIS:  Brief.

24                      REDIRECT EXAMINATION

25  BY MS. LEWIS:

1    Q.  I just want to be clear.  The testimony that you provided

2    earlier about your experiences, and we were going -- talking

3    about working at Steadfast and even the statement, that was

4    related to your experience from 2016 onward, correct?

5    A.  Repeat the question again.

6    Q.  Sure.  Your testimony, which you told the Court about

7    your experience working at Steadfast, was that from 2016

8    until you left in approximately 2020?  Was it about that?

9    A.  Correct.  The latter experience, correct.

10   Q.  Going back to the statement, as a general matter, that

11   was around your statement that was made under duress; is that

12   correct?  Is that how you would describe it?

13          MS. RUST:  Objection, mischaracterization.

14          THE COURT:  Sustained.

15   BY MS. LEWIS:

16   Q.  Do you regret making that statement?

17          MS. RUST:  Objection, leading.

18          THE COURT:  No, overruled.

19          THE WITNESS:  Yes, ma'am, I do regret making the

20   first statements within the declaration, yes, ma'am.  I

21   regretted it, and that's why it was changed.

22   BY MS. LEWIS:

23   Q.  And so that statement is, as written and signed, it's

24   wrong, it's inaccurate, correct?

25   A.  Correct.

 1    Q.  And you're telling the truth now regarding your

 2    experiences as an employee at Steadfast; is that right?

 3          THE COURT:  You're leading your witness.  Same

 4    question.  Just phrase it differently.

 5    BY MS. LEWIS:

 6    Q.  Okay.  Are you telling the truth now with respect to the

 7    testimony you provided to this Court today?

 8    A.  Yes, ma'am.

 9    Q.  And you're telling the truth -- are you telling the truth

10    because you had a real fear of retaliation?

11          MS. RUST:  Objection, leading.

12          THE COURT:  Sustained.

13    BY MS. LEWIS:

14    Q.  Did you have a fear of retaliation at the time that you

15    made that statement?

16    A.  Yes, ma'am.

17    Q.  And was that fear real?

18    A.  Yes, ma'am.

19          MS. LEWIS:  Your Honor, if I could go back to the

20    statement, I'd like to move to admit Plaintiff's 53 --

21    plaintiff's slide 53 and 54 into the record.

22          THE COURT:  Well.

23          MS. LEWIS:  I didn't move to admit it previously.

24          THE COURT:  Oh, her statement?

25          MS. LEWIS:  Yes, just her statement, the exhibit.

1             THE COURT:  Not the statement declaration?

2             MS. LEWIS:  This statement declaration, which is

3    PX5-53 and 54, which we reviewed as she testified to.

4             THE COURT:  Yeah, but what's the reason for

5    admitting it because -- what was the reasons it was

6    presented to her in the first place?

7             MS. LEWIS:  I'm sorry.  I didn't hear.

8             THE COURT:  For what purpose was it submitted to

9    her in the first place?  It wasn't to refresh recollection?

10   What purpose did you show it to her in the first place?

11            MS. LEWIS:  For her to -- it was to refresh her

12   recollection and to testify regarding her experiences within

13   the statement.

14            THE COURT:  Then the statement doesn't come in.  It

15   was for refreshing recollection, even though both of you all

16   got all into it, it doesn't come in.

17            MS. LEWIS:  May I try to move it in through a

18   different means?

19            THE COURT:  What's the other evidentiary basis for

20   bringing it in?

21            MS. LEWIS:  Business record as an exception, Your

22   Honor, and it's also part of the record of the case.  This

23   was an exhibit, if you can direct your attention to the top

24   of this.

25            THE COURT:  I understand.  I'm not going to admit

```
1    it because the best -- I'll give you something else.  The
2    best evidence in here is her testimony on the stand, not
3    that statement.  So the statement is not coming in.
4           MS. LEWIS:  Thank you.  No further questions.
5           THE COURT:  Next witness.
6           May this witness be permanently excused?
7           MS. LEWIS:  Yes, she may.
8           THE COURT:  All right.  You may step down.
9           (Witness excused.)
10          MR. SEIFELDEIN:  Your Honor, the Department is
11   calling in Dawn Wooten as our next witness.
12          (Via videoconference.)
13          THE CLERK:  Ms. Wooten, can you hear me?
14          THE WITNESS:  Yes, ma'am.
15          THE COURT:  Okay.
16          (Witness was sworn.)
17          DAWN M. WOOTEN, called by the Plaintiff, having
18   been first duly sworn, was examined and testified as
19   follows:
20                        DIRECT EXAMINATION
21   BY MR. SEIFELDEIN:
22   Q.  Good afternoon, Ms. Wooten.
23   A.  Good afternoon.
24   Q.  Can you please state your full name for the record and
25   spell it.
```

```
 1   A.  Dawn, D-a-w-n; Michelle, M-i-c-h-e-l-l-e; Wooten,

 2   W-o-o-t-e-n.

 3   Q.  Ms. Wooten, are you familiar with Steadfast Medical

 4   Staffing?

 5   A.  Yes.

 6   Q.  What type of services does Steadfast provide?

 7   A.  They do nursing, staff relief.

 8   Q.  Were you employed by Steadfast?

 9   A.  Yes.

10   Q.  What was your job title at Steadfast?

11   A.  LPN.

12   Q.  And when did you work for Steadfast?  Between what dates?

13   A.  From 2016 -- I think it was November of 2016 to June of

14   2019.

15   Q.  Okay.  What time did you apply to work for Steadfast?

16   A.  I went into the office and filled a piece of paper out.

17   Q.  Okay.  Ms. Wooten, I want to direct your attention to

18   Plaintiff's Exhibit 26, Pages 8 through 10.  If you'd just

19   look at that document.  Do you recognize it?

20   A.  Yes.

21   Q.  Is it the employment application you submitted to

22   Steadfast?

23   A.  Yes.

24   Q.  And what information did Steadfast ask you to put on the

25   job -- I mean, the employment application?
```

Wooten, D. - Direct                                          172

```
 1    A.  My license number, my CPR, and my driver's license and

 2    Social Security card.

 3    Q.  Did it ask to provide your employment history?

 4    A.  Yes.

 5    Q.  Did it provide you -- did it ask you to provide

 6    references?

 7    A.  Yes.

 8    Q.  Okay.  And were those references provided on Page 10?

 9    A.  I couldn't hear.  Can you repeat that?

10    Q.  Are those the references you provided?

11    A.  Yes.

12          MR. SEIFELDEIN:  Your Honor, I'd like to admit

13    Plaintiff's Exhibit PX26, 8 through 10, Dawn Wooten's

14    employment application.

15          MS. RUST:  No objection.

16          THE COURT:  What pages were they again?

17          MR. SEIFELDEIN:  And that's Plaintiff's Exhibit 26,

18    Pages 8 through 10.

19          THE COURT:  I have a question for you.  You have a

20    number of probably applications in Exhibit 26, right?

21          MR. SEIFELDEIN:  Correct.

22          THE COURT:  But they are on different pages.

23          MR. SEIFELDEIN:  That is correct.

24          THE COURT:  Do you know how many more you have in

25    that same exhibit?
```

**JA224**

1            MR. SEIFELDEIN:  I'm sorry?

2            THE COURT:  Do you know how many more applications

3    you have in that same exhibit?

4            MR. SEIFELDEIN:  It was about five, Your Honor.

5            THE COURT:  Because I think it will probably be

6    more appropriate simply just admit Exhibit 26, and then you

7    can go to any page in Exhibit 26 that you want instead of

8    keeping putting into the record multiple Exhibit 26s.  We

9    are going to put in one.  Exhibit 26 is admitted.  You can

10   go to any page you want to in Exhibit 26 without having to

11   move it in again.

12           MR. SEIFELDEIN:  Well taken, Your Honor.  We would

13   like to admit Plaintiff's Exhibit 26 in its entirety.

14           THE COURT:  We are already admitted it in here.

15           MR. SEIFELDEIN:  All right.

16           (Plaintiff's Exhibit 26 received in evidence.)

17           THE COURT:  Just go to the pages you want.

18           MR. SEIFELDEIN:  Thank you, Your Honor.  Very good.

19           THE COURT:  All right.

20   BY MR. SEIFELDEIN:

21   Q.  Ms. Wooten, were you required to provide any documents

22   when you applied?

23   A.  Yes.  My driver's license, Social Security card, nursing

24   license, CPR card.

25   Q.  When you filled out the application, were you required to

```
 1    complete any forms or do you have to complete any sort of

 2    test or quizzes?

 3    A.  Yes.

 4    Q.  What sort of quizzes do you have to fill out and answer?

 5    A.  The HIPAA, the elderly abuse or like little test.

 6    Q.  And who asked you to fill out that quiz and those

 7    sections you just talked about?

 8    A.  Lisa.

 9    Q.  And were there consequences if you did not get it

10    correctly or did you not fill it out?

11          MS. RUST:  Objection.  Requires speculation and

12    foundation.

13          THE COURT:  Overruled.

14    BY MR. SEIFELDEIN:

15    Q.  You can answer.

16    A.  You have to pass them to be able to go onto an

17    assignment.

18    Q.  And was that a requirement by Steadfast?

19    A.  Yeah.

20    Q.  After you completed the application, did you meet with

21    anyone from Steadfast?

22    A.  Lisa.

23    Q.  Okay.  And did she interview and asking you questions?

24    A.  Yes.

25    Q.  Did she question you about your work experience?
```

```
 1    A.  Yes.
 2    Q.  Did they refer you for -- excuse me, did Ms. Pitts refer
 3    you for drug screening or testing as part of your employment
 4    requirement?
 5    A.  Yes.
 6    Q.  And after you had this interview with Ms. Lisa Pitts, who
 7    hired you to work for Steadfast?
 8    A.  Lisa.
 9    Q.  And when you were hired, were you paid on an hourly
10    basis?
11    A.  Yes.
12    Q.  How much were you paid an hour, Ms. Wooten?
13    A.  I believe it was 38 an hour.
14    Q.  And who set that rate of pay for you?
15    A.  Lisa.
16    Q.  Ms. Wooten, did you ever work more than 40 hours in a
17    workweek?
18    A.  Yes.
19    Q.  And how often did you work more than 40 hours in a
20    workweek?
21    A.  Most of the time.
22    Q.  On average approximately how many hours did you work each
23    day?
24    A.  Well, it was different.  A lot of them -- a lot of times
25    it was 16 hours.
```

Wooten, D. - Direct                                          176

1    Q.  Was that a double shift that you worked when you got 16

2    hours per day?

3    A.  Yes.

4    Q.  Throughout your employment period with Steadfast, how

5    many hours did you work per week on average?

6    A.  Um, anywhere like 70, 80 hours.

7    Q.  And when you worked between 70 to 80 hours on average per

8    week with Pitts, did you receive time and a half for the

9    hours you worked?

10   A.  No.

11   Q.  Did you ever talk to Ms. Pitts about not receiving time

12   and a half when you worked over 40 hours in a workweek?

13   A.  I did.  And --

14   Q.  Okay.  Go ahead.  I'm sorry.

15   A.  I said I asked about it in the beginning.

16   Q.  And what did she say to you?

17   A.  She told me that it's straight pay and that the pay that

18   she was paying me was a good rate.

19   Q.  Were you required to maintain malpractice insurance by

20   Ms. Lisa Pitts?

21   A.  No.

22   Q.  Were you required to maintain your own workers'

23   compensation by Steadfast?

24   A.  No.

25   Q.  When you worked for Steadfast, did you own your own

1   healthcare business?

2   A.   No.

3   Q.   Did you advertise the healthcare business when you worked

4   for Steadfast?

5   A.   No.

6   Q.   Which facilities did you typically work at?

7   A.   I worked at Henrico Healthcare, I've worked at Culpeper

8   Health & Rehab.  I've worked at Avante in Harrisonburg,

9   Charlottesville Health & Rehab.

10  Q.   And when you worked for those facilities through

11  Steadfast, were you able to express the terms of your working

12  relationship with the facilities directly or did you have to

13  go through someone else?

14  A.   Everything went through Lisa.

15  Q.   Did there come a time where Lisa Pitts pulled you out of

16  one of those facilities that you've just mentioned?

17  A.   The one in Harrisonburg.

18  Q.   And is that because they tried to hire you?

19  A.   Yes.

20  Q.   Okay.  What was Lisa's response when you were told that

21  the facility was trying to hire you?

22  A.   She got mad, and she told me they would have to pay her a

23  finder's fee, and then the following week, I was out.

24  Q.   What do you mean you were out?

25  A.   She pulled me out.

```
 1    Q.   Out of the facility?

 2    A.   Yes, sir.

 3    Q.   Did Lisa Pitts or Steadfast require you to complete time

 4    sheets?

 5    A.   Yes.

 6    Q.   And were you required to submit those time sheets to

 7    Steadfast Medical Staffing?

 8    A.   Yes.

 9    Q.   And how often were you required to provide these time

10    sheets?

11    A.   You do it after every shift or once a week.

12    Q.   Okay.  And who told you you were required to submit the

13    time sheets?

14    A.   Lisa.

15    Q.   Okay.  And did Lisa/Steadfast provide you the time

16    sheets?

17    A.   Yes.

18    Q.   Do you recall the time sheets had the name of Steadfast

19    Medical Staffing as the header on them?

20    A.   They do.

21    Q.   And if you could not submit your time sheets to

22    Steadfast, would you have issue receiving pay for the hours

23    you worked?

24    A.   Correct, you would not get paid.

25    Q.   If you were having issues with your time sheets or
```

```
 1   payment, who would you contact?

 2   A.   Lisa Pitts.

 3   Q.   Would you contact the facility that you worked for?

 4   A.   No.

 5   Q.   Why would you contact Lisa instead of the facility?

 6   A.   Because she was our boss, not the facility.

 7   Q.   She was your supervisor?

 8   A.   Yes.

 9   Q.   Ms. Lisa Pitts?

10   A.   Yes.

11   Q.   Okay.  Have you ever turned down a shift offered by

12   Steadfast?

13   A.   Yes.

14   Q.   And what did Steadfast or Lisa do in response to you

15   turning down a shift?

16   A.   If she asked you to take a shift, and you didn't take it,

17   she would put you on what I call punishment by making you sit

18   out a couple of shifts till she needed you.

19   Q.   Did she ever call you when you turned down a shift,

20   Ms. Lisa Pitts?

21   A.   Yes.  Yes.

22   Q.   I'm sorry.  Go ahead.

23   A.   No, I just said yes.  I'm sorry.

24   Q.   And when she called you, what did she say?

25   A.   She would ask you to take it, and if you said no, she
```

1   would ask you why, and then ask you again to take it, and if

2   you still said no, then she would get upset.

3   Q.  And did she get upset with you?

4   A.  Yeah.

5   Q.  Were you required to provide a notice to Steadfast if you

6   didn't take work shifts?  I'm sorry, let me rephrase that.

7   Were you required to provide a notice to Steadfast if you

8   couldn't work?

9   A.  If -- like say you were calling out?

10  Q.  Yes.

11  A.  Yes.

12  Q.  Okay.  And how much notice did you have to provide to

13  Steadfast if you were calling out?

14  A.  Four hours.

15  Q.  What if you were not available to work, did you have to

16  provide a notice as well?

17  A.  If you were scheduled a shift, and you couldn't work it,

18  yes.

19  Q.  If you had a scheduling conflict, Ms. Wooten, did

20  Steadfast allow you to send another LPN in your place?

21  A.  No.

22  Q.  Were you allowed to call another LPN to work a shift for

23  you?

24  A.  No.

25  Q.  Were you allowed to assign your shift to another LPN

1   without Steadfast approval?

2   A.   No.

3   Q.   Did Steadfast send out memos about expectations of how

4   you should behave when you were sent to other facilities?

5   A.   Yes.

6   Q.   And what sort of memos did Steadfast send to you?

7   A.   To be there for your shift, to be on time to your shift,

8   to be off your phone, and to dress properly.

9   Q.   And which medium did she communicate these memos to you?

10  How did she send them to you?

11  A.   Through e-mail.

12  Q.   How did Steadfast determine your schedule?

13  A.   They would call and ask you to pick a shift up, and if

14  you agreed, then that was your day to work.  If not, then,

15  no.

16  Q.   How far in advance did Steadfast give you your schedule?

17          MS. RUST:  Objection.  Foundation, mischaracterizes

18  her prior testimony.

19          THE COURT:  Yes, sir.

20          MR. SEIFELDEIN:  I asked a question.  I didn't

21  restate the witness's testimony.  The question was how far

22  in advance did Steadfast give you your schedule?  I'm not

23  sure how that's a mischaracterization of the statement that

24  the witness said.

25          MS. RUST:  She just previously testified right

1    before that the scheduled shift she would call and see what

2    was available.

3            THE COURT:  That doesn't tell us how far ahead of

4    time that is.

5            MR. SEIFELDEIN:  I believe she said, Your Honor,

6    that Lisa or Steadfast called to ask if she wanted to work a

7    shift.

8            THE COURT:  All right.  Objection overruled.  Let's

9    move on.

10           MR. SEIFELDEIN:  Okay.  Thank you, Your Honor.

11   BY MR. SEIFELDEIN:

12   Q.  How far in advance did you get your schedule?

13   A.  Depending on the facility, if you were going there,

14   sometimes it was a daily thing, or it could be a week to

15   weeks at a time if you were going to one particular facility.

16   Q.  Okay.  Once you were provided -- once Lisa Pitts provided

17   you the schedule, would Steadfast follow up to confirm the

18   shift?

19   A.  No.

20   Q.  Would Steadfast send you text messages about your

21   upcoming shifts?

22   A.  No.  Once you were confirmed the original confirmation,

23   they didn't call back to confirm every day.

24   Q.  So once you received clarification what your schedule and

25   your shift, did you have any further contact with Steadfast

1    after you accepted the assignment?

2    A.   No, not unless there's a problem.

3    Q.   Okay.  So then once you got to the facility, would you

4    negotiate your rate of pay with the facility?

5    A.   No.

6    Q.   Who would do that?

7    A.   Lisa.

8    Q.   Ms. Pitts?

9    A.   Yes.

10   Q.   Did Steadfast allow you to -- after being paid at a

11   facility, were you interviewed by the facility?

12   A.   No.

13   Q.   Did Ms. Pitts allow you to communicate directly with the

14   facility to establish your schedule?

15   A.   Yes.

16   Q.   Okay.  And if she did that, what would you have to do?

17   A.   If you were going to be there for a long time, the

18   scheduler would come to you and make a schedule with you, and

19   then you would have to call and have it verified by Lisa to

20   be approved before you work it.

21   Q.   Okay.  So even on the occasions when you got familiar

22   with the facility, you would still have to call Lisa, and

23   they would have to approve it before you can work the

24   assignment?

25   A.   Yes.

Wooten, D. - Direct                                                    184

```
 1    Q.  And who -- did you receive any profits from Steadfast
 2    other than your just regular pay?
 3    A.  No.
 4    Q.  And who paid you for the services that you provided on
 5    behalf of Steadfast?
 6    A.  Lisa Pitts.
 7    Q.  If you did not receive a pay for the care that you
 8    provided on behalf of Steadfast, would your ability to meet
 9    your financial obligation be compromised?
10    A.  Yes.
11    Q.  Do you have ownership interest in Steadfast?
12    A.  No.
13    Q.  And when you worked for Steadfast, were you an officer or
14    manager or director of the company?
15    A.  No.
16    Q.  As an LPN, Ms. Wooten, what type of equipment do you
17    usually need to complete your job duties?
18    A.  Stethoscope and blood pressure cuff and an oximeter and
19    pins.
20    Q.  And when you received the assignment from Steadfast, did
21    you buy any equipment beyond the normal tools of the trade
22    that you just mentioned?
23    A.  No.
24    Q.  And are you required to hold a license to practice in
25    Virginia?
```

**JA236**

1   A.   Yes.

2   Q.   And is this license required regardless of what type of

3   facility that you went to in Virginia?

4   A.   Yes.

5   Q.   And as an LPN, what type of services do you provide?

6   A.   Patient care and medication administration.

7   Q.   Okay.  And the care that you provide, are those the type

8   of -- is that the type of care that you provide regardless of

9   which facility you were sent to?

10  A.   Yes.

11  Q.   And the same license still required of all LPNs?

12  A.   Yes.

13  Q.   And just for the record, what is an LPN?

14  A.   Licensed practical nurse.

15  Q.   To your knowledge, does Steadfast Medical Staffing

16  provide any other services other than the ones you described

17  earlier?

18  A.   No.

19  Q.   Did you complain to Ms. Pitts about not receiving the

20  overtime?

21  A.   Yes.

22  Q.   Okay.  Did you do it more than one time?

23  A.   Yes.

24  Q.   How often would you say that you complained about not

25  receiving overtime?

1   A.  It was multiple times because I was working a lot of

2   hours for her.

3   Q.  And you never received overtime for those hours?

4   A.  No.

5   Q.  And since leaving Steadfast, did you receive any back

6   wages for those overtime hours you worked?

7   A.  No.

8   Q.  Let me talk to you briefly about your compensation with

9   Steadfast.  Have you had any discussions with Steadfast about

10  this trial at any point?

11  A.  When it first started, their lawyer contacted me, and I

12  declined to speak with them.

13  Q.  Was there a point where you spoke with Ms. Pitts, and she

14  told you not to testify?

15  A.  When it first happened, she did say something to me about

16  it and accused me of the ones that brought it up, and I told

17  her it was not me.

18  Q.  What did she say to you about not testifying at the

19  trial?

20  A.  She asked me not to do it.

21  Q.  Did you tell her why she (sic) didn't testify at trial?

22  A.  She didn't.  No.

23  Q.  Okay.  She just told you not to do it?

24  A.  She asked me not to testify.

25  Q.  And provided no reason?

 1   A.  But she accused --

 2   Q.  Please, continue.

 3   A.  She accused me of filing the thing against her, and it --

 4   and that's how it all started.

 5   Q.  What thing?

 6   A.  The lawsuit.

 7   Q.  Okay.  She accused you of filing this lawsuit?

 8   A.  Correct.

 9   Q.  And she told you not to testify?

10   A.  Correct.

11   Q.  Was this in March of 2019 that she asked you not to

12   testify at this trial?

13   A.  Yes.

14           MR. SEIFELDEIN:  Ms. Wooten, thank you for

15   testifying today.

16           No further questions, Your Honor.

17           THE COURT:  Cross.

18                     CROSS-EXAMINATION

19   BY MS. RUST:

20   Q.  Hi, Ms. Wooten.  My name is Julia Rust.  I'm an attorney

21   for Steadfast and Lisa Pitts.  I'm going to ask you a couple

22   of questions about your testimony.  How did you hear about

23   Steadfast before you applied for, submitted an application?

24   A.  A previous employer.

25   Q.  Was that another registry or was it a facility you worked

```
 1   full-time with?
 2   A.  No.  Sorry.  A previous employee of hers.
 3   Q.  Oh, a previous employee of hers?
 4   A.  Yes.
 5   Q.  Was -- to clarify, is that another nurse in a facility?
 6   A.  Yes.  It was another nurse that I was working with on an
 7   assignment.
 8   Q.  Okay.  And at that time were you -- the facility you were
 9   at, were you working directly for that facility or were you
10   there through another agency or registry?
11   A.  I was there with another agency.
12   Q.  Okay.  Did you continue to work for that agency or any
13   other agency while you were on Steadfast's registry?
14   A.  Yes.
15   Q.  Okay.  And while you were working for multiple registries
16   at the same time, did you pick up shifts with all of them
17   regularly or did you --
18   A.  No.
19   Q.  Did you only schedule with one of them at a time?
20   A.  Only did one of them at a time.
21   Q.  Would you work -- go ahead.
22   A.  I did travel nursing, so when I was home on my breaks is
23   when I would work for Lisa, and then when I was home-home, I
24   fully worked for Lisa.
25   Q.  Okay.  So you would take travel assignments with other
```

| | |
|---|---|
| 1 | registries, but then when you were in the area here, you |
| 2 | would pick up shifts through Steadfast registry; is that |
| 3 | right? |
| 4 | A.  Correct. |
| 5 | Q.  Okay.  So you were not required to pick up shifts while |
| 6 | you were traveling out of state; is that right? |
| 7 | A.  No. |
| 8 | Q.  Okay.  And when you were -- well, when you were here and |
| 9 | were interested in picking up shifts through Steadfast |
| 10 | registry, you were able to pick up whichever shifts that were |
| 11 | available for you that you wanted to pick up; is that right? |
| 12 | A.  Correct. |
| 13 | Q.  Okay.  And could you stop working on Steadfast registry |
| 14 | at any time you wanted? |
| 15 | A.  I did stop working for her -- |
| 16 | Q.  Okay. |
| 17 | A.  -- totally. |
| 18 | Q.  And you were free to continue working with other |
| 19 | registries after you stopped on Steadfast; is that right? |
| 20 | A.  Yes.  I continued to work for the other agency. |
| 21 | Q.  Okay.  And you were able to maintain a consistent income |
| 22 | after you quit Steadfast registry, right? |
| 23 | A.  Yes.  I moved out of state. |
| 24 | MS. RUST:  Okay.  I have no further questions. |
| 25 | Thank you. |

```
 1              THE WITNESS:  Thank you.

 2              THE COURT:  Redirect.

 3              MR. SEIFELDEIN:  No further questions, Your Honor.

 4              THE COURT:  All right.  May the witness be excused

 5   permanently?

 6              MR. SEIFELDEIN:  The witness may be excused, Your

 7   Honor.  Thank you.

 8              THE COURT:  Ms. Rust, may this witness be excused?

 9              MS. RUST:  Yes.

10              THE COURT:  Okay, ma'am.  You are permanently

11   excused.  Thank you for coming.

12              THE WITNESS:  Thank you.

13              (Witness excused.)

14              THE COURT:  All right.

15              MS. LEWIS:  I was just going to let the Court know

16   I thought I was going to be short on time, but it appears as

17   though we're good.

18              THE COURT:  Just a housekeeping matter here.  The

19   final pretrial order is supposed to permit the Court to be

20   able to see what the order of proof is going to be, what the

21   witnesses are going to be called.  But I looked at this

22   order, and the secretary has listed 737 witnesses in this

23   order.  I have no idea what witnesses you are calling.  Now,

24   a couple of them I can't even find them in the order.  Maybe

25   you know where they are.  I saw one of them on Page number
```

```
 1    113, or somewhere or another, 152.  Where are these
 2    witnesses coming from, because you're skipping all over the
 3    place, and the Court doesn't have any idea who you're
 4    calling or whether these are in order.  Tell me, for
 5    example, where is Courtnay Draughn in this final pretrial
 6    order?
 7              MS. LEWIS:  Court's indulgence, Your Honor.  She's
 8    listed as Courtnay Hope.  If you look at the supplement,
 9    directing your attention to ECF Number --
10              THE COURT:  Well, I tell you what we are going to
11    do.  We are going to work this out tomorrow morning.  You
12    come in here tomorrow and you have some idea what witnesses
13    you are calling.  Let the Court know which witnesses you're
14    calling that day.  You're not bound by it, but at least give
15    me some idea of where you are going, and I'll be able to
16    locate them and figure out what is what here.
17              We are going to come in here tomorrow at 1:00, and
18    we are going to get started.  The only thing I would say is
19    you can tell, we are moving on.  Pregnant pauses during the
20    cross-examination or even the direct, the Court doesn't have
21    time for it so be able to move to your next question, and we
22    can get on through this case.  We have a long way to go.
23              Anyway, everybody be safe, be well.  I'll see you
24    tomorrow at 1:00 p.m.
25              (Hearing adjourned at 4:52 p.m.)
```

```
1                         CERTIFICATION

2

3          I certify that the foregoing is a correct transcript

4      from the record of proceedings in the above-entitled matter.

5

6

7              X_____/s/_____x

8                         Jody A. Stewart

9                 X_____9-20-2021 _____x

10                             Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF VIRGINIA
 2                          Norfolk Division

 3   - - - - - - - - - - - - - - - - - -
                                        )
 4    MARTIN J. WALSH, SECRETARY OF     )
      LABOR, UNITED STATES              )
 5    DEPARTMENT OF LABOR,              )
                                        )
 6           Plaintiff,                 )
                                        )      CIVIL ACTION NO.
 7    v.                                )        2:18cv226
                                        )
 8    MEDICAL STAFFING OF AMERICA,      )
      LLC, etc., et al.,                )
 9                                      )
             Defendants.                )
10   - - - - - - - - - - - - - - - - - -

11

12                      TRANSCRIPT OF PROCEEDINGS

13                     ** Bench Trial - Day 2 **

14                         Norfolk, Virginia

15                         September 1, 2021

16

17   BEFORE:  THE HONORABLE RAYMOND A. JACKSON
                 United States District Judge
18

19

20   APPEARANCES:

             UNITED STATES DEPARTMENT OF LABOR
21           By:  Ryma N. Lewis
                  Chervonti Jones
22                Mohamed E. Seifeldein
                  Counsel for the Plaintiff
23
             PIERCE McCOY, PLLC
24           By:  Joshua L. Jewett
                  Julia A. Rust
25                Counsel for the Defendants
```

```
1                        I N D E X

2    PLAINTIFF'S
     WITNESSES                                      PAGE
3
       JOHNESE JONES
4          Direct Examination By Ms. Lewis          195
           Cross-Examination By Ms. Rust            208
5          Redirect Examination By Ms. Lewis        212
       ASHLEY MEGGIE
6          Direct Examination By Ms. Lewis          214
           Cross-Examination By Ms. Rust            223
7      KIMBERLY BELLAMY
           Direct Examination By Mr. Seifeldein     227
8          Cross-Examination By Ms. Rust            238
           Redirect Examination By Mr. Seifeldein   242
9      TERESA MOREY (Via ZoomGov.com)
           Direct Examination By Ms. Lewis          245
10         Cross-Examination By Ms. Rust            254
       TATIANNA CANADY
11         Direct Examination By Ms. Jones          260
           Cross-Examination By Ms. Rust            274
12         Redirect Examination By Ms. Jones        277
       COURTNEY TURNER (Via ZoomGov.com)
13         Direct Examination By Ms. Jones          281
       TYWANN WHITE
14         Direct Examination By Ms. Lewis          288

15

16                     E X H I B I T S

17   PLAINTIFF'S
     NO.                                            PAGE
18
       PX-55                                        217
19     PX-54                                        254

20

21

22

23

24

25
```

────────── J. Jones - Direct ──────────

```
 1              (Proceedings resumed at 1:00 p.m.)

 2              THE COURT:  Good afternoon, counsel.

 3              MR. SEIFELDEIN:  Good afternoon.

 4              MS. RUST:  Good afternoon.

 5              THE COURT:  We are ready to begin again.  Next

 6    witness.

 7              MS. LEWIS:  Your Honor, we'll be calling Ms. Johnese

 8    Jones.

 9              (Witness sworn.)

10              JOHNESE JONES, called by the Plaintiff, having been

11    first duly sworn, was examined and testified as follows:

12                        DIRECT EXAMINATION

13    BY MS. LEWIS:

14    Q.  Good afternoon, Ms. Jones.

15    A.  Good afternoon.

16    Q.  Would you please state your name for the record and spell

17    your last name.

18    A.  Johnese Jones, J-o-n-e-s.

19    Q.  Are you familiar with Steadfast Medical?

20    A.  Yes.

21    Q.  How are you familiar with that company?

22    A.  I work for that company.

23    Q.  Okay.  When were you employed there?

24    A.  August '18 through December of 2019, if I'm not mistaken.

25    Q.  What type of services does Steadfast provide?
```

─────J. Jones - Direct─────

1   A.  It's a staffing agency for nurses and CNAs to facilities.

2   Q.  When you first started at Steadfast, what was your job

3   title?

4   A.  A CNA.

5   Q.  And did there come a time that your position changed?

6   A.  Yes.

7   Q.  And when was that?

8   A.  Was it in -- I think it was in July 2019 when I became a

9   staffing coordinator.  I had broke my foot.

10  Q.  So you were, both, out in the field at one point and then

11  in the office?

12  A.  Yes, ma'am, correct.

13  Q.  When you switched to working in the office, did you need

14  to reapply for that position?

15  A.  No, ma'am.

16  Q.  Okay.  Did you work for any other agencies?

17  A.  Yes, ma'am.

18  Q.  During that time?

19  A.  Yes, ma'am.

20  Q.  What other agency did you work for?

21  A.  First Choice Nurses.

22  Q.  Did you ever work over 40 hours there?

23  A.  No, ma'am.

24  Q.  Okay.  And why not?

25  A.  They didn't offer overtime.  They gave you a cap at 40

—————————————————————— J. Jones - Direct ——————————————————————

 1   hours.

 2   Q.  When you first started working for Steadfast as a CNA,

 3   how did you apply?

 4   A.  I went into the office and applied in person.

 5   Q.  Did you have to submit any paperwork when you applied?

 6   A.  Yes, ma'am, I did.

 7   Q.  What did you have to complete?

 8   A.  Of course a paper application and I had to bring my

 9   certifications in, copies of my PPD, CNA license, CPR

10   certification.

11   Q.  I want to direct your attention to an exhibit that's been

12   marked as Plaintiff's 26.11 through 14.  If you could just

13   take a minute to review this document.

14            MS. LEWIS:  If you could scroll to the next page,

15   please.  If you could go back up to the top when you are done

16   scrolling, please.  It starts on Page 11, Ms. Jones.

17   BY MS. LEWIS:

18   Q.  And that's the date that you had submitted the

19   application, and that's August 2018; is that right?

20   A.  Yes, ma'am, that's correct.

21   Q.  And this information asked for your availability, as you

22   indicated?

23   A.  Yes, ma'am.

24   Q.  And so is this a true and accurate representation of the

25   employment application that you submitted?

─────────────── J. Jones - Direct ───────────────

 1  A.  Yes, ma'am.

 2          MS. LEWIS:  Your Honor, I move to admit PX-26.  I

 3  can't recall if we admitted that.

 4          THE COURT:  What we did was --

 5          MS. LEWIS:  We did the whole entire exhibit.

 6          THE COURT:  -- the entire exhibit.

 7          MS. LEWIS:  Okay.

 8  BY MS. LEWIS:

 9  Q.  How much were you paid per hour when you worked as a CNA?

10  A.  15.

11  Q.  Who set and established those rates of pay?

12  A.  To my understanding, Ms. Pitts.

13  Q.  Was the rate specified, or did it vary based upon your

14  personal experience or skills?

15  A.  No, ma'am.

16  Q.  Were taxes withheld from your paycheck?

17  A.  No, ma'am.

18  Q.  Did you communicate with the facilities you worked at to

19  negotiate your hourly rate?

20  A.  No, ma'am.

21  Q.  Why not?

22  A.  Their hourly rate was set for each building that you

23  worked at.  Each building had a different rate of pay.

24  Q.  So other than your hourly pay rate, did you receive any

25  profits besides the hourly rate that was predetermined by

─────────────────── J. Jones - Direct ───────────────────

1    Steadfast?

2    A.  No, ma'am.

3    Q.  Did you ever make any more than the rate you received

4    from Steadfast?

5    A.  No, ma'am.

6    Q.  And who paid you for the care that you provided to the

7    residents at the facilities?

8    A.  Steadfast.

9    Q.  So you indicated that at a certain point you became a

10   scheduler.  Can you tell me how that came about.

11   A.  I had broke my foot outside of work, and I needed to have

12   some income coming in, so I called Ms. Pitts personally and

13   asked her was there anything that I could do to still make

14   income, and she allowed me to come into the office and staff

15   CNAs out to facilities.

16   Q.  And how much were you paid when you worked as a

17   scheduler?

18   A.  I think it was 10.50 or 10.25.

19   Q.  And who set and established that rate of pay?

20   A.  Ms. Pitts.

21   Q.  Coming back to when you -- we'll separate them.

22         When you worked as a CNA, did you ever work more

23   than 40 hours in a workweek?

24   A.  Yes, ma'am.

25   Q.  What about when you worked as a scheduler?  Did you ever

—————J. Jones - Direct—————

1   work more than 40 hours?

2   A.  Only if I was on call for the weekend, it may have ran

3   into overtime for that week.

4   Q.  So on average, when working as a CNA, approximately how

5   many hours did you work each day?

6   A.  Eight, but sometimes I worked eight, and sometimes I

7   worked 16, depending if I did a single or a double shift.  It

8   varied.

9   Q.  I'm sorry.  I didn't mean to interrupt you.

10  A.  It varied.

11  Q.  Okay.  So when you said eight or 16, you are referring to

12  hours?

13  A.  Yes, ma'am.

14  Q.  And what about when you were in the office?

15  Approximately how many hours did you work each day?

16  A.  Approximately eight.

17  Q.  You indicated that -- if you had weekend or were on call,

18  how many additional hours did you work on those occasions?

19  A.  It would be an eight-hour shift on a Saturday and -- did

20  I come in on Sunday?  I don't think I came in on Sunday, just

21  on Saturday.

22  Q.  Okay.  So when you worked as a CNA and you worked over 40

23  hours, what rate were you paid when you worked over 40?

24  A.  Still the 15.

25  Q.  And when you worked as a scheduler in the office and you

———J. Jones - Direct———

| | |
|---|---|
| 1 | worked over 40, what rate were you paid? |
| 2 | A.  It was time and a half. |
| 3 | Q.  When you were hired, were you required to complete any |
| 4 | assessments? |
| 5 | A.  Yes, ma'am. |
| 6 | Q.  What kind of assessments? |
| 7 | A.  If I'm not mistaken, I think it was, like, a test that |
| 8 | they ask you about CNA skills, like a skill assessment test. |
| 9 | Q.  When you were hired, were you required to complete any |
| 10 | refreshers or trainings? |
| 11 | A.  Not to my knowledge. |
| 12 | Q.  I'd like to direct your attention -- if you could take a |
| 13 | look at PX-32. |
| 14 | MS. LEWIS:  If you could just scroll through that so |
| 15 | she can review it. |
| 16 | BY MS. LEWIS: |
| 17 | Q.  When you're done reviewing and she's done scrolling, if |
| 18 | you could look up at me. |
| 19 | A.  (Witness reviewing.) |
| 20 | Q.  Do you recognize these documents? |
| 21 | A.  Yes, ma'am.  That was in the application packet. |
| 22 | Q.  It was part of the application? |
| 23 | A.  Yes, ma'am. |
| 24 | Q.  So these are refreshers or trainings on HIPAA.  Do you |
| 25 | recognize that one? |

─────────── J. Jones - Direct ───────────

1   A.  Yes, ma'am, I do.

2   Q.  What about substance abuse?

3   A.  Yes, ma'am.

4   Q.  Abuse and neglect?

5   A.  Yes, ma'am.

6   Q.  And then the assessment skills test you referred to with

7   respect to care that CNAs provide?

8   A.  Yes, ma'am, that's correct.

9   Q.  When you were working as a CNA, were you given the option

10  to be classified as an independent contractor or an employee?

11  A.  To my understanding, we were independent contractors.

12  Q.  I'm sorry?

13  A.  To my understanding, that's what we were classified as,

14  independent contractors.

15  Q.  With the new hire paperwork, the employment application,

16  did you sign an employment agreement with Steadfast?

17  A.  I don't remember.

18  Q.  Okay.  I want to direct your attention to PX-25.

19       MS. LEWIS:  Starting on Page 13, Ms. Jones.

20  BY MS. LEWIS:

21  Q.  Take a moment to review that as she scrolls.

22       Is that your signature there?

23  A.  Yes, ma'am.

24  Q.  Okay.  So do you recognize this document?

25  A.  No.

J. Jones - Direct

1    Q.   I'm sorry?

2    A.   Actually, no.

3    Q.   But you recognize your signature?

4    A.   It's my signature.  Yes, ma'am, it is.

5    Q.   And going to the top, is that your handwriting?

6    A.   Not my name, it is not.

7    Q.   Okay.  So that's not --

8    A.   No, ma'am.

9    Q.   What is wrong with your name?  Is it spelled incorrectly?

10   A.   No, it's spelled correctly.  That's just not how I write.

11   Q.   Okay.  Thank you.

12        Were you able to structure the terms of your working

13   relationship with the facilities you were placed at?

14   A.   Meaning?

15   Q.   Meaning were you able to initially set your schedule,

16   establish the rate of pay that you were going to be paid?

17   A.   It was set in the schedule.  You were not supposed to,

18   but once you went to a facility, you pretty much did if you

19   had a good rapport with the scheduler for that facility.

20   Now, as far as the rate of pay, no, you couldn't negotiate

21   the rate of pay.

22   Q.   Okay.  So when you say you're not supposed to, what do

23   you mean by that?

24   A.   Because from us working for Steadfast, Steadfast had to

25   schedule us to make sure that, I guess, the time sheets and

──────J. Jones - Direct──────

```
 1   stuff came back so they could make sure they're getting paid
 2   the correct amount.
 3   Q.  Okay.
 4   A.  So we couldn't book ourselves without the company being
 5   aware.
 6   Q.  So you mentioned time sheets, but were you required to
 7   complete time sheets as a CNA?
 8   A.  Yes, ma'am.
 9   Q.  How often were you required to submit the time sheets
10   when you worked?
11   A.  They wanted you to submit a time sheet after each shift.
12   Q.  Who told you when you were required to submit time sheets
13   when you worked as a CNA?
14   A.  I can't remember who told us.  I just know that that's
15   what you were supposed to do.
16   Q.  Was it the facility or Steadfast?
17   A.  No, it was Steadfast.
18   Q.  Okay.  Someone at Steadfast.
19        Were you required to provide notice to Steadfast if
20   you were unavailable to work?
21   A.  Yes.
22   Q.  And who would you call?
23   A.  You'd have to call the on-call scheduler at Steadfast.
24   Q.  What if it was after hours?
25   A.  There was always someone on call for them.
```

—————————J. Jones - Direct—————————

1    Q.  So a scheduler, whomever was on call?

2    A.  Yes, ma'am.

3    Q.  And how much notice were you required to provide if you

4    were unavailable?

5    A.  You're supposed to give a two-hour advanced notice.

6    Q.  If you were running late for a shift or have to cancel a

7    shift, did you have to notify Steadfast?

8    A.  Yes, we did.

9    Q.  Who would you call?

10   A.  You would call the scheduler, whoever is on call for that

11   day.

12   Q.  If you had a scheduling conflict, did Steadfast allow you

13   to send another CNA in your place?

14   A.  No, ma'am.

15   Q.  Who would send someone?

16   A.  Steadfast would have to find a replacement for you.

17   Q.  Were you allowed to employ another CNA to complete a

18   shift that Steadfast paid you for?

19   A.  No, ma'am.

20   Q.  Did you have a supervisor when you worked at Steadfast?

21   A.  Yes, ma'am.

22   Q.  Who was your supervisor?

23   A.  Lisa Pitts.

24   Q.  What was Lisa's involvement in the supervision of nurses

25   at the facilities?

────────── J. Jones - Direct ──────────

 1   A.  She would make sure we, you know, knew the code of

 2   conduct, make sure we went to work on time and completed our

 3   shifts.

 4   Q.  Are you aware of Lisa ever disciplining or counseling

 5   employees?

 6   A.  Yes, ma'am.

 7   Q.  What do you know about that?

 8   A.  Well, when I worked in the office as a scheduler, you

 9   know, if people would miss a shift or didn't show up, I would

10   hear her on the phone disciplining them.

11   Q.  Okay.  Did you ever hear her say anything?  What would

12   she say to them?

13   A.  She would be like, "Look, you fucking with my money."

14   Q.  Anything else?

15   A.  "If you don't go to work, you're F'ing with my money."

16   "You signed up for these shifts.  I need you-all to be there.

17   You-all know you're supposed to be at work.  This is what

18   you're supposed to do."

19   Q.  Did she say anything about whether it was their business

20   or her business?

21   A.  Just like, "You're messing with my money."  So pretty

22   much her business.

23   Q.  So did Steadfast have a code of conduct or behavior

24   expectations?

25   A.  Yes, ma'am, they did.

─────────────── J. Jones - Direct ───────────────

1   Q.  What were the expectations Steadfast had regarding

2   conduct?

3   A.  To act professional, you know, go to work like you're

4   supposed to, show up on time and do what you're supposed to

5   do as whatever you are, a CNA or a nurse.

6   Q.  If you were interested in a placement that Steadfast had

7   available, how would a nurse, like yourself, or even as a

8   scheduler, because you have it on both sides, find out more

9   about a placement opportunity, an assignment?

10  A.  Repeat the question.

11  Q.  Sure.

12        How would a nurse or CNA get an assignment?

13  A.  We would call out and ask nurses or CNAs whether or not

14  they were available for a shift.

15  Q.  After being placed at a facility, were you interviewed to

16  work by the facility, or did you just get to work right away?

17  A.  You just went to work right away.

18  Q.  If you did not receive pay from Steadfast, would you have

19  been able to meet your financial obligations?

20  A.  No.

21  Q.  Do you have an ownership interest in Steadfast?

22  A.  No, ma'am.

23  Q.  Are you on officer, manager, or director of the business?

24  A.  No, ma'am.

25  Q.  Do you own a percentage of Steadfast?

—————J. Jones - Cross—————

 1   A.  No, ma'am.

 2   Q.  When you went to different facilities that Steadfast had

 3   contracts, were you required to wear a badge identifying you

 4   as a Steadfast nurse?

 5   A.  Yes, ma'am.

 6   Q.  And have you ever received any back wages from Steadfast

 7   for the hours you worked over 40?

 8   A.  No, ma'am.

 9          MS. LEWIS:  No further questions for this witness,

10   Your Honor.

11          THE COURT:  Cross-examination.

12                     CROSS-EXAMINATION

13   BY MS. RUST:

14   Q.  Good afternoon, Ms. Jones.

15   A.  Good afternoon.

16   Q.  My name is Julia Rust.  I'm an attorney for the

17   defendants, Steadfast and Lisa Pitts.

18   A.  Yes, ma'am.

19   Q.  I have a couple of questions about what you discussed.

20          So you worked as a CNA, and then you also worked in

21   the call center, right?

22   A.  Correct.

23   Q.  And you were paid overtime when you worked over 40 hours

24   in a workweek for the call-center shifts; is that correct?

25   A.  Yes, ma'am.

—————————————————————J. Jones - Cross—————————————

1  Q.  And you talked about when Lisa Pitts would -- you said

2  there were circumstances where she might discipline people

3  over the phone and that she would get mad when people picked

4  up shifts.  I think you said she said, "You signed up for

5  these shifts."

6        So were those instances where people canceled the

7  shifts last minute and she would get frustrated about that?

8  A.  Yes, ma'am.  Or a no show.

9  Q.  And a no call, no show.

10        And in those instances, did Steadfast try to fill

11  those shifts before they started or --

12  A.  Yes, ma'am.

13  Q.  Okay.  And does it require a little bit of -- well, when

14  you have to fill a shift at the last minute because somebody

15  no-showed or canceled at the last minute, that would require

16  the call center to make a lot of phone calls quickly, or

17  reach out to nurses quickly to find someone who is willing to

18  stop what they're doing and go take a shift at the last

19  second, right?

20  A.  Correct.

21  Q.  Okay.  Is that a lot of work, to try and find somebody?

22  A.  Very.  A whole lot of work.

23  Q.  I bet.  Okay.

24        You mentioned the behavioral expectations; to be

25  professional and show up on time as a nurse.  Have you ever

——————J. Jones - Cross——————

1   worked a job where those were not the expectations?

2   A.  No, ma'am.

3   Q.  Whether that job classified you as a contractor or as an

4   employee?

5   A.  No, ma'am.

6   Q.  Okay.  And when you worked as a CNA, were there

7   facilities that you preferred to work at over others?

8   A.  I only went to three facilities.  I really stayed on the

9   Peninsula side, in Newport News where I lived, so that's the

10  facility that I preferred to go to, so that's where I would

11  work at.

12  Q.  So when you would call Steadfast and ask for available

13  shifts, if that was one of the options, you would choose that

14  facility over the others; is that correct?

15  A.  Yes, ma'am.

16  Q.  Okay.  And were you allowed to schedule as many shifts as

17  you wanted?

18  A.  Yes, ma'am.

19  Q.  And you were able to negotiate higher rates of pay for

20  shifts with facilities; is that right?

21  A.  No.

22  Q.  What if there was a last-minute need in the call center,

23  did Steadfast -- well, let me rephrase that.  That was

24  confusing.

25          From the call center, if you're trying to schedule a

—————J. Jones - Cross—————

1    shift last minute, would the facility often allow you to

2    offer a higher rate of pay than what was originally offered

3    for that shift?

4    A.  Not the facility, but we could get it approved through

5    Lisa to offer a higher rate of pay.

6    Q.  Okay.  And did you receive training and education in

7    order to get your --

8             You said you were a CNA, right?

9    A.  Yes, ma'am.

10   Q.  -- in order to get your CNA certificate?

11   A.  Yes, ma'am.  I've been a CNA since 2001.

12   Q.  Did Steadfast pay for any of your education or testing

13   for that?

14   A.  No, ma'am.

15   Q.  Without that certificate, would you be able to work as a

16   CNA?

17   A.  No, ma'am.

18   Q.  And you have never seen Lisa Pitts on site at a facility

19   while you were providing CNA services; is that right?

20   A.  No, ma'am.

21           MS. RUST:  Okay.  I have no further questions.

22   Thank you, Ms. Jones.

23           THE WITNESS:  You're welcome.

24           THE COURT:  Any redirect?

25           MS. LEWIS:  Just briefly, just one question.

———— J. Jones - Redirect ————

|     | REDIRECT EXAMINATION |
|-----|---------------------|
| 1   | |
| 2   | BY MS. LEWIS: |
| 3   | Q.  Ms. Jones, when you were questioned about being able to |
| 4   | offer a higher rate of pay after receiving Ms. Pitts' |
| 5   | approval, was that an hourly amount or a lump-sum amount? |
| 6   | A.  It would be an hourly amount.  It just really depends on |
| 7   | what the circumstance was. |
| 8   | Q.  Okay. |
| 9   | A.  Because I've had to offer somebody, like -- where if they |
| 10  | needed a place to stay, like, she would pay for that hotel |
| 11  | fee or something like that. |
| 12  | Q.  So in those approvals in those situations, was that a |
| 13  | regular occurrence or based upon Steadfast's needs to be able |
| 14  | to fill shifts? |
| 15  | A.  It was based upon the needs to fill shifts. |
| 16  | Q.  So it wasn't based upon the nurses negotiating a rate, it |
| 17  | was Steadfast's needs; is that right? |
| 18  | A.  Yes, ma'am. |
| 19  |         MS. LEWIS:  No further questions. |
| 20  |         THE COURT:  May the witness be permanently excused? |
| 21  |         MS. LEWIS:  She may. |
| 22  |         THE COURT:  You may step down, ma'am. |
| 23  |         (Witness excused.) |
| 24  |         THE COURT:  Your next witness? |
| 25  |         MS. LEWIS:  One moment, Your Honor. |

——J. Jones - Redirect——

```
 1          MS. RUST:  Your Honor, if I may, as a housekeeping
 2   matter, which, perhaps, might expedite some of the testimony,
 3   I know the Department has asked quite a few of the nurse
 4   witnesses if they were paid hourly rates and if they were
 5   paid overtime.  The pretrial order stipulated in paragraph 5
 6   that nurses were paid hourly rates and overtime.  So
 7   that's -- well, that's what's stipulated to.
 8          THE COURT:  Wait a minute.  You said there's a
 9   pretrial stipulation they were paid hourly rates and
10   overtime?
11          MS. RUST:  Sorry.  They were paid hourly rates and
12   that they were not paid overtime for hours over 40.
13          THE COURT:  That is established.  You need not
14   establish that.
15          MS. LEWIS:  Right.  It's -- it was a foundational
16   question.
17          THE COURT:  It's a foundational question?
18          MS. LEWIS:  Yes, it's a foundational question, Your
19   Honor.
20          THE COURT:  Well, I'll put it this way:  In view of
21   the fact that it's foundational, you hit it, and you keep on
22   moving, we'll let it go.  But you're right; we don't dwell on
23   things already established.
24          MS. RUST:  Thank you.
25          (Witness sworn.)
```

─────────────A. Meggie - Direct─────────────

```
 1              ASHLEY MEGGIE, called by the Plaintiff, having been
 2    first duly sworn, was examined and testified as follows:
 3                         DIRECT EXAMINATION
 4    BY MS. LEWIS:
 5    Q.  Good afternoon.
 6    A.  Good afternoon.
 7    Q.  If you could please state your name and spell your last
 8    name for the record.
 9    A.  Ashley Meggie, M-e-g-g-i-e.
10    Q.  Are you familiar with Steadfast?
11    A.  Yes.
12    Q.  And how are you familiar with the company?
13    A.  I was an employee.
14    Q.  What was your job title?
15    A.  CNA.
16    Q.  When were you employed at the company?  And if you could
17    speak up a little bit.
18              THE COURT:  Much louder.
19    BY MS. LEWIS:
20    Q.  You have to leave your mask on.  Just speak up.
21    A.  From the fall of 2019 to present.
22    Q.  So, currently, you are still employed at Steadfast; is
23    that right?
24    A.  Correct.
25    Q.  And as a CNA, what were your job duties and -- as a CNA
```

———A. Meggie - Direct———

1    at Steadfast, what are your job duties and responsibilities?

2    A.  To report for my shifts, take care of the assigned

3    residents that I was assigned, and to turn in my time sheets.

4    Q.  Did you ever work more than 40 hours in a workweek?

5    A.  Yes.

6    Q.  How many hours do you typically work each week?

7    A.  Anywhere from 60 to 108 hours a week.

8    Q.  You indicated a moment ago that part of your

9    responsibilities is submitting time sheets.  To whom do you

10   submit time sheets?

11   A.  To Steadfast.

12   Q.  And when do you submit them?

13   A.  We're supposed to submit them by 9:00 a.m. on Tuesday.

14   Q.  I'm going to direct your attention to a document that has

15   now been marked as Plaintiff's 55.

16        MS. LEWIS:  If you could scroll through that

17   document, please, Ms. Jones.

18   BY MS. LEWIS:

19   Q.  Do you recognize these documents?

20   A.  Yes.

21   Q.  What are they?

22   A.  My time sheets.

23   Q.  And these are the time sheets that you submit to

24   Steadfast?

25   A.  Yes.

─────A. Meggie - Direct─────

1   Q.  Are they a true and accurate reflection of just some of

2   the time sheets that you've submitted?

3   A.  Yes.

4   Q.  You indicated that you could work anywhere between 60 and

5   108 hours a week.

6          MS. LEWIS:  If you could scroll up, Ms. Jones.

7   BY MS. LEWIS:

8   Q.  Who do you send your time sheets to at Steadfast?

9   A.  Can you repeat that, please.

10  Q.  Sure.

11         Who do you send your time sheets to at Steadfast?

12  A.  To payroll.

13  Q.  And you e-mail them?

14  A.  Yes.

15  Q.  And is this a true and accurate reflection of one of the

16  e-mails that you sent?

17  A.  Yes.

18  Q.  Is that your sort of summation of how many hours, rate of

19  pay, et cetera, for one workweek that you worked in?

20  A.  Yes.

21         MS. LEWIS:  Your Honor, I move to admit Plaintiff's

22  55.

23         THE COURT:  Any objection?

24         MS. RUST:  No objection.

25         THE COURT:  Plaintiff's Exhibit 55 is hereby

─────────────A. Meggie - Direct─────────────

1   admitted.

2          (Plaintiff's Exhibit PX-55 received in evidence.)

3   BY MS. LEWIS:

4   Q.  How much were you paid per hour?

5   A.  Usually $25 an hour.

6   Q.  Have there been cases that you have been paid more or

7   less?

8   A.  Certain buildings where we were paid more.

9   Q.  Okay.  Why the range?

10  A.  It was just told to us by the staffing coordinators that

11  that building would pay us that much.

12  Q.  And when you say the staffing coordinator for that

13  building, is that someone at the facility or someone at

14  Steadfast?

15  A.  At Steadfast.

16  Q.  Were you able to negotiate different pay?

17  A.  No.

18  Q.  Who set the rate of pay?

19  A.  Steadfast.

20  Q.  And who told you that it was Steadfast that set the rate

21  of pay?

22  A.  The coordinators.

23          THE COURT:  The what?

24          THE WITNESS:  The staffing coordinators.

25          THE COURT:  I'm still having difficulty hearing you.

—————————A. Meggie - Direct—————————

 1  Who told you that?

 2          THE WITNESS:  The staffing coordinators.

 3          THE COURT:  Okay.  Thank you.

 4  BY MS. LEWIS:

 5  Q.  Does Steadfast make the ultimate decision to effectively

 6  set your rate of pay?

 7  A.  Yes.

 8  Q.  What rate were you paid for hours worked over 40 in a

 9  workweek?

10  A.  I was not paid for any overtime.

11  Q.  How frequently are you paid?

12  A.  Weekly.

13  Q.  Okay.  In the past, have you ever done an expedited pay?

14  A.  Yes.

15  Q.  What is that called?

16  A.  Next Day Pay.

17  Q.  Can you tell me -- well, first, before going into

18  Next Day Pay, you said currently you are paid weekly.  When

19  are you paid?  What day of the week?

20  A.  Friday.

21  Q.  And you said in the past you did Next Day Pay?

22  A.  Yes.

23  Q.  Approximately how long ago was that?

24  A.  From 2019 to April of this year.

25  Q.  Okay.  And tell me, what is Next Day Pay?

A. Meggie - Direct

 1    A.  You can get paid --

 2    Q.  If you could speak up a little bit.

 3    A.  You can get paid the next day, and, also, they take a

 4    6 percent fee out of getting your pay early.

 5    Q.  Okay.  How are you paid the next day?  What do you need

 6    to do, or is there anything that you need to do?

 7    A.  You need to turn in your time sheets to a separate e-mail

 8    that's designated for Next Day Pay.

 9    Q.  And this e-mail here, is that the one reflected on the

10    screen in front of you, that PDF Page 19?

11    A.  Yes.

12    Q.  For the Next Day Pay, is it total the hours that you

13    work?  Do you ever receive a pay stub at the end of the week

14    that you could use to verify "I worked X amount of hours; so,

15    therefore, this was my Next Day Pay for this entire week"?

16    A.  No.

17    Q.  Did you ever get pay stubs?

18    A.  We never got pay stubs.

19    Q.  Did you ever have any issues with your paychecks?

20    A.  Yes.

21    Q.  What was the issue?

22    A.  The pay amounts weren't correct for dates that I turned

23    in that weren't paid out.

24    Q.  Did you do Next Day Pay and always get paid the next day

25    when you did it?

─────A. Meggie - Direct─────

1  A.  No.  Sometimes it was late.

2  Q.  And was that 6 percent still taken out even when it was

3  late?

4  A.  Yes.

5  Q.  How did you -- so you said sometimes it would be the

6  wrong amount, not getting paid, still the 6 percent.

7        So how did you keep track of the pay you received

8  from Steadfast?

9  A.  I would ask them to send an e-mail, like the displayed

10  e-mail, breaking down the shifts and pay rates.

11  Q.  Is there anything you did separate and apart from

12  reaching out to Steadfast to keep track of the pay you

13  received from Steadfast?

14  A.  Yes.

15  Q.  What was that?

16  A.  I had a separate bank account that I used just for

17  deposits coming from Steadfast.

18  Q.  And the purpose of you opening the separate account just

19  for pay from Steadfast was for what reason?

20  A.  So that I could verify that I was employed and that I was

21  making a steady income.

22  Q.  Did you receive a 1099 tax form from Steadfast in

23  February of each year?

24  A.  I received one in April.

25  Q.  Okay.  So my understanding is you had started working for

A. Meggie - Direct

1    Steadfast in 2019; is that correct?

2    A.   Yes.

3    Q.   Did you receive a 1099 from Steadfast for 2019?

4    A.   No.

5    Q.   Did you receive a 1099, I guess, for last year?  Is that

6    the one you are referring to that you received in April?

7    A.   Yes.

8    Q.   Did the 1099 accurately reflect the pay you received from

9    Steadfast?

10   A.   No.

11   Q.   How do you know?

12   A.   I printed out all of my bank statements and added the

13   amounts together.

14   Q.   Was the amount more or less than what Steadfast actually

15   paid you?

16   A.   The amount that I added up was more than what was on the

17   1099.

18   Q.   Have you received any back wages from Steadfast for hours

19   worked over 40?

20   A.   No.

21   Q.   And have you ever complained about not receiving

22   overtime?

23   A.   Yes.

24   Q.   When did you complain?

25   A.   The first week that I worked with Steadfast.

A. Meggie - Direct

1   Q.   And what was their response to your complaint?

2   A.   "The reason you get the higher pay rate is because we're

3   not paying you overtime."

4   Q.   Have you worked at other staffing agencies?

5   A.   Yes.

6   Q.   Did those other staffing agencies pay you overtime?

7   A.   Yes.

8   Q.   In terms of your experience working at other staffing

9   agencies, when you worked at the facilities, was their

10  supervision the same or different than Steadfast's when you

11  went to work?

12  A.   The same.  The same.

13  Q.   What about in terms of setting the pay rate when you

14  worked at those other agencies relative to Steadfast?  Were

15  you able to negotiate the rate of pay?

16  A.   No.

17  Q.   So with the other agencies, you couldn't, and with

18  Steadfast, it was the same?

19  A.   Yes.

20  Q.   What about the payment?  How did Steadfast pay you?  Was

21  it Steadfast that paid you or the facilities?

22  A.   Steadfast.

23  Q.   And Steadfast paid you directly into your bank account;

24  is that correct?

25  A.   Yes.

                              ─A. Meggie - Cross─

 1   Q.  So when you worked with the other agencies, did they,

 2   likewise, pay you directly?

 3   A.  Yes.

 4   Q.  As a CNA, when you go and provide care for residents and

 5   patients at facilities, whether you're working for Steadfast

 6   or another agency, was the type of care that you provided

 7   different?

 8   A.  No.

 9          MS. LEWIS:  No further questions for this witness,

10   Your Honor.

11          THE COURT:  Cross.

12                      CROSS-EXAMINATION

13   BY MS. RUST:

14   Q.  Hi, Ms. Meggie.  My name is Julia Rust.  I'm an attorney

15   for the defendants.

16          You said that there were some instances where your

17   paycheck was incorrect; is that right?

18   A.  Yes.

19   Q.  And were you -- did you alert anybody at payroll at

20   Steadfast of those discrepancies?

21   A.  Yes.

22   Q.  And were those discrepancies resolved or explained?

23   A.  No.

24   Q.  What was the issue?

25   A.  Sometimes they would say you're getting paid $25 an hour

———————————A. Meggie - Cross———————————

 1  and then --

 2          THE COURT:  Raise your voice, please.

 3          THE WITNESS:  Sometimes they said we were going to

 4  get paid $25 an hour, and then we were paid less.  Or

 5  sometimes I would turn in time sheets, and they forgot to

 6  submit it, and I didn't get paid for that day.

 7  BY MS. RUST:

 8  Q.  And were you able to notify them about the missing time

 9  sheets?  And they would resolve that, right?

10  A.  I notified them.  It was not resolved.

11  Q.  Okay.  But if you submit the time sheets and they're

12  accounted for, you get paid for them, right?

13  A.  I did submit them.  They were not paid out.  So it was

14  not resolved.

15  Q.  And do you know if there was an issue with the facility

16  approving the time that you had submitted for?

17  A.  No, there was no issue with the facility.

18  Q.  There was no issue, or you're not sure if there was an

19  issue?

20  A.  I asked why I didn't get paid, and they said, "Oh, well,

21  you know, we're working on it."  I never got paid.

22  Q.  Okay.  And you didn't follow up, so you don't know what

23  the issue was?

24  A.  I wasn't explained what the issue was.

25  Q.  So with the other agencies that you worked with, do you

─────────── A. Meggie - Cross ───────────

1    schedule shifts through multiple agencies at the same time

2    generally?

3    A.  I'm sorry.  Can you repeat that?

4    Q.  Of course.

5           Do you typically schedule shifts through multiple

6    agencies at the same time?

7    A.  I don't schedule my shifts.  The staffing coordinators

8    schedule it.

9    Q.  Let me back up.

10          You said you worked with other registries or

11   agencies, right?

12   A.  In the past, yes.

13   Q.  Did you work at those at the same time you picked up

14   shifts with Steadfast?

15   A.  Not necessarily.

16   Q.  Well -- okay.  Are there certain facilities that you

17   prefer to work at?

18   A.  No.

19   Q.  You are happy with any facility you go to, typically?

20   A.  Yes.

21   Q.  Are there any facilities you don't enjoy going to?

22   A.  No.

23   Q.  Okay.  Well, that's good.

24          So when you're discussing your availability with a

25   scheduling planner at Steadfast, are you allowed to select

———A. Meggie - Cross———

1   which of the facilities that they have available for your

2   schedule?  Right?

3   A.  I usually give my entire availability, and they will tell

4   me which facility needs help more.

5   Q.  Okay.  And that's because you provided the availability

6   you wanted to fill, right?

7   A.  It just doesn't change.  It's always the same.

8   Q.  Okay.  And you don't specify that you want to be at a

9   specific facility?

10  A.  No.

11  Q.  You just provide your availability and say "I'm happy

12  with whatever you've put in the schedule," right?

13  A.  Yes.

14  Q.  Okay.

15          MS. RUST:  I have no further questions.  Thank you.

16          MS. LEWIS:  No redirect, Your Honor.

17          THE COURT:  May the witness be permanently excused?

18          MS. LEWIS:  Yes, Your Honor.

19          THE COURT:  You may step down, ma'am.

20          (Witness excused.)

21          MS. LEWIS:  Your Honor, what time will our break be?

22          THE COURT:  Our break will be at 3:00.

23          MS. LEWIS:  Kimberly Bellamy.

24          (Witness sworn.)

25          KIMBERLY BELLAMY, called by the Plaintiff, having

```
 1   been first duly sworn, was examined and testified as follows:
 2                        DIRECT EXAMINATION
 3   BY MR. SEIFELDEIN:
 4   Q.  Good afternoon, Ms. Bellamy.
 5   A.  Hello.
 6   Q.  Could you state your full name for the record and spell
 7   your last name, please.
 8   A.  It's currently Kimberly Ann Summers, S-u-m-m-e-r-s, but
 9   it was Bellamy.
10   Q.  And when did it change to Summers?
11   A.  About a year ago.
12   Q.  Are you familiar with the company Steadfast?
13   A.  Yes.
14   Q.  What type of service does Steadfast provide, Ms. Bellamy?
15   A.  They staff different facilities with nurses and CNAs.
16   Q.  Were you employed by Steadfast?
17   A.  Yes.
18   Q.  What was your job title when you worked for Steadfast?
19   A.  LPN.
20   Q.  When did you stop working for Steadfast?
21   A.  Around January or February of 2020.
22   Q.  I'm sorry?
23   A.  Around January or February of 2020.  You said when did I
24   stop?
25   Q.  Okay.  You stopped in 2020.  When did you start?  I
```

K. Bellamy - Direct

1    apologize.  I wasn't very clear.

2    A.   Oh, around June of 2017.

3    Q.   And did you have to apply to work for Steadfast?

4    A.   Yes.

5    Q.   And what did you do to work for Steadfast?  What did you

6    fill out?

7    A.   I went to them, and I filled out an application, which

8    consisted of, you know, background checks and drug testing

9    and stuff like that, and my nursing license.

10   Q.   Okay.  An employment application?

11   A.   Yes, sir.

12   Q.   Okay.  And after you completed the job or employment

13   application with Steadfast, did you meet with anyone at

14   Steadfast?

15   A.   I met with -- I think her name was, like, Christine.  She

16   did payroll.

17   Q.   What is her name?

18   A.   Christine.

19   Q.   Christine Kim is the person you met with?

20   A.   Yes.

21   Q.   And when you met with Christine Kim, did she ask you

22   about your availability?

23   A.   No.  I just gave her my payroll information.  And then,

24   as far as my availability, I spoke with a lady named Hope.  I

25   gave her my availability and my schedule, and she told me

K. Bellamy - Direct

 1   what they had available.

 2   Q.  Okay.  So you spoke to Miss Hope, and she gave you that

 3   information.

 4          Before you left the building or at any point after

 5   that, did Steadfast issue you a badge?

 6   A.  Yes.

 7   Q.  Did the badge have the name "Steadfast" on it?

 8   A.  Yes.

 9   Q.  Did it have a picture on it as well?

10   A.  Yes.

11   Q.  And did Steadfast take that picture?

12   A.  Yes.

13   Q.  And were you paid on an hourly basis?

14   A.  Yes.

15   Q.  Were you able to negotiate a different rate with

16   Steadfast?

17   A.  No.

18   Q.  Did Steadfast make the ultimate decision to effectively

19   set your rate of pay?

20   A.  Yes.

21   Q.  Were you able to structure the terms of your work

22   relationship with the facility directly?

23   A.  No.

24   Q.  Who did you set that working relationship with?

25   A.  The schedulers at Steadfast.

K. Bellamy - Direct

```
 1   Q.   Did Steadfast give you an option to be classified as an

 2   employee or independent contractor?

 3   A.   No.

 4   Q.   They just told you this is what you are?

 5   A.   Uh-huh.

 6   Q.   Do you recall what they told you your classification is?

 7   A.   Say that again.

 8   Q.   Did they tell you what you were classified as?

 9   A.   Just a 1099 contractor.

10   Q.   And as part of working for Steadfast and getting

11   compensation, were you required to submit time sheets to

12   Steadfast?

13   A.   Yes.

14   Q.   And who issued you those time sheets that you were

15   required to submit to Steadfast?

16   A.   We picked them up at the building.

17   Q.   And did these time sheets have the name "Steadfast" on

18   them?

19   A.   Yes.

20   Q.   And was Steadfast's name on top of the time sheet --

21   A.   Yes.

22   Q.   -- on the header?

23   A.   Uh-huh, yes.

24   Q.   And who told you that you were required to submit these

25   time sheets?
```

K. Bellamy - Direct

1    A.  I'm not sure of her exact name, but I do know I received

2    an e-mail from Christine saying that it had to be submitted

3    by Monday at a certain time.  But who initially told me, I'm

4    not sure.

5    Q.  But it was someone from Steadfast?

6    A.  Yes.

7    Q.  So once you submitted these time sheets, did you ever

8    submit a time sheet where you worked more than 40 hours in a

9    workweek?

10   A.  Yes.

11   Q.  And on average how many hours did you work per week?

12   A.  I would say between 40 and 60.

13   Q.  Between 40 and 60.

14        When you worked more than 40 hours in a workweek,

15   what rate of pay did Steadfast pay you for those hours when

16   you worked over 40?

17   A.  It was the same rate of pay based upon the building that

18   we went to.

19   Q.  So you were paid straight time, not time and a half?

20   A.  Right.

21   Q.  And once you received your check or direct deposit, did

22   you ever complain to Steadfast about not receiving overtime

23   or time and a half for the hours you worked over 40 hours?

24   A.  Initially, I didn't, because they said we was

25   contractors, we wasn't supposed to be paid overtime, but when

K. Bellamy - Direct

```
 1    I talked to some other people that worked for a different
 2    agency who was contractors as well, they said their agency
 3    was paying overtime.  So I did inquire were we supposed to
 4    get paid overtime, and they said, no, that contractors don't
 5    get paid overtime.
 6    Q.  So you expressed concerns to Steadfast at some point
 7    about not being paid overtime --
 8    A.  Yes.
 9    Q.  -- and the response was "We don't pay overtime"; is that
10    correct?
11    A.  Yes.
12    Q.  Do you, roughly, recall when that was?  You said you
13    started working in 2017.  Was it in '17, '18?
14    A.  Probably close to the end of '17.
15    Q.  Okay.  So from '17 all the way through 2020 when you
16    left, Steadfast had not paid you time and a half for the
17    hours you worked over 40?
18    A.  No.  Unless it was holiday pay, but not overtime.
19    Q.  Okay.  I understand.
20         So if you weren't -- if you were not available to
21    work, did you have to give Steadfast a notice of your
22    unavailability?
23    A.  Not -- no, not unless I picked up a shift and then I
24    couldn't make it, then I had to tell them, but that was about
25    it.
```

K. Bellamy - Direct

```
 1   Q.  So if you did pick up a shift and you were canceling the
 2   shift, did you have to notify Steadfast?
 3   A.  Yes.
 4   Q.  Who told you that you needed to notify Steadfast?
 5   A.  The scheduler there.
 6   Q.  Was there a time frame or a period where you had to
 7   notify Steadfast?
 8   A.  At least two hours prior to our shift.
 9   Q.  And does that work for both late arrival and cancellation
10   or just for cancellation?
11   A.  Late -- it works for both.  Even if we were going to be
12   late, we were supposed to let them know that we were going to
13   be arriving to the facility late.
14   Q.  How about if you had a scheduling conflict and you
15   couldn't work?  Could you send another LPN to take your place
16   without Steadfast's approval?
17   A.  No.  No.
18   Q.  Were you allowed to employ another LPN to complete a
19   shift that Steadfast had assigned to you?
20   A.  No.
21   Q.  And if you were having issues with those time sheets we
22   talked about earlier that you submitted to Steadfast, who
23   would you communicate those concerns to?
24   A.  Christine.
25   Q.  Christine.  So you would communicate the concerns to
```

K. Bellamy - Direct

 1   Steadfast?

 2   A.  Steadfast, yes.

 3   Q.  Why wouldn't you communicate those concerns to the

 4   facilities that you worked in?

 5   A.  Because we were already instructed that we don't deal

 6   directly with the facility.  They are not the ones paying us.

 7   We deal with Steadfast.

 8   Q.  Who instructed you to do that?

 9   A.  Steadfast.

10   Q.  Did you have a supervisor at Steadfast?

11   A.  Not directly, but Hope is the one I normally talked to

12   about any concerns that I had.

13   Q.  Okay.  So what sort of concerns, other than the pay

14   issue, did you discuss with Hope?

15   A.  You know, just like I said, if I couldn't get to work on

16   time or if I needed more hours, I would go to her.  If I had

17   an issue at a facility, like, with one of the employers --

18   one of the other employees at a facility, then I would tell

19   Hope about it, and she would reach out to the managers there

20   and try to facilitate some type of agreement.

21   Q.  So if there was an issue that you were experiencing at a

22   facility, you would address it with Steadfast, not the

23   facility?

24   A.  Right.

25   Q.  Did Steadfast have a code of conduct that they expected

K. Bellamy - Direct

1   you to adhere to?

2   A.   Yes.

3   Q.   Could you tell me about that.

4   A.   Basically, report to work on time.  When we get to work,

5   we go to the manager and let them know that we're there.  We

6   should be dressed appropriately, you know, professional, have

7   all of our supplies ready.  Make sure we submit our time

8   sheets on time.  Just a regular professional code of conduct.

9   Q.   Did Steadfast provide you with sort of a booklet or

10  pamphlet of these expectations at any point?

11  A.   Not a booklet, but it came over in, like, an e-mail

12  fashion.

13  Q.   Okay.  E-mail.

14         Once you were placed at a facility, did you

15  negotiate the rate of pay with the facility?

16  A.   No.

17  Q.   Were you interviewed by a facility once you got there?

18  A.   Not concerning pay.

19  Q.   Did you receive any profit from Steadfast?

20  A.   What do you mean "profit"?  Just my regular paycheck.

21  Q.   Just your paycheck, nothing else?

22  A.   No.

23  Q.   Okay.  And you don't have any ownership interest in

24  Steadfast; is that correct?

25  A.   No.

1    Q.  Did you ever advertise that you are a business to

2    Steadfast or to anyone?

3    A.  No.

4    Q.  As an LPN, what type of equipment do you need to perform

5    your duties?

6    A.  Blood pressure cuff, stethoscope, thermometer, pen,

7    paper, uniform.

8    Q.  Are these normal tools of the trade that LPNs usually

9    carry with them?

10   A.  Yes.

11   Q.  Once you were sent to a facility or received an

12   assignment from Steadfast, did you have to buy special tools

13   to complete that shift?

14   A.  Yes, I had -- I bought my own.

15   Q.  I'm sorry?

16   A.  I bought my own.

17   Q.  Other than those you talked about, did you have to buy

18   any specific --

19   A.  Oh, no.

20   Q.  You did not buy equipment to complete a shift that

21   Steadfast assigned you?

22   A.  No.

23   Q.  And once you arrived at the facility, they had their own

24   equipment, correct, the bigger stuff?

25   A.  Yes.

K. Bellamy - Direct

```
 1   Q.   Now, you are required to maintain a license to practice;
 2   is that correct?
 3   A.   Yes.
 4   Q.   And is this license required regardless of which facility
 5   Steadfast sent you to?
 6   A.   Yes.
 7   Q.   And the type of care that you provide to patients, is
 8   that the same, also, regardless of which facility that you're
 9   sent to?
10   A.   Yes.
11   Q.   And the care that you provide requires the same skill
12   levels of all LPNs?
13   A.   Yes.
14   Q.   To your knowledge, is Steadfast Medical providing other
15   services?
16   A.   I'm sorry?
17   Q.   To your knowledge, does Steadfast provide any other
18   services other than assigning nurses to facilities?
19   A.   No.
20   Q.   Since you stopped working for Steadfast, did you ever
21   receive back wages for the overtime hours that you worked?
22   A.   No.
23   Q.   Okay.
24        MR. SEIFELDEIN:   No further questions for this
25   witness, Your Honor.
```

—————————————————K. Bellamy - Cross—————————————————

```
 1              THE COURT:  Cross-examination.
 2                          CROSS-EXAMINATION
 3    BY MS. RUST:
 4    Q.  Hi, Ms. Summers.
 5    A.  Hello.
 6    Q.  My name is Julia Rust.  I'm an attorney for the
 7    defendants.  I have a couple of questions regarding your
 8    testimony.
 9              You talked about your hourly rate.  You said it was
10    when -- your hourly rate as a CNA, it was based on the
11    building?
12    A.  As an LPN.
13    Q.  I'm sorry.  As an LPN, yes, it was based on the building.
14    So there were different rates depending on which facilities
15    you worked at; is that right?
16    A.  Yes.
17    Q.  When you were scheduling shifts with Steadfast, you said
18    you provided your availability, right?
19    A.  Yes.
20    Q.  And Hope would tell you which shifts matched up with that
21    availability?
22    A.  Uh-huh, yes.
23    Q.  I'm sorry?
24    A.  Yes.
25    Q.  And then were you able to pick which shifts she told you
```

K. Bellamy - Cross

```
 1   were available that you wanted to work?
 2   A.  Yes.
 3   Q.  And would you choose a shift that had a higher hourly
 4   rate over a lower hourly rate?
 5   A.  I would choose a shift that was available and closest to
 6   my home.
 7   Q.  So the location was important to you?
 8   A.  Yes.
 9   Q.  So you could choose the facilities that were closer if
10   they were available to you?
11   A.  Yes.
12   Q.  Were there facilities you preferred to work at?
13   A.  Just like I said, whatever was closest to me, but if I
14   had to go further out, then I would because I have four kids
15   to take care of.
16   Q.  Okay.  That's a lot.
17   A.  Yeah.
18   Q.  Were you able to request any pay advances or bonuses for
19   shifts from Steadfast when you were talking to Steadfast
20   about the shifts?
21   A.  Not pay advances, no.  But if she called on short notice
22   and asked if I could go somewhere, she might would try to
23   say -- well, she would say, "Well, I can help you with gas
24   or" -- if it was further out, "I could help you with gas or
25   maybe put you in a hotel for a couple days if you do a couple
```

————K. Bellamy - Cross————

1    of double shifts," or something like that.  But as far as a

2    pay advance, no.  But she did offer to help with gas if we

3    had to go further out.

4    Q.  Okay.  So typically when there was a last-minute need,

5    you were able to get additional incentives for a shift?

6    A.  Yes, if I so chose to go.

7    Q.  And did you ever work with any other staffing agencies or

8    registries?

9    A.  I did work with one other staffing agency.

10   Q.  Was it at the same time that you were working on

11   Steadfast's registry?

12   A.  It was a short transition.

13   Q.  Okay.  And were you -- well, have you ever seen Lisa

14   Pitts on site at a facility while you were working a shift

15   for Steadfast?

16   A.  You said did I receive -- what?

17   Q.  Sorry.

18          Have you ever seen Lisa Pitts on site while you were

19   working a shift for Steadfast?

20   A.  No.

21   Q.  So nobody from the Steadfast office has ever supervised

22   you while you provided nursing services?

23   A.  Not in the building, no.

24   Q.  Okay.

25   A.  But they have called to the facility to give specific

—————————————K. Bellamy - Cross—————————————

1   instructions.

2   Q.  As an LPN, you're subject to certain regulations and

3   requirements that are set by the Board of Nursing; is that

4   right?

5   A.  Yes.

6   Q.  And you are required to follow those?

7   A.  Yes.

8   Q.  And are those the regulations and requirements that set

9   your scope of practice as an LPN?  Is that right?

10  A.  Yes.

11  Q.  And you've never provided LPN services at Steadfast's

12  office in Norfolk; is that right?

13  A.  At the building?

14  Q.  Yeah, in Steadfast's office in Norfolk.

15  A.  No, not at that building, just the buildings they

16  contract.

17  Q.  And you talked about the code of conduct.  You said

18  Steadfast wanted you to be on time, be professional, and

19  submit time sheets on time; is that right?

20  A.  That was a list of some, yes.

21  Q.  Have you ever worked a job where those were not the

22  expectations?

23  A.  As an employee?

24  Q.  As an employee or a contractor, any job.

25  A.  No.

—————————————————K. Bellamy - Redirect—————————————————

```
 1          MS. RUST:  Okay.  Thank you.  I have no further
 2     questions for you.
 3          MR. SEIFELDEIN:  Briefly, Your Honor.
 4          THE COURT:  Briefly.
 5          MR. SEIFELDEIN:  Thank you.  I understand.
 6                    REDIRECT EXAMINATION
 7     BY MR. SEIFELDEIN:
 8     Q.  Ms. Bellamy, Ms. Rust asked you about you providing your
 9     availability to Ms. Hope and then you picking the shifts that
10     are available.
11          Would you know -- actually, strike that.
12          You could only work the shifts that Miss Hope
13     presented to you, correct?
14     A.  Yes.
15     Q.  So if you wanted to work at another facility and they did
16     not present it to you, you wouldn't know if Steadfast
17     actually had that shift available, correct?
18     A.  Right.
19     Q.  And you could not go to the facility that's nearest your
20     home and ask them, "Hey, I want to work this shift," correct?
21     A.  No, we couldn't.
22     Q.  And you would have to go through Steadfast?
23     A.  Yes.
24     Q.  Ms. Rust asked you about working for another agency.
25          Which agency did you work for?
```

K. Bellamy - Redirect

 1   A.   First Choice Nurses.

 2   Q.   First Choice.   Okay.

 3           And when you worked for First Choice, did you ever

 4   work more than 40 hours in a workweek?

 5   A.   Yes.

 6   Q.   When you worked more than 40 hours in a workweek with

 7   First Choice, did they pay you overtime?

 8   A.   Initially, they didn't, but then they began to pay

 9   overtime.   They said it had to be approved prior by the

10   facility that we were going to, and if they agreed to pay us,

11   then we could work overtime, but if they didn't, then we

12   couldn't work past the 40 hours.

13   Q.   So you didn't work more than 40 hours, but when you did

14   work more than 40 hours, they did pay you overtime?

15   A.   Yes.

16   Q.   And when you worked for First Choice, did you set your

17   schedule in a similar manner as you did with Steadfast?

18   A.   Yes.

19   Q.   And the pay, was it done in a similar manner as it was

20   with Steadfast?

21   A.   Yes.

22   Q.   So you were scheduling to go through First Choice and not

23   the facility?

24   A.   Yes.

25   Q.   But the facility -- excuse me -- First Choice did pay

─K. Bellamy - Redirect─

 1  overtime, correct?

 2  A.  Yes.

 3  Q.  And Steadfast did not pay you overtime?

 4  A.  No.

 5         MR. SEIFELDEIN:  No further questions, Your Honor.

 6         THE COURT:  May the witness be permanently excused?

 7         MR. SEIFELDEIN:  Yes, Your Honor, the witness may be

 8  excused.

 9         THE COURT:  Step down.

10         (Witness excused.)

11         THE COURT:  Next witness?

12         MS. LEWIS:  Your Honor, we have a remote witness.

13  It looks like she was on and then she was gone.  Is there a

14  way that we can try to take a moment so we can try and see

15  what's going on?  She's out of the country, and I know

16  there's weather going on there right now, and I want to be

17  sure that if she's not going to be available, we're not

18  holding things up.

19         THE COURT:  Okay.

20         MS. LEWIS:  Thank you.

21         (Pause in the proceedings.)

22         THE COURT:  I would note that you are reaching the

23  point of being overly cumulative.

24         MS. LEWIS:  Understood.

25         (Witness sworn remotely.)

─────────────── T. Morey - Direct ───────────────

1      TERESA MOREY, called by the Plaintiff, having been

2  first duly sworn, was examined and testified via ZoomGov.com

3  as follows:

4                    DIRECT EXAMINATION

5  BY MS. LEWIS:

6  Q.  Good afternoon, Ms. Morey.  I'm Ryma Lewis on behalf of

7  the Department of Labor.

8      If you could, please state your name for the record

9  and spell your last name.

10 A.  Teresa Morey, M-o-r-e-y.

11 Q.  Are you familiar with Steadfast Medical Staffing?

12 A.  Yes, I am.

13 Q.  How are you familiar with the company?

14 A.  I worked for Lisa Pitts, the owner of Steadfast.

15 Q.  And what was your job title?

16 A.  LPN, Licensed Practical Nurse.

17 Q.  When did you start working for Steadfast?

18 A.  I believe May of 2017.

19 Q.  Do you still currently work for Steadfast?

20 A.  No, I do not.

21 Q.  How did you apply to work for the company?

22 A.  Online.  The application was sent to me through Lisa, and

23 I was to fill it out and send it back.

24 Q.  Was that an employment application?

25 A.  Yes, ma'am.

─────────────── T. Morey - Direct ───────────────

```
 1    Q.   And did it have you submit references?

 2    A.   Yes, ma'am.

 3    Q.   Were you required to complete a drug test?

 4    A.   Yes, ma'am.

 5    Q.   Did you pay for that test?

 6    A.   No.

 7    Q.   Were you required to complete a background test?

 8    A.   Yes, ma'am.

 9    Q.   And did you pay for that test?

10    A.   No.

11    Q.   How much were you paid per hour?

12    A.   $30 an hour.

13    Q.   And was that -- did that rate vary?

14    A.   It was a flat rate of 30 an hour unless she got a call

15    and was desperate and needed someone to go somewhere, and she

16    would call and say, "I will give you an extra $2 an hour if

17    you pick this shift up."

18    Q.   Were you paid a different rate for hours worked over 40?

19    A.   No, we were not.

20    Q.   And who set the rate of pay?

21    A.   Lisa Pitts.

22    Q.   Did you ever work more than 40 hours in a single

23    workweek?

24    A.   Yes, ma'am.

25    Q.   When did you work over 40 hours in a workweek?  Was it a
```

—————————— T. Morey - Direct ——————————

1   consistent or inconsistent thing?

2   A.  No.  Pretty much -- pretty much every week I would work

3   sometimes 40 or more hours over a week.

4   Q.  I want to direct your attention to what's been marked as

5   54.  Can you see the document?

6   A.  It's --

7           MS. LEWIS:  Actually, let's go to 6 instead.

8   BY MS. LEWIS:

9   Q.  I want to direct your attention to what's been marked as

10  Plaintiff's 6, starting at Page 251.

11          So in a workweek, approximately how many hours were

12  you working?  You said over 40.  Can you provide me a range?

13  A.  Basically 70 to 80 to somewhere upwards of 120 hours a

14  week.

15  Q.  How in the world would you be able to work over 100 hours

16  in a workweek?  Can you tell me what your schedule looked

17  like?

18  A.  Pretty much three or four hours of sleep a night seven

19  days a week; some days, 16-plus hours.  One day in

20  particular, I believe I worked 21 and a half hours.

21  Q.  In this exhibit that you see here in front of you, can

22  you see the total amount of hours?  It's the third line there

23  that is highlighted by your name.

24  A.  I apologize.  I can't.  It's so blurry on the computer.

25  Q.  That's fine.  It's no problem.

T. Morey - Direct

1        So how did you submit your time?

2   A.   I would fill out a time sheet, and I would either e-mail

3   it in or take a picture and send it in via text message.

4   Q.   I want to direct your attention to, now, an

5   exhibit that's been marked as 54.

6   A.   Okay.

7        THE COURT:  Did you move the previous exhibit into

8   evidence?

9        MS. LEWIS:  No, Your Honor, that was just to refresh

10  recollection.  If I may, she's having trouble figuring out

11  which document she needs to point to.

12       (Pause in the proceedings.)

13  BY MS. LEWIS:

14  Q.   Can you see these documents?

15  A.   The document on the screen says "Payroll Details" at the

16  top, and it has my name highlighted, and it's --

17  Q.   I think you have a delay on your end.

18  A.   Okay.

19  Q.   Can you see it now?

20  A.   Yes.  Right now it's just showing me the courtroom.

21  Q.   We'll come back to this until it catches up with us.

22       Were you restricted from accepting placement

23  opportunities with other companies when you worked at

24  Steadfast?

25  A.   Yes, ma'am.

—————————— T. Morey - Direct ——————————

1   Q.  Did you have to wait a period of time before you could

2   start working at the facility?

3   A.  It would have to be -- after you terminated your

4   employment with Lisa, you would have to wait a year before

5   you could work for any of the companies that you had worked

6   for under her.

7   Q.  Who told you that?

8   A.  Lisa Pitts.

9   Q.  Why would you have to wait?

10  A.  Because you were an employee of hers, and in order for

11  you to work for another company, they would have to buy out

12  your agreement with her.

13  Q.  Did this occur with you?  Did you personally experience

14  this?

15  A.  Yes.  I started at Avante in Lynchburg as a floor nurse,

16  and they moved me into an LPN position -- I mean, as a unit

17  manager position, still up under Lisa; and, eventually, they

18  went to -- Avante management went to Lisa to buy my contract

19  out.  I don't know the details because I wasn't involved with

20  that.

21  Q.  When that happened, did Lisa approach you about that?

22  A.  She spoke with me, but they handled all the details

23  between her and Avante.

24  Q.  So did you receive any funds from Lisa for the buyout?

25  A.  No, not at all.

—————————————T. Morey - Direct—————————————

1    Q.  Were you involved in that negotiation?

2    A.  No.

3    Q.  Do you know how much she received for the buyout?

4    A.  I don't.  I was told it was 10,000 or more, but I don't

5    know the details.  That's just hearsay.

6            MS. RUST:  Objection.  Hearsay.

7            THE WITNESS:  I'm sorry.  I was told through the DON

8    at the facility.  I did not hear that directly.

9            MS. LEWIS:  I'll move on.

10   BY MS. LEWIS:

11   Q.  So when this buyout period was happening, were you still

12   working for Steadfast?

13   A.  Yes.

14   Q.  Did anything happen with your hours?

15   A.  Yes.  I was told I had to cut back hours -- this was

16   through Lisa -- until they finished getting everything worked

17   out.

18   Q.  Okay.  And so during that time, were you able to work at

19   any other facilities, or did your income just sort of

20   decrease during that time?

21   A.  No.  I wasn't allowed to work at any other facility.  It

22   was decreased.

23   Q.  Were you required to maintain your own malpractice or

24   liability insurance?

25   A.  No.

—————————————T. Morey - Direct—————————————

```
 1    Q.  Were you required to maintain your own Workers' Comp

 2    Insurance?

 3    A.  No.

 4    Q.  Were you given the option to be classified as an

 5    independent contractor or an employee?

 6    A.  No.  My understanding is I was an employee of Lisa's.

 7    Q.  I want to come back to the buyout that we were just

 8    talking about a moment ago.

 9         Did Lisa tell you whether or not you would be faced

10    with consequences if you just stopped working for her?

11    A.  If I stopped working for her and then just went to work

12    for Avante, yes.

13    Q.  What did she tell you?

14    A.  I could be held liable and she could file a civil suit

15    against me.

16    Q.  On what basis?  What did she tell you she would file a

17    civil suit against you for?

18    A.  Because if you work for her, once you terminate your

19    employment with her, you have to wait a year before you can

20    work at any of the facilities that you worked for under her.

21    Q.  And who was your supervisor at Steadfast?

22    A.  Lisa Pitts.

23    Q.  Have you received any back wages from Steadfast for hours

24    worked over 40?

25    A.  No.
```

———————T. Morey - Direct———————

1   Q.  Did you ever question Steadfast and/or Lisa about being

2   paid overtime?

3   A.  Yes.  And I was told that Lisa told me herself that they

4   do not pay overtime.  It's a flat rate of $30 an hour, or

5   whatever your pay is.  Mine, in particular, was 30 an hour.

6   Q.  Did she ever tell you -- make any other representations

7   about whether or not they would permit you to work overtime,

8   over 40 hours in a week?

9   A.  Oh, yeah, I could work all the overtime I wanted.  I just

10  wasn't paid time and a half.  I was only paid the flat rate

11  of 30.

12  Q.  I want to go back and see if we can get this exhibit to

13  work.  Tell me if you can see these.

14  A.  It's just a white screen on my end.

15  Q.  Okay.  Give it a second.

16          THE CLERK:  Your Honor, this is what she sees.  This

17  is what we see.

18          THE COURT:  We don't know what the reason for that

19  is?

20          THE CLERK:  I do not.  It's technical.

21  BY MS. LEWIS:

22  Q.  Can you see anything now?

23  A.  It's just a white screen.

24          THE COURT:  Well, I think, Ms. Lewis, you will have

25  to figure out some way to navigate around that.

─────────────── T. Morey - Direct ───────────────

1          MS. LEWIS:  Okay.

2     BY MS. LEWIS:

3     Q.  So, coming back, you submitted time sheets to Steadfast;

4     is that right?

5     A.  Yes.

6     Q.  And you submitted them, and the time sheets reflected

7     your schedule that you worked at whatever specific facility?

8     A.  Yes.

9     Q.  And you had to sign those time sheets?

10    A.  Yes.

11    Q.  And then they were submitted to -- then the time sheets

12    were submitted to Steadfast as a concurrent or near-time

13    record of the hours that you worked at whichever facilities

14    you worked; is that right?

15    A.  Yes.  I had to sign them, and, also, management personnel

16    at the facility, verifying that those were hours I actually

17    worked, had to sign them, and then I submitted them to Lisa.

18          THE COURT:  The Court will simply suggest that you

19    were leading your witness.

20          MS. LEWIS:  Okay.  Your Honor, I move to admit

21    Plaintiff's 54.

22          THE COURT:  Any objection to Plaintiff's 54?

23          MS. RUST:  No, Your Honor.

24          MS. LEWIS:  No further questions for Ms. Morey.

25          THE COURT:  Plaintiff's 54 is admitted.

──────T. Morey - Cross──────

         1              (Plaintiff's Exhibit PX-54 received in evidence.)

         2              MS. LEWIS:  Stand by, Ms. Morey.  Opposing counsel

         3       will have some questions for you.

         4                         CROSS-EXAMINATION

         5       BY MS. RUST:

         6       Q.  Hi, Ms. Morey, my name is Julia Rust.  I'm an attorney

         7       for the defendants.  I have a couple of questions about your

         8       testimony.

         9              You're not currently working on Steadfast's

        10       registry; is that right?

        11       A.  No.

        12       Q.  Are you currently employed directly by a facility?

        13       A.  Yes.

        14       Q.  Are you employed by Avante or Accordius?

        15       A.  No, I'm not.

        16       Q.  When did you start your current employment?

        17       A.  February of this year.

        18       Q.  And when did you stop working on Steadfast's registry?

        19       A.  I believe it was November of 2017.

        20       Q.  Okay.  So you were just there for a couple of months?

        21       A.  May, June -- May through November, I believe, is what it

        22       was.

        23       Q.  Where did you go after that?  What were you doing for

        24       work after that?

        25              MS. LEWIS:  Your Honor, objection as to relevance.

─────────────── T. Morey - Cross ───────────────

1          THE COURT:  Sustained.

2          MS. RUST:  Well, Your Honor, she testified regarding

3    whether she was allowed to work for a year after her time at

4    Steadfast.

5          THE COURT:  Okay.  If that's the basis for it, then

6    the Court would permit it, but as the Court recalls, I think

7    the testimony was she was threatened and she was told --

8    maybe it was a year.

9          MS. LEWIS:  Your Honor, if I may, Ms. Morey's

10   testimony is she wasn't allowed to work for the facility she

11   was working at that Steadfast had placed her with for a year.

12   She didn't testify "I wasn't allowed to work anywhere."  She

13   said she wasn't allowed to work at the facility.

14          The testimony and the line of questioning was

15   related to her relationship with Steadfast, the facility she

16   was working at for Steadfast, and what restrictions, if any,

17   Steadfast placed on her ability to take a permanent position

18   at that facility or other facilities Steadfast placed her at.

19          THE WITNESS:  Yeah.

20          THE COURT:  Well, okay.  Even with that, the Court

21   is going to permit her to answer that question.

22          MS. RUST:  Thank you, Your Honor.

23   BY MS. RUST:

24   Q.  Ms. Morey, I'll go ahead and restate that for you.

25          So after you stopped working on Steadfast's

————————————T. Morey - Cross————————————

```
 1   registry -- you said around November 2017 -- where did you
 2   work after that?
 3   A.  I worked at Avante in Lynchburg, because they bought my
 4   contract out from Lisa.
 5   Q.  Did Lisa Pitts or anybody else at Steadfast tell you that
 6   the contract had actually been bought out?
 7   A.  Yes.  Lisa did.
 8   Q.  You said you were not part of the negotiations between
 9   Steadfast and Avante regarding any buyout, though, right?
10   A.  No.
11   Q.  So you don't know what the ultimate determination was
12   between --
13   A.  No, I don't.
14   Q.  So it's possible, then, that they did not negotiate a
15   buyout, but Steadfast did not pursue any liability against
16   you for working at Avante after that?
17           THE COURT:  Sustained.
18           MS. LEWIS:  If I can just make it for the record.
19           THE COURT:  Your objection was?
20           MS. LEWIS:  My objection was speculation.
21           THE COURT:  The Court anticipated that.  You're
22   calling for speculation.  So the objection is sustained.
23           MS. RUST:  Of course.  Thank you.
24   BY MS. RUST:
25   Q.  Have you ever been involved in Steadfast's negotiations
```

1   with facilities for the contracts it has to staff those

2   facilities?

3   A.  Only aspect I was involved in is once I was working

4   officially through Avante, our staffing needs of what holes

5   we needed to fill, I would give that to the DON, and then she

6   would go through Lisa to cover holes.

7   Q.  So if I understand correctly, it was only once you were

8   working through Avante, you might have -- is that what you

9   said?  You were negotiating on behalf of Avante with

10  Steadfast?

11  A.  No.  The only thing I did is, based on our schedule, we

12  have to have X amount of nurses and X amount of CNAs for our

13  patient-to-staff ratio.  So when I was the unit manager, when

14  we didn't have staffing, based on what the needs were to get

15  nurses and CNAs in there, I would say, "We have X holes.  I

16  need X amount of nurses and X amount of CNAs on this day or

17  that day."

18          I would give that information to the DON of the

19  facility, who would then call and speak with Lisa and get

20  those holes filled when she could.  That would be my only

21  part in it.

22  Q.  Okay.  I see.  But you've never been involved in the

23  actual negotiation of the staffing contracts between

24  Steadfast and --

25  A.  No.

———————T. Morey - Cross———————

 1  Q.  Okay.  And when you mentioned in your testimony that it

 2  was -- you typically received $30 an hour, unless there was a

 3  situation where there was a last-minute need to pick up a

 4  shift; is that right?

 5  A.  Yeah.  That would be up to Lisa.  If she was going to

 6  offer -- she would call and ask, "Hey, can you pick up such

 7  and such," but if she was desperate and couldn't get anybody

 8  to pick it up, she would say something like, "I'll give you

 9  an extra $2 an hour if you could cover this for me."

10  Q.  So in those instances, you could negotiate a higher

11  hourly rate for a shift; is that right?

12  A.  No.  There was no negotiation.  It was --

13  Q.  She would --

14          THE COURT:  Only one of you-all can talk at a time.

15  Let's back up.  What was the question again?

16  BY MS. RUST:

17  Q.  I think the last question I asked was:  So you could

18  negotiate a higher rate in those instances?

19          THE COURT:  Your answer?

20          THE WITNESS:  No.  The incident in particular, she

21  called me.  There was a need at Autumn Care in Altavista on

22  third shift.  She said, "I know you just worked all day,"

23  she's like, "I know you haven't had any sleep, but if you

24  will cover this for me, I'll give you an extra $2 an hour."

25  BY MS. RUST:

—————T. Morey - Cross—————

1   Q.  Do you have any knowledge as to whether that increase in

2   hourly rate was authorized by the facility or not?

3   A.  I don't handle that.

4   Q.  Okay.

5           MS. RUST:  I think those are all the questions I

6   have for you.  Thank you, Ms. Morey.

7           THE COURT:  The Court hasn't heard any evidence in

8   the case that the facilities where these people worked

9   controlled the rates they were paid.  That was with respect

10  to your last question.  But move on.  No problem.

11          MS. RUST:  Well, Your Honor, I would just proffer

12  that it would be something that we would intend to discuss in

13  our case in chief, at least, for the defense.

14          THE COURT:  So you are raising a question based on

15  something not in evidence at this juncture.

16          MS. RUST:  Understood.  If I may, I believe I was

17  ask -- well, questioning the witness's knowledge as to who

18  was actually making an offer of an increased hourly rate,

19  because the witnesses have said that it was offered by

20  Steadfast.  They may have received that information from

21  Steadfast, but they aren't aware of who actually authorized

22  that offer.

23          THE COURT:  I thought your question was whether the

24  facility approved that $2 increase that she offered.  That's

25  what the Court is referring to.

Carol L. Naughton, Official Court Reporter

**JA311**

 1          Okay.  Let's just move on.  May this witness be

 2   permanently excused, or is there any redirect?

 3          MS. LEWIS:  Permanently excused.

 4          Thank you, Ms. Morey.

 5          THE WITNESS:  Thank you.

 6          (Witness excused.)

 7          THE COURT:  Thank you very much.

 8          MS. JONES:  Tatianna Canady.

 9          (Witness sworn.)

10          TATIANNA CANADY, called by the Plaintiff, having

11   been first duly sworn, was examined and testified as follows:

12                     DIRECT EXAMINATION

13   BY MS. JONES:

14   Q.  Hi, Ms. Canady.  Could you please state and spell your

15   name for the record.

16   A.  Tatianna, T-a-t-i-a-n-n-a.  My last name is C-, as in

17   cat, -a-n-a-d-y.

18   Q.  And, Ms. Canady, are you familiar with Steadfast Medical

19   Staffing?

20   A.  Yes.

21   Q.  To your knowledge, what type of services does Steadfast

22   provide?

23   A.  Travel nurse agency.  She sends nurses to facilities.

24   Q.  And were you employed or are you currently employed by

25   Steadfast?

———T. Canady - Direct———

 1   A.   Yes, I was.

 2   Q.   And when were you employed by Steadfast?

 3   A.   2018 until 2020.

 4   Q.   And what was your job title when you were employed by

 5   Steadfast?

 6   A.   Licensed practical nurse.

 7   Q.   And if you recall, how did you apply to work for

 8   Steadfast?

 9   A.   I applied online, and then I went in to finish.

10   Q.   And when you say you applied online, what specifically

11   did you complete online?

12   A.   Something was sent through e-mail.  It's not applied.  I

13   was given paperwork from the receptionist over the phone,

14   that when I contacted Steadfast, she sent to my e-mail what I

15   needed to fill out, and then I had to come in and finish the

16   rest.

17   Q.   So the online documents that were e-mailed to you, did

18   that include some sort of employment application?

19   A.   Yes.

20   Q.   Okay.  And do you recall what type of information was

21   requested on that employment application?

22   A.   I don't.

23   Q.   And you indicated that you went into the office to

24   complete certain things.  What did you go into the office to

25   complete?

┌─────────────────── T. Canady - Direct ───────────────────┐

1   A.   A big packet, paper-wise.  I had to finish a bigger

2   packet.

3   Q.   Did that bigger packet contain any type of training

4   materials to your recollection?

5   A.   No.

6   Q.   Did it contain an independent contractor agreement?

7   A.   I received an independent contractor agreement after I

8   was already working.

9   Q.   Okay.  And as part of the application process, did you

10   have to submit for a drug test?

11   A.   Yes.

12   Q.   And what about a background check?

13   A.   I filled paperwork out for it.

14   Q.   And once you submitted all of those documents and the

15   drug test and the background check, were you hired to work

16   for Steadfast?

17   A.   Correct.  I worked the exact same day.

18   Q.   And how were you offered the position?  Who offered the

19   position to you?

20   A.   Lisa Pitts.

21   Q.   And did you have a formal interview with anyone?

22   A.   I -- I had a conversation with Ms. Lisa Pitts.

23   Q.   And when you were employed by Steadfast, were you paid an

24   hourly rate, or were you paid a salary?

25   A.   Hourly.

1  Q.  Okay.  And did your hourly rate ever vary?

2  A.  Yes.

3  Q.  To your knowledge, why did your rate vary?

4  A.  I was informed it was because of the facilities we went

5  to.  Every facility's price wasn't the same.

6  Q.  And was there ever any incidents where you were told you

7  would be paid one hourly rate but were paid a lower hourly

8  rate?

9  A.  Yes.

10  Q.  When would you be made aware that your hourly rate would

11  be lower?

12  A.  When I saw my check and I contacted Steadfast.

13  Q.  And what did you do when you contacted Steadfast about

14  that lower hourly rate?

15  A.  We were informed to try to get in touch with

16  Miss Christine, and I would e-mail Miss Christine, but

17  nothing was ever resolved.

18  Q.  Did Miss Christine ever respond to your e-mails?

19  A.  Yes.

20  Q.  And what was the response regarding that lower hourly

21  pay, if you recall?

22  A.  Most of the time, she'll check into it.

23  Q.  When you say Miss Christine, is Miss Christine an

24  employee of Steadfast?

25  A.  I was informed that she ran payroll.

─────────────── T. Canady - Direct ───────────────

1    Q.   She ran payroll for Steadfast?

2    A.   Correct.

3    Q.   And during your time with Steadfast, were you ever able

4    to structure your relationship with the facility directly?

5    A.   No.

6    Q.   Were you required to go through Steadfast?

7    A.   Correct.

8    Q.   And to your knowledge, who negotiated your hourly rate of

9    pay?

10   A.   Lisa.

11   Q.   And were you required to maintain your own malpractice or

12   liability insurance?

13   A.   I wasn't informed, if I was.

14   Q.   I'm sorry?

15   A.   I was not informed of that, if I was.

16   Q.   So was that a no, you didn't provide it?

17   A.   No.  I did not provide it, no.

18   Q.   And what about Workers' Compensation Insurance?

19   A.   No, I didn't have anything with that either.

20   Q.   Were you given the option to be classified as an

21   independent contractor or as an employee?

22   A.   No.  Again, I received the independent contractor after,

23   through e-mail, because I guess paperwork wasn't all the way

24   up-to-date, so we received extra paperwork later on to

25   complete, and that's when the independent contractor came up,

———T. Canady - Direct———

1   the agreement.

2   Q.  Do you know how -- prior to receiving that agreement, do

3   you know how Steadfast classified you?  Did they classify you

4   as an employee or independent contractor?

5   A.  Independent contractor.

6   Q.  And that was even before you signed that agreement?

7   A.  Yes, ma'am.

8   Q.  And just based upon your general knowledge, do you know

9   what is required to be considered an independent contractor?

10  A.  I do now.

11  Q.  So you identified as an independent contractor because

12  that's what Steadfast identified you as?

13  A.  I identified as contractor.  I didn't know the

14  independent part, but yes, ma'am, we were identified as

15  contractors.

16  Q.  And do you advertise your healthcare services in any way?

17  A.  I'm sorry.  What was that?

18  Q.  Do you advertise your healthcare services as an LPN in

19  any way?

20  A.  Advertise?  Can you --

21  Q.  Do you specifically, as Tatianna Canady, represent your

22  services to any facility on your own, independently of

23  Steadfast or any other facility?

24  A.  Not other than Steadfast, no.

25  Q.  And when you were employed by Steadfast, were you

———————— T. Canady - Direct ————————

1   required to submit time sheets?

2   A.  Correct.

3   Q.  And were you required to submit those time sheets to

4   Steadfast?

5   A.  Correct.

6   Q.  And how often did you submit those time sheets?

7   A.  It should have been after every shift.

8   Q.  And who told you that you were required to submit time

9   sheets?

10  A.  It was within the packet that we received once we got --

11  when I got to the facility -- I mean, to Steadfast to finish

12  the rest of my paperwork.  One of the paperworks did state

13  that we were supposed to sign -- get a signature after every

14  shift.

15  Q.  And you got the signature from -- from who did you get

16  the signature on the time sheet from?

17  A.  Most of the time it was whatever nurse for that facility

18  that was working with me.  If we did not have a nurse at that

19  facility, whatever nurse I was working with at that time.

20  Q.  And then after, you would submit that signed time sheet

21  to Steadfast?

22  A.  Correct.

23  Q.  And let's talk a little bit about your work schedule when

24  you were working with Steadfast.  What was your schedule?

25  A.  I didn't have a schedule.  I picked my hours.

─────────────── T. Canady - Direct ───────────────

1    Q.   So what hours did you generally work?

2    A.   Nights, days, evenings.  I worked all of them.

3    Q.   So, specifically, how many hours would you work each

4    shift that you worked?

5    A.   16-plus.

6    Q.   And so how was your -- you indicated that you picked your

7    shifts.  How did you pick your shifts?

8    A.   I would tell them what days I was available, and they

9    would inform me if there was availability there.  If not, I

10   will ask for a different recruiter who also worked in maybe a

11   different area to pick up whatever I couldn't get from that

12   one recruiter.

13   Q.   So would Steadfast provide you the facilities for your

14   schedule?

15   A.   Correct.

16   Q.   Have you ever turned down a shift Steadfast offered you?

17   A.   Correct, yes.

18   Q.   I'm sorry.  What was that last word?

19   A.   Yes.

20   Q.   Did Steadfast do anything in response to that?

21   A.   I was apprehended [sic].  I definitely got taken off the

22   shift for two weeks if I did not do what they wanted me to

23   do.

24   Q.   If Steadfast offered you a shift -- strike that.

25            Did you ever work more than 40 hours in a workweek?

─────────────── T. Canady - Direct ───────────────

1   A.  Yes.

2   Q.  And how often would you say that you worked more than 40

3   hours?

4   A.  How do you -- I guess I don't know exactly how I can say

5   it, but maybe three weeks out of a month every month.  I

6   definitely did a lot of overtime -- a lot.

7   Q.  And when you worked those overtime hours, how were you

8   compensated?

9   A.  I was told that we had a straight-across-the-board price.

10  So I was just paid whatever the hourly was for that facility.

11  Q.  So were you ever paid time and a half for overtime hours

12  worked while you worked for Steadfast?

13  A.  No.

14  Q.  Were you required to provide notice to Steadfast if you

15  were unavailable to work?

16  A.  No.  Most of the time I told them if we could work.

17  Q.  I'm sorry.  What was that?

18  A.  We only told them if we could work.

19  Q.  If you were running late for a shift, would you ever have

20  to call anyone to let them know?

21  A.  Yes.

22  Q.  And who would you call?

23  A.  I would contact the recruiter.

24  Q.  And that is the recruiter for Steadfast?

25  A.  Correct.

T. Canady - Direct

1   Q.  Were you allowed to employ any other LPN to assist you in

2   completing the shift assigned to you by Steadfast?

3   A.  "Employ"?

4   Q.  Yes.  Could you hire another LPN to do the work for you?

5   A.  No.  I just gave the information to Steadfast if I knew

6   another worker, a referral.

7   Q.  So you are saying you referred other LPNs to work for

8   Steadfast?

9   A.  Correct.  Yes, ma'am.

10  Q.  But they could not cover your shift?

11  A.  No.  Not if we didn't call to see if it was okay, because

12  I did that and I ended up getting in trouble.

13  Q.  So you got in trouble for trying to have someone cover

14  your shifts?

15  A.  No.  I tried to get somebody else's shift, and I didn't

16  know I was in trouble at that time.  So I ended up getting in

17  more trouble.

18  Q.  So what do you mean you were in trouble?

19  A.  I guess I didn't do something prior for Ms. Pitts, and I

20  got tooken off the schedule for a facility that I never got

21  canceled for that day.  So when I went in, I thought I was on

22  the schedule.  I was tooken off.  So, instead, I asked

23  someone who had a double shift if I could take their morning

24  and they take the evening, and she said it was fine, but we

25  have to contact the facility.

T. Canady - Direct

1          Once we contacted Steadfast to see if it was okay,

2     the recruiter gave an okay, but then she got a call back, and

3     the recruiter stated exactly, "I don't know what Lisa and

4     Tatianna have going on, but you better stay out of it.  She

5     cannot take your shift and leave it alone."  And I was off

6     the schedule for two weeks.

7     Q.  So Steadfast removed you from the schedule for two weeks

8     for attempting to take someone else's shift -- a part of

9     someone's double shift?

10    A.  No.  She took me off before the shift.  I didn't know I

11    was off.  So when I tried to take that shift, it was pretty

12    much letting me know, no, you cannot take the shift, and, no,

13    you are not working at all.

14    Q.  So as a result of that, did you state that you were taken

15    off the schedule completely for two weeks?

16    A.  I was.  I was informed by the recruiter to just give her

17    time to cool down.

18    Q.  Give who time to cool down?

19    A.  Miss Lisa, because I was tooken off because of her.

20    Q.  So during the times you were working with Steadfast, did

21    they ever allow you to negotiate your rate of pay with the

22    facility directly?

23    A.  No.

24    Q.  So who was responsible for the negotiation with the

25    facility?

—————————T. Canady - Direct—————————

1    A.   Steadfast.

2    Q.   And when you were at the facility, did you interview with

3    them prior to starting the shifts there?

4    A.   No.  I just went straight to work.

5    Q.   Did you ever communicate with the facilities you worked

6    for directly to establish the shifts?

7    A.   Sometimes, yes.  Because I started noticing if I did not

8    go through the facility, I would be tooken off schedules

9    without knowing information.

10   Q.   And if you did schedule a shift with the facility, would

11   you be required to let Steadfast know that you were picking

12   up a shift?

13   A.   We were required, yes.

14   Q.   And do you know why you were required to let Steadfast

15   know?

16   A.   I was not.  I don't know why.  I don't.

17   Q.   Other than your hourly rate, did you receive any other

18   profits from Steadfast?

19   A.   We would be told -- if it was, like, a last-minute shift

20   or anything, we would get incentives, but once I got paid, my

21   incentives was never there, really.

22   Q.   So outside of your hourly rate and the rates that you

23   were paid to work at the facility, did you receive any other

24   compensation?

25   A.   Not often, but like I said, if she gave us $2 extra,

1    sometimes I probably would see it, and others, I would not.

2    Q.  But just to clarify, that was because of your work at the

3    facility?

4    A.  Correct.

5    Q.  And who paid you for the work and the services that you

6    provided at the facilities?

7    A.  Steadfast.

8    Q.  If you didn't receive your check or compensation from

9    Steadfast, would that impact your ability to meet your

10   financial obligations?

11   A.  Yes.

12   Q.  And do you have any ownership interest in Steadfast?

13   A.  No.

14   Q.  And as an LPN, what type of equipment or supplies do you

15   use to complete your job?

16   A.  Stethoscope, blood pressure cuff, thermometer.  We have

17   bags, pens, papers, clipboards.

18   Q.  Are those items that you detailed, are those considered

19   normal tools of the trade?

20   A.  Correct.

21   Q.  When you are at a facility for an assignment, are you

22   required to provide your own supplies outside of the tools of

23   the trade that you would use?

24   A.  Correct.

25   Q.  And are you required to hold a license to practice as an

─────────────────T. Canady - Direct─────────────────

1   LPN?

2   A.   Correct.

3   Q.   Is this license required regardless of what facility you

4   are placed to work in?

5   A.   Yes.

6   Q.   And as an LPN, what type of care do you provide to

7   patients?

8   A.   I pass medications --

9   Q.   What type of care -- oh, sorry.

10  A.   I pass medications to the residents.  Sometimes I have

11  hands-on, but most of the times, it's passing meds.

12  Q.   And do you do these same type of services regardless of

13  the facility you are placed in?

14  A.   Yes, ma'am.

15  Q.   And did you ever complain about not receiving time and a

16  half for hours worked over 40?

17  A.   Yes.

18  Q.   Who did you complain to?

19  A.   Mostly the recruiters is who we had more contact with.

20  Q.   And what was their response?

21  A.   I really don't remember.

22          THE COURT:  What was that?

23          THE WITNESS:  I don't remember.

24  BY MS. JONES:

25  Q.   After those conversations, did you ever receive time and

```
                          ┌──────── T. Canady - Cross ────────┐
  1    a half or overtime?
  2    A.  No.
  3            MS. JONES:  I have no further questions.
  4            THE COURT:  The Court has a question, and maybe I
  5    should ask it before your cross in case you want to follow up
  6    on it.
  7            Did you have health benefits when you were working
  8    for Steadfast?
  9            THE WITNESS:  No, sir.
 10            THE COURT:  No health insurance?
 11            THE WITNESS:  No health insurance.
 12            THE COURT:  Okay.  So Steadfast didn't offer health
 13    benefits?
 14            THE WITNESS:  No, sir.
 15            THE COURT:  All right.  Thank you.
 16            Cross-examination.
 17                      CROSS-EXAMINATION
 18    BY MS. RUST:
 19    Q.  Hi, Ms. Canady.
 20    A.  Hello.
 21    Q.  My name is Julia Rust.  I'm an attorney for the
 22    defendants.
 23            You said you were able to schedule some shifts
 24    directly with the facility; is that right?
 25    A.  Some, yes, ma'am.
```

─────────T. Canady - Cross─────────

1    Q.  And when you were on site or -- let me -- actually, you

2    talked about time sheets?

3    A.  Yes.

4    Q.  When you would get a signature from somebody, from a

5    facility nurse, did they verify the number of hours that you

6    said you worked on the time sheet?  Is that what the

7    signature was for?

8    A.  That is what it was supposed to be for, yes.

9    Q.  Okay.  And when you would -- you talked about the process

10   for picking up shifts and that you would tell Steadfast what

11   you had available and pick your hours.

12          When they provided you with the available

13   opportunities, were you able to choose which facility you

14   wanted to be at, if any of them at all?

15   A.  No.

16   Q.  And if I need to rephrase -- that was a long question.

17   So if I need to rephrase, just tell me.

18   A.  Yes.  I think it's rephrasing.  I don't know if I

19   understand correctly but --

20   Q.  Let me rephrase it for you, then, so we're not confused.

21   A.  Okay.

22   Q.  So when you would call and tell what your availability

23   was and somebody at Steadfast would tell you what available

24   opportunities there were --

25   A.  Uh-huh.

—————T. Canady - Cross—————

1   Q.  -- then -- tell me if I'm wrong -- you would pick which

2   shifts you wanted to pick up, right?

3   A.  Correct.

4   Q.  And you could pick whether you wanted it based on the

5   time of the shift or the location of the shift; is that

6   right?

7   A.  Correct.

8   Q.  Okay.  And based on the hourly rate that was offered for

9   that shift; is that right?

10  A.  We didn't know our hourly rate, ma'am.

11  Q.  I think you said the hourly rate varied at each facility.

12  A.  Yes.  But we never knew what facility was what price.

13  That wasn't a specific.

14  Q.  And you said as part of the type of care that you offer

15  as an LPN was passing medications, right?

16  A.  Correct.

17  Q.  When you're on site at a facility, has Lisa Pitts or any

18  of the other office employees at Steadfast been on site to

19  supervise how you pass medications?

20  A.  No.

21  Q.  Okay.

22          MS. RUST:  I have no further questions.  Thank you,

23  Ms. Canady.

24          THE COURT:  Any redirect?

25          MS. JONES:  Just two quick questions, Your Honor.

———————T. Canady - Redirect———————

            1          REDIRECT EXAMINATION

            2   BY MS. JONES:

            3   Q.  Ms. Canady, you indicated that you could pick your

            4   schedule, but the schedule was based on what Steadfast

            5   presented to you?

            6   A.  Yes.

            7   Q.  So if they didn't present a facility to you, were you

            8   able to work there?

            9   A.  No, not at all.

           10   Q.  So, essentially, your schedule was based on what

           11   Steadfast provided to you?

           12   A.  Correct.

           13           MS. JONES:  I have no further questions, Your Honor.

           14           THE COURT:  May the witness be permanently excused?

           15           MS. JONES:  Yes, Your Honor.

           16           (Witness excused.)

           17           THE COURT:  I think what the Court is going to do is

           18   just go on and take about a 15-minute break right here in

           19   between these witnesses.

           20           MS. LEWIS:  If I may, Your Honor, as a housekeeping

           21   matter.  We provided our list of anticipated additional

           22   witnesses today, and we have at least five no-shows that

           23   we've been trying to get in touch with.  They were

           24   subpoenaed, but with that, we don't -- yeah, we called them

           25   last night to confirm, and they confirmed.  They are not here

────────────── T. Canady - Redirect ──────────────

 1  today now.

 2          THE COURT:  All five of these left are no-shows?

 3          MS. LEWIS:  Yes, Your Honor.  And some of them we

 4  had to move around from other days because of the changes.

 5  So three of them -- Courtney Turner, Tiffany Trogdon, and

 6  Ryan Thompson were moved up.  And Andrea White and Tywann

 7  White, they should be here, for sure, and we don't know where

 8  they are.

 9          THE COURT:  Okay.  Well, the Court will extend the

10  break by five minutes, and maybe 20 minutes will give you

11  more time to see if you can find someone.  Otherwise, you

12  have no one to go forward with after we come back?

13          MS. LEWIS:  That is correct, Your Honor.

14          THE COURT:  Well, let's hope that something happens

15  over the break so that you can find some of these people.

16          MS. LEWIS:  Yes, thank you.

17          (Recess from 2:49 p.m. to 3:19 p.m.)

18          THE COURT:  Counsel, if you could update the Court

19  on the status of these witnesses.  You can do it right there.

20          MS. LEWIS:  Thank you, Your Honor.

21          Your Honor, we have had -- as indicated to the

22  Court, there were five witnesses today that we subpoenaed to

23  testify, in addition to there was one yesterday.  So that's a

24  total of six witnesses, all of whom are current employees of

25  Steadfast, that have been responsive and indicated a

─────────────T. Canady - Redirect─────────────

1   willingness to testify, and they are under subpoena.

2           There's at least one individual who initially

3   indicated to us, when we were just able to reach him, that he

4   was scheduled to work today.  Now, the Court has heard

5   numerous times what has happened if they cancel or turn down

6   shifts, and I just confirmed with him last night that he

7   would be here.

8           Now, it would be inappropriate to maintain a report

9   that something is amiss, but something is not right.  And

10  this is -- nonappearance of these witnesses directly

11  undermines our ability to put on evidence in our case.

12          THE COURT:  Okay.  For the record, list the names of

13  the witnesses who got subpoenas and have not showed.  As a

14  matter of fact, come to the podium.  I thought it would be

15  quicker.  Come on around.

16          MS. LEWIS:  Andrea Tirado, T-i-r-a-d-o; Tywann

17  White, T-y-w-a-n-n; Courtney Turner; Tiffany Trogdon; Ryan

18  Thompson; and Brandi Plummer.

19          THE COURT:  Brandi who?

20          MS. LEWIS:  Plummer.

21          Now, we have on the phone -- we were able to get in

22  touch with two of those six.  Currently holding via video is

23  Ms. Courtney Turner.  Tywann White initially indicated that

24  he was scheduled, but he said he would be able to leave his

25  shift and come, and he's on his way.  But we have not been

Carol L. Naughton, Official Court Reporter

**JA331**

---

T. Canady - Redirect

```
 1   able to reach the remaining four.
 2          THE COURT:  Here's the procedure:  Anyone who does
 3   not show up in here faces the likelihood of fine and going to
 4   jail.  And the Court will issue a Show Cause to each of these
 5   people who do not show as to why they should not be held in
 6   contempt of this court, and the Court will have the U.S.
 7   Marshals serve them.  They will be brought to this Court, and
 8   the Court will conduct a hearing.  It won't be done during
 9   this trial, but that's exactly what's going to happen here,
10   now, unless they in some kind of way find time to show up
11   here.  But you're not going to ignore a subpoena from this
12   Court.  I don't know where that idea popped into somebody's
13   head, but it doesn't work that way.
14          That being the case, we're prepared to move on, but
15   somebody is in serious jeopardy.
16          MS. LEWIS:  Understood, Your Honor.  If I may, just
17   with respect to -- the Court had indicated a little bit
18   earlier today that -- never mind, Your Honor.  Excuse me.
19   Thank you for your time.
20          THE COURT:  So is a witness here?
21          MS. JONES:  Courtney Turner is on the Zoom.
22          (Pause in the proceedings.)
23          (Witness sworn remotely.)
24          COURTNEY TURNER, called by the Plaintiff, having
25   been first duly sworn, was examined and testified via
```

---

C. Turner - Direct

 1   ZoomGov.com as follows:

 2                        DIRECT EXAMINATION

 3   BY MS. JONES:

 4   Q.  Ms. Turner, could you please state and spell your last

 5   name for the record.

 6   A.  Yes.  C-o-u-r-t-n-e-y T-u-r-n-e-r.  Courtney Turner.

 7   Q.  Are you familiar with Steadfast?

 8   A.  Yes, I am.  That's where I work.

 9   Q.  And how long have you worked with Steadfast?

10   A.  Ever since 2016.

11   Q.  And what is your position with Steadfast?

12   A.  A traveling CNA.

13   Q.  Do you recall how you applied when you began working for

14   Steadfast?

15   A.  By paper.

16   Q.  And by "paper," do you mean a paper application?

17   A.  Absolutely.

18   Q.  Do you recall what type of questions were asked on that

19   application?

20   A.  No.  Many moons ago.

21   Q.  Do you recall if you were required to give references?

22   A.  Yes, I do know that.

23   Q.  Were you required to provide any documents in support of

24   that application?

25   A.  As far as our credentials, first aid, CPR, updated

—————————C. Turner - Direct—————————

```
 1   license, you know, necessities for working in the building.
 2   Q.  Were you required to have a drug test?  Can you hear me?
 3   A.  I'm sorry?
 4   Q.  Were you required to have a drug test?
 5   A.  Yes.  That's how you could pass.  You go to Greenwich
 6   Road, you take a drug test, and then they report it to
 7   Miss Lisa.
 8   Q.  After you submitted those applications and those
 9   accompanying materials, were you interviewed by anyone at
10   Steadfast?
11   A.  Melissa, at the time, meaning she was there for Lisa.
12   Q.  After that interview with Melissa, were you hired by
13   Steadfast?
14   A.  Yes.  That was the whole process.
15   Q.  And do you recall how you were offered the position to
16   work with Steadfast?
17   A.  Yes.  Once we took our drug screening, they reported it
18   to Miss Lisa, and her callers then offered you shifts, and
19   you could say "yea" or "nay."
20   Q.  Are you paid an hourly rate or a salary?
21   A.  Hourly rate, depending on where you go at the time.
22   Q.  And who negotiates that hourly rate?
23   A.  I'm guessing Miss Lisa.
24   Q.  Do you negotiate that rate yourself with the facilities?
25   A.  No.
```

1    Q.  Have you ever had any issues getting shifts during your

2    employment with Steadfast?

3    A.  No.  Not -- no.  Only like if you don't -- we can't get

4    written up, verbal warnings.  We're agency.  So we get what

5    is called DNR'd, and that's do not rehire.  So Lisa, what

6    she'll do is, I guess, you just won't be on the schedule for

7    a couple of days.  That's part of -- if you're late, you

8    know, these are things as an adult you should do, but that's

9    how she handles things.

10   Q.  Are you required to submit time sheets?

11   A.  Yes, Steadfast Medical time sheets.  Steadfast Medical

12   pays -- pays from the time sheets.

13   Q.  Are you saying that you e-mail those time sheets?

14   A.  Yeah, we e-mail the time sheets in, yeah.

15   Q.  How often are you required to submit those time sheets?

16   A.  I submit mine after every shift.

17   Q.  And do you recall who told you that you are required to

18   submit those time sheets?

19   A.  Yeah.  Lisa, Miss Lisa, you know, and her company, I

20   guess you would say.  They e-mail you.  They communicate,

21   this is how you do this, this is how you do that.

22   Q.  When you say this is how you do this and this is how you

23   do that, is there anything specific that you're referring to?

24   A.  Yes, ma'am.  You fill out your time sheet; you make sure

25   you put your .5 for your break; don't put a double shift on

──────────C. Turner - Direct──────────

```
 1   one sheet; and e-mail it.
 2   Q.  And the "they" you are referring to is Steadfast?
 3   A.  Yes.
 4   Q.  And what is your schedule when you work for Steadfast?
 5   A.  As you set it.  It's how you set it.  I take many shifts,
 6   whether it be 7:00 to 3:00, 3:00 to 11:00, anything that's
 7   available.  You're in total control of what you do.
 8   Q.  Have you ever worked more than 40 hours in a workweek?
 9   A.  Absolutely.  From the beginning.
10   Q.  And when you say "absolutely," does that mean you do it
11   frequently?
12   A.  Yes.  I barely like to not to work overtime.  I have an
13   abundance of kids, so I'm going to work overtime.
14   Q.  That's totally understandable.
15           If you're interested in a placement that Steadfast
16   has, how do you find out about that opportunity?
17   A.  Sometimes -- well, now, it's different, because now, you
18   know, they have this little phone app, and communication is
19   much better.  And we can't compare the times because we
20   didn't have this accessibility, but back then, you would call
21   her scheduler.
22   Q.  And would the scheduler provide you information about the
23   shifts?
24   A.  Yes.  People always know -- they deal with 100-and-some
25   people.  So if I'm just working with Betty Boop over here --
```

C. Turner - Direct

1    being facetious -- but if I'm working with her and she's just

2    talking and I hear it and I ask, they never turn us down, but

3    it's not always offered to you if you didn't hear it through

4    the grapevine, so to speak.

5    Q.  So just to confirm what you just said, you would have to

6    ask -- you could ask for a facility, but it wasn't always

7    offered to you to work at that facility?

8    A.  Yes, because it might be a new facility and they're

9    not -- they're trying to get into the swing of things.  They

10   already have solidified facilities that they know you can

11   work.  I might just hear something, or, you know, "Did you

12   know Lisa has dah, dah, dah," or here or there, you know, and

13   then I'll call and "What is the schedule like?"  You know,

14   "What do they need?"  It's to promote yourself.

15   Q.  And you said Steadfast identifies the facilities you're

16   already able to work for.  Is that what you said?

17   A.  (Inaudible response.)

18   Q.  We have to have a verbal response because you are on

19   video.

20   A.  Yes.

21   Q.  And when you get to those facilities that you're working

22   with, do you ever negotiate your pay rate with those

23   facilities?

24   A.  No.  I didn't, huh-uh.

25   Q.  And have you ever communicated with a facility directly

—————————————— C. Turner - Direct ——————————————

 1  to schedule a shift?

 2  A.  Yes.

 3  Q.  In those instance, would you have to let Steadfast know

 4  that you scheduled the shift?

 5  A.  Yes, you do.  Because if not, it would be a whole mix-up.

 6  Q.  If you didn't, what would happen?  Has it ever happened

 7  that you did not --

 8  A.  Sometimes you could be double-booked.  Sometimes the

 9  scheduler at Steadfast or somewhere else found somebody, but

10  you're talking to them, but they already had somebody in

11  place.  So it's like you're overstepping, kind of, so to

12  speak.  You kind of, you know -- (inaudible).

13  Q.  And who compensates you for the services you provide at

14  the various facilities?

15  A.  Lisa.

16  Q.  And so to clarify, do your checks come from Steadfast or

17  your direct deposits come from Steadfast?

18  A.  Yes, ma'am.

19  Q.  You indicated that you work over 40 hours in a workweek.

20  Have you ever complained about not receiving time and a half

21  for hours worked over 40?

22  A.  I have, but not, I guess, to them, just to the girls,

23  mostly the girls, really.  But, you know -- (inaudible).

24  Q.  And when your assignment at the facility ends, does

25  Steadfast provide you a new placement?

─────────────── C. Turner - Direct ───────────────

1   A.  Absolutely.  You are not out of work, unless you mess up

2   your name.  You only have one name in this outfit.  If you

3   mess up your name, that's on you.  The work is there.  If you

4   carry yourself right, work is there.

5           MS. JONES:  I have no further questions for this

6   witness.

7           THE COURT:  Any cross?

8           MS. RUST:  No cross, Your Honor.

9           THE COURT:  May this witness be permanently excused?

10          MS. JONES:  Yes, she may.

11          THE COURT:  Thank you, ma'am.  You may be

12  permanently excused.

13          THE WITNESS:  Thank you, Your Honor.  You have a

14  good one.

15          (Witness excused.)

16          THE COURT:  Okay.  So where are we now, Counsel?

17          MS. LEWIS:  As indicated, one of the six, Mr. White,

18  said that he would leave a shift and come.  So I don't know

19  where he is, and I suspect the Court is not inclined to wait

20  for him today.

21          THE COURT:  Do you have a cell phone number?

22          MS. LEWIS:  We do have a cell phone number for him.

23          THE COURT:  The Court will take a brief recess, and

24  you go call him on the cell phone and find out how far is he

25  from this courthouse.

—————T. White - Direct—————

 1          MS. LEWIS:  Thank you, Your Honor.

 2          THE COURT:  Where was he working, first of all?

 3          MS. LEWIS:  I don't know what facility he said he

 4   was working at.

 5          THE COURT:  Well, find out how far away is he.

 6          MS. LEWIS:  Okay.  Thank you.

 7          THE COURT:  Recess.

 8          (Recess from 3:35 p.m. to 4:25 p.m.)

 9          THE COURT:  Call your next witness.

10          MS. LEWIS:  Thank you, Your Honor.  Tywann White.

11          (Witness sworn.)

12          MS. LEWIS:  Thank you, Your Honor, for the Court's

13   patience today, for allowing this witness to get here this

14   afternoon.

15          TYWANN WHITE, called by the Plaintiff, having been

16   first duly sworn, was examined and testified as follows:

17                        DIRECT EXAMINATION

18   BY MS. LEWIS:

19   Q.  Mr. White, thank you for being committed to providing

20   your testimony.

21          If you could please state your name for the record

22   and spell your first and last name, please.

23   A.  Tywann White, T-y-w-a-n-n, last name is W-h-i-t-e.

24   Q.  Are you familiar with Steadfast Medical?

25   A.  Yes, ma'am.

─────────────────────────T. White - Direct─────────────────────

1    Q.  And how are you familiar with the company?

2    A.  I work with them.

3    Q.  Approximately when did you start working at Steadfast?

4    A.  Roughly, August 2017.

5    Q.  About four or five years ago?

6    A.  Yes, ma'am.

7    Q.  And what type of nurse are you?

8    A.  I'm a certified nursing assistant.

9           THE COURT:  Raise your voice, please.

10          THE WITNESS:  Certified nursing assistant.

11          THE COURT:  That's it.

12   BY MS. LEWIS:

13   Q.  And did you apply to work at the company?

14   A.  Yes, ma'am.

15   Q.  How did you apply?

16   A.  I went in person and applied.

17   Q.  Did you submit a job application?

18   A.  Yes, ma'am.

19   Q.  Did you submit anything else with that application?

20   A.  Yes, ma'am.

21   Q.  What did you have to provide?

22   A.  My CNA certificate, licensing, a drug screen, and that's

23   all I can remember.

24   Q.  Okay.  So you submitted to a drug screen, you said?

25   A.  Yes, ma'am.

—————————————T. White - Direct——————————————

```
 1   Q.   Did you pay for that?

 2   A.   No.

 3   Q.   And a background check?  Did you take a background check?

 4   A.   I cannot answer that question.

 5   Q.   Do you remember if you took a background check?

 6   A.   I do not remember about the background check.

 7   Q.   Were you given the option to be classified as an

 8   independent contractor or an employee?

 9   A.   No.  It was written in the contract.

10   Q.   Okay.  So you signed a contract that specified that you

11   would be one of those two things?

12   A.   Yes, ma'am.

13   Q.   Which one?

14   A.   The independent contractor.  It's in the contract.

15   Q.   Do you know if it's required to be an independent

16   contractor?

17   A.   Not really.

18   Q.   Okay.  When you worked at Steadfast, did you own your own

19   healthcare business?

20   A.   No, ma'am.

21   Q.   Did you advertise your healthcare services in any way to

22   healthcare facilities separate and apart from Steadfast?

23   A.   No, ma'am.

24   Q.   Do you recall what the agreement says that you signed?

25   A.   No, ma'am.
```

———————T. White - Direct———————

1   Q.  Okay.  Did you ever financially invest in Steadfast?

2   A.  No, ma'am.

3   Q.  Do you have an ownership interest in Steadfast?

4   A.  No, ma'am.

5   Q.  Are you an officer, manager, or director of Steadfast?

6   A.  No, ma'am.

7   Q.  Do you own a percentage of Steadfast?

8   A.  No, ma'am.

9   Q.  Were you paid on an hourly or salaried basis?

10  A.  Hourly.

11  Q.  And how much are you paid per hour?

12  A.  25.

13  Q.  Have you always been paid that same rate?

14  A.  No, ma'am.

15  Q.  What were you previously paid?

16  A.  Before COVID, it was 15 an hour.

17  Q.  And did your rate of pay vary?

18  A.  It depends upon different facilities.

19  Q.  Were you able to negotiate a different pay?

20  A.  No, ma'am.

21  Q.  If you tried to negotiate a different pay, what would be

22  Lisa's response to that?

23       MS. RUST:  Objection.  Calls for speculation.

24       THE COURT:  Sustained.

25  BY MS. LEWIS:

─────────────T. White - Direct─────────────

1   Q.  Have you ever tried to negotiate a different rate with

2   Lisa?

3   A.  I asked for 1 or 2 dollars extra, but majority of the

4   time, you cannot, you know, negotiate.

5   Q.  So who set the rate of pay?

6   A.  I would assume it's Lisa Pitts because it's her company.

7   Q.  So does Steadfast make the ultimate decision to set your

8   rate of pay?

9         MS. RUST:  Objection.  Calls for speculation.

10         THE COURT:  Sustained.

11  BY MS. LEWIS:

12  Q.  Are you aware whether the facility sets your rate of pay?

13  A.  No, ma'am.

14  Q.  Who pays you for the services that you provide when

15  placed at facilities?

16  A.  As my pay sheet states, it's Medical Staffing Solutions,

17  and the owner of the company is Lisa Pitts.

18  Q.  Other than your hourly pay rate, did you receive any

19  profits besides the hourly rate that was set by Steadfast?

20  A.  No, ma'am.

21  Q.  Do you know whether the facilities pay Steadfast

22  overtime?

23  A.  I'm aware that Medical Solutions -- what is it? -- MFA, I

24  used to work for them.  I know that they pay Steadfast

25  overtime.

──────────────────────T. White - Direct──────────────────────

1    Q.  If you didn't receive pay from Steadfast, would you be

2    able to meet your financial obligations?

3    A.  Yes, ma'am.

4    Q.  Okay.  You would be -- if you didn't receive a paycheck

5    from Steadfast, you'd be able to meet your bills?

6    A.  No, ma'am.  I mean, I would have other means, but if I

7    didn't -- no.  I'm sorry.

8    Q.  What day of the week -- when are you paid?

9    A.  I use Next Day Pay.

10   Q.  What is Next Day Pay?

11   A.  Next Day Pay is just like a bonus, kind of like incentive

12   to get paid faster.  You submit your time sheet.  They

13   process it one day with the facility, and then you'll have it

14   around 5:30 the next following day.

15   Q.  You said they process it with the facility.  So the

16   facility pays you for Next Day Pay?

17   A.  The facility confirms if I showed up, the times and

18   things of that nature.

19   Q.  Who do they confirm that with?

20   A.  The schedulers.

21   Q.  So the facility confirms the hours that you worked with

22   the schedulers?

23   A.  Yes.

24   Q.  And then who pays you?

25   A.  Steadfast.

──────────────── T. White - Direct ────────────────

 1   Q.  And since you do Next Day Pay, is there a fee associated

 2   with that?

 3   A.  6 percent.

 4   Q.  Do you get a pay stub with Next Day Pay?

 5   A.  No, ma'am.

 6   Q.  Have you ever asked for a pay stub?

 7   A.  Yes, ma'am.

 8   Q.  And what was the response when you asked?

 9   A.  The response that I got was with Next Day Pay, you cannot

10   get a pay stub.  You only can get a proof of income, but my

11   proof of income didn't match my bank statement, so I kind

12   of --

13   Q.  So are you saying that the proof of income that Steadfast

14   provided you was not accurate based upon the compensation

15   Steadfast did a direct deposit to?

16   A.  Yes, ma'am.

17   Q.  Have you worked for other agencies?

18   A.  Yes, ma'am.

19   Q.  And which agencies?

20   A.  Favorite Staffing, Crucial Staffing.

21   Q.  I'm sorry.  What were the names of those agencies?

22   A.  Oh, it's Favorite Staffing, Crucial Staffing, Hamilton

23   Staffing, Essential Medical Staffing.

24   Q.  And did you work as a CNA for those agencies as well?

25   A.  Yes, ma'am.

─────────────── T. White - Direct ───────────────

1   Q.  Are your job duties and responsibilities the same or

2   equivalent at Steadfast as with those other agencies?

3   A.  Yes, ma'am.

4   Q.  Do those agencies pay you time and a half?

5          MS. RUST:  Objection to the line of questioning

6   whether another agency --

7          THE COURT:  I think the Court said the practices of

8   other agencies are not really at issue in this case.  What is

9   at issue here is whether Steadfast has properly refused to

10  pay overtime.  So there's really no need for us to compare,

11  and I mean as to "us," as to the parties.

12         MS. LEWIS:  Your Honor, with respect to this line of

13  questioning, it's in regard to -- well, first of all, it's

14  foundational with respect to the next questions that I intend

15  to ask with respect to his interactions with Steadfast.

16         Within their opening statement, defendants

17  represented that "We're different.  We're not like any of

18  these other agencies.  We are a matchmaking service.  We're

19  not a registry."

20         THE COURT:  Two things:  To the extent they made

21  that representation in their opening statement, that's

22  irrelevant.

23         MS. LEWIS:  I'm sorry?

24         THE COURT:  That's irrelevant whether they're like

25  other agencies.  They made that statement in their opening

—————————————T. White - Direct—————————————

```
 1    statement.  I'm back to what the Court has to find in this
 2    case.
 3              Now, you said it was foundational, so you can
 4    continue into something else that the Court will find
 5    eventually as relevant.
 6              MS. LEWIS:  Okay.  So may he answer that last
 7    question, or I just need to move on?
 8              THE COURT:  Well, to the extent you said they raised
 9    it in opening statement, I said that is irrelevant, whether
10    they are like other agencies or not.  The question is whether
11    they are in compliance with the law.  So I don't think
12    there's any need to be going into that.  So, no.  I sustain
13    the objection.  They raised it, but it's going nowhere.
14              All right.  Next question.
15    BY MS. LEWIS:
16    Q.  Does Steadfast communicate behavior expectations to you?
17    A.  I really can't answer that because I don't recall
18    being --
19    Q.  Let me ask it a different way.
20              Does Steadfast tell you how or give you guidance
21    with respect to how you should conduct yourself?
22    A.  No.  I just know how I should conduct myself in a
23    healthcare setting.
24    Q.  I'm sorry.  I didn't quite understand what you said.
25    What was your response?
```

————————————T. White - Direct————————————

1    A.  I said -- I haven't really spoken with Steadfast.  So I

2    just, you know -- they kind of put you on, and then you

3    really don't hear any more from them, so I just go in and do

4    as I would if I were a regular CNA.

5           So I would say, no, I have not heard anything about

6    behavioral expectations.  There's really no supervision.

7    Q.  Has Steadfast communicated to you their expectations

8    regarding professionalism?

9    A.  No, I haven't spoken with Steadfast.

10   Q.  You haven't spoken to Steadfast at all or ever?

11   A.  In regards to that statement, no.  In regard to

12   professionalism, no.

13   Q.  You worked last night for Steadfast, correct?

14   A.  Yes, ma'am.

15   Q.  So within the past week, you've worked shifts for them?

16   A.  Yes, ma'am.

17   Q.  And you've communicated with the scheduler?

18   A.  Yes, ma'am.

19   Q.  And you've been given -- you've been compensated for that

20   work, correct?

21   A.  No, ma'am.  I mean, are you asking about compensated --

22   Q.  Have you been paid by Steadfast for the work you've

23   performed?

24   A.  Yes, ma'am.

25   Q.  What rate were you paid for the shifts you did this week?

─────────────────────────T. White - Direct─────────────────────────

1   A.   25 flat.

2   Q.   Who scheduled those shifts?

3   A.   I scheduled them through the scheduler or through the DON

4   of the facility.

5   Q.   Did you talk to Lisa this week?

6   A.   No, ma'am.

7   Q.   Last week?

8   A.   No, ma'am.

9   Q.   Last night?

10  A.   No, ma'am.

11           THE COURT:  Have you talked to her about this case

12  at any point?

13           THE WITNESS:  No, ma'am -- no, sir.

14           THE COURT:  Thank you.

15  BY MS. LEWIS:

16  Q.   You indicated a moment ago that -- so who determined the

17  hours that you worked?

18  A.   There's not really, like, a set schedule.  You kind of

19  just get where you can fit in.  So if you can find a shift,

20  you can work that shift.  There's no such schedule.

21  Q.   Are you required to complete time sheets?

22  A.   Yes, ma'am.

23  Q.   And how often are you required to submit time sheets?

24  A.   Every shift, after every shift that you work.

25  Q.   So I understand that you -- you said you sort of get in

────── T. White - Direct ──────

1   where you can, but you need to contact the schedulers to do
2   so; is that right?
3   A.  Yes, ma'am.  They have to confirm your shifts.
4   Q.  And if you have to cancel a shift, do you have to provide
5   notice?
6   A.  You have to provide two hours' notice, or you could be
7   penalized by the facility.
8   Q.  And who do you provide that notice to?
9   A.  It's supposed to be going through the scheduler through
10  Steadfast, and then they communicate it to the facility.
11  Q.  Have you received any back wages from Steadfast for hours
12  you've worked over 40?
13  A.  No, ma'am.
14  Q.  Have you received any other compensation from Steadfast?
15  A.  No, ma'am.
16  Q.  Have you ever complained about not receiving overtime?
17  A.  Yes, ma'am.
18  Q.  And who did you complain to?
19  A.  To payroll.  Her name is Christine.  And they have
20  Next Day Pay payroll too.
21  Q.  Do you ever talk to Lisa?
22  A.  No, ma'am.
23  Q.  What did they say to you when you complained about
24  overtime?
25  A.  They stated, as an independent contractor, you are not

```
 1    eligible for overtime, and that was basically it.
 2              MS. LEWIS:  No further questions for this witness.
 3              THE COURT:  Cross.
 4              MS. RUST:  One moment, Your Honor.
 5              (Pause in the proceedings.)
 6              MS. RUST:  No cross, Your Honor.
 7              THE COURT:  May the witness be permanently excused?
 8              MS. LEWIS:  Yes, Your Honor.
 9              THE COURT:  You may step down, sir.
10              (Witness excused.)
11              THE COURT:  It's the Court's understanding that you
12    have no further witnesses for the day?
13              MS. LEWIS:  That is correct, Your Honor.
14              THE COURT:  Just one thing, just housekeeping notes.
15              You can have a seat there.
16              A couple breaks ago, I ordered you to call the
17    witness.  When I ordered you to call the witness, that's what
18    the Court meant, for you to call the witness, not to
19    reevaluate whether the witness should be called.  And then,
20    eventually, the courtroom deputy called the witness.  But
21    when the Court says to do something, it intends just that.
22              Second thing.  I think you've called 13 witnesses
23    now.  At least 12 of them have been, in my view, testifying
24    about the same thing regarding the procedures and practices
25    of Steadfast.
```

```
 1            Now, that is getting very deep into the cumulative

 2    side.  If you are trying to explain to the Court exactly the

 3    way the business works, the Court has heard it.  So with

 4    respect to going forward, I don't know how many more

 5    witnesses you have, but unless there's something different

 6    about one of these records, the Court doesn't want to hear

 7    any more testimony about the same thing.  That's cumulative.

 8            And so I'm hoping that you have on hold some

 9    witnesses that can shift to something else in this case.  I

10    think that's a better use of the Court's time in here.

11            Any questions?

12            MS. LEWIS:  Excuse me.

13            (Pause in the proceedings.)

14            MS. LEWIS:  Your Honor, may I have a five-minute

15    sidebar just to review the list so I can properly respond?

16            THE COURT:  Sidebar with the Court?

17            MS. LEWIS:  Sidebar with the solicitor.

18            THE COURT:  Sidebars are usually with the Court, but

19    if you want to talk for just a second, go right on.

20            MS. LEWIS:  Thank you.

21            (Pause in the proceedings.)

22            MS. LEWIS:  Thank you, Your Honor.

23            THE COURT:  Okay.

24            MS. LEWIS:  I apologize.

25            THE COURT:  Yes, ma'am.
```

```
 1            MS. LEWIS:  Your Honor, I would like to proffer that
 2    we have --
 3            THE COURT:  Wait a second.  Let me get this
 4    technology to stop goofing around up here.
 5            Okay.  Go on.
 6            MS. LEWIS:  Okay.  Your Honor, the Secretary has
 7    approximately eight additional witnesses that will testify
 8    consistent with the witnesses, the employee witnesses that
 9    the Court has already heard from, but we do want to make sure
10    that with respect to all of the evidence, that the Court has
11    enough information into the record with respect to, as you
12    indicated, the policy and practices.
13            So based upon the Court's information, we just
14    wanted to make sure that it was clear, with respect to the
15    represented testimony, that we've established a pattern.
16            THE COURT:  Here's what I'm representing to you:
17            You can go back, just as the Court can, and review
18    the testimony --
19            You can have a seat, sir.
20            -- and review the testimony of each one of those
21    witnesses in terms of what they got out and what they
22    presented to the Court.
23            Now, if you have another witness who has something
24    to add regarding past practices of the defendant in this
25    case, then you can call that witness.  In other words, I
```

```
 1    don't want to keep calling witnesses that say the same thing.
 2    If there's something additional that you missed, another
 3    witness can address it, then the Court will listen at it.
 4    That's the only thing the Court is saying.
 5              MS. LEWIS:  With that, Your Honor, with respect to
 6    the eight, and certainly we would reserve some for rebuttal.
 7    So...
 8              THE COURT:  All right.  That's fine.  That's fine.
 9              All right, then.  What we're going to do is come
10    back in here tomorrow morning at 10:00 and get started.
11              Now -- yes, ma'am?
12              MS. RUST:  Well, I just want to clarify with respect
13    to the global trial schedule.  If they'll -- if they don't
14    anticipate calling eight witnesses they had scheduled, are
15    they still anticipating going a full five days as originally
16    estimated, just so that we can make sure that our witnesses
17    are ready to go.
18              Our witnesses we instructed that our case would be
19    going on next week based on the representation of their
20    schedule.  So we certainly want to have ours ready to go once
21    they are done.  So if they have a different estimation of
22    their case in chief...
23              THE COURT:  Well, I can say this much, based on the
24    Court's practice, you be prepared to bring some witnesses in
25    case their case ends early.
```

```
 1              MS. RUST:  Of course.

 2              THE COURT:  You have somebody.

 3              Now, I don't know how many more witnesses they do

 4      have or whether those witnesses will take up -- tomorrow is,

 5      what, Thursday?  And potentially Friday, two days.  I don't

 6      know.

 7              Do you have any idea?

 8              MS. LEWIS:  Your Honor, we anticipate with the

 9      remaining witnesses that we'll go till Friday.

10              THE COURT:  They will take till Friday.

11              MS. LEWIS:  They will take till Friday.

12              THE COURT:  With that being the case and with that

13      representation, we will anticipate that if she starts on

14      Friday and she quits at 12:00, we will still start on

15      Monday -- Tuesday.  Okay.  On Tuesday.

16              MS. RUST:  Thank you for that clarification.

17              THE COURT:  We'll recess court until tomorrow

18      morning at 10:00.

19              (Proceedings adjourned at 4:47 p.m.)

20

21

22

23

24

25
```

```
1

2                        CERTIFICATION

3

4        I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7

8           _____/s/_____

9                      Carol L. Naughton

10                     October 4, 2021

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Carol L. Naughton, Official Court Reporter

**JA357**

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
2                     Norfolk Division

3    - - - - - - - - - - - - - - - - - -
                                        )
4    MARTIN J. WALSH, SECRETARY OF      )
     LABOR, UNITED STATES               )
5    DEPARTMENT OF LABOR,               )
                                        )
6          Plaintiff,                   )
                                        )         CIVIL ACTION NO.
7    v.                                 )            2:18cv226
                                        )
8    MEDICAL STAFFING OF AMERICA,       )
     LLC, etc., et al.,                 )
9                                       )
           Defendants.                  )
10   - - - - - - - - - - - - - - - - - -

11

12                 TRANSCRIPT OF PROCEEDINGS

13                 **Bench Trial - Day 3**

14                    Norfolk, Virginia

15                   September 2, 2021

16

BEFORE:  THE HONORABLE RAYMOND A. JACKSON
17          United States District Judge

18

19   APPEARANCES:

20          UNITED STATES DEPARTMENT OF LABOR
            By:  Ryma N. Lewis
21               Chervonti Jones
                 Mohamed E. Seifeldein
22               Counsel for the Plaintiff

23

            PIERCE McCOY, PLLC
24          By:  Joshua L. Jewett
                 Julia A. Rust
25               Counsel for the Defendants

```
 1                       I N D E X

 2   PLAINTIFF'S
     WITNESSES                                      PAGE
 3
       CHANTELLA SMITH
 4          Direct Examination By Ms. Jones          308
            Cross-Examination By Ms. Rust            320
 5          Redirect Examination By Ms. Jones        324
       ANDREA TIRADO
 6          Direct Examination By Ms. Lewis          329
            Cross-Examination By Ms. Rust            345
 7          Redirect Examination By Ms. Lewis        348
       ERICA JOHNSON
 8          Direct Examination By Mr. Seifeldein     360
            Cross-Examination By Mr. Jewett          387
 9          Redirect Examination By Mr. Seifeldein   406
            Recross-Examination By Mr. Jewett        412
10     DAVID RAWLINGS
            Direct Examination By Mr. Seifeldein     414
11          Cross-Examination By Mr. Jewett          434
            Redirect Examination By Mr. Seifeldein   448
12     ROBERTO MELENDEZ
            Direct Examination By Ms. Lewis          449
13          Cross-Examination By Ms. Rust            462
            Redirect Examination By Ms. Lewis        467
14     YAOZU XIONG (Via ZoomGov.com)
            Direct Examination By Ms. Lewis          470
15          Cross-Examination By Ms. Rust            488
            Redirect Examination By Ms. Lewis        501
16

17
                       E X H I B I T S
18
     PLAINTIFF'S
19   NO.                                            PAGE

20     PX-8                                          312
       PX-10                                         387
21     PX-7                                          456
       PX-21                                         461
22     PX-7a                                         479
       PX-22                                         488
23     PX-43                                         503

24

25
```

```
 1              (Proceedings resumed at 10:00 a.m.)

 2          THE COURT:  Good morning, counsel.  We're ready to

 3  get started again.  The United States may call the next

 4  witness.

 5          MS. LEWIS:  Good morning, Your Honor.  Chantella

 6  Smith.

 7          THE COURT:  I appreciate your aspiration if you

 8  think you can get through 16 witnesses today, but we shall

 9  see.

10          MS. LEWIS:  We're just trying to make up and keep

11  this train moving down the track, Your Honor.

12          THE COURT:  Okay.

13          (Witness sworn.)

14          MS. RUST:  Your Honor, I think there's a witness for

15  the plaintiff in the room, and we're just going to move to

16  exclude the witness pending other witness testimony.

17          THE COURT:  Each party is entitled to have a

18  representative in the courtroom, though that party may very

19  well testify.  As I understand it, this individual is a

20  representative for the Secretary.

21          Am I correct?

22          MS. JONES:  Yes, Your Honor.

23          THE COURT:  So a representative for a party under

24  the Rules of Federal Court can stay in the courtroom though

25  that individual is going to testify.
```

```
                            ┌── C. Smith - Direct ──┐
```

 1              MS. RUST:  Okay.  We were unaware of who he was.

 2      I'm sorry.

 3              MS. JONES:  That's Roberto Melendez.  He's a

 4      district director that will be testifying regarding the

 5      back-wage computations.

 6              MS. RUST:  Okay.  Thank you.  We were unaware.

 7              Thank you.

 8              THE COURT:  Okay.

 9              CHANTELLA SMITH, called by the Plaintiff, having

10      been first duly sworn, was examined and testified as follows:

11                      DIRECT EXAMINATION

12      BY MS. JONES:

13      Q.  Ms. Smith, could you please state and spell your name for

14      the record, please.

15      A.  Chantella, C-h-a-n-t-e-l-l-a, last name Smith, S-m-i-t-h.

16      Q.  And are you familiar with Steadfast Medical Staffing?

17      A.  Yes, ma'am.

18      Q.  To your knowledge, what type of services does Steadfast

19      provide?

20      A.  It's a medical staffing company for nurses and CNAs.

21              THE COURT:  Can you speak a little louder.

22              THE WITNESS:  Okay.  It's a medical staffing agency

23      for nurses as well as CNAs.

24      BY MS. JONES:

25      Q.  Were you or are you currently employed by Steadfast?

C. Smith - Direct

```
 1   A.  I was employed.
 2   Q.  When were you employed by Steadfast?
 3   A.  I believe it was September 2016 up until February 2017.
 4   Q.  Why did you stop working for Steadfast?
 5   A.  I wasn't given my paycheck.
 6   Q.  When you're saying you weren't getting your paycheck, are
 7   you saying that you weren't paid for the hours you worked?
 8   A.  Yes.  I wasn't paid for the hours I worked.
 9   Q.  And when you were employed by Steadfast, what was your
10   job title?
11   A.  I was a charge nurse at various facilities.  I assisted
12   with medication administration, reporting to the doctor if
13   there's any change of condition, and supervising the CNAs on
14   the floor.
15   Q.  If you recall, how did you apply to start working with
16   Steadfast?
17   A.  It was online, and I spoke with Lisa.
18   Q.  When you say -- sorry.  I didn't mean to interrupt you.
19   A.  I contacted Lisa Pitts, and I was e-mailed an
20   application.
21   Q.  And do you recall what type of information was requested
22   on that application?
23   A.  I can recall some.
24   Q.  Can you tell us what you can recall?
25   A.  It was a basic employment application.
```

```
                          ┌─── C. Smith - Direct ───┐
```

 1    Q.  So did it ask for things such as work history and

 2    references, if you recall?

 3    A.  Yes, ma'am.

 4    Q.  And were you required to provide any documents in

 5    addition to that application?

 6    A.  Yes, ma'am.  My driver's license, my CPR card, a copy of

 7    my nurse's license, and references.

 8    Q.  And what tax form did you complete, if you can recall?

 9    A.  I don't recall filling out a tax form.  I questioned my

10    earnings for 2016, and I was told that I was an independent

11    contractor and was going to get a 1099.

12    Q.  And do you recall who told you you were an independent

13    contractor?

14    A.  Lisa Pitts.

15    Q.  And do you know what is required to be considered an

16    independent contractor?

17    A.  No, I don't.

18            MS. RUST:  Objection.  Foundation.

19            THE COURT:  First of all, whether she knows or does

20    not know, I'll sustain the objection.  It doesn't make any

21    difference.

22            MS. JONES:  I'll move on, Your Honor.

23            THE COURT:  All right.

24    BY MS. JONES:

25    Q.  You indicated that you spoke with Ms. Pitts.  Was that

—————————C. Smith - Direct—————————

1   before or after you submitted your application?

2   A.  It was before and after.

3   Q.  And after you submitted your application, when you spoke

4   to Ms. Pitts, was it some sort of interview?

5   A.  Not so much of an interview.  She let me know which

6   facilities that she had and which shifts.

7   Q.  And so when you were offered to work for Steadfast, how

8   were you offered the position?

9   A.  Over the phone, I would say.

10  Q.  And do you recall taking a drug test?

11  A.  Yes.

12  Q.  What about a background check?

13  A.  Yes.

14  Q.  Were you paid an hourly rate or a salary basis?

15  A.  Hourly.

16  Q.  How much were you paid per hour?

17  A.  It was $30 an hour.

18  Q.  Did that pay ever vary?

19  A.  It could vary depending on which facility that you went

20  to.

21  Q.  Were you always paid the rate that was told to you?

22  A.  According to my pay stubs, no.  There was some

23  discrepancies in the pay.

24          MS. JONES:  Could you please pull up Exhibit 8.

25  BY MS. JONES:

312

———C. Smith - Direct———

1    Q.  I would like to direct your attention to Exhibit 8, if

2    you could just scroll through.  At the top, starting at

3    Page 1, is this the --

4           MS. RUST:  I'm sorry, Ms. Jones.  Our screen is not

5    working.

6           MS. JONES:  Okay.  Let me know when you're ready.

7           (Pause in the proceedings.)

8    BY MS. JONES:

9    Q.  I would like to direct your attention to what has been

10   identified as Exhibit 8.

11          MS. JONES:  And could you scroll through the

12   document, Ms. Lewis.

13   BY MS. JONES:

14   Q.  Are these the statements that you were referring to?

15   A.  Yes.

16   Q.  Okay.  And have you seen these documents before?

17   A.  Yes, ma'am.

18          MS. JONES:  I would like to move to admit these

19   documents in evidence.

20          THE COURT:  Any objection?

21          MS. RUST:  No objection, Your Honor.

22          THE COURT:  Exhibit 8 will be admitted.

23          (Plaintiff's Exhibit PX-8 received in evidence.)

24          MS. JONES:  Could you please turn to Page 10 of this

25   document, Ms. Lewis.

**JA365**

─────────────C. Smith - Direct─────────────

 1   BY MS. JONES:

 2   Q.  You indicated that the pay rates would be different.

 3   When you say they would be different, would they be higher or

 4   lower than what was represented for that shift?

 5   A.  They're usually higher.

 6   Q.  So is it your position that you agreed to work for $10.68

 7   per hour for a shift?

 8   A.  Never.

 9   Q.  So in this instance, would the pay rate be lower than

10   what you were told it would be?

11   A.  Yes.  It's a lot lower.

12   Q.  Did anyone tell you that it would be lower?

13   A.  No.

14   Q.  And how did you discover that you would be receiving

15   lower pay?

16   A.  I discovered going through my -- going through my pay

17   stubs that I had been paid at the lower rate.

18           THE COURT:  What was that?

19           THE WITNESS:  I discovered it when I went through my

20   pay stubs, that I was being paid at a lower rate.

21   BY MS. JONES:

22   Q.  And did you ask anyone about this lower pay rate?

23   A.  At the time, no, because I had already submitted this to

24   the Department of Labor.

25   Q.  Were you able to negotiate a different rate of pay with

```
                          ┌─── C. Smith - Direct ───┐
   1  │ anyone?
   2  │ A.  If you could negotiate, it would be through Lisa Pitts.
   3  │ Q.  Would you ever negotiate with a facility directly
   4  │ regarding your rate of pay?
   5  │ A.  No.
   6  │ Q.  And so, to your knowledge, who set the rate of pay that
   7  │ you received?
   8  │ A.  It was supposed to be $30 an hour.
   9  │ Q.  Who set that rate for you?
  10  │ A.  Oh, Lisa Pitts.  I'm sorry.
  11  │ Q.  And were you ever able to structure the working
  12  │ relationship with the facilities directly?
  13  │ A.  No.
  14  │ Q.  And who did that for you?
  15  │ A.  Lisa Pitts.
  16  │ Q.  Okay.  And when you worked for Steadfast, were you ever
  17  │ restricted from working with any other agency?
  18  │ A.  We were pretty much told that we were employed by
  19  │ Steadfast, that we needed to work solely through her.
  20  │ Q.  And while working with Steadfast, were you required to
  21  │ maintain any malpractice or liability insurance?
  22  │ A.  No, ma'am.
  23  │ Q.  During the time you worked for Steadfast, did you own
  24  │ your own healthcare agency?
  25  │ A.  Never.
```

─────────────────────── C. Smith - Direct ───────────────────────

1    Q.   And were you required to submit time sheets?

2    A.   Yes.

3    Q.   And who were those time sheets submitted to?

4    A.   Lisa Pitts.

5    Q.   Was the facility in which you were placed required to

6    sign off on those time sheets?

7    A.   Yeah, at the end of the shift.

8    Q.   After that, when would you submit the time sheets to

9    Steadfast?

10   A.   Weekly.  We would submit them weekly.

11   Q.   Do you recall who told you that you were required to

12   submit those time sheets?

13   A.   Lisa Pitts.

14   Q.   And what was your work schedule when you worked with

15   Steadfast?

16   A.   It varied.  It varied.  3:00 to 11:00, 11:00 to 7:00.

17   Q.   Would you ever do double shifts?

18   A.   I would do double shifts every week.  I would work a

19   total of 80-plus hours.

20   Q.   And how was your schedule determined?

21   A.   Lisa Pitts would -- we would talk with Lisa Pitts at the

22   beginning of the week.  She would pretty much tell us what

23   she had opening and what facility that she had available for

24   us to go to.

25   Q.   Okay.  And have you ever turned down a shift that

```
                          ┌─C. Smith - Direct─┐
 1   Steadfast offered to you?
 2   A.  I attempted to turn down a shift because I had a death in
 3   my family.
 4   Q.  And when you say you "attempted to," what do you mean by
 5   that?
 6   A.  When I called Lisa Pitts to call out, she pretty much
 7   told me that she doesn't accept call-outs.  So I had to go
 8   into the shift.
 9   Q.  And you indicated that you worked, in some instances, 80
10   hours a week.  So based upon that, would you say that you
11   worked more than 40 hours in a workweek?
12   A.  Yes, ma'am.
13   Q.  When you worked those hours over 40 in a workweek, how
14   were you paid?
15   A.  I was told by Lisa Pitts that we were independent
16   contractors and it was straight pay, that she didn't have to
17   pay time and a half.
18   Q.  So you received straight pay for the overtime hours
19   worked?
20   A.  Yes.
21   Q.  Were you required to provide notice to Steadfast if you
22   were unavailable to work?
23   A.  Yeah.  If you had an issue, yeah, you were supposed to
24   report to her.
25   Q.  When you say "report to her," who do you mean by "her"?
```

─────────────── C. Smith - Direct ───────────────

 1    A.   Lisa Pitts.

 2    Q.   And if you were ever running late for your shift, did you

 3    have to contact anyone?

 4    A.   We would contact Lisa Pitts at Steadfast.

 5    Q.   If you ever had a scheduling conflict, did Steadfast

 6    allow you to send another nurse in your place?

 7    A.   No, ma'am.

 8    Q.   To your knowledge, who was responsible for that?

 9    A.   Lisa Pitts.

10    Q.   Were you ever allowed to assign your shifts to different

11    LPNs?

12    A.   No.

13    Q.   Other than your hourly rate that you received from

14    Steadfast, did you receive any profits?

15    A.   No.

16    Q.   If you were interested in a placement Steadfast had

17    available, how would you find out about that opportunity?

18    A.   Can you repeat that?

19    Q.   Absolutely.

20         If you were interested in a placement that Steadfast

21    had, how would you find out more about that opportunity?

22    A.   You would contact Lisa Pitts.

23    Q.   So after you would go to the facility that you were

24    assigned to work for, would you have an interview with that

25    facility, or would you just begin working?

```
                          ┌──────── C. Smith - Direct ────────┐

 1    A.   No.  You would just begin working.

 2    Q.   And did you ever communicate directly with the facility

 3    to establish your shifts?

 4    A.   No.

 5    Q.   And who paid you for the services you provided to the

 6    facilities?

 7    A.   Lisa Pitts at Steadfast.

 8    Q.   If you did not receive your pay from Steadfast, would

 9    your ability to meet your financial obligations be

10    compromised?

11    A.   Yes.

12    Q.   Do you have any ownership interest in Steadfast?

13    A.   No.

14    Q.   As an LPN, what type of equipment or supplies do you use

15    to complete your tasks at the facilities in which you are

16    placed?

17    A.   We use basic medical supplies; thermometers, blood

18    pressure cuffs, stethoscopes, et cetera.

19    Q.   And would those be considered general tools of the trade

20    of an LPN?

21    A.   Yes, ma'am.

22    Q.   And other than those tools, were you required to purchase

23    any additional equipment to complete the tasks at the various

24    facilities in which Steadfast placed you?

25    A.   Just your uniform.
```

──────────────── C. Smith - Direct ────────────────

1          THE COURT:  What was that?

2          THE WITNESS:  Your uniforms.

3   BY MS. JONES:

4   Q.  But nothing outside your uniforms?

5   A.  No.

6   Q.  And are you required to hold a license to practice as an

7   LPN?

8   A.  Yes.

9   Q.  Is that license required regardless of what facility you

10  work at?

11  A.  Yes.

12  Q.  And as an LPN, what type of care do you generally provide

13  to patients?

14  A.  We provide direct care.  We do assessments.  As I stated

15  previously, we administer medication.  We respond to

16  emergencies and report any findings to the doctor.

17  Q.  And are those the same tasks that you provided to the

18  facilities when you were working with Steadfast?

19  A.  Yes.

20  Q.  When you were working at the various facilities when

21  working with Steadfast, were you required to wear a badge?

22  A.  Yes.

23  Q.  And what badge was on -- what name was on that badge?

24  A.  Steadfast Medical Staffing.

25  Q.  Do you know why you were required to wear that badge?

———C. Smith - Cross———

 1 | A.  Because we were employed by Steadfast and not the
 2 | facility.
 3 |         MS. JONES:  I have no further questions for this
 4 | witness.
 5 |         THE COURT:  Cross-examination.
 6 |                     CROSS-EXAMINATION
 7 | BY MS. RUST:
 8 | Q.  Good morning, Ms. Smith.
 9 | A.  Good morning.  How are you?
10 | Q.  Good.  Thank you.  My name is Julia Rust.  I'm an
11 | attorney for the defendants.  I have a few questions about
12 | your testimony.
13 | A.  Okay.
14 | Q.  You said that at the beginning of the week, you would
15 | call Steadfast about shifts, and they would tell you what's
16 | available, right?
17 | A.  Yes.
18 | Q.  And that's how you would decide which shifts to pick up,
19 | based on the availability that they told you, right?
20 | A.  Yes.
21 | Q.  And if you did not call at the beginning of the week or
22 | at any point during the week, then you were not assigned or
23 | picked up any additional shifts, correct?
24 | A.  If I didn't call?  She would call us.
25 | Q.  And they might tell you what was available?

```
 1    A.  Yes.
 2    Q.  Okay.  You have never seen Lisa Pitts or any of the other
 3    office employees from Steadfast on site while you were
 4    providing nursing services.  Is that true?
 5    A.  On site?
 6    Q.  Yes.
 7    A.  No.  I've seen other nurses employed by her.  I've never
 8    seen Lisa Pitts on site.
 9    Q.  So you never -- Lisa Pitts has never supervised you while
10    you provided any of the services you described before.  You
11    said reporting changes in conditions to the doctor.
12    A.  Uh-huh.
13    Q.  No one from Steadfast has ever told you how to report
14    those changes; is that right?
15    A.  Those are things that you would communicate with the --
16    that's what the job entails.  I'm not sure what you're asking
17    me.  Can you elaborate?
18    Q.  Yes.
19         You said that as part of the responsibilities when
20    you're providing your nursing services, one of the things you
21    do is report changes and conditions to the doctor; is that
22    right?
23    A.  Yes.
24    Q.  Has Lisa Pitts ever told you how to report changes to the
25    doctor?
```

```
                              ┌──C. Smith - Cross──┐
 1    A.  No.
 2    Q.  Has Christine Kim ever told you how to report changes to
 3    the doctor?
 4    A.  No.
 5    Q.  Has Lisa Pitts or Christine Kim or anybody else from the
 6    front office at Steadfast told you how to pass medication?
 7    A.  No.
 8    Q.  Okay.  You said you stopped working in February 2017; is
 9    that right?
10    A.  Correct.
11    Q.  Because you did not get paid?
12    A.  Yes.
13    Q.  And is that because the facility did not sign off on the
14    time sheets for that pay period?
15    A.  No.
16              MS. JONES:  Objection.
17              THE WITNESS:  No.
18              THE COURT:  What is the objection?
19              MS. JONES:  Speculation, Your Honor.
20              MS. RUST:  Well, she testified that --
21              THE COURT:  Simply rephrase the question.  "Did you
22    know the reason why you were not paid?"
23              MS. RUST:  Of course.
24              THE COURT:  That's the question that you ask her.
25    BY MS. RUST:
```

———C. Smith - Cross———

1   Q.  Do you know why you were not paid for that week?

2   A.  Yes.

3   Q.  And was it because the facility rep did not sign your

4   time sheet, to the extent that you know?

5            MS. JONES:  Objection.

6            THE COURT:  Objection overruled.  She can use

7   leading questions on cross-examination.

8   BY MS. RUST:

9   Q.  Did the facility rep sign off on the time sheets for the

10  weeks that you did not get paid?

11  A.  Yes.

12  Q.  And were those timely submitted to Steadfast?

13  A.  Yes.

14  Q.  And for the weeks that you did not get paid, is that

15  because you -- the facility you were working at reported that

16  you showed up to work drunk and left --

17            MS. JONES:  Objection, Your Honor.

18            THE COURT:  What is the objection?

19            MS. JONES:  Calls for speculation, Your Honor, and

20  hearsay.

21            THE COURT:  The Court will sustain that because I

22  told you you need to ask her "Do you know the reason you were

23  not paid?"

24  BY MS. RUST:

25  Q.  Did you show up to work drunk for a shift that you

———————C. Smith - Redirect———————

1   scheduled through Steadfast at any point?

2   A.   No.  I don't drink.

3   Q.   And a facility has never asked -- or a facility has never

4   told you not to come back because you had showed up to work

5   drunk?

6   A.   No.

7   Q.   And you've never had any performance complaints by a

8   facility for showing up to work in an incapacitated state?

9   A.   I got a complaint from Lisa Pitts.  I was told that a

10  resident complained that she didn't get some medication and

11  that I needed to take a drug test within two hours.  I took a

12  drug test within 30 minutes, and the drug test was negative.

13  So I was cleared, and I was available to go back to work per

14  Lisa Pitts.

15          THE COURT:  This line of inquiry started off about

16  why she was not paid.  That's what it started off on.  I'll

17  leave it to you.  Continue.

18          MS. RUST:  I have no further questions.  Thank you,

19  Ms. Smith.

20          THE COURT:  Any redirect?

21          MS. JONES:  Briefly, Your Honor.

22                      REDIRECT EXAMINATION

23  BY MS. JONES:

24  Q.   Ms. Smith, I just have a few follow-up questions.

25          You stated that Lisa Pitts contacted you regarding

```
                          ┌─C. Smith - Redirect─┐
```

 1   an incident at a facility.

 2   A.   Yes.

 3   Q.   And is it your testimony that, based upon that, she

 4   disciplined you in some capacity?

 5   A.   Can you repeat that?

 6   Q.   Based upon that call from Ms. Pitts, is it your testimony

 7   that she disciplined you --

 8            MS. RUST:  Objection.  Leading.

 9            THE COURT:  Sustained.

10   BY MS. JONES:

11   Q.   What happened when Ms. Pitts contacted you?

12   A.   Ms. Pitts contacted me when I was headed to the facility,

13   and she stated that there was a discrepancy in medication and

14   that I needed to go take a drug test.  And I went and took

15   the drug test.  I made a U-turn.  I took the drug test within

16   30 minutes of her asking for it, and it was negative.

17   Q.   And she contacted you based upon something that was

18   reported to her from the facility, if you know?

19   A.   That's what she said, yes.

20            MS. JONES:  I have no further questions, Your Honor.

21            THE COURT:  Thank you.  May the witness be

22   permanently excused?

23            MS. JONES:  Yes, Your Honor.

24            THE COURT:  The question the Court has is did the

25   Court learn anything from this witness that it has not

```
 1   learned through the past ten witnesses?  If not, we're being
 2   cumulative and repetitive.
 3          MS. LEWIS:  Your Honor, we would like to put on
 4   evidence for one additional and then provide an offer of
 5   proof with respect to the remaining employee witnesses.
 6          THE COURT:  All right.
 7          MS. LEWIS:  Thank you.
 8          Andrea Tirado.
 9          THE COURT:  Well, if you want to make an offer of
10   proof, that would be for appellate purposes.  Is that what
11   you're doing?
12          MS. LEWIS:  That is correct, Your Honor.
13          THE COURT:  So you want to make an offer of proof
14   for cumulative evidence.  Is that it?  If it's an offer of
15   proof that the witnesses would say the same things that these
16   witnesses have said, that's an offer of proof for cumulative
17   evidence, and the Court clearly has control over cumulative
18   evidence.
19          MS. LEWIS:  Okay.  Understood, Your Honor.
20   Nonetheless, after this additional witness, based upon the
21   Court's indication that it's heard enough of these employee
22   witnesses' testimony in the plaintiff's case in chief and the
23   Secretary's need to address the concerns regarding cumulative
24   testimony, the Secretary would like to offer proof regarding
25   the testimony of the additional six employee witnesses.
```

     1          THE COURT:  Six employee witnesses on the same

     2     issue?

     3          MS. LEWIS:  Six employee witnesses who have

     4     different information with respect to their experience in

     5     terms of representative testimony of approximately 1,100

     6     scheduling employees who have been identified.  So the

     7     Secretary is seeking to preserve the record in the event that

     8     this matter is --

     9          THE COURT:  The Court said to the Secretary

    10     yesterday in clear English, if you had a witness to provide

    11     information different from what you've already provided, you

    12     could do that.  If that is what you're saying, there's no

    13     need to make an offer of proof.  You can call the witness.

    14          The only thing the Court was putting a limit on was

    15     having witnesses after witnesses say the same thing.  If

    16     there is something different you want to put into the record,

    17     you call the witness.

    18          MS. LEWIS:  Your Honor, I understand the Court's

    19     position with respect to the clarification of what it is that

    20     the Court would like to -- it's not inclined to hear from,

    21     but in the interest again, Your Honor, of preserving the

    22     record, we would like to make it on the record.

    23          THE COURT:  Well, in the interest of preserving the

    24     record, if it's the same thing the Court has heard the last

    25     day and a half, denied.  You can appeal it if you don't

```
1    prevail, but the Court is just telling you that that is an

2    unusual thing that you're trying to do.

3              MS. LEWIS:  So the Court is denying the Secretary

4    from putting an offer of proof on the record?  I want to be

5    very clear.

6              THE COURT:  For cumulative evidence.

7              MS. LEWIS:  Okay.  Understood.

8              THE COURT:  For cumulative evidence.  That's the

9    Court's ruling.  If it's cumulative, the same things the

10   Court has heard from the last 11 or 12 witnesses, the Court

11   is denying it.  You can put that in writing, your proffer,

12   and file it in the record.

13             MS. LEWIS:  I want to make sure I'm clear, Your

14   Honor.  So the Court is instructing us to file, if we would

15   like to have an offer of proof, file it with the Court via

16   ECF.  You don't want to hear it.

17             THE COURT:  Simply that.

18             MS. LEWIS:  Okay.

19             THE COURT:  Now, if the Court finds anything in that

20   proffer that is different from what these other witnesses

21   said, then you have a problem, because the Court told you if

22   it's different, you call the witness.

23             MS. LEWIS:  Understood.

24             THE COURT:  All right.  Bring the witness in here.

25             (Witness sworn.)
```

A. Tirado - Direct

```
 1          ANDREA TIRADO, called by the Plaintiff, having been

 2    first duly sworn, was examined and testified as follows:

 3                        DIRECT EXAMINATION

 4    BY MS. LEWIS:

 5    Q.  Good morning.

 6    A.  Good morning.

 7    Q.  May you please state your first and last name for the

 8    record, spelling your last name, please.

 9    A.  Sure.  Andrea Tirado, T-i-r-a-d-o.

10    Q.  Are you familiar with Steadfast Medical Staffing?

11    A.  Yes.

12    Q.  What type of services does Steadfast Medical Staffing

13    provide?

14    A.  LPN, CNA staffing for buildings.

15    Q.  And were you employed by Steadfast?

16    A.  Yes.

17    Q.  When was that?  When did you start working for Steadfast?

18    A.  2016, June.

19    Q.  You have to leave your mask on up there in the well.

20          And what was your job title?

21    A.  LPN.

22    Q.  Did you apply to work for the company?

23    A.  Yes.

24    Q.  And how did you apply?

25    A.  Went to the office, filled out paperwork, gave a copy of
```

330

```
                          A. Tirado - Direct
 1   my BLS, and went to work.
 2   Q.  When you say you filled out paperwork, did that paperwork
 3   include an application?
 4   A.  Yes.
 5   Q.  Did you have to provide references in support of that
 6   application?
 7   A.  It was part of it, but I don't think they were called.
 8   Q.  Who hired you to work for Steadfast?
 9   A.  Lisa.
10   Q.  And were you paid on an hourly or salary basis?
11   A.  Hourly.
12   Q.  How much were you paid per hour?
13   A.  It depended on the facility.
14   Q.  What was the range?
15   A.  40 to 50 sometimes, or 30 to 50.  It just depends.
16   Q.  Do you know why that rate of pay varied?
17   A.  No.  It's just whatever, you know, she told us the
18   building was.
19   Q.  Were you able to negotiate a different pay rate?
20   A.  No.
21   Q.  Did you have any say-so with respect to what rate of pay
22   you would receive when you worked at the facilities that you
23   provided LPN care?
24   A.  No.
25   Q.  So who made the ultimate decision to effectively set your
```

**JA383**

———————A. Tirado - Direct———————

 1  rate of pay?

 2          MS. RUST:  Objection.  Calls for speculation.

 3  BY MS. LEWIS:

 4  Q.  Do you know who made the ultimate decision as to who set

 5  your rate of pay?

 6  A.  Whatever the agency said, whatever Lisa...

 7  Q.  Were you given the option to be classified as an

 8  independent contractor or an employee?

 9  A.  No.  I mean, we were just employees, told we were

10  contractors.

11  Q.  After you were hired, did you enter into any contracts

12  detailing the relationship between you and Steadfast?

13  A.  No.

14  Q.  Do you recall receiving an agreement that specified the

15  relationship between you and Steadfast?

16  A.  It did say that, you know, I was a contractor.  It did

17  say that.

18  Q.  Okay.  Do you recall how long that agreement was?

19  A.  I only filled it out one time, and that was in the

20  beginning.

21  Q.  Let me clarify.

22          How many pages was that agreement?

23  A.  One page.

24  Q.  Did it specify the rate you would be paid for the service

25  of providing LPN care?

```
                              ┌─A. Tirado - Direct─┐
```

 1   A.  No.

 2   Q.  Was there anything in the contract that said whether you

 3   had to provide notice if you no longer wanted to work for

 4   Steadfast?

 5   A.  No.

 6   Q.  Did anyone tell you whether or not you would have to

 7   provide notice?

 8   A.  No.  Not at -- that didn't happen until I actually went

 9   with a building and became a permanent employee, and then

10   that's when that issue came up.

11   Q.  Okay.  Let's take a step back.

12          Can you tell me about that incident?

13   A.  So I was working at Charlottesville Health & Rehab.  I

14   had been there for, like, six months or something.  And I was

15   there every day, really, and they had a unit manager position

16   open.  So they asked me to apply because I was there all the

17   time anyway.

18          And I went to Lisa, and I said, "Hey, you know, they

19   want this to happen," and she said that there was a -- I had

20   to give a 60-day notice -- I had to give her a 60-day notice

21   and that she contacted the building, because I had already

22   gotten approved and had gotten the position.

23          And then they told me that they couldn't hire me

24   because I had to work for Lisa an additional 60 days, plus

25   they had to pay, like, a -- kind of like a finder's fee, I

1    guess is what it's called, and that was like $4,000 or

2    something like that.

3           And I was like, "Well, that's weird because, like, I

4    can quit and go anywhere and do something else," but they

5    were like, "Well, this is what she's saying, so you're going

6    to have to give her this time."  So I still stayed in the

7    building, worked those 60 hours, or whatever, and then, you

8    know, became a unit manager of their building.

9    Q.  So do you currently work for Steadfast Medical?

10   A.  I do.

11   Q.  And had you stopped working there for a period of time?

12   A.  Yes.

13   Q.  And when was that?

14   A.  Let's see.  Last year from October all the way to June of

15   this year.

16   Q.  Okay.  Were you still working in your capacity as an LPN

17   somewhere else?

18   A.  Yes.  With First Choice.

19   Q.  Were you providing the same type of services?

20   A.  Yes.

21   Q.  Did there come a time that you then came back to start

22   working at Steadfast?

23   A.  Yes.  After my contract with First Choice was over.

24   Q.  When was that, approximately?

25   A.  June the 1st.

A. Tirado - Direct

1   Q.  Were you required to complete time sheets?

2   A.  Yes.

3   Q.  Were you required to submit time sheets to Steadfast?

4   A.  Yes.

5   Q.  How often are you required to submit time sheets?

6   A.  It's supposed to be after every shift.

7   Q.  Who told you you were required to submit time sheets?

8   A.  The company.

9   Q.  Which company?

10  A.  Oh, sorry.  Steadfast.

11  Q.  Did you have any issues with your pay?

12  A.  Yes.

13  Q.  What were those issues?

14  A.  Sometimes it was, you know, they would take out 30

15  minutes for lunch that we didn't actually -- that I didn't

16  actually have.

17        In the last couple weeks, it's been -- I worked

18  COVID, you know, worked a COVID building and didn't get COVID

19  pay and then had to go back and, like, put everything in an

20  e-mail to let them know that these are the hours, this is

21  what this is, this is COVID, you know, and then after like a

22  week or so, you know, they put the money back in.

23  Q.  Okay.  Did you have any issues -- have you ever not been

24  paid for hours that you've worked?

25  A.  Yes.

1    Q.  And can you tell me about those instances or instance?

2    A.  It was the end of 2016.  Lisa and I had gotten into, you

3    know, an issue.  I was having an issue with my son at the

4    time, and she wanted me to go work.  I couldn't work because

5    there were too many other things going on, and she just kind

6    of, like, held my paycheck for a while.

7            The next time it happened I was in Canada on

8    vacation, and I was supposed to get a $3,000 check, and I

9    got, like, 250 or $300 put in my check instead.  And when I

10   called, she was like, "Well, you've got to talk to payroll."

11           And when I talked to payroll, they were like, "Well,

12   you've got to talk to Lisa."  And so we went back and forth,

13   back and forth.  And they were like, "Bottom line, you're

14   just not going to get paid.  You just have to wait."

15           So I was in a whole 'nother country, you know,

16   didn't have what I needed, and I didn't get paid until that

17   following Friday.

18   Q.  After that instance, did you have any issues with respect

19   to getting further assignments or shifts with Steadfast?

20   A.  There were a couple other times where, you know, I was on

21   vacation -- because Lisa would send me in to fix situations,

22   you know, where she had too many people that, like, didn't

23   show up, or, you know, they left a bad taste in their mouth,

24   or whatever, so I was like a fixer.  So I would go in and

25   make sure everything was, you know, nice, deal with the

—————A. Tirado - Direct—————

1    scheduler, do all of my own scheduling.

2          I went on vacation.  So the scheduler was aware and

3    Lisa was aware, and I guess she couldn't find anyone to fill

4    my shifts when I was gone.  So when I came back, I said,

5    "Hey, don't forget I'm ready to start Monday," or whatever,

6    and they were like, "No, she canceled your shifts, like you

7    can't work in the building anymore."

8    Q.  So were you required to provide notice to Steadfast if

9    you were unavailable to work?

10   A.  No.  We were just supposed to let them know.  There

11   wasn't anything in writing that said she needed two weeks or

12   a month or anything like that.  We're per diem.  So we really

13   just show up.  It's not, you know -- we're only supposed to

14   give them a four-hour window of whether or not we're going to

15   show up or not.

16   Q.  When you say "per diem," what does that mean within the

17   nursing healthcare industry?

18   A.  So "per diem" means that you're only there for, like,

19   that particular day.  Right?  So you have per diem, and you

20   have contractor, and then you have, you know, regular

21   employees who work, you know, hourly or salary.

22          Per diem employees pick the days that they want to

23   work.  So, you know, I'll say, okay, I'm just going to work

24   Monday, Tuesday, and Friday, right, 7A to 7P.  That doesn't

25   mean that they necessarily have, you know, shifts that are

―――――――――――――A. Tirado - Direct―――――――――――――

1   open.  That's just what I'm saying my availability is.  And

2   they don't have to guarantee that I can get those days.

3   Q.  So per diem is a daily basis, not a guaranteed schedule,

4   essentially?

5   A.  Right.  Correct.

6   Q.  But in the past when you have been unavailable to work,

7   have you given notice to Steadfast?

8   A.  Yes.

9   Q.  And how do you go about doing that?

10  A.  Just calling Lisa, texting Lisa.

11  Q.  What is the longest amount of time that you've given them

12  notice with respect to being unavailable for per diem work?

13  A.  I've given them, like, a month.  If I'm going on

14  vacation, I know ahead of time, and I give them something.

15  Q.  When you gave them a month's notice, was that the

16  incident that you referred to that your subsequent shifts got

17  canceled?

18  A.  Yes.  Because at that particular time in that building, I

19  was doing all my own scheduling.  Lisa wasn't doing any

20  scheduling at all.  So I was with the building, and I was

21  dealing with the building.  So during that week, she couldn't

22  find anybody to fill my shifts.  So it was a deal when I came

23  back.

24  Q.  So with respect to the month scheduling, you said you

25  were doing it with the facilities, but did you have to relay

A. Tirado - Direct

 1   that to Steadfast in terms of the scheduling?

 2   A.   They would send an e-mail to her to let her know.

 3   Q.   Okay.  So even though -- since you were there long term,

 4   you still needed to communicate with Steadfast with respect

 5   to the schedules that --

 6   A.   Yes.  They were paying us, ultimately, and I still had to

 7   turn in a timecard to them.

 8   Q.   So to get back onto the schedule, within Lisa's good

 9   graces, what did you have to do?

10   A.   It really just depended.  Sometimes she would be in a

11   bind, and she would be like, "Okay, I'm going to help you out

12   this time," whatever, and then she would send you somewhere

13   you didn't want to go, you know, an hour or two hours away,

14   or whatever.  You would do that for a while, and then she

15   would let you come back.

16   Q.   Did she ever make you have to apologize to get back in on

17   the schedule?

18   A.   Once or twice.  You know, she was like, "You put me in a

19   bind.  You really should make it right."  That's what that

20   scheduler had said.

21   Q.   Have you ever turned down a shift Steadfast has offered

22   you?

23   A.   Yes.

24   Q.   If you could verbalize your answer.

25   A.   Yes.

─────────────────A. Tirado - Direct─────────────────

1    Q.  The court reporter can take down everything but not body
2    movements.
3    A.  Yes.
4    Q.  And did Steadfast do anything in response when you turned
5    down shifts?
6    A.  You could get calls from, like, four other people.  Like,
7    Lisa would call, you know, or other people in the office
8    would call, or you would get text messages, you know, "Could
9    you come," "Could you come," "Could you come," "Could you
10   please do this," "Could you please do that," whatever.
11   Q.  If you had a scheduling conflict, did Steadfast allow you
12   to send another LPN in your place?
13   A.  No.
14   Q.  And why not?
15   A.  Because you were the one who signed up for the shift.
16   Q.  Were you allowed to employ another LPN to complete a
17   shift that Steadfast paid you for?
18   A.  No.
19   Q.  And why not?
20   A.  Because that's just not how it works.  I mean, when we
21   sign up for a shift, our name is on the schedule, so we are
22   the one who is supposed to show up.
23   Q.  So, ultimately, whose responsibility is it to fill that
24   shift?
25   A.  Yeah, it's my responsibility to fill the shift.

─────────────A. Tirado - Direct─────────────

1   Q.  But if you're unavailable since --

2   A.  Then what would happen is that --

3            MS. RUST:  Objection to the extent it calls for

4   speculation.

5            THE WITNESS:  Then --

6            THE COURT:  Hold on a second.

7            The objection is overruled.  If she knows how it

8   works, she can testify to it.

9   BY MS. LEWIS:

10  Q.  Do you know how that works?

11  A.  Yes.  So what happens is, is that let's say -- like

12  today, for instance, right, so I'm here in court today, and I

13  was supposed to be --

14           MS. LEWIS:  I'm sorry, Your Honor.  If we could hold

15  for just a moment.  This is an employee witness.  I want to

16  make sure that he's not...

17           THE COURT:  In the courtroom.

18           Okay.  You may continue.

19           THE WITNESS:  So like today, I was supposed to be in

20  Lexington.  Right?  So I contacted Lexington after I got the

21  e-mail and everything about, you know, I needed to come to

22  court, so I contacted Lexington to let them know, "Hey, FYI,

23  I can't make this shift."

24           And they are like, "Well, why?"

25           "I have to be in court."  I'm like, "If you guys

────────── A. Tirado - Direct ──────────

1   need proof, I can send it."

2          And they're like, "Well, do you know anybody who can

3   fill the shift?"

4          "I don't."

5          They are like, "Okay."  So they said they would

6   contact Steadfast.

7   BY MS. LEWIS:

8   Q.  To be clear, Steadfast scheduled you for a shift today?

9   A.  Yeah.  So they have an app now where you go in and you

10  can claim a shift, and then the facility will say "yea" or

11  "nay" to whether or not they have the need, don't have the

12  need.  And then the people in the office will put you down

13  as, you know, you being in that building.

14  Q.  Were you scheduled for a shift yesterday as well through

15  Steadfast?

16  A.  All week, yeah.  I was scheduled all week, two different

17  buildings.

18  Q.  Were you allowed to have other LPNs assist you in the

19  performance of the services -- strike that.

20          If Steadfast offered you a shift but you could only

21  cover part of it, would Steadfast let you work only part of

22  that shift?

23  A.  No.  I was never offered half shifts like that.

24  Q.  What rate were you paid for hours worked over 40 in a

25  workweek?

─────────────A. Tirado - Direct─────────────

```
 1    A.   The same hourly wage.
 2    Q.   Did you ever receive time and a half for overtime, for
 3    hours you worked over 40 in a workweek?
 4    A.   No.
 5    Q.   Did you have a supervisor at Steadfast?
 6    A.   Lisa.
 7    Q.   As your supervisor, would Lisa retaliate against you if
 8    you did not comply with her scheduling and/or behavior
 9    expectations --
10            MS. RUST:  Objection.
11            MS. LEWIS:  If I could finish my question, please.
12            THE COURT:  Let her finish it, then you object
13    before she answers.  Then the Court knows what the basis of
14    the objection is.
15            MS. RUST:  Of course.
16    BY MS. LEWIS:
17    Q.   As your supervisor, would Lisa retaliate against you if
18    you did not comply with her scheduling and/or behavior
19    expectations?
20            MS. RUST:  Objection.  Leading the witness.
21            THE COURT:  Overruled.
22            THE WITNESS:  So it would just depend.  Initially,
23    like, for instance, there was a time where my daughter had a
24    whole lot of anxiety.  I was scheduled for a bunch of shifts.
25    I was like, "I can't do it, you know, my kid has just too
```

┌─────────────────────── A. Tirado - Direct ───────────────────────┐

 1    many things going on," and then the same scheduler in the

 2    building would call me and tell me "I have all these open

 3    shifts," but then Lisa would tell me there wasn't anything.

 4    So, yes.

 5    BY MS. LEWIS:

 6    Q.  The time period that you had left Steadfast last year,

 7    did you have things going on personally with respect to

 8    caring for your children?

 9    A.  Yes.

10    Q.  And did that influence your decision to take time off

11    from picking up shifts from Steadfast, based upon your

12    previous experience with them in terms of scheduling?

13    A.  I needed something more stable.  So I decided on contract

14    instead of per diem.

15    Q.  Would you negotiate your rates with the facilities?

16    A.  No.

17    Q.  Who would?

18    A.  Lisa.

19    Q.  Do you know how the rate was established with the

20    facilities?

21    A.  Not how it was established, no.  I just know, because I

22    was a regular employee and then -- because I was an agency

23    employee and then a regular employee, that, you know,

24    overtime and all that kind of thing was being paid.  I just

25    know that just from business, you know, meetings and whatnot

└──────────────────────────────────────────────────────────────────┘

A. Tirado - Direct

 1   that I had to go to.

 2   Q.  Did you ever financially invest in Steadfast?

 3   A.  No.

 4   Q.  Do you have an ownership interest in Steadfast?

 5   A.  No.

 6   Q.  Are you an officer, manager, or director of the business?

 7   A.  No.

 8   Q.  Do you own a percentage of Steadfast?

 9   A.  No.

10   Q.  Have you received any back wages from Steadfast for the

11   hours that you worked over 40?

12   A.  No.

13   Q.  And on average, how many hours did you work each

14   workweek?  You can give a range, not an hour.

15   A.  It would really just depend.  Sometimes it could be 40,

16   sometimes it could be 90, it just really depends.  Sometimes

17   it was six 16s.  It just depended on, you know --

18   Q.  So that would be six times 16 hours a week?

19   A.  Yes.

20   Q.  And do you receive overtime from Steadfast now?

21   A.  No.

22   Q.  Had you ever complained to Steadfast about not receiving

23   overtime?

24   A.  We've had a conversation about it a couple of times, and

25   she just said that we were independent contractors, and

```
                          ┌──────── A. Tirado - Cross ────────┐
 1    that's just what it was.

 2            MS. LEWIS:  No further questions for this witness,

 3    Your Honor.

 4            THE COURT:  Cross.

 5                        CROSS-EXAMINATION

 6    BY MS. RUST:

 7    Q.  Hi, Ms. Tirado.  My name is Julia Rust.  I'm an attorney

 8    for the defendants.  I just have a couple of questions for

 9    you.

10            You talked about some of your schedule with the

11    facility.  To the extent you know, are you aware whether

12    facilities will ask certain nurses not to come back?

13    A.  Yes.

14    Q.  And do the facilities cancel shifts sometimes for their

15    temporary staffing?

16    A.  Yes.

17    Q.  And when you -- you said you were doing all your own

18    scheduling with the facility when -- I think you said when

19    you were on vacation.

20    A.  When I went, it was scheduled in my schedule that I was

21    going on vacation.

22    Q.  So you had picked up the shifts --

23    A.  No.

24    Q.  -- and then you --

25    A.  So --
```

─────────── A. Tirado - Cross ───────────

1   Q.  -- went on vacation?

2   A.  So it's a 30-day calendar, right?  So I would put in the

3   days that I was working and then let them know that from the

4   7th to the 14th, I was unavailable, and then these were my

5   other days.  So then they would say, "Okay, no problem.  I

6   know you can work these days, not these days.  This week you

7   will be off.  I'll have Lisa send somebody over."

8   Q.  Okay.  And then with respect to the app that you talked

9   about --

10  A.  Uh-huh.

11  Q.  -- now you can just voluntarily claim or voluntarily

12  choose whichever shifts that are in the app, right?  Is that

13  what you said?

14  A.  Now, yes.  Now we can, yeah.

15  Q.  And you voluntarily signed up for the shift yesterday and

16  the shift for today that you talked about, correct?

17  A.  Correct.

18  Q.  And just to clarify what you said before, you went to

19  work with First Choice around October 2020, right?

20  A.  Correct.

21  Q.  And then you said around June, you stopped working with

22  First Choice.

23  A.  Correct.

24  Q.  And since then, you've been back on Steadfast's registry

25  picking up shifts?

─────────A. Tirado - Cross─────────

```
 1    A.  Yes.

 2    Q.  Okay.

 3            MS. RUST:  I have no further questions.  Thank you.

 4            THE COURT:  The Court has a couple questions before

 5    you come back.

 6            You can go on.

 7            Were you subpoenaed to testify in this case?

 8            THE WITNESS:  Yes.

 9            THE COURT:  And do you recall when you got your

10    subpoena?

11            THE WITNESS:  I got it in the mail in, like, 2018.

12            THE COURT:  20' what?

13            THE WITNESS:  2018.

14            THE COURT:  Okay.  And did you share the fact that

15    you were subpoenaed to testify in this case with Steadfast?

16            THE WITNESS:  No.

17            THE COURT:  So when they scheduled you, is it

18    correct that they did not know you were scheduled to testify

19    in this case?

20            THE WITNESS:  Correct.

21            THE COURT:  Okay.  But you knew when you accepted

22    the assignment that you were scheduled to testify in this

23    days.  Did you?

24            THE WITNESS:  Well, yes.

25            THE COURT:  In other words, it's not due and owing
```

─────────────────────── A. Tirado - Redirect ───────────────────────

1   to a conflict with Steadfast that you were scheduled to work

2   and scheduled to testify too?

3            THE WITNESS:  Correct.

4            THE COURT:  Okay.  I just wanted to be clear.

5            All right.  You may redirect.

6            MS. LEWIS:  Thank you.

7                        REDIRECT EXAMINATION

8   BY MS. LEWIS:

9   Q.  So just a couple follow-up questions.  First, we'll sort

10  of go where the Judge went.

11           Did you come to court yesterday?

12  A.  Yes.

13  Q.  And what happened when you got here?

14  A.  The person out front sent me back to my car, like, four

15  different times with another reason why I couldn't come in.

16  And I kept going back to the parking deck and coming back and

17  going back to the parking deck and coming back.  I asked him

18  if he would get the lawyer.  And he said, you know, I could

19  get that taken care of when I came back.

20           So after the fourth time, I was, like, this is

21  insane, like, I really just need to get into court, and he

22  said -- he was like, "Well, as soon as you, you know, get" --

23  what did I have then?  He was complaining about my wallet, or

24  whatever.

25           And I was like, "You want me to leave my cell phone,

1    my watch, and my wallet?"  Like, I'm four hours away from

2    home.  Like, that's insane.  I'm too far away.  And then he

3    was complaining about my key chain on my car keys.

4    Q.  Did you provide -- did we speak last night regarding your

5    nonappearance?

6    A.  Yes.

7    Q.  Did you provide any proof of your parking receipt?

8    A.  I did.

9    Q.  So you did appear yesterday.  You had an issue at the

10   front door; is that correct?

11   A.  Correct.

12   Q.  Now, with respect to your testimony regarding the app,

13   when did you start using that app?

14   A.  June.

15   Q.  I'm sorry?

16   A.  June.

17   Q.  And when you go on to the app system, you can request --

18   how does it work?

19   A.  So it gives you all the facilities that have something

20   available, and then you can -- it tells you how much you will

21   be paid, and then you click on it, and it will say, like,

22   "claim a shift," and then you have to wait for it to be

23   approved to know whether or not you can do it.  And then you

24   can clock in and out on the app and all those kinds of

25   things.

A. Tirado - Redirect

1  Q.  So to be clear, even though you go on and select shifts,

2  Steadfast still has to approve you for those shifts --

3          MS. RUST:  Objection.

4  BY MS. LEWIS:

5  Q.  -- is that what you were saying?

6          MS. RUST:  Objection.  Mischaracterization of

7  testimony and leading.

8          THE COURT:  Misinterpretation?

9          MS. RUST:  Yes.  She testified earlier that the

10  facility had to approve it.  She did not say that Steadfast

11  had to approve it.  She said it had to be approved.

12          THE COURT:  Here's what we're going to do:

13          Let's try this again, because the Court can't

14  remember what she said, and the Court doesn't know which way

15  you're going here.  So let's ask the question again.

16  BY MS. LEWIS:

17  Q.  We'll start from the top.

18  A.  Okay.

19  Q.  Who has extended this app to you?

20  A.  Steadfast.

21  Q.  How do you use the app?

22  A.  So on the app, you open it, you click on whatever

23  facility it is, and it will say "claim shift."  So you click

24  it.  It will go yellow -- or not yellow, it will turn white,

25  and it will be sort of pending.  Then the facility will say

A. Tirado - Redirect

1   "yes" or "no," whether or not they are going to take it or

2   not, and then they let Steadfast know that you're going to be

3   working that day.

4   Q.   So how do you know that it's the facility that has to

5   approve rather than Steadfast if it's Steadfast's app?

6   A.   The only reason I know that is because I deal with the

7   schedulers in the building, and they will tell me, "Okay,

8   well, in the app, I put you in for this day, this day, this

9   day, but not this day, this day."  So I'm sending it to

10  Steadfast so they are aware.

11  Q.   So, either way, Steadfast is still in the middle of you

12  having to be approved for a shift; is that correct?

13          MS. RUST:  Objection.  Leading.

14          THE COURT:  Overruled.

15          THE WITNESS:  Yes, because otherwise I can't get

16  paid.  They are the ones who pay me.

17  BY MS. LEWIS:

18  Q.   Going to the time period where you stopped working for

19  Steadfast, in between that time, were you working for

20  Steadfast and First Choice during that same period of time?

21  A.   No.

22  Q.   It was just one?

23  A.   It was just the one, yes.

24  Q.   And with respect to -- also just clarifying for the

25  subpoena, did you also receive a subpoena again this year?

```
 1   A.   I did.

 2              MS. LEWIS:   Okay.  No further questions, Your Honor.

 3              THE COURT:   May the witness be permanently excused?

 4              MS. LEWIS:   Yes, she may.

 5              THE COURT:   You may step down.

 6              (Witness excused.)

 7              MS. LEWIS:   Your Honor, with respect to yesterday

 8   and the concerns that the Department raised, the Secretary

 9   has reconciled all of those issues with respect to those five

10   witnesses.

11              THE COURT:   What I want to know is, with respect

12   to -- you were down to three that did not show or you didn't

13   get the testimony.  Did you subpoena those three?

14              MS. LEWIS:   Yes, they were.

15              THE COURT:   If you subpoenaed those three and they

16   did not honor the subpoenas, it becomes a question of what

17   the Court's response would be, no matter what you want to do,

18   because we cannot have people ignoring subpoenas.

19              Can you provide the Court documents showing that

20   they were served with the subpoena?  Do you have the returns?

21              MS. LEWIS:   Right, Your Honor.  So we served the

22   subpoenas via e-mail.  We requested a response of "received

23   and accepted."  We have e-mails confirming that.

24              With respect to two of those individuals -- and I'll

25   say them by name as they were mentioned on record earlier.
```

```
 1    The first one is -- if I may get my computer, because I want
 2    to be accurate.
 3              THE COURT:  Okay.
 4              MS. LEWIS:  The three remaining, Your Honor --
 5    Tiffany Trogdon and Ryan Thompson are two of the three.
 6    Ms. Trogdon, there was a -- best way to describe it, a
 7    misunderstanding with respect to whether she was in person or
 8    remote.  It was not an intentional nonappearance.
 9              With respect to Mr. Thompson, his subpoena was for a
10    later day, and because of the shifting, there was a
11    miscommunication with respect to when he needed to appear,
12    but he will be able to appear at the date indicated on his
13    original subpoena.
14              THE COURT:  What date is that?
15              MS. LEWIS:  He has been reserved as a rebuttal
16    witness.
17              THE COURT:  Okay.
18              MS. LEWIS:  So much later on.
19              The last individual, we have not been able to get in
20    touch with, which is Brandi Plummer.
21              THE COURT:  Though you subpoenaed her and she
22    indicated she would be here?
23              MS. LEWIS:  Yes.  We subpoenaed her.  We talked to
24    her.  She was actually subpoenaed the day before.  So we
25    don't know her status.
```

```
 1              THE COURT:  Okay.  Well, then, I'll tell you what
 2      we'll do.  We will inquire for her status because no one gets
 3      a pass on ignoring subpoenas.
 4              MS. LEWIS:  Understood.  But that's where we are.
 5              THE COURT:  Just make sure that the name -- for the
 6      record, again, here name was Brandi what?
 7              MS. LEWIS:  Brandi Plummer.
 8              THE COURT:  Okay.  And any information you have
 9      dealing with the e-mails you sent, e-mails you received, I
10      want you to provide that to the courtroom deputy before the
11      case is ended.
12              MS. LEWIS:  Certainly, Your Honor.
13              THE COURT:  Now, let me go back to something because
14      I want the record to be very clear.
15              This witness provided some testimony slightly
16      different or in addition to what the others provided.  To the
17      extent that is happening -- first of all, let me ask you
18      this:
19              How many witnesses are you wanting to make the
20      proffer on in that?
21              MS. LEWIS:  Six additional.
22              THE COURT:  Six.  Now, would these six witnesses
23      provide the same testimony regarding the procedures and
24      practices of Steadfast consistent with what we've heard from
25      the previous witnesses?
```

```
 1              MS. LEWIS:  Yes, Your Honor.

 2              THE COURT:  Same testimony?

 3              MS. LEWIS:  Same similar testimony.

 4              THE COURT:  Okay.  Then the Court will stand by its

 5    objection to cumulative evidence being provided in the

 6    record.  It will stand by that.

 7              And since you said it's the same testimony, the

 8    Court sees no need for you to be making an oral proffer, but

 9    if you insist on doing this, the Court is permitting you to

10    put it in writing, as long as it's consistent with the same

11    thing that's previously been admitted.

12              But it's just a proffer.  It's not something that

13    the Court is going to consider in disposing of this case,

14    because it's cumulative.

15              MS. LEWIS:  Understood, Your Honor.

16              THE COURT:  All right.  Next witness.

17              MS. LEWIS:  Thank you.  If I may talk to my

18    co-counsel.

19              (Pause in the proceedings.)

20              MS. LEWIS:  Your Honor, if we may release the

21    employee witnesses who are here, based upon the discussion we

22    just had.

23              THE COURT:  If they are providing the same testimony

24    and we're not going to learn anything new, you may release

25    them.
```

 1            MS. LEWIS:  Thank you.

 2            The next witness we'll call is the Farmville

 3    facility.

 4            Your Honor, if I may, we're still calling Farmville,

 5    but with that, the list that we talked about earlier today,

 6    the 16, is now down by six.

 7            Last night I indicated to defense counsel that

 8    because a number of -- not a number, but one witness,

 9    Christine Kim, who is a payroll manager, needed to appear

10    today, it's my understanding from defendants that she will be

11    unable to appear today because today is the day that they run

12    payroll, but she's one of our sort of last witnesses in terms

13    of our case in chief.

14            THE COURT:  Okay.

15            MR. JEWETT:  We object to this next witness.  When

16    we received the Secretary's list last night -- when we

17    received the Secretary's witness list last night, we did not

18    see this particular witness.  This was not in the Final

19    Pretrial Order that was entered.

20            THE COURT:  Is the witness's name anywhere on the

21    Pretrial Order?

22            MR. SEIFELDEIN:  Yes, Your Honor, we believe that it

23    is.

24            If you can pull it up, Ms. Lewis.

25            This is the representative of the Farmville

```
 1    facility.  This is Pastor Gregory Ashley, and we can verify

 2    that.

 3              THE COURT:  Here's the way it works:

 4              If the witness is on the pretrial list, you can call

 5    them.  The matter of giving each other the list of who you're

 6    going to call the next day is a courtesy to facilitate moving

 7    the case along.  It doesn't bar the witness from testifying.

 8              So if it has been previously provided in the

 9    Pretrial Order, then the witness can be called.  Of course,

10    it works a lot better if you would be consistent with what is

11    on the list that you give them, but that doesn't bar the

12    witness from testifying.

13              Mr. Jewett is talking.  Only one of you-all can

14    address an issue at a time.

15              Is there another question about this?

16              MR. JEWETT:  Your Honor, I'm sorry, I didn't hear

17    the last thing you said.

18              THE COURT:  What I said is, if the witness is on the

19    pretrial list as someone they may call, the fact that,

20    perhaps, they didn't give them to you overnight does not bar

21    the witness from testifying, as long as he has been

22    previously listed as someone that would be called.  But if

23    you've never even heard of the witness, he's never been on

24    the Pretrial Order, that's a different story.

25              MR. JEWETT:  That is our position, Your Honor.  We
```

```
1   are on Page 16 of the Final Pretrial Order.

2            THE COURT:  You've never heard of this witness?

3            MR. JEWETT:  We do not see this witness on the Final

4   Pretrial Order.

5            MR. SEIFELDEIN:  We're checking the Pretrial Order.

6   We believe that he was identified, but perhaps the witness

7   may be under the legal name of the facility, but as of now,

8   we do not see Farmville on the list.

9            MS. LEWIS:  What is the legal name?

10           MR. SEIFELDEIN:  The legal name is Farmville Rehab

11  Center.  Actually, I have the contract here.  It is Farmville

12  Rehabilitation Healthcare Center.

13           THE COURT:  The Court is going to take a five-minute

14  recess.  If the witness is not on the pretrial list, you

15  never raised him, never listed him, then you're not going to

16  be calling the witness.

17           We'll be in recess for five minutes.

18           (Recess from 11:00 a.m. to 11:08 a.m.)

19           MR. SEIFELDEIN:  Good morning, Your Honor, and thank

20  you for indulging us.

21           Your Honor, indeed, on or about August 10, 2021, the

22  plaintiff identified to Steadfast, on its 15th Supplemental

23  Response to Request for Production, Farmville; identified it

24  and then also provided the contract between Farmville and

25  Steadfast.
```

```
 1          And to answer the Court's question, the Final
 2  Pretrial Order did not include the name "Farmville," but we
 3  believe that in the interest of justice, that individual
 4  should be allowed to testify as the defendants have not
 5  articulated a harm that would come to them or how they would
 6  be prejudiced.
 7          THE COURT:  Here's the situation:  The witness
 8  should have been on the Final Pretrial Order.  What the Court
 9  will do is this:
10          You're not required to give notice of a witness held
11  for rebuttal.  This witness may testify as a rebuttal
12  witness, depending upon what the defendants have to say about
13  their practices.  He's not going to testify in the case in
14  chief.  He can testify as a rebuttal witness.  So you need to
15  call another witness.
16          MR. SEIFELDEIN:  I understand, Your Honor.
17          THE COURT:  I understand it's in the interest of
18  justice, but that's just basic trial practice.  You have
19  800-some witnesses in there.  If the witness you want to call
20  is not in there, rebuttal.  You have him called for rebuttal
21  but not the case in chief.
22          Next witness.
23          MR. SEIFELDEIN:  The plaintiff will call Ms. Erica
24  Johnson from Princess Anne facility.
25          (Witness sworn.)
```

E. Johnson - Direct

1        ERICA JOHNSON, called by the Plaintiff, having been

2    first duly sworn, was examined and testified as follows:

3                         DIRECT EXAMINATION

4    BY MR. SEIFELDEIN:

5    Q.  Good morning, Ms. Johnson.

6    A.  Good morning.

7    Q.  Could you please state your name for the record and spell

8    your last name.

9    A.  Erica Johnson, J-o-h-n-s-o-n.

10   Q.  Where are you currently employed, Ms. Johnson?

11   A.  Princess Anne Health & Rehab Center.

12   Q.  How long have you been employed with Princess Anne

13   healthcare?

14   A.  Since 2017.

15   Q.  Okay.  And what is your job title?

16   A.  Administrator.

17   Q.  And what are your responsibilities as an administrator at

18   Princess Anne?

19   A.  I oversee operations for the facility, ensuring that

20   quality patient care is taken care of, and employee safety

21   reports.

22        THE COURT:  Can you keep your voice up, please,

23   Ms. Johnson.

24        THE WITNESS:  Yes.  Is that better?

25        THE COURT:  Yes, ma'am.

E. Johnson - Direct

```
 1              THE WITNESS:  Do you want me to take my mask off?
 2              THE COURT:  No, you can't, but you can speak closer
 3      to the microphone.
 4      BY MR. SEIFELDEIN:
 5      Q.   Did you say you oversee the operation of the facility?
 6      A.   Yes.
 7      Q.   Has this always been your job title?
 8      A.   At Princess Anne, yes.
 9      Q.   And I'm sorry, you said it has been your title with
10      Princess Anne since 2017?
11      A.   Yes.
12      Q.   And prior to that, did you work for Princess Anne as well
13      before you became the admin?
14      A.   Yes.  For Medical Facilities of America.
15      Q.   When did you start that?
16      A.   In 2008.
17      Q.   So you've been with them for quite a bit?
18      A.   Yes.
19      Q.   What is the general nature of the business of Princess
20      Anne Health & Rehab?
21      A.   We provide nursing and therapy services to residents,
22      specifically the geriatric population.
23      Q.   Is that long-term care and short-term care?
24      A.   Yes.
25      Q.   And what sort of healthcare professional does Princess
```

1    Anne use to provide these services that you just mentioned?

2    A.   CNAs, LPNs, RNs, physical/occupational/speech therapists.

3    Q.   Does Princess Anne hire your staff directly?

4    A.   Yes.

5    Q.   That's how you fulfill your staffing needs?

6    A.   Yes.

7    Q.   And does Princess Anne use supplemental staffing?

8    A.   Yes.

9    Q.   Could you just explain to us, what is supplemental

10   staffing?

11   A.   Supplemental staffing is whenever our employees cannot

12   meet all of the requirements that we need, we reach out to

13   supplemental staffing to fill those shortages.

14   Q.   I understand.

15           And are you familiar with the company called

16   Steadfast Medical Staffing?

17   A.   Yes.

18   Q.   Has Princess Anne ever used Steadfast to fulfill some of

19   its staffing needs?

20   A.   Yes.

21   Q.   When did Princess Anne begin working with Steadfast, if

22   you recall?

23   A.   2018.

24   Q.   And what positions, staffing-wise, did Princess Anne

25   request of Steadfast to fulfill?

```
 1   A.  Nursing, CNAs, RNs, LPNs.

 2   Q.  Did Princess Anne enter into a contractual agreement with

 3   Steadfast?

 4   A.  Yes.

 5   Q.  Let's look at Plaintiff Exhibit 10.

 6          MR. SEIFELDEIN:  If the Court will indulge me, Your

 7   Honor?

 8          (Pause in the proceedings.)

 9          MR. SEIFELDEIN:  Thank you, Your Honor.

10   BY MR. SEIFELDEIN:

11   Q.  We'll just scroll through this document, Ms. Johnson, and

12   see if you recognize it.  Let me know if you recognize that

13   document when you're done with that.

14   A.  Yes, I do.

15   Q.  What is it?

16   A.  It is our contract with Steadfast for supplemental

17   staffing.

18   Q.  Is this contract made in the regular course of business?

19   A.  Yes.

20   Q.  Is the contract kept in the regular course of business?

21   A.  Yes.

22   Q.  Is this a true and accurate copy of the contract between

23   Princess Anne Health & Rehab and Steadfast?

24   A.  Yes.

25   Q.  And does this contract generally provide -- does it
```

E. Johnson - Direct

1    define the scope of services provided by the Steadfast

2    nurses?

3    A.   Yes.

4    Q.   Did there come a time when Princess Anne stopped

5    contracting with Steadfast?

6    A.   Stopped contracting?

7    Q.   Well, yeah.  Let me rephrase that.

8         Did there come a time when Princess Anne stopped

9    working or using Steadfast nurses?

10   A.   Yes.

11   Q.   Do you recall when that was?

12   A.   The exact date, I do not recall.

13   Q.   Do you recall the year?

14   A.   I believe '19.

15   Q.   2019.  Okay.

16        Does Princess Anne enter into individual contracts

17   with the Steadfast nurses?

18   A.   No.

19   Q.   And why not?

20   A.   Our contract is with Steadfast Medical Staffing.

21   Q.   So if Princess Anne wants to fulfill some of those

22   staffing needs that you talked about earlier, who would you

23   contact?

24   A.   Steadfast's office.

25   Q.   And would Princess Anne contact -- why would Princess

E. Johnson - Direct

 1   Anne contact Steadfast rather than the nurses directly?

 2   A.  Because we have the contract with Steadfast.

 3   Q.  Once you call Steadfast and ask for those additional

 4   staffing, does Steadfast provide you the phone numbers or the

 5   contact information of the nurses?

 6   A.  No.  Their scheduler would reach out to their employees

 7   that were available to fill those needs.

 8   Q.  And why wouldn't they provide you the numbers to call

 9   them and contact them yourself?

10   A.  Because they are employees of Steadfast, not Princess

11   Anne's.

12   Q.  Let's look at PX-10, Page 128, or Bates 128.

13         Do you see the staffing services?  Are those the

14   duties of the staffing services by Steadfast?

15   A.  Yes.

16   Q.  Can you describe the work typically performed by the

17   Steadfast nurses.  For example, the LPNs, the RNs, the CNAs,

18   take them one by one, please.

19   A.  Sure.  The CNAs are responsible for activities of daily

20   living, providing those services to the patients, taking

21   vital signs, and following through with any direction that

22   the charge nurse is giving to them.  And then RNs and LPNs

23   are responsible for medication administration, treatment

24   administration, any other task that is assigned to them,

25   assessing the patients clinically.

1    Q.  If you wanted to change a Steadfast nurse's duties, would

2    Steadfast have to agree to those changes?

3    A.  Yes.

4    Q.  Why would you have to contact Steadfast to make any

5    changes to the duties described within the contract -- the

6    general scope of the services provided by the nurses?

7    A.  Because we would follow up with their supervisor, which

8    would be Steadfast.

9    Q.  So Steadfast would negotiate any changes to the contract?

10   A.  Correct.

11   Q.  Why wouldn't it be the nurses?

12   A.  Because the contract is with Steadfast Medical Staffing

13   and not with the employee or the nurse.

14   Q.  All right.  So are the nurses involved in any way in the

15   negotiation of this contract between Princess Anne and

16   Steadfast?

17   A.  No.

18   Q.  I want to direct your attention to Page 136,

19   paragraph 12.  Are you able to see that, Ms. Johnson?

20   A.  Yes.

21   Q.  Was it Princess Anne's expectation that Steadfast would

22   follow federal laws with respect to the employees?

23   A.  Yes.

24   Q.  Was it Princess Anne's expectation that Steadfast would

25   follow labor and employment laws with respect to the

──────────────────E. Johnson - Direct──────────────────

1    employees?

2    A.   Yes.

3    Q.   How are the services rendered once -- excuse me.

4         How are services rendered once a nurse is actually

5    placed at the facility?

6    A.   Well, the nurse or the CNA would get report -- do you

7    mean about their job duties or...

8    Q.   Yeah, just generally.

9    A.   Yeah, the nurse or CNA would get report from the previous

10   shift, and they would be given an assignment, and they would

11   follow through with making sure that proper care was done.

12   Q.   I understand.

13        Let me just back up a little bit here.  We talked

14   about the placement of the nurses by Steadfast at your

15   facility, and if I recall correctly, you said you call

16   Steadfast, not the nurses, for the scheduling, correct?

17   A.   Correct.

18   Q.   When you do call them, what information do you provide to

19   Steadfast regarding the assignments?

20   A.   We would tell Steadfast that I have, for example, two

21   nurse holes that needs to be filled or three CNAs, and their

22   scheduling office would say, "Okay, I will supply you with

23   these names, and they will be there at whatever shift and

24   date."

25   Q.   Are the Steadfast nurses themselves permitted to directly

—————————————E. Johnson - Direct——————————————

 1  contact you for placements or work?

 2  A.   No.  They would call their scheduling office.

 3  Q.   And why don't you allow them to contact you directly for

 4  work?

 5  A.   Because our contract is with Steadfast.  They provide the

 6  needs to us.

 7  Q.   Who determines which of the Steadfast nurses are placed

 8  at Princess Anne?

 9  A.   Steadfast.

10  Q.   Does Steadfast provide Princess Anne access to its entire

11  list of vetted nurses?

12  A.   No.

13  Q.   So who ultimately selects which Steadfast nurses are

14  placed at your facility, Princess Anne?

15  A.   Steadfast.

16  Q.   And who structures the term of the relationship between

17  Princess Anne and the nurses -- excuse me, between

18  Princess -- yes, Princess Anne and the nurses?

19  A.   Steadfast.

20  Q.   Regarding credentials and skills, what information does

21  Steadfast provide to Princess Anne before they place a nurse

22  at your facility?

23  A.   Information and skills.

24  Q.   What credentials?

25  A.   None, generally.

E. Johnson - Direct

1   Q.  If I could have you look at Page 140 of the exhibit.  Do

2   you see that?

3   A.  Yes.

4   Q.  Does Princess Anne do any screening of the Steadfast

5   nurses prior to their placement at Princess Anne?

6           Let me ask it this way:

7           Does Princess Anne interview the nurses before they

8   are placed at Princess Anne?

9   A.  No.

10  Q.  Who does that -- why not?  Why don't you do interviews?

11  A.  Because they aren't our employees, they are Steadfast

12  employees.

13  Q.  Does Princess Anne conduct background checks on the

14  nurses before they are placed at your facility?

15  A.  No.

16  Q.  And why not?

17  A.  Because they are employees of Steadfast.

18  Q.  So who would do that?

19  A.  Steadfast Medical Staffing.

20  Q.  The background checks?

21  A.  Yes.

22  Q.  And does Princess Anne verify the nurse's credentials

23  that are placed at your facility by Steadfast?

24  A.  No.

25  Q.  Why?

1    A.  Because Steadfast runs their license to make sure that

2    they are valid before they send them to us to work.

3    Q.  Okay.  Does Princess Anne verify the Steadfast nurses'

4    references?

5    A.  No.

6    Q.  What obligations, if any, Ms. Johnson, does Princess Anne

7    have to accept the Steadfast nurses once they are referred to

8    your facility?

9    A.  What obligation?

10   Q.  Yeah.  Can you decline a nurse that has been referred to

11   you for placement by Steadfast?

12   A.  Yes.

13   Q.  Okay.  And have you done that before?

14   A.  Yes.

15   Q.  And who do you communicate that to?  Steadfast or the

16   nurse?

17   A.  Steadfast.

18   Q.  Why do you communicate that to Steadfast and not the

19   nurse?

20   A.  Because the nurse is employed through Steadfast.  So if

21   there is any issues, we contact Steadfast's office so that

22   they can either counsel their employee or rectify the

23   situation.

24   Q.  And let me have you look at Page 131 of this document,

25   paragraph 5.  Do you see that?

E. Johnson - Direct

 1   A.   Yes.

 2   Q.   And does Steadfast mandate that you notify them of any

 3   removal or the like of a nurse?

 4   A.   Yes.

 5   Q.   And is Princess Anne able to cancel a scheduled nurse's

 6   shift?

 7   A.   Yes.

 8   Q.   Let's look at the same page, letter D here.  Do you see

 9   that?

10   A.   Uh-huh.

11   Q.   So if Princess Anne cancels a shift, is there a time

12   period in which you have to notify Steadfast?

13   A.   Within two hours.

14   Q.   And do you notify the nurse?

15   A.   No.  We notify Steadfast.

16   Q.   Why do you notify Steadfast and not the nurse?

17   A.   Because Steadfast then calls their employee to cancel

18   them, and sometimes we don't even know who they are sending

19   us, so we wouldn't have the staff member's name.

20   Q.   And so what if a nurse fails to show up or is running

21   late?  Who would you contact?

22   A.   Steadfast staffing agency.

23   Q.   Why would you contact Steadfast instead of the nurse?

24   A.   So that they can either find a replacement or figure out

25   where that person -- or what time that person will arrive.

```
                          ┌─E. Johnson - Direct─┐
```

 1   Q.  So then Steadfast would contact them, and then they'll

 2   contact you back and give you a status update?

 3   A.  Correct.

 4   Q.  Let's look at Page 134, Ms. Johnson, paragraph 10.

 5         Are the Steadfast nurses who are placed at your

 6   facility employees of your facility?

 7   A.  No.

 8   Q.  Would you consider them employees of Steadfast?

 9         MR. JEWETT:  Objection.  Calls for speculation.

10         THE COURT:  Calls for opinion.  Sustained.

11         I realize that through the testimony she referred to

12   them as employees, but that's still not cause for her

13   opinion -- well, on second thought, objection overruled.

14   That's just asking for her assessment on what they are, and

15   that's not binding on the Court.

16         MR. SEIFELDEIN:  The Court has the ultimate

17   decision, correct, Your Honor.

18         THE COURT:  That's correct.

19         MR. SEIFELDEIN:  Very good, Your Honor.

20   BY MR. SEIFELDEIN:

21   Q.  Ultimately, they are not your employees?

22   A.  Correct.  They are not Princess Anne employees.

23   Q.  Actually, let's look at that, the opinion -- actually,

24   not the opinion, the document itself here, and I want to have

25   you look at the second sentence there.  This is the contract

Carol L. Naughton, Official Court Reporter

**JA425**

E. Johnson - Direct

```
 1    between Steadfast and the facility, and I will read it for
 2    you.
 3              And it starts with "It is specifically understood
 4    and agreed that the temporary personnel assigned by
 5    supplemental staffing services to the healthcare center is
 6    the sole employee of supplemental staffing services and not
 7    an employee," end quote, in your facility.
 8              Correct?  Is that what it says?
 9    A.  Correct.
10    Q.  And this is an acknowledgment between you and Steadfast
11    because it's in the contract, correct?
12    A.  Correct.
13    Q.  And, also, let's look at Page 142 of the same document,
14    an Acknowledgment and Waiver.  That's Exhibit C of the
15    contract.
16    A.  Yes.
17    Q.  Generally, what is this Acknowledgment and Waiver here?
18    A.  It's acknowledging the contract between Steadfast and
19    Princess Anne.
20    Q.  And is it true, then, based on the contract in this
21    acknowledgment, that Steadfast agreed that the nurses are,
22    indeed, its employees?
23    A.  Yes.
24    Q.  Does Princess Anne discipline the Steadfast nurses?
25    A.  No.
```

─────────────────── E. Johnson - Direct ───────────────────

1    Q.   Why not?

2    A.   Because they aren't Princess Anne employees, we can't

3    hold them accountable.

4    Q.   And to the extent there is a concern with an employee,

5    who do you communicate that to?

6    A.   Steadfast.

7    Q.   Is Princess Anne involved in providing -- well, does

8    Steadfast require the facility, Princess Anne, to provide

9    feedback regarding the employee's performance or any issues?

10   A.   Yes.  I would say yes.

11   Q.   And if a nurse is not performing her or his duties up to

12   your standards, how would you handle that?  With the nurse or

13   with Steadfast?

14   A.   We would call Steadfast.

15   Q.   You address performance issues with Steadfast?

16   A.   Correct.

17   Q.   Do you address performance issues directly with the

18   nurses?

19   A.   No.

20   Q.   Let's talk about the billing briefly here.  Let me have

21   you look at Page 141 of the contract.

22           THE COURT:  Excuse me, Counsel.

23           MR. SEIFELDEIN:  Yes.

24           THE COURT:  The Court cannot see it on the screen.

25   You're leaving Page 142?

Carol L. Naughton, Official Court Reporter

**JA427**

E. Johnson - Direct

```
 1            MR. SEIFELDEIN:  141, Your Honor.
 2            THE COURT:  You're leaving Page 141 of Exhibit 10?
 3            MR. SEIFELDEIN:  Pardon me, Your Honor?
 4            THE COURT:  Okay.  I just want to be sure which page
 5   it was.
 6            MR. SEIFELDEIN:  You can see it?
 7            THE COURT:  I can see it now.
 8            MR. SEIFELDEIN:  Thank you, Your Honor.
 9   BY MR. SEIFELDEIN:
10   Q.  So does the contract between Princess Anne and Steadfast
11   detail the billing rate for Steadfast?
12   A.  Correct, yes.
13   Q.  And does it state the amount that you would pay
14   Steadfast?
15   A.  Yes.
16   Q.  And as far as you know, this is the billing rate that
17   Steadfast asked of you?
18   A.  Correct.
19   Q.  And do you know the pay rate that Steadfast pays to
20   nurses?
21   A.  No.
22   Q.  Okay.  And you don't know if it's this amount?
23   A.  No.
24   Q.  So $55 per hour, for example, for an RN, that's what you
25   pay Steadfast?
```

```
 1   A.  Correct, through invoice.

 2   Q.  Pardon?

 3   A.  I said, "Correct, through invoice."

 4   Q.  Through an invoice.

 5          And then you don't know if Steadfast pays that $55

 6   to the nurse?

 7   A.  Correct, I do not know.

 8   Q.  Okay.  And this price here, did Princess Anne negotiate

 9   the compensation with any of the Steadfast nurses?

10   A.  No.

11   Q.  And why not?

12   A.  Because they are employees of Steadfast, and the contract

13   is with Steadfast, not the nurses.

14   Q.  So the Steadfast nurses have no say in this amount that

15   was set in the contract between the facility and Steadfast?

16   A.  Correct.

17   Q.  Does Princess Anne compensate the Steadfast nurses for

18   the services that they provide at the Princess Anne facility?

19   A.  No.

20   Q.  And who do you provide the compensation to for the care

21   provided by these nurses?

22   A.  Steadfast Medical Staffing.

23   Q.  Is Princess Anne responsible for paying the Steadfast

24   nurses for the hours they work?

25   A.  No.
```

E. Johnson - Direct

1  Q.  Okay.  Let's have a look at Page 129, paragraphs 2 and 4,

2  of the agreement between Steadfast and Princess Anne.

3  A.  Yes, I see it.

4  Q.  Okay.  Let's begin with paragraph 2 there.

5          Who is responsible for paying the Steadfast nurses?

6  A.  Steadfast.

7  Q.  And I'm just looking at the first sentence there.  It

8  says:

9          "Assume sole and exclusive responsibility for

10  payment of wages, including overtime where applicable, to

11  temporary personnel for services performed at the healthcare

12  center..."

13          Is that correct?

14  A.  Correct.

15  Q.  Is that the expectation, that Steadfast would be the sole

16  entity responsible for paying the nurses, including overtime

17  to the extent nurses worked over 40 hours in a workweek?

18  A.  Correct.

19  Q.  This is a contract that Steadfast signed, correct?

20  A.  Correct.

21  Q.  Does Princess Anne have any role in determining or

22  setting the hourly rate that Steadfast pays its nurses for

23  the care provided at Princess Anne?

24  A.  No.

25  Q.  Earlier you mentioned to me, Ms. Johnson, invoices.  I

E. Johnson - Direct

1    want to talk to you about that a little bit.

2           Does Princess Anne provide the Steadfast nurses a

3    time sheet?

4    A.  Princess Anne does not provide them with a time sheet,

5    no.

6    Q.  Does Princess Anne require Steadfast nurses to fill out a

7    time sheet?

8    A.  No.  Steadfast gives them the time sheet for our team to

9    sign.

10   Q.  Why does your team sign the time sheet that Steadfast

11   provides these nurses?

12   A.  Just stating the hours worked for that day.

13   Q.  And is that part of the billing practice?

14   A.  Yes.

15   Q.  So if there is a discrepancy regarding the hours worked,

16   for example, on one of the Steadfast nurses' time sheet,

17   would the nurses contact you, Princess Anne, or would they

18   contact Steadfast to resolve the issue?

19   A.  Steadfast.

20   Q.  Why would they contact -- not "why would they," what

21   would you do if they contact you regarding pay issues and

22   time sheet issues?

23   A.  Call Steadfast.

24   Q.  You would tell them to call Steadfast?

25   A.  Yes.

—————————————E. Johnson - Direct—————————————

```
 1   Q.  Why would you tell them to call Steadfast when they
 2   actually provided the services at your facility?
 3   A.  Because Steadfast pays them.
 4   Q.  Are they employees of yours, the nurses?
 5   A.  No, they are not our employees.
 6   Q.  And once these time sheets are completed, you talked
 7   about receiving an invoice.  Let's get into that.  Let's look
 8   at Page 131 of the document at the very top.  And looking at
 9   paragraph 3 there, and we'll have you look at E as well.  3
10   and E.
11   A.  Yes.
12   Q.  So how does Princess Anne compensate Steadfast for the
13   care provided by the nurses?
14   A.  Through an invoice.
15   Q.  So Steadfast sends you an invoice, and what is included
16   within that invoice, typically?
17   A.  Typically, their hours worked and the time sheets that
18   were signed on those days.
19   Q.  So time sheets are submitted with the invoices by
20   Steadfast?
21   A.  Correct.
22   Q.  And if you look at E, directing your attention to letter
23   E of Page 131 of this exhibit, it states:
24        "Healthcare center shall submit payment to
25   supplemental staffing services within 45 days upon receipt of
```

—————————E. Johnson - Direct—————————

1    accurate invoice."

2           Is that how long it usually takes you, within 45

3    days that you have to pay the Steadfast invoice?

4    A.  Yes.

5    Q.  Does Princess Anne pay Steadfast the next day after

6    receiving an invoice?

7    A.  No.

8    Q.  Does Princess Anne have some sort of a Next Day Pay

9    agreement with Steadfast?

10   A.  No.

11   Q.  And you don't know whether Steadfast pays its nurses the

12   next day or not?

13   A.  I do not know that, no.

14   Q.  I understand.  Thank you.

15          Talk to us briefly about the process of invoicing.

16   I know you said you receive the invoice with the time sheets.

17   A.  Uh-huh.

18   Q.  Tell us about that process.

19   A.  So we would receive an invoice through our accounts

20   payable department.  It would get forwarded over to our

21   scheduler, just to make sure the invoice is accurate, and

22   then we would submit it for payment once it's completely

23   accurate.

24   Q.  Okay.  And to make sure that the invoice is accurate,

25   does that take you a little bit of time?

 1   A.  Yes.

 2   Q.  More than a day, perhaps?

 3   A.  Yes.

 4   Q.  And once you receive an invoice and you have some

 5   concerns about the hours worked, who does Princess Anne

 6   contact?

 7   A.  Steadfast.

 8   Q.  Why would you contact Steadfast?

 9   A.  So that we can get further clarification or dispute

10   anything.

11   Q.  Why wouldn't you contact the nurses?

12   A.  Because they are employees of Steadfast, and the contract

13   is with Steadfast.

14   Q.  So once the invoice has been verified, who do you pay?

15   A.  Steadfast.

16   Q.  Not the nurses?

17   A.  Not the nurses, no, sir.

18   Q.  Do the nurses submit these time sheets to you directly?

19   A.  No.

20   Q.  Ms. Johnson, let me have you look at Page 132,

21   paragraph 8, and then Page 133 of the contract between

22   Steadfast and Princess Anne.

23        Do you see number 8 there where it says "Insurance"?

24   A.  Yes.

25        MR. SEIFELDEIN:  Let's scroll down, Ms. Lewis, to

─────────────────────── E. Johnson - Direct ───────────────────────

1    Page 131 of the agreement.  Pause right there.

2    BY MR. SEIFELDEIN:

3    Q.  Do you see that, Ms. Johnson?

4    A.  Yes.

5    Q.  Is Steadfast required to carry insurance, as part of its

6    contract here, on its nurses?

7    A.  Yes.

8    Q.  And what kind of insurance is Steadfast required to have

9    for its nurses that are placed at your facility?

10   A.  Commercial general liability, automobile liability,

11   Workers' Compensation, employer's liability, fidelity bond,

12   umbrella liability, cyber liability.

13   Q.  And malpractice as well?

14          MR. SEIFELDEIN:  If you could scroll back to the

15   first page, paragraph 8, Ms. Lewis.

16   BY MR. SEIFELDEIN:

17   Q.  Is Steadfast required to have professional malpractice

18   liability insurance covering itself and its nurses?

19   A.  Yes.

20   Q.  Is it the expectation that these insurances cover the

21   nurses for providing care at your facility?  Correct?

22   A.  Correct.

23   Q.  Does Princess Anne require -- well, actually, is

24   Steadfast required to have Workers' Compensation for the

25   nurses that are placed at your facility?

```
                         ┌─────────── E. Johnson - Direct ───────────┐
```

 1   A.   Yes.

 2   Q.   Let's go back to, Ms. Johnson, to Page 132 of this

 3   exhibit, the contract between Steadfast and Princess Anne.

 4            We're looking at paragraph 6 here.  Would you look

 5   at paragraph 6, Ms. Johnson.

 6   A.   Uh-huh.

 7   Q.   Are there any contracts or restrictions to Princess Anne

 8   recruiting, hiring, or retaining any of the Steadfast nurses

 9   that are placed at your facility?

10   A.   Yes.

11   Q.   And is that a time-period restriction?

12   A.   Yes.

13   Q.   And how many days?

14   A.   60.

15   Q.   60 days.

16            And do you have to provide a notice to Steadfast to

17   the extent that you want to retain/hire one of the Steadfast

18   nurses that are placed at your facility?

19   A.   Typically, the nursing staff would do that.

20   Q.   If you look at the third line from the bottom of

21   paragraph 6.

22            "...staffing service agrees to release temporary

23   personnel upon 60 days' written notice."

24            Is that the 60 days' notice that you have to give to

25   Steadfast before you can retain --

E. Johnson - Direct

```
 1   A.  Yes.
 2   Q.  Let me talk to you briefly about equipment here.
 3          What type of equipment, if any, do the nurses use in
 4   the performance of their work at your facility?  These are
 5   the CNAs, LPNs and RNs.
 6   A.  General equipment, vital sign machines, blood glucose
 7   monitor, med cart, treatment cart.
 8   Q.  And these equipment, does Princess Anne provide these to
 9   Steadfast nurses?
10   A.  Yes.
11   Q.  Would a nurse be able to bring some of these smaller
12   equipment that you talked about, like the stethoscope or
13   vital sign --
14   A.  Yes.
15   Q.  But they are available there, correct?
16   A.  Correct.
17   Q.  So it's more of a personal preference, maybe?
18   A.  Yes.
19   Q.  Do you require the nurses to purchase their own equipment
20   to work once they are placed at your facility?
21   A.  No.
22   Q.  Ms. Johnson, would it be fair to say that based on your
23   work with Steadfast and the contract, that Steadfast controls
24   the assignments, the selection, and other conditions of
25   employment of the nurses that are placed at your facility?
```

─────────────────── E. Johnson - Direct ───────────────────

 1          MR. JEWETT:  Objection.  He's asking the witness for

 2     an opinion.

 3          THE COURT:  Objection overruled.  Based on reading

 4     the contract, I think she can answer that question.

 5     BY MR. SEIFELDEIN:

 6     Q.  You can answer.

 7     A.  No.

 8     Q.  Let me repeat that.

 9     A.  Yes.

10          THE COURT:  What was your answer?

11          THE WITNESS:  I said, "No," but I didn't hear

12     everything you said because he jumped in.

13     BY MR. SEIFELDEIN:

14     Q.  Let's have you hear the question before you answer it.

15          Based on what you've talked about today in the

16     contract, would it be fair to say that Steadfast controls the

17     assignment of the nurses, the selection of the nurses, and

18     other terms and conditions of employment of the nurses that

19     are placed at your facility?

20     A.  Oh, yes.

21          MR. JEWETT:  Objection, Your Honor.  This was asked

22     and answered.  She answered "no."  He directed her to change

23     her answer.

24          THE COURT:  No.  He asked her to be sure she knows

25     what she's answering before she speaks.  So the objection is

─────────────────── E. Johnson - Direct ───────────────────

```
 1   overruled.

 2              MR. JEWETT:  Thank you.

 3              MR. SEIFELDEIN:  Thank you, Your Honor.  No further

 4   questions for this witness.

 5              THE COURT:  What we're going to do here is -- we're

 6   overdue -- we're going to take our break, and then we'll come

 7   back for cross-examination.  We're still going to stop at

 8   1:00.

 9              All right.  15-minute break.

10              (Recess from 11:50 a.m. to 12:10 p.m.)

11              THE COURT:  Before we get started, I want to address

12   the status of Exhibit 10.  Counsel, did you ever move to

13   admit Exhibit 10?

14              MR. SEIFELDEIN:  I was just going to do that, Your

15   Honor.  I would like to move to admit Exhibit 10, 128 through

16   142, which is the contract between Steadfast and Princess

17   Anne.

18              THE COURT:  Okay.  If you're going to admit the

19   exhibit, we don't need to go through and make excerpts of the

20   pages.  The exhibit contains everything that's in the exhibit

21   if the Court admits the exhibit.

22              MR. SEIFELDEIN:  The exhibit, Your Honor, contains

23   the sampling of the contract between Steadfast and many of

24   the facilities.

25              THE COURT:  The exhibit is the exhibit.
```

---E. Johnson - Cross---

 1           MR. SEIFELDEIN:  Absolutely.

 2           THE COURT:  Any objection?

 3           MR. JEWETT:  We would object to the entire

 4   Exhibit 10.  We don't have objection to admitting just the

 5   contract that Ms. Johnson went over.

 6           MR. SEIFELDEIN:  Your Honor, with the exception of

 7   this one, which has been admitted by this witness, and maybe

 8   another one, these are business records of Steadfast,

 9   produced by Steadfast.

10           THE COURT:  The objection is overruled.  Exhibit 10

11   is admitted.

12           We're going to be in the same position we were in

13   the other day.  We end up going back to the exhibit again and

14   end up with separate numbers for the exhibit because you're

15   talking about an item that is in Exhibit 10.

16           So there's one Exhibit 10.  And then counsel,

17   defendant and the Secretary, can go to whatever they want in

18   that exhibit.

19           (Plaintiff's Exhibit PX-10 received in evidence.)

20           THE COURT:  All right.  Cross-examination.

21           MR. JEWETT:  Thank you.

22                     CROSS-EXAMINATION

23   BY MR. JEWETT:

24   Q.  Good morning, Ms. Johnson.

25   A.  Good morning.

E. Johnson - Cross

```
 1   Q.  My name is Josh Jewett.  I'm an attorney for Steadfast,
 2   and I have a few questions for you --
 3   A.  Okay.
 4   Q.  -- based on your testimony today.
 5            You testified that you're familiar with the way in
 6   which the facility staffs agency nurses.  Did I get that
 7   right?
 8   A.  Yes.
 9   Q.  And you're generally familiar, then, with your facility's
10   needs when it comes to temporary staffing of nurses?
11   A.  Correct.
12   Q.  You also testified, I believe, that your facility no
13   longer uses Steadfast, since 2019?
14   A.  Correct.
15   Q.  Did you begin using a different staffing agency at that
16   time?
17   A.  At one point, we were not using any supplemental staffing
18   agencies.
19   Q.  Okay.  At the time you were using Steadfast, were you
20   using any other staffing agencies at the same time?
21   A.  Yes.
22   Q.  And how many others?
23   A.  Just one.
24   Q.  The name of that one?
25   A.  I believe it's First Choice.
```

―――――E. Johnson - Cross―――――

1   Q.  So if at the time you were using both Steadfast and First

2   Choice, do you send your staffing needs to -- did you send

3   your staffing needs to both First Choice and Steadfast at the

4   same time, in other words, a request for staffing?

5   A.  Correct.

6   Q.  You didn't decide which staffing agency to use, one

7   versus the other?

8          MR. SEIFELDEIN:  Your Honor, objection.  Object to

9   the relevance of the line of questioning about other

10  facilities that they had.

11         THE COURT:  The Court has said repeatedly in this

12  case that the focus has to be on the practices and procedures

13  of Steadfast, not what happened with other facilities.  So I

14  sustain the objection.

15         MR. JEWETT:  I'll move on.

16  BY MR. JEWETT:

17  Q.  At any given time, how many temporary staffing nurses

18  does your facility use?

19  A.  It depends on what the needs are.

20  Q.  Does it fluctuate from day to day and week to week?

21  A.  Correct.

22  Q.  What are some of those factors that determine the needs?

23  A.  Depends on census, how many patients we have.

24  Q.  The first thing you said it depends on?

25  A.  Census.

─────────── E. Johnson - Cross ───────────

1   Q.  Census?

2   A.  Uh-huh.

3   Q.  Okay.  So you testified you no longer use Steadfast, and

4   when your facility stopped using Steadfast, I didn't quite

5   hear you.  You said you did continue to use temporary nurses

6   at that time?

7   A.  Yes.

8   Q.  When you stopped using Steadfast, then, did your

9   facility's needs for temporary nurses -- did that go up,

10  down, or stay the same?

11          MR. SEIFELDEIN:  Your Honor, I'm going to have to

12  object again to the relevance of these questions.  It's

13  clearly outside of the scope, and it's not discussing

14  Steadfast, as the Court just noted.

15          THE COURT:  Well, you know, the Court is trying to

16  figure out where counsel is going, so the Court will overrule

17  the objection, but let's get to the point.

18          THE WITNESS:  Can you repeat the question?

19  BY MR. JEWETT:

20  Q.  Sure.

21          When your agency stopped using Steadfast, did your

22  agency -- excuse me -- did your facility's needs for staffing

23  nurses -- did it go up, down, or stay the same?

24  A.  Stayed relatively the same.

25  Q.  Stayed relatively the same.

```
 1            When that happened, did you have nurses from
 2    Steadfast's registry continue staffing with your facility
 3    through another agency?
 4    A.  I can't speak to that.  I don't know.
 5    Q.  Mr. Seifeldein went over some of the terms of your
 6    contract with Steadfast with you.  I'd like to ask you a few
 7    questions about that.
 8    A.  Okay.
 9    Q.  I'm showing you what's been admitted as Plaintiff's
10    Exhibit 10.  Do you recognize this as the contract that you
11    discussed with Mr. Seifeldein?
12    A.  Yes.
13    Q.  And this contract, was it prepared by Princess Anne?
14    A.  Yes.
15    Q.  And have you seen, in your position, other contracts that
16    Princess Anne uses with other temporary staffing facilities?
17    A.  Yes.
18    Q.  Is this contract the same or similar to those contracts?
19    A.  Yes.
20    Q.  Let me ask you about Schedule A on here.  Can you see
21    that okay?
22    A.  Yes.
23    Q.  This listing of Schedule A, are these your facility's
24    requirements?
25    A.  Yes.
```

—E. Johnson - Cross—

 1   Q.   Okay.  Why does your facility require nurses to enter

 2   your facility to have these requirements?

 3   A.   It's based off of federal and state regulations for

 4   nursing homes.

 5   Q.   Okay.  If a nurse does not have these requirements, is

 6   the nurse allowed to practice nursing in your facility?

 7   A.   No.

 8   Q.   So at the end of the day, is it fair to say that your

 9   facility retains the right to decide who gets to practice

10   nursing in your facility or not practice nursing in your

11   facility?  Is that fair?

12   A.   We can cancel anyone and --

13   Q.   Let me rephrase the question.

14        What I'm trying to ask is:

15        If a nurse does not -- if a nurse is sent to you,

16   for example, from Steadfast and the nurse does not have these

17   credentials to meet the requirements, your facility reserves

18   the right to not allow that nurse to practice nursing in your

19   facility?

20   A.   Correct.

21   Q.   Let me direct your attention to paragraph 4.  Can you see

22   that okay?

23   A.   Yes.

24   Q.   Okay.  Paragraph 4(C) states:  "Healthcare center has the

25   right to cancel an assignment not less than two hours before

1    the time temporary personnel is scheduled to report without

2    incurring liability."

3            Why does your facility have that term in its

4    contract?

5    A.  Two hours is typically a time of window so that we can

6    try to, I guess, fill any other holes.

7            Are you referring to specific liability?

8    Q.  No, I'm sorry.  I'm referring to -- it says your facility

9    retains the "right to cancel an assignment not less than two

10   hours."

11           Why does your facility retain the right to cancel an

12   assignment not less than two hours?

13   A.  Because we work really hard to provide our own staff, and

14   two hours is a good rule of window to -- for them to get

15   someone to come in if we -- if we can't fill it ourselves.

16   Q.  So just to make sure I understand it, if Steadfast had

17   scheduled a nurse at your facility, under the terms of this

18   contract, you could cancel that assignment up to two hours

19   before the shift starts; is that correct?

20   A.  Yes, without liability.

21   Q.  And Steadfast wouldn't have the right to challenge that

22   decision.  Is that fair?

23   A.  Yes.

24   Q.  Okay.  Do you remember signing a statement under oath

25   earlier in this case?

E. Johnson - Cross

1    A.  Yes.

2    Q.  And in that statement, you testified that your facility

3    does not supervise Steadfast nurses.  Do you remember that?

4    A.  Yes.

5    Q.  Is that still accurate?

6    A.  Yes.

7    Q.  I'd like to ask you a few questions about that.

8            The nurses -- I think this was assumed from your

9    testimony with Mr. Seifeldein, but the nurses, they perform

10   the work in your facility; is that correct?

11   A.  Correct.

12   Q.  Okay.  And you said the facility does not supervise them?

13   A.  Correct.

14   Q.  Does the facility instruct the nurses how to practice

15   nursing?

16   A.  In an aspect, yes.

17   Q.  What do you mean by that?

18   A.  Well, there's general procedures that an RN, an LPN, a

19   CNA are required to do in regards to their license.  So...

20   Q.  So does your facility supervise the nurses, the

21   administration of those duties that you just listed?

22   A.  Yes.  You could say that.

23   Q.  Well, in what way does it do that?

24   A.  Well, if an area of their work was not completed, for

25   instance, if a nurse hasn't charted on a patient, it would

E. Johnson - Cross

 1  come up as a red flag, and so in order to correct the red

 2  flag, we would call Steadfast --

 3  Q.  I see.

 4  A.  -- so that they could come back and complete their job

 5  duty.

 6  Q.  Let me be more specific, I guess, then.

 7       When Mr. Seifeldein was talking to you, you listed

 8  some of the duties that the LPN does, and the CNA, such as

 9  checking vital signs, administering medications, and things

10  like that.

11  A.  Uh-huh.

12  Q.  Does your facility train the nurses how to do those

13  things?

14  A.  No.

15  Q.  Okay.  Does your facility provide them a how-to guide

16  when they're practicing nursing?

17  A.  No.

18  Q.  Let me rephrase that.

19       Before they go out and take a shift, do you provide

20  them a how-to guide?

21  A.  No.

22  Q.  So you don't tell them how to draw blood, take blood

23  pressure, or a variety of other things that nurses come into

24  your facility to do?

25  A.  We do not.

——————E. Johnson - Cross——————

1    Q.  Do you give them critical feedback?

2    A.  Yes.

3    Q.  In what way?

4    A.  For instance, the example that I just gave you; if they

5    didn't complete a job task, we would let the agency know so

6    that they could inform their staff.

7    Q.  What I was asking, though, does your nurse supervisor

8    specifically go to a Steadfast nurse and say, "Here are the

9    things you did wrong.  You need to do it better next time."

10   Or do you communicate that to Steadfast?

11   A.  No.  We communicate that to Steadfast.

12   Q.  So it sounds like before a temporary nurse comes into

13   your facility, the expectation is that they know how to

14   practice nursing.  Is that fair?

15   A.  Correct.

16   Q.  And then when the nurses are in your facility, they are

17   given some discretion in the manner in which they practice

18   nursing?

19   A.  Correct.

20   Q.  Is there a Steadfast supervisor present at your facility

21   when their nurses are practicing nursing?

22   A.  No.

23   Q.  Okay.  And so you'd agree, then, that if a Steadfast

24   supervisor isn't present, they aren't actually supervising

25   the nurses while they are practicing nursing in your

——————E. Johnson - Cross——————

 1  facility?

 2  A.  That's a fair assumption.

 3  Q.  Okay.

 4          THE COURT:  Keep your voice up, ma'am.

 5          THE WITNESS:  What's that?

 6          THE COURT:  Keep your voice up.

 7  BY MR. JEWETT:

 8  Q.  Mr. Seifeldein asked you some questions about -- I think

 9  he called them "do not returns."  Do you remember that?

10  A.  Yes.

11  Q.  And you talk about those as well in the signed statement

12  that you provided earlier in this case.  Do you recall that?

13  A.  Yes.

14  Q.  And is that part of your statement still accurate?

15  A.  Yes.

16  Q.  So these DNRs, this is something that the facility has a

17  right to do as a matter of contract; is that right?

18  A.  Yes.

19  Q.  And the facility at the end of the day has a

20  responsibility to decide who can and cannot care for its

21  patients.  Is that fair?

22  A.  Yes.

23  Q.  And under the terms of this contract, the DNR provision,

24  the facility's right to DNR a Steadfast nurse, that's

25  absolute; is that right?

─────────────── E. Johnson - Cross ───────────────

 1   A.   Yes.

 2   Q.   Steadfast doesn't have a right to challenge a DNR

 3   decision?

 4   A.   Correct.

 5   Q.   So at the end of the day, it sounds like your facility

 6   maintains a decision about whether a nurse gets to continue

 7   to practice nursing in your facility or not.  Is that fair?

 8   A.   That's fair.

 9   Q.   Okay.  Have you ever been to Steadfast's office?

10   A.   No.

11   Q.   Do you have specific knowledge about Steadfast's inner

12   operational workings?

13   A.   No.  Outside of the contract, no.

14   Q.   Do you have specific knowledge if a Steadfast nurse is

15   free to accept a shift or not to your facility?

16   A.   No, I don't have any knowledge of that.

17   Q.   You testified -- one more question -- strike that -- on

18   one of those lines.

19        Now, do you personally, in your position, observe

20   sort of how things work on a day-to-day basis with the

21   Steadfast nurses?  Are you observing them while they are

22   practicing nursing?

23   A.   Yes.

24   Q.   You do.  Okay.

25        You testified earlier -- Mr. Seifeldein pointed out

─────E. Johnson - Cross─────

1   the provision, I think, in the contract to you, and I thought

2   I heard you say that the contract requires Steadfast to

3   provide feedback to the facility about the performance of its

4   nurses.  Did I hear you say that correctly?

5           MR. SEIFELDEIN:  Objection, Your Honor,

6   characterization.  I think it was that -- sorry.

7           THE COURT:  Okay.  Rephrase.  Sustained.  Rephrase.

8           MR. JEWETT:  I'm asking the witness to clarify

9   something I thought she said, Your Honor.  I'll rephrase the

10  question.

11          THE COURT:  All right.

12          MR. JEWETT:  Because I didn't -- I don't know if I

13  have my notes down right.

14  BY MR. JEWETT:

15  Q.  I thought I heard you testify when you were speaking with

16  Mr. Seifeldein about the provision in your contract that

17  required Steadfast to provide feedback to the facility about

18  the performance of its nurses.

19          Did I hear you say that correctly?

20          MR. SEIFELDEIN:  Same objection, Your Honor,

21  characterization.

22          THE COURT:  If he's wrong, she will tell him he's

23  wrong.  So overruled now.

24          Answer the question if you can.

25          THE WITNESS:  I don't mean to laugh.  I'm sorry.

Carol L. Naughton, Official Court Reporter

**JA452**

—————————E. Johnson - Cross—————————

 1              THE COURT:  What was that?

 2              THE WITNESS:  I do not mean to laugh.  I apologize.

 3         What I gather what you're trying to ask me is, in

 4    the contract, is it required for me to give Steadfast

 5    feedback about the performance of their nurses?  And yes.

 6    BY MR. JEWETT:

 7    Q.  Okay.  I understand now.  I think I had it the other way

 8    around.

 9         So going back to this contract, you said that this

10    is your facility's contract.  This was -- well, I guess I

11    shouldn't assume.  This was prepared by your company's

12    attorney?

13    A.  Yes.  They oversee the final contracts.

14    Q.  Sure.

15         Is this an in-house attorney or external?

16    A.  It's throughout our company.  They are internal.

17    Q.  Internal.  Okay.

18         Do these attorneys who prepare your contracts -- do

19    they, to your knowledge --

20              MR. SEIFELDEIN:  Your Honor, I have to object.

21              MR. JEWETT:  Let me finish the question, please.

22    BY MR. JEWETT:

23    Q.  -- do they actually come down and observe the nurses

24    nursing before they prepare the contracts?

25    A.  No.

```
 1          MR. SEIFELDEIN:  Your Honor --

 2          THE COURT:  Yes, sir?

 3          MR. SEIFELDEIN:  I was making an objection to the

 4   line of questioning asking about what the attorneys do for

 5   the facility, and whether they come down or not is outside of

 6   her --

 7          THE COURT:  The Court was told that that was the

 8   last question about the attorneys.

 9          MR. JEWETT:  It is.

10          MR. SEIFELDEIN:  Not relevant also.

11   BY MR. JEWETT:

12   Q.  Let me ask you about this -- I believe this is -- this is

13   paragraph 8, Insurance.  Are you tracking with me?

14   A.  Yes.

15   Q.  Mr. Seifeldein asked you about this paragraph 8 and some

16   of these insurance requirements.  The contract, for example,

17   requires $1 million in automobile liability.  Do you see

18   that?

19   A.  I do.

20   Q.  Why is that required?

21   A.  I believe it's required for any other reason insurance is

22   required, for liability purposes.

23          Are you referring to the amount?

24   Q.  No, I'm referring to the actual requirement to have

25   automobile liability insurance under the terms of this
```

 1   staffing contract.

 2          MR. SEIFELDEIN:  Your Honor, objection.  The

 3   automobile liability is not relevant to the case at hand.

 4   This is a Fair Labor Standard question.

 5          THE COURT:  Well, I don't know whether this witness

 6   is even qualified to get into the details of what the

 7   attorneys put in this contract, Mr. Jewett.

 8          MR. JEWETT:  May I, Your Honor?

 9          THE COURT:  Yeah.  What are you asking?

10          MR. JEWETT:  The point I'm trying to make for this

11   line of questioning, Your Honor, is that the terms of the

12   contract are sometimes incongruent with the reality of

13   relationships.

14          THE COURT:  Well, whether they are or not, these are

15   the terms that your client signed.  It may very well be, but

16   these are the terms of the contract.

17          MR. JEWETT:  Very well.  I'll move on.

18   BY MR. JEWETT:

19   Q.  Let me direct your attention to the last page of this

20   contract.  Mr. Seifeldein went through quite a few of these

21   terms with you, but let me ask you about one more that your

22   company agreed to and Steadfast agreed to.

23          This is Exhibit B.  Can you see that okay?

24   A.  Yes.

25   Q.  Do you see here on Exhibit B that your facility agreed

—————————————————E. Johnson - Cross—————————————————

1   that the Steadfast personnel are independent contractors?

2   A.  Yes.  I agree that there's a job code for an independent

3   contractor.

4          THE COURT:  Mr. Jewett, what page number were you

5   just on that you just pointed to?

6          MR. JEWETT:  Sorry.  This is Plaintiff's 10, 141.

7          THE COURT:  Okay.  Thank you.

8          MR. JEWETT:  Yes.

9   BY MR. JEWETT:

10  Q.  Let me return to -- just a moment -- the signed statement

11  that you provided.  Do you recognize this document?

12  A.  Yes.

13  Q.  Okay.  I'm going to just flip through it.

14          THE COURT:  For what purpose are you using this

15  document, Mr. Jewett?

16          MR. JEWETT:  My intention is to -- it's a line of

17  questioning, Your Honor, about whether she's the person who

18  wrote this contract, whether or not this contract was written

19  after meeting with the Department of Labor -- I'm sorry.  I

20  said "contract," I meant "statement" -- and then the extent

21  to which her testimony was prepared by the Department of

22  Labor today.

23          THE COURT:  All right.

24          MR. JEWETT:  Okay.

25  BY MR. JEWETT:

────────────── E. Johnson - Cross ──────────────

1   Q.  Ms. Johnson --

2          MR. SEIFELDEIN:  Your Honor, we're going to object

3   to the relevance.

4          THE COURT:  The Court has got to find out what he's

5   saying first, and then I can say just how relevant it is.

6          MR. SEIFELDEIN:  Your Honor, if I could represent to

7   the Court, to our understanding there's a potential

8   attorney-client privilege here that is being asked about by

9   Steadfast as it's understood that this declaration was

10  prepared in working with the witness and her attorneys, the

11  facility's attorneys.

12         MR. JEWETT:  I have no intention to ask about that.

13         MR. SEIFELDEIN:  That is exactly what we say to a

14  representative, Your Honor, that intends to go -- who

15  drafted --

16         THE COURT:  Nothing like the actual question.  Let's

17  see what the questions are, and then your objection may

18  become appropriate, but let me see what the questions are

19  first.

20         MR. JEWETT:  Thank you.

21  BY MR. JEWETT:

22  Q.  Ms. Johnson, going back to this declaration, did you

23  write the language in this declaration?

24  A.  Yes.

25  Q.  You did.  You sat down at your computer and wrote this

─────────────────── E. Johnson - Cross ───────────────────

1  out?

2  A.  Not the entire document.  I provided information to my

3  attorney before it was concluded.

4       MR. SEIFELDEIN:  Your Honor, I must reiterate that

5  the --

6       THE COURT:  Okay.  Mr. Jewett, the only thing you

7  can find out is are the statements in the declaration

8  accurate.  Doesn't matter if Santa Claus wrote it.  If she

9  signed it, are they accurate?  That's all.

10      MR. JEWETT:  Understood, Your Honor.  I'll withdraw

11  my questions, and I have no further questions.

12           Thank you, Ms. Johnson.

13      THE COURT:  The Court has a question before you

14  stand back up.  I want to be clear about something.

15           This supplemental staffing agreement here,

16  Ms. Johnson.

17      THE WITNESS:  Yes, sir.

18      THE COURT:  This was between your facility, Princess

19  Anne, and Steadfast; is that correct?

20      THE WITNESS:  Yes, sir.

21      THE COURT:  Do you know who signed it on behalf of

22  your agency?

23      THE WITNESS:  Yes.

24      THE COURT:  Who was it?

25      THE WITNESS:  Keith Helmer, my chief operating

─────────────────E. Johnson - Redirect─────────────────

1    officer.

2          THE COURT:  And who signed it on behalf of

3    Steadfast?

4          THE WITNESS:  Lisa Pitts.

5          THE COURT:  And Ms. Pitts is in court today?

6          THE WITNESS:  I've never met Ms. Pitts before.

7          THE COURT:  Never met her?

8          THE WITNESS:  No.

9          THE COURT:  But Lisa Pitts on behalf of Steadfast?

10         THE WITNESS:  Yes, sir.

11         THE COURT:  All right.  That's all.

12         Hold a second.  Let's see if he has any more

13   questions.

14         MR. JEWETT:  No more questions.  Thank you, Your

15   Honor.

16         THE COURT:  All right, then.  Fine.

17         Any redirect?

18         MR. SEIFELDEIN:  Yes, Your Honor.

19         THE COURT:  Let's let him clear out first.

20                    REDIRECT EXAMINATION

21   BY MR. SEIFELDEIN:

22   Q.  Thank you, Ms. Johnson.  A few follow-up questions for

23   you here.

24         Mr. Jewett, I believe, asked you about Plaintiff

25   Exhibit 131, the cancellation and the two hours' notice.  If

—————————————————E. Johnson - Redirect—————————————————

```
 1   the facility were to cancel -- excuse me.  Strike that.
 2            When the facility cancels a scheduled shift, would
 3   there be a liability fee to Steadfast?
 4   A.  Yes.
 5   Q.  And would you have to pay Steadfast an amount of money
 6   for cancelling a shift?
 7   A.  Yes.
 8   Q.  And you talked earlier about -- let me ask it this way:
 9            Who ultimately sends the nurses to your facility?
10   A.  Steadfast.
11   Q.  And who selects them?
12   A.  Steadfast.
13   Q.  Do you get a list of nurses to pick from before they are
14   sent to you?
15   A.  No.
16   Q.  Do you get the number of the nurses before they are sent
17   to you?
18   A.  No.
19   Q.  And is it your expectation, consistent with Exhibit A,
20   the screening procedure that we went through, that Steadfast
21   will provide nurses who are competent to perform the duties
22   that they are there to perform?
23   A.  Yes.
24   Q.  And you were asked about your ability, the facility's
25   ability, to decline nurses and the requirements that the
```

──────E. Johnson - Redirect──────

1    nurses must have before they come to your facility.

2    A.  Yes.

3    Q.  Are those requirements generally set by the state for a

4    nurse, for example, to practice?

5    A.  Yes.

6    Q.  And does your facility actually perform the screening of

7    these nurses?

8    A.  No.

9    Q.  Does Steadfast actually provide you with the screening

10   that it has performed of these nurses?

11   A.  No.

12   Q.  So you accept Steadfast's representation that the nurses

13   are competent to practice?

14   A.  Yes.

15   Q.  And these requirements, actually, what is the purpose of

16   having them before a nurse is sent to your facility,

17   regarding the care that you provide?

18   A.  To make sure that we are in compliance with regulations

19   and patient safety.

20   Q.  Patient safety.

21        Now, I won't get too much into this.  You were asked

22   questions about terms used throughout the contract, and you

23   indicated that you did not draft the contract, correct?

24   A.  Yes.

25   Q.  And you wouldn't necessarily -- you're the administrator,

——————E. Johnson - Redirect——————

```
 1  correct?
 2  A.  Correct.
 3  Q.  And you have an understanding of what is required by the
 4  contract?
 5  A.  Correct.
 6  Q.  But you don't understand every term that is in the
 7  contract, do you?
 8  A.  I do.
 9  Q.  You do.  Okay.  So when, for example, when Mr. Jewett was
10  asking you -- actually, forget the automobile liability.
11  It's not relevant.  Strike that.
12          Are the nurses given a discretion to perform the job
13  at your facility?
14  A.  Are they given a discretion?
15  Q.  Uh-huh.
16  A.  Are Steadfast nurses given a discretion to work at our
17  facility?
18  Q.  The jobs that are being performed, you indicated that the
19  nurses are trained to perform these jobs, correct?
20  A.  Yes.
21  Q.  And as far as, for example, when they arrive at the
22  facility and they are told to administer medication --
23  A.  Yes.
24  Q.  -- you don't tell them how to administer the medication.
25  A.  No.  It's common practice.
```

┌─────────────────── E. Johnson - Redirect ───────────────────┐

1    Q.  Common practice.  They're expected to have that knowledge

2    in performing these duties?

3    A.  Yes.

4    Q.  So would you consider that supervision?

5    A.  No.

6            THE COURT:  I think he asked those questions on

7    cross-examination.  What you asked and what you're getting is

8    not inconsistent with what she gave previously.

9            MR. SEIFELDEIN:  Your Honor, if I may, I think what

10   defendants were getting at, that the facilities were

11   supervising the nurses, where I believe Ms. Johnson testified

12   that these are duties that nurses are expected to perform.

13   So you're here to perform a duty; therefore, you do it.

14   There's no direct supervision as to how to administer certain

15   medication.

16           THE COURT:  The Court understood that while she was

17   testifying to it, but go ahead.

18           MR. SEIFELDEIN:  Thank you, Your Honor.  I think the

19   point is made.

20           MR. JEWETT:  May I ask a single question on recross?

21           THE COURT:  Well, let's see whether the Court is

22   going to grant any recross first.  Let's see whether that's

23   necessary.  The Court generally doesn't do recross and "sur"

24   recross in here.  So let's see whether there is anything that

25   comes out of any significance of this redirect that would

└──────────────────────────────────────────────────────────────┘

Carol L. Naughton, Official Court Reporter

**JA463**

 1   necessitate a recross.

 2          MR. JEWETT:  I'm sorry.  I thought Mr. Seifeldein

 3   was finished.  I didn't mean to interrupt.

 4   BY MR. SEIFELDEIN:

 5   Q.  Ms. Johnson, to your knowledge, the standard of care that

 6   you just talked about required by regulations, are those

 7   supervisions?

 8   A.  No.

 9   Q.  And you have to comply with the law; is that correct?

10   A.  Yes.

11   Q.  Is it typical for an agency personnel -- excuse me.

12          Is it typical for agency administrators/employers to

13   come to the facility that they send nurses to?

14   A.  No.

15   Q.  Going back to the DNR list, when there is an issue

16   regarding the safety of the residents that you talked about,

17   who do you communicate that to?

18   A.  Steadfast.

19   Q.  And why don't you communicate that to the nurses?

20   A.  Because they are employees of Steadfast, and our contract

21   is with Steadfast, not with the individual nurse.

22   Q.  My last question for you was going to be "Who signed the

23   contract" and show it to you, but the Court got into that

24   already.

25          MR. SEIFELDEIN:  I have no further questions for

—————————————— E. Johnson - Recross ——————————————

```
 1   this witness, Your Honor.  She may be excused with the
 2   Court's...
 3              THE COURT:  Now, if the Court permits you to do
 4   recross, it has to be pertaining to something that he has
 5   said during his redirect, but not something that you've
 6   already covered in your first cross.
 7              MR. JEWETT:  Understood, Your Honor.
 8              THE COURT:  With that guidance, do you need to
 9   recross?
10              MR. JEWETT:  I have a single question about --
11              THE COURT:  Okay.  If it's within the guidance the
12   Court has given you, all you have to do is just ask your
13   question.
14              MR. SEIFELDEIN:  Your Honor, I object to recross.
15   The redirect did not introduce any new information that was
16   not --
17              THE COURT:  That's not your authority.  The Court
18   decides whether there is going to be recross.
19              MR. SEIFELDEIN:  Absolutely.  I just needed to
20   object for the record.
21              THE COURT:  You cannot object to recross.  It's the
22   Court's discretion.
23              MR. SEIFELDEIN:  Thank you, Your Honor.
24                         RECROSS-EXAMINATION
25   BY MR. JEWETT:
```

```
                        ┌──── E. Johnson - Recross ────┐
  1    Q.  Thank you, Ms. Johnson.

  2            Mr. Seifeldein, in his redirect, asked you a

  3    question about the two-hour cancellation policy.  Do you

  4    recall that?

  5    A.  Yes.

  6    Q.  I believe he asked you if your facility could incur

  7    liability if you cancelled within the two-hour time window.

  8    Do you recall that?

  9    A.  Yes.

 10    Q.  Can you recall a single situation where your facility

 11    cancelled within that two-hour window and incurred some

 12    liability for it?

 13    A.  Yes.

 14    Q.  What is that example?

 15    A.  So if you cancel before two hours, you will be billed

 16    four hours for that employee.

 17    Q.  Is that under the terms of the contract?

 18    A.  I believe there is a cancellation fee in the contract.

 19    Q.  Okay.  And so that is something that your facility

 20    presumably agreed to pursuant to the terms of the contract?

 21    A.  Yes.

 22            MR. JEWETT:  Thank you.  No further questions.

 23            THE COURT:  May this witness be permanently excused?

 24            THE WITNESS:  Thank you.

 25            MR. SEIFELDEIN:  Yes, Your Honor, this witness may
```

─D. Rawlings - Direct─

1   be excused.

2           MR. JEWETT:  Yes, Your Honor.

3           (Witness excused.)

4           THE COURT:  We're going to terminate right here, and

5   we'll be back in here at 2:25 to recommence.

6           (Recess from 12:49 p.m. to 2:27 p.m.)

7           THE COURT:  Okay.  We're ready to commence.  Where

8   are we?

9           MR. SEIFELDEIN:  Your Honor, the Secretary will call

10  Dave Rawlings of Dunlop House.

11          (Witness sworn.)

12          DAVID RAWLINGS, called by the Plaintiff, having been

13  first duly sworn, was examined and testified as follows:

14                      DIRECT EXAMINATION

15  BY MR. SEIFELDEIN:

16  Q.  Good afternoon, Mr. Rawlings.

17  A.  Good afternoon.

18  Q.  Could you please state your full name for the record and

19  spell your last name.

20  A.  David Lewis Rawlings, R-a-w-l-i-n-g-s.

21  Q.  Are you currently employed?

22  A.  Yes.

23  Q.  Where are you currently employed?

24  A.  Coordinated Services Management.

25  Q.  And how long have you been employed by Coordinated

---

D. Rawlings - Direct

1    Services Management?

2    A.  A little over 23 years.

3    Q.  And what is Coordinated Services Management's

4    relationship with Dunlop House?

5    A.  We're the property management company and consultant for

6    the Dunlop House.

7    Q.  And what is your title at Dunlop House?

8    A.  My title at Dunlop House is management agent.  My title

9    at Coordinated Services Management is vice president of

10   operations.

11   Q.  Just for the record, we're going to refer to Coordinated

12   Services Management and Dunlop House as "Dunlop House," for

13   efficiency purposes.

14   A.  Okay.

15   Q.  What are your job responsibilities at Dunlop House?

16   A.  I provide oversight for the regional directors who are

17   specifically providing the consultation and property

18   management for the Dunlop House.

19          THE COURT:  Where is Dunlop House?  Where is this?

20   Where is this business located?  Where is he from?

21   BY MR. SEIFELDEIN:

22   Q.  You may answer.

23   A.  Dunlop House is located in Colonial Heights, Virginia.

24          THE COURT:  Thank you.

25   BY MR. SEIFELDEIN:

---

Carol L. Naughton, Official Court Reporter

**JA468**

416

D. Rawlings - Direct

```
 1   Q.  Sorry, I believe you were talking about your job
 2   responsibilities and duties.
 3   A.  I believe I answered that.  Property management and
 4   consultation, yes.
 5   Q.  Has this always been your title?
 6   A.  No, it's not always been my title.
 7   Q.  What other positions have you held within the industry?
 8   A.  I've had regional director positions.  I've also been an
 9   administrator for both nursing homes and assisted living.
10   Q.  And what is the general nature of Dunlop House, its
11   business?
12   A.  It's a licensed assisted living community.
13   Q.  What type of service does Dunlop House provide?
14   A.  It provides activities of daily living care for residents
15   who require help with their day-to-day living.
16   Q.  And what healthcare professionals compose the staff of
17   Dunlop House?
18   A.  We have registered nurses, licensed practical nurses,
19   certified nursing aides, and registered medication aides.
20   Q.  And how does Dunlop House maintain its staffing needs?
21   A.  Through a recruitment retention program.
22   Q.  Is that through direct hire?
23   A.  Yes.
24   Q.  Other than direct hire, how does Dunlop House maintain
25   its staffing needs?
```

D. Rawlings - Direct

1   A.  From time to time, Dunlop House has used agency staffing.

2   Q.  And are you familiar with Steadfast Medical Staffing?

3   A.  Yes.

4   Q.  How are you familiar with it?

5   A.  I'm familiar that there was an agreement between the

6   Dunlop House and Steadfast.

7   Q.  So Dunlop House has used Steadfast to provide some

8   nurses?

9   A.  Yes.

10  Q.  Okay.  And when did Dunlop House begin working with

11  Steadfast, from your knowledge?

12  A.  I'm familiar with an agreement that was dated April 8,

13  2019.

14  Q.  And what positions did Dunlop House ask Steadfast to

15  staff?

16  A.  Based on the agreement, it was for licensed practical

17  nurses, certified nursing aides, and medication technicians

18  or registered medication aides.

19  Q.  You just mentioned that you -- excuse me -- Dunlop House

20  entered into an agreement with Steadfast.  I'm going to have

21  you look at Plaintiff Exhibit 10, Pages 116 through 119.

22          Do you recognize this document, sir?

23  A.  Yes.

24  Q.  What is it?

25  A.  This is the agreement between Steadfast and Dunlop House.

─────────────────────── D. Rawlings - Direct ───────────────────────

 1   Q.  Is this contract made in the regular course of business?

 2   A.  Yes.

 3   Q.  Is it kept in the regular course of business?

 4   A.  Yes.

 5   Q.  Is it a true and accurate copy of the contract between

 6   Dunlop House and Steadfast?

 7   A.  As far as I know, yes.

 8   Q.  Does this contract generally govern the scope of services

 9   provided by Steadfast to Dunlop House?

10   A.  Yes.

11   Q.  Does Dunlop House enter into contracts with the Steadfast

12   nurses?

13   A.  Directly with the Steadfast nurses?

14   Q.  Correct.

15   A.  No.

16   Q.  Why not?

17   A.  Because it would be an agreement between the staffing

18   agency with Steadfast.  We have our own employees.

19   Q.  If Dunlop House requires the services of Steadfast

20   nurses, would Dunlop House contact Steadfast or the nurse?

21   A.  Steadfast.

22   Q.  Why would you contact Steadfast and not the nurse?

23   A.  It's part of the agreement that that is how the

24   arrangements are made.

25   Q.  Okay.  Would you be permitted to contact the nurses?

D. Rawlings - Direct

 1   A.  That's not a normal course of --

 2         MR. JEWETT:  Objection.  Foundation.

 3         THE COURT:  Foundation?

 4         MR. JEWETT:  I don't think Mr. Seifeldein has

 5   established that he has the working familiarity with the

 6   actual facility.  I heard the witness say he's testifying

 7   based on his knowledge of the contract.

 8         THE COURT:  Well, you're testifying about the

 9   practice based upon what -- the normal practice based upon

10   what?

11         THE WITNESS:  I'm familiar, Your Honor, with how

12   these contracts are used at all of the communities that

13   Coordinated Services Management manages.

14         THE COURT:  All right.  Overruled.

15   BY MR. SEIFELDEIN:

16   Q.  I'm sorry.  So the question, I believe, was if Dunlop

17   requires the services from Steadfast, who do you contact?

18   And I believe you said the nurses, and the question was why

19   not?  The following question was why not?  Why not contact

20   the nurses -- sorry.  Let me rephrase that.  Strike that.

21         Why contact Steadfast instead of the nurses was the

22   question.

23   A.  Because the agreement is between Dunlop House and

24   Steadfast.

25   Q.  What was the expectation of the type of care and services

420

———— D. Rawlings - Direct ————

1    that these nurses would provide at Dunlop House once they are
2    placed there by Steadfast?
3    A.  There's a scope of practice based on the individuals who
4    may be requested to provide the services, and then there's a
5    standard of practice.
6    Q.  By "standard," what are you referring to?
7    A.  An LPN has a certain standard of practice in how they
8    document, give medications, how they do assessments, and it
9    would be different for a certified nursing assistant, who
10   would have a different standard of practice in how they
11   provide activities of daily living, those things related to
12   bathing, dressing, feeding, that kind of thing.
13   Q.  Is that standard of practice part of them getting the
14   license?
15   A.  It is.
16   Q.  If you wanted to make changes to this contract, who would
17   you contact?
18   A.  Steadfast.
19   Q.  Why would you contact Steadfast?
20   A.  Because the agreement is with Steadfast.
21   Q.  Would you be involved -- I'm sorry.
22          Would you be -- would the nurses be involved in the
23   contract negotiations?
24   A.  No.
25   Q.  Let me have you look at Page 117 of this exhibit,

**JA473**

```
 1   letter I, on the top of the page there.

 2            Are you able to see it, sir?

 3   A.  The line that says that Steadfast will be compliant with

 4   all state and federal laws?

 5   Q.  Yes.

 6            Was it Dunlop House's expectation that Steadfast

 7   will follow federal laws with respect to the nurses?

 8   A.  Yes.

 9   Q.  And what was that expectation?

10   A.  That they would be compliant involving those state and

11   federal laws regulating their employees.

12   Q.  Let me have you look at Page 119 of the agreement.

13            Does this contract generally detail the rates that

14   Dunlop House pays Steadfast?

15   A.  Yes.

16   Q.  Did Dunlop House negotiate compensation with the

17   Steadfast nurses directly?

18   A.  No.

19   Q.  Who do you negotiate the rate of pay with?

20   A.  It would be negotiated with Steadfast.

21   Q.  Does Dunlop have any role in determining or setting the

22   hourly rate Steadfast pays its nurses for the services

23   provided at Dunlop House?

24   A.  No.

25   Q.  And why not?
```

D. Rawlings - Direct

1    A.  Because they're not Dunlop House employees, they are

2    Steadfast employees.

3    Q.  Let me direct your attention to Page 118, letter H.

4         Is Dunlop House responsible for paying the Steadfast

5    nurses for hours worked at Dunlop House?

6    A.  No.

7    Q.  Excuse me.  I misidentified that.  I said Page 118, I

8    meant 117.

9         Are you able to see that, sir?

10   A.  Where it says "Steadfast shall assume sole and exclusive

11   responsibility for the payment of wages"?

12   Q.  Yes.

13   A.  I see -- yes, I see that.

14   Q.  So who is responsible for paying the nurses for the

15   services provided at Dunlop House?

16   A.  Steadfast.

17   Q.  Let's have you look, sir, at Page 117, the same page

18   we're on.  Just look further down under "Facility

19   Responsibilities," and I want you to look at letter B.

20   A.  Yes.

21   Q.  And just before I ask you that question, who presented --

22   who drafted this contract?  Do you know who drafted this

23   contract, Dunlop House or Steadfast?

24   A.  Steadfast.

25   Q.  So are there any contracts or restrictions on Dunlop

D. Rawlings - Direct

1   House in recruiting, hiring, or retaining some of the

2   Steadfast nurses who are placed at your facility?

3   A.  Yes.

4   Q.  Okay.  And does the contract restrict you from recruiting

5   the Steadfast employees without paying a rate -- excuse me --

6   a certain amount of money?

7   A.  The contract stipulates a buyout clause.

8   Q.  And tell me about this buyout clause.  What amount of

9   money would you have to pay Steadfast if you were to retain

10   one of their nurses?

11   A.  A registered nurse is $4,000; a licensed practical nurse

12   is $3,000; and a certified nursing aide is $2,000.

13   Q.  Are the nurses that are placed at Dunlop House your

14   employees?

15   A.  No.

16   Q.  Does Dunlop House discipline the Steadfast nurses?

17   A.  No.

18   Q.  Let's have you look at the same exhibit, Plaintiff

19   Exhibit 10, Page 117, the letter G.  Look at it and look up

20   when you're done.

21        Is Dunlop House required to provide Steadfast

22   feedback on the nurse's performance?

23   A.  To assist them with feedback on performance?

24   Q.  Yes.

25   A.  Yes.

424

D. Rawlings - Direct

1    Q.   If a nurse is not performing duties up to the facility's
2    standard, how is that handled by Dunlop House?
3    A.   It's communicated to Steadfast.
4    Q.   Okay.  Let's have you look at the same page number of the
5    exhibit, 10, Page 117, letters I and J.
6    A.   Okay.
7    Q.   Would you tell me your understanding of what your duties
8    are when it comes to addressing performance issues?
9    A.   So if there were any problems regarding a Steadfast
10   employee, we would contact Steadfast.
11   Q.   And do you address these problems with the nurses?
12   A.   Directly?
13   Q.   Yes.  I need to verbalize that.  Yes.  Do you address the
14   performance issues with the nurses directly?
15   A.   Not from a disciplinary standpoint.  If there was a
16   standard of practice that was -- that needed to be corrected
17   immediately because of safety or the care of a resident, yes,
18   but not from a disciplinary standpoint.
19   Q.   And why would you address these concerns with Steadfast?
20   A.   Because they're Steadfast employees.
21   Q.   Let's have you look, sir, at Page 118 of this contract --
22   I'm sorry.
23        Yes, that's correct, Page 118 of the contract, and
24   look at paragraphs A and B under "Insurance."  Do you see
25   that, sir?

D. Rawlings - Direct

```
 1    A.   Yes, I do.
 2    Q.   Is Steadfast required to carry any insurance as part of
 3    its contract with Dunlop House?
 4    A.   Yes.
 5    Q.   What kind of insurance?
 6    A.   They are to provide general liability and professional
 7    liability insurance coverage.
 8    Q.   Is it for $1 million?  Not less than $1 million?
 9    A.   $1 million per occurrence and $6 million in the
10    aggregate.
11    Q.   And you said -- I'm sorry -- this is the contract that
12    was drafted by Steadfast, correct?
13    A.   Yes.
14    Q.   Does Dunlop House require the nurses to carry insurance,
15    the Steadfast nurses to carry insurance?
16    A.   No.
17    Q.   Earlier you talked about you contact Steadfast when you
18    need some of the nurses for your staffing needs.  What
19    information does the facility, Dunlop House, provide to
20    Steadfast regarding the assignment?
21    A.   Whether it needs to be a licensed practical nurse, a
22    certified nursing aide, or a medication technician, and the
23    shift that needs to be covered, and sometimes the number of
24    days needed.
25    Q.   Okay.  Are the nurses, the Steadfast nurses, permitted to
```

D. Rawlings - Direct

1    directly contact you, Dunlop House, for shift placements?

2    A.   No.

3    Q.   And why not?

4    A.   Because they are employees of Steadfast, and our

5    arrangement is with Steadfast.  That's how we get the nurses.

6    Q.   Who determines which Steadfast nurses are placed at

7    Dunlop House?

8    A.   The individual itself, the person?  I don't think I

9    understand your question.

10   Q.   Let me rephrase that.

11        When you contact Steadfast and you say "I need an

12   LPN," who makes the determination as to which LPN will be

13   presented to Dunlop House?

14   A.   Steadfast.

15        MR. JEWETT:  Objection.  Calls for speculation.

16        THE COURT:  Overruled.

17   BY MR. SEIFELDEIN:

18   Q.   Does Steadfast provide Dunlop House access to its entire

19   list of vetted nurses before it assigns someone to your

20   facility?

21   A.   I'm sorry.  Ask that question again, please.

22   Q.   Sure.

23        When your facility calls Steadfast and says "I need

24   an LPN," does Steadfast give you a list of its entire vetted

25   nurses to select from, or does it send someone?

D. Rawlings - Direct

1    A.   No.

2    Q.   Tell me about that.

3    A.   When a request is made for services to fill a vacancy,

4    Steadfast would make the determination as to who the

5    individual is that would come and fill that vacancy.

6    Q.   Do the Steadfast nurses contact Dunlop House to structure

7    the terms of the working relationship once they are placed at

8    the facility?

9    A.   No.

10   Q.   Who structures the terms of the relationship between

11   Dunlop House and the Steadfast nurses?

12   A.   I would assume that Steadfast would do that.  They are

13   Steadfast employees.

14   Q.   Is that based on the contract?

15   A.   Yes.

16   Q.   Regarding credentials, what information does Steadfast

17   provide to Dunlop House before placing a nurse at your

18   facility?

19   A.   There are a number of credentials that may need to be

20   provided, including their license, their background check.

21   Q.   And are they always provided?

22   A.   They are provided when requested.

23   Q.   These credentials, are they sent to you by Steadfast with

24   every nurse that is placed at your facility?

25   A.   No.

428

─────────────── D. Rawlings - Direct ───────────────

1    Q.  Why is this information needed, the credentials?

2    A.  Because the Dunlop House is a licensed assisted living

3    community, and it's governed by certain state regulations

4    that are required.

5    Q.  So it's a state regulation compliance matter?

6    A.  Correct.

7    Q.  Does Dunlop House screen the Steadfast nurses before they

8    are placed at your facility?

9    A.  No.

10   Q.  Does Dunlop House interview the nurses before they are

11   placed at the facility?

12   A.  No.

13   Q.  Does Dunlop House interview the nurses after they are

14   placed at the facility?

15   A.  No.

16   Q.  Why not?

17   A.  They are Steadfast employees.

18   Q.  Does Dunlop House conduct background checks on the

19   Steadfast nurses that are placed at your facility?

20   A.  No.

21   Q.  Does Dunlop House verify the nurses' employment history?

22   A.  No.

23   Q.  Why not?

24   A.  They are Steadfast employees.

25   Q.  Does Dunlop House verify the employees' work references?

**JA481**

D. Rawlings - Direct

1   A.   No.

2   Q.   Why not?

3   A.   They are Steadfast employees.

4   Q.   Does Dunlop House provide the nurses that are placed by

5   Steadfast at your facility with an employee handbook?

6   A.   No.

7   Q.   What obligations, if any, does Dunlop House have to

8   accept the Steadfast nurses once they're referred to your

9   facility?

10   A.   There's no obligation.

11   Q.   Can the facility decline a nurse that is placed there by

12   Steadfast?

13   A.   Yes.

14   Q.   And how is that communicated?

15   A.   It would be communicated directly to Steadfast.

16   Q.   Why would you communicate it to Steadfast, not the

17   nurses?

18   A.   Because the agreement is between the Dunlop House and

19   Steadfast.

20   Q.   Let me have you look at Plaintiff Exhibit 10, Page 117,

21   the letter L at the very bottom of that page.

22   A.   Yes, sir.

23   Q.   So if Dunlop House cancels a shift, does it contact

24   Steadfast to cancel the shift or the nurses?

25   A.   They would contact Steadfast.

D. Rawlings - Direct

1    Q.   And to the extent that you do cancel a shift, is there a

2    fee associated with that cancellation?

3    A.   Yes.

4    Q.   And tell me about that.

5    A.   If the cancellation happens less than two hours before

6    the reporting time, then Dunlop House would be billed for

7    four hours at the hourly rate of the personnel that the

8    employee, Steadfast employee, was supposed to come.

9    Q.   That's the billing rate?

10   A.   Yes.

11   Q.   The billing rate on the agreement?

12   A.   The billing rate on the agreement.

13   Q.   And do you know how much Steadfast actually pays its

14   nurses?

15   A.   No.

16   Q.   So if a Steadfast nurse fails to report to the facility

17   or is late, what does Dunlop House do?

18   A.   Contact Steadfast.

19   Q.   And why would you contact Steadfast, not the nurse?

20   A.   Because the agreement is with Steadfast.

21   Q.   Does Dunlop House compensate Steadfast for the services

22   that the nurses provide at Dunlop House?

23   A.   I'm sorry.  Ask the question again.

24   Q.   Sure.

25        The services that are provided by the nurses, who do

1   you pay for those services?

2   A.   Steadfast.

3   Q.   Let's have you look at Page 118 of Plaintiff Exhibit 10

4   under "Billing Procedures," letters A and B.

5   A.   Okay.

6   Q.   How does Dunlop House compensate Steadfast for the care

7   provided by the Steadfast nurses at your facility?

8   A.   Steadfast would send an invoice to the Dunlop House.

9   Q.   And how often would the invoice be sent?

10  A.   On a weekly basis.

11  Q.   And what would be included within the invoice that you

12  receive from Steadfast?

13  A.   The personnel who were provided to the Dunlop House, the

14  hours worked at their hourly rate based on the contract.

15  Q.   And is it true, based on letter B here of the contract,

16  that Dunlop House must pay the invoice within 35 days of

17  receiving that invoice?

18  A.   Yes.

19  Q.   Does Dunlop House use Next Day Pay to pay Steadfast?

20  A.   No.

21  Q.   Once you receive the bill from Steadfast, what do you do

22  from your end to verify its correctness, if any?

23  A.   It would be verified against the timecard that was

24  provided to Dunlop House to verify the hours.

25  Q.   And does that usually take more than 24 hours?

─────────────────── D. Rawlings - Direct ───────────────────

1    A.  Yes.

2    Q.  Okay.  And based on this contract here, is it true that

3    if the facility does not make the payment within 35 days, is

4    interest charged?

5    A.  Yes.

6    Q.  Do you know whether -- actually, let me back up.  I'll

7    move on.

8            So you get these invoices and the bills, and you go

9    through your verification process.  What if the nurse is

10   having an issue with the time sheet or its pay?  How would

11   you handle that?

12   A.  Dunlop House wouldn't handle that.

13   Q.  And so if a nurse comes to you with that issue, what

14   would you do?

15   A.  I would -- Dunlop House would have that nurse go back to

16   Steadfast.

17   Q.  And why would you send them to Steadfast instead of you

18   addressing it?

19   A.  Because it's their Steadfast employee.

20           THE COURT:  You've given him the answer about five

21   times now, and I think the questions you asked, you already

22   knew the answer, Mr. Seifeldein.

23           MR. SEIFELDEIN:  Noted, Your Honor.

24   BY MR. SEIFELDEIN:

25   Q.  Does Dunlop House pay the invoices directly to the

1    Steadfast nurses?

2    A.  No.  It's paid to Steadfast.

3    Q.  Now, you talked about these invoices containing time

4    sheets.  Are these time sheets provided to the nurses by

5    Dunlop House?

6    A.  No.

7    Q.  Do you know who provides the time sheets to the nurses?

8    A.  I would think it would be Steadfast who provides the time

9    sheets to the nurses.

10   Q.  I understand.

11          Do the Steadfast nurses use any medical equipment to

12   perform their care at Dunlop House?

13   A.  Medical equipment that's present at the Dunlop House,

14   which is available to the Dunlop House employees, are

15   available to Steadfast nurses, like vital machines.

16   Q.  Does Dunlop House require that Steadfast nurses purchase

17   certain equipment before they come or they are assigned to

18   Dunlop House?

19   A.  No.

20   Q.  Do, on occasion, nurses bring their own personal

21   equipment?

22   A.  Yes.

23   Q.  Are these large or small equipment?

24   A.  Typically, they would be blood pressure cuffs,

25   stethoscopes, those kind of things.

─────────────D. Rawlings - Cross─────────────

 1    Q.  Would those be considered tools-of-the-trade equipment?

 2    A.  Yes.

 3          MR. SEIFELDEIN:  No further questions for this

 4    witness.

 5          THE COURT:  Cross-examination.

 6                    CROSS-EXAMINATION

 7    BY MR. JEWETT:

 8    Q.  Hello, Mr. Rawlings.  My name is Josh Jewett.  I'm an

 9    attorney for Steadfast.  I have a few questions to ask you

10    based on your testimony.

11    A.  Yes, sir.

12    Q.  You spoke with Mr. Seifeldein about the contract that

13    Dunlop agreed to between Steadfast and Dunlop House.

14    A.  Yes.

15    Q.  Does Dunlop review the terms of a contract before

16    agreeing to the terms?

17    A.  Yes.

18    Q.  I want to direct your attention first -- I have a few

19    questions about this contract, as Mr. Seifeldein did -- to

20    paragraph B right here.  Can you see that on the screen?

21    A.  Yes.

22    Q.  Okay.  Under paragraph B, there are a list of things that

23    Dunlop House requires of a nurse before the nurse enters a

24    facility.  Do you see that?

25    A.  Yes.

———D. Rawlings - Cross———

1   Q.   Why does Dunlop require these things?

2   A.   I'm sorry?  Ask the question again.

3   Q.   Sure.

4        Why does Dunlop House require a nurse entering the

5   facility to go through these things?

6   A.   Because of regulatory compliance.

7   Q.   Regulatory compliance.  Okay.

8        And this is a service that Steadfast provides for

9   Dunlop under the terms of the contract; is that correct?

10  A.   Yes.

11  Q.   That's one of the purposes of the relationship -- is that

12  fair? -- for Steadfast to make sure these regulatory

13  requirements are in place so when a nurse comes to your

14  facility, your facility can be sure that they've had all the

15  boxes checked before they start practicing nursing?

16  A.   It's standard practice, yes.

17  Q.   Okay.  Now, if a nurse were to show up at the Dunlop

18  House facility and hadn't completed one of these items, would

19  you permit that nurse to practice nursing at your facility?

20  A.   Yes.

21  Q.   You would still allow a nurse to practice nursing at the

22  facility if a nurse hadn't completed one of the items on this

23  contract?

24  A.   I'm sorry.  I misunderstood your question.  If there was

25  something that was not completed, like a current license,

—————D. Rawlings - Cross—————

1   then they could not work at the Dunlop House.

2   Q.  So it sounds like, then, Dunlop House ultimately reserves

3   the right to decide what nurse can practice nursing at its

4   facility.  Is that fair?

5   A.  I don't think I would characterize it like that.  I would

6   say that it's Steadfast's responsibility to be sure that the

7   nurses that they are sending or the staff that they are

8   sending meet the requirements of state regulations.

9   Q.  Well, you can't just let any nurse enter your facility to

10  practice nursing.  You reserve the right to allow and not

11  allow a particular nurse to enter your facility --

12          MR. SEIFELDEIN:  Objection, Your Honor.

13  BY MR. JEWETT:

14  Q.  -- based on these credentials?

15          MR. SEIFELDEIN:  Objection, Your Honor.

16  Argumentative.

17          MR. JEWETT:  It's a cross-examination.

18          THE COURT:  Well, you're permitted to use leading

19  questions.  So overruled.

20          THE WITNESS:  I'm sorry.  Ask the question again,

21  please.

22  BY MR. JEWETT:

23  Q.  Sure.  The point I was making to you is you just can't

24  allow any nurse to enter the facility, right?  And so my

25  question to you is:

─────────────────D. Rawlings - Cross─────────────────

1      Dunlop House ultimately reserves the right to decide
2  which nurses can enter its facility to care for its patients
3  or not enter its facility to care for its patients.  It's
4  part of your company's responsibility; is that fair?
5  A.  I would disagree that it's ultimately Dunlop House's
6  responsibility.  The nursing agency has a responsibility to
7  be sure that the nurses that they are placing into the Dunlop
8  House meet not only the scope of practice, but understand the
9  standard of practice in order to be able to care for the
10  residents who live at the Dunlop House.
11  Q.  Let me turn to the next page here and direct your
12  attention to part B.
13      You agreed with me a few moments ago that -- we went
14  through this list -- let me give it to you again.  It's on
15  Page 1, part B.  It says PX-10, Page 116 -- a list of vetting
16  requirements that Steadfast does for Dunlop by contract, and
17  you agree that's part of the relationship for Steadfast to do
18  that for you?
19  A.  Yes.
20  Q.  So Mr. Seifeldein asked you some questions about part B
21  on Page 117, Plaintiff's 10, right here, the "Buyout Clause."
22  Do you see that?
23  A.  Yes.
24  Q.  You said Steadfast verifies these credentials for your
25  agency as part of the contract, right?

─────D. Rawlings - Cross─────

1    A.   Yes.

2    Q.   And Steadfast performs these background checks as part of

3    its service to Dunlop House, correct?

4    A.   Yes.  Not just for Dunlop House.

5    Q.   Sure.  I'm talking about the terms of your contract with

6    Steadfast.

7    A.   Yes.

8    Q.   And they do that to make sure that these nurses have the

9    right credentials, the ones that you talked about in your

10   testimony?

11   A.   Correct.

12   Q.   And Steadfast performs these functions so Dunlop House

13   does not have to, I think you said.  Is that true?

14   A.   That's correct.

15   Q.   Because that would be an expense for the facility to have

16   to do that on its own.  You would have to pay for background

17   checks, maybe some administrative expenses that go into that?

18   A.   Because they are Steadfast employees.

19   Q.   Right.  But if you had to do this on your own -- when I

20   say "you," of course I mean Dunlop House -- there would be an

21   expense that goes into that.

22   A.   There would be.

23   Q.   And so when Steadfast -- or Steadfast were to provide

24   you -- strike that.

25            And so if your facility were to decide to directly

D. Rawlings - Cross

1    hire a Steadfast nurse -- say the director of nursing thought

2    this was a great nurse.  If your facility were to decide to

3    hire a Steadfast nurse, Steadfast has already performed those

4    background and administrative tasks for you, so Dunlop House

5    does not have to.

6    A.  They would be done again as part of our -- it's part of

7    Dunlop's policy to reverify the information.

8    Q.  Let me ask you about, next, paragraph E here.  Can you

9    see that okay?

10   A.  Yes.

11   Q.  Okay.  Paragraph E says "Facility agrees that Steadfast

12   Medical Staffing's duty to fill assignments is subject to

13   availability of qualified contractors."

14        Why is that clause in there?

15   A.  Because there may not be someone to fill the need from

16   time to time.

17   Q.  And that's because Steadfast can't guarantee that a

18   particular nurse can show up to your facility when you need

19   one, true?

20        MR. SEIFELDEIN:  Objection, Your Honor.  Calling for

21   speculation as to what Steadfast would do.

22        MR. JEWETT:  I'm going through the language on the

23   contract, Your Honor.

24        THE COURT:  Go back to the section that you're

25   relying on for that purpose.

Carol L. Naughton, Official Court Reporter

**JA492**

-------------------------D. Rawlings - Cross-------------------------

     1          MR. JEWETT:  Yes.  So I'm on the second page, Your

     2     Honor, Page 117, Section E, under "Facility

     3     Responsibilities."

     4          THE COURT:  Okay.  Objection overruled.

     5          MR. JEWETT:  Okay.

     6          I've lost my train of thought.  Could you please

     7     repeat me question to me.

     8          THE COURT:  We usually don't do that.

     9          MR. JEWETT:  Oh, I'm sorry.

    10     BY MR. JEWETT:

    11     Q.  So we're on section -- I'll just read it to you again.

    12          "Facility agrees that Steadfast Medical Staffing's

    13     duty to fill assignments is subject to availability of

    14     qualified contractors."

    15          And I asked you why that's in there.  And can you

    16     please repeat your answer.

    17     A.  I said it's based on the availability of someone to be

    18     placed when a request is made to Steadfast.

    19     Q.  Right.  Okay.

    20          And that's because Steadfast can't guarantee that a

    21     particular nurse is going to be available when Dunlop needs

    22     that nurse?

    23          MR. SEIFELDEIN:  Your Honor, objection.  Asking the

    24     witness to speculate about what Steadfast could or would

    25     have.  The witness already answered the question that --

D. Rawlings - Cross

```
1            THE COURT:  All right.  The Court is going to have
2   you rephrase that, Counsel, because, in a way, it calls for
3   speculation after the fact; what they would have done, could
4   have done.  So let's try it again.
5   BY MR. JEWETT:
6   Q.  Let me try to be more concrete.
7            Are you aware of a situation, in your position,
8   where Dunlop House asked Steadfast to fill a shift and
9   Steadfast wasn't able to do that?
10  A.  I'm not aware.
11  Q.  Okay.  Sticking to the same page, you said you're not
12  aware of any instances where Steadfast was unable to fulfill
13  a shift.  Mr. Seifeldein asked you about paragraph I here,
14  "Facility will notify Steadfast of any problems regarding
15  Steadfast contractors."
16           In your position, are you aware of any specific
17  instances where your facility notified Steadfast of -- let me
18  make sure I use the language of the contract -- of any
19  problems regarding Steadfast contractors?
20  A.  No, I'm not aware.
21  Q.  Okay.  So as far as you know, this paragraph has never
22  come up in the relationship with Steadfast?
23           MR. SEIFELDEIN:  Your Honor, objection.  Calls for
24  speculation.  Asked and answered as well.
25           MR. JEWETT:  Your Honor, I said, "as far as you
```

D. Rawlings - Cross

 1   know."  I qualified the question.

 2         THE COURT:  Well, usually the form of your question

 3   calls for the objection, but the Court will overrule.  You

 4   simply asked whether you know if the issue has come up or

 5   not.

 6         You can answer that.

 7         THE WITNESS:  I'm not aware, Your Honor.

 8   BY MR. JEWETT:

 9   Q.  Okay.  I think I'm almost done with this page.

10         You testified that Dunlop House reads its contracts

11   before they sign them.  Do you recall that?

12   A.  Yes.

13   Q.  And so on paragraph G here -- I'm circling -- do you see

14   where Dunlop House agreed that the contractors assigned to

15   the facility pursuant to this agreement for the purposes of

16   this contract be considered contractors for Steadfast Medical

17   Staffing.  Did I read that correctly?

18   A.  Yes.

19   Q.  Do you see where you agreed to that?

20   A.  It's in the agreement, sir.

21   Q.  Okay.  Mr. Seifeldein asked you some questions about the

22   pay rates.  Those are listed on Page 4 of the contract there.

23   Do you see those?

24   A.  Yes.

25   Q.  Those rates vary depending on the credentials of the

1    professional, right?

2    A.   Yes.

3    Q.   Okay.  I think you testified that you don't have any

4    knowledge what Steadfast actually pays the nurses?

5    A.   Correct.

6    Q.   Okay.  Does the facility ever receive cancellations from

7    staff nurses?

8    A.   Directly?

9    Q.   Well, either directly from the nurse or from Steadfast.

10   A.   Any cancellations would come directly from Steadfast.

11   Q.   What about no call/no show?  Does the facility receive

12   those?

13   A.   If they did, they would contact Steadfast to let them

14   know that the individual who they said they were placing

15   didn't show up.

16   Q.   Okay.  And I would imagine if a no-call, no-show happened

17   or there was a last-minute cancellation, it would put the

18   facility in a jam for staffing purposes.  Fair?

19   A.   I don't think that that necessarily characterizes what

20   might happen.

21   Q.   Okay.  Well, would you at least agree that it would leave

22   you a little short-handed at the facility if there was a

23   no-call, no-show from a Steadfast nurse?

24   A.   I would not agree with that.

25   Q.   Why is that?  You're down one --

———D. Rawlings - Cross———

1  A.  Because our staffing patterns are such that we expect to

2  have a certain level, but it doesn't mean that we are

3  necessarily down in order to be able to meet the needs of the

4  residents.  So being short, no, that doesn't necessarily mean

5  that.

6          THE COURT:  That question calls for speculation

7  about what might have happened if the person didn't show.  So

8  let's just move on.

9  BY MR. JEWETT:

10  Q.  I do have a follow-up question about that, though.

11          When the facility receives a no-call, no-show, under

12  the terms of the contract, it's Steadfast's obligation to try

13  to fulfill or fill that vacancy, right?

14  A.  Yes.

15  Q.  Okay.  And in those situations, isn't it true that the

16  facility will agree to a higher rate of pay to get a

17  replacement there?

18  A.  I'm sorry.  Ask that question again.

19  Q.  Sure.

20          In those situations that we're talking about right

21  now, it's true, isn't it, that the facility will actually

22  agree to a higher rate of pay to get a nurse there to fill

23  that vacancy?

24  A.  Higher than what's been stated in the contract?

25  Q.  Higher rate than what is stated here in the contract.

─────D. Rawlings - Cross─────

```
 1   A.  I'm not aware of that.
 2   Q.  Mr. Seifeldein asked you a few questions about the duties
 3   of the Steadfast nurses at the facility.  He asked you if you
 4   give them a handbook.
 5   A.  Yes.
 6   Q.  I believe you said "no."
 7   A.  Correct.
 8   Q.  Does the facility instruct the nurses how to carry out
 9   their duties of nursing, such as taking blood pressure and
10   all the many things that nurses do?
11   A.  That's a scope of practice, a standard of practice that
12   they would not be oriented to do.  It would be expected that
13   they would already know how to do that.
14   Q.  You would expect that they already know how to do that
15   sort of thing independently.
16   A.  Correct.
17   Q.  Without someone sitting there telling them how to do it.
18   A.  Correct.
19   Q.  Okay.  Do you provide them a how-to guide on how to do
20   these things, like when they get to the facility, "Here's a
21   sheet.  Here's how to..."
22   A.  It would be oriented to the unit that they are working
23   and provided certain documents based on the assignment that
24   they have.
25   Q.  Okay.  And beyond that, do you give them, like, a tour of
```

D. Rawlings - Cross

 1   the facility or anything?

 2   A.  Of the unit that they are working on.

 3   Q.  Sure, sure.

 4          So you said that it's a scope-of-practice issue,

 5   that these are things that you expect them to do

 6   independently.

 7          So the nurses at your facility, it sounds like they

 8   are given discretion in the manner in which they practice

 9   nursing at your facility.

10   A.  Discretion within the scope of their responsibilities and

11   standard of practice, yes, sir.

12   Q.  Okay.  I want to ask you -- turning back to the contract

13   here.  Here's Page 1.  I'm going to turn to Page 2.  I'm

14   going to ask you about Section K there.  Do you see that?

15   A.  Yes.

16   Q.  Okay.  I think you mentioned this in your testimony, but

17   when a nurse engages in something incompetent -- let me just

18   put it in terms of the contract here -- incompetent,

19   negligence, engages in misconduct, the facility will notify

20   Steadfast.  Is that what you said?

21   A.  Correct.

22   Q.  And the facility will put that nurse, in some occasions,

23   some situations, on a -- will ask them not to return that

24   nurse; is that fair?

25   A.  Yes, it could --

1  Q.  Do they call that a "do not return" list, a DNR list?

2  A.  I'm not aware of the terminology.

3  Q.  Fair.

4       And this is something that the facility has as a

5  matter of right to do under the terms of this contract, under

6  Section K, right?

7  A.  Correct.

8  Q.  After all, the facility has a responsibility to decide

9  who can and can't care for its patients.  Fair?

10  A.  Yes.

11  Q.  Okay.  And under the terms of this contract, Steadfast

12  doesn't have the right to challenge the decision to say "We

13  can't have this nurse at our facility anymore."  You retain

14  all discretion on that, right?

15  A.  Under these circumstances, yes.

16  Q.  And so at the end of the day, it sounds like your

17  facility ultimately decides who gets to practice nursing in

18  your facility or not practice nursing.  You get to decide who

19  ends up practicing and who gets excluded.

20       MR. SEIFELDEIN:  Your Honor, that question has been

21  asked and answered.

22       THE COURT:  Sustained.

23       MR. JEWETT:  Okay.  No further questions.  Thank

24  you.

25       THE WITNESS:  Thank you.

D. Rawlings - Redirect

```
 1          THE COURT:  Mighty brief.  I take it you're going to

 2   do a redirect?

 3          MR. SEIFELDEIN:  Real brief, Your Honor.

 4          THE COURT:  Okay.

 5                     REDIRECT EXAMINATION

 6   BY MR. SEIFELDEIN:

 7   Q.  Sir, is it Dunlop House's expectation that Steadfast will

 8   maintain the screening records that Steadfast does before it

 9   places nurses at your facility?

10   A.  Yes.

11          MR. SEIFELDEIN:  No further questions, Your Honor.

12          THE COURT:  Thank you.

13          May this witness be permanently excused?

14          MR. SEIFELDEIN:  Yes, Your Honor.

15          THE COURT:  Thank you, sir.  You may step down.

16          (Witness excused.)

17          THE COURT:  Your next witness?

18          MS. LEWIS:  Your Honor, housekeeping matter.  What

19   time is our next break?

20          THE COURT:  4:00.

21          MS. LEWIS:  District director Roberto Melendez,

22   Your Honor.

23          (Witness sworn.)

24          ROBERTO MELENDEZ, called by the Plaintiff, having

25   been first duly sworn, was examined and testified as follows:
```

449

R. Melendez - Direct

```
 1                    DIRECT EXAMINATION
 2   BY MS. LEWIS:
 3   Q.  Good afternoon.  May you please state and spell your name
 4   for the record.
 5   A.  Roberto Melendez.  R-o-b-e-r-t-o M-e-l-e-n-d-e-z.
 6   Q.  Where are you currently employed?
 7   A.  At the Wage and Hour Division of Department of Labor.
 8   Q.  What year did you join the Department of Labor?
 9   A.  In 2010.
10   Q.  What is your current position?
11   A.  District director.
12   Q.  How long have you been in this position?
13   A.  Since January of 2021.
14   Q.  Prior to holding that position as the district director,
15   did you hold any other positions within the Department of
16   Labor?
17   A.  Yes, I did.
18   Q.  What were they?
19   A.  I was an investigator and also an assistant district
20   director.
21   Q.  What dates were you an investigator?
22   A.  Approximately 2010 to 2015.
23   Q.  And what dates were you an assistant district director;
24   also for shorthand, ADD?
25   A.  From September 2015 to January 2021.
```

R. Melendez - Direct

```
 1   Q.  And within these various positions within the Wage and
 2   Hour Division of the Department of Labor, what have been your
 3   general job duties and responsibilities?
 4   A.  Generally to enforce labor laws; as a supervisor, to
 5   supervise cases that are being investigated by investigators.
 6   Q.  When you joined the Wage and Hour Division, what kind of
 7   trainings did you receive?
 8   A.  We received training identified as Basic 1 and Basic 2.
 9   Q.  And, generally, what is Basic 1?
10   A.  Basic 1 is an introduction to the Fair Labor Standards
11   Act and investigative process.
12   Q.  What is Basic 2?
13   A.  Basic 2 is additional training that deals with more
14   complex laws, such as immigration law, Family Medical Leave
15   Act, and government contracts.
16   Q.  Have you received any other trainings related to the Act,
17   the Fair Labor Standards Act, since completing Basic 1 and
18   Basic 2?
19   A.  Yes.
20   Q.  What other trainings have you completed?
21   A.  The training is continuous.  It's ongoing throughout the
22   year.  In the Fair Labor Standards Act, there's many
23   different things that come up, such as initiatives that the
24   agency is doing.
25   Q.  You indicated that you had trainings in the Fair Labor
```

R. Melendez - Direct

 1   Standards Act.  Approximately how many hours of training have
 2   you had?
 3   A.  Difficult to say how many hours.  The initial Basic 1
 4   training is approximately three weeks of classroom training.
 5   Q.  And who is the FLSA applicable to?
 6   A.  The FLSA is applicable to any employer who does gross
 7   annual sales of $500,000 or more, to employees whose duties
 8   involve the movement of interstate commerce, as well as
 9   employees whose duties are subject to -- excuse me -- they're
10   critically essential and directly -- I'm sorry -- directly
11   essential to the movement of interstate commerce.
12   Q.  And were you trained on the regular rate of pay within
13   that meaning within the FLSA?
14   A.  Yes.
15   Q.  What is the regular rate?
16   A.  The regular rate is the result of taking an employee's
17   gross pay and dividing it by all the hours worked.
18   Q.  What is the frequency of that calculation?  Weekly?
19   Annually?
20   A.  It could be weekly, biweekly.  It's really based on the
21   employer's pay period.
22   Q.  And were you trained in the overtime provisions of the
23   Fair Labor Standards Act?
24   A.  Yes.
25   Q.  Under the FLSA, when is an employer required to pay

R. Melendez - Direct

1  overtime?

2  A.  An employer is required to pay overtime when an employee

3  works more than 40 hours in a workweek.

4  Q.  What is a workweek?

5  A.  A workweek is seven consecutive 24-hour days, not to

6  exceed 168 hours.

7  Q.  What is the rate an employer must pay after 40 hours in a

8  workweek?

9  A.  Time and a half the regular rate.

10  Q.  So for overtime, what were you trained to look for when

11  determining if an employer is in compliance with the FLSA?

12  A.  One of the things that we look for is to see if the -- if

13  there is a separate line item in the record books that

14  demonstrate additional half-time pay for hours over 40.

15  Q.  Is it a violation of the FLSA to not pay overtime?

16  A.  Yes.

17  Q.  Were you trained on the recordkeeping requirements of the

18  FLSA?

19  A.  Yes.

20  Q.  Under the FLSA, what information is an employer required

21  to keep related to payroll?

22  A.  So the employer is required to keep identifying

23  information of the employee, hours that the employee worked,

24  the day -- the date and time that they started the work, the

25  date and time that they ended the work, hours worked during

453

R. Melendez - Direct

1   the week, and to separate any hours for overtime purposes.

2   Q.  Does an employer's pay records have to specify the

3   regular rate of pay?

4   A.  Yes.

5   Q.  Does an employer's pay records have to specify the

6   overtime premium rate?

7   A.  Yes.

8   Q.  Are you familiar with Medical Staffing of America doing

9   business as Steadfast Medical?

10  A.  Yes.

11  Q.  How are you familiar with that company?

12  A.  I was the supervisor of the investigator who conducted

13  the investigation.

14  Q.  And was this during your time as district director or

15  ADD?

16  A.  Assistant district director.

17  Q.  Okay.  And when you were the assistant district director

18  supervising the investigator, did you verify the back wages

19  for the investigation?

20  A.  Yes.

21  Q.  What time period did you verify back wages?

22  A.  From approximately -- it was June 2015 to December 30,

23  2018.

24  Q.  So for the time period of the investigation, did you

25  review Steadfast's payroll records?

R. Melendez - Direct

1  A.  Yes.

2  Q.  For that time period, what records did you review?

3  A.  Payroll summaries.

4  Q.  Were there any payroll records missing between August 18,

5  2015, and December 30, 2018?

6  A.  Yes.

7  Q.  What dates were missing?

8  A.  The records that were missing were from approximately

9  August of 2015 to August of 2016.

10 Q.  As a result of those missing records, were you able to

11 compute back wages for that time period?

12 A.  No.

13 Q.  I want to direct your attention to what we've previously

14 marked as Plaintiff's 7.  It's really tiny.  I can barely see

15 it myself.  There we go.

16      Do you recognize this document?

17 A.  I do.

18 Q.  What is it?

19 A.  A payroll summary.

20 Q.  Who provided these documents?

21 A.  Steadfast.

22 Q.  What information is on this document?

23 A.  Employees' names, the hours they worked, the total paid.

24 Q.  Is there a column for deductions?

25 A.  There is.

─── R. Melendez - Direct ───

```
 1    Q.  Does it appear --
 2              MS. LEWIS:  If we can scroll through the document,
 3    please, Ms. Jones.  Keep going.
 4              Your Honor, if I may approach, in the interest of
 5    there is 68 pages here.
 6              THE COURT:  You may.
 7              (Pause in the proceedings.)
 8    BY MS. LEWIS:
 9    Q.  Sorry.  We were looking at the wrong one.  Now we're on
10    the right track.  But if you can -- we were looking at the
11    wrong exhibit.  This is the one that is in the binder.
12              Nonetheless, does it appear, when scrolling through
13    this document, whether the employer made some sort of
14    deductions -- made any sort of deductions?
15    A.  I don't see any.  All right.  There's one there.
16    Q.  The sixth column over is deductions.  So sixth column
17    over.
18    A.  There's some deductions, there is.
19    Q.  Did DOL receive these documents in the course of the
20    investigation?
21    A.  Yes.
22    Q.  Is this an accurate representation of the payroll
23    summaries that were provided during the investigation?
24    A.  Yes.
25              MS. LEWIS:  Now, the exhibit binder that has been
```

──────────── R. Melendez - Direct ────────────

1   presented to the Court has a sampling, if you could scroll

2   through.  We printed out 69, but there is a disk attached

3   that has all of the payroll summaries.  We move to admit the

4   entirety of Plaintiff's 7.

5           THE COURT:  First of all, you're moving to amend it?

6           MS. LEWIS:  No, admit.

7           THE COURT:  Any objection to Plaintiff's 7?

8           MS. RUST:  No objection, Your Honor.

9           THE COURT:  Plaintiff's Exhibit 7 will be admitted.

10          (Plaintiff's Exhibit PX-7 received in evidence.)

11  BY MS. LEWIS:

12  Q.  Can you tell whether the employer was in compliance with

13  Section 7 of the FLSA based upon this document, the payroll

14  summary?

15  A.  Yes.

16  Q.  Was the employer in compliance?

17  A.  The employer was not in compliance.

18  Q.  How can you tell?

19          MS. RUST:  I'm going to object to the foundation.

20  We're still dealing with whether the individuals were

21  classified.  If they're not classified as employees, then

22  they're not going to have deductions.  That doesn't

23  necessarily mean they are not in compliance with the FLSA.

24          THE COURT:  That's the ultimate issue.  What you can

25  do is you can cross-examine him on what he says.  The Court

Carol L. Naughton, Official Court Reporter

**JA509**

─────────────── R. Melendez - Direct ───────────────

```
 1    will have to take into consideration his statement that there
 2    were not deductions in compliance as well as whatever you
 3    determine on cross-examination.  So I'll just have to hear it
 4    all.
 5            MS. RUST:  Okay.  Thank you, Your Honor.
 6    BY MS. LEWIS:
 7    Q.  The question asked was:  How can you tell, regarding the
 8    compliance?
 9    A.  You can see that there are hours over 40.  There is no
10    separate line item to identify the payment of overtime, and
11    it seems to be just a gross amount paid.
12    Q.  Okay.  Can you provide an example of where you have
13    deduced these conclusions with respect to the Section 7
14    half-time not being paid?
15            Let me streamline this a bit.
16            (Pause in the proceedings.)
17    BY MS. LEWIS:
18    Q.  Can you tell whether or not Valerie McQueen was receiving
19    half-time?
20    A.  That's probably not a good example.  It's only 15 hours.
21    Q.  All right.
22            MS. LEWIS:  Try another example, Ms. Jones.
23            THE COURT:  Can you pick an example of what you're
24    testifying to?
25            THE WITNESS:  I could.  If I had a calculator, then
```

R. Melendez - Direct

```
 1   I can do the computation of taking the total pay divided by
 2   the hours worked and establish a regular rate.
 3             MS. LEWIS:  Okay.
 4             THE COURT:  Hold on.  We can do this.
 5             THE WITNESS:  So looking at -- I'm focusing here.
 6   Looking at -- I think it's the last name of Mueller.  I can't
 7   read the first name.  That person worked 53 hours and was
 8   paid 2,120.  If you take the total pay divided by the hours
 9   worked, it comes out to $40 an hour.
10   BY MS. LEWIS:
11   Q.  Piers Mitiliers is the one that you're referring to, in
12   between the names "Lakisha Miller" and "Natalia Moore" on
13   3/31/2017.  Is that the one you're looking at?
14   A.  Yes.
15   Q.  Based on this example, did the employer pay half-time?
16   A.  The employer did not pay half-time.
17   Q.  Was there any information provided to Wage and Hour that
18   confirmed the employer only paid straight time?
19   A.  Say that one more time.
20   Q.  Yes.
21             Did the employer provide any information to Wage and
22   Hour that confirmed its practice of paying straight time?
23   A.  Yes.
24   Q.  What information was provided?
25   A.  The information was provided during the initial
```

R. Melendez - Direct

1    conference between the investigator and the employer as well
2    as information from interviews.
3    Q.  Okay.  And to compute the back wages for the time period
4    of August 23, 2016, to December 3, 2018, were these payroll
5    summaries used to compute the back wages?
6    A.  Yes.
7    Q.  Were additional records reviewed to verify the accuracy
8    of the payroll summaries?
9    A.  There were additional records in addition to the payroll
10   summaries.  There might have been some invoices and time
11   records.
12   Q.  When you say "time records," are you referring to time
13   sheets?
14   A.  Yes.
15   Q.  Based upon the review of these additional records, was
16   there any reason to question the accuracy of the information
17   on the payroll summaries?
18   A.  No.
19   Q.  Were there any records not used to compute back wages --
20   sorry.  Strike that.
21          So based upon the payroll records that Wage and Hour
22   received, specifically the payroll summaries, how was an
23   individual's regular rate of pay determined?
24   A.  By taking their gross pay and dividing it by the total
25   hours that they worked.

─────R. Melendez - Direct─────

1    Q.  And that arrives at the regular rate?

2    A.  Yes.

3    Q.  Once a regular rate was determined, how were the rest of

4    the back wages determined for an overtime violation?

5    A.  So you -- you -- it's the half-time that's due for any

6    hours over 40.

7    Q.  Okay.  So what do you do with the regular rate?  What is

8    the equation?

9    A.  So half the regular rate times any hours over 40.

10   Q.  How did you know the total hours worked based on the

11   payroll summaries?

12   A.  They are taken from the payroll summaries and time

13   records.

14   Q.  So on the face of the records?

15   A.  Yes.

16   Q.  Okay.  And directing your attention to Plaintiff's 21, do

17   you recognize these documents?

18   A.  I do.

19   Q.  And what is it?

20   A.  They are Wage Transcription and Computation sheets.

21   Q.  Was this document created during the regular course of

22   business by the Department of Labor?

23   A.  Yes.

24   Q.  Where did the information come from that was used to

25   create these calculations?

R. Melendez - Direct

1  A.  From the employer's payroll summaries.

2  Q.  Is this document a true and accurate representation of

3  the employees who are owed back wages between August 2016 and

4  December 30 of 2018 based upon the payroll records defendants

5  provided?

6  A.  Yes.

7  Q.  Do these calculations follow the methodology for

8  computing overtime due that you just explained?

9  A.  Yes, they do.

10        MS. LEWIS:  Your Honor, I move to admit

11  Plaintiff's 21.

12        THE COURT:  Any objection?

13        MS. RUST:  No objection.

14        THE COURT:  Exhibit 21 will be admitted.

15        (Plaintiff's Exhibit PX-21 received in evidence.)

16  BY MS. LEWIS:

17  Q.  Based upon the last payroll records for the time period

18  you reviewed that supported the back-wage computation -- that

19  is, the December 2018 date -- did this -- strike that.

20        Based upon the last set of payroll records for the

21  period that you reviewed -- that was the August 2016 through

22  December 2018 -- did the employer pay time and a half for

23  hours worked over 40?

24  A.  They did not.

25  Q.  And how did they pay them?

———————R. Melendez - Cross———————

 1  A.  At straight time.

 2  Q.  Is this practice a violation of the FLSA?

 3  A.  It is.

 4         MS. LEWIS:  No further questions for this witness,

 5  Your Honor.

 6         THE COURT:  Cross.

 7         I don't know how long your cross will be, but it may

 8  be interrupted by a break, but you will be permitted to

 9  finish it, Ms. Rust.

10         MS. RUST:  I think it will be short.

11         THE COURT:  Okay.

12         (Pause in the proceedings.)

13                    CROSS-EXAMINATION

14  BY MS. RUST:

15  Q.  Hi, Mr. Melendez.  My name is Julia Rust.  I'm an

16  attorney for the defendants.  I just want to clarify a few

17  things that you talked about.

18         First of all, your determination -- well, Ms. Lewis

19  asked you whether the payroll practices, as far as paying

20  overtime, were in compliance with the FLSA.

21         That determination is ultimately based on whether

22  the Court decides whether these individuals are properly

23  classified as independent contractors; is that correct?

24         MS. LEWIS:  Objection, Your Honor.  Argumentative.

25  The Court has already stated that it maintains the ultimate

R. Melendez - Cross

1    conclusion.  So to the extent that they are seeking -- it's,

2    one, argumentative and, two, calls for a legal conclusion.

3         THE COURT:  I'm trying to determine whether you're

4    asking him a legal question.  I think the Court has made it

5    clear that he can get these records in.  You can talk about

6    it being a violation, but ultimately, the Court has to decide

7    whether it's a violation of the Federal Labor Standards Act

8    based upon whether the defendant is, in fact, an employer.

9         So the Court understands the question that you asked

10   him.  The Court will let it go.  There's no jury in here.

11        MS. RUST:  Thank you, Your Honor.

12   BY MS. RUST:

13   Q.  And to clarify, an individual is only entitled to

14   overtime pay as an employee, not as an independent

15   contractor, correct?

16   A.  That would be correct.

17   Q.  And if the payroll records we -- when Ms. Lewis reviewed

18   the payroll summary with you on the screen, the example you

19   gave was on 3/31/2017 for an individual named Piers

20   Mitiliers.  He worked 53 hours and was paid 2,120.  I think

21   you calculated that at $40 an hour, right?

22   A.  Yes.

23   Q.  But the payroll summary did not specify what the

24   flat-time hourly rate for that individual was, correct?

25   A.  It did not.

R. Melendez - Cross

1    Q.  So you don't -- you aren't able to determine, based on

2    the payroll summaries, if that individual actually was paid

3    overtime.  Basically, your calculation is on the assumption

4    that his hourly rate was only $40 an hour the entire time for

5    that payroll period.

6    A.  That's what the calculation came up to, yes.

7    Q.  Okay.  And the manner in which you calculated the Wage

8    Transcription and Computation worksheets, are those

9    calculations done manually?

10   A.  So they are done manually, and I'm going to assume that

11   the investigator who did it put it -- input it into the sheet

12   to make the computation, yes.

13   Q.  Okay.  So there is room for human error in the

14   transposition of information; is that correct?

15   A.  Yes.

16   Q.  And this is a pretty significant volume of damages

17   calculations, right?

18   A.  Yes.

19   Q.  So there is a likelihood that there are errors in the

20   calculations based on high volume, right, in what you just

21   said?

22   A.  Yes.

23   Q.  So you can't verify the accuracy of the information in

24   PX-22; is that correct?

25   A.  In regards to the sheet that was provided and the

────────────R. Melendez - Cross────────────

1   computation that was made, yes, that was an accurate

2   computation.

3   Q.  It's an accurate computation if the information was

4   transposed correctly?

5   A.  Yes.

6   Q.  Okay.  And you just stated that it may not have been

7   transposed correctly.

8           MS. LEWIS:  Objection.  Misstates the testimony.

9           THE COURT:  Sustained.

10  BY MS. RUST:

11  Q.  Okay.  Let me back up.

12          You just agreed with me -- tell me if I'm

13  misstating.  You just agreed with me that there is room for

14  human errors in the calculation on these worksheets because

15  it's based on manual transposition of information, right?

16  A.  Yes.

17  Q.  So in a volume of this size, there is a likelihood of an

18  error in calculations, correct?

19  A.  Yes.

20  Q.  Okay.  And you did not personally go through and

21  calculate every single one of these Wage and Hour computation

22  worksheets, correct?

23  A.  Correct.

24  Q.  So you did not personally verify the accuracy of the

25  calculations, correct?

R. Melendez - Cross

```
 1   A.  So there's always a portion of taking some records that
 2   are in the file and bouncing it off of some records that the
 3   employer provided.  To go through all of them, no one
 4   necessarily does all that.
 5          If the scope of the investigation is this large, we
 6   will take a sampling to identify if things were done
 7   correctly.  But to do every single one of them, no, that
 8   would not be efficient of our agency to do that.
 9          THE COURT:  The Court understands that we're
10   engaging in speculation that there's some inaccuracy here,
11   and this is speculation going on backwards and forwards.
12          MS. RUST:  Understood, Your Honor.  I think I only
13   have one more question.
14   BY MS. RUST:
15   Q.  Are you familiar with the liquidated damages provision
16   under the FLSA for classification purposes?
17   A.  I'm familiar with liquidated damages, yes.
18          THE COURT:  That's beyond the scope of the direct.
19          MS. RUST:  Well, it goes to calculations, Your
20   Honor.  I have one question --
21          THE COURT:  I know, but there's been no discussion
22   of liquidated damages on direct here.  As a matter of fact,
23   there was no indication of what the total damages were here,
24   let alone whether liquidated damages are involved.
25          MS. RUST:  Then I'll wrap up.  That's all I have.
```

─────────R. Melendez - Redirect─────────

1   Thank you.

2            THE COURT:  May the witness be excused?

3            MS. LEWIS:  Brief redirect.

4                     REDIRECT EXAMINATION

5   BY MS. LEWIS:

6   Q.  For the time period that you were responsible for

7   supervising the investigator and reviewed the back-wage

8   computations, are you aware whether defendants provided

9   precise information with respect to any discrepancy in the

10  calculations that Wage and Hour came to?

11  A.  I am aware of some discrepancies, yes.

12  Q.  And then when those discrepancies were brought to your

13  attention, were they resolved for the time period -- the

14  2016-2018 period?

15  A.  I believe that they were.

16  Q.  Okay.  Now, in terms -- going back to the exhibit,

17  defendant asked whether -- what information Wage and Hour had

18  with respect to knowing the regular rate.

19            Whose responsibility is it to maintain the regular

20  rate on payroll records?

21  A.  The employer's.

22  Q.  And if an employer doesn't do that, then how does the

23  Department of Labor, Wage and Hour Division, go about

24  determining the regular rate?

25  A.  The same computation, taking the gross pay divided by the

```
                          ┌─R. Melendez - Redirect─┐
 1   total hours worked.
 2   Q.  So does the Department of Labor only have the employer's
 3   own records to rely upon with respect to determining regular
 4   rate when it's not indicated?
 5   A.  So we can use records, or we can conduct interviews.
 6              MS. LEWIS:  No further questions, Your Honor.
 7              THE COURT:  Well, you know, the Court said a few
 8   minutes ago it was speculation about the accuracy of the
 9   records, and then you raised the question whether there had
10   been any discrepancies.  So the Court will permit Ms. Rust,
11   if she wishes, to go back on recross to address that issue.
12              MS. LEWIS:  Your Honor, if I may?  When this trial
13   was initially scheduled in 2019, the Court directed defendant
14   to perform a math check.  They did so, and they have not done
15   any subsequent since that time.
16              So pursuant to the Court's own order, defendant has
17   represented through his testimony that that math check was
18   performed for the time period that he's speaking to.
19              THE COURT:  All right.
20              MS. RUST:  Well, if I can address that?  During the
21   pretrial conference, we stated -- it's in the Pretrial Order
22   that we are objecting to the accuracy of the computations,
23   but if liability is established, then we would work with the
24   plaintiff to verify the accuracy.  We didn't receive a final
25   calculation of damages until August 26th.
```

─────────R. Melendez - Redirect─────────

1       THE COURT:  Let's put it this way:  If liability is

2  determined, the Court will be having to make the

3  determination about what the calculations will be, not,

4  per se, the parties getting together and deciding now we're

5  going to decide what damages there are.

6       The damages need to be established in this case, and

7  the Court, based on the information it gets from the record

8  and what is presented, will determine what the damages will

9  be.

10      So the simple fact is, if the parties wanted to get

11  together before this case started and reach an agreement and

12  stipulate to what the potential damages would be, if, in

13  fact, it was found that the defendant was an employer, you

14  had a chance to do that.

15      MS. LEWIS:  Your Honor, and just to be clear for the

16  regard, the order I'm referencing is ECF 84.  And with

17  respect to counsel's representations that the computations

18  were provided on whichever date it was, I'd note for the

19  Court that the last set of records defendants produced, which

20  will be testified to by the investigator, were on the Tuesday

21  before trial for -- and he'll testify about that.

22      So this time period, there is an ECF and a direction

23  from the Court for defendants to complete a math check.  Such

24  math check was done.  So in terms of any argument regarding

25  that, I refer the Court to its previous order and direction

─────────Y. Xiong - Direct─────────

1    to the defendants.

2          THE COURT:  All right.  This is the end of the

3    discussion, then.  Step down.

4          MS. LEWIS:  Thank you.

5          (Witness excused.)

6          THE COURT:  The Court is going to take a 15-minute

7    break, and then we'll come back and continue.

8          (Recess from 3:53 p.m. to 4:15 p.m.)

9          THE COURT:  Okay.  You may call your next witness.

10         MS. LEWIS:  Xiong Yaozu.  He's on Zoom.

11         THE COURT:  Okay.

12         (Witness sworn remotely.)

13         YAOZU XIONG, called by the Plaintiff, having been

14   first duly sworn, was examined and testified via ZoomGov.com

15   as follows:

16                      DIRECT EXAMINATION

17   BY MS. LEWIS:

18   Q.  Good afternoon.  If you could please state your name and

19   spell your name for the record.

20   A.  My name is Yaozu Xiong.  First name spelled Y-a-o-z-u.

21   Last name spelled X-i-o-n-g.

22   Q.  Where are you currently employed?

23   A.  I am employed with the U.S. Department of Labor, Wage and

24   Hour Division.  My station is at the New York City District

25   office.

———————————Y. Xiong - Direct———————————

1   Q.  And what is your current position?

2   A.  I am one of the Wage and Hour investigators.

3   Q.  How long have you been in this position?

4   A.  I've been in the position for about five years now.

5   Q.  Okay.  So since approximately 2016?

6   A.  Yes.

7   Q.  What year did you join the Department of Labor?

8   A.  Joined the Department of Labor back in 2015.

9   Q.  Have you held any other positions prior to being an

10  investigator?

11  A.  Yes.

12  Q.  What other positions have you held?

13  A.  I was a Wage and Hour assistant.

14  Q.  What were your duties and responsibilities in the

15  positions that you've held within the Wage and Hour Division,

16  generally speaking?

17  A.  As an assistant, we deal with complaint intakes and help

18  out with the administrative tasks of the office; and as an

19  investigator, I get assigned cases and investigate employers

20  that have potential Fair Labor Standards Act violations.

21  Q.  When you joined the Wage and Hour Division, what type of

22  trainings did you receive?

23  A.  When I joined the Wage and Hour Division, I received a

24  Basic 1A training.  That is for the assistant position.  And

25  when I became the investigator, I went through the Basic 1

Carol L. Naughton, Official Court Reporter

**JA524**

—— Y. Xiong - Direct ——

1    training, Basic 2 training, and also with a lot of ongoing

2    refresher -- annual refresher trainings as well.

3    Q.  Generally, what is Basic 1?

4    A.  Basic 1 is the basic concept -- understanding basic

5    concepts of FLSA, the Fair Labor Standards Act, which include

6    the hours worked, hours paid, recordkeeping.

7    Q.  And you also mentioned Basic 2.  What did you learn in

8    Basic 2?

9    A.  Basic 2 is a little bit more advanced on top of the

10   Basic 1.  It talks about more -- other laws that Wage and

11   Hour enforces.  For example, the Family and Medical Leave

12   Act, the Davis-Bacon Act, and the Service Contract Act.

13   Q.  Does Wage and Hour provide any other training after the

14   completion of these courses that you mentioned?

15   A.  Yes.

16   Q.  What sort of other trainings?

17   A.  We have periodic just-in-time training.  We also have the

18   micro training about the Fair Labor Standards Act and other

19   laws that we enforce as well.

20   Q.  You indicated that within Basic 1 you learned about the

21   Fair Labor Standards Act.  Approximately how many hours of

22   FLSA training have you had?

23   A.  It's hard to quantify.  Basic training consists of,

24   together, about 13 weeks, and plus the ongoing training,

25   there are too many.

Carol L. Naughton, Official Court Reporter

**JA525**

Y. Xiong - Direct

 1  Q.   Were you trained on the regular rate of pay?

 2  A.   Yes.

 3  Q.   And what is the regular rate?

 4  A.   Regular rate, we have a formula to compute the regular

 5  rate.  It arrives when you use the total amount paid divided

 6  by total hours worked for that workweek.

 7  Q.   Were you trained on the overtime provisions of the FLSA?

 8  A.   Yes.

 9  Q.   Under the FLSA, when is an employer required to pay

10  overtime?

11  A.   Under the FLSA, the employer is required to pay at least

12  time and a half of the regular rate when hours worked exceed

13  40 in a workweek.

14  Q.   What is a workweek?

15  A.   A workweek is seven consecutive days of a 24-hour day in

16  any week.

17  Q.   Okay.  Is it a violation of the FLSA for an employer not

18  to pay overtime?

19  A.   Yes.

20  Q.   What is the rate an employer must pay after 40 hours in a

21  workweek?

22  A.   The employer is required to pay at least time and a half

23  of the regular rate when hours worked exceed 40.

24  Q.   For overtime, what were you trained to look for when

25  determining if an employer is in compliance with the FLSA?

―――――――――――――Y. Xiong - Direct―――――――――――――

1   A.   I was trained to look for any additional premium payment

2   that the employer makes when hours worked exceed 40.

3   Q.   Were you trained on the recordkeeping requirements of the

4   FLSA?

5   A.   Yes.

6   Q.   Under the FLSA, what records is an employer required to

7   keep?

8   A.   Under the FLSA, the employer is required to keep about 14

9   items.  Relevant to this case, the employer is required to

10  keep the name, full name of the employee, Social Security

11  number, the position, rate of pay, total hours worked, and

12  total amount paid.

13  Q.   Are employers required to keep a record of the regular

14  rate of pay?

15  A.   Yes.

16  Q.   Are you familiar with Medical Staffing of America doing

17  business as Steadfast Medical?

18  A.   Yes.

19  Q.   And how are you familiar with that company?

20  A.   I assisted in computing back wages for the case.

21  Q.   For what period of time did you compute back wages?

22  A.   The period that I computed was from December 30, 2018, to

23  June 27, 2021.

24  Q.   In computing these back wages, did you review Steadfast's

25  payroll records?

———Y. Xiong - Direct———

1   A.  Yes.

2   Q.  What records did you review?

3   A.  I reviewed their payroll summaries and the Next Day Pay.

4   Q.  Were there any payroll records missing between

5   December 30 of 2018 and June 27 of 2021?

6   A.  Yes.

7   Q.  What type of records were missing?

8   A.  The NDP records.  Some of them were missing about 90

9   days.

10  Q.  And just to clarify, and moving forward, Next Day Pay,

11  we'll refer to shorthand as "NDP."  Are we on the same page?

12  A.  Yes.

13  Q.  So you indicated that you also used payroll summaries.

14          What information was on the payroll summaries that

15  you reviewed in computing back wages?

16  A.  The information on the payroll summaries were the name of

17  the employee, total hours worked, and total amount paid.

18  Q.  On the payroll summaries that the employer provided, was

19  there a regular rate?

20  A.  No.

21  Q.  So how did you determine the regular rate since it was

22  not listed on the payroll summaries?

23  A.  I determined the regular rate using the total amount paid

24  divided by total hours worked.

25  Q.  I'm going to direct your attention to what has previously

―――――――――――Y. Xiong - Direct―――――――――――

 1  been marked as Plaintiff's 7, starting at 7.011.

 2          Can you see this document?

 3  A.  Yes.  It's blurry, though.  It's not clear.

 4  Q.  Okay.  I'll make it a little bigger and see if that

 5  helps.

 6  A.  All the wordings are blurry.  Can't see.

 7          MS. LEWIS:  Just keep making it bigger.  We'll try

 8  going up a little bit.

 9  BY MS. LEWIS:

10  Q.  How about now?

11  A.  There you go.  Yes.

12  Q.  Okay.  Good.

13          What is this document?  Do you recognize this

14  document?

15  A.  Yes.

16  Q.  What is it?

17  A.  This is the payroll summary that I used to compute the

18  back wages.

19  Q.  Where did this record come from?

20  A.  It was -- this record was provided by the employer.

21  Q.  And did you receive payroll summaries for the period of

22  time that you computed the back wages?

23  A.  Yes.

24  Q.  Is this an accurate representation of the payroll

25  summaries provided to you?

─────────────────── Y. Xiong - Direct ───────────────────

1   A.  Yes.

2   Q.  Can you tell whether the employer was in compliance with

3   Section 7 of the FLSA based on this document?

4   A.  Yes.

5   Q.  What can you tell from this document regarding

6   compliance, the employer's compliance, with Section 7 of the

7   FLSA?

8   A.  I see that the employer is not in compliance with

9   Section 7 of the FLSA.

10  Q.  How?  What section?  Can you clarify, please?

11  A.  Sure.

12        So based on the highlighted example here, Latasha

13  Barnes-Jenkins, one of the licensed practical nurses, she

14  received $2,640 of total pay for that week with 66 hours

15  worked.

16        Now, if you used 2,640 divided by 66, it arrives at

17  her regular rate of pay, which I believe was $40.  And I do

18  not see any additional amount paid to this person.  That

19  means the employer only paid a straight-time pay for total

20  hours worked.

21  Q.  So to be clear, based upon this example in this record,

22  does it appear as though the employer paid time and a half?

23  A.  No.

24  Q.  Besides the payroll summaries, did you receive any other

25  records that reflected time worked and pay?

—————————————Y. Xiong - Direct—————————————

```
 1   A.   Yes.

 2   Q.   What other records did you receive?

 3   A.   The NDP, the Next Day Pay record.

 4   Q.   Did you use the Next Day Pay records for computations?

 5   A.   Yes.

 6   Q.   What information did you use on the Next Day Pay records

 7   for computations?

 8   A.   Similar to the payroll summary, I used -- I get the name

 9   of the person, the worker, the date of the pay, the amount of

10   number of hours worked, and the amount paid to that worker

11   for that date.

12   Q.   I want to direct your attention to what's been marked as

13   Plaintiff's Exhibit 7a.  Can you see these?

14   A.   You might want to adjust the clarity.

15   Q.   How is that?

16   A.   Okay.  Yeah, I can see it now.

17   Q.   Do you recognize this document?

18   A.   Yes.

19   Q.   What is it?

20   A.   This is the Next Day Pay that I used to compute the back

21   wage.

22   Q.   And, likewise, who provided these records?

23   A.   The employer provided the record.

24   Q.   And is this a true and accurate representation of the

25   Next Day Pay records that the Department of Labor received
```

———Y. Xiong - Direct———

1    from Steadfast?

2    A.  Yes.

3           MS. LEWIS:  Your Honor, I move to admit

4    Plaintiff's 7a in its entirety, which, likewise, is

5    included -- all of the records received from defendants are

6    on the CD-ROM.  A sampling, which has been printed, is in the

7    exhibit binders.

8           THE COURT:  I think we previously admitted 7.

9           MS. LEWIS:  Right.  7a is a separate...

10          THE COURT:  Any objection to 7a?

11          Hearing no objection, 7a is admitted.

12          (Plaintiff's Exhibit PX-7a received in evidence.)

13          MS. LEWIS:  If you could, Ms. Jones, scroll to

14   Page 19.

15   BY MS. LEWIS:

16   Q.  Based upon this record, on this entry, does it appear

17   that the employer is paying overtime on the Next Day Pay

18   records?

19   A.  We cannot determine that because this is the daily hours

20   worked and not the weekly hours worked.

21   Q.  Based on the records shown on the screen, do you see any

22   indication that there is an overtime rate paid?

23   A.  No.

24   Q.  So you indicated that, as a whole, you cannot tell

25   whether the employer is paying overtime based on this

—Y. Xiong - Direct—

1  document?

2  A.  That's correct.

3  Q.  And why is that?

4  A.  Under the FLSA, when we compute back wages, we look at

5  total weekly hours worked instead of on a daily basis, but we

6  are able to figure out whether the employer -- whether they

7  were paying the time and a half or not when we combine all

8  the hours.

9  Q.  So since this does not have weekly total hours worked,

10 how were these records used to compute back wages?

11 A.  I combined these NDP records for the hours worked and the

12 total amount paid with the payroll summary.

13 Q.  And specifically, how did you combine those?  Was that

14 manually or via computer?

15 A.  This was exported to an Excel spreadsheet when I did the

16 payroll summary, and after that, we have added the week

17 ending, because the Wage and Hour Division is looking at each

18 week, standard long, so we're looking at on the weekly basis.

19 Q.  How were you able to determine workweek ending since it's

20 not on this record?

21 A.  From the employer and the employee interview, the

22 employer had told us that the week ends on Sunday.  So that's

23 the basis that I add the week ending, workweek ending, for

24 overtime purposes.

25 Q.  Okay.  So I just want to be clear.  After you determined

—————————————Y. Xiong - Direct—————————————

```
 1   the workweek ending dates for the Next Day Pay records, how
 2   did you then combine the hours for the Next Day Pay and the
 3   payroll summaries?
 4   A.  Right.  So I added the workweek ending.  All of the hours
 5   falling within the same workweek will be combined along with
 6   the payroll summary to arrive at the total hours worked for
 7   that person.
 8   Q.  After combining the hours from the two different payroll
 9   records -- that is, the NDP and the payroll summaries -- were
10   there instances that had an excessive amount of hours worked
11   in a workweek?
12   A.  Yes.
13   Q.  How did you define "excessive"?
14   A.  Excessive is, on a weekly basis, when hours worked exceed
15   168, because that's the maximum hours that anyone is possible
16   to work.  There's only 168 hours in a week.
17   Q.  So in those instances, after combining the Next Day Pay
18   payroll summary and -- the Next Day records and the payroll
19   summaries where you had the excessive amount of hours, what
20   did you end up doing with those hours that were over 168?
21   A.  We used an average of 112 hours as the maximum hours
22   worked to adjust the back-wage computation.
23   Q.  Why did you use 112 hours as the maximum hours as opposed
24   to 168 hours?  What was the basis for the 112?
25   A.  It was based on employee interviews and employer records.
```

—————————————Y. Xiong - Direct—————————————

1    Q.   I'm sorry.  And employer records?

2    A.   Yes.

3    Q.   What records are you referring to?

4    A.   I'm referring to the NDP and the payroll summary.

5    Q.   So to be clear, the NDP and payroll summary records is

6    what was used.  Am I following correctly?

7    A.   Yes.

8    Q.   Okay.  So after combining these records, what were your

9    next steps in determining whether there was overtime due?

10   A.   After combining the records, the NDP and the payroll

11   summary, we had also combined the total amount paid, and we

12   determined the regular rate.  Once we've determined the

13   regular rate, then we had computed the additional half-time

14   for the employees.

15   Q.   Okay.  So what number did you use for computing the

16   half-time in terms of hours?  Were there any steps between

17   taking the regular -- regular rate over what amount of hours?

18   A.   Oh, yes.  So much of the values of the formula was -- we

19   were using any hours exceeding 40 times the regular rate

20   times half-time.

21   Q.   So when you said "formula," is this within Excel that you

22   set up a formula, and then Excel computed it for you?

23   A.   Yes.

24   Q.   Okay.  So it wasn't by hand with a pen and paper?

25   A.   No.

483

─────────────────Y. Xiong - Direct─────────────────

1    Q.   Okay.  Directing your attention to Plaintiff's 21,

2    starting at Page 482.

3            Do you recognize this document?

4    A.   It's a little bit blurry.

5    Q.   We'll make it bigger for you.

6    A.   There you go.  No, I got it.  Yeah, I see it.

7    Q.   Do you recognize this document?

8    A.   Yes.

9    Q.   What is it?

10   A.   It's just a master computation I did.

11   Q.   And this master computation was the Excel document that

12   you just indicated that you set up the formula, et cetera?

13   A.   Yes.

14   Q.   So does this document reflect the back-wage computations

15   that you just detailed?

16   A.   Yes.

17   Q.   Can you tell me what each of the columns mean?

18   A.   Sure.

19           The first column, you see the date.  That's the

20   workweek ending day and, of course, the first name, last

21   name, gross amount.  Gross pay is the total amount paid

22   combined with the NDP and the payroll summary.  Same thing

23   with the total hours worked.  The regular rate is calculated

24   based on the total amount paid divided by the total hours

25   worked.  And, of course, you have the overtime hours here.

———— Y. Xiong - Direct ————

1          Now, the next one is kind of blurry, but it's

2     Section 7 regular rate due.  That's the difference between if

3     there is any deficiency or any discrepancy about the rate of

4     pay.  If it's lower than what is required, then it will show

5     up here.

6          The next column is Section 7 half-time due.  And

7     that is the column where I mentioned earlier with the

8     formula.  It will calculate the half-time rate times the

9     number of overtime hours.  That will equal the Section 7

10    half-time due.

11         And the next column is blocked by my screen, but I

12    believe -- yeah, that's Section 7 total due.  And that's the

13    amount calculated, pretty much the total between Section 7

14    regular rate due plus the Section 7 half-time due.

15    Q.  Okay.  So did you create this document?

16    A.  Yes.

17    Q.  And where did the information come from that you used to

18    create this document?

19    A.  The information was provided by the employer, the payroll

20    summary and the NDP.

21    Q.  Is this document a true and accurate representation of

22    employees who are owed back wages between December 30, 2018,

23    and June 27, 2021?

24    A.  Yes.

25         MS. LEWIS:  Your Honor, I move to admit

────────────Y. Xiong - Direct────────────

```
 1   Plaintiff's 21 as a whole.

 2            THE COURT:  Any objection?

 3            THE CLERK:  It's already in.

 4            THE COURT:  It's already admitted.

 5            MS. LEWIS:  Oh, we already did?  Okay.  All right.

 6   BY MS. LEWIS:

 7   Q.  If the Next Day Pay records were not used, would the

 8   total weekly hours worked be accurate for employees who

 9   received Next Day Pay?

10   A.  It would not.

11   Q.  If only the payroll summaries were used to compute back

12   wages, would the back-wage amount be accurate?

13   A.  No.

14   Q.  Why not?

15   A.  It would undercount the hours worked under the NDP

16   record.

17   Q.  Why would that happen?

18   A.  Because those are the actual hours worked per day by the

19   employees.  So we have to add together with the payroll

20   summary to determine the total hours worked for the

21   employees.

22   Q.  To make sure I'm clear, are the Next Day Pay hours on the

23   payroll summaries?

24   A.  Yes.  There are hours worked on the NDP and the payroll

25   summary.
```

1    Q.   Let me make sure I'm being clear.  Do the hours worked on

2    the Next Day Pay payroll -- let me start again.

3              On the payroll summaries, do they include the Next

4    Day Pay hours?

5    A.   No, they do not.

6    Q.   I want to direct your attention to what's been marked as

7    Plaintiff's 22.  Take a look at this document.  Can you see

8    it?

9    A.   Yes.

10   Q.   What is this document?

11   A.   This is the back-wage summary, which has the total amount

12   due to each employee.

13   Q.   Did you create this document?

14   A.   Yes.

15   Q.   And where did the information come from that you used to

16   create this document?

17   A.   It was coming from the master computation sheet, which

18   the information was provided by the employer, which consists

19   of the NDP and the payroll summaries.

20   Q.   And on this document, are there -- it includes the back

21   wages for the entire period of this investigation for

22   Steadfast dating back to 2016?

23   A.   No.

24   Q.   If you could take a look --

25   A.   Well, actually, yes, it is.  This is the summary that I

—— Y. Xiong - Direct ——

1   created along with the back wages computed for the previous

2   years.

3   Q.  Okay.  Is this document a true and accurate

4   representation of the employees who are owed back wages for

5   the entire period for which records were provided?

6   A.  Yes.

7   Q.  Directing your attention to the bottom, what were the

8   total amount of back wages that were computed as being owed

9   to employees for this entire period?

10  A.  It's $3,619,716.49.

11  Q.  To the right of that total on the back-wage summary,

12  there's another column, and there's the equal amount.  What

13  is that column?

14  A.  That is the liquidated damages amount.

15  Q.  And how were the liquidated damages computed for this

16  back-wage summary computation?

17  A.  Liquidated damages is the equal amount of the back wage

18  due.

19  Q.  What is the total amount due for back wages and

20  liquidated damages?

21  A.  It's $7,239,432.98.

22          MS. LEWIS:  No further questions, Your Honor.

23          THE COURT:  Cross.

24          MS. LEWIS:  Sorry, Your Honor.  I forgot to move to

25  admit -- I'd like to move to admit Plaintiff's 22.

——————————Y. Xiong - Cross——————————

```
 1          MS. RUST:  We have no objection to authenticity,
 2   with the reservation for our objection as to accuracy.
 3          THE COURT:  All right.  Exhibit 22 will be admitted.
 4          (Plaintiff's Exhibit PX-22 received in evidence.)
 5                        CROSS-EXAMINATION
 6   BY MS. RUST:
 7   Q.  All right.  Hello, sir.  My name is Julia Rust.  I'm an
 8   attorney for the defendants.  I have a couple of questions
 9   for you regarding the records.
10          First, you mentioned that there were about 90 days
11   of NDP records missing.  Is that correct?
12   A.  Yes.
13   Q.  And were you aware that -- well, let me ask you this:
14          When was the last time you received any NDP records?
15   A.  You mean the date?
16          MS. LEWIS:  Your Honor, if I may object.  This was
17   discovery.  So it came through me, as counsel, and then
18   passed along.  Counsel is aware of the date that she provided
19   those records, which was on August 23rd.
20          MS. RUST:  Well, the issue was that --
21          THE COURT:  All right.  That's noted.  Let's see
22   what he says about when he got them.
23   BY MS. RUST:
24   Q.  When was the last time you received any NDP records from
25   the plaintiff's attorneys?
```

———————————————Y. Xiong - Cross———————————————

1    A.  I received the NDP -- additional NDP records from counsel

2    on August 23rd.

3    Q.  And do you know exactly what dates you're saying of the

4    NDP records were missing?

5    A.  I don't remember the exact dates.  I believe it was about

6    three or four months on and off.

7    Q.  And were they scattered dates, or was it a consecutive 90

8    days?

9    A.  I believe they were consecutive.  Most of them, yes,

10   consecutive.

11   Q.  But you don't recall for sure?

12   A.  I do not recall that off the top of my head.

13   Q.  In your review of the missing dates, did any of those

14   dates include -- well, let me ask you this:

15          Your determination that 90 days were missing, is

16   that based on an expectation to receive Next Day Pay records

17   for every single day?

18          MS. LEWIS:  Objection.  Form.  Confusing.

19          THE COURT:  All right.  Well, let's rephrase it.

20   The Court is a little confused on the question too.  So could

21   you rephrase.

22          MS. RUST:  Yes, of course.

23   BY MS. RUST:

24   Q.  You said about 90 days were missing, right?

25   A.  Uh-huh.

Carol L. Naughton, Official Court Reporter

**JA542**

———————Y. Xiong - Cross———————

1  Q.  And you said -- well, tell me if I'm wrong.  You said

2  they may have been scattered, but you think a chunk of them

3  were consecutive days; you're not sure, though?

4  A.  Yes.

5       MS. LEWIS:  Your Honor --

6       THE COURT:  You're getting ready to object, but I

7  want to find out what's the question she's getting ready to

8  get out first.  What is the objection?

9       MS. LEWIS:  My objection is confusing with respect

10 to the characterization of the previous question that I

11 didn't object to because it assumes -- she said

12 "consecutive," but I'm not sure what she is defining as

13 consecutive -- consecutive versus scattered.  And he

14 indicated it was over a three-year period of time.  So the

15 question as a whole is confusing to me.

16      THE COURT:  All right.

17      MS. RUST:  Well, this was a discovery issue.  And I

18 think the confusion is that this -- there was communications

19 regarding some dates that the Department raised that were

20 missing, and we responded and provided dates, and there was

21 no information about that afterward.

22      THE COURT:  Maybe the Court can unconfuse itself.

23      Were the records that were missing, from your

24 determination, consecutive; or were they scattered over a

25 period of years or months?  That's to the witness.

Carol L. Naughton, Official Court Reporter

**JA543**

—————————————Y. Xiong - Cross—————————————

1          MS. RUST:  I'm sorry?

2          THE COURT:  That's what the Court wants to get from

3    the witness.

4          MS. RUST:  Okay.

5    BY MS. RUST:

6    Q.  Sir, to repeat the Court's question, were the dates that

7    were missing, the approximately 90 days, was that a

8    consecutive 90 days, or were they 90 days scattered over the

9    three-year period?

10   A.  Consecutive.

11   Q.  Do you recall specifically which dates were missing?

12   A.  I do not recall the specific dates.

13   Q.  And you have no idea whether those -- well, I'll leave it

14   at that.

15          Okay.  And you stated that your calculations were

16   based on a pay period based on the workweek ending on a

17   Sunday; is that right?

18   A.  That's correct.

19   Q.  So if the workweek was actually -- if the company ended a

20   workweek on a different day, would that change the

21   accuracy -- or impact the accuracy of your calculations?

22          MS. LEWIS:  Objection.  Calls for speculation.

23          MS. RUST:  I think that goes to the calculation

24   formula he described.  But I can rephrase.

25          THE COURT:  Hold it.  Overruled.  Let's see if he

Carol L. Naughton, Official Court Reporter

**JA544**

—————Y. Xiong - Cross—————

1  can answer that.

2  BY MS. RUST:

3  Q.  Do you need me to repeat the question?

4  A.  Yes.

5  Q.  You said that your calculations were based on the

6  workweek ending on a Sunday.  If the company actually ended a

7  workweek on a different day of the week, would that impact

8  the accuracy of your back-wage calculations?

9  A.  I don't think so, because the hours worked as a whole

10  will not change.  The total amount of hours worked will be

11  the same whether the week ends on a Sunday or on a different

12  day.

13  Q.  Well, if the -- so you're aware that -- okay.  Let me say

14  this:

15          In your review of these payroll records, did you

16  observe that there were hours worked on all seven days of the

17  week?  Meaning were the individuals only working a

18  Monday-through-Friday workweek, in your observation?

19  A.  Most of -- most of the employees worked Monday through

20  Friday, and I did see that there are days that fall under

21  Saturday and Sunday.

22  Q.  Okay.  So if the workweek actually started on a Tuesday,

23  then would that impact the accuracy of your back-wage

24  calculation because different -- well, I'll stop there.

25  Would that impact the accuracy of your calculation for

———Y. Xiong - Cross———

1    calculating 40 hours in a workweek?

2    A.  If a workweek is ending on a different day, it will

3    change the number of hours worked for that workweek ending,

4    but it will not change the total hours worked as a whole.

5    Q.  Right.  But it might change whether there were actually

6    40 hours worked in a workweek.

7            MS. LEWIS:  Objection.  Asked and answered.

8            THE COURT:  As a matter of fact, we're getting into

9    the speculative range.  The Court let you go on and ask the

10   question a few minutes ago, but we're getting to be very

11   speculative.

12           MS. RUST:  Understood, Judge.

13   BY MS. RUST:

14   Q.  Sir, are you aware that Steadfast actually starts its pay

15   period on a Tuesday and ends on a Monday?

16           MS. LEWIS:  Objection.  Assumes facts not in

17   evidence.

18           MS. RUST:  Well, he testified regarding the workweek

19   start date that he was aware of.

20           THE COURT:  I think that you need to rephrase the

21   question.  Ask him "Do you know what the workweek is?" and

22   see what he says.

23           MS. RUST:  Understood.

24   BY MS. RUST:

25   Q.  Sir, do you know what day Steadfast Medical Staffing

—————————————Y. Xiong - Cross—————————————

1    starts its weekly pay period -- what day of the week?

2    A.  The workweek starts from Monday to Sunday.

3    Q.  Okay.  You talked about -- so your back-wage calculation

4    that you went over with Ms. Lewis, you said that those

5    calculations were based on your review of payroll summaries

6    and Next Day Pay only; is that correct?

7    A.  That's correct.

8    Q.  And you did not review payroll detail reports; is that

9    correct?

10   A.  No, I did not.  Yes.

11   Q.  So when you were calculating or when you were reviewing

12   the payroll summaries, did the payroll summaries identify the

13   hourly rate for that individual for that payment?

14   A.  It did not.

15   Q.  And I think you testified that you -- you testified how

16   you calculated an hourly rate without that information

17   specifically provided, correct?

18   A.  Yes.

19   Q.  Okay.  So if an individual in a pay period was making

20   different hourly rates, would that impact the accuracy of

21   your calculations?

22            MS. LEWIS:  Objection --

23            THE WITNESS:  No.

24            MS. LEWIS:  -- calls for speculation.

25            THE COURT:  Objection overruled.

—————Y. Xiong - Cross—————

 1    BY MS. RUST:

 2    Q.  I'm sorry.  You said "no"?

 3    A.  No.

 4    Q.  So if an individual made -- well, so -- let me make sure

 5    I understand.

 6            So you testified that to determine the hourly rate,

 7    you divided the total wages and the number of hours worked,

 8    correct?

 9    A.  It's the gross amount paid divided by the total hours

10    worked.

11    Q.  Okay.  So that would arrive to a singular hourly rate,

12    correct?

13    A.  It will arrive at the regular rate.

14    Q.  Okay.  So if an individual was working hours during that

15    workweek where they received different hourly rates for

16    different hours, you would not -- that would not be factored

17    into your calculations then?

18            MS. LEWIS:  Objection, Your Honor.  Calls for

19    speculation and improper hypothetical.

20            THE COURT:  Objection overruled.

21            THE WITNESS:  So when an employee --

22            THE COURT:  Excuse me for a second.

23            Ms. Pitts, do not disturb the examination by what

24    you're doing over there.  If you want to confer with counsel,

25    let him talk to you, but otherwise, refrain.  Now go back to

—Y. Xiong - Cross—

1   what you were doing.

2   BY MS. RUST:

3   Q.  Do you need me to restate the question, sir?

4   A.  Yes, please.

5   Q.  So I think I asked if an individual was working different

6   shifts during that pay period and received, for example, 20

7   hours per -- or $20 per hour for one shift and then received

8   $25 an hour for another shift, you would not have factored

9   that into your calculation, based on the payroll summaries?

10  A.  No.

11  Q.  Okay.  And so you would not be able to determine if that

12  impacted the accuracy of your calculation?

13  A.  I don't believe it will impact the calculation because

14  overall when we compute the back wages, we have to come out

15  with the regular rate, and the only way -- the way that we

16  come out with the regular rate is using total amount paid

17  divided by total hours worked.

18  Q.  Right.  But --

19  A.  Because rate of pay can be changed, depending on the

20  amount paid to the employees.  So if the employer did not

21  specify the rate of pay on any of the recordkeeping

22  requirements, it is for us to calculate the regular rate.

23  Q.  Okay.  But you were not provided with payroll detail

24  reports, correct?

25  A.  I was not.

———————Y. Xiong - Cross———————

1    Q.   Okay.  And do you know whether Steadfast did provide

2    payroll detail reports in this litigation?

3    A.   Not in the records that I reviewed.

4    Q.   Okay.  So you don't know if those payroll detail reports

5    actually included an hourly rate for a pay period; is that

6    correct?

7    A.   Yes.

8    Q.   Okay.  And you did not review any of the facility

9    invoices that were provided and produced in this litigation

10   either; is that correct?

11   A.   That's correct.

12   Q.   Okay.  So you did not review those to see what the hourly

13   rate was for each nurse for each shift that they worked; is

14   that correct?

15   A.   I did not review those records.

16   Q.   Okay.  And when you're calculating an hour -- a regular

17   rate, you're using the regular rate to determine the overtime

18   rate, correct?

19   A.   That's correct.

20   Q.   So if a regular rate is $20 an hour, the overtime rate

21   would be $30 an hour -- is that right? -- total?

22   A.   If you're talking about time and a half, yes.

23   Q.   Okay.  So if the regular rate was $25 an hour, what would

24   the overtime rate be?

25   A.   That will be -- if you're talking about time and a half,

—————————Y. Xiong - Cross—————————

1    that would be time and half after 25.  Now, once we know that
2    the employer paid straight time, we're not looking for that
3    time and a half.  We're looking for additional half-time
4    premium.
5    Q.  Right.  But the half-time premium is a different amount
6    if --
7    A.  It will be based on the calculated regular rate since the
8    employer did not provide the regular rate.
9    Q.  And you don't know whether Steadfast provided the hourly
10   rate for each shift worked, correct?
11   A.  They indicated the regular rate on the NDP but not on the
12   payroll summaries.
13   Q.  Okay.  Got it.
14        And regarding the calculation -- you testified right
15   at the end of your testimony with Ms. Lewis that the
16   liquidated damages was equal to the back wage; is that
17   correct?
18   A.  Yes.
19   Q.  Would you be able to recalculate the amount of liquidated
20   damages if the period for liquidated damages was determined
21   to be shorter than the full period for back-wage damages?
22   A.  Recalculate -- I'm not sure what you're asking.
23   Q.  Sure.  That was a long question.  Let me rephrase.
24        So the back-wage calculations, the back-wage total
25   that you calculated was for the full period on -- I think it

—————————Y. Xiong - Cross—————————

1    was Plaintiff's 22, and you said that the liquidated damages

2    was equal to that number, so they were based on the same

3    period of time, correct?

4    A.  Yes.

5    Q.  So if the liquidated damages was determined to actually

6    be for a shorter period of time, would you be able to

7    calculate the appropriate liquidated damages for a reduced

8    period of time?

9         THE COURT:  Wait a minute, Ms. Rust.  Liquidated

10   damages is simply double the back wages.  So you asked him

11   about calculating liquidated damages on a shorter period, and

12   that's not the Court's understanding of the way it works

13   here.  Once you calculate the wages that were not paid, then

14   the liquidated damages simply double that, not for a shorter

15   period.  So the Court doesn't understand the question that

16   you asked.

17        MS. RUST:  Understood, Your Honor.  Our -- well, our

18   argument would be that even if there is discretion in the

19   period of -- to the extent the Court determines that

20   liquidated damages would be appropriate, there is discretion

21   to award for a limited period of time based on information,

22   and so the question is pertaining to whether that calculation

23   would be possible.

24        THE COURT:  Based on what limited period?

25        MS. RUST:  Well, it would go to -- well, I would ask

—Y. Xiong - Cross—

1    the Court to indulge.  This would be information that would

2    be presented in our defense as far as --

3              THE COURT:  Okay.  Well, then, you're asking him

4    something -- maybe you're asking him a question based on

5    facts that are not in evidence, is the reason the Court is

6    getting a little confused on what you're doing, but even the

7    question appears to the Court to be inconsistent with the way

8    you calculate liquidated damages.

9              Now, if you said the Court has some discretion about

10   what it does, then I think you probably would need to be

11   arguing that after you put on some evidence showing that

12   there is such a limited period on which you can base

13   calculated damages.  But I don't know that that's a question

14   for him.  That's a question the Court has to determine,

15   whether liquidated damages are appropriate.  We just need the

16   be facts.

17             MS. RUST:  I'm good with that.  Then that wraps up

18   my questions.  Thank you, Your Honor.

19             If the Court will permit.  Thank you.

20             (Pause in the proceedings.)

21             MS. RUST:  No further questions, Your Honor.  Thank

22   you.

23             THE COURT:  All right.

24             MS. LEWIS:  Very brief, as I'm aware of the time,

25   Your Honor.

———————————————Y. Xiong - Redirect———————————————

1                        REDIRECT EXAMINATION

2    BY MS. LEWIS:

3    Q.  You indicated that the workweek that you -- what was the

4    workweek again?

5    A.  The workweek ends on Sunday.

6    Q.  Okay.  And the entire workweek would be seven days?

7    A.  Yes.  The seven days would be Monday through Sunday.

8    Q.  Okay.  And you received that information from the

9    investigative file from Wage and Hour; is that right?

10   A.  Yes.

11   Q.  Directing your attention to Plaintiff's 43, I believe you

12   stated that --

13            MS. LEWIS:  If you could scroll to the top of the

14   page, Ms. Jones.

15   BY MS. LEWIS:

16   Q.  Can you see that document?

17   A.  Yes.

18   Q.  I believe you stated that you received that information

19   from the notes from the initial conference that was in the

20   investigative file; is that right?

21   A.  That's correct.

22   Q.  And is this the document with the notes --

23            MS. LEWIS:  Scrolling down, please, Ms. Jones.

24   BY MS. LEWIS:

25   Q.  -- that the investigator took at the initial conference?

─────────────── Y. Xiong - Redirect ───────────────

 1          MS. LEWIS:  Is he frozen?

 2   BY MS. LEWIS:

 3   Q.  Did you hear me?

 4   A.  Yes.

 5   Q.  I thought you were frozen.

 6          Are these the notes from the investigative file that

 7   the investigator took that is part of the DOL file?

 8   A.  Yes.

 9   Q.  And this record was created within the regular course of

10   business?

11   A.  That's correct.

12   Q.  And this is a true and accurate representation of the

13   initial conference notes that was in the Wage and Hour

14   investigative file?

15   A.  Yes.

16          MS. LEWIS:  Your Honor, I move to admit

17   Plaintiff's 43.

18          MS. RUST:  I'm going to object as it's out of the

19   scope, and it's hearsay.  He did not make these notes.

20          MS. LEWIS:  Well, he's an agency representative.

21   The investigator, as the Court is aware, is unavailable.  We

22   can likewise designate the deposition testimony.

23          THE COURT:  If he's familiar with it and she's laid

24   the proper foundation -- and she has -- the document will be

25   admitted.

1           MS. LEWIS:  Thank you.

2           THE COURT:  As a matter of fact, it's not outside

3    the scope because you did raise questions about when the week

4    began and, et cetera, when it ended, so it's not outside the

5    scope.

6           (Plaintiff's Exhibit PX-43 received in evidence.)

7    BY MS. LEWIS:

8    Q.  In terms of the regular rate calculation, you kept saying

9    the same formula over and over again.

10          Where does that formula that you used for

11   calculating regular rates -- where does that come from?  Did

12   you just make it up?  Where does it come from?

13   A.  It's within our regulation, the FOH, the Field Operations

14   Handbook, and also the 29 CFR.

15   Q.  And 29 CFR, that's the Federal Code of Regulations, is

16   what you're referring to?

17   A.  That's correct.

18   Q.  And in terms of if there was another rate, there was a

19   lot of questions, "Well, what if the rate was this," and if

20   there was another rate and the employer provided this, based

21   upon the information that you have received, did the employer

22   confirm that they were paying straight time?

23   A.  The employer did not confirm that they were paying

24   straight time, but for the record, it shows that the employer

25   did not make additional half-time payments to the workers for

```
 1   the hours worked over 40.

 2          MS. LEWIS:  All right.  No further questions for

 3   this witness, Your Honor.

 4          THE COURT:  May this witness be permanently excused?

 5          MS. LEWIS:  Yes, Your Honor.

 6          THE COURT:  I'm asking both counsel.

 7          MS. RUST:  Oh, yes.

 8          THE COURT:  All right.  Then you may be excused,

 9   sir.  Thank you for coming.

10          THE WITNESS:  Thank you.

11          (Witness excused.)

12          MS. LEWIS:  Your Honor, if I may, Mr. Melendez was

13   likewise under subpoena to appear, even though he's also the

14   agency representative.  So I just wanted to make it -- that

15   he is in the clear to leave as well -- is that correct? --

16   after today?

17          THE COURT:  If the parties do not want an agency

18   representative here by --

19          MS. LEWIS:  Well, what I'm indicating is he may be

20   here -- it may be somebody else tomorrow.  He doesn't have to

21   keep coming back.

22          THE COURT:  Let's put it this way:  We don't need a

23   different agency representative in here every day.  You get

24   one, not multiple coming and going.  So if you want one here,

25   he's the man.  If you're not going to have one, you're not
```

```
 1    going to have one.  But we're not going to have multiple
 2    agency representatives bouncing in and out of here.
 3            MS. LEWIS:  So to clarify, Mr. Hampton, who is a
 4    solicitor, is he -- so that's what I'm referring to, because
 5    he'll be back.
 6            THE COURT:  The Court was never told he was the
 7    agency representative because I thought he was the deputy
 8    solicitor.
 9            MS. LEWIS:  Right.  The regional solicitor for the
10    Department of Labor, this region.  He's not testifying.
11            THE COURT:  Okay.  Well, he can come on back, but in
12    terms of sitting over there at that table, that means you
13    just don't have an agency representative.  That's all.
14            MS. LEWIS:  Understood.  Thank you.
15            THE COURT:  So if he wants to leave, he can leave,
16    but there's no other agency representative coming.
17            All right.  We will get started again tomorrow
18    morning at 10:00, and we'll see where we go.
19            All right.  Recess court.
20            (Proceedings adjourned at 5:04 p.m.)
21
22
23
24
25
```

```
 1                        CERTIFICATION

 2

 3        I certify that the foregoing is a correct transcript

 4   from the record of proceedings in the above-entitled matter.

 5

 6

 7              _____/s/_____

 8                        Carol L. Naughton

 9                        October 4, 2021

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                     Norfolk Division

 3   - - - - - - - - - - - - - - - - - -
                                        )
 4   MARTIN J. WALSH, SECRETARY OF      )
     LABOR, UNITED STATES               )
 5   DEPARTMENT OF LABOR,               )
                                        )
 6          Plaintiff,                  )
                                        )       CIVIL ACTION NO.
 7   v.                                 )          2:18cv226
                                        )
 8   MEDICAL STAFFING OF AMERICA,       )
     LLC, etc., et al.,                 )
 9                                      )
            Defendants.                 )
10   - - - - - - - - - - - - - - - - - -

11

12                  TRANSCRIPT OF PROCEEDINGS

13                  ** Bench Trial - Day 4 **

14                     Norfolk, Virginia

15                    September 3, 2021

16

17   BEFORE:  THE HONORABLE RAYMOND A. JACKSON
              United States District Judge
18

19   APPEARANCES:

20              UNITED STATES DEPARTMENT OF LABOR
                By:  Ryma N. Lewis
21                   Chervonti Jones
                     Mohamed E. Seifeldein
22                   Counsel for the Plaintiff

23              PIERCE McCOY, PLLC
                By:  Joshua L. Jewett
24                   Julia A. Rust
                     Aaron D. Siegrist
25                   Counsel for the Defendants
```

1                             I N D E X

2    PLAINTIFF'S
     WITNESSES                                          PAGE
3
      LISA PITTS
4          Direct Examination By Ms. Lewis             511
           Cross-Examination By Mr. Jewett             552
5          Redirect Examination By Ms. Lewis           562
           Recross-Examination By Mr. Jewett           567
6     CHRISTINE KIM
           Direct Examination By Ms. Jones             572
7          Cross-Examination By Ms. Rust               599
           Redirect Examination By Ms. Jones           604
8     PEYTON LEX
           Direct Examination By Ms. Jones             616
9          Redirect Examination By Ms. Jones           625

10

11

12                        E X H I B I T S

     PLAINTIFF'S
13   NO.                                                PAGE

14    PX-39                                             516
      PX-17                                             517
15    PX-24                                             522
      PX-37                                             538
16    PX-34                                             539
      PX-19                                             540
17    PX-16                                             542
      PX-12                                             572
18    PX-28                                             572
      PX-9                                              588
19    PX-11                                             591
      PX-2                                              608
20    PX-3                                              608

21

22

23

24

25

```
1                   (Proceedings resumed at 10:00 a.m.)

2               THE COURT:  Good morning, counsel.  We are prepared

3    to go forward this morning.

4               MS. LEWIS:  Yes, Your Honor.

5               THE COURT:  Call your first witness.

6               MS. LEWIS:  Lisa Pitts, Your Honor.

7               MS. RUST:  Your Honor, we --

8               THE COURT:  Come up to the podium.

9               MS. RUST:  Of course.

10              Your Honor, the Department notified us last night

11   that they had three witnesses on the schedule for today,

12   including Ms. Pitts and Ms. Kim, and another witness, First

13   Choice.

14              Ms. Kim was subpoenaed by the Department for

15   September 7th, for Tuesday, and Steadfast made a bunch of

16   rearrangements to the schedule to accommodate Ms. Kim to be

17   here on Tuesday, in light of the payroll schedule she has to

18   manage.

19              When the Department's case -- when it looked like

20   the pace of their witnesses was going to be moving quicker

21   and they might be finishing on Friday, we reached out and

22   said if you need her before Tuesday, we could try to work

23   with you and make her available on Friday.

24              The issue right now is that she needs to finish

25   running payroll by 1:30 today.  So we asked if she could be
```

```
 1    put on as the first witness so that she could get back to the

 2    office and finish running payroll, since we are making her

 3    available and moving up.  We understand trial witness

 4    schedules change a lot, and that's just par for the course,

 5    but the Department is not willing to move her up to the first

 6    witness.

 7            THE COURT:  Okay.  First thing, the Court has

 8    pressed the plaintiff to get through this case and to

 9    eliminate witnesses.  So to the extent that the schedule is

10    changing, it's due and owing to the Court's taking the view

11    that it has in terminating cumulative witnesses.

12            Secondly, the Court doesn't tell either party the

13    order in which they should call witnesses.

14            The third thing is, it's like jury duty.  These

15    cases often end up being an inconvenience and an obstruction

16    to people who have to leave their private responsibilities

17    and come to court.

18            So what the Court is simply saying is the Court is

19    not going to tell them which witness to call first.

20    Christine Kim is going to have to work around it.  She'll

21    have to go back and finish payroll after 1:30, whatever.

22    Payroll may be delayed.  That's a consequence of these cases.

23            And so the Court is not going to compel them to move

24    the witness.  It's not going to do that.

25            MS. RUST:  Understood, Your Honor.  We just wanted
```

```
 1    to make it on the record and make the Court aware that the
 2    timely delivery of payroll would be jeopardized if Ms. Kim
 3    has to testify longer than -- or if she has to wait around
 4    longer than if she were to be put on first.
 5            And we understand that this is often an
 6    inconvenience for witnesses, and that's standard, but we were
 7    hoping that there would be an accommodation as a professional
 8    courtesy.  So we understand that Court's order.
 9            THE COURT:  Well, it's obvious that you all haven't
10    worked together very well in this case, in any event, so
11    that's no surprise.  But I'm not going to order them to put
12    on one witness versus another.  Okay?
13            MS. RUST:  Understood.
14            THE COURT:  Do you have some response you want to
15    make?  If so, come around to the microphone.
16            MS. LEWIS:  Good morning, Your Honor.  I just want
17    to respond briefly, and not to dwell on this, but this case
18    has been continued three times.  Ms. Kim has been subpoenaed
19    three times.  They have known that this case was happening,
20    as the Department has, for years at this point.
21            If their practice is to run payroll on Fridays, then
22    it was incumbent upon defendants to make the appropriate
23    accommodations such that their employee witness was
24    available.
25            Defendants were notified on Wednesday at the Court's
```

L. Pitts - Direct

1   inquiry with respect to when the Department anticipated

2   concluding its case, and at that time, a reasonable person

3   would take a look at the employee witness list.  And Ms. Kim

4   has been identified repeatedly -- and we spoke about it on

5   Wednesday -- that we intended to call her on Thursday.

6          We did extend a professional courtesy of rearranging

7   our witnesses yesterday to not call Christine Kim because it

8   was represented by defendants that she would be available

9   today.  Last night, at approximately 11:59 p.m., we were

10  notified that she was not going to be available again today

11  because of their payroll processing.

12         Given the fact that defendants have had, within this

13  week, three conversations about it, any characterization of

14  lack of professional courtesy that's been put on the record,

15  the Secretary takes issue with because we have been as

16  accommodating as we could, given the movement of this trial.

17         THE COURT:  Thank you.  No, don't need any response.

18  This is over.  Let's get on with the witnesses.  Call the

19  first witness.

20         MS. LEWIS:  Ms. Lisa Pitts.

21         (Witness sworn.)

22         LISA PITTS, called by the Plaintiff, having been

23  first duly sworn, was examined and testified as follows:

24                      DIRECT EXAMINATION

25  BY MS. LEWIS:

512

————— L. Pitts - Direct —————

1   Q.   Good morning.  Would you please state your name for the
2   record.
3   A.   Lisa Pitts.
4   Q.   You're the owner and president and director of Medical
5   Staffing of America, doing business as Steadfast Medical; is
6   that correct?
7   A.   I'm a member.
8   Q.   I'm sorry?
9   A.   I'm a member.
10  Q.   And you're the owner as well?
11  A.   The LLC paperwork states I'm a member.
12  Q.   My question is:  You're the owner of the company; is that
13  correct?
14  A.   I'm an owner, but it doesn't state I'm an owner on the
15  LLC.  It says I'm a member.
16  Q.   So I'm going to ask you questions, and if you could, just
17  respond to that.
18          Are you the owner of Steadfast Medical?
19  A.   I'm a member on the LLC.
20  Q.   You own 100 percent of the company?
21  A.   I own 55 percent.  Someone else owns the rest.
22  Q.   I'm sorry.  You said you own how much?
23  A.   It's 55 or 60 percent.  My ex-husband is still up there
24  for the other 49 percent.  That was never changed.
25  Q.   Do you recall taking a deposition in this matter?

─────────────L. Pitts - Direct─────────────

1   A.  Excuse me?

2   Q.  Do you recall being deposed in this matter?

3   A.  Yes, I do.

4   Q.  And you were deposed on multiple occasions, correct?

5   A.  Yes.

6   Q.  Do you recall being asked on January 23rd, 2019, that --

7   you had a deposition?

8   A.  Yes.

9           THE COURT:  The proper procedure here is to

10  determine whether she was under oath when she took the

11  deposition.

12  BY MS. LEWIS:

13  Q.  You were under oath when you took the deposition?

14  A.  Yes.

15  Q.  And at the deposition, you were questioned regarding your

16  percentage ownership of the company; is that correct?

17  A.  Yes.

18  Q.  And you were asked, "What percentage ownership do you

19  have in the company?"  And you responded, "100 percent."

20  Isn't that correct?

21  A.  Well -- yes.

22  Q.  Steadfast is a limited liability corporation; is that

23  right?

24  A.  Yes, it's registered as an LLC.

25  Q.  And its primary business location is at 5750 Chesapeake

—————————L. Pitts - Direct—————————

1    Boulevard in Norfolk, Virginia --

2    A.  Yes.

3    Q.  -- 23513?

4    A.  Yes.

5    Q.  And the core business activities for Steadfast is

6    providing medical personnel support services to healthcare

7    facilities on a per diem, short-term, and PRN basis to cover

8    facility needs?

9    A.  Yes.

10   Q.  And since at least August 18, 2015, Steadfast has had

11   contracts with over 50 facilities; is that right?

12   A.  Roughly.

13   Q.  And Steadfast places registered nurses, certified nursing

14   assistants, and licensed practitioner nurses in facilities

15   that are in need of nurses?

16   A.  Yes.

17   Q.  And Steadfast's gross annual income and revenue has been

18   over 500,000 every year since 2015.

19   A.  Yes.

20   Q.  In 2015, it was, based upon your tax return, $123,866.

21   A.  I'd have to see the tax return to say yes.

22   Q.  2016, over 2 million.

23   A.  Roughly.  I have to see the tax return to give you exact.

24   Q.  2017, over 5 million.

25   A.  Roughly.

─────────── L. Pitts - Direct ───────────

1   Q.  And 2018, '19, and '20, over 10 million.

2   A.  Roughly.

3   Q.  You've invested substantially into the business to grow

4   it and to make it what it is today?

5   A.  Yes.

6   Q.  You paid to have a website created?

7   A.  Yes.

8   Q.  Directing your attention to Plaintiff's 29.

9        MS. LEWIS:  Sorry, Your Honor.  Brief indulgence.  I

10   need to grab my exhibit list.

11        (Pause in the proceedings.)

12        MS. LEWIS:  39.

13        THE COURT:  What are we doing here?

14        MS. LEWIS:  We have a new captain at the ship, at

15   the computer here today.  I apologize, Your Honor.  Let me

16   help him out.

17        THE COURT:  Do you have a hard copy of what you're

18   trying to get him to put up on the screen?

19        MS. LEWIS:  Yes, Your Honor.  It's in the exhibit

20   binder under tab 39.  We have hard copies of everything.

21        Do you have it?  Go ahead and plug it in there.

22        And can you scroll down, please.

23   BY MS. LEWIS:

24   Q.  Back when the investigation started -- this is dated

25   9/21/2017 -- this is what your website looked like; isn't

Carol L. Naughton, Official Court Reporter

**JA569**

──────────────L. Pitts - Direct──────────────

1   that correct?

2   A.  Yes.

3   Q.  And this is a true and accurate representation of the

4   website's imagery from 2017?

5   A.  Yes.

6           MS. LEWIS:  Your Honor, I move to admit

7   Plaintiff's 39.

8           THE COURT:  Any objection?

9           MS. RUST:  No objection.

10           THE COURT:  It will be admitted.

11           (Plaintiff's Exhibit PX-39 received in evidence.)

12   BY MS. LEWIS:

13   Q.  You lease office space for Steadfast's business office;

14   is that correct?

15   A.  Yes.

16   Q.  And you purchase office supplies?

17   A.  Yes.

18   Q.  You also pay for background checks, which in some cases

19   can go up to 5,000 or $6,000, for the nurses that work with

20   your company; is that right?

21   A.  Yes.

22   Q.  And you pay for the drug tests as well?

23   A.  Correct.

24   Q.  Coming back to the purchases, office supplies, and the

25   like, directing your attention to Plaintiff's 17.  And you

Carol L. Naughton, Official Court Reporter

# JA570

L. Pitts - Direct

```
 1    keep track of the accounting in terms of the expenses of the
 2    business.  You have an accountant that helps you to manage
 3    the business, correct?
 4    A.  He does everything.
 5    Q.  And he prepares these profit-and-loss statements?
 6    A.  Yes, he does.
 7    Q.  And these are the -- going through, this is a true and
 8    accurate representation of profit-and-loss statements for the
 9    company for at least one year, 2019.  Is that accurate?
10    A.  I'm going to say approximately.  I don't know the exact
11    offhand.  Like I said, they are prepared by the CPA.  So I
12    don't remember the totals, but he prepared this for
13    Steadfast.
14    Q.  So it's a business record of Steadfast.
15              MS. LEWIS:  Your Honor, I move to admit 17.
16              MR. JEWETT:  No objection.
17              THE COURT:  17 will be admitted.
18              (Plaintiff's Exhibit PX-17 received in evidence.)
19    BY MS. LEWIS:
20    Q.  And you've networked.  We've talked about the number of
21    contracts you have.  You've networked to obtain these
22    contracts extensively; is that right?
23    A.  Depends.  There's a nursing shortage, so everyone calls
24    us.  Mostly referrals.
25    Q.  So as a CEO and owner of Steadfast, you're actively
```

─────L. Pitts - Direct─────

1   involved in the day-to-day operations of the company.

2   A.  Yes.

3   Q.  As an owner and CEO, you're over all operations of

4   Steadfast.

5   A.  Yes.

6   Q.  You're aware of the different type of individuals who

7   work for the company.

8   A.  Yes.

9   Q.  The individuals who support the operations of Steadfast.

10  A.  Yes.

11  Q.  Steadfast has employees that work in the office.

12  A.  Yes.

13  Q.  There's a receptionist.

14  A.  Yes.

15  Q.  Recruiters or schedulers.

16  A.  Yes.

17  Q.  There's someone responsible for payroll and accounting.

18  A.  Yes.

19  Q.  And there are also individuals who work out in the field

20  at facilities; is that right?

21  A.  Individuals?

22  Q.  Yes, individuals.

23  A.  No.

24  Q.  LPNs.

25  A.  Yeah, independent contractors, LPNs, RNs, and CNAs.

─────────────L. Pitts - Direct─────────────

1   Q.   So LPNs, RNs, and CNAs work out in the field.

2   A.   As independent contractors do.

3   Q.   My question is:  RNs, LPNs, and CNAs work out in the

4   field.

5   A.   Yes, they do.

6   Q.   And Steadfast maintains a list of those individuals with

7   notations regarding their eligibility to work.

8   A.   The independent contractors?

9   Q.   The nurses.

10  A.   The independent contractors, we do.

11  Q.   We're getting caught up on -- I'm asking this question

12  using a specific term.

13       Does Steadfast keep track of the nurses' eligibility

14  to work at specific facilities?

15  A.   Steadfast keeps track of the independent contractors to

16  work at the facilities, RNs, LPNs, and CNAs.

17       THE COURT:  Ms. Pitts, you don't have to keep making

18  your point that they're independent contractors.  The Court

19  is going to determine that at the end of this case.  She's

20  just asking you about the various professions and

21  occupations.  She hasn't asked you about the status.  So just

22  answer the question.

23       THE WITNESS:  RN, LPN, and CNA.

24  BY MS. LEWIS:

25  Q.   Are nurses LPNs and RNs and CNAs?  Right?

```
 1   A.  Yes.
 2   Q.  And certified nursing assistants, they don't have the
 3   same skills and qualifications.  So generically throughout
 4   this, I'll refer to them all -- so I don't have to say
 5   "nurses and CNAs," I'll just say "nurses."  Okay?
 6           So Steadfast keeps a list of the nurses -- and I'm
 7   referring to RNs, LPNs, and CNAs -- regarding their
 8   eligibility to be placed out at the facilities with Steadfast
 9   contracts; is that correct?
10   A.  Yes.
11   Q.  Directing your attention to Plaintiff's 24, do you
12   recognize this document?
13   A.  Yes.  It's a registry.
14   Q.  Do you recognize this document?
15   A.  Yes.
16   Q.  And this is a list of the nurses, LPNs, and CNAs that
17   Steadfast keeps track of that Steadfast provides placement
18   opportunities; is that correct?
19   A.  Yes.
20   Q.  And on this list --
21           MS. LEWIS:  Going back to the top, Mr. Seifeldein.
22   BY MS. LEWIS:
23   Q.  -- the headers you have here, you kept the nursing title;
24   is that right?
25   A.  Yes.
```

521

1   Q.   CPR expiration and PPD expiration?

2   A.   Yes.

3   Q.   The license in which these individuals hold licenses

4   related to the type of nurse that they are?

5   A.   Yes.

6   Q.   Date of the license expiration?

7   A.   Yes.

8   Q.   You also have a column indicating whether or not they've

9   signed an independent contractor agreement.

10  A.   Yes.

11  Q.   You also have information related to their health status

12  and information that you guys have gathered within the course

13  of onboarding them at Steadfast and the drug screens.

14  A.   Yes.

15  Q.   And then there's also -- this is a newer one.  You have

16  the COVID status, whether or not they've been vaccinated or

17  otherwise.

18  A.   Yes.

19  Q.   And then there's a notes column.

20  A.   Yes.

21  Q.   Is this a true and accurate representation of the list

22  with notations regarding the nurses' eligibility to work that

23  Steadfast maintains?

24  A.   This is not the updated one.

25  Q.   Right.  But it's one of the lists.  You guys regularly

—————————— L. Pitts - Direct ——————————

```
 1   update it, correct?

 2   A.  Every day.

 3   Q.  So this is at least one version.  This is how it looks.

 4   A.  Yes.

 5           MS. LEWIS:  Your Honor, I move to admit

 6   Plaintiff's 24.

 7           MR. JEWETT:  No objection.

 8           THE COURT:  Plaintiff's 24 will be admitted.

 9           (Plaintiff's Exhibit PX-24 received in evidence.)

10   BY MS. LEWIS:

11   Q.  Since at least August 18, 2015, you have classified these

12   nurses as independent contractors; is that right?

13   A.  Correct.

14   Q.  And to date, even with this litigation and the DOL's

15   investigation, they are still classified as independent

16   contractors.

17   A.  Correct.

18   Q.  They are paid the same rate for all hours worked.

19   A.  The rates vary.

20   Q.  Right, the rates vary, but in terms of the base rate,

21   that doesn't change.  In other words, you all don't pay

22   overtime for the independent -- for the individuals you've

23   classified as independent contractors; is that correct?

24   A.  Correct.

25   Q.  And all of these individuals, they are integral to
```

─────────── L. Pitts - Direct ───────────

```
 1    Steadfast's business operations, which is providing medical
 2    personnel on a per diem/PRN basis to healthcare facilities;
 3    is that right?
 4    A.  Correct.
 5    Q.  And as such, Steadfast needs to regularly and actively
 6    recruit these nurses for the business to keep going.
 7    A.  Correct.
 8    Q.  And as part of the application process, Steadfast
 9    requires nurses to complete an application and also sign an
10    independent contractor agreement.
11    A.  Correct.
12    Q.  And every nurse that takes an assignment through
13    Steadfast is required to sign an independent contractor
14    agreement.
15    A.  Correct.
16    Q.  And as part of this agreement, in the interest of the
17    investment Steadfast has placed in recruiting and hiring
18    these nurses for placement opportunities at these facilities,
19    Steadfast discourages the nurses from working for
20    competitors.
21    A.  That's not true.
22    Q.  I'm going to direct your attention to Plaintiff's 36.
23    Take a moment to review those.  If you can look up at me once
24    you're done reading, or at least when you need Mr. Seifeldein
25    to scroll.
```

─────────────────── L. Pitts - Direct ───────────────────

```
 1          Is that your signature at the bottom of the
 2   document?
 3   A.  Yes.
 4   Q.  And you prepared this memo?
 5   A.  Sure did, yes.
 6   Q.  It's a true and accurate representation of a memo that
 7   was provided to the nurses that work with you?
 8   A.  Yes.
 9          MS. LEWIS:  Your Honor, I move to admit
10   Plaintiff's 36.
11          MR. JEWETT:  No objection.
12          THE COURT:  Well, first of all, that document does
13   not come into evidence.  You used that document to impeach
14   her, and impeachment items don't come into evidence.
15          MS. LEWIS:  Okay.
16          THE COURT:  So, now, you were using the document to
17   impeach her.  So what was your follow-up question?  I stopped
18   you on the admission, but do you have a question to follow
19   up?
20          MS. LEWIS:  No.  No further questions on this
21   document, Your Honor.
22          THE COURT:  Okay.
23          MS. LEWIS:  Well, maybe I do.
24   BY MS. LEWIS:
25   Q.  You indicated that you provided this document to nurses
```

─────────────── L. Pitts - Direct ───────────────

```
 1   who work with Steadfast nurses -- I mean, nurses who
 2   Steadfast sends out to facilities, right?  Strike that.  You
 3   already answered that question.
 4          As owner and CEO, you have taken the lead in
 5   establishing relationships with healthcare facilities; is
 6   that right?
 7   A.  Yes.
 8   Q.  And Steadfast has contracts with each of the facilities
 9   in which CNAs, LPNs, and RNs are placed?
10   A.  Yes.
11   Q.  And you're the sole signatory on the contract Steadfast
12   enters into with these facilities?
13   A.  Correct.
14   Q.  Directing your attention to Plaintiff's 10, there's 115
15   pages here, so we're not going to go through all of them, but
16   these are some contracts that Steadfast has entered into with
17   facilities; is that right?
18   A.  Correct.
19          MS. LEWIS:  And just go to the last page,
20   Mr. Seifeldein.  Right there.
21   BY MS. LEWIS:
22   Q.  And as indicated, you signed this document.  You signed
23   the contract for Steadfast?
24   A.  Correct.
25   Q.  Directing your attention to the title by the signature
```

L. Pitts - Direct

1   line, you've identified yourself as CEO; is that right?

2   A.   Correct.

3   Q.   Because that's your title for Steadfast.

4   A.   CEO/member.

5   Q.   And these contracts are a true and accurate

6   representation of the contracts that Steadfast has entered

7   into with facilities?

8   A.   Correct.

9   Q.   And you've kept them in the regular course of business --

10  these contracts.

11  A.   Excuse me?

12  Q.   You've maintained these contracts.  In other words, you

13  have a copy of them at the office, and you keep them.

14  A.   Yes.

15  Q.   Okay.

16          MS. LEWIS:  Your Honor, I move to admit

17  Plaintiff's 10.

18          THE COURT:  That's already in evidence.

19          MS. LEWIS:  It is.

20          THE COURT:  Exhibit 10 is already in evidence.

21  BY MS. LEWIS:

22  Q.   As the owner and CEO of Steadfast, you're responsible for

23  the contact and negotiating contracts with the facilities; is

24  that right?

25  A.   Yes, I'm the liaison.

———L. Pitts - Direct———

```
 1   Q.  And those contracts include terms and conditions which
 2   nurses will work at those facilities.
 3   A.  Excuse me.  Can you repeat that?
 4   Q.  Sure.  No problem.
 5           The contracts include the terms and conditions where
 6   the nurses will work at the facility?
 7   A.  Correct.
 8   Q.  And the contracts specify how much the facility is going
 9   to pay the nurses -- going to pay Steadfast?
10   A.  Correct.
11   Q.  And under the terms of those contracts, Steadfast is paid
12   a premium rate for holidays?
13   A.  Well, we haven't.  The facility has certain holidays that
14   pay the nurses -- independent contractor nurses, CNAs, and
15   all them, they pay them time and a half.
16   Q.  Let me repeat the question because I'm not sure you heard
17   it.
18           Under the contract, there is a pay rate sheet,
19   correct?
20   A.  Correct.
21   Q.  And under those pay rate sheets, on all of them there's a
22   premium rate that Steadfast is able to bill the facilities
23   for for holidays.
24   A.  Correct.
25   Q.  And under certain contracts, Steadfast also receives
```

L. Pitts - Direct

```
 1   overtime pay for the facilities, if that's part of the
 2   contract terms.
 3   A.  No, that's never part of the contract terms.
 4          MS. LEWIS:  Mr. Seifeldein, if you could scroll down
 5   to -- let's show 112.  Let's try 101.
 6          Your Honor, if I could take a moment.  This is
 7   challenging.
 8          (Pause in the proceedings.)
 9   BY MS. LEWIS:
10   Q.  Directing your attention to PX-10.57, this is a rate
11   sheet that we had talked about earlier that every contract
12   has.  Some are different than others.
13          And for this particular facility, or these
14   entities -- I believe it's Bon Secours.  B-o-n S-e-c-o-u-r-s
15   is the name of the entity that owns a number of different --
16   has a number of different facilities.  Steadfast has the
17   ability to bill them for overtime -- isn't that correct? --
18   based upon this rate sheet?
19   A.  Yes.  That's their standard, what they give to every
20   facility.  Everyone who wants a contract with them, that's a
21   standard, but we don't -- they know we have independent
22   contractors, and we don't pay overtime.
23   Q.  There's a requirement within those contracts that
24   Steadfast provide professional liability insurance coverage
25   to personnel Steadfast places at the facilities.
```

529

———— L. Pitts - Direct ————

 1    A.  No.  Steadfast has personal liability over Steadfast.

 2              MS. LEWIS:  Mr. Seifeldein, if you could go up to

 3    the first contract in the liability term section.

 4    BY MS. LEWIS:

 5    Q.  Directing your attention to Plaintiff's 3 and

 6    paragraphs A and B, it specifies that "Steadfast must

 7    maintain, during the terms of this agreement, any subsequent

 8    renewals of general liability and professional liability

 9    insurance coverage for all acts and omissions in the

10    provision of the designated services with limits of not less

11    than $1 million per occurrence and $6 million aggregate."

12              That's a standard term within all of the contracts.

13    The amounts and terms of the insurance may cover -- but the

14    requirement for Steadfast to maintain professional liability

15    is consistent in all the contracts.

16    A.  Yes.  Steadfast -- I spoke with an attorney.  Steadfast

17    Medical Staffing has insurance to cover --

18              MS. LEWIS:  Your Honor, I move to strike the

19    nonresponsive portion.  The question was:  Is that a standard

20    term?

21              THE COURT:  Just respond to her question.  If she

22    wants to know anything else, she will follow it up with a

23    question.

24              But for future procedures, a witness may answer

25    "yes" or "no" to a question and then respond.

Carol L. Naughton, Official Court Reporter

**JA583**

L. Pitts - Direct

1        But otherwise, just respond to the question.

2        THE WITNESS:  Yes.

3    BY MS. LEWIS:

4    Q.  Directing your attention to Plaintiff's 28.  And

5    Steadfast has, indeed, complied with these requirements of

6    maintaining a Certificate of Insurance; is that right?

7    A.  Correct.

8    Q.  And this is a copy of an insurance certificate

9    identifying Steadfast's maintaining such professional

10   liability insurance.  Is that accurate?

11   A.  Correct.

12   Q.  And this is a true and accurate copy of the liability

13   insurance.

14   A.  Correct.

15       MS. LEWIS:  Scroll a little bit.  Keep going.

16   BY MS. LEWIS:

17   Q.  And Steadfast, within these insurance certificates, is

18   identified as a "nursing firm"; is that right?

19   A.  Yes.  At the time, that was the only bracket that we

20   filled in -- that we could come under, that title for that

21   insurance company.

22   Q.  Coming back to Plaintiff's 10, within these contracts

23   with the facilities, there's also a hold harmless clause

24   between the facilities and Steadfast regarding any acts of

25   negligence or actions by Steadfast nurses; is that right?

1  Are you familiar with those terms, indemnification clauses

2  within these contracts that you entered into with the

3  facilities?

4  A.  I need to see it.

5  Q.  Okay.  It's light there, but it's titled

6  "Indemnification."  Do you see that?

7  A.  Yes, I see that.

8  Q.  Okay.  And that's a standard term in the standard

9  contract, as we established yesterday, in most of the

10  contracts that you've entered into with Steadfast; is that

11  right?

12  A.  Correct.

13  Q.  There's also a requirement that Steadfast is to comply

14  with all laws, including the responsibility to pay the nurses

15  that Steadfast provides the PRN/per diem services within

16  these contracts, correct?

17          MR. JEWETT:  Objection.  Foundation.

18          THE COURT:  The objection is overruled.

19          THE WITNESS:  Can you repeat the question?

20  BY MS. LEWIS:

21  Q.  Sure.  No problem.

22          Within these contracts, there's also a requirement

23  including the responsibility that Steadfast is to pay the

24  nurses -- it's Steadfast's responsibility to pay the nurses

25  that it places at the facility; is that right?

L. Pitts - Direct

1   A.  Can you show me where that is?

2   Q.  Sure.

3           MS. LEWIS:  Mr. Seifeldein, go back up to the

4   responsibilities.

5   BY MS. LEWIS:

6   Q.  Paragraph H:  "Steadfast Medical shall assume sole and

7   exclusive responsibility for the payment of wages to such

8   contractors for services performed by them."

9           That's in every contract that you've entered into

10  with these facilities; is that right?

11  A.  Yes.

12  Q.  And there's also a requirement for Steadfast to complete

13  background screenings of nurses Steadfast places at

14  facilities.

15  A.  Correct.

16  Q.  And the facility is required to drug-test, which

17  Steadfast completes through a third-party service provider.

18  A.  Correct.

19  Q.  And some, if not all, of the contracts that Steadfast

20  enters into with these facilities require the facilities to

21  pay Steadfast if they want to hire Steadfast's nurses to work

22  there permanently.

23  A.  Repeat that, please.

24  Q.  Sure.

25           Some, if not all, of these contracts that Steadfast

—————————————L. Pitts - Direct—————————————

1   enters into with the facilities requires the facilities to

2   pay Steadfast if the facilities want to hire the nurses that

3   Steadfast places at those facilities.

4   A.   Correct.

5   Q.   And the rate that the facilities have to pay Steadfast

6   for permanent placement varies, or a change of employer; is

7   that right?

8   A.   Excuse me?

9   Q.   Sure.

10            The rate that the facilities have to pay, it varies.

11   There's different --

12   A.   Correct.   Correct.

13   Q.   Some contracts, directing your attention to 15 of

14   Plaintiff's 10 --

15            MS. LEWIS:   Scroll down, please, Mr. Seifeldein.

16   BY MS. LEWIS:

17   Q.   -- require RNs to be paid 4,000 -- paragraph B -- LPNs,

18   3,000; and CNAs, 2,000.   That's one of the ranges, right?

19   A.   Correct.

20   Q.   Other contracts require a minimum of a 60-day notice to

21   Steadfast; otherwise, the facilities are required to pay

22   Steadfast the rate that you all mutually negotiate and

23   determine.

24   A.   Correct.

25   Q.   So there's a number of terms that are standard in these

L. Pitts - Direct

```
 1    contracts.  Also among the terms and conditions that you
 2    negotiate is a rate that Steadfast is paid for providing
 3    temporary nurses at the facility; is that right?
 4    A.  Can you repeat the question.
 5    Q.  Sure.  Let me ask it differently.
 6         The amount Steadfast pays nurses is less than the
 7    amount the facilities pay Steadfast.
 8    A.  Correct.
 9    Q.  And to ensure predictability regarding -- or some level
10    of predictability regarding the amount of profit Steadfast
11    receives, you establish the range which to pay the nurses.
12         In other words, there's a set amount that the
13    facility pays you, and you've decided, okay, in order for me
14    to make a profit, this is the most I can afford to pay a
15    nurse for going into that facility.
16    A.  Correct.
17    Q.  As the CEO of Steadfast, to ensure proper business flow,
18    you develop and establish certain payroll policies in terms
19    of the way that Christine Kim is supposed to manage payroll;
20    is that right?
21    A.  Correct.
22    Q.  So coming back to the office, or, really, all of the
23    individuals that support Steadfast, they are paid an hourly
24    rate.
25    A.  In the office?
```

──────────────── L. Pitts - Direct ────────────────

1   Q.  In the office and in the field, everybody gets paid

2   hourly --

3   A.  Yes.

4   Q.  -- there's nobody on salary.

5        And occasionally, office employees work over 40

6   hours in a single workweek -- office.

7   A.  Excuse me?

8   Q.  Yeah, office employees.

9   A.  Okay.  Can you repeat the question?

10  Q.  Sure.

11       Occasionally, office employees work over 40 hours in

12  a workweek.

13  A.  Correct.

14  Q.  And when those office employees work over 40 hours in a

15  single workweek, Steadfast has paid them time and a half for

16  those overtime hours.

17  A.  Repeat the question.

18  Q.  So when the office employees have worked over 40 hours in

19  a single workweek, Steadfast pays them time and a half for

20  hours worked over 40.

21  A.  Correct.  I'm just trying to make sure I hear you.

22  Q.  No.  It's my long...

23  A.  Yeah.

24  Q.  In terms of Steadfast knowing about the obligation to pay

25  overtime, Steadfast knows that if it's an employee, you have

────────── L. Pitts - Direct ──────────

```
 1   to pay time and a half.
 2   A.  Correct.
 3   Q.  As owner and CEO of Steadfast -- as the CEO of Steadfast,
 4   you're aware of how payroll is processed.
 5   A.  Correct.
 6   Q.  You've developed, directed, and implemented the processes
 7   for processing payroll that whomever your payroll manager is
 8   or your staff is, they know what to do.  They know the
 9   established procedures for processing payroll.
10   A.  Correct.
11   Q.  You've sent out reminders and memos to employees about
12   submitting their time sheets.  Steadfast has sent out
13   reminders and memos to nurses about submitting their time
14   sheets.
15   A.  Correct.
16   Q.  Directing your attention to Plaintiff's 37.  And it goes
17   out in a big blast on occasion.  It looks like this at the
18   top --
19           MS. LEWIS:  Scroll down, please.
20   BY MS. LEWIS:
21   Q.  -- with various reminders about "You need to submit
22   time" --
23           MS. LEWIS:  Go back up to the last one, please.
24   Scroll down, please, to the blue text.
25   BY MS. LEWIS:
```

───────L. Pitts - Direct───────

1    Q.  -- "Reminder:  Make sure you get your time sheets in.

2    It's a holiday."

3           This is very similar of the type of reminders that

4    Steadfast sends; is that right?

5    A.  Can you scroll down?

6    Q.  Oh, it's the blue text.

7    A.  Excuse me?

8    Q.  The blue text, can you see it?

9    A.  Oh, okay.  Yes.

10   Q.  And these reminders that are contained within this

11   exhibit are true and accurate representations of the

12   reminders that Steadfast sends out in terms of timely

13   submitting time sheets.

14   A.  Correct.

15   Q.  And they are made within the regular course of

16   Steadfast's business; is that right?

17   A.  Excuse me?  What did you say?

18   Q.  I said they are made within the regular course of

19   business.

20   A.  Yes.

21          MS. LEWIS:  Your Honor, I move to -- we already --

22   did we do 37?

23          Move to admit Plaintiff's 37.

24          MR. JEWETT:  Your Honor, we don't object to the

25   admission of the one shown, but they've only shown Ms. Pitts

538

—————L. Pitts - Direct—————

```
 1   a quarter of the memos.

 2           THE COURT:  Well, she's only moving to admit this

 3   memo, right?

 4           MS. LEWIS:  No, the entire 37.  So there's 43

 5   similar e-mails in here.  So if we want to take the time,

 6   there's a binder behind her that it may be faster for her to

 7   flip through.

 8           THE COURT:  The whole point is that she sends

 9   information to the nurses and the RNs to remind them to file

10   their time sheets and et cetera, and this is an example, and

11   the Court overrules the objection.

12           The document is admitted.

13           (Plaintiff's Exhibit PX-37 received in evidence.)

14   BY MS. LEWIS:

15   Q.  Since April 2019, Steadfast has a pay practice called

16   "Next Day Pay"; is that right?

17   A.  Correct.

18   Q.  With Next Day Pay, nurses are able to be -- are supposed

19   to be paid or have an option to be paid outside of their

20   regular established payday, which, as we've talked about

21   today, is typically Friday; is that correct?

22   A.  Yes, it's typically Friday.

23   Q.  Right, a typical payday is Friday, but on Next Day Pay,

24   you can submit your time sheet on Monday and, ideally, get

25   paid on Tuesday.  That's the way it works.
```

539

─────────────── L. Pitts - Direct ───────────────

1    A.   Yes.  And you also can submit your time that day, and

2    sometimes we pay out that day.

3    Q.   Okay.  Directing your attention to Plaintiff's 34.  And

4    back in -- I think I initially said April 2019, but here it

5    looks like beginning February 2019, that's when you all

6    started to offer Next Day Pay.

7    A.   Correct.

8    Q.   And this memo was sent out to nurses that work with

9    Steadfast letting them know we have this new option available

10   for you all.

11   A.   Correct.

12   Q.   And this is a true and accurate representation of the

13   memo that was sent out advising the nurses that this option

14   was available.

15   A.   Correct.

16        MS. LEWIS:  Your Honor, I move to admit

17   Plaintiff's 34.

18        MR. JEWETT:  No objection.

19        THE COURT:  Plaintiff's 34 will be admitted.

20        (Plaintiff's Exhibit PX-34 received in evidence.)

21   BY MS. LEWIS:

22   Q.   You, also, as CEO of Steadfast, oversee the payroll

23   accounts for the company; is that right?

24   A.   Yes.

25   Q.   Directing your attention to Plaintiff's 19.  And you're

─────────────────── L. Pitts - Direct ───────────────────

1    the signatory for those accounts.  You're the only signatory

2    for the payroll accounts.

3    A.  Correct.

4    Q.  And those accounts are through BB&T; is that right?

5    A.  Correct.

6    Q.  Is this a sampling of some of the payroll accounts

7    that -- the checking accounts that payroll is processed

8    through?  Is that correct?

9    A.  Correct.

10          MS. LEWIS:  Your Honor, I move to admit

11   Plaintiff's 19.

12          MR. JEWETT:  No objection.

13          THE COURT:  Plaintiff's 19 will be admitted.

14          (Plaintiff's Exhibit PX-19 received in evidence.)

15   BY MS. LEWIS:

16   Q.  Additionally, you all also use ADP to support your

17   payroll processing; is that right?

18   A.  Correct.

19   Q.  Directing your attention to an exhibit previously marked

20   as Plaintiff's 16, you reach out to ADP to make certain

21   changes to the ADP management side of the nurses' information

22   that is input there for payroll processing; is that right?

23   A.  Correct.

24   Q.  You've inquired about setting up child support

25   garnishments for 1099s with ADP.

┌─────────────────────────── L. Pitts - Direct ───────────────────────────┐

 1    A.  Correct.

 2    Q.  You've approved or directed employee address changes --

 3    I'm sorry.

 4            You've approved or directed address changes for

 5    CNAs, LPNs, and RNs through ADP, the communications that you

 6    had.

 7    A.  Correct.

 8            MS. LEWIS:  Scrolling down a bit further.  Right

 9    there at the top of the page.

10    BY MS. LEWIS:

11    Q.  You're able to generate through ADP, at your direction or

12    with their assistance, a document that is called a "Change

13    Report."

14    A.  Exactly, correct.

15    Q.  And on this ADP report, it identifies a hire and term

16    date for, i.e., when they were entered into the payroll for

17    Steadfast.

18    A.  Correct.

19    Q.  And also other identifying information for each nurse

20    that works with Steadfast.

21    A.  Yes, in the ADP form.

22    Q.  In the ADP form.

23    A.  In their form, yes.

24    Q.  And this is a true and accurate representation of these

25    Change Reports, communications, and the like that Steadfast

└──────────────────────────────────────────────────────────────────────────┘

─────────────── L. Pitts - Direct ───────────────

1    has had with ADP.

2    A.  Correct.

3         MS. LEWIS:  Your Honor, I move to admit

4    Plaintiff's 16.

5         MR. JEWETT:  No objection.

6         THE COURT:  It will be admitted.

7         (Plaintiff's Exhibit PX-16 received in evidence.)

8    BY MS. LEWIS:

9    Q.  In the processing of payroll, you also regularly review

10   payroll to ensure accuracy of the rates that the nurses are

11   paid and the pay that they are receiving.

12   A.  Correct.

13   Q.  And as owner and CEO of Steadfast, you're concerned about

14   the company's reputation.

15   A.  Correct.

16   Q.  And that reputation flows from the nurses that are placed

17   at the facilities by Steadfast schedulers.

18   A.  It flows from everybody; in-house, everybody.

19   Q.  Everybody.

20        So from time to time, you've sent out memos to

21   nurses about Steadfast's expectation about how they should

22   conduct themselves when Steadfast places them in those

23   facilities.

24   A.  That's not correct.

25   Q.  I want to direct your attention to Plaintiff's 33.

─────── L. Pitts - Direct ───────

1          Going to the top of this memo, this is on

2   Steadfast's letterhead, correct?

3   A.   Correct.

4   Q.   Going to the bottom of this page, that's your signature

5   there, right?

6   A.   Correct.

7   Q.   Going to the actual text of what this document is talking

8   about, do you recognize this document?

9   A.   Yes.  The facility asked us to send a memo out.

10  Q.   So my question was:  Do you recognize this document?

11  A.   Yes, I do.  Yes, I do.

12  Q.   And the document says:  "No sleeping in residents' rooms.

13  Some residents have cameras in the room."

14          You sent out that memo, correct?

15  A.   Correct.

16          MS. LEWIS:  And go to the next one on Page 2,

17  please.

18  BY MS. LEWIS:

19  Q.   Another memo of the same effect, on Steadfast's

20  letterhead, and it's called "Memo of the Week," 2/17/2017.

21          "If you need to reach Lisa, please call her."  And

22  it's your number listed.  "You can contact her 24 hours a

23  day, seven days a week, 24/7.  Absolutely no sleeping on the

24  job.  If caught, you will be reported to the Board of

25  Nursing.  It is called neglect."

───────────────── L. Pitts - Direct ─────────────────

```
 1            And you signed this memo, too?
 2   A.  Correct.
 3            MS. LEWIS:  Going to the next one, please.
 4   BY MS. LEWIS:
 5   Q.  Again, on Steadfast's letterhead; is that right?
 6   A.  Correct.
 7   Q.  And on this memo, it indicates:  "Please chart on all
 8   residents before leaving the facility."  There's a cute
 9   little JPEG image there.  And scrolling down some more,
10   there's your signature again.
11   A.  Correct.
12   Q.  And you also have a note there again reminding about when
13   they need to submit time sheets and to whom.
14   A.  Correct.
15   Q.  So coming back to the top of my first question, Steadfast
16   sends a memo of the week; is that correct?
17   A.  No.
18   Q.  Okay.  Let's go back to this one, because this is another
19   memo of the week dated August 26, 2016.  This one is a
20   couple -- the same blurb at the top, providing the office
21   number.  "If you need to reach Lisa, call her at this number
22   24 hours a day, seven days a week."
23            The memo says:  "No smoking on facility grounds.  No
24   cell phones on the facility.  No exceptions.  No head wear in
25   the facility; scarfs, hats, headbands, et cetera.  Leave
```

Carol L. Naughton, Official Court Reporter

**JA598**

———————L. Pitts - Direct———————

1    copies of time sheets to scheduler.  Please be" -- in all

2    caps -- "on time for each shift.  Time slips must be in the

3    office by Monday," a time sheet reminder, and again, your

4    signature -- no, not on this one.

5            MS. LEWIS:  Keep scrolling, please.

6    BY MS. LEWIS:

7    Q.  Here's another memo just directing -- dated July 14,

8    2017, again, about how to communicate with Steadfast, what

9    the expectations are.

10           Do you recognize this document?

11   A.  Yes.

12   Q.  Signed by you?

13   A.  Yes.

14   Q.  As CEO?

15   A.  Yes.

16           MS. LEWIS:  Next page, please.

17   BY MS. LEWIS:

18   Q.  This one is a reminder about nurses working at certain

19   facilities, and the second bullet point says:

20           "If you're asked to" -- "If you're asked who you

21   work for, please let them know you're contracted through

22   Atlantic Shores and your supervisor is LaShawn."

23           This is a memo that Steadfast -- you sent out and

24   signed June of 2017, reminding them that they are contracted,

25   not employees of that facility, correct?

┌─────────────────────── L. Pitts - Direct ───────────────────────┐

1   A.   Scroll the memo up, please.

2          No.   They are contracted through Atlantic Shores.

3   Q.   Right, contracted.

4   A.   Yeah.

5   Q.   Not employees.

6          MS. LEWIS:   Going to the next page, please.

7   BY MS. LEWIS:

8   Q.   This is another memo of the week dated --

9          THE COURT:   Now, if your intent was to impeach the

10  witness on whether she gave instructions and et cetera to

11  these nurses and LPNs, you've gone through about five of

12  these now.

13         MS. LEWIS:   Well, when I was going through it, she

14  still indicated that she hadn't.   So I wanted to -- sorry.

15         THE COURT:   Even though she says she has not and

16  you've shown multiple ones, you can move on.

17         THE WITNESS:   I didn't say I had not.   I didn't say

18  I had not.   I said I was instructed by the facility to send

19  certain memos.

20         MS. LEWIS:   Keep scrolling, please.

21  BY MS. LEWIS:

22  Q.   So since at least August 18, 2015 -- strike that.

23         Steadfast didn't consult with any personnel within

24  the Department of Labor to determine whether their

25  compensation and overtime policies which had been in effect

└──────────────────────────────────────────────────────────────┘

L. Pitts - Direct

 1  since August 18, 2015, have complied with the FLSA; is that

 2  right?

 3  A.  I consult with my attorneys.

 4  Q.  My question was:  Steadfast did not consult with anyone

 5  in the Department of Labor to determine whether their

 6  compensation, meaning Steadfast's compensation, and overtime

 7  policies which have been in effect since August 18, 2015,

 8  complied with the FLSA.

 9          In other words, you didn't talk to anybody at the

10  Department of Labor about your policies that were in effect

11  in 2015, correct?

12  A.  What policies?  See that's --

13  Q.  Your pay policies, your compensation policies, the reason

14  we're here.  You haven't talked to anybody at the Department

15  of Labor --

16  A.  No --

17  Q.  -- you didn't talk to anyone in 2015 --

18  A.  -- I talked to my attorney.

19  Q.  My question was at the Department of Labor.

20          THE COURT:  Okay.  That's three times.  Ms. Pitts,

21  answer the question, and then if you need to explain,

22  explain.  But answer the question.  We're not going to keep

23  going over and over --

24          THE WITNESS:  I don't understand the question.

25          THE COURT:  What?

─────────── L. Pitts - Direct ───────────

1      THE WITNESS:  I didn't understand it.

2      THE COURT:  The question was very clear.  Have you

3  spoken or did you consult with anyone at the Department of

4  Labor about how you were paying your wages and whether they

5  were in compliance with the FLSA?  That's what the question

6  is.

7      THE WITNESS:  When they came to my office.

8  BY MS. LEWIS:

9  Q.  In 2015?

10 A.  That's when they came to the office.

11 Q.  Directing your attention to the Request for Admission,

12 Number 8.

13      Do you recall receiving written discovery in this

14 matter?

15 A.  Personally, my attorneys received everything.  So I don't

16 remember seeing this.  I know we had that.  They flashed it.

17 They showed me what came from the Department of Labor, but I

18 didn't read it.  My attorneys were handling this.

19 Q.  So you signed -- within this discovery, you indicated

20 that you had not spoken to any -- let me go back.

21      Discovery was sent, propounded in this matter,

22 correct, sent to defendants in this matter, sent to you?

23 A.  Yes, to my attorneys.

24 Q.  Okay.  And they provided answers to those discovery

25 responses.

```
                          ┌─ L. Pitts - Direct ─┐
  1    A.  Correct.
  2    Q.  And you had to review and sign the answers with a sworn
  3    affidavit indicating that those answers were truthful and
  4    accurate.
  5    A.  Correct.
  6    Q.  And one of those requests was whether or not you,
  7    defendants, had discussed the compensation policies with the
  8    Department of Labor, and you admitted that you had not.
  9    A.  Yeah, but when they came to my office, they discussed
 10    everything.  When they first came to my office and did their
 11    investigation, they discussed the things with me.
 12    Q.  You also talked with colleagues, other businesses, such
 13    as WTS and First Choice, about compensation practices of
 14    registries and agencies; is that right?
 15    A.  No.  I haven't discussed anything with WTS.
 16    Q.  First Choice?
 17    A.  I talked to him because he asked about my business.
 18    That's the last time that I talked to him.
 19    Q.  Do you recall being in a deposition on February 21st with
 20    the Department of Labor?
 21    A.  Repeat the question.
 22    Q.  Do you recall having a deposition with the Department of
 23    Labor again on February 21st --
 24    A.  Correct.
 25    Q.  -- 2019?
```

550

L. Pitts - Direct

```
 1   A.  Correct.
 2   Q.  Directing your attention to --
 3           MS. LEWIS:  Go to the very beginning.
 4           If I could help him.  Thank you.
 5           (Pause in the proceedings.)
 6   BY MS. LEWIS:
 7   Q.  And you were sworn and you were under oath at that
 8   deposition, correct, to testify truthfully and accurately?
 9   And at the deposition, you were asked:  "Okay" --
10           THE COURT:  Ms. Lewis, you asked the witness a
11   question and never permitted her to answer your question.
12           MS. LEWIS:  My apologies.
13   BY MS. LEWIS:
14   Q.  Were you under oath at that deposition?
15   A.  Yes, I was.
16   Q.  And at that deposition, you were asked:
17           "Okay," question, "aside from WTS and your
18   attorneys, did you speak to anyone else about how you pay
19   these individuals?"
20           And you answered:  "Yeah.  Yes.  I spoke to First
21   Choice Nursing."
22   A.  Yes.  We talked about that when he offered to buy my
23   company.  We talked about pay rates and what I was paying my
24   nurses.
25   Q.  So you participated in a final conference with the
```

—L. Pitts - Direct—

 1    Department of Labor that was in 2018.  That was when you met
 2    with Investigator Mazuera; is that right?
 3    A.  Yes.
 4    Q.  And at that conference you were informed, as a result of
 5    the Department of Labor's investigation, DOL was making a
 6    finding that Steadfast's pay practices violates the FLSA.
 7    A.  Yes.
 8    Q.  Do you recall that discussion?
 9    A.  Yes.
10    Q.  But after that conference, you continued to pay straight
11    time for all hours worked to nurses.
12    A.  Correct.
13    Q.  And you continued to do so to this day.
14    A.  Correct.
15    Q.  After the Department of Labor filed suit in this matter,
16    you haven't changed your practices, your pay practices.
17    A.  Because my attorneys told me I didn't have to.
18    Q.  You continue to treat every new nurse that is placed and
19    works at the facility that Steadfast places them with as
20    independent contractors.
21    A.  Correct.
22    Q.  And so you've continued to classify these nurses as
23    independent contractors after your conference with the
24    Department of Labor and suit has been filed in this matter.
25    A.  Correct.

552

─────L. Pitts - Cross─────

 1           MS. LEWIS:  No further questions for this witness.

 2                       CROSS-EXAMINATION

 3   BY MR. JEWETT:

 4   Q.  Hello, Ms. Pitts.

 5   A.  Good morning.

 6   Q.  I have just a few questions for you based on your

 7   testimony.

 8           Do you recall Ms. Lewis asked you if you ever

 9   consulted with the Department of Labor about your practices?

10   A.  Correct.

11   Q.  Okay.  And you had a little trouble with that question.

12   I'm going to actually clarify the question for you.  Okay?

13   A.  Okay.

14   Q.  Did you ever call the Department of Labor and ask them if

15   you're complying with the law?

16   A.  No, sir.

17   Q.  Did you ever send them an e-mail or letter and ask them

18   if you're complying with the law?

19   A.  No, sir.

20   Q.  Okay.  Ms. Lewis showed you a series of memos.  Do you

21   recall that?

22   A.  Yes.

23   Q.  She pointed out that the top of, maybe, several of the

24   memos said "Memo of the Week."

25   A.  Uh-huh.

─────────────────────────── L. Pitts - Cross ───────────────────────────

1    Q.  Do you actually send a memo every week?

2    A.  No.

3    Q.  She also showed you an e-mail about reminders about time

4    sheets.  Do you recall that?

5    A.  Yes.

6    Q.  Why are those sent out?

7    A.  Because it was a lot of issues with the facility not --

8    they have to leave a copy of the time sheets at the facility,

9    and they wasn't leaving them at the facility.  We were

10   getting the time sheets.  We had to give them back to the

11   facility.  And getting them paid by a certain time could not

12   happen unless we get the time sheets in a timely manner.

13   Q.  If a nursing registry were to not submit a time sheet on

14   time, would that jeopardize the nurse's ability to get paid

15   on time?

16   A.  Correct.

17         MS. LEWIS:  Objection.  Confusing.  I'm not sure I

18   understood the question.

19         THE COURT:  Hold a second.  The Court didn't

20   understand.

21         MR. JEWETT:  Sure.

22         THE COURT:  The Court didn't understand the

23   question, either.  So now you can start again.

24         MR. JEWETT:  Yes, sir.

25   BY MR. JEWETT:

554

—————L. Pitts - Cross—————

 1   Q.  Ms. Pitts, my question is:  If the nurse failed to submit

 2   the time sheet on time, would that jeopardize the nurse's

 3   ability to get paid on time?

 4   A.  Correct.

 5   Q.  Ms. Lewis asked you about some of the employees in your

 6   office.

 7   A.  Correct.

 8   Q.  Do you remember that?

 9   A.  Correct.

10   Q.  She asked you if there were hourly employees.

11   A.  Correct.

12   Q.  What about Christine Kim?  Is she paid hourly or salary?

13   A.  She was paid hourly, and now she's salary.  We moved her

14   to salary.

15   Q.  Thank you for that clarification.

16        Okay.  Ms. Lewis also asked you some questions about

17   professional liability or malpractice coverage.  Do you

18   recall that?

19   A.  Yes.

20   Q.  Do you have professional malpractice liability coverage

21   for all 800-plus nurses on your registry?

22   A.  No.  It's only for Steadfast Medical Staffing, to protect

23   the name and the brand of the company.

24   Q.  What do you base that on?

25   A.  Well, I spoke with an attorney, and I thought I had to

Carol L. Naughton, Official Court Reporter

**JA608**

─────L. Pitts - Cross─────

```
 1   have it on everyone, and he said you've got to protect the
 2   company because in the healthcare industry when they sue,
 3   they sue everybody.  They're going to sue your company.
 4            THE COURT:  Excuse me.  You know that's all hearsay,
 5   what the attorney said.  So just answer his question.  You
 6   can indicate you consulted with counsel, but you can't go
 7   into what he said to you.
 8            THE WITNESS:  I consulted with counsel.
 9   BY MR. JEWETT:
10   Q.  Thank you.
11            Okay.  Ms. Lewis showed you a document that I
12   believe was marked as Plaintiff's 36.  This was a letter that
13   you sent out regarding Tammi Odom.  Do you recall that?
14   A.  Yes, sir.
15   Q.  Who is Tammi Odom?
16   A.  She used to be my assistant.
17   Q.  She wasn't a nurse?
18   A.  No, sir.
19   Q.  And why did you send that letter out?
20   A.  Because she had went in my office, stole all of our
21   paperwork to start our company, and she went to start her own
22   company and used all our paperwork.  And then she was going
23   to get contracts and saying she was part of Steadfast, her
24   company Steadfast was a joint company, and she did it with
25   Corrections, and it caused a big mess.
```

──────L. Pitts - Cross──────

```
 1              And they was asking me questions about that, and I
 2    said, "I don't know anything about it."  So that's why we had
 3    to put something so we didn't get blamed if something
 4    happened.
 5              MR. JEWETT:  Thank you, Ms. Pitts.  I have no
 6    further questions.
 7              THE WITNESS:  Thank you.
 8              THE COURT:  The Court has a series of questions
 9    here.  You may have a seat.
10              The Court is a little confused about something.
11    Have you always considered all the nurses, LPNs, and CNAs
12    that you hire at Steadfast to be independent contractors?
13              THE WITNESS:  Yes, sir.
14              THE COURT:  I notice on Exhibit 16 -- I think it's
15    Exhibit 16.  It's called a Change Report.  Can we go back to
16    Exhibit 16, please.  I think it's the Change Report.
17              MS. LEWIS:  Yes.  It's connected.
18              THE COURT:  Employee Change Report.
19              THE WITNESS:  This is from ADP.
20              THE COURT:  From ADP.
21              THE WITNESS:  Yes, sir.  It's not Steadfast.  I had
22    to use their forms.
23              THE COURT:  Can we go back to the agreement that
24    Steadfast has with, I think it's Princess Anne.  That's
25    probably it.  I wanted to put that agreement back up on the
```

————L. Pitts - Cross————

1    screen, please.  I have some questions about it.

2             THE WITNESS:  The MFA form.

3             THE COURT:  I think it came out during the testimony

4    of Erica Johnson, the representative from Princess Anne.

5    That's when that report --

6             MS. LEWIS:  I have it up, Your Honor.

7             THE COURT:  Okay.  Can you scroll through the report

8    very slowly for the Court.  Keep going.  Keep going.

9    Continue.  Continue.  Keep up.  Hold.  Hold up a second.

10   Keep on moving.

11            MS. LEWIS:  Next page, Your Honor.

12            THE COURT:  Next page.  Keep moving.  Keep moving.

13   Continue.  Continue.  Okay.  Stop right there for the time

14   being.

15            In this paragraph, you indicate the supplemental

16   staffing service would maintain through the term of the

17   agreement certain insurances:  commercial general liability,

18   automobile liability, Workers' Compensation, employer's

19   liability, fidelity bond, umbrella liability, and cyber

20   liability.  Is that correct?

21            THE WITNESS:  Yes, that's what it states.

22            THE COURT:  That Workers' Compensation, do you pay

23   Workers' Compensation for independent contractors?

24            THE WITNESS:  Yes.  By law, we have to.

25            THE COURT:  You've always done that?

———L. Pitts - Cross———

1           THE WITNESS:  From day one, sir.

2           THE COURT:  And you were told you had to do that.

3           THE WITNESS:  Yes, sir.

4           THE COURT:  Okay.  Continue.  Next page.  Hold it.

5    Continue.

6           Now, in this paragraph 10, it says that it's

7    "specifically understood and agreed that temporary personnel

8    assigned by supplemental staffing service to the healthcare

9    center is the sole employee of" -- not independent

10   contractor -- "sole employee of supplemental staffing service

11   and not an employee or joint employee of the healthcare

12   center."

13          It doesn't say "independent contractor."  It just

14   says "the sole employee of supplemental staffing service,"

15   which is Steadfast, "and not an employee or joint employee of

16   the healthcare center."

17          Did you read this contract before you signed it?

18          THE WITNESS:  I sent them my contract.  It was done

19   at their corporate office in Roanoke.  I sent -- they

20   inquired about us staffing all the facilities.  I sent them

21   our contract.  They said they have a standard contract for

22   all the staffing agencies, if you want to do business with

23   them.

24          They also said -- I said, "Well, I have independent

25   contractors.  We don't take out taxes."  He said --

————— L. Pitts - Cross —————

1        THE COURT:  Ms. Pitts, this is your contract.  No

2   matter where you got it from, this is your contract, and it

3   says that they're the sole employee of the supplemental

4   staffing service, which is Steadfast.

5        THE WITNESS:  This is not my contract.  This is

6   MFA's contract that they sent me that I had to sign.

7        THE COURT:  That they sent you and you signed it.

8        THE WITNESS:  Yes, sir.  I sent them my contract,

9   and they said, "We can't use your contract because we have a

10   standard contract that's drawn up by the attorneys in Roanoke

11   that everybody has to use."

12        THE COURT:  So you signed the contract saying that

13   the LPNs and RNs, the folks you send out there from

14   Steadfast, were employees of Steadfast.

15        THE WITNESS:  He told me to put in the -- in our

16   rate sheet that's attached, to put it up there that they are

17   all independent contractors.  They can't change theirs.

18        THE COURT:  Thank you.

19        Keep scrolling on through there.  Hold up.  Keep on

20   moving.  I still haven't found what I'm looking for.  So keep

21   rolling.  Keep moving.  Continue to move.  Is that the end of

22   it?  Hold it.  Back up.  Continue on through it.

23        Okay.  The Court was looking through this document.

24   The Court recalled, when that document came up on the screen,

25   a paragraph being in there that specifically said that the

─────── L. Pitts - Cross ───────

 1   people, the LPNs and et cetera, were the employees of

 2   Steadfast, and the Court may not find it now, but the Court

 3   will have time to go back and look at it.  That's what the

 4   Court was looking for.

 5           MS. LEWIS:  Your Honor, we know where it's at.  We

 6   can direct you to it.

 7           THE COURT:  That's the paragraph the Court was

 8   looking for in this agreement.  It said in clear terms that

 9   they were the employees of Steadfast.  We're not going to

10   spend any more time trying to find it.  The Court will review

11   the document at a later point.

12           MS. LEWIS:  I think this is what you were looking

13   for, Your Honor.

14           THE COURT:  An Acknowledgment and Waiver.  This is a

15   sample.  Is this Acknowledgment and Waiver signed by all

16   people who work for Steadfast out in the field?

17           THE WITNESS:  No.  No, sir.  All MFA -- yes, they

18   had to sign it because of their computer system.

19           THE COURT:  So if I understand, "I acknowledge and

20   agree that I am solely employed by Steadfast" -- so the Court

21   understands that.  I don't think this is the language the

22   Court was looking for.

23           MS. LEWIS:  Okay.

24           THE COURT:  But that's okay.  The Court has spent

25   enough time on that.

─────────────── L. Pitts - Cross ───────────────

1          I guess one of my final questions I have is there

2     has been some testimony in here that you were in some way

3     involved in disciplining employees, these nurses and

4     registered nurses and LPNs, when something happened at the

5     facilities.

6          Is it your practice to be involved in the discipline

7     of an independent contractor?

8          THE WITNESS:  May I speak, sir?

9          THE COURT:  No.  Answer my question, and then you

10    may explain.

11         Is it your practice to be involved in the discipline

12    of an independent contractor?  "Yes" or "no" and then --

13         THE WITNESS:  No, it's not a practice.

14         THE COURT:  It's not a practice?

15         THE WITNESS:  No, sir.

16         THE COURT:  And do you consider -- having the

17    facilities report to you on any alleged violations, are you

18    taking any action to be involved in discipline?

19         THE WITNESS:  They report to me on actions because

20    sometimes they reach out to the Board of Nursing, and they

21    have to get demographics from me.  But I can't discipline any

22    of them because there's nothing I can do to discipline them.

23    I don't have a handbook.  I don't have rules for disciplining

24    nurses.

25         THE COURT:  So, then, you deny the claims or the

```
                        ┌── L. Pitts - Redirect──┐
```

 1   testimony that you would sometimes basically respond by not

 2   giving them shifts or things of that nature.

 3            THE WITNESS:  Yes.  I don't do that.  If they're

 4   DNR'd from the facility, I can't control that.

 5            THE COURT:  Okay.  All right.  The Court has no

 6   further questions, unless someone has some questions based on

 7   something the Court said.

 8            MS. LEWIS:  Your Honor, I have very brief redirect.

 9            THE COURT:  Okay.  Fine.  I interrupted your

10   opportunity to do the redirect.

11            MS. LEWIS:  Just two more questions, Your Honor.

12                      REDIRECT EXAMINATION

13   BY MS. LEWIS:

14   Q.  In addition to previously having provided written

15   responses to Request for Admissions, you also provided

16   written responses to interrogatories.

17            MS. LEWIS:  Go to 19, please.

18   BY MS. LEWIS:

19   Q.  And you all -- Steadfast didn't claim any exemptions for

20   any employees.  You didn't claim exemptions for Christine Kim

21   because she wasn't salaried at the time that you all provided

22   these responses, correct?

23   A.  She was a W-2, correct.

24   Q.  She was a W-2.

25   A.  Correct.

────────L. Pitts - Redirect────────

1    Q.  But she wasn't paid on an hourly basis.  And defendants

2    never provided any supplements advising the Department that

3    she had been changed to a salaried basis; isn't that right?

4    A.  Excuse me?

5    Q.  Steadfast never informed the Department of Labor, after

6    providing this response at Interrogatory Number 5, that

7    Christine Kim -- that you all were seeking an exemption for

8    her.

9    A.  No, because I didn't know I had to.

10   Q.  Coming back to the information with respect to the WTS

11   memo, you explained to your counsel why you sent that memo

12   out.

13   A.  You want me to explain?

14   Q.  No.  I was leading up to a question.

15          You had another deposition again on March 12, 2020.

16   Do you recall?

17   A.  I have to see it.

18   Q.  Do you recall sitting in a room with me somewhere in

19   Norfolk?

20   A.  I don't remember the date, but I remember sitting with

21   you.

22   Q.  Okay.  So that was a deposition, and you were under oath

23   at that deposition, correct?

24   A.  Yes.

25   Q.  And at that deposition, we talked about that memo.  Do

L. Pitts - Redirect

```
 1   you recall?
 2   A.  I don't recall talking about it.  I have to see it again,
 3   see the deposition.
 4   Q.  Tammi Odom is her name, right?
 5   A.  Yes.  I remember talking about her.
 6   Q.  You indicated during your testimony that you were
 7   considering pressing charges against her because she stole
 8   some proprietary information from you when she worked for
 9   you, right?
10   A.  Correct.
11   Q.  And that propriety information being the list of nurses
12   that Steadfast placed on, you know -- provides assignments
13   to.
14   A.  Yes.
15   Q.  Because that nurse list is part of the bread and butter
16   of your business.  If somebody else has it, it could cause
17   Steadfast financial harm; is that right?
18   A.  Well, they work for different agencies anyway, so, yeah.
19   Q.  That was part of the issue; is that right?
20   A.  It was part of the issue, yes.
21   Q.  And so to try and address the fact that she had stolen
22   your list of nurses, you sent out that memo.
23   A.  No, that's not why I sent it out.
24       THE COURT:  The Court is having some difficulty
25   determining how this line of inquiry is within the scope of
```

-------------------------------L. Pitts - Redirect-------------------------------

1   the cross-examination, which was very brief.

2          MS. LEWIS:  Well, on redirect, counsel sought to

3   elicit that she did not send out that memo to WTS and the

4   reasons behind it.

5          THE COURT:  You're doing the redirect.

6          MS. LEWIS:  I'm sorry?

7          THE COURT:  You're doing the redirect.

8          MS. LEWIS:  Right.  I meant, during cross, counsel

9   sought clarification with respect to that memo and then tried

10  to make a distinction with respect to the reason that memo

11  was sent.

12         THE COURT:  Okay.  Now the Court is following you.

13  BY MS. LEWIS:

14  Q.  This is what we talked about.  During the deposition, I

15  asked:

16         "Did you file any criminal charges?"

17         Your response:  "I don't know if I did.  I doubt

18  it."

19         "Did you go to court?"

20         "We didn't.  No, we didn't go to court."

21         And I asked:  "How did you -- I want to go back to

22  the statement you made earlier that she stole everything;

23  clients, contracts, independent contractors to the registry."

24         And you interrupted and then said:  "Rosters --

25  rosters, all of those things."

```
                        ┌─────────L. Pitts - Redirect─────────┐
```

 1        "As it relates to independent" -- and I asked:  "As

 2   it relates just to the independent contractor rosters, why is

 3   that a problem?"

 4        And your response was:  "Well, you worked for me,

 5   and you were doing my marketing, and that's a problem that

 6   you stole my independent contractor roster without getting my

 7   permission.  That belongs to my company."

 8        THE COURT:  So what is the question?

 9   BY MS. LEWIS:

10   Q.  So my question is:  You sent out that memo because it was

11   an issue that she had your list of nurses that Steadfast

12   relies upon to do business; isn't that right?

13   A.  No.

14        MR. JEWETT:  Objection, Your Honor.  This has been

15   asked and answered.

16        THE COURT:  Objection overruled.  She just answered

17   you "no."

18        MS. LEWIS:  No further questions, Your Honor.

19        MR. JEWETT:  Your Honor, may I ask one additional

20   question of the witness about the contract that you asked the

21   witness about?

22        THE COURT:  I don't usually allow recross, but you

23   can come on back and ask a question.  We may end up with

24   sur-recross or sur-whatever.  Just pull it up, and you may go

25   forward.

1          MR. JEWETT:  The terminology kind of throws me too.

2          Can you please expand the screen.  Can you please

3     scroll up.

4                    RECROSS-EXAMINATION

5     BY MR. JEWETT:

6     Q.  Ms. Pitts, do you see that this is the MFA contract that

7     Judge Jackson asked you about?

8     A.  Yes.

9     Q.  The Court asked you why you signed this contract, and I

10    believe you said that you originally sent your contract to

11    the MFA representative.  Is that accurate?

12    A.  Yes.

13    Q.  And then you told the Court that you were informed that

14    this is their standard contract to sign.  Do you recall that?

15    A.  Yes.  By their attorneys.

16    Q.  I believe you also referenced that you asked them to sign

17    an attachment indicating that the nurses are not independent

18    contractors.  Do you recall saying that?

19    A.  Yes.

20    Q.  What I'm showing on the screen here is Exhibit B to that

21    particular contract with the MFA.  Is this the attachment

22    that you referenced to the Judge?

23    A.  Yes.

24          MR. JEWETT:  Can you scroll back up so she can see

25    it, please?

568

```
 1             THE WITNESS:  Yes.
 2    BY MR. JEWETT:
 3    Q.  This is the attachment that you referenced that indicated
 4    independent contractors.
 5    A.  Yes.
 6    Q.  At the bottom there, is that the signature of MFA?
 7    A.  Yes.
 8             MR. JEWETT:  Can you please show her the signature.
 9    BY MR. JEWETT:
10    Q.  Is that the MFA's signature?
11    A.  Yes.
12             MR. JEWETT:  Thank you.  No further questions.
13             THE COURT:  Okay.  We're going to take a break, and
14    we'll be back in 15 minutes.
15             You may step down, Ms. Pitts.
16             (Witness stepped down.)
17             (Recess from 11:27 a.m. to 11:51 a.m.)
18             THE COURT:  Next witness.
19             MS. LEWIS:  Your Honor, before moving to the next
20    witness, I realized I had a couple of housekeeping matters
21    with respect to exhibits from Ms. Pitts' testimony that I
22    neglected to move into evidence, if I may.
23             THE COURT:  Okay.
24             MS. LEWIS:  Starting from the top, during Ms. Pitts'
25    testimony, we were testifying regarding the contract terms,
```

1    which is Plaintiff's 12, which is a summary pursuant to

2    Federal Rules of Evidence 1006, of all of the contracts that

3    were produced within discovery that Ms. Pitts provided.

4            THE COURT:  Excuse me.  Were those contracts within

5    Exhibit 10?

6            MS. LEWIS:  No.  So we printed out a sampling of the

7    contracts, but we were provided -- thank you.

8            THE COURT:  You can have a seat while she finishes,

9    and then you can come up when she finishes.

10           MR. JEWETT:  Yes, sir.

11           MS. LEWIS:  So Exhibit 10, we had printed out 10

12   because of the voluminous nature.  So 12 is all of the

13   contracts that were produced in discovery with the central

14   contract terms that we were discussing with Ms. Pitts.  So

15   it's a summary under Federal Rules of Evidence -- is it under

16   1001 or 1006?

17           THE COURT:  1006.  Okay.

18           MS. LEWIS:  So Plaintiff's 12.

19           Plaintiff's 28, and that was the insurance policy,

20   the Certificate of Insurance page that we had discussed.  I

21   laid the foundation, but I did not request to move it in.

22           THE COURT:  Any others?

23           MS. LEWIS:  And there's just one more, but I'll

24   leave that.  It's fine.  Just those two.

25           THE COURT:  Any objection to those exhibits?

```
 1              MR. JEWETT:  We do not object to the insurance

 2     policy.  We do object to the 1006 exhibit.  The standard for

 3     1006 is accuracy and completeness.  There are 58 contracts

 4     listed in 1006.  I don't have an exact count.  We had

 5     compared the record this morning, and the record is missing

 6     maybe 40 percent of them.  That's number one.

 7              Number two, at least one of the columns contains

 8     inaccurate information.  It says that Steadfast has a

 9     non-solicit with the hospitals -- excuse me -- the

10     facilities, and the non-solicit actually goes the other way

11     around; Steadfast is prohibited from soliciting facility

12     employees.

13              THE COURT:  Well, let's back up for a minute, now.

14     With respect to Exhibit 28, that will be admitted.  You have

15     no objection to that.

16              MR. JEWETT:  Yes.

17              THE COURT:  But you went back, and you objected to

18     an exhibit which is a compilation, as I understand it.

19              MR. JEWETT:  Yes, sir.

20              THE COURT:  And you can introduce a compilation if

21     you have, in fact, had an opportunity, of course, to talk

22     about your records, about seeing all the underlying records.

23     So you can introduce a compilation.  They're sometimes

24     referred to as a summary chart or a calculation.

25              Do you have the actual full documents in Number 12?
```

```
1            MS. LEWIS:  Yes, Your Honor, they were provided by

2    defendants in discovery.  So Exhibit 12, what is highlighted

3    as blue is what is in Plaintiff's 10.  So those are all the

4    ones that we copied.  What is not highlighted are the

5    remaining ones.  There's two pages to Plaintiff's 12.  So we

6    have our summary, and then the second page has the list with

7    the Bates numbers that defendants provided.

8            MR. JEWETT:  Your Honor, may I comment?

9            THE COURT:  No.  Let me tell you something.  This is

10   a very simple problem you have here.  They are your

11   documents.

12           MR. JEWETT:  Yes, sir.

13           THE COURT:  It's not like they came from another

14   planet.  They are your documents that you produced to the

15   plaintiff in discovery.  What they have is a summary of those

16   documents, and then the documents are attached.

17           Now, that's a little farther than you usually go,

18   because usually sometimes you can just put in the summary

19   alone.  But you have the documents.  Anyway, there's no

20   prejudice to the defendant because the defendant produced the

21   documents.  So what is the problem?

22           MR. JEWETT:  Okay.  That's well taken, Your Honor.

23           The second objection to the 1006 is to its accuracy.

24   One of the columns in here says that Steadfast has a

25   non-solicit preventing the facilities from hiring Steadfast
```

────────────── C. Kim - Direct ──────────────

1   employees.  It's the other way around.  The non-solicit says

2   that the Steadfast can't hire the facility employees.  What

3   Steadfast does have is the buyout clause that we've all seen.

4          THE COURT:  So you said that column is in the

5   summary that the plaintiffs intend to produce, right?

6          MR. JEWETT:  Yes, sir.

7          THE COURT:  Well, the Court happens to know from

8   looking at the evidence in here that what you suggested is

9   not accurate.  The Court has seen something in here

10  indicating that the facility cannot hire Steadfast's

11  employees.

12         Objection overruled.  Exhibit 12 will be admitted.

13         (Plaintiff's Exhibits PX-12 and PX-28 received in

14  evidence.)

15         MS. LEWIS:  Thank you, Your Honor.

16         Our next witness, Ms. Christine Kim.

17         (Witness sworn.)

18         CHRISTINE KIM, called by the Plaintiff, having been

19  first duly sworn, was examined and testified as follows:

20                     DIRECT EXAMINATION

21  BY MS. JONES:

22  Q.  Ms. Kim, could you please state and spell your full name

23  for the record.

24  A.  Christine Lee Kim.  C-h-r-i-s-t-i-n-e L-e-e K-i-m.

25  Q.  Are you currently employed?

——————————C. Kim - Direct——————————

1   A.   I am.

2   Q.   And where are you currently employed?

3   A.   At Steadfast Medical Staffing.

4   Q.   You're the payroll manager for Steadfast?

5   A.   Correct.

6   Q.   And you've had this position since November 2017?

7   A.   Correct.

8   Q.   As a payroll manager, you oversee the administrative

9   portion of Steadfast?

10  A.   Yes.

11  Q.   And that includes the payroll administration, billing and

12  invoicing of accounts receivable?

13  A.   Yes.

14  Q.   Steadfast operates a business that places nurses at

15  various healthcare facilities; is that right?

16  A.   Correct.

17  Q.   If Steadfast did not have any nurses to place at the

18  facilities, the business would essentially cease to exist?

19  A.   Say that one more time.

20  Q.   If Steadfast did not have any nurses to place at the

21  various facilities, the business would essentially cease to

22  exist?

23  A.   Yes.

24          THE COURT:  Ms. Jones, it's the form of your

25  question.  You cannot use leading questions on direct.

—————————————— C. Kim - Direct ——————————————

1          MS. JONES:  Your Honor, she is an adverse witness.

2     She is the payroll --

3          THE COURT:  I hate to cut you off but -- well, go on

4     and say it, and then I'll respond.

5          MS. JONES:  From my general understanding, pursuant

6     to Federal Rules of Evidence 611(c), Ms. Kim is an adverse

7     witness, which is why she was seated in the hallway.  She is

8     the payroll manager for Steadfast, and she works closely with

9     Ms. Pitts.  She was identified as a corporate representative

10    in 30(b)(6) depositions.

11         THE COURT:  Notwithstanding that rule, she has to

12    demonstrate to the Court that she's going to be hostile with

13    your questions.  If the Court declares her a hostile witness,

14    then you can use leading questions.  So far, she has not.

15         So you ask your questions.  If we reach the point

16    where she is evasive and does not answer you, then the Court

17    makes the determination whether she's a hostile witness and

18    you can use leading questions.  So just ask your questions.

19         MS. JONES:  I understand, Your Honor.

20         THE COURT:  Until she becomes evasive or hostile.

21         MS. JONES:  So is it the Court's position that she

22    is not considered an adverse --

23         THE COURT:  She has not failed to respond to

24    anything you said so far.  So you asked them in the regular

25    form, and then we shall see.

C. Kim - Direct

 1   BY MS. JONES:
 2   Q.  So to your knowledge, are the CNAs, LPNs, and RNs that
 3   Steadfast places at the various facilities an integral part
 4   of Steadfast's business?
 5   A.  I'm sorry.  Repeat that.
 6   Q.  The CNAs, RNs, and LPNs that Steadfast places at the
 7   various facilities, they are an integral part of Steadfast's
 8   business?
 9   A.  So just to answer that, Steadfast doesn't place any of
10   the nurses at the facilities.  They accept the shifts at the
11   facilities.
12   Q.  So let me ask it this way:
13          Are Steadfast nurses an integral part of Steadfast's
14   business?  Would you consider Steadfast nurses to be an
15   integral part of Steadfast's business?
16   A.  Yes.
17   Q.  Are you familiar with the nurses who are placed at the
18   various facilities on behalf of Steadfast to work?
19   A.  So, again, just the wording where you're stating that
20   Steadfast is placing the nurses, the contractors aren't
21   placed at the facilities.
22   Q.  Are you aware of the nurses that Steadfast assigns shifts
23   to?
24   A.  Am I aware of the nurses?
25   Q.  Are you familiar with them?

                                    ┌─C. Kim - Direct─

 1    A.  Familiar with them in a personal matter?

 2    Q.  Are you familiar with their names?

 3    A.  So just for clarification, you're asking me do I -- if I

 4    were -- if you were to show me a list of names, would I

 5    recognize them?

 6    Q.  That's exactly the question, Your Honor -- I mean, that's

 7    exactly the question.

 8    A.  Then, yes.

 9    Q.  I would like to direct -- you said "yes"?

10    A.  Yes.

11    Q.  I would like to direct your attention to Plaintiff's

12    Exhibit 23.

13          MS. JONES:  Ms. Lewis, could you slowly scroll

14    through this exhibit.

15          THE WITNESS:  Can you scroll slower, please.

16          THE COURT:  While you're looking for this,

17    Ms. Jones, the Court is going to reverse its ruling and

18    permit you to use leading questions.

19          MS. JONES:  Thank you, Your Honor.

20    BY MS. JONES:

21    Q.  Would it be easier for you to see a paper copy of this

22    list?

23    A.  I think that would be faster.

24          THE COURT:  Okay.

25          (Witness reviewing.)

——————————————C. Kim - Direct——————————————

1           THE COURT:  What are we looking for, Ms. Jones?

2           MS. JONES:  I wanted to move to admit Exhibit 23

3    into evidence, Your Honor.

4           THE COURT:  All right, then.  Let's move on here.

5           Ms. Kim -- are you trying to see if she can identify

6    those names?

7    BY MS. JONES:

8    Q.  Do you recognize the names in that list?

9    A.  All of the names?  Or...

10   Q.  Do you recognize the names in that list to be nurses from

11   Steadfast?

12   A.  So not all of the names on your Tenth Revised Schedule

13   are nurses, because you have people that are employees on

14   this list that work in the office.

15   Q.  Do you recall providing a declaration on -- I'd like to

16   direct your attention to what has been identified as

17   Plaintiff's Exhibit 1.

18           Do you recall providing a declaration on --

19           MS. JONES:  Could you scroll to the bottom so I can

20   see the date, please.

21   BY MS. JONES:

22   Q.  -- on March 10, 2020?

23           MS. JONES:  And if you could scroll up to

24   paragraph 1.

25           THE COURT:  Did you answer that question?

———C. Kim - Direct———

 1   BY MS. JONES:

 2   Q.  Could you use verbal responses.

 3        Do you recall signing a declaration in March 2020?

 4   A.  Yes.

 5   Q.  And at the time you signed this declaration, you

 6   indicated, in subsection D, that "The individuals attached to

 7   the Complaint all worked for Steadfast at some point between

 8   June 10, 2017, and the present.  The RNs, CNAs, and LPNs

 9   identified on Schedule A attached to the Complaint in this

10   case provide basic healthcare services at various healthcare

11   facilities with which Steadfast contracted."

12        Is that correct?

13   A.  Correct.  However, this is a Tenth Revised Schedule A.

14   At that point, this list wasn't the same that was attached to

15   this declaration.

16   Q.  Okay.  What is your role in the hiring process?

17   A.  Hiring process for the employees in the office or for the

18   contractors?

19   Q.  Let's start with the employees in the office.

20   A.  Okay.  So I typically interview them.  I see if they are

21   a good fit for the job description that is available.  We

22   then usually have them come in -- well, I'm sorry.

23        So we usually have a phone -- I talk to them over

24   the phone and see when is a good time for them to come into

25   the office.  They'll come into the office, and we'll do a

—————————C. Kim - Direct—————————

 1  face-to-face interview.  In that interview, if they are a

 2  good fit for the job that is available, we will -- I will set

 3  the hours based on the job.

 4          We discuss, you know, the expectations.  We go over

 5  pretty much the job description if they -- and it's mutual,

 6  if they feel like they're going to be a good fit and I feel

 7  they are going to be a good fit, then we tell them a start

 8  date.

 9  Q.  What is Ms. Pitts' involvement with the hiring process of

10  the office employees?

11  A.  They're interchangeable.

12          THE COURT:  Go on.

13          THE WITNESS:  If I'm not available, then she also

14  does the interviews also.

15  BY MS. JONES:

16  Q.  So does Lisa Pitts have the ultimate determination of the

17  office employees that are hired?

18  A.  So just -- can you requestion that?

19  Q.  I'll rephrase it.

20          So to clarify, Lisa Pitts is involved in the hiring

21  of the office employees, correct?

22  A.  Correct.

23  Q.  Is she involved in the firing of the office employees?

24  A.  Is she involved?  Like, does she have --

25  Q.  Does she fire office employees?

C. Kim - Direct

1   A.   Yes.

2   Q.   There are also LPNs, CNAs, and RNs who are placed at

3   various facilities who are considered Steadfast nurses,

4   correct?

5   A.   I'm sorry.  Repeat the question.

6   Q.   There are also CNAs, RNs, LPNs who work for Steadfast,

7   correct?

8   A.   Correct.

9   Q.   And Lisa Pitts is responsible for determining if a CNA,

10  RN, or LPN will work for Steadfast?

11  A.   No.

12  Q.   Who is responsible for that?

13  A.   The contractor.  So if they have the prerequisites that's

14  required, then no one establishes if they are willing -- if

15  they are qualified.

16  Q.   Well, who determines if they meet the prerequisites?

17  A.   They bring their own prerequisites.

18  Q.   Who reviews their prerequisites?

19  A.   The office staff.

20  Q.   And who on the office staff specifically?

21  A.   The front desk coordinator and the recruiter.

22  Q.   So is it your testimony that Lisa Pitts does not review

23  any of the prerequisites for the nurses, LPNs, and RNs that

24  work on behalf of Steadfast?

25  A.   Could you rephrase that.

───C. Kim - Direct───

1   Q.  So is it your testimony that Lisa Pitts does not -- is

2   not -- does not review any of the prerequisites for the LPNs,

3   RNs, and CNAs who work on behalf of Steadfast?

4   A.  Correct.

5   Q.  Is Lisa Pitts responsible for determining if a CNA, RN,

6   or LPN is no longer eligible to work for Steadfast?

7   A.  Could you say that again.

8           THE COURT:  Let's get something straight here.  You

9   speak clear English, and you're a professional.  We're not

10  going to repeat every question two times in here.  Enough of

11  it.

12          Ask that question one more time, and we're going to

13  put an end to this.

14  BY MS. JONES:

15  Q.  Lisa Pitts is responsible for determining if a CNA, RN,

16  or LPN is no longer eligible to work for Steadfast, correct?

17  A.  She doesn't determine that.

18  Q.  So it's your testimony that Lisa Pitts is not responsible

19  for determining if a nurse can work for Steadfast or can no

20  longer work for Steadfast?

21  A.  Correct.

22  Q.  Do you recall taking a -- being deposed by the Department

23  of Labor in January 2019?

24  A.  Yes.

25  Q.  And that you were under oath at the time you were

─────────────── C. Kim - Direct ───────────────

 1   deposed, correct?

 2   A.   Correct.

 3        MS. JONES:  Could you please bring up Ms. Kim's

 4   January 22nd, 2019, deposition, and please turn to Page 9.

 5        Actually, could we begin on -- actually, begin on

 6   Page 8 at the bottom.

 7   BY MS. LEWIS:

 8   Q.   Beginning at line 21, it reads:

 9        "So they are the W-2s, W-4s that are in-house; the

10   front desk coordinator and administrative assistants and

11   payroll account managers, the call center account managers.

12        "QUESTION:  And what is your role in the hiring

13   process?

14        "ANSWER:  I review their resume.  I call them in for

15   preliminaries and for a post interview, and if Lisa and I --

16   if Lisa agrees with me, you know, they're pretty much --

17   they've accepted our terms as far as employment, then I hire

18   them."

19        So based upon your testimony at the time of that

20   deposition, Lisa does review for office employees, hire/fire

21   office employees?

22   A.   So it's interchangeable.  If I'm not available, then Lisa

23   would be doing the interviews.  If Lisa is not available,

24   then I would be doing the interviews.

25   Q.   Lisa Pitts is responsible for setting pay rates for

—————————————————————C. Kim - Direct—————————————————————

1  Steadfast workers, correct?

2  A.  Steadfast workers in the office?

3  Q.  Yes, we'll start with in the office.

4  A.  Yes.

5  Q.  She's also responsible for setting the pay rates for the

6  CNAs, RNs, and LPNs, right?

7  A.  For the standard rates.

8  Q.  Is that a "yes"?

9  A.  Yes, the standard rates.

10  Q.  Lisa Pitts is responsible for recruiting the CNAs, RNs,

11  and LPN, correct?

12  A.  Incorrect.

13  Q.  I want to go back to that January deposition that we just

14  discussed briefly.  And, again, you were under oath at that

15  time, correct?

16  A.  Yes.

17  Q.  Could you please turn to 18.  I will read the question.

18  Question, at line 10:

19      "QUESTION:  Are you involved in recruiting what

20  you're referring to as the independent contractors in any

21  way?

22      "ANSWER:  No.

23      "QUESTION:  Who is responsible for that?

24      "ANSWER:  Lisa."

25      So based upon your testimony in January of 2019,

---
C. Kim - Direct
---

1  Lisa Pitts was responsible for recruiting the nurses,

2  correct?

3  A.  So the question that you asked earlier, you were stating

4  Lisa was responsible for bringing all of the nurses to

5  Steadfast.  The majority of the contractors that are on our

6  registry, it's either by word of mouth -- their interest in

7  coming to Steadfast is either by word of mouth or by

8  referral.

9       What you have in front of me, what's in the

10  deposition, is in regard to the recruiting process for our

11  marketing.

12  Q.  The question I asked is:

13       Lisa Pitts is responsible for recruiting CNAs, RNs,

14  and LPNs.  Did that phrase say the word "all"?

15  A.  Okay.  For the recruitments, then, yes.

16  Q.  Steadfast classifies some workers as employees and some

17  workers as independent contractors, correct?

18  A.  Yes.

19  Q.  Specifically the office employees are classified as

20  employees, according to Steadfast?

21  A.  Correct.

22  Q.  And Lisa Pitts made that determination to classify the

23  office staff as employees, right?

24  A.  Yes.

25  Q.  Steadfast classifies the CNAs, RNs, and LPNs as

─────────────── C. Kim - Direct ───────────────

1   independent contractors, correct?

2   A.   True.

3   Q.   Steadfast maintains personnel files for office employees,

4   correct?

5   A.   Correct.

6   Q.   What do the personnel files consist of?

7   A.   Personnel files for the employees in the office consists

8   of their resume, the notes during the interview, their

9   application, their ID, their Social Security card, any form

10  of reprimands, write-ups, tardiness, requests for times off

11  dates, any changes to their financial forms.  That's about

12  it.

13  Q.   And Steadfast also maintains personnel files for the

14  CNAs, RNs, and LPNs, correct?

15  A.   Correct.

16  Q.   Steadfast CNAs, RNs, and LPNs are paid hourly, right?

17  A.   Paid hourly, correct.

18  Q.   And Lisa Pitts determines that hourly rate for them,

19  correct?

20  A.   She determines the standard rate of pay.

21  Q.   And what do you mean the standard rate of pay?

22  A.   So there are many events where a contractor will want to

23  negotiate their pay rate.

24  Q.   And so I'm -- it's still unclear what the standard rate

25  is.  So what is the standard rate?  Is that the hourly rate

———C. Kim - Direct———

 1   that they are paid?
 2   A.  Correct.  So if a CNA goes to a facility, the standard
 3   rate of pay is X amount for that contract, for that
 4   assignment.
 5          And there's an example.  If that CNA wants to -- or
 6   if they have to travel and they want a higher pay or if they
 7   want a special exception or bonuses, then, again, they would
 8   negotiate their pay.
 9   Q.  And they would negotiate that pay with Steadfast?
10   A.  They would negotiate that with Lisa.
11   Q.  Steadfast has contracts with each of the facilities in
12   which the CNAs, LPNs, and RNs are placed?
13   A.  Yes.
14   Q.  And those contracts specify how much the facility is
15   going to pay Steadfast for the services provided by the
16   nurses?
17   A.  Yes.
18   Q.  And Lisa Pitts negotiates those rates of pay with the
19   facilities, correct?
20   A.  I think that's a Lisa question.
21          THE COURT:  What was your response to that question?
22          THE WITNESS:  To refer to Lisa.
23          MS. JONES:  Court's indulgence?
24          THE COURT:  You don't know whether your boss
25   negotiates those contracts?

──────────── C. Kim - Direct ────────────

 1          THE WITNESS:  I don't believe it's a matter of

 2   negotiation.  It's what the facility agrees to pay.

 3          THE COURT:  My question was:  You don't know whether

 4   your boss negotiates those contracts.  What they agree to pay

 5   is at the end of the negotiation.

 6          My question was:  Do you know whether, or you don't

 7   know whether, your boss is involved in the negotiation of

 8   those contracts?

 9          THE WITNESS:  She's involved in the contracts, but

10   as far as negotiating for the rates, it's really what the

11   facility is willing to pay.

12          THE COURT:  Who demands or asks what rate would be

13   paid or can be paid or they're willing to pay?  From

14   Steadfast, who does that?

15          THE WITNESS:  Lisa.

16   BY MS. JONES:

17   Q.  Steadfast requires CNAs, RNs, and LPNs to submit time

18   sheets, correct?

19   A.  Correct.

20   Q.  And they are required to submit time sheets generally

21   after each shift?

22   A.  Yes.

23   Q.  And how are they required to submit these time sheets?

24   A.  We ask them to submit them via e-mail or by fax.

25   Q.  And I would like to direct your attention to what has

──────────────────C. Kim - Direct──────────────────

 1   been marked as Plaintiff's Exhibit 9.

 2          MS. JONES:  Ms. Lewis, can you scroll through the

 3   exhibit, please.

 4   BY MS. JONES:

 5   Q.  And have you seen these documents before?  It's just a

 6   sampling.

 7   A.  Of the time sheets, yes.

 8   Q.  And to confirm, these are a sample of the time sheets

 9   that the nurses submit to Steadfast?

10   A.  Correct.

11   Q.  And who provides these time sheets to the nurses?

12   A.  Steadfast does.

13          MS. JONES:  Your Honor, I would move to admit

14   Exhibit 9 into evidence.

15          THE COURT:  Any objection?

16          MS. RUST:  No objection, Your Honor.

17          THE COURT:  The exhibit will be admitted.

18          (Plaintiff's Exhibit PX-9 received in evidence.)

19   BY MS. JONES:

20   Q.  Steadfast invoices the facilities for the CNAs they place

21   in facilities, correct?

22   A.  Yes.

23   Q.  And I would like to direct your attention to Exhibit 11.

24          Do you recognize these documents?

25   A.  Yes.

——————C. Kim - Direct——————

1    Q.  And is this an example of an invoice that Steadfast sends

2    to client facilities to receive compensation for services

3    rendered by Steadfast nurses?

4    A.  Yes.

5    Q.  And the payroll manager compiles the information from the

6    time sheets that nurses submit to create the invoice?

7    A.  So the time sheets -- once the time sheets are received

8    by Steadfast, then they manually calculate them, calculate

9    the hours.  They'll transpose them into decimal format.

10   They'll write down -- as you can see on the time sheet,

11   they'll write the calculation on the time sheet, and they'll

12   collect that data and put it into a spreadsheet.

13   Q.  Just to clarify, the information used to compile the

14   invoices is based upon the time sheet submitted by the nurse

15   for the specific facility, correct?

16   A.  So, yes; however, all the time sheets are submitted for

17   confirmations for approval from the facility.  There are

18   times where a time sheet may not reflect the invoice based

19   upon what was given by the facility.

20   Q.  So Steadfast uses the invoices to bill the facility for

21   services rendered by the nurses, correct?

22   A.  Correct.

23   Q.  Lisa Pitts signs or otherwise approves all invoices prior

24   to them being submitted to the facilities?

25   A.  Correct.

---

C. Kim - Direct

1  Q.  The information compiled by the payroll manager is also

2  provided to the in-house ADP processing clerk?

3  A.  So the information from the time sheets is collected by

4  the payroll team.  The payroll team, what they collect, that

5  data is given to the processor.

6          MS. JONES:  Your Honor, I would like to move

7  Exhibit 11 into evidence.

8          THE COURT:  Any objection?

9          MS. RUST:  Our only objection would be that the way

10  they were produced was with underlying time sheets, and this

11  exhibit only --

12          THE COURT:  You need to speak into your microphone.

13          MS. RUST:  I apologize.

14          Our only objection would be that this exhibit only

15  includes the facility invoice itself, and the way they were

16  produced was with underlying time sheets for each invoice.

17  So they are not complete.

18          THE COURT:  Yes, ma'am.

19          MS. JONES:  Your Honor, we were just providing a

20  sample so that the Court has an idea of what the invoices

21  look like, and I do believe they are provided on a CD.

22          THE COURT:  Were these documents produced to you

23  from the defendant?

24          MS. JONES:  They were during discovery, Your Honor.

25          THE COURT:  Objection overruled.  The document will

---

C. Kim - Direct

1    be admitted.

2              (Plaintiff's Exhibit PX-11 received in evidence.)

3              THE COURT:  Don't know how helpful it will be to the

4    Court, since the Court understands the process after being

5    here for days, but you can continue.

6              MS. JONES:  Thank you, Your Honor.

7    BY MS. JONES:

8    Q.  So I want to discuss compensation and payroll a little

9    bit briefly.

10             So Steadfast uses employee time sheets to compensate

11   the Steadfast nurses, correct?

12   A.  We use the time sheets -- so the contractors submit the

13   time sheets in order for us to calculate and process that for

14   payroll.

15   Q.  So you rely on the time sheets to process payroll.

16   A.  So we get that initial information, and we send that to

17   the facility for confirmation, and then the facility will

18   confirm/deny/contest.

19   Q.  So you rely on the approved time sheets submitted by

20   Steadfast employees to process payroll -- time sheets that

21   are approved by the facility?

22   A.  So I rely on the facility's confirmations in order to

23   compensate the contractors.

24   Q.  And confirmation based upon what information?

25   A.  The time sheets submitted.

─────────────── C. Kim - Direct ───────────────

 1   Q.  Nurses, which includes CNAs -- I'm just going to use the

 2   general term "nurses" -- are paid on a weekly basis, correct?

 3   A.  Weekly or daily.

 4   Q.  You said, "weekly or daily."  And the regular pay

 5   generates a payroll summary, correct?

 6   A.  The regular pay?

 7   Q.  Uh-huh.

 8   A.  The weekly pay?

 9   Q.  The weekly pay.

10   A.  Correct.

11   Q.  You said that nurses are paid daily.  Is that through

12   Next Day Pay?

13   A.  Correct, if they choose to do so.

14   Q.  I'm sorry.  I didn't hear that last part.

15   A.  If they choose to do so.

16   Q.  One more time.

17   A.  If they choose.

18   Q.  If they choose, correct.

19        Next Day Pay hours of compensation is not on the

20   payroll, correct?

21   A.  Is not on the payroll?

22   Q.  Correct.

23        You indicated that there were employees who are paid

24   weekly and that there are also employees who are paid daily

25   through Next Day Pay, correct?

─────────── C. Kim - Direct ───────────

 1   A.   Correct.

 2   Q.   Are the Next Day Pay payroll or compensation, is that --

 3   that's not detailed on the payroll records, correct?

 4   A.   What payroll records are you referring to?

 5        MS. JONES:   Could you pull up Exhibit 7, please.

 6   BY MS. JONES:

 7   Q.   This is a sample of payroll summaries from Steadfast.

 8   A.   Okay.   I recognize the payroll.

 9   Q.   Do you recognize these are some of the payroll summaries?

10   A.   That's one report from ADP, a payroll summary.

11   Q.   Right.

12        So the payroll from ADP, does this include

13   Next Day Pay?

14   A.   No.

15   Q.   So the payroll summaries would not include any hours

16   worked or anything that is detailed on Next Day Pay records,

17   correct?

18   A.   On that -- on the payroll summary that I'm looking at,

19   no.

20   Q.   Okay.   Thank you.

21        So I would like to direct your attention to

22   Exhibit 7a.   And have you seen these documents before?   Have

23   you seen these documents before?

24   A.   Yes.

25   Q.   And these are Next Day Pay records, correct?

————C. Kim - Direct————

1    A.   Next Day Pay summaries.

2    Q.   Next Day Pay summaries.

3         What information is used to process these

4    Next Day Pay -- this Next Day Pay summary?

5    A.   Time sheets submitted by the contractors.

6    Q.   And how many times per week is Next Day Pay processed?

7    A.   Five days a week.

8    Q.   And a nurse can be paid using both payroll and

9    Next Day Pay in a workweek, right?

10   A.   When you mean "payroll," you mean ADP?

11   Q.   Yes, payroll meaning ADP.

12   A.   Yes.  They can choose either, if they want ADP or through

13   Next Day Pay.

14   Q.   And when a nurse receives compensation through

15   Next Day Pay and ADP payroll during the pay period, the

16   Next Day Pay compensation is still not listed on payroll,

17   correct?

18   A.   No, because those are two separate processors.  So

19   Next Day Pay is processed differently than ADP.  So the

20   payroll summary that you've shown me is a report just

21   generated by ADP.

22   Q.   Is there any consolidation of the ADP payroll and

23   Next Day Pay records to determine the number of hours that a

24   nurse may have worked during a given week?

25   A.   Nothing on the report.  Not based on the payroll summary

C. Kim - Direct

 1  report.

 2  Q.  What document would have that information?

 3  A.  An invoice.

 4  Q.  An invoice?

 5  A.  Correct.

 6  Q.  I would like to direct your attention to Page 46 of this

 7  document.  And do you see the name highlighted in red that

 8  says Shawvone Brockman?

 9  A.  Yes.

10  Q.  And it says "Active Garnishment."

11          What is an active garnishment?

12  A.  So we received a garnishment summons from the Court.

13  Q.  And it can be any type of garnishment.  It's just not

14  specified here.  It could be a garnishment for wages for any

15  type of judgment?

16  A.  Yes.

17  Q.  Are there instances in which Steadfast will not allow a

18  nurse to be compensated with Next Day Pay?

19  A.  So based on the Court's summons for the garnishment, it

20  stated that it had to be within -- the wage that was

21  garnished would have to be within a certain time period.  So

22  that's why they weren't able to do Next Day Pay.

23  Q.  Is that the only instance in which a Steadfast nurse

24  would not be eligible to be compensated through Next Day Pay?

25  A.  To my knowledge, yes.

──────── C. Kim - Direct ────────

1    Q.  Would a nurse who had court-ordered child support

2    deducted from their pay be eligible to be paid using

3    Next Day Pay?

4    A.  Child support is a form of garnishment.

5    Q.  So that would be a "yes"?

6    A.  So that would still be classified from the prior

7    question.

8    Q.  So would that be yes or no?

9    A.  No, they would not do Next Day Pay.

10   Q.  So if employees are not taking advantage of Next Day Pay,

11   Steadfast adds all hours worked for the workweek on one

12   paycheck?

13   A.  You mean a contractor?

14   Q.  For the Steadfast nurses, if they opt out of

15   Next Day Pay, Steadfast would pay all of their wages for the

16   week on one paycheck.

17   A.  So it varies how the contractor submits their time

18   sheets.  It's at their liberty or their freedom as far as

19   when they want to submit their time sheets and how they want

20   it.  If they want it Next Day Pay, then they get it processed

21   and paid out through Next Day Pay.  If they want it through

22   weekly pay, then they will process it through weekly pay.

23   Q.  So the question that I actually asked was:  If they opted

24   not to do Next Day Pay for that particular week, would all of

25   their hours be paid through payroll?

```
                          ─C. Kim - Direct─
 1   A.  If they submit their time to weekly pay.  They have to
 2   submit their time sheets in order for them to be processed.
 3   Q.  So if they submit their time sheets, all their time
 4   sheets, would all the hours be on payroll?
 5   A.  Weekly pay Friday, yes.
 6   Q.  So the client facilities in which the nurses are placed,
 7   they do not process the payroll for the nurses, correct?
 8   A.  Correct.
 9   Q.  And the facilities do not pay the nurses directly, right?
10   A.  Correct.
11   Q.  And Lisa Pitts established the compensation practices,
12   correct?
13   A.  Correct.
14   Q.  And I just have a quick -- a few more questions on
15   Exhibit 46.  Strike that.
16          So Steadfast is responsible for processing the
17   payroll for the nurses?
18   A.  Yes.
19   Q.  To your knowledge, does Steadfast bill facilities for
20   overtime?
21   A.  No.
22   Q.  Do you recall having another deposition in February of
23   2019 with the Department of Labor?
24   A.  I can't confirm the exact dates, but I do recall in 2019.
25   Q.  So you recall two depositions in 2019?
```

598

                                    ┌─ C. Kim - Direct ─┐

 1   A.  Was it two in 2019?  I thought there was one in 2019 and

 2   one in 2020.  I can't confirm the dates, but I do recall

 3   being deposed twice.

 4   Q.  So this is a transcript from a deposition from

 5   February 28, 2019, and it's a deposition of Christine Kim.

 6           And Christine Kim is you, correct?

 7   A.  Correct.

 8   Q.  And this deposition was under oath, correct?

 9   A.  Yes.

10   Q.  And I would like to draw your attention to Page 71 of

11   this document.

12           "QUESTION:  Have they ever weighed in on the issue

13   of overtime with respect to these workers?"

14           And you put:  "No, they do not.  They do not because

15   it's addressed in the contract with the client that no

16   overtime would be paid to us, to Steadfast."

17   A.  Correct.

18   Q.  And so it's your position that they don't bill overtime.

19   A.  It's not in my position.  It's because our -- in our

20   staffing agreements, there are no differentials in overtime.

21   Q.  Can I direct your attention to Exhibit 7a, I believe, the

22   facility invoices -- Exhibit 11.  So I want to take a look at

23   Stephanie Griffin's hours worked.

24   A.  Okay.

25   Q.  And it says that she made $23, and then it was increased

C. Kim - Cross

1   to 34.50, and that appears to be an overtime rate, correct?

2   A.  It wasn't overtime.  It was because December 31st was New

3   Year's Eve.  So that's holiday.

4   Q.  So holidays you pay overtime?

5   A.  So holiday pay rates are time and a half of that shift

6   per the contract.  Each contract has a list of approved

7   holidays that the facility considers holidays.

8              MS. JONES:  I have no further questions, Your Honor.

9              THE COURT:  Cross.

10                       CROSS-EXAMINATION

11  BY MS. RUST:

12  Q.  Hi, Christine.  I just have a few questions for you.

13             You referred to the office staff at Steadfast that

14  are classified by the company as employees.  Can you just

15  clarify which positions, which Steadfast positions those are,

16  typically?

17  A.  Front desk coordinator, administrative assistants,

18  payroll processors, payroll account managers, recruiters,

19  call center account managers, payroll managers.

20  Q.  Okay.  And I just want to clarify.  I think there may

21  have been some confusion on the questions regarding

22  controlling the hiring and firing of employees versus nurses.

23             So you, as far as the hiring and firing of the

24  office employees at Steadfast, the positions we looked over,

25  was it your testimony that you and Lisa interchangeably

C. Kim - Cross

     1    handle hiring and firing of those positions?

     2    A.   Yes.

     3    Q.   And as far as the nurses, what was your testimony as far

     4    as who can hire and fire those, just to clarify?

     5    A.   So there really is no firing by Steadfast.  So the

     6    nurses, if they have the prerequisites and their credentials

     7    are valid, then they are added.  I consider it more of an

     8    onboarding to our registry.

     9         There's no -- there's no time when a nurse would be,

    10    quote, "fired" by Steadfast unless if they don't have a valid

    11    license or if they don't keep up with their credentials.

    12    It's not a matter of being fired.  They would be inactive.

    13    So the nurse wouldn't be fired by Steadfast.

    14    Q.   And why would they be -- to the extent you know, why are

    15    they required to have those prerequisites?

    16         MS. JONES:  Objection.  Outside the scope of the

    17    direct.

    18         MS. RUST:  Well -- sorry.

    19         THE COURT:  The Court is going to overrule it

    20    because I think you got slightly into this area.

    21         Haven't specifically got there far enough, but you

    22    can keep on with this question.  Continue.

    23    BY MS. RUST:

    24    Q.   I can rephrase that question too.

    25         I think there was a question to you about if a nurse

C. Kim - Cross

1    is no longer eligible, is eligibility for the roster based on

2    those prerequisites?

3    A.  Correct.

4    Q.  And those prerequisites, I believe we went over some of

5    them regarding the licensure, et cetera; is that right?

6    A.  CPR, PPD.

7    Q.  And that just involves verifying whether those

8    prerequisites are still current; is that right?

9    A.  Correct.

10   Q.  Ms. Jones asked you if Steadfast keeps personnel files

11   for nurses.  Can you tell me what is typically maintained in

12   the company's file for a nurse?

13   A.  It will have their credentials.  It will have a copy of

14   their CPR, their PPD, their nursing license, their license

15   look-up, the acknowledgment forms, independent contractor

16   agreement, and finance forms.

17   Q.  Okay.  And those are -- are those all collected during

18   that onboarding process you talked about for the prerequisite

19   for the registry?

20   A.  Correct.

21   Q.  Okay.  Ms. Jones, showed you, I believe it was PX-11, the

22   facility -- the invoices that Steadfast submits to the

23   facilities.

24          When Steadfast submits those invoices to the

25   facilities, what is included in that document?

Carol L. Naughton, Official Court Reporter

**JA655**

───────────────── C. Kim - Cross ─────────────────

1  A.  So the front cover was a copy of the invoice and then

2  supporting time sheets behind.  So every individual that's

3  placed on an invoice, there's a supporting time sheet, a

4  signed time sheet, from the facility behind there.

5  Q.  And those are the time sheets that were -- you said you

6  request approval from the facility on those time sheets

7  before billing them?

8  A.  Correct.

9  Q.  And if you needed, does the -- I believe you also -- let

10  me start over.

11       Ms. Jones showed you an example of a facility

12  invoice, and there were two different pay rates for, I think,

13  Ms. Griffin.

14       So do the invoices show the nurse's hourly rate paid

15  for each shift?

16  A.  It will show their bill rate to the facility.

17  Q.  Okay.  Correct.  Okay.

18       MS. RUST:  I don't have any further questions for

19  you.  Ms. Jones may have some more.

20       THE COURT:  The Court has some before you stand back

21  up, so that both parties get a chance to address any

22  questions the Court may have.

23       With respect to the relationship between Steadfast

24  and the nurses and the CNAs out in the field, if one of the

25  nurses or RNs or LPNs or CNAs fail to show up for work at a

————— C. Kim - Cross —————

1   designated place, what role, if any, does Steadfast play in

2   dealing with that issue?

3            THE WITNESS:  To the contractor or to the shift?

4            THE COURT:  I'm talking about to the individual who

5   is supposed to show up.

6            THE WITNESS:  Really, nothing.

7            THE COURT:  So Steadfast does nothing to that

8   particular individual who fails to show up?

9            THE WITNESS:  Correct.

10           THE COURT:  What does Steadfast do if an individual

11  LPN or RN or CNA is reported to have failed to perform

12  satisfactorily?  What does Steadfast do?

13           THE WITNESS:  Usually in those events, at the

14  request of the facility, they ask that that individual not

15  return back to the facility.

16           THE COURT:  Does Steadfast take action with respect

17  to the individual whether the facility makes a request or not

18  regarding what should happen to the individual?

19           THE WITNESS:  No.

20           THE COURT:  So it's your testimony that if a

21  facility doesn't ask anything to be done to an individual who

22  fails to show or fails to satisfactorily perform, Steadfast

23  doesn't do anything to that individual?

24           THE WITNESS:  Correct.

25           THE COURT:  Thank you.

─────────────── C. Kim - Redirect ───────────────

```
 1              Okay.  Any redirect?
 2              MS. JONES:  Yes, Your Honor, just a few quick
 3    questions.
 4              THE COURT:  Ask her about any questions about
 5    anything the Court said.  That goes to either party.
 6                       REDIRECT EXAMINATION
 7    BY MS. JONES:
 8    Q.  You indicated that, when Ms. Rust was questioning you, a
 9    nurse could be considered ineligible to remain on the
10    Steadfast roster.  Do you recall that?  Without having the
11    prerequisites or updated license or various reasons?
12    A.  Correct.
13    Q.  To be considered ineligible means being unable to work,
14    correct?
15    A.  Because they don't have a valid license.
16    Q.  But that means you're not able to work, correct?
17    A.  Correct.
18    Q.  And do you recall Ms. Rust asking you about a pay stub, I
19    believe, for Ms. Griffin?
20    A.  Yes.
21    Q.  And so based upon that, Steadfast bills a premium pay
22    rate in certain instances, correct?
23    A.  I didn't get that.
24    Q.  They bill a premium rate in certain instances to the
25    facilities?
```

```
                              C. Kim - Redirect
```

1   A.  So each facility's contract, the staffing agreement, they

2   have an approved list of days that they consider holidays.

3   So in that example, where the differential was, was it was

4   New Year's Eve, and that facility has New Year's Eve as an

5   approved holiday.

6   Q.  And so you billed essentially a premium overtime rate to

7   that facility?

8   A.  A time-and-a-half rate.

9   Q.  And do you pay that time-and-a-half rate to the Steadfast

10  nurse?

11  A.  Correct.

12  Q.  And you indicated that nothing is done when the Court

13  asked you if anything is done if a nurse fails to show up for

14  a shift.

15          Are nurses required to inform Steadfast if they are

16  not going to show up for a shift?

17  A.  We ask, as a courtesy -- we ask, as a courtesy, for the

18  nurses to let us know.

19  Q.  Is that a two-hour notice that they are required to

20  provide?

21  A.  I don't know the hours, but we just -- I know generally

22  that we do ask for a courtesy if they know that they will not

23  be able to make the shift that they accepted.

24          MS. JONES:  Could you pull up Exhibit 7a for a quick

25  moment, please.

──────C. Kim - Redirect──────

 1  BY MS. JONES:

 2  Q.  I have one final question.

 3       MS. JONES:  Could you scroll to Page 9, please.

 4  BY MS. RUST:

 5  Q.  Do you see the name for Alliyah Gaston?

 6  A.  Yes.

 7  Q.  And it has a "two-hour show-up."  Can you please explain

 8  what that is?

 9  A.  So when the facility -- or when, for this example, the

10  nurse -- she accepted the shift on the 6th for 11:00 p.m.

11  She showed up to the facility, and the facility sent her

12  home.

13  Q.  So this is a fee that is paid to a nurse for showing up

14  to a facility but is unable to work because the shift is

15  cancelled?

16  A.  Correct.

17       MS. JONES:  I have no further questions, Your Honor.

18       MS. RUST:  I have no further questions based on what

19  the Court asked.

20       THE COURT:  May the witness be permanently excused?

21       MS. JONES:  Yes, Your Honor.

22       MS. RUST:  Yes.  We've subpoenaed her for our case,

23  but for the plaintiff's case.

24       THE COURT:  But she may be excused?

25       MS. RUST:  Yes.

```
 1              THE COURT:  Ma'am, you may be permanently excused.

 2              (Witness excused.)

 3              MS. LEWIS:  May I approach, Your Honor?

 4              THE COURT:  Yes, ma'am.

 5              MS. LEWIS:  Your Honor, before we move to our next

 6    witness, we would like to move to admit Plaintiff's 2 and 3,

 7    Plaintiff's 2 being the deposition transcript excerpts for

 8    the 30(b)(6) deposition deponents.  Consistent with local

 9    rules, Plaintiff's 3 is the deposition summary and is

10    accompanying the same.

11              THE COURT:  It's the deposition for which witness?

12              MS. LEWIS:  The corporation, the 30(b)(6)

13    depositions for the corporation.

14              THE COURT:  All right.

15              MS. LEWIS:  Additionally -- I probably should have

16    separated them --

17              THE COURT:  What exhibit number is that?

18              MS. LEWIS:  That's 2.

19              THE COURT:  Any objection to Number 2?

20              MS. LEWIS:  I need to get into the second part.

21    There's also -- I should have made this one 2 and then 3.  My

22    apologies to the clerk.  But there is also another 30(b)(6)

23    for Zira Technologies, which is the app that has been

24    discussed throughout this proceeding.  That deponent is not

25    available.  So Plaintiff's 2 are only 30(b)(6) deposition
```

 1    transcripts.

 2            THE COURT:  So Exhibits 2 and 3 you're asking to be

 3    admitted?

 4            MS. LEWIS:  Yes, Your Honor.

 5            THE COURT:  Hearing no objection, they are admitted.

 6    I said they are admitted.

 7            MS. LEWIS:  Oh, okay.  Sorry.

 8            (Plaintiff Exhibits PX-2 and PX-3 received in

 9    evidence.)

10            MS. LEWIS:  With that, Your Honor, we have our last

11    witness, and I see the time, so I'll defer to the Court with

12    respect to how you want to handle it.

13            THE COURT:  All right.  Thank you.

14            So are you saying -- you said that's your last

15    witness, and the plaintiff is resting?

16            MS. LEWIS:  Plaintiff's case in chief, yes, Your

17    Honor.

18            THE COURT:  Okay.  Thank you very much.

19            Ms. Rust, it's about time to take a lunch break

20    here.  Does the defendant have any witnesses they are able to

21    call?

22            MS. RUST:  No, Your Honor.  Based on your comments

23    earlier this week, if the plaintiff went into Friday

24    afternoon, then the Court would plan to break for the day.

25    So based on the notice for witnesses, we anticipated that it

```
 1    would go into the afternoon.
 2            THE COURT:  Okay.  Now, my question:  How many days
 3    do you anticipate you will need starting Tuesday of next
 4    week?
 5            MS. RUST:  We believe we can complete it in three
 6    days.
 7            THE COURT:  In three days.  All right.  That being
 8    the case, the Court will terminate here.  Everyone have a
 9    safe weekend, and we will --
10            MS. LEWIS:  We still have a remaining witness, Your
11    Honor.  The plaintiffs have one witness.
12            THE COURT:  I asked you if the plaintiff rested.
13            MS. LEWIS:  After this witness.
14            THE COURT:  It was not clear to me.  I was asking
15    you were you resting your case; was that the end?
16            MS. LEWIS:  Miscommunicated.  We have one more
17    witness.  I thought we were just trying to get an idea of
18    where we were in terms of time.
19            THE COURT:  No.  Resting means you're ending your
20    case.
21            MS. LEWIS:  No, Your Honor.  We indicated we have
22    one more witness.
23            THE COURT:  All right.  The Court will be in recess
24    until 2:30.
25                 (Recess from 12:52 p.m. to 2:30 p.m.)
```

```
 1              THE COURT:  Okay.  We're prepared to go with the

 2    next witness.

 3              MS. JONES:  Yes, Your Honor.

 4              MS. RUST:  Your Honor, I'm sorry to interrupt.  I

 5    had one housekeeping item I wanted to check with before we

 6    get to this witness regarding the Plaintiff's Exhibit --

 7              THE COURT:  Turn your microphone on.

 8              MS. RUST:  Of course.  Thank you.

 9              -- regarding Plaintiff's Exhibit 2 that had been

10    admitted, which was deposition transcript designations.  One

11    of those included a deposition of a 30(b)(6) witness for Zira

12    Technologies.

13              The defendants have filed counter-designations to

14    that deposition.  Ms. Lewis and I had discussed this.  She

15    acknowledged the counter-designations.  I was under the

16    impression that she would be submitting them jointly.  She

17    was under the impression that I would be submitting the

18    counter-designations separately in my case.

19              So I just wanted to raise it before the Court, if

20    the Court had a preference for the counter-designations to be

21    submitted together or in the defense case.

22              THE COURT:  Well, the counter-designations could

23    have been submitted at the same time, but the Court will

24    permit you to put the counter-designations in the record, in

25    any event.
```

```
 1            MS. RUST:  Okay.

 2            THE COURT:  There will be no problems with it.  If

 3    you agreed there would be -- well, you have a right to

 4    counter-designations.  So you will be able to put them in the

 5    record independently, or you may wait for your case in chief.

 6            MS. RUST:  I have a paper copy of them if the Court

 7    would prefer them now, or I'm happy to do them at a separate

 8    time.

 9            THE COURT:  Yes, ma'am.

10            MS. LEWIS:  Yes, Your Honor.  So those were

11    plaintiff's exhibits, and since they are

12    counter-designations, presumably it would be, from our

13    perspective, most appropriate to be in her case in chief, so

14    however the Court wants to manage it...

15            THE COURT:  The Court will take it either way.  Hold

16    on to them, and you can pass them up during your case.

17            MS. RUST:  Very well.  Thank you, Judge.

18            Your Honor, before we start with this witness, we

19    have a pending motion in limine on testimony regarding this

20    witness.

21            MS. JONES:  Your Honor, their motion in limine

22    regarding testimony from this witness was denied.

23            THE COURT:  Was that motion in limine presented to

24    the Magistrate Judge?

25            MS. RUST:  Yes.  And the Magistrate deferred it to
```

```
 1    the trial judge.

 2              THE COURT:  Was it denied or deferred?

 3              MS. JONES:  I thought it was denied.  Let me just

 4    check, Your Honor.

 5              MS. RUST:  The order said that it was denied because

 6    the Court cannot make the determinations prior to trial.

 7              THE COURT:  Which means it was denied.  Therefore,

 8    if there's anything you want to raise about this witness,

 9    this Court has to determine it, and I don't know what the

10    grounds for the motion in limine were.

11              Tell you what, I don't want you talking back there,

12    and you standing at the podium.  So you return to your seat,

13    Attorney Jones, and you come up and explain to me what it is

14    that you're raising in limine about this witness.

15              First of all, I need to get straight on the name of

16    the witness.  I didn't hear it.

17              MS. JONES:  It's Peyton Lex of First Choice.

18              THE COURT:  Now you may raise some motion in limine.

19    Let me ask you something.  When did the Magistrate Judge deny

20    the motion in limine?

21              MS. RUST:  It is dated May 18th.

22              THE COURT:  You know, you had a right to appeal that

23    motion in limine.  He said he couldn't decide it before

24    trial.  Maybe the Judge could have, but you didn't appeal it,

25    so we're starting afresh here on whatever it is, but a lot of
```

1    times, the judges like to know ahead of time about motions in

2    limine.  That's the usual way that a motion in limine is

3    filed before trial.

4         He said he couldn't decide.  So let's see what issue

5    you're raising here.  How is the Court going to handle this?

6         MS. RUST:  Of course, Your Honor.

7         The defendants are moving to exclude evidence of

8    industry standard during the plaintiff's case in chief

9    because evidence of industry standard has no bearing on

10   liability.  The only issue that industry standard is relevant

11   to is the good-faith defense, and the defendants have the

12   right to determine whether they want to raise that defense.

13        So our position is that whether Steadfast was

14   compliant or not compliant with industry standards is not

15   relevant to the analysis under the economic realities test.

16   The manner in which other companies do business is not -- is

17   not considered under the test.

18        So if Steadfast chooses to present evidence of

19   industry standard as a good-faith defense, then the

20   Department can raise it in rebuttal, but it is not relevant

21   to their case in chief as to liability.

22        THE COURT:  I'm not sure that it's relevant to the

23   defendants' case, to be candid with you, given what the issue

24   is.  So you may not get to raise it, either.

25        MS. RUST:  We may not, but the motion --

```
 1            THE COURT:  I'm just telling you ahead of time.  I
 2    said repeatedly that no matter what the other companies may
 3    be doing out there with respect to compliance with the Fair
 4    Labor Standards Act, the question is, factually, whether
 5    Steadfast is in violation of the rules of the Fair Labor
 6    Standards Act; no matter what First Choice, Third Choice, or
 7    anybody else might be doing.  And so if that is what is going
 8    on here -- let me find out if that is where the plaintiffs
 9    are going with this testimony.
10            MS. JONES:  May I respond?
11            THE COURT:  So is that accurate, that you're trying
12    to put in the industry standard?
13            MS. JONES:  No, Your Honor.  As detailed in our
14    opposition to their motion in limine, ECF 276, this line of
15    testimony goes towards willful.  It specifically speaks to
16    the defendants' knowledge and state of mind during the
17    relevant period regarding her requirement to pay overtime in
18    compliance with FLSA.
19            And as detailed in her testimony today, she
20    indicated that she spoke to First Choice regarding
21    compensation.  That was her testimony today.  So based upon
22    that information that she presented today and in depositions,
23    we contacted First Choice to understand their compensation
24    practices to get a better insight on her knowledge into the
25    willfulness of this matter.
```

```
 1          THE COURT:  But you're not going into First Choice's
 2    procedures, are you?
 3          MS. JONES:  We will be asking them about their
 4    compensation practices.
 5          THE COURT:  Well, the simple truth is, it doesn't
 6    matter what their compensation practices are.  Now, if it's a
 7    situation where First Choice said to Ms. Pitts, "You know
 8    you're required to do A, B, C, and D" and she gave a specific
 9    response, it might be, in some way, relevant to her state of
10    mind on this case, is one thing, but we don't need to spend
11    any time going into their standards.
12          It has to do with what, if anything, did she say to
13    First Choice that would indicate her state of mind regarding
14    compliance with the FLSA.  That's what the Court will permit.
15    But in terms of going through all of what they do, that
16    doesn't help.
17          MS. JONES:  But based upon the testimony today, she
18    did have a discussion regarding compensation.  So she would
19    have knowledge of the requirement to pay overtime to her
20    nurses based upon that correspondence.
21          THE COURT:  As I said, if there's anything that they
22    have that would be indicative of her state of mind, the Court
23    is going to permit you to do that --
24          MS. JONES:  Okay.
25          THE COURT:  -- but to question her.  That's surely
```

```
                            ─P. Lex - Direct─

  1    spending a lot of time talking about who First Choice pays.

  2            Now, I could give you a hypothetical.

  3    Hypothetically, if they explain their position, and they told

  4    her that, and she said something that reflects what her

  5    position is regarding the Fair Labor Standards Act, then that

  6    is something that may be relevant.  But just to talk about

  7    their standards and et cetera, that would not be helpful to

  8    the Court.

  9            So I guess we have to get started and see where

 10    we're going.

 11            MS. JONES:  Thank you, Your Honor.

 12            THE COURT:  But that's the guidance the Court gives

 13    you.

 14            (Witness sworn.)

 15            PEYTON LEX, called by the Plaintiff, having been

 16    first duly sworn, was examined and testified as follows:

 17                        DIRECT EXAMINATION

 18    BY MS. JONES:

 19    Q.  Can you please state and spell your name for the record.

 20    A.  My name is Peyton Lex, P-e-y-t-o-n, and my last name is

 21    Lex, L-e-x.

 22    Q.  Are you currently employed?

 23    A.  I am.

 24    Q.  Where are you currently employed?

 25    A.  First Choice Nurses of Eastern Virginia.
```

P. Lex - Direct

1   Q.  What is the general nature of the business of First

2   Choice?

3   A.  We're a medical staffing company.  We provide medical

4   staff to various healthcare providers.

5   Q.  And what type of services does First Choice provide?

6   A.  We offer registered nurses, licensed practical nurses,

7   and certified nursing assistants, and some other

8   professionals to healthcare providers to -- so they can --

9   ancillary to their own staff.

10  Q.  What occupations compose the staff of First Choice?

11  A.  Mostly certified nursing assistants, LPNs, licensed

12  practical nurses, and registered nurses.

13  Q.  What type of facilities does First Choice staff?

14  A.  We staff acute care settings in hospitals.  We staff

15  long-term care facilities, nursing homes, and residential

16  treatment centers, and retirement communities.

17  Q.  And given the nature of First Choice's business, do you

18  consider the services that the nurses provide to the client

19  facilities to be an integral part of the business?

20  A.  Yes.

21  Q.  And what is your specific title at First Choice?

22  A.  I'm the president of the company.

23  Q.  How long have you been the president of the company?

24  A.  A little over ten years.

25  Q.  Are you familiar with Steadfast Medical Staffing?

—————————P. Lex - Direct—————————

```
 1    A.   I am.

 2    Q.   How are you familiar with Steadfast?

 3    A.   Steadfast is one of our competitors in the local

 4    marketplace.

 5    Q.   And have you ever spoken to anyone from Steadfast?

 6    A.   Yes.  I spoke to Lisa Pitts, I don't know, a year ago,

 7    early 2020.

 8    Q.   And do you have a relationship with Steadfast?

 9    A.   Not -- no, we don't.

10    Q.   When you say you spoke with Lisa, what did you

11    specifically speak about?

12    A.   Well, I called Lisa just to float the idea of possibly

13    buying Steadfast at the time.  I was advised that maybe that

14    would be a good idea.  So I spoke to her briefly about it.

15    She was not interested in it, and so that was the end of it.

16    Q.   Did you ever speak with her about being audited?

17    A.   Yeah, I might have.  I don't quite remember.  I don't

18    remember if I did or not.

19    Q.   Does First Choice and Steadfast contract with some of the

20    same facilities?

21    A.   Yes.

22    Q.   Are you familiar with Steadfast's compensation practices?

23    A.   Only -- yes, what the -- we share nursing personnel, and

24    I hear what they tell me.

25    Q.   Okay.  To your knowledge, how does Steadfast compensate
```

P. Lex - Direct

1   its nurses?

2   A.   They consider their nurses to be independent contractors.

3   Q.   And based upon the classification of independent

4   contractors, how do they compensate their nurses?

5   A.   Well, I believe they compensate them without taking --

6   without taking taxes out, paying unemployment taxes, or

7   providing healthcare or overtime.

8   Q.   And how does Steadfast's practice impact your business

9   organization?

10   A.   Well, as someone who --

11        MS. RUST:   Object to relevance.   We're still not

12   getting to the --

13        THE COURT:   Sustained.

14   BY MS. JONES:

15   Q.   How does First Choice classify its nurses?

16   A.   Our nurses are employees of First Choice.

17   Q.   I'm sorry, I couldn't hear the last part.

18   A.   Our nurses are employees of First Choice.

19   Q.   Has First Choice always classified its nurses as

20   employees of First Choice?

21   A.   No.   We started out -- I bought -- purchased the company,

22   and at the time of purchase, the model was to consider our

23   nurses as independent contractors, and I was told at the time

24   that that was a legitimate way to run it.

25        So we started out that way.   We did have an audit

P. Lex - Direct

1    with the Virginia Employment Commission, and basically, they

2    determined that we had misclassified our nursing staff, and

3    so I was -- I looked into it and read cases involving the

4    Department of Labor and the Virginia Employment Commission

5    and talked to people about it and really came to the

6    determination that I needed to change my company's structure

7    so that the nurses were employees.

8    Q.  When did that occur?

9    A.  That occurred in the period of time between 2016 and '17.

10   We made the switch in January of 2018.

11   Q.  And for clarification, who conducted the audit or the

12   investigation into your compensation practices?

13   A.  The Virginia Employment Commission.

14          The specific person, are you asking me?

15   Q.  No, just the agency or --

16   A.  The Virginia Employment Commission.

17   Q.  Okay.  And did you ever consult with any attorney or law

18   firm regarding the classification?

19   A.  You know, at the time --

20          MS. RUST:  Objection.  Relevance.

21          THE COURT:  Sustained.

22          MS. JONES:  I have no further questions -- one

23   moment, Your Honor.

24          (Pause in the proceedings.)

25          MS. JONES:  A few more questions, Your Honor.

──────────── P. Lex - Direct ────────────

1   Apologies to the Court.

2   BY MS. JONES:

3   Q.  So you indicated that -- do you believe that Steadfast's

4   practice of not paying overtime has suppressed wages?

5           MS. RUST:  Objection.  Relevance.

6           THE COURT:  Sustained.

7           MS. JONES:  Your Honor, this line of questioning

8   goes to the reason why we bring about these investigations.

9   It speaks directly to the injunctive relief that we are

10  seeking in this matter.

11          THE COURT:  So maybe you need to clarify the nature

12  of your question.  You said, "Do you believe it suppressed

13  wages?"  In what way?  Are you talking about with respect to

14  the nurses and LPNs?

15          MS. JONES:  Yes, Your Honor.

16          THE COURT:  Then overruled.  I thought you were

17  talking about suppression of wages with respect to the

18  industry or something.

19          THE WITNESS:  Yes, I do.

20  BY MS. JONES:

21  Q.  Do you believe it has also impacted the competition with

22  regards to placing nurses at your facilities?

23  A.  Yes.

24          MS. RUST:  I'm going to object again for relevance

25  and also opinion.  There's no foundation, as well, that this

—————————— P. Lex - Direct ——————————

1    witness can speak to the industry at large.

2        THE COURT:  I'll sustain as to the last question,

3    Ms. Jones.

4        MS. JONES:  Again, Your Honor, this speaks directly

5    to why we bring about these actions and these investigations,

6    and it also speaks toward injunctive relief.  By Steadfast

7    not paying overtime, they have an advantage over the agencies

8    that are following the dictates of the FLSA and are actually

9    paying overtime.

10       THE COURT:  I'll tell you what, you need to pass me

11   up some case law, something that shows that that is a

12   relevant inquiry for your injunctive relief.  I don't have a

13   problem waiting until you find a case.  The Court is just not

14   familiar with that.

15       MS. JONES:  I will, Your Honor.  Thank you.

16       I have no further questions.

17       THE COURT:  Hold on a second.  You said it's

18   relevant.  Now, the Court doesn't want to exclude something

19   that's relevant if the case law says it's appropriate

20   inquiry.

21       We're going to take a break.  Give me something that

22   the Court can rely on to permit me to pursue that line of

23   inquiry.  That's what the Court wants to do.

24       MS. JONES:  All right.  Thank you, Your Honor.

25       THE COURT:  The Court will be in recess for 15

──────────────────── P. Lex - Direct ────────────────────

1    minutes.

2           Meanwhile, don't discuss anything with anybody while

3    the Court is in break.

4           (Recess from 2:49 p.m. to 2:54 p.m.)

5           THE COURT:  Okay.  The Court still wants the

6    research, but here's we're going to do:

7           The Court is going to go on and let you ask the

8    questions of Mr. Lex so he won't have to come back in next

9    week.  But if over the weekend you conduct the research --

10   both parties -- and the Court finds that that testimony is

11   not relevant, the Court will strike it.  That's what we'll

12   do.

13          MS. JONES:  Thank you, Your Honor.

14          THE COURT:  All right.  You may proceed.

15          MS. JONES:  And I'll just repeat, these are the

16   final questions for this witness.

17   BY MS. JONES:

18   Q.  Do you believe that the practice of -- Steadfast's

19   practice of not paying overtime has impacted its competition

20   in the industry regarding the placement of your nurses?

21   A.  Yes.

22   Q.  How?  In what way?

23   A.  Well, you know, if we're scheduling a CNA, for instance,

24   with a nursing home and they are getting ready to go over 40

25   hours in their workweek, we have to get permission, often

Carol L. Naughton, Official Court Reporter

**JA677**

———————————— P. Lex - Direct ————————————

1   denied; so that we're not able to place that person over 40

2   hours anywhere.

3           So if you're able -- if you're not paying overtime,

4   then you're able to charge the facility the same flat rate

5   that you already are charging them without the overtime, and

6   the worker can work as many hours as they wish.

7           MS. JONES:  No further questions, Your Honor.

8           THE COURT:  Before you start cross-examining, so you

9   can take advantage of whatever the Court asks -- you may have

10  a seat.

11          A few minutes ago you said you had a conversation

12  with the defendant, Ms. Pitts.

13          THE WITNESS:  Yes.

14          THE COURT:  Did you have a conversation with her

15  about how she went about paying wages?

16          THE WITNESS:  I don't believe I talked to her about

17  that, no.

18          THE COURT:  Okay.  Fine.

19          THE WITNESS:  I don't remember that being -- part of

20  the conversation being about that.

21          THE COURT:  All right.  That's it.  Thank you.

22          Cross-examination.

23          MS. RUST:  No cross, Your Honor.

24          THE COURT:  May the witness be permanently --

25          MS. JONES:  I just want to ask one question based

--------- P. Lex - Redirect ---------

1    upon the question that you presented, Your Honor.

2            THE COURT:  Oh, okay.  You may do that.  That's

3    permissible.

4            MS. JONES:  Thank you.

5            (Pause in the proceedings.)

6            THE COURT:  Waiting on you, counsel.

7                    REDIRECT EXAMINATION

8    BY MS. JONES:

9    Q.  Mr. Lex, you indicated that you had a conversation with

10   Lisa Pitts, but the Judge asked you if you remembered any

11   discussion about compensation.

12           Do you recall how you came to have any discussions

13   with Ms. Pitts at all?

14   A.  Yeah.  So I was speaking with a colleague -- not a

15   colleague, a colleague in a different industry at that time,

16   who was helping us develop some software, and he -- I was

17   telling him what I heard through the grapevine that --

18           THE COURT:  You cannot tell us what he said to you.

19   You can tell us what you did as a result of speaking to him,

20   but do not tell us what he said.

21           THE WITNESS:  So as a result of that conversation, I

22   called Ms. Pitts to inquire about buying her business.

23   BY MS. JONES:

24   Q.  During that conversation, was there any discussion about

25   the incident with your audit?

P. Lex - Redirect

1        MS. RUST:  Objection.  Asked and answered on direct.

2        THE COURT:  Did you ask that question?  The Court

3   does not recall.

4        MS. JONES:  I don't recall asking that question.

5        THE COURT:  The Court doesn't recall, either.

6        So overruled.  Let's find out if he can answer it.

7   BY MS. JONES:

8   Q.  Did you have any discussion with Ms. Pitts regarding the

9   investigation and audit into your business?

10  A.  No, not that I recall.

11  Q.  Do you recall -- what was that discussion regarding when

12  you called?

13  A.  I called and we talked briefly about general topics, and

14  basically, then it came to the point where I asked her if she

15  was interested in selling her business.  She discussed her

16  situation with the Department of Labor briefly, saying that

17  she was confident she would win, and, you know, because we

18  weren't going to go any further in the discussion about the

19  sale, it ended there.  That's where the conversation ended.

20  Q.  When you say she discussed her situation, what do you

21  mean?

22  A.  She said she was -- that the Department of Labor had

23  filed a suit against her, and she was looking at ways to

24  defend herself.

25        MS. JONES:  No further questions, Your Honor.

```
 1              THE COURT:  Any examination?

 2              MS. RUST:  No, Your Honor.

 3              THE COURT:  May this witness be permanently excused?

 4              MS. JONES:  Yes, Your Honor.

 5              (Witness excused.)

 6              THE COURT:  Now, is there anything else the

 7    plaintiff wishes to present, or do you wish to reserve your

 8    closing until Monday, or are you -- what is your status?

 9              MS. LEWIS:  Yes, Your Honor.  So the Department

10    wishes to reserve our closing until after defendants' case in

11    chief, and with respect -- so we don't have any further

12    witnesses in terms of --

13              THE COURT:  I don't mean your closing argument.  I'm

14    trying to find out whether you're resting.

15              MS. LEWIS:  Yes, we're resting in our case in chief,

16    with respect to rebuttal witnesses after defendants' present

17    their case, so, yes.

18              THE COURT:  Okay.  All right.  With that, then,

19    since you rest, then on Tuesday morning at 10:00, we will be

20    prepared to go with any witnesses that the defense wishes to

21    call.  And over the weekend, each party can look to the

22    relevance of that testimony you raised regarding the fact

23    that you want injunctive relief.

24              MS. RUST:  Your Honor, when would you like those?

25    Would you like those filed, or would you like us to be
```

628

```
 1   prepared to make those arguments?
 2         THE COURT:  Well, you know, if you've got anything
 3   you can file in writing, you make it short, three pages at
 4   the most, if you wish to file anything.  Otherwise, I will
 5   hear what you have to say regarding the issue on Monday.  But
 6   the Court would prefer that it get it early enough so the
 7   Court can at least look at the cites that you raise.
 8         MS. RUST:  Thanks for the direction.
 9         THE COURT:  Okay.  So you will have a very busy
10   holiday.
11         (Proceedings adjourned at 3:01 p.m.)
12
13                        CERTIFICATION
14
15      I certify that the foregoing is a correct transcript
16   from the record of proceedings in the above-entitled matter.
17
18
19             _____/s/_____
20                     Carol L. Naughton
21                     October 4, 2021
22
23
24
25
```