# IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

—————————

### JULIE A. SU,
Acting Secretary of Labor, United States Department of Labor,
*Plaintiff - Appellee,*

v.

### MEDICAL STAFFING OF AMERICA, LLC, d/b/a Steadfast Medical Staffing, a limited liability company; LISA ANN PITTS, individually and as owner and officer of the aforementioned company*,*
*Defendants - Appellants.*

—————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT NORFOLK

—————————

### JOINT APPENDIX - VOLUME II OF V
### (Pages 683 - 1219)

—————————

Abram J. Pafford
Francis J. Aul
MCGUIREWOODS, LLP
Black Lives Matter Plaza
888 16th Street, NW
Washington, DC 20006
202-857-1725
apafford@mcguirewoods.com
faul@mcguirewoods.com

*Counsel for Appellants*

Anne W. King
U. S. DEPARTMENT OF LABOR
Office of the Solicitor
200 Constitution Avenue, NW
Room N-2716
Washington, DC 20210
202-663-4699
king.anne.w@dol.gov

*Counsel for Appellee*

# TABLE OF CONTENTS

# VOLUME I OF V

                                                                        Page

District Court Docket Sheet [2:18−cv−00226−RAJ−LRL] ....................... 1

Complaint
   Filed May 2, 2018 [Dkt. 1] ................................................. 48

Transcript of Trial Proceedings - Day 1
Before the Honorable Raymond A. Jackson
   On August 31, 2021 [Dkt. 312] ............................................ 53

   COURTNAY HOPE DRAUGHN
      Direct by Examination by Ms. Lewis ................................... 74
      Cross-Examination by Ms. Rust ....................................... 95
      Redirect Examination by Ms. Lewis .................................. 105

   YETUNDE TAYLOR
      Direct Examination by Mr. Seifeldein ................................ 106
      Cross Examination by Ms. Rust........................................ 129

   CHRISTOPHER RYAN HOPSON
      Direct Examination by Ms. Jones ..................................... 137
      Cross-Examination by Ms. Rust ....................................... 154
      Redirect Examination by Ms. Jones ................................... 151

   SAUDIA BOYKINS
      Direct Examination by Mr. Seifeldein ................................ 165
      Cross-Examination by Ms. Rust ....................................... 180
      Redirect Examination by Mr. Seifeldein .............................. 186

   ROXANNE ADAMS
      Direct Examination by Ms. Lewis ..................................... 188
      Cross-Examination by Ms. Rust ....................................... 206
      Redirect Examination by Ms. Lewis ................................... 218

DAWN M. WOOTEN
    Direct Examination by Mr. Seifeldein .................................................. 222
    Cross-Examination by Ms. Rust ........................................................ 239

Transcript of Trial Proceedings - Day 2
Before the Honorable Raymond A. Jackson
  On September 1, 2021 [Dkt. 313] ........................................................ 245

    JOHNESE JONES
    Direct Examination by Ms. Lewis ...................................................... 247
    Cross-Examination by Ms. Rust ........................................................ 260
    Redirect Examination by Ms. Lewis ................................................... 264

    ASHLEY MEGGIE
    Direct Examination by Ms. Lewis ...................................................... 266
    Cross-Examination by Ms. Rust ........................................................ 275

    KIMBERLY BELLAMY
    Direct Examination by Mr. Seifeldein .................................................. 279
    Cross-Examination by Ms. Rust ........................................................ 290
    Redirect Examination by Mr. Seifeldein ............................................... 294

    TERESA MOREY (Via ZoomGov.com)
    Direct Examination by Ms. Lewis ...................................................... 297
    Cross-Examination by Ms. Rust ........................................................ 306

    TATIANNA CANADY
    Direct Examination by Ms. Jones ...................................................... 312
    Cross-Examination by Ms. Rust ........................................................ 326
    Redirect Examination by Ms. Jones .................................................... 329

    COURTNEY TURNER (Via ZoomGov.com)
    Direct Examination by Ms. Jones ...................................................... 333

    TYWANN WHITE
    Direct Examination by Ms. Lewis ...................................................... 340

Transcript of Trial Proceedings - Day 3
Before the Honorable Raymond A. Jackson

On September 2, 2021 [Dkt. 314] ...................................................................358

CHANTELLA SMITH
Direct Examination by Ms. Jones ...........................................361
Cross-Examination by Ms. Rust ............................................373
Redirect Examination by Ms. Jones.......................................377

ANDREA TIRADO
Direct Examination by Ms. Lewis ..........................................382
Cross-Examination by Ms. Rust ............................................398
Redirect Examination by Ms. Lewis.......................................401

ERICA JOHNSON
Direct Examination by Mr. Seifeldein ...................................413
Cross-Examination by Mr. Jewett...........................................440
Redirect Examination by Mr. Seifeldein.................................459
Recross-Examination by Mr. Jewett .......................................465

DAVID RAWLINGS
Direct Examination by Mr. Seifeldein ...................................467
Cross-Examination by Mr. Jewett...........................................487
Redirect Examination by Mr. Seifeldein.................................501

ROBERTO MELENDEZ
Direct Examination by Ms. Lewis ..........................................502
Cross-Examination by Ms. Rust ............................................515
Redirect Examination by Ms. Lewis.......................................520

YAOZU XIONG (Via ZoomGov.com)
Direct Examination by Ms. Lewis ..........................................523
Cross-Examination by Ms. Rust ............................................541
Redirect Examination by Ms. Lewis ......................................5554

Transcript of Trial Proceedings - Day 4
Before the Honorable Raymond A. Jackson
On September 3, 2021 [Dkt. 315] ....................................................................... 560

LISA PITTS
Direct Examination by Ms. Lewis ........................................................ 565
Cross-Examination by Mr. Jewett.......................................................... 606
Redirect Examination by Ms. Lewis...................................................... 616
Recross-Examination by Mr. Jewett ...................................................... 621

CHRISTINE KIM
Direct Examination by Ms. Jones ........................................................ 626
Cross-Examination by Ms. Rust ............................................................ 653
Redirect Examination by Ms. Jones....................................................... 658

PEYTON LEX
Direct Examination by Ms. Jones ........................................................ 670
Redirect Examination by Ms. Jones....................................................... 679

## <u>VOLUME II OF V</u>

Transcript of Trial Proceedings - Day 5 (Morning Session)
Before the Honorable Raymond A. Jackson
    On September 7, 2021 [Dkt. 316] ...................................................................... 683

    PENNY CLARK
        Direct Examination by Ms. Rust.......................................................... 687
        Cross-Examination by Ms. Lewis ........................................................ 696
        Redirect Examination by Ms. Rust ...................................................... 702

    NAPOLEAN ALSTON
        Direct Examination by Ms. Rust..........................................................705
        Cross-Examination by Ms. Lewis ........................................................ 720
        Redirect Examination by Ms. Rust ...................................................... 732

    TAWANDA HALL
        Direct Examination by Mr. Siegrist ...................................................... 735
        Cross-Examination by Ms. Jones .......................................................... 745

    DASELINE HALL (Via ZoomGov.com)
        Direct Examination by Mr. Siegrist ......................................................750
        Cross-Examination by Ms. Lewis ........................................................768
        Redirect Examination by Mr. Siegrist....................................................777

Transcript of Trial Proceedings - Day 5 (Afternoon Session)
Before the Honorable Raymond A. Jackson
    On September 7, 2021 [Dkt. 313] ......................................................................786

    CHRISTINE LEE KIM
        Direct Examination by Ms. Rust..........................................................790
        Cross-Examination by Ms. Jones ..........................................................846
        Redirect Examination by Ms. Rust ......................................................861

    RACHARLOTTE LEE COATES
        Direct Examination by Ms. Rust...........................................................864
        Cross-Examination by Mr. Seifeldein ....................................................875
        Redirect Examination by Ms. Rust ......................................................890

Transcript of Trial Proceedings - Day 6
Before the Honorable Raymond A. Jackson
　　On September 8, 2021 [Dkt. 318] ...................................................................... 901

　　　　LESLIE BOONE (Via ZoomGov.com)
　　　　　　Direct Examination by Ms. Rust........................................................903
　　　　　　Cross-Examination by Mr. Seifeldein ...................................................912

　　　　DIXIE DeLUTIS (Via ZoomGov.com)
　　　　　　Direct Examination by Ms. Rust.........................................................932
　　　　　　Cross-Examination by Ms. Lewis ....................................................... 937
　　　　　　Redirect Examination by Ms. Rust ...................................................... 943

　　　　LISA PITTS
　　　　　　Direct Examination by Mr. Jewett ...................................................... 950
　　　　　　Cross-Examination by Ms. Lewis ..................................................... 1047
　　　　　　Redirect Examination by Mr. Jewett ................................................. 1103

Transcript of Trial Proceedings - Day 7
Before the Honorable Raymond A. Jackson
　　On September 9, 2021 [Dkt. 319] ................................................................... 1113

　　　　JOHN BREDEHOFT
　　　　　　Direct Examination by Mr. Jewett .................................................... 1115
　　　　　　Cross-Examination by Mr. Seifeldein................................................. 1137
　　　　　　Redirect Examination by Mr. Jewett ................................................. 1169

Memorandum Opinion and Order Entered
　　Entered January 14, 2022 [Dkt. 324] ............................................................. 1185

Judgment in a Civil Case Entered
　　Entered January 14, 2022 [Dkt. 325] ............................................................. 1216

Notice of Appeal Filed
　　Filed March 14, 2022 [Dkt. 332] ................................................................... 1217

# **VOLUME III OF V**

Attachments and Exhibits to Consent Notice of Filing
of Certain Exhibits for Purposes of Appeal
 Filed August 17, 2022 [Dkt. 356]:

Att. 1: Alvaro Mazuera Deposition Transcript [Dkt. 356-1] ................. 1220

Att. 2: Zira Technologies 30(b)(6) Deposition Transcript
[Dkt. 356-2] ................................................................................ 1526

Ex. PX-10: Staffing Agreements Between Steadfast and Facilities
(Excerpts of Exhibit) [Dkt. 356-3]......................................... 1692

Ex. PX-11: Facility Invoices (Excerpt of Exhibit) [Dkt. 356-4]............... 1781

Ex. PX-12: Summary Exhibit - Facilities Steadfast Contracts
(Excerpt of Exhibit) [Dkt. 356-5] .......................................... 1786

Ex. PX-16: ADP Employee Change Report (Excerpt of Exhibit)
[Dkt. 356-6] .......................................................................... 1787

Ex. PX-25: Agreement for Independent Contractor Services
(Excerpts of Exhibit) [Dkt. 356-7]......................................... 1793

Ex. PX-26: Steadfast Applications (Excerpts of Exhibit)
[Dkt. 356-8] .......................................................................... 1831

Ex. PX-37: Timesheet Reminder Memos (Excerpts of Exhibit)
[Dkt. 356-9] .......................................................................... 1839

Ex. DX-41: Steadfast Memo - Advisory Atlantic Shores
[Dkt. 356-10] ........................................................................ 1848

Ex. DX-42: Steadfast Memo - Be on Time [Dkt. 356-11] ........................ 1849

Ex. DX-44: Steadfast Memo - No Sleeping in Rooms [Dkt. 356-12]....... 1850

Ex. DX-46: Steadfast Memo - Be on Time [Dkt. 356-13] ........................ 1851

PX-34 Gmail - Next Day Pay Memo ......................................................1852

DX-50 Memo re Thanksgiving Holiday Pay.............................................1853

DX-58 - Memo re CNA and LPN Needs (155830292.1)..........................1854

DX-59 - Memo re CNA and Nurse Needs (155830293.1).......................1857

**VOLUME IV OF V**

Defendants' Response to Plaintiff's Motion to Revise the Court's Order
Filed March 20, 2020 [Dkt. 247] ....................................................................... 1859

Joint Pretrial Order
Filed March 21, 2021 [Dkt. 261] ....................................................................... 1865

Notice of Filing Tenth Revised Schedule a In Steadfast II
Filed August 25, 2021 [Dkt. 287] ..................................................................... 1918

    Ex.1:  Tenth Revised Schedule A [Dkt. 287-1] 1924

Plaintiff's Supplemental Proposed Findings of Fact and Conclusions of Law
Filed November 3, 2021 [Dkt. 321] ................................................................... 1953

Defendants' Motion for Relief in Connection with Plaintiff's
Trial Exhibit Px-21, And Opposition to Plaintiff's March 11
"Updated Back Wage Computations"
Filed March 13, 2022 [Dkt. 331] ....................................................................... 1981

    Att. 1:    Memorandum of Points and Authorities [Dkt. 331-1] ............... 1985

    Ex. 1:    Steadfast March 6 letter to DOL [Dkt.  331-2] ........................... 2002

    Ex. 2    Attachment A to March 6 letter [Dkt. 331-3] ............................. 2006

    Ex. 3:    Attachment B to March 6 letter [Dkt. 331-4] ............................. 2010

    Ex. 4:    Attachment C to March 6 letter [Dkt. 331-5] ............................. 2013

    Ex. 5:    March 8-10 counsel email exchange [Dkt. 331-6] ...................... 2015

    Ex. 6:    W-2 employee corrections [Dkt. 331-7] ...................................... 2019

    Ex. 7:    Sample packets re: PX-21 errors [Dkt. 331-8] ........................... 2023

Defendants' Reply Brief in Support of Motion for Relief In
Connection with Plaintiff's Trial Exhibit Px-21, And Opposition to
Plaintiff's March 11 "Updated Back Wage Computations"
    Filed April 4, 2022 [Dkt. 337]........................................................... 2059

    Ex.1:       Spreadsheet [Dkt. 337-1] ............................................. 2080

    Ex. 2:      Sampling Breakdown [Dkt. 337-2]............................... 2081

    Ex.3:       Plaintiff's Answers and Objections to Defendants' First Set
                Of Request Interrogatories [Dkt. 337-3]...................... 2082

    Ex.4:       Plaintiff's Second Supplemental Answers and Objections To
                Defendants' First Set of Interrogatories [Dkt. 337-4] ................ 2099

Defendants' Opposition to Plaintiff's "Motion for Entry of Updated Order"
    Filed July 28, 2022 [Dkt. 350]........................................................... 2110

    Ex.1:       July 28 letter to DOL [Dkt. 350-1] ............................................2123

Order Reimposing Injunction
    Filed September 7, 2023 [Dkt. 395] ................................................. 2135

Notice of Appeal (interlocutory)
    Filed November 3, 2023 [Dkt. 404] ................................................. 2144

Order
    Filed November 30, 2023 [Dkt. 410] ............................................... 2147

Memorandum Opinion and Order Denying relief re PX21
    Filed December 7, 2023 [Dkt. 411].................................................. 2149

Updated Order and Judgment
    Filed December 8, 2023 [Dkt. 412].................................................. 2160

Amended Final Judgment
    Filed December 11, 2023 [Dkt. 413]................................................ 2167

Amended Notice of Appeal
    Filed December 11, 2023 [Dkt. 415]................................................ 2169

**VOLUME IV OF V**

PX-21 Wage Transcription and Computation Sheets.............................................2172

PX-22 Summary of Back Wage Computations.....................................................2782

```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
 2                         Norfolk Division

 3    - - - - - - - - - - - - - - - - - - -
                                           )
 4    MARTIN J. WALSH, SECRETARY OF         )
      LABOR, UNITED STATES                  )
 5    DEPARTMENT OF LABOR,                  )
                                           )
 6            Plaintiff,                    )
                                           )        CIVIL ACTION NO.
 7    v.                                    )           2:18cv226
                                           )
 8    MEDICAL STAFFING OF AMERICA,          )
      LLC, etc., et al.,                    )
 9                                          )
              Defendants.                   )
10    - - - - - - - - - - - - - - - - - - -

11

12                     TRANSCRIPT OF PROCEEDINGS

13                    ** Bench Trial - Day 5 **
                         (Morning Session)
14
                         Norfolk, Virginia
15
                        September 7, 2021
16

17

18    BEFORE:  THE HONORABLE RAYMOND A. JACKSON
              United States District Judge
19

20    APPEARANCES:

21            UNITED STATES DEPARTMENT OF LABOR
              By:  Ryma N. Lewis
22                 Chervonti Jones
                   Mohamed E. Seifeldein
23                 Counsel for the Plaintiff

24            PIERCE McCOY, PLLC
              By:  Joshua L. Jewett
25                 Julia A. Rust
                   Aaron D. Siegrist
                   Counsel for the Defendants
```

Carol L. Naughton, Official Court Reporter

**JA683**

```
1                          I N D E X

2

   DEFENDANTS'
3  WITNESSES                                          PAGE

4    PENNY CLARK
          Direct Examination By Ms. Rust              633
5         Cross-Examination By Ms. Lewis              642
          Redirect Examination By Ms. Rust            648
6    NAPOLEAN ALSTON
          Direct Examination By Ms. Rust              651
7         Cross-Examination By Ms. Lewis              666
          Redirect Examination By Ms. Rust            678
8    TAWANDA HALL
          Direct Examination By Mr. Siegrist          681
9         Cross-Examination By Ms. Jones              691
     DASELINE HALL (Via ZoomGov.com)
10        Direct Examination By Mr. Siegrist          696
          Cross-Examination By Ms. Lewis              714
11        Redirect Examination By Mr. Siegrist        723

12

13

14                       E X H I B I T S

15                        (None offered.)

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Proceedings resumed at 9:59 a.m.)

 2              THE COURT:  Good morning, counsel.

 3              I understand we, at least, have turned back one

 4    person this morning because of the COVID concerns.  I do not

 5    want anyone coming in to testify who has not been vaccinated

 6    or who has not been tested.  So if you have a witness of that

 7    nature, just see if you can make some arrangement to do some

 8    type of virtual testimony.

 9              All right.  Last week the Secretary rested.  So we

10    are prepared to go forward this morning.  You may call your

11    first witness.

12              MS. RUST:  Your Honor, I believe when we broke on

13    Friday, you said you would want to address brief arguments on

14    the issue regarding the final witness for the plaintiff

15    concerning the injunction.

16              Did you want to handle that first?

17              THE COURT:  That will be fine.  Okay.  I forgot all

18    about that issue.  You had to remind me.

19              Okay.  Does the Secretary wish to make any argument

20    in reference to that issue?

21              MS. JONES:  Briefly, Your Honor.  As detailed on

22    Friday, we believe the testimony that was provided by First

23    Choice can be considered by the Court when determining

24    whether injunctive relief should be applied to this case.

25              Mr. Lex testified regarding the wage suppression
```

Carol L. Naughton, Official Court Reporter

**JA685**

1   caused to the nurses as a result of defendants' failure to

2   pay overtime, and he also spoke about the unfair competition

3   that resulted in them complying with the law and Steadfast

4   failing to pay proper overtime.

5          And as detailed on Friday, in addition to protecting

6   employees, the FLSA, likewise, prevents employers from

7   gaining an unfair advantage against competitors.  And I will

8   submit to the memorandum we submitted in support of our

9   position.

10          THE COURT:  All right.  Thank you very much.

11          Anything you wish to say, Ms. Rust or Mr. Jewett?

12          MR. JEWETT:  I'll be very brief, Your Honor.

13          We did have a chance to research this issue, per the

14   Court's instructions.  Every case we found, was the three

15   factors for an injunction are employer's past conduct,

16   employer's current conduct, and whether the employer can be

17   counted on to follow the law following the Court's decision.

18          None of those cases took the position the Secretary

19   has taken here, that market forces bear on the injunction

20   decision.

21          The Secretary did list two old cases in its bench

22   memo.  We haven't had a chance to look at those yet.  They

23   could still be good law.  I would suggest the fact that they

24   come from the '60s and '70s means that it's kind of an

25   unusual issue.  So that's our position on the topic right

```
                        ┌─ P. Clark - Direct ─┐
 1   now.

 2          THE COURT:  What the Court will do, the Court will

 3   look at whatever memoranda has been filed, and the Court will

 4   resolve that issue as it makes its ruling on this case.

 5   Simple as that.

 6          The Court will have an opportunity to research the

 7   law, and if the Court finds that that testimony is not

 8   admissible or may not be used, then the Court will so

 9   indicate in its ruling in the case.

10          All right.  Call your first witness.

11          MS. RUST:  The defense's first witness is Napolean

12   Alston.

13          He may just be arriving.  If Penny Clark is here, we

14   can call her first.

15          (Witness sworn.)

16          PENNY CLARK, called by the Defendants, having been

17   first duly sworn, was examined and testified as follows:

18                      DIRECT EXAMINATION

19   BY MS. RUST:

20   Q.  Good morning, Ms. Clark.

21          Can you state your name for the record, and please

22   spell both your first and last name.

23   A.  Yeah.  Penny Clark, P-e-n-n-y C-l-a-r-k.

24   Q.  Thank you, Ms. Clark.

25          And what is your occupation?
```

P. Clark - Direct

1    A.  I am a nurse.

2    Q.  Are you a registered nurse?

3    A.  I'm a registered nurse.

4    Q.  And are you familiar with Steadfast Medical Staffing?

5    A.  Yes, I am.

6    Q.  Are you on Steadfast Medical Staffing's registry?

7    A.  Yes, ma'am.

8    Q.  How long have you been on Steadfast's registry?

9    A.  Since about 2007, on and off.

10   Q.  Okay.

11   A.  And I'm currently working there now.

12   Q.  Okay.  Have you ever been to Steadfast's office in

13   Norfolk?

14   A.  Yes.

15   Q.  Do you go there regularly?

16   A.  Not recently since everything -- a lot of things are

17   online.  But I used to go in, like, 2008 -- 2007, 2008 to

18   pick up time sheets or pick up paychecks.

19   Q.  Okay.  Have you ever been scheduled to work to provide

20   nursing services as an RN at Steadfast's office in Norfolk?

21   A.  I don't understand the question.

22   Q.  Sure.

23        Have you ever provided nursing services at

24   Steadfast's office in Norfolk?

25   A.  No.

Carol L. Naughton, Official Court Reporter

**JA688**

P. Clark - Direct

```
 1   Q.  Okay.  Has Steadfast ever provided you with any equipment
 2   to provide nursing services?
 3   A.  No.
 4   Q.  How do you schedule shifts through Steadfast?
 5   A.  Well, now there's an app.  We can use the app, or usually
 6   I call the office, or they might call me or text me.
 7   Q.  Okay.  So when you call the office, what do you do with
 8   the schedule?
 9   A.  Whatever I want or whatever they have available.
10   Q.  Okay.  So do you -- you call the office and you let them
11   know you want to schedule shifts?
12   A.  Exactly.
13   Q.  What do they tell you?
14   A.  They tell me what shifts they have at what facilities.
15   Q.  Okay.  And can you pick up whichever of those shifts you
16   want for your licensure?
17   A.  Yes, absolutely.
18   Q.  Can you decline any shifts that are available?
19   A.  Yes.
20   Q.  Have you ever experienced any consequences for declining
21   a shift?
22   A.  No.
23   Q.  So you just said they might -- well, I believe you
24   said -- tell me if I'm wrong -- that they would tell you what
25   is available, right?
```

P. Clark - Direct

1    A.   Right.

2    Q.   Would there be more than one facility available --

3    A.   Yes.

4    Q.   -- typically?

5    A.   They would tell me what they have available, and I would

6    tell them what I had available, and I would take something

7    from the availability.

8    Q.   Okay.  And if they present you with a few different

9    options that are available, what are some factors that you

10   consider when you are choosing whether you want to pick up

11   one of those available shifts?

12   A.   If it's a facility that I've been to before, and I'm

13   familiar with it, and I like it; the distance for travel is

14   another consideration.  Usually those two things.

15   Q.   Okay.  So if you like the facility and whether you need

16   to travel, those are factors you consider?

17   A.   Correct.

18   Q.   And, of course, if it lines up with your availability; is

19   that right?

20   A.   Yes.

21   Q.   Okay.  So have there been instances when you've chosen to

22   work at a facility that was farther than you wanted to go but

23   it was because you liked the facility, based on the factors

24   you just described?

25   A.   Yes.

P. Clark - Direct

1   Q.  Have there been instances when you have chosen to work at
2   a facility for -- well, let me ask you this:
3          Is the hourly rate a consideration when you are
4   choosing whether to pick up an available shift?
5   A.  It can be, but it's pretty steady.
6   Q.  Okay.
7   A.  Or pretty, you know -- pretty much the same at most
8   places.
9   Q.  Okay.  So if Steadfast had shifts that were farther than
10  you wanted to travel and you didn't like the facility, have
11  you declined those options before?
12  A.  Yes.
13  Q.  Who determines your work schedule, then?
14  A.  I do.
15  Q.  You mentioned the app briefly before for scheduling.  You
16  said that was an app you can use to schedule; is that right?
17  A.  Yes.
18  Q.  And have you used that in the past to schedule shifts
19  with Steadfast?
20  A.  Just recently.
21  Q.  Okay.  And can you just briefly tell me what your ability
22  is on that app.
23  A.  On the app, there are multiple dates, facilities,
24  location, and the pay, and if I want to pick up a shift, I
25  would click on it and claim it, and then Steadfast would be

P. Clark - Direct

1    in touch to confirm it.

2    Q.   Okay.  So have you ever needed to cancel a shift that

3    you've already picked up?

4    A.   Yes.

5    Q.   And in your experience, what do you need to do to cancel

6    a shift that you've picked up?

7    A.   I just have to notify the agency.  I try to -- if I've

8    had to call out, I would try to give as much notice as

9    possible so they could get someone else.

10   Q.   Okay.  And have you ever been running late for a shift

11   that you signed up for through Steadfast?

12   A.   Every now and then.

13   Q.   Okay.  And what do you do in that situation?

14   A.   I would notify Steadfast and they would call the

15   facility.

16   Q.   Okay.

17   A.   And let them know I was running late.

18   Q.   Have you ever been required to request permission from

19   Steadfast to take vacation or time off?

20   A.   No.

21   Q.   On Steadfast's registry, are you required to work a

22   minimum or a maximum number of hours?

23   A.   No.

24   Q.   Currently, approximately, how often are you picking up

25   shifts with Steadfast?

P. Clark - Direct

1   A.  Three shifts a week, average.

2   Q.  Have you always picked up about three shifts a week?  You

3   said, I think before, you were on and off the registry.

4   A.  Yeah.  When I'm active, that's about my normal.

5   Q.  Okay.  And has it ever been more or less than three

6   shifts a week at any point?

7   A.  Yeah.  When I was in RN school, because I was an LPN

8   first, I only worked, like, maybe every weekend or every

9   other weekend.

10   Q.  Okay.  So were you able -- well, have you worked for

11   other registries at the same time that you were working on

12   Steadfast's registry in the past?

13   A.  In the past.

14   Q.  Were there any benefits or what was the reason you

15   decided to work on more than one registry at the same time in

16   the past?

17   A.  Well, a lot of nurses or healthcare workers are on more

18   than one registry in case one has less work or one is going

19   to a facility that you like better.

20   Q.  And is that your experience?

21   A.  Yes.

22   Q.  Is that why you've --

23   A.  Yeah, that's why I did.

24   Q.  Okay.

25   A.  But that was, like, 2008.  Currently, I'm only on

P. Clark - Direct

1   Steadfast.

2   Q.  And why are you only working on Steadfast's registry as

3   opposed to working on multiple, for the reasons you've stated

4   just a moment ago?

5   A.  Because there's plenty of facilities available.

6   Q.  Okay.  So are you able to -- you said you are picking up

7   about three shifts a week right now?

8   A.  Uh-huh.

9   Q.  Are those all the shifts --

10  A.  That's all I want.

11  Q.  Okay.  Has Steadfast ever provided you with any training

12  for nursing services?

13  A.  No.

14  Q.  Has Steadfast ever provided any instructions or guidance

15  to you on how to provide nursing services at a facility?

16  A.  No.

17  Q.  Is anyone from Steadfast's office, meaning their -- I'm

18  not asking about maybe other nurses who are working shifts at

19  a facility, but if you know, have you ever seen anybody from

20  Steadfast's office on site at a facility while you're

21  working?

22  A.  No.

23  Q.  Have you ever received a performance evaluation from

24  Steadfast?

25  A.  No.

─────────────────── P. Clark - Direct ───────────────────

1  Q.  Have you ever negotiated your rate of pay for shifts

2  you've picked up on Steadfast's registry?

3  A.  Not so often but sometimes -- not recently, but in the

4  past, Steadfast would offer a bonus or something if they were

5  really short-staffed or a facility really needed somebody at

6  the last minute.

7  Q.  Okay.  Are those the typical circumstances --

8  A.  That's not typical.  But it has happened.

9  Q.  Okay.  Let me -- okay.  So you said when there's a short

10  staff --

11  A.  Immediate, emergent need.

12  Q.  And do you track your own hours for the shifts you pick

13  up through Steadfast?

14  A.  I do.

15  Q.  How do you submit those -- or do you submit those hours

16  to Steadfast?

17  A.  I do.  I e-mail a picture of my time sheet with my name

18  and my title and the facility I worked and the date along

19  with a signature from someone at the facility.

20  Q.  Okay.  And what is the -- do you know what the purpose of

21  getting a signature from the facility is on your time sheet?

22  A.  To verify the time between Steadfast and me and them.

23  Q.  Okay.  You said you've been on and off with the

24  registry --

25  A.  Correct.

Carol L. Naughton, Official Court Reporter

**JA695**

```
                         ┌─ P. Clark - Cross ─┐
```

1    Q.  -- for Steadfast?

2            Have you worked in full-time employment since you've

3    been with Steadfast since around 2008?

4    A.  Other employment, yes.

5    Q.  And why have you -- you're not currently employed by a --

6    directly with a facility; is that right?

7    A.  That's correct.

8    Q.  Why do you choose to work through a registry?

9    A.  Well, with the agency, it's very flexible.  You make -- I

10   can make my own hours, and I do like having a home facility,

11   but, you know, like a work family, but, you know, some places

12   aren't a good fit.  So Steadfast is always there, has always

13   been there, you know, in between with lots of work.

14           MS. RUST:  Okay.  Those are all the questions I have

15   for you.  Someone from the Department may have a few

16   questions for you.  Thank you, Ms. Clark.

17           THE COURT:  Any cross-examination?

18           MS. LEWIS:  Yes, Your Honor.

19                       CROSS-EXAMINATION

20   BY MS. LEWIS:

21   Q.  Good morning, Ms. Clark.

22   A.  Good morning.

23   Q.  Ryma Lewis from the Department of Labor.  I just have a

24   couple of questions for you in follow-up to the responses you

25   gave a moment ago.

Carol L. Naughton, Official Court Reporter

**JA696**

P. Clark - Cross

```
 1            So you've been a long-term nurse with Steadfast, you
 2    said, since approximately 2007?
 3    A.  Uh-huh, yes.
 4    Q.  And first you worked at Steadfast as an LPN?
 5    A.  Correct.
 6    Q.  And 2017, you became an RN; is that right?
 7    A.  Correct.
 8    Q.  And you've worked with them, since 2007, on a part-time
 9    basis, more or less; is that right?
10    A.  More or less.
11    Q.  And you've worked part time because you have a
12    dual-income household and your husband has a good job, so you
13    don't need to work full time; is that correct?
14    A.  Yes.
15    Q.  And when you first signed up with Steadfast back in 2007,
16    they did different types of work; they were doing home health
17    as well, correct?
18    A.  Steadfast?
19    Q.  Yes.
20    A.  I don't think I ever did a home-health case with them.
21    Q.  Okay.  Are you aware that they did home health back in
22    2007?
23    A.  I'm thinking, because I did do a couple of home-health
24    cases with the other agency, but I don't think I did one with
25    Steadfast.  If I did do one, I don't remember.
```

P. Clark - Cross

1    Q.   Okay.  So when you signed up to work with them back in
2    2007, that was as an LPN, right?
3    A.   Yes.
4    Q.   And when you signed up back then, you were interviewed to
5    work at Steadfast in 2007, right?
6            MS. RUST:  Objection.  Outside the scope.
7            THE WITNESS:  Yes.
8            THE COURT:  Objection overruled.
9    BY MS. LEWIS:
10   Q.   And in between 2007 and when you came back in 2017, when
11   you came back as an RN, your -- well, let me ask it this way:
12           How much were you paid as an LPN when you worked at
13   Steadfast?
14   A.   I don't remember back then -- back then, in 2007-2008,
15   and then, you know, I was there '14, '15, a little bit in
16   '17.
17   Q.   So somewhere between '14 and '17 as an LPN?
18   A.   No.  That's the years that I worked there.  I don't
19   remember the pay.  Maybe $30 or 35 an hour.
20   Q.   And then when you came back to work as an RN, your rate
21   of pay didn't increase that much, correct?
22   A.   Correct.
23   Q.   And you talked to Lisa about that, because LPN, RN,
24   there's a higher level of responsibility associated with
25   being an LPN versus RN in terms of the job duties and

P. Clark - Cross

1    responsibilities; isn't that right?

2    A.  Yeah.  Yes.

3    Q.  Okay.  And Lisa -- when you talked to her about it, you

4    tried to negotiate a higher rate because now you are an RN,

5    not an LPN, and Lisa, she wouldn't budge on increasing your

6    amount to the range that RNs were paid, correct?

7    A.  Correct.

8    Q.  And so the only time that Steadfast has given you an

9    increased rate of pay is based upon Steadfast's needs, right?

10          MS. RUST:  Objection.  Calls for speculation.

11          THE COURT:  Objection overruled.

12          THE WITNESS:  What was the question?

13   BY MS. RUST:

14   Q.  Sure.

15          So the only time that you received an increased rate

16   of pay, in your testimony earlier, you said it was because

17   Steadfast had a -- you know, they were in a bind, they

18   were -- they needed a nurse at the facility, right?

19   A.  Right.

20   Q.  So it wasn't based upon your skills and experience; it

21   was based upon Steadfast's needs.  Is that right?

22   A.  Or the facilities that was -- hired Steadfast.

23   Q.  The facilities that would hire Steadfast?

24   A.  Yeah.

25   Q.  So at the end of the day, Steadfast's needs, correct?

P. Clark - Cross

```
 1          MS. RUST:  Objection.
 2          THE COURT:  Now I'm going to sustain it.
 3          MS. LEWIS:  Okay.
 4    BY MS. LEWIS:
 5    Q.  You also testified about using the app that Steadfast
 6    recently -- you said you started to recently use the app.
 7    When did you start to use that app?
 8    A.  Just in the last few months.
 9    Q.  Okay.  Can you give me a range?  Just give us an idea so
10    when we say "last few months" --
11    A.  Yeah, two months.  I mean, it's been up there for several
12    months, but it wasn't working properly for the first, I don't
13    know how long, three or four months, but it's working now.
14    Q.  Okay.  So initially when they rolled it out, you were
15    still going about the same process of getting shifts through
16    the schedulers at Steadfast, correct?
17    A.  Correct.
18    Q.  And now with the shifts, you sometimes get them through
19    the app, still sometimes get them through the scheduler; is
20    that correct?
21    A.  Correct.
22    Q.  And whether you are using the app or the schedulers, you
23    still have to confirm your shifts directly with Steadfast; is
24    that right?
25    A.  Correct.
```

Carol L. Naughton, Official Court Reporter

**JA700**

P. Clark - Cross

1  Q.  You also indicated during your testimony that you have

2  worked with other agencies; is that right?

3  A.  I did in 2008.

4  Q.  In 2008?

5  A.  Uh-huh.

6  Q.  But not in your second go-round, coming back as an RN?

7  A.  No.  Correct.

8  Q.  And you've never spoken to facilities directly about

9  scheduling, correct?

10  A.  I have.

11  Q.  And when you talked to the facilities directly about

12  scheduling, were you reprimanded by Lisa at Steadfast?

13  A.  Yes.

14  Q.  Can you tell us about that?

15  A.  I was told to go through the office and not directly

16  through the facility.

17          MS. LEWIS:  No further questions for this witness.

18          THE COURT:  The Court has a question.

19          You indicated that you are still working on the

20  registry at Steadfast; is that correct?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  Did you volunteer to come testify this

23  morning?

24          THE WITNESS:  Yeah.

25          THE COURT:  Did you volunteer to come in?

```
                              ┌── P. Clark - Redirect ──┐
 1              THE WITNESS:  Did I volunteer?

 2              THE COURT:  Yes.

 3              THE WITNESS:  I was subpoenaed.

 4              THE COURT:  You were subpoenaed to testify.  Okay.

 5          And in coming in to testify this morning, do you

 6     have any concern about your ability to continue to work for

 7     Steadfast?

 8              THE WITNESS:  No.

 9              THE COURT:  Thank you very much.

10              Any further questions?

11          MS. RUST:  Brief redirect, Your Honor.

12              THE COURT:  All right.

13              THE WITNESS:  I just don't feel like I'm very

14     helpful.

15                         REDIRECT EXAMINATION

16     BY MS. RUST:

17     Q.  It's okay, Ms. Clark.  Just asking you to respond to the

18     questions.  I just have a couple of follow-up questions.

19          Regarding the questions about scheduling directly

20     with the facility, were there some instances where there were

21     shifts that got double-booked when you scheduled through the

22     facility?

23              MS. LEWIS:  Objection.  Calls for speculation.

24              THE COURT:  Well, if she knows.  Overruled.

25     BY MS. RUST:
```

Carol L. Naughton, Official Court Reporter

**JA702**

```
                          ┌─── P. Clark - Redirect ───┐
```

 1   Q.  So let me state the question again, then.

 2          THE COURT:  Let's specify.  When you say

 3   "double-booked," let's clarify.  Double-booked with respect

 4   to her or what?

 5          MS. RUST:  Her schedule, if she was double-booked

 6   for --

 7          THE WITNESS:  Two showing up for one position, is

 8   that what you mean, when two nurses show up for one position?

 9   BY MS. RUST:

10   Q.  No.  So my question is:

11          In the instances where you were scheduling with the

12   facility or talking to the facility about scheduling directly

13   with them, was there ever an instance where you

14   double-booked -- your shifts were double-booked, meaning you

15   were supposed to be in more than one facility at a time or

16   you had overlapping shifts?

17   A.  No.

18   Q.  You're not aware of picking up multiple shifts?

19   A.  No.

20   Q.  Did Lisa talk to you about getting double-booked?

21   A.  No.

22   Q.  Ms. Lewis asked you some questions about your rate of

23   pay.  Are you aware of other facilities on Steadfast's

24   registry that pay a higher rate than the facility you are

25   currently taking shifts at?

650

┌─────────────── P. Clark - Redirect ───────────────

1   A.  Yes.  There's a few facilities that are paying a higher

2   rate.

3   Q.  Okay.  And do you like those facilities?

4   A.  No.  I don't want to travel that far.

5   Q.  Okay.  So you testified earlier that the factors that

6   were important to you in picking up shifts were whether you

7   like the facility and the distance, right?

8   A.  Correct.

9   Q.  So have you declined to take opportunities with those

10  higher hourly rate shifts because of those factors?

11  A.  Yes.

12  Q.  Okay.  And could you take shifts at those other

13  facilities that pay higher hourly rates if you wanted?

14  A.  Yes, probably.

15         MS. RUST:  Okay.  Those are all the questions I have

16  for you.  Thank you, Ms. Clark.

17         THE COURT:  May the witness be permanently excused?

18         MS. RUST:  Yes, Your Honor.

19         MS. LEWIS:  Yes, Your Honor.

20         THE COURT:  You are permanently excused, ma'am.

21  Have a good day.

22         THE WITNESS:  Thank you.

23         (Witness excused.)

24         THE COURT:  Next witness.

25         MS. RUST:  The defendants' next witness is Napolean

**JA704**

N. Alston - Direct

```
 1  Alston, and I understand he has arrived.
 2          (Witness sworn.)
 3          NAPOLEAN ALSTON, called by the Defendants, having
 4  been first duly sworn, was examined and testified as follows:
 5                    DIRECT EXAMINATION
 6  BY MS. RUST:
 7  Q.  Good morning, Mr. Alston.
 8  A.  Good morning.
 9  Q.  Can you state your name for the record and spell it for
10  the court reporter.
11  A.  Napolean, N-a-p-o-l-e-a-n, A-l-s-t-o-n, and I'm a Jr.
12  Q.  Okay.  Napolean Alston, Jr.  And just so you know, you
13  have to keep your mask on the whole time, but you've got the
14  mic, so just try to speak as clearly as you can so that the
15  court reporter can get down everything that you're saying.
16  A.  Okay.
17  Q.  So, Mr. Alston, what is your occupation?
18  A.  Licensed practical nurse.
19  Q.  Okay.  And are you -- how long have you been a licensed
20  practical nurse?
21  A.  About 21 years.
22  Q.  Okay.  Are you familiar with Steadfast Medical Staffing?
23  A.  Absolutely.
24  Q.  Are you on Steadfast's registry?
25  A.  I am.
```

———N. Alston - Direct———

1   Q.  How long have you been on Steadfast's registry?

2   A.  I wouldn't know exactly, but if I can guesstimate it,

3   since probably about 2014 or 2015 --

4   Q.  Okay.

5   A.  -- roughly.

6   Q.  And are you currently picking up shifts on Steadfast's

7   registry?

8   A.  I am.

9   Q.  Okay.  How often are you picking up shifts?

10  A.  Very often.  Every week.

11  Q.  Every week?

12  A.  Uh-huh.

13  Q.  Do you pick up the same number of shifts every week?  Or

14  does it vary?

15  A.  It varies according to what I want to do.

16  Q.  What was the last thing you said?

17  A.  According to what I want to do, you know, how I want to

18  work.

19  Q.  Okay.  So are you -- I'm going to come back to that, but

20  just to follow up, have you been picking up shifts on

21  Steadfast's registry regularly since 2015?

22  A.  Yes.

23  Q.  Has it always been every week?

24  A.  Yes.  There might have been -- I was at Old Dominion

25  University, so I think there was like a year that I kind of

—————————— N. Alston - Direct ——————————

1   didn't work a lot or hardly at all.

2   Q.  I'm sorry.  I can't understand.

3   A.  I'm sorry.  I have a bad lisp, and this mask is not

4   helping it.

5           There was about a year -- I went to Old Dominion

6   University.  I graduated from there, and there was about a

7   year, while I was going to school there, that I didn't take

8   shifts that often, but I was in school at the time.  But then

9   as soon as I finished, I picked the shifts back up.

10  Q.  Okay.  So have you ever been to Steadfast's office in

11  Norfolk?

12  A.  Yes.

13  Q.  Have you ever provided nursing services at Steadfast's

14  office in Norfolk?

15  A.  I don't know what you mean by that.  Nursing services at

16  the office?

17  Q.  Correct.

18  A.  Like, working in the office?

19          THE COURT:  Do not ask her questions, Mr. Alston.

20  Just tell her you don't understand.

21          THE WITNESS:  I don't understand -- have I served as

22  a nurse in the office?

23  BY MS. RUST:

24  Q.  Yes.  Have you provided nursing services in the office at

25  Steadfast's --

─────N. Alston - Direct─────

```
 1   A.  No, ma'am.

 2   Q.  -- office?

 3           Okay.  Tell me about picking up shifts.  How do

 4   you -- when you're taking shifts from the registry, first,

 5   are you going to various facilities currently?

 6   A.  Typically, you would go to various facilities that are

 7   available for hours that suit my needs.  I would say for the

 8   past year, I've been primarily at one facility that I've been

 9   working that has a lot of needs.  I like the facility.  So

10   I've been primarily there the whole time.  I haven't gone

11   anywhere else.

12   Q.  Okay.  And have you wanted to pick up shifts at other

13   facilities, or you want to only pick up shifts at this

14   facility?

15   A.  Oh, no.  I stay there.  I like this facility, so I've

16   stayed there.  I can pick up shifts at other facilities, but

17   I choose to stay at this one.

18   Q.  Okay.  So how do you schedule shifts from the registry

19   right now?

20   A.  Well, there's a website.  You will go on the website, and

21   there will be a list of facilities and needs, hours, and you

22   can scroll down and choose what you want -- you know, what

23   facility you would like to go to and what shift you can work,

24   and you would click on it and claim a shift.

25           There's a little time in between where the --
```

N. Alston - Direct

```
 1   Steadfast will confirm it.  Once you claim the shift, they
 2   will confirm with that facility, do you still need this, you
 3   know, these hours and this availability, because we have a
 4   nurse that claimed the shift.
 5          Once that facility confirms, yes, we still do need
 6   that, then Steadfast will reply to that website, saying that
 7   the shift has been confirmed, they do still need you, so, you
 8   know, you can go during that shift.
 9   Q.  Okay.  And have you scheduled a shift through that site
10   that way recently?
11   A.  With the facility I'm at now, I've been there so long,
12   I've kind of, you know -- as with nursing, you kind of get
13   used to things, and people get used to you.  So the facility
14   likes my work a lot, so I've kind of been on a personal basis
15   with them.
16          So, recently, I just go to the management at the
17   facility, and they will tell me, "We need you this, this,
18   this, and this."  So I haven't gone through the registry in,
19   you know, the past couple of months due to that.
20          I just go to them directly and ask them, you know,
21   "What do you need me for?"
22          And they'll say, "We need you this day, this day,
23   this day."
24          And I'll say, "Okay."  Then I'll just let Steadfast
25   know that I'm working these days here.
```

Carol L. Naughton, Official Court Reporter

**JA709**

N. Alston - Direct

1   Q.  So when you are talking to the facility about the shifts,
2   those are still shifts that you're working through Steadfast,
3   though; is that right?
4   A.  Absolutely.
5   Q.  Okay.  So tell me again, who are you talking to at the
6   facility?  Is there a certain position that you typically --
7   A.  The actual facility scheduler, the person that schedules
8   shifts through different agencies, you know, that their own
9   employers -- I mean, employees -- I actually go through them.
10  Q.  So when you talk to the scheduler and pick up shifts
11  directly with the scheduler at the facility --
12  A.  Yes.
13  Q.  -- do you confirm with Steadfast what you've picked up
14  through the facility?
15  A.  Yes.  You know, as a courtesy, I let Steadfast know I've
16  picked up these hours and --
17  Q.  Sorry.  I don't mean to cut you off.
18          Do you always let Steadfast know if you've picked up
19  shifts directly with the facility?
20  A.  You know, honestly, there might have been, maybe, some
21  weeks that I didn't let them know some days, but I just turn
22  in my time sheets at the end of the week, and Steadfast
23  always confirms the hours with the facility.
24          They will call them and say, you know, "We've got
25  these time sheets from Napolean that say he was there Monday,

Carol L. Naughton, Official Court Reporter

**JA710**

─────────N. Alston - Direct─────────

1   Wednesday, Thursday, at these hours."

2           And the facility will confirm and say, "Yes, he was,

3   and he worked," and then Steadfast will pay me for it.

4   Q.  So have you ever been reprimanded or suffered any

5   consequences when scheduling shifts directly with the

6   facility?

7   A.  Not -- well, I've been told that that is not the way that

8   they would like it to go, and can I please stick to the

9   guidelines of Steadfast, yes.

10  Q.  Okay.  Have there been any consequences, though, for

11  doing that?

12  A.  No.

13  Q.  Okay.  After you were told by Steadfast that -- I think

14  you said they were the guidelines to not schedule --

15  A.  Yes, ma'am.

16  Q.  Have you still scheduled through the facility after

17  receiving those comments?

18  A.  No.  The owner of Steadfast has got someone that will

19  take lightly not following rules.  So, no, if after I was

20  told, you know, you need to follow the guidelines, I

21  typically will revert back to following and letting them know

22  that, "Hey, I got these hours.  Is that okay?"

23          So I would send a text to a number, and I would say,

24  "I've got this day, this day, this day, these hours.  Is it

25  okay if I work these hours?"

Carol L. Naughton, Official Court Reporter

**JA711**

─────────────N. Alston - Direct─────────────

1          And they will text back and say, "Yes, you can work

2    the hours."

3    Q.  And in the instances when you did not notify Steadfast,

4    there were no issues, though, no consequences; is that right?

5    A.  Yeah.

6              MS. LEWIS:  Objection.  Asked and answered.

7              THE COURT:  Sustained.

8              MS. LEWIS:  This is prior testimony.

9    BY MS. RUST:

10   Q.  Have you ever worked in a different staffing agency

11   besides Steadfast?

12   A.  Yes.

13   Q.  Have you worked with a different staffing agency at the

14   same time as being on Steadfast's registry?

15   A.  Yes.

16   Q.  And why would you choose to work with more than one

17   registry at a time?

18   A.  With agency nursing, sometimes our hours are not

19   available.  With the agency you're working, you work when

20   facilities need help.  So to supplement your lifestyle, to

21   make sure you are paying your bills on time, sometimes

22   it's -- it's beneficial for you to have more than one area

23   that you can go to to meet the needs of your lifestyle.

24   Q.  Okay.

25   A.  To make ends meet.

─────N. Alston - Direct─────

1   Q.  So when you've worked for Steadfast and other registries

2   at the same time, how would you choose to split up shifts

3   amongst the registries?

4   A.  So the other agency does mostly occupational health.  So

5   with that, I do -- I work at, like, Smithfield packing plant

6   in their clinic and the Surry Nuclear Power Plant/Dominion

7   Energy in their clinic.

8         So they would say, "We need a nurse for this day,

9   this day, this day," and I will write it down, their needs,

10  and then if it only comes out to, let's say, 24 hours, then I

11  would say, "That's only 24 hours, but I need, you know, 40 to

12  meet my needs financially," or "I need this amount."

13        So I will go to Steadfast, pick up hours at other

14  shifts; and then, total, I will meet my goal of 40 or 50

15  hours, however many I need.  If I'm going on vacation, I will

16  try to do 80.

17  Q.  Okay.  Let me come back to that in a minute.

18        So I want to clarify, when you're scheduling, have

19  you ever contacted -- you talked about scheduling through the

20  site and potentially with the facility.

21        Have you ever called Steadfast to schedule shifts?

22  A.  No.

23  Q.  Okay.  Has Steadfast ever called you about available

24  shifts?

25  A.  Oh, years ago.  That's not the way they work now.  The

1   way they work now is you go on the site and see if you want

2   to do something, and you choose it.  Years ago, you know, in

3   the very beginning, when I first started, it was -- you know,

4   schedulers would call you and say, "We have a need at this

5   facility, we have a need at that facility, are you

6   available?"  And you would, you know, say yes or no.

7   Q.  Okay.  So whether you're talking to a scheduler on the

8   phone at Steadfast or looking at the website or maybe even

9   talking to the facility, are you able to choose whichever of

10  those shifts that are available?

11  A.  Absolutely.

12  Q.  And what factors do you consider when you are choosing

13  which shifts or facilities to pick up with?

14  A.  In nursing, it's more of a -- we kind of go off of word

15  of mouth with facilities that are not -- how can I explain

16  it?

17          The way I choose my shifts is according to what my

18  lifestyle is.  So let's say I want to go on a two-week

19  vacation.  I will schedule a lot of shifts, as many as I can,

20  because I want to save money to go.

21          Or if I have to take time off for school and I miss

22  six days of not working, then I'll say the next week, "Let me

23  pick up extra hours to make up what I didn't make."  That's

24  what I love about contracting.

25          On occasion, it's also according to facilities.

661

———————N. Alston - Direct———————

1   Some facilities are very hard, as far as the work, than

2   others.  So if there is a facility that I know to be very,

3   you know, short-staffed a lot and you will go and you will

4   work very hard, I kind of shy away from those facilities, try

5   to choose some that are a little easier.  It just depends on

6   how I choose shifts and choose facilities.

7          THE COURT:  Mr. Alston, try to make your responses

8   concise, and she will follow up if she does not get

9   everything she needs from you.

10         THE WITNESS:  Okay.

11  BY MS. RUST:

12  Q.  Okay.  So I think you said that if the facility is

13  difficult, you will consider that when picking a shift?

14  A.  I consider a less difficult one.  But if it's not

15  available, then I have no problem with working any facility.

16  Q.  Okay.  So are there any other factors besides the level

17  of difficulty or, I think you said the availability of

18  shifts, based on how much you want to work in a week versus

19  vacation, et cetera.

20  A.  Uh-huh.

21  Q.  Is there anything about a particular facility or the

22  aspects of that shift that are important for you to consider

23  when picking it up?

24  A.  No.

25  Q.  Okay.  Can you decline any of the available shifts that

Carol L. Naughton, Official Court Reporter

**JA715**

N. Alston - Direct

1    are on the registry?

2    A.  Yes.

3    Q.  Have you ever -- have you ever declined any shifts?

4    A.  It's not really a question of declining because you

5    wouldn't -- you wouldn't click the shift if you didn't want

6    it.  So it's not like you would say, "No, I'm not going to

7    work it," because you wouldn't -- you would only click it if

8    you wanted to do it.

9    Q.  Okay.  What about when you've been, in the past, talking

10   to a scheduler at Steadfast on the phone, if you're talking

11   about availability?

12   A.  They would call and say, "We have this facility, these

13   hours.  Can you do that?"

14           "No, I can't do it that day," or, "Yes, I can do

15   it."

16   Q.  Have there been any -- have you ever experienced any

17   consequences for declining to take available shifts?

18   A.  No.

19   Q.  And on Steadfast's registry, are you required to work a

20   minimum or maximum number of hours?

21   A.  No.

22   Q.  So who would you say determines your work schedule?

23   A.  Me.

24   Q.  What do you do if you want to -- you've mentioned you've

25   taken some breaks from Steadfast's registry in the past.

———N. Alston - Direct———

1        What do you do if you want to take a break or stop

2   taking shifts for a while?

3   A.  I do it.

4   Q.  Do you have to notify Steadfast?

5   A.  No.

6   Q.  Do you notify Steadfast when you are going on vacation?

7   A.  No, ma'am.

8   Q.  Has Steadfast ever provided you with any training?

9   A.  We had -- in the very beginning, we had training, but

10  that's every nursing job you take.  So you go over, you know,

11  your HIPAA violations and your normal nursing training, yes.

12  Q.  And you said that it was normal nursing training?

13  A.  Yeah.  Anywhere you go, you will have the standard

14  nursing training.  Like, you'll have a short test on

15  medications or a short test on scenarios and what you would

16  do, HIPAA violations and HIPAA laws, and things like that.

17  So, yes.

18  Q.  And that's been your experience at the various facilities

19  you've worked at in your career.  Is that what you're saying?

20  A.  Yes, ma'am.

21  Q.  Okay.  Have you ever received a formal performance

22  evaluation from Steadfast?

23  A.  Sort of.  The performance evaluation comes from the

24  facilities.  So I've gotten plenty evaluations from

25  facilities of how awesome I am, but Steadfast will relay that

──────N. Alston - Direct──────

1  to me.  But, yeah.

2  Q.  Okay.  So it's coming from a facility?

3  A.  Yes.

4  Q.  Okay.

5  A.  Because they are the ones that, you know, are watching me

6  work.

7  Q.  And is the rate of pay consistent with every shift or

8  facility, or does it vary?

9  A.  Sometimes it varies, but pretty much, it will be a set

10  rate.  But sometimes it will vary according to how far you

11  are going, what facility it is, the emergence of the need.

12  Sometimes you'll have a facility that needs someone, and they

13  call at 8:00 in the morning, and they need someone for 3:00.

14        So that would be, like, a short-notice kind of

15  thing, and Steadfast would call and say, "This was on short

16  notice, and they are willing to pay extra if you can make it

17  out there."

18  Q.  Okay.  And do you track your own hours for the shifts you

19  pick up through Steadfast?

20  A.  Yes.

21  Q.  Do you notify Steadfast what your hours are?

22  A.  Yes.  Or we turn in the time sheets, and I, you know,

23  track my own hours.

24  Q.  Okay.  And does a facility -- somebody from a facility

25  sign that time sheet?

──────N. Alston - Direct──────

```
 1   A.  Yes, ma'am.
 2   Q.  And is that to verify the hours that you said you worked
 3   on the time sheet?
 4   A.  Yes, ma'am.
 5   Q.  Have you ever experienced any errors or discrepancy in
 6   the pay that you have received from Steadfast?
 7   A.  Never.
 8   Q.  So you've been nursing for 20 years, right?
 9   A.  Yes, uh-huh.
10   Q.  Why do you choose to work through an agency or a
11   registry?
12   A.  When you work for a regular employer, which I've had
13   plenty -- I did it more for the freedom.  Like I said, I
14   started back at Old Dominion University, and for the freedom
15   of kind of setting my own hours and doing my own thing as
16   opposed to -- I mean, I love the fact that I can say I'm
17   going to Chicago next week for six days and not have to go to
18   someone and say, "Can I go to Chicago?"
19          "Well, no, we can't let you go.  Maybe you can go
20   next month."
21          I can go and come as I please.  I have the luxury of
22   saying I'm going to take six days off and being able to make
23   up six days however I want to do it the next week.  It's the
24   freedom to work the way I want to work, how I want to work,
25   take what I want to make, when I want to make it.
```

————N. Alston - Cross————

 1          MS. RUST:  Okay.  Those are all the questions I have

 2    for you.  Opposing counsel may have a couple questions.

 3          THE WITNESS:  Okay.

 4          THE COURT:  Any cross?

 5          MS. LEWIS:  Yes, Your Honor.

 6                         CROSS-EXAMINATION

 7    BY MS. LEWIS:

 8    Q.  Good morning, Mr. Alston.

 9    A.  Good morning.

10    Q.  My name is Ryma Lewis.  I'm an attorney for the U.S.

11    Department of Labor.

12    A.  Yes, ma'am.

13    Q.  I understand you have been working with Steadfast for

14    quite some time, at least since 2014?

15    A.  Yes, ma'am.

16    Q.  And when you started working at Steadfast, you completed

17    an Employment Application; isn't that correct?

18    A.  Yes, ma'am, I did.

19    Q.  I want to direct your attention to this document.

20          MS. RUST:  I'm going to object.  This is outside the

21    scope.

22          MS. LEWIS:  Your Honor, she asked about when he

23    started working there.

24          THE COURT:  Continue.

25    BY MS. LEWIS:

———N. Alston - Cross———

1   Q.  When you completed this Employment Application, you had

2   to provide the shifts available to work, and you put

3   everything and anything pretty much, correct?

4   A.  Yes, ma'am.

5   Q.  And there was also an option for you to decide what type

6   of assignments that you would work, and there was full time,

7   part time, per diem, permanent, travel, variety.  And what

8   did you select?  What kind of work?

9   A.  The type of assignment?

10  Q.  Yes.

11  A.  Per diem.

12  Q.  Okay.  Now, within -- you've been a nurse for 21 years.

13         What is per diem?

14  A.  Per diem is basically how I just explained to where you

15  would -- you would have the freedom of dictating what days

16  you want to work, what hours you want to work.  That's

17  basically what per diem is.

18         So full time would be hours set for you

19  specifically.  Part time would be hours set for you

20  specifically but not at the expense of full-time hours; it

21  would be somewhere between 20 and 25 hours.

22  Q.  So per diem is daily basis, as needed?

23  A.  Right.  As I --

24  Q.  And in your 21 years of working as an LPN, have you --

25  you've worked per diem and also full time?

Carol L. Naughton, Official Court Reporter

**JA721**

—————N. Alston - Cross—————

1    A.  Yes, ma'am.  I've had full-time positions.

2    Q.  And you also alluded to working at other agencies.

3    You've also worked per diem in those capacities as well,

4    correct?

5    A.  Yes, ma'am.

6    Q.  And you've worked in facilities, be it hospitals or

7    nursing homes as well?

8    A.  Correct.

9    Q.  And within those settings, per diem, that's just

10   something that is particular to the healthcare profession; is

11   that right?

12   A.  Yes, ma'am.

13   Q.  And so being per diem with Steadfast versus a hospital,

14   it's still the same.

15   A.  It is.

16   Q.  You work on a daily basis based upon the schedule you

17   want, correct?

18   A.  Yes, ma'am.  This -- yes, per diem would mean that, yes.

19   Q.  So even if you were to work at a hospital per diem, you

20   still have that same degree of flexibility.

21   A.  With an employer, per diem can be a little bit different,

22   because they will dictate -- like, Sentara wouldn't say you

23   can work per diem and not work this month.  They will say you

24   can work per diem, but you have to do this many weekends in a

25   month and this many days.  So however you do it during the

N. Alston - Cross

 1   month is your, you know, discretion, but you need to do at

 2   least one weekend and, let's say, three or four days.

 3          So that would be more indicative of working for,

 4   like, a company like Sentara, or when I worked at Eastern

 5   State or -- that would be a requirement; whereas when you're

 6   contracting through an agency, I did not work a month or two

 7   months, and there's no ramifications for it.

 8   Q.  Okay.  And that's been the case -- scrolling down the

 9   application, you also indicated -- when you worked at other

10   agencies too.  First Choice, for example.

11   A.  Yes, ma'am.

12   Q.  And you indicated, in terms of scheduling -- so you

13   mentioned that there's a website.  It's an app on your phone,

14   correct?

15   A.  Yes, ma'am.

16   Q.  And when did you start using that app?

17   A.  This application is fairly new.  I just started using it

18   this year.

19   Q.  Okay.  Approximately what month?

20   A.  I honestly don't remember.  I'm sorry.  If I can

21   guesstimate it --

22          THE COURT:  Don't speculate.

23          THE WITNESS:  I honestly don't remember.

24   BY MS. LEWIS:

25   Q.  Okay.  Well, you've mentioned that you've been at your

Carol L. Naughton, Official Court Reporter

**JA723**

N. Alston - Cross

```
 1   current placement through Steadfast for a while now; is that
 2   right?
 3   A.  Yes, ma'am.
 4   Q.  When did you start there?
 5   A.  I would say I started at -- working at this facility
 6   November of 2020.
 7   Q.  The app wasn't in place when you started working at that
 8   facility --
 9   A.  No, ma'am.
10   Q.  -- correct?
11   A.  No, ma'am, it wasn't.
12   Q.  So you got that assignment directly through Steadfast and
13   not the app; is that right?
14   A.  Correct.
15   Q.  So you didn't need to use the app to schedule that
16   initial placement at that facility, correct?
17   A.  Not at that time, no.
18   Q.  And so since you've been there, since approximately
19   November, you haven't regularly had the occasion to use the
20   app because, as you testified, you've only been working at
21   that facility; is that right?
22   A.  Correct.
23   Q.  And so when you were detailing how you go through the
24   app, you don't really know, because you were placed at that
25   facility back in November through Steadfast, this additional
```

────────────── N. Alston - Cross ──────────────

1   means of scheduling; isn't that right?

2   A.   That's a little bit incorrect.

3        MS. RUST:  Objection.

4        THE COURT:  When they object, you have to stop.

5        What is the objection?

6        MS. RUST:  Mischaracterization of testimony.

7        MS. LEWIS:  Your Honor, he indicated he has been

8   there since November.  He hasn't worked at any other

9   facility.

10        THE WITNESS:  That's not totally correct.

11        THE COURT:  Mr. Alston, you don't talk when they are

12   talking to the Court.

13        THE WITNESS:  Okay.

14        THE COURT:  When they object, you stop talking.

15        THE WITNESS:  Yes, sir.  This is my first time.

16        MS. LEWIS:  I'll restate the question.

17        THE COURT:  No need.  The Court understood exactly

18   what the examination was.  The objection is overruled.

19   BY MS. LEWIS:

20   Q.   So, Mr. Alston, if you could answer my question.  My

21   question was:

22        You did not schedule your shifts with your current

23   placement through the app, correct?

24   A.   Not in the beginning, no.  So I don't do it through the

25   app now, no, but I have worked at other facilities since

Carol L. Naughton, Official Court Reporter

**JA725**

———N. Alston - Cross———

1    November of last year where I did use the app.

2    Q.  Which other --

3          THE COURT:  What he did on the app on the other

4    facilities is irrelevant.  We're just talking about what he's

5    done with Steadfast.

6          MS. LEWIS:  Right.

7    BY MS. LEWIS:

8    Q.  That's the question, what you have done with Steadfast.

9    A.  I've gone on Steadfast's app while working at Elizabeth

10   Adam Crump.  If Crump didn't have the hours that I needed, I

11   have used the app maybe more than ten times to get other

12   shifts to supplement what I need.

13         So if I was to say -- it's incorrect that I have

14   only worked at Crump for the -- since November.  It's not

15   correct.  I've worked at other facilities through Steadfast,

16   but Crump is 95 percent of where I've gone, but I have gone

17   to other facilities using the app.  That's how I know how it

18   works.

19   Q.  And so when you used the app on those other occasions,

20   you still had to get Steadfast's approval to confirm those

21   shifts, correct?

22   A.  Yes, ma'am.

23   Q.  And on the app, it doesn't have the rate of pay for those

24   facilities; isn't that right?

25   A.  That's correct.

————N. Alston - Cross————

1   Q.  So you still need to contact Steadfast to see how much

2   you would be paid if you were to work at those other

3   facilities.

4   A.  Correct.

5   Q.  It's not established.

6   A.  Yes, ma'am.

7   Q.  So Steadfast is still in the middle with respect to your

8   placement at other facilities.  Is that a correct

9   characterization?

10  A.  In the middle?

11  Q.  In the middle in terms of you being able to go work at a

12  facility.  They have to confirm the shifts, and they have to

13  tell you what you would be paid; is that right?

14  A.  Yes.

15  Q.  You don't negotiate your rate of pay directly with the

16  facilities?

17  A.  No.  Sometimes with Steadfast, but not the facility.

18  Q.  You still have to submit time sheets through Steadfast?

19  A.  Correct.

20  Q.  Steadfast pays you directly, not the facilities, correct?

21  A.  Right.

22  Q.  You also talked about how you also do occupational health

23  with other per diem agencies; is that right?

24  A.  Yes, ma'am.

25  Q.  And that's separate and apart from LPN, or is that just a

———N. Alston - Cross———

 1    different --
 2    A.  It's still in the scope of the nursing practice, just a
 3    different type of nursing.
 4    Q.  Okay.  And Steadfast doesn't provide you occupational
 5    health placements; is that right?
 6    A.  I don't know if they have those or not.  I've never done
 7    any of them with them.  I just have done what I've done.
 8    I've never done it.
 9    Q.  So if you want to utilize that skill set, you use a
10    different agency?
11    A.  Right now, yes.
12    Q.  Okay.  And you rely on Steadfast to provide you -- you
13    indicated you've got a little bit of a hustler spirit,
14    hustling in terms of getting money --
15    A.  Uh-huh.
16    Q.  -- right?
17            And so Steadfast is one of your primary sources of
18    income, but if you want more money, just like any position,
19    you go out and look for more jobs, right?
20    A.  Exactly.
21    Q.  So in order to make more income from Steadfast, you just
22    have to work more hours; is that right?
23    A.  Correct.
24    Q.  So it's nothing of an entrepreneurial spirit with respect
25    to your position at Steadfast; it's just "If I want to make

N. Alston - Cross

1    more, I have to work more hours"; is that right?

2    A.  Correct.

3    Q.  So you don't independently market yourself to the

4    facilities directly; you go to Steadfast.

5    A.  Correct.

6    Q.  In terms of -- you talked about the training.  I mean,

7    you indicated that, in the beginning, when you signed up to

8    work with Steadfast, you had some, you said in the beginning,

9    training on HIPAA, normal nurse training.

10          Do you recall that testimony?

11   A.  Yes.

12   Q.  And within that -- that was with Steadfast.  When you

13   signed up with Steadfast, you had to take a skills test with

14   Steadfast to demonstrate your competency as an LPN; is that

15   right?

16   A.  Yes, ma'am.

17   Q.  And when you signed up, you also had to complete some

18   abuse and neglect training as well.

19   A.  Absolutely.

20   Q.  And that was through Steadfast and not the facilities.

21   A.  Yes.  The facility, when you go there, in most cases,

22   they will have their own training.  So when you get there,

23   they will give you their own in-services and training

24   according to what their company requires and how they do

25   things and their fire drills.  So you will go through some

—————N. Alston - Cross—————

1   trainings with the facilities that you go to.

2   Q.  So it was both, Steadfast and the facility.

3   A.  Yes, ma'am.

4   Q.  I just want to make sure I'm clear.

5   A.  Uh-huh.

6   Q.  Okay.  You also mentioned to the facilities -- well,

7   before I get there, have you ever been placed on any

8   do-not-return list?

9   A.  No, ma'am.

10   Q.  You also indicated that some facilities have provided you

11   evaluations; is that right?

12   A.  Yes.

13   Q.  Which facilities were those?

14   A.  Elizabeth Adam Crump, Waverly, Princess Anne Nursing

15   Rehab.

16       THE COURT:  What is the relevance of whether other

17   facilities have given an evaluation?

18       MS. LEWIS:  Well, Your Honor, with respect -- they

19   asked the question if they -- defendants in their direct

20   asked whether or not he had received any evaluations from the

21   facilities, trying to -- presumably trying to demonstrate a

22   lack of control.

23       My next question, if the Court would indulge for a

24   moment, is whether or not he is aware of the contractual

25   obligations between Steadfast and the facilities with respect

—————N. Alston - Cross—————

1    to the evaluations.

2            THE COURT:  Well, with respect to "his" evaluation.

3            MS. LEWIS:  Right, his evaluation.

4            THE COURT:  Okay.  All right, then.  Fine, now,

5    because even though that question was asked, you didn't

6    object to it.  It wasn't relevant.  The question is what goes

7    on with the evaluation between Steadfast and those people it

8    considered to be independent contractors.

9            So go on and ask him the question with respect to

10   his evaluations.

11   BY MS. LEWIS:

12   Q.  With respect to the evaluations that you've had, are you

13   aware of whether -- are you aware of the contractual

14   obligations, of the facilities to provide you feedback, that

15   Steadfast has with the facilities?

16   A.  No.

17   Q.  And we've talked about your hours.  Approximately how

18   many hours a week do you work on average?  Or a range, if you

19   can't give an average.

20   A.  An average would probably be about 50 to 60 hours.

21   Q.  Okay.  And when you work over 40 hours in a workweek,

22   have you ever received overtime compensation from Steadfast?

23   A.  No.

24   Q.  Have you questioned them about receiving overtime?

25   A.  No.

N. Alston - Redirect

```
 1          MS. LEWIS:  No further questions for this witness,
 2    Your Honor.
 3          THE COURT:  Thank you.
 4          MS. LEWIS:  Oh, I'm sorry, Your Honor.  One more
 5    question.
 6    BY MS. LEWIS:
 7    Q.  One last question about the evaluation.
 8          You said that you received feedback from the
 9    facilities about your performance.  Is it Steadfast that
10    relayed that feedback to you regarding their confidence or
11    their appreciation of your performance?
12    A.  Yes.
13    Q.  So that the facilities reported to Steadfast and you the
14    same in terms of, you know, their pleasure with your work?
15    A.  Yes, ma'am.
16          MS. LEWIS:  No further questions, Your Honor.
17          THE COURT:  Any redirect?
18          MS. RUST:  Very brief, Your Honor.
19                    REDIRECT EXAMINATION
20    BY MS. RUST:
21    Q.  Mr. Alston, regarding your -- Ms. Lewis asked you some
22    questions about, to make more money, you had to work more
23    hours; is that right?
24    A.  Yes, ma'am.
25    Q.  We talked earlier during your testimony about the factors
```

N. Alston - Redirect

```
 1    that were important to you when choosing which facilities or
 2    shifts to pick up.
 3    A.  Yes, ma'am.
 4    Q.  The hourly rate a facility or a shift is paying, is that
 5    one of the factors you consider?
 6    A.  No.  The hourly rate, to me, is wonderful.  It's actually
 7    pretty good.
 8    Q.  Okay.  So you could, if you wanted to -- so would you say
 9    that you could choose -- can you choose shifts, though, that
10    do pay a higher hourly rate as opposed to a shift that is
11    available that pays a lower hourly rate?
12    A.  Through Steadfast?
13    Q.  Correct.
14    A.  Normally, it's a set rate no matter what the shift is.
15    Q.  I'm sorry?
16    A.  It's a set rate no matter the shift.
17    Q.  For every facility?
18    A.  Every facility is a little bit different.  So, yes, some
19    pay more than others.
20    Q.  Okay.  So you could choose -- so you are aware that some
21    facilities pay different hourly rates than others?
22    A.  Yes, ma'am.
23    Q.  So you could choose a facility that pays a higher rate as
24    opposed to a facility that pays a lower rate?
25    A.  Yes.
```

N. Alston - Redirect

```
 1   Q.  Okay.  And to maximize your ability to earn money, you
 2   could focus on higher hourly rate shifts; is that right?
 3   A.  Yes, ma'am.
 4   Q.  Okay.
 5           THE COURT:  You know, both of you have gone over
 6   what he could do.  The question is what he did do.  But
 7   continue.
 8           MS. RUST:  Sure.
 9   BY MS. RUST:
10   Q.  So in the past, have you chosen a facility specifically
11   because the offered hourly rate was higher than another
12   available opportunity?
13   A.  Yes, ma'am, I have.
14   Q.  Okay.  And have you ever been in an -- has Steadfast ever
15   given you an in-service training?
16           MS. LEWIS:  Objection.  Asked and answered.  We've
17   been down this line of training several times.
18           THE COURT:  Sustained.  You asked that on your first
19   direct.
20           MS. RUST:  Okay.  I have no further questions.
21   Thank you, sir.
22           THE COURT:  May Mr. Alston be permanently excused,
23   counsel?
24           MS. LEWIS:  Yes, Your Honor.
25           MS. RUST:  Yes, Your Honor.
```

```
                        ┌─T. Hall - Direct─┐
```

1            THE COURT:  You are permanently excused, sir.

2            (Witness excused.)

3            THE COURT:  Your next witness.

4            MS. RUST:  Your Honor, our next witness is Tawanda

5    Hall.

6            (Witness sworn.)

7            TAWANDA HALL, called by the Defendants, having been

8    first duly sworn, was examined and testified as follows:

9                        DIRECT EXAMINATION

10   BY MR. SIEGRIST:

11   Q.  Good morning, Ms. Hall.

12   A.  Good morning.

13   Q.  Please state your name for the record.

14   A.  Tawanda Hall.

15   Q.  Can you spell that for the Court, please.

16   A.  T-a-w-a-n-d-a H-a-l-l.

17   Q.  What is your occupation, Ms. Hall?

18   A.  LPN.

19   Q.  How long have you been an LPN?

20   A.  13, 14 years.

21   Q.  Are you familiar with the company Steadfast Medical

22   Staffing, Ms. Hall?

23   A.  Yes.

24   Q.  Are you working on Steadfast's registry currently?

25   A.  Yes.

T. Hall - Direct

1   Q.  How long have you been on the registry?

2   A.  Approximately three and a half years.

3   Q.  And you are currently picking up shifts on the registry?

4   A.  Yes.

5   Q.  About how often are you picking up shifts?

6   A.  Every day.

7   Q.  Every day?

8        Can you give the Court an idea of how much you tend

9   to work per week.

10  A.  Probably 48 hours a week, depending on the hours of the

11  facility.

12  Q.  Does that vary from time to time?

13  A.  Yes.

14  Q.  Okay.  Of these shifts you just mentioned, have you ever

15  performed any nursing services at Steadfast's office?

16  A.  No.

17  Q.  Have you ever been to Steadfast's office?

18  A.  Yes.

19  Q.  Ms. Hall, has Steadfast ever supplied to you any

20  equipment to provide nursing services?

21  A.  No.

22  Q.  Okay.  Do you provide any of your own equipment to

23  provide nursing services?

24  A.  Yes.

25  Q.  What do you provide?

─────────────── T. Hall - Direct ───────────────

1   A.  My stethoscope, blood pressure cuff, thermometer, pulse

2   ox machine, pens, notebooks.

3   Q.  Do you bring those with you to the facilities where you

4   work?

5   A.  Yes.

6   Q.  Okay.  Is there a reason you bring those with you?

7   A.  Sometimes the facilities don't have enough to go around,

8   and sometimes I just need it right away.  You never know

9   what's going on, so just knowing that I have it, I can

10  perform my duties.

11  Q.  Are you able to do your job without those pieces of

12  equipment?

13  A.  Not really.

14  Q.  Okay.  Ms. Hall, do you maintain your own liability

15  insurance for nursing services?

16  A.  No, I don't.

17  Q.  Have you considered it?

18  A.  Yes.

19  Q.  If you have considered it, is there a reason why?

20  A.  Because I'm a contractor and just want to be safe.

21  Q.  Understood.

22       Ms. Hall, I want to talk to you a little bit about

23  how you select assignments on the registry.

24       If you are going to select a particular shift, how

25  do you go about doing that through Steadfast's registry?

Carol L. Naughton, Official Court Reporter

**JA737**

T. Hall - Direct

1   A.  I usually call one of the schedulers, or I'll text the

2   schedulers, or sometimes if I go to a facility, often I will

3   go to their scheduler and ask them what shifts they have

4   available, and I would schedule with Steadfast and with the

5   scheduler at the facility.

6   Q.  Let's talk a little bit about your communications with

7   the Steadfast scheduler.

8           When you are having these conversations, what do you

9   all talk about?

10  A.  What is available, what shifts are available at certain

11  facilities.

12  Q.  Okay.  And then do you -- then what do you tell them?  Do

13  you tell them what you would like, or do you discuss

14  preferences for what you do or don't want in terms of a shift

15  or assignment?

16  A.  I just tell them my availability, and they just let me

17  know what they have available.

18  Q.  Okay.  So who determines your work schedule?

19  A.  I do.

20  Q.  Are you available to pick up any shifts that are

21  available for your licensure?

22  A.  Yes.

23  Q.  What about if you don't want to take a shift?  Are you

24  able to say "I don't want to take that shift"?

25  A.  Yes.

Carol L. Naughton, Official Court Reporter

**JA738**

─────────────────────── T. Hall - Direct ───────────────────────

1    Q.   Okay.  And is that true even if you called the scheduler

2    directly and said, "Let's talk about availability"?

3    A.   Yes.

4    Q.   Is there any consequence if you tell a scheduler, "I

5    don't want to take this shift or that shift"?

6    A.   No.

7    Q.   Does the registry require you to work any minimum number

8    of shifts or number of hours?

9    A.   No.

10   Q.   Have they ever limited the number of shifts you take?

11   A.   No.

12   Q.   Have they ever limited the number of facilities that you

13   could work for?

14   A.   No.

15   Q.   When you are talking with the schedulers, do they give

16   you options of -- is it just one facility, or are there

17   shifts available at different facilities?

18   A.   They give you an option.

19   Q.   Okay.  Is there any limitation on -- let's say you want

20   to work at three facilities or five facilities or one

21   facility.  Is there any limitation on how many different

22   facilities you can select shifts at?

23   A.   No.

24   Q.   I think you mentioned earlier you scheduled shifts

25   directly with the facility before.

─────T. Hall - Direct─────

1    A.  Yes.

2    Q.  Who do you communicate with if you're going to do that?

3    A.  The scheduler at the facility.  And then I let the

4    scheduler know at Steadfast that I picked up those shifts.

5    Q.  Okay.  So you'll discuss with the facility, "I want to

6    work these shifts," and then communicate that to Steadfast

7    that you're taking the shift?

8    A.  Yes.

9    Q.  Is that accurate?

10   A.  Yes.

11   Q.  Okay.  How do you determine whether you want to work at a

12   particular facility?

13   A.  How do I determine?

14   Q.  Let me ask it a different way.

15        Are there any factors that you consider to

16   determine, maybe, "I like this facility better than that

17   facility"?  Are there things personal to you that you think

18   about when figuring out where you want to work?

19   A.  No.  Everyone needs help, so I just go.

20   Q.  Okay.  Have you ever decided "I don't like working at

21   that facility, I don't want to go there anymore"?

22   A.  Yes.

23   Q.  Okay.  Ms. Hall, what, in your experience, happens if,

24   let's say, you picked up a shift and you need to cancel it?

25   What process do you go through to go about doing that?

Carol L. Naughton, Official Court Reporter

**JA740**

─────T. Hall - Direct─────

```
 1   A.  You call the one -- call the scheduler at Steadfast and
 2   let them know that you're not available, that you have to
 3   call in and cancel that shift.
 4   Q.  Okay.  Are there any consequence if you need to cancel?
 5   A.  No.
 6   Q.  Have you ever been running late for a shift, Ms. Hall?
 7   A.  No.
 8   Q.  So in your experience, do you know the process by which
 9   you would let someone know if you were running late?
10   A.  I would call the scheduler on call --
11           MS. JONES:  Objection.  Calls for speculation.
12           THE COURT:  Well, no, the question -- rephrase the
13   question.  "In the past, what have you done when you were..."
14           First of all, have you ever run late?
15           THE WITNESS:  No, sir.
16           THE COURT:  Okay.  Then that's the end of that.
17   BY MR. SIEGRIST:
18   Q.  Ms. Hall, what do you want to do if you want to stop
19   accepting assignments for a period of time?
20   A.  What I would do, I would just contact the scheduler and
21   let them know that "I will be off the grid for a couple of
22   days, and I'll contact you when I'm ready to pick up a
23   shift."
24   Q.  Okay.  So do you need permission from Steadfast to --
25   let's say you want to go on vacation.  Do you need permission
```

Carol L. Naughton, Official Court Reporter

**JA741**

─────────────────────── T. Hall - Direct ───────────────────────

1  from Steadfast to go ahead and do that?

2  A.  No.

3  Q.  And have you, in the past, taken periods of time where

4  you weren't taking shifts?

5  A.  Yes.

6  Q.  Okay.  Have you done that recently?

7  A.  Yes.

8  Q.  Ms. Hall, do you work on any other nursing registries

9  currently?

10  A.  No.

11  Q.  Is there a reason that you are not, or is that a personal

12  preference?

13  A.  Personal preference.  I like working for the company I

14  work with.

15  Q.  Have you ever worked full time for a facility directly?

16  A.  Yes.

17  Q.  What capacity did you work -- well, first, which

18  facilities have you worked at as a full-time employee?

19          MS. JONES:  Objection.  Relevance.

20          THE COURT:  Sustained.

21  BY MR. SIEGRIST:

22  Q.  In your experience working for facilities in the past,

23  can you describe how your schedule is determined when you're

24  going to work.

25          MS. JONES:  Objection.

─────────────────────T. Hall - Direct─────────────────────

 1          THE COURT:  I just sustained that.  We're limiting
 2    this case to working for Steadfast.
 3    BY MR. SIEGRIST:
 4    Q.  Ms. Hall, has Steadfast ever provided you with any
 5    training or orientation?
 6    A.  No.
 7    Q.  Has Steadfast ever given you instructions on how to
 8    perform nursing facilities at the facilities where you work?
 9    A.  What do you mean?
10    Q.  Let me rephrase that.
11          Have you ever gotten direction from somebody at
12    Steadfast about how to go about providing nursing services at
13    the facilities where you work?
14    A.  No.
15    Q.  Is anyone from the Steadfast office ever on site at the
16    facilities when you are performing nursing services there?
17    A.  I can recall just once.  That's all.
18    Q.  Okay.  And to clarify, I'm not referring to other nurses
19    who are taking shifts from the registry, but are there any
20    other folks from the office who are at the facilities, when
21    you are working there, providing you directions on how to
22    nurse?
23    A.  Oh, no.
24    Q.  Have you ever received a performance evaluation from
25    Steadfast?

Carol L. Naughton, Official Court Reporter

**JA743**

---

T. Hall - Direct

1   A.  No.

2   Q.  Have you ever received discipline or corrective action

3   from Steadfast?

4   A.  No.

5   Q.  Do you track your own hours for shifts that you work?

6   A.  Yes.

7   Q.  And how do you go about tracking those?

8   A.  I just write it down on a calendar that I have to keep up

9   with my schedule, the hours that I've worked.

10  Q.  Do you submit that to anybody when you are done doing

11  that?

12  A.  I submit it to Steadfast weekly.

13  Q.  Okay.  And what information is on those documents?

14  A.  You put your time in, your time out, and your lunch, how

15  long you took for lunch, the signature of a staff member at

16  the facility, and my signature as well.

17  Q.  Okay.  And does that get verified by anybody at

18  Steadfast?

19  A.  Yeah -- yes.

20  Q.  Does that get verified by the facility?

21  A.  Yes.

22  Q.  Okay.  Has there ever been an error in any of the pay

23  that you've received through your work on the registry?

24  A.  I just recall once, when I first started.  That was it.

25  Q.  Okay.  Were you able to get that resolved?

---

Carol L. Naughton, Official Court Reporter

**JA744**

─T. Hall - Cross─

1   A.  Oh, yes.  That was resolved in an hour.

2   Q.  Ms. Hall, you mentioned earlier that you had previously

3   worked as a full-time employee.

4         Why do you choose to work as a registry nurse?

5   A.  The flexibility and the pay increase.

6   Q.  Understand.

7         MR. SIEGRIST:  No further questions for the witness.

8         Ms. Hall, the attorney for the Department may have

9   some questions for you.

10        THE COURT:  Cross-examination.

11        MS. JONES:  Thank you, Your Honor.

12              CROSS-EXAMINATION

13   BY MS. JONES:

14   Q.  Hi, Ms. Hall.  My name is Chervonti Jones from the

15   Department of Labor.  I have a few questions based upon the

16   responses you just provided.

17         You indicated that you worked for Steadfast,

18   correct?

19   A.  Yes.

20   Q.  And you've worked there for three to four years, roughly?

21   A.  Yes.

22   Q.  And do you recall how you began to work for Steadfast?

23   A.  I went into the office and filled out an application.

24   Q.  And if I could direct your attention to the monitor.

25         And is this a copy of the application that you

———————————T. Hall - Cross———————————

1   provided when you began working with Steadfast?

2   A.  Yes.

3   Q.  And this lists information and requests things, such as

4   your name, correct?

5   A.  Yes.

6   Q.  And your availability, correct?

7   A.  Yes.

8   Q.  And those are the type of shifts you wish to work,

9   correct?

10  A.  Yes.

11  Q.  Okay.  And you also indicated that you work -- that

12  during your work with Steadfast, you often provide your own

13  equipment; is that right?

14  A.  Yes.

15  Q.  And is that normally equipment just general tools of the

16  trade for general LPNs who provide similar services?

17  A.  Yes.

18  Q.  I'm sorry.  I couldn't hear you.

19  A.  Yes.  I'm sorry.

20  Q.  Thank you.

21          And I want to discuss the assignments.  You

22  indicated that you get assignments in two ways.

23          You contact Steadfast, correct?

24  A.  Yes.

25  Q.  And you contact the facility in which you want to be

```
                          ┌T. Hall - Cross┐
 1    placed, correct?
 2    A.  Yes.
 3    Q.  When you get an assignment from Steadfast, your only
 4    options are the facilities they provide to you, correct?
 5    A.  Yes.
 6    Q.  So if they don't identify a facility, you can't work
 7    there, correct?
 8    A.  Correct.
 9    Q.  So would you say the facilities in which you work are
10    based upon what Steadfast provides to you?
11    A.  Yes.
12    Q.  And when you provide that schedule with the facilities,
13    you are required to let Steadfast know that you are going to
14    be working at that facility, right?
15    A.  Yes.
16    Q.  And why are you required to let Steadfast know that you
17    will be working at that particular facility?
18    A.  So they'll know I'm scheduled that day, and if they have
19    someone or they have that shift available, they will know
20    that that shift has already been picked up.  It's
21    communication.
22    Q.  So just to clarify here, you are letting Steadfast know
23    so that they will know that the shift is covered?
24    A.  Yes.
25    Q.  And you are also letting them know to confirm that you
```

T. Hall - Cross

```
 1  will receive compensation for the work you provided, correct?
 2  A.  Correct.
 3  Q.  And you testified that you've never received any type of
 4  evaluation while working with Steadfast.
 5  A.  Correct.
 6  Q.  However, if something happened at a facility, would you
 7  let Steadfast know about it?
 8  A.  Yes.
 9  Q.  And I want to talk a little bit about tracking hours.
10          You say that you track your hours, correct?
11  A.  Yes.
12  Q.  And is that done on a time sheet?
13  A.  Yes.
14  Q.  Is that time sheet provided by Steadfast or the facility?
15  A.  Steadfast.
16  Q.  And you submit that time sheet to Steadfast, correct?
17  A.  Yes.
18  Q.  And you submit that time sheet to Steadfast to be paid
19  for the hours you worked, correct?
20  A.  Yes.
21  Q.  And as an LPN, do you need to have a certain level of
22  competency to complete your job functions?
23  A.  Yes.
24  Q.  Could you explain what some of those competency skills
25  are?
```

Carol L. Naughton, Official Court Reporter

────────────────────────T. Hall - Cross────────────────────────

1    A.   You have to know how to read a doctor's order, know what

2    medications -- what they do for the patient.  You have to

3    know some of the critical values of labs, critical values

4    of -- I just said labs.  You have to know trachs and G-tubes

5    and how to treat dialysis ports and things like that.

6    Q.   And is that level of competency required regardless of

7    the facility that Steadfast places you to work?

8    A.   Can you repeat that?

9    Q.   Absolutely.

10          The competencies that you just described, are those

11   competencies the same skill that you are required to have

12   regardless of the facility you are placed to work in on

13   behalf of Steadfast?

14   A.   That's how -- we're taught that in school, so, yes.

15          MS. JONES:  I have no further questions, Your Honor.

16          THE COURT:  Any redirect?

17          MR. SIEGRIST:  No redirect for this witness, Your

18   Honor.

19          THE COURT:  You may step down.  You are permanently

20   excused.

21          (Witness excused.)

22          THE COURT:  We're going to take the break now and

23   come back and continue.  Fifteen minutes.

24          (Recess from 11:21 a.m. to 11:38 a.m.)

25          THE COURT:  Okay.  Your next witness.

Carol L. Naughton, Official Court Reporter

**JA749**

696

D. Hall - Direct

```
 1            MR. SIEGRIST:  Daseline Hall, Your Honor.
 2            THE CLERK:  She's virtual.
 3            THE COURT:  She's virtual?
 4            THE CLERK:  Yes, sir.
 5            (Witness sworn virtually.)
 6            DASELINE HALL, called by the Defendants, having been
 7    first duly sworn, was examined and testified via ZoomGov.com
 8    as follows:
 9                      DIRECT EXAMINATION
10    BY MR. SIEGRIST:
11    Q.  Good morning, Ms. Hall.
12    A.  Good morning.
13    Q.  Can you please state your name for the record.
14    A.  Daseline Hall.
15    Q.  Would you mind spelling that for the Court, please.
16    A.  D-a-s-e-l-i-n-e, last name H-a-l-l.
17    Q.  Ms. Hall, what is your occupation?
18    A.  Registered nurse.
19    Q.  And how long have you been a registered nurse?
20    A.  I've been a registered nurse since 2018.
21    Q.  Are you registered in the State of Virginia?
22    A.  Yes.
23    Q.  Before becoming a registered nurse, did you have a
24    different nursing licensure?
25    A.  A licensed practical nurse.
```

Carol L. Naughton, Official Court Reporter

**JA750**

697

————————D. Hall - Direct————————

1   Q.  Did you work -- did you have a different nurse licensure
2   prior to becoming a registered nurse?
3   A.  Yes.  An LPN.
4   Q.  And when did you become an LPN?
5   A.  In 2008.
6   Q.  Okay.  So, Ms. Hall, about how long have you been in the
7   nursing field?
8   A.  About 12 years or more.
9   Q.  Ms. Hall, are you familiar with the company Steadfast
10  Medical Staffing?
11  A.  Yes.
12  Q.  Ms. Hall, have you ever worked as a nurse on Steadfast's
13  registry?
14  A.  Yes.
15  Q.  Ms. Hall, do you recall when you first joined Steadfast's
16  registry?
17  A.  Yes.
18  Q.  And when was that?
19  A.  In October of 2008.
20  Q.  Ms. Hall, have you lived in Virginia since 2008?
21  A.  Yes.
22  Q.  Is that a yes?
23  A.  Yes.
24  Q.  Okay.  Did you move away for a while, or did you move to
25  a different -- let me ask this:

Carol L. Naughton, Official Court Reporter

D. Hall - Direct

```
 1        Which part of Virginia do you live in currently?
 2   A.   Hampton Roads.
 3   Q.   Have you lived in the Hampton Roads area since 2008?
 4   A.   Yes.
 5   Q.   Ms. Hall, you said that you joined the registry in 2008;
 6   is that correct?
 7   A.   Yes.
 8   Q.   Okay.  Are you still picking up shifts on Steadfast's
 9   registry?
10   A.   Not at the current moment.
11   Q.   Do you recall when the last time was that you picked up a
12   shift?
13   A.   In 2020.
14   Q.   So you were accepting shifts from the registry, you said,
15   from 2008 to 2020?
16   A.   Yes.
17   Q.   Okay.  During that time period, do you recall how often
18   you would accept assignments through the registry?
19   A.   It all just depended on my needs at that time.
20   Q.   Do you know whether the number of assignments that you
21   would accept through the registry would vary over that time
22   period?
23   A.   Yes, it would.
24   Q.   What are some of the factors that dictate how often you
25   will work shifts through the registry?
```

699

---
D. Hall - Direct
---

1    A.  My availability, the pay, the shifts.  Like, I like to

2    work preferably day shift.  So...

3    Q.  Do you have an idea of, roughly, how many hours you tend

4    to work or you tended to work per week on assignments through

5    the registry during the time period when you were taking

6    shifts?

7    A.  I would say typically about, probably, 30 hours or so or

8    less, maybe, sometimes, but it would all depend, like I say,

9    on my needs.

10   Q.  So would that workload vary from time to time during that

11   time period when you were accepting shifts?

12   A.  Yes.

13   Q.  And would you accept shifts at -- well, would you work

14   shifts at different facilities during that time period?

15   A.  Yes.

16   Q.  Ms. Hall, have you ever worked for a facility directly?

17          MS. LEWIS:  Objection.  Relevance.

18          MR. SIEGRIST:  Your Honor, if I may?

19          THE COURT:  Sustained.  If you're talking about

20   Steadfast, fine, but otherwise, sustained.

21   BY MR. SIEGRIST:

22   Q.  Ms. Hall, what do you do for work now?

23   A.  I'm an acute dialysis RN.

24   Q.  Can you repeat?

25   A.  Dialysis.

**JA753**

-----D. Hall - Direct-----

1   Q.  Can you repeat -- I'll just ask it again.

2           What is your current position?

3   A.  I'm an acute dialysis RN.

4   Q.  An acute dialysis registered nurse?

5   A.  Yes.

6   Q.  Who do you work for?

7   A.  Fresenius Medical Care.

8   Q.  Can you repeat that one more time for me.

9   A.  Fresenius Medical Care.

10  Q.  When did you start that position?

11  A.  In November of 2020.

12  Q.  Ms. Hall, I want to ask you some questions about the

13  equipment that you would use to perform nursing services

14  during the time period when you were accepting shifts from

15  the Steadfast registry.

16          During that time period, did Steadfast ever provide

17  you any equipment that you needed to perform nursing

18  services?

19  A.  No.

20  Q.  Now, when you would accept shifts at a particular

21  facility, would you ever bring equipment with you?

22  A.  Yes.  I provided my own equipment.

23  Q.  Is that equipment that you purchased?

24  A.  Yes.

25  Q.  Can you give me an idea of what that equipment would have

D. Hall - Direct

```
 1   consisted of?
 2   A.  My personal stethoscope, blood pressure cuff,
 3   thermometer, pens, things of that sort.  Just my own personal
 4   equipment that nurses would purchase.
 5   Q.  Did you write any of those investments off on your taxes
 6   or anything like that?
 7   A.  Yes.
 8   Q.  Do you happen to recall what year you would have done
 9   that?  Or if it was more than one year?
10   A.  It was more than one year.
11   Q.  Do you remember that year by chance?
12          THE COURT:  What is the relevance of that,
13   Mr. Siegrist?
14          MR. SIEGRIST:  Your Honor, I think it's relevant to
15   the ultimate question of whether she is in business for
16   herself.  Writing off something as a tax expense indicates
17   that.
18          THE COURT:  We understand that.  But I'm just saying
19   in terms of what is the relevance of the year that she wrote
20   it off?
21          MR. SIEGRIST:  Understood, Your Honor.  I'll
22   withdraw the question.
23   BY MR. SIEGRIST:
24   Q.  Ms. Hall, do you maintain your own liability insurance
25   for nursing services?
```

D. Hall - Direct

1   A.   Yes.

2   Q.   Okay.  You pay for that yourself?

3   A.   Yes.

4   Q.   Okay.  Do you write that off on your taxes as well?

5   A.   Yes.

6   Q.   Okay.  Ms. Hall, I want to talk to you a little bit about

7   the time period when you were accepting shifts from the

8   registry, how you would go about determining which shift you

9   would work.

10          How would you go about accepting or determining

11   which shifts you were going to work through Steadfast's

12   registry during the time period when you were accepting

13   shifts?

14   A.   I would go about -- like I say, it's based off of my

15   availability.  So if I was available on the days that they

16   had available on the locations or facilities that they had

17   contracts with that I actually wanted to work, that's how I

18   would sign up for the places --

19   Q.   Understood.

20   A.   -- where I work at.

21   Q.   Let me ask you a question about the process by which you

22   would do that.

23          Would you talk to somebody to determine what was

24   available?

25   A.   It would be either by phone, or I would come in person

D. Hall - Direct

1   into the office to one of the schedulers.

2   Q.  Let's talk about the phone portion first.

3        Give me an idea of what you would do on these phone

4   calls when you are determining which shifts to take.

5   A.  I would talk to one of the schedulers.  We would go over

6   which facilities had which openings, dates, and times, and we

7   would just fill in my name or just put my name in that

8   opening.

9   Q.  Now, would you call them, or would they call you?

10  A.  Well, I would call the scheduler, like, at the beginning

11  of the week or at the end of the week so I can go over for

12  the next following week.

13  Q.  Understood.

14       So you would call the scheduler and discuss what

15  shifts were available; is that right?

16  A.  Correct.

17  Q.  Okay.  Now, the shifts that you would discuss, were those

18  shifts all at one facility, or did they offer shifts at

19  different facilities?

20  A.  It would be for different -- it would just be for

21  anything that was available or any shift that I wanted,

22  because not every facility would have every opening --

23  Q.  Understood.

24  A.  -- for what I wanted to work.

25  Q.  Okay.  So you would discuss over the phone with the

D. Hall - Direct

1   scheduler and discuss availability, and is it fair to say
2   then you would determine which shifts you wanted to take?
3   A.  Yes.
4   Q.  So as part of that process, who ultimately determined
5   your work schedule?
6   A.  Me.  I did.
7   Q.  Okay.  And who determined which facilities you were going
8   to work at?
9   A.  I did.
10  Q.  Okay.  Now, if you're on the phone with a scheduler
11  discussing availability, did you ever tell a scheduler, "I
12  don't want to take this shift even though it is available"?
13  A.  Yes.
14  Q.  Okay.  You weren't required to take any particular shift?
15  A.  No.
16  Q.  Were you able to select any shifts that were available
17  for your licensure at the time?
18  A.  Yes.
19  Q.  Now, is that true of the shifts available at any of the
20  facilities that had openings?
21  A.  Any facility that I wanted that was in my radius, I could
22  go to if I wanted to.  It was always my choice.
23  Q.  When you mentioned your radius a moment ago, what do you
24  mean by that?
25  A.  Like, for me, like, I didn't want to travel so far out

─────────────────── D. Hall - Direct ───────────────────

1    mile-wise, so that's why I stated my radius.

2    Q.  Okay.  You're talking about the --

3    A.  -- travel distance-wise.

4    Q.  Okay.  You are referring to the amount of distance you

5    were willing to travel?

6    A.  Yes.

7    Q.  Okay.  So did you ever turn down a shift at a facility

8    because you thought it was too far away?  "I don't want to go

9    that far."

10   A.  Yes.

11   Q.  Okay.  On Steadfast's registry, are you required to work

12   any set number of shifts?

13   A.  No.

14   Q.  Do you know, for example, if there's a minimum number of

15   shifts you have to take, anything like that?

16   A.  Not that I'm aware of, no, sir.

17   Q.  You mentioned that you had a radius of a certain distance

18   that you were willing to travel.

19          Were there any other -- did you discuss those

20   considerations with the scheduler?

21   A.  Yes, I think those were.  I mean, they knew I really

22   didn't like working nights, so they would not ask me to work

23   night shifts, or that would not be something that they would

24   really offer to me too much.

25          I think once me and the scheduler started building a

Carol L. Naughton, Official Court Reporter

————D. Hall - Direct————

1   relationship and had a better rapport, I think me and her

2   started to understand, "Okay, this is what Daseline likes, so

3   I'm not introducing assignments in these facilities to

4   Daseline because I understand she doesn't like X, Y, Z."

5   Q.  And I think you said earlier your preference was day

6   shifts?

7   A.  Yes.

8   Q.  Other than the amount of distance you would travel and

9   the time of the shift, were there any other factors that

10  determined what shifts you would take and reject?

11  A.  Pay is always a factor.

12  Q.  You said "pay"?

13  A.  Yes.

14  Q.  Did the pay vary based on the shift available?

15  A.  And location.

16  Q.  Now, you mentioned that you've worked with Steadfast

17  schedulers about accepting or declining shifts.

18          Would you ever discuss shift availability with a

19  facility directly?

20  A.  Not so much, because I never really wanted to get into

21  that gray area of confusion.

22  Q.  During the time period where you were accepting shifts

23  from the registry, do you happen to remember how many

24  different facilities you would have worked at?

25  A.  Too many to keep count of.  It was several.

D. Hall - Direct

1  Q.  Other than timing of the shift and the distance you

2  travel, is there any particular type of work that you like to

3  perform?

4  A.  Just nursing overall.  No, like, specialty.

5  Q.  There's not a type of facility that you prefer, a

6  specialty, or practice area that you prefer doing?

7  A.  No, not so much.

8  Q.  Ms. Hall, during the time period where you were accepting

9  shifts in the registry, were you ever running late for a

10  shift?

11  A.  No.

12  Q.  Did you -- were you ever in a situation where you had

13  accepted a shift and then decided you wanted to cancel it?

14  A.  Sometimes I did cancel.

15  Q.  Can you tell the Court a little bit about the process you

16  would go through to cancel that shift.

17  A.  Typically, if you do have to cancel, you have to give a

18  two-hour notice with the scheduler.  You will call them and

19  just inform them that you are unable to make your shift.

20  Q.  Ms. Hall, I want to talk to you a little bit about time

21  off now.

22        During the time period where you were accepting

23  shifts on the registry, what would you do if you wanted to

24  stop taking shifts for a period of time?

25  A.  If I just wanted to stop taking time, I just would stop

D. Hall - Direct

1   taking time.  I wouldn't pick up any shifts.

2   Q.  You would just not take any assignments during that time

3   period?

4   A.  Correct.

5   Q.  So you determined -- let's say, for example, you wanted

6   to go on a vacation.  You would just not accept shifts for

7   any of the days you wanted to go on vacation.  Is that fair

8   to say?

9   A.  Correct.  Yes.

10  Q.  Were you ever required to get permission from Steadfast

11  to take time off or stop taking shifts for any period of

12  time?

13  A.  No.

14  Q.  During this time period we've been talking about, was

15  there any period of time where you stopped taking shifts for

16  an extended period of time?

17  A.  Yeah, it has been times, like.

18  Q.  In any of those, do you recall any situations where maybe

19  you decided you didn't want to take shifts for an extended

20  period of time?

21         MS. LEWIS:  Objection.  Asked and answered.

22         THE COURT:  Sustained.

23  BY MR. SIEGRIST:

24  Q.  Ms. Hall, when you were taking shifts on Steadfast's

25  registry, did you have other sources of income during that

Carol L. Naughton, Official Court Reporter

**JA762**

D. Hall - Direct

```
 1    time period?
 2    A.  Yes.
 3    Q.  Okay.  Can you give the Court an idea of where those
 4    other sources of income came from.
 5              MS. LEWIS:  Objection.  Relevance.
 6              THE COURT:  Sustained.
 7    BY MR. SIEGRIST:
 8    Q.  Ms. Hall, would the amount of income you received from
 9    other sources vary during the time period where you were
10    accepting shifts on Steadfast's registry?
11              MS. LEWIS:  Objection.  Foundation.
12              THE COURT:  Sustained.  What we're boiling down to
13    is this:  We're focusing on her relationship with Steadfast.
14    It doesn't matter where she got other money from.
15              MR. SIEGRIST:  I understand, Your Honor.  I'm trying
16    to get to, really, the dependence issue.
17              THE COURT:  Well, that doesn't make any difference,
18    either.  The question is what was her relationship with
19    Steadfast.  You can focus on how many times she worked and
20    give an idea of what the relationship was, but her
21    dependence, the Court doesn't know that that is relevant in
22    determining whether Steadfast was an employer or not.
23    BY MR. SIEGRIST:
24    Q.  Ms. Hall, when you were working for Steadfast, were there
25    any other registries that you were working with?
```

Carol L. Naughton, Official Court Reporter

**JA763**

```
                            ┌─D. Hall - Direct─┐
 1    A.   When I was -- at the same time, no.

 2    Q.   What about at different times?

 3    A.   At different times, yes.

 4    Q.   Okay.  Ms. Hall, while you were accepting shifts on

 5    Steadfast's registry, did Steadfast ever provide you with an

 6    orientation?

 7    A.   That's -- a Steadfast orientation?  No.

 8    Q.   Okay.  Did Steadfast ever tell you how to perform the

 9    nursing services that you would perform at the facilities

10    where you worked?

11    A.   I really don't understand that question.  Can you

12    rephrase it a little?

13    Q.   If you were at a facility, was there ever somebody from

14    Steadfast who was giving the directions on "Here's how you

15    should do" -- you know, "Here's how you should perform," for

16    example, "taking somebody's blood pressure"?

17              Would somebody from Steadfast ever tell you "This is

18    how you should take the blood pressure of this patient"?

19    A.   No.

20    Q.   And, more broadly speaking, would anybody from Steadfast

21    ever tell you how to perform any of the nursing services that

22    you provided at these facilities where you worked?

23    A.   No.

24    Q.   Was there ever anybody from Steadfast's office on site at

25    the facilities where you were working?
```

—D. Hall - Direct—

```
 1   A.  No.
 2   Q.  You mentioned that you are a registered nurse; is that
 3   right?
 4   A.  Yes.
 5   Q.  In your capacity as an RN, did you ever act -- did you
 6   ever supervise other people at facilities, other nurses?
 7   A.  Yes.
 8   Q.  Did you ever report back to Steadfast on the performance
 9   of any of those nurses that you were supervising?
10   A.  No.
11   Q.  Ms. Hall, I want to talk to you a little bit about rate
12   of pay.  You mentioned earlier the rate of pay was one of the
13   factors that informed whether you work at a particular
14   facility.
15          Did you ever negotiate your rate of pay with anybody
16   at Steadfast while you were accepting shifts on the registry?
17   A.  I wouldn't -- when it comes to negotiate, I would just
18   state that I would say -- I would let -- I would let them
19   know certain -- I wouldn't want to work, I guess, unless --
20   for a certain pay.  If it's not a certain pay, I wouldn't
21   want to work, if that makes sense.
22   Q.  So did you have a rate of pay that you were willing to
23   accept?
24   A.  Yes.
25   Q.  Okay.
```

D. Hall - Direct

 1   A.   And if it was under that, I just did not want to work for

 2   any facility, regardless.

 3   Q.   Understood.

 4        So you would not take shifts from facilities that

 5   weren't paying the amount that you had decided you wanted.

 6   A.   Yes.

 7   Q.   When you were working at these facilities, did you track

 8   your hours?

 9   A.   Yes.

10   Q.   Okay.  And how would you go about doing that?

11   A.   I personally had a -- downloaded an app on my phone where

12   I could just track my hours.

13   Q.   You said an application on your phone?

14   A.   Yes.

15   Q.   Was that some sort of timekeeping application?

16   A.   Yes, sir.

17   Q.   Okay.  Was that something -- was that an application

18   developed by Steadfast?

19   A.   No, sir.

20   Q.   Okay.  This is a third-party application?

21   A.   Yes.

22   Q.   And you would log your hours that way?

23   A.   Yes.

24   Q.   Okay.  And then did you send a report of your hours to

25   anybody after you had logged them?

Carol L. Naughton, Official Court Reporter

**JA766**

D. Hall - Direct

```
 1    A.   After every shift, we were to fax in -- to e-mail our
 2    time sheets into the office after each shift.
 3    Q.   Did the facility verify your recording of the hours that
 4    you had worked?
 5    A.   Yes.
 6    Q.   Okay.  Ms. Hall, during the time period where you were
 7    accepting shifts from the registry, what prompted you to be a
 8    registry nurse during that time period?
 9    A.   To supplement my income and also to have extra
10    flexibility over my hours of work.
11    Q.   And you mentioned earlier that you have not accepted a
12    shift from the registry in a while.
13    A.   Yes.
14    Q.   Okay.  If your circumstances were different, was that
15    something that you would be willing to do?
16              MS. LEWIS:  Objection.
17              THE WITNESS:  Yes.
18              THE COURT:  Sustained.
19    BY MR. SIEGRIST:
20    Q.   Ms. Hall, would you be willing to accept shifts from
21    Steadfast's registry in the future?
22    A.   Yes.
23              MS. LEWIS:  Objection.
24              THE COURT:  Sustained.  Strike that answer.  That's
25    calling for speculation about what she would do in the
```

Carol L. Naughton, Official Court Reporter

**JA767**

─────────D. Hall - Cross─────────

```
 1   future.
 2          MR. SIEGRIST:  Well, Your Honor, I'm just asking her
 3   whether in her prior experience she be willing to, and her
 4   willingness is a present state of mind.
 5          THE COURT:  So would she be willing to work with
 6   Steadfast in the future?  Is that what you're asking her?
 7          MR. SIEGRIST:  Right.
 8          THE WITNESS:  Yes.
 9          MS. LEWIS:  Objection to the relevance, Your Honor.
10   I'm not sure how this has to do with the relationship.
11          THE COURT:  That's the biggest problem, is the
12   relevance.  Sustained.
13          MR. SIEGRIST:  I have no further questions for you,
14   Ms. Hall.  An attorney from the Department of Labor might
15   have some questions for you.  Thank you very much.
16          THE COURT:  Cross-examination.
17                       CROSS-EXAMINATION
18   BY MS. LEWIS:
19   Q.  Good morning, Ms. Hall.  My name is Ryma Lewis.  I'm an
20   attorney with the U.S. Department of Labor.  I have a few
21   follow-up questions to the information you just provided the
22   Court.
23          You indicated that you used equipment -- I believe
24   you said thermometers, pulse ox, blood pressure cuffs -- in
25   performing nursing care and services at facilities that you
```

Carol L. Naughton, Official Court Reporter

**JA768**

─────D. Hall - Cross─────

```
 1   worked with as an RN or LPN; is that right?
 2   A.  Yes.
 3   Q.  And that equipment that you used, they are normal tools
 4   of the trade, right?
 5   A.  Correct.
 6   Q.  And you've had those since nursing school, presumably, I
 7   mean, not those specific ones, but some variety of the same;
 8   is that right?
 9   A.  Right.
10   Q.  In terms of the investments that you've made in terms of
11   providing nursing care and services, when you were placed at
12   assignments with Steadfast, you didn't make any substantial
13   capital investments; is that right?
14           I can clarify if you don't understand the question.
15   A.  Can you, please.
16   Q.  Sure.
17           You don't lease office space, correct?
18   A.  No.
19   Q.  You don't hire or employ nurses of your own to perform
20   assignments that Steadfast gives you?
21   A.  No.
22   Q.  You don't have payroll to manage or a third-party
23   provider that manages payroll?
24   A.  No.
25   Q.  You don't have a website that you use to solicit
```

————————————D. Hall - Cross————————————

```
 1   contracts and get contracts at facilities to provide nursing
 2   care and services?
 3   A.  No.
 4   Q.  So that the investments that you've made, they're not
 5   substantial; they are not a large dollar amount.  Is that
 6   right?
 7            MR. SIEGRIST:  Objection.  That calls for
 8   speculation.
 9            THE COURT:  Overruled.
10   BY MS. LEWIS:
11   Q.  You can answer the question.
12   A.  I'm sorry.  What was the question again?
13   Q.  Sure.
14            The investments that you've made to provide services
15   at the facilities that Steadfast has placed you at, they're
16   not substantial investments.
17   A.  No.
18   Q.  Meaning you haven't spent a lot of money.  Okay.
19            You also were asked about maintaining
20   professional -- your own liability insurance coverage.
21            Do you recall that line of questioning?
22   A.  Yes.
23   Q.  If you were working at a facility that Steadfast placed
24   you at, if something occurs there resulting in an injury,
25   would you contact Steadfast?
```

─────────D. Hall - Cross─────────

```
 1   A.  I would contact Steadfast.
 2   Q.  And why would you contact Steadfast?
 3           MR. SIEGRIST:  Yeah, I'm going to object to
 4   speculation.
 5           THE WITNESS:  Why would I contact --
 6           THE COURT:  Hold on a second.
 7           You have an objection.  Stand up, sir.
 8           MR. SIEGRIST:  I do, Your Honor.  We're
 9   discussing --
10           THE COURT:  Well, stand.
11           MR. SIEGRIST:  I'm sorry, Your Honor.  My apologies.
12           We're discussing hypotheticals here, Your Honor.
13   This question calls for speculation.
14           THE COURT:  Sustained.
15   BY MS. LEWIS:
16   Q.  Have you had an injury that has occurred at a facility
17   that you've worked at?
18   A.  No.
19   Q.  Any needle pricks?
20   A.  I have, but not under Steadfast.
21   Q.  Okay.  Have you been injured when you worked at any of
22   the facilities that Steadfast placed you at?
23   A.  No injuries, no.
24   Q.  Let's go back to when you first started working at
25   Steadfast some time ago.
```

─────────────────── D. Hall - Cross ───────────────────

 1           I believe you said you worked there between 2008 and
 2   2020; is that right?
 3   A.  Correct.
 4   Q.  So approximately 12 years.
 5           And when you first applied to work at Steadfast,
 6   like any other place that you work at, you submitted a job
 7   application; is that right?
 8   A.  Correct.
 9   Q.  And on that application, you were asked about your
10   availability?
11   A.  Yes.
12   Q.  And throughout the years, the 12 years that you worked
13   with Steadfast, you gave periodic updates to Steadfast about
14   your availability for work, right?
15   A.  Yes.
16   Q.  And you were also asked, when you initially applied, your
17   preferred schedule for work, right?
18   A.  I probably was.  That was back in 2008.  Yes.
19   Q.  And over that 12-year period of time, again, you
20   periodically updated Steadfast about your preferred schedule?
21   A.  Yeah, I would say.
22   Q.  So on the application that you completed were normal
23   things that one would find on a job application, right?  It
24   asked you your name?
25   A.  On a, yeah, job application.

─── D. Hall - Cross ───

1  Q.  References?  Asked you for your references?

2  A.  I'm not sure if the reference part was up there.  I can't

3  recall that.

4  Q.  It asked you about past employment history?

5  A.  Probably, initially, when I did back in 2008.

6  Q.  That was so long ago.

7  A.  I haven't had to fill out -- yeah.

8  Q.  So in order to pick up shifts at Steadfast, you would

9  contact Steadfast to get assignments; is that right?

10  A.  I would contact the scheduler.

11  Q.  And you did not schedule directly with the facilities;

12  isn't that right?

13  A.  No, not directly with.

14  Q.  And you indicated that you work generally about 30 hours

15  or so a week; is that right?

16        MR. SIEGRIST:  I'm going to object.

17        THE WITNESS:  It would vary.

18        THE COURT:  Objection is overruled.  It's a leading

19  question.  Still within the scope.

20  BY MS. LEWIS:

21  Q.  You irregularly worked more than 40 hours a week,

22  correct?

23  A.  I can't really recall.  Like I just said, the hours would

24  really vary just depending upon my needs at that time.

25  Q.  Okay.  So Steadfast was supplemental income?

Carol L. Naughton, Official Court Reporter

**JA773**

─────────────── D. Hall - Cross ───────────────

1    A.  Yes.

2    Q.  You said it varied.  So when you did work more than 40

3    hours a week -- and you did, at times; is that right?

4    A.  At times.

5    Q.  But you can't necessarily quantify how frequently that

6    was, right?

7    A.  Right.

8    Q.  Okay.  So when you did work, you didn't receive time and

9    a half of the rate that was established; is that right?

10   A.  Honestly, I can't say yes or no because I can't really

11   remember.

12   Q.  Right.

13          Were you paid the same hour -- the same rate for all

14   hours that you worked?  Let me ask it this way.

15   A.  No.  Because a different facility may be a different

16   amount.

17   Q.  Okay.  So let's say you worked at one facility, and when

18   you worked that one facility, you may have worked more than

19   40 hours in a week.  Were you paid the same rate?

20          MR. SIEGRIST:  I'm going to object.  I think this

21   misstates prior testimony.  I don't think the witness said

22   she worked more than 40 hours a week for any facility.

23          MS. LEWIS:  That's all right.  I'll move on.

24          THE COURT:  Okay.  Question withdrawn.

25   BY MS. LEWIS:

721

─D. Hall - Cross─

1  Q.  So Steadfast established the rate you would be paid by

2  each facility?

3  A.  Yeah.  They had a rate.

4  Q.  So in terms of the question, there was a question about

5  whether or not you would be able to negotiate.

6         Wasn't the situation "take it or leave it"?  There

7  really wasn't a negotiation; is that correct?

8         MR. SIEGRIST:  I'm going to object.

9         THE WITNESS:  No, I wouldn't say it's --

10        MR. SIEGRIST:  Withdraw the objection.

11        THE COURT:  Restate the question.  Was there a

12  negotiation with the facility for your amount you would be

13  paid?

14  BY MS. LEWIS:

15  Q.  Was there a negotiation with the facility on the amount

16  that you would be paid?

17  A.  With the facility --

18  Q.  Yes.

19  A.  -- on how much I would be --

20  Q.  Uh-huh.

21  A.  Meaning how much the -- I don't understand that question.

22  Q.  Sure.

23        Would you negotiate with the facilities your rate of

24  pay?

25  A.  No, I wouldn't negotiate with the facilities.

Carol L. Naughton, Official Court Reporter

**JA775**

─── D. Hall - Cross ───

```
 1   Q.  You indicated that you had an app that you used to keep

 2   track of your own hours that you worked; is that right?

 3   A.  Yes.

 4   Q.  But that was for you.  You had to submit a time sheet to

 5   Steadfast to be paid; is that right?

 6   A.  Yes.

 7   Q.  Okay.

 8           MS. LEWIS:  Your Honor, just one moment, please.

 9           (Pause in the proceedings.)

10   BY MS. LEWIS:

11   Q.  And when you submitted those time sheets, Steadfast paid

12   you, correct, not the facility?

13   A.  Yes.

14           MS. LEWIS:  No further questions of this witness,

15   Your Honor.

16           THE COURT:  The Court has a question, just in case

17   you want to follow up on it.

18           When you worked for a facility and you were late, to

19   whom did you report the fact that you were going to be late?

20           THE WITNESS:  I would notify the scheduler if I was

21   running late.

22           THE COURT:  The scheduler where?

23           THE WITNESS:  At Steadfast.  So that she could

24   notify whoever at the facility because we would not always

25   know which unit or which, I guess, wing we were on, so they
```

Carol L. Naughton, Official Court Reporter

**JA776**

—————————————————————D. Hall - Redirect—————————————————————

1  could notify the correct person at that facility.

2          THE COURT:  Okay.  That's all.

3          Redirect if you wish, if you have any.

4          MR. SIEGRIST:  Thank you, Your Honor.

5                   REDIRECT EXAMINATION

6  BY MR. SIEGRIST:

7  Q.  Ms. Hall, a moment ago I believe you were discussing your

8  communications with Steadfast's schedulers about your

9  preferences for shift availability.  Is that correct?

10 A.  Yes.

11 Q.  Okay.  And I think you were discussing your

12 communications with the scheduler about which facilities you

13 would like to work at, your preferences, in other words; is

14 that right?

15 A.  Yes.

16 Q.  Okay.  Were these communications part of your discussions

17 with the schedulers about when and where you wanted to work?

18 A.  Yes.

19 Q.  And these are -- does this occur in situations where you

20 are calling the scheduler to determine what shifts they have

21 available?

22 A.  Yes.

23 Q.  Okay.  Were you required to communicate your preferences

24 to the facility, or is this something that you were doing as

25 part of those conversations?

Carol L. Naughton, Official Court Reporter

**JA777**

724

D. Hall - Redirect

1  A.  When I would tell her my preference, it would be, for

2  instance, times when it was gaps of time when I haven't

3  worked for Steadfast in a period of time.  So it was, like,

4  "Oh, let me make sure they know how or what shifts I would

5  like to work for now."  So...

6  Q.  Is it fair to say you would do that to make sure that you

7  were selecting shifts that you wanted to take?

8          MS. LEWIS:  Objection.

9          THE WITNESS:  Yes.

10         THE COURT:  Sustained.  Leading.  You are leading

11  your witness.  You are on direct.

12         MR. SIEGRIST:  I'll rephrase the question, Your

13  Honor.

14  BY MR. SIEGRIST:

15  Q.  Ms. Hall, why would you communicate those preferences to

16  Steadfast when you would call the scheduler?

17  A.  So that they could have the nearest -- the nearest of

18  shifts that I wanted, you know, preference that I wanted to

19  work.

20         MR. SIEGRIST:  No further questions, Your Honor.

21         THE COURT:  May the witness be permanently excused?

22         MS. RUST:  Yes, Your Honor.

23         MS. LEWIS:  Yes.

24         THE COURT:  Thank you, ma'am.  You are permanently

25  excused.  Thank you.

**JA778**

725

```
 1            (Witness excused.)

 2            THE COURT:  Your next witness?

 3            MS. RUST:  Your Honor, the defendants' next witness

 4    is Renay Hellinger.

 5            MS. LEWIS:  Your Honor, with respect to this

 6    witness, Mr. Seifeldein would like to be heard.

 7            THE COURT:  Okay.  Step to the podium.

 8            MR. SEIFELDEIN:  Good morning, Your Honor, counsel.

 9            Your Honor, it's our understanding this witness is a

10    former employee of one of the facilities.  The defendants, in

11    their pretrial disclosure -- pretrial statement, stated that

12    they would have a corporate designee from the facility.  Our

13    understanding is that this employee is no longer working

14    there; therefore, they are not a corporate designee and have

15    not been identified.

16            THE COURT:  Has this witness been identified as a

17    witness, period, just as a witness?

18            MR. SEIFELDEIN:  No, Your Honor.  Just last night.

19            THE COURT:  Never been identified in pretrial?

20            MR. SEIFELDEIN:  No, Your Honor, not to our

21    understanding.

22            The facility has been identified, but the facility

23    representative/designee has already testified for the

24    Secretary.  That was Princess Anne, Erica Johnson, for MFA.

25            THE COURT:  So when did you learn of this witness?
```

Carol L. Naughton, Official Court Reporter

**JA779**

```
 1              MR. SEIFELDEIN:  Last night at 11:30 or something
 2     like that.
 3              THE COURT:  You haven't deposed this witness?
 4              MR. SEIFELDEIN:  I'm sorry?
 5              THE COURT:  Have you ever deposed this witness?
 6              MR. SEIFELDEIN:  This witness, we have not deposed,
 7     Your Honor, no.  As I said, the corporate designee for the
 8     company already testified.
 9              THE COURT:  Okay.  Let me hear from counsel.
10              Mr. Jewett, what is your authority for calling this
11     witness?
12              MR. JEWETT:  Certainly, Your Honor.
13              As the Court knows, this case has a long history to
14     it.  It's been on the docket a long time.  We have designated
15     Charlottesville Health & Rehab as a witness in this case
16     since pretty much the get-go.
17              During a prior iteration of this trial, I believe
18     the last time it was scheduled, we submitted the subpoena for
19     the corporate designee to attend.  Ms. Renay Hellinger was
20     identified as the corporate designee.  The trial was, of
21     course, postponed.  When we resubmitted our subpoena to
22     Charlottesville Rehab, we sent the subpoena to corporate
23     designee or Ms. Hellinger.
24              My understanding -- I was not a part of that
25     conversation, but my understanding is what happened then is
```

```
1    the facility's, I believe, attorney forwarded our subpoena to
2    Ms. Hellinger who was supposed to be the corporate designee
3    earlier in this case.  She is the person who dealt with
4    Steadfast at this facility.
5          THE COURT:  Was she identified in the Final Pretrial
6    Order as a witness?
7          They are saying they heard last night at 11:30 that
8    you are going to call her.  It doesn't make any difference
9    what you were doing long before the case was continued.  The
10   Court relies on, and you are required to put in the Final
11   Pretrial Order who you are calling as witnesses.
12         Was she in the Final Pretrial Order, no matter what
13   they talked about previously?
14         MR. JEWETT:  Understood, Your Honor.
15         So what is identified in the Final Pretrial Order is
16   our number 43, designated corporate representative,
17   Charlottesville Health & Rehab.  And then we learned after
18   that that she had left the facility, that she's no longer
19   there.  But she is the person who had been identified by the
20   facility as the corporate designee in this case.
21         THE COURT:  But it doesn't work that way.  This case
22   has been pending long enough for you all to have straightened
23   this out, no matter what the facility has done.  You can't
24   come up with a witness that you haven't identified and just
25   say "the corporate representative," and then you come back to
```

Carol L. Naughton, Official Court Reporter

**JA781**

728

```
 1   a witness that you have not placed in the Final Pretrial
 2   Order.
 3          This witness is stricken.  This witness may not be
 4   called.  So you have to call the next witness.
 5          MR. JEWETT:  Your Honor, would the Court permit us,
 6   as with the Secretary, to put a proffer on the record
 7   tonight, on the ECF?
 8          THE COURT:  You can put a proffer here, but the
 9   Court controls that.  That is just plain basic, Mr. Jewett.
10   Everyone's making proffers, but I'm telling you, you are
11   basically wasting your time -- both parties.
12          It's basic trial practice, and we follow it forever
13   and a day.  You identify witnesses in the Final Pretrial
14   Order, and you don't spring them on people at 11:30 at night.
15   It just doesn't do it.
16          So, no, you can put a proffer in there, and what the
17   Court says in the record will stand.
18          Next witness.
19          MS. LEWIS:  Your Honor, if I may?
20          With respect, the Secretary would just like to note
21   an objection to such proffer.
22          As previously filed and identified with the Court,
23   Medical Facilities of America actually provided a declaration
24   of the administrator for that facility as a corporate
25   designee.  At no point has this individual's name been
```

729

```
1    designated as a corporate representative.

2           So, for the record, we're noting an objection to any

3    prospective proffer with respect to this being a corporate

4    designee for MFA.

5           THE COURT:  Only one party can speak at a time,

6    Ms. Rust.

7           It's a waste of your effort, Mr. Jewett, to be

8    putting the proffer in here on something that you are just

9    plain dead wrong.  But if you want to put that piece of paper

10   in the record, the Court will let you put it in there.

11   Simple as that.  But it should not be that you're calling a

12   witness when you had a corporate representative.  You can't

13   spring one out here.

14          All right.  Next witness.

15          MS. RUST:  Your Honor, the next two witnesses we

16   have are remote.  One of them had a medical emergency and was

17   supposed to be --

18          THE COURT:  Step to the podium and talk to the

19   Court, please.

20          MS. RUST:  Your Honor, we have a few witnesses left

21   on our call sheet for today; Leslie Boone, Racharlotte

22   Coates, Christine Kim.  And then we received confirmation

23   from another witness, Ozey Thorpe, late, late last night

24   after the call sheet was submitted.

25          Leslie Boone and Racharlotte Coates and Ozey Thorpe
```

730

```
 1   are all remote witnesses.  Leslie Boone was supposed to be
 2   here in person but had to leave the state unexpectedly due to
 3   a family medical emergency.  We've been in touch with her.
 4   She's in and out of medical appointments today.  She said
 5   that she has -- I believe she said she has an appointment
 6   until about 2:00.  And Ms. Coates gets off work at 3:00 p.m.
 7           Mr. Thorpe we were expecting to call after lunch.  I
 8   can reach out to him and see if he can log in prior to the
 9   lunch break.
10           THE COURT:  What about Christine Kim?
11           MS. RUST:  Christine Kim's testimony would probably
12   take a few hours, so I would anticipate the Court wouldn't
13   want her to start prior to the lunch break.
14           THE COURT:  The Court needs a witness in here.  It's
15   12:30.
16           MS. RUST:  Yes, Your Honor.  So if the Court would
17   allow a brief recess, I can reach out to Mr. Thorpe and have
18   him log in.  Otherwise, the rest of our witnesses, without
19   Ms. Hellinger, would be available after the lunch break.
20           THE COURT:  Okay.  I'll tell you what.  We're going
21   to take about a five- or ten-minute break, and you have
22   Mr. Thorpe to log in.
23           Approximately how long is Mr. Thorpe's testimony?
24           MS. RUST:  Consistent with the other nurses, 30
25   minutes or less.
```

Carol L. Naughton, Official Court Reporter

**JA784**

731

```
 1          THE COURT:  Here's what the Court is going to do:
 2          That's just going to break it up over lunch.  The
 3  Court is going to stop right here for lunch, and we are going
 4  to be back in here at 2:00.  And you have whatever witnesses
 5  you want in here, but we will not waste any time today
 6  because of a shortage of witnesses.
 7          The Court will be in recess until 2:00 p.m.
 8          (At 12:28 p.m., a luncheon recess was taken.)
 9
10                         CERTIFICATION
11
12      I certify that the foregoing is a correct transcript
13  from the record of proceedings in the above-entitled matter.
14
15
16          _____/s/_____
17                       Carol L. Naughton
18                       October 4, 2021
19
20
21
22
23
24
25
```

Carol L. Naughton, Official Court Reporter

**JA785**

732

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION


MARTIN J. WALSH, Secretary of Labor,)
United States Department of Labor,  )
                                    )
            Plaintiff,              )
v.                                  ) Civil Action No.:
                                    )    2:18cv226
MEDICAL STAFFING OF AMERICA, LLC,   )
et al.,                             )
                                    )
            Defendant.              )


                TRANSCRIPT OF PROCEEDINGS

                **  Bench Trial – Day 5 **
                    (Afternoon Session)

                   Norfolk, Virginia

                   September 07, 2021



BEFORE:    THE HONORABLE RAYMOND A. JACKSON
           United States District Judge



Appearances:

       UNITED STATES DEPARTMENT OF LABOR
               By: Chervonti Jones
                   Ryma Naje Lewis
                   Mohamed Elnour Seifeldein
                   Counsel for Plaintiff

       PIERCE McCOY PLLC
               By: Julia Amato Rust
                   Aaron Daniel Siegrist
                   Joshua Lee Jewett
                   Counsel for Defendant

733

```
1                      I N D E X

2   WITNESSES ON BEHALF
    OF PLAINTIFF:                              Page
3
    CHRISTINE LEE KIM
4   Direct Examination by Ms. Rust............   736
    Cross-Examination by Ms. Jones............   792
5   Redirect Examination by Ms. Rust..........   807

6   RACHARLOTTE LEE COATES
    Direct Examination by Ms. Rust............   810
7   Cross-Examination by Mr. Seifeldein.......   821
    Redirect Examination by Ms. Rust..........   836

8


9                      E X H I B I T S

10  Defendant Exhibit No.                      Received

11
           75                                    746
12        201                                    780
          202                                    784
13        203                                    843

14

15

16

17

18

19

20

21

22

23

24

25
```

Paul L. McManus, RMR, FCRR Official Court Reporter

**JA787**

734

```
 1                    P R O C E E D I N G S

 2

 3           (Commenced at 2:00 p.m. as follows:)

 4

 5           THE COURT:  Just a housekeeping note here.

 6           Mr. Siegrist?

 7           MR. SIEGRIST:  Yes, Your Honor?

 8           THE COURT:  You didn't introduce yourself when you

 9    came in the court this afternoon and before we started

10    questioning witnesses and Court inadvertently called you Mr.

11    Jewett.

12           MR. SIEGRIST:  I heard that, Your Honor.  My

13    apologies.  I unfortunately had to miss the first week, but glad

14    to be here for Week Two.

15           THE COURT:  We're glad to have you here.

16           MR. SIEGRIST:  Thank you, sir.

17           THE COURT:  Another housekeeping matter.  You may have

18    a seat.  I note that you listed Christine Kim as a witness.  She

19    was called in the Secretary's case, and she testified about the

20    payroll and you cross-examined her.  And I understand you said

21    she would be a two-hour witness.  I don't know on what.  I will

22    say this:  The Court will not have repetitive testimony.  She's

23    testified to it in direct examination, the cross-examination,

24    even in the Secretary's case.  The Court will not hear the same

25    evidence again.  So if you have something new to offer, that's
```

**JA788**

735

```
 1   different, you may certainly go forward, but she cannot get on
 2   the stand and repeat the same thing that the Secretary brought
 3   out when you cross-examined her.  So I don't know what it is,
 4   but I just want to raise that.
 5              MS. RUST:  Thank you, Your Honor.  We do have other
 6   testimony she'll be bringing.  There will be some discussion
 7   regarding payroll, but we are not intending to repeat what was
 8   already discussed.
 9              THE COURT:  Okay.
10              MS. RUST:  There may be some minor repeat just to get
11   us into the right topic, but I'm not intending to belabor things
12   that were already discussed.
13              THE COURT:  That's fine.
14              MS. RUST:  I understand.
15              THE COURT:  Where are we on the witnesses this
16   afternoon?
17              MS. RUST:  So we will be calling Christine Kim as our
18   next witness.  And as I said before, we expect her direct exam
19   to run for quite some time.  It may carry us through to the end
20   of the day between cross and redirect.  If not, we have a
21   virtual witness who has confirmed that she would be available
22   towards the end of the day.
23              THE COURT:  Okay.  Call your next witness.
24              MS. RUST:  The defense calls Christine Kim as their
25   next witness.
```

**JA789**

```
 1              THE COURT:  Ms. Kim is still under oath from her

 2   previous appearance in here.  The Court will simply tell her

 3   that when she comes on the stand.

 4              (Witness entered the courtroom.)

 5              THE COURT:  Ms. Kim, you are still under oath from

 6   your previous appearance in this court.

 7              THE WITNESS:  Yes, sir.

 8              MS. LEWIS:  Your Honor, before we begin, there was a

 9   rule on witnesses, and as Court had noted she has been called in

10   our case-in-chief, but just a reminder with respect to

11   discussing her testimony prior, even current, in that this does

12   carry through.

13              THE COURT:  The Court will certainly give her that

14   warning in the event this is not in the record.  She certainly

15   cannot have any contact with any other expected witnesses in the

16   case.  No discussion.

17              Okay.  You may commence.

18              MS. RUST:  Thank you, Your Honor.

19              CHRISTINE LEE KIM, having been previously duly sworn,

20   was examined and testified as follows:

21                         DIRECT EXAMINATION

22   BY MS. RUST:

23   Q.   Ms. Kim, thank you for returning.

24        Just for the record, could you restate your name for the

25   record.
```

1  A.   Christine Lee Kim.

2  Q.   And we -- you talked about a handful of things in your last

3  testimony, so I want to skip through to some things that we did

4  not talk about.

5       So regarding your role as payroll manager, I want to go

6  through -- you testified briefly about some of the

7  responsibilities that you had.  I want to go through some of

8  those in more detail though.

9       So what are the categories of the business aspects that you

10 oversee in your role as payroll manager?

11 A.   I oversee the administrative side, over the front desk

12 coordinator, the recruiters and the payroll department.

13 Q.   Okay.  And you testified last week I believe -- or -- yes,

14 last week, that you oversee or supervise the office employees in

15 the office, right?

16 A.   Correct.

17 Q.   I wanted to talk a little bit about how that works and the

18 practices with office employees.

19      So with respect to the office employees' schedules, do

20 you -- what is the schedule for an office employee as far as

21 their work schedule?

22 A.   So it varies with their role, with their position in the

23 office.  The front desk coordinator works Monday through Friday

24 10 to 6, the recruiter works Monday through Friday 9 to 5, the

25 payroll department works Monday through Friday; however, their

 1  hours slightly vary.  Monday through Wednesday, typically it's a

 2  9 a.m. to 7 o'clock-type day.  Thursdays and Fridays, roughly

 3  around 9 to 5-type hours.

 4  Q.   Okay.  And those -- you said the front desk recruiting and

 5  the payroll, are those the positions and areas and employees you

 6  oversee, right?

 7  A.   I oversee.

 8  Q.   So are you setting -- how are those schedules determined

 9  for those employees?

10  A.   So I try to, I try to set their schedule based on

11  efficiency of the operations of the office.  So prime-time phone

12  calls usually come in, my front desk coordinator and my

13  recruiters are the first people who answer those phones, so I

14  primarily want them on 9-to-5-type hours.  Payroll we have

15  deadlines to meet, so Monday through Wednesday, although their

16  hours might fluctuate, it really varies on what time they may

17  leave the office, so I may modify it throughout the week.

18  Q.   When you're hiring these individuals for these employment

19  positions, is their schedule something that is considered by

20  Steadfast in determining whether to hire them?

21  A.   Absolutely.

22  Q.   If they are, if you -- have you ever interviewed an

23  applicant for an employment position that did not have

24  availability for schedules you set for these positions?

25  A.   Yes.

1  Q.   In those instances have you determined whether to hire or

2  not hire that person based on that availability?

3  A.   That would be a very -- that would be a deciding factor to

4  see if they would be able to work.

5  Q.   Okay.  Are there employees in the office other than

6  positions we talked about who you are not responsible for

7  supervising?  Just give us a picture.

8  A.   I don't interview the call center.

9  Q.   So as far as supervising these office employees, you talked

10 about the front desk coordinator, the recruiter and the payroll

11 department.  As the supervisor of those positions, in what ways

12 do you supervise those employees and their work?

13          THE COURT:  Counsel, the Court wanted to give you

14 latitude on putting on your case, but the Court's trying to

15 determine what is the relevance of having this witness go into

16 how she supervises the office employees and how she hired the

17 office employees when that is not the focus of the case?

18          MS. RUST:  Understood, Your Honor.  We consider it

19 relevant because Steadfast, Steadfast has classified the nurses

20 on the registry as contractors, but they've also classified the

21 employees in the office as employees.  So I'd like to talk to

22 Ms. Kim about the difference in the way Steadfast handles those

23 two classifications to compare the levels of control and manner

24 that they oversee the work.

25          THE COURT:  Well, you know the question is what do

1  they do -- doesn't make any difference how do they compare.  The

2  question is what they do with the folks they call independent

3  contractors.  They can do anything they want to do with those

4  office employees, but the question is what do they do with the

5  people they call independent contractors.  That's the question.

6  They may be wrong in what they're doing with the office

7  employees.  That's the question we need to stick to in this

8  case.  What do you do with the people you call contractors?

9  Independent contractors.

10          MS. RUST:  Agreed, Your Honor. I completely agree

11  that's the focus.  We did consider at least a discussion of the

12  operations in the in-house side relevant to show that Steadfast

13  is aware of differences in what they can and cannot do between

14  the two classifications.

15          THE COURT:  All right.  We're going a little far, but

16  we're not going to be on this long, because the Court still

17  takes a view it doesn't matter what she did with the employees,

18  the question is whether she is right or wrong and what you're

19  doing with these individuals you call independent contractors.

20  People on the registry.

21          MS. RUST:  Okay, Your Honor.  I'll abbreviate this

22  portion.

23          THE COURT:  Okay.

24          MS. RUST:  Thank you.

25  BY MS. RUST:

1  Q.   Okay.  So let me back up and restate that so we can move

2  through that a little bit quicker.

3       For the employees you oversee, do you set certain policies

4  and procedures that you require them to follow in the manner in

5  which they perform the work for Steadfast?

6  A.   I do.

7  Q.   Okay.  And that applies to the front desk coordinator, the

8  recruiter and the payroll department?

9  A.   Correct.

10  Q.   The in-office employees, do you require them to request

11  time off?

12  A.   I do.

13  Q.   And can Steadfast approve or deny those requests?

14  A.   Yes.

15  Q.   And have there been occasions when you have denied those

16  requests?

17  A.   I have.

18  Q.   Were those occasions based on staffing needs or -- what

19  were those based on typically?  Just generally.

20  A.   Okay.  Usually if we're short, if someone else has

21  requested that date off in that department and I don't have any

22  coverage in the department.

23  Q.   Okay.  And what about disciplining office employees, is

24  that something that you handle?

25  A.   I do.

1  Q.   And do you, do you have a process in place for how you can

2  go through the disciplining process?

3          MS. LEWIS:  Your Honor, I'm going to make an objection

4  with respect to the relevance of this line of testimony.

5  Christine Kim previously testified, as we heard from other

6  employees and witnesses in the Secretary's case-in-chief, about

7  sort of office management and organization.  I don't think it's

8  in dispute that there's two different sides, there's two

9  different practices, policies and procedures.  As the Court

10 noted with respect to its inquiry to counsel, the primary focus

11 of this case is what happens in the field with these nurses.  So

12 any testimony with respect to the office policy which they have

13 already admitted to within the testimony of Christine Kim, they

14 paid time and a half, the policies, practices and procedures,

15 they know their employees, so I'm having a hard time trying to

16 understand the relevance of this questioning with respect to the

17 case at large.

18         THE COURT:  The Court's going to sustain the objection

19 because the Court hears what your explanation was you wanted the

20 Court to compare.  The Court doesn't need to compare.  The Court

21 needs to understand the full range of controls that Steadfast

22 has over the nurses, the LPNs and people working at the

23 facility.  That's where the focus needs to be.  And so I'm --

24 the Court tried to lead you there, but that's where you need to

25 be.  It doesn't matter how she supervised the employees.  The

```
 1   question is what's happening with the individuals that the Labor

 2   Department claims are employees, but you claim they're

 3   independent contractors.  So let's concentrate on what goes on

 4   with them.

 5           MS. RUST:  Yes, Your Honor.  I was trying to run

 6   through those questions a little bit quicker.  As I said before,

 7   I do think it goes to the issue of --

 8           THE COURT:  And I just told you it does not help you,

 9   so now let's get to where the Court is telling you you need to

10   go.

11           MS. RUST:  I'm sorry, Judge, just to be clear for the

12   record, your ruling is that it does not go to the relevance of

13   the issue of willfulness?

14           THE COURT:  Well, I'm saying it goes to you might be

15   doing one thing with regard to your employees within the office,

16   but the point here is the Court has to determine what conduct

17   you're engaging in with the individuals you call independent

18   contractors.  And you're saying, okay, if you're looking at it

19   to determine whether it's a willful violation of FLSA because I

20   do certain things with the office employees and I treat these

21   differently, so there's no willfulness.  I understand the

22   argument you're making.  But I think you've certainly had her

23   already testify to various things that you do with office

24   employees.  I don't know how much farther you want to go with

25   it, but the Court sustains the objection.  I think you've gotten
```

 1  it in the record with what she does.

 2          MS. RUST:  Thank you, Your Honor.  I wasn't going much

 3  further, so I think we're good.

 4          THE COURT:  Okay.

 5  BY MS. RUST:

 6  Q.   Okay.  Ms. Kim, let's move on to the next topic.

 7       I want to talk to you about -- are you aware whether

 8  Steadfast has used any online applications or apps to assist

 9  with scheduling recently?

10  A.   Yes.

11  Q.   What app is that?  What's it called?

12  A.   Zira.

13  Q.   Can you spell that for the record?

14  A.   Z-i-r-a.

15  Q.   Okay.  So the Zira app.  When did Steadfast start using

16  that app?

17          MS. LEWIS:  Objection, Your Honor.  Ms. Kim previously

18  testified she's not involved at all with the scheduling.  So

19  objection with respect to lack of personal knowledge and

20  foundation on the same basis on her prior testimony.

21          MS. RUST:  I can lay a little bit of foundation.

22          THE COURT:  Okay.  If you can lay a foundation to get

23  around the objection, the Court gives you the opportunity.

24          MS. RUST:  Thank you, Your Honor.

25  BY MS. RUST:

```
 1   Q.   My last question was approximately when did Steadfast start

 2   utilizing that app?

 3   A.   Early 2021.

 4   Q.   Okay.  And are you familiar with how the app works?

 5   A.   Yes.

 6   Q.   And for the next two questions, can you briefly state what

 7   the app is used for?

 8   A.   So the app, it's pretty much like a digital version of our

 9   schedules that we have in the call center.  So there's a

10   platform online for access for our clients to use and for our

11   contractors to see and claim a patient.

12   Q.   And just to clarify, when you say clients, are you

13   referring to the facilities that --

14   A.   Correct.

15   Q.   Do you use those terms interchangeably?

16   A.   Yes.

17   Q.   Okay.  Just to make sure we're talking about the same

18   terms.

19        So are you familiar with how the app works for a nurse to

20   generally schedule a shift via the app?

21   A.   So a nurse --

22   Q.   Just, just asking if you are familiar with it.

23   A.   Yes.

24   Q.   And are you familiar with how a facility can add shifts via

25   the app?
```

```
 1   A.   Yes.

 2   Q.   Okay.  All right.  I'm going to turn to Exhibit 75.

 3            MS. RUST:  And that's PX-75, sorry.

 4   BY MS. RUST:

 5   Q.   Can you see that on your screen, Ms. Kim?

 6   A.   I can.

 7   Q.   And can you just scroll through the pages briefly so

 8   Ms. Kim can see what they are?

 9        And Ms. Kim, can you tell me do you recognize these

10   documents?

11   A.   Yes.

12   Q.   And what are these documents?

13   A.   These are screenshots of our Zira scheduling app.

14   Q.   Okay.  Did you take these screenshots?

15   A.   I did.

16   Q.   Okay.  Are these true and accurate screenshots of the Zira

17   Scheduling Platform at the time you took them?

18   A.   Yes.

19            MS. RUST:  Okay.  I'm move to admit PX-75 -- or DX-75,

20   I'm sorry.

21            THE COURT:  I take that there is no --

22            MS. JONES:  Objection to authentication, Your Honor.

23            THE COURT:  On what ground?  She said she's familiar

24   with it, it's from the company and she took the screenshots, so

25   objection's overruled.  The exhibit will be admitted.
```

 1                    (DX-75 received in evidence.)

 2   BY MS. RUST:

 3   Q.   Okay.  Ms. Kim let's go through a couple of these pages.

 4   So I'm going to start with the first page, which is Bates

 5   stamped Steadfast 6087520.  Can you tell me what we're looking

 6   at on this screen?

 7        Can you see it clearly?  Is it zoomed in enough?

 8   A.   I can see it.

 9   Q.   What is that a screenshot of?

10   A.   This is a screenshot of the Team tab.  On the left where it

11   says Team, if you click that it actually shows the list of the

12   individuals that were sent invitation links to gain access to

13   the scheduling app.

14   Q.   So is this a screenshot, is this from Steadfast account, is

15   this a view that Steadfast has from its account for this app?

16   A.   Correct.

17   Q.   Okay.  So you said it's a team page, and then we've got a

18   list of individuals, individual names here in the first column

19   on the left.  Can you say again what you said that was?  I'm

20   sorry.

21   A.   The first on the far left?

22   Q.   The names.  The list of names.

23   A.   So the names are -- those are individuals that were sent an

24   invitation to get access to the scheduling app.

25   Q.   Okay.  And does it show if they activated their account on

 1  this screenshot?

 2  A.   Correct.

 3  Q.   Just to briefly go walk through some of the basics, on the

 4  far left column, what page features do we have here?

 5  A.   So the Dashboard is just a general, I guess, a summary of

 6  today's coverage.  Team has a list of the individuals that were

 7  given the invitation for the scheduling app.

 8  Q.   That's what we're looking at here?

 9  A.   Correct.

10  Q.   And what is the Chat setting?

11  A.   Chat, it's a function within the application where it

12  allows the contractors and the client to communicate via chat.

13  Q.   Okay.  And Schedule?

14  A.   Schedule is a more detailed view of specific dates in mind

15  for each facility.

16  Q.   Okay.  Let's go to the second page of the exhibit, which is

17  Bates stamped Steadfast 6087521.

18      What are we looking at on this screenshot?

19  A.   So this is a dashboard tab for the facility according to

20  Charlotte.  It shows today's coverage with the nurses that

21  claimed those shifts.

22  Q.   So according to Charlotte, that's the facility that

23  scheduled with Steadfast, correct?

24  Q.   Okay.  I'm sorry, you said it's showing today's coverage

25  for this facility, right?

```
 1  A.   Correct.

 2  Q.   These are just the Steadfast nurses that are on for today's

 3  coverage for that facility; is that right?

 4  A.   Correct.

 5  Q.   Does Steadfast use the app -- or does Steadfast require

 6  nurses to -- well, does Steadfast require nurses to clock in or

 7  clock out on this app?

 8  A.   No.

 9  Q.   So let's go to the third page, which is Bates stamp

10  Steadfast 6087522.  What is this screenshot showing us?

11  A.   So this is if one were to click the Schedule tab, that's

12  where they can be a little more intimate as far as the dates,

13  the ranges.  Up on the top you can see the range, February 22nd

14  to the 28th.  So you can kind of modify the dates, the range for

15  a specific facility.

16  Q.   And is this the -- it looks like the schedule here, there's

17  nothing on it.  What is this scheduled for on this page?

18  A.   So this one shows the dates February 22nd to the 28th for

19  Steadfast Staffing for the schedules at that staffing agency.

20  Q.   Okay.  And do -- so this is for -- before we saw like a

21  screenshot of coverage for a facility.  So is this a schedule

22  for Steadfast?  Is that what you're saying?  Steadfast office?

23  A.   It's not a schedule for Steadfast.  We don't do any

24  schedules for Steadfast itself.  We use this generally just as a

25  template.  So what happens is we preprogram a majority of our
```

 1  facilities, they have very similar shifts.  So there's 7 to 3, 3

 2  to 11, 11-to-7-type shifts.  So we program all that into our

 3  Steadfast Staffing Agency profile so that when we add a new

 4  client or we revise, we don't have to start from the beginning,

 5  we can just duplicate that template so it works a little more

 6  efficiently, a little more user-friendly.

 7  Q.   Okay.  So the template can be changed if a facility doesn't

 8  use those scheduling shifts?

 9  A.   Yes.

10  Q.   Okay.  Let's skip to the fifth page, the last page in the

11  exhibit.

12       What is this a screenshot showing?

13  A.   So this is for Accordius, Charlotte.  This is their

14  schedule for the week range February 22nd to the 28th.

15  Q.   Okay.  So looking the Calendar portion of it, the top row

16  says Unassigned.  What is that telling us?

17  A.   So that means that the facility published their needs,

18  shifts, that have not been claimed yet by contractors.

19  Q.   Okay.  So it's showing us several shifts between Friday the

20  26th, 27th and 28th, so those four shifts have not been claimed

21  by a contractor?

22  A.   Correct.

23  Q.   But the facility has published them as available; is that

24  what you said?

25  A.   Correct.

```
 1   Q.   So then below the Unassigned row there is several rows of

 2   names.  What is that showing us there?

 3   A.   So this is for nurses who claimed the shift and was

 4   approved by the facility.

 5   Q.   Okay.  And who inputs the shifts into the app, the open

 6   shifts?

 7   A.   An authorized individual from the facility:  The scheduler,

 8   the DON, the administrator.

 9   Q.   Okay.  Let's go back to the fourth page in the exhibit,

10   Bates stamp Steadfast 6087523.  And tell me what we're looking

11   at on this page.

12   A.   So this is the dashboard tab.  It's a sky view for

13   Steadfast so we can scroll through and see all of our clients,

14   their coverage based on the day.  So if we were to continue to

15   scroll, the screenshot shows, if they went further down, it

16   would list all of our facilities and their coverage for the day.

17   Q.   Okay.  And is this a page that you said it was a sky view?

18   Is it for Steadfast's account view?

19   A.   Correct.

20   Q.   Okay.  So for here it shows Accordius Charlotte is listed,

21   and there's several names listed under there.  So that's showing

22   coverage for the day?

23   A.   Correct.

24   Q.   Those are nurses whose shifts that had been picked up in

25   the app?
```

**JA805**

1  A.   Yes.

2  Q.   Okay.  Does the nurse's view of the scheduling app look

3  different than Steadfast's view?

4  A.   Yes.

5  Q.   I'm going to pull up on the screen DX-77 which is a video

6  file.

7          MS. LEWIS:  Your Honor, I'm going to object to this

8  for authentication.  It was not introduced -- it wasn't created

9  by -- it was created by a developer for their technology who

10  provided deposition testimony, and they're not here for us to

11  cross-examine.

12          MS. RUST:  Ms. Kim told us she took the screen

13  recording herself.

14          THE COURT:  She what now?

15          MS. RUST:  Ms. Kim will testify that she took this

16  screen recording, and the plaintiff did depose Zira Technologies

17  regarding all these exhibits.

18          MS. LEWIS:  Your Honor, if I may, during the

19  deposition the video was played.  It's a minute and 44 seconds.

20  The video was observed.  The question was asked:

21          "Do you recognize that video?"

22          The response was:  "Yes".

23          "And did you create this video?

24          "Yes.

25          "And when did you create that video?

**JA806**

 1              "About a month or so ago.

 2              "Who asked that you create this video?

 3              "Steadfast."

 4              So in our --

 5              MS. RUST:  We're starting -- maybe we're looking at

 6    the wrong exhibit numbers.  We're starting with a --

 7              THE COURT:  Wait a minute.

 8              MS. RUST:  -- video of 36 seconds.

 9              THE COURT:  The video is 36 seconds.  And your

10    objection is?

11              MS. RUST:  The one that we were produced is a

12    44-second video.

13              THE COURT:  So we have two different videos, one 44

14    seconds, one 36 seconds.  And do you know which one they have?

15    Which one are you trying to introduce?

16              MS. RUST:  Yes.  So there were three videos produced

17    in discovery.  I'll be going through two of them with Ms. Kim.

18    DX-77, which is 36 seconds, and then DX-78 which is a minute 44

19    seconds.  And she'll testify that she took both of those screen

20    recordings for these videos.

21              MS. LEWIS:  Well, we won't know until we --

22              (Plaintiff counsel conferred.)

23              THE COURT:  Wait a minute.  What did you say?

24              MS. JONES:  I said we won't know until we see the

25    videos, but it's our position that these aren't the videos that

 1   were presented during the deposition of the actual developer.

 2            MS. RUST:  They were produced --

 3            THE COURT:  If they're not the same videos then you

 4   cannot introduce them.  We're going to wait and reserve your

 5   objection, you see what she's offering, okay, and then we'll

 6   come back to it.  If she objects to it, it's not the same thing

 7   that's on the deposition, then the Court will sustain.

 8   Otherwise we'll keep on going.

 9            MS. RUST:  Okay.

10   BY MS. RUST:

11   Q.   Well, before we press Play, do you know what this is a

12   video of?

13   A.   Yes.

14   Q.   And what is it?  Just generally, what is it a video of?

15   A.   It's a perspective from a client logging into their app.

16   Q.   And did you take this screen recording video?

17   A.   I did.

18   Q.   Okay.  And is this -- did you have an opportunity to review

19   this video?

20   A.   Yes.

21   Q.   And is it a fair and accurate video of a contractor's

22   perspective on the Zira scheduling app?

23   A.   Yes.

24            MS. RUST:  Okay.  I was going to move to admit it, but

25   if the Court would prefer we look at the video first then I can

 1  move to admit it after?

 2          THE COURT:  All right.

 3  BY MS. RUST:

 4  Q.   We'll play through the video, 36 seconds, then we'll talk

 5  about what we saw, okay?

 6          MS. RUST:  You can play the 36-second video.  And just

 7  for the record, there's no audio on this video.

 8          (Video exhibit played.)

 9          MS. JONES:  Your Honor, I'm going to make an

10  objection.  We do not have that video that they're showing.

11  We -- at the deposition, further testimony says:

12          "Sorry, I just want to make sure we authenticated the

13  other two newer videos that were produced, which will be, I

14  think, Defendant's 77 and 76.  Really quick I can share my

15  screen.  I do not have them up."

16          THE COURT:  All right.  Okay.  First of all, what is

17  it you're trying to -- you can have a seat.

18          What is it you're trying to establish by showing these

19  videos in the first instance?  What are you trying to show?

20          MS. RUST:  So I'd like to walk through the way that a

21  nurse can pick up a shift via the app, what shows up, how it

22  works, since the way that nurses can schedule shifts is relevant

23  to the level of control and flexibility they have and whether

24  they work and when they work and what information is available

25  to them.

```
 1            THE COURT:  But do you need these videos to establish

 2   it?  Her testimony is the nurses can establish shifts through

 3   the app.  Do you need to show the Court the apps that they're

 4   complaining about that they have not seen to establish that

 5   point?  Her testimony is the best testimony.  That's what's

 6   corroborated.  But their objection here is they have not seen

 7   what you're trying to show.  So the Court has no objection to

 8   her giving the testimony that they establish the nurses can pick

 9   their schedule using the app.  What they're objecting to is

10   attempting to show the videos to prove that they can do it,

11   okay?  Since there's an objection to the video you're using, the

12   Court will sustain that objection.  But that doesn't take away

13   the testimony she gave that they can use the app to schedule.

14   All right?

15            MS. RUST:  Well, Your Honor, as if I may, there is

16   testimony regarding the availability and knowledge of the shifts

17   that are available to nurses, and while we -- of course you know

18   the testimony of the Steadfast representatives is the best

19   evidence, we do think that the issue, the evidence, using these

20   videos would make it more likely to support their testimony on

21   what's available so that the Court can actually see what is

22   there.  It's available to us to view.  It's been authenticated.

23   And that would assist the Court in determining a material fact.

24            THE COURT:  That's the issue here.  It's an

25   authentication issue here.  That's the problem we have.  That's
```

 1   the problem we have in trying to use the video.  That's the

 2   problem.

 3          MS. RUST:  So --

 4          THE COURT:  She's objected to it.  Now you can show

 5   one -- if you have a video in there showing how the nurses can

 6   schedule using the app that they have seen and you all agree on

 7   it, use that one.  But to the extent they said they have not

 8   seen that one, then the Court will sustain that objection.  You

 9   have three, I understand.  Use one that you've shown in

10   deposition.

11          MS. RUST:  Your Honor, this is a video showing how

12   nurses can schedule a shift.  With respect to whether the

13   plaintiff has seen it, this was produced to them in discovery,

14   they have never -- it's been identified as an exhibit in the

15   pretrial order, and there's never been any representation to us

16   that they didn't see the video.  So if that's an issue, it

17   sounds like there needs to be a conversation that we've never

18   been made a aware of, we shouldn't be prejudiced by not being

19   able to use them in the testimony.

20          THE COURT:  Was it produced in discovery?

21          MS. LEWIS:  Your Honor, the videos that were produced

22   in discovery were provided by Zira App.  The Court's prior

23   rulings is these were untimely produced and said you all can

24   have a 30(b)(6) deposition with respect to these videos, as

25   defendants represented at the pretrial conference and summarily

 1   in the deposition of Zira that they were created by Zira.  The

 2   objection made at the pretrial conference was to authentication,

 3   because they were not created by Steadfast.

 4          Now it's my understanding today that that deposition

 5   was not needed because they weren't created by Zira, well, then

 6   I'm very confused about what happened in the deposition when

 7   Ms. Rust stated that they needed to authenticate these videos by

 8   Zira because they were created by Zira.  Now the testimony today

 9   is that they were created by Steadfast, but on two occasions, at

10   the pretrial conference and at the 30(b)(6) deposition, it was

11   represented that they were created by Zira App and the 30(b)(6)

12   representative for that deposition likewise confirmed the same.

13          THE COURT:  Who created it?  Who created it?

14          MS. RUST:  These two individuals, Christine Kim

15   testified she created them.  The third video, it's our

16   understanding that somebody from the Zira development company

17   created that video.  We're not looking at that video on

18   Christine Kim's testimony.  But as far as authentication,

19   whether we wanted or asked or were considering having Zira

20   authenticate exhibits, these two videos, 77 and 78, more than

21   one individual can authenticate a document, so...

22          THE COURT:  Where are the ones that this witness,

23   Ms. Kim, created?  Which exhibit is that?

24          MS. RUST:  This exhibit, 77, and then the next

25   Exhibit, which is 78, which is --

```
 1              THE COURT:  Okay.  Now, were the exhibits that this

 2   witness created, were they provided to the Secretary?

 3              MS. RUST:  Yes.

 4              THE COURT:  And were they listed in the initial -- in

 5   the final pretrial order?

 6              MS. RUST:  Yes.

 7              THE COURT:  And were there objections raised to those

 8   videos in the final pretrial order; that is, those created by

 9   this witness?  Did she raise objections to it?

10              MS. LEWIS:  Yes, Your Honor.  We raised objections to

11   it.  And if I may share my screen from the deposition transcript

12   where she's dealing with this very exact exhibit, Defendant 77,

13   speaking to the Secretary's objection from ECF 261 with respect

14   to the authentication, I understand that 78 was not produced,

15   but 77 which is on the screen was the very issue in which we had

16   the deposition.  I'm at the Zira deposition transcript at

17   Page 156, and Ms. Rust stated:  "Make sure we authenticated the

18   other two Zira videos that were produced, which would be, I

19   think, Defendant's 77 and 76."  Now Ms. Rust is referencing the

20   78, which we don't have.

21              THE COURT:  Okay.  Here's what we are going to do:

22   Where is 77?

23              MS. RUST:  It's on the screen.

24              MS. LEWIS:  And this is the one that she said was

25   created by Zira.  Ms. Kim did not create this.
```

1              THE COURT:  Okay.  Tell you what you're going to do:

2   I'm going to defer admission of the exhibit.  You go through it,

3   then on cross-examination you can cross-examine on what she

4   created, what she didn't, then I'll rule.

5              MS. LEWIS:  Thank you, Your Honor.

6              THE COURT:  77 is the only one we're going to use, and

7   you can question her on 77.  On 78, the Court has sustained the

8   objection to 78.  Use 77.  On cross-examination you can question

9   what she had to do with 77.

10             MS. RUST:  For 78 is the objection sustained because

11  of the representation they did not receive it?

12             THE COURT:  Objection sustained on 78, all right?

13  Period.

14             MS. RUST:  Okay.

15  BY MS. RUST:

16  Q.   Ms. Kim let's move forward with looking at this video.  So

17  we already played it briefly once, and I want to go through the

18  different aspects of it.  So we can restart from the beginning

19  and pause.

20             (Video exhibit published.)

21  BY MS. RUST:

22  Q.   Can you just tell me what this screen is showing on the

23  video?

24             MS. RUST:  For the record we're at two seconds.

25  A.   So the contractor logs into the app at the login page.

 1          MS. RUST:  Okay.  And let's go forward to about five

 2   seconds on this screen.

 3          Okay, pause.

 4   BY MS. RUST:

 5   Q.   What is this showing now that we've moved on to five

 6   seconds on the video?  What is this showing?

 7   A.   On the mobile app there's a few different icons there.  Now

 8   we're in the Calendar tab.  So the Calendar tab shows pretty

 9   much a brief summary of any open shifts that are available if

10   they have already claimed a shift.  Just gave people the

11   capability to go through the different dates to see what open

12   shifts there are.

13          MS. RUST:  Let's keep playing the video.  Let's pause

14   at 10 seconds right there.

15   BY MS. RUST:

16   Q.   We're at 11 seconds on the screen.  Tell us how this has

17   changed.  Where in the app is this?

18   A.   So when the individual was scrolling through the calendar

19   they saw that there was an open shift on Friday, March 5th.  The

20   shift was 9 to 5.  So they click that for more detail, and on

21   the bottom of this you see the black button where it says Claim

22   Shift.  This gives them the ability to claim the shift.

23          MS. RUST:  Okay.  So let's keep going through the

24   screen, through the video.

25          And let's pause right there at 15.

```
 1  BY MS. RUST:

 2  Q.   It says Account at the top of the screen.  What are you

 3  looking at here?

 4  A.   So that's just their profile account that has their name,

 5  their phone number, Edit Personal Info if they want to change

 6  their phone number or any personal information.  And then in the

 7  middle there is a section for Time Preference where they have a

 8  specific preference in time that they're available.  It gives

 9  them -- I mean, they can log out from here also.

10  Q.   Okay.  So they -- this is their account page that they can

11  update?

12  A.   Correct.

13          MS. RUST:  Okay.  Let's keep going through a few more

14  seconds.  Play the video to stop at 20.

15  BY MS. RUST:

16  Q.   What are we seeing here at 21 seconds on the video?

17  A.   So this is an open shift for Saturday, March 6.  The shift

18  is from 9 a.m. to 5 p.m., has the facility's name, has the

19  ability for them to claim that shift.

20          MS. RUST:  Okay.  Let's play.  Stop.

21  BY MS. RUST:

22  Q.   Okay.  At 27 seconds, what's on the screen now?

23  A.   The notification stating that it successfully was claimed,

24  and that it just notifies you.  It has a little notification

25  saying we will let you know when it's approved.
```

```
1   Q.   Okay.  So it's a pop-up at the bottom of the screen -- just
2   explaining what's on the screen -- the pop-up at the bottom of
3   the claim says Claim Requested, and then it says "We will let
4   you know when it's approved."  Right?
5   A.   Correct.
6         MS. RUST:  And let's keep just playing through to the
7   end of the video.
8   BY MS. RUST:
9   Q.   Okay.  So is that -- based on your understanding, of how
10  you use the app, is that how -- the process for how a
11  scheduler -- excuse me.
12       Based on your understanding of how to use the Zira app for
13  a contractor, is that generally the process for how a nurse on
14  the Steadfast registry can view available shifts on the app and
15  select a shift on the app?
16  A.   Yes.
17  Q.   Okay.  And are you familiar with how a facility can
18  schedule -- well, let me start there:
19       Do the facilities that Steadfast contracts with, are they
20  provided with the opportunity to access this app?
21  A.   Yes.
22  Q.   Okay.  And what can they do generally -- just a brief
23  description -- what can they do on this app from the facility
24  perspective?
25  A.   So they can go through the schedule and they can add open
```

```
 1   shifts, pretty much all the needs that they have at their
 2   facility.  They can see the --
 3   Q.   I'll stop there.  We'll walk through a little bit.
 4        So the facility has its own account?
 5   A.   Correct.
 6   Q.   And can they post shifts that they want to post on the app
 7   for Steadfast nurses to select?
 8   A.   Correct.
 9   Q.   Okay.  And are they on the app -- if a nurse claims a shift
10   like we just saw in DX-77, the nurse claims a request, then in
11   the app do the -- is the facility notified in the app?
12   A.   So they get the notification stating that that individual
13   has claimed that shift.
14   Q.   Okay.  And then does the -- what does the facility do as
15   their next step as far as confirming the shift?
16   A.   They can either approve it or deny it.
17   Q.   Okay.  And then will they be able to see from their
18   facility account page any unclaimed open shifts and any shifts
19   that have been approved and confirmed by them?
20   A.   Yes.
21   Q.   Okay.  Let's move to the next topic.  I want to talk to you
22   about payroll.  I know we talked about some of the aspects of
23   payroll last week.  I want to discuss a few of the specifics
24   with you.
25        So first of all, let's pull up PX-9, which --
```

```
 1        All right.  And are these -- is this a photo of the time

 2   sheet for Steadfast?

 3   A.   Yes.

 4   Q.   Okay.  So I want to talk about the specific process for

 5   how, how Steadfast processes these time sheets for payroll.  So

 6   when this time sheet is submitted by a nurse to Steadfast,

 7   what's the first thing that happens?

 8   A.   So the payroll team will look at the time sheet and they do

 9   a quick review and audit to make sure all the tables are

10   properly completed.  They look for the date, they look for the

11   legibility on the time sheet, make sure that the client is a

12   valid client, a signature both from the facility and from the

13   contractor.

14   Q.   So looking at PX-9 that you have on your screen, just the

15   first page, does that time sheet have all of the information

16   that would be needed to process this time sheet?

17   A.   Yes.

18   Q.   If the time sheet is illegible or missing information,

19   which you said they're looking for when this comes in, what did

20   the payroll processer do at that point?

21   A.   So we would respond back to -- respond to that time sheet

22   and list the discrepancies or what further action would be

23   needed.

24   Q.   Okay.  And if the -- and is that typically via email?

25   A.   Yes.
```

1  Q.   Okay.  So you will reply to the email with the information

2  that's needed?

3  A.   Yes.  Correct.

4  Q.   And if the contractor doesn't respond, what happens with

5  the time sheet for that pay period?

6  A.   So we do the courtesy of trying to reach out them to let

7  them know we're still waiting for them; however, if we don't

8  receive any further information then we don't process the time

9  sheet.

10 Q.   Why aren't you able to process the time sheet if they don't

11 respond with the information you asked for?

12 A.   The information that's on the time sheet is important to

13 properly process the time sheet.  Depending on the discrepancy,

14 if there is no time, if the facility is missing, if the date is

15 missing, those -- that data is required in order for us to send

16 that to the facility.

17 Q.   Okay.  So if we -- looking at the first page of PX-9, you

18 said this has all the information that would be needed to

19 process this time sheet, right?

20 A.   Correct.

21 Q.   If we have all the information, what does the payroll

22 processor do next?

23 A.   So if -- for this example we would send a confirmation

24 receipt to the contractor with the date, the time in and time

25 out at the facility, and we would write Received and Sent For

1  Processing.  That information then is printed, we manually

2  calculate the hours in decimal format, and we transfer all that

3  data into a spreadsheet.

4  Q.   So as far as -- let's scroll down a little bit on the first

5  page of PX-9.

6       So does this, the first page here, does it indicate that

7  the payroll processor manually calculated those hours into

8  decimal format?

9  A.   Correct.

10 Q.   Okay.  And is that the handwriting directly under the image

11 of the time sheet?

12 A.   Yes.

13 Q.   Okay.  And is this stating that there was, it was

14 calculated in decimal format for 8.5 hours; is that right?

15 A.   Correct.

16 Q.   Okay.  Once the hours are manually calculated like this,

17 then what happens?

18 A.   That information is transferred onto a spreadsheet.  The

19 spreadsheet is then sorted by the facility and then the data is

20 sent to the facility for confirmation.

21 Q.   Okay.  When it's sent to the facility for confirmation,

22 what happens next then?

23 A.   So we just ask for the authorized person from the facility

24 to review the information to confirm that they have worked, the

25 authorized person responds back either approving them, denying

```
 1  them or contesting the information that we gave them.

 2  Q.   Okay.  So if it's approved, we'll come back to that.  As

 3  far as contesting or denying, is there a difference between

 4  those two options?

 5  A.   Yes.  So --

 6  Q.   What is contesting?

 7  A.   So usually if the person at the facility can confirm that

 8  the person was there, they might have some issues with the hours

 9  that were logged.  So for example if this information from 7 to

10  4 was given to the facility and they're contesting it, they can

11  say, hey, this individual didn't arrive to the facility until

12  10 a.m.

13  Q.   Okay.  And then what does denying the time sheet mean in

14  comparison to contesting?

15  A.   So that means that the facility cannot confirm.

16  Q.   Confirm the shift at all?

17  A.   Correct.

18  Q.   Okay.  So if the time sheet's approved then do you pay out

19  on it?  What do you do?

20  A.   Yes.  So then we send it -- so then now once it's confirmed

21  from the facility then we pay the contractor.

22  Q.   Okay.  So let's talk a little bit about the approval

23  process though, if there's an issue with it.

24       So when the facility contests or denies a nurse's time

25  sheet, you said you send it to them to review, and they can
```

```
 1  contest or deny.  What is the process for handling a contested

 2  or denied time sheet?

 3  A.   So it would vary.  So if the facility is saying that

 4  they're contesting it based upon the hours or if they are

 5  denying it, depending on what the reason is from the facility,

 6  we then relay that information to the contractor.  We say, hey,

 7  you know, you submitted your time sheet from 7 to 4; however,

 8  the facility states that you arrived at 10 a.m.  So your

 9  approved hours is 10 a.m. to 4 p.m.; however, we find this

10  information not accurate, please provide us detailed information

11  for us to forward back to the facility for them to approve.

12  Q.   So if a nurse responds to that email with information to

13  support the times they have put on the time sheet, do you

14  forward that to the facility?

15  A.   Yes.

16  Q.   Do you always forward that information to the facility?

17  A.   Yes.

18  Q.   And do you make any judgment call as to the credibility or

19  sufficiency of the information provided to the nurse in

20  determining whether to send it to the facility?

21          MS. LEWIS:  Objection, confusing.

22          THE COURT:  You what?

23          MS. LEWIS:  Objection, confusing.  I didn't --

24  confusing.  Form.  Confusing.

25          MS. RUST:  I can break it down.  That was a long
```

```
 1  question.

 2            THE COURT:  Rephrase it.

 3            MS. RUST:  Sure.

 4  BY MS. RUST:

 5  Q.   So if the nurse sends information back, you said you always

 6  send it to the facility.  When you're sending it to the facility

 7  though, do you ever -- has there ever been an instance where you

 8  look at the information the nurse sent and think -- do you

 9  consider whether the nurse's information is sufficient or

10  credible before sending it?

11  A.   No.  So I don't, I don't use -- so I literally, any

12  information that's vague or is detailed, I send that information

13  to the facility for the facility to approve or deny.

14  Q.   Okay.  Do you offer any -- during this process do you offer

15  any input to the facility as to whether to approve or deny the

16  invoice based on what the nurse sends you or sends to them?

17  A.   No.

18  Q.   Do you offer any input to the nurse as to how to support

19  the time sheet?

20  A.   I ask them to be as detailed as possible.

21  Q.   Okay.  And any further instruction on how to support it?

22  A.   No.

23  Q.   Okay.  And if a nurse doesn't respond to your email

24  regarding the facility contesting or denying the time sheet,

25  what would be the next step then if you don't have further
```

**JA824**

1  information on the time sheet?

2  A.   So typically I encourage, you know, we -- as a courtesy we

3  reach out to the contractor, again, ask them for the

4  information.  If we still don't receive that then we process

5  what the facility has approved.

6  Q.   Okay.  So is it fair then that the nurses are -- Steadfast

7  is only --

8       Let me restart that question.

9       Is it fair then that the nurses can only get paid for what

10 the facility approves to pay the nurse?

11          MS. LEWIS:  Your Honor, I'm going to object.  A lot of

12 these are leading questions.  But I'm kind of -- this is very

13 much leading territory.

14          THE COURT:  Sustained.  Also calling for an opinion as

15 the way you started that question:  "So is it fair then".

16          MS. RUST:  Understood.  I was trying to summarize what

17 we're talking about.  But I can, I can rephrase this.

18 BY MS. RUST:

19 Q.   So if you -- if the facility -- if you don't get any

20 information from the nurse to support the time sheet, then I

21 think what you said is you just have what the facility approves

22 and that's what gets paid out?

23 A.   Correct.

24 Q.   So does Steadfast only pay a nurse for what's approved by

25 the facility?

 1  A.   Correct.

 2  Q.   Okay.  All right.  So does Steadfast use any clock-in our

 3  clock-out software that they require the nurses to use to track

 4  time?

 5  A.   No.

 6  Q.   And so can Steadfast process payroll without receiving time

 7  sheets?

 8  A.   No.

 9  Q.   Can Steadfast process payroll without receiving facility

10  confirmation?

11  A.   No.

12  Q.   If a nurse didn't submit a time sheet, would Steadfast on

13  the payroll side even know if the nurse worked that shift?

14  A.   No.

15  Q.   So if a nurse signs up for a shift though, and you don't

16  have a time sheet for it, will you -- does Steadfast pay out for

17  that shift without the time sheet?

18  A.   No.

19            THE COURT:  Keep your voice up, please.

20            MS. LEWIS:  Your Honor, I was going to object.  I'm

21  going to sit down.  No objection.  Thank you.

22  BY MS. RUST:

23  Q.   From a payroll perspective, is -- why can't the payroll

24  department pay a nurse without the time sheet even if there

25  might be a record that they had picked up the shift on the

1   schedule somewhere?

2   A.   So the contractor has to submit that information for the

3   payroll department to process in order for that information to

4   be relayed over to the facility.

5   Q.   So -- okay.  What is the first and last day of Steadfast's

6   pay period in a week?

7   A.   For weekly pay, our pay period starts on Tuesday and ends

8   on Monday.

9   Q.   Okay.  And when do you have -- when do you need the time

10  sheets to be submitted to Steadfast to run weekly payroll?

11  A.   So we request that they submit them no later than Tuesday

12  morning at 9 a.m.

13  Q.   Okay.  And have nurses ever submitted time sheets after the

14  Tuesday morning deadline for weekly payroll?

15  A.   Yes.

16  Q.   What is Steadfast's policy for handling those submissions?

17  A.   We typically try to process as many as we can, but to

18  understand with respect to our deadline we have a lot to do,

19  that's why we have that request for them to submit them no later

20  than 9 a.m. on Tuesday.  But if they do submit them after a

21  specific deadline we try our hardest to process as many as we

22  can.

23  Q.   Okay.  Is there any penalty for submitting a time sheet

24  after the Tuesday morning deadline for a weekly payroll?

25  A.   No.

1  Q.   Have you had nurses submit -- you said you had nurses

2  submit time sheets late, right?

3  A.   Correct.

4  Q.   Have you ever received time sheets for more than the

5  previous pay period that week, that previous week?

6  A.   Yes.

7  Q.   So are they submitting time sheets for more than a week at

8  a time?

9  A.   Yes.

10  Q.   What do they -- does Steadfast -- will Steadfast still

11  process those time sheets?

12  A.   Yes.

13  Q.   And when do those time sheets get processed?

14  A.   At the time of submission.

15  Q.   For that weekly payroll?

16  A.   Correct.

17  Q.   Okay.  Even if the time sheets were from three weeks ago?

18  A.   Yes.

19  Q.   And are there -- in your experience with processing the

20  payroll, are there nurses who tend to submit time sheets late or

21  in long periods of -- batches of long periods of time?

22  A.   Yes.

23  Q.   What are some -- can you think of any nurses off the top of

24  your head that have done that recently?

25  A.   The names?

```
 1  Q.    Just a couple examples, yes.

 2  A.    Jolonda Able.  Ashley Meggie.  Ashlee Starks.

 3  Q.    And for those individuals, is there any consequence for

 4  them submitting time sheets outside of the week of the work?

 5          MS. JONES:  I'm going to object to this line of

 6  questioning.  Relevance, Your Honor.

 7          THE COURT:  Sustained.

 8          MS. RUST:  Your Honor, there was testimony from

 9  previous witnesses regarding discrepancies or the timing of pay,

10  and so I think the testimony is relevant to show that there are

11  time sheets that are submitted much later and that Steadfast

12  would still process them as soon as they received.

13          THE COURT:  To be candid, I probably should have

14  stated then, I don't know how helpful that is to the Court.  To

15  be candid with you, you had that testimony.  I'll say the same

16  thing about this testimony now:  About the lateness of the time

17  sheets, she has explained in detail how time sheets are

18  submitted, calling some examples of people who may have

19  submitted them late, et cetera.  We're just drifting here.

20          MS. RUST:  Understood, Your Honor.  Trying to be

21  thorough, but...

22          THE COURT:  I wouldn't call that thorough, I would

23  call that drifting.  So go on.

24          MS. RUST:  Understood.

25  BY MS. RUST:
```

1  Q.   So let me close this up then.

2       So you received -- I'll close this up.

3       So if you received multiple time sheets over multiple weeks

4  and they're processed in a single pay period, will -- how will

5  that be reflected in that nurse's pay in the payroll reports?

6  A.   So there's two reports that can be generated from ADP.  And

7  so it will reflect how many hours that they worked, how much

8  they were paid in that pay period.

9  Q.   Okay.  So which payroll report are you talking about?

10 A.   There's a Payroll Summary Report.

11 Q.   Okay.  So on the Payroll Summary Report, that's reflecting

12 the number of hours that were paid for that period?

13 A.   Correct.  For that week.

14 Q.   Okay.  And is that always indicative of the number of hours

15 that that nurse worked during that period?

16 A.   No.

17 Q.   Okay.  I'm going to show you an exhibit.  We're going to

18 look at PX-11, which are the facility invoices.  And actually --

19           MS. RUST:  So this exhibit was admitted as a

20 voluminous file.  I think the plaintiff's had an excerpt.  I

21 have a different excerpt that we're going to look at today.

22 I'll provide a copy.

23           MS. LEWIS:  Your Honor, this was not submitted as

24 voluminous.  We only provided samples of PX-11, just to clarify.

25           THE COURT:  This exhibit was not submitted?

**JA830**

```
 1              MS. LEWIS:  It was submitted, but as counsel

 2   represented, it was part of voluminous.  It wasn't -- we only

 3   put sample exhibits in our PX-11.  So what's there is what's

 4   there.  There's no more.

 5              MS. RUST:  Okay.  I'm sorry, did -- was there a ruling

 6   on the objection?

 7              THE COURT:  It was just a comment to the Court.  She

 8   doesn't object, she was simply saying this is not derived from a

 9   summary, this is the exhibit.  That's all she said.  It's a

10   single exhibit, it's not a compilation from a voluminous

11   document.

12              Do you agree with that?

13              MS. RUST:  Well, when the exhibit was identified in

14   the pretrial order it was identified as Steadfast facility

15   invoices, and when we received the copy of those -- of that

16   exhibit it was only an excerpt.

17              THE COURT:  So it's an excerpt.

18              MS. RUST:  Yes.

19              THE COURT:  In other words, we didn't have a pile of

20   invoices from which this was summarized; it was represented that

21   this is an excerpt of invoices.

22              MS. RUST:  Correct.

23              THE COURT:  That's all she's saying.  It's a single

24   document.  Let's move on.

25              MS. RUST:  Okay.
```

 1  BY MS. RUST:

 2  Q.    Okay.  So looking at this document --

 3          MS. RUST:  And for the record, this is marked

 4  Steadfast 6077516 through 0775366 are the Bates stamps.

 5  BY MS. RUST:

 6  Q.    And is this -- do you recognize this document?

 7  A.    I do.

 8  Q.    And can you tell me what it is?

 9  A.    This is an invoice for the facility Accordius Health at

10  Creekside.

11  Q.    Can you go up there just really quick the next few pages?

12          Are these -- what's attached to this invoice here?

13  A.    The time sheets and supporting documents.

14          MS. RUST:  We can scroll back up to the top.

15  BY MS. RUST:

16  Q.    Is this an accurate copy of the invoice of Steadfast

17  invoices to Accordius Health at Creekside Care dated 9/17/2020?

18  A.    Correct.

19          MS. RUST:  And Your Honor, I would move to admit this

20  under PX-11, but we can move to admit it under a different

21  exhibit for the defendants?

22          MS. JONES:  Your Honor, that's not our PX-11.  We

23  didn't attach underlying time sheets to our exhibits.  This has

24  time sheets, so I'm not sure where this exhibit derives from.

25          THE COURT:  The only thing you are saying is this is

1   the basic sheet, but you're indicating that the other time

2   sheets were not attached to the exhibit?

3          MS. JONES:  Yes, Your Honor.  She can admit it under a

4   different exhibit.

5          MS. RUST:  So I can move it under a different exhibit.

6   I was just saying my understanding when they identified these

7   documents in the pretrial order, it was just identified as

8   Steadfast facility invoices.  So we believe they were

9   identifying all of the facility invoices, and we did not know

10  until the day or two before trial when they dropped off their

11  exhibit binder it was a select excerpt.  So I'm happy to put

12  this in as a different exhibit under the defendants.

13         THE COURT:  When who dropped off their invoices?

14         MS. RUST:  Plaintiff's counsel on the day before

15  trial.

16         THE COURT:  So are you maintaining an objection to the

17  attachments?

18         MS. LEWIS:  Your Honor, our representation is this is

19  not our PX-11.  Probably make it simpler just to give her a new

20  exhibit number, because this is not -- our PX-11 is simply

21  invoices.  This exhibit has time sheets with invoices.

22         THE COURT:  So you make it Defense?

23         MS. RUST:  No problem.

24         THE COURT:  What is the number?

25         COURTROOM DEPUTY CLERK:  201.

```
 1              THE COURT:  201.

 2              MS. RUST:  Thank you, Your Honor.

 3              THE COURT:  We're going to admit 201.

 4              MS. LEWIS:  No objection.

 5                   (DX-201 received in evidence.)

 6              THE COURT:  All right.  Let's move on.

 7  BY MS. RUST:

 8  Q.   Okay.  I just want to walk through the basic information

 9  that's on the facility invoice for Steadfast.

10              THE COURT:  I think -- continue.

11              MS. RUST:  Okay.

12  BY MS. RUST:

13  Q.   Can you just tell me what information, I'm going to walk

14  through the obviously we've got the information regarding the

15  facility up top.  But the chart down here with the columns at

16  the top columns says Date, Independent Contractor, Bill Rate and

17  Total.

18       What information is indicated in this?  Let's start with

19  the left column, the date.

20  A.   That's the date of the time sheet.  That goes to the name

21  of the contractor followed by the title of the contractor, the

22  hours that were calculated in decimal format, the hours in and

23  out, the bill rate, and the total.

24  Q.   Okay.  And so the left column, you said this is for the

25  time sheet, so that's a shift, a date of the shift that was
```

 1  worked?

 2  A.    Correct.

 3  Q.    Okay.  And this invoice was -- this invoice is dated 9/17.

 4  Are these -- how frequently are you invoicing facilities?

 5  A.    Weekly.

 6  Q.    So which dates would this invoice cover for that week?

 7  A.    I would have to see a calendar.

 8  Q.    That's fine.  I guess my question is --

 9  A.    So it would be Tuesday to Monday.

10  Q.    So like directly -- are you invoicing them like a week

11  later or typically like right at the end of the week?  How

12  quickly are the invoices issued, is what I'm asking.

13  A.    So it's a Tuesday to Monday.  That date, because it's a

14  Monday, it would be Thursday.

15  Q.    Okay.  So in this invoice, were all of these shifts worked

16  within the pay period directly preceding this invoice?

17  A.    No.

18  Q.    Okay.  So for example -- we'll go through some other

19  exhibits we'll look at.  Are there any shifts on here that were

20  worked at least a week prior to the invoice being issued?

21  A.    So for the invoice date of 9/17, Nurse Tatianna Canady, her

22  dates are in August, so that's two or three weeks prior to the

23  reflecting pay period date.

24        MS. RUST:  I want to look at the corresponding payroll

25  summary, which my understanding was -- and plaintiff's counsel

```
 1   can correct me if I'm wrong -- but PX-7 included all of the

 2   payroll summaries which was our understanding until we received

 3   the exhibit binders, okay?  So then this is an excerpt of PX-7

 4   which is already --

 5           THE COURT:  Is this another example of a payroll

 6   summary of invoices other than PX -- I mean defendant's exhibit

 7   that you just questioned her on?  Is it another example of

 8   invoices submitted for payment other than the one you just gave

 9   the Court?

10           MS. RUST:  I am just following through the payroll

11   reports to show how it comes up which was --

12           THE COURT:  Okay.  The point is, if you're showing the

13   Court the invoices that you submit and the detail of how you

14   submit these invoices for payment, then you don't need to go

15   back to the payroll provided.  The Court just heard her testify

16   about how you get these and get this information off the time

17   sheets.  It's put in that summary that you just put into the

18   record and they use that to pay.  So the Court doesn't need

19   another one.  I mean --

20           MS. RUST:  Okay.

21           THE COURT:  -- just being repetitive.

22           MS. RUST:  Understood.  If that is clear then we will

23   not need to look at that document.

24   BY MS. RUST:

25   Q.   Okay.  The next one's PX-6, which is a document we've not
```

 1  looked at before.  This is an excerpt of PX-6.  It covers -- the

 2  Bates stamps are Steadfast 6074733 to 074818.

 3      Do you recognize this document, Ms. Kim?

 4  A.    I do.

 5  Q.    And what is this, what is this document?

 6  A.    It's a generated detail -- payroll detail report by ADP.

 7  Q.    Okay.  And does it say -- is this for a specific period of

 8  time that this report's generated for?

 9  A.    Yes.  It's from July 3rd, 2020 to September 25th, 2020.

10  Q.    Okay.  Just looking at the first page, can you just tell us

11  what -- and if this needs to be zoomed in just let me know --

12  but can you tell me what the payroll detail report is showing?

13  And let's just use Jamie Adames, whose name is listed on the

14  first page here as an example.

15  A.    So it does a breakdown, it's a more intimate view of the

16  breakdown of what they were paid, how many hours for that pay

17  period they were paid at the rate and the total, and it gives

18  them -- it shows us how they were paid, how it was delivered, if

19  it was direct deposit or a check, reflecting each check date,

20  how it was delivered, their account information and the total.

21  Q.    Okay.  And the top of the double column, one of them is

22  Rate.  So following that column down to Jamie Adames there is

23  several different notes.  What is that telling us?

24  A.    Different columns?  So the --

25  Q.    For the rate column.

```
 1   A.    For the rate column.

 2   Q.    Did you understand what I was asking?

 3   A.    For each column?

 4   Q.    So looking at the rate column, following that down to Jamie

 5   Adames, the example we're looking at?

 6   A.    Okay.

 7   Q.    Why are there different numbers listed here on the right?

 8   A.    Because they were paid differently per assignment.

 9   Q.    Okay.  So does this -- what is this breaking down for us to

10   read this report?

11   A.    It shows that for the hours of 112.5 hours at a facility

12   that paid $16 an hour, then it goes to 156.5 hours at the

13   facility that she worked at that paid out 17 an hour.

14   Q.    Okay.  That's good.  Okay.  Thank you.

15         MS. RUST:  I'll move to admit PX-6.  It will be as a

16   defense exhibit if the Court would prefer it admitted as a

17   defense.

18         MS. LEWIS:  No objection, Your Honor.

19         THE COURT:  Defendant 6 will be admitted.

20         MS. RUST:  Is it marked as PX-6?

21         COURTROOM DEPUTY CLERK:  Do you want it marked as a

22   defense exhibit and not a plaintiff's?

23         THE COURT:  Change it to defense exhibit.

24         COURTROOM DEPUTY CLERK:  202.

25                   (DX-202 received in evidence.)
```

 1              THE COURT:  That should be the exhibit given to the

 2    courtroom deputy.  Have you got it?

 3              COURTROOM DEPUTY CLERK:  Yes, sir.

 4    BY MS. RUST:

 5    Q.   Okay.  I want to talk a little bit about payroll complaints

 6    or discrepancies.  What happens if a nurse complains about a

 7    discrepancy in their pay?  Is there a process?

 8    A.   Yes.  So depending if they call in or if they email the

 9    discrepancy, someone from our team will address it and ask for

10    the information to pretty much review where the discrepancy was.

11    Q.   Okay.  And what information are they asking for, or how do

12    they resolve that?

13    A.   So, I mean, numerous reasons why they would be asking

14    specific questions to target what problem they were trying to

15    resolve.  If a contractor calls stating that, you know, my check

16    is short, I was expecting to receive this amount, then the

17    payroll team member would ask them, you know, where did they

18    work and we would ask them what shifts they worked.  We would

19    review that against what we have on file, kind of reverse

20    engineer and, you know, where they, where the contractor is

21    stating that they have that discrepancy.

22    Q.   Okay.  And do you oversee the payroll department's handling

23    of those complaints and discrepancies?

24    A.   I do.

25    Q.   Are you familiar with an individual on the registry named

1  Ashley Meggie?

2  A.    I am.

3  Q.    Have you ever spoken directly to Ms. Meggie about alleged

4  discrepancies in her pay?

5          MS. JONES:  Objection, hearsay.

6          THE COURT:  Well, she can testify if she has spoken to

7  her, but she certainly can't tell us what she said.  Let's see

8  where we're going here.

9  BY MS. RUST:

10 Q.    So the question is have you ever spoken directly with

11 Ms. Meggie about alleged discrepancies in her pay?

12 A.    Yes.

13 Q.    Okay.  Approximately when was that conversation?

14 A.    March of this year.

15 Q.    March of this year?

16 A.    Of this year.

17 Q.    Okay.  And what was the discrepancy concerning?

18         THE COURT:  Before we go into all of that, what's the

19 relevance of getting into the discrepancy of one particular

20 person to a defect in their pay?  The Court's given you lot of

21 latitude, Ms. Rust, but you know, there's a limit.  What is the

22 purpose of getting into this discrepancy?

23         MS. RUST:  Of course Ms. Meggie testified last week

24 and alleged that there were discrepancies in her pay that were

25 not resolved, so Ms. Kim will testify about what information

```
 1  that the company has regarding that to impeach that testimony.

 2            THE COURT:  Okay.  So this is rebuttal testimony?

 3            MS. RUST:  Yes.

 4            THE COURT:  All right.  Then continue.  As long as

 5  she's not going to say what she said, court will let you go.

 6  Continue.

 7            Move it along.  What did you do in response to the

 8  alleged discrepancy?

 9  BY MS. RUST:

10  Q.   Okay.  So what was the alleged discrepancy regarding?

11  A.   She stated that her 1099 --

12            MS. JONES:  Objection, hearsay.

13            THE COURT:  Sustained.  You cannot tell us what she

14  said.  You can tell us what you did as a result of her

15  complaint.

16            MS. RUST:  Okay.

17  BY MS. RUST:

18  Q.   So you had a conversation with her regarding an alleged

19  discrepancy, right?

20  A.   Correct.

21            MS. JONES:  Objection, leading.

22            MS. RUST:  I'm just recapping so we can --

23            THE COURT:  Overruled.

24            MS. RUST:  -- move forward.

25  BY MS. RUST:
```

```
 1  Q.    And what is the -- was the alleged discrepancy resolved?

 2  A.    Yes, to the best of my knowledge.

 3  Q.    And did you review records with Ms. Meggie in the effort to

 4  resolve that discrepancy?

 5  A.    Yes.

 6  Q.    And were, were you able to confirm Ms. Meggie that there

 7  was no further issues with the alleged discrepancy that she

 8  raised?

 9  A.    Correct.

10  Q.    And as a result of that conversation did you take any

11  further action to -- regarding that alleged discrepancy?

12  A.    I did not.

13  Q.    Okay.  Are you familiar with an individual on the registry

14  named Tatianna Canady?

15  A.    I am.

16  Q.    Okay.  And have you ever spoken directly with Ms. Canady

17  about alleged discrepancies in her pay?

18  A.    No.

19        MS. JONES:  Your Honor, I'm going to object to the

20  relevancy of this on the testimony.

21        THE COURT:  Well, for what purpose are you pursuing

22  this?

23        MS. RUST:  Same purpose:  Impeaching.

24        THE COURT:  Objection overruled.

25  BY MS. RUST:
```

**JA842**

```
 1  Q.    What was the answer to your question?

 2  A.    No, not directly.

 3  Q.    You have not spoken directly with Mrs. Canady?

 4  A.    Correct.

 5  Q.    And can you -- are you aware of any instances when a

 6  complaint was submitted to the payroll department regarding

 7  Ms. Canady's pay?

 8  A.    Yes.

 9  Q.    And are you aware whether that was resolved?

10          MS. JONES:  Objection, Your Honor.  Hearsay.

11          THE COURT:  No, she hadn't said anything yet, so the

12  Court overrules the objection.

13  A.    Yes.

14  BY MS. RUST:

15  Q.    Okay.  So you said you were aware that it was resolved; is

16  that what you said?

17  A.    Yes.

18  Q.    Okay.  And as a result of that did you take any further

19  action in response to that to deal with the alleged discrepancy

20  that was reported?

21  A.    I did not.

22  Q.    Okay.  And did you direct anyone in your payroll department

23  to take further action?

24  A.    After they informed me it (inaudible).

25          COURT REPORTER:  I'm sorry, what was your answer?
```

1          THE WITNESS:  After they informed me that it was

2    resolved, no.

3    BY MS. RUST:

4    Q.   All right.  I just have a couple more things to go through

5    with you.  We're right at the end.

6         So are you generally familiar with -- in your experience

7    running the payroll and reviewing payroll, are you generally

8    familiar with the frequency or different frequencies that nurses

9    work on the registry?

10   A.   Yes.

11   Q.   Okay.  And are the -- is that work consistent?  How would

12   you describe the -- your understanding of the frequency with

13   which the nurses work on the registry?

14   A.   I mean, there's a lot of nurses that will -- I'll see them

15   one time or I'll see their names a few times and I'll never see

16   them again.  I have a few contractors that, they usually have a

17   pattern of holiday time, usually anticipate them working around

18   holidays, and then there's a few handful that, you know, if it's

19   specific, last-minute requests they will say, hey, you know,

20   I'm --

21   Q.   You don't have to recount what somebody else said, but

22   okay.

23   A.   Yeah.

24   Q.   And on average how many, when you're running payroll

25   weekly, approximately how many payrolls are you running for

```
 1  nurses in a week?

 2  A.    Approximately 200.

 3  Q.    Okay.  Is it always the same list of nurses that you're

 4  running payroll for each week?

 5  A.    No.

 6  Q.    Okay.  And approximately how many -- are there nurses that

 7  you see regularly on the payroll?

 8  A.    Yeah, there's a handful.

 9  Q.    Okay.  Just a handful?  More?

10          MS. JONES:  Objection, asked and answered.

11          THE COURT:  Sustained.  As a matter of fact, the Court

12  has a relevancy question about how many -- about the question

13  anyway, Ms. Rust.

14          MS. RUST:  I'm sorry, Your Honor?

15          THE COURT:  The Court has a question of relevancy of

16  how many names do you see.

17          MS. RUST:  Well, she testified regarding the frequency

18  with which they were working.  So with respect to the side of

19  payroll, if it was just a handful of the people working

20  regularly, the side of payroll is relevant to assessing the

21  handful.

22          THE COURT:  After that she said it was approximately

23  200.

24          MS. RUST:  Okay.  Understood.

25          Okay Ms. Kim, I think those are all the questions I
```

**JA845**

```
 1  have for you.  Opposing counsel may have some questions for you.

 2            THE COURT:  We'll be taking a 15-minute break.

 3            Do not discuss your testimony on the break.

 4            We'll be back in 15 minutes.

 5            (Recess taken from 3:28 p.m. to 3:44 p.m.)

 6            THE COURT:  Cross-examination.

 7                        CROSS-EXAMINATION

 8  BY MS. JONES:

 9  Q.   Hello, Ms. Kim.

10  A.   Hello.

11  Q.   You were found guilty of embezzlement on May 21st of 2015,

12  correct?

13  A.   Correct.

14            MS. RUST:  Objection, relevance.

15            MS. JONES:  Your Honor, this goes to character

16  evidence pursuant to Federal Rule of Evidence 609 admitted to

17  attack credibility.

18            THE COURT:  Well, under 609, if it's a felony.

19            MS. JONES:  Yes it is, Your Honor.

20            THE COURT:  Well, then the objection is overruled.

21  BY MS. JONES:

22  Q.   You were also found guilty of embezzlement on October 19,

23  2011, correct?

24            MS. RUST:  I'll re-assert my objection again as to

25  relevance.
```

**JA846**

```
 1              THE COURT:  You may raise previous convictions for

 2   crimes of moral turpitude, even if it's a misdemeanor or a

 3   felony conviction, to impeach a witness under Rule 609.

 4              MS. JONES:  May I proceed, Your Honor?

 5              THE COURT:  You may.

 6   BY MS. JONES:

 7   Q.   And Steadfast has been one of your only jobs since your

 8   2015 conviction, right?

 9   A.   Yes.

10   Q.   And so essentially Lisa --

11        Just for clarification, you were also found guilty of

12   embezzlement on October 19th, 2011, correct?

13   A.   Yes.

14   Q.   And Steadfast has been one of your only jobs since your

15   2015 conviction, right?

16   A.   Yes.

17   Q.   And so essentially Lisa Pitts gave you a second chance, for

18   lack of a better term?

19   A.   Correct.

20   Q.   And so because of that you're extremely loyal to her,

21   correct?

22   A.   I'm thankful, but I'm loyal -- just -- it's a just a

23   personal character trait that I have.

24   Q.   You would not say anything that would undermine her case

25   even if you knew it was not accurate, right?
```

1   A.   No, I would -- I don't agree with that.

2   Q.   I would like to direct you -- do you recall seeing

3   Defendant's Exhibit 75, which was I believe a screenshot of the

4   Zira app?

5   A.   What was the question?

6   Q.   Do you recall seeing Defendant's Exhibit 75 which was a

7   screenshot of the Zira app?

8   A.   Yes.

9   Q.   And that is what Steadfast used, correct?

10  A.   Can I see the screen -- I mean the screenshots?  Can I see

11  the screenshots?

12  Q.   Absolutely.

13          MS. JONES:  Is there an extra witness binder -- I

14  don't have the electronic copy of that exhibit.

15          THE COURT:  Let's see if you can find a hard copy

16  then.

17          MS. JONES:  I'm sorry, Your Honor?

18          THE COURT:  Let's see if we can find a hard copy.

19          All right.

20  BY MS. JONES:

21  Q.   This is previously identified as Defendant's Exhibit 75.

22  Do you recall seeing this document?

23  A.   I do.

24  Q.   And this is what Steadfast used, correct?

25  A.   Yes.

 1  Q.   And this is what Steadfast uses for -- in the Zira app,

 2  correct?

 3  A.   That is what we use?  Could you clarify?

 4  Q.   Strike that.

 5       So this is what Steadfast uses?

 6  A.   Correct.

 7  Q.   This is not what the nurse sees, right?

 8  A.   Correct.

 9  Q.   And this app was not used at least until February 2021,

10  correct?

11  A.   Approximately early 2021.

12  Q.   And so to your knowledge Steadfast reached out to Zira in

13  December 2020 to develop this app, correct?

14  A.   It was latter of 2020.

15  Q.   This app was not used in 2020, correct?

16  A.   Correct.

17  Q.   This app was not used in 2019, correct?

18  A.   Correct.

19  Q.   And this app was not used at any time between 2015

20  and 2018, correct?

21  A.   Correct.

22  Q.   And I would like to --

23            THE COURT:  Let me stop.  Has the Court admitted this

24  exhibit?

25            MS. JONES:  Yes, Your Honor.  Exhibit 75 was admitted.

1          THE COURT:  Well, why wasn't this raised when the

2    Court was raising, considering whether it was admissible or not

3    if it wasn't even in use?

4          MS. JONES:  It was admitted into evidence, Your Honor.

5    I mean, they're saying it was in use in 2021 which is during the

6    time period we're alleging that the violations have --

7          THE COURT:  That's exactly why the Court said it

8    should have raised it at that point because it becomes a

9    relevancy question if it's not even being used at the time the

10   alleged violations took place.

11         MS. JONES:  Your Honor, it's our position that the

12   alleged violations had preceded from 2015 through present.

13   Quite frankly we computed back wages at least through, I

14   believe, July of 2021, which means the application --

15         THE COURT:  Okay.  Then the Court --

16         Go.  Continue.

17   BY MS. JONES:

18   Q.   And do you recall seeing Defendant's Exhibit 77, which I

19   believe was a video of the functioning of the app?

20   A.   Do I get to see it?

21   Q.   I don't have access to the video.  It was not provided to

22   me, so I can't pull it up.

23         MS. JONES:  Are defendants able to pull up the video

24   that's identified as Defendant's Exhibit 77?

25         MS. RUST:  Yes, we'll pull it up for you.

```
 1              MS. JONES:  Thank you.

 2   BY MS. JONES:

 3   Q.   You did not create this app, this -- correct?

 4              MS. RUST:  Objection.  Mischaracterizes her testimony.

 5              THE COURT:  It's a leading question.  Overruled.

 6   BY MS. JONES:

 7   Q.   Did you not create this functional video, correct?

 8   A.   I created multiple videos, and I do recall doing a

 9   screenshot of this video.

10   Q.   So you did a screenshot, but you did not actually create

11   the functional video that this shows?

12              MS. RUST:  Objection.  Confusing.

13              MS. JONES:  Strike that.

14   BY MS. JONES:

15   Q.   Zira created this video as a demo for Steadfast, correct?

16   A.   So I was given a dummy account, and I logged in to the

17   dummy account and this screen recording.

18   Q.   So you recorded the video of this?

19   A.   So that is me on my phone.  I pressed Screen Record and I

20   went through the app.

21   Q.   So to your knowledge did Zira create a similar video for

22   Steadfast?

23   A.   Has Zira?  I'm sorry, has...

24   Q.   Has Zira created a video for Steadfast on how to use the

25   app?
```

*C.W. Kim - Cross - Jones*                                                      798

```
 1  A.    For training purposes, yes.

 2  Q.    And is this a different video than the video that was

 3  provided for training purposes?

 4  A.    So I've never seen Zira create a video like that.

 5  Q.    So would your response be yes, that's a different video

 6  that was provided by Zira?

 7  A.    Yes.

 8  Q.    To your knowledge did Zira also create a video for the

 9  facilities on how to use the application?

10  A.    I don't know.

11        MS. JONES:  And would you mind playing this a bit, the

12  video?

13        (Video exhibit published.)

14        MS. JONES:  You can stop it here.

15  BY MS. JONES:

16  Q.    So if you look at the top right-hand corner of this video

17  shot, this still of the video, it says zero dollars.  And is it

18  safe to assume that a nurse isn't working for zero dollars per

19  hour to accept a shift?

20  A.    No.  So there is a function in Zira's scheduling app where

21  you can put a, just a value amount, because they have it

22  calculated.  So if 9 to 5 is eight hours, eight hours times the

23  rate, if a rate was plugged in would populate right there.  So

24  it's a function that the Zira app has.

25  Q.    But this video that you took that you created does not
```

Paul L. McManus, RMR, FCRR Official Court Reporter

**JA852**

 1   include a rate of pay for the shift, correct?

 2   A.    Correct.

 3   Q.    And so if this was a screenshot that was provided to a

 4   nurse, a nurse would have to contact Steadfast to find out the

 5   rate of pay for this shift, correct?

 6   A.    So at that time I did not put in any rates; however, if a

 7   contractor is utilizing the app right now it can see what the

 8   rate of pay would be at the facility based on which facility it

 9   is.

10   Q.    But in this video that you created does not have a rate of

11   pay -- if a nurse were to utilize this, that you created, it

12   wouldn't have a rate of pay, correct?

13   A.    Correct.  Because the facility isn't even valid.

14   Q.    And just to clarify, you knew how to go into Zira and

15   create a demo of how to use the application in Zira?

16   A.    Yes.

17   Q.    Just to clarify, how were you trained to do this?

18   A.    On Zoom.

19   Q.    Zira has a how-to video on Zoom?

20   A.    No.  We had a training session with the support team.

21   Q.    The support team of Zira?

22   A.    Correct.

23   Q.    And you previously testified that within the application a

24   facility can list an assignment, correct?

25   A.    Correct.

1  Q.    And you likewise testified that a nurse can accept a

2  assignment, correct?

3  A.    Correct.

4  Q.    However, Steadfast is still required to confirm that

5  assignment?

6  A.    I'm sorry, repeat the question?

7  Q.    Steadfast is still required to confirm that the assignment

8  has been accepted?

9  A.    Confirm it with who?

10 Q.    Let's start with the facility.  I mean with the nurse.

11 Steadfast has to confirm that the assignment has been accepted

12 by the nurse, correct?

13 A.    No.

14 Q.    So it wasn't your testimony that when a nurse accepts a

15 shift --

16 A.    Correct.

17 Q.    -- it just notifies someone, I don't know who, that they

18 selected the shift, correct?

19 A.    Yes.  So a notification is sent to the facility stating

20 that Jane Doe has claimed the open shift.

21 Q.    And is Steadfast required to confirm that assignment?

22 A.    No.  The facility approves or denies it.

23 Q.    Does Steadfast have the ability to decline a nurse's

24 assignment in Zira?

25 A.    Do we have the -- does Steadfast have the capability?

**JA854**

 1   Q.   Yes.

 2   A.   Yes.

 3   Q.   And do you recall Ms. Rust asking you about the time

 4   sheets?

 5        You recall Ms. Rust asking you about the Steadfast time

 6   sheets, correct?

 7   A.   Yes.

 8   Q.   And Steadfast requires employees to submit time sheets,

 9   right?

10   A.   The contractors?

11   Q.   The nurses.  I'm using the global term for the RNs, CNAs,

12   LPNs similar to what you said on direct.  I'm classifying them

13   as nurses.

14   A.   Okay.

15   Q.   So I'll repeat the question:  Steadfast requires nurses to

16   submit time sheets, correct?

17   A.   Yes.

18   Q.   And Steadfast creates invoices based on those time sheets,

19   correct?

20   A.   Correct.

21   Q.   And so Steadfast has a two-step process in terms of the

22   times -- of the invoices, correct?

23   A.   A two-step process?

24   Q.   Right.  They create -- Steadfast creates the invoices using

25   the time sheets, correct?

*C.W. Kim - Cross - Jones*                                                    802

```
 1  A.    We create the invoices based off of the confirmations from

 2  the facilities.  The data is from the time sheets.

 3  Q.    So I ask again, Steadfast uses the time sheets which are

 4  signed by the facilities to create the invoices, correct?

 5           MS. RUST:  Objection, asked and answered.

 6           THE COURT:  I don't think it was answered.  Overruled.

 7  BY MS. JONES:

 8  Q.    It's a yes or no question.

 9  A.    Yes.

10  Q.    And then Steadfast sends the invoices to the facilities to

11  verify the hours worked on the invoice, correct?

12  A.    We don't send them the invoice.  So we send them the

13  information that's off of the time sheet onto a spreadsheet,

14  that data is collected and sent to the facility.  Once the

15  facility approves, denies, whatever their response is, that is

16  what's on the invoice.

17  Q.    So the facility essentially gives a confirmation on the

18  invoice, correct?

19  A.    A confirmation of the time sheets that were received.

20  Q.    So does the -- the facility responds with a yes or no, then

21  you can send an invoice?

22  A.    So they -- however they respond, based off of their

23  response, we would reflect how they responded and transfer that

24  information on to an invoice.

25  Q.    Do you recall Ms. Rust asking you about the payroll
```

**JA856**

*C.W. Kim - Cross - Jones*                                              803

1   details?

2   A.   Yes.

3   Q.   And the payroll details does not include Next Day Pay

4   hours, correct?

5   A.   Correct.

6   Q.   So the payroll details do not include all hours worked by

7   the nurses, correct?

8   A.   That specific payroll detail, no.

9   Q.   But in general, payroll details do not include Next Day Pay

10  hours, correct?

11  A.   Correct.  Because they're separate processors.

12  Q.   The question submitted was does the payroll details list

13  Next Day Pay compensation in hours?

14           MS. RUST:  Objection, asked and answered.

15           THE COURT:  Well, I'm going to overrule the objection

16  and give her a chance to answer directly.

17  A.   It does not reflect that.

18  BY MS. JONES:

19  Q.   So just to clarify, the payroll details that Ms. Rust asked

20  you about reflect hours worked by nurses who could reflect hours

21  worked by nurses who were also compensated using Next Day Pay?

22  A.   Correct.

23  Q.   And you indicated that Steadfast invoices the facility;

24  however, Next Day Pay is allegedly paid the next day, correct?

25  A.   Correct.

1  Q.   So if this is true, is the Next Day Pay reflected on the

2  invoices submitted to the facilities?

3  A.   Correct.

4  Q.   So Steadfast pays nurses for the hours worked for Next Day

5  Pay prior to the time it's approved by the facilities, correct?

6  A.   No.  So the facility confirms the hours that were submitted

7  and then we would pay the nurses.  From that time to processing

8  on an invoice there's no parallel.  So if I have a response to a

9  facility to that specific shift, it could be days later until we

10 transfer that on to an invoice.

11 Q.   So the question was, with the Next Day Pay, it's under the

12 assumption that the nurse submits her time sheet on a Tuesday

13 and gets compensated on a Wednesday through Next Day Pay,

14 correct?

15 A.   Correct.

16 Q.   And Steadfast would not have invoiced the facility and been

17 compensated for the Next Day Pay at the time Steadfast pays the

18 nurse using next Day Pay, Correct?

19 A.   Correct.

20 Q.   And to confirm, the Next Day Pay comes from Steadfast

21 accounts, correct?

22 A.   What comes from Next Day?

23 Q.   The worker's wages for the hours that they worked and

24 submitted through Next Day Pay is paid through Steadfast

25 accounts?

1  A.    Yes.

2  Q.    And nurses are paid weekly, correct?

3  A.    It's at their discretion, if they want Next Day Pay or

4  weekly.

5  Q.    Nurses who are paid via payroll are paid weekly, correct?

6  A.    Through ADP weekly, yes.

7  Q.    And the ADP payroll is also paid from a Steadfast account,

8  correct?

9  A.    Correct.

10  Q.    And so is it safe to say that Steadfast is in the middle of

11  the review and approval process of time for the nurses'

12  compensation?

13  A.    We don't approve their time, but we do review them.

14  Q.    So you reviewed their time and then sent it to the

15  facility, correct?

16  A.    Correct.

17  Q.    And you paid them based upon the facility approving the

18  hours worked by that nurse, correct?

19  A.    Correct.

20  Q.    And Steadfast keeps track of where nurses work, correct?

21  A.    We don't keep track of it.  We can find where they're

22  working based off of an invoice.

23  Q.    So is it your testimony that Steadfast has no knowledge

24  where their nurses are working on a different day?

25  A.    I can, I can utilize the scheduling app or -- there are

```
 1  times where there are nurses that pick up shifts directly

 2  through the facilities which we have no records of.

 3  Q.   So is it your testimony that Steadfast doesn't know where

 4  its nurses work?

 5  A.   It could be a possibility.

 6  Q.   So even using utilizing the current app which details the

 7  shifts that a nurse can select, is it your testimony that

 8  Steadfast would not know where a nurse is placed even utilizing

 9  the application?  The Zira app?

10  A.   Correct.  Because not all nurse are utilizing the app.

11  Q.   So is it your testimony based upon your recent statement

12  that Steadfast does not keep track of weekly hours worked for

13  its nurses?

14  A.   Correct.

15  Q.   And do you recall Ms. Rust asking you about nurses who

16  submit a large number of time sheets at one time?

17  A.   Yes.

18  Q.   And Steadfast doesn't segregate those hours, correct?

19  A.   No.

20  Q.   Is it just pays them straight out on a payroll, correct?

21  A.   So for that pay period upon the date of submission, if

22  they're approved by the facility, then it's paid out to the

23  nurse.

24  Q.   So Steadfast does not go back to compute hours worked for

25  the later-submitted, the later-submitted time sheets?
```

*C.W. Kim - Cross - Jones*                                                  807

```
 1  A.   I'm sorry, repeat the question?

 2  Q.   So Steadfast would not -- if they submitted 50 time sheets

 3  a day, Steadfast would not go back to the previous weeks to

 4  compute the wages owed for them?

 5  A.   No.  We would ensure that they're not -- it hasn't been

 6  priorly processed, but if they submit 50 time sheets on one day

 7  it's the same process:  We would calculate, we would submit it

 8  to the facility for approval, upon approval we would pay the

 9  contractor.

10          MS. JONES:  I have no further questions, Your Honor.

11          THE COURT:  Court has a question.

12          After Steadfast pays Next Day Pay and pays nurses

13  generally, how does Steadfast get its money?

14          THE WITNESS:  So that's the part of the invoice.  So

15  we -- there's -- different facilities have different net terms

16  as far as when a payment is due.  So we invoice the facility and

17  we get compensated by the client based on the invoice that was

18  submitted.

19          THE COURT:  So the facilities reimburse Steadfast for

20  paying the salaries of the nurses and the other persons working

21  at their facilities?

22          THE WITNESS:  That's correct.

23          THE COURT:  Okay.  Thank you.  Any redirect?

24          MS. RUST:  Just a few very quick questions, Your

25  Honor.
```

**JA861**

```
 1              THE COURT:  Okay.

 2                      REDIRECT EXAMINATION

 3  BY MS. RUST:

 4  Q.   Ms. Kim, have you had any criminal convictions since 2015?

 5  A.   No.

 6  Q.   And have you told the truth today?

 7  A.   Yes.

 8  Q.   And did your prior convictions impact your ability to

 9  understand Steadfast's payroll practices?

10  A.   No.

11  Q.   Did your prior convictions impact your ability to

12  understand any of the other items you testified about today or

13  last week?

14              MS. JONES:  Objection, relevance, Your Honor.

15              MS. RUST:  It's directly relevant to their --

16              THE COURT:  Well, the Court's going to overrule it,

17  but the Court makes the credibility findings.

18              You can continue.

19              MS. RUST:  Of course.

20  BY MS. RUST:

21  Q.   Just to clarify, are ADP and NDP, Next Day Pay, are they

22  separate payment processors --

23  A.   Yes.

24  Q.   -- for Steadfast?

25  A.   Yes.
```

**JA862**

1   Q.   The payroll summary reports and the payroll detail reports

2   we reviewed during your testimony, were -- which processor did

3   those reports come from?

4   A.   ADP.

5   Q.   ADP.  Okay.

6        So are they going to reflect -- are they only going to

7   redirect information in the ADP process?

8   A.   Yes.

9   Q.   And when you're processing Next Day Pay, Ms. Jones asked

10  you about the approval process with the facilities.  Just want

11  to clarify, is it still Steadfast -- is it Steadfast's process

12  to still get a facility to approve a time sheet before paying on

13  the Next Day Pay time sheet?

14  A.   Correct.

15           MS. RUST:  Those are all the questions.

16           THE COURT:  Before you sit down, the Court has another

17  question.

18           When you pay a nurse or an LPN or any one of these

19  people who are on this registry, whose name is on the check as

20  the payor?  Not the payee; on whose account does it reflect the

21  check is drawn, Steadfast?

22           THE WITNESS:  Steadfast Medical Staffing.

23           THE COURT:  Okay.  Thank you.

24           All right.  May the witness be affirmatively excused?

25           MS. RUST:  Yes, Your Honor.

*R.L. Coates - Direct - Rust*                                              810

```
 1              MS. JONES:  Yes, Your Honor.

 2              THE COURT:  You may step down.

 3              Next witness?

 4              MS. RUST:  Your Honor, the defendant's next witness is

 5  Racharlotte Coates.

 6              THE COURT:  Who?  I couldn't understand you.

 7              MS. RUST:  Racharlotte Coates.  And she will be a

 8  remote witness.

 9              Is she logged in?  Has she been logged in?

10              COURTROOM DEPUTY CLERK:  No.

11              MS. RUST:  Your Honor, I just spoke to her during the

12  break, so if the Court would allow us to make a brief phone call

13  to make sure she didn't have difficulty accessing the Zoom app

14  or if the deputy would prefer to call?

15              THE COURT:  Court will take a five-minute recess.

16              MS. RUST:  Thank you, Your Honor.

17              (Recess taken from 4:14 p.m. to 4:21 p.m.)

18              THE COURT:  Next witness?

19              MS. RUST:  The defense called Racharlotte Coates.

20              THE COURT:  All right.  Ms. Coates.

21              RACHARLOTTE LEE COATES, having been duly sworn, was

22  examined and testified via videoconference as follows:

23                          DIRECT EXAMINATION

24  BY MS. RUST:

25  Q.   Hi, Ms. Coates.
```

**JA864**

```
 1   A.    Hi.

 2   Q.    Thank you for joining us today.

 3         Can you state your name for the record?

 4   A.    Racharlotte Lee Coates.

 5   Q.    Ask you to spell your name for the court reporter?

 6   A.    R-a-c-h-a-r-l-o-t-t-e, Lee, L-e-e, and last name Coates,

 7   C-o-a-t-e-s.

 8   Q.    Thank you, Ms. Coates.

 9         What is your occupation?

10   A.    Licensed practical nurse.

11   Q.    Okay.  And are you familiar with Steadfast Medical

12   Staffing?

13   A.    I am.

14   Q.    You've been on Steadfast's registry as a nurse?

15   A.    I have.

16   Q.    Are you currently on Steadfast's registry during -- are you

17   currently picking up shifts on Steadfast's registry?

18   A.    I've relocated.  I live in a different state now.

19   Q.    Okay.  How long -- well, approximately when did you join

20   Steadfast's registry?

21   A.    Around 2016.  Mid 2016.

22   Q.    Okay.  And when, when was the last time approximately that

23   you worked on Steadfast's registry?

24   A.    May of this year.

25   Q.    Okay.  And that's when you relocated?
```

1  A.   Yes.  I relocated in April and I moved back to North

2  Carolina and did some work.

3  Q.   Okay.  I'm going to ask you some questions about your

4  experience with Steadfast.

5       So when you were working shifts with Steadfast's registry,

6  did Steadfast ever provide you with any equipment to provide

7  nursing services?

8  A.   No.

9  Q.   Do you provide any of your own supplies to provide nursing

10 services when you're picking up a shift on Steadfast's registry?

11 A.   I do.

12 Q.   Can you give an example of some of the equipments that you

13 bring with you?

14 A.   I mean, you know, your basic healthcare stuff:

15 Stethoscope, blood pressure cuff, pulse oximeter, gloves.

16 Depending sometimes on the facility you go to you may need to

17 take gloves and sanitizer.

18 Q.   Why do you bring those items with you on shifts that you

19 pick up through Steadfast?

20 A.   Well, because sometimes the facilities don't offer it so

21 you need it in order to get your job done.

22 Q.   Okay.  Do you maintain your own liability insurance for

23 your nursing services?

24 A.   Yes.

25 Q.   Why do you maintain insurance for that?

```
 1  A.   It's a good thing to do when you're in the field that we're

 2  in.  Like a doctor having malpractice insurance.

 3  Q.   How do you schedule shifts through Steadfast?

 4  A.   I personally, for the time that I've been there, I mean,

 5  and that's been before the app, I just used to just call and,

 6  you know, ask.  Or if they call me.  It could go both ways.

 7  Q.   Okay.  So when you would call, what was the conversation --

 8  how did you get a shift scheduled by calling?

 9  A.   I would just give them my availability and they would see

10  what they had available and they would either be a yes or a no

11  depending on the shift that I wanted or the location.

12  Q.   And who would say yes or no?

13  A.   It would be whoever the scheduler is.  The schedulers

14  changed on several occasions, so it would really just depend on

15  who was manning the office at that time.

16  Q.   That you spoke to?

17  A.   Yeah.

18  Q.   Okay.

19  A.   I mean, if there was something that needed to go through

20  Ms. Lisa then, you know, they would, you know, take -- tell you

21  we have to get Lisa, you know, to see if that's okay.

22  Q.   Okay.  So when you're talking to Steadfast about the shifts

23  you said that they would let you know what's available and then

24  it was a yes or a no?

25  A.   Yeah.
```

1  Q.    So could you pick any of those opportunities that they

2  discussed with you on the phone?

3  A.    Yeah.  I mean, it's up to me if I wanted to take it or not.

4  Q.    Okay.

5  A.    I mean, they could call me and say, hey, we have this

6  available and I could say yes or no.

7  Q.    Okay.  So who determines your work schedule when you're

8  picking up shifts through Steadfast?

9  A.    Well, whatever schedule they had available, if you want to

10 work that schedule, it could be a 7a to 7p, a 7p to 7a, it could

11 be a 7a to 3p.  It really depended on the facility and what they

12 offered, what they needed.  Could be a four-hour shift if they

13 just needed coverage.  So it just really depended on what's

14 available and what you're willing to work.

15 Q.    You mentioned an instance when maybe Steadfast would call

16 you with an available shift, and have you ever -- in the past

17 when they have called you about available shifts, have you

18 declined the shifts that they offered on the phone?

19 A.    Of course.

20 Q.    And --

21 A.    If I'm not already booked somewhere else with another

22 company or, you know, I'm already working or I just don't feel

23 like working, then yeah, I'd say no, I'm not available.

24 Q.    Okay.  And have you ever experienced any consequences for

25 declining to take a shift?

1  A.    No.

2  Q.    Okay.  Have you ever canceled a shift that you've already

3  picked up through Steadfast?

4  A.    I have.

5  Q.    Okay.  And in your experience -- well, first of all, how do

6  you cancel that shift?

7  A.    So you just call -- for me personally, you always have to

8  call your, your company, let them know that you can't make it,

9  and then typically they're supposed to contact the facility, but

10 I would also contact the facility since I was the one working.

11 Q.    Okay.

12 A.    So I would do both.

13 Q.    Okay.  And have you -- in your experience have you ever

14 been running late for a shift that you picked up through

15 Steadfast?

16 A.    I have.

17 Q.    And when that happens do you notify anybody?

18 A.    Sometimes.  It depends on the time of day.  I'm a

19 night-shifter, so sometimes somebody's not always available to

20 answer the phone at night.  But I would call, leave a voicemail,

21 or like maybe send an email.  But then I would always call the

22 facility, because they were the one waiting on me.

23 Q.    Okay.  When you're scheduling shifts with Steadfast, are

24 you, have you -- in your experience, have you ever been required

25 to request permission to take vacation or time off?

 1   A.    No.

 2   Q.    Have you --

 3   A.    You mean somebody -- someone saying to you you work this

 4   amount of hours, you must take a vacation time or something like

 5   that?

 6   Q.    Let me ask a follow-up question.  Have you -- when you've

 7   been working on Steadfast's registry have there been times where

 8   you took a vacation or took a period away from scheduling with

 9   Steadfast?

10   A.    Oh, sure.  Of course.

11   Q.    And did you notify them that ahead of time that you were

12   doing that?

13   A.    No.  I mean, you just don't pick up a shift if you don't

14   want to.

15   Q.    Okay.

16   A.    So if I'm working with several other companies

17   that's not -- Steadfast's not the only company I work for, so if

18   I work for two other companies, there may be a company, a

19   facility that's paying more.  So go there.  Or they're giving

20   more hours that you're looking for.  Or like a community setup

21   that you're interested in.  You know every, every agency does

22   not work within the same buildings.  So sometimes some buildings

23   are a little more desirable than others.

24   Q.    Okay.  So let me ask you some more questions.  Maybe we'll

25   touch on the things you talked about.  So it sounds like you

1   have worked with other agencies, other staff nursing agencies,

2   and have you --

3   A.    Yes.

4   Q.    -- and have you worked with them at the same time that

5   you've been on Steadfast's registry?

6   A.    Absolutely.

7   Q.    And would you, were you required to work a minimum or

8   maximum number of hours for Steadfast's registry?

9   A.    Not me personally, no.

10  Q.    And when you are considering whether to pick up a shift,

11  what are some factors that are important to you --

12  A.    For me?

13  Q.    -- whether to pick it up?

14  A.    My decision?  My personal decision?  Finance first.

15  Q.    What was that?

16  A.    Financial.  Financial consideration.  How much you're

17  paying me an hour.

18  Q.    Okay.  So are you looking at the hourly rate?

19        Ms. Coates, did you --

20  A.    Okay.

21  Q.    Sorry.  I said so are you looking at the hourly rate for a

22  shift when you're considering whether to pick it up?

23  A.    Of course.

24  Q.    Okay.  And any other considerations when you're deciding

25  whether to pick up a shift?

1  A.    Location of the facility itself.

2  Q.    Okay.

3  A.    You know, agency work is a tight-knit little community, so

4  you get the word of mouth from other nurses, what's a good place

5  to go to and what's a not-so-great place to go to.  So, but some

6  people will go to a place that's five minutes from their house

7  even though it's terrible.  I just choose not to go there.  But

8  I've driven hours to get to a place and work.

9  Q.    Why do you prefer -- or why do you schedule with multiple

10  agencies at the same time?

11          MR. SEIFELDEIN:  Your Honor, objection as to

12  scheduling with other facilities.  The Court has repeatedly said

13  Steadfast.  There's really no relevance to that line of

14  questioning.

15          THE COURT:  Sustained.

16          MS. RUST:  I'm not asking about the practices of the

17  other agencies, but her scheduling preferences.

18          THE COURT:  No, you've already asked her whether she

19  scheduled with other agencies at the same time.  That question

20  has been asked repeatedly during this case, as the Court

21  understands it, to show that they have some control over their

22  schedule.  So I think I'll sustain the objection.  We've gone

23  far enough with that.

24          MS. RUST:  Okay.  I'll move on.

25  BY MS. RUST:

```
 1  Q.   Has Steadfast ever provided you with any training or

 2  orientation?

 3  A.   No.

 4  Q.   Has Steadfast ever provided instructions or guidance to you

 5  for performing nursing services at a facility?

 6  A.   No.

 7  Q.   Have you ever seen anyone from Steadfast's office -- and

 8  I'm not referring to other nurses on the regular industry, but

 9  Steadfast management -- have you ever seen someone from

10  Steadfast management on-site at a facility with you?

11  A.   No.  You have to remember, Steadfast is in Virginia, I work

12  and live in North Carolina.

13  Q.   Well, when you were picking up shifts through --

14  A.   Oh, when I -- no.  No.  Because I worked overnight too.  So

15  you have to think about who's coming out at midnight or one,

16  two o'clock in the morning.

17  Q.   Okay.  Of course.

18  A.   I mean, unless was an issue, but I mean, I'm a

19  professional, so I've always handled myself accordingly.

20  Q.   Okay.  Have you ever received a performance evaluation from

21  Steadfast?

22  A.   No.

23  Q.   Have you ever received discipline or corrective action from

24  Steadfast?

25  A.   No.
```

1   Q.   And have you ever -- are there circumstances where you have

2   negotiated for a different rate of pay?

3   A.   There have been.

4   Q.   What did -- can you give an example of some of those

5   circumstances, just briefly?

6   A.   I worked in Baltimore one time for like a three -- 16-hour

7   shift -- a three-day, 16-hour shift from like Friday to Sunday

8   and negotiated a higher rate then and then stayed out there and

9   then came back home.

10  Q.   Okay.  And do you track your -- when you've picked up

11  shifts on Steadfast's registry, do you track your own hours for

12  the shifts that you worked?

13  A.   Now see, remember, that's new to me.  Everything with me

14  was -- before that came about, it was all just paper and, you

15  know, phone calls --

16  Q.   Okay.  So let me -- talking about when you were picking up

17  shifts at Steadfast's registry, during that time, how did you

18  keep track of your hours for the shifts you picked up with

19  Steadfast?

20  A.   I'm not -- I mean -- well, I mean, I personally had like a

21  calendar.  You just write down what days you got.  But once

22  you're in the business and the way we work, you're pretty much

23  kind of keeping it in your head, like who you're working with

24  this week.  Like I can work in one building for two different

25  agencies in one day.

1  Q.   And do you have to submit any information to Steadfast

2  about the hours that you've worked on their registry?

3  A.   You just submit your time slip as you work.  I mean, *per*

4  *diem*.

5  Q.   Okay.  And in your experience, does the facility have to

6  sign that time sheet when you finish a shift?

7  A.   Yes.  Yes.  The facility -- whoever's the charge nurse or

8  the scheduler has to sign or you can't get paid.  But that's

9  with any company.

10 Q.   Okay.  And how long have you been in the nursing industry?

11 A.   I've been a nurse nine years.  I was a CNA for 12 before I

12 became a nurse.

13 Q.   Okay.  Why do you, why have you chosen to work as a nurse

14 in an agency when you were doing that?

15 A.   Because it pays more money.

16 Q.   Okay.  Any other reasons, or is that --

17 A.   I'm just not, I'm not -- I don't like to be complacent.  I

18 like to come and go as I please.

19 Q.   I'm sorry, I didn't hear the last sentence.

20 A.   I said I like -- I don't like to become complacent so I

21 look to move around.

22        MS. RUST:  All right.  Thank you for your testimony,

23 Ms. Coates.  The attorney for the plaintiff might ask you a few

24 questions if you can hold on just a moment.

25        THE WITNESS:  Okay.

```
 1              THE COURT:  Cross-examination?

 2                      CROSS-EXAMINATION

 3  BY MR. SEIFELDEIN:

 4  Q.   Good afternoon, Ms. Coates.

 5  A.   Good afternoon.

 6  Q.   This is Mohamed Seifeldein from the Department of Labor.

 7  A.   Okay.

 8  Q.   So just to begin with, the company that you worked for is

 9  called Steadfast Medical Staffing, correct?

10  A.   That's correct.

11  Q.   You don't know the difference between a staffing agency and

12  a registry, do you?

13  A.   I don't.

14  Q.   Okay.  And --

15  A.   First time I've heard it called a registry before.

16  Q.   This is the first time?

17  A.   First time.

18  Q.   Now, you talked briefly with Ms. Rust about time slips and

19  payment.  Steadfast required you to submit a time sheet,

20  correct?

21  A.   Correct.

22  Q.   And if you did not provide that time sheets back to

23  Steadfast with the hours you worked, you would have a issue

24  receiving payment for the services or the care you provided,

25  correct?
```

1    A.   That's correct.

2    Q.   And these time sheets that Steadfast provided to you had

3    the name Steadfast on them, correct?

4    A.   Correct.

5    Q.   And when you went to facilities and worked, you did work

6    more than 40 hours in the work week at some point, correct?

7    A.   Sure.  Yes.  Correct.

8    Q.   When you worked more than 40 hours in the work week

9    Steadfast did not pay you overtime, correct?

10   A.   So that's where -- see, I -- with me personally, I just

11   worked.  So because I worked for multiple companies, I never

12   paid attention to something like that.  I just knew I was

13   working a lot.

14   Q.   Did you get time and a half -- well, let me ask it this

15   way:  What was your hourly rate when you worked for Steadfast?

16   A.   30 was the base rate when I left.

17   Q.   So if 30 was the base rate -- and that was set by

18   Steadfast, correct?

19   A.   Correct.

20   Q.   Okay.  So when you worked more than 40 hours in a work

21   week, your hourly rate was still $30, correct?

22   A.   Correct.

23   Q.   And when you were sent to a facility by Steadfast you did

24   not bring anyone with you to work the shift with you, correct?

25   A.   No.  You can't do that.

```
 1  Q.   And you cannot hire anyone to complete the shift on your

 2  behalf and then Steadfast would pay you, correct?

 3  A.   That would be -- no, you cannot do that.

 4  Q.   And --

 5  A.   I can't even imagine, but you can't do that.

 6  Q.   I can't either.  Thank you.

 7       I'm sorry?

 8  A.   No, I was saying no, you just can't do that.  You can't do

 9  that.

10  Q.   And that's Steadfast's requirement, correct?

11  A.   I mean, that would be any company -- I mean, I don't know.

12  Would that be any company's requirement?  I'm the nurse, but I'm

13  going to send what my daughter out on my behalf --

14  Q.   I'm asking specifically --

15  A.   -- she's not a nurse.

16  Q.   I'm sorry.

17       I'm asking specifically about Steadfast.

18  A.   Oh, okay.  No.  No, you can't do that.

19            THE COURT:  You have to wait.  Can't but one of you

20  talk at a time, so wait for him to finish his question before

21  you give an answer.

22            THE WITNESS:  Okay.  Sorry.

23            MR. SEIFELDEIN:  I know you're sitting outside, so I

24  appreciate your patience.

25  BY MR. SEIFELDEIN:
```

1  Q.    And when you work at a facility -- I know you do a solid

2  job.  If there's a issue, you address it with Steadfast,

3  correct?

4  A.    Correct.

5  Q.    You would not address it with the facility?

6  A.    I would do both.

7  Q.    You would address it with Steadfast?  Would you call Lisa

8  or would you --

9  A.    You would call them.  Yeah, you would call them.

10 Q.    And those instructions were given to you by Steadfast,

11 correct?

12 A.    Correct.

13 Q.    And Ms. Rust talked to you briefly about equipment that you

14 may use to perform some of your duties, correct?

15 A.    Correct.

16 Q.    And you mentioned some of those equipments that you use,

17 right?

18 A.    Correct.

19 Q.    Those equipments are normal tools of the trade that an LPN

20 usually uses regardless of what type of facility she performs

21 her duties, correct?

22 A.    Correct.

23 Q.    And some of these equipments are more of a personal

24 preference, correct?

25 A.    Correct.

1   Q.   And when you went to a facility, the larger equipment were

2   provided by facility, correct?  Like the computer, the charting

3   and things like that?

4   A.   Correct.

5   Q.   And you didn't pay any money out of your pocket once

6   Steadfast assigned you a shift to pay for this equipment every

7   time?

8   A.   No.

9   Q.   Okay.  Now, you talked to Ms. Rust about receiving

10  incentives to drive far to go to Baltimore when you worked the

11  three-day shift, 16 hours --

12  A.   Correct.

13  Q.   -- a lot of hours, and --

14  A.   Correct.

15  Q.   -- as an incentive for you to go to Baltimore Steadfast

16  paid for your hotel, correct?

17  A.   Correct.

18  Q.   And the reason they paid for your hotel was because they

19  were in a bind and they needed someone to cover the shift,

20  correct?

21          MS. RUST:  Objection, calls for speculation.

22  A.   Correct.

23          THE COURT:  Sustained.

24  BY MR. SEIFELDEIN:

25  Q.   And other than the hourly rate that Steadfast paid you and

```
 1  the incentive we just talked about, you didn't receive any

 2  profit from Steadfast, correct?

 3  A.   Correct.

 4  Q.   And you couldn't -- well, did you assign a shift to another

 5  nurse at any point when you worked at Steadfast?

 6  A.   Never.

 7  Q.   Would you need Steadfast's approval?

 8  A.   Excuse me?  Can you clarify?  What do you mean "assign it

 9  to someone else?"  Like... how is that possible?

10  Q.   So you were assigned a shift by Steadfast and you can't

11  make it for some reason and then you called Steadfast like you

12  testified and say, hey, I can't make it, can I send, you know,

13  LPN Taylor?

14  A.   No.  If I couldn't make it I would just cancel and say I

15  can't make it.  But I would do it in enough time that they can

16  try to get someone else to cover it.

17  Q.   And with those you talked to Ms. Rust about, if you were to

18  run late, you -- you don't -- actually strike that.

19       You provided a notice to Steadfast and the facility,

20  correct?

21  A.   Of course.

22  Q.   Okay.

23  A.   Correct.

24  Q.   And that notice has to be within two hours; is that

25  correct?
```

```
 1   A.    Within -- correct.

 2   Q.    And that's required by Steadfast, correct?

 3   A.    Correct.

 4   Q.    And Steadfast determined the service that you would provide

 5   based on your classifications as an LPN, correct?

 6           MS. RUST:  Objection, mischaracterization of

 7   testimony.  Also outside of the scope.

 8           THE COURT:  Well, if she knows.  It's overruled.

 9           MR. SEIFELDEIN:  Okay.

10           THE COURT:  Rephrase the question.

11           MR. SEIFELDEIN:  Sure, Your Honor.  Thank you.

12   BY MR. SEIFELDEIN:

13   Q.    Do you know how Steadfast assigns your shift?  Based on

14   what?

15   A.    I mean they -- my assumption is when they send you it's

16   because it's for an LPN or whatever my scope of practice is.

17   Q.    Right.

18   A.    I know what my scope of practice is when I go in any

19   building.

20   Q.    And that scope of practice as an LPN is the same regardless

21   of which building you work in on behalf of Steadfast, correct?

22   A.    Correct.

23   Q.    And as far as you know, Steadfast is a company that

24   provides temporary personnel to nursing homes or other medical

25   facilities, correct?
```

```
 1  A.   Correct.

 2  Q.   And to your knowledge that's the only service that

 3  Steadfast provides, correct?

 4  A.   Correct.

 5  Q.   Now, you talked about scheduling with Ms. Rust, and that

 6  Steadfast will call you or you will call them for assignments,

 7  correct?

 8  A.   Correct.

 9  Q.   And you've indicated that ultimately you pick from the

10  options that Steadfast gives you, correct?

11  A.   Correct.

12  Q.   So absent those options, you would not be able to pick up a

13  shift with a facility directly, correct?

14  A.   Correct.

15  Q.   And you cannot talk to the facility directly -- in fact,

16  you did not talk to the facility directly about how much you

17  would get paid for the care you provided at the facility,

18  correct?

19  A.   Correct.

20  Q.   And Steadfast did that for you?

21          MS. RUST:  Objection, calls --

22  A.   Correct.

23          MS. RUST:  -- for speculation.

24          THE COURT:  Overruled.

25  BY MR. SEIFELDEIN:
```

**JA883**

1  Q.   When you provided care to the facility, who paid you for

2  the care that you provided?  Steadfast?

3  A.   My paycheck would come from Steadfast.

4  Q.   And the paychecks that you received had the name Steadfast

5  on them, correct?

6  A.   Correct.

7  Q.   And so going back to the scheduling, ultimately the shifts

8  you picked were based on what Steadfast provided?

9  A.   I'm sorry I didn't hear you.  Can you repeat that?

10 Q.   Ultimately -- I'm sorry, yeah.  Technology.  There's a

11 delay here, I think.

12 A.   Yeah.

13 Q.   Ultimately you, depended on Steadfast to provide those

14 options for you, correct?

15 A.   Correct.

16 Q.   And you did not have your own business when you worked for

17 Steadfast, correct?

18 A.   Correct.

19 Q.   And you did not advertise your business in any way when you

20 worked for Steadfast, correct?  Because you didn't have one.

21 A.   Correct.  I don't have one.  I can't advertise something I

22 don't have.  I'm my own advertisement.  I work.

23 Q.   It speaks for itself.  I understand.  I understand.

24      You said you worked for Steadfast from 2016 up until

25 roughly May 2021, correct?

 1 | A.    Correct.

 2 | Q.    And only if you know, during that time period early on did

 3 | you know if Steadfast had insurance on you?

 4 | A.    I don't know.

 5 | Q.    And you're not privy to any information or discussion that

 6 | Steadfast had with the facilities about insurance, correct?

 7 | A.    I don't.  I don't know.  Correct.

 8 | Q.    And if you were having issues with your time sheets or your

 9 | paycheck, you would address them with Steadfast, correct?

10 | A.    You would address them with Steadfast, correct.

11 | Q.    And have you ever received Next Day Pay from Steadfast?

12 | A.    I've done it several times, but Next Day is never next day,

13 | it's only certain days you get paid for Next Day.

14 | Q.    Within a couple of days or so?

15 | A.    Yeah.  It's every Tuesday and Thursday, I believe.  So if

16 | you work Friday you wouldn't get paid until the next Tuesday.

17 | Q.    And you testified that you -- that Steadfast began using an

18 | app recently, correct?

19 | A.    Correct.

20 | Q.    And you've had experience with that app, correct?

21 |         MS. RUST:  Objection.  Mischaracterization of the

22 | testimony.

23 |         THE COURT:  It's a leading question whether she's had

24 | experience with it.  She can answer yes or no.  So overruled.

25 | BY MR. SEIFELDEIN:

**JA885**

1  Q.    You had experience with the app, correct?

2  A.    Correct.

3  Q.    And that related to you working hours that you put on the

4  app but were not reflected on your paycheck, correct?

5  A.    Say -- I don't understand that question.

6  Q.    So you had issues with the app when you put hours in,

7  correct?

8  A.    Correct.

9  Q.    And as a result of filling the hours in the app, Steadfast

10  did not pay you for certain of those hours, correct?

11  A.    Well, let me just explain.  The issue that I had with that

12  app, which is called Zira, I believe, I wasn't clear on how to

13  actual -- it actually worked, so I didn't know that you had to

14  also submit a time slip once you clocked in.  I thought once you

15  clocked in you were, that was it, that was your time keep.  So

16  for, I want to say maybe three days, I worked and it didn't

17  submit -- you're supposed to submit your time slip at the end of

18  each shift, but I didn't do that because I thought -- my

19  assumption was once you clocked in, that was the time keep.

20  Q.    So as a result --

21  A.    And then when I --

22  Q.    I'm sorry, go ahead.

23  A.    No.  I was just saying that when I didn't get paid, I had

24  to contact them to find out what was going on, and then I was

25  explained how it actually worked.  So the scheduler forwarded my

1  time to them so I could get paid.

2  Q.   So you still have to submit an app -- I'm sorry.  You still

3  have to submit a time sheet when you're using the app, correct?

4  A.   Correct.

5  Q.   And you submit that to Steadfast, correct?

6  A.   Correct.

7  Q.   In order to get paid, correct?

8  A.   Correct.

9  Q.   And you've had -- you attempted to claim a shift through

10  the app, correct?  Or picked up a shift?

11  A.   I -- yes.  You're asking me --

12  Q.   You've tried to use the app to schedule a shift?

13  A.   That, that app was very -- it wasn't user-friendly.  Not

14  for me.

15  Q.   Right.  So as a result --

16  A.   I would always just call.

17  Q.   You had to call.

18       So as a result, you still have to call Steadfast for

19  approval for them to assign you a shift?

20  A.   Correct.  Which you would typically get a text or a phone

21  call, but mostly a text saying that you've been approved for

22  this shift or this date is confirmed.  It would just say

23  confirmed.

24  Q.   So even when you sign up with the app you get a

25  confirmation or approval from Steadfast?

**JA887**

```
 1  A.    Right.  You got to get a confirmation before you can go.

 2  Q.    Right.  So ultimately Steadfast is still in control?

 3  A.    Well, yeah.  Because you can't go -- if you go you won't

 4  get paid.

 5  Q.    Right.  And you get access to the app -- only Steadfast

 6  allows to you use the app, correct?

 7          MS. RUST:  Objection, calls for speculation.

 8          THE COURT:  Wait a minute.

 9          MR. SEIFELDEIN:  I'm sorry?

10          THE COURT:  Let me rule on the objection.  That's a

11  conclusory statement, but it's a leading statement and she can

12  answer yes or no.  Objection overruled.

13  BY MR. SEIFELDEIN:

14  Q.    So can you answer the question?

15  A.    Can you ask that again, please?

16  Q.    Sure.  Ultimately Steadfast was in control?

17      Well, you have to get Steadfast approval to pick up the

18  shifts, correct?

19  A.    Correct.

20  Q.    So ultimately Steadfast was in control of the shifts that

21  you worked or you picked?

22  A.    Well, I mean, it's their app, so yeah.  You download the

23  app on your phone and, yeah.

24  Q.    And you get the app through a notification from Steadfast,

25  correct?
```

**JA888**

```
 1  A.   Correct.

 2  Q.   And the app has the name Steadfast on it, correct?

 3  A.   I don't remember from the last time I used it.

 4  Q.   Okay.  So you couldn't use this app to pick up a shift in

 5  New Jersey where you are right now, correct?

 6  A.   No.

 7  Q.   Now, regarding your testimony today, did you receive a

 8  notice from defendants about what this case is about when you

 9  spoke with them?

10  A.   I mean, they called me and just, like, asked me questions

11  like you're asking me now.

12  Q.   Other than the subpoena that you received from

13  defendants -- let me show you something here.

14  A.   Okay.

15       Yeah, I remember seeing the subpoena.

16  Q.   This is not the subpoena.  Can you look at it closely?

17  A.   Okay.  I see it now.  Notice from the Court.

18  Q.   Did the defendants provide you with this notice?

19  A.   I don't recall that one.

20  Q.   Okay.

21  A.   I mean, I may have.  I don't recall it.  I'm honestly going

22  to tell you, I'm not big on checking emails or my mail.

23  Q.   Okay.  And just to be clear, when you worked over 40 hours

24  in the work week you said you were paid straight time, correct?

25  A.   Correct.
```

```
 1  Q.   And ever since you left Steadfast in May to this point you

 2  have not received back wages for the overtime hours that you

 3  worked, correct?

 4  A.   Correct.

 5  Q.   And to the extent that -- well, would you like to be paid

 6  for the overtime hours that you worked?

 7  A.   Yes.  If I worked and earned it, yes.

 8           MR. SEIFELDEIN:  No further questions, Your Honor.

 9           THE COURT:  Any redirect?

10           MS. RUST:  Just a few quick questions.

11                        REDIRECT EXAMINATION

12  BY MS. RUST:

13  Q.   Okay.  Ms. Coates, I have a couple of quick questions for

14  you?

15  A.   Okay.

16  Q.   When you were talking to Mr. Seifeldein you said I'm my own

17  advertisement at work; is that right?

18  A.   Well, because you're asking me, you asked me a question

19  about having a business, I mean --

20  Q.   Yeah.

21  A.   -- I don't own a business.  I would be my business if I'm

22  working.  I'm an LPN, you know.  I'm coming as a nurse, is what

23  I'm saying.

24  Q.   Right.  So what did you mean by saying you're your own

25  advertisement?
```

```
 1  A.    I mean if I -- if I walk into the nursing home and I had a

 2  nursing uniform, what would you assume that I was?  I would

 3  either be a nurse or a CNA.  I would be one of the two, is what

 4  I'm saying.

 5  Q.    Okay.  And Mr. Seifeldein also asked you, he asked you

 6  about the opportunities presented by Steadfast to you, and if --

 7  I think he asked whether those would -- you would rely on them

 8  to let you know about the opportunities.

 9        I'm sorry I lost you again.

10            THE WITNESS:  I'm sorry.  Uh-oh.  Wait a minute.

11  There's a tow truck behind me.

12            (Off-screen) I'm on the phone!  I'm okay!  Thank you!

13            THE WITNESS:  I'm sorry.  My apologies.  I'm on the

14  side of the road --

15            MS. RUST:  Okay.  I'm sorry.

16            THE WITNESS:  -- on the Turnpike and -- thank you.

17            My apologies to the Court.

18            MS. RUST:  Is everything okay, Ms. Coates?

19            THE WITNESS:  Yeah.  It -- well, I guess the cops

20  thought I might be in trouble because I'm sitting on side of the

21  road with my hazards on.

22            MS. RUST:  All right.  Well, let us know if thinking

23  anything changes.

24            THE WITNESS:  I'm okay.  Okay.  He's pulling off.

25  BY MS. RUST:
```

**JA891**

1  Q.   Okay.  Just a couple quick questions and then you can be on

2  your way.

3  A.   Sorry.

4  Q.   Okay.  So I think my question was Mr. Seifeldein asked you

5  about when you're scheduling, you can only pick from the options

6  that are provided to you; is that right?

7  A.   That's correct.

8  Q.   Okay.  And is that your -- do you have any reason to

9  believe that Steadfast would not tell you about other available

10  opportunities that they have for your licensure?

11         MR. SEIFELDEIN:  Objection, Your Honor.  Calls for

12  speculation.

13         THE COURT:  Sustained.

14  BY MS. RUST:

15  Q.   When you pick up, when you pick up shifts with Steadfast,

16  are you able to pick up as many shifts as you want or as little

17  as you want based on --

18  A.   Personally, me, yes.

19  Q.   Okay.  And then I just want to follow up on

20  Mr. Seifeldein's question about that notice from the court

21  really quick.

22  A.   Hm-hmm.

23  Q.   Can you see this document?

24  A.   I can.

25  Q.   Okay.  And in the To column here, is that your email

1   address?

2   A.    It is.

3   Q.    Okay.  And can you -- the date here, can you read that?  If

4   you can't, I can zoom in.

5   A.    Yeah.  Well, I can see it's highlighted.

6           THE COURT:  Don't let the witness speculate.  We will

7   not have the witness speculate what the document says.

8           MS. RUST:  Yeah, I'm sorry.

9   BY MS. RUST:

10  Q.    Are you able to read through the highlighting or --

11          MR. SEIFELDEIN:  Objection, Your Honor.

12          THE WITNESS:  I see --

13          MR. SEIFELDEIN:  Objection, Your Honor.  Misleading,

14  mischaracterization of the document, as it says "When we spoke

15  last year on the phone about your experience working for

16  Steadfast."

17          THE COURT:  The basic problem here with the document

18  is the document is hard to see on the screen here.  So we have

19  to find some other way to question the witness.

20          Well, now you've sharpened it some, maybe that will

21  improve.

22          Now what's your objection?  We can see the document.

23  What's your objection?

24          MR. SEIFELDEIN:  This says "When we spoke last year",

25  so it does not capture the proposition that defense counsel is

1  trying to establish.

2          MS. RUST:  Perhaps I can ask her a few questions then

3  he'll know what I'm trying to establish.

4          THE COURT:  All right, then let's see what she's

5  trying to establish.

6          MS. RUST:  Okay.

7  BY MS. RUST:

8  Q.   Ms. Coates, are you able to read the date on this email now

9  that I've zoomed in a little bit?

10  A.   Yes.

11  Q.   Can you say what the date of the email is?

12  A.   August 13th, 2021 at 12:14 p.m.

13  Q.   Okay.  And do you recognize the name right above the date?

14  A.   Yeah.

15  Q.   And do you recall receiving this email?

16       And let me know, I can zoom out so you can read further a

17  little bit.

18  A.   I don't recall the email, but I just recall, I recall

19  speaking to someone on different occasions.

20  Q.   Okay.  Do you recall receiving an email from me maybe a

21  month ago or a few weeks ago?

22  A.   It's possible.  It's possible.  I, I honestly am, truly am

23  pretty terrible with going over my email if it does not pertain

24  to the --

25  Q.   That's okay.  So I want to confirm --

```
 1              MR. SEIFELDEIN:  Objection, Your Honor, calls for

 2   speculation because the witness already answered the question.

 3              THE COURT:  We have another problem, Ms. Rust:  Be

 4   careful not to interject yourself into the middle of your

 5   testimony here.

 6              MS. RUST:  Understood.  Okay.

 7   BY MS. RUST:

 8   Q.   Ms. Coates, do you recall signing a statement regarding

 9   your experience with Steadfast Medical Staffing?

10   A.   I don't -- I can't say yes or no, because I don't verbatim

11   remember.  I mean, I'm kind of all over.  I work a lot and I'm

12   in different places.  Like, I'm in New Jersey.  My focus is

13   not -- I'm sorry --

14   Q.   That's okay.

15   A.   -- if it's not in my sight it's not on my mind.

16   Q.   If I showed you the document, might that refresh your

17   recollection as to whether you signed a statement?

18   A.   If you show me it's my signature I can tell you if it's my

19   signature or not.

20              MR. SEIFELDEIN:  Your Honor, objection.  This is

21   outside of the scope as well and --

22              THE COURT:  Let's find out what you're trying to do

23   with the document.  What are you trying to do with the document

24   distinctly?

25              MS. RUST:  Mr. Seifeldein specifically asked her about
```

Paul L. McManus, RMR, FCRR Official Court Reporter

**JA895**

1   whether she received that notice from the court regarding

2   information that we were to provide to witnesses, and I am going

3   through testimony establishing the various times she was

4   informed of that information.

5              THE COURT:  That she what?

6              MS. RUST:  That she was informed of that information

7   or provided a copy.

8              THE COURT:  If you can use the document to refresh her

9   recollection, that's the only thing -- it doesn't come into

10  evidence -- but to use it to refresh her recollection, you may

11  proceed.

12             MS. RUST:  That's all I'll do.

13             MR. SEIFELDEIN:  Your Honor, the statement that

14  Ms. Rust is talking with about was from June 27, 2020, and the

15  last document was from August 31st, 2021.  The notice was

16  supposed to be provided before the statement was even drafted.

17  But also, Your Honor, the witness, when I asked her the question

18  she says she doesn't recall, so I'm not sure this is the most

19  useful use of the Court's resources.  It's not relevant.

20             THE COURT:  You can use almost anything to refresh a

21  witness's recollection.  Now, if you have a problem of when this

22  document there was submitted to her versus the date that you're

23  inquiring about in 2021, there's a problem.  But ordinarily you

24  can use anything to refresh a witness's recollection.

25             MS. RUST:  Okay, Your Honor.  Thank you.

Paul L. McManus, RMR, FCRR Official Court Reporter

**JA896**

```
 1              THE COURT:  If it can refresh it.

 2              Other thing:  It needs to be marked too.

 3              MS. RUST:  For refreshing?

 4              THE COURT:  Yes, ma'am.  Even though it's not coming

 5   in, it has to be marked so we can track whatever was shown to a

 6   witness.

 7              MS. RUST:  Of course.

 8              THE COURT:  So what exhibit number is it?

 9              COURTROOM DEPUTY CLERK:  203.

10              THE COURT:  203.  So see if we can get the witness to

11   refresh her recollection using 203.

12                        (DX-203 received in evidence.)

13   BY MS. RUST:

14   Q.   I'll zoom out a little bit on this document.  This is the

15   first page, and I'll show you the second page as well.

16              THE COURT:  You may ask her to read the pertinent part

17   to kind of speed things along.

18              MS. RUST:  Of course.

19   BY MS. RUST:

20   Q.   Here is the second page.  Do you recognize your signature?

21   A.   That is my signature.

22   Q.   Okay.  You can read through this to yourself and let me

23   know if it refreshes your recollection as to my question about

24   whether you were provided a notice from -- regarding this case?

25   A.   I mean, I'm looking over it, again.  Honestly, I will just
```

1   say I may have skimmed through it, but I never really took into

2   detail about what exactly it pertained to.

3   Q.   Okay.  That's fine.  I only want you to talk about what you

4   remember.

5          MS. RUST:  Okay.  Ms. Coates, I don't have any other

6   questions for you.  Thank you very much for your time today.

7          THE COURT:  Is the witness permanently excused,

8   Counsel?

9          MS. RUST:  Yes, Your Honor.

10         THE COURT:  You're excused.  Thank you for taking the

11  time, Ms. Coates.

12         THE WITNESS:  Thank you.  I'm done?  I can hang up

13  now?

14         THE COURT:  You can leave.  You can drive.

15         THE WITNESS:  Okay.  Thank you, Your Honor.  Take

16  care.

17         THE COURT:  Okay.  It's ten past 5:00.  We're going to

18  quit right here and we're going to resume tomorrow morning at

19  10 o'clock.

20         Now, having gone through today, do you have an

21  estimate of how many witnesses you're going to be calling

22  tomorrow, Ms. Rust?

23         MS. RUST:  Yes.

24         THE COURT:  You can share it with the plaintiff -- as

25  long as you know where you're going, to save some time, you can

```
 1   share it with the Court and the plaintiffs tomorrow morning.

 2            MS. RUST:  Of course.  We'll send out the list

 3   tonight, as has been the practice.  As far as the estimated

 4   length of our case, if that's what the Court is asking for, I

 5   think we will go through tomorrow and probably spill into the

 6   next morning, but I don't believe we'll need all of -- what's

 7   today, Tuesday?  I don't think we'll end up using all of

 8   Thursday.  I will update counsel accordingly, but that's our

 9   estimate right now.

10            THE COURT:  Just remember the Court's precaution about

11   being repetitive and cumulative.

12            MS. RUST:  Of course.  Thank you.

13            (Whereupon, proceedings concluded at 5:10 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25
```

**JA899**

846

*CERTIFICATION*

    *I certify that the foregoing is a true, complete and correct transcript of Volume 5, Afternoon Session, of proceedings held in the above-entitled matter.*



Paul L. McManus, OCR

Digitally signed by Paul L. McManus, OCR
DN: cn=Paul L. McManus, OCR, c=US,
email=pmcmanusocer@verizon.net
Date: 2021.10.04 14:03:23 -04'00'

_____

Paul L. McManus, RMR, FCRR

_____

Date

**JA900**

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF VIRGINIA
 2                       Norfolk Division

 3   - - - - - - - - - - - - - - - - - - -
                                         )
 4   MARTIN J. WALSH, SECRETARY OF        )
     LABOR, UNITED STATES                 )
 5   DEPARTMENT OF LABOR,                 )
                                          )
 6          Plaintiff,                    )
                                          )       CIVIL ACTION NO.
 7     v.                                 )          2:18cv226
                                          )
 8   MEDICAL STAFFING OF AMERICA,         )
     LLC, etc., et al.,                   )
 9                                        )
            Defendants.                   )
10   - - - - - - - - - - - - - - - - - - -

11

12                   TRANSCRIPT OF PROCEEDINGS

13                 ** Bench Trial - Day 6 **

14                     Norfolk, Virginia

15                     September 8, 2021

16

17   BEFORE:  THE HONORABLE RAYMOND A. JACKSON
              United States District Judge
18

19   APPEARANCES:

20            UNITED STATES DEPARTMENT OF LABOR
              By:  Ryma N. Lewis
21                 Chervonti Jones
                   Mohamed E. Seifeldein
22                 Counsel for the Plaintiff

23            PIERCE McCOY, PLLC
              By:  Joshua L. Jewett
24                 Julia A. Rust
                   Aaron D. Siegrist
25                 Counsel for the Defendants
```

Carol L. Naughton, Official Court Reporter

**JA901**

1                          I N D E X

2

   DEFENDANTS'
3  WITNESSES                                        PAGE

4    LESLIE BOONE (Via ZoomGov.com)
          Direct Examination By Ms. Rust           849
5         Cross-Examination By Mr. Seifeldein      858
     DIXIE DeLUTIS (Via ZoomGov.com)
6         Direct Examination By Ms. Rust           878
          Cross-Examination By Ms. Lewis           883
7         Redirect Examination By Ms. Rust         889
     LISA PITTS
8         Direct Examination By Mr. Jewett         896
          Cross-Examination By Ms. Lewis           993
9         Redirect Examination By Mr. Jewett      1049

10

11

12                        E X H I B I T S

13  PLAINTIFF'S
    NO.                                             PAGE
14
     PX-100        (For ID only)                    859
15   PX-25                                          1013

16

    DEFENDANTS'
17  NO.                                             PAGE

18   DX-58                                          947
     DX-59                                          948
19   DX-42                                          977
     DX-44                                          977
20   DX-46                                          977
     DX-41                                          978
21   DX-50                                          979
     DX-64                                          993

22

23

24

25

849

L. Boone - Direct

1          (Proceedings resumed at 9:59 a.m.)

2          THE COURT:  Good morning, ladies and gentlemen.

3          We are ready to get started once again, and we're

4    prepared to go forward with a series of witnesses.  I see at

5    least three of them are remote.  I hope none are on the

6    New Jersey Turnpike.

7          MS. RUST:  I hope so too, Your Honor.

8          THE COURT:  Call your first witness.

9          MS. RUST:  The defendant calls Leslie Boone.

10          (Pause in the proceedings.)

11          THE COURT:  Perhaps the Court will simply take a

12    break while you work this out with her.  We're going to take

13    a five-minute break.

14          (Recess from 10:04 a.m. to 10:08 a.m.)

15          THE CLERK:  Ms. Boone, the Court has taken the

16    bench.  I'm going to ask you if you could please raise your

17    right hand to be sworn.

18          (Witness sworn remotely.)

19          LESLIE BOONE, called by the Defendants, having been

20    first duly sworn, was examined and testified via ZoomGov.com

21    as follows:

22                        DIRECT EXAMINATION

23    BY MS. RUST:

24    Q.  Good morning, Ms. Boone.  This is Julia Rust, the

25    attorney for Steadfast Medical Staffing and Lisa Pitts.

Carol L. Naughton, Official Court Reporter

**JA903**

850

```
                          ┌L. Boone - Direct┐
 1 │ A.  Good morning.
 2 │ Q.  I'm well.  Good morning.
 3 │          Could you please state your name for the record.
 4 │ A.  My name is Leslie Boone.
 5 │ Q.  And can you spell your name for us too.
 6 │ A.  Yes.  L-e-s-l-i-e B-o-o-n-e.
 7 │ Q.  Can I just confirm, that's L-e-s-l-i-e B-o-o-n-e; is that
 8 │ correct?
 9 │ A.  Correct.
10 │ Q.  Okay.  Ms. Boone, what is your occupation?
11 │ A.  I am a CNA.
12 │ Q.  And are you familiar with Steadfast Medical Staffing?
13 │ A.  Yes.
14 │ Q.  How are you familiar with Steadfast?
15 │ A.  (Indiscernible.)
16 │ Q.  Sorry.  We didn't catch that.  Can you speak a little
17 │ slower.
18 │ A.  It is an agency that I'm employed through.
19 │ Q.  Okay.  What work do you do for Steadfast?
20 │ A.  I'm a self-contractor through Steadfast.
21 │ Q.  Say that again.
22 │ A.  I am a self-contractor through Steadfast.
23 │ Q.  And when did you first start working with Steadfast?
24 │ A.  Oh, boy.  I believe 2015, maybe, or 2016.  I'm not sure.
25 │ Q.  Okay.  That's all right.
```

**JA904**

851

L. Boone - Direct

1          Do you currently take work with Steadfast?

2     A.  I still do, yes.

3     Q.  Okay.  On average, how often are you taking shifts with

4     Steadfast?

5     A.  One to two days a week.  Sometimes more.  But mostly two

6     days.

7     Q.  I'm sorry.  We didn't catch that.  Could you repeat that

8     a little slower for us.  The connection is a little spotty.

9     A.  I'm sorry.  I said maybe one to two days a week.

10    Normally two days a week.  Sometimes more, sometimes less.

11    Q.  Okay.  And how do you take shifts with Steadfast?

12    A.  Sometimes they go through the -- they have a scheduler --

13    Steadfast has a scheduler, and sometimes the scheduler will

14    give you assignments or ask you if you are willing to pick up

15    shifts, and sometimes when you want to take an assignment and

16    you go to a facility, they will schedule your shifts.

17    Q.  When you talk to Steadfast about the shifts, do you

18    discuss what is available or what your availability is?

19    A.  I discuss my availability, and then they try to match it.

20    Q.  Okay.  And who decides which shifts you will work?

21    A.  I do.

22    Q.  Can you repeat that?  I'm sorry.

23    A.  I do.

24    Q.  Did you say you do?

25    A.  I do.  Yes, I do.

L. Boone - Direct

1   Q.  Ms. Boone, have you ever had to cancel a shift you had
2   picked up with Steadfast?
3   A.  Yes.  I have had to cancel.  And when I cancel -- if I
4   cancel a shift, I call Steadfast or the facility.  It all
5   depends on the time for me.
6   Q.  And in the event when you have called to cancel the
7   shift, has there ever been any consequence for cancelling?
8   A.  No.  No.  I'm going to leave it like that.  No.
9   Q.  No.  Okay.
10          Ms. Boone, have you ever received any training from
11  Steadfast?
12  A.  No.
13  Q.  Okay.  And have you ever received a performance
14  evaluation from Steadfast?
15  A.  No.
16  Q.  Okay.
17  A.  No, ma'am.
18  Q.  And when you have picked up shifts with Steadfast, have
19  you gone to different facilities, or do you go to the same
20  facility?
21  A.  No.  I go to different facilities.  I go to different
22  cities.  I even go to different states.
23  Q.  Okay.  And when you have gone -- when you have worked
24  Steadfast shifts at different facilities, have you ever
25  received feedback from the facility regarding your

853

```
                              ┌─── L. Boone - Direct ───
 1 │ performance?
 2 │ A.  Yes.
 3 │ Q.  Okay.  Can you describe an example of that, when you
 4 │ received feedback from the facility?
 5 │ A.  Yes --
 6 │        MR. SEIFELDEIN:  Objection, Your Honor.
 7 │        THE COURT:  Wait a minute.
 8 │        What is your objection?
 9 │        MR. SEIFELDEIN:  Hearsay.  This is inquiring about
10 │ statements from other individuals.
11 │        THE COURT:  Well, she can tell us -- I think she can
12 │ answer the question without giving hearsay.
13 │        You just cannot testify about what -- you cannot
14 │ state what someone else said to you, but she can still answer
15 │ the question without engaging in hearsay.
16 │        So let's see how she is going to answer the
17 │ question.
18 │        MS. RUST:  Okay.
19 │ BY MS. RUST:
20 │ Q.  Ms. Boone, did you hear that?  Did you understand that?
21 │ A.  Yes, I do.
22 │        So I'll give you a "for instance."  Is it
23 │ permissible to say the facility name, or do I need to make up
24 │ a different facility name?  Because what happens is --
25 │ Q.  Ms. Boone, let me pause you.  It was a little hard to
```

Carol L. Naughton, Official Court Reporter

**JA907**

854

```
                        ┌─ L. Boone - Direct ─┐
  1  │ understand.  If you could speak slower, it will be easier.
  2  │ A.  Yes, ma'am.
  3  │ Q.  Go ahead.
  4  │ A.  If I go into a facility today and work a 7:00 to 3:00
  5  │ shift, while working that 7:00 to 3:00 shift, my supervisor
  6  │ or the scheduler for that facility, the charge nurse will
  7  │ then say to you, "Ms. Boone, can you please pick up these
  8  │ shifts?  We want you to come back."  So that's the feedback
  9  │ that I would get.
 10  │        THE COURT:  All right.  Objection sustained.
 11  │ Objection sustained.
 12  │        MS. RUST:  Well, may I reask the question?  I think
 13  │ she may not have -- I asked her about a specific experience.
 14  │        THE COURT:  Well, I'll give you an opportunity,
 15  │ Ms. Rust, to try to get this out without hearsay, and that's
 16  │ the best the Court can do.  She cannot testify about what
 17  │ someone told her to do.
 18  │        THE WITNESS:  No.  Okay.  Okay.  I got it.  I
 19  │ understand what you're saying.  I was asked to come back.
 20  │ BY MS. RUST:
 21  │ Q.  Hold on one moment, Ms. Boone.  Let's make sure we've got
 22  │ a question in front of you.
 23  │        MS. RUST:  If the Court may allow me to ask a couple
 24  │ of follow-up questions?
 25  │        THE COURT:  Okay.  But we're not going to keep doing
```

Carol L. Naughton, Official Court Reporter

**JA908**

─────────────── L. Boone - Direct ───────────────

1    this.  When the Court's ruled, it's ruled.  We'll give her

2    one more chance, and then we're moving on.

3         MS. RUST:  Understood.  Thank you, Your Honor.

4    BY MS. RUST:

5    Q.  Ms. Boone, in your experience, can you tell us if --

6    without describing what the facility told you, can you tell

7    us, have you ever received feedback from a facility about a

8    specific instance?

9    A.  Yes.

10   Q.  Okay.  And was that feedback positive or negative?

11   A.  Positive.

12        MR. SEIFELDEIN:  Your Honor, same objection.  Still

13   asking about what --

14        MS. RUST:  I'm sorry.  What did you say?

15        MR. SEIFELDEIN:  It's leading and still asking about

16   what someone else said to her rather than what she --

17        THE COURT:  That has not violated the hearsay rule

18   by asking her whether it was positive or negative.  So that

19   is overruled.

20        MS. RUST:  Okay.

21   BY MS. RUST:

22   Q.  I'm sorry.  Did you say the feedback was positive?

23   A.  Yes.

24   Q.  Have you ever received negative feedback?

25   A.  Yes.

```
                         ─L. Boone - Direct─
  1    Q.  Okay.  And was -- well, when you received negative
  2    feedback, what happened?  What was the process?
  3    A.  We found out that it was the wrong person in question.
  4    Q.  Okay.  You said --
  5    A.  It was the wrong person in question.
  6    Q.  Okay.
  7    A.  Right.  They were describing a situation that I was not
  8    present.
  9    Q.  Okay.
 10          MR. SEIFELDEIN:  Your Honor, it's hard to understand
 11    the witness.  I could not hear what the witness was saying.
 12          MS. RUST:  I'll follow back with her.
 13    BY MS. RUST:
 14    Q.  Ms. Boone, what you just said, it was something about it
 15    was the wrong person.  Could you just repeat that more
 16    slowly.
 17    A.  Yes, ma'am.
 18          I said the negative feedback I heard, that I had
 19    gotten back, came back to me, but it was the wrong person in
 20    question.  They mistook me with someone else's identity.
 21    Q.  Did you discuss that incident about feedback with anyone
 22    at Steadfast?
 23    A.  Yes.
 24    Q.  Okay.  And did Steadfast -- did you receive any
 25    discipline from Steadfast as a result of that feedback?
```

Carol L. Naughton, Official Court Reporter

**JA910**

───────────────────── L. Boone - Direct ─────────────────────

1    A.  No.  Ms. Pitts, at that point, did an investigation as

2    well.

3    Q.  Can you say the last sentence again.

4    A.  I said Ms. Pitts, at that point, did an investigation

5    herself, and we found that it was the wrong person.

6    Q.  Okay.  Did you continue to pick up shifts with Steadfast

7    after that?

8    A.  Yes, ma'am.

9    Q.  Okay.  And then, Ms. Boone, I think this is my last

10   question for you.

11          Can you just briefly describe why you have -- why

12   you choose to pick up shifts or work shifts through

13   Steadfast, personally?

14   A.  I still pick up shifts through Steadfast.  It's more

15   convenient for me.  It fits my needs.

16   Q.  I'm sorry.  Can you say that slower.  One more time and

17   that will be it.

18   A.  It fits my needs.

19   Q.  It fits your needs?  Is that what you said?

20   A.  Yes.

21          MS. RUST:  Those are all the questions.  If you

22   could stay right there, the attorney for the plaintiff may

23   ask you a few questions.

24          THE WITNESS:  Yes, ma'am.

25          THE COURT:  Cross-examination.

Carol L. Naughton, Official Court Reporter

**JA911**

─────────────────────────────L. Boone - Cross─────

1            MR. SEIFELDEIN:  Good morning, Your Honor.

2                        CROSS-EXAMINATION

3    BY MR. SEIFELDEIN:

4    Q.  Good morning, Ms. Boone.

5    A.  Good morning.

6    Q.  My name is Mohamed Seifeldein.  I'm an attorney with the

7    Department of Labor.  I've got a few follow-up questions for

8    you here.

9    A.  Yes, sir.

10   Q.  Now, you were hired by Steadfast, correct?

11   A.  Correct.

12   Q.  And as part of that hiring process, you had to fill out

13   an application, correct?

14            MS. RUST:  Objection.  Outside the scope.

15            THE WITNESS:  Correct.

16            THE COURT:  Not yet.  Not yet, Counsel.  Overruled.

17            MS. RUST:  Okay.

18   BY MR. SEIFELDEIN:

19   Q.  You had to fill out an application, correct?

20   A.  Correct.

21   Q.  And that application asked you for references, correct?

22   A.  I don't remember.

23   Q.  Okay.

24   A.  I don't remember.

25   Q.  All right.  Let me show you a document and see if that --

Carol L. Naughton, Official Court Reporter

**JA912**

——————— L. Boone - Cross ———————

1    your Employment Application and see if that refreshes your

2    memory.

3    A.   Okay.  I can't see nothing but you.

4          THE COURT:  What document are you using?  Again, to

5    refresh recollection, you have to mark this document for

6    identification, and then you show it to the witness.

7          What document number?

8          MR. SEIFELDEIN:  This is her application, Your

9    Honor, that she submitted to Steadfast, and it's marked as

10   Steadfast 6.  And what is the number there?  Beginning with

11   0966 --

12         THE CLERK:  PX-100.

13         THE COURT:  PX-100.  So you are showing her PX-100.

14         (Plaintiff's Exhibit PX-100 marked for

15   identification purposes only.)

16   BY MR. SEIFELDEIN:

17   Q.   I'm showing you a document that has been marked as

18   PX-100.

19         Do you recall filling this document out -- this

20   application out for employment?

21   A.   I cannot see anything, sir.  I don't see anything but me.

22   I don't see any document.  I don't see anything.

23   Q.   We're having a technical difficulty.  Bear with us.

24   A.   Okay.

25         THE COURT:  Counsel, you are going to have to move

Carol L. Naughton, Official Court Reporter

**JA913**

```
                          ┌L. Boone - Cross┐
 1    past this.  The only way we can do it is by share screen, and

 2    she's not able to do share screen.  So find another way to

 3    get to the point that you want to address with her.

 4    BY MR. SEIFELDEIN:

 5    Q.  However, you did fill out an application when you applied

 6    for Steadfast, correct?

 7    A.  Yes, sir.

 8    Q.  And when you filled out that application, you spoke with

 9    someone from Steadfast, correct?

10    A.  Correct.

11    Q.  And they asked you about your availability?

12    A.  Yes.

13    Q.  And then you were, after that, hired, correct?

14    A.  Correct.

15    Q.  And as part of the hiring process, you filled -- you did

16    a background check and a drug-screening test, correct?

17    A.  Correct.

18    Q.  Okay.  And Steadfast paid for those, correct?

19    A.  Correct.

20    Q.  Okay.  Now, when Steadfast assigned you to a facility,

21    you were required to submit a time sheet?

22    A.  Correct.

23    Q.  And the time sheet was provided to you by Steadfast?

24    A.  Correct.

25    Q.  And this time sheet had Steadfast's name on the top of
```

```
                          ─L. Boone - Cross─
 1    it, correct?

 2    A.  Correct.

 3    Q.  And you were required to submit this time sheet either

 4    weekly or daily, correct?

 5    A.  Correct.

 6    Q.  And you can only work shifts that Steadfast provided to

 7    you, correct?

 8    A.  I beg your pardon?

 9    Q.  The shift that you worked --

10    A.  I can't hear you.

11    Q.  -- was provided to you by Steadfast.

12    A.  (Indiscernible.)

13            THE COURT:  She's breaking up.

14    BY MR. SEIFELDEIN:

15    Q.  Ms. Boone, we're having connection problems here, so if

16    you could just pause for a second.  And the question was a

17    yes-or-no answer.  It might be easier that way.

18            So the shifts --

19    A.  (Indiscernible.)

20    Q.  The shifts that you picked up with Steadfast were

21    provided to you by Steadfast; is that correct?

22    A.  No, sir.

23    Q.  So you worked for Steadfast from, what, 2016; is that

24    correct?  Or '15?

25    A.  If you have the application in front of you, you can tell
```

Carol L. Naughton, Official Court Reporter

**JA915**

────────── L. Boone - Cross ──────────

 1  me more better.

 2          THE COURT:  Okay.  Try another question,

 3  Mr. Seifeldein.

 4          MR. SEIFELDEIN:  Okay.

 5  BY MR. SEIFELDEIN:

 6  Q.  As part of working for Steadfast, you had to get

 7  assignments, correct?

 8  A.  Yes.  You are offered assignments.

 9  Q.  The assignments were provided to you by Steadfast more

10  often than not, correct?

11  A.  Yes.

12  Q.  And you have to get Steadfast's approval to work those

13  assignments, correct?

14  A.  No, sir.

15  Q.  So you could work for another facility -- for a facility

16  that Steadfast pays you for without having to go through

17  Steadfast?

18  A.  What are you -- no.  That's not what I'm saying.  That's

19  not what I'm saying.

20  Q.  Okay.  When you worked for Steadfast, you did not invest

21  in capital funds or anything like that, did you?

22  A.  What is that?  No.

23  Q.  And when you worked for Steadfast, you didn't have your

24  own business, correct?

25  A.  I beg your pardon?

Carol L. Naughton, Official Court Reporter

**JA916**

—————L. Boone - Cross—————

1  Q.  When you worked for Steadfast, you did not have your own

2  business?

3  A.  What do you mean?  If I'm a self-contractor, isn't that

4  your own business?

5  Q.  So you had a business that was established?

6  A.  If you are -- if you are a contractor, isn't that your

7  own business?  I'm not understanding the question.

8  Q.  If you don't understand the question, say that, but you

9  don't get to ask questions.  Okay?

10         The question is:  Did you have an established

11  business formerly?

12  A.  No.

13  Q.  Okay.  You did not.

14         And when you worked for Steadfast after that

15  interview when they hired you, Steadfast set how much you get

16  paid, correct?

17  A.  Yes.

18  Q.  And you could not talk about how much you get paid with

19  the facility, correct?

20         MS. RUST:  I'm going to object.  Outside the scope

21  at this point.

22         THE COURT:  Well, you put the witness on.  You

23  explored the relationship the witness had with Steadfast.  So

24  the Court is overruling the objection.

25         MS. RUST:  Your Honor, if I may, we limited

1   Ms. Boone's testimony based on the Court's direction to avoid

2   cumulativeness.  So we limited it to specific aspects of that

3   relationship.  We are going far afield of that.  We would've

4   modified the direct.

5          THE COURT:  Let me explain it this way:

6          If you're trying to avoid being cumulative, then you

7   don't put on another witness, then, to go into this

8   relationship of whether they work for Steadfast, and

9   et cetera, because you opened the door generally to it.

10  That's what I'm talking about.

11         When you open the door to it, then the Court will

12  allow, on cross-examination, them to explore the

13  relationship.  So you opened the door to all of this.

14         But I'll say this to you, Mr. Seifeldein.

15         MR. SEIFELDEIN:  Yes?

16         THE COURT:  The Court has heard over and over about

17  these relationships with Steadfast.  So the Court doesn't

18  need to hear it all again from every witness that takes the

19  stand.

20         MR. SEIFELDEIN:  I understand.

21         THE COURT:  Cut right to the part of the best

22  questions that you've got, and then let it go.

23         Overruled.  If you keep opening the door on the same

24  thing, then we end up going over the same thing again about

25  who assigns the job, how the registry works.  I've heard it

L. Boone - Cross

 1   over and over.

 2          MR. SEIFELDEIN:  Understood, Your Honor.  As you

 3   noted, when defendants open the door, the Secretary has to

 4   respond.

 5          THE COURT:  The Court is going to put a limit on you

 6   replowing everything the Court has heard for the last three

 7   days.

 8          MR. SEIFELDEIN:  Is the Court determining that the

 9   testimony is cumulative?

10          THE COURT:  Well, we don't need to go back into all

11   the details of that because we've heard it time and time

12   again from every witness that has come on this stand, how the

13   registry works.  And that's another one.  If you have

14   something different, go right on, as long as it's within the

15   scope of the fact that she opened the door on all of this.

16          MR. SEIFELDEIN:  Understood, Your Honor.

17   BY MR. SEIFELDEIN:

18   Q.  When you worked for Steadfast --

19   A.  Yes, sir.

20   Q.  When you worked for Steadfast, you didn't employ another

21   nurse to assist you with the work, correct?

22   A.  Yes.

23   Q.  And Ms. Rust talked to you briefly about cancellation,

24   and when you needed to cancel a shift, you had to notify

25   Steadfast with a two hours' notice at least, correct?

Carol L. Naughton, Official Court Reporter

**JA919**

──────── L. Boone - Cross────────

1    A.  No.

2    Q.  Did you have to notify Steadfast?

3    A.  (Indiscernible.)

4    Q.  I apologize.  We're having difficulty hearing you.  So

5    let me repeat the question.  If you could just answer with a

6    "yes" or "no."

7            When you were cancelling a shift or running late,

8    you had to notify Steadfast, correct?

9    A.  No.

10   Q.  Okay.  Actually, if you needed to change your incentives

11   or compensation for working for Steadfast, you needed

12   Steadfast's approval, correct?

13   A.  No.

14   Q.  No?

15   A.  No.

16   Q.  Didn't you, in fact, provide a declaration and stated so

17   much, that you -- excuse me.

18           You provided a declaration in which you stated that

19   Lisa has to approve any changes --

20   A.  No.

21   Q.  -- or incentives?

22   A.  No.  Not that I know of, no.

23   Q.  I'd like to show you the statement, but I don't think

24   we'll be able to see it.

25   A.  Okay.

─────────────────────────L. Boone - Cross─────────────────────────

1           MR. SEIFELDEIN:  Your Honor, I'm going to stop here

2     at this point and just respectfully note for the record that

3     this may cause some unfairness to the Secretary in putting

4     forward some of his testimony to rebut what was

5     discussed about -- what was -- excuse me -- what defendants

6     discussed and put into the record, because the witness --

7           MS. RUST:  I'm going --

8           THE COURT:  Wait a minute.

9           You can certainly -- you said "unfairness to the

10    Secretary."  Just because you can't show her the statement

11    doesn't mean you cannot ask precise questions to get to the

12    heart of the problem.

13          MR. SEIFELDEIN:  Right.  And then she does not

14    recall -- or excuse me, Your Honor.  She said she did not put

15    a statement out.  So to that extent, the Court needs to see

16    it, but we'll just stop here.

17          THE COURT:  The Court has to be the trier of fact.

18    The Court can't try the case until we get clarification here.

19          Ms. Boone?

20          THE WITNESS:  Yes, sir.

21          THE COURT:  Do you recall making a statement in this

22    case?

23          THE WITNESS:  Yes, I do.

24          THE COURT:  And who took the statement from you?

25          THE WITNESS:  I think I did a statement with -- I'm

Carol L. Naughton, Official Court Reporter

**JA921**

———L. Boone - Cross———

1   not sure of the lady's name.  It was a lady.  She worked for

2   the Department of Labor.  I'm not sure of her name.

3          THE COURT:  And do you know when you made that

4   statement?

5          THE WITNESS:  I believe it was 2018 or 2019.

6          THE COURT:  That's all the Court is going to do.

7   You certainly have the opportunity, because you're talking

8   about the unfairness or disadvantage to the Secretary, to

9   question the witness to narrow it down piece by piece,

10  Mr. Seifeldein, just as the Court began to do it.

11         MR. SEIFELDEIN:  Appreciate your indulgence, Your

12  Honor.  No further questions.

13         MS. LEWIS:  No.

14         MR. SEIFELDEIN:  If I may consult with counsel.

15         (Pause in the proceedings.)

16         MR. SEIFELDEIN:  All right.  Your Honor, I apologize

17  to the Court again.

18         It appears that I did not hear what Ms. Boone said.

19  The declaration that we're talking about, in fact, was not

20  provided to or by the Department of Labor.  We believe it was

21  from defendants.  So that needs to be clarified.

22         And as far as the unfairness that we talked about,

23  it's that the ability for the Department due to technology to

24  put forward the documents to rebut what was said and also to

25  protect the record and admit them into the record if so

Carol L. Naughton, Official Court Reporter

**JA922**

———————L. Boone - Cross———————

 1    needed.

 2           THE COURT:  Wait a minute, now.  Wait a minute, now.

 3    You are talking about admitting something into the record.

 4           Do you have a copy of the declaration you are trying

 5    to use to refresh the witness's recollection?

 6           MR. SEIFELDEIN:  Right.  I was referencing, Your

 7    Honor, but due to the difficulties -- I was going to show her

 8    the Employment Application, the Independent Contractor

 9    Agreement, and then the declaration as we just saw that it

10    was necessary.

11           THE COURT:  Okay.  So the simple truth is you are

12    unable to do it because of the technological problem we're

13    having here.

14           MR. SEIFELDEIN:  Correct.

15           THE COURT:  All right.

16           Yes, ma'am?

17           MS. RUST:  Your Honor, I would assert my objection

18    as to the contentions regarding the declaration.  He was only

19    using it to question the witness regarding refreshing her

20    recollection, which wouldn't be admitted anyway, and she

21    already testified that she didn't recall.

22           THE COURT:  Well, there's no objection to be lodged,

23    Ms. Rust.  The simple truth is he was simply attempting to

24    use a document that the defendant had to refresh her

25    recollection about what has happened, and we can't do it

--- L. Boone - Cross ---

1    because we can't do share screen with the witness.  That's

2    just the bottom line.

3            Are you finished?

4            MR. SEIFELDEIN:  Yes, Your Honor.

5            THE COURT:  The Court has a couple questions.

6            Ms. Boone, you mentioned an example of where a

7    complaint was made and it was determined that they had the

8    wrong person, it was not you.  Do you remember that?

9            THE WITNESS:  Correct.  Yes, sir.

10           THE COURT:  Who first brought that complaint or

11   issue to your attention?

12           THE WITNESS:  Steadfast.

13           THE COURT:  Who?

14           THE WITNESS:  Steadfast.  Steadfast brought it to my

15   attention because the facility had tried to call me, and

16   because I didn't recognize the number, I did not answer the

17   phone call.

18           THE COURT:  Okay.  And so you indicated that

19   Ms. Pitts conducted an investigation to resolve it?

20           THE WITNESS:  Ms. Pitts, yeah, she did as well.  You

21   need to understand; we are mandated reporters.  We are

22   mandated reporters, and she is also a mandated reporter.  So

23   if there's an allegation of some type of abuse, you have to

24   do an investigation into it.

25           THE COURT:  Okay.

Carol L. Naughton, Official Court Reporter

**JA924**

```
                        ┌─ L. Boone - Cross ─┐
```

 1          THE WITNESS:  So it was the wrong person that they
 2    were accusing, and Ms. Pitts stepped in.
 3          THE COURT:  Thank you.  That's all the Court has.
 4          Any redirect?
 5          MS. RUST:  No, Your Honor.
 6          THE COURT:  All right.  Thank you, Ms. Boone.
 7          May the witness be excused?
 8          MS. RUST:  Yes, Your Honor.
 9          MR. SEIFELDEIN:  Yes, Your Honor.
10          THE COURT:  You may be excused.  Thank you,
11    Ms. Boone.
12          THE WITNESS:  Thank you, sir.
13          (Witness excused.)
14          THE COURT:  What we have is one of the drawbacks of
15    the technology.  When it works, it's great.  When it doesn't
16    work, it's just a problem.  And that is one situation where
17    it did not work very well.  So we hope that going forward we
18    will have a better experience with these remote witnesses.
19          All right.  Let's move on to the next witness.
20          MS. RUST:  The defendants call Dixie DeLutis, which
21    would be a remote witness.
22          MS. LEWIS:  Your Honor, the Secretary, very much
23    like yesterday, likewise objects to this witness testifying.
24          She was not identified in the Pretrial Order, nor
25    was her name in any of the discovery responses.  We did a

```
 1   basic search last night, and it appears that at some point in

 2   time, back in, approximately, 2008, at least according to her

 3   LinkedIn profile, she worked at one of the facilities,

 4   Bon Secours, but she was an RN nurse manager, from 2009 to

 5   2011; however, that time predates Steadfast's interactions at

 6   that facility by at least seven years, because Steadfast did

 7   not begin to contract, at least based upon the discovery

 8   documents that they produced, with Bon Secours until 2018.

 9           So two issues:  One, she wasn't identified in the

10   pretrial conference or any of the discovery documents; and,

11   two, to the extent that she is being used for something else

12   relative to that facility or otherwise, it predates

13   Steadfast's involvement with the facility.

14           THE COURT:  Ms. Rust, first question:  Was this

15   witness in the Pretrial Order?

16           MS. RUST:  No.  We're calling her for impeachment

17   purposes only.

18           MS. LEWIS:  Impeachment of whom, Your Honor?  This

19   is their case in chief.

20           THE COURT:  Hold it.

21           This is your case in chief.  You cannot call her in

22   your case in chief.

23           MS. RUST:  We're calling to impeach a witness --

24   testimony provided by a witness from the Department of Labor.

25           THE COURT:  But you cannot call her in your case in
```

```
 1   chief.  This is your case in chief that you're putting on.
 2   And you didn't identify her in the Pretrial Order.
 3            And is it true that she worked from 2010 to 2011
 4   before these issues even came up in this case?
 5            MS. RUST:  No.  Her testimony will be that she was
 6   working at a Sentara facility when one of the witnesses that
 7   the plaintiff called was there, and she will testify
 8   regarding a specific incident that that witness testified
 9   regarding dealing with a disciplinary issue.
10            So the evidence is for impeachment by contradiction
11   and to rebut the evidence provided.
12            THE COURT:  Okay.
13            MS. RUST:  So we wouldn't have known what testimony
14   that witness would be putting on.  So there's no way we could
15   have identified her.  She was called solely to rebut and
16   impeach that witness.
17            THE COURT:  When did you discover this witness that
18   you're calling an impeachment witness?
19            The testimony just came out here in the last three
20   or four days.  When did you identify this witness as a
21   rebuttal or impeachment witness, as you say?
22            MS. RUST:  This weekend, after the testimony from
23   Ms. Chantella Smith on the plaintiff's case in chief.
24            MS. LEWIS:  Your Honor, I submit to the Court that,
25   one, starting from the top, these are all nurses that
```

```
1    Steadfast has a relationship with.  So to the extent that
2    there was surprise with respect to Ms. Chantella Smith, that
3    information, particularly if it dates back to whenever this
4    was, has been within defendants' custody, possession, and
5    control.
6            Secondly, the discovery response -- and if the Court
7    would give me the indulgence to bring up interrogatories
8    specifically asking for disciplinary actions, et cetera, no
9    such information was provided.
10           Again, there's been multiple opportunities for
11   this representation of surprise of whatever information
12   Ms. Chantella Smith testified to that should have been
13   disclosed within the discovery process.
14           Moreover, Your Honor, this case is about the
15   relationships as a whole, and I find it difficult to find the
16   tangential relationship between one specific incident to a
17   witness, that we just found out about last night at 11:30,
18   who has never been identified as a facility POC from any of
19   defendants' supplements or otherwise.
20           THE COURT:  Here's what we're going to do with this.
21           MS. RUST:  Your Honor, may I respond to some of the
22   representations made?
23           As far as the relationship and the allegations of no
24   surprise, as the Court has noted, there's hundreds of nurses
25   listed as potential witnesses in this case.  There is no way
```

Carol L. Naughton, Official Court Reporter

**JA928**

```
 1    for us to know which witnesses the plaintiff may call and
 2    which -- what testimony that they might bring up.  So when
 3    the testimony was brought up, then we learned of the
 4    information, and we can bring it up as rebuttal impeachment.
 5           We looked into the incident and identified
 6    Ms. DeLutis over the weekend, over the last few days, who has
 7    personal knowledge regarding the testimony that Ms. Chantella
 8    Smith testified to.
 9           We had specifically asked Ms. Smith regarding
10    testimony about disciplinary actions or showing up
11    incapacitated or being sent home from a facility and how that
12    was resolved.  She testified that Ms. Pitts -- there was no
13    such event that occurred, that Ms. Pitts required her to take
14    a drug screen, and she did so within 30 minutes.
15           Ms. DeLutis will testify that she was on the floor
16    that day and observed Ms. Chantella Smith's behavior.  She
17    observed that she was incapacitated and sent her home and
18    spoke to Steadfast about it in that it was Sentara's policy
19    to require a drug screen, and it was not Steadfast's
20    decision.
21           That does go to the relationship between the nurses
22    and Steadfast because it deals with the level of control of
23    disciplinary actions and whether Steadfast is deciding to
24    discipline or send somebody home or it's the facility.
25           THE COURT:  Let's put it this way:
```

Carol L. Naughton, Official Court Reporter

**JA929**

```
 1              The Court is going to permit her to put the

 2     testimony on, but I want both of you to understand if you

 3     read the law, whether there's an employee-employer

 4     relationship here does not turn on one single incident.

 5              It's a case-specific inquiry that looks at a number

 6     of factors.  And this case is not going to turn on what

 7     happened on one alleged disciplinary event.  It's not going

 8     to happen.  There's more to it than that, but we can strike

 9     here and there and all over the place here, but it's a

10     cumulative issue.  Okay?

11              I understand what your position is, but the Court

12     knows how to handle all of it.  So put her on.

13              MS. LEWIS:  Your Honor, if I may?

14              The Secretary, likewise, we still may have rebuttal

15     witnesses because, again, there was an opportunity to cross.

16     She did cross her about this, and since we're going down this

17     path --

18              THE COURT:  You can call rebuttal witnesses when

19     she's finished.  You certainly can.

20              MS. LEWIS:  Thank you.

21              THE COURT:  The Court still has some concerns.  The

22     Court is simply putting it in the record because there's no

23     jury here.  The Court has the capability to put it all in the

24     proper perspective.

25              So let's get on with it.  But let's be specific.
```

```
 1   We're not going to go all over the place.

 2           MS. RUST:  It will be very specific, Your Honor.

 3           THE COURT:  What is this business that it's always

 4   11:30 at night when you all are exchanging information?

 5           I say to you, as counsel in this case, I've never

 6   heard of such a thing.  It's always 11:30 at night that you

 7   are receiving something.  What is this all about?

 8           MS. LEWIS:  What I will say, Your Honor -- and I

 9   think defendants will, likewise, be on the same page with us

10   with respect to the witnesses the day before.

11           So at least for the Secretary, we confirmed our

12   witnesses weeks, months, days before; but the day before

13   trial, to make sure people show up and where they need to be,

14   we confirm the same when we get back to our hotels or

15   respective offices, and that takes time to do.

16           So the objection -- and let me be clear with respect

17   to the late disclosure of Ms. DeLutis.

18           It's not that we got it at 11:30 at night; it's that

19   we've never seen this name before.  So I understand that,

20   much in trial practice, we have calls to make, and there's a

21   list of people, but the fact is, for this particular witness,

22   we've never seen her name before.

23           MS. RUST:  I will not disagree with Ms. Lewis's

24   description of contacting nurses the night before to confirm

25   their availability for the following day.
```

Carol L. Naughton, Official Court Reporter

**JA931**

─────────────── D. DeLutis - Direct ───────────────

```
 1              THE COURT:  The Court is going to give you a pass,

 2    but if you pick another one out of here, it's not going to

 3    happen.  Go on with this one.

 4              MS. RUST:  Okay.  Thank you, Your Honor.

 5              (Witness sworn remotely.)

 6              DIXIE DeLUTIS, called by the Defendants, having been

 7    first duly sworn, was examined and testified via ZoomGov.com

 8    as follows:

 9                        DIRECT EXAMINATION

10    BY MS. RUST:

11    Q.  Good morning, Ms. DeLutis.  This is Julia Rust, the

12    attorney for Steadfast and Lisa Pitts.

13    A.  Good morning.

14    Q.  Can you state your name for the record, please.

15    A.  Yes.  Dixie DeLutis.

16    Q.  Can you spell your name.

17    A.  Dixie, D-i-x-i-e; DeLutis, D-e capital L-u-t-i-s.

18    Q.  Okay.  Thank you.

19              And what is your occupation, Ms. DeLutis?

20    A.  I am an RN.

21    Q.  Okay.  And are you familiar with Steadfast Medical

22    Staffing?

23    A.  Yes.

24    Q.  How are you familiar with Steadfast?

25    A.  I have worked with them in a couple of different
```

D. DeLutis - Direct

1  facilities as they are a staffing agency that provides nurses

2  for us.

3  Q.  You said a "staffing agency that provides nurses for us."

4       Did you work for Steadfast or --

5  A.  No.  They were a contracting company that worked with the

6  company that I worked with in the past.

7  Q.  Okay.  And what position did you hold at the facility

8  where they staff nurses?

9  A.  Director of nursing.

10 Q.  Are you familiar with an individual named Chantella

11 Smith?

12 A.  Yes.

13 Q.  How are you familiar with Ms. Smith?

14 A.  She worked for us through Steadfast when I worked at

15 Hampton through Sentara.

16 Q.  Through Sentara.  Okay.

17      And you said she worked -- can you clarify, she

18 worked for Steadfast or at Sentara?

19 A.  She worked for Steadfast.

20 Q.  Okay.  And did you ever observe Chantella Smith while she

21 was working at your Sentara facility while on a Steadfast

22 shift?

23 A.  Yes.

24 Q.  And do you recall the last time you saw Chantella Smith?

25 A.  Yes.

Carol L. Naughton, Official Court Reporter

**JA933**

880

D. DeLutis - Direct

 1   Q.  And where was that?

 2   A.  That was in the rehab unit at Sentara in Hampton.

 3   Q.  Okay.  And were you working as the DON at that time as

 4   well?

 5   A.  Yes.

 6   Q.  Okay.  Do you recall what occurred during that shift?

 7   A.  Yes.

 8   Q.  Okay.  And did you personally interact with Ms. Smith

 9   during that shift?

10   A.  Yes.

11   Q.  Did Ms. Smith work the entire shift she was scheduled for

12   that day?

13   A.  No, she did not.

14   Q.  Do you recall why she did not work the entire shift?

15   A.  I do recall.

16   Q.  Okay.  Can you tell me what happened?

17   A.  Yes.

18   Q.  And what you observed personally.

19           THE COURT:  Concisely.

20   BY MS. RUST:

21   Q.  Concisely.

22   A.  Yes.  I went down to the department where she was working

23   and noticed that her demeanor was different than it had been

24   in the past.  Her eyes were glazed over.  Her gait was

25   different.  Her verbal articulation was different.  She just

Carol L. Naughton, Official Court Reporter

**JA934**

————D. DeLutis - Direct————

1   appeared in a different -- different than she had in the

2   past.

3   Q.  Okay.  And when you observed that behavior, what action

4   did you take, if any?

5   A.  I called Steadfast and verbalized my concern.  I asked if

6   we could remove her from the shift because I was concerned.

7   Q.  And what specifically was your concern that you relayed?

8   A.  I was concerned that she was impaired.

9   Q.  What was the last word you said?

10  A.  I was concerned that she was impaired and not safe to

11  perform her job duties.

12  Q.  Okay.  So you called Steadfast.  I think you said you

13  asked about removing her from the shift; is that right?

14  A.  Correct.

15  Q.  Okay.  And then was -- what was the next action that you

16  took?

17  A.  I spoke with Ms. Pitts, and she and I talked about what

18  the concerns were.  She had asked me to go down to the

19  department to remove Chantella and ask her to call her, so

20  that's what I did.  I went down and told her that we were

21  going to take her off the rest of the shift and that she

22  needed to call Steadfast.

23  Q.  Okay.  And do you recall approximately how far into the

24  shift she was sent home?

25  A.  I do not know exactly, but I do know it was within a

Carol L. Naughton, Official Court Reporter

**JA935**

─────────── D. DeLutis - Direct ───────────

1   couple of hours.

2   Q.  Okay.  And who made the decision as to whether to send

3   Ms. Smith home from Sentara from that shift?

4   A.  I had to make her leave because, per policy, if we have

5   any concerns that someone is potentially impaired, we have to

6   remove them to protect the safety of our patients.

7   Q.  Okay.  And did you permit Ms. Smith to return to the

8   facility?

9   A.  She could have.  I just asked that I have confirmation of

10  a negative drug and alcohol screen.

11  Q.  Okay.  And why did you request confirmation of a negative

12  drug and alcohol screen?

13  A.  Because that was my concern, that she was impaired by a

14  substance.

15  Q.  Okay.  So you said she could have returned if you had

16  the -- the negative confirmation.

17          So did Ms. Smith ever return to your facility

18  through Steadfast?

19  A.  She did not.

20  Q.  Okay.  Did you ever receive the negative confirmation of

21  a drug screen?

22  A.  I did not.

23  Q.  Okay.  Did you follow up to find out if that had

24  occurred?

25  A.  I did.  Because we had her assigned to other shifts

1  and --

2  Q.  Can you repeat the last sentence you said.

3  A.  I was told she did not ever go in to do her drug test.

4  Q.  Okay.  And so the additional shifts you said that she was

5  on a schedule for, did she work those shifts?

6  A.  She did not.

7        MS. RUST:  Okay.  Those are all the questions I have

8  for you.  An attorney from the Department of Labor will ask

9  you a few questions, if you could just stay right there.

10        THE COURT:  Cross-examination.  Waiting on you

11  Ms. Lewis.

12                    CROSS-EXAMINATION

13  BY MS. LEWIS:

14  Q.  Good morning, Ms. DeLutis.  My name is Ryma Lewis.  I'm

15  an attorney with the U.S. Department of Labor.  I have a

16  couple of just follow-ups and clarifications because I

17  couldn't hear.

18        What facility did you say this occurred at?

19  A.  It was at Sentara in Hampton, nursing facility.

20  Q.  And what year was this?

21  A.  I believe it was around 2017.

22  Q.  So you told Ms. Smith to leave the facility; isn't that

23  right?

24  A.  Yes.

25  Q.  But that was after you spoke with Steadfast?

───────────── D. DeLutis - Cross ─────────────

1   A.  Yes.

2   Q.  And you called Steadfast because Chantella Smith was

3   their nurse; is that right?

4   A.  Yes.

5   Q.  And you sought permission to remove their nurse, direct

6   her removal from the facility through Steadfast, on top of

7   what you testified with respect to sort of just your facility

8   safety concerns; is that right?

9          MS. RUST:  Objection.  Mischaracterization of

10  testimony.

11         THE COURT:  Well, it was a leading question.

12  Overruled.

13  BY MS. LEWIS:

14  Q.  You can answer.

15  A.  Yes.

16  Q.  You contacted Steadfast because within the contractual

17  relationship between Sentara-Hampton and Steadfast, Steadfast

18  has a responsibility to those nurses, correct?

19         MS. RUST:  Objection.  Foundation.

20         THE COURT:  Objection overruled.

21  BY MS. LEWIS:

22  Q.  You can answer the question.

23  A.  Yes.

24  Q.  And you talked to Lisa Pitts about the incident.  Am I

25  correct?

Carol L. Naughton, Official Court Reporter

**JA938**

─────────────── D. DeLutis - Cross ───────────────

1    A.  Yes, ma'am.

2    Q.  And you talked to Lisa Pitts because it's Lisa Pitts's

3    responsibility to oversee supervisor charges of the nurses

4    when they were in that facility, right?

5            MS. RUST:  Objection.  Foundation.  Not in evidence.

6            THE COURT:  Sustained.

7            MS. RUST:  Beyond the scope.

8            THE COURT:  Not beyond the scope, but sustained in

9    the form of the question.

10           You need to change that around.  Does she know

11   whether that -- I mean, because there's no evidence.  There's

12   nothing in evidence to support the question you asked, so you

13   need to inquire whether that is the situation.

14   BY MS. LEWIS:

15   Q.  Did you know Lisa Pitts to be the point of contact at

16   Steadfast?

17   A.  Yes.  She was one of them.

18   Q.  Okay.  And you contacted Lisa Pitts because she was one

19   of the point of contacts that, if there was an issue with a

20   nurse, you would refer to at Steadfast; is that right?

21   A.  Yes.

22   Q.  And you talked to Lisa Pitts about this incident?

23   A.  Yes.

24   Q.  And you talked to Lisa Pitts about this incident because,

25   as one of the point of contacts at Steadfast, she was in

─────────────D. DeLutis - Cross─────────────

 1   charge of those nurses?

 2           MS. RUST:  Objection.

 3           THE COURT:  Overruled.  If that's not the case, she

 4   can testify that's not the case.

 5           MS. RUST:  Okay.

 6   BY MS. LEWIS:

 7   Q.  You can answer the question.

 8   A.  Yes.

 9   Q.  Okay.  And when you contacted Ms. Pitts about this

10   incident, you were not the person that told Ms. Smith that

11   she needed to take a drug test; is that correct?

12   A.  Yes.

13   Q.  From your understanding, based upon your follow-up

14   conversation with Ms. Pitts, she was the one who told her to

15   take the drug test; is that right?

16   A.  I believe we had a three-way call; Ms. Pitts, myself, and

17   Chantella.

18   Q.  Okay.  And during that call, the direction to take the

19   drug test came from Lisa Pitts, not you; is that right?

20   A.  Yes.

21   Q.  You requested the result -- you indicated that you

22   requested the results of the drug/alcohol screen?

23   A.  Yes.

24   Q.  And you requested those results because the facility has

25   a responsibility to the residents, correct?

─────────── D. DeLutis - Cross ───────────

1   A.   Correct.

2   Q.   And based under those contractual terms, Steadfast,

3   likewise, has liability for their nurses.

4           MS. RUST:  Objection.  Vague.

5           THE COURT:  Sustained.

6   BY MS. LEWIS:

7   Q.   Are you familiar with the contract between Steadfast and

8   Sentara-Hampton?

9   A.   To an extent.

10  Q.   And based upon your understanding of the contractual

11  terms, does Steadfast have a duty to manage the

12  behavior/supervision of nurses at the facility?

13  A.   I think it was a joint effort.  We were there with them,

14  so we were able to see what was happening in front of us.

15  But it was their staff member.

16  Q.   Right.

17          And so within that joint responsibility, Steadfast

18  has an affirmative obligation to oversee that their nurses

19  are behaving appropriately, right?

20          MS. RUST:  Objection.  Asked and answered.

21          THE COURT:  Sustained.

22  BY MS. LEWIS:

23  Q.   You requested the -- you didn't seek the drug test

24  results directly back from Chantella, correct?

25  A.   Correct.

Carol L. Naughton, Official Court Reporter

**JA941**

888

D. DeLutis - Cross

1  Q.  You requested them from Steadfast?

2  A.  Yes.

3  Q.  And you told Steadfast that Ms. Smith could return with a

4  negative drug test; is that right?

5  A.  Yes.

6  Q.  But Steadfast did not send her back to that facility.

7        MS. RUST:  Objection.  Mischaracterization of

8  testimony.

9        THE COURT:  It's a leading question asking did they

10  send her back.  Maybe rephrase it, and it would be clearer.

11        MS. LEWIS:  Does she understand the question?  Or

12  the Court didn't understand the question?

13        THE COURT:  I'm just saying, she objected to your

14  question because of the way you phrased it, and the Court

15  simply said maybe if you rephrase it, it will be clearer to

16  the witness and maybe to counsel.  Just rephrase the

17  question.

18        MS. LEWIS:  I don't remember what my question was,

19  Your Honor.  It threw me off.  It was clear to me, but if it

20  wasn't clear to the Court, let me go back to my notes here.

21        THE COURT:  The question was:  Did they send back

22  the results of the drug test to Sentara?

23        MS. LEWIS:  Right.

24  BY MS. LEWIS:

25  Q.  Well, did Steadfast send the drug-test results to

Carol L. Naughton, Official Court Reporter

**JA942**

1   Sentara?

2   A.  Not to my building, no.

3   Q.  Did Steadfast place Chantella Smith back on the schedule

4   at Sentara?

5   A.  No.

6   Q.  You don't know what other or additional discussion

7   Steadfast may or may not have had with Ms. Smith regarding

8   this incident, do you?

9   A.  No.

10          MS. LEWIS:  No further questions.

11          THE COURT:  Any redirect?

12          MS. RUST:  Very briefly.

13                  REDIRECT EXAMINATION

14   BY MS. RUST:

15   Q.  Okay.  Ms. DeLutis, I just want to clarify a couple of

16   questions with you.

17          You discussed with Ms. Lewis regarding maybe a

18   three-way conference call with Ms. Pitts and yourself and

19   Ms. Chantella Smith.

20   A.  Yes.

21   Q.  And the discussion with Ms. Smith about taking the drug

22   test was -- you said that the direction to take the drug test

23   was from Lisa Pitts; is that right?

24   A.  Yes.

25   Q.  Was that information -- did you instruct or discuss with

─────D. DeLutis - Redirect─────

1   Ms. Pitts your request for the drug test?

2   A.  Yes.  We had to follow our protocol.

3   Q.  Okay.  So the request for the drug test was -- tell me if

4   I'm wrong, but the request for the drug test was based on

5   Sentara's protocol?

6   A.  Yes.

7   Q.  Okay.  And without the negative drug screen, could you --

8   could you accept Ms. Smith back at your facility?

9   A.  No.

10  Q.  Okay.  So if you -- you mentioned during the cross-exam

11  that Steadfast did not place Chantella Smith back on the

12  schedule.

13  A.  Correct.

14  Q.  Based on Sentara's policy, though, at that point, if she

15  had showed up for a shift through Steadfast, would Sentara's

16  policy have required you to send her home without -- if she

17  did not have that negative drug screen?

18          MS. LEWIS:  Objection, Your Honor.  Calls for

19  speculation.

20          MS. RUST:  No.  It would be based on present --

21          THE COURT:  Wait.  Don't do that.  Let me address

22  the objection first.

23          MS. RUST:  Sorry.

24          THE COURT:  Let me be clear on what the objection

25  was.  Based on what?

─────────────D. DeLutis - Redirect─────────────

```
 1          MS. LEWIS:  There was a number of ifs and thens.
 2   She previously testified that they didn't receive a drug test
 3   back.  So, Your Honor, I'd say it's an improper hypothetical
 4   based upon her prior testimony, and speculation.
 5          THE COURT:  All right.  So you can ask that question
 6   again.  I believe the question was whether that was based on
 7   Sentara's policy.  Can you ask your question again.
 8          So right now the Court overrules your objection.
 9          Ask the question again.
10          MS. RUST:  Yes, Your Honor.
11   BY MS. RUST:
12   Q.  Ms. DeLutis, at that time, if Steadfast had sent
13   Ms. Smith back to your facility on the schedule, would
14   Sentara's policy require you to send her home if you did not
15   have that negative drug screen from her at that point?
16   A.  Yes.
17          MS. RUST:  All right.  No further questions.  Thank
18   you.
19          THE COURT:  May the witness be permanently excused,
20   counsel?
21          MS. RUST:  Yes.
22          THE COURT:  Ms. Lewis, may the witness be
23   permanently excused?
24          MS. LEWIS:  We may want to reserve her.  She can be
25   excused for today, but I'd also request that counsel provide
```

─────────────────── D. DeLutis - Redirect ───────────────────

```
 1    contact information, likewise.  Again, we have no idea who
 2    this individual was.
 3            THE COURT:  All right.  Just provide the contact
 4    information for Ms. DeLutis to opposing counsel.
 5            You may be excused for the time being.  You may be
 6    subject to recall virtually again.  Thank you, ma'am.
 7            THE WITNESS:  Thank you.
 8            (Witness excused subject to recall.)
 9            THE COURT:  Okay.  Next witness.
10            MS. RUST:  Your Honor, we will not be calling
11    Mr. Thorpe who is marked as tentative on our list.
12            We subpoenaed Ms. Adams.  She notified me last night
13    that she had -- we discussed the schedule with her.  She
14    notified me last night that she had worked a shift yesterday
15    and then drove out of state to visit family last night and
16    would not be testifying.
17            THE COURT:  You subpoenaed her?
18            MS. RUST:  Yes, Your Honor.
19            THE COURT:  And she drove on out of state even
20    though she had a subpoena?
21            MS. RUST:  Yes, Your Honor.
22            THE COURT:  Where is she located?
23            MS. RUST:  Normally she's local, the Virginia Beach
24    area.  I think she said last night that she had to visit her
25    mother in Pennsylvania to take care --
```

Carol L. Naughton, Official Court Reporter

**JA946**

─────D. DeLutis - Redirect─────

1            THE COURT:  Did you explain to her the nature of

2    what a subpoena was?

3            MS. RUST:  We did discuss the subpoena, and it was

4    e-mailed to her over the last week or so when discussing the

5    timing of her testimony, yes.

6            THE COURT:  And she ignored the subpoena, in other

7    words?

8            MS. RUST:  Uh-huh.

9            MS. LEWIS:  Your Honor, I would just make an

10   inquiry.  The timely subpoena pursuant to local rules is 14

11   days.  So the question is was it sent prior to 14 days with

12   respect to the enforcement of the subpoena?

13           THE COURT:  Well, we're coming to that issue,

14   because what the Court will do before the Court does issue

15   any show cause or anything of that nature, the Court will

16   want to find out when was the subpoena served, when was it

17   executed, whether it's all in proper form and order.  The

18   Court does not ignore circumstances where people just ignore

19   subpoenas from the Court.

20           So you will have to provide to the Court when she

21   was subpoenaed and when she was served, and then the Court

22   will find out whether the Court should issue a show cause at

23   some point, even after this case is over, for failure to

24   appear.

25           Now, since that was Ms. Adams, you said, so -- now,

Carol L. Naughton, Official Court Reporter

**JA947**

D. DeLutis - Redirect

1    I see Ms. Pitts is down here on the list again.  You know,

2    it's wonderful.  It would have been very good if you had told

3    the Court when they put on Christine Kim and they put on

4    Ms. Pitts that you intended to call both witnesses, because

5    what the Court in the past has done is to just simply permit

6    you to go beyond sometimes the scope of the direct to avoid

7    having a witness come back a second time.

8          Now, so we've heard from Ms. Pitts.  We're not going

9    to be repeating anything Ms. Pitts said on direct examination

10   and cross-examination.  We're not going to do that two times.

11         MS. RUST:  Absolutely, Your Honor.

12         THE COURT:  If you've got anything new, the Court

13   will permit you to do it, but ordinarily, in the interest of

14   judicial economy, we could have done that.  But this is where

15   we are.  So who is your next witness?

16         MS. RUST:  Our next witness is Ms. Pitts, and we are

17   certainly going to be dealing with her testimony under the

18   Court's direction on that issue.  Mr. Jewett will be taking

19   her testimony.

20         THE COURT:  Yes, ma'am.

21         MS. LEWIS:  Just a general inquiry with respect to

22   housekeeping.

23         Yesterday we were trying to get an understanding of

24   sort of where we're going to fall with respect to how much

25   longer we'll be down in this lovely city of Norfolk,

─────D. DeLutis - Redirect─────

1    Virginia.

2            THE COURT:  I'm not sure that that was meant to be

3    "lovely."  Go on.

4            MS. LEWIS:  So that's our inquiry.

5            THE COURT:  So what we're trying to find out -- only

6    one can talk at a time, Counsel.

7            What she's getting ready to ask is something the

8    Court was going to inquire about, looking at your witness

9    list.

10            How many more witnesses do you have?  Because this

11    doesn't look like this is going to get us to the end of the

12    day here, Ms. Rust.

13            MS. RUST:  Yes.  So we, based on the testimony that

14    we have, we do think this will bring us out to the end of the

15    day, and these will be our final witnesses.

16            THE COURT:  You think these two witnesses are going

17    to take from now till 5:00?

18            MS. RUST:  Yeah.  With the lunch break, yes, we do

19    expect that it will take us through the afternoon.

20            THE COURT:  We shall see.

21            I'll tell you what we are going to do.  I don't know

22    how long Ms. Pitts is going to be, but I'll tell what we're

23    going to do.  We're going to take our 15-minute break now.

24    Otherwise, she can start testifying, and then we're going to

25    quit in 15 minutes.  So to avoid that, we're just going to do

Carol L. Naughton, Official Court Reporter

**JA949**

```
                          ┌─ L. Pitts - Direct ─┐
```

1   that.

2          Now, you should confer with Ms. Rust because only

3   one counsel needs to address the Court at a time, Mr. Jewett.

4          MR. JEWETT:  Yes, Your Honor.  I think I jumped the

5   gun by standing up there.

6          THE COURT:  Okay.  We'll take a 15-minute break,

7   then we'll come back, and we'll call Ms. Pitts back.

8          (Recess from 11:11 a.m. to 11:28 a.m.)

9          THE COURT:  All right.  You may call your next

10  witness.

11         MS. RUST:  The defendants call Lisa Pitts.

12         THE COURT:  Ms. Pitts, you are still under oath from

13  your previous testimony.

14         THE WITNESS:  Yes, sir.

15         LISA PITTS, called by the Defendants, having been

16  previously duly sworn, was examined and testified as follows:

17                        DIRECT EXAMINATION

18  BY MR. JEWETT:

19  Q.  Good morning, Ms. Pitts.

20  A.  Good morning.

21  Q.  I realize you've already testified in this trial, but can

22  you please say and spell your name again for the court

23  reporter.

24  A.  Lisa, L-i-s-a P-i-t-t-s.

25  Q.  And you are the owner of Steadfast; is that correct?

──────────── L. Pitts - Direct────────────

```
 1    A.   Correct.

 2    Q.   Okay.  And do you understand that you've also been sued

 3    personally in your individual capacity?

 4    A.   Yes.

 5    Q.   Okay.  Now, before I get into your company and we talk

 6    about some of the things you've heard in this trial so far, I

 7    want to spend about two minutes with some background

 8    information with you.  Okay?

 9             You are from Virginia?

10    A.   No, I'm not.

11    Q.   What state?

12    A.   North Carolina.

13    Q.   Okay.  Military family?

14    A.   Yeah.  Camp Lejeune.

15    Q.   Camp Lejeune?

16    A.   Uh-huh.

17    Q.   Okay.  Is your father in the military?

18    A.   Yes.

19    Q.   His position?

20    A.   Retired warrant officer.

21    Q.   Okay.  I mentioned in my opening statement that you were

22    a runaway teenager; is that accurate?

23    A.   It's accurate.

24    Q.   Did you eventually graduate from high school?

25    A.   Barely, yes, but I did.
```

898

L. Pitts - Direct

1   Q.   Okay.  And did you have any learning disabilities at that

2   time?

3   A.   Yes.

4   Q.   Okay.  I mentioned in my opening statement that you had a

5   third-grade reading level.

6           Did I characterize that accurately?

7   A.   Yes.

8   Q.   Okay.  So you said you graduated from high school.

9           Following high school, did you follow in your

10  father's footsteps and go into the military?

11  A.   A couple of years afterwards.  A couple of years

12  afterwards.

13  Q.   What branch?

14  A.   Navy.

15  Q.   And after the Navy, did you eventually become a nurse?

16  A.   Yes.

17  Q.   What kind of nurse?

18  A.   Licensed practical nurse.

19  Q.   Okay.  And how many years were you a nurse?

20  A.   Going on my 23rd year.

21  Q.   You are in your 23rd year, you said?

22  A.   Yes.

23  Q.   Okay.  When did you start practicing nursing?  Do you

24  recall?

25  A.   1999, right after graduation.

**JA952**

———————L. Pitts - Direct———————

1    Q.   Okay.  And were you working as a nurse at the time that

2    you had the idea to start Steadfast?

3    A.   Yes.

4    Q.   Okay.  Where were you working at at that time?

5    A.   Medical Facilities of America.

6    Q.   You said you were an LPN.

7              Were you in some type of specialty at that time?

8    A.   Geriatrics.

9    Q.   I see.

10             So while you're working at Medical Facilities of

11   America -- we've referred to them as MFA in this trial, I

12   believe -- what caused you to start Steadfast?  What were the

13   circumstances?

14   A.   Well, I was working at MFA, Medical Facilities of

15   America, as a floor nurse, and then I got promoted to a

16   nursing supervisor, 3:00 to 11:00 shift, and it was a

17   terrible nursing shortage.  It's worse than it is now.  It

18   just was unbelievable back then, but now it's just triple

19   shortage.

20             We had to use agency, and the agency was coming in

21   and out of our building.  I was in charge of agency staff

22   coming in and out, and I heard -- I overheard the nurses from

23   agency talking about working agency, picking up when they

24   want to pick up, and all the money they made working agency.

25             And I was a single mom with four kids, yet at the

Carol L. Naughton, Official Court Reporter

**JA953**

––––––––––––––––––––– L. Pitts - Direct –––––––––––––––––––––

1    time MFA was only paying me $16 an hour, and I was working

2    like three and four jobs, and they had control over my life,

3    you know.

4            Whenever I wanted to take off, I had to ask, and

5    nine times out of ten, working for them, you didn't take off

6    unless they had another nurse.

7            So I just, you know, talking to the nurses and

8    seeing how their lives were, and one of the nurses was a

9    single mom, and she said, "I only work six months out of the

10   year."  And I said, "How is that possible?"

11           THE COURT:  Mr. Jewett.

12           MR. JEWETT:  Yes, sir?

13           THE COURT:  Two things:  Number one, I don't want

14   what we call a narrative where you're going on and on; and,

15   number two, avoid the hearsay about what other people said.

16           So I want you to guide her through her testimony so

17   she is able to testify concisely without a long narrative.

18           MR. JEWETT:  Okay.  Thank you, Your Honor.  We'll

19   adhere to that instruction.

20   BY MR. JEWETT:

21   Q.  All right.  Ms. Pitts, and so you just kind of recaptured

22   what was going on in your life at that time.  You said you

23   were a single mother with four children?

24   A.  Yes.

25   Q.  And you were working long hours?

—————————L. Pitts - Direct—————————

1    A.  Yes.

2    Q.  And I believe you said something to the effect that you

3    didn't have control of your hours; is that correct?

4    A.  Exactly.

5    Q.  Okay.  So you started Steadfast.

6            Did you do any research about classifying nurses

7    before you started Steadfast?

8    A.  Well, I didn't know anything about classifying nurses

9    until I talked to my attorney.  When I first decided to start

10   a staffing agency, I Googled it, "staffing agencies,"

11   "independent contractors."  It was way back.  It's been years

12   ago.  And a bunch of agencies came up, and they were talking

13   about they were doing 1099s, and I wasn't sure about that.

14           So before I started my company, I consulted an

15   attorney about all that.

16   Q.  Okay.  The name of that attorney?

17   A.  Wanda Cooper.

18           MS. LEWIS:  Your Honor, I'm going to object to this

19   line of testimony.  This issue and testimony with respect to

20   advice, information, et cetera, with respect to Ms. Cooper

21   was previously ruled on by the Court.  The Court excluded --

22   the Court issued a ruling with respect to advice,

23   information, or otherwise from Ms. Cooper.

24           I direct the Court's attention to ECF number -- the

25   "Motion in Limine to Exclude Wanda Cooper" was ECF 165.  The

────────L. Pitts - Direct────────

 1   subsequent order granting that motion in limine and that

 2   testimony is at --

 3          THE COURT:  Okay.  First of all, with respect to

 4   this objection, I don't know when you're talking about you

 5   consulted an attorney.  When were you talking about it?  And,

 6   number two, with respect to that order, I'm trying to figure

 7   out whether I entered the order or Judge Leonard entered that

 8   order.

 9          MS. LEWIS:  202.

10          I'm sorry, Your Honor?

11          THE COURT:  Which judge entered the order?

12          MS. LEWIS:  I'm pulling it up now.

13          MR. JEWETT:  You entered the order, Your Honor.

14          MS. LEWIS:  No.  Magistrate Judge Leonard issued the

15   order.

16          MR. JEWETT:  And then we objected, and then you

17   confirmed your reasoning was a little bit different.  You

18   excluded Ms. Cooper from testifying in the trial -- that was

19   your ruling -- because she couldn't recall the substance of

20   the meeting.  I didn't read the order to say that Ms. Pitts

21   couldn't at least describe her consultation.

22          THE COURT:  Well, number one, in having her testify,

23   you didn't indicate -- she said she consulted an attorney.

24   You didn't talk about time frame.

25          MR. JEWETT:  Yes, sir.

─────────── L. Pitts - Direct ───────────

1          THE COURT:  What she is talking about, when it
2    allegedly happened, and so she can indicate she consulted an
3    attorney, but she is not going to tell us what the attorney
4    said, and certainly Ms. Cooper is not testifying.  So it's
5    very limited things you can do with the witness.
6          It's overruled.  She can indicate she consulted an
7    attorney, but it needs to be clear about on what subject and
8    when.
9          MR. JEWETT:  Sure.  I can focus the questions, Your
10   Honor.  Thank you.
11         THE COURT:  We'll keep it within the bounds of the
12   Court's previous ruling.
13         MR. JEWETT:  Yes, of course.
14   BY MR. JEWETT:
15   Q.  Did you consult with Ms. Cooper before you started your
16   company?
17   A.  Yes, sir.
18   Q.  Okay.  Now, did you meet with Ms. Cooper in her office?
19   A.  Yes, sir.
20   Q.  Did you review any documentation with Ms. Cooper?
21   A.  Yes, sir.
22   Q.  Okay.  Do you recall what documents you reviewed with
23   her?
24   A.  When I was in her office, we sat down, and she went over
25   the classification, like, what the 1099 was about and making

1   sure that I was in the guidelines.

2           MS. LEWIS:  Your Honor, I re-assert the same

3   objection.  The Court affirmed Judge Magistrate Leonard's

4   order, and that order specifically stated that it is not

5   relevant because she did not advise defendants as to the

6   FLSA.  This was briefed extensively, and so to the extent

7   that she's testifying --

8           THE COURT:  Sustained.  And the Court is going to

9   stick by that order.  And I think if Ms. Cooper didn't give

10  her advice about what the FLSA required, then the Court

11  sustains the objection.  And you cannot put on testimony in

12  effect alleging that she was given advice about what the FLSA

13  requires, if that is what we've already ruled on.

14          MR. JEWETT:  To clarify our position, Your Honor, we

15  are not claiming advice-of-counsel defense with respect to

16  Ms. Cooper.  The purpose of this is to show that Ms. Pitts

17  did do some due diligence before she started the company.

18  She's talking about the start-up date.  I maybe have just 60

19  seconds left worth of questions for her.

20          THE COURT:  But if you're still saying she got

21  advice about independent contractors from Ms. Cooper, and

22  Ms. Cooper has been excluded because she doesn't recall

23  giving any such advice, then the Court sustains the

24  objection.

25          MR. JEWETT:  Okay.  I can move on from the

—————————————L. Pitts - Direct—————————————

```
 1   discussions with Ms. Cooper.

 2   BY MR. JEWETT:

 3   Q.  Okay.  So when you started Steadfast, did you have an

 4   office?

 5   A.  No, I didn't.

 6   Q.  Okay.  Did you have a computer?

 7   A.  No, I didn't.

 8   Q.  Where did you get your first computer?

 9   A.  One of my bosses on my job gave me a computer.

10   Q.  Gave you a computer.  Okay.

11          How did you get your first contract?

12   A.  Well, I went to one of the nursing homes, and then I

13   went -- I had an appointment to meet with the administrator,

14   and I went in and sat and talked to the administrator, and he

15   basically told me he would never do business with the likes

16   of me.

17          MS. LEWIS:  Objection.  Hearsay.

18          THE COURT:  Sustained.

19   BY MR. JEWETT:

20   Q.  Remember the Court's instruction.  You will have to share

21   that experience without saying what anybody told you.

22   A.  I just went to a facility, tried to get a contract, and I

23   was rejected.

24   Q.  All right.  Were you turned down initially for that

25   contract?
```

──────── L. Pitts - Direct ────────

```
 1   A.  Yes.
 2   Q.  How did you end up getting it?
 3   A.  They -- the DON called me back in, because they were so
 4   desperate, and she said she got him to sign it.
 5   Q.  Okay.  So that was your first contract.  Let me
 6   fast-forward to today.
 7   A.  Okay.
 8   Q.  Your office, I believe you said, is located in Norfolk?
 9   A.  Yes.
10   Q.  What part of Norfolk?
11   A.  Worst part.  5750 Chesapeake Boulevard.
12   Q.  What did you say before that?
13   A.  The worst part.
14   Q.  Can you please get a little closer to the microphone.
15   I'm having a hard time hearing you.
16   A.  I said the worst part in Norfolk.
17   Q.  Okay.  Thank you.
18           What do you pay for rent?
19   A.  27 -- 26-, 2,700 a month.
20   Q.  I'm not going to go through your staff.  I believe
21   Ms. Kim already covered that.
22           But how many total employees do you have actually
23   working in the office?
24   A.  About 15.
25   Q.  15.  Okay.  Great.
```

L. Pitts - Direct

```
 1          You've heard Steadfast referred to as a registry
 2   throughout this trial.  Do you recall that?
 3   A.  Correct.
 4   Q.  What is a registry?  What do you mean by that?
 5   A.  It's like a holding house.  It's like a warehouse of
 6   nurses, and we match jobs, temporary jobs, in the field.
 7   Q.  Okay.  Does Steadfast facilitate matches between facility
 8   clients and nurses on, I think you called it, a warehouse or
 9   a clearing house?
10   A.  We're like a liaison.
11   Q.  Okay.
12          MR. JEWETT:  Could you please pull up the first
13   document.
14   BY MR. JEWETT:
15   Q.  This was previously admitted as PX-24.
16          Ms. Pitts, I believe you were shown this document
17   before, but do you recognize this document?
18   A.  Yes.
19   Q.  What is this a picture of?
20   A.  At the time it was a registry, a roster that we had.
21   It's updated now, but that's a very old roster.
22   Q.  Okay.  This is the registry that we're looking at right
23   here?
24   A.  Correct.
25   Q.  So can you explain how a nurse actually gets her name on
```

L. Pitts - Direct

1   this roster, on this registry?

2   A.  Usually, we have a website, and they send an e-mail

3   requesting information how to sign up with the -- with

4   Steadfast, and the recruiter gets that e-mail, and then she

5   reaches back out at them and tells them to submit their

6   credentials.

7           And she's just got to make sure their license is

8   current before she puts them up there.  They have to have a

9   current license, current license from the Board of Nursing,

10  because we can't work anyone unless they have a current

11  license.  So once they produce they have a current license,

12  then she puts them on the registry.

13  Q.  I want to -- well, let me ask you this:

14          Does the nurse submit an application in order to get

15  her name or his name on this document?

16  A.  They used to but not anymore.

17  Q.  Not anymore.  Okay.

18          Let me -- well, you said they used to.  What kind of

19  paperwork do they submit now?

20  A.  Well, now, it's required, just a resume -- make sure you

21  have everything on it because we might -- we will send that

22  to the facility -- a full resume; their PPD; CPR; and nursing

23  license.  There's documents that each facility requires.  So

24  like the prisons require documents, major documents.  MFA

25  requires major documents.  Each facility has their own set of

———— L. Pitts - Direct————

1   documents.

2   Q.  I'm not familiar with this term.  What is the PPD?

3   A.  That's a skin test, TB skin test.

4   Q.  You said PPD and CPR.  And what was the third one?

5   A.  License.

6   Q.  License.  Okay.

7   A.  And now COVID, now COVID test.  They have to have the

8   COVID test or the vaccine.

9   Q.  Okay.  So once they submit that, they are then added to

10  the roster; is that correct?

11  A.  Correct.

12  Q.  All right.

13          MR. JEWETT:  Can you please pull up the next

14  document.

15  BY MR. JEWETT:

16  Q.  And what you are about to see was, I think, previously

17  admitted as PX-26.

18          Do you recognize what you see on the screen there?

19  A.  Which page am I looking at?

20  Q.  Sorry.  Let's start with Page 2.

21          Do you recognize this document?

22  A.  Yes.

23  Q.  Okay.

24          MR. JEWETT:  Can you zoom out just a little bit.

25          There we go.

Carol L. Naughton, Official Court Reporter

**JA963**

910

L. Pitts - Direct

 1 | BY MR. JEWETT:
 2 | Q.  Is this a document that Steadfast currently uses?
 3 | A.  I'm not sure.  We did a lot of changes.  I'm not sure.
 4 | We've done a lot of changes in the application process.
 5 | Q.  Well, in any event, did Steadfast, at least at some
 6 | point, use this document as part of the application process?
 7 | A.  Yes.
 8 | Q.  Where did you get this document?  Did you create it
 9 | yourself?
10 | A.  No.  I got it from another staffing agency when we first
11 | started online.
12 | Q.  Why did you use this document as part of the application
13 | process?
14 | A.  Because the other staffing agency did it, and we were
15 | doing the same thing they were doing.
16 |         MR. JEWETT:  Can you go to Page 3, please.
17 | BY MR. JEWETT:
18 | Q.  Do you recognize this document?
19 | A.  Page 2 or 3?
20 | Q.  I believe this is Page 3.  Yeah.  You see at the bottom
21 | there the page number is 003.
22 | A.  Yes, I do.
23 | Q.  Okay.  Did you get this document online too?
24 | A.  Yes.
25 | Q.  All right.  And why did you use it?

Carol L. Naughton, Official Court Reporter

**JA964**

L. Pitts - Direct

1    A.  Because it was from another staffing agency that had

2    independent contractors.

3    Q.  And I'm not sure if I asked this question earlier, but

4    this document you are seeing on the screen, what has been

5    referred to as an application throughout this trial, does

6    Steadfast still use this document?

7    A.  No, we don't.

8    Q.  Okay.  There is a section on this document -- if you see,

9    there's a section called "Check the type of assignment you

10   are available for:  full time, part time, travel, per diem,

11   permanent."

12          Do you see that?

13   A.  Yes.

14          THE COURT:  Excuse me, sir.  Let me understand

15   something.  She says Steadfast no longer uses this document.

16          Was this document in use during the period of the

17   alleged violations in this case?  That's what I want to be

18   sure of.

19          MR. JEWETT:  I believe that -- I believe that it

20   was.

21          MS. LEWIS:  Yes, Your Honor.  It was confirmed

22   through both Ms. Pitts' prior testimony, Ms. Kim's, and the

23   previously admitted 30(b)(6) depositions, as well as employee

24   witnesses.

25          THE COURT:  Okay.  That's fine.  Thank you.

Carol L. Naughton, Official Court Reporter

**JA965**

912

L. Pitts - Direct

1    BY MR. JEWETT:

2    Q.  Okay.  So back to the section, the type of assessment --

3    or, excuse me, assignment, full time, part time, travel,

4    per diem.

5           Do you see that?

6    A.  Yes.

7    Q.  Once the nurse -- when you were using -- when Steadfast

8    was using this application, once the nurse submitted that,

9    does Steadfast go back and evaluate that section to try to

10   figure out what kind of schedule to give the nurse?

11   A.  No.

12   Q.  Okay.

13          MR. JEWETT:  Turn to the next page, please.  The one

14   after that, there's a section for references.

15   BY MR. JEWETT:

16   Q.  Okay.  Do you see -- we're on Page 5 now of PX-26.

17          Do you see the "References" section?

18   A.  Yes.

19   Q.  Did you check references when you would receive an

20   application from a nurse?

21   A.  Not really.

22   Q.  What does that mean?  What does "not really" mean?

23   A.  Well, the facility usually, in the contracts, at the

24   bottom of the contracts, it lists what we need, and sometimes

25   they would ask us, "Please can you go back and check their

L. Pitts - Direct

1   references," if they are having behavior problems in a

2   facility.

3   Q.  Maybe the better question is this:

4          Did you check the references before putting the

5   nurse on that roster we looked at, on the registry roster?

6   A.  No.

7   Q.  Okay.

8          MR. JEWETT:  Can you scroll to Page 17, please.

9   BY MR. JEWETT:

10  Q.  I want to ask you a question that I don't think has been

11  covered yet in this trial.

12         Do you recognize this document?

13  A.  Yes.

14  Q.  What is this?

15  A.  It's a memo.

16  Q.  Okay.  This document references, it says at the bottom

17  there, "Any shifts not completed will result in a

18  chargeback."

19         What does that mean?

20  A.  Well, at the time the facility was charging us back

21  because we had nurses walking into their facility and didn't

22  like the assignment, and they walked out.  So they would

23  start charging the company back for the eight hours.

24  Q.  So in those instances --

25         MS. LEWIS:  Your Honor, I'm going to object to

L. Pitts - Direct

1    hearsay.  She is representing with respect to what the

2    facility did.  So she is seeking to assert that the facility

3    did something for the truth of the matter asserted.  So with

4    respect to that, best evidence would be the chargeback

5    document.  She's building upon, you know -- building a

6    document here in the -- it's hearsay.

7         MR. JEWETT:  Your Honor, this sort of testimony is

8    common in employment cases, as the Court knows.  We're not

9    offering it for the truth of the matter asserted.  We're

10    offering it for Ms. Pitts to explain why she did something.

11         THE COURT:  Objection overruled.

12         MR. JEWETT:  Thank you.

13    BY MR. JEWETT:

14    Q.  So, Ms. Pitts, I believe the question that I was going to

15    ask you is:

16         This form here, did Steadfast charge back to the

17    nurses when the facility would charge Steadfast for a

18    chargeback?

19    A.  No.

20         MS. LEWIS:  Your Honor, same objection.  We don't

21    have that the facility actually charged back anything.

22         THE COURT:  I'll sustain that because there's

23    nothing in evidence to suggest that the facility -- you

24    suggested that the facilities charged.  She simply testified

25    the reason that language was there, and the Court didn't

Carol L. Naughton, Official Court Reporter

**JA968**

L. Pitts - Direct

1    overrule that.  But you added something else there about what

2    the facilities were doing.

3           MR. JEWETT:  I think I took a step too quickly.

4    BY MR. JEWETT:

5    Q.  Did the facilities ever charge Steadfast under this

6    chargeback document that you have?

7    A.  Yes.  What they did was, when we submitted the invoice,

8    they didn't pay -- whoever walked out the building, they

9    didn't pay it on the invoice.

10   Q.  Okay.  So in those circumstances, within this relevant

11   time period we're talking about for this case, did Steadfast

12   charge back the nurses when that would happen?

13   A.  No.

14   Q.  Okay.  Do you still use this document?

15   A.  No.

16   Q.  Let me ask you about two more forms --

17   A.  Okay.

18   Q.  -- before we move on from this.

19          MR. JEWETT:  Can you please pull up the third

20   document.

21          MS. LEWIS:  Your Honor, just for recordkeeping, I

22   don't believe this exhibit was marked.

23          THE COURT:  Okay.  Has it been marked?

24          THE CLERK:  I think it's part of 26.

25          THE COURT:  Hold on.  She thinks it's part of 26.

Carol L. Naughton, Official Court Reporter

**JA969**

—————————L. Pitts - Direct—————————

 1          MS. LEWIS:  I don't believe 26 was admitted.  We

 2   used it --

 3          THE COURT:  26 is in.

 4          MS. LEWIS:  26 is in.  Okay.

 5   BY MR. JEWETT:

 6   Q.  Ms. Pitts, you're looking at what I believe is PX-32, and

 7   we're on Page 10 of PX-32.  This is a document titled

 8   "Receipt of substance abuse and drug testing policy and drug

 9   testing consent form."

10          Do you recognize this document?

11   A.  Yes.

12   Q.  This is a document that Steadfast used at some point?

13   A.  Yes.

14   Q.  Okay.  Why did Steadfast use this document?

15   A.  Because we were under contract with the different

16   facilities, and it's certain documents they require through

17   their rules and regulations, and drug testing was a big thing

18   with them.

19   Q.  Okay.  Do all facilities you contract with -- do they

20   require some type of drug test before the nurse can --

21   A.  Before and during.

22   Q.  Before and during.  Okay.

23          Let's look at -- this is PX-32 at Page 6.

24          Ms. Pitts, this is a document titled "HIPAA training

25   module test."  Do you recognize this document?

Carol L. Naughton, Official Court Reporter

**JA970**

917

——L. Pitts - Direct——

1   A.  Yes, I do.

2   Q.  All right.  And this is a document that Steadfast says it

3   used at some point during the relevant time period in this

4   case?

5   A.  Yes.

6   Q.  Okay.  Why did Steadfast use this document?

7   A.  Because the nurses had to go through HIPAA training

8   before they can even go to the facilities.  We used to

9   have this in profile -- well, we still send profiles over,

10  and there's certain things certain facilities have, but I

11  know HIPAA, all the facilities are requiring that.

12  Q.  Okay.  So you mentioned you would send profiles on nurses

13  to the facilities.

14        Would this completed document for the nurse be part

15  of that profile?

16  A.  Yes.

17  Q.  Okay.  Have you ever had a nurse fail this true/false

18  test?

19  A.  Well, it's open book.

20  Q.  So is that a no?

21  A.  I'm not sure.  It's open book.  So nobody can fail.

22  Q.  Well, have you ever had a facility get back to you and

23  say, "Hey, one of the profiles you sent to us had a failed

24  HIPAA test?"  Do you recall that?

25        MS. LEWIS:  Objection.  Hearsay -- I withdraw the

Carol L. Naughton, Official Court Reporter

**JA971**

```
                        ┌──────── L. Pitts - Direct ────────┐
```

 1   objection, Your Honor.

 2           THE COURT:  What did you say?

 3           MS. LEWIS:  I initially had objected to hearsay, but

 4   I said I withdraw it.

 5           THE COURT:  Thank you.

 6           THE WITNESS:  I don't recall.

 7           THE COURT:  What was your answer?

 8           THE WITNESS:  I don't recall.  I don't recall.

 9   BY MR. JEWETT:

10   Q.  Okay.  Let me just circle back to a couple of questions

11   on the current practice.  We're talking about the practice to

12   actually get the name on the registry.  Okay?

13           I believe you said you no longer require an

14   application; is that correct?

15   A.  Correct.

16   Q.  Okay.  But does Steadfast still confirm the nurse's

17   credentials, such as with the Board of Nursing, before

18   placing a nurse on its registry?

19   A.  We have to.

20   Q.  Does Steadfast conduct background checks before placing a

21   nurse on its registry?

22   A.  Yes.

23   Q.  Okay.  Do you actually interview the nurse before placing

24   the nurse on the registry?

25   A.  I don't -- half the nurses, I've never seen before.  They

                              ┌─L. Pitts - Direct─┐

 1   pick up online and reach out to the recruiters.  So, no, I
 2   don't interview the nurses.
 3   Q.  Okay.  Does anybody from your office at least talk to the
 4   nurse on the phone sometimes before they get on the registry?
 5   A.  Yes.
 6   Q.  Are you aware of the substance of those conversations,
 7   like what information they are gathering?
 8   A.  I don't listen in on the conversations.  So they know
 9   what they are supposed to do.
10   Q.  So, now, once the nurse is on the registry, the document
11   we looked at in the very beginning, the roster of nurses --
12   once the nurse's name is on there, what kind of orientation
13   does Steadfast provide to the nurse?
14   A.  We don't provide any orientation.
15   Q.  Okay.  What about a handbook?
16   A.  We don't have a handbook.
17   Q.  Policies and procedures?
18   A.  We don't have that.
19   Q.  What about a how-to guide?
20   A.  We don't have that.
21   Q.  Does Steadfast provide the nurses any training at all?
22   A.  No, we don't.
23   Q.  Okay.  I want to shift gears and ask you a few questions
24   about the facility contracts.
25   A.  Okay.

L. Pitts - Direct

1   Q.  I believe Ms. Lewis may have asked you a few questions

2   about those last week when you were testifying, but let me

3   circle back on a few items for that.

4           What categories of healthcare facilities does

5   Steadfast have contracts with?

6   A.  Geriatrics, long-term care facilities.

7   Q.  Any others?

8   A.  I can't recall any others.  We're a staffing agency, so

9   people call us.  Corrections, we have some with corrections.

10  Q.  Corrections.  Okay.

11  A.  They will call us.

12  Q.  And approximately how many contracts -- strike that.

13          Approximately how many facilities does Steadfast

14  have a contract with?

15  A.  I'm not sure of the number.  It shouldn't be more than

16  50, I don't think.

17  Q.  Okay.  And who at Steadfast has the authority to enter

18  into a contract with a facility?

19  A.  Me.

20  Q.  Can you explain to the Court how that process works, like

21  how you actually come to the point where you've entered into

22  a signed contract with the facility?

23  A.  Yes.

24          So what happens is they usually -- sometimes they

25  reach out to the office, and I get a message that a facility

———L. Pitts - Direct———

1    needs nurses.  Sometimes I get an e-mail.  Most of the times
2    I get a phone call.  And they probably heard of us through
3    other facilities, because most of the facilities are owned by
4    one corporation and with a lot of facilities.
5          And I tell them to submit an e-mail requesting a
6    contract.  And they submit the e-mail requesting the
7    contract.  And then I send them -- well, usually I talk to
8    the administrator, and I'll say, "Look" -- or the
9    administrator at the corporate office, whoever reached out --
10   "what are the rates?  What are you all paying?"  Because I
11   give them a chance, you know.
12         They refer me to corporate, usually a corporate
13   representative.  He starts telling me the rates, and I say,
14   "Well, let me see if we can do the same thing that you have
15   been doing."  And we'll send over a rate sheet first.  It's
16   the last page of a contract, and it lets them know we're
17   independent contractors, flat rate, blah, blah, blah.
18   Q.  I see.
19         Okay.  Now, you heard some testimony -- well, let me
20   ask it this way:
21         Did you hear testimony earlier in this trial about
22   Steadfast having a buyout clause in some of these contracts?
23   A.  Yes.
24   Q.  Okay.  What's the purpose of this buyout clause?
25   A.  Well, when we first started, one of our contracts, one of

Carol L. Naughton, Official Court Reporter

**JA975**

L. Pitts - Direct

1   the clients put -- told us that we had to put that in there

2   because they said we need nurses bad, we need to retain

3   nurses, and I guess they were using us as their headhunters

4   to find nurses for their organization.  That's how it came

5   about.

6   Q.  So did you start using the buyout clause after that

7   particular contract?

8   A.  Correct.

9   Q.  Okay.  But as the owner of the company, what is the

10  purpose of that buyout clause?

11  A.  Well, we spend a lot of money processing credentials, you

12  know.  Each facility, like at corrections, they require a lot

13  of stuff that we have to do.  So we've spent a lot of money

14  doing that, vetting these girls and getting them ready for

15  the facilities.

16  Q.  And do you pay your administrative team to conduct those

17  background searches?

18  A.  Yes.

19  Q.  Have you ever had a facility refuse to pay the buyout

20  clause, the matching fee?

21  A.  I can't recall.

22  Q.  Okay.  Have you ever had a nurse get placed with a

23  facility without a matching fee being paid?

24  A.  Yes.

25  Q.  Okay.  Have you ever refused to allow a nurse to work

Carol L. Naughton, Official Court Reporter

**JA976**

1   directly for a facility due to the buyout clause?

2   A.  No.

3   Q.  Okay.  I want to ask you a few questions about one of the

4   nurses who testified earlier in this trial, Teresa Morey.

5           Do you recall her testifying in this trial?

6   A.  Correct, yes.

7   Q.  And was she a nurse who took shifts through Steadfast's

8   registry?

9   A.  Yes.

10  Q.  Okay.  Do you recall that she testified that you blocked

11  her from working at another facility when she was here in the

12  courtroom?

13  A.  Yes.

14  Q.  And I believe she said you threatened to sue her.

15          Do you recall her saying that?

16  A.  Yes.

17  Q.  And I believe -- strike that.

18          And do you recall that she said that she had to sit

19  out a year because of something that you did?

20  A.  Yes.

21  Q.  Okay.  Did you prevent her from working for that facility

22  she's referring to?

23  A.  No.

24  Q.  And do you recall the facility she said she was trying to

25  work for?

Carol L. Naughton, Official Court Reporter

**JA977**

L. Pitts - Direct

1    A.  Yes.

2    Q.  What is the name of the facility?

3    A.  Avante, Lynchburg.

4          MR. JEWETT:  Can you please pull up the next

5    document.

6          You know what, I have this one.

7    BY MR. JEWETT:

8    Q.  Okay.  Ms. Pitts, on your screen is an e-mail from -- do

9    you see that's from Teresa Morey?

10   A.  Yes.

11   Q.  Is that to you?  Is that your e-mail?

12   A.  Yes.

13   Q.  Dated November 13th, 2017?

14   A.  Yes.

15   Q.  It's a short e-mail.  I'll read it to you.  The e-mail

16   reads:

17          "First of all, let me start by saying thank you for

18   the amazing opportunity of working for your company.  It has

19   been such a joy.  It opened my eyes to travel nursing, which

20   was new for me outside of home health.  Per yours and

21   Nathan's conversation, effective 11/14/2017, I will be taking

22   the position of first shift full-time unit manager at Avante

23   Lynchburg working no longer through Steadfast but directly

24   through Avante.  Again, thank you, Lisa.  You have been

25   amazing to work for.  God bless."

─────────────── L. Pitts - Direct ───────────────

1              Did I read that correctly?

2    A.  Yes.

3              MS. LEWIS:  Your Honor, if counsel could scroll

4    down, please, I may have an objection.

5              Your Honor, I object to this document as it was not

6    produced in discovery.  We requested any and all records

7    related to personnel files and the like for employee

8    witnesses.  This does not have -- as counsel scrolled down,

9    there is no Bates-stamp number.  It was not previously

10   provided.

11             So even if they are using it for impeachment,

12   rebuttal, or otherwise, this was squarely within the realm of

13   discovery, which defendants declined or failed to produce.

14             MR. JEWETT:  So, of course, as the Court knows,

15   impeachment is exempt from Rule 26.  I don't know what

16   request she's referring to by a request for "all records."

17   And this is a "thank you" e-mail from a nurse that directly

18   contradicts her testimony.

19             THE COURT:  What are you impeaching?

20             MR. JEWETT:  I didn't hear you.

21             THE COURT:  What are you impeaching?

22             MR. JEWETT:  I am impeaching under 608.  I'm

23   bringing on evidence of contradictory -- of contradiction,

24   which is, of course, allowed, especially on a material issue

25   such as this where we have direct testimony in the courtroom

—————————— L. Pitts - Direct ——————————

 1   that Ms. Pitts blocked a nurse from working, and we have an

 2   e-mail from this particular nurse that says the opposite of

 3   that.

 4          MS. LEWIS:  But, Your Honor, my objection is with

 5   respect to a discovery abuse.  This document was not

 6   produced.  Whether or not he's using it for impeachment or

 7   rebuttal, it's directly responsive.

 8          Now, defendants produced personnel files for what

 9   they represented to be anything and everything they had.

10   There's other documents and e-mails between Ms. Pitts -- for

11   example, in our case in chief, they provided a personnel

12   record for an office employee, Courtney Draughn Hope, in

13   which there was issues of we don't have this document.

14          THE COURT:  Why wasn't that document produced?

15          MR. JEWETT:  She is referring to the personnel file.

16   The Court heard the testimony from Ms. Kim that the personnel

17   file for nurses are just simply the application and some

18   banking information.

19          THE COURT:  Where did that document come from?

20          MR. JEWETT:  Ms. Pitts searched for it after she

21   heard the story on the stand that she couldn't believe she

22   heard.

23          THE COURT:  Why didn't she search for it during the

24   search for all documents during discovery?

25          MR. JEWETT:  Because this document wasn't asked for

Carol L. Naughton, Official Court Reporter

**JA980**

L. Pitts - Direct

1    during discovery, Your Honor.

2            MS. LEWIS:  It certainly was, Your Honor.

3            MR. JEWETT:  She is referring to a vague request for

4    personnel files and records.  This in no way is responsive to

5    that.  They don't keep personnel files on the nurses.  This

6    is a "thank you" e-mail that directly contradicts what the

7    nurse said.  It's admissible under the comments of Rule 608,

8    and it's very material to this case.

9            THE COURT:  You said that document -- well, counsel

10   always tells the Court what is material.  That document was

11   not in the personnel file.

12           MR. JEWETT:  No, it was not, Your Honor.

13           THE COURT:  It was in the personal file of

14   Ms. Pitts?

15           MR. JEWETT:  It was in her e-mail account.  She

16   started -- when she heard this testimony, she -- when she

17   heard the testimony, she started searching her e-mail because

18   she couldn't believe what she heard, and this is what she

19   found.

20           MS. LEWIS:  Your Honor, I can point to at least

21   three requests for production responses that that document

22   would be responsive to.

23           THE COURT:  You read to me the Request for

24   Production that covers documents that are in the possession

25   of Ms. Pitts.  Do you have anything?

Carol L. Naughton, Official Court Reporter

**JA981**

L. Pitts - Direct

1          MS. LEWIS:  Yes, Your Honor.

2          Discovery was propounded upon Ms. Pitts individually

3     and on the corporation as a whole.  And those requests were

4     the same, both ways.  So Request for Production of

5     Documents -- I can start at the top.

6          MR. JEWETT:  Your Honor, while Ms. Lewis is looking,

7     I will note that the parties had an extensive hearing with

8     Judge Leonard on some of these issues, and he did enter an

9     order on the production.

10          THE COURT:  Let's put it this way:

11          Once you reach trial, the trial judge has the

12     authority to rule on any matter, either affirm it or reverse

13     it, pure and simple as that.

14          If she finds anything that required Ms. Pitts to

15     produce this document, then I'll sustain the objection, and

16     she can testify about what she told Ms. Morey, but the

17     document will not be used to affirm her testimony.  It's

18     simple as that.

19          MS. LEWIS:  Your Honor, I'll start with Request 8,

20     9, and 10.

21          Starting with Request 8:  "All documents,

22     correspondence, e-mails, and written guidance in the

23     possession of Steadfast and/or Lisa Pitts regarding the plans

24     or strategies to obtain work of employees who would be or

25     characterized or claimed by Steadfast as independent

Carol L. Naughton, Official Court Reporter

**JA982**

L. Pitts - Direct

1    contractors for purposes of compensation, including any

2    analysis of costs, savings, changes in tax liability,

3    profitability analysis."

4           Request Number 9:  "All documents regarding

5    Steadfast's efforts or actions to advertise, recruit, and

6    contract employees as defined herein who have worked for

7    Steadfast, have been paid as independent contractors during

8    the relevant period."

9           Request for Production Number 10:  "All documents,

10   including but not limited to, contracts and invoices related

11   to any agreements or business relationships between Steadfast

12   and any third party covering any part of the last three

13   calendar years regarding staffing services and/or Steadfast

14   providing various -- all documents which" -- Your Honor, I

15   can --

16          THE COURT:  Don't go any further.

17          MS. LEWIS:  I can keep going.

18          MR. JEWETT:  May I please just say one thing?

19          She referenced a request for plans and strategies.

20   This is a "thank you" e-mail.  She referenced a request for

21   advertising notes.  This is a "thank you" e-mail.  She

22   referenced a request for things, including but not limited

23   to, contracts and invoices.  This is a "thank you" e-mail.

24   That's not responsive to any of these.

25          THE COURT:  It goes a little further than that.  The

L. Pitts - Direct

```
 1    Court is going to sustain the objection.  You can have her

 2    testify, and she can dispute, but the document is not coming

 3    in.  It's not going to be used, period.

 4              MR. JEWETT:  Your Honor, just a point of

 5    clarification.

 6              THE COURT:  What do you need to clarify?  The Court

 7    just ruled the document would not be coming into evidence.

 8    It's clearly covered by those three requests for production.

 9    We're not going to argue it.  That's the Court's ruling.

10              And something that seems to be a pattern in this

11    case from both parties, the Court rules, and then you come

12    back after you have been told what the Court is going to do.

13    The Court is finished with that.

14              Now you can move on to something else.

15              MR. JEWETT:  My question is:  May I examine the

16    witness about the document without moving to admit it?

17              THE COURT:  No.

18              MR. JEWETT:  Okay.  Thank you.

19              THE COURT:  I just said it couldn't be used.

20              MR. JEWETT:  Okay.

21    BY MR. JEWETT:

22    Q.  Who is Nathan from Avante?  Are you familiar with that

23    name?

24    A.  He was administrator.

25    Q.  Okay.  Did you have a discussion with Nathan from Avante,
```

Carol L. Naughton, Official Court Reporter

**JA984**

L. Pitts - Direct

1   the administrator, on or before November 13th about the

2   direct hire of Teresa Morey?

3   A.  Yes.

4   Q.  Okay.  Do you know if Teresa Morey began working for

5   Avante on or after November the 14th, 2017?

6   A.  Yes.

7   Q.  Is that a yes, she did?

8   A.  Yes, she did.

9   Q.  I want to shift gears and ask you a few questions about

10  the relationship with Dunlop House.

11  A.  Yes.

12  Q.  You were in the courtroom when David Rawlings, the

13  representative from Dunlop House, testified.

14          Do you recall that?

15  A.  Yes.

16  Q.  Have you ever spoken with David Rawlings before?

17  A.  No.

18  Q.  Have you ever heard of him?

19  A.  No.

20  Q.  You never talked with David Rawlings or anyone from your

21  company, to the extent you are aware, about scheduling nurses

22  or the relationship between Dunlop House and Steadfast?

23  A.  No.

24  Q.  Who is your point of contact at Dunlop House?

25  A.  The director of nursing.

Carol L. Naughton, Official Court Reporter

**JA985**

─────── L. Pitts - Direct ───────

1    Q.  And how often did Steadfast communicate with the director
2    of nursing at Dunlop House?
3    A.  The call center schedulers communicated with her because
4    she sent the schedules over.
5    Q.  Weekly?  Daily?  Once a month?
6    A.  Sometimes daily, sometimes weekly.
7    Q.  When a nurse was being scheduled at Dunlop House, did
8    your team speak with David Rawlings or the director of
9    nursing?
10   A.  Director of nursing.
11   Q.  When a nurse needed to be DNR'd from Dunlop House, does
12   your team speak with David Rawlings or the director of
13   nursing?
14   A.  Director of nursing.
15   Q.  If there was a discrepancy over a time sheet for a nurse,
16   did your team speak with David Rawlings or the director of
17   nursing?
18   A.  Director of nursing.
19   Q.  In any conversation that you ever had with any person
20   from Dunlop House, did David Rawlings' name get mentioned?
21   A.  No.
22   Q.  I now want to ask you a few questions about the Princess
23   Anne contract.
24   A.  Okay.
25   Q.  The Court, if you recall, had some questions for you on

Carol L. Naughton, Official Court Reporter

**JA986**

—— L. Pitts - Direct ——

1   that contract as well.

2   A.  Yes.

3          MR. JEWETT:  Could you please pull up PX-10 at 128.

4          THE COURT:  Did you cross-examine this witness on

5   PX-10 when she appeared in the plaintiff's case?  Did the

6   defense cross-examine Ms. Pitts on this exhibit when she

7   appeared in the plaintiff's case?

8          MR. JEWETT:  I did ask her several questions about

9   it.  I believe I asked her questions pertaining to the

10   formation of this contract.  I do not recall, Your Honor, if

11   I asked her specific questions about the contract itself.

12          My questions on this contract are fairly brief.

13          THE COURT:  Okay.  Continue.  As long as it's not a

14   repetition of something you have already done.

15          MR. JEWETT:  Okay.  Thank you.

16   BY MR. JEWETT:

17   Q.  Okay.  Ms. Pitts, do you see on your screen that this is

18   the contract between Steadfast and Princess Anne?

19   A.  Yes.

20   Q.  We're on PX-10, Page 128.

21   A.  Yes.

22   Q.  You see on this first page, at the bottom, there's a

23   section called "Supplemental Staffing Service."

24   A.  Yes.

25   Q.  And you understand that refers to Steadfast?

934

                              ┌─ L. Pitts - Direct ─┐

 1   A.  Yes.

 2           MR. JEWETT:  Can you please go to Page 129.

 3   BY MR. JEWETT:

 4   Q.  Let's look at Section 5.  It's short.  I'll read it to

 5   you.  Section 5 states that Steadfast will "comply with and

 6   ensure that temporary personnel placed at the healthcare

 7   center comply with the guidelines of OSHA standards."

 8           Did I read that correctly?

 9   A.  Yes.

10   Q.  All right.  Did you ensure that Steadfast nurses complied

11   with OSHA standards while they were practicing nursing at

12   Princess Anne?

13           MS. LEWIS:  Your Honor --

14           THE WITNESS:  No.

15           MS. LEWIS:  -- I'm going to object to relevance.

16   This is an FLSA trial.  I'm not really sure where we're going

17   with this.

18           MR. JEWETT:  I believe the degree that Steadfast was

19   supervising -- the Fourth Circuit has said the degree that

20   Steadfast is supervising and evaluating the workers while

21   they are actually performing their work is highly relevant.

22   It's the most important question of the case.

23           THE COURT:  Objection overruled.

24   BY MR. JEWETT:

25   Q.  Let me repeat the question, Ms. Pitts.


                    Carol L. Naughton, Official Court Reporter


                              **JA988**

935

L. Pitts - Direct

```
 1           Did Steadfast ensure that its nurses were complying
 2    with OSHA standards while they practiced nursing at Princess
 3    Anne?
 4    A.  No.
 5    Q.  This particular section, Section 5, did it ever come up
 6    in any conversation with Erica Johnson at Princess Anne?
 7    A.  No.
 8    Q.  Or any representative from Princess Anne?
 9    A.  No.
10    Q.  Okay.
11           MR. JEWETT:  Let's look at Section 6.
12    BY MR. JEWETT:
13    Q.  Again, it's short.  I'll just read it to you.  Section 6.
14    A.  You said Section 4?
15    Q.  Section 6, right in front of you.
16           Can you see that?
17    A.  Yes.
18    Q.  "Be in compliance with..."
19           Do you see that in front of you?
20    A.  Yes.
21    Q.  Section 6 provides that Steadfast will "be in compliance
22    with all applicable provisions of federal, state, and local
23    laws, rules and regulations, including, but not limited to
24    patient care guidelines, and monitor the temporary personnel
25    placed at the healthcare center to insure that the temporary
```

**JA989**

──────────── L. Pitts - Direct ────────────

1   personnel are in compliance with the same."

2        Ms. Pitts, did Steadfast monitor the nurses placed

3   at Princess Anne to ensure that they were in compliance with

4   federal, state, local laws, rules, and regulations, that's

5   provided in this section?

6   A.  No.

7   Q.  Okay.  Did this particular section of the contract ever

8   come up in a conversation with Erica Johnson?

9   A.  No.

10  Q.  Did this particular section of the contract ever come up

11  in a -- excuse me -- in a conversation with any

12  representative from Princess Anne?

13  A.  No.

14  Q.  Let's take a look now at Page 130.  I'm looking at

15  Section C, "Confidentiality."

16        Do you see that?

17  A.  Yes.

18  Q.  This is a long one.  I won't read it, except I will point

19  your attention to the second paragraph.

20        Are you with me?

21  A.  Yes.

22  Q.  It says that "Supplemental staffing service" -- so that's

23  Steadfast -- "shall also maintain and assure that" -- and I'm

24  skipping some words here but -- "maintain and assure that"

25  its temporary personnel "shall maintain strict

Carol L. Naughton, Official Court Reporter

**JA990**

L. Pitts - Direct

1   confidentiality of all proprietary information regarding

2   healthcare center or MFA."

3          Do you see that?

4   A.  Yes.

5   Q.  Okay.  Did Steadfast assure that its nurses were not

6   taking proprietary information while they were practicing

7   nursing at Princess Anne?

8   A.  No.

9   Q.  Did this particular section of the contract ever come up

10  in a conversation with Erica Johnson or any representative

11  for Princess Anne?

12  A.  No.

13  Q.  Did the topic of proprietary information ever come up in

14  any conversation with any representative from Princess Anne?

15  A.  No.

16  Q.  Okay.  I want to ask you now about something that Erica

17  Johnson -- well, strike that.

18          Do you recall Erica Johnson was in the courtroom

19  earlier --

20  A.  Yes.

21  Q.  -- in this trial, and she testified here?

22  A.  Yes.

23  Q.  Do you recall her saying that this contract that we're

24  looking at together --

25  A.  Yes.

Carol L. Naughton, Official Court Reporter

**JA991**

938

L. Pitts - Direct

```
 1   Q.  -- that it is the same or similar to the contract that
 2   MFA uses for other staffing agencies?
 3   A.  Correct.  Yes.
 4   Q.  Okay.
 5           MR. JEWETT:  Let's go back to Page 129.
 6           THE COURT:  I will say this to you, Mr. Jewett:
 7           Before you get into it, we're dealing with what is
 8   written in this contract.  Whether it's similar to something
 9   else makes no difference.  The question is, this is admitted
10   into evidence, and this is what we're dealing with, this
11   contract.
12           MR. JEWETT:  Thank you, Your Honor.  And I think
13   this is the last section of the contract that we'll be
14   looking at.
15           THE COURT:  In other words, its similarity to other
16   contracts is irrelevant.
17           MR. JEWETT:  Okay.
18   BY MR. JEWETT:
19   Q.  Ms. Pitts, let's look at paragraph 2 together.
20           Do you see that?
21   A.  Yes.
22   Q.  Paragraph 2 says that Steadfast will "assume sole and
23   exclusive responsibility for the payment of wages...to
24   temporary personnel for services performed at the healthcare
25   center to the extent temporary personnel are considered to be
```

Carol L. Naughton, Official Court Reporter

**JA992**

———————— L. Pitts - Direct————————

1    [Steadfast's] employees."

2            Do you see that?

3    A.  Hold on.  I think you skipped a line.  Wait a minute.

4            MS. LEWIS:  Your Honor, I'm going to object.  He

5    didn't read the full sentence.  The document speaks for

6    itself.  He skipped over the parentheses.  Completeness is my

7    objection.

8            THE COURT:  You can get back to that on

9    cross-examination.

10            MS. LEWIS:  Okay.

11            MR. JEWETT:  I'm just trying to summarize.

12            THE COURT:  We'll permit him to go through the

13    sections that he deems appropriate, and you go through the

14    sections you deem appropriate.

15    BY MR. JEWETT:

16    Q.  Do you see that there in paragraph 2 that I just read?

17    A.  Can you reread that for me, please.

18    Q.  I'll read the whole thing; the first sentence, that is.

19            It says that Steadfast will "assume sole and

20    exclusive responsibility for the payment of wages, including

21    overtime where applicable, to temporary personnel for

22    services performed at the healthcare center to the extent

23    temporary personnel are considered to be supplemental

24    staffing services' employees."

25            Did I read that accurately?

Carol L. Naughton, Official Court Reporter

**JA993**

—— L. Pitts - Direct ——

1    A.  Yes.

2    Q.  Do you see that?

3    A.  Yes.

4    Q.  Let me draw your attention to paragraph 4 now.  I'm going

5    to read you the first sentence.  Paragraph 4 reads:

6            "Steadfast will assume sole and exclusive

7    responsibility for the payment of compensation to temporary

8    personnel for services performed at the healthcare center to

9    the extent temporary personnel are considered to be

10   independent contractors."

11           Do you see that?

12   A.  Yes.

13   Q.  So do you see that this contract contemplates that

14   temporary nurses may be considered either employees or

15   independent contractors of Steadfast?

16           MS. LEWIS:  Objection.  Calls for a legal

17   conclusion.

18           THE COURT:  Sustained.

19   BY MR. JEWETT:

20   Q.  Let me shift gears and ask you about the cancellation

21   policy.

22           You heard several nurses testify in this trial about

23   a two-hour cancellation policy.  Do you recall that?

24   A.  Yes.

25   Q.  Is that accurate?  There's a two-hour cancellation

```
                              ┌─ L. Pitts - Direct ─┐
  1   policy?

  2   A.  Yes.

  3   Q.  Okay.  And is that two-hour cancellation policy in

  4   Steadfast's contracts, or the majority of the contracts?

  5   A.  Correct, yes.

  6   Q.  Why is that two-hour cancellation policy in the contract?

  7   A.  Well, the facility -- the facility wanted enough time so

  8   we could find someone else if somebody cancels.  If someone

  9   cancels, they want enough time for us to find someone else,

 10   even though two hours is not enough, but they wanted some

 11   kind of clause in there.

 12   Q.  Okay.  The last question I want to ask you about is about

 13   the rate sheet.

 14   A.  Uh-huh.

 15   Q.  This is on Page 141 of PX-10.  This is -- I think this is

 16   still part of the Princess Anne contract.

 17           Can you see this okay?

 18   A.  Yes.

 19   Q.  Do you recognize this as the rate sheet for Steadfast and

 20   Princess Anne?

 21   A.  Yes.

 22   Q.  Okay.  So there's three rates listed here:  RNs, 55 an

 23   hour; LPNs, 40 an hour; CNAs, 25 an hour.

 24           Do you negotiate these rates?

 25   A.  Well, me and the facility negotiate the rates.  I submit
```

---
L. Pitts - Direct
---

1    them -- they tell me what they have been paying, what other

2    facilities charge, and I try to keep the rates there, and

3    sometimes they will mark them and say, hey, we need to go a

4    little lower.

5    Q.  Okay.  How is the rate ultimately determined in these

6    contracts?

7    A.  Between the facility and Steadfast.

8    Q.  And that's following a period of negotiation?

9    A.  Exactly.

10   Q.  The nurses don't take part in that?

11   A.  No.

12   Q.  So this particular rate sheet shows $55 an hour for RNs.

13            Is that what the nurse actually gets paid?

14   A.  No.  That's the bill rate.

15   Q.  That's the bill rate.  That is what Steadfast gets paid?

16   A.  Right.

17   Q.  So how does Steadfast get paid out of this?  What is its

18   cut, I guess?

19   A.  Well, if it's 55 an hour, usually the RNs are paid

20   anywhere from 40 to 45 an hour.

21   Q.  And what does Steadfast use that cut for?

22   A.  That's a processing fee.  That's for, you know, having

23   the office, processing payroll, someone we have to get to vet

24   all the nurses, extensive drug screen for corrections,

25   extensive background checks.  We have to pay people to do all

--- L. Pitts - Direct ---

1    that.

2    Q.  Okay.  So does Steadfast inform the nurses of the

3    contract rate or the actual rate they are going to make when

4    they are working at the facility?

5    A.  We give them their pay rate.

6    Q.  Their pay rate?

7    A.  Yes.

8    Q.  So in this example, not the 55, the 45 is what the nurse

9    sees?

10   A.  Exactly.

11   Q.  Have you ever had a nurse attempt to negotiate that rate?

12   A.  The rate that we tell them for the facility?

13   Q.  Yes.

14   A.  Yes.

15   Q.  So just to be clear, so if we're just sticking with the

16   $45-an-hour example, have you ever had a nurse attempt to

17   negotiate that rate?

18   A.  Yes, all the time.

19   Q.  Under what circumstances have you had nurses attempt to

20   negotiate the rate?

21   A.  If the facility is really, really bad.  The nursing homes

22   have a standard-of-care star, and some of these facilities

23   are bad, and the nurses are, like, "I can't go in there for

24   that.  I need more money."

25   Q.  Okay.  So if a nurse says that to you, "I'm not going to

─────────────────── L. Pitts - Direct ───────────────────

1   go there for that rate," what do you do with that

2   information?

3   A.  Sometimes I reach out to the facility and renegotiate the

4   bill rate, and if not, sometimes we just eat it.

5   Q.  Okay.  Do you recall some testimony earlier in this case

6   about late cancellations?

7   A.  Yes.

8   Q.  And I believe a few -- correct me if I'm wrong, but I

9   believe a few nurses testified that they can get a higher

10  rate if there's a last-minute cancellation.

11          Did I say that accurately?

12  A.  Yes.

13  Q.  Is that your experience too?

14  A.  Yes.

15  Q.  Okay.  Have you ever had a facility willing to negotiate

16  the rate for a nurse just because the nurse is really good at

17  what she does?

18  A.  Yes.

19  Q.  Okay.  I think we're done with that exhibit.

20          I want to shift gears, Ms. Pitts, to another topic

21  and ask you some questions about scheduling.

22  A.  Okay.

23  Q.  We'll go through this quickly.

24          At the beginning of your testimony, we looked at --

25  I don't recall the number now, but we looked at the database,

L. Pitts - Direct

```
 1   the roster of nurses together.
 2   A.  Right.
 3   Q.  So once a nurse is actually on that roster --
 4   A.  Correct.
 5   Q.  -- how does the nurse go about getting scheduled for a
 6   shift?
 7          And I'm sorry.  That was kind of a big question.  I
 8   realize that the company has now shifted to have the Zira
 9   app.  So I want you to describe the process before the
10   company used the Zira app.
11          How would a nurse go about getting scheduled for a
12   shift before the company used the Zira app?
13   A.  Well, she would call to the office, or the schedulers
14   would reach out to her to get her availability -- he or she
15   availability.
16          And once they tell them their availability -- you
17   know, usually the facility will send over e-mails saying,
18   "Hey, we need all these nurses," blah, blah, blah; and we
19   reach out to the contractors and say, "Hey, look, these are
20   the facilities, and we need nurses for such and such.  What
21   is your availability?"  And they tell us which days they can
22   pick up.
23   Q.  Okay.  So does Steadfast -- does it provide the available
24   shifts to the nurses only once the facility provides the
25   available shifts to Steadfast?
```

Carol L. Naughton, Official Court Reporter

**JA999**

946

———————— L. Pitts - Direct ————————

1   A.  Correct.

2   Q.  Okay.  Let me zero in a little bit on your testimony

3   about how the information flows to the nurses.

4        Are there occasions where Steadfast will just --

5   they will get a request for staffing from a facility --

6   A.  Right.

7   Q.  -- and Steadfast just sends a general blast to the whole

8   database and says, "Hey, here's what's available.  Let us

9   know if you can work"?

10  A.  Correct.  Yes.

11  Q.  Steadfast does that sometimes?

12  A.  Yes.

13  Q.  Let me show you two documents very quickly.  I think

14  these were premarked as Defendants' 58 and 59.

15       This is 58.  This is an e-mail -- well, do you

16  recognize this as an e-mail from your company?

17  A.  Yes.

18  Q.  And the names listed here, without going through all of

19  them, are these the nurses from your registry at this time?

20  A.  Correct, yes.

21       MR. JEWETT:  Can you please scroll down.

22  BY MR. JEWETT:

23  Q.  Have you seen the whole document?

24  A.  Yes.

25  Q.  Okay.  Was this e-mail sent to Steadfast's database in

Carol L. Naughton, Official Court Reporter

**JA1000**

```
                    ┌─ L. Pitts - Direct ─┐
```

  1  │ response to a request from a facility?

  2  │ A.  Yes.

  3  │          MR. JEWETT:  Your Honor, we move to admit DX-58.

  4  │          THE COURT:  Any objection?

  5  │          MS. LEWIS:  No objection, Your Honor.

  6  │          THE COURT:  DX-58 will be admitted.

  7  │          (Defendants' Exhibit DX-58 received in evidence.)

  8  │          MR. JEWETT:  Can we please pull up the next

  9  │ document.  This is DX-59.

 10  │ BY MR. JEWETT:

 11  │ Q.  Ms. Pitts, you are being shown what's been marked as

 12  │ DX-59.  Do you recognize this e-mail as an e-mail coming from

 13  │ Steadfast?

 14  │ A.  Yes.

 15  │ Q.  And is this a list of nurses on Steadfast's registry?

 16  │ A.  Yes.

 17  │          MR. JEWETT:  Can you please scroll down.

 18  │ BY MR. JEWETT:

 19  │ Q.  This e-mail refers to an "increase of crisis pay rates

 20  │ for Citadel Salisbury in North Carolina."

 21  │          Is that one of Steadfast's facility clients?

 22  │ A.  Yes.

 23  │ Q.  Was this e-mail sent out at the request -- strike that.

 24  │          Was this e-mail sent out in response to the

 25  │ facility's request for staffing?

─────────────── L. Pitts - Direct ───────────────

1  A.  Yes.

2           MR. JEWETT:  Your Honor, we move to admit DX-59.

3           THE COURT:  Any objection?

4           MS. LEWIS:  No objection.

5           THE COURT:  DX-59 will be admitted.

6           (Defendants' Exhibit DX-59 received in evidence.)

7  BY MR. JEWETT:

8  Q.  Okay.  So we've looked at a few examples, Ms. Pitts, of

9  larger blasts that went out to the database seeking available

10 nurses for shifts.

11          Are there circumstances where the schedulers kind of

12 zero in on a subgroup of nurses or a smaller group of

13 individuals to see if they are available for shifts?

14 A.  Well, we try to zero in on everybody; but, yes, we do

15 that.

16 Q.  Okay.  Under what situations does Steadfast, pre-Zira

17 days -- so pre-Zira days, under what situations did Steadfast

18 target a smaller group of nurses instead of sending out a

19 larger blast to the registry?

20 A.  Well, during -- well, you're talking about pre-COVID or

21 COVID?

22 Q.  Just, in general, during the relevant time period.

23 A.  Well, when a facility says they have a need and they need

24 a lot of nurses and they have a lot of needs at multiple

25 facilities the corporation owns, we send out e-mail blasts.

Carol L. Naughton, Official Court Reporter

**JA1002**

949

─────────── L. Pitts - Direct ───────────

1   Q.  But my question is -- I understand that.  Okay.  Thank

2   you.

3           But my question is:  When would the schedulers --

4   instead of sending out a large blast to the whole registry,

5   when would they look at the roster and start calling or

6   texting nurses to see who is available to take the shifts?

7   A.  Well, if no one is picking up the shifts that the

8   facility sends us --

9   Q.  I see.

10  A.  -- who is on it -- who is already on the schedule, we

11  reach out to the registry and just start calling people and

12  getting their availability.

13  Q.  I see.

14          Do nurses in your registry -- do they ever schedule

15  directly with the facility?

16  A.  Yes.

17  Q.  How is it that you know that?

18  A.  Because they usually, when they schedule -- when the

19  facility calls them and they pick up shifts with the

20  facility, they've already picked up shifts in another

21  building.  So it's double-booking.  So we have, like, that

22  nurse at two different places.

23  Q.  Okay.  Let me back up.

24          So when the nurse schedules directly with the

25  facility, does that ever cause issues for Steadfast?

L. Pitts - Direct

1    A.  Yes.

2    Q.  And what are those issues?

3    A.  Double-booking.

4    Q.  Double-booking.

5         Why is double-booking an issue?

6    A.  Because if she's already -- we already have -- say, for

7    example, we have her scheduled at Nansemond Pointe, and

8    Princess Anne calls her and says, "Hey, look, we need a nurse

9    this morning.  Can you help us out?"

10        And nine times out of ten -- I don't know how they

11   forget that they are already supposed to be working for

12   someone.  I don't know how that happens.  But then if she

13   goes to Princess Anne -- he or she goes to Princess Anne but

14   she is on Nansemond Pointe's schedule also, so Nansemond

15   Pointe is looking for her, but she's at another building

16   double-booking.

17   Q.  Let me ask you a few questions, just a few, about the

18   Zira app.

19        Steadfast is now scheduling through the Zira app; is

20   that correct?

21   A.  That's correct.

22        MR. JEWETT:  Can you please pull up DX-75.  This is

23   the next document in the list.

24   BY MR. JEWETT:

25   Q.  Now, Ms. Kim already testified about this, but do you

Carol L. Naughton, Official Court Reporter

**JA1004**

—————————————L. Pitts - Direct—————————————

 1  recognize this as screenshots of the Zira app that Steadfast
 2  uses?
 3  A.  Correct.
 4  Q.  Why did Steadfast change from this e-mail and
 5  calling-and-texting scheduling model to the Zira app model?
 6  A.  Double-booking.
 7  Q.  Okay.  Did the Zira app alleviate the double-booking
 8  problem?
 9  A.  Once we tweaked it, yes, it did.
10  Q.  Any other reason that Steadfast switched to the Zira app?
11  A.  It gives -- we don't have to send out individual e-mails,
12  and when you're doing Gmail, you're limited to how many
13  e-mails you can send out.  With Zira, we can just send out
14  one e-mail, and it goes out all over the country.
15  Q.  Has the Zira app resulted in less effort to get nurses
16  scheduled by your schedulers?
17  A.  Yes, it has.
18  Q.  Why is that?
19  A.  Because, you know, the nurses -- the nurses who get
20  picked up in the Zira app, who's already registered for the
21  Zira app, it just makes it easier for the facility to go in,
22  and they can text the nurses from the Zira app.  If they
23  click on the personal information, they can go in and call
24  the nurses.  Everything is right there for them.  It's like a
25  one-stop shop.

L. Pitts - Direct

 1          Now, we have four buildings that's not in here, and
 2     we're in the process of putting the rest of the buildings in
 3     here.  So most of the facilities that now call to
 4     troubleshoot, "Hey, I'm having trouble getting in here," we
 5     tell them to reach out to the software guy.
 6          And the girls in the call center kind of manage this
 7     app saying, "Hey, you've got a bunch of people that want to
 8     work in your building, and you need to check and confirm
 9     them," or whatever.
10     Q.  Let me pull back on something that you just mentioned,
11     and I want to ask you this:
12          What percentage of the facilities Steadfast has
13     contracts with are using the Zira app for scheduling?
14     A.  All of them except four.
15     Q.  All except four.
16          So does Steadfast tell the nurses what shifts to
17     select in the Zira app?
18     A.  No.  No, we don't.
19     Q.  Does Steadfast tell the nurses what shifts they are
20     eligible for in the Zira app?
21     A.  No, we don't.
22     Q.  Once a nurse selects a shift in the Zira app, does
23     Steadfast go into the app to approve or decline the nurse
24     claiming the shift?
25     A.  Well, unless a facility calls us and lets us know --

Carol L. Naughton, Official Court Reporter

**JA1006**

L. Pitts - Direct

1    usually, you know, if we see a lot of people that sign up for

2    a shift and the facility is not getting back to them, I tell

3    the schedulers to reach out to them and figure out why they

4    are not, you know, confirming those girls' shifts.

5          Nine times out of ten, they are not in the office;

6    they can't access it on their phone.

7    Q.  Let me make sure I understand the testimony.

8          Are you saying that the times that a Steadfast

9    scheduler would go in and either accept or decline a shift,

10   is that when the facility has not gotten around to it?

11   A.  Or they are not in the building.

12   Q.  Okay.

13   A.  So what happens is, if they don't, they're going to lose

14   out, and the nurse is going to go pick up somewhere else.

15         MS. LEWIS:  Your Honor, I'm going to object to this

16   line of questioning with respect to what the facilities do

17   when they are in the app, their needs, et cetera.

18         Moreover, as previously admitted into testimony,

19   there were excerpts and counter-designations with respect to

20   the functionality of the Zira app, both designations by

21   plaintiff and defendants, regarding how the tool actually

22   functions.

23         So two objections:  One, it calls for speculation;

24   and then, secondly, it misstates prior evidence.

25         THE COURT:  What we can do here, Counsel, is to the

Carol L. Naughton, Official Court Reporter

**JA1007**

954

L. Pitts - Direct

1    extent that the questions that you ask are consistent with

2    what both parties have already determined in their discovery,

3    then I'll let you continue, but we don't need to have her

4    speculate to anything beyond what both parties have agreed

5    about how the app works.

6             MR. JEWETT:  Certainly.  I will ask one more

7    question and then move on.

8    BY MR. JEWETT:

9    Q.  In the Zira app, Ms. Pitts, are the facilities able to

10   log into the app to accept or decline nurses who have tried

11   to claim a shift?

12   A.  Yes.

13   Q.  Okay.  Now, I want to ask you some questions about what

14   happens once a nurse reports for duty at the facility.  Okay?

15            Before the nurse reports to the facility for her

16   shift, does she first report to Steadfast's office?

17   A.  No.

18   Q.  Under what circumstances do nurses come to Steadfast's

19   office?

20   A.  Well, they used to come -- local nurses would come and

21   see how they get on the registry or pick up a check.

22   Q.  Okay.  Now, do the nurses clock in with Steadfast once

23   they arrive at the healthcare facility?

24   A.  No.  Some facilities have a time clock there, and they

25   require our nurses to clock in and out at the facility.

Carol L. Naughton, Official Court Reporter

**JA1008**

L. Pitts - Direct

1   Q.  If you know, is that like a Kronos system?

2   A.  It's really a tracking system for them, because they have

3   had a lot of theft with time.

4   Q.  Now, so the nurses don't clock in with Steadfast when

5   they start their shifts, but do they otherwise notify

6   Steadfast?  Do they call up and say, "Hey, I made it to my

7   shift"?

8   A.  No.

9   Q.  Okay.  So if the nurses don't notify Steadfast that

10  they've made it to their shift, how does Steadfast actually

11  know if a nurse has shown up to work?

12  A.  We'll get the time sheet, or the facility will call and

13  say, "I just tried to reach out to so-and-so.  We can't reach

14  her.  Can you give her a call?"

15  Q.  I'm going to go through a few additional questions about

16  working at the facility.

17        Once the nurse is at the facility filling a shift,

18  does Steadfast send a representative to the facility to

19  monitor the nurse's work?

20  A.  No.

21  Q.  What about just to check in to see how the nurses are

22  performing?

23  A.  No.

24  Q.  Does Steadfast ever check in with the facility clients

25  while the nurses are performing work to see if things are

Carol L. Naughton, Official Court Reporter

**JA1009**

956

```
                           ┌─ L. Pitts - Direct ─┐
 1    going smoothly?
 2    A.  No.
 3    Q.  So how does Steadfast, then, monitor the nurse's
 4    performance?
 5    A.  We can't.
 6    Q.  You don't provide performance evaluations?
 7    A.  No.
 8    Q.  What about critical feedback on performance?
 9    A.  No.
10    Q.  Okay.  What about just questions about the work?  Do you
11    ever receive calls from a nurse, while she is or he is
12    nursing at a facility, with questions about how to do
13    something?
14    A.  No.
15    Q.  Do you recall, in the earlier parts of this trial,
16    several nurses testifying that you had removed them from
17    their schedule?
18    A.  Yes, I remember.
19    Q.  Okay.  Is it true that you remove nurses from the
20    schedule?
21    A.  Only if the facility tells me to.
22    Q.  Okay.  Do you ever receive -- well, let me go back to
23    that.
24            Do you remove nurses from the schedule if the
25    facility doesn't tell you to?
```

**JA1010**

L. Pitts - Direct

1   A.  No.

2   Q.  Do you ever receive e-mails from a facility instructing

3   Steadfast to remove a nurse from the schedule?

4   A.  Yes.

5   Q.  Okay.

6          MR. JEWETT:  Can you please pull up the next

7   document.

8   BY MR. JEWETT:

9   Q.  This is an e-mail from Jessica Sledge at Accordius

10  Courtland --

11         MS. LEWIS:  Your Honor, I'm going to object again to

12  this document.  Once again, there's no Bates stamp number.

13  It was not produced in discovery.

14         THE COURT:  Is this another document in her e-mails?

15         MR. JEWETT:  It is.  It is a document, Your Honor,

16  under 608, offered to provide contradiction, which it's our

17  understanding is permitted under the rules, based on specific

18  testimony in the trial earlier in the case.

19         THE COURT:  Are we going over the same thing we went

20  over before where they made a request for production of

21  documents with respect to the performance, agreements,

22  et cetera, et cetera, and this came out of her e-mails, but

23  it was not in the personnel file?

24         Just answer that.  Is that what we have?

25         MR. JEWETT:  Yes, because they don't keep --

Carol L. Naughton, Official Court Reporter

**JA1011**

L. Pitts - Direct

1     THE COURT:  Is this another document --

2     MR. JEWETT:  Yes, because they don't keep personnel

3  files on the nurses, Your Honor.

4     THE COURT:  So you didn't produce, based upon those

5  requests for production, any documents out of Ms. Pitts'

6  files?

7     MR. JEWETT:  We did.  We did, Your Honor, and we

8  have produced -- I don't want to exaggerate the number, but

9  it's close to hundreds of thousands of documents in this

10  case.  We've had countless conferral sessions.  Judge Leonard

11  had to get involved.  He narrowed the scope of the requests.

12     THE COURT:  You didn't produce anything out of her

13  e-mails.  Is that it?

14     MR. JEWETT:  Yes, we did.

15     THE COURT:  How did you miss this one?

16     MR. JEWETT:  I need to confer with Ms. Rust on this,

17  because she was really -- it was not responsive to any

18  particular request.

19     MS. LEWIS:  Your Honor, I'd be happy to continue to

20  read the requests.

21     THE COURT:  Wait a minute.  Are you getting ready to

22  read the same three requests for production you previously

23  read?

24     MS. LEWIS:  Well, there's more.  This one could,

25  likewise, be responsive to other ones.  The answer of

Carol L. Naughton, Official Court Reporter

**JA1012**

———————————— L. Pitts - Direct ————————————

1    "nonresponsive" is too cute to pass muster, Your Honor.

2            This request was clearly within the request for

3    production of documents.  It asked for -- I'm going to go

4    to -- let me use, for example, request for production

5    number 14.

6            "All documents that refer or relate to the

7    instructions, policies and procedures, or guidelines that any

8    individuals listed in Schedule A were required or recommended

9    to follow in performing any job tasks, assignments, duties,

10   or functions during the relevant period."

11           Request for production number 15:

12           "All manuals, handbooks, memorandums, or other

13   documentation provided by Steadfast to any individual listed

14   in Schedule A during the relevant period of time."

15           Your Honor, these document requests, whether you

16   could say that they are responsive to a personnel file or

17   otherwise, it covers the gambit.  So to say that it's

18   nonresponsive -- all of these documents that have been

19   presented to the Court clearly are responsive to some

20   document request.

21           THE COURT:  Is there a particular reason the e-mails

22   of Ms. Pitts pertaining to matters involving the execution

23   and the performance of Steadfast contracts and relationships

24   with the facilities were not provided?  You said they were

25   nonresponsive?

960

L. Pitts - Direct

1      MR. JEWETT:  The request -- I did not hear the
2  second request.  The one I heard was a request for policies
3  and procedures.  That does not encompass e-mails.
4      And, Your Honor, I will just say, there have been
5  scores and scores of hours of phone calls between counsel in
6  this case.  It was a very difficult discovery process, and
7  there are many letters that narrow in the finest scope of
8  these requests.  There's no --
9      THE COURT:  Let me tell you something.
10      MR. JEWETT:  Yes, sir.
11      THE COURT:  It's very unusual to the Court that
12  Ms. Pitts was sued in an individual capacity.  She's the
13  owner of the company.  So any documents or any e-mails that
14  she has, it's very unlikely that they would not be something
15  that you would be producing, Mr. Jewett.
16      MR. JEWETT:  Okay.  I understand the Court's
17  concern.  This is her business e-mail, Your Honor.  This is
18  not her personal e-mail.  The business uses a Gmail account.
19      THE COURT:  It's her business e-mail?
20      MR. JEWETT:  Yes, sir.
21      THE COURT:  And we're talking about her business
22  here, right?
23      MR. JEWETT:  Yes.
24      THE COURT:  This lawsuit is against her business as
25  well as her.

**JA1014**

L. Pitts - Direct

```
 1          MR. JEWETT:  Yes.

 2          THE COURT:  I'm not going any further.  Objection

 3   sustained.  This e-mail is out.

 4          MR. JEWETT:  Okay.

 5          THE COURT:  Don't produce another one out of her

 6   e-mails if you haven't turned it over, Mr. Jewett.

 7          MR. JEWETT:  Understood, Your Honor.

 8   BY MR. JEWETT:

 9   Q.  Ms. Pitts, I want to circle back to your testimony.  I

10   believe you said that the only circumstance that you remove a

11   nurse from a schedule is if requested by the facility.

12          Is that what you said?

13   A.  Yes.

14   Q.  Okay.  How often does Steadfast receive these sort of

15   requests -- I'm going to call them do-not-return requests, or

16   DNR requests.

17          How often does Steadfast receive a DNR request from

18   a facility?

19   A.  Every day, all day.

20   Q.  Every day, all day.  Okay.

21          What are some circumstances where Steadfast has

22   received a DNR request based on information provided by the

23   facility?

24          Let me be more specific.

25          What I'm asking is, is the facility reporting to
```

Carol L. Naughton, Official Court Reporter

**JA1015**

—————————————L. Pitts - Direct—————————————

1    Steadfast that, for example, somebody is a no call/no show?

2    A.  Yes.

3    Q.  So can you give the Court some examples of the sort of

4    things that the facilities notify Steadfast about that causes

5    them to give Steadfast a DNR request?

6    A.  No call/no shows; if the nurse shows up at the facility,

7    doesn't like the assignment and walks out, they DNR them;

8    neglect; abuse; fighting; sleeping in patients' beds.

9    Q.  These would be at long-term facilities?

10   A.  Yeah.

11   Q.  What about purported intoxication?

12   A.  All the time.

13   Q.  So when Steadfast receives a DNR request like this, what

14   is Steadfast's general practice when it receives one of these

15   DNR notifications from a facility?

16   A.  Usually we would tell the nurses, say, "You need to call

17   the facility.  Evidently you had an issue with them.  DON is

18   taking you off."

19        We used to tell them why, but it was so

20   controversial, you know, the arguments back and forth.  And

21   we weren't there.  We tell them to call the facility.  "Call

22   the facility."

23   Q.  Does Steadfast have the right to challenge the facility's

24   determination to DNR a nurse?

25   A.  No.  That's the company's right.  We signed a contract.

963

                              ┌─ L. Pitts - Direct ─┐

 1   It's their right to tell us that they can't have someone

 2   there.  It's their right to tell us not to bring them in.

 3   Q.  Okay.  After a DNR has been issued for a nurse, does the

 4   facility refuse the nurse from all future shifts?

 5   A.  Yes.  Depends on how extent it is.

 6          Like, if you go in there intoxicated or you're

 7   sleeping or fighting, they'll do that, and usually the police

 8   gets involved, if they go in there intoxicated or fighting.

 9   So, yes.

10   Q.  Just to be clear, say a nurse had signed up for a

11   three-week stint, or gig or shift that lasts three weeks with

12   a facility, and the facility DNRs the nurse after the first

13   week.  Does the facility cancel the remaining shifts for the

14   next two weeks?

15   A.  Depends on what it is.  Depends on --

16   Q.  You've seen that happen, though?

17   A.  Yes, it happens.

18   Q.  Let me just start over, and I'll try not to interrupt you

19   anymore.  I'm sorry about that.

20          So my question is:

21          Say a nurse signed up for a three-week-long

22   assignment with a facility and then the facility DNRs the

23   nurse after the first week.  Okay?  Does the facility cancel

24   the remaining two weeks of the nurse's assignment after it

25   issued that DNR?

                    Carol L. Naughton, Official Court Reporter

**JA1017**

964

─────── L. Pitts - Direct ───────

1    A.  More likely they do.  It depends on if it was something

2    involving fighting or drugs or sleeping or abuse.  Some

3    barrier crimes, they will.

4          THE COURT:  You realize that there are two things

5    wrong with that whole exchange:  Number one, it's a

6    hypothetical; number two, it calls for speculation.

7          MR. JEWETT:  Okay.  Noted, Your Honor.

8    BY MR. JEWETT:

9    Q.  You talked about this briefly.

10          I believe you said when Steadfast receives a DNR

11   notification from the facility, you generally communicate

12   that to the nurse.

13   A.  Yes.

14   Q.  Okay.  What does Steadfast do to the nurse once the nurse

15   is DNR'd?

16   A.  Depends on if it's a barrier crime.  If it's a barrier

17   crime, we can't put them back on the schedule until

18   everything is resolved.  But if it's something dealing with

19   personality conflicts, which we have all the time, we will

20   just move them to another building.

21   Q.  Does Steadfast remove the nurse from its registry when a

22   nurse is DNR'd from a facility?

23   A.  No.

24   Q.  Does Steadfast -- did you say something?

25   A.  No.

Carol L. Naughton, Official Court Reporter

**JA1018**

———————L. Pitts - Direct———————

1    Q.  Does Steadfast make the nurse sit out from its registry

2    for a period of time, like a few weeks, once a nurse receives

3    a DNR from a facility?

4    A.  No.

5    Q.  Does Steadfast allow a DNR'd nurse to take shifts at

6    another facility?

7    A.  Depends on if it's a barrier crime.  If it's alcohol or

8    something like that, we have to wait, because usually the

9    Board of Nursing is involved.

10   Q.  I see.

11          When a nurse is DNR'd, does Steadfast then go tell

12   all the other facilities that that nurse has been DNR'd by

13   this particular facility?

14   A.  No.

15   Q.  I want to ask you a couple questions about Dixie

16   DeLutis's testimony today.

17          Do you recall that?

18   A.  Yes.

19   Q.  I believe she testified that she was involved in a

20   three-way conversation with you and Ms. Smith.

21   A.  Yes.

22   Q.  Without getting back into that story, what did you do in

23   response to the phone call that you received from

24   Ms. Smith -- I'm sorry -- from Ms. DeLutis?

25   A.  Well, we told Chantella that she had to go get a drug

Carol L. Naughton, Official Court Reporter

**JA1019**

```
                         ┌──────────L. Pitts - Direct──────────┐
 1      screen before she reported back into the building.
 2      Q.  Did Ms. Smith -- did she provide a drug screen to
 3      Steadfast for that?
 4      A.  No.
 5              MR. JEWETT:  Your Honor, I want to be sensitive to
 6      the Court's typical schedule.  I was about to move on to a
 7      new topic.  Would you like me to do that?
 8              THE COURT:  Well, it depends on how long the topic
 9      is.  How many questions on the topic?
10              MR. JEWETT:  Well --
11              THE COURT:  If it's a prolonged series of questions,
12      we'll quit right here.
13              MR. JEWETT:  Yeah, I'm about to get into -- I'm just
14      looking at my outline, Your Honor.
15              THE COURT:  Tell you what, we'll just stop right
16      here and come back at 2:30 to finish this witness.  We'll
17      come back at 2:30 to finish your direct on this witness.
18              MR. JEWETT:  Yes, sir.
19              THE COURT:  During this break, Ms. Pitts, you're
20      still under examination.
21              THE WITNESS:  Yes, sir.
22              THE COURT:  Counsel, you know what that means.
23              MR. JEWETT:  We won't talk to her.
24              THE COURT:  All right.  Recess court until 2:30 p.m.
25              (Recess at 12:55 p.m. to 2:38 p.m.)
```

```
                          ┌─ L. Pitts - Direct ─┐
```

1          THE COURT:  Okay.  You may resume your cross --

2    first, Ms. Pitts, do you want to come back to the stand?

3          (The witness resumed the stand.)

4          THE COURT:  You may resume.

5          MR. JEWETT:  Thank you.

6    BY MR. JEWETT:

7    Q.  Ms. Pitts, I want to ask you a couple of questions about

8    Roxanne Adams.

9          How are you familiar with her?

10   A.  She was one of the nurses on the registry.

11   Q.  Did you have a personal relationship with her outside of

12   work?

13   A.  Yes.

14   Q.  Okay.  Do you know her family?

15   A.  Yes.

16   Q.  And where does she work now?

17   A.  Essential Medical Staffing.

18   Q.  Do you recall the name of the position she said she has

19   at that company?

20   A.  She said she was a finance manager.

21   Q.  Do you recall her testifying in the court that she had

22   been investigated by the Department of Labor in this case?

23   A.  Yes.

24   Q.  And then you saw her come to testify for the Department

25   of Labor last week.

**JA1021**

968

──────────── L. Pitts - Direct ────────────

1      Do you recall that?

2   A.  Yes.

3   Q.  And do you recall that she testified that she does not

4   have a financial interest in Essential Medical Staffing?

5   A.  Yes.

6   Q.  Do you know who Troy Meads is?

7   A.  Yes.

8   Q.  Who is Troy Meads?

9   A.  Her husband.

10          MS. LEWIS:  Your Honor, before we get too far down

11  this line, I object to the relevance of her husband.

12          THE COURT:  So where are we going with this,

13  Mr. Jewett?

14          MR. JEWETT:  This is impeachment by contradiction

15  under Rule 608.

16          THE COURT:  Wait a minute now.

17          You keep citing Rule 608.  She said that she had no

18  interest in it, so you're going to impeach her by saying her

19  husband had an interest?

20          MR. JEWETT:  We're going to show the State

21  Corporation Commission document, which, of course, is

22  authenticated, showing that her husband formed and organized

23  the company, according to the records for the State

24  Corporation Commission.

25          THE COURT:  It doesn't show she has any interest,

—————— L. Pitts - Direct ——————

1    does it?

2          MR. JEWETT:  Well, Ms. Pitts testified that she is

3    married to Mr. Meads.

4          THE COURT:  She made the statement "I do not have an

5    interest in it."  You think this contradicts it?

6          MR. JEWETT:  I do, Your Honor, because she's married

7    to Troy Meads.  And I would take the position that she was

8    not forthcoming when she was asked repeatedly by Ms. Rust

9    whether she had a financial interest in this company.

10          THE COURT:  Well, she didn't ask her, "Does your

11    husband have a financial interest in it?"

12          MS. LEWIS:  Moreover, Your Honor, we re-assert the

13    objection with respect to relevance, but I can dig back into

14    my domestic relations background.  There could be all sorts

15    of documents that divest her of any sort of interest in the

16    company.

17          MR. JEWETT:  It could also come in under the bias

18    clause for 608 too.  Contradiction or bias is a --

19          THE COURT:  What is the bias?  What are you driving

20    at, anyway, about the Essential Medical?  What is the

21    relevance of that to whether Ms. Pitts and Steadfast violated

22    the Fair Labor Standards Act?

23          MR. JEWETT:  Ms. Adams came into court, after

24    signing two sworn statements in this case, after being

25    investigated by the Department of Labor, and then she

—— L. Pitts - Direct——

1   testified that she had essentially settled up with them, and

2   then she shows up into court as their witness, and then she's

3   asked if she has a financial interest in this company, and

4   she says, "No, I don't."  And it turns out her husband owns

5   the company.  I think that shows bias, and it is,

6   respectfully, we believe, an appropriate way to impeach a

7   witness.

8           THE COURT:  You have not answered the Court's

9   question.

10          What does that have to do with the bias that you're

11  trying to show?

12          MR. JEWETT:  It is the -- it was impeaching the bias

13  of a single witness in this case out of a course of many

14  witnesses.

15          THE COURT:  You still haven't answered my question.

16          What does Essential Medical have to do with whether

17  the defendants in this case, Steadfast and Ms. Pitts,

18  violated the Fair Labor Standards Act?  What does that have

19  to do with it?

20          MR. JEWETT:  They have -- I agree with you, Your

21  Honor; their practices have nothing to do with Steadfast's

22  practices.  But it does show that a particular witness, who

23  testified very negatively against Steadfast, came in here

24  with a bias and that she was not forthcoming with the Court.

25          THE COURT:  It still doesn't answer the Court's

Carol L. Naughton, Official Court Reporter

**JA1024**

L. Pitts - Direct

1    question.
2          Objection sustained.  I gave you a couple of chances
3    to tell the Court how it was relevant, and you didn't answer
4    it.
5          MR. JEWETT:  Well, Your Honor, I agree with the
6    Court that it's not -- okay.
7    BY MR. JEWETT:
8    Q.  Ms. Pitts, when Ms. Lewis called you as a witness, do you
9    recall being shown a series of memos that you had authored?
10   A.  Yes.
11   Q.  Okay.  And my acoustics aren't real great over here.
12   Would you mind getting a little closer to the microphone so I
13   can hear you.
14   A.  I said "yes."
15         MR. JEWETT:  Pull up the 13th document.
16         And, Your Honor, this particular document was
17   previously marked as Defendants' 42 in the Joint Pretrial.
18   BY MR. JEWETT:
19   Q.  Before I ask you about this particular document,
20   Ms. Pitts, let me ask you this:
21         Speaking generally about your practices, under what
22   circumstances have you sent out memos to nurses?
23   A.  On request of the facilities.
24   Q.  So let's look at this first one.  This is DX-42.
25         Okay.  This is your signature?  Did you send this

────────── L. Pitts - Direct ──────────

1   memo?

2   A.  Yes.

3   Q.  Do you recognize this memo?

4   A.  Yes.

5   Q.  Why did you send this memo reminding the nurses to be on

6   time for their shifts?

7   A.  Because I received correspondence from the facility

8   stating "Can you please relay to the nurses they need to be

9   on time."

10          MS. LEWIS:  Your Honor, I'm going to object with

11  respect to best evidence in terms of she's representing --

12  this is being presented for the truth of the matter asserted.

13  The best evidence is this memo here.  Likewise, the direction

14  of the memo that she received from the facility, we don't

15  have an opportunity, nor do we know which facility allegedly

16  gave her this direction.  It's speculation, hearsay, and best

17  evidence.

18          MR. JEWETT:  I think we had this conversation

19  earlier.  It's not hearsay because the question is not being

20  presented for the truth of the matter.  It gets into why she

21  did what she did.  And these kinds of questions are very

22  common in employment cases.

23          THE COURT:  It goes exactly to the truth of the

24  matter asserted.  Why she did what she did, the Court wants a

25  truthful response of why she did it.  I mean, if you're just

L. Pitts - Direct

1    saying it's not for the truth of the matter asserted, then

2    nothing needs to come into evidence.

3          What we do need is we need the truth of why she sent

4    it out, because this goes to the question of how much

5    involvement she has, how much control she has over these

6    nurses.  So we need a truthful response to this.

7          So is there another reason you're submitting this?

8          MR. JEWETT:  Yeah.  And I agree with that, Your

9    Honor, and maybe my question wasn't very clear.

10         THE COURT:  Okay.

11   BY MR. JEWETT:

12   Q.  Ms. Pitts, why did you circulate this memo?

13   A.  Because the facilities called me and sent an e-mail and

14   said, "Ms. Pitts, can you send something out so the nurses

15   can be on time," because nurses were showing up late to the

16   facilities.

17         THE COURT:  What facilities?  All the facilities?

18   You deal with a lot of them.  Which facilities?

19   BY MR. JEWETT:

20   Q.  Do you recall, Ms. Pitts, this is -- let me just point

21   you to the date here to help give you a frame of reference.

22         The memo is dated March 2017.

23         Do you recall which particular facility gave you

24   this request?

25   A.  It was several facilities.  I have to think of the main

Carol L. Naughton, Official Court Reporter

**JA1027**

L. Pitts - Direct

1    one who started it.

2    Q.  Okay.  Take your time.

3          MS. LEWIS:  Your Honor, again, this is hearsay.  Why

4    or who directed her to do that, that's not answering the

5    question.

6          THE COURT:  It's not hearsay for her to say "I sent

7    it out."  It's hearsay for her to say "I sent it out because

8    John Jones of such-and-such facility said the nurses were" --

9    then it's hearsay.  But for her to testify "I sent this out

10   for concerns that nurses were being late," that would not be

11   hearsay.

12          Now, if she cannot name who told her to send it out,

13   it simply goes to the weight of it, the weight of the

14   document.  In terms of the Court measuring the credibility,

15   it goes to the weight.

16          MS. LEWIS:  Understood.

17          THE COURT:  You can cross-examine her on it further

18   when you stand up, but it goes to the weight.

19          It doesn't carry very much weight, Mr. Jewett, if

20   she can't even remember who told her to send it out.

21   BY MR. JEWETT:

22   Q.  Let me ask the question again.  Maybe you've had a chance

23   to think about it.

24          This memo is dated March 2017.

25          Do you recall which facility or facilities had

975

─────────── L. Pitts - Direct ───────────

1   approached you about this issue?

2   A.  I think it was Avante healthcare systems.

3         THE COURT:  If you don't know, you don't speculate.

4   I tell witnesses that all the time.  "I think."  Okay?

5         MR. JEWETT:  Understood, Your Honor.

6         Brief moment, Your Honor, to confer with counsel.

7         (Pause in the proceedings.)

8         MR. JEWETT:  Can you please pull up the next

9   document.  This is DX-44, Defendants' 44.

10  BY MR. JEWETT:

11  Q.  Ms. Pitts, do you recognize this document?

12  A.  Yes.

13  Q.  That's your signature on it?

14  A.  Yes.

15  Q.  Okay.  This document says "No sleeping in the residents'

16  rooms.  Some residents have a camera in the room."

17         Without talking about what was told to you, do you

18  recall why you sent this memo?

19  A.  Yes.

20  Q.  Why did you send this memo?

21  A.  Because Armor Corrections and Nansemond Pointe were

22  having issues with our staff sleeping in the resident's room.

23  Q.  Let's go to the next one.  This is Defendants' 46.  This

24  is a memo dated January 27th, 2017.

25         That's your signature on it?

Carol L. Naughton, Official Court Reporter

**JA1029**

976

———— L. Pitts - Direct ————

1    A.  Yes.

2    Q.  Okay.  This memo says "Humility goes a long way.  Please

3    be on time for all shifts."

4           Do you recall why you sent this memo?

5    A.  Yes.

6    Q.  Why did you send this memo?

7    A.  Because Avante healthcare systems, they were having

8    trouble with our nurses being on time in their facilities,

9    and they asked me to send something out to the nurses because

10   they had spoken to them and it's not working.

11   Q.  Okay.  Let's go to Defendants' 52.  This is the

12   "no smoking" one.

13          THE COURT:  While we're doing this, what was the

14   first exhibit?  I had 42.  What was the first one we talked

15   about, about being on time?

16          MR. JEWETT:  That was Defendants' 42, and I failed

17   to move to admit it.  I will say, there is some overlap

18   between these memos, and then the Department had a whole

19   category of them.

20          I think, for completeness, I would ask that

21   Defendants' 42, 44, and 46 be admitted.

22          MS. LEWIS:  Just as a housekeeping matter, we didn't

23   admit those prior ones, so no overlap.  And no objection to

24   any of these memos; 42, 44, 52, and whatever other memos he

25   wants to move to admit.

977

─────────── L. Pitts - Direct ───────────

1          THE COURT:  42, 44, 46, 52, you want all those

2     admitted?

3          MR. JEWETT:  42, 44, and 46, so far, and then the

4     next one we just pulled up is 52.

5          THE COURT:  All right.

6          (Defendants' Exhibit DX-42, DX-44, and DX-46 were

7     received in evidence.)

8     BY MR. JEWETT:

9     Q.  Ms. Pitts, showing you this memo, this is a memo dated

10    from August 2016.  It says -- well, your name isn't on this.

11         Did you send this memo, or did somebody else?

12    A.  I can't recall.

13    Q.  Okay.  All right.  Well, then, if you can't recall, I

14    won't ask you about it.

15         MR. JEWETT:  Let's go to Defendants' 41.

16    BY MR. JEWETT:

17    Q.  Okay.  Is that your signature on Defendants' 41?

18    A.  Yes.

19    Q.  Dated 6/26/2017.

20         All right.  The memo reads:

21         "When you are working at Atlantic Shores private

22    duty, please be advised:  Leave your badge in your car.  If

23    you are asked who you work for, please let them know you are

24    contracted through Atlantic Shores, and your supervisor is

25    LaShawn."

Carol L. Naughton, Official Court Reporter

**JA1031**

─────────── L. Pitts - Direct ───────────

1            Did you send this memo?

2    A.  Yes, I did.

3    Q.  Why did you send this memo?

4    A.  Because Atlantic Shores Retirement center is where a lot

5    of wealthy clients live at, and the administrator there told

6    me she didn't want her clients --

7            THE COURT:  Wait a minute.

8    BY MR. JEWETT:

9    Q.  Wait a minute.  We're getting into hearsay.

10           THE COURT:  Sustained.

11   BY MR. JEWETT:

12   Q.  Just to adhere to the Court's instructions --

13   A.  Okay.

14   Q.  -- the question is "Why did you send it?"  And maybe I

15   need to ask this:

16           Did Atlantic Shores request that you send this memo?

17   A.  Yes.  LaShawn did.

18   Q.  Okay.

19           MR. JEWETT:  Move to admit Defendants' 41.

20           MS. LEWIS:  No objection.

21           THE COURT:  It will be admitted.

22           (Defendants' Exhibit DX-41 received in evidence.)

23   BY MR. JEWETT:

24   Q.  And the last one is Defendants' 50.  Well, it looks like

25   this was sent by Catherine Martinez.

Carol L. Naughton, Official Court Reporter

**JA1032**

L. Pitts - Direct

1          Did Ms. Martinez work for Steadfast during this time

2   period?

3   A.  Yes.  She was my receptionist.

4   Q.  She was a receptionist.  Okay.

5          The memo is dated 11/4/2016.

6          Did you instruct Ms. Martinez to send this memo?

7   A.  Yes, I did.

8   Q.  Why did you instruct Ms. Martinez to send this memo?

9   A.  Because it was a holiday, and EDP cuts off their holiday

10  pay cycle and was trying to get everybody to get all of their

11  time sheets in and everything so we could get enough time to

12  enter payroll.

13          MR. JEWETT:  We move to admit Defendants' 50.

14          THE COURT:  Any objection?

15          MS. LEWIS:  No objection.

16          THE COURT:  It will be admitted.

17          (Defendants' Exhibit DX-50 received in evidence.)

18  BY MR. JEWETT:

19  Q.  Ms. Pitts, has Steadfast ever reported a nurse in its

20  registry to the Board of Nursing?

21  A.  No, we haven't directly.

22  Q.  Has Steadfast ever received inquiries from the Board of

23  Nursing about a nurse in its registry?

24  A.  Yes.

25  Q.  Okay.  What does Steadfast do in response to these Board

L. Pitts - Direct

1   of Nursing inquiries?

2   A.  We cooperate.

3   Q.  Has Steadfast ever terminated a nurse?

4   A.  No, we haven't.

5   Q.  Has Steadfast ever removed a nurse from its registry,

6   that database we looked at?

7   A.  Yes.

8   Q.  Okay.  What are some circumstances where Steadfast has

9   removed a nurse from its database?

10  A.  Well, one of the reasons, if your credentials -- if your

11  nursing license has expired.  And you have so many months to

12  reinstate your license, and if you don't, we can't keep you

13  on the registry because you can't go in the facilities.

14  Q.  Okay.

15  A.  And number two --

16  Q.  Oh, I'm sorry.  You have a second reason.  Go ahead.

17  A.  There's a second reason.  If the Board of Nursing

18  reprimands them or deals with them on an issue, we -- and

19  they are found guilty, I have to take them off the registry.

20  Q.  Okay.

21          MR. JEWETT:  Can you go back to PX-26.  And then

22  when you pull it up, can you scroll down to the Independent

23  Contractor Agreement.

24  BY MR. JEWETT:

25  Q.  Ms. Pitts, you're looking at Plaintiff's Exhibit 26,

Carol L. Naughton, Official Court Reporter

**JA1034**

———— L. Pitts - Direct ————

1   Page 12.

2          Do you recognize the first page of this document as

3   a copy of one of the Independent Contractor Agreements that

4   your company has used?

5   A.  Yes.

6   Q.  Can you please turn to Page 3, paragraph 8.

7          Do you see in paragraph 8 where it says

8   "Noncompetition"?

9   A.  Correct.

10  Q.  Does Steadfast enforce this noncompete?

11  A.  No.

12  Q.  Who are Steadfast's competitors?

13  A.  Other staffing agencies.

14  Q.  Do you remember Peyton Lex testifying earlier in this

15  case?

16  A.  (Inaudible response.)

17  Q.  Do you recall him saying that his company and your

18  company share nurses?

19  A.  Yes.

20  Q.  Is that accurate?

21  A.  Yes.

22  Q.  Outside of Mr. Lex's company, are you aware of nurses who

23  work for other staffing agencies?

24  A.  Yes.

25  Q.  Okay.  Have you ever sent a notice or called a nurse when

982

L. Pitts - Direct

1   you found out she was working for one of Steadfast's

2   competitors and said, "Hey, you have a noncompete here"?

3   A.  No.

4   Q.  Does Steadfast's Independent Contractor Agreement -- does

5   it still contain this noncompete language?

6   A.  I'm not sure.

7   Q.  Okay.  I believe we also heard some nurses testify in the

8   trial in this case that they also have jobs with healthcare

9   facilities.

10          Do you recall hearing that?

11  A.  Yes.

12  Q.  Is that accurate?

13  A.  Yes.

14  Q.  Okay.  Let me shift to a new topic on you.  I want to ask

15  you some questions about your decision to continue

16  classifying the nurses as independent contractors after the

17  Department of Labor initiated its investigation in this case.

18  Okay?

19  A.  Okay.

20  Q.  Okay.  After the Department of Labor initiated this case,

21  did you consult with an attorney?

22  A.  Yes.

23  Q.  Who was that?

24  A.  John Bredehoft.

25  Q.  After the Department of Labor filed this case, did you

Carol L. Naughton, Official Court Reporter

**JA1036**

────────── L. Pitts - Direct ──────────

 1  rely on Mr. Bredehoft's advice to continue classifying nurses

 2  as independent contractors?

 3  A.  Yes, I did.

 4  Q.  Okay.  Before you -- well, I shouldn't assume that.

 5          Did you actually meet with Mr. Bredehoft?

 6  A.  Yes, I did.

 7  Q.  Okay.  Before you met with Mr. Bredehoft, did you do any

 8  research on him or check on his credentials?

 9  A.  Yes, I did.

10  Q.  What did you find?

11  A.  He was an attorney who deals with the labor board and

12  labor board issues.

13  Q.  And approximately when was it that you sought

14  Mr. Bredehoft's advice?

15  A.  2018, I think it was.

16  Q.  And how many total times did you meet with him?

17  A.  About three times.

18  Q.  Okay.  Were these in-person meetings?

19  A.  One was over the phone, when I first talked to him.

20  Q.  Okay.

21  A.  And then the other two were in person.

22  Q.  Okay.  And let's talk about, I guess, the first in-person

23  meeting.

24          How long did that first in-person meeting last?

25  A.  Maybe about an hour.

————L. Pitts - Direct————

1  Q.  What did Mr. Bredehoft tell you in that meeting about the

2  classification of nurses on your registry?

3          THE COURT:  Wait a minute, now.

4          Are you going to ask her basically for hearsay about

5  what the attorney told her?

6          MR. JEWETT:  Excuse me, Your Honor?

7          THE COURT:  Are you going to ask her for hearsay

8  about what the attorney said to her?  That's what you're

9  doing.

10          MR. JEWETT:  Well, it gets into the reasonableness

11  of her belief.

12          THE COURT:  Well, it's still hearsay.

13          MR. JEWETT:  Okay.  Mr. Bredehoft is a witness in

14  this case.  We could ask him those questions.

15          THE COURT:  Well, then, you ask him the questions,

16  but she's not going to testify "he said," "she said," "she

17  said."  That is just outright hearsay.

18          MR. JEWETT:  Understood, Your Honor.

19          THE COURT:  You can formulate the question to avoid

20  the hearsay.

21          MR. JEWETT:  Sure.

22  BY MR. JEWETT:

23  Q.  In the meeting with Mr. Bredehoft, did he go through any

24  documents with you?

25  A.  Yes.

Carol L. Naughton, Official Court Reporter

**JA1038**

985

─────────────── L. Pitts - Direct ───────────────

1   Q.  Did he go through, like, any factors with you?

2   A.  Yes.

3   Q.  Now, the Department of Labor filed a second lawsuit in

4   this case against your company and you in October 2019.

5        Do you recall that?

6   A.  Yes.

7   Q.  And I'll refer to the second lawsuit as "Steadfast II."

8        Okay?  Does that make sense?

9   A.  Okay.

10  Q.  Okay.  Did you rely on Mr. Bredehoft's advice in your

11  decision to continue classifying nurses as independent

12  contractors after the Department of Labor filed Steadfast II?

13  A.  Yes.

14  Q.  After the Department of Labor filed -- initiated this

15  case against you, did you review any publications or memos

16  from the Department of Labor?

17  A.  Yes.

18        MR. JEWETT:  Can you pull up Defendants' 64.

19  BY MR. JEWETT:

20  Q.  I need to finish the question, actually.

21        Did you rely on any publications or memos from the

22  Department of Labor as part of your decision to continue

23  classifying nurses as independent contractors?

24  A.  Yes.

25  Q.  Okay.

Carol L. Naughton, Official Court Reporter

**JA1039**

                          ┌─────── L. Pitts - Direct ───────

 1           MS. LEWIS:  Your Honor, I'm going to raise an

 2      objection with respect to this exhibit.

 3           Within the final pretrial conference, the Department

 4      asserted the objections relevance, confusion, and hearsay

 5      with respect to this document.  The Court at that time

 6      deferred ruling on our objections to the same.

 7           THE COURT:  What is your specific objection?  First

 8      of all, what document is he about to show the witness?

 9           MS. LEWIS:  Defendants' 64 is a Field Assistance

10      Bulletin dated 2018-4.  For shorthand, call them FABs within

11      the Department of Labor.  And it provides sort of -- there's

12      a prompt, and then the Department of Labor provides

13      information based upon the Department's interpretations of

14      its own regulations.

15           This document as a whole, Your Honor, in terms of

16      relevance, it predates these violations here at issue.  The

17      dates of the violations, whether we're talking about

18      Steadfast I or Steadfast II, or if we just refer to it

19      generically in this matter as "Steadfast" because the matter

20      has been consolidated, started in 2015.  This document was

21      issued three years after the relevant period of time for this

22      matter.

23           Secondly, to the extent that they are relying on it

24      with respect to Steadfast II, again it predates that time

25      because these practices -- Steadfast II begins June 10, 2017,

987

```
                          ┌─────L. Pitts - Direct─────┐
```

 1   nearly a year before this document was issued or made

 2   available online.

 3          So in terms of just the timing of any reliance on

 4   this document with respect to any arguments as to

 5   willfulness, knowledge, et cetera, this is an ad hoc reliance

 6   on something that came well after the time that these

 7   practices, as Ms. Pitts and everyone else has testified, have

 8   been at issue in this case.

 9          THE COURT:  All right.  What it boils down to is she

10   can be questioned, he can admit the document, but on

11   cross-examination, you can raise the very same points.

12          MS. LEWIS:  Thank you.

13          THE COURT:  And the Court is fully capable of

14   understanding that you're attempting to persuade the Court

15   that she relied on something that probably wasn't in

16   existence, that probably predates the violations.  So the

17   Court is perfectly capable of understanding that.

18          You can cross-examine her on that.  You'll get an

19   opportunity.

20          But you're on notice, Mr. Jewett.

21          MR. JEWETT:  Your Honor, I need to correct something

22   that Ms. Lewis said.

23          In the case of *McFeeley vs. Jackson State*, a Fourth

24   Circuit case, in that case, the District Court held that the

25   company seeking advice after the lawsuit was filed was

Carol L. Naughton, Official Court Reporter

**JA1041**

L. Pitts - Direct

1    sufficient to meet the good-faith defense.

2            The plaintiffs appealed that to the Fourth Circuit,

3    among other issues, and the Fourth Circuit agreed you can get

4    advice; you can look into things after a suit is filed; and

5    it can still count as good faith.

6            And this document is dated 2018.  I think we all

7    agree that the time period is 2015 up until the present,

8    2021.  So this one splits the baby.  I agree it would not

9    have an impact on anything prior to 2018.

10           MS. LEWIS:  Your Honor, we'll take it up on cross as

11   I think the Court understands the Secretary's position with

12   respect to the relevance and confusion of this document.

13           THE COURT:  Okay.  The Court understands.

14           MR. JEWETT:  Okay.

15   BY MR. JEWETT:

16   Q.  Ms. Pitts, do you recognize this document?

17   A.  Yes, I do.

18   Q.  Okay.  Have you seen this document before?

19   A.  Yes.

20   Q.  Okay.  When did you first see this document?

21           THE COURT:  What exhibit number is that again?

22           MR. JEWETT:  This is Defendants' 64.

23           THE COURT:  I don't think the Court has

24   Defendants' 64 up here.

25           THE CLERK:  I have it, Your Honor.

989

```
                    ┌─── L. Pitts - Direct ───┐
   1                THE COURT:  Okay.  I think the Court is familiar

   2     with this bulletin.  Go on.

   3                MR. JEWETT:  Thank you, Your Honor.

   4     BY MR. JEWETT:

   5     Q.  Ms. Pitts, I think my last question was -- I don't recall

   6     if you answered it.

   7                When did you first see this document?

   8     A.  It was in 2018 or -- I think it was 2018 when I saw this

   9     document.

  10     Q.  Would it have been -- this document is dated July 2018.

  11     Would it have been the later half of 2018, then?

  12     A.  I'm not sure of the date.  I'm not sure.

  13     Q.  Okay.  That's fine.

  14                Let's start with Page 1.  I'd like to -- I'd like

  15     you to take just a quick minute and take a look at Page 1

  16     there, the first two paragraphs.

  17     A.  (Witness reviewing.)

  18     Q.  Have you had a chance to read it?

  19     A.  Yes.

  20     Q.  In that first paragraph there, is there anything in that

  21     first paragraph that you relied on when you made the decision

  22     to continue classifying nurses as independent contractors?

  23     A.  Yes.

  24     Q.  Okay.  Can you explain to the Court what that is?

  25     A.  The one that says "A registry is an entity that typically
```

**JA1043**

L. Pitts - Direct

1   matches people who need caregiving services with caregivers

2   who provide the services, usually nurses, home health aides,

3   personal care attendants, or home care workers with other

4   titles (collectively, caregivers)."

5   Q.  Okay.  Does that sentence accurately describe your

6   company?

7   A.  Yes.

8   Q.  Let's look at the second paragraph.

9   A.  Yes.

10  Q.  Have you had a chance to read the second paragraph?

11  A.  (Witness reviewing.)

12          Yes.

13  Q.  Is there anything in the second paragraph that you relied

14  on as part of your decision to continue classifying nurses as

15  independent contractors after the Department initiated this

16  action?

17  A.  Yes.

18  Q.  What is that?

19  A.  The part that says "A registry that simply facilitates

20  matches between clients and caregivers, even if the registry

21  also provides certain other services, such as payroll

22  services, is not an employee under the FLSA."

23  Q.  Okay.  Does that sentence accurately describe your

24  company?

25  A.  Yes.

991

L. Pitts - Direct

1   Q.  Let me try to speed this along a little bit.

2   A.  Oh, please.

3   Q.  I'll ask you more specific questions.

4        MR. JEWETT:  Can you please turn to Page 2.  I'm

5   sorry, can you please scroll to Page 2.

6   BY MR. JEWETT:

7   Q.  Looking at the first full paragraph, "WHD has previously

8   issued..."

9        Do you see that paragraph?

10  A.  Hold on a minute.

11       Yes, I see it.

12  Q.  Okay.  And then there's a sentence halfway down that

13  starts with "A registry may confirm caregiver..."

14       Do you see that?

15  A.  Yes.

16  Q.  Let me read it to you.

17       "A registry may confirm caregiver credentials,

18  conduct background checks, contact professional references,

19  and engage in quality-control measures."

20       Does that sentence accurately describe your company?

21  A.  Yes.  Yes.

22  Q.  Let's look at the last paragraph together on this page.

23       The sentence in the last paragraph says "In addition

24  to providing matchmaking services, a registry may provide

25  administrative services to the caregivers and clients.  These

Carol L. Naughton, Official Court Reporter

**JA1045**

L. Pitts - Direct

1  services include recordkeeping, invoicing, collecting, and

2  disbursing payments, and other administrative services that

3  are ministerial in nature."

4          Does that sentence accurately describe your company?

5  A.  Yes.

6  Q.  I won't belabor the point too much longer.  I have just a

7  few more questions.

8          MR. JEWETT:  Can you please turn to Page 5.

9  BY MR. JEWETT:

10 Q.  Under "Scheduling and Assigning Work," can you take a

11 look at the second paragraph there where it says "At times a

12 registry may post..."

13         Do you see that?

14 A.  Yes.

15 Q.  I'll read it to you.

16 A.  Yes.

17 Q.  "At times a registry may post to an online message board

18 or send a text or e-mail to all qualified caregivers asking

19 them to contact a particular client if they are interested in

20 working for the client."

21         Is that something your company does?

22 A.  Yes.

23 Q.  "The registry may also narrow the offer to a subset of

24 caregivers screened by objective criteria, such as those

25 whose availability matches the needs of the client..."

993

```
                         ┌─ L. Pitts - Direct ─┐
  1              Is this something that your company does?
  2    A.  Yes.
  3    Q.  Ms. Pitts, did you rely on -- excuse me.
  4              MR. JEWETT:  I forgot to move to admit -- I move to
  5    admit Defendants' 64.
  6              MS. LEWIS:  Maintain the previously stated
  7    objections of relevance and confusion.
  8              THE COURT:  Objection is overruled.  Exhibit 64 will
  9    be admitted.
 10              (Defendants' Exhibit DX-64 received in evidence.)
 11    BY MR. JEWETT:
 12    Q.  Ms. Pitts, did you rely on Defendants' 64, Field
 13    Assistance Bulletin 2018-4, as part of your decision to
 14    continue to classify nurses as independent contractors in
 15    this case?
 16    A.  Yes.
 17              MR. JEWETT:  I have no further questions.  Thank
 18    you.
 19              THE COURT:  Cross.
 20                         CROSS-EXAMINATION
 21    BY MS. LEWIS:
 22    Q.  Good afternoon, Ms. Pitts.
 23    A.  Good afternoon.
 24    Q.  I want to come back to the sort of very beginning.  I
 25    know you have been up there for a while.  So I'm going to try
```

**JA1047**

994

———— L. Pitts - Direct ————

1    to be as streamlined as possible in my inquiries to you.

2           Earlier when you were giving us a little bit of your

3    history, your background, you indicated that you have a

4    third-grade reading level; is that right?

5    A.  I did.

6    Q.  You did.

7           You did in the third grade or in the recent relevant

8    time period?

9    A.  When I was in high school.

10   Q.  Okay.  But since then, you've been an LPN for over 20

11   years?

12   A.  Exactly.

13   Q.  To be an LPN, you have to have a level of competency to

14   provide care to people, right?

15   A.  Exactly.

16   Q.  And you keep your license current?

17   A.  Yes.

18   Q.  And to become an LPN, you have to take boards.  You took

19   a test which required you to read and use analytical

20   reasoning skills; isn't that right?

21   A.  Yep.

22   Q.  And since that time, when you started Steadfast, you have

23   entered into over 50 contracts with facilities, which you

24   have read and signed those agreements, right?

25   A.  Yes.

Carol L. Naughton, Official Court Reporter

**JA1048**

L. Pitts - Direct

```
 1   Q.  And you've worked with a number of attorneys to draft and
 2   enter into contracts with nurses and CNAs for independent
 3   contract agreements, right?
 4   A.  Yes.
 5   Q.  Okay.  And throughout this litigation, and even with the
 6   FAB that we just looked at, you understand that the title of
 7   an entity does not determine a company's obligation to comply
 8   with the FLSA, correct?
 9           MR. JEWETT:  Objection.  It's a legal question.  It
10   calls for a legal answer.
11           THE COURT:  Overruled.
12           THE WITNESS:  Can you repeat the question?
13   BY MS. LEWIS:
14   Q.  Sure.
15           So within all these discussions with attorneys, and
16   even the FAB that you just reviewed with your attorney,
17   you've come to understand that the title of an entity
18   relationship, that does not determine whether or not a
19   company is obligated to comply with the FLSA.
20   A.  Can you break that down a little?  I'm not understanding.
21           THE COURT:  Just say you don't understand.
22           THE WITNESS:  I don't understand the question.
23   BY MS. LEWIS:
24   Q.  Okay.  So courts, attorneys, they look at a number of
25   things to say "This is what this is."  You can call your
```

996

────────── L. Pitts - Direct ──────────

1   business a cat, but that doesn't mean it's a cat, right?

2   A.  Right.

3   Q.  So there's a number of factors that the Courts look at to

4   determine what makes a company have to comply with the Act,

5   the Fair Labor Standards Act.

6           MR. JEWETT:  Objection.  Your Honor, she's basically

7   making a closing argument here.  She's telling her what --

8           THE COURT:  No.  That's a fair question, Mr. Jewett.

9           THE WITNESS:  I can't answer that question because I

10  really don't understand that question.

11          MS. LEWIS:  Okay.  I'll move on.

12          THE COURT:  Just move on.

13          MS. LEWIS:  I'll move on.

14  BY MS. LEWIS:

15  Q.  I want to direct your attention to -- well, before I

16  direct your attention to an exhibit, throughout this

17  litigation process, you've worked with your attorneys to

18  write answers to discovery and provide documents to them

19  which were then turned over to plaintiff, the Department of

20  Labor in this matter, right?

21  A.  Yes.

22  Q.  And you've done that quite frequently and periodically

23  throughout the three-plus years of this litigation.

24  A.  Yes.

25  Q.  And you provided, within those discovery requests -- now

Carol L. Naughton, Official Court Reporter

**JA1050**

L. Pitts - Direct

```
 1   I'd like to direct your attention to Plaintiff's 26.

 2            THE COURT:  Are you putting that on the screen?

 3            MS. LEWIS:  Yes.  It should be coming up on the

 4   screen.  There we go.  26.

 5   BY MS. LEWIS:

 6   Q.  Within those requests, you've provided a number of

 7   employment applications for a number of the nurses and CNAs

 8   that work with Steadfast, right?

 9   A.  Yes.

10   Q.  And this was the application that had been used

11   throughout, at least since 2015?

12   A.  Yes.

13   Q.  And directing your attention to Plaintiff's 32.

14            Likewise, you also confirmed that what has

15   previously been admitted as 32, these, likewise, were

16   documents that Steadfast has used in conducting its business

17   of signing and onboarding nurses to its registry, correct?

18   A.  Yes.

19   Q.  Also during discovery, you provided at least 62 different

20   facility contracts, correct?

21   A.  Yes.

22   Q.  And several of those contracts -- if I could direct your

23   attention to Plaintiff's 12.

24            These are all of the contracts that we received

25   throughout discovery, all of these, but we've only provided a
```

Carol L. Naughton, Official Court Reporter

**JA1051**

998

┌─────────────────────────────────────────────────────────┐

──────────L. Pitts - Direct──────────

 1 │ sampling to the Court.

 2 │        Please take a moment to review the farthest column

 3 │ that says "Facility or Entity."

 4 │        So several of the contracts that were provided, it's

 5 │ not just for that specific facility; it's the company as a

 6 │ whole.

 7 │        So, for example, Bon Secours -- is that how you

 8 │ pronounce it?

 9 │ A.  Yes.

10 │ Q.  Directing your attention to Plaintiff's 10 --

11 │ Plaintiff's 10.056.

12 │        MS. LEWIS:  Excuse me, one second, Your Honor.  If I

13 │ could help Ms. Jones with this.

14 │        (Pause in the proceedings.)

15 │ BY MS. LEWIS:

16 │ Q.  So like Bon Secours, they have a number of facilities,

17 │ and all of these facilities Steadfast, likewise, can place --

18 │ you guys get requests to have nurses cover per diem

19 │ assignments at any Bon Secours, correct?

20 │ A.  Yes.

21 │ Q.  So even though it's 62 contracts, I mean, there's more

22 │ than 62 facilities that Steadfast places nurses at; there's

23 │ many, right?

24 │ A.  Well, there's many, but some of them fall under one

25 │ umbrella.

└─────────────────────────────────────────────────────────┘

Carol L. Naughton, Official Court Reporter

**JA1052**

999

L. Pitts - Direct

1   Q.  Okay.  Right.

2          So I want to come back to Plaintiff's 10.120.

3          MS. LEWIS:  I think it's the Princess Anne one.

4   That's the PX-10 additions one, Ms. Jones, the one you were

5   at initially.

6   BY MS. LEWIS:

7   Q.  So this is Farmville, one of the contracts that we've

8   talked about over the past couple of days.

9          And so within these contracts, we talked about all

10  of them have -- on your initial, when I called you up in my

11  case in chief, about how all the contracts -- they have very

12  similar terms, specifically directing your attention to where

13  it talks about Steadfast's staffing responsibilities.

14          Directing your attention to paragraph B, Steadfast

15  has complied with its contractual obligations for each of the

16  facilities that it works with, correct?  It places nurses?

17  A.  Yes.

18  Q.  So in line with that, B(a) says that it's Steadfast's

19  responsibility to have nurses complete an application.

20          Steadfast does that, correct?

21  A.  Are you saying B -- which one are you talking about?

22  Q.  B(a).

23  A.  Yes, that's correct.

24  Q.  And that application is the application that you talked

25  about earlier, which was previously marked as Plaintiff's 26.

Carol L. Naughton, Official Court Reporter

**JA1053**

─────────────── L. Pitts - Direct ───────────────

1    A.  Yes.

2    Q.  Steadfast does that.

3    A.  Yes.

4    Q.  And Steadfast has also complied with the contractual

5    obligations to do the skills inventory.

6           Directing your attention to Plaintiff's 33.

7           Well, anyway, Steadfast has -- it was in the

8    application.  There's a skills checklist that Steadfast makes

9    sure, depending upon the discipline of nurses, they have to

10   do, correct?

11   A.  Yes.

12   Q.  And the PPD test is another contractual obligation.

13   Steadfast makes sure that PPDs are up to date.

14   A.  Yes.  Yes.

15   Q.  And you also testified a moment ago about having to keep

16   up and make sure that licenses are current -- license,

17   registration, certifications and the like are current.

18           Steadfast has done that, correct?

19   A.  Yes.

20   Q.  So Steadfast has also done the negative drug screen and

21   the background check as well.

22   A.  Yes.

23   Q.  Steadfast has done all of those things?

24   A.  Yes.

25   Q.  I want to direct your attention to Plaintiff's 10.128.

Carol L. Naughton, Official Court Reporter

**JA1054**

——————————L. Pitts - Direct——————————

1  Give it a moment to come up here.

2          You were questioned whether Steadfast complies with

3  the OSHA standards.

4          MS. LEWIS:  If you could scroll down, I believe that

5  was at paragraph 5.  Yes.

6          I'm sorry, Your Honor, I'm not sure who this is that

7  just walked in the courtroom.  Is this a witness?

8          MR. JEWETT:  No, it's not a witness.

9  BY MS. LEWIS:

10 Q.  So this indicates that -- you indicated one of the

11 requirements is about complying with the OSHA standards, and

12 your question about whether or not you complied, do you

13 recall that?

14 A.  Yes.

15 Q.  And you indicated that you all don't do anything to

16 comply with OSHA standards; is that right?

17         MR. JEWETT:  Objection.  Misstates testimony.  The

18 question was whether she monitors the nurses to see if they

19 are complying with OSHA standards.

20         MS. LEWIS:  Okay.  I'll adopt that, then.

21 BY MS. LEWIS:

22 Q.  Do you monitor the nurses to assure or see that they

23 comply with OSHA standards?

24         And your testimony was "no," correct?

25 A.  Not in the facilities, I don't.

—L. Pitts - Direct—

1   Q.  I want to direct your attention to Plaintiff's 24 again.

2          This is a document that was provided in discovery

3   that at least is current -- that at least has dates current

4   through '21-'22.  There's some deadlines here.  It looks like

5   it was probably produced sometime in 2020.

6          Steadfast does keep up to date.  In fact, you added

7   a column about COVID-19.

8          That's an OSHA standard, isn't it?

9   A.  Yes.  That's a CDC guideline they came out with.

10  Q.  A CDC/OSHA standard correct?

11  A.  Exactly.

12  Q.  I want to direct your attention to Plaintiff's 33.008.

13         Steadfast also -- this is a letter that, scrolling

14  down to the signature, that you signed.  And you drafted this

15  letter to provide to your nurses, correct?

16  A.  Can I take a minute to read it, please?

17  Q.  Absolutely.

18  A.  (Witness reviewing.)

19         Yes.

20  Q.  Again, this is a letter, and you've designated it's

21  dealing with essential personnel related to the COVID-19

22  pandemic, again relative to OSHA/CDC standards, correct?

23  A.  This letter had nothing to do with the standards of CDC.

24  This letter was so when the police -- we were on lockdown,

25  and if the police stopped the nurses, they would let them

---

L. Pitts - Direct

1    keep going, so they would know that they were working in

2    COVID facilities.

3    Q.  So you gave this letter to nurses and CNAs that Steadfast

4    placed at facilities so they could get to work?

5    A.  Well, what happened was, we gave the letter to nurses who

6    were having trouble getting to work.

7    Q.  Okay.  So just select field nurses who needed letters

8    from Steadfast to get to work?

9    A.  Whoever asked.  Because the facility was calling.  The

10   nurses wasn't showing up during COVID, and they were being

11   stopped by the police.

12   Q.  Okay.

13   A.  And they don't have any identification or paper saying

14   they're on their way to work when we had the lockdown.  So

15   this letter really had nothing to do with CDC.  This was like

16   a pass for the police to see that they weren't horsing

17   around, they were on their way to work.  Because the

18   facilities were saying people weren't showing up during

19   COVID, they're getting stopped.  They were having a lot of

20   issues.

21   Q.  So this was adequate for them to get through to get to

22   work?

23   A.  Yes, if they needed it.

24   Q.  A letter from Steadfast?

25   A.  Yes.

---

Carol L. Naughton, Official Court Reporter

**JA1057**

————————L. Pitts - Direct————————

1    Q.  You also made sure that -- you also had to make sure that

2    Steadfast is in compliance, pursuant to the contract terms.

3         MS. LEWIS:  So let's go back to Plaintiff's 10,

4    please, Ms. Jones.

5    BY MS. LEWIS:

6    Q.  You've also had to make sure that Steadfast is in

7    compliance -- paragraph 6 -- "with all federal, state, and

8    local laws, rules, and regulations, including patient care

9    guidelines."

10        That's one of the responsibilities under the

11   contract for Steadfast to do, correct?

12   A.  Yes.

13   Q.  And you have reported to the Board of Nursing to update

14   them about nurses' background checks, haven't you?

15   A.  Repeat that question again.

16   Q.  Sure.

17        You have been in touch with the Board of Nursing to

18   update them about the background checks and results of nurses

19   that Steadfast gives assignments to, correct?

20   A.  Not many.  It's just when requested.

21   Q.  Okay.  I want to direct your attention to -- do you

22   recall having a deposition back in March of last year, right

23   before the shutdown happened -- March last year?

24   A.  Yeah.  Briefly.

25   Q.  And during that deposition, you were sworn.  You were

```
                          ┌─ L. Pitts - Direct ─┐
  1  │ under oath, correct?
  2  │ A.  Yes, I was.
  3  │         MS. LEWIS:  Ms. Jones, I want to direct her to
  4  │ Page 189.
  5  │         THE COURT:  Unfortunately, usually when you're using
  6  │ a deposition, you have to end up marking it.
  7  │         MS. LEWIS:  I'm sorry, Your Honor?
  8  │         THE COURT:  You end up having to mark the
  9  │ deposition.
 10  │         MS. LEWIS:  It's been marked.  It's been admitted.
 11  │         THE COURT:  Oh, okay.
 12  │ BY MS. LEWIS:
 13  │ Q.  And I asked you then:  "How does the Board of Nursing
 14  │ know to get in touch with you?"
 15  │         And you answered:  "Because, you know, come on.
 16  │ When you're doing a background, they tell you your job.  It
 17  │ tells you where you work at, you see what I'm saying, on the
 18  │ background check."
 19  │         And then I asked you:  "Is there a particular point
 20  │ of contact at the Board of Nursing that will contact
 21  │ Steadfast?"
 22  │         And you indicated:  "They will contact me, or they
 23  │ will call Christine, or they will send an e-mail."
 24  │         And I said:  "Who from the Board of Nursing?"
 25  │         And you indicated:  "I coordinate.  I coordinate.
```

Carol L. Naughton, Official Court Reporter

**JA1059**

L. Pitts - Direct

1    I'm like best friends with them."

2            Then I asked:  "With who?"

3            And you indicated:  "The Board of Nursing."

4            And then I asked you:  "Is there a particular

5    individual?"

6            And you stated:  "It doesn't matter.  They are

7    enforcement with the Department.  It can be anybody, you

8    know."

9            So you are in regular contact with the Board of

10   Nursing about the nurses that are on Steadfast's registry;

11   isn't that right?

12   A.  I think that's kind of taken out of context because what

13   I was talking about, they call me every day because they have

14   issues with my nurses.  So they know Steadfast well.  They've

15   been having a lot of problems.

16   Q.  So they know that there are nurses that work with

17   Steadfast, so they know to contact you about those nurses?

18   A.  Not necessarily.

19   Q.  Let me move on.

20           So you've communicated with the Board of Nursing

21   about, sort of leading into that, when nurses that Steadfast

22   has at facilities have failed to provide a certain standard

23   of care.

24   A.  I didn't.  The facility has -- the facility calls the

25   Board of Nursing.  Then the Board of Nursing sends me a

L. Pitts - Direct

1  subpoena and requests files.

2       MS. LEWIS:  Let's scroll down to Page 190.

3  BY MS. LEWIS:

4  Q.  So here I asked you some more questions about the

5  standard of care, and so we started -- the discussion was

6  about, you know -- very much like this discussion right now.

7  Is it the facilities?  Was it you?  Was it Steadfast?

8       And then I asked you:  "So this really sounds to me

9  like nurses -- they have two masters.  They've got the Board

10 of Nursing, who ultimately can pull the plug, but why are

11 they communicating with you?"

12      And you answered:  "Because they are on our

13 registry."

14      And I said:  "Okay."

15      And then you further stated:  "They are on our

16 registry.  They have to communicate.  The Board of Nursing

17 has to call us.  It's not even about the labor board.  It's

18 about healthcare.  The people are taking care of live humans.

19 The Board of Nursing has to reach out to us.  They can be

20 fined for not calling us."

21      So that's inconsistent with what you just said.

22 That's not a subpoena.  That's just the Board of Nursing

23 reaching out to you, as the entity with which these

24 individuals work, to get information about the standard of

25 care and the care that they provide; isn't that right?

Carol L. Naughton, Official Court Reporter

**JA1061**

L. Pitts - Direct

1    A.  That's not correct.

2    Q.  Okay.  I want to direct your attention going back to

3    Plaintiff's 10 at Page 130.

4         Your attorney also asked you some questions about

5    the confidentiality clauses within these contracts that

6    Steadfast has with the facilities and asked whether or not

7    you enforce those clauses, and you indicated you don't.

8         But that's not accurate, is it?

9    A.  Well, we have a confidentiality statement that they fill

10   out as part of their package that the facilities want, that

11   we send over to the facility.

12   Q.  Okay.  So within Steadfast's relationship with these

13   nurses you have, it starts at the top.  You've got the

14   relationship with the facilities, right, and that's where you

15   have these contracts that have these terms, correct?

16   A.  Correct.

17   Q.  And then you have the relationship with the nurses, and

18   within those relationships with the nurses, you also have a

19   confidentiality clause in at least two documents that you

20   require them to sign before they are able to take

21   assignments; isn't that right?

22   A.  I don't require them to sign it.  It's part of the

23   facility.  It's part of their profile with the facility,

24   because they're looking at all these patients' documents.

25   It's part of the HIPAA package.

Carol L. Naughton, Official Court Reporter

**JA1062**

────────────── L. Pitts - Direct ──────────────

```
 1   Q.  I want to direct your attention going back to

 2   Plaintiff's 25, Page 51.

 3          So Plaintiff's 25 were a sampling of the Independent

 4   Contractor Agreements that you, Steadfast, require the nurses

 5   to sign before they can start picking up shifts at

 6   facilities, correct?

 7   A.  Repeat that again one more time.

 8   Q.  Steadfast requires nurses who work with Steadfast to

 9   complete an Independent Contractor Agreement; is that right?

10   A.  Right.

11   Q.  And Plaintiff's 25, it's a sampling of those Independent

12   Contractor Agreements.

13          MS. LEWIS:  You can scroll through it, just to

14   refresh her recollection, since she doesn't have it in front

15   of her.  Maybe just go to the top of this one.

16   BY MS. LEWIS:

17   Q.  Recognize this document?

18   A.  Right.

19   Q.  Okay.  So coming back down to the page, within the

20   contract that Steadfast has with the nurses, you have a

21   confidentiality clause.  That's not the facilities.  That's

22   Steadfast and the nurses, right?

23   A.  Correct.

24   Q.  Okay.  And you also indicated that there's also a

25   confidentiality clause as part of the HIPAA training
```

Carol L. Naughton, Official Court Reporter

**JA1063**

──────────────────L. Pitts - Direct──────────────────

1   agreements, correct?

2          MS. LEWIS:  If you could jump down to 51, please.  I

3   think that's what it is.

4   BY MS. LEWIS:

5   Q.  This is the confidentiality statement you were referring

6   to, correct?

7   A.  Yes.

8   Q.  So in two places that Steadfast has, and scrolling to the

9   top of this document, that's Steadfast's name on this

10  document, not a facility, correct?

11  A.  Most of our forms have our name on it because --

12  Q.  So this is a Steadfast form?

13  A.  It's a Steadfast form, correct.

14  Q.  And it's a Steadfast form that Steadfast requires nurses

15  to sign before they can work in facilities, correct?

16  A.  No.  It's not correct.

17  Q.  It's part of the application, correct?

18  A.  Well, the facility requires a confidentiality statement,

19  as part of the HIPAA, before they come into the facility, so

20  they won't discuss patients' personal information.

21  Q.  And so following through with that, coming back to what

22  we were talking about at the top in terms of Steadfast's

23  conduct, Steadfast makes sure that it follows those

24  contractual terms by making sure that the nurses that it

25  places at the facility sign the confidentiality statement,

**JA1064**

─────── L. Pitts - Direct ───────

1   correct?

2   A.  Yes.

3   Q.  And that's a Steadfast requirement.  Regardless of how it

4   flows, that's a Steadfast requirement.  If a nurse doesn't

5   sign it, a nurse can't get placed.

6   A.  No --

7           MR. JEWETT:  Objection.  Mischaracterizes testimony.

8   She testified that it's the facility's requirement as part of

9   their package.

10          THE COURT:  That's a leading question, Mr. Jewett.

11   Overruled.

12   BY MS. LEWIS:

13   Q.  You can answer.

14   A.  Well, the facility requires a certain amount of

15   information before they come -- certain amount of documents

16   have to be filled out before they can come into the facility.

17   So the confidentiality statement is one of their documents.

18   They won't let them in unless they have certain

19   documentation.  It's not Steadfast who won't let them in.

20   They won't let them in.

21   Q.  Let me wrap this up.

22          This is Steadfast's form, correct?

23   A.  Yes.

24   Q.  And Steadfast has this form in its personnel files for

25   nurses and CNAs, correct?

Carol L. Naughton, Official Court Reporter

**JA1065**

L. Pitts - Direct

1   A.  Correct.

2   Q.  And let's sort of stick with these Independent Contractor

3   Agreements for a moment.

4        Since Steadfast has been in business, there's been

5   at least four different iterations of this Independent

6   Contractor Agreement; is that right?

7   A.  That's correct.

8   Q.  I want to direct your attention back to plaintiff's --

9   the contract, the Independent Contractor Agreements.

10       MS. LEWIS:  Is that 25 still?  Jump down to 40,

11  please, Ms. Jones.

12  BY MS. LEWIS:

13  Q.  In Plaintiff's 25, we had a sampling in the beginning of

14  signed ones, and towards the bottom, there's four different

15  versions that Steadfast has used over the years.  I want to

16  just take a moment to review them.

17       So we'll call this one version.  I'm sorry.  One

18  version starts at 43, Plaintiff's 25.43.

19       You have another version that starts at

20  Plaintiff's -- Plaintiff's 25.54.

21       THE COURT:  This entire exhibit, as the Court

22  understands it, is not admitted, just a couple of pages.

23       So are you moving to admit these sections?

24       MS. LEWIS:  Yes, Your Honor, I move to admit the

25  entirety of Plaintiff's 25.

**JA1066**

L. Pitts - Direct

```
1              THE COURT:  Any objection?

2              MR. JEWETT:  No objection.

3              THE COURT:  Exhibit 25 will be admitted.

4              (Plaintiff's Exhibit PX-25 received in evidence.)

5              THE COURT:  So where are we?

6              MS. LEWIS:  She's going through -- this is the

7    second version, and then we're going to jump to 58.

8              You can keep going.  Just keep scrolling.

9              THE COURT:  Exhibit 58?

10             MS. LEWIS:  No, Page 58 within Exhibit 25.

11             This is another version.

12             And then finally at Plaintiff's 25.68, the Bates

13   number -- jump down to 68.  This is a fourth version.

14   BY MS. LEWIS:

15   Q.  Now, within each of these versions -- you indicated

16   earlier in your testimony that Steadfast doesn't enforce the

17   noncompete agreement, correct?

18   A.  Correct.

19   Q.  But in each iteration of these contracts, you have that

20   term in it.  So you have had at least four opportunities to

21   remove it, if it's of no consequence, correct?

22   A.  Correct.

23   Q.  But you've left it in?

24   A.  Because I was instructed by my attorney to leave it in.

25   Q.  And, likewise, each version also has that confidentiality
```

Carol L. Naughton, Official Court Reporter

**JA1067**

L. Pitts - Direct

 1  clause as well, correct?

 2  A.  Yes.

 3  Q.  I want to jump a bit to your testimony about the Zira

 4  app.

 5          So you started using the Zira app sometime earlier

 6  this year, in 2021; is that right?

 7  A.  Correct.

 8  Q.  And to identify that app, you completed an online

 9  questionnaire, spoke to someone about Steadfast's needs and

10  desires in terms of developing or using an app; is that

11  right?

12  A.  Yes.  Someone referred their company to us.  We were

13  referred to that company.

14  Q.  And then you spoke to someone and discussed what

15  Steadfast's needs were in terms of an app, correct?

16  A.  Correct.

17  Q.  And your needs for the app was not limited to avoid

18  double-booking, but there was a plethora of needs, correct?

19          For example, generally speaking, you wanted to

20  increase the efficiency of which Steadfast operates, right?

21  A.  Operates how?

22  Q.  Scheduling, sending out shifts.

23  A.  Yeah.

24  Q.  Just make the business more efficient.

25  A.  Yes.

————————L. Pitts - Direct————————

1   Q.  And you also wanted to avoid underbooking staff,

2   underbooking nurses at facilities.

3        In other words, a facility reaches out; you guys are

4   scrambling, trying to find someone.  You also wanted to make

5   sure that you guys were working at maximum ability to fill

6   shifts and assignments.  That's also part of the reason,

7   correct?

8   A.  Yes.

9   Q.  Okay.  So you used the app to streamline the

10  paper-and-pen process, the paper-and-pen calling process,

11  which we've heard about how schedulers go about soliciting

12  and giving out shifts, right?

13  A.  That's one of the reasons.

14  Q.  Okay.  But even though the app is partially automated,

15  Steadfast still has to be involved in the administration of

16  the app, correct?

17  A.  We have to troubleshoot the app.

18  Q.  Okay.  I want to direct your attention to

19  Plaintiff's 2.088.

20        So you had a number of conversations with Mr. Arjun

21  Vora at Zira about customizing the app based upon Steadfast's

22  needs, right?

23  A.  Yes.

24  Q.  And there was e-mails exchanged between you and the Zira

25  people about getting the app up and running to work for

```
                        ┌─────── L. Pitts - Direct ───────┐
```

 1   Steadfast, essentially, right?

 2   A.  Yes.

 3   Q.  And so on the app -- we talked a lot about how it looks

 4   on a higher level with Steadfast, the facilities, the users,

 5   et cetera, but within all of that, Steadfast, unlike the

 6   facilities and unlike the -- unlike the facilities and unlike

 7   the nurses, Steadfast sees everything that the app has to

 8   offer.  In other words, there's not an area that is blocked

 9   off that Steadfast can't see.

10            MR. JEWETT:  Objection.  Calling for speculation.

11            THE COURT:  Well, if she knows it, she can testify

12   to it.  Overruled.

13            THE WITNESS:  There are some things that they had in

14   the package that we didn't get.

15   BY MS. LEWIS:

16   Q.  Okay.

17   A.  I'm not sure exactly what it is, but some things we

18   didn't need because we didn't do it.  In the package, when I

19   first sat down and interviewed the developer, some things

20   they offered, we didn't get.

21   Q.  You jumped ahead of me, but let me direct your attention

22   to -- I know we're on 88, but let's go to 87.

23            One of those things in the package that you didn't

24   want that you told them to take off was "Take off overtime.

25   We don't pay it."

————— L. Pitts - Direct —————

1          That was an option in the app, and you told them to
2     disable that feature; isn't that right?
3     A.  Yes, because that's not the way our company was set up.
4     This app was specialized.  I paid money for this app to be
5     equipped for Steadfast.
6     Q.  Within the app, there's an ability for Steadfast to know
7     whether or not a nurse or a CNA is working over 40 hours in a
8     workweek, and you didn't want to know that information.
9     A.  That's not how we're set up.  We didn't need to know
10    overtime because we had our independent contractors in there.
11    Q.  My question is --
12    A.  We didn't need that feature.
13    Q.  So my question is:
14          In the app, is there that feature?
15    A.  Not in my app.  Now, it was offered in a package, but we
16    don't have it in our app.
17    Q.  So it was offered in the package.  You didn't just
18    decline it, you sent an e-mail directing them to take it off,
19    correct?
20    A.  Yes, because it was part of their overall package, and
21    you had to let them know what you wanted on it and what you
22    did not need.  Our app is specialized to meet Steadfast's
23    needs.
24    Q.  Going down to 88, in terms of how we're talking about how
25    Steadfast has the ability to see things within the app,

———————————L. Pitts - Direct———————————

1   Steadfast receives a notification of accepting shifts in the

2   app, correct?

3   A.  Excuse me.  Repeat that.

4   Q.  Yeah.

5           Steadfast receives notifications where a nurse or

6   CNA accepts the shift?

7   A.  Yes, we do.

8   Q.  Steadfast receives notifications where a shift is

9   cancelled?

10  A.  Yes, we do.

11  Q.  Steadfast also can edit and delete and confirm shifts

12  within the app, correct?

13  A.  With the facilities, we can.

14  Q.  Well, it's both, right?

15  A.  Correct.

16  Q.  So coming back to that, you said "It's a feature we

17  didn't want.  We don't need it because that's how we handle

18  our nurses."

19          Although you've taken all of these steps to

20  streamline and make things easier for scheduling from the

21  pen-and-paper process and you were in the middle of this

22  lawsuit when this was going on, you took active steps to

23  avoid knowing about it, avoid knowing if a nurse was working

24  more than 40 hours a week, by not requesting or specifically

25  requesting to disable a feature that would have had you to at

Carol L. Naughton, Official Court Reporter

**JA1072**

L. Pitts - Direct

1   least have the knowledge, correct?

2           MR. JEWETT:  Objection.  It's mischaracterizing.

3   I'm starting to question the relevance of this inquiry.

4           THE COURT:  Objection overruled.

5           THE WITNESS:  Repeat that again.  I'm sorry.

6   BY MS. LEWIS:

7   Q.  Sure.

8           So I said, so although you took steps of adopting

9   this app which would make it easier and more efficient for

10  Steadfast to streamline scheduling, make the business more

11  efficient, while in the middle of this lawsuit, just seven

12  months ago, you got this app, and you actively avoided

13  knowing whether or not your nurses, the nurses and CNAs that

14  Steadfast placed, were working more than 40 hours in a

15  workweek.  You didn't want to know.

16  A.  That's not true.  You're saying I didn't want to know.

17  That's not true.  That was not how my company was set up.

18  And I only use the features on his software that my company

19  uses.

20          THE COURT:  I think we can move on from this

21  question.

22          MS. LEWIS:  Right.  Almost done.

23  BY MS. LEWIS:

24  Q.  I want to direct your attention to Plaintiff's 7a.  It's

25  the PDF Page 35.

Carol L. Naughton, Official Court Reporter

**JA1073**

———— L. Pitts - Direct ————

```
 1            There was a question about whether or not Steadfast
 2   charges back nurses when they don't show up or there's a
 3   discrepancy, a chargeback.  And you indicated that Steadfast
 4   doesn't.
 5            But Steadfast does charge back nurses; isn't that
 6   right?
 7   A.  No, we don't.
 8   Q.  This is a Next Day Pay record which was previously
 9   admitted into evidence.  At Carlenna Mosley, there's a
10   negative .67 hours.
11            That's a chargeback, isn't it?
12   A.  No.
13   Q.  What is it?
14   A.  When we got her time from Farm, additionally in the
15   e-mail, they deducted some hours because she didn't show up
16   on time.
17   Q.  And so you had paid her -- so you didn't pay her for
18   that, so that's a chargeback, right?
19   A.  That's not a chargeback.  That's being honest.  If you
20   didn't show up, that's lying, paying you for 7:00 and you
21   didn't show up at 7:00.
22   Q.  But it was her representation that she was there?
23   A.  But the facility didn't confirm it.
24   Q.  My question was:
25            Was it her representation that she was there?
```

L. Pitts - Direct

1    A.  I have no idea.

2    Q.  So you just deducted the time without confirming with her

3    whether or not she was there or not?

4    A.  We did confirm with her.  And evidently, when we

5    confirmed with her, she couldn't give us an explanation, and

6    the facility sent something back stating the actual time she

7    worked.

8    Q.  I want to -- almost done.  Let's talk about the FAB a

9    bit.

10          MS. LEWIS:  Ms. Jones, we're going to be on the 3/12

11   deposition, if you want to pull it up.

12          THE WITNESS:  Can we back up to that?

13   BY MS. LEWIS:

14   Q.  No, ma'am.  I don't have any further questions on that.

15          So during your testimony, you talked about -- well,

16   before I get to the FAB, Steadfast vets nurses in order to

17   provide them assignments?  The vetting process?

18   A.  We vet the nurses because that's required in our

19   contract.

20   Q.  And so you -- the business of Steadfast, you're not in

21   the business of vetting nurses, correct?

22   A.  If we have to do it, we have to do it.

23   Q.  But that's not the primary purpose of your business.

24   It's not to vet nurses and place them; it's to place nurses

25   at facilities to work on a per diem basis.  Is that right?

———L. Pitts - Direct———

1    A.   That's correct.

2    Q.   Okay.  And so there was an inquiry about whether or not

3    Steadfast has received a fee on the buyout provisions, the

4    solicitation clauses, if one of your nurses is hired

5    permanently.

6              Do you remember that line of questioning from

7    Mr. Jewett?

8    A.   Yes.

9    Q.   And Steadfast has received fees from facilities if one of

10   your nurses is hired permanently; isn't that right?

11   A.   Not often.

12   Q.   But it's happened?

13   A.   In the past, it's happened, but it's not often.

14   Q.   And "the past" being within sometime since at least 2015,

15   Steadfast has received a fee from a facility when nurses have

16   permanently gone there to work; is that right?

17   A.   I have to look at it.  I have to see it to confirm --

18   Q.   You don't know whether or not Steadfast has received a

19   buyout fee?

20   A.   I don't have the documentation in front of me.  So I

21   don't know when we received the buyout fee.  We have, but I

22   can't tell you when.

23   Q.   I wasn't asking when.  I wanted to know whether you have

24   received a buyout fee.

25   A.   We have received a buyout fee.

──────────── L. Pitts - Direct ────────────

1  Q.  And that fee is charged, in part, because you expend the

2  money -- you make the investment on the nurses to vet them,

3  and then Steadfast could lose the opportunity to earn

4  additional profits from that nurse because they're not

5  available to work further shifts, correct?

6  A.  There's a processing fee.

7  Q.  Okay.  Directing your attention to 173.

8        During your deposition back in April, you

9  likewise -- I asked you about the same thing.  I asked you --

10       THE COURT:  What line are you on?

11       MS. LEWIS:  I am starting on line 18.

12 BY MS. LEWIS:

13 Q.  And I asked:  "So why did you say we don't need this

14 registry?  I mean, Steadfast is the one who would get the

15 compensation, correct?"

16       And there you, like today, said:  "Right, right.

17 We're the one who gets the fee."

18       And I questioned:  "So do the nurses get a portion

19 of that compensation fee if, indeed, the registry fee is

20 paid?"

21       And you stated:  "The reason we do a registry fee is

22 we do all the vetting, and that costs money to vet."

23       So you all are seeking to recover the investment

24 that you've made in these nurses and recover that with these

25 fees that you charge to the facilities; isn't that right?

L. Pitts - Direct

1   A.  No, that's not correct.

2   Q.  Okay.  Now, shifting to the FAB, you indicated that you

3   reviewed the FAB with your attorney; is that right?

4           THE COURT:  Let's stop right there.  Take a

5   15-minute break, and then you can come back and start with

6   that question.  Mark it.  15-minute break and then we'll be

7   back.

8           (Recess from 3:58 p.m. to 4:17 p.m.)

9           THE COURT:  You may resume.

10          MS. LEWIS:  Thank you.

11  BY MS. LEWIS:

12  Q.  So we had started talking about the FAB 2018-4.

13          So you indicated during your testimony that you

14  reviewed that with your attorney; is that correct?

15  A.  Yes, it is.

16  Q.  And during your deposition last year in March, you also

17  indicated that you did not actually recall reviewing that

18  FAB.  Do you remember that?

19  A.  I guess, because I didn't realize it was a FAB until my

20  attorneys pointed out to me it was a FAB that I looked at.

21  Q.  I want to direct your attention to that deposition.

22          MS. LEWIS:  And, Your Honor, before I jump into

23  that, I have a housekeeping matter that was brought to my

24  attention.

25          So the exhibits that were previously admitted under

Carol L. Naughton, Official Court Reporter

**JA1078**

L. Pitts - Direct

1   Plaintiff's 2, which are the deposition summaries, I'd like

2   to -- I'll need to consolidate these deposition pages that

3   I'm referencing and using for impeachment and refreshing

4   recollection purposes, and I would like to have them marked.

5           THE COURT:  Well, first of all, if any party uses a

6   deposition in here during the course of testimony to impeach

7   people, though we mark it, it's not admissible.

8           MS. LEWIS:  Right.  I understand.  But this is just

9   for housekeeping purposes.

10          THE COURT:  For housekeeping purposes.  Well, you

11  can consolidate them and have them marked.

12          MS. LEWIS:  Yes.  That's all I was making sure of.

13          THE COURT:  All right.

14          MS. LEWIS:  If you could scroll up, Ms. Jones.

15  BY MS. LEWIS:

16  Q.  So at the deposition, I provided you a copy of this.

17  Directing your attention to deposition -- it's PDF Page 167,

18  but I believe the actual page is 166 -- yes, 166, at line 10.

19          And I asked you -- I provided you the FAB, and I

20  said:  "If you can take -- do you recognize the document

21  that's been received and marked as Plaintiff's 7?  And that

22  document, for the record, is dated July 13th, 2018, Field

23  Assistance Bulletin Number 2018-4.  Do you recognize that

24  document?"

25          Your answer was:  "Yes, yes."

Carol L. Naughton, Official Court Reporter

**JA1079**

─────────────────L. Pitts - Direct─────────────────

1        And then I asked you:  "What is your familiarity

2   with the document?"

3        And you indicated:  "I think my attorneys went over

4   it with me."

5        Then I questioned you:  "Did you -- when was the

6   first time that you saw this document?  Was it this year?"

7        And "this year" would have been last year,

8   March 2020.

9        And you indicated:  "I'm not even sure.  I'm not

10  sure.  I remember seeing it, but I don't remember what year

11  it was or what month it was."

12       Next page, please.

13       So I said:  "Okay.  What is the date of it?"

14       And your response was:  "Uh-huh."

15       And you indicated -- my response was:  "Okay.

16  Uh-huh."

17       And you indicated:  "I remember my attorneys going

18  over it with me, but I don't know when exactly that was."

19       I asked you whether or not you independently located

20  the document or whether it was just provided by your

21  attorneys.

22       "ANSWER:  I'm not sure.

23       "QUESTION:  Have you had an occasion to research the

24  Department of Labor's website after the investigation?

25       "ANSWER:  I think that -- I can't recall."

Carol L. Naughton, Official Court Reporter

**JA1080**

————————— L. Pitts - Direct —————————

1           So I asked more broadly.

2           "QUESTION:  Have you ever gone to the Department of

3    Labor's website for guidance, for materials, or research?"

4           Your response:  "I can't recall.  I just can't

5    recall if I went to the website or not.  I just can't

6    remember."

7           Next question:  "Okay.  Do you have this document

8    saved on your computer?

9           "ANSWER:  I'm not sure.  I have a lot on my

10   computer.  I'm not sure."

11          THE COURT:  I think we can stop right there in terms

12   of what you were trying to do by going through the

13   deposition.

14   BY MS. LEWIS:

15   Q.  At least last year, 2020, which would only have been two

16   years versus this year, three years later, you didn't

17   remember then whether or not you had ever seen the FAB, but

18   your testimony today is that you used that document or relied

19   upon it to continue your practices of classifying nurses as

20   independent contractors?

21          MR. JEWETT:  Objection.  She completely

22   mischaracterized the deposition testimony she just read.

23          THE COURT:  Well, I don't know about that.  The

24   Court read the same deposition that she just read,

25   Mr. Jewett, and the question she's following up now is not an

--------L. Pitts - Direct--------

 1   inappropriate question.

 2          MR. JEWETT:  Your Honor, in the deposition

 3   transcript, she testified that she had seen it before.

 4   Ms. Lewis just characterized her testimony from the

 5   deposition transcript as saying "I don't recall if I seen it

 6   before."

 7          THE COURT:  Well, she said, "I just can't recall if

 8   I went to the website earlier."

 9          Well, you can redirect, but the Court overrules the

10   objection.

11          Rephrase the question and put it to her again.

12   BY MS. LEWIS:

13   Q.  So is it your testimony, then, today, that now you did

14   remember reviewing that and you relied upon this document

15   which -- closer to the time that you allegedly reviewed it,

16   that's what you used to rely upon to continue your practice

17   of classifying nurses as independent contractors rather than

18   employees?

19   A.  This is -- this transcript here says I can't recall, like

20   I can't remember.

21   Q.  But that's not my question.

22          My question is whether or not you used the FAB --

23   you didn't remember -- you didn't remember the document last

24   year, but today you remember it.

25          Is that your testimony?

─────────────── L. Pitts - Direct ───────────────

1    A.  Yes, after reading it.

2    Q.  Okay.  So sometime between last year and today, you've

3    read it and you remembered it?

4          MR. JEWETT:  Objection.  She's mischaracterizing the

5    testimony, Your Honor.  The deposition transcript does not

6    say that.

7          THE COURT:  It's based on the answer she just gave,

8    Mr. Jewett.  Let's see if we can get through one exchange,

9    and then we can figure out what is going on here.

10          MR. JEWETT:  Yes, sir.

11          THE COURT:  Back up again.

12   BY MS. LEWIS:

13   Q.  Okay.  At the time of the deposition testimony, the most

14   you could testify to regarding the FAB 2018 was that you

15   remembered seeing it and reviewing it with your attorney,

16   correct?

17   A.  Correct.

18   Q.  But you weren't familiar with the details of that

19   document, correct?

20   A.  I didn't read the document until my attorney --

21   Q.  So you didn't read the document.

22          So you could not have relied upon that document to

23   continue your practice of classifying nurses as independent

24   contractors rather than employees.  You did not rely on that

25   document, did you?

Carol L. Naughton, Official Court Reporter

**JA1083**

L. Pitts - Direct

```
 1   A.  Yes, I did.
 2              MR. JEWETT:  Object --
 3              THE COURT:  Okay.  She said she did.  Follow up.
 4   Keep on going.
 5   BY MS. LEWIS:
 6   Q.  You've classified nurses as independent contractors since
 7   2015?
 8   A.  Yes.
 9   Q.  And again, coming back to this deposition testimony,
10   which was focused on the practices of Steadfast from the
11   Steadfast II moving forward, you still classified the nurses
12   as independent contractors, correct?
13   A.  Correct.
14   Q.  There hadn't been any change from 2015 to 2017 on how you
15   conducted the onboarding and staffing process of nurses at
16   Steadfast, correct?
17   A.  Correct.
18   Q.  So you still required them to complete an application?
19   A.  Now or --
20   Q.  We're talking about back then.
21   A.  2015?
22   Q.  Uh-huh -- 2017.
23   A.  '17.
24   Q.  Yeah, 2017.  They were still required to complete an
25   application.
```

1031

L. Pitts - Direct

```
 1   A.  I have to check that date when they stopped --

 2   Q.  Let's go to one of the Plaintiff's 25 applications.

 3   A.  I didn't say I didn't.  I said I have to check the date.

 4        MS. LEWIS:  26, Ms. Jones, Employment Application

 5   PX-26.  Let's look for a date that's signed 2017, the

 6   application date.  There's one.

 7   BY MS. LEWIS:

 8   Q.  12/6/2017, you still required an application, correct?

 9   A.  At the time, some people were still doing apps, and some

10   people were sending in resumes.  So both were coming to the

11   office.

12   Q.  Okay.  You still required the completion of a background

13   check?

14   A.  Yes.  Yes.

15   Q.  You still required a drug screen?

16   A.  Yes.

17   Q.  Going to the memos that were sent out, you were still

18   sending out memos?

19   A.  Yes.

20   Q.  Nothing had changed in the way that Steadfast conducted

21   and interacted with the nurses in 2017 from how it was doing

22   in 2015?

23   A.  Yes.

24   Q.  Nothing had changed in 2018, either, because some of

25   those memos were in 2018, correct?
```

Carol L. Naughton, Official Court Reporter

**JA1085**

─────────── L. Pitts - Direct ───────────

 1   A.  Correct.

 2   Q.  Let's talk a little bit in more detail about the FAB and

 3   some of the information that's contained therein.

 4          The FAB confirms that it's a case-by-case analysis.

 5   Do you recall reviewing that within the FAB, it's a

 6   case-by-case circumstance?

 7   A.  No, I didn't recall that.  I was looking at the subject

 8   line.

 9          MS. LEWIS:  You can take that off, Ms. Jones.

10   BY MS. LEWIS:

11   Q.  Let's start with the first page, and we'll go through it

12   as you did with your attorney.  This was previously admitted.

13          THE COURT:  Let's move, Ms. Lewis.  Let's move to a

14   question here.

15          MS. LEWIS:  I'm trying to display the FAB on the

16   projector, Your Honor.

17   BY MS. LEWIS:

18   Q.  The FAB indicates that "A registry that controls the

19   terms and conditions of the caregiver's employment activities

20   may be an employer of the caregiver and, therefore, subject

21   to the requirements of the FLSA."

22          It says "may be."  It's not definitive, correct?

23   A.  That's what it says.

24   Q.  And coming back to my question earlier, when we had

25   talked about understanding the factors and a lot of

─────────── L. Pitts - Direct ───────────

1  discussion back and forth about independent contractors or

2  employees, it doesn't matter; it's the relationship that

3  controls.

4        Do you recall seeing that within the FAB, the

5  highlighted portion?

6        "The title an entity uses does not determine whether

7  it's obligated to comply with the FLSA; instead, the

8  particular facts and circumstances..." do.

9        THE COURT:  You need to push that up on the screen.

10 Thank you.

11       Thank you, Mr. Jewett.

12 BY MS. LEWIS:

13 Q.  Do you recall seeing that?

14 A.  I just saw that when you showed it to me.

15 Q.  You just saw it.

16       And, again, nothing -- not one thing matters.  This

17 is the thing that we've heard about throughout this entire

18 testimony.

19       Do you recall reviewing the first paragraph where

20 it's highlighted?

21       I want to talk about some specifics.

22       The FAB indicates that "A registry that directs and

23 controls the caregiver's work and sets the caregiver's rate

24 of pay may be an employer of the caregiver."

25       In this case, the nurses are the caregiver in this

——————————L. Pitts - Direct——————————

1   scenario, and Steadfast sets the rate of pay which they

2   receive by the facilities; isn't that right?

3           Let me rephrase that question.

4           Steadfast sets the rate nurses are paid, correct?

5   A.  Yes, we have the rates.

6   Q.  And Steadfast also keeps a log of the assignments where

7   nurses go.  That's part of the scheduling process, part of

8   the new scheduling process with the Zira app, part of the

9   scheduling process even before where schedulers would call,

10  contact the nurses, find out where they were going.  That's

11  part of the process, correct, that Steadfast does?

12  A.  Yes.

13  Q.  And you all do that because you all need to know where

14  the nurses are.  Like you said, one of the concerns is

15  overbooking and underbooking; is that right?

16  A.  I didn't say underbooking.  You did.  I said overbooking.

17  Q.  Overbooking.  Okay.

18          As the FAB indicates, in that situation, that may be

19  an employee.

20          I want to go to --

21          MR. JEWETT:  I object.  I don't know if there's been

22  a question asked.

23          MS. LEWIS:  I haven't asked anything yet.

24          THE COURT:  I think you need to ask the question.

25  BY MS. LEWIS:

L. Pitts - Direct

1    Q.  I want to go to Page 6.  We've heard a lot of testimony

2    over the course of this matter about scheduling shifts.

3          The FAB here states that "requiring a caregiver to

4    call only the registry, instead of the client, if the

5    caregiver will be late or miss a shift; and disciplining a

6    caregiver for his or her performance" is another thing that

7    may be indicative of an employer/employee relationship.

8          Do you see that statement there?

9    A.  Yes, I see the statement.

10   Q.  And Steadfast -- in this scenario, the nurse is the

11   caregiver; the registry is Steadfast; and the client is the

12   facility.  Correct?

13         And so Steadfast requires the nurses to contact the

14   registry if they are going to be late or miss or cancel a

15   shift.  In fact, you've sent memos to that regard; isn't that

16   right?

17   A.  Yes.

18   Q.  Another example that's within this FAB, "prohibiting a

19   caregiver from working directly with clients outside of the

20   registry."

21         You all have a noncompete clause in your Independent

22   Contractor Agreements, don't you?

23   A.  Yes, we do.

24   Q.  And it prohibits those nurses from working with outside

25   agencies.  As you indicated, outside agencies like First

Carol L. Naughton, Official Court Reporter

**JA1089**

———————————— L. Pitts - Direct ————————————

1    Choice, those are your competitors.

2    A.  I'm not reading that like that.

3    Q.  No, no.  I'm asking the question.

4         The Independent Contractor Agreements that Steadfast

5    requires nurses to sign has a noncompete agreement, correct?

6    A.  Correct.

7    Q.  And those noncompete agreements prohibit the nurses from

8    working with other entities.  That's what it says; is that

9    right?

10   A.  Can I look at that again?

11   Q.  Sure.

12        MS. LEWIS:  May you please pull up one of the

13   Independent Contractor Agreements, Ms. Jones.

14   BY MS. LEWIS:

15   Q.  Directing your attention to what has been previously

16   marked as Plaintiff's 25, there's a noncompete agreement

17   here, and it states -- I'm reading from the last sentence of

18   this paragraph.

19        Well, let me just read the whole thing.

20        "Noncompetition.  Commencing from the first date of

21   the contractor's work for SMS under this agreement and

22   continuing for a period of 12 months from the expiration or

23   termination date of this agreement, whether initiated by SMS

24   or the contractor, with or without notice or cause,

25   contractor agrees that the contractor shall not directly

L. Pitts - Direct

1   provide the same type of services provided to SMS under this

2   agreement to any competitors of SMS without first obtaining

3   the express written permission of SMS.

4           "Contractor agrees that during the term of this

5   agreement and for 12 months thereafter, contractor will not

6   enter into, be engaged in, or be interested in any capacity

7   whatsoever, directly or indirectly, in any business or

8   undertaking with any person or entity that competes with

9   SMS."

10          So there's a noncompetition clause within the

11  contracts that you require the nurses to sign before they can

12  pick up assignments with Steadfast in each version, each of

13  the four versions, that you've had over the years; isn't that

14  right?

15  A.  Yes.

16  Q.  And so coming back to the FAB, the FAB says that when you

17  prohibit that, it's, again, indicative of an

18  employer/employee relationship.

19          Directing your attention to paragraph E, it states

20  "The client instead negotiates the rate of pay directly with

21  the caregiver."

22          That's prohibited under Steadfast's practices, isn't

23  it?

24  A.  Yes.

25  Q.  Nurses are not allowed to negotiate their rate of pay

1038

─────────── L. Pitts - Direct ───────────

1   with the facilities directly.

2   A.  They do, but they're not supposed to.

3   Q.  They are not supposed to.

4           Steadfast sets a wage range for the nurses and CNAs

5   that it places on assignment at a facility, correct?

6   A.  Yes.

7   Q.  And that wage range is set based upon the negotiated

8   contract price that Steadfast has made with each of the

9   facilities; isn't that right?

10  A.  Yes.

11  Q.  And the FAB indicates "Such behavior indicates the

12  existence of an employment relationship between the registry

13  and caregiver."

14          You read that sentence and still maintained the

15  position that the nurses were not misclassified?

16  A.  Yes, because the nurses can choose whether they want to

17  take that pay rate or not.  They have a choice.

18  Q.  So there were some changes in Steadfast's pay over the

19  years.

20          You guys started to do Next Day Pay in 2019,

21  February 2019, correct?

22  A.  Correct.

23  Q.  And you still do Next Day Pay to this day?

24  A.  Correct.

25  Q.  And as we heard, that comes after a nurse submits

**JA1092**

─────────── L. Pitts - Direct ───────────

1    whatever time sheet to Steadfast the day of, and presumably,

2    they are paid the next day or within a day or so, right?

3    A.   Right.

4    Q.   And so the FAB indicates "A registry's direct payment of

5    its own funds to the caregiver, however, may indicate that

6    the registry is the caregiver's employer.  This is true

7    regardless of whether the registry typically receives

8    reimbursement from the client because, in this situation, the

9    registry may be effectively guaranteeing the payment even if

10   the client does not ultimately pay."

11           So my question is this:

12           When you all do Next Day Pay and there is an issue,

13   you all don't seek a chargeback to the nurses if the client

14   refuses to pay that invoice, do you?

15   A.   Restate that question.  Can you say that again?

16   Q.   Sure.

17           So a nurse submits a time sheet for Next Day Pay.

18   Steadfast pays them the next day or the next two days, before

19   the regular Friday payday.  Steadfast then, as Christine Kim

20   testified, submits an invoice to the facility on its regular

21   cycle, and the facility says, "I'm not paying."

22           Based upon your testimony earlier, if the facility

23   doesn't pay, you all then don't charge back the nurse for

24   that time that -- for the payment that they received via Next

25   Day Pay, do you?

—————————————L. Pitts - Direct—————————————

1   A.  No.  What happens is -- we don't submit the invoice when

2   we confirm.  We submit an e-mail with the time that the

3   nurses put on their time sheet, then they will send it to the

4   facility.  The facility then says yes, that's the time they

5   got there, or if they got there late.

6   Q.  Okay.  But you all still would do the Next Day Pay before

7   you get the confirmation from the facility.  That's the way

8   Next Day Pay works, correct?

9   A.  That's not true.  We have to get confirmation from the

10  facility before we pay them.

11  Q.  Let me direct your attention to Plaintiff's -- the Next

12  Day Pay memo.  We previously talked about this in your case

13  in chief.

14        Do you recall this memo that was sent out to the

15  nurses when you started Next Day Pay?

16  A.  Yes.

17  Q.  And the memo states that "Steadfast Medical is

18  introducing the option of SMS instant pay for all 1099

19  contractors effective Tuesday, February 19.  Please note,

20  this is optional."

21        And scrolling down, it talks about the instructions

22  and what the nurses have to do to get paid.

23        This indicates that nurses have to, one, take a

24  picture of the time sheet and to ensure the image quality is

25  clear and legible; you submit the time sheets to an e-mail

──────────────L. Pitts - Direct──────────────

1    address; then it says "Upon receipt of the time sheet, it

2    will be forwarded to the facility to confirm hours worked";

3    four, "once the facility approves, the deposit will be

4    initiated into your requested direct deposit account.  Be

5    mindful that deposits are made upon confirmation from the

6    facility of the time sheet submitted."

7         So within this process of Next Day Pay, it's

8    automated in that the nurse submits it, the facility

9    confirms, and then payment is made, but Steadfast hasn't

10   necessarily received payment for that confirmed invoice; is

11   that right?  They've just confirmed the hours worked.

12   A.  They confirmed the hours worked, but we have a finance

13   company that gives us the money before the facility does.

14   Q.  So Steadfast advances the money.  You wait for

15   reimbursement from the facility to reconcile the invoice,

16   essentially.

17   A.  No, we don't advance the money.  That is our money.  So

18   we use our money, and we pay the staff.

19   Q.  Okay.  You use your money to pay the nurse via the Next

20   Day Pay.

21   A.  No, they don't have to wait.

22   Q.  Okay.  And so once the time is confirmed, Steadfast

23   guarantees that payment to the nurse whether or not Steadfast

24   has received the actual deposit from the facility into your

25   account.

Carol L. Naughton, Official Court Reporter

**JA1095**

L. Pitts - Direct

 1 | A.  Exactly.

 2 | Q.  Okay.  So coming back to the FAB, we'll go to the next

 3 | page -- I skipped a page.  That was 7.  I want to go back to

 4 | Page 6.

 5 |         No.  Sorry.  I'm on Page 8 now.

 6 |         Within this process that we just talked about, and

 7 | also from your prior testimony, Steadfast verifies time

 8 | records, time sheets, to make sure nurses worked the hours

 9 | that they worked; is that right?

10 | A.  No.  We verify it to make sure it's truthful and nobody

11 | is stealing time and to make sure that those hours are

12 | correct that we're paying them for.

13 | Q.  So based upon the FAB, it says "A registry's active

14 | creation and verification of time records may indicate that

15 | the registry may be, in fact, an employer of the caregiver.

16 | Tracking and independently verifying time worked is generally

17 | a form of supervision on which the caregiver depends to

18 | ensure proper payment and, therefore, may indicate the

19 | existence of an employment relationship."

20 |         So Steadfast does track and independently verify the

21 | hours worked of nurses; isn't that right?

22 | A.  Yes, we do verify their hours.

23 | Q.  So within -- so, in fact, a number of the things that

24 | Steadfast does to conduct its business are in opposite to

25 | what the FAB says makes an independent contractor; is that

─────────────── L. Pitts - Direct ───────────────

1   right?

2   A.  Repeat that again.  What did you say?

3   Q.  A number of the practices that Steadfast implements are

4   in opposite to what the FAB says regarding may be indicative

5   of being an independent contractor.

6   A.  I don't agree with that.

7   Q.  Okay.  Steadfast did not revise any of its practices to

8   conform with the examples set forth in the FAB, did it?  You

9   made no changes?

10  A.  But I don't agree with the FAB.

11  Q.  You don't agree with the FAB?

12  A.  I don't agree with the wording of the document.

13  Q.  So your position is not that you rely upon the document,

14  you just disagree with it.

15  A.  No, I didn't say I disagree with the document.  I

16  disagree with what you're saying in part of the document

17  where you're saying the "may be" part, the part -- the part

18  you're pointing out, I don't agree with.  The other parts I

19  read, that's what I agree with.

20  Q.  So there's parts of the FAB that you agree with and parts

21  that you disagree with.

22  A.  Yeah.  Because it's so vague.

23         MS. LEWIS:  No further questions for this witness,

24  Your Honor.

25         THE COURT:  The Court has a couple of questions for

―――――――L. Pitts - Direct―――――――

```
 1   Ms. Pitts.

 2          Ms. Pitts, you identified several memos you sent out

 3   to various facilities.  You indicated that the facilities

 4   asked you to send those memos out.

 5          THE WITNESS:  Yes, sir.

 6          THE COURT:  There's nothing to prevent the

 7   facilities from putting out guidance within the facility

 8   about what they wanted done with respect to the persons you

 9   call independent contractors in their facility, is there?

10          THE WITNESS:  They did put memos out, but they

11   wouldn't heed to it, and they were thinking people weren't

12   getting it, so they wanted us to reiterate it.

13          THE COURT:  So they asked you, as a registry, to put

14   out memos directing the independent contractors what to do?

15          THE WITNESS:  Not what to do.  They were saying

16   things they were having issues with, and they asked us could

17   we put out a memo, because they talked to them numerous

18   times, can we send out a memo, also, because maybe everybody

19   is not getting the message.

20          THE COURT:  That's not what I said.

21          They asked you to put out a memo which, in effect,

22   directed the independent contractors what to do; be on time,

23   don't sleep in the patients' beds.

24          The number of things that you put in here as

25   guidance to the independent contractors, that's what they had
```

———— L. Pitts - Direct ————

 1    you put out.  Am I correct?

 2            THE WITNESS:  Yes.

 3            THE COURT:  So did you view this as guidance and

 4    supervision of the independent contractors?

 5            THE WITNESS:  No.  I viewed it as obeying the

 6    contract that I filled out with the facility, that if they

 7    need help reiterating or anything, if they needed help, that

 8    I was going to do what they told me they needed me to do.

 9    And per their decision and per their discretion, they asked

10    me for the help, you know, and I intervened.

11            But I didn't do it as supervisor.  I did it because

12    my facility asked me to do it.

13            THE COURT:  Did you seek any legal guidance before

14    you put these memos out?

15            THE WITNESS:  I don't recall.  I don't recall

16    talking to anyone about the memos.  I didn't think it was a

17    big deal because the facility told me to.

18            THE COURT:  You didn't think that was a big deal?

19            THE WITNESS:  Because the facility asked me to do

20    it.

21            THE COURT:  A couple witnesses testified, at least

22    one of them testified that there was an issue that came up --

23    I can't even think of her name -- and a false complaint or

24    something was filed against her.  And she indicated that you

25    investigated the situation, and apparently, I guess it

────────────── L. Pitts - Direct──────────────

1  resolved in her favor.

2          Do you recall that?

3          THE WITNESS:  I didn't investigate anything.  What

4  happened was somebody Black hit a resident, and we have all

5  Black females.  So they said it was her, but it wasn't her;

6  it was another Black female.

7          I didn't investigate anything.  They asked me do I

8  know who all worked that day, and we had to look back on our

9  schedule to see who all worked that day.

10         THE COURT:  So you disagree; you did not make an

11 inquiry?

12         THE WITNESS:  No.  No.  I didn't know anything about

13 it until the facility couldn't reach her.  She said, "The

14 facility couldn't reach me, so they reached out to Lisa."

15 And they were going to file a fraud with the Board of Nursing

16 if they couldn't get some explanation on it.  I didn't do the

17 investigation.

18         THE COURT:  I think there is one other witness from

19 Sentara-Hampton who indicated there was a three-way call

20 regarding a nurse who was allegedly intoxicated.

21         Do you recall that testimony?

22         THE WITNESS:  Yeah.

23         THE COURT:  And they indicated that you became

24 involved in a three-way teleconference call wherein you

25 eventually indicated that the nurse had to take a drug test

Carol L. Naughton, Official Court Reporter

**JA1100**

——————— L. Pitts - Direct ———————

1     before she could go back.

2                Do you remember that?

3                THE WITNESS:  I didn't indicate it.  The facility

4     relayed to me, before she can come back there, she had to

5     have a drug test.

6                THE COURT:  So you didn't tell her that she had to

7     take a drug test?

8                THE WITNESS:  I told her the facility was not going

9     to let her back unless she took a drug test.

10               THE COURT:  Okay.

11               THE WITNESS:  Some of this stuff, I have to say.  I

12    mean, I can't just sit on the phone with them, Your Honor,

13    and just keep my mouth shut.  I signed a contract.  Sometimes

14    I have to act as a liaison, because these girls are violent,

15    and I have to act as a liaison with these facilities.

16               So if the facility tells me, "Hey, she needs to get

17    a drug test," I'm going to call her on the phone and tell

18    her, "Yes, you need to go get a drug test.  The facility

19    wants you to get a drug test.  Go get a drug test.  They say

20    you can't come back until you have the drug test."

21               THE COURT:  My next question has to do with the

22    rates.

23               You set the rates on the hours the persons on your

24    registry would receive for their work with the facilities; is

25    that correct?

—————————— L. Pitts - Direct ——————————

1          THE WITNESS:  I don't set the hours, but we have

2     different rates for different facilities.

3          THE COURT:  You set the rates?

4          THE WITNESS:  We set the rates.

5          THE COURT:  Okay.  Now, the Court noted, in one of

6     these exhibits, that you charge the facilities for overtime

7     rates for holidays; is that correct?

8          THE WITNESS:  Yes.

9          THE COURT:  And do you share any of those overtime

10    rates with the nurses?

11         THE WITNESS:  Yes.  The stars on our invoices mean

12    the nurse got time and a half for that day.

13         THE COURT:  So they get time and a half during what

14    period?

15         THE WITNESS:  Holidays.  All the holidays that

16    facilities say they are paying time and a half for.

17         THE COURT:  So you give the time and a half that you

18    get on the holidays from the facility to the nurses?

19         THE WITNESS:  I don't have to give it to the

20    facility because the nurses get -- the nurses get time and a

21    half of what they made that day.  It's a holiday.  So it's

22    like the rate -- our rate may be $60 an hour, and their rate

23    might be $40 an hour or $50 an hour, so they get 50 times

24    time and a half.  That's their rate.

25         THE COURT:  Okay.  Thank you.

———————— L. Pitts - Redirect ————————

1    THE WITNESS:  You're welcome.

2    THE COURT:  Do either counsel have any questions

3    based on the questions the Court's asked?  You may ask them.

4    Any redirect?

5    MR. JEWETT:  Yes, Your Honor.

6                    REDIRECT EXAMINATION

7    BY MR. JEWETT:

8    Q.  Ms. Pitts, Ms. Lewis asked you some questions about

9    Next Day Pay.  Do you recall that?

10   A.  Yes.

11   Q.  Does Steadfast require verification of the hours from a

12   facility before it will pay the actual money in Next Day Pay?

13   A.  Yes.  We have to get the hours verified.

14   Q.  So if a facility won't verify the hours, Steadfast won't

15   pay the Next Day Pay until the facility verifies it?

16   A.  We pay them, but the facilities have to verify the hours.

17   That's how we know that they actually showed up for the

18   shift.  So we don't pay them if they weren't really there.

19   Q.  Okay.  Ms. Lewis asked you a few questions about the

20   Field Assistance Bulletin.  I have a few additional ones for

21   you.  Let's look at Section H here.

22       It says "A registry does not typically create and

23   confirm records of a caregiver's hours worked."

24       Does Steadfast do this?  Do you understand that

25   sentence?  Can you see the sentence?

Carol L. Naughton, Official Court Reporter

**JA1103**

1   A.  Yeah, I'm looking at it.  I'm reading it.

2   Q.  Do you understand the sentence?

3   A.  Yes, I understand what it's saying.

4   Q.  Okay.  Does Steadfast do that?  Does Steadfast create the

5   records of the caregiver's hours worked?

6   A.  No.

7   Q.  It says "It may perform payroll services after the client

8   or caregiver submits time records, as discussed above, but

9   that does not indicate that the registry is the caregiver's

10  employer."

11          Does Steadfast perform payroll services once the

12  client -- in this scenario, the facility -- submits or

13  verifies the time records?

14  A.  Yes.

15  Q.  This next green paragraph:

16          "A registry might collect time sheets from

17  caregivers or offer an electronic time verification system."

18          Does Steadfast collect the time sheets from

19  caregivers?

20  A.  Yes.

21  Q.  Okay.  It says "A registry may also require the correct

22  completion and submission of certain time sheets for purposes

23  of payroll processing."

24          Does Steadfast do that?

25  A.  Yes.

─────L. Pitts - Redirect─────

1   Q.  "These activities do not indicate that the registry is

2   the caregiver's employer, as long as the client" -- that is,

3   here, the facility -- "is the one actually verifying and

4   adjusting the timekeeping information for accuracy."

5        Is the facility -- in Steadfast's model, it's the

6   facility that verifies the hours?

7   A.  Correct.

8   Q.  Ms. Lewis -- forgive my marks here.  I'm on Page 6 of the

9   FAB.

10       Ms. Lewis asked you about this section here.  She

11  pointed out that "prohibiting a caregiver from working

12  directly with clients outside of the registry" -- I'll just

13  parenthetically say -- indicates that the registry is the

14  employer and not an independent contractor relationship.  And

15  she pointed out the company's noncompete agreement.

16       Do you recall that?

17  A.  Yes.

18  Q.  Have you ever enforced a noncompete agreement?

19  A.  (Inaudible response.)

20  Q.  And, in fact, do your nurses work for your competitors in

21  other registries?

22  A.  Yes.

23  Q.  Ms. Lewis also pointed out this sentence to you.  I don't

24  believe she asked you about this last section, about

25  controlling the caregiver.

L. Pitts - Redirect

```
 1          The FAB indicates that disciplining a caregiver for
 2   his or her performance would indicate that the registry is an
 3   employer and not a 1099 relationship.
 4          Does Steadfast discipline its nurses --
 5   A.  No.
 6   Q.  -- for their performance?
 7   A.  No.
 8   Q.  Okay.  Let's go up to the next paragraph.  This is the
 9   control factor again.
10          It provides "The registry may not, for example,
11   instruct caregivers how to provide caregiving services."
12          Does Steadfast instruct nurses how to conduct
13   nursing services?
14   A.  No.
15   Q.  Moving on, "The registry may not...monitor or supervise
16   caregivers in clients' homes."
17          Does Steadfast monitor or supervise nurses in the
18   facilities?
19   A.  No.
20   Q.  Moving on, it also says "A registry may not...evaluate
21   caregivers' performance."
22          Does Steadfast evaluate caregivers' performance?
23   A.  No.
24   Q.  "The absence of such control indicates that a registry is
25   not an employer."
```

L. Pitts - Redirect

1          Okay.  Let me go back to Page 5.  Let's look at this

2    last sentence.  I think I already asked you about this one.

3          It says the registry -- I'm doing some phrasing here

4    to have the question make sense for you.

5          The registry provides -- it does not assign -- the

6    work opportunities because it is matching the client with

7    caregivers who meet the requisite qualifications.

8          Does Steadfast "provide" rather than "assign" work

9    opportunities?

10   A.  We just provide it.  It's up to them to pick what they

11   want to pick up.

12   Q.  Okay.  This sentence here says -- moving up, still under

13   cancelling and assigning.

14          "A registry's lack of control over work schedules

15   and assignments may indicate that a registry is not the

16   caregiver's employer."

17          Does Steadfast control the work schedules of the

18   nurses who take shifts in its registry?

19   A.  No.

20   Q.  Hiring and firing?

21   A.  No, we don't fire.

22   Q.  You don't fire.

23          This says "A registry's inability to hire and fire

24   employees indicates that the registry is not an employer of

25   the caregiver."

L. Pitts - Redirect

1    "As with hiring" -- I'm going to the previous

2  sentence -- "the ultimate termination decision is the

3  client's."

4    Is it Steadfast's determination to remove a nurse

5  from a facility, or is it the facility's?

6  A.  It's the facility's.

7  Q.  Okay.  I'm going to ask you a question more broadly about

8  some questions Ms. Lewis asked you about your review of the

9  FAB.  There was some confusion about that.

10   She showed you your deposition transcript.  Do you

11 recall that?

12 A.  Yes.

13 Q.  Okay.  I'm going to show this to you.  She asked you

14 about the question concerning whether and when you went over

15 the FAB.  This is Page 167 of your deposition.

16   "What is the date of it?  2018?"

17   I'm sorry.  That's your answer.  You're asking her a

18 question.

19   And you said:  "I remember my attorneys going over

20 it with me, but I don't know when it was exactly."

21   Where were you at when you went over the FAB with

22 your attorneys?

23 A.  I think I was at Bredehoft's.  I'm not sure.

24 Q.  You don't recall?

25 A.  I just -- you guys have shown me thousands of documents.

L. Pitts - Redirect

1    Q.  I understand.

2            When you went over -- when you went over this FAB

3    with your attorney, did the attorney who went over this FAB

4    with you go through the entire FAB with you?

5    A.  I can't remember what exactly he went over, but we went

6    over stuff in that document.

7    Q.  Okay.

8            THE COURT:  When you leave the podium in the middle

9    of your questioning, it's appropriate to ask the Court for a

10   moment to confer.

11           MR. JEWETT:  I'm sorry, Your Honor.  May I please

12   confer with my co-counsel?

13           THE COURT:  Yes, you may.

14           (Pause in the proceedings.)

15   BY MR. JEWETT:

16   Q.  Ms. Pitts, I have one final question for you.

17           When you structured your registry, what was the most

18   important thing to you when you decided to classify the

19   nurses as independent contractors?

20   A.  Flexibility for them.

21   Q.  Okay.

22           MR. JEWETT:  I have no further questions.  Thank

23   you.

24           THE COURT:  If there are no further questions, may

25   the witness step down?

```
 1              MR. JEWETT:  Yes, Your Honor.

 2              THE COURT:  You may step down, Ms. Pitts.

 3              (The witness stepped down.)

 4              THE COURT:  Okay.  Back to counsel for the defense.

 5    Now you have, I think, another witness?

 6              MR. JEWETT:  We do, Your Honor.

 7              I think, from a timing standpoint, between direct

 8    and cross, I don't know how long the cross would be, but the

 9    Court might be looking at another 35 to 60 minutes, and then

10    we also have some -- we have deposition designations that we

11    need to go through and objections we need to go through with

12    the Court as well.

13              Whatever the Court pleases, obviously.  We've

14    confirmed with the witness who is, I think, available to hang

15    out tonight, or can also come back in the morning.

16              THE COURT:  We will start again 10:00 tomorrow

17    morning.  The Court will be in recess until --

18              MS. RUST:  I'm sorry, Your Honor.

19              Just as far as the trial schedule, after we complete

20    those, we'll be resting, and then I'm not sure how long the

21    plaintiffs' rebuttal case might be, but I'm just trying to

22    get an idea that we might be presenting closing arguments on

23    Friday or if the Court would like to...

24              THE COURT:  Here is the Court's practice:

25              The Court doesn't usually have closing arguments
```

```
 1    from counsel.  What the Court has is you both file
 2    memorandums of proposed factual findings and conclusions of
 3    law.
 4            What the Court usually will do is direct the parties
 5    to file a supplemental memo of proposed facts, findings, and
 6    conclusions of law, and that substitutes for any closing
 7    argument that either counsel can make.
 8            And the Court will give you an opportunity to do
 9    that, but first, the Court is going to ask you to get
10    together and order the transcript.  Now, I do not know, I've
11    not conferred with my court reporter on how long it will take
12    to produce the transcript.
13            But after that transcript is produced, you will be
14    given a certain number of days to file your proposed findings
15    of fact -- supplemental, because you have already filed
16    something pretrial -- supplemental proposed findings of fact
17    and conclusions of law.
18            And the Court will then take your filings, and the
19    Court will try to seasonably issue an opinion and ruling in
20    the case.  And I say "seasonably" because the Court's docket
21    is a train wreck between here and Christmas, and I may be
22    sitting in here most of the time.
23            I hope I'm not.  I prefer to be there working on an
24    opinion than probably sitting in here every day, but the work
25    goes on.  Though you're in here, it keeps on rolling back
```

Carol L. Naughton, Official Court Reporter

**JA1111**

```
 1   there.

 2          So that's what the Court proposes so that you won't

 3   have to worry about having to fashion a closing argument.

 4   That is what the Court is going to be doing.

 5          So we'll recess until tomorrow morning at 10:00.

 6          (Proceedings adjourned at 5:09 p.m.)

 7

 8

 9                        CERTIFICATION

10

11      I certify that the foregoing is a correct transcript

12   from the record of proceedings in the above-entitled matter.

13

14

15          _____/s/_____

16                    Carol L. Naughton

17                    October 4, 2021

18

19

20

21

22

23

24

25
```

Carol L. Naughton, Official Court Reporter

**JA1112**

```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF VIRGINIA
 2                        Norfolk Division

 3   - - - - - - - - - - - - - - - - - -
                                       )
 4   MARTIN J. WALSH, SECRETARY OF     )
     LABOR, UNITED STATES              )
 5   DEPARTMENT OF LABOR,              )
                                       )
 6         Plaintiff,                  )
                                       )        CIVIL ACTION NO.
 7   v.                                )           2:18cv226
                                       )
 8   MEDICAL STAFFING OF AMERICA,      )
     LLC, etc., et al.,                )
 9                                     )
           Defendants.                 )
10   - - - - - - - - - - - - - - - - - -

11

12                   TRANSCRIPT OF PROCEEDINGS

13                  ** Bench Trial - Day 7 **

14                     Norfolk, Virginia

15                    September 9, 2021

16

17   BEFORE:  THE HONORABLE RAYMOND A. JACKSON
              United States District Judge
18

19   APPEARANCES:

20           UNITED STATES DEPARTMENT OF LABOR
             By:  Ryma N. Lewis
21                Chervonti Jones
                  Mohamed E. Seifeldein
22                Counsel for the Plaintiff

23           PIERCE McCOY, PLLC
             By:  Joshua L. Jewett
24                Julia A. Rust
                  Aaron D. Siegrist
25                Counsel for the Defendants
```

1060

```
 1                        I N D E X

 2
     DEFENDANTS'
 3   WITNESSES                                    PAGE

 4     JOHN BREDEHOFT
           Direct Examination By Mr. Jewett       1061
 5         Cross-Examination By Mr. Seifeldein    1083
           Redirect Examination By Mr. Jewett     1115
 6

 7

 8
                        E X H I B I T S
 9
     PLAINTIFF'S
10   NO.                                          PAGE

11     PX-103                                     1092
       PX-104         (For ID only)               1103
12

13   DEFENDANTS'
     NO.                                          PAGE
14
       DX-2                                       1123
15     DX-76                                      1127
       DX-77                                      1127
16

17

18

19

20

21

22

23

24

25
```

**JA1114**

```
                        ┌─────── J. Bredehoft - Direct ───────┐
```

 1              (Proceedings resumed at 10:02 a.m.)

 2              THE COURT:  Good morning, ladies and gentlemen.  We

 3    are ready to commence with the next witness from the

 4    defendants.

 5              MS. RUST:  Your Honor, the defendants call John

 6    Bredehoft.

 7              THE COURT:  All right.  Step forward to be sworn.

 8              MR. JEWETT:  Your Honor, within the stands with us

 9    is Mr. Pat O'Donnell from Mr. Bredehoft's law firm.

10              THE COURT:  Will he be testifying in this case?

11              MR. JEWETT:  He is not.  He is here attending with

12    Mr. Bredehoft.

13              THE COURT:  All right.  Thank you.

14              (Witness sworn.)

15              JOHN BREDEHOFT, called by the Defendants, having

16    been first duly sworn, was examined and testified as follows:

17                          DIRECT EXAMINATION

18    BY MR. JEWETT:

19    Q.  Good morning, Mr. Bredehoft.

20    A.  Good morning, Counsel.

21    Q.  Could you please state your name and spell your last name

22    for the court reporter.

23    A.  Of course.  My name is John Michael Bredehoft,

24    B-r-e-d-e-h-o-f-t.

25    Q.  Thank you.

—————————————————J. Bredehoft - Direct—————————————————

1          Are you familiar with Lisa Pitts?

2     A.  Yes, I am.

3     Q.  How is that?

4     A.  I and my firm represented her for a while in matters

5     against the U.S. Department of Labor.

6     Q.  Okay.  Before I get into that, I would like to ask you a

7     few background questions.

8     A.  Sure.

9     Q.  In what states are you licensed to practice law?

10    A.  I am admitted to practice in Virginia, the District of

11    Columbia, and the state of Maryland and a number of federal

12    courts.

13    Q.  Did you read for the Bar, or did you graduate from law

14    school?

15    A.  No.  I graduated from law school.

16    Q.  Your law school and your year of graduation?

17    A.  I graduated in 1983 cum laude from Harvard.

18    Q.  You graduated in 1983.

19         About how long have you been practicing law?

20    A.  I began practicing immediately thereafter, upon my

21    admission to the Bar.  I worked with the firm in a nonlegal

22    capacity until Bar results came out in December, in D.C., and

23    I've been practicing continuously ever since.

24    Q.  And have you practiced in the area of labor and

25    employment during the course of your career?

—————J. Bredehoft - Direct—————

1   A.  Yes, I have.

2   Q.  In how many of those years have you practiced in the area

3   of labor and employment law?

4   A.  It has formed the predominant part of my practice since

5   approximately 1984, although I did do labor and employment

6   matters before that.  I'm sorry, 1994.

7   Q.  My acoustics aren't very good right here.  Could I ask

8   you to get a little bit closer to the microphone.

9   A.  Is this better?

10  Q.  That's better.  Thank you.  I appreciate it.

11          Your current position?

12  A.  I'm an equity member of the law firm of Kaufman & Canoles

13  in Norfolk.

14  Q.  Back to your practice experience, does your practice

15  experience include representing and advising clients on the

16  Fair Labor Standards Act?

17  A.  Yes, it does.

18  Q.  Have you previously advised companies regarding the

19  classifications of workers as independent contractors under

20  the Fair Labor Standards Act?

21  A.  Yes, I have.

22  Q.  About how many?

23  A.  I would be unable even to estimate.  I believe it would

24  be at least scores.  I don't want to say it was hundreds, but

25  it might be.

─────────────────────J. Bredehoft - Direct─────────────────────

1  Q.  Okay.  And have you also represented medical registries

2  in matters adverse to the Department of Labor?

3  A.  I have represented medical staffing agencies in matters

4  adverse to the Department of Labor.  I have also represented

5  medical registries in matters where the Department of Labor

6  was not adverse.

7  Q.  You make a distinction between medical staffing companies

8  and medical registries.  What is that distinction?

9  A.  What I call "medical staffing companies" hire nurses and

10 then place the nurses, and in that case, the nurses are

11 employees of the staffing company.  Registries merely set up

12 a matching service to allow nursing homes, hospitals, other

13 facilities to be matched with nurses who are willing to work

14 there.

15 Q.  Okay.  And just following up on that, in your experience,

16 are medical registries -- the nurses who accept positions out

17 of medical registries, are they typically classified as

18 independent contractors?

19        MS. LEWIS:  Objection, Your Honor.  Calls for a

20 legal conclusion.

21        MR. JEWETT:  Your Honor, Rule 701 allows the witness

22 to --

23        THE COURT:  Well, are you calling him as an expert,

24 or are you calling him as a lawyer for the defendants?

25        MR. JEWETT:  Well, 701 does accept from Rule 702

Carol L. Naughton, Official Court Reporter

**JA1118**

```
                              ┌─J. Bredehoft - Direct─┐
```

 1  certain opinions as long as it's based on --

 2          THE COURT:  Sustained.

 3          MR. JEWETT:  Okay.

 4  BY MR. JEWETT:

 5  Q.  So let me back up.

 6          You said that you have experience representing and

 7  advising companies on independent contractor questions.

 8          Are you familiar with the economic realities test,

 9  sometimes referred to as the *Silk* test?

10  A.  Yes.

11  Q.  Going back to Ms. Pitts, how is it that you came to

12  represent Ms. Pitts?

13  A.  An attorney in our firm was asked by a judge in Virginia

14  Beach, I believe a state court judge, to see if we could

15  assist Ms. Pitts.  And that attorney called me.  I called

16  Ms. Pitts.  We met, and we accepted representation.

17  Q.  When did you start representing Ms. Pitts?

18  A.  I don't know the date the engagement letter was signed,

19  but I believe my first meeting with Ms. Pitts occurred about

20  June 15, 2018.

21  Q.  Okay.  Before I get to that first meeting, did you meet

22  with Ms. Pitts -- your first meeting was around June 15th.

23          Did you meet with Ms. Pitts on multiple occasions

24  following that meeting?

25  A.  I am not sure -- pardon me, Your Honor.  May I move the

─────J. Bredehoft - Direct─────

1    chair?  My wife gave me a new hip for Christmas, and it's not
2    fully unwrapped.
3         Thank you.
4         I know I met with Ms. Pitts in January of 2019,
5    probably in the third week.  I can't exclude the possibility
6    that we met physically other than those two times, but I
7    don't remember it.  It would have been in the context of
8    gathering documents to respond to discovery.
9    Q.  Okay.  Let's go back to the first meeting.
10        Was this first meeting in person or over the phone?
11   A.  It was in person.
12   Q.  Okay.  And about how long did it last?
13   A.  My best recollection is it lasted more than an hour,
14   perhaps up to two hours, but perhaps not.
15   Q.  Okay.  And did you obtain any information from Ms. Pitts
16   about her company during that meeting?
17   A.  Yes.  We met at the offices of her general corporate
18   lawyer, Wanda Cooper, who was also present, and Ms. Pitts
19   described for me the operations of Steadfast.  I asked
20   questions, and we talked back and forth about how it worked.
21   Q.  Okay.  And based on -- well, let me ask you this:
22        Can you give the Court some more details about the
23   operations that she provided to you -- strike that.
24        Can you give the Court more details about what she
25   informed you about the operations of her company during that

J. Bredehoft - Direct

1    first meeting?

2    A.  Sure.

3          During that first meeting, we discussed the

4    differences between a staffing agency and a registry.  We

5    discussed where her individual nurses would match themselves

6    with where -- I mean physically, geographically, in

7    facilities, how someone would get on the registry, what

8    Steadfast did for people who were on the registry, any

9    expenses that Steadfast assumed for people who were on the

10   registry, anything that Steadfast provided for people who

11   were on the registry, and restrictions or mandates regarding

12   how often they needed to work, whether they needed to call in

13   if they were going to be sick, whether they needed to call in

14   if they were taking vacation.

15         That is the general parameter of the things that we

16   discussed at the first meeting regarding the working

17   conditions.  We also discussed what documents existed, what

18   discovery would be possible.  And we did discuss the nature

19   of the economic realities test.

20   Q.  In that first meeting, did you walk through the factors

21   of the economic realities test with Ms. Pitts?

22   A.  Well, we didn't walk through the seven factors that are

23   set out in the Department of Labor's Publication 13.  We did

24   talk about a number of the factors that are in the

25   publication.  We didn't go through them seriatim.

1    Can I say this?  I'm not sure, Your Honor.

2    In my experience, the most important factor has been

3    a particular factor.

4    MS. LEWIS:  Your Honor, objection with respect to --

5    THE COURT:  I'm going to overrule it.  He can tell

6    us what he discussed with her.  He can certainly do that.

7    THE WITNESS:  Thank you, Your Honor.

8    I did tell Ms. Pitts that, in my experience, the

9    most important factor of the economic realities test, as set

10   out in Fact Sheet 13, was the fourth factor, which is the

11   degree of power or control that the entity exercises over the

12   performance of the job.

13   We also talked about scheduling, which is relevant

14   to one of the other factors, I think the second factor,

15   permanence.  And we talked about what the expenses were for a

16   nurse on the registry who assumed those -- the fact that

17   Steadfast did not assume any of those expenses, except for

18   paying for a background check, which goes to at least two of

19   the other factors on that list.

20   BY MR. JEWETT:

21   Q.  Okay.  Did you discuss classification of the nurses in

22   Steadfast's registry during this initial meeting with

23   Ms. Pitts?

24   THE COURT:  Mr. Jewett, you need to let him tell us

25   what he discussed.  The Court doesn't want you to lead him

─────────────J. Bredehoft - Direct─────────────

1  through some of the essential factors or issues.  Let him

2  tell us what he discussed.  In other words, that question, in

3  its own way, is a leading question and is something that the

4  Court is concerned about.  So you let him tell us what he's

5  discussed.  So far he's done a good job of telling you what

6  he discussed.

7        MR. JEWETT:  Your Honor, may I ask Mr. Bredehoft if

8  he discussed the classification question with Ms. Pitts in

9  this first meeting?

10        THE COURT:  All right.

11        MR. JEWETT:  Thank you.

12  BY MR. JEWETT:

13  Q.  Did you discuss the classification question with

14  Ms. Pitts during this initial meeting?

15  A.  Absolutely.  That's why I was there.

16  Q.  And what did you tell Ms. Pitts about that?

17  A.  Well, this was only on a brief acquaintance, but we

18  discussed at the first meeting, I remember, the fact that --

19  any of these facts are coming to me.  I don't know them of my

20  own -- but the fact that the individuals could call in or not

21  as their own decision and that there were no negative

22  consequences to any individual deciding not to call in or not

23  to work.

24        We discussed that individuals did not need to get

25  permission for taking a break, that some individuals -- I

Carol L. Naughton, Official Court Reporter

**JA1123**

J. Bredehoft - Direct

1    remember this clearly from both of our meetings -- some

2    individual nurses would call in once or twice, then not for a

3    couple of years, and then call in again after a couple of

4    years with no negative consequences.

5           We discussed that several nurses -- I don't know how

6    many, and I don't think I discussed that at the first

7    meeting -- that nurses would work for two or three weeks and

8    then take off for two or three weeks, or work a week on, a

9    week off, and again, there was no negative consequence to any

10   of the scheduling.

11          We discussed that there were no restrictions, I was

12   told at the first meeting, on any of the nurses working for a

13   facility outside the registry, not going through it, or from

14   working through another registry even at the same facility,

15   and that that was a not-uncommon occurrence, that nurses

16   would be registered with several different registries, work

17   through them at their disposal, at their own choice.

18          We discussed the fact that the nurses knew that,

19   that they had the ability to work at other facilities or

20   through other staffing agencies, because they frequently did

21   so, without negative consequence.

22          And at the first meeting --

23          THE COURT:  Well, I think you might want to stop

24   there and see where he goes next with his questions.

25          THE WITNESS:  Very good, Your Honor.

—————————J. Bredehoft - Direct—————————

1  BY MR. JEWETT:

2  Q.  Did you provide Ms. Pitts an opinion in that first

3  meeting about whether the nurses appeared to be classified

4  correctly?

5  A.  I did not provide a formal legal opinion, and she didn't

6  ask me if they were properly qualified.  I did, however, say

7  that it appeared to me that they were properly qualified

8  based on the information I had been provided so far.

9  Q.  You mentioned that you had a second meeting with Pitts, I

10  think, did you say January 2019?

11  A.  I believe it is the third week of January.

12  Q.  Before I get into what you advised Ms. Pitts in that

13  meeting, I want to ask you a few questions about what

14  information you had at your disposal heading into that

15  meeting.

16         Well, actually, let me ask you this:

17         That second meeting you had with Ms. Pitts, about

18  how long was it, and was it in person?

19  A.  It was in person.  It was several hours.  It was not only

20  to meet with her and discuss the case in general, but also to

21  prepare her for her deposition.

22         We also prepared one of her employees for her

23  deposition during those meetings, and I believe Ms. Pitts may

24  have sat in on that.  It was a number of hours, half a day,

25  perhaps more.

─────────────────── J. Bredehoft - Direct ───────────────────

1    Q.  So prior to that meeting, had you obtained any additional

2    information about Steadfast before that meeting?

3    A.  Yes.  We were engaging in responding to discovery, and we

4    had received, and I had reviewed, a large number of the

5    agreements between Steadfast and the nurses on the registry.

6    I have also received and, I believe, reviewed all of the

7    agreements between Steadfast and healthcare providers, such

8    as hospitals.  I believe I reviewed all of those.

9           We had also received a large number of invoices and

10   transactional documents.  I have to say, I reviewed what I

11   believed to be a representative sample of those, but I

12   certainly did not review all of the invoices personally.

13   Q.  You said that you reviewed a number of facility

14   contracts.  Are you aware that some of those facility

15   contracts included a buyout clause?

16   A.  Yes.

17   Q.  Did the fact that some of those contracts contained a

18   buyout clause -- did that give you concern about the

19   classification status of the nurses?

20   A.  No.

21   Q.  Why is that?

22   A.  Because -- well, for a number of reasons.  First, I had

23   previously seen agreements from other registries as well as

24   from staffing agencies that contained buyout clauses.

25   Second, it really doesn't go to any of the seven factors in

1    the Department of Labor Wage and Hour Fact Sheet 13, which is

2    the Department's analysis of how to interpret the economic

3    realities test.

4         The Department says, and I agree, the economic

5    realities test is really about whether this individual is

6    dependent for the entity on their livelihood.  In this

7    registry circumstance, the nurse is not, and the buyout

8    clause doesn't change that.

9    Q.  Okay.

10        MS. LEWIS:  Your Honor, I'm going to object to some

11   of this line of questioning.  If Mr. Bredehoft is here to

12   testify with respect to the legal advice and opinions he gave

13   Ms. Pitts, I think that that is perfectly permissible, but he

14   hasn't been presented as an expert, and much of this

15   commentary that he's providing is outside of the scope of

16   what information he gave her and based upon that information

17   she relied upon.

18        MR. JEWETT:  Your Honor --

19        THE COURT:  Wait a minute, before you say anything.

20        I heard what he said.  He can testify to what he

21   told her about the buyout clause, but all the analysis of why

22   he told her, the Court will sustain that.  I mean, he can

23   tell us what he told her.  He told her there's no problem

24   with the buyout clause, in his opinion, and other things.

25   But the Court doesn't need your analysis of the opinion of

---
J. Bredehoft - Direct
---

 1   whether that is, in fact, correct or not.  The Court will

 2   determine that itself.

 3          MR. JEWETT:  Of course, Your Honor.  If I can just

 4   respond with one brief comment.  We do have the burden of

 5   proof, of course.

 6          THE COURT:  I know you have the burden of proof.

 7          MR. JEWETT:  One of the categories is that we have

 8   to show that Mr. Bredehoft had a reasonable basis for giving

 9   the opinion, which is why we're getting into this "why"

10   question, the basis for his opinion.

11          MS. LEWIS:  Your Honor --

12          MR. JEWETT:  That's one of the two prongs for the

13   good-faith defense.

14          MS. LEWIS:  Right, Your Honor, but the reasonable

15   basis is not -- it's information that Ms. Pitts provided him

16   and that he relied upon in giving that advice.  This

17   additional commentary goes to -- as the Court noted, the

18   Court's purpose in here is to make that determination.

19          He testified with respect to his credentials.  We

20   know he's been an attorney who has practiced for a number of

21   years in this area.  Much of his commentary goes beyond that.

22   He testified that he was provided documents, he reviewed

23   that, and based upon that, "X is my opinion."

24          The Secretary maintains that that is appropriate,

25   but there's been -- more so, he's relying on additional

─────────────────────── J. Bredehoft - Direct ───────────────────────

 1    documents and information that haven't even been presented

 2    into evidence.

 3           THE COURT:  He provided us the basis for his opinion

 4    based upon the information she provided.  He said he reviewed

 5    the contract.  He found those buyout agreements to be proper,

 6    based on having seen them other places, but what I'm saying

 7    is I really do not need his legal analysis.

 8           MR. JEWETT:  Understood, Your Honor.  Thank you.

 9           THE COURT:  All right.  And I think, in terms of

10    your burden to show the reasonable basis, reasonable basis is

11    he said he reviewed the contract.  He's seen that before, so

12    he gave her advice.  Nothing wrong with the buyout

13    agreements.

14    BY MR. JEWETT:

15    Q.  Okay.  Mr. Bredehoft --

16    A.  Your Honor, may I clarify?

17           THE COURT:  Not unless he asks you a question.

18           THE WITNESS:  Very good, sir.

19    BY MR. JEWETT:

20    Q.  We were talking about the documents you reviewed, the

21    buyout clause.

22           Did Ms. Pitts, during that meeting, provide you any

23    additional information about the scheduling for nurses?

24    A.  The answer to that is yes.  We talked -- it was not new

25    information, by and large, but we confirmed that the nurses

─────J. Bredehoft - Direct─────

1  themselves had full autonomy as to whether or not they would

2  be scheduled, that there were no negative consequences --

3          (Brief interruption.)

4          THE WITNESS:  Thank you very much.  I'm COVID

5  negative, but I am allergic to everything.  Pardon me.

6          We discussed that there would be no negative

7  consequences to any of the nurses for not calling.  We

8  discussed a particular circumstance in which a nurse would go

9  to -- sign up for and go to a facility and then leave sick

10 and whether there would be any negative consequences to the

11 nurse for that, and I was told no.

12         We also discussed a particular instance -- and these

13 were not given instances, these were examples -- where a

14 nurse would say, yes, they were going to the facility and

15 they did not go, and I was told that, in that case, Steadfast

16 would merely attempt to match someone else on the registry,

17 and there were no negative consequences to the nurse who

18 didn't show, at least not from Steadfast.

19         And I think that is all the additional information

20 that I was provided regarding scheduling during the second

21 meeting.

22 Q.  I think you touched on this briefly when you were

23 answering my question, but did you discuss with Ms. Pitts the

24 nature in which nurses would take time off from the registry,

25 such as a vacation or --

———————J. Bredehoft - Direct———————

1    A.   Oh, yes.  We discussed that at the first meeting and at

2    the second meeting.  The discussion at the second meeting was

3    consistent with the discussion of the first meeting.  It

4    wasn't new information.  It was just that a nurse would take

5    a vacation by not calling in.  There was no need to get

6    permission from Steadfast or even to apprise Steadfast that

7    the nurse would not be calling in; same thing for sick days.

8         That information was provided to me by Ms. Pitts and

9    also by Christine Kim at the second meeting, who was

10   essentially the office manager, but that was consistent with

11   what I had heard at the first meeting.  It wasn't new

12   information.

13   Q.   Did you discuss with Ms. Pitts how the nurses were

14   actually paid?

15   A.   Yes, I did.

16   Q.   So based on the information you discussed with Ms. Pitts

17   at this second meeting, did you evaluate the economic

18   realities of the situation at the second meeting?

19   A.   Yes, I did.  There was a substantial additional

20   information that we discussed at the second meeting that also

21   came into my evaluation; but, yes, we discussed where the

22   economic realities test, as interpreted through the

23   Department of Labor Fact Sheet 13, would come out.

24   Q.   Did Ms. Pitts ask you during that meeting what factors

25   you thought were important?

J. Bredehoft - Direct

1   A.   I believe I stated the factors which I thought were most

2   important.  I do not believe she asked me the question "Which

3   factors do you think are most important?"

4   Q.   Did you convey to Ms. Pitts at the second meeting your

5   assessment of the control factor?  You mentioned that

6   earlier, the control factor.

7   A.   Yes, I did.

8           MS. LEWIS:  Your Honor, I'm going to, again, object

9   to this.  He's already answered and provided his opinion

10  about what is most important, but that is not what is

11  controlling here; it's the law and the Court's determination.

12          Moreover, the law is very clear.  No one factor is

13  dispositive, and we keep coming back to the same line of

14  questioning seeking to elicit a legal analysis or conclusion

15  with respect to the same.

16          MR. JEWETT:  I asked Mr. Bredehoft what he conveyed

17  to her in the first meeting, and I'm asking what he conveyed

18  to her in the second meeting.  I think what he advised her in

19  the meetings is important.

20          THE COURT:  Well, I think what you're doing is

21  you're leading him into the potential elements or issues.

22  That's what you're doing.  He said he discussed the economic

23  realities test with her, and he went through a series when he

24  first started testifying.  I think he laid out what he

25  considered to be most important.  He's done that.

Carol L. Naughton, Official Court Reporter

**JA1132**

————J. Bredehoft - Direct————

1      So your question, in its own way, leads him through
2  some things he has not raised.  But let's put it this way:
3      This is not a jury trial.  This is a bench trial,
4  and the Court can understand exactly what is happening with
5  respect to your questions, whether you are, in fact, leading
6  him or not.  So I'm going to let you ask him that question,
7  but just be aware about the way you phrase the question.  I
8  think he's been very clear about what he discussed on each
9  occasion.
10      MR. JEWETT:  Thank you, Your Honor.
11  BY MR. JEWETT:
12  Q.  So, Mr. Bredehoft, in the second meeting with Ms. Pitts,
13  did you convey to her your assessment based on the
14  information she provided you of the control factor?
15  A.  Yes, I did.
16  Q.  And what did you tell her?
17  A.  I told her -- and this is something I actually said to
18  her, Your Honor.  I hope I'm not transgressing -- but that in
19  my reading of the law, the control factor was the most
20  important factor.  And, here, Steadfast exercised no control
21  over the manner in which the nurses perform their tasks.
22      It did not have the ability to discipline them.  It
23  did not have the ability to initiate any type of progressive
24  proceeding against them.  It did not exert a quality control
25  function over them.  It did not review -- and this is all

Carol L. Naughton, Official Court Reporter

**JA1133**

J. Bredehoft - Direct

1   what I said to her -- it did not review their work to see if

2   it was acceptable for nursing or if improvements could be

3   made, and that all of that combined with the scheduling

4   issues and, in particular, the fact that they could work for

5   other staffing companies made it seem to me that the control

6   factor here -- and I did use this term -- would be

7   "dispositive."

8   Q.  Did you discuss with Ms. Pitts during that second meeting

9   the degree of skill required of the nurses?

10  A.  We discussed whether there was anything extraordinary or

11  different about -- I asked anything extraordinary or

12  different about the degree of skill required, and I believe

13  the response was, no, because once they have the licensure

14  and have met the requirements of the Board of Nursing,

15  Steadfast doesn't delve further into that.

16  Q.  Okay.  Did you discuss with Ms. Pitts your assessment of

17  the permanence factor in that second meeting?

18  A.  Yes, I did.

19  Q.  What did you tell her?

20  A.  I told her that I thought the fact that certain

21  individuals on the registry could call in and then not call

22  in for two years and still be matched on the registry of the

23  second call -in without any negative implication indicated

24  that there -- at least with respect to the structure of the

25  organization, there was not the degree of permanence that is

```
                          ┌J. Bredehoft - Direct┐
 1   usually found in employment relationships.
 2   Q.  I just want to ask you about two more of the factors and
 3   whether you discussed those with Ms. Pitts.
 4           You are familiar with a profit-and-loss factor?
 5   A.  Yes, I am.
 6   Q.  Did you discuss that with her?
 7   A.  Only in passing, and it didn't perform -- it didn't
 8   affect my analysis much.  We discussed that the company paid
 9   virtually none of the expenses and that any expenses incurred
10   in getting ready to work, such as licensure itself and the
11   tuberculosis test, which is required, I believe by the
12   Department of Nursing in Virginia, and the CPR certification,
13   which, I believe, is required by Nursing, that was all on the
14   dime of the nurse who wants to be on the registry.
15           So while I didn't think -- I told her I didn't think
16   that was an important factor, I thought that, to the extent
17   it existed, it was probably in her favor.
18   Q.  I think the last question on the factors and whether you
19   talked to Ms. Pitts about it in the second meeting is:
20           Are you familiar with the factor of whether the work
21   is integral to the business?
22   A.  Yes.
23   Q.  Did you discuss that factor with Ms. Pitts during that
24   meeting?
25   A.  Yes, we did.  And although I didn't use the term
```

———————————J. Bredehoft - Direct———————————

1    "integral," we actually discussed it during the first meeting

2    as well.

3           There are individuals whose work is integral to the

4    business of the registry.  Those are the call-in center

5    people, the office manager.  They are all employees because

6    their work is integral.

7           But the staffing agency in other cases and the

8    registry in this case does not nurse.  The work that is being

9    performed is nursing.  And the individuals who are on the

10   registry are nursing.  I mean, that's not the business of

11   this company.

12   Q.  All right.  Based on the information Ms. Pitts provided

13   you, did you provide an assessment during that meeting about

14   whether, in your judgment, the workers should be classified

15   as independent contractors?

16   A.  Yes, I did.

17   Q.  And what did you inform Ms. Pitts?

18   A.  I informed her to a very high degree of confidence that,

19   in my view, they were independent contractors, and I told her

20   that, in my view, she had a very good or excellent chance of

21   prevailing on the issue, if it should be challenged all the

22   way to trial.  And I remember using the word "excellent"

23   chance.

24           MR. JEWETT:  No further questions.  Thank you.  And,

25   of course, the Department may have some questions for you.

Carol L. Naughton, Official Court Reporter

**JA1136**

```
                        ┌J. Bredehoft - Cross┐
```

 1          THE COURT:  Cross-examination.

 2          MR. SEIFELDEIN:  Thank you, Your Honor.  Good

 3    morning, Your Honor.

 4                    CROSS-EXAMINATION

 5    BY MR. SEIFELDEIN:

 6    Q.  Good morning, Mr. Bredehoft.  My name is Mohamed

 7    Seifeldein.  I'm an attorney with the Department of Labor.  I

 8    have a few questions for you here based on the discussion

 9    that you had with defendants' counsel.  Let's just start from

10    the end here.

11          You did not advise defendants that they could

12    continue to classify the nurses as independent contractors,

13    correct?

14    A.  I was not asked to give that advice; that's correct.

15    Q.  So your advice was exclusively to the probability of

16    prevailing in this case.

17    A.  If I remember my exact words, the use of the word

18    "excellent" chance was --

19    Q.  It was a yes-or-no question.

20          THE COURT:  Well, hold on a second here.

21          The Court's procedure here is the witness may answer

22    "yes" or "no" and explain his or her reason for saying "yes"

23    or "no."

24          So if you can answer it "yes" or "no," you can, and

25    then you can give your opinion, your statement.

---
J. Bredehoft - Cross
---

```
 1          THE WITNESS:  I'm not sure I can answer that "yes"

 2    or "no," although I can say that the statement where I said

 3    there was an excellent chance of prevailing certainly related

 4    to chances of prevailing in this proceeding.

 5    BY MR. SEIFELDEIN:

 6    Q.  I'll come back to that in a second.

 7    A.  Sure.

 8    Q.  So you began representing Ms. Pitts and Steadfast in June

 9    of 2018?

10    A.  I believe that's correct.

11    Q.  And your representation ended on or about February 2019?

12    A.  Yes, I believe that is correct.

13    Q.  And your scope of representation was limited to defending

14    this lawsuit, correct?

15    A.  Yes, that's correct.

16    Q.  All right.  The probability of winning the lawsuit?

17          The scope of the representation was limited to

18    defending the lawsuit that the Department of Labor had

19    brought against defendants, correct?

20    A.  Yes.  I just said that.

21    Q.  Let's have you look at -- it's now going to be PX-103.

22          MR. SEIFELDEIN:  Ms. Lewis, it's the e-mail between

23    Mr. Bredehoft and the defendants' counsel.

24    BY MR. SEIFELDEIN:

25    Q.  And if we scroll to the bottom of that e-mail, you
```

——————J. Bredehoft - Cross——————

1   received an e-mail from defendants' counsel asking to speak

2   with you regarding the advice you gave to defendants,

3   correct?

4           MS. RUST:  Sorry, our screen is not on.

5           THE WITNESS:  My screen has just come on.

6           (Pause in the proceedings.)

7   BY MR. SEIFELDEIN:

8   Q.  And let's just begin by identifying the e-mail, who it

9   came from and to who, for the record, and then we'll get into

10  the vital part.

11          This is an e-mail that you received from Mr. Josh

12  Jewett, counsel for Steadfast and Lisa Pitts, on or about

13  January 11, 2020, and that's your e-mail, correct?

14  A.  That's my correct e-mail address, yes.

15  Q.  When you received it from defendants' counsel?

16  A.  Since 2006, that has been my correct e-mail address.

17  Q.  The question was:

18          This is the e-mail you received from defendants'

19  counsel on January 11, 2020, correct?

20  A.  Yes.  I said that.

21  Q.  Okay.  Thank you.

22          Now, defendants' counsel asked you -- I'm sorry.

23          This is defendants' counsel asking to speak with you

24  about the advice you rendered to the defendants, correct?

25  A.  Yes.

————J. Bredehoft - Cross————

1   Q.  All right.

2          MR. SEIFELDEIN:  And let's go up to -- higher, the

3   next e-mail.

4   BY MR. SEIFELDEIN:

5   Q.  And this is your response, correct?

6          Let's identify it for the record, the date.

7          So that's your e-mail address again.  You responded

8   on January 13, 2020, at 8:49 a.m., to defendants' counsel

9   Josh Jewett saying, of course, you're willing to discuss it

10  with them, "although we were not retained to provide that

11  advice."

12         You recognize this document, correct?

13  A.  I'm sorry.  Did you --

14  Q.  Do you recognize this document as your e-mail?

15  A.  Sure.

16  Q.  Okay.  And the advice that you're talking about there is

17  the classification to Ms. Pitts and defendants about their

18  contractors, correct?

19  A.  That's exactly correct.  We were not retained to provide

20  that advice.

21  Q.  Okay.

22         MR. SEIFELDEIN:  Keep going to the highlighted part.

23  BY MR. SEIFELDEIN:

24  Q.  And this is an e-mail from you to one of your attorneys

25  in the law firm, correct?

J. Bredehoft - Cross

1  A.  That's correct.  Sharon Reyes is the associate who was

2  working with me on the matter.

3  Q.  This is an e-mail from February 20, 2020, correct?

4  A.  That's correct.

5  Q.  And, here, you are checking with one of your associates

6  about the advice you have given, and you asked them to review

7  the documents, although you were almost certain that you had

8  not provided advice regarding classification, correct?

9  A.  I don't see anything there on reviewing the documents.

10  I'm sorry.

11  Q.  Let's read it.

12       She's relying on advice of counsel -- defendants --

13  saying that "We" -- "we," that's your firm -- "told her that

14  they -- the way she was doing it was correct, the

15  classifications.  I do not remember giving her advice --

16  giving her this advice, although I do remember telling her on

17  many occasions that she had a much stronger case than most I

18  have seen."

19  A.  And that I believed her individuals were, in fact,

20  independent contractors.  This may be a distinction without a

21  difference.  Yes, I wrote that.  It's correct.

22  Q.  So the question was:

23       You didn't give her advice on the classification,

24  and that's you saying that to your counsel and saying it to

25  her counsel as well.

Carol L. Naughton, Official Court Reporter

**JA1141**

```
                        J. Bredehoft - Cross
```

 1          MR. JEWETT:  Objection.  He's mischaracterizing

 2   Mr. Bredehoft's testimony.

 3          THE COURT:  Objection overruled.  We're talking

 4   about the e-mail here.  Now, let's just stick with the e-mail

 5   and make it clear what you're talking about, Mr. Seifeldein.

 6   BY MR. SEIFELDEIN:

 7   Q.  I am talking about the e-mail, sir.

 8   A.  Sure.  I wrote it.  It is correct.  We didn't give

 9   advice, but I did tell her on many occasions that she had a

10   much stronger case and that I believed her individuals were,

11   in fact, independent contractors.  I told her that.

12   Q.  Yes, you told her that.

13   A.  If you call that advice or not advice or something that

14   comes up in the defense of a case, that's what I said.

15   Q.  Well, that's for the Court to decide.

16          I'm just asking you about what you said and the

17   distinctions that you made.

18          THE COURT:  I think the e-mail is clear to the Court

19   what has been said.

20          MR. SEIFELDEIN:  Absolutely, Your Honor.

21   BY MR. SEIFELDEIN:

22   Q.  So this is the e-mail that your associate sent to you.

23          Could you just read it and identify who the

24   associate is.

25   A.  Sure.  Ms. Reyes at this time continued to be the

Carol L. Naughton, Official Court Reporter

**JA1142**

---
J. Bredehoft - Cross
---

1   associate who had been assigned to the case.  She's still an

2   associate with our firm.  That is an e-mail that I received

3   from her on February 20th, and I remember reading it, yes.

4   Q.  Okay.  And this, again, goes to the same topic.

5       Your associate is saying "I did not advise her that

6   they were properly classified.  I would only have explained

7   the argument that we were planning to make for summary

8   judgment."  Correct?

9   A.  That's exactly correct, and that's consistent with my

10  recollection today.

11  Q.  Okay.  So let's go back to the June 15, 2018, meeting

12  that you had at Ms. Cooper's office.

13      During this meeting, you mainly obtained information

14  from Ms. Pitts, correct?

15  A.  That's correct.  Ms. Cooper did chime in on a number of

16  cases, but it was mostly Ms. Pitts.

17      I'm sorry.  If you're rolling your eyes at me, I

18  will stop doing whatever does that.

19  Q.  At the first meeting, sir, you mainly discussed the

20  control factors, such as discipline, schedule control, and

21  the nurses holding multiple jobs, correct?

22  A.  That formed the majority of the conversation, yes, in the

23  context of discussing -- yes, in the context of discussing

24  what the overall test was, yes.

25  Q.  You also discussed the nurses being registered or working

---
J. Bredehoft - Cross
---

1    for another agency and you discussed the control factor,

2    right?

3    A.  I don't understand your question.  We did discuss what

4    you say we discussed.  I don't know what the second half of

5    the question means.

6    Q.  Let me clarify, Mr. Bredehoft.

7    A.  Sure.

8    Q.  And I appreciate you saying that you don't understand the

9    question.  So if you don't understand the question, just for

10   the record, let me know before you provide an answer, and

11   then I'll restate the question.

12          Does that make sense?

13   A.  Okay.

14   Q.  Thank you.

15          During the first meeting in June 2018, you discussed

16   with Ms. Pitts that her nurses could work at another job,

17   correct?

18   A.  Yes.

19   Q.  And you discussed that this is part of the control

20   factor, correct?

21   A.  I don't understand the question, and the reason is --

22   Q.  Okay --

23   A.  -- there's no such thing as a control factor.

24          THE COURT:  The Court understands the question.  In

25   the last series of questions to you from her counsel, he

Carol L. Naughton, Official Court Reporter

**JA1144**

---

————J. Bredehoft - Cross————

1   asked you about the control factor, and you gave testimony

2   about the ability of the nurses to work for other people and

3   that it would not have a negative consequence.

4          So the Court understands what he's asking you.  Did

5   you discuss it or didn't discuss the control factor in the

6   first meeting?

7          THE WITNESS:  We discussed factor 4, which is the

8   degree of control, absolutely.

9          THE COURT:  All right.  Let's move on.

10         MR. SEIFELDEIN:  Your Honor, just some housekeeping.

11  I'll move to admit PX-103, the e-mail.

12         THE COURT:  You don't admit those.  You admit --

13  hold on.

14         For what purpose did you do that?  No, it wasn't to

15  refresh recollection.  So they are admissible.

16         Any objection to the e-mail?

17         MR. JEWETT:  Your Honor, these e-mails were not

18  provided as part of the Final Pretrial Order.  Consistent

19  with the Court's prior ruling, we object to their admission.

20         MR. SEIFELDEIN:  This is rebuttal, and these

21  documents actually were provided by Mr. Bredehoft in response

22  to a subpoena, which I believe that defendants --

23         MR. JEWETT:  It wasn't impeachment because

24  Mr. Bredehoft agreed with what the e-mail said.

25         THE COURT:  Objection is overruled.  The document is

---

———————————J. Bredehoft - Cross———————————

 1  admitted.

 2          (Plaintiff's Exhibit PX-103 received in evidence.)

 3          THE COURT:  The Court has a totally different

 4  approach on a situation where you are doing it by bench.  The

 5  Court understands the Rules of Evidence, so a lot of things

 6  you counsel have been arguing about is really a waste of your

 7  time, because the Court understands what is admissible and

 8  what is not admissible, what weight to give to it, what

 9  weight to not give to it.  So let's move past the e-mail and

10  get to the core issue that you might want to raise.

11          MR. SEIFELDEIN:  Thank you, Your Honor.

12  BY MR. SEIFELDEIN:

13  Q.  Mr. Bredehoft, when you met with Ms. Pitts, she

14  demonstrated her knowledge of the Fair Labor Standards Act

15  requirement of overtime and independent contractors, correct?

16  A.  Yes, if we're still talking about the first meeting.

17  Q.  She demonstrated and expressed an understanding that an

18  employee is one who is economically dependent on the

19  employer, correct?

20          Let me give you an example.  She gave you a case

21  where the employees working in her office are classified as

22  employees and paid overtime, if applicable, correct?

23  A.  Yes, we discussed that.

24  Q.  Okay.  She expressed her understanding that Steadfast is

25  responsible to comply with the Fair Labor Standards Act,

Carol L. Naughton, Official Court Reporter

**JA1146**

```
                        ─J. Bredehoft - Cross─
 1   correct, regarding the office employees?

 2   A.  Of course.

 3   Q.  Ms. Pitts explained that she was fully aware of her

 4   obligations to pay overtime for the individuals who were

 5   employees, correct?

 6   A.  Yes.

 7   Q.  She also expressed her understanding that employers are

 8   required to pay employees time and a half for hours worked

 9   over 40 in a workweek, correct?

10   A.  I don't recall discussing the one and a half times, but

11   we did discuss, quote, overtime, unquote.

12   Q.  Let's go to the second meeting that you had with

13   Ms. Pitts in January of 2019.

14          And this was a meeting in person, correct?

15   A.  Yes.

16   Q.  In this meeting, you rendered advice to Ms. Pitts --

17   actually, Ms. Kim was at this meeting as well, correct?

18   A.  I'm sorry.

19   Q.  Let me strike that.

20          In the meeting, you rendered advice to Ms. Pitts

21   after you spoke with Ms. Pitts and Ms. Kim and after you

22   reviewed some documents, correct?

23   A.  I told her what I testified I told her.  If that's

24   advice, that's advice.

25   Q.  At the second meeting, sir, you met with Ms. Pitts,
```

———————J. Bredehoft - Cross———————

1   correct?

2   A.  Yes.

3   Q.  And prior to this meeting, you received information from

4   Ms. Pitts, Ms. Kim, and then some documents, correct?

5   A.  I don't believe I received any new documents at that

6   meeting.  I believe I brought a document to the meeting.  But

7   the answer to the rest of your question is yes.

8   Q.  Prior to the meeting, prior to you rendering advice to

9   Ms. Pitts, you had spoken with Ms. Pitts and Ms. Kim,

10  correct?

11  A.  I don't recall my conversations, if any, with Ms. Kim

12  prior to that meeting.

13  Q.  Okay.

14  A.  Otherwise, the answer to your question is yes.

15  Q.  And you received some documents sometime between

16  January -- excuse me -- June 2018 and the second meeting in

17  January of 2019, correct?

18  A.  Yes.

19  Q.  And you reviewed those documents?

20  A.  As I discussed, I didn't review all of them, but I did

21  review many of them.

22  Q.  And the advice that you gave to defendants at that second

23  January 2019 meeting was based on information provided to you

24  by Ms. Pitts and Ms. Kim, correct?

25  A.  And the documents, yes, correct.

Carol L. Naughton, Official Court Reporter

**JA1148**

```
                      ┌J. Bredehoft - Cross┐
```

 1   Q.  You never conducted an independent factfinding to verify

 2   whether the information Ms. Pitts and Ms. Kim gave you were

 3   the actual practices of the business?

 4           MR. JEWETT:  Objection.  The question is vague.

 5           THE COURT:  Objection overruled.  The question is

 6   clear.

 7           THE WITNESS:  The answer is no, Your Honor.

 8           THE COURT:  Okay.  He answered it "no."

 9   BY MR. SEIFELDEIN:

10   Q.  You did not speak to any of the nurses, correct?

11   A.  No -- I mean, sorry, yes, correct, I did not speak to any

12   of the nurses.

13   Q.  And you did not speak to Steadfast client facilities,

14   correct?

15   A.  Yes, that is correct.

16   Q.  You did not speak to any office employees, schedulers at

17   Steadfast, correct?

18   A.  I had no substantive discussions.  I may have said "hi,"

19   but no substantive discussions, no.

20   Q.  Well, excluding Ms. Kim, who was the manager, correct,

21   you had no discussion with any of the office employees?

22   A.  No substantive discussions, that's correct.

23   Q.  So you've had conversations with office employees?

24   A.  No.  I may have said "hi" to them.  That's what I said.

25   But I've had no substantive discussions with any of those

————J. Bredehoft - Cross————

1   office employees.

2   Q.  So you went to her office?

3   A.  Yes.  That's where the second meeting took place.

4   Q.  All right.  And the purpose of your document review was

5   to determine if Steadfast was in compliance with the Fair

6   Labor Standards Act?

7   A.  That plus to comply with the discovery requests that had

8   been served by the Department of Labor.

9   Q.  And you reviewed information that Steadfast provided to

10  you, some of it, as you said?

11  A.  I reviewed, I believe, all of the nurse contracts, all of

12  the contracts with the facilities, and what I thought to be

13  a, and still think to be, representative sample of the

14  invoices, but not all of them.

15  Q.  Sure.

16          Based on your review of the information provided to

17  you, you provided defendants with advice as to how to comply

18  with the Fair Labor Standards Act with respect to the nurses

19  in January of 2019, correct?

20  A.  I believe the advice -- no, that's incorrect.  The advice

21  that I --

22  Q.  You answered the question.

23          THE COURT:  Let him finish.  I don't think he

24  finished his answer.

25          MR. SEIFELDEIN:  Sure.

```
                          J. Bredehoft - Cross
```

 1          THE WITNESS:  Thank you, Your Honor.

 2          I did not provide them with advice going forward on

 3   what to do at all.  I had provided my view that what they

 4   were doing was in compliance with the Fair Labor Standards

 5   Act to a very high degree of certainty.  And I said those

 6   words.

 7   BY MR. SEIFELDEIN:

 8   Q.  You provided two pieces of advice to defendants during

 9   that meeting, correct?

10   A.  Two prophylactic pieces of advice, yes, I did.

11   Q.  And during the course of your representation,

12   Mr. Bredehoft, you provided -- well, the first one was a

13   review -- you reviewed their website, correct?

14   A.  Yes, I did.

15   Q.  Okay.  And in reviewing the website, Steadfast sought

16   input from you regarding a document entitled "Employment

17   Application" that the nurses used to apply to work for

18   Steadfast, correct?

19   A.  No, that's not correct.  They did not seek the advice.  I

20   proffered it.

21   Q.  Okay.  You proffered advice regarding a document entitled

22   "Employment Application," correct?

23   A.  That's correct.  And I sought additional information

24   about its use.

25   Q.  Okay.  And you had concerns about this, quote, Employment

---
J. Bredehoft - Cross
---

1   Application Form, correct?

2   A.  No, "concerns" is not the correct word.

3   Q.  You told Steadfast and Ms. Pitts that they should not use

4   a form labeled as "Employment Application," correct?

5   A.  That's correct, because they weren't hiring employees.

6   Q.  Because it shows an employee-employer relationship,

7   correct?

8   A.  Absolutely not.  And as the Court knows, the label -- and

9   I told Ms. Pitts this during the meeting.

10          The label on an agreement has virtually no meaning

11  in this context.  You can call somebody an "independent

12  contractor" 30 times from Sunday.  It doesn't mean a darned

13  thing.  But I told her that since she was not hiring

14  employees, she shouldn't use something that says "Employment

15  Application."

16  Q.  If it didn't matter, why did you ask her to not use it?

17  A.  Because it was wrong.

18  Q.  Wrong in what sense?

19  A.  She was not hiring employees.

20  Q.  So she was not hiring employees, it was wrong, and you

21  asked her to remove it?

22  A.  That's correct.

23  Q.  But you had no concern about that?

24          THE COURT:  Well, I think we're going around in

25  circles here.  I think that question has been answered.

Carol L. Naughton, Official Court Reporter

**JA1152**

————J. Bredehoft - Cross————

1        MR. SEIFELDEIN:  I understand, Your Honor.  Thank

2   you.

3   BY MR. SEIFELDEIN:

4   Q.  And you did not follow up with defendants to see, in

5   fact, if they had stopped using the Employment Application

6   Form, correct?

7   A.  Yes, it is correct; I did not follow up.

8   Q.  So Steadfast used this Employment Application from at

9   least 2015 through 2019, as far as you know, when your

10  representation ended -- February 2019, to be exact?

11  A.  There -- no, that's not correct.

12  Q.  Okay.  You have no knowledge that they stopped using the

13  application after February 2019?

14  A.  I have no knowledge relating to that.

15  Q.  Okay.  All right.

16       So you discussed this with counsel, and one of the

17  documents that you reviewed and just talked about are the

18  Independent Contractor Agreements, correct?

19  A.  I'm sorry.  I don't understand what your question means

20  when I discussed it with counsel.

21  Q.  Well, you reviewed a document that Steadfast gave you

22  that's been labeled by Steadfast as Independent Contractor

23  Agreement?

24  A.  I reviewed many of them.  They were not all the same.

25  Q.  Okay.  But you reviewed some of them?

—————————————————J. Bredehoft - Cross————————————————

```
 1  A.  I reviewed each that I was given.

 2  Q.  Okay.  And this is what Steadfast required the nurses to

 3  sign, correct, the Independent Contractor Agreement?

 4  A.  Every one that I read -- yes, to the best of my

 5  knowledge, they were all signed by nurses.  It was not a

 6  form.

 7  Q.  And when you reviewed the Contractor Agreement, did you

 8  proffer or express some concerns about a clause in the

 9  Independent Contractor Agreement -- actually, let me rephrase

10  that.  Strike that.

11          When you reviewed the contract, you proffered or

12  expressed some concerns about a clause in the contract,

13  correct?

14  A.  It was a clause present, yes, in a number but not all of

15  the contracts.

16  Q.  And this clause has been referred to as a "covenant not

17  to compete," correct?

18  A.  Yes, I understand what you mean by that; and, yes, it

19  was.

20  Q.  And you informed defendants, Ms. Pitts and Steadfast,

21  that the clause was inappropriate because, quote, it was

22  inconsistent with their classifications as independent

23  contractors, correct?

24  A.  I first informed them that it was inconsistent with their

25  practices as described to me, and then I, yes, did say it
```

Carol L. Naughton, Official Court Reporter

**JA1154**

1   would, in the context of their employment, be inconsistent

2   with the independent contractor status.

3   Q.  So you determined that this restrictive covenant or

4   covenant not to compete was "inappropriate" -- your word --

5   because it demonstrates an element of control, correct?

6   A.  I think it may go more to permanence than control, but it

7   does go to control.  In any event, I think in the context of

8   the registry, it is inappropriate and shouldn't be there.

9   Q.  All right.  So this element of control or permanency that

10   you're talking about is inconsistent with the nurses being

11   classified as independent contractors, correct?

12   A.  If any of the nurses obeyed it and if Steadfast ever

13   enforced it, yes, it would have been, in this context,

14   inconsistent with my notion that they were independent

15   contractors.

16          MR. SEIFELDEIN:  Your Honor, I move to strike that.

17   The witness didn't answer the question, and he answered with

18   a hypothetical.  I believe the Court instructed the witness

19   to say "yes" or "no" and then provide an explanation.

20          THE COURT:  Well, I think the Court understood the

21   response, and I think it was responsive.  Even though he

22   didn't follow the Court's instructions to answer "yes" or

23   "no," I think it was responsive.  At least the Court

24   interpreted it as being inconsistent with being an

25   independent contractor.  That's the way the Court interpreted

J. Bredehoft - Cross

1    it.  So let's just move on.

2           MR. SEIFELDEIN:  Thank you, Your Honor.

3    BY MR. SEIFELDEIN:

4    Q.  And you instructed Ms. Pitts and Steadfast to remove the

5    language from the Independent Contractor Agreement, correct?

6    A.  Yes.

7    Q.  You also told Steadfast and defendant Ms. Pitts to make

8    sure that the covenant-not-to-compete clause is not in any of

9    the current agreements, correct?

10   A.  Yes.

11   Q.  And you did not follow up to see whether they had, in

12   fact, removed that?

13   A.  No, I did not.

14   Q.  And that's because your representation ended in

15   February 2019?

16   A.  I don't remember the date, but that's about the time.

17   Q.  Okay.  And this advice was in January of 2019, correct?

18   A.  That's correct.

19   Q.  So you had, maybe, a month that you did not follow up

20   with her?

21   A.  No.  I didn't review her agreements that were generated

22   in that month, no.

23   Q.  And you were not retained, Mr. Bredehoft, to determine

24   the classification of the workers as employees or independent

25   contractors, correct?

———————J. Bredehoft - Cross———————

 1   A.  That's correct.  I was retained to defend the lawsuit.

 2          THE COURT:  I think that's been asked and answered.

 3          MR. SEIFELDEIN:  Apologize, Your Honor.

 4          THE COURT:  Okay.

 5   BY MR. SEIFELDEIN:

 6   Q.  In fact, defendants never asked you if the workers can

 7   continue to be classified as independent contractors,

 8   correct?

 9   A.  No, not in those words.

10   Q.  Well, let's look at your exact words in the transcript.

11          THE COURT:  What exhibit number is that?

12          MR. SEIFELDEIN:  This exhibit has not been marked

13   yet.  So it will be PX-104, Your Honor, the deposition of

14   Mr. Bredehoft.

15          THE COURT:  PX-104 for identification.

16          (Plaintiff's Exhibit PX-104 marked for

17   identification purposes only.)

18   BY MR. SEIFELDEIN:

19   Q.  Do you recall being deposed on March 13th, 2020, by the

20   Department of Labor?

21   A.  Yes, I do.

22   Q.  And you were under oath during that deposition?

23   A.  Yes, I was.

24   Q.  All right.  Those are your words, correct, sir?

25          THE COURT:  Wait a minute, now refer him to the line

—————J. Bredehoft - Cross—————

1  and the question.

2  BY MR. SEIFELDEIN:

3  Q.  Mr. Bredehoft, I'm referring to the highlighted portion

4  of the deposition beginning with line 12, ending with

5  line 20.

6  A.  Yes, those are my words.  Those are my answers, and that

7  is correct and consistent with what I just testified to.

8         THE COURT:  For the record, you should read the

9  question and then let him read the answer because otherwise

10  the Court doesn't have the transcript.  Those are your words.

11         MR. SEIFELDEIN:  Correct.  I was giving him an

12  opportunity to review it.

13  BY MR. SEIFELDEIN:

14  Q.  Mr. Bredehoft, let me just state for the record the

15  question that was asked of you.

16         "Okay.  Did you ultimately advise Ms. Pitts that the

17  RNs, CNAs, and LPNs could remain classified as independent

18  contractors?"

19         Your answer?

20  A.  "She did not ask me that question, so I did not answer

21  it."

22  Q.  "Did you ever follow up with Ms. Pitts about the

23  classification of the nurses following the advice you

24  provided?"

25         We're reading the transcript here.  Your answer,

```
                          ┌─ J. Bredehoft - Cross ─┐
```

 1    line 20?

 2    A.   "No."

 3    Q.   Okay.  And I asked you:

 4         "Defendants never asked you if the workers can

 5    continue to be classified as independent contractors,

 6    correct?"

 7    A.   "That's correct."

 8    Q.   And you did not advise Ms. Pitts that the defendants

 9    could continue to be -- excuse me -- the nurses --

10    A.   I'm sorry.  Sir, I'm having a problem hearing you.

11    Q.   I apologize, Mr. Bredehoft.

12         You did not advise defendants to continue to

13    classify the nurses as independent contractors, correct?

14         MR. JEWETT:  Objection.  This has been asked and

15    answered.  He's gone around the same question multiple times

16    now.

17         THE COURT:  I think the question -- the objection is

18    sustained.  The answer is clear.  You've refreshed his

19    recollection, or if you want to call it impeachment with the

20    transcript, but the question has been answered.

21         MR. SEIFELDEIN:  All right.

22    BY MR. SEIFELDEIN:

23    Q.   Mr. Bredehoft, you did not discuss the degree of skill

24    required with defendants as you assumed that there is some

25    degree of skill required, correct?

Carol L. Naughton, Official Court Reporter
```

J. Bredehoft - Cross

1    A.  We discussed it only to the extent I previously testified

2    today, that there was no unusual degree of skill either

3    required or maintained by these nurses.

4    Q.  Okay.  And based on your conversation with Ms. Pitts, you

5    were not aware of the average length of placement

6    opportunities of the nurses and did not ask about it,

7    correct?

8    A.  That is correct; I did not ask about it.  We discussed

9    not averages but examples.

10   Q.  Okay.  And, in fact, Mr. Bredehoft, you do not know what

11   led defendants to classify the nurses as independent

12   contractors, correct?

13   A.  No.  That was done before I was involved.

14   Q.  Okay.  You testified about a distinction between

15   registries and staffing agencies.

16          You are aware, sir, that the Department of Labor

17   does not make a distinction between agencies and registries

18   and that it's economic realities that determines the

19   relationship, correct?

20          MR. JEWETT:  Objection.  Your Honor, this is the

21   same line of questioning that the Court instructed me not to

22   go down.  We're getting into his opinions about

23   classifications and registries, and I adhered to that.

24          THE COURT:  The Court doesn't recall dealing with

25   any objection talking about the difference between the

Carol L. Naughton, Official Court Reporter

**JA1160**

```
                            ─J. Bredehoft - Cross─
```

 1   staffing agency and the registry, and I think he gave

 2   testimony on direct about what a staffing agency was versus

 3   what a registry was.  So I permitted him to basically examine

 4   on that, and that only.

 5           THE WITNESS:  I'm aware of no regulation, guidance,

 6   or opinion letter that discusses the difference or the

 7   similarities that has been issued by the Department of Labor.

 8   They are examined by the same economic realities test.  It

 9   applies across the board.

10   BY MR. SEIFELDEIN:

11   Q.  And, Mr. Bredehoft, you did not discuss what's been

12   referred to as Field Bulletin 2018-4 with Ms. Pitts, correct?

13   A.  2004-18 [sic] does not come immediately to mind.

14   Q.  Let me ask it in a general way.

15           You did not discuss -- you did not discuss with

16   defendants a field bulletin that the Department of Labor has

17   put out regarding classification?

18   A.  Regarding -- I'm sorry, classifications of nurses in

19   staffing agencies?

20   Q.  Uh-huh.

21   A.  No, I did not discuss that.

22           Now I am familiar with it that you've refreshed my

23   recollection.  I haven't looked at it in years, but I know it

24   exists.  I know I've read it.

25   Q.  And you were the second attorney that defendants have

                              ─J. Bredehoft - Cross─

1    hired in this matter, correct?

2              MR. JEWETT:  Objection.  Relevance.

3              THE COURT:  Well, before you -- I'll sustain it.

4    Let's see where you're going with that question,

5    Mr. Seifeldein.

6              What is the relevance of that question?

7    BY MR. SEIFELDEIN:

8    Q.  Is that correct, sir?

9    A.  I don't know if I'm second.  I know I wasn't first.

10             THE COURT:  Wait a minute.  You didn't answer my

11   question.  I asked you what was the relevance of asking that

12   question?

13             MR. SEIFELDEIN:  I'll move on, Your Honor.

14             THE COURT:  You'll move on?

15             MR. SEIFELDEIN:  Yes.

16             THE COURT:  Wonderful.

17             THE WITNESS:  My answer was I don't know.

18             THE COURT:  It doesn't matter.  It's a relevance

19   issue.

20   BY MR. SEIFELDEIN:

21   Q.  Based on your discussion, Mr. Bredehoft, with defendants,

22   were you aware that Steadfast nurses could not directly

23   negotiate the rate of pay with the facilities?

24   A.  Yes, I was told that the facility sets the rate of pay.

25   Q.  And you relied on that?

                    Carol L. Naughton, Official Court Reporter

**JA1162**

<div align="center">J. Bredehoft - Cross</div>

```
 1    A.  Yes, I did.

 2    Q.  And you testified about having experience in advising

 3    others about Fair Labor Standards Act compliance, correct?

 4    A.  I didn't hear the third word.

 5    Q.  You -- based on your experience, you advised others about

 6    compliance with the Fair Labor Standards Act, correct?

 7    A.  Yes.

 8    Q.  And you've advised clients generally about when an

 9    individual can be classified as an independent contractor or

10    an employee, correct?

11    A.  Yes.

12    Q.  And does the name "First Choice" ring a bell?

13          MR. JEWETT:  Objection, Your Honor.  I think the

14    identification of Mr. Bredehoft's clients are privileged to

15    the extent they are not on the public docket.

16          THE COURT:  I don't know where he's going with the

17    question yet, Mr. Jewett.  So I can't sustain it, so I'll

18    overrule it.

19          Let me see where you're going with the question.

20    The question was:

21          Does the name "First Choice" ring a bell?

22          THE WITNESS:  Yes, it does.

23    BY MR. SEIFELDEIN:

24    Q.  How do you know First Choice?

25    A.  Over 20 years ago, when I was a partner at Venable, I
```

—————J. Bredehoft - Cross—————

 1   represented a First Choice Automotive.  In Florida, I also

 2   provided advice and currently am providing advice to First

 3   Choice Credit Union.  It's a common name.  I really don't

 4   recall any others.

 5           THE COURT:  So what is the question?

 6   BY MR. SEIFELDEIN:

 7   Q.  Are you familiar with the staffing agency in the Hampton

 8   Roads area that is called "First Choice"?

 9   A.  The name does not ring a bell for me.  It may be a

10   partner's client who asked me a question once, but it does

11   not ring a bell for me in that context.

12   Q.  All right.  Well, let's move on.

13           You were aware that Steadfast provided Workers'

14   Compensation to the nurses, correct?

15   A.  Yes, gratuitously so.

16   Q.  And you took that determination in rendering your advice

17   about defending this case, correct, when you represented

18   Steadfast?

19   A.  I didn't ignore it, but it did not form any part of the

20   basis for my determination.

21   Q.  And in your discussion with Steadfast and the documents

22   that were provided to you, you were not provided with memos

23   that Steadfast had sent to the nurses, correct?

24   A.  I believe that is correct.  We had not been provided any

25   of those at that time.

—————————————————————————J. Bredehoft - Cross—————————————————————————

 1 | Q.  Okay.  And so in rendering that advice that you gave
 2 | Steadfast, these memos were not part of that consideration,
 3 | correct?
 4 | A.  That's correct.
 5 | Q.  Okay.  And would that have an impact -- would that have
 6 | an impact on the advice you have given Steadfast?
 7 | A.  Depends on what the memos say.
 8 | Q.  Right.  So absent the memos, you wouldn't know.
 9 | A.  That's correct.
10 | Q.  You are aware, sir, that mere reliance on the advice of
11 | counsel alone is insufficient to satisfy the burden of
12 | proving good faith in the Fair Labor Standards Act?
13 |          THE COURT:  Sustained.  That is something the Court
14 | will deal with, and he doesn't have to deal with that.  So
15 | objection to that question.
16 | BY MR. SEIFELDEIN:
17 | Q.  You didn't receive memos.  You didn't review them.  You
18 | don't know what is in them.
19 | A.  I just testified to that.
20 | Q.  And you've also discussed with Steadfast its -- some of
21 | its reimbursement policies and practices, correct?
22 | A.  Yes.  We discussed several of those.
23 | Q.  And you took that into consideration in rendering your
24 | opinion regarding defending the case?
25 | A.  Yes, I did.

```
                         ─J. Bredehoft - Cross─

  1            MR. SEIFELDEIN:  Your Honor, may I refer with my

  2    co-counsel?

  3            THE COURT:  You may.

  4            (Pause in the proceedings.)

  5            MR. SEIFELDEIN:  Thank you, Your Honor.

  6            May I confer with counsel again?

  7            THE COURT:  Last time.

  8            (Pause in the proceedings.)

  9    BY MR. SEIFELDEIN:

 10    Q.  Mr. Bredehoft, you are aware that Steadfast sets the rate

 11    of pay for the nurses, correct?

 12    A.  It is my understanding that the hospitals say what they

 13    are willing to pay, and that is used to generate a rate of

 14    pay for the nurses by Steadfast.

 15    Q.  Mr. Bredehoft, you are aware that defendants did not take

 16    into account the nurses' skills and experience when they

 17    determined the rate of pay, correct?

 18    A.  Yes.  Absolutely, they did not.

 19    Q.  They did not?

 20    A.  Absolutely not.

 21    Q.  Okay.  Based upon your conversation with Ms. Pitts, you

 22    are aware that Steadfast nurses had no contractual or

 23    economic relationship with the facilities, correct?

 24    A.  Other than through Steadfast, yes, that's correct.

 25    Q.  Okay.
```

```
                        ─J. Bredehoft - Cross─
 1   A.  I'm sorry.  That may not be correct.
 2           We did discuss that others may have had -- and this
 3   is in my deposition -- some of the nurses may have had
 4   separate non-Steadfast economic relations or contracts and
 5   that I did not know if that occurred.
 6   Q.  Based upon your conversation with Ms. Pitts, you are
 7   aware that Steadfast nurses are required to track their hours
 8   as a requirement to receive compensation, correct?
 9   A.  Of course.
10   Q.  And based on your conversation with Ms. Pitts, you are
11   aware that Steadfast nurses could not directly negotiate
12   their pay rate with the facilities, correct?
13   A.  I think I just testified to that by saying the facilities
14   set the rate and that Steadfast adjusted it.  That's right.
15   That's what I just said.
16   Q.  I'll make it clear for the record because I didn't
17   understand you, Mr. Bredehoft.
18   A.  Sure.  My understanding is -- sorry.  Would you like to
19   ask me a different question?
20   Q.  If I could.  And forgive me.
21           The question is:
22           Based upon your conversation with Ms. Pitts, the
23   nurses could not directly negotiate their pay rate with the
24   facilities?
25   A.  Yes, that's correct.
```

Carol L. Naughton, Official Court Reporter

**JA1167**

```
                          ─J. Bredehoft - Cross─
```

1    Q.  Mr. Bredehoft, Steadfast, as far as you know, only

2    provides nurses to facilities, correct?

3           That's the main line of business.  Nurses are needed

4    at facilities, and Steadfast provides those nurses, correct?

5    A.  No.  Steadfast provides a registry to match facilities

6    and nurses.

7    Q.  Okay.  So they send nurses to certain facilities.

8    A.  They match them.  The nurses go themselves.

9           I'm not sure what else you are asking.

10   Q.  I understand.

11          So nurses are an integral part of Steadfast's

12   business, correct?

13   A.  No.  Steadfast's business is operating the registry.  It

14   doesn't practice medicine.  It doesn't have a license to

15   practice nursing, and if it tried to practice nursing, it

16   would be prosecuted by the State.

17   Q.  So in Steadfast's matching the nurses with the

18   facilities, would you agree that absent the nurses, the

19   business would cease to exist?

20   A.  Yes.

21          MR. SEIFELDEIN:  No further questions, Your Honor.

22          THE COURT:  Any redirect?

23          MR. JEWETT:  Very briefly, Your Honor.

24          THE COURT:  Very briefly, you may redirect.

25          MR. JEWETT:  Yes, sir.

```
                        ──J. Bredehoft - Redirect──
```

 1                        REDIRECT EXAMINATION

 2    BY MR. JEWETT:

 3    Q.  Thank you, Mr. Bredehoft.

 4          Mr. Seifeldein asked you a few questions about a

 5    noncompete.

 6    A.  Yes, sir.

 7    Q.  And do you recall that?

 8    A.  Yes, sir.

 9    Q.  Did Ms. Pitts provide you any information about whether

10    that noncompete was actually enforced?

11    A.  I was told both at the first meeting in June of 2018 and

12    emphatically at the second meeting in January of 2019 -- and

13    I believe Ms. Kim was in the room and seconded this, but

14    Ms. Pitts was emphatic that it had never been enforced, it

15    had never been threatened to be enforced, and she also told

16    me that all the nurses knew it because they signed up with

17    other registries and services.

18    Q.  Mr. Seifeldein asked you a couple of questions about some

19    prophylactic advice that you provided.

20    A.  Yes, sir.

21    Q.  I believe you testified that you recommended to Steadfast

22    to remove the noncompete language.

23    A.  That's correct.

24    Q.  And that they remove the term "employment" from the

25    application paperwork; is that correct?

—————J. Bredehoft - Redirect—————

1    A.   From the application that was on their website.  It was

2    not a frequently used one.  They told me that.

3    Q.   The opinion that you provided to Steadfast, was that

4    contingent on them making those two changes that you just

5    testified to?

6              Let me clarify that.

7              The opinion that the nurses are properly classified,

8    was it contingent on her making those two changes?

9    A.   The views I expressed about the proper classification are

10   not at all contingent on stopping using the employment

11   agreement, although it would be a silly thing not to have

12   done.

13             With respect to the noncompete, if the noncompete

14   was enforced or threatened to be enforced, then my views

15   would change; but, otherwise, no, they were not contingent

16   views.

17             MR. JEWETT:  Thank you.  I have no further

18   questions.

19             THE COURT:  Counselor, the Court heard you say you

20   were not asked to give advice about whether the nurses were

21   properly classified as independent contractors versus

22   employees; is that correct?

23             THE WITNESS:  That is correct, Your Honor.

24             THE COURT:  At the same time, it appears as though,

25   the testimony is, that you told her that they were

J. Bredehoft - Redirect

1   independent contractors.

2           THE WITNESS:  Yes.  In the course of evaluating the

3   case, I told her that it -- well, she had an excellent chance

4   of prevailing on that.  And I used the term "excellent."  And

5   that, yes, they were independent contractors, in my view.

6           THE COURT:  And whatever advice you gave to

7   Ms. Pitts was dependent upon your opinion or belief that you

8   had all the facts necessary to reach that conclusion; is that

9   correct?

10          THE WITNESS:  Yes, that I had all material facts.

11          THE COURT:  Now, if, in fact, there were critical

12  issues that you were not provided, then you would not be able

13  to issue that opinion with such confidence.  Would that be

14  correct?

15          THE WITNESS:  By definition, if they were critical,

16  then, yes, that is correct.

17          THE COURT:  All right.  May this witness be

18  permanently excused?

19          MR. JEWETT:  Yes, Your Honor.

20          MR. SEIFELDEIN:  Yes, Your Honor.

21          THE COURT:  Thank you, sir.

22          THE WITNESS:  Thank you, Your Honor.

23          (Witness excused.)

24          THE COURT:  We're going to take a 15-minute recess,

25  and then we'll come back and continue.

Carol L. Naughton, Official Court Reporter

**JA1171**

```
 1              (Recess from 11:23 a.m. to 11:43 a.m.)

 2              THE COURT:  Okay.  You may call your next witness.

 3              MR. SIEGRIST:  Your Honor, we have some designations

 4    from some depositions to admit into the record, if you would

 5    permit.

 6              THE COURT:  All right.

 7              MR. SIEGRIST:  Your Honor, we have two sets of

 8    depositions here.  The first is -- the plaintiffs have filed

 9    supplemental designations of the deposition of Zira

10    Technologies, the 30(b)(6) deposition.  We filed our

11    counter-designations, and I would move to admit those into

12    the record, unless there's an objection.

13              THE COURT:  This deposition is from Zira

14    Technologies?

15              MR. SIEGRIST:  Yes, Your Honor.

16              THE COURT:  Hopefully you have already made your

17    designations?

18              MS. LEWIS:  I'm sorry, Your Honor?

19              THE COURT:  Have you already made your designations?

20              MS. LEWIS:  We made our designations, and we,

21    likewise, filed our objections too.

22              THE COURT:  All right.  Then the Court will admit

23    your designations from that deposition.

24              MR. SIEGRIST:  Thank you, Your Honor.

25              THE COURT:  We need exhibit numbers on them.
```

Carol L. Naughton, Official Court Reporter

**JA1172**

```
 1          What are the exhibit numbers on your depositions?

 2          MS. LEWIS:  Our depositions are all under PX-2, and

 3   then pursuant to local rules, there's deposition summaries

 4   for the same at PX-3.

 5          THE COURT:  So that the Court can match these things

 6   up easily when we look at them, if all of yours are under

 7   PX-2 --

 8          MS. LEWIS:  That is correct.

 9          THE COURT:  -- what we're going to do is see if we

10   can adopt a number so that the defendants' will be DX-2, or

11   whatever, so that the Court can easily match them up when

12   we're going through.

13          Is that number available, Madam Clerk?

14          THE CLERK:  Yes, sir.

15          THE COURT:  All right.  And you will tender them to

16   the clerk.  Just pass them to her.

17          MR. SIEGRIST:  Your Honor, we also have some

18   designations from the deposition transcript of the Wage and

19   Hour investigator who was unavailable at this trial due to

20   his illness.

21          THE COURT:  Are there any objections to those?

22          MS. LEWIS:  Yes, sir.  We, likewise, filed

23   objections and counter-designations to those additional ones.

24          THE COURT:  Are all of those under PX-2?

25          MS. LEWIS:  All of ours are all under PX-2, yes.
```

1        THE COURT:  Then we'll do the same thing with
2    respect to that one.
3        MR. SIEGRIST:  I would like to raise that issue with
4    the Court on this topic.
5        We have a number of designations in the pretrial
6    order that were not objected to and that concern,
7    essentially, the same subject matter as our supplemental
8    designations which we filed after Mr. Mazuera became
9    unavailable.
10        In response to that, we got a number of objections
11    from the plaintiff that, one, many of them are objections to
12    designations that were in the Pretrial Order and waived; but,
13    secondly, if waived, they have designated, essentially, the
14    entire deposition transcript, Page 3 to 305.  I've never,
15    frankly, seen that before, Your Honor.
16        THE COURT:  How many pages in the deposition?
17        MR. SIEGRIST:  I think it's 305.  So they designated
18    302 pages of the deposition as a counter-designation.
19        Frankly, Your Honor, I think there are two issues
20    with this one.  I don't think that's efficient for the
21    Court's review of the relevant portions; but, also, I don't
22    think it cures the -- some of the objections, for example,
23    are to completeness.
24        In my experience, typically if there is a
25    completeness objection and a counter-designation, you

Carol L. Naughton, Official Court Reporter

**JA1174**

1    supplement -- you counter-designate the portion that you

2    believe renders a complete narrative on a discrete topic.

3    But, frankly, I don't think the Court is going to be assisted

4    by a counter-designation of the entire transcript.

5            THE COURT:  Okay.  What is the name of the

6    deposition, anyway?  You said from the Wage and Hour

7    Division.

8            MR. SIEGRIST:  Investigator Alvaro Mazuera.  He was

9    the Wage and Hour investigator for the Department of Labor.

10           THE COURT:  What I was trying to get, Ms. Lewis, is

11   why so many objections to the transcript, the deposition?

12           MS. LEWIS:  Your Honor, the answer to the Court's

13   question, there's objections to the depositions because,

14   within the designations that they've made, the deposition

15   didn't necessarily flow, and so they have an answer here, but

16   the question may have been asked 30 pages earlier.  And so

17   with respect to the designations that they made, they are

18   really incomplete.  So to understand the context of what the

19   question came up, they only picked out a single line.

20           The designation of the -- the objection -- first, to

21   be clear with respect to the previous designations that were

22   made in the Pretrial Order, that was before times had changed

23   and the deponent was unavailable, and we lodged our

24   objections because they said he would be available.  Now

25   they've identified counter-designations which, frankly, this

 1    isn't about what the Department of Labor did; it's about what

 2    defendants did.

 3          So to the extent that they believe that they're

 4    necessary and relevant to the Court's determination and he's

 5    not available here to testify, Your Honor, I think it's

 6    important for the Court to have the completeness of what his

 7    testimony was, particularly in light of the cherry-picking of

 8    answers that just, frankly, are confusing and don't make any

 9    sense.

10          THE COURT:  Here is what the Court is going to do:

11          The Court is just going to have to admit the whole

12    deposition.  Counter-designations, et cetera, et cetera, the

13    Court is going to have to deal with the whole deposition.

14    Because you all have picked it apart so badly, the Court is

15    going to have to deal with the whole deposition.

16          MR. SIEGRIST:  Your Honor, I would ask to be heard

17    on that topic.

18          Plaintiff's counsel's representation on the manner

19    in which we designated this is entirely inaccurate, and we've

20    mixed discrete topics.  I'm not aware of any designations

21    that are a one-line response; and, frankly, Your Honor, I'm

22    prepared to address each and every one of these objections in

23    detail.

24          I understand the --

25          THE COURT:  We're not going to do it.

```
 1            MR. SIEGRIST:  -- Court may not want to do that;
 2    but, Your Honor, it's simply incorrect to say that we have
 3    cherry-picked these.  These are discrete topics, and I don't
 4    agree with the characterization.
 5            THE COURT:  The Court will make its own
 6    determination about the deposition.  You can put your
 7    counter-designations in there, and the Court will simply have
 8    to look at the entire deposition.
 9            So that will be DX-2, whatever, your deposition
10    there, and we'll just take a look at the entire deposition
11    and the Court will make its own determination about what is
12    relevant and what is not relevant in that deposition.
13            (Defendants' Exhibit DX-2 received in evidence.)
14            THE COURT:  Next.  Your next witness.
15            MS. RUST:  Your Honor, we do not have any further
16    witnesses.  I do have one housekeeping item to address with
17    the Court before we rest.
18            THE COURT:  All right.  You have a further
19    housekeeping note?
20            MS. RUST:  Yes.
21            THE COURT:  All right.  That's fine.
22            MS. LEWIS:  Your Honor, I, likewise, just have one
23    housekeeping note with respect to PX-101.  I don't think I
24    made it clear yesterday with respect to that one.
25            THE COURT:  All right.  Well, I'll deal with yours
```

1      in a minute.

2                  Let's see what your housekeeping note is.

3                  MS. RUST:  Okay.  Your Honor, we wanted to address

4      an issue that was raised by the plaintiff regarding the

5      production of DX-76, 77, and 78 on Tuesday.

6                  During Ms. Kim's testimony, the Secretary

7      represented to the Court that those were not produced in

8      discovery, and as we understand it, the Court excluded DX-78

9      as a result of that representation.

10                 Because it was more of a discovery issue, which is

11     the function of the pretrial conference and order, that came

12     as a surprise, since it was the first time that the Secretary

13     had ever made any indication of not being in possession of

14     those exhibits.

15                 So after those representations were made, we

16     reviewed our files, reviewed the information and

17     communications on these, and as we understood it, it was not

18     accurate, and we just wanted to take an opportunity to

19     correct the record by reviewing a couple of the relevant

20     dates on which these exhibits were produced and discussed

21     with the Secretary.

22                 On February 23rd and 24th, DX-76, 77, and 78 were

23     all produced to the Department of Labor via their file share

24     platform Kiteworks, which they required us to use to produce

25     large files.  That same week, within a couple of days, the

Carol L. Naughton, Official Court Reporter

**JA1178**

1    attorneys had their attorney conference to -- prior to the

2    pretrial conference to review all the exhibits, objections,

3    discuss, confirm those.  It was never represented that those

4    video files were not in their possession.

5            On March 3rd, we had a several-hour-long pretrial

6    conference with Judge Leonard.  The Secretary asserted five

7    different objections to DX-78, five different objections to

8    77, and five different objections to 76.  At no point did the

9    Secretary assert that they were not even in possession of

10   these exhibits.  The objections went to substantive aspects

11   of the content of those exhibits.

12           And then on March 13th, the Secretary's counsel sent

13   proposed topics to our office for the corporate deposition of

14   Zira Technology.  The first topic in the proposed topics was

15   the subjects addressed in your DX-77 and 78.

16           On March 19th, they issued their notice of corporate

17   deposition.  The first topic was knowledge about the subjects

18   addressed in Steadfast Exhibits DX-75 through 78 and when and

19   who recorded them.  It would be impossible or difficult to

20   depose Zira Technologies regarding exhibits that they did not

21   have in their possession.

22           And on March 30th, they actually conducted the

23   deposition of Zira.  In that transcript, they deposed

24   Mr. Vora regarding a video that was a minute and 44 seconds

25   long and described it as the training videos for facilities.

Carol L. Naughton, Official Court Reporter

**JA1179**

```
 1    The Pretrial Order describes DX-78 as the "Steadfast Zira
 2    Workforce Video for Facilities."
 3         During Ms. Kim's testimony, I specified that DX-78
 4    was one minute and 44 seconds long.  So this is the same
 5    video as DX-78, which the Secretary represented during her
 6    testimony that they were not in possession.
 7         So, again, after all of that, during the testimony,
 8    this was the first time that they indicated that they did not
 9    have possession of that file, without even taking the
10    opportunity to review the video to confirm whether it was the
11    same video that they had in their possession.  As we
12    understood it, as a result of that misrepresentation, the
13    Court excluded DX-78 from evidence.
14         Since that is typically dealt with in pretrial
15    conference and orders, we wanted to make sure that we had an
16    opportunity to address that and correct that for the record,
17    since it apparently impacted the admission of certain
18    evidence.
19         THE COURT:  All right.  Well, I thank you very much.
20         Two things here:  Number one, 76 is already in.
21         The Court is going to admit 77.  If we didn't, 77
22    is coming in, because I've said that I will withhold and
23    delay admission of 77 until cross-examination takes place.
24    So 77 is coming in.
25         (Defendants' Exhibits DX-76 and DX-77 received in
```

```
 1   evidence.)

 2            THE COURT:  So that just leaves 78.  Let me hear

 3   from the plaintiff.

 4            Ms. Lewis, come around to the podium, please.

 5            So we're just talking about 78.  76 and 77 are not

 6   at issue here.  The question is this:

 7            I know it was represented that you didn't have it.

 8   According to what she said, you did have it.  So was that

 9   just an error or omission or what?

10            MS. LEWIS:  No, Your Honor.  First of all, I would

11   like to correct, one, what the contentions were that

12   defendants just made.

13            The representation from the Court was that Christine

14   Kim created 76, 77, and 78.  Based upon that proposition, the

15   Secretary asserted and still maintains that if those

16   documents, those videos, were created by Christine Kim, we

17   did not receive videos created by Christine Kim; hence the

18   reason why we had and the Court ordered defendants to make

19   available Arjun Vora, a 30(b)(6) representative for Zira

20   Technologies, who confirmed and has already been admitted

21   onto the record that he created those videos.

22            So the issue is not that we didn't have the videos.

23   It was based upon the representations of the testimony that

24   defendants asserted that they were created by Christine Kim,

25   and we maintain that position.
```

```
 1              THE COURT:  Let's put it this way:
 2              The Court excluded 78.  The Court is not going to
 3    change that.  And I'm going to tell you something else.  For
 4    the record, Counsel, this case is not going to rise and fall
 5    on Exhibit 78.  It's just not going to happen.  Or 77 or 76.
 6    All right?
 7              MS. LEWIS:  But I do want to make clear, the
 8    Secretary did not make any misrepresentations to the Court
 9    regarding what we received.
10              THE COURT:  The Court will accept that, and now the
11    Court has resolved the dispute.  So we're finished with that.
12              Anything else?  Is there any rebuttal evidence?
13              Wait.  Hold on.
14              Does the defense rest?
15              MS. RUST:  The defense rests, Your Honor.
16              THE COURT:  Is there any rebuttal witnesses or
17    evidence?
18              MS. LEWIS:  No, Your Honor.  I think the evidence is
19    quite robust.
20              THE COURT:  All right.  Well, I tell you what, then,
21    here's what we're going to do:
22              I want you to check with the courtroom deputy to
23    make sure we have all the exhibits that are supposed to be in
24    this case.
25              And maybe I just need to take a brief recess for you
```

1    to do that.  Do you need time to do that?  Are you confident

2    they are all here?

3           Ms. Thompson, do you have everything?

4           THE CLERK:  There are some that are marked for

5    identification that I don't have, but I've made arrangements

6    with counsel for them to e-mail them to me.

7           (Pause in the proceedings.)

8           THE COURT:  All right.  The Court is going to ask

9    that you get with the court reporter to order the transcript.

10   Once the transcript is in your possession, the Court will

11   give you 30 days to provide any supplemental proposed

12   findings of fact or conclusions of law in this case.  The

13   Court said 30 days.  You've already got a head start.

14          And once the Court receives your proposed findings

15   of fact and conclusions of law, the Court will then review

16   the record and try to "seasonably," the word I use, get out a

17   ruling in this case.

18          It has been the Court's experience that closing

19   argument doesn't really assist the Court as much as your

20   proposed findings of fact and conclusions of law.  The

21   traditional page limit, 30 pages, because you've already

22   filed 30 pages, and this is supplemental.

23          Yes, ma'am?

24          MS. LEWIS:  Your Honor, the Secretary just had one

25   housekeeping matter, and that was the excerpts that were

```
 1   PX-101, the Pitts deposition, we've made arrangements with

 2   Ms. Thompson to get those to her, but I just wanted to, for

 3   tracking purposes, et cetera, it's PX-101 that are the Pitts

 4   deposition excerpts.

 5           THE COURT:  All right.

 6           MS. LEWIS:  Thank you.

 7           THE COURT:  That's fine.

 8           Anything else, Mr. Jewett, Ms. Rust, Mr. Siegrist?

 9           MS. RUST:  I don't believe so, Your Honor.

10           THE COURT:  Okay.  Thank you, counsel.  If you will

11   make sure that you pick up all extra exhibits and anything

12   you left in here.  The Court has a copy of all the exhibits

13   needed in this case.  The Court will be in touch.

14           (Proceedings adjourned at 12:01 p.m.)

15

16                       CERTIFICATION

17

18     I certify that the foregoing is a correct transcript

19   from the record of proceedings in the above-entitled matter.

20

21

22   _____/s/_____

23                 Carol L. Naughton

24                 October 4, 2021

25
```

Carol L. Naughton, Official Court Reporter

**JA1184**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division



FILED

JAN 1 4 2022

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

| | |
|---|---|
| MARTIN J. WALSH,<br>SECRETARY OF LABOR,<br>UNITED STATES DEPARTMENT OF LABOR,<br><br>               Plaintiff,<br><br>        v.<br><br>MEDICAL STAFFING OF AMERICA, LLC, d/b/a<br>STEADFAST MEDICAL STAFFING, and LISA<br>PITTS,<br><br>               Defendants. | Case No. 2:18–cv–226<br><br>Case No. 2:19–cv–475 |

### *MEMORANDUM OPINION AND ORDER*

The Court issues this Memorandum Opinion and Order after a bench trial in the above-styled matter to resolve the U.S. Department of Labor's ("Plaintiff" or "DOL") claims against Medical Staffing of America, LLC, d/b/a Steadfast Medical Staffing, and Lisa Pitts ("Defendants") for failing to pay overtime and maintain pay records in accordance with the Fair Labor Standards Act ("FLSA"), as amended, 29 U.S.C. § 201, et seq. For the reasons below, the Court **FINDS** that the nurses employed by Defendants are employees of Defendants. Accordingly, the Court **FINDS** Defendants liable for violating the FLSA and enters judgment for Plaintiff.

### I.   PROCEDURAL HISTORY

On May 2, 2018, Plaintiff filed the Complaint in this matter, initiating an enforcement action against Defendants for willfully misclassifying their workers as independent contractors and violating the FLSA. Complaint ("Compl."), ECF No. 1. Defendants answered the Complaint on July 11, 2018. Answer, ECF No. 8. On July 23, 2020, after full briefing by the parties, the Court denied the parties' cross-motions for summary judgment. Summary Judgment Order ("Summ. J.

Or."), ECF No. 251. The Court held a bench trial, which commenced on August 31, 2021. Note, ECF No. 301–311. The parties filed post-trial briefs, and this matter is now ripe for judicial determination. The Court issues the following Findings of Fact and Conclusions of Law, as required by Rule 52(a) of the Federal Rules of Civil Procedure.

## II.   FINDINGS OF FACT

### A.   Stipulated Facts

The parties have stipulated to the following facts, which the Court accepts and finds:

1. Since at least August 18, 2015, Steadfast Medical Staffing ("Steadfast") has been a limited liability corporation with a place of business at 5750 Chesapeake Boulevard, Norfolk, Virginia 23513, and under the ownership of Lisa Ann Pitts ("Ms. Pitts"). *Id.* at 2. Joint Pretrial Or. ("J. Pretrial Or."), ECF No. 261 at 1.

2. Since at least August 18, 2015, Steadfast has had an annual gross volume of sales made or business done of not less than $500,000.00. *Id.*

3. The individuals listed in Schedule A were paid straight-time hourly for all hours worked, including for all hours worked over 40 hours in a workweek. *Id.*

4. Lisa Pitts has maintained 100% ownership interest in Medical Staffing of America, LLC since at least August 2015. *Id.*

5. Since August 18, 2015, Steadfast has negotiated and established contracts with healthcare facilities. J. Pretrial Or. at 2.

6. Steadfast's negotiated contracts established an hourly rate Steadfast would receive for placing nurses, including the individuals listed in Schedule A. *Id.*

7. Since August 18, 2015, "Medical Staffing of America" appears on the earnings statements of individuals listed in Schedule A. *Id.*

2

**JA1186**

**B.    Additional Factual Findings**

The Court makes the following additional factual findings (unless otherwise noted, the facts below are reflective of Defendants' business practices since August 18, 2015):

*Steadfast's Relationship with the Nurses*

1.    Lisa Pitts is responsible for the day-to-day operations of Medical Staffing of America, LLC ("Steadfast"). Trial Transcript ("Tr.") at 517:25–518:5.

2.    Steadfast is a nursing registry that maintains a database of licensed nurses and connects those nurses with work opportunities at healthcare facilities. Tr. at 23:9–11, 227:14–15, 514:5–16, 520:6–19, 907:1–6; Plaintiff's Trial Exhibit ("PX") 24.

3.    Specifically, Steadfast receives staffing requests from healthcare facilities with which it has contracted ("client-facilities" or "facilities"), identifies nurses on its registry who satisfy the facilities' needs, then provides the nurses with the opportunity to accept or reject assignments (or "shifts") with those facilities. J. Pretrial Or. at 2; Tr. at 907:1–6, 920:4–921–4, 945:11–946:12, 947:11–948:16; Defendants' Trial Exhibit ("DX") 58–59.

4.    The individuals listed in Schedule A of the Complaint include individuals who worked for Steadfast as Certified Nursing Assistants ("CNA"), Licensed Nurse Practitioners ("LPN"), and Registered Nurses ("RN")[1] at some point between August 18, 2015 and June 27, 2021. Tr. at 55:13–18, 86:7–9, 114:1–6, 520:5–19; Tenth Revised Schedule A, ECF No. 287 at Ex. 1; PX-7; PX-7a; PX-21; PX-22; PX-24.

---

[1] The Certified Nursing Assistants ("CNA"), Licensed Nurse Practitioners ("LPN"), and Registered Nurses ("RN") listed in Schedule A are hereinafter referred to as "nurses."

3

**JA1187**

5.      Steadfast compensated the nurses for work performed on behalf of or for the benefit of Defendants at some point between August 18, 2015 and June 27, 2021. PX-7; PX-7a; PX-8; PX-22.

6.      Steadfast does not pay the nurses overtime (a rate of one and one-half times their regular rate of pay for hours worked over 40 hours in a week). Tr. at 32:23–25, 94:21–25, 95:1–6, 121:12–17, 176:7–10, 200:22–25, 231:11–20, 316:9–20, 551:1–14, 677:17–23; PX-7; PX-7a.

7.      Steadfast pays the nurses straight-time for all hours worked (except for holidays). Tr. at 527:11–15, 551:10–25; PX-21.

8.      "Medical Staffing America" appears on the nurses' paystubs and earnings statements. Joint Pretrial Statement ("J. Pretrial Statement"), ECF No. 84 at 2.

9.      The nurses provide staffing services for businesses located across state lines. Tr. at 128:11–17, 820:6–9.

10.     The nurses render services that are integral to Steadfast's business. Joint Pretrial Statement. J. Pretrial Statement at 2.

11.     The nurses do not have opportunities for profit or loss depending on their managerial skill. Tr. at 292:18–20, 317:13–15; PX-17.

12.     The nurses do not own their own businesses and have not advertised their services. Tr. at 92:8–12, 140:25–141:5, 176:25–177:5, 290:18–23; 715:10–716:3.

13.     Steadfast classifies the nurses on its registry as independent contractors. Tr. at 522:11–17.

14.     Before a nurse is added to Steadfast's registry, the nurse is required to complete an application that includes questions about the nurse's employment history, skill set,

4

**JA1188**

and references. Tr. at 87:14–88:13; PX-26. Steadfast repeatedly refers to itself as an "employer" and the nurses as "employees" in the application. PX-26. Steadfast occasionally refers to the application as an "application for employment" in the application and related documents. *Id.*

15. Steadfast also pays for the nurses to undergo a credentialing process, in which Steadfast (1) performs a background check; (2) confirms that the nurse is properly licensed; (3) conducts a drug screening and tuberculosis test; (4) has the nurse sign a Health Insurance Portability and Accountability Act ("HIPAA") compliance form; and (5) confirms that the nurse has a negative COVID test or proof of vaccination. Tr. at 246:3–10, 282:2–19, 289:24–25, 290:1–2, 916:24–917:11; J. Pretrial Statement at 2.

16. Once a nurse applies and passes the credentialing process, Steadfast enters into an "independent contractor" agreement with the nurse and adds the nurse to its registry. Tr. at 522:11–17, 1009:8–10; PX 25.

17. Nurses must obtain and maintain their own licensure. Tr. at 83:23–25, 84:15–18, 99:5–10, 184:24–185:4, 211:6–17. Steadfast does not pay for or reimburse nurses for licensing or educational expenses. Tr. at 83:4–8.

18. Once a nurse is added to Steadfast's registry, Steadfast trains the nurse on the following topics: HIPAA compliance, substance abuse, and harassment. Tr. at 66:7–25; PX-32.

19. The nurses are also covered under Steadfast's insurance policy, and Steadfast is responsible for processing all workers' compensation claims for any injuries the nurses incur while working at a facility. Tr. at 42:25–43:15; PX-28.

5

20. Steadfast does not have an "employee handbook." Tr. at 919:15–16.

21. Nurses on Steadfast's registry are required to wear badges bearing the name, "Steadfast Medical," while working at client-facilities. Tr. at 72:16–73:3, 99:25–100:5, 124:14–20.

22. Steadfast does not provide the nurses with any equipment. Tr. at 84:1–14, 98:8–16, 635:1–3, 682:19–21, 700:16–19, 812:5–8.

23. During the 2020–2021 COVID-19 pandemic lockdowns, Steadfast provided the nurses with letters that the nurses could present to government officials, permitting them to travel to work. Tr. at 1002:12–1003:25.

24. Steadfast's relationship with the nurses is permanent in nature, even if a term limit is stated in a nurse's contractor agreement. *See e.g.* Tr. at 86:5–11, 811:19–25; PX-11; PX-16; PX-25.

25. Steadfast maintains "employee change" forms for the nurses that document each nurse's "hire/term date" and "tax jurisdiction." PX-16.

26. Steadfast's agreements with the nurses include "non-competition" clauses, in which the nurses are prohibited from working for Steadfast's competitors without Steadfast's express, written consent. PX-10; PX-12; PX-25.

27. The nurses are not permitted to hire other nurses, employees, or contractors to work for them at client-facilities. Tr. at 73:24–74:7, 122:15–25, 141:12–18, 270:7–16, 823:23–824:5.

28. Steadfast identifies available shifts and then communicates with nurses regarding available shifts via phone, email, text, and/or a mobile application that Steadfast

6

launched in January 2021 to digitize the scheduling process (the "Zira app"). Tr. at 74:8–13, 96:12–16, 744:7–745:9.

29. In the Zira app, Defendants are notified whenever a nurse accepts a shift, and Defendants can edit/decline shifts. Tr. at 800:23–801:2.

30. Because Steadfast gives nurses the opportunity to accept or decline shifts, the nurses do not have a start date or set work schedule. *See e.g.* Tr. at 128:14–129:16, 189:5–12, 210:6–18, 238:17–239:11, 266:23–25, 284:4–7, 298:16–20, 702:10–704:18, 851:3–21, 945:5–946:1.

31. Steadfast does not require the nurses to work a minimum number of hours or prohibit the nurses from exceeding a maximum number of hours. Tr. at 638:21–23, 662:19–21, 685:7–23, 705:11–16, 817:7–9.

32. The nurses must notify and/or obtain approval from Steadfast, not client-facilities, when they are running late to a shift, want time off, are sick, or otherwise cannot complete a shift. Tr. at 37:15–38:5, 70:13–72:11, 95:7–23, 121:24–22:11, 335:18–338:20, 1035:13–17.

33. Steadfast determines the nurses' hourly pay rate, and nurses cannot negotiate their pay rate with Steadfast unless changing the rate would benefit Steadfast. Tr. at 29:8–25, 61:3–11, 74:8–13, 96:12–16, 116:2–6, 144:15–22, 151:8–17, 198:18–23, 203:20–21, 210:22–211:5, 217:10–22, 222:13–19, 229:15–25, 232:15–18, 246:13–19, 292:1–5, 330:19–24.

34. The nurses on Steadfast's registry can only increase their wages by working more hours. Tr. at 247:2–20, 252:1–11, 284:8–13, 674:21–23.

7

**JA1191**

35. Steadfast is solely responsible for compensating the nurses and handling any compensation related issues, including wage garnishments. Tr. at 33:19–35:6, 97:19–24, 93:5–11, 138:22–24, 184:4–6, 199:6–8, 222:20–25, 286:16–18, 292:14–17, 293:24–25, 297: 22–24, 33:19–34:10, 377:5–18, 531:22–532:11, 595:6–22, 673:18–21; PX-7a; PX-8; PX-19, PX-21–22.

36. Steadfast pays the nurses an hourly rate from their own financial accounts on a weekly basis. Since April 2019, Steadfast has provided nurses the option to be compensated on an expedited basis via a program called, "Next Day Pay" or "NDP" Tr. at 60:24–25, 90:5–7, 115:24–116:1, 538:15–22, 539:22–540:14, 804:23–805:9, 1039:4–1042:1; PX-8; PX-19; PX-21, PX-34.

37. Steadfast guarantees the nurses their hourly pay rate for hours worked, regardless of whether a client-facility pays Steadfast for the nurse's work. Tr. at 1041:22–1042:1.

38. Not receiving a paycheck from Steadfast would impact the nurses' ability to meet their financial obligations. *See e.g.* Tr. at 75:6–8, 97:25–98:2, 125:15–18, 184:7–10.

39. Steadfast requires the nurses to track their hours when working at client-facilities using timesheets that were created by Steadfast and then submit those timesheets to Steadfast for payment. Tr. at 38:25–39:6, 92:13–93:11, 117:21–118:4, 178: 3–20, 204:6–17, 215:8–216:25, 224:11–17, 230:10–231:6, 265:25–266:9, 283:10–284:3, 315:1–13, 433:7–10; PX-9; PX-53; PX-55.

40. Before Steadfast compensates a nurse for completing a shift, Steadfast requires a staff member at the client-facility to sign the nurse's timesheet to verify the start

8

**JA1192**

and end times of the nurse's shift. *See e.g.* Tr. at 110:23–111:5, 131:25–132:6, 253:15–17.

41.    Steadfast disciplines nurses by cancelling nurses' shifts or otherwise "removing them from the schedule." Tr. at 30:1–9, 35:14–20, 40:1–42:2, 44:1–8, 119:17–120:12, 206:4–207:5, 335:18–336:7, 647:8–16.

42.    Steadfast disciplines nurses for a variety of reasons including, but not limited to, discussing compensation with a co–worker or client-facility; attempting to contact client-facilities to set their own schedules or rates; being recruited by a client-facility; working for a competitor; declining or cancelling shifts; and being intoxicated or otherwise engaged in unprofessional conduct while working at a client-facility. Tr. at 30:1–25, 31:5–22, 35:14–20, 37:1–5, 41:18–22, 62:6–63:3, 177:15–178:2, 248:22–250:20, 283:1–9, 647:8–16, 883:18–886:9–20.

43.    The nurses do not exercise independent judgment and perform activities typical of nurses in the medical industry including, but not limited to, administering medications, treating wounds, taking notes, and otherwise caring for patients. Tr. at 99:11–21, 360:3–387:19, 414:14–434:4; PX-10; PX-12.

44.    Steadfast instructs nurses on how they should behave while working at client-facilities by sending the nurses written memorandums on topics including, but not limited to, work attire, punctuality, and timekeeping. Tr. at 137:18–138:1, 181:3–8, 536:11–15, 1031:17–19, 1035:10–16.

45.    The Board of Nursing contacts Steadfast if it has any questions or issues with the nurses on Steadfast's registry. Tr. at 979:22–980:2, 1004:17–20, 1006:9–15.

**JA1193**

46. The nurses complained to Steadfast on numerous occasions that they were not receiving overtime. Tr. at 78:3–13, 127:5–18, 185:24–186:7; 221:21–222:3, 344:10–345:1.

### *Steadfast's Relationship with Client-Facilities*

47. Healthcare facilities enter into staffing contracts with Steadfast to obtain healthcare services from the nurses on Steadfast's registry. Tr. at 514:10–12, 525:8–10, 920:4–21; PX-10.

48. Healthcare facilities that contract with Steadfast for nursing services are clients of Steadfast. Tr. at 922:25–923:1, 947:21–22, 1050:11–14.

49. Client-facilities rely on Steadfast to ensure that the nurses are properly licensed and otherwise qualified for work. Tr. at 407:19–23, 907:25–909:12; PX-10.

50. Steadfast does not provide client-facilities with a complete listing of the nurses on its registry or the nurses' contact information; Steadfast decides which nurse is sent to respond to the client-facilities' needs. Tr. at 365:3–7, 368:10–12, 426:23–427:9.

51. Client-facilities are prohibited from recruiting the nurses on Steadfast's registry. PX-10; PX-12. Steadfast enforces the prohibition by requiring facilities to first buy-out Steadfast's contract with a particular nurse or by removing nurses who receive employment offers from facilities from the registry. *Id.*; Tr. at 31:5–22, 177:15–178:2, 248:22–250:22, 273:6–14.

52. In some of Steadfast's staffing contracts with healthcare facilities, the nurses on Steadfast's registry are expressly designated as "employees" or "employed personnel" of Steadfast, and Steadfast assumes all legal responsibility as the nurses' "employer." *See e.g.* PX-10 at 48, 82–83, 90, 134–135, 142.

53.   Steadfast and client-facilities negotiate the amount a facility will be charged for the work performed by the nurses. Tr. at 941:12–942:20, 943:2–10; PX-10.

54.   Client-facilities require Steadfast to submit invoices detailing the total hours worked by the nurses and pay Steadfast a set hourly rate for the hours worked by the nurses at their respective facilities. Tr. at 135:9–20, 375:1–24, 376:1–10, 377:5–24, 378:6–9, 379:6–380:4, 380:5–381:19, 381:14–19, 430:21–433:10, 586:11–17, 431:15–432:5, 432:8–19, 587:3–15, 527:5–10; PX-10; PX-11.

55.   The hourly rate a facility pays Steadfast is not the same rate Steadfast pays the nurses. Steadfast retains a percentage of the hourly rate charged to facilities as revenue. Tr. at 534:6–16, 942:12–20, 943:2–10; PX-10.

56.   Steadfast requires client-facilities to provide Steadfast with feedback on the nurses' performance. Tr. at 374:7–19, 400:2–5, 423:21–25.

57.   If a client-facility no longer wants a particular nurse to work at its facility, the facility contacts Steadfast and requests that the nurse be put on a "do not return" or "DNR" list. *See e.g.* Tr. at 397:8–398:4.

58.   By not paying overtime, Steadfast can charge client-facilities lower rates for their services than their competitors who do pay overtime. These lower rates make Steadfast's services more desirable to healthcare facilities than their competitors' services, creating unfair competition in interstate commerce. Tr. at 623:18–624:6.

*The Nurses' Relationship with Client-Facilities*

59.   There is no contractual relationship between the nurses and client-facilities. Tr. at 514:10–12, 525:8–10, 920:4–21.

11

**JA1195**

60.   Client-facilities do not interview applicant nurses. Tr. at 317:23–318:1, 428:10–15, 369:4–9.

61.   Steadfast does not permit the nurses to negotiate their hourly pay rate with client-facilities directly. *See e.g.* Tr. at 123:8–16, 183:3–9, 198:18–21, 203:12–21, 270:20–23, 282:24–25.

62.   Client-facilities do not require nurses to complete timesheets for compensation and are not involved in any compensation issues between Steadfast and the nurses. Tr. at 135:9–20, 375:1–18, 377:5–24, 378:6–9, 379:6–380:4, 380:5–381:19, 381:14–19, 430:25–433:10, 431:15–432:5, 432:8–19.

63.   While some nurses prefer to use their own equipment (e.g. stethoscopes, blood pressure cuffs, etc.), the nurses are not required to use their own equipment because client-facilities provide all tools and equipment the nurses need to perform their work. Tr. at 84:1–14; 98:8–99:4; 184:16–23, 825:13–826:8.

64.   Client-facilities do not discipline the nurses and contact Steadfast regarding any issues they may have with a nurse's performance. Tr. at 150:20–24, 373:24–374:19, 396:1–11, 423:16–17, 424:9–18.

65.   Client-facilities do not train the nurses, but some client-facilities provide nurses with an "orientation" that includes a tour of the facility and "certain documents" related to the nurse's specific work assignment. Tr. at 396:12–15, 445:22–446:2.

### *Steadfast's Recordkeeping*

66.   When working with Zira Technologies, Inc. to develop the Zira app, Steadfast declined the option to include a feature that would have tracked the number of hours

12

the nurses worked in excess of 40 hours each workweek. Tr. at 1016:23–1017:23; PX-2 at 74–75, 81–82; PX-3 at 5.

67.  Steadfast does not record the nurses' total overtime pay and total additions or deductions from wages for each pay period. PX-7; PX-7a; PX-8.

68.  Steadfast does not record the hours worked for straight-time pay separately from the hours worked for overtime pay. Tr. at 803:3–8; PX-7; PX-7a; PX-8.

*Good Faith Defense*

69.  Defendants never contacted any personnel within the U.S. Department of Labor ("DOL") to determine whether their compensation policies complied with the FLSA. Tr. at 552:14–19.

70.  In 2018, after concluding an initial administrative investigation into Defendants' pay practices, Plaintiff informed Defendants that their pay practices violated the FLSA. Tr. at 550:25–551:25.

71.  Prior to Plaintiff's investigation, Defendants never consulted an attorney to determine how the nurses on their registry should be classified before Defendants classified the nurses as independent contractors. Tr. at 904:2–24, 1106:10–13.

72.  After Plaintiff's administrative investigation, Ms. Pitts met with John Michael Bredehoft, Esq. on two occasions—in June 2018 and January 2019—and discussed the classification status of Steadfast's nurses. Tr. at 1069:13–15, 1096:2–3.

73.  Mr. Bredehoft spoke with Ms. Pitts and Steadfast Payroll Manager, Christine Kim, to glean information about Defendants' business operations. Tr. at 1069:13–15, 1077:8–12, 1096:2–3.

13

**JA1197**

74. In addition to speaking with Ms. Pitts and Ms. Kim, Mr. Bredehoft reviewed Steadfast's application form for nurses, all of Steadfast's nurse contracts, all of Steadfast's contracts with healthcare facilities, and some of Steadfast's invoices to client-facilities. Tr. at 1100:2–1101:8, 1096:7–14. Defendants provided Mr. Bredehoft the above-referenced documentation. *Id.*

75. Based on the information Defendants provided Mr. Bredehoft, in January 2019, Mr. Bredehoft communicated to Ms. Pitts "to a very high degree of confidence" that Defendants' nurses were independent contractors because Steadfast did not exercise significant control over its nurses. Tr. at 1071:2–8, 1075:22–1077:12, 1079:2–1082:23. He also indicated that Ms. Pitts had an "excellent chance" of prevailing on the issue of worker classification under the FLSA. *Id.*

76. Mr. Bredehoft also advised Defendants, however, to remove the non-compete clause in their contractor agreements and cease using a document called, "Employment Application," when recruiting nurses as those features are inconsistent with the nurses being classified as independent contractors. Tr. at 1097:21–1098:5, 1100:2–1101:15, 1116:13–16.

77. Mr. Bredehoft never conducted an independent factfinding to verify whether the information Defendants provided to Mr. Bredehoft reflected Steadfast's actual business practices. Tr. at 1069:19–20, 1095:1–1096:14. Mr. Bredehoft never discussed Steadfast's business practices with any of Steadfast's nurses or office employees (apart from Ms. Kim, who was convicted for felonious embezzlement); he did not discuss Steadfast's business practices with any of Steadfast's client-

14

**JA1198**

facilities; and Mr. Bredehoft only reviewed documentation provided by Defendants in evaluating Defendants' business practices. *Id.*; Tr. at 792:11–13, 793:11-13.

78.   Mr. Bredehoft did not review any of the memorandums Defendants sent to the nurses before advising Defendants regarding the nurses' classification status. Tr. at 1110:21 – 1111:4.

79.   Mr. Bredehoft did not discuss the DOL Wage and Hour Division ("WHD")'s Field Assistance Bulletin No. 2018–4 ("FAB") with Defendants. Tr. at 1107:15–21.

80.   Defendants are familiar with the WHD's FAB No. 2018–4 ("FAB"). Tr. at 993:12–16, 1029:13–17.

81.   Defendants know that they must pay employees overtime under the FLSA. Tr. at 535:24–536:2; 1092:13–1093:11.

### *Back Wages*

82.   Plaintiff used the information in Steadfast's payroll summaries and Next Day Pay ("NDP") records to calculate the total hours worked and alleged backpay for the nurses from August 18, 2015 through June 27, 2021. J. Pretrial Statement at 2; Tr. at 453:21–454:6, 459:3–6, 474:21–475:3, 476:13–477:1, 478:2–479:2, 480:4–18, 485:11–25; PX-7; PX-7a; PX-21; PX-22.

83.   Between February 1, 2019 and June 27, 2021, where the total number of hours a nurse worked in one workweek exceeded 168 (the maximum number of hours in a week), Plaintiff used an average of 112 hours as the maximum hours worked to adjust the back–wage calculation based on employee interviews. Tr. at 481:8–25.

84.     Plaintiff calculated backpay by dividing each nurse's gross weekly wage by the nurse's total hours worked for that workweek[2] to determine the nurse's regular rate of pay. Plaintiff then multiplied each nurse's regular rate of pay by the hours worked over 40 in that workweek and multiplied the resulting number by .5 to account for the fact that Steadfast paid these individuals straight-time for every hour worked. The resulting number equaled the total backpay owed to that nurse for that workweek. Tr. at 459:21–460:13, 482:8–20; PX-21; PX-22.

85.     Based on the calculations explained above, the total alleged backpay for Steadfast's nurses from August 18, 2015 through June 27, 2021 is $3,619,716.49. Tr. at 487:7–10; PX-21; PX-22; PX-43.

86.     Defendants were ordered to review Plaintiff's back wage calculations for accuracy. J. Pretrial Statement at 4.

87.     Defendants did not offer evidence to refute Plaintiff's damages calculations or offer a counter-calculation of damages.

### III.    CONCLUSIONS OF LAW

The Court has made the following conclusions of law:

1.      Subject matter jurisdiction in this action is conferred upon the Court by 29 U.S.C. § 217 and 28 U.S.C. §§ 1331.

2.      This Court has personal jurisdiction over Plaintiff pursuant to 28 U.S.C. § 1345 and personal jurisdiction over Defendants because Defendants are domiciled in Virginia.

---

[2] Amounts for gross weekly wage and total hours worked appear in Defendants' payroll summaries. PX-21; PX-22.

**JA1200**

3.  Venue is proper under 28 U.S.C. § 1391 in any judicial district in which the defendant is properly subject to personal jurisdiction. 28 U.S.C. § 1391(b) and (c). Venue is proper pursuant to § 1391 because a substantial part of the acts giving rise to the claims occurred in this District; Defendants have sufficient connection with this District; and Defendants are domiciled in this District.

4.  Under the FLSA, employers are required to pay their employees overtime (not less than one and one-half times an employee's regular rate of pay for every hour worked over 40 hours in a workweek). 29 U.S.C. § 207.

5.  Employers subject to the FLSA are also required to "make, keep, and preserve" records of those who work for the employer and their applicable "wages, hours, and other conditions and practices of employment," including employees' total overtime earnings each week. 29 U.S.C. § 211(c); 29 C.F.R. § 516.2. Employers must also produce those records to the Government when "necessary and appropriate" for enforcing the FLSA. *Id.*

6.  Under the FLSA, "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. §203(d). "Employee" means "any individual employed by an employer," and "employ" means "to suffer or permit to work." 29 U.S.C. §§ 203(e)(1), (g).

7.  Federal courts utilize a six-factor test to determine whether an individual is an employee or independent contractor under the FLSA: "(1) the degree of control that the putative employer has over the manner in which the work is performed, (2) the worker's opportunities for profit or loss dependent on his managerial skill, (3) the worker's investment in equipment or material, or his employment of other workers,

17

**JA1201**

(4) the degree of skill required for the work, (5) the permanence of the working relationship, and (6) the degree to which the services rendered are an integral part of the putative employer's business." *McFeeley v. Jackson St. Entm't*, LLC , 825 F.3d 235, 241 (4th Cir. 2016); *Schultz v. Cap. Int'l Sec., Inc.*, 466 F.3d 298 (4th Cir. 2006); *Alley v. Quality Eco Techs., LLC*, No. 3:20CV355, 2021 WL 1196188, at *6 (E.D. Va. Mar. 29, 2021).

8.    No single factor in the six-factor test is dispositive as "the test is designed to capture the economic realities of the relationship between the worker and the putative employer." *McFeeley*, 825 F.3d at 241; *Schultz*, 466 F.3d at 305. "The touchstone of the 'economic realities' test is whether the worker is 'economically dependent on the business to which he renders service or is, as a matter of economic [reality], in business for himself.'" *McFeeley*, 825 F.3d at 241 (quoting *Schultz*, 466 F.3d at 304). The degree of control a putative employer has over the way an alleged employee's work is performed is the "most important factor" in making this determination. *Smith v. CSRA*, No. 20–1377, 2021 U.S. App. LEXIS 26390, at *31 (4th Cir. Sep. 1, 2021) (citing *Garrett v. Phillips Mills, Inc.*, 721 F.2d 979, 982 (4th Cir. 1983)).

9.    Any employer who is subject to the FLSA and willfully fails to pay overtime wages to its employees is liable for all unlawfully kept overtime wages and an equal amount as liquidated damages. 29 U.S.C. § 216(e)(2).

10.   The FLSA also authorizes district courts to issue injunctive relief to "restrain violations" of Sections 206 and 207 of the Act upon a showing of cause. 29 U.S.C. § 217. Whether to issue an injunction under the FLSA is within the discretion of

18

the district court. *See Sec'y of Labor, United States DOL v. Access Home Care. Inc.*, Civil Action No. 1:18–cv–581 (AJT/MSN), 2019 U.S. Dist. LEXIS 231687, at *12–13 (E.D. Va. Mar. 20, 2019) (citing *McComb v. Homeworkers' Handicraft Coop.*, 176 F.2d 633, 641 (4th Cir. 1949); *see also Tobin v. Flippo*, 91 F. Supp. 302, 304 (E.D. Va. 1950) (holding that whether to issue an injunction is "discretionary with the trial court").

11.   In deciding whether to issue an injunction under the FLSA, courts may consider: (1) the employer's previous conduct; (2) whether it is currently compliant (or non-compliant) with the FLSA; and (3) the dependability of any assurances that it will comply with the Act in the future. *See Access Home Care*, 2019 U.S. Dist. LEXIS 231687, at *12–13 (E.D. Va. Mar. 20, 2019) (citing *Martin v. Funtime, Inc.*, 963 F.2d 110, 114 (6th Cir. 1992)); *see also Acosta v. Emerald Contractors Inc.*, Civil Action No. TDC–18–3762, 2019 U.S. Dist. LEXIS 160500, at *14–15 (D. Md. Sep. 19, 2019).

12.   If, however, an employer "shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA], the court may, in its sound discretion, award no liquidated damages." 29 U.S.C. § 260; *Van Dyke v. Bluefield Gas Co.*, 210 F.2d 620, 622 (4th Cir 1954).

13.   The employer has the "plain and substantial burden of persuading the court by proof that his failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict." *Burnley v. Short*, 730 F.2d 136, 140 (4th Cir. 1984). An

employer's subjective "'[g]ood faith' and 'reasonable grounds' are measured objectively, 29 C.F.R. § 790.22(c), and establishing either element is sufficient to satisfy the statute." *Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 116 (4th Cir. 2015). An employer must meet this burden by a preponderance of the evidence. *Troutt v. Stavola Bros.*, 905 F. Supp. 295, 298 (M.D.N.C. 1995).

14.    To support a good faith defense, an employer must attempt to "look into the law," "seek legal advice," or otherwise take "active steps to ascertain the dictates of the FLSA and then move to comply with them." *McFeeley*, 825 F.3d at 245. *See also Anderson v. Penn Nat'l Gaming, Inc.*, Civil Action No. 3:04CV42, 2007 U.S. Dist. LEXIS 71703, at *6 (N.D.W. Va. Sep. 26, 2007) (citing *Reich v. Southern New England Telecomm. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997)).

15.    "[T]o reap the benefit of the good faith defense of § 260 based on the advice of counsel[,] the defendant must honestly and truly seek the advice of counsel, counsel must give advice that is reasonable in a legal sense, and the defendant must act in strict conformity with that advice." *Fuentes v. CAI Int'l, Inc.*, 728 F. Supp. 2d 1347, 1358–59 (S.D. Fla. 2010) (citing *Townley v. Floyd & Beasley Transfer Co.*, No. 88–AR–0907–S, 1989 WL 205342, at *4 (N.D. Ala. Dec. 8, 1989)). "[W]hat advice was sought, what disclosures were made by the defendants to their counsel, whether the legal advice was reasonable, and whether the defendants strictly complied with the legal advice" are all factors the court can consider in deciding whether a defendant proved its good faith defense "to the satisfaction of the court." *Id.* at 1359; 29 U.S.C. § 260.

20

**JA1204**

## IV.   DISCUSSION

In analyzing the economic realities of the relationship between the nurses and Steadfast, the Court must determine whether the nurses are employees of Steadfast or independent contractors by considering: (1) the degree of control Steadfast had over the manner in which the nurses performed their work; (2) the nurses' opportunities for profit or loss based on their managerial skill; (3) the nurses' investment in equipment or material, or the employment of other workers; (4) the degree of skill required for the nurses' work; (5) the permanence of the working relationship between the nurses and Steadfast; and (6) the degree to which the nurses' services are integral to Steadfast's business. *McFeeley*, 825 F.3d at 241; *Schultz*, 466 F.3d at 298; *Alley*, 2021 WL 1196188, at *6. If employer liability is established, the Court will need to determine whether Defendants are liable for willfully failing to pay overtime and maintain pay records under the FLSA.

### A.   Defendant's Degree of Control Over the Manner of Work

The evidence shows that Defendants exercise extensive control over the nurses' manner of work, and therefore, employ the nurses under the FLSA. The U.S. Wage and Hour Division ("WHD") published Field Assistance Bulletin No. 2018–4 ("FAB") to "provide guidance to Wage and Hour Division (WHD) field staff to help them determine whether home care, nurse, or caregiver registries . . . are employers under the Fair Labor Standards Act (FLSA)." U.S. DEP'T OF LABOR, WAGE & HOUR DIV., FIELD ASSISTANCE BULL. NO. 2018–4, DETERMINING WHETHER NURSE OR CAREGIVER REGISTRIES ARE EMPLOYERS OF THE CAREGIVER 1 (2018) ("FAB No. 2018–4"). The FAB also details "specific examples of common registry business practices, which may, when the totality of factors is analyzed, establish the existence of an employment relationship under the FLSA." *Id.* The FAB generally describes a registry that is *not* an employer as an entity

21

that "act[s] as the liaison between the caregiver and the client but does not typically negotiate the terms or conditions of the job on either party's behalf." *Id.* at 2. The Court relies on the FAB as guidance in assessing the extent to which Defendants exercise control over the nurses' manner of work below.

### 1.   Scheduling and Assigning Work

First, the record clearly establishes that Defendants have an extensive degree of control over the scheduling and assigning of work between the nurses and client-facilities. According to the FAB, "a registry's exercise of control over the caregiver's work schedules and assignments may indicate that the registry is an employer of the caregiver." FAB No. 2018–4 at 5. In this case, Defendants are in complete control of what information, if any, nurses receive regarding available shifts at client-facilities. Findings of Fact ("FOF") ¶¶ 28–29, 32, 42, 50, 59. It is only through contact with Defendants via phone, email, text, or the Zira app that nurses can learn of available shifts at client-facilities. *Id.* Moreover, Defendants prohibit nurses from communicating with facilities directly regarding available shifts and scheduling. *Id.* For these reasons, the way nurses are scheduled and assigned work is indicative of an employment relationship with Defendants.

### 2.   Investment in Training and Insurance

Defendants also invest in the nurses' training and insurance, which weighs in favor of an employment relationship. A registry's investment in "a caregiver's training or pay for his or her licenses, insurance, or medical supplies . . . may indicate that the registry is acting as the caregiver's employer, instead of simply a referral service." FAB 2018-4 at 8. The record reflects that Defendants train nurses on a variety of topics (e.g. HIPAA compliance, substance abuse, and harassment); cover nurses under their own malpractice insurance policy; and provide nurses worker's compensation benefits. FOF ¶ 18–19. The evidence also demonstrates that Defendants

22

**JA1206**

send nurses written memorandums with guidance on healthcare worker professionalism. *Id.* ¶ 44. Therefore, Defendants have demonstrated an investment in the nurses' training and insurance that is equivalent to the investment of an employer.

    3.    *Setting the Pay Rate*

Defendants admit that they set the nurses' pay rate, an action typical of an employer. According to the FAB, "[a] registry typically does not determine a caregiver's rate of pay. The client instead negotiates the rate of pay directly with the caregiver." FAB 2018-4 at 6. "[A] registry's decision to effectively set a caregiver's rate of pay without the caregiver making the ultimate determination indicates that the registry is acting as the caregiver's employer." *Id.* at 7. In this case, not only do Defendants determine the nurses' pay rates without any input from the nurses, Defendants expressly forbid nurses from negotiating their pay rates with facilities directly and withhold the nurses' contact information from facilities. FOF ¶ 33, 61. Even the nurses' ability to negotiate their pay rate with Defendants is limited by the extent to which changing the pay rate would benefit Defendants. *Id.* ¶ 33. Thus, Defendants' decision to set the nurses' pay rates is consistent with the actions of an employer.

    4.    *Continuous Payments for Caregiver Services*

Like an employer, Defendants receive continuous payments from client-facilities for the nurses' services. As the FAB advises:

> "A registry may instead choose to charge fees that fluctuate based on the number of hours that a caregiver works for the client. Such a registry may have an ongoing interest in the employment relationship, including in the number of hours the caregiver works and whether those hours are tracked accurately. The registry's fees are based on the ongoing caregiver relationship, not the registry's initial referral or administrative efforts. The caregiver's pay then depends, in part, on the amount the registry charges. Such charges, therefore, may indicate that the registry is the caregiver's employer."

**JA1207**

FAB 2018-4 at 7. Here, the amount Defendants invoice client-facilities is based directly on the numbers of hours worked by the nurses, not the initial referral or administrative efforts. FOF ¶ 54–55. Defendants set the nurses' hourly rate, negotiate a higher hourly rate with client-facilities, and retain the difference as revenue. *Id.* For these reasons, the record clearly establishes that Defendants have an ongoing interest in its relationship with the nurses and facilities, which is indicative of an employment relationship.

   5.   *Paying Wages*

Defendants are acting as the nurses' employer by guaranteeing direct payment of wages from Defendants' own financial accounts. A registry "may be exercising control over the caregiver, [if] the caregiver may economically depend on the registry's preferences and decisions." FAB 2018-4 at 6. Specifically,

> "[a] registry's direct payment of its own funds to the caregiver . . . may indicate that the registry is the caregiver's employer. This is true regardless of whether the registry typically receives reimbursement from the client because, in this situation, the registry may be effectively guaranteeing the payment even if the client does not ultimately pay. In such circumstances, the caregiver may be economically dependent on the registry, which indicates that the registry is the caregiver's employer."

FAB 2018-4 at 7. In this case, Defendants pay the nurses directly, from their own accounts, and regardless of whether client-facilities pay Defendants for its nurses' services. FOF ¶ 35–37. Defendants guarantee nurses straight-time pay for virtually all hours worked on a weekly or, at the nurses' election, an expedited basis. *Id.*; Stipulated Findings of Fact ("SFOF") ¶ 3. Moreover, "Medical Staffing of America" appears on all the nurses' earnings statements. SFOF ¶ 7. Testimony from several nurses supports that not receiving a paycheck from Defendants would

24

**JA1208**

impact the nurses' ability to meet their financial obligations. FOF ¶ 38. Ultimately, the nurses are economically dependent on Defendants as their employer.

### 6. *Tracking Caregiver Hours*

Defendants' efforts to maintain detailed and accurate records of the nurses' time is more like the efforts of an employer than an agency providing a mere administrative function. "[A] registry's active creation and verification of time records may indicate that the registry . . . [is] an employer of the caregiver. Tracking and independently verifying time worked is generally a form of supervision on which the caregiver depends to ensure proper payment." FAB 2018-4 at 8. In the instant matter, Defendants create the timesheets the nurses must use to record their time and submit to Defendants for payment. FOF ¶ 39. While Defendants require a staff member at client-facilities to verify nurses' hours by signing the timesheets, generally, client-facilities do not require the nurses to track their hours nor do they maintain a record of the nurses' hours. *Id.* ¶ 40, 62. Thus, Defendants' method of tracking caregiver hours is indicative of an employment relationship.

### 7. *Supervision and Discipline*

Finally, the record reflects that Defendants exercise excessive control over the nurses by supervising the nurses' performance and disciplining them when Defendants' deem necessary. According to the FAB, "[a] registry usually has no right to alter or terminate the terms and conditions of the caregiver's employment[,]" "monitor or supervise caregivers[,] . . . or evaluate caregivers' performance" without assuming employer liability. FAB 2018-4 at 5–6. Testimony from several nurses and client-facility representatives establish that Defendants are responsible for supervising and disciplining nurses. FOF ¶ 21, 23, 25, 32, 41, 42, 44. Defendants require facilities to provide Steadfast with feedback on the nurses' performance. *Id.* ¶ 56. Client-facilities do not discipline the nurses and contact Defendants regarding any issues they may have with a nurse's

25

performance. *Id.* ¶ 64. And finally, several nurses testified that Defendants discipline nurses by cancelling nurses' shifts or otherwise diminishing their ability to obtain work through the registry. *Id.* 41–42. Defendants "remove nurses from the schedule" at their discretion for a variety of reasons, e.g. discussing compensation with a co–worker or client-facility; attempting to contact client-facilities to set their own schedules or rates; being recruited by a client-facility; working for a competitor; and declining or cancelling shifts. *Id.* Thus, the level of supervision and discipline Defendants exercise over the nurses is indicative of an employment relationship.

For the reasons above, Defendants have extensive control over the nurses' manner of work, a level of control that far exceeds the administrative functions in which a registry may engage without creating an employment relationship with the caregivers on its registry.

## B.  The Remaining Factors

Virtually all the remaining factors—workers' opportunities for profit/loss; the permanence of the working relationship; workers' investment in equipment/other workers; and the degree to which the work is integral to Defendants' business—indicate that Defendants are the nurses' employer. First, it is evident that the nurses' have no opportunities for profit/loss in its relationship with Defendants. FOF ¶ 11. Ms. Pitts is the sole owner of Steadfast, and there is no evidence that the nurses have an interest in Steadfast beyond their role as workers for a set hourly pay rate. *Id.* ¶ 4; SFOF ¶ 4. Furthermore, the non-competition clauses in the contracts between Defendants and the nurses significantly hinder the nurses' ability to accumulate profit independent of Defendants.[3] FOF ¶ 26. Second, Defendants' pay records indicate that the relationship between Defendants and the nurses is permanent in nature, even if a term limit is stated in a nurse's contractor agreement. *Id.* ¶ 24. Third, the evidence shows that nurses do not invest in equipment to an extent indicative

---

[3] *See* FAB 2018-4 at 6 (stating that "prohibiting a caregiver from registering with other referral services . . . [or] clients outside of the registry" indicates the existence of an employment relationship).

26

of an independent contractor status and that Defendants prohibit nurses from hiring other nurses, employees, or contractors to work for them at client-facilities. *Id.* ¶ 22, 63. Finally, the parties agree that the work the nurses perform is integral to Defendants' business. *Id.* ¶ 10.

Therefore, like the control factor, the totality of the remaining factors courts consider in determining whether workers are employees or independent contractors weigh in favor of the nurses being properly classified as Defendants' employees. The degree of skill (via education and licensures) required for the nurses' work suggests that the nurses could work in an independent capacity, but the economic realities of the nurses' relationship with Defendants under the other factors outweigh this factor significantly. Ultimately, under the FLSA, the nurses on Defendants' registry are Defendants' employees, not independent contractors.

## C.    Good Faith Defense

Defendants have failed to prove a good faith defense under 29 U.S.C. § 260 that would defeat or diminish their liability for willfully violating the FLSA's overtime and recordkeeping provisions. Defendants allege that they have a reasonable, good faith belief that they are not violating the FLSA after being advised by legal counsel that their nurses are likely properly classified as independent contractors. Defendants' Supplemental Brief ("Defs.' Supp. Br."), ECF No. 322 at 28–29. Ultimately, Defendants' alleged good faith belief is not objectively reasonable.

As an initial matter, the evidence clearly demonstrates that Defendants could not have classified their nurses as independent contractors in good faith prior to seeking legal counsel in June 2018. Defendants failed to present any evidence that it sought legal advice on the classification of its nurses or took any proactive steps to educate themselves on the FLSA prior to meeting Mr. Bredehoft in June 2018. FOF ¶ 69, 71.

27

**JA1211**

Moreover, Defendants' continuing reliance on Mr. Bredehoft's legal opinion on and after June 2018 is not objectively reasonable. First, the DOL conducted a multi–year administrative investigation into Defendant's pay practices and informed Defendants in 2018 that their pay practices violated the FLSA. *Id.* ¶ 70. *See Burnley*,730 F.2d at 140 (citing *Marshall v. Brunner*, 668 F.2d 748, 753–54 (3d Cir. 1982), which affirmed an award of liquidated damages where the employer deliberately circumvented FLSA requirements after the DOL Wage and Hour Division investigated the employer's pay practices). Second, Defendants admit that they are familiar with FAB 2018-4, which expressly identifies several of Defendants' pay practices as indicative of an employment relationship with the nurses. *Id.* ¶ 80. *See Richard v. Marriott Corp.*, 549 F.2d 303 (4th Cir.), *cert. denied*, 433 U.S. 915, 53 L. Ed. 2d 1100, 97 S. Ct. 2988 (1977) (affirming liquidated damages where the employer was aware of an opinion letter issued by the Wage and Hour Administrator that indicated that its pay practices were illegal). Therefore, while Mr. Bredehoft did not review this bulletin with Defendants, they are independently aware of the guidance and have not sought counsel regarding whether their practices comply with the guidance. *Id.* ¶ 79, 80.

And finally, Defendants failed to prove that they provided Mr. Bredehoft all the information he would have needed to provide a fully informed, reasonable legal opinion on Defendants' pay practices. For example, there is no evidence that Mr. Bredehoft spoke with the nurses, client-facilities, or anyone other than Ms. Pitts and the Payroll Manager, Ms. Kim (who was convicted for felonious embezzlement), regarding Defendants' actual business practices. FOF ¶ 77. Mr. Bredehoft did not review the memorandums Steadfast sends nurses regarding best work practices. *Id.* ¶ 44; 78. And there is no evidence that Defendants informed Mr. Bredehoft that Defendants, not the client-facilities, require nurses to notify them if they are late, sick, or otherwise

28

**JA1212**

cannot fulfill a shift and discipline nurses by cancelling their shifts. *Id.* ¶¶ 41, 42. In fact, Defendants convinced Mr. Bredehoft of the exact opposite despite being fully aware at the time of their meetings with Mr. Bredehoft of the reasons the DOL found Defendants' pay practices in violation of the FLSA. *See Fuentes*, 728 F. Supp. 2d at 1358–59 (citing *Townley*, 1989 WL 205342, at *4, which rejected an employer's good faith defense when the employer "did not furnish counsel information necessary for a legitimate legal opinion upon which it could rely and base a subsequent defense of 'good faith'"). Thus, Defendants' reliance on Mr. Bredehoft's legal advice was not in good faith or objectively reasonable, and they failed to prove their good faith defense by a preponderance of the evidence.

Defendants rely on precedent from within the Fourth Circuit where courts have declined to award liquidated damages where an employer adheres to legal advice regarding its compliance with the FLSA. Defs.' Supp. Br. at 28–29 (citing *Burnley*, 730 F.2d 136 and *McFeeley*, 825 F.3d 235). This case is distinguished from *Burnley* and *McFeeley* because Defendants, unlike the employers in those cases, were subject to an administrative investigation by the DOL Wage and Hour Division, the sole agency responsible for enforcing the FLSA and sole beneficiary of judicial deference on issues relating to the FLSA. *See* 29 U.S.C. § 259 (instructing courts to bar court actions against employers that rely on the DOL Wage and Hour Division's interpretation of the FLSA). At the conclusion of that investigation, the DOL advised Defendants that their pay practices were illegal. FOF ¶ 70. Moreover, regardless of this distinction, Defendants did not adhere to Mr. Bredehoft's advice to forgo the non-compete clauses in its contractor agreements. FOF ¶ 26; *McFeeley*, 825 F.3d at 245 (holding that an employer must adhere to the legal advice received to prevail on their good faith defense). Mr. Bredehoft testified that if the non-compete clause is enforced, "then [his] views would change" regarding the nurses' classification. *Id.* ¶ 76.

29

**JA1213**

Therefore, the record reflects that Defendants acted willfully and did not violate the FLSA in good faith.

**D.    Recordkeeping Violations**

As the nurses' employer under the FLSA, Defendants are liable for failing to "make, keep, and preserve" records of those who work for the employer and their applicable "wages, hours, and other conditions and practices of employment . . . ." 29 U.S.C. § 211(c); 29 C.F.R. § 516.2. The record reflects that Defendants declined to include an overtime-tracking function in the Zira app and otherwise failed to accurately record the nurses' total overtime pay and total additions or deductions from wages for each pay period. *Id.*; FOF ¶ 66–68. Therefore, Defendants are liable to Plaintiff for failing to meet the recordkeeping requirements under the FLSA.

**E.    Injunctive Relief**

The evidence demonstrates that Defendants have never complied with the FLSA and will continue to violate the FLSA, rendering injunctive relief appropriate. 29 U.S.C. § 217; *Access Home Care,* 2019 U.S. Dist. LEXIS 231687, at *12–13. Defendants' deposition and trial testimony as well as other documentary evidence supports Defendants' intent to continue misclassifying the nurses on their registry despite their familiarity with DOL guidance and law to the contrary. *Id.* ¶ 3, 6–7, 80–81. Therefore, Plaintiff has shown good cause for enjoining Defendants from violating the FLSA's overtime and recordkeeping provisions. *Id.*

## V.    CONCLUSION

For the foregoing reasons, the Court **FINDS** Defendant liable for failing to pay overtime and maintain pay records in accordance with the FLSA. Accordingly, **JUDGMENT IS ENTERED FOR PLAINTIFF**, and Defendants are **ENJOINED** from committing further violations of the FLSA.

30

**JA1214**

Plaintiff is **ORDERED** to provide the Court with an updated calculation of back pay and liquidated damages within sixty (60) days of the date of this opinion. Defendants are **ORDERED** to cooperate with Plaintiff by providing Plaintiff with all information necessary for compliance with this order.

The Clerk is **DIRECTED** to send a copy of this Order to the parties and counsel of record.

**IT IS SO ORDERED**.

Norfolk, Virginia

January /3 , 2022

Raymond A. Jackson
**United States District Judge**

31

**JA1215**

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
## Norfolk Division

**MARTIN J. WALSH,**
**Secretary of Labor, United States Department of Labor,**

          **Plaintiff,**

                                            **Case No. 2:18cv226**

        **v.**

**MEDICAL STAFFING OF AMERICA, LLC, et al.,**

          **Defendant.**

### JUDGMENT IN A CIVIL CASE

   **Decision by the Court.**   This action came for trial before the Court. The issues have been considered and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED that JUDGMENT IS ENTERED FOR PLAINTIFF, and Defendants are ENJOINED from committing further violations of the FLSA.**

January 13, 2022                      FERNANDO GALINDO, Clerk

                                        By _____/s/_____
                                        T. Armstrong, Deputy Clerk

**JA1216**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

---

| | |
|---|---|
| MARTIN J. WALSH, ) | |
| SECRETARY OF LABOR, ) | |
| UNITED STATES DEPARTMENT OF LABOR, ) | |
| ) | |
| Plaintiff, ) | Case No. 2:18-cv-226 |
| ) | |
| v. ) | Case No. 2:19-cv-475 |
| ) | |
| MEDICAL STAFFING OF AMERICA, LLC, a limited ) | |
| liability company, d/b/a STEADFAST MEDICAL ) | |
| STAFFING, and LISA ANN PITTS, individually and as ) | |
| owner and officer of the aforementioned company, ) | |
| Defendants. ) | |

---

<u>**NOTICE OF APPEAL**</u>

Notice is hereby given that Defendants Medical Staffing of America, LLC d/b/a Steadfast

Medical Staffing, and Lisa Ann Pitts (collectively "Defendants") appeal to the United States Court

of Appeals for the Fourth Circuit from the Order and Judgment entered on January 14, 2022 (Dkt.

Nos. 324, 325) in favor of the U.S. Department of Labor, and all earlier adverse interlocutory

orders and rulings subsumed into that judgment.  Defendants acknowledge that the District Court

has not yet entered a final judgment with a dollar amount.  Defendants file this Notice of Appeal

now in an abundance of caution, recognizing that premature notices of appeal are proper.  <u>See</u> Fed.

R. App. P. 4(a)(2).  Defendants expect to amend this Notice of Appeal and seek to pursue a single

combined appeal once proceedings are complete in the District Court.

_____/s/ Julia A. Rust_____

Abram J. Pafford (VSB No. 79999)
McGuireWoods LLP
888 16th Street NW
Black Lives Matter Plaza
Suite 500
Washington, D.C. 20006
Tel: 202-857-1725
Fax: 202-828-3350
apafford@mcguirewoods.com

Joshua L. Jewett (VSB No. 76884)
Julia A. Rust (VSB No. 87270)
Pierce / McCoy, PLLC
101 West Main Street, Suite 101
Norfolk, VA  23510
Tel: (757) 216-0226
Fax: (757) 257-0387
jjewett@piercemccoy.com
julia@piercemccoy.com

*Counsel for Defendants Medical Staffing of America,
LLC d/b/a Steadfast Medical Staffing, and Lisa Ann
Pitts*

2

**JA1218**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 14, 2022 I filed the foregoing document which provided notice to

the following counsel of record:

Ryma Lewis (VSB No. 83322)
Chervonti Jones (*pro hac vice*)
Mohamed E. Seifeldein (VSB No. 84424)
Office of the Regional Solicitor
U.S. Department of Labor
201 12th Street South, Suite 401
Arlington, VA  22202
Telephone:  (202) 693-9393
Facsimile:  (202) 693-9392
lewis.ryma@dol.gov
jones.chervonti.j@dol.gov
seifeldein.mohamed.e@dol.gov


    /s/ Julia A. Rust         
Julia A. Rust, Esq.

156929605_1

3

**JA1219**