# IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

JULIE A. SU,
Acting Secretary of Labor, United States Department of Labor,

*Plaintiff - Appellee,*

v.

MEDICAL STAFFING OF AMERICA, LLC, d/b/a Steadfast Medical Staffing, a limited liability company; LISA ANN PITTS, individually and as owner and officer of the aforementioned company*,*

*Defendants - Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT NORFOLK

## JOINT APPENDIX - VOLUME III OF V
### (Pages 1220 - 1858)

Abram J. Pafford
Francis J. Aul
MCGUIREWOODS, LLP
Black Lives Matter Plaza
888 16th Street, NW
Washington, DC 20006
202-857-1725
apafford@mcguirewoods.com
faul@mcguirewoods.com

Anne W. King
U. S. DEPARTMENT OF LABOR
Office of the Solicitor
200 Constitution Avenue, NW
Room N-2716
Washington, DC 20210
202-663-4699
king.anne.w@dol.gov

*Counsel for Appellants*

*Counsel for Appellee*

# TABLE OF CONTENTS

## VOLUME I OF V

Page

District Court Docket Sheet [2:18−cv−00226−RAJ−LRL] ....................................... 1

Complaint
    Filed May 2, 2018 [Dkt. 1] ...................................................................48

Transcript of Trial Proceedings - Day 1
Before the Honorable Raymond A. Jackson
    On August 31, 2021 [Dkt. 312] ...........................................................53

    COURTNAY HOPE DRAUGHN
        Direct by Examination by Ms. Lewis .....................................................74
        Cross-Examination by Ms. Rust ...........................................................95
        Redirect Examination by Ms. Lewis.....................................................105

    YETUNDE TAYLOR
        Direct Examination by Mr. Seifeldein ..................................................106
        Cross Examination by Ms. Rust............................................................129

    CHRISTOPHER RYAN HOPSON
        Direct Examination by Ms. Jones .......................................................137
        Cross-Examination by Ms. Rust ...........................................................154
        Redirect Examination by Ms. Jones.....................................................151

    SAUDIA BOYKINS
        Direct Examination by Mr. Seifeldein .................................................165
        Cross-Examination by Ms. Rust ...........................................................180
        Redirect Examination by Mr. Seifeldein ..............................................186

    ROXANNE ADAMS
        Direct Examination by Ms. Lewis .......................................................188
        Cross-Examination by Ms. Rust ...........................................................206
        Redirect Examination by Ms. Lewis.....................................................218

DAWN M. WOOTEN
    Direct Examination by Mr. Seifeldein .......................................222
    Cross-Examination by Ms. Rust ............................................ 239

Transcript of Trial Proceedings - Day 2
Before the Honorable Raymond A. Jackson
  On September 1, 2021 [Dkt. 313] ....................................... 245

JOHNESE JONES
    Direct Examination by Ms. Lewis .........................................247
    Cross-Examination by Ms. Rust ........................................... 260
    Redirect Examination by Ms. Lewis.....................................264

ASHLEY MEGGIE
    Direct Examination by Ms. Lewis .........................................266
    Cross-Examination by Ms. Rust ........................................... 275

KIMBERLY BELLAMY
    Direct Examination by Mr. Seifeldein ...................................279
    Cross-Examination by Ms. Rust ........................................... 290
    Redirect Examination by Mr. Seifeldein................................ 294

TERESA MOREY (Via ZoomGov.com)
    Direct Examination by Ms. Lewis .........................................297
    Cross-Examination by Ms. Rust ...........................................306

TATIANNA CANADY
    Direct Examination by Ms. Jones .........................................312
    Cross-Examination by Ms. Rust ...........................................326
    Redirect Examination by Ms. Jones.....................................329

COURTNEY TURNER (Via ZoomGov.com)
    Direct Examination by Ms. Jones .........................................333

TYWANN WHITE
    Direct Examination by Ms. Lewis .........................................340

Transcript of Trial Proceedings - Day 3
Before the Honorable Raymond A. Jackson
On September 2, 2021 [Dkt. 314] ...................................................................358

CHANTELLA SMITH
    Direct Examination by Ms. Jones ..........................................361
    Cross-Examination by Ms. Rust ...........................................373
    Redirect Examination by Ms. Jones......................................377

ANDREA TIRADO
    Direct Examination by Ms. Lewis ........................................382
    Cross-Examination by Ms. Rust ..........................................398
    Redirect Examination by Ms. Lewis....................................401

ERICA JOHNSON
    Direct Examination by Mr. Seifeldein .................................413
    Cross-Examination by Mr. Jewett.........................................440
    Redirect Examination by Mr. Seifeldein...............................459
    Recross-Examination by Mr. Jewett .....................................465

DAVID RAWLINGS
    Direct Examination by Mr. Seifeldein .................................467
    Cross-Examination by Mr. Jewett.........................................487
    Redirect Examination by Mr. Seifeldein...............................501

ROBERTO MELENDEZ
    Direct Examination by Ms. Lewis ........................................502
    Cross-Examination by Ms. Rust ..........................................515
    Redirect Examination by Ms. Lewis....................................520

YAOZU XIONG (Via ZoomGov.com)
    Direct Examination by Ms. Lewis ........................................523
    Cross-Examination by Ms. Rust ..........................................541
    Redirect Examination by Ms. Lewis ...................................5554

Transcript of Trial Proceedings - Day 4
Before the Honorable Raymond A. Jackson
On September 3, 2021 [Dkt. 315] ...................................................................... 560

LISA PITTS
    Direct Examination by Ms. Lewis ....................................................... 565
    Cross-Examination by Mr. Jewett......................................................... 606
    Redirect Examination by Ms. Lewis...................................................... 616
    Recross-Examination by Mr. Jewett ..................................................... 621

CHRISTINE KIM
    Direct Examination by Ms. Jones ......................................................... 626
    Cross-Examination by Ms. Rust ........................................................... 653
    Redirect Examination by Ms. Jones...................................................... 658

PEYTON LEX
    Direct Examination by Ms. Jones ......................................................... 670
    Redirect Examination by Ms. Jones...................................................... 679

# **VOLUME II OF V**

Transcript of Trial Proceedings - Day 5 (Morning Session)
Before the Honorable Raymond A. Jackson
    On September 7, 2021 [Dkt. 316] ..................................................................... 683

    PENNY CLARK
        Direct Examination by Ms. Rust.......................................................... 687
        Cross-Examination by Ms. Lewis ........................................................ 696
        Redirect Examination by Ms. Rust ...................................................... 702

    NAPOLEAN ALSTON
        Direct Examination by Ms. Rust..........................................................705
        Cross-Examination by Ms. Lewis ........................................................ 720
        Redirect Examination by Ms. Rust ...................................................... 732

    TAWANDA HALL
        Direct Examination by Mr. Siegrist ...................................................... 735
        Cross-Examination by Ms. Jones .......................................................... 745

    DASELINE HALL (Via ZoomGov.com)
        Direct Examination by Mr. Siegrist ...................................................... 750
        Cross-Examination by Ms. Lewis ........................................................ 768
        Redirect Examination by Mr. Siegrist....................................................777

Transcript of Trial Proceedings - Day 5 (Afternoon Session)
Before the Honorable Raymond A. Jackson
    On September 7, 2021 [Dkt. 313] .....................................................................786

    CHRISTINE LEE KIM
        Direct Examination by Ms. Rust..........................................................790
        Cross-Examination by Ms. Jones .......................................................... 846
        Redirect Examination by Ms. Rust ...................................................... 861

    RACHARLOTTE LEE COATES
        Direct Examination by Ms. Rust..........................................................864
        Cross-Examination by Mr. Seifeldein ....................................................875
        Redirect Examination by Ms. Rust ......................................................890

Transcript of Trial Proceedings - Day 6
Before the Honorable Raymond A. Jackson
    On September 8, 2021 [Dkt. 318] ....................................................................... 901

      LESLIE BOONE (Via ZoomGov.com)
          Direct Examination by Ms. Rust ..................................................903
          Cross-Examination by Mr. Seifeldein ...................................... 912

      DIXIE DeLUTIS (Via ZoomGov.com)
          Direct Examination by Ms. Rust ..................................................932
          Cross-Examination by Ms. Lewis ............................................ 937
          Redirect Examination by Ms. Rust ......................................... 943

      LISA PITTS
          Direct Examination by Mr. Jewett ......................................... 950
          Cross-Examination by Ms. Lewis ......................................... 1047
          Redirect Examination by Mr. Jewett .................................... 1103

Transcript of Trial Proceedings - Day 7
Before the Honorable Raymond A. Jackson
    On September 9, 2021 [Dkt. 319] ..................................................................... 1113

      JOHN BREDEHOFT
          Direct Examination by Mr. Jewett ....................................... 1115
          Cross-Examination by Mr. Seifeldein ................................ 1137
          Redirect Examination by Mr. Jewett .................................. 1169

Memorandum Opinion and Order Entered
    Entered January 14, 2022 [Dkt. 324] ............................................................ 1185

Judgment in a Civil Case Entered
    Entered January 14, 2022 [Dkt. 325] ............................................................ 1216

Notice of Appeal Filed
    Filed March 14, 2022 [Dkt. 332] ................................................................... 1217

**VOLUME III OF V**

Attachments and Exhibits to Consent Notice of Filing
of Certain Exhibits for Purposes of Appeal
  Filed August 17, 2022 [Dkt. 356]:

Att. 1:    Alvaro Mazuera Deposition Transcript [Dkt. 356-1] ................. 1220

Att. 2:    Zira Technologies 30(b)(6) Deposition Transcript
           [Dkt. 356-2] ................................................................................. 1526

Ex. PX-10: Staffing Agreements Between Steadfast and Facilities
           (Excerpts of Exhibit) [Dkt. 356-3] ......................................... 1692

Ex. PX-11: Facility Invoices (Excerpt of Exhibit) [Dkt. 356-4] ............... 1781

Ex. PX-12: Summary Exhibit - Facilities Steadfast Contracts
           (Excerpt of Exhibit) [Dkt. 356-5] .......................................... 1786

Ex. PX-16: ADP Employee Change Report (Excerpt of Exhibit)
           [Dkt. 356-6] ............................................................................. 1787

Ex. PX-25: Agreement for Independent Contractor Services
           (Excerpts of Exhibit) [Dkt. 356-7] ......................................... 1793

Ex. PX-26: Steadfast Applications (Excerpts of Exhibit)
           [Dkt. 356-8] ............................................................................. 1831

Ex. PX-37: Timesheet Reminder Memos (Excerpts of Exhibit)
           [Dkt. 356-9] ............................................................................. 1839

Ex. DX-41: Steadfast Memo - Advisory Atlantic Shores
           [Dkt. 356-10] ........................................................................... 1848

Ex. DX-42: Steadfast Memo - Be on Time [Dkt. 356-11] ........................ 1849

Ex. DX-44: Steadfast Memo - No Sleeping in Rooms [Dkt. 356-12] ....... 1850

Ex. DX-46: Steadfast Memo - Be on Time [Dkt. 356-13] ........................ 1851

PX-34 Gmail - Next Day Pay Memo ........................................................1852

DX-50 Memo re Thanksgiving Holiday Pay.............................................1853

DX-58 - Memo re CNA and LPN Needs (155830292.1)..........................1854

DX-59 - Memo re CNA and Nurse Needs (155830293.1).......................1857

# VOLUME IV OF V

Defendants' Response to Plaintiff's Motion to Revise the Court's Order
Filed March 20, 2020 [Dkt. 247] ........................................................................ 1859

Joint Pretrial Order
Filed March 21, 2021 [Dkt. 261] ........................................................................ 1865

Notice of Filing Tenth Revised Schedule a In Steadfast II
Filed August 25, 2021 [Dkt. 287] ...................................................................... 1918

    Ex.1:  Tenth Revised Schedule A [Dkt. 287-1] 1924

Plaintiff's Supplemental Proposed Findings of Fact and Conclusions of Law
Filed November 3, 2021 [Dkt. 321] .................................................................... 1953

Defendants' Motion for Relief in Connection with Plaintiff's
Trial Exhibit Px-21, And Opposition to Plaintiff's March 11
"Updated Back Wage Computations"
Filed March 13, 2022 [Dkt. 331] ........................................................................ 1981

    Att. 1:    Memorandum of Points and Authorities [Dkt. 331-1] ............... 1985

    Ex. 1:    Steadfast March 6 letter to DOL [Dkt.  331-2] .......................... 2002

    Ex. 2    Attachment A to March 6 letter [Dkt. 331-3] ............................ 2006

    Ex. 3:    Attachment B to March 6 letter [Dkt. 331-4] ............................ 2010

    Ex. 4:    Attachment C to March 6 letter [Dkt. 331-5] ............................ 2013

    Ex. 5:    March 8-10 counsel email exchange [Dkt. 331-6] ..................... 2015

    Ex. 6:    W-2 employee corrections [Dkt. 331-7] ..................................... 2019

    Ex. 7:    Sample packets re: PX-21 errors [Dkt. 331-8] ........................... 2023

Defendants' Reply Brief in Support of Motion for Relief In
Connection with Plaintiff's Trial Exhibit Px-21, And Opposition to
Plaintiff's March 11 "Updated Back Wage Computations"
　　Filed April 4, 2022 [Dkt. 337]........................................................ 2059

　　　　Ex.1:　　Spreadsheet [Dkt. 337-1] ............................................. 2080

　　　　Ex. 2:　　Sampling Breakdown [Dkt. 337-2]............................... 2081

　　　　Ex.3:　　Plaintiff's Answers and Objections to Defendants' First Set
　　　　　　　　Of Request Interrogatories [Dkt. 337-3].................................... 2082

　　　　Ex.4:　　Plaintiff's Second Supplemental Answers and Objections To
　　　　　　　　Defendants' First Set of Interrogatories [Dkt. 337-4] ................ 2099

Defendants' Opposition to Plaintiff's "Motion for Entry of Updated Order"
　　Filed July 28, 2022 [Dkt. 350]........................................................ 2110

　　　　Ex.1:　　July 28 letter to DOL [Dkt. 350-1] ...............................2123

Order Reimposing Injunction
　　Filed September 7, 2023 [Dkt. 395] ................................................ 2135

Notice of Appeal (interlocutory)
　　Filed November 3, 2023 [Dkt. 404] ................................................ 2144

Order
　　Filed November 30, 2023 [Dkt. 410] .............................................. 2147

Memorandum Opinion and Order Denying relief re PX21
　　Filed December 7, 2023 [Dkt. 411]................................................. 2149

Updated Order and Judgment
　　Filed December 8, 2023 [Dkt. 412]................................................. 2160

Amended Final Judgment
　　Filed December 11, 2023 [Dkt. 413].............................................. 2167

Amended Notice of Appeal
　　Filed December 11, 2023 [Dkt. 415].............................................. 2169

**VOLUME IV OF V**

PX-21 Wage Transcription and Computation Sheets.............................................2172

PX-22 Summary of Back Wage Computations......................................................2782

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                    Norfolk Division

 3   _____

 4
     R. ALEXANDER ACOSTA
 5   SECRETARY OF LABOR,
     UNITED STATES DEPARTMENT OF LABOR,
 6            Plaintiff,
     v                                    CASE NO.2:18-CV-226
 7
     MEDICAL STAFFING OF AMERICA, LLC,
 8   D/B/A STEADFAST MEDICAL STAFFING,
     AND LISA ANN PITTS
 9            Defendants.

10   _____

11
              The deposition of ALVARO MAZUERA, a
12
     witness in the above-entitled cause, taken before
13
     Danette M. Wilson, Notary Public in and for the
14
     Commonwealth of Virginia at Large, at Pierce McCoy,
15
     PLLC, 101 W. Main Street, Suite 101, Norfolk,
16
     Virginia, on February 28, 2019, commencing at or
17
     about the hour of 10:00 a.m.
18
19   APPEARANCES:  FOR THE PLAINTIFF:

20               Pierce McCoy, PLLC
                 BY: CHRISTOPHER D. DAVIS, ESQUIRE
21               101 West Main Street, Suite 101
                 Norfolk, Virginia 23510
22
                 FOR THE DEFENDANT:
23
                 Office of Regional Solicitor
24               BY:  AVNI J. AMIN, ATTORNEY AT LAW
                 201 12th Street South
25               Arlington, Virginia 22202
```

1                          **I N D E X**

2

**WITNESS:**                                          **PAGE:**

3

1.  Alvaro Mazuera

4

     Examination by Christopher Davis  .......... 3

5

6

**ALVARO EXHIBITS:**                                  **PAGE:**

7

No. 1  -  Notice of Deposition....................  3
No. 2  -  Exhibit B ............................. 168
No. 3  -  Back Wages............................ 173
No. 4  -  Field Assistance Bulletin.............. 227
No. 5  -  Payroll Details....................... 230
No. 6  -  Wage Transcription Computation......... 232
No. 7  -  Redacted page......................... 233
No. 8  -  Acknowledgement and Waiver............. 234
No. 9  -  MFA/MFNC Access Request Packet......... 239
No. 10 -  MFA/MFNC Access Acknowledgement........ 245
No. 11 -  Exhibit E............................. 249
No. 12 -  Webpage.............................. 252
No. 13 -  Employment Application................. 254
No. 14 -  Confidentiality Statement.............. 259
No. 15 -  List of Names/Addresses............... 259
No. 16 -  List of Names/Addresses............... 261
No. 17 -  Settlement Agreement.................. 264
No. 18 -  Memo of the Week...................... 267
No. 19 -  Initiating Information................. 274
No. 20 -  Redacted pages........................ 278
No. 21 -  Exhibit C............................. 279
No. 22 -  Exhibit D............................. 285
No. 23 -  Letter............................... 289

8

9

10

11

12

13

14

15

16

17

18

19

20                          -----oOo-----

21

22

23

24

25

Mazuera - Davis                                   3

```
 1                    ALVARO MAZUERA,

 2   having been produced and first duly sworn as a witness,

 3   testified as follows:

 4

 5                    EXAMINATION

 6

 7   BY MR. DAVIS:

 8        Q     Would you please state your full name for

 9   the record, please?

10        A     My full name?

11        Q     Yes.

12        A     Alvaro Mazuera.

13        Q     And, Mr. Mazuera, I'm going to show you a

14   notice.

15             MR. DAVIS:  I'll ask you to mark this as

16        Exhibit 1.  Alvaro 1.

17             (Marked in evidence as Alvaro Exhibit

18        Number 1.)

19

20   BY MR. DAVIS:

21        Q     This is -- this is a notice -- our amended

22   notice of deposition to take your deposition here

23   today.  Is this the reason why you're here today?

24        A     Yes.

25        Q     Okay.  Very good.  Are you taking any kind
```

**JA1222**

1    of medication or under the influence of anything that

2    would prevent you from giving full and truthful --

3         A    No.

4         Q    -- answers today?

5         A    No.  Just coffee.

6         Q    Okay.  Just coffee?  Me too.  Me too.

7    Very good.  I'm assuming that you had your deposition

8    taken before?

9         A    No.  I testified in court but no

10   depositions.

11        Q    This is your first deposition?

12        A    Yes.

13        Q    Okay.

14        A    I witnessed several deposition, but this

15   is my first deposition.  Yeah.

16        Q    Okay.  Meaning -- when you say that you

17   witnessed several depositions, does that mean you sat

18   while someone else was deposed?

19        A    Yes.  I have in previous cases.

20        Q    Okay.  And -- and were the -- in the other

21   cases where you sat in a deposition, you were not being

22   deposed.  Were those all cases involving the Department

23   of Labor?

24        A    Yes, it was.

25        Q    Okay.  What -- since you haven't been

Mazuera - Davis                                          5

```
 1   deposed, I'll just tell you a couple ground rules that

 2   might be helpful just -- after I turn off my cell

 3   phone.  The court reporter's going to take everything

 4   down, of course, and it's important that we don't talk

 5   over each other because she can't take down, you know,

 6   when we're talking over each other.

 7        A    Uh-huh.

 8        Q    And just like you just did, try not to say

 9   uh-huh.  Try to say yes or no.  I'm terrible at it.  I

10   do the same thing, so I'll watch you and you watch me

11   and Avni can watch both of us, but let's try to keep

12   our answers audible.  Make sense?

13        A    Okay.

14        Q    Okay.  Good.  All right.  What did you do

15   to prepare for this deposition?

16        A    What did I do to prepare for this

17   deposition?  I just talked to -- to my attorney -- our

18   attorney from the Department of Labor.  That's it.

19        Q    Okay.  I'm not going to ask you and I'm

20   not inquiring as to anything that you -- that you all

21   talked about.  That would be protected information.

22        A    Yes.

23        Q    But did you talk to anybody else other

24   than Avni here?

25        A    No.
```

Mazuera - Davis                                        6

```
 1      Q      Okay.  Did you review any documents to
 2   prepare for your deposition?
 3      A      No.
 4      Q      Okay.  Very good.  Have you ever been
 5   involved in a lawsuit personally before?  Not involving
 6   the Department of Labor?
 7      A      No.
 8      Q      Okay.  Can you tell me about your
 9   educational background?
10      A      I have -- I studied law school in
11   Colombia, South America.
12      Q      Did you?
13      A      Five years.  I was close to graduation but
14   the only thing left was the thesis.  I completed
15   everything but --
16      Q      The only thing was the what?
17      A      My thesis.
18      Q      Thesis?
19      A      Yeah.  That was the only thing left.
20      Q      We don't have to do a thesis here.
21      A      Yeah.  We have to do it over there.  We
22   have to do a year of consulting.  You know, free
23   consulting, you know, for the public, and then after
24   that we have to do some preparatories to cover all the
25   main laws, you know, civil law, you know, and -- and
```

Mazuera - Davis                                        7

 1   all of the labor law and everything.  Then after that
 2   we have to do a thesis, and the thesis has to be based
 3   on any subject that you -- my subject was going to be
 4   extradition, so --
 5        Q     Let me just stop you for a second.
 6        A     Yeah.
 7        Q     I don't need to know all that stuff.
 8   Great information.
 9        A     So I -- I -- I came to the U.S.  I had the
10   opportunity to come to the United -- United States.  I
11   joined the military three years after.  I did
12   twenty-four years in the United States Navy.
13        Q     Thank you for your service.
14        A     Yes.  While I was in Navy I started --
15   went to school too.  I graduated with a business
16   degree, and then I did a master's degree in -- in
17   business.
18        Q     So you have a bachelor's degree in
19   business and then a --
20        A     A master's in business.
21        Q     An MBA?
22        A     Uh-huh.  MBA.
23        Q     Okay.  Where -- where did you get your
24   MBA?
25        A     University of Maryland University College.

Mazuera - Davis                                                    8

```
 1       Q       Okay.

 2       A       I did some course online and some others

 3   in the classroom.

 4       Q       The -- the law training that you had, so

 5   that was a degree program but you didn't complete it,

 6   so is there a certificate or anything that you have

 7   from that program --

 8       A       From the --

 9       Q       In Colombia.

10       A       In Colombia?  No, I did not.  I just have

11   this much left (indicating).

12       Q       Okay.  So five years of training in law?

13       A       Yeah.  Law school.

14       Q       What was the name of the school?

15       A       It was University of Santiago de Cali.

16       Q       Okay.  All right.  And then the bachelor's

17   degree from --

18       A       The bachelor's from UMUC.

19       Q       Okay.  All right.  And then the MBA.  Any

20   other education?

21       A       Not really.  No.  No.  No need.

22       Q       Got it.  Did you have any -- any kind of

23   professional certifications of any kind?  I'm being

24   very vague.  I don't know --

25       A       No.  No, I don't.
```

**JA1227**

Mazuera - Davis                                    9

```
 1       Q       Six Sigma or -- I mean, there's lots of
 2  certifications people can have.
 3       A       That's all in the military.
 4       Q       Okay.
 5       A       But that stay with the military.
 6       Q       Okay.  What was your position in the
 7  military?
 8       A       I was a chief.  An E-7.
 9       Q       An E-7?  Okay.
10       A       Uh-huh.
11       Q       Did you say which branch?
12       A       United States Navy.
13       Q       In the Navy?
14       A       Yeah.
15       Q       Okay.  Were you on a boat or a sub?
16       A       Boat and shore duty.  Sixteen years on the
17  boat.
18       Q       Got it.  When did you start working for
19  the Department of Labor?
20       A       I started in 2013.
21       Q       Okay.  And what -- what was your -- can
22  you walk me through -- not in a lot detail, but can you
23  walk me through what position you were initially,
24  leading up to what your position is today?
25       A       I was a GS-7 when I joined the Department
```

1   of Labor.  I went to school.  We have Basic 1, Basic 2,

2   and I attended --

3        Q       Let me stop you for a second.  You went to

4   school with the Department of Labor?

5        A       Yes.

6        Q       And what is that schooling?

7        A       That school is -- the first one, the Basic

8   1, is introduction to Fair Labor Standards Act --

9        Q       Uh-huh.

10       A       -- and other regulations.  The second one

11  was more into Davis-Bacon Act, Service Contract, H-1A,

12  H-1B, H-2A, and then after that I took several courses

13  on Section 14 also.  Then I went back --

14       Q       Section 14 of --

15       A       Section 14.

16       Q       Of what?

17       A       That's for minimum wage.

18       Q       Oh, okay.

19       A       Yes.  For people who have some

20  disabilities, you know.

21       Q       Okay.

22       A       Sub-minimum wage.  I also attended class

23  with agricultural -- H-2A classes with the Department

24  of Labor.  I went for H-2B also.  Yeah.  I've been

25  taking different courses with them.

Mascara - Davis                                          11

```
 1        Q       Okay.  When you take these courses, are
 2   they offered internally with the Department of Labor?
 3        A       It is internal.  Yeah.  Internally.  Yeah.
 4   We travel to several locations and we sit down in the
 5   classroom.  We discuss about our regulations.
 6        Q       In other words, members of the public
 7   would not be entitled to take these classes?
 8        A       No.
 9        Q       Is that correct?
10        A       No.
11        Q       All right.  Okay.  Any other training with
12   the Department to Labor?
13        A       Not that I'm aware.
14        Q       So you started with them in 2013.  What
15   was your job title in 2013?
16        A       I was an investigator, Wage and Hour
17   Investigator.
18        Q       And did you have to start the training
19   before you could have the position or did you take the
20   position and then train while you --
21        A       No.  I took the position and then started
22   training.
23        Q       Simultaneously?
24        A       Uh-huh.
25        Q       Okay.  And did your -- did your job title
```

1   and position change over time from 2013 until today?

2        A      Yeah.  I turned -- the second year I

3   became GS-9.

4        Q      Okay.

5        A      And then the third year I became a GS-11.

6        Q      Okay.

7        A      The fourth year I became GS-10.

8        Q      Okay.

9        A      I mean a GS-12.  I'm sorry.  Then I been a

10  GS-12 ever since.

11       Q      And my question is actually not going to

12  your -- the GS level refers to your pay scale and all

13  of that.  I understand.  I'm asking about your job

14  title.  Did you change?

15       A      Wage and Hour Investigator.

16       Q      Always a Wage and Hour Investigator?

17       A      Always.  Yeah.

18       Q      Okay.  Understood.  Okay.  And as a Wage

19  and Hour Investigator, I understand in this instance

20  you traveled to Norfolk and then we talked about going

21  to St. Croix.  Do you travel around the country

22  typically in -- in your role as a Wage and Hour

23  Investigator?

24       A      No.  Typically as a Wage and Hour

25  Investigator we travel in Virginia.

**JA1231**

Case 2:18-cv-00226-RAJ-LRL   Document 356-1   Filed 08/17/22   Page 13 of 306 PageID#

Mustafa - Davis                                    13

1       Q       Okay.

2       A       That's what I'm assigned.  Our office is

3  assigned to the southern part of Virginia.

4       Q       Okay.

5       A       Now, if my district office says, You have

6  to go somewhere else, you know, to provide support -- I

7  did it before.  With H-2A employees I went to the

8  Baltimore district --

9       Q       Okay.

10      A       -- and I provided assistance over there.

11      Q       And I heard you say your office used to be

12  in this building, correct?

13      A       It used to be on the seventh floor.

14      Q       Okay.  And where -- where are you now?

15      A       Newport News in Merchants Walk.

16      Q       Very good.  Okay.  All right.  Do you

17  do -- in your role as a Wage and Hour Investigator, are

18  you mostly involved in FLSA matters or does that vary

19  to other things?  You mentioned Davis-Bacon.  Like

20  what -- do you deal with government contractors?  How

21  does that work?

22      A       No.  We all train to oversee any act.  We

23  supposed to be trained to oversee any Davis-Bacon Act,

24  Service Contract, all the acts.  However, FLSA is a

25  requirement for all the acts once we -- if we doing the

Fiduciary Reporting, Inc.
(757) 482-2729

**JA1232**

1    Davis-Bacon, I'm not just going to concentrate -- you

2    know, I wear different hats, so I always tell the

3    employer, I'm changing my hat.  We going to FLSA.  We

4    moving from mechanics -- you know, labor and mechanics

5    and moving to the office.

6           Q       Okay.

7           A       Who are you -- the people that is working

8    for you in the office?  And I always test the

9    exemptions of the overtime with the office personnel.

10          Q       Okay.

11          A       So it changes hats.  For every -- for

12   every act, we always have to enforce also FLSA.

13          Q       Do you keep up with case law?  Meaning the

14   rulings of courts with regard to FLSA matters to know

15   what that current law is?

16          A       Yes.  We -- in a weekly basis we get

17   messages from the national office with letters --

18          Q       Okay.

19          A       -- with any changes.  Yeah.  We also have

20   changes and when we have training -- we have monthly

21   training with the district office.  We discuss about

22   any changes in the rules, you know, and regulations.

23          Q       Okay.  Can you walk me through -- I'm

24   going to get specific to this case in just a minute --

25          A       Sure.

```
 1        Q       -- but can you walk me through what the

 2   normal investigative process is for an FLSA matter?

 3        A       Okay.  For an FLSA matter, the first thing

 4   that we do is -- the first thing when we have a

 5   complaint is -- sometimes the investigation will start

 6   as a complaint.  Sometimes it starts as directed by the

 7   regional office or by the district office.

 8        Q       Okay.

 9        A       So if it's directed, we just go straight

10   to the employer.  If it's a complaint, we meet the

11   complainant or we call them depending on the

12   availability, and then we -- we take an interview.

13        Q       Okay.

14        A       And we discuss about his complaint and

15   that's it.  After that, you call the employer.  You

16   already have some basis of what's going on.  You read

17   your file and then you call the employer.  Normally I

18   send an appointment letter.  I wait about three days

19   until that appointment letter has arrived to the

20   point -- you know, the destination because sometimes

21   the address might be wrong, so within three to four

22   days I call the employer and I says, Hey, have you

23   received my letter?

24               Then at that time we discuss about the

25   letter.  What are requirements?  What does the letter
```

**JA1234**

Mazota - Davis                          16

1    requires?  I explain to them about the Fact Sheet 44,

2    you know, visits to employers, and Fact Sheet 77 also,

3    retaliation against employees, because sometime

4    employers when they see the Department of Labor they

5    think someone complain and they start targeting their

6    employees and looking at everybody and asking, Okay.

7    Have you heard anybody complaining or saying anything?

8    The first thing I tell them is, Please, do not target

9    any employees.  That's it.

10              The day of the appointment, I visit the

11   employer and the first thing that we ask is for taxes,

12   you know, a copy of the taxes, to establish enterprise

13   coverage.  It all depends on the case.  If it's home

14   healthcare case, we automatically have coverage because

15   it's a health -- it's a health issue.  It's a health

16   case where we have people that are aged, sick, that

17   are, you know, old or that stay in hospitals or nursing

18   homes, so -- and that's the normal procedure.

19      Q       Okay.  Okay.  Keep going for me.  So then

20   you establish that there's coverage and then what's

21   next?

22      A       Yeah.  Once we establish coverage, I

23   explain to the employer what is coverage.

24      Q       Okay.

25      A       And I make the comparison like the FBI

1    when they going to investigate a case, the first thing

2    they have to do is establish jurisdiction.

3          Q      Of course.

4          A      And that's what I tell them because when

5    you tell them coverage, like, What is that?

6          Q      Right.

7          A      If it's more than 500,000, then we proceed

8    with the investigation, with the compliance inspection,

9    and we tell the employer -- you know, we normally show

10   the Department of Labor leaflets, you know, guide and

11   reference, and say, This is what it says in there.

12         Q      Okay.

13         A      And then I continue to ask questions of

14   the employer and I have like a --

15         Q      Are those questions that are predetermined

16   or do you select the questions?  Where do they come

17   from?

18         A      No.  It's already predetermined.  We have

19   to follow FOH fundamentals --

20         Q      Okay.

21         A      -- the procedures, because you have to put

22   information in the -- in the system about this

23   employer.  You ask them for their legal name, to check

24   for -- for the, you know, FSLA posters and make sure

25   they're in there.

Matthea - Davis                                          18

```
 1        Q       Yeah.

 2        A       That could be a violation.  Then after

 3   that we ask for taxes.  When we look at the taxes, we

 4   look at the employer's identification number.  We check

 5   that.  We ask, How many employees do you have?  Are you

 6   a corporation?  What -- what are you?  Then after

 7   that, there's several questions on that paper that --

 8   that you have to follow.

 9        Q       Okay.  So now after you do the interview

10   with the -- with the individual at the business, what's

11   the next step?

12        A       You mean with the employer?

13        Q       Well, I was going to ask you about that.

14   Do you always refer to them as an employer before

15   you've made a determination whether they're --

16        A       Well, normally when I walk into an office

17   I ask for the owner.

18        Q       The owner?

19        A       Yeah.  Of the business.

20        Q       Okay.

21        A       I identify who's the owner.  If they say,

22   The owner's not here, and I ask them, Can you please

23   call the owner?

24        Q       Okay.

25        A       And if they say, No, we can't contact them
```

Matoaca - Davis                                                     19

1    right now, I say, Okay, so who's in -- who's in charge?

2         Q       Yes.

3         A       Who's representing the -- the owner?  Once

4    I identify that person, then I present the letter, you

5    know.  We talk about it.  Sometimes we -- I do

6    walk-ins, you know.  I say, It's very important for you

7    to locate the owner because I would like to talk to him

8    in person or over the phone and explain the

9    requirement.

10        Q       Can I stop you for a second?

11        A       Sure.

12        Q       I'm asking about the word employer.

13   Several times when you were telling me this process you

14   said that you talked to the employer, and my

15   understanding is --

16        A       The employer of the business --

17        Q       Correct.

18        A       -- that I'm -- that I'm investigating.

19        Q       Right.  And I'm asking about do you -- do

20   you always use the word employer when you're

21   investigating whether or not they're an employer or

22   somebody?

23        A       No.  No.  We use employer or owner.

24        Q       Or owner?

25        A       Yeah.  The determination of employer, it

Mascia - Davis                                    20

1   gets decided, yeah, when we start that meeting.

2         Q      Right.  Okay.  It's decide -- when is it

3   decided?

4         A      When is it decided?

5         Q      Yeah.

6         A      Throughout the meeting that I have with

7   the owner of the establishment.

8         Q      Okay.  Got it.  Do you typically make a

9   decision as to whether the individual is an employer or

10  someone who retains independent contractors after that

11  first interview with the owner?

12        A      Well, the determination of calling someone

13  employer is after -- typically after I collect -- not

14  just the interview from the employee that complain but

15  sometimes it's not just one person but a bunch of

16  complaints, so when I talk to them I ask them -- I ask

17  them about the economic realities and I ask questions

18  about that and I ask them, Do you have business --

19  sometimes I ask questions, Do you have a business?  Are

20  you registered?  Do you have -- are you registered with

21  the Commonwealth of Virginia?  If they say no, Do you

22  have any employees?  No?  So if it's not relevant to

23  what I need to write on the interview -- but I ask

24  those questions to make sure that if the -- what is

25  complaint?  If the complaint is that if employee saying

Matoaca - Davis                                        21

1   that I'm not getting paid overtime because the employer

2   or the owner of the business has me as an exempt, then

3   we test it for that.  I ask him specific questions

4   based on the 541.100 exemptions.

5           Q       I see.

6           A       It depends on what type employee it is.

7   If it is an administrative employee, then we use the

8   541.100.  If it's professional -- in some cases

9   sometimes like cooks, cooks are sometimes misclassified

10  as a professional, so I ask questions --

11          Q       Really?

12          A       Yeah.  Sometimes they use -- employers,

13  owners of business of restaurants, they -- they

14  asked -- so we have to ask questions specific with the

15  regulation.  Everything is based on the regulation.

16          Q       Okay.  So I just want to finish up the

17  process.  So as I understand it, you have either a

18  complaint from an individual or you have -- or you're

19  directed from the organization to investigate.  You

20  send the letter.

21          A       Yes.

22          Q       You go and meet with the owner, and then

23  after meeting with the owner, then you conduct

24  interviews with the workers?

25          A       The workers.  I conduct interviews with

Mazzola - Davis                                    22

1   the office workers, and I also conduct interviews with

2   any individual that is working for this owner or

3   employee that is working outside.  Sometimes you have,

4   one example, sales representatives that working the

5   outside.  They have different rules than the salesman

6   that works in the office, so they all abide by

7   different rules and regulations.

8         Q      Is it typical that you find organizations

9   that have both employees and independent contractors

10  working with them?

11        A      Not really.

12        Q      Okay.  It's generally one or the other?

13        A      Yeah.  It's generally one or the other.

14  Yeah.

15        Q      Have you ever investigated an organization

16  that maintained both employees and independent

17  contractors at the same time?

18        A      Yes, I did.

19        Q      Okay.  And have you found instances where

20  the Department of Labor determined that it was proper

21  to have class -- these individuals, some individuals,

22  classified as employees while others would be

23  classified as independent contractors?

24        A      No.  It all depends on the test that -- if

25  they pass the test.  You know, the questions that I

Mattera - Davis                                    23

1   ask.

2        Q       Okay.

3        A       But so far I have not seen anyone that was

4   working as an independent -- that was classified as an

5   independent contractor by his employer and -- and that

6   at the end he was independent contractor.  Normally a

7   lot of employers they misunderstand the regulation and

8   they -- it could be used -- the employer can use it and

9   decide, Well, this is an independent contractor, but

10  it's -- there's some requirements that you have to ask

11  in order to get somebody.  I have different cases like

12  that right now where I am on the island where employers

13  are alleging that someone is independent contractor and

14  it's not because the realities show different.  Yeah.

15       Q       Okay.  So what is the process after you --

16  after you interview the owner and the workers, what's

17  the next process?

18       A       After interviewing the owner, I ask for

19  the employers all the stuff that I asked in the

20  appointment letter.

21       Q       Okay.

22       A       So I verify the appointment letter.  I ask

23  them for the last payroll and I establish the SIP, the

24  statutory limitations.

25       Q       S-I-P?  Oh, standard -- statute of

**JA1242**

Masuda - Davis                                        24

1    limitations?

2         A       Yes.  Statutory limitations.  I establish

3    the statutory limitations and then I go back two years.

4         Q       Okay.

5         A       I tell the employer I need to have two

6    years of payroll records.  I need to have them in a

7    certain format to identify -- easily identify how many

8    hours they work, who the employee, what's rate of pay,

9    what's the gross, and what's the deductions.  That's

10   all -- this is all the information that I need because

11   they tell me -- the first one tells me, Okay. This is

12   the person that I'm -- that -- that -- you know, I have

13   to identify who the complainant was if he isn't there.

14        Q       Yes.

15        A       That's one thing.  The second one is

16   the -- the hours worked.

17        Q       Okay.

18        A       The hours worked are verified.  I ask

19   them, How are you paying your employees?  If he says

20   weekly or bi-weekly, if it's weekly, then I see that

21   it's bi-weekly, anything over forty hours will be

22   considered overtime.  Therefore, their employer owes

23   them an additional half time.  I look for that

24   additional half time or the overtime.  You know, the

25   regulation requires that you separate actual hours

1    worked on a weekly basis, so for us to identify how

2    many hours this person work, it has to be in that

3    payroll, so I tell them it should say Week 1, Week 2.

4    Normally a lot of employers fail on that one.  They

5    don't have it like that.  They don't have Week 1, Week

6    2, so in situations like that if it's only weekly

7    payroll, then anything over forty would be an

8    additional half time.

9               Then after that we check the rate of pay,

10   if it's less than 7.25.  If it's not less than 7.25, I

11   continue.  I look at the deductions to make sure that

12   the deductions are legal, there are no illegal

13   deduction such as cash shortages or any big deduction

14   that might reduce their rate of pay to less than 7.25.

15   That would be a minimum wage violation.

16        Q    Of course.  Okay.  So when you come --

17   this is in the initial meeting with the owner, correct?

18        A    Uh-huh.

19        Q    When you come in -- I'm just asking about

20   the general process and you've said several times

21   you've asked them about their employees, about their

22   employees, employees, employees, but at the time when

23   you go into the initial interview with the owner, do

24   you already assume that the individuals are employees?

25        A    No.  I just ask about the employees.  If

Marchetta - Davis                                              26

1    the employer says, No, I don't have any employees. I

2    have independent contractor employees, then the first

3    thing is take care of employees -- you know, the

4    employees to make sure that they're correctly exempt.

5    Then we talk about -- discuss about independent

6    contractors, what you call independent contractors.

7    Why you calling them independent contractors?  That's

8    the first question.

9         Q     Okay.  And do you find or in your

10   experience have you found that owners have

11   misclassified employees that should have been

12   classified as independent contractors?

13        A     No.

14        Q     Okay.  But you -- you find the opposite,

15   right?  Independent contractors that should have been

16   identified or should have been properly classified as

17   employees?

18        A     Yes.

19        Q     Okay.  All right.  Have you ever -- the

20   questions that you said you asked the owner and that

21   you asked the workers, those are standardized questions

22   that you ask everybody uniformly?

23        A     It all varies from case to case.  It

24   depends, but if it's independent contractors, I asked

25   them, What basis do you use to classify these

Maldonada - Davis                              27

1    individuals as independent contractors?

2         Q       Right.  I guess -- I'm sorry to interrupt

3    but I just want to make sure -- be efficient.  So when

4    an owner says, I have independent contractors, do you

5    then just start to ask general questions from your head

6    from your experience or do you have a sheet that you

7    pull out and start to read a list of questions to them?

8         A       No.  No.  I ask the employer, What are --

9    are basis for you to -- what are the -- what basis do

10   you have to classify these individuals as independent

11   contractors?

12        Q       Okay.

13        A       And based on the employee answer, that's

14   when I start asking more questions.

15        Q       I see.  Okay.  And those questions come

16   just from you, though?  That's just your experience and

17   your training?

18        A       No.  Those questions are -- we -- we

19   follow the fundamentals, the FOH, the fundamentals of

20   an investigation.  In the FOH we have to follow certain

21   steps.

22        Q       Okay.

23        A       There is economic realities in the FOH.

24        Q       Walk me through those steps.

25        A       You have the economic realities.  Like say

Mazzola - Davis                                        28

1    Fact Sheet Number 13, it talks about, Am I an employee
2    or am I an independent contractor?
3         Q      Okay.
4         A      So we ask them questions.  Okay.  So what
5    do you do?  What -- what is the -- what is -- who is
6    the integral part of business?
7         Q      I guess what I'm asking is the questions
8    that you ask, are you reading them from a sheet or are
9    you just asking -- you know, where -- do you understand
10   my question?
11        A      The questions to the employees or to --
12        Q      To -- to the owner or to the workers.  Are
13   those from a sheet that you're reading the questions
14   and writing the answers down or are they just general
15   things that you should look at and you form your own
16   questions?
17        A      No.  Normally I ask the employer, Why do
18   you consider this individual independent contractor?
19        Q      Yes.
20        A      Based on those answers, then I ask more
21   questions.
22        Q      Okay.
23        A      Like the case with Steadfast, she showed
24   me contracts and she explained that she -- she gave me
25   some explanation, but it's not -- it wasn't a full

1   explanation until I received the letter from

2   Mr. Rothlisberger, her first attorney.

3         Q      Yes.

4         A      And that's where -- because she didn't

5   know about the economic realities.  She says that she

6   had discussed with a lawyer and she was advised by

7   another lawyer and now Mr. Rothlisberger that she could

8   classify these individuals as independent contractors,

9   so I asked her for the name of the lawyer and she said,

10  no, she will not give it to me.  I said okay.  So I

11  say -- basically I keep asking, What basis do you use

12  to classify these individuals independent contractors?

13        Q      Uh-huh.

14        A      And she showed me the contract, and the

15  contract -- and I'm sure you have a copy of that

16  contract.

17        Q      We'll -- we'll look at it.  Yeah.

18        A      But in that contract there some steps or

19  some numbers where she has in that contract where it

20  was questioned -- it was very questionable, so I ask

21  her, So you basing these individuals -- these employees

22  as independent contractors based on this, on your

23  contract, not on the law and the regulations?  She

24  says, No.  I say, you know, my -- my interaction with

25  Ms. Lisa Pitts was not too long because she has -- she

1  has -- she was very temper.  She went off very -- very

2  easy and I told her, I says, Just give me the basis why

3  do you consider these individuals independent

4  contractors, and she could not answer to me.  She says

5  that -- the only thing she says is she was advised by

6  her lawyer and I say, Ma'am, I think your information

7  is wrong and -- and you owe this -- you have to pay

8  these individuals.

9            We discussed about what they do and how

10  she hires them.  She told me everything how she gets in

11  contact with employees.  She told me that she had

12  recruiters.  You know, looking at the web page, there

13  different page where they could apply for these jobs,

14  and I asked her questions about who has control of the

15  hours?  How do you hire?  What's the process?  What are

16  the requirements for these individuals to be -- you

17  know, to work for her.  I mean, How do you determine

18  that?  I ask, How do you determine the amount of hours?

19  She says that it was the employees' decision, but I

20  told her, Okay. But is the -- is the decision from the

21  employees based on what hours do you have available?

22  It's basically not the employees' decision when the

23  hours are available.  Just like when you go to

24  McDonald's, the hours available, the manager's going to

25  tell you, I've got a shift from 4:00 to 12:00.  If you

Mazieka - Davis                                        31

1    want to take it, you take it.  If not, I find someone

2    else.

3              So we have a discussion about this and I

4    told her at the end, Look, I think you misclassified

5    employees as independent contractors.  I have -- I

6    have -- I believe that you owe them an additional half

7    time.  She just went off and told me she was going to

8    fight me until the end.  That's what she said to me.

9        Q    Okay.

10       A    When -- when I told her, I says -- I

11   witnessed all the things in there that I did not

12   discuss with the employee, but it determined to me that

13   she was in control of this business of these

14   independent contractors, and that's one of the economic

15   realities of -- of know how to -- when you classify an

16   independent contractor as employee.

17       Q    Okay.

18       A    So --

19       Q    All right.  So when you say that Ms. Pitts

20   went off on you and she has a temper, what -- what did

21   she do and say that --

22       A    She says that -- that I wrong, that the

23   government just is going against her business, and that

24   she was advised by a lawyer and that she believed what

25   the lawyer say is okay.  Just give the name of the

1    lawyer.  She said, No, I'm not going to give you the

2    name of the lawyer.  Then I just say, Okay, ma'am.  She

3    said she's going -- she was going to hire a lawyer,

4    that from now on I will not talk to her, so I say,

5    Okay, ma'am. Thank you very much.  I walked away.

6              There was no issue, no -- no -- no --

7    friction between the two of us, but I received a

8    letter -- I give her my business card and I receive a

9    letter on the e-mail from Mr. Rothlisberger with a

10   letter.  In the letter he was analyzing the economic

11   realities he was basing why -- that's when he give me

12   the -- the -- a letter saying why the employer

13   classified the employees as independent contractors and

14   it was based on these economic realities.

15             So when I went to my office I just started

16   doing to the computations.

17       Q     Computations of what?

18       A     We do the back wages.  When we find a

19   case --

20       Q     Of back wages?

21       A     Yeah.  And then we normally have a -- a

22   final conference with employer.

23       Q     Let me -- let me go back.  I've got a

24   bunch of follow-up questions.  So back to when you said

25   she went off on you and she has a temper, did she --

Maksuta - Davis                                    33

1    did she use any expletives with you?

2        A       No.  No.

3        Q       Did she threaten you at all personally?

4        A       No.  No.

5        Q       Did she physically do anything?

6        A       No.  But she was -- no.  It's the

7    normal -- well, you can see when someone is upset.

8        Q       Okay.  Okay.

9        A       She was very upset.

10       Q       Did she do anything inappropriate?

11       A       No.  No.  She didn't do anything

12   inappropriate.

13       Q       Okay.  And then you -- you said that when

14   you were meeting with her you said, I think that the

15   information you have is wrong about these individuals

16   being independent contractors as opposed to employees.

17   Is this -- this meeting that you had with Lisa Pitts

18   that we're talking about, this was before you met or

19   interviewed --

20       A       No.  This was -- this was after -- after I

21   took some interviews in the office.  I took some

22   interviews prior to my --

23       Q       You said a word.  I'm sorry.  You had two

24   what interviews?

25       A       I took interviews in the office.

1        Q        Took interviews.  Okay.

2        A        From office employees and I took the

3    interview from the -- the first party, you know, the

4    complainant, and then I took some interviews from all

5    the individuals that the complainant refer me.  Then

6    after -- after I left the office, I took all the

7    interviews from list -- the only list that Ms. Pitts

8    provided me because I had request former and current

9    employees' addresses but she didn't want to give me all

10   the information.  I just ask, Can you give me a few

11   employees' information because I'm going to do some

12   more interviews?

13       Q        Help me with the structure here because

14   we've -- we've kind of moved on from your general

15   process to the specific process.

16       A        Uh-huh.

17       Q        I think before we get into some more

18   specifics I've got some questions about how this

19   process went down with Steadfast and what were -- what

20   were all of the meetings.  We talked about one of those

21   meetings where she -- you said she went off on you, but

22   in the standard process of things, just the way you

23   normally do things, going back, we left off with that

24   you do interviews with the owner.  You do interviews

25   with the workers, and then what -- what is the

Maldaba - Davis                                    35

1    process -- what are the steps after that to bring this

2    to a complete conclusion?

3         A       We're supposed to -- if there's an

4    allegation from the employee that they're not

5    independent contractors, we take more interviews.

6         Q       Okay.  So after the interviews, then

7    what's next?

8         A       After the interviews, we normally look at

9    the payroll records.

10        Q       Okay.

11        A       And we look if there's any violations on

12   the payroll records.  Anything that is over forty in

13   the weekly payroll record, then it gets transcribed

14   into a WS-55, a spreadsheet WS-55.  We have to -- this

15   the normal procedures.  Then after you do this, you

16   have to create a WH-56 and you put it into the system

17   and -- and you have to create this WH-56.  Then you

18   have a final conference with employer.

19               At that point there is no agreement to pay

20   or agreement to comply yet, but when you establish a

21   final conference with the -- with the employer --

22        Q       So then after you put this together, then

23   you arrange a second conference with the --

24        A       Yeah.  A second conference.

25        Q       Okay.

**JA1254**

Matista - Davis                                          36

1       A       Well, we call it -- yeah.  A second

2  conference like a final conference with employer.

3  That's where I discuss with employer the findings and

4  that where, you know, I go over the same questions and

5  same information that I went over the initial

6  conference and then the findings, the disposition, the

7  findings.  I tell, This is the finding from this

8  investigation.

9               Whether she agree or not, is -- is from

10  the employer.  I ask them, Do you agree to comply?

11  That's the first thing that we ask them.  They say, No,

12  I'm not going to agree to comply, then we -- we write

13  it down.  Then, Do you agree to pay these employees?

14  If they say, No, refuse to pay, then we move into a

15  second level conference because -- you know, because in

16  my regulation, my -- my standards procedures tell me

17  that once I do a final conference with employer, I have

18  to move -- move on, you know, complete the report and

19  bring it to my management for to review.

20      Q       Okay.  Okay.

21      A       Yeah.

22      Q       And then what happens?

23      A       Then -- well, in this case when

24  Steadfast -- she -- she had a lawyer.  Prior to the

25  final conference he sent me this letter.  On this

 1    letter he discussed economic realities, so when I have

 2    the conference with him -- with employer and her

 3    lawyer, we discussed everything that we discussed in

 4    initial conference.

 5         Q      Can I stop you for a second?

 6         A      Uh-huh.

 7         Q      I'm sorry.  I -- I want to go through the

 8    specific things from Steadfast from the beginning to

 9    the end, but right now -- and we'll get to that.  I

10    want to hear what you have to say about it, but I just

11    wanted to know the standard processes.  After -- the

12    last step is then you bring it to management and --

13         A      Well, that's what I'm getting to.

14         Q      Okay.  Okay.

15         A      I discussed with the lawyer --

16         Q      Yeah.

17         A      -- his letter because she wants me.

18         Q      Okay.

19         A      We discussed this copy of the letter, the

20    economic realities.  I gave him my answer.

21         Q      Okay.

22         A      And -- and -- and I ask them again, Do

23    agree to comply?  Do you agree to pay?  They say no.

24    Then we stop right there.

25         Q      Okay.

```
1        A       I walked away.  Then I tell the lawyer, I
2    would get back with you.
3        Q       Okay.
4        A       That's where we go to management and we
5    start the procedure.  You know, we go -- we do an
6    analysis of the case.
7        Q       Okay.  Okay.
8        A       Yeah.
9        Q       You do an analysis of the case?
10       A       Not just me.  I have -- I have to bring
11   this case file -- I have to submit a report.
12       Q       Okay.
13       A       Once I finish the report, I put it in the
14   case file.  Then I submit it to management.
15       Q       Yes.
16       A       After that, management decides.  That's
17   their decision.  I cannot say what they do with it.
18       Q       I see.  It's out of your hands at that
19   point?
20       A       It's out of my hands.  Yes.
21       Q       Okay.  Do --
22       A       However, I still overseeing the
23   investigation.  You know, for whatever they call me, I
24   will have the answers.
25       Q       Okay.  You indicated that -- you said as
```

1    part of the process with the first meeting, the typical

2    process, you said, We look at the payroll records.

3    When you say we, does that mean it's typically you or

4    you with --

5         A       No.  When I -- when I say we, I'm

6    representing the Department of Labor.

7         Q       But it's you that does it?

8         A       Yes, I did.

9         Q       Got it.  Okay.  All right.

10        A       I'm the one -- the only one that looks at

11   the payroll records.

12        Q       And then in the -- have you -- have there

13   been any instances where you've been through this and

14   you looked at the payroll records and you determined

15   that the individuals were properly classified as

16   independent contractors?

17        A       Until this day, no.

18        Q       It's never happened?

19        A       Not yet.  No.  No.  Because --

20        Q       How many investigations --

21        A       -- normally --

22        Q       -- have you done --

23        A       How many investigations?

24        Q       -- in your career?

25        A       Well, I make an average of twenty-five to

Mababa - Davis                                          40

1    twenty-eight investigations per year.

2         Q     Okay.

3         A     So on the top of my head, I don't have

4    exactly.  It's five times -- it's probably over 140

5    investigations --

6         Q     Okay.

7         A     -- so far, not include the ones I have

8    done since I started the new fiscal year.

9         Q     Okay.

10        A     Yeah.  But I think normally I do --

11        Q     So roughly 140 -- did you say 140

12   probably?

13        A     Uh-huh.

14        Q     So in your career working for the

15   Department of Labor, 140 roughly investigations that

16   have been initiated on FLSA matters regarding --

17        A     Let me correct that one.

18        Q     Sure.

19        A     I know what you trying to question.  The

20   investigation that I have -- I think I'm recalling one.

21   I mean, there's so many.  I can't recall every single

22   one.

23        Q     Sure.  Sure.

24        A     But I recall one where the individual

25   was -- he was classified as independent contractor.  We

1    questioned and when I looked at the payroll records,

2    their names were not on the payroll.  He has no -- that

3    business didn't have a payroll with that individual on

4    there.

5         Q    Okay.

6         A    That's what -- that's why I say in the

7    beginning when I get the payroll records --

8         Q    Ah.

9         A    -- I look for that individual --

10        Q    Sure.

11        A    -- to make sure that it's there.  If it's

12   not there, then I ask the employer, Do you have a 1099?

13   Do you have a W-2 form for him?  Or sometimes employers

14   forgot to put someone in there for reason.  I cannot

15   say, and then I question, How come this individual is

16   not included in your payroll?

17        Q    Yeah.

18        A    Then they say, Oh, I'm sorry.  We forgot.

19   He's an employee, but he was not -- he's no longer

20   working with us.

21        Q    Okay.

22        A    So I says, Can I see your payroll?  That's

23   why we look at the payrolls from the previous months.

24   You know, two years.

25        Q    Okay.

1        A       I'm looking for that person.

2        Q       Yes.

3        A       So if I see this person right here and I

4    see this person right here, there is a common, you

5    know, control.  That person appears in the payroll so

6    many times, so it's a dependency --

7        Q       Yeah.

8        A       -- from this individual.  That's also part

9    of economic realities.

10       Q       Okay.  Sure.

11       A       I'm looking at the individuals that I

12   interviewed to see they also in there too.  That's why

13   I'm looking at --

14       Q       Yes.

15       A       -- every single payroll to make sure that

16   they in there because normally independent contractors

17   like the -- the case of a painting company comes in

18   here, you not going to find the painting company inside

19   the payroll.  Normally it's a contract.

20       Q       Right.

21       A       So I ask for the contract.  But it's weird

22   to find a contract -- it's not normal to find a

23   contract and to find the person in -- in the payroll

24   and not only that, to find this person also that is

25   included on the pay stubs.  That is not the normal --

1    the normal situation where --

2        Q       Yeah.

3        A       -- an employer that classifies an

4    individual as independent contractor is provided with a

5    pay stub and is included in the payroll.

6        Q       Yeah.

7        A       So that -- this is -- that is part of

8    economic realities too.

9        Q       Okay.  But my question was -- am I

10   correct, though, in understanding that in 140 roughly

11   investigations that you've done, there have been no

12   instances were someone has complained that they were

13   improperly classified as an independent contractor that

14   you found that the owner was correct, that they were

15   properly classified?  Is that right?

16       A       There was probably one -- one individual

17   that -- one case that I have where --

18       Q       Just that one case?

19       A       Yeah.  It was just one case and he

20   classified them independent contractors.  He didn't

21   have any payroll at all.

22       Q       Okay.

23       A       And the -- the procedures in there is when

24   you have an individual --

25       Q       I don't need to know the facts.  You don't

                          Madera - Davis                        44

 1   have to tell me.  It's okay.  I just wanted to know

 2   what percentage.  So out of 140 investigations --

 3        A        Maybe one or two.  Maybe.

 4        Q        One or two?

 5        A        Yeah.  Maybe.  Maybe.  If that many

 6   because it was one only where I found --

 7        Q        Got it.  So one or two investigations out

 8   of 140-ish the owner was correct?  In your opinion they

 9   were independent contractors, but all the others you --

10   you found or you determined --

11        A        Well, no.  I didn't say that it was

12   correct.

13        Q        Oh, okay.

14        A        That it was difficult to substantiate

15   because if -- if the individual says, I'm an employee,

16   and the other persons says, I'm -- I'm an employee,

17   then you cannot substantiate if you don't have any

18   other people saying and if you don't have any other

19   interviews or any other statements saying -- any

20   statements that confirm.

21        Q        Okay.

22        A        The same situation as this guy right here.

23        Q        Okay.

24        A        So in this situation we have different

25   statements confirming the same thing that this person

Mazuca - Davis                                                45

1   is alleging for that case.  It was -- it was only one
2   person and we ask some questions to that person.  I
3   asked them questions, Do you have any employee?  Do you
4   have anybody working for you?
5        Q    Yes.
6        A    And he says, Yes, I have a crew.  So -- so
7   in situations like that when you have employees working
8   for you -- working for an employer, for a -- for a
9   company, then you determine, Okay. This is a case where
10  you an independent contractor.  Maybe your company's
11  not registered in the Virginia Commonwealth as
12  business, so that's the determination, but normally I
13  don't have a case where -- I have not had a case where
14  the employee's alleging that this guy's an independent
15  contractor and when I look at the payroll, he's not
16  there.  If he's not there, then that tells me something
17  different.
18       Q    Okay.  So would it be safe to say that
19  given the overwhelming majority of instances that
20  you've investigated it turns out that these people were
21  misclassified, that when you go into the interview,
22  you're already assuming most likely they're
23  misclassified?
24       A    I don't assume.  I just ask questions, and
25  based on the answers from the employer --

1          Q       Yeah.

2          A       -- based on the evidence that I collect --

3          Q       Okay.

4          A       -- that's what -- that's what -- I collect

5     evidence to substantiate something.

6          Q       Okay.

7          A       We get a contract.  I go online.  I do

8     research online.  I find the contract that the company

9     has online.  I read.

10         Q       Yes.

11         A       Normally when I go into conference, I show

12    the contracts to the employer.

13         Q       Yes.

14         A       If they identify the contract, that tells

15    me that they know this contract.

16         Q       Okay.

17         A       So I ask the questions about the contract.

18    I ask questions about what's inside the contract, but I

19    don't say -- I don't determine anything there.  I

20    collect more evidence from interviews.

21         Q       Yes.

22         A       We ask questions that -- you know, the

23    right questions on the interviews to make sure that

24    we -- we making the right decision.

25         Q       Okay.

1      A      And once we do that, then I look at the

2   economic realities and I analyze everything -- every

3   answer that I have, every evidence or piece of evidence

4   that I have.

5      Q      Yes.

6      A      I use it -- I compare -- you know, I

7   analyze and I use the economic realities and I say,

8   Okay. Is this -- what is the integral part of this

9   business?  If this business doesn't have any CNAs --

10     Q      CNAs?

11     A      No -- yeah.  CNAs.  Certified Nurse

12   Assistants --

13     Q      Okay.

14     A      -- or LPNs -- I'm not sure if you know

15   that --

16     Q      Licensed --

17     A      Licensed Practice Nurse.  Or RNs.

18     Q      Yes.

19     A      Okay.

20     Q      Registered Nurse.  I know that one.

21     A      Yeah.  Registered Nurse.  So if -- if --

22   if this business will not have any of these employees,

23   would this business exist?  So what is the integral

24   part because this person can go and look job -- for job

25   somewhere else.

Madhava - Davis                                          48

1        Q       Yes.

2        A       Well, you know, they could go to home care

3    company.

4        Q       Yes.

5        A       There's plenty of those.  So the integral

6    part of the business, that's what I look for.

7        Q       Who -- you mentioned that -- you said that

8    you want to make sure that we are making the right

9    decision.  Who makes the decision?  Is that you?  The

10   initial decision that the individuals are employees,

11   not independent contractors?

12       A       The decision is based on the Department of

13   Labor regulations.

14       Q       But who makes it?  Who -- who --

15       A       I make the decision.

16       Q       You make that?

17       A       Yes.  And I submit my case to my

18   management.  Management reviews.

19       Q       Okay.

20       A       If I'm wrong, they come back and say, You

21   made the wrong decision.

22       Q       Has that ever happened?

23       A       No.  No.

24       Q       Okay.  Okay.  And I'm going to get into

25   the issues pertinent to Steadfast in just a minute, but

Maldava - Davis                                             49

1   in the initial meeting that you with Lisa Pitts, was

2   that first meeting that you had with her the one where

3   she went off on you?

4        A       It was the first time that I have a

5   meeting with her.  Yeah.. that was it.

6        Q       Okay.

7        A       Yeah.

8        Q       And in that first meeting --

9        A       And I think she was kind of upset not just

10  with me because she had -- she had a phone call from

11  one of the facilities that -- that she has business

12  with --

13       Q       Yes.

14       A       -- and they were discussing about one

15  employee.  The employee over there has issues and I

16  think it was with drugs, and the facility was

17  complaining -- was talking to her because what I heard

18  is that when -- whenever someone -- one of her CNAs,

19  LPNs, or RNs do not show up or they have to go, then

20  she has to look for a replacement.  Sometimes she --

21  she used replacements from the office, people that work

22  for her in the office.

23       Q       Okay.

24       A       So I think she aggravated not -- not with

25  me maybe because I was telling her they were

 1    independent -- they were not independent contractors,
 2    but she was aggravated also with the -- with the
 3    employee that was misbehaving at the other site, so to
 4    me that was really strange to have.  If they're not
 5    independent contractors -- why would the facility call
 6    the agency to complain about someone when they
 7    independent contractors?  If you have a -- a painting
 8    company or a plumbing company, you go directly to the
 9    plumbing company because they're the employer, not the
10    employee, so to me that was really strange.  Maybe she
11    was aggravated because of that.
12         Q      Okay.  You're not sure but maybe?
13         A      No.  That's what it seems.
14         Q      Okay.
15         A      I wasn't sure.  She was upset because
16    someone was on drugs.
17         Q      So in this initial meeting that you have
18    with Lisa Pitts that we're talking about --
19         A      Uh-huh.
20         Q      -- at that initial meeting was that before
21    you had done the interviews with the nurses that are in
22    your report?
23         A      At this individual meeting I had -- no.
24    That was only one.  It was the complainant.
25         Q      You had the complainant?

Mazzola - Davis                                        51

 1        A       Yes.

 2        Q       And you did an interview with the -- the

 3   nurse that complained?

 4        A       Uh-huh.

 5        Q       And then subsequent to that, then you had

 6   the interview with Lisa Pitts?

 7        A       Yes.  And I have some interviews with

 8   employees in -- inside there also --

 9        Q       I -- I want to get to Lisa Pitts --

10        A       -- that had worked as a --

11               MS. AMIN:  So let me just caution you.

12        Listen to his question and carefully answer the

13        question before you.

14               THE WITNESS:  Sure.

15               MS. AMIN:  And just make sure you just

16        don't talk over Attorney Davis because I think the

17        court reporter's going to have some --

18               THE WITNESS:  Okay.  Okay.

19               MS. AMIN:  -- a hard time getting

20        everything down, so just listen to the question.

21               THE WITNESS:  Okay.

22

23   BY MR. DAVIS:

24        Q       So I'm getting a sequence right now and

25   I'm -- I'm -- forgive me.  I'm super methodical and --

```
 1       A       Okay.  That's fine.

 2       Q       -- and -- and you are a wonderful

 3  conversationalist and I wish that we could have dinner

 4  and talk about all these things, but I'm getting into

 5  some very specific things.

 6       A       Okay.

 7       Q       Okay.  So the sequence in the Steadfast

 8  case, this is how I understand it.  I want to make sure

 9  I'm correct and then I'll ask you a question.  You

10  received a complaint from a nurse?

11       A       Yes.

12       Q       You interviewed that nurse?

13       A       Uh-huh.

14       Q       After that, you interviewed Lisa Pitts?

15       A       Uh-huh.

16       Q       And then after that, you interviewed other

17  people; is that correct?

18       A       Yes.

19       Q       Okay.  So prior to your initial meeting

20  with Lisa Pitts, the only interview you had conducted

21  was with the complaining nurse?

22       A       Yes.  Yes.  Yes.

23       Q       Okay.  Very good.  So let me ask you some

24  questions about that.  When you had the initial meeting

25  with Lisa Pitts, had -- during the course of that
```

Martha - Davis                                    53

1   meeting before your other interviews, am I correct in

2   understanding at that meeting you made a determination

3   that the nurses were improperly classified?

4          A       No.  I didn't make the determination by

5   then.

6          Q       Okay.

7          A       I made the determination -- all I told

8   was, I believe that you had misclassified the -- the

9   employees.  I interviewed some employees in the office.

10         Q       Okay.  Let me stop you though.  Let me

11  stop you because I want to make sure I understand what

12  happens.

13         A       Uh-huh.

14         Q       So the sequence is that you

15  interviewed one nurse --

16         A       Uh-huh.

17         Q       -- then Lisa --

18         A       Yes.  And then --

19         Q       -- and then employees in the office?

20         A       Yes.

21         Q       Okay.  So I'm asking about the meeting

22  with Lisa before the employees in the office.  I'm just

23  asking about the initial meeting with Lisa.

24         A       Okay.  Okay.

25         Q       Just one at a time.  We'll get to each one

 1   of them.  Okay?

 2        A       No.  I didn't make any determination

 3   there.

 4        Q       Okay.

 5        A       I just -- I just asked her -- I just told

 6   her after the fact.  After I interviewed the other

 7   employes, I came back and talked to Ms. Lisa again.

 8        Q       Ah, I see.

 9        A       Yeah.  I collect interviews first.  I

10   collect -- I look at payroll records.  I look at

11   interviews.  I ask questions mostly related with the

12   payroll records.

13        Q       I see.

14        A       Then after that, I sit down with Ms. Lisa

15   again.

16        Q       Okay.  So this -- so you went onsite to

17   Steadfast.  You met with Lisa, and then you met with

18   employees in the office, and then you met with Lisa

19   again?

20        A       Yes.  In the same place.

21        Q       Same day?

22        A       Same day.  Same day.  Yeah.

23        Q       Okay.  Very good.  Now, the employees that

24   you met with in the office, were those the individuals

25   that answer the telephones that are in the room next

Maluia - Davis                                            55

1   door?  Is that who you talked to?

2            MS. AMIN:  I'm going to instruct the

3        witness to the extent that your answer -- to the

4        extent that your question seeks information that

5        encroaches upon on the informant's privilege, I'll

6        instruct you not to answer.

7            THE WITNESS:  Okay.

8            MS. AMIN:  But to the extent that it does

9        not, you may answer.

10           THE WITNESS:  Okay.

11   A      No.  I can't answer that because then I

12   will reveal confidentiality.

13

14   BY MR. DAVIS:

15   Q      I'm asking -- I'm not asking a name right

16   now.

17   A      Yeah.  I understand that, but I can't --

18   repeat the question again.

19   Q      My question is did -- there are

20   individuals who work in the -- in that building, in the

21   Steadfast building, who answer the telephone.  There's

22   a secretary at the front and those --

23   A      I can't --

24   Q      Hold on.  Hold on.  And those people are

25   employees --

```
 1         A       Uh-huh.

 2         Q       -- and it's admitted that they're

 3    employees and they're paid as employees.  So my

 4    question is when you say that you met with employees in

 5    the office, are you referring to the individuals that

 6    we all agree are employees or did you meet with nurses

 7    that -- I don't know.  I'm looking for the class of

 8    people.

 9         A       I cannot give --

10              MS. AMIN:  That's a different question.

11              THE WITNESS:  Yeah.

12              MS. AMIN:  Let me just clarify.

13              MR. DAVIS:  Yeah.

14              MS. AMIN:  Are you asking whether he

15         interviewed office staff versus the individuals

16         you've misclassified as independent contractors?

17         Is that your question?

18              MR. DAVIS:  No.

19              MS. AMIN:  Okay.

20              MR. DAVIS:  I'm not -- well, in the way

21         you said it, yes, that's what I'm asking, but I'm

22         not agreeing that they've been misclassified.

23              MS. AMIN:  Sure.  Okay.

24              MR. DAVIS:  I'm asking -- I'm not asking

25         for names.  I'm asking for --
```

 1   BY MR. DAVIS:

 2        Q     There's two groups of people.  Let's

 3   just -- framework here.  We have the individuals who

 4   work in the office who are employees, who are paid as

 5   employees.  They answer telephones.  They are

 6   secretaries.  No one -- no one disagrees that they're

 7   employees.  Then there are other people that are nurses

 8   that are the subject of this lawsuit.  Those nurses, we

 9   contend, are independent contractors.  You contend that

10   they're employees.

11              Do you -- does that framework make sense?

12        A     Yes.  I understand that.

13        Q     Okay.  So in that -- so now we understand

14   that framework.  I'm going to refer to -- maybe for

15   simplicity, I'll refer to the people that work in the

16   office as office employees.  Okay?

17        A     Uh-huh.  I understand that.  Yeah.  But I

18   cannot --

19              MS. AMIN:  You may answer the question if

20         the question is, Did you speak to or interview

21         office employees?  You may answer that question.

22        A     Yes.  I interviewed office employees.

23   Yeah.

24

25

Mashita - Davis                                          58

1   BY MR. DAVIS:

2        Q        Okay.  All right.  And during that day did

3   you also interview nurses that day or only office

4   employees?

5        A        After -- after the fact.  I interviewed

6   after I left the office --

7        Q        No.  I'm not --

8        A        -- and not during the time I was there

9   nurses.  They have no nurses available with them

10  because most nurses are -- I can't recall right now

11  if -- maybe if I look at the interviews it will tell

12  you that I did exactly interviews on one in there maybe

13  because I told her that -- Ms. Pitts that I will be

14  interviewing office -- office employees and I will be

15  interviewing any of her employees working in different

16  nursing homes.  I cannot recall exactly -- I can't

17  remember if I did interviews on one -- one of the

18  nurses in there because that's not normally the

19  situation where the employer brings some of his

20  employees, you know, to the office like the case it is

21  with home care offices and firms where they bring CNAs

22  to the office and I interview them for twenty minutes

23  and then they go back and take care of the clients, but

24  I cannot recall that exactly.  If I did interview

25  nurses, I would have to look at the interviews and

1    recall the date of the interviews because normally I

2    put a date on the interview --

3         Q      Okay.

4         A      -- if it's over the phone, if it's in

5    person, or what else, but I did interview employees in

6    the office.

7         Q      Okay.

8         A      I don't recall -- I can't remember if it

9    was -- if I did interview any nurses that day while I

10   was in the office.

11        Q      Okay.  At the time when you interviewed

12   employees in the office, were you under the impression

13   that the office workers -- that they were also being

14   improperly classified?

15        A      I cannot answer that question because then

16   I would be revealing confidentiality.

17        Q      I don't know how.  I'm not asking names.

18   I'm asking --

19        A      I understand.

20        Q      There's fourteen individuals that work

21   there.

22        A      I understand that, but if I -- if I tell

23   you yes or no, then you practically could look into the

24   interview if you have access to the interviews and

25   could easily identify someone, so --

Mosca - Davis                                    60

```
 1          Q      Yes.  But --

 2          A      -- I can't answer that.

 3          Q      Okay.  We -- we're not on the same page.

 4   We've got to get on the same page.  There's interviews.

 5   We'll go into those interviews, right?  The interviews

 6   are all with nurses.  Every interview I read --

 7          A      I understand, but if you look at the

 8   interviews --

 9          Q      Yes.

10          A      -- look at the type of job they do --

11          Q      Yes.

12          A      -- and that will give you the answer.

13   There is -- there was -- am I allowed?

14                 MR. DAVIS:  Do you understand what I'm

15          saying?

16                 MS. AMIN:  I think so.  So if you showed

17          him the interview statements, this might clarify

18          it.  I don't have them in front of me, but to the

19          extent that any office workers were interviewed,

20          their job titles may have been redacted for

21          purposes of informant's privilege.

22                 MR. DAVIS:  Uh-huh.

23                 MS. AMIN:  For example, if there was only

24          two receptionists and the job title is not

25          redacted, that would tend to identify who that
```

Matouta - Davis                                      61

1          individual is even though the name is redirected.

2          So I don't know if that helps to clarify.

3                    THE WITNESS:  Yes.  Yeah.  In that -- in

4          that title it could be a person working as a

5          secretary --

6                    MR. DAVIS:  Yes.

7                    THE WITNESS:  -- and probably was working

8          also as an LPN.

9                    MR. DAVIS:  Yes.

10                    THE WITNESS:  Because they use --

11          Ms. Pitts sometimes use some of her employees to

12          cover for --

13                    MR. DAVIS:  Right.

14                    THE WITNESS:  -- out there when they have

15          no -- so I cannot answer that.

16                    MR. DAVIS:  Understand.  Okay.  So I think

17          what we need to do here is -- I was hoping we

18          could get through some questions before we got to

19          this, but we're already there.  In my view,

20          identifying classes of people, we've got two

21          groups.  Did you interview in this group or

22          interview people in this group?  I don't even

23          think that consents to the informant's privilege

24          issue, but if you do, I understand.

25                    MS. AMIN:  Well, so I -- I just -- maybe

Maddula - Davis                                      62

1            I'm unclear as to the question or

2       misunderstanding.  Your question is, Did you

3       interview individuals that work in the office that

4       are classified as employees?

5              MR. DAVIS:  Yes.

6              THE WITNESS:  Okay.

7              MS. AMIN:  I think he answered -- did you

8       answer that question?

9              THE WITNESS:  Yes.  I answered yes.

10             MR. DAVIS:  Yes, he did.

11             THE WITNESS:  And I also interviewed one

12       individual that work as a -- as a nurse outside

13       too.

14             MR. DAVIS:  Yes.

15             THE WITNESS:  So that's the one you wanted

16       me to answer.

17             MR. DAVIS:  Right.  But I --

18             THE WITNESS:  Beside the complainant.

19

20  BY MR. DAVIS:

21       Q    My specific question that we had the issue

22  with, when you interviewed -- you go into the Steadfast

23  office.  You've met with Lisa Pitts?

24       A    Uh-huh.

25       Q    Then you said, And then I met with

                    Fiduciary Reporting, Inc.
                        (757) 482-2729

Mazzara - Davis                                                    63

 1   employees?

 2        A      Yes.

 3        Q      And I asked, Are those employees the

 4   people who work in the office?  You said, I believe,

 5   yes.  I think there may have been a nurse, but I don't

 6   recall.  Okay?

 7        A      Uh-huh.

 8        Q      Okay.  That's fine.  And then you went

 9   back and met with Lisa Pitts again, correct?

10        A      Uh-huh.

11        Q      So my question was when you met with the

12   office employees, were you at the time under the

13   impression or did you believe that those office

14   employees were also being improperly classified?

15        A      Some of them.  Yes.

16        Q      You --

17        A      Some.  Yeah.

18        Q      You -- you believe that the office workers

19   were also improperly classified?

20        A      I would say yes.

21        Q      They're all classified as employees and

22   paid as employees?

23        A      Yes.  But if you look at the payroll

24   records and if you see that someone has been working as

25   a, say, secretary and then is being sent to work as a

1   Certified Nurse Assistant, a CNA --

2           Q       Yes.

3           A       -- and then you look at the payroll

4   records and they don't combine -- and that's one of the

5   violations in there.  They don't combine the hours and

6   they don't get paid overtime, so the assumption is that

7   Ms. Lisa Pitts is not paying overtime.  The questions I

8   ask are also questions in regards of what type of job

9   they do when they were working as CNAs.

10          Q       So you're saying you found instances where

11  there was an office worker who was working as maybe a

12  secretary or telephone -- I don't know.  Something --

13  but they were also simultaneously working as a nurse?

14          A       Correct.

15          Q       I see.

16          A       Yes.

17          MR. DAVIS:  I see.  I see.  Okay.  Here's

18          the issue.  Why don't we go off the record for a

19          second.

20          (At 11:10 a.m. a conversation was held off

21          the record.  A telephone call was made to Judge

22          Krask to mediate an issue.  All parties were

23          informed he would call back when available, and a

24          short break was taken.  At 11:24 a.m. all parties

25          went back on the record and the following took

```
 1        place:)

 2              MR. DAVIS:  All right.  We're back on the

 3        record.  Let me see if I can remember where I left

 4        off.

 5

 6  BY MR. DAVIS:

 7        Q      Okay.  So during that -- that day when you

 8  had that initial meeting with Lisa, you interviewed

 9  some office employees and then you met with Lisa again.

10  Who -- who was in the room with you when you met with

11  Lisa?

12        A      I think it was her husband.  There was a

13  gentlemen in the back, but I don't recall.

14        Q      Okay.

15        A      I just -- I just -- I always ask, Who's

16  the owner of the business a hundred percent?

17        Q      Okay.

18        A      Are you a hundred percent?  If she's a

19  hundred percent, I don't call anybody else.

20        Q      Okay.

21        A      Every question is for -- for the owner of

22  the business.

23        Q      Okay.  I see.  Christine was not there

24  during that meeting?

25        A      No.  No.
```

Mancía - Davis                                          66

1        Q       And when you did the interviews, did you

2    do them privately or did Lisa --

3        A       Privately.

4        Q       Privately?

5        A       Uh-huh.

6        Q       Did you meet with people in a separate

7    room or how did -- how did that happen?  Did you pick

8    people and say, Come meet with me?

9        A       I believe Lisa Pitts stepped out of the

10   office and then I did interviews with the remaining

11   employees.

12       Q       Did you pick people at random or did you

13   have a certain idea in mind?

14       A       No.  I just asked for the -- when you --

15   when you go into a business, you ask for last, you

16   know, payroll.

17       Q       Yes.

18       A       You point, I want this and that, of what

19   you want to bring in here, you know.

20       Q       Yes.

21       A       And she -- and I asked her -- I always ask

22   her, Okay. What kind of work do you have? What type of

23   office employees you have?  Then she says, I have this.

24   I have that.  Then from that, I picked.

25       Q       Did you tell Ms. Pitts who you want to

1    meet with on that day?

2         A      She brought me some -- I say -- I normally

3    I want -- if there's a secretary, I say, Can I speak to

4    your secretary?  Can I speak to your office -- office

5    assistant?  Or if there's any office manager, I ask for

6    the office manager.  If she has -- if she has other

7    types of employees, then I say, Can I have one of

8    these?  I normally go into a business and I say, Can I

9    get two -- once I identify what type of employees they

10   have, Can I have two of these, two of these, and one

11   this?  That's it.

12        Q      And did Lisa select those people for you?

13        A      I believe so.  Yes.

14        Q      Okay.  So Lisa knows who these people are

15   that you met with?

16        A      I'm not sure.  You know, I can't recall

17   that day how -- if she did it or I did it.  I cannot

18   remember right now.

19             MR. DAVIS:  So if Lisa picked the people

20        he met with, how come we can't talk about who he

21        met with?  Lisa picked them.

22             MS. AMIN:  We would still invoke the

23        privilege.

24             MR. DAVIS:  How?  Why?

25             MS. AMIN:  Regardless.  So regardless of

Mazuera - Davis                                          68

1          if she was aware -- if she picked the individual,

2          if she saw who he was speaking to, I would not

3          have my investigator confirm any individuals that

4          he spoke to about the violations or interviewed

5          and took statements from.

6               MR. DAVIS:  So my understanding is --

7               MS. AMIN:  Your client can certainly

8          answer that question if she has a recollection to

9          who she picked, but I won't have my investigator

10         confirm who he spoke to, whether it was an oral --

11         you know, information that has not been documented

12         in a statement or information that was just given

13         to him, so written or oral.  I would not have my

14         investigator confirm that based on the informant's

15         privilege.

16              MR. DAVIS:  So, just for example, if -- if

17         Mr. Mazuera said, I'd like to speak to somebody,

18         and Lisa said, I'm going to let you speak to

19         Christine -- I don't know that that happened.  I'm

20         just saying in theory -- then he spoke to

21         Christine, and if I say, Who did you speak with?

22         You're going -- you're instructing him to not

23         identify her name even though --

24              MS. AMIN:  Employees.  So to the extent

25         that they're supervisors or managers and that is

1        clear, those are -- that would not be covered by

2        the informant's privilege.

3                MR. DAVIS:  So if Lisa went to the call

4        center and picked, I don't know, John -- a made up

5        name. Don't know -- and says, John, I want you to

6        speak to this investigator, and John gets up and

7        goes and meets with the investigator, even though

8        Lisa picked this person, you're instructing him

9        not to disclose who he spoke to?

10               MS. AMIN:  Correct.

11               MR. DAVIS:  Why?

12               MS. AMIN: Because that is covered by the

13       informant's privilege.  Information -- the

14       identity of an individual who speaks to an

15       investigator about violations -- alleged

16       violations as well as statements given to an

17       investigator are privileged and are protected

18       until the government decides to waive that

19       privilege.

20               MR. DAVIS:  What about individuals who are

21       employees and/or independent contractors who are

22       no longer working for Steadfast?

23               MS. AMIN:  Same thing.

24               MR. DAVIS:  Even though there's case law

25       that says if they're no longer working there, the

1          informant's privilege doesn't apply any more?

2              MS. AMIN:  There's case law that supports

3          government's continued invocation of the

4          informant's privilege for former employees.

5              MR. DAVIS:  Did you read the case I sent

6          you in the letter?

7              MS. AMIN:  I don't know if I did.  Which

8          one was that?

9              MR. DAVIS:  It's okay.  We'll get into it

10          with the judge.  Okay.  Okay.

11

12  BY MR. DAVIS:

13      Q     All right.  So going back to the day that

14  you met with Lisa that we were talking about, do you

15  recall approximately how many people you met with other

16  than Lisa that day?

17      A     Do I recall how many people I met?

18      Q     Yes.

19      A     The amount of people?  No.  I cannot

20  recall.

21      Q     Okay.  If -- if you interviewed somebody,

22  would -- in every instance would you have taken notes

23  on that interview?

24      A     No.  I don't take notes.  I just go from

25  the questionnaire, the -- the statement.  You know, the

1    interview statement.

2          Q       Yes.

3          A       That's where I write the information.

4    That's it.

5          Q       Okay.  So when I say take notes, so --

6          A       I don't have any -- yes, I write it down

7    by hand.  Yeah.

8          Q       On the statement?  Okay.

9          A       Yeah.  On the statement.

10         Q       Do -- would you have interviewed anybody

11   at any point in time regarding the Steadfast matter

12   where you did an oral interview and did not take notes?

13   Did you understand the question?  That was not a real

14   great question.

15         A       No.  No.

16         Q       Okay.  So let me rephrase.  So my question

17   is every -- am I correct in understanding that every

18   time you met with somebody you took notes about that

19   meeting?

20         A       Correct.

21         Q       Every time?

22         A       Yes.

23         Q       So there isn't anybody that you met with

24   that you had a discussion with that you didn't have

25   some note about that you wrote down?

```
 1        A       No.

 2        Q       Okay.  And in the -- in the report that

 3   you've given us that has the exhibits, some of them

 4   have been redacted, but it has notes.  We'll go through

 5   them, but are those notes from every interview you met

 6   with regarding the Steadfast case?

 7        A       Yes.

 8        Q       Okay.  Thank you.  All right.  Okay.  Then

 9   after you met with Lisa, met with the employees, you

10   said that you were concerned that some of -- or based

11   on something, that some of those individuals were also

12   nurses and then you met with Lisa again.  Was it the

13   first time you met with Lisa that day or the second

14   time that you met with Lisa that day that you

15   determined that the individuals on Schedule A -- do you

16   know what I mean when I say Schedule A?

17        A       Yes.  Yes.

18        Q       Okay.  That those individuals were

19   improperly classified as independent contractors?

20        A       That when I told her that I believe she

21   has misclassified some --

22        Q       The first meeting or second meeting?

23        A       On the second meeting.

24        Q       Okay.  Then after the second meeting, what

25   happened after that?
```

                              Mauldia - Davis                              73

    1        A       After the second meeting, I have -- I went

    2   to my office and I collected more interviews.

    3        Q       Okay.  Is that when you sent the letter

    4   to -- I can't remember -- maybe fifteen people or

    5   something saying, I'm doing an investigation. Please

    6   call me?

    7        A       Yes.

    8        Q       Okay.  And then after you received phone

    9   calls from those nurses -- they all didn't call you,

   10   correct?

   11        A       Uh-huh.

   12        Q       Only some of them?

   13        A       Yeah.  Some of them.

   14        Q       And every time that a nurse would call

   15   you, you always took notes on that meeting?

   16        A       Yes.

   17        Q       Okay.  The notes that you took, we'll look

   18   at.  Do those notes reflect just the things that you

   19   felt were important or do they reflect everything that

   20   the nurse told you?

   21        A       Everything that -- I just asked them for

   22   how -- how did they get hired?  How did they start?

   23   Who contact you?  How do you find out the business?

   24   You know, questions that you have to ask normal in an

   25   interview.

```
 1          Q       Okay.  So my question is did -- were there
 2    occasions where a nurse would tell you things and you
 3    would decide that doesn't matter so you wouldn't write
 4    it down?  Or did you write down everything they told
 5    you?
 6          A       No.  I just asked the same questions to
 7    every single one and I just -- I just answer -- you
 8    know, write down the answer.
 9          Q       I'm sorry.  Yeah.  Let me try to rephrase
10    it.  So if you asked a question -- and you did.  You
11    asked questions, right?
12          A       Uh-huh.
13          Q       You ask questions.  They give you answers,
14    correct?
15          A       Uh-huh.
16          Q       If after you ask the question and they're
17    giving you an answer, did you write down every word
18    that came out of their mouth or --
19          A       No.  I write everything that -- that
20    they -- I asked the question.  They answer.  I write it
21    down.
22          Q       Okay.  Did -- were there occasions where
23    they would answer but you wouldn't write down what they
24    said?
25          A       No.
```

**JA1293**

Masella - Davis                                   75

```
 1        Q       Okay.  That's all I wanted to know.
 2  Perfect.  Thank you.  All right.  And if you -- at any
 3  point in time, if you don't understand what I'm asking
 4  you, please stop me and say, I don't understand it.
 5        A       Okay.
 6        Q       Sometimes I ask terrible questions, and I
 7  will admit that.  If that happens --
 8        A       That's fine.
 9        Q       -- stop me and I'll rephrase it.  Okay?
10        A       Uh-huh.
11        Q       Okay.  So can we agree if you don't
12  understand, you're going to tell me to rephrase?
13        A       Yes, I will.
14        Q       Okay.  Very good.  Very good.  Okay.  All
15  right.  Okay.  So how long were these two meetings that
16  you had with Lisa on that day approximately?
17        A       I can't recall the time that I spent
18  there.
19        Q       Okay.  Was it the whole day?
20        A       No.
21        Q       A half day?
22        A       I can't recall that, exactly how long.
23        Q       Okay.
24        A       Because I normally get there at 10:00 so I
25  don't look.
```

```
 1       Q       Yeah.

 2       A       Well, I look at the time for recording

 3  purposes, you know, for my time at the establishment --

 4       Q       Okay.

 5       A       -- but I can't recall that number.

 6       Q       Okay.  So just roughly, it wasn't the

 7  whole day, but it was --

 8       A       It normally -- normally I take four to

 9  five hours depending on the case.

10       Q       Okay.

11       A       Yeah.  If -- if I have all the employees

12  available right there, it make take a little bit

13  longer.

14       Q       Okay.  All right.  You said that while you

15  were there that you witnessed other things there that

16  led you to believe that the individuals were improperly

17  classified?

18       A       Correct.

19       Q       I'm going to ask you about that in one

20  second, but I want to ask you about -- well, tell me

21  what things you observed.  What other things?

22       A       That -- that was the only thing that I

23  observed.  Yeah.

24       Q       What was the only thing?

25       A       That why would a facility that the
```

1   employer or the owner of this business is in contact

2   with her?

3        Q       Oh, the telephone call?

4        A       Yeah.  The telephone call.  Yeah.

5        Q       Okay.  Anything else other than the

6   telephone call?

7        A       No.

8        Q       Okay.  Got it.  All right.  You said you

9   look for posters.  Was there an FSLA poster?

10       A       Yeah.  There was a FSLA poster.  That's

11  the first thing that we check.

12       Q       Okay.  So -- so the things that caused you

13  to come to the conclusion on that day that the Schedule

14  A individuals were improperly classified were your

15  meeting with Lisa, that telephone call, and your

16  meetings with employees onsite; is that correct?

17       A       Well, I did not make a conclusion on that

18  day, but --

19       Q       Led you to believe.

20       A       -- the evidence that made me believe there

21  might be a misclassification of employees, you know,

22  being -- it gave my some evidence there.

23       Q       Okay.

24       A       Now, when you take more interviews, that

25  where you confirm more.

Maldona - Davis                                    78

1          Q       Yes.

2          A       You know, the more evidence, the more --

3    the more confirm and you put -- say, Okay, a hundred

4    percent sure.  Then once you collect all this evidence,

5    you -- you have to look at the regulation.

6          Q       Did you talk to Ms. Pitts about settlement

7    that day?

8          A       No.

9          Q       Okay.  That was a different day that you

10   talked about settlement?

11         A       No.  The day of the initial conference,

12   Ms. Pitts said, You will talk to my lawyer.  That's it.

13   So that's the end of the conversation.  Once -- once

14   the employee or the owner of business tells me that,

15   I'm going to talk to a lawyer, I don't talk to a

16   lawyer.  I just --

17         Q       You stop?

18         A       I just stop and I wait for the lawyer to

19   call me.  Then every information goes through the

20   lawyer.

21         Q       Okay.  And so then after that -- you

22   already told me about your letters with the lawyer.  I

23   know that.  Then you sent out letters to the nurses,

24   and then you did some phone interviews.  Then what

25   happened after that?

1        A       After getting interviews with the nurses?

2        Q       Yes.

3        A       I do -- I sit down with the -- well, once

4    I analyze the -- the interviews and I look at the

5    regulations, what it says, and I analyze the economic

6    realities that Mr. Rothlisberger provided me --

7        Q       Yes.

8        A       -- I analyze that with the elements of

9    economic realities that we have on Fact Sheet Number

10   13 --

11       Q       Yes.

12       A       -- and the regulation, what it says.  Am I

13   an employee?  Who's an employee?  Who's an independent

14   contractor?  Then based on that, I make a decision to

15   start doing back wages.

16       Q       Okay.  And in this case you made that

17   decision?

18       A       Yes.

19       Q       And then after you made the calculations,

20   then what?

21       A       After I made the calculations and I'm done

22   and I put them in the system because, you know, we have

23   to create different documents like I mentioned earlier.

24       Q       Right.

25       A       A WH-58.  A WH-58 is the receipts that the

Mastria - Davis                                    80

1    employer normally presents to the employee when they

2    pay back wages and they have to sign and I present it.

3    I also created a WH-56 and the instruction letter.

4              Q       Okay.

5              A       So once you get all these documents, then

6    you call the employer's representative, if there's any

7    attorney, and I says, I would like to have a final

8    conference with you, and that's what -- that was my

9    procedure.

10             Q       Is that what happened in this case?

11             A       Yes.

12             Q       Okay.  So did you -- did you have a final

13   conference with the attorney?

14             A       Yes.  At his office and Ms. Lisa Pitts was

15   there too.

16             Q       Okay.  And in that office did you talk to

17   Ms. Pitts about a settlement?

18             A       I did not talk to Ms. Lisa Pitts.  I

19   talked to the lawyer.  I presented the WH-56.

20             Q       Okay.

21             A       And I presented it and I say, This is how

22   much money you owe.

23             Q       Okay.

24             A       And then I told her that -- the rest of

25   the information.  We discussed what we discussed

1    earlier.  Yeah.

2         Q       What was it that caused you to make the

3    final determination that the Schedule A workers were

4    improperly classified?  Was it the interviews with the

5    nurses?

6         A       The interviews -- not really.  Well, the

7    interviews -- of course the interview with the nurses

8    and their -- their office records.  You know,

9    everything black and white that is on the payroll

10   determines the dependency.  When you look at the

11   payroll, the payroll is the certified payroll that the

12   employer or the owner of the establishment has overseen

13   and that he has that person.  Once I look at the

14   payroll and the previous certification of the payroll

15   where the employee -- the employer has agreed is

16   correct, that information becomes a true document.

17        Q       Okay.

18        A       And like I tell you earlier, I look at the

19   names of the individuals that I interviewed, look at

20   the dependency.

21        Q       Okay.

22        A       And I ask them for pay stubs, you know,

23   items that will help me to make a determination.

24        Q       Okay.

25        A       And that is based on the economic

**JA1300**

1    realities.

2         Q        Okay.  And do you -- I don't know your

3    process.  I don't work in your -- in your enterprise,

4    so is -- is the process that you make a determination

5    that they're improperly classified and then you submit

6    it to your supervisors and they approve or disapprove

7    or do you just make the decision?

8         A        No.  I just make the decision.

9         Q        Okay.

10        A        What I -- what I do is sometimes I really

11   analyze the case.

12        Q        Okay.

13        A        Everything is -- my decisions are based on

14   the FOH and the -- the 29 Code of Federal Regulations.

15        Q        Yes.

16        A        And that's where I look.  I look at the --

17   the information that the law provides.

18        Q        Yeah.

19        A        And based on that, I make the

20   determination.

21        Q        Got it.  Okay.  Good.  So the economic

22   realities test, is that -- is that the primary test

23   that you use to make a determination?

24        A        Well, the economic realities -- not just

25   that but in the FOH you ask, Am I an employee?  Who's

1    an employee?  You have to look at the factors.  There

2    are some factors that help you determine.  There are no

3    final facts, but there are some facts that determine --

4    that help you determine whether someone is independent

5    contractor or an employee.

6         Q        You said something and I think I

7    misunderstood you.  So you said that you look at the

8    economic realities test and FOH factors?

9         A        Well, the FOH help you to -- it guides you

10   to make a determination.

11        Q        Okay.  FOH stands for?

12        A        I can't recall.  It's the Fundaments of --

13   of -- I can't remember.  I always forget that one, but

14   it's -- FOH is the Fundamental of --

15             MR. DAVIS:  Hold on.  Do you know what FOH

16        stands for?  I just don't --

17             MS. AMIN:  Field Operations.

18             THE WITNESS:  Field Operations.

19             MR. DAVIS:  There we go.

20             THE WITNESS:  Field Operations.

21             MR. DAVIS:  Field Operations?  Field

22        Operations -- H is what?  Handbook?

23             MS. AMIN:  Handbook.

24             MR. DAVIS:  There we go.

25        A        We have to go by the Field Operations.  We

1    have to follow every step in the Field Operations.

2    Yeah.

3

4    BY MR. DAVIS:

5         Q      Okay.  And do you know if the Field

6    Operations Handbook, FOH, is that -- is that based on

7    the economic realities test or is that based on

8    something else?

9         A      It is based on the 29 Code of Federal

10   Regulations.  You know, most of the information comes

11   from there.  Yeah.

12        Q      Okay.  Some of it doesn't come from there?

13        A      No.  Most -- all the information comes

14   from there.  It reflects it.  It's just a handbook to

15   help you -- it's easier to read one handbook than

16   reading so many --

17        Q      Understood.  Understood.  Piles and piles

18   of cases.

19        A      Yeah.  Well, not piles of cases, but to --

20   when you pull the Code of Federal Regulations, you

21   could have a thousand or more than a thousand pages.

22        Q      Okay.

23        A      When you read the FOH, it might have less

24   pages.  I'm not sure how many pages, but it's more

25   compressed.

Ma5666a - Davis                                      85

     1          Q       Yes.

     2          A       And it give you the information that --

     3   you know, the information you need.

     4          Q       Okay.

     5          A       But I not rely just on the FOH.  I always

     6   rely -- I always look at the regulations, you know, the

     7   Code of Federal regulations, depending on what -- what

     8   case do I have, you know, and I look at the act, the

     9   Fair Labor Standards Act, whatever it applies to the

    10   case.

    11          Q       Okay.

    12          A       That's what I'm looking at.

    13          Q       All right.  Are you familiar with the

    14   economic realities test?

    15          A       Yes.  I would say yes.

    16          Q       What does that mean to you?  Tell me what

    17   you know about the economic realities test?

    18          A       The economic realities test, it tell you

    19   whether someone is an independent contractors or not.

    20          Q       Okay.  Do you -- do you know what factors

    21   are -- are often considered a part of that test?

    22          A       Yes.

    23          Q       What -- what do you recall?

    24          A       Profit or loss, control, integral part of

    25   the business.  It's about six factors.  Yeah.

**JA1304**

Matera - Davis                                          86

```
 1        Q       Very good.  We'll go through those.  And
 2   in this case -- we'll go through them one by one, so --
 3   but were there any particular factors of the economic
 4   realities test that to you stood out more than others
 5   in this case with Steadfast?
 6        A       I don't think so.  I can't remember which
 7   one stood out.
 8        Q       They were all about the same?
 9        A       I would say -- no.  There were some that
10   stood out, yeah, more than others.
11        Q       Which -- which stood out?
12        A       Control.
13        Q       Okay.
14        A       Profit or loss.
15        Q       Okay.
16        A       Integral part of the business.
17        Q       Okay.
18        A       Maybe all six are the ones that --
19        Q       Okay.  We'll just go through them one at a
20   time.
21        A       Sure.  Sure.
22        Q       Okay.  That's fine.
23        A       Sure.
24        Q       All right.  Did any of the -- any of the
25   factors, did you find any of them weighed in favor of
```

Matoaka - Davis                                          87

1     the workers being independent contractors?

2          A     I would say yes.

3          Q     Okay.  Which ones favored them being

4     independent contractors?

5          A     That I can remember, maybe the three that

6     I just mentioned, profit, loss, integral part of the

7     business.

8          Q     Yeah.

9          A     Control of the -- of -- who has control.

10         Q     Sure.  And I don't want to confuse you,

11    and maybe I said this badly.  Let's go back for a

12    second.  Of those six factors, right, sometimes a

13    factor might go in favor of them being employees,

14    sometimes a factor might go in favor of them being

15    independent contractors.  I'm not asking you to give me

16    a detailed legal analysis.  I'm asking of the

17    factors -- this is my first question --

18         A     Uh-huh.

19         Q     -- which one of the factors did you find

20    weighed in favor of them being employees?

21         A     Okay.  To me, I think all six.

22         Q     All six?

23         A     Yes.

24         Q     None of them weighed in favor of them

25    being independent contractors, in other words?

1        A       No.

2        Q       Okay.  Very good.  That's what I was

3   asking.  All right.  What about the failure to maintain

4   records that was also a part of the complaint at issue?

5   Is that something you found, that Steadfast didn't

6   maintain proper records?

7        A       Yeah.  Part 516 of the Code to Federal

8   Regulations, 7-Alpha, requires the employer to separate

9   hours worked from the overtime.  The first forty has to

10  be separate from the overtime.  That doesn't assess any

11  penalties to the employer, but it's a requirement.  You

12  have to separate.  If you look at the payroll where

13  someone worked more than forty hours, you've got to

14  separate and identify that there was overtime.

15       Q       Did you come to the conclusion that

16  Steadfast did not maintain proper records of that?

17       A       Yes.

18       Q       And that was based totally on the payroll

19  records; is that right?

20       A       It was totally on the payroll records and

21  also on the interviews that I took.

22       Q       Okay.  What -- what, from the interviews

23  that you took, led you to believe that there were

24  improper records being kept?

25       A       I cannot -- I cannot reveal that

Malueca - Davis                                    89

```
 1    information.  You know, it's -- you have to look at the

 2    interviews.  Whatever information's in there, it's

 3    going to tell you whether the person had -- I'm not

 4    sure if you read the report, but --

 5         Q       I did.

 6         A       -- if you look at failure to combine

 7    hours --

 8         Q       Yes.

 9         A       -- that's another regulation that they

10    failed to do.

11         Q       Yes.

12         A       In the recordkeeping, when you fail to

13    combine hours for a worker who has worked --

14         Q       Okay.

15         A       -- that becomes a violation and a

16    violation of the overtime.

17         Q       Yeah.  And I'm asking just generally

18    speaking what type of information did you elict from

19    nurses that led to you to the conclusion that Steadfast

20    was not maintaining proper records?

21         A       The payroll.  You know, the payroll.  You

22    combine -- you -- you have to take interviews, take the

23    payroll, look for the names on the -- on the payroll.

24         Q       Yes.

25         A       And that's what tells you if there's a
```

```
 1   violation -- recordkeeping violation.

 2        Q       Okay.  I think I understand.  Let me

 3   repeat it to make sure I understand.  So you're saying

 4   that to determine if improper records was an issue --

 5        A       Uh-huh.

 6        Q       -- you looked at the payroll and then you

 7   interviewed the nurses and based on your determination

 8   that a nurse was improperly classified, you went back

 9   to the payroll and that's how you made the decision

10   that --

11        A       No.

12        Q       No?  That's not correct?  Okay.

13        A       A week stands alone.  You know, seven

14   days.

15        Q       Yes.

16        A       If the person works more than forty

17   hours --

18        Q       Yes.

19        A       -- anything after forty is overtime.  If I

20   look at the records --

21        Q       Right.

22        A       -- and to me all the people that are in

23   payroll -- payroll records --

24        Q       Yes.

25        A       -- are employees --
```

Mazzola - Davis                                                     91

1          Q       Yes.

2          A       -- and I see that there is no

3    identification of who paid overtime or not but that she

4    just paid straight time for overtime --

5          Q       Yeah.

6          A       -- then it becomes a violation.

7          Q       I totally understand your position on

8    that, but my question is very specific, so just bear

9    with me.  Okay?

10         A       Uh-huh.

11         Q       So my question was what information did

12   you look at that brought you to the conclusion that

13   Steadfast did not maintain proper records?  You said --

14         A       I --

15         Q       Hold on.  Hold on.

16         A       Uh-huh.

17         Q       And you said the payroll records and my

18   interview with the nurses.  So my second question,

19   okay, what information did you get from the nurses that

20   led to you to believe that Steadfast was not

21   maintaining proper records?  In other words -- in other

22   words, not information from payroll.  What information

23   did you get from nurses that led you to believe that

24   they were not maintaining records?

25         A       Well, when I -- when I interview an

1    employee, I ask them, Do you work -- it goes for a

2    specific case, you know.

3          Q      Okay.

4          A      For this case, Do you work in the office?

5    Do you work outside?  Then if they say yes, Do you

6    get -- do you get paid overtime?  If they say no or

7    they say yes, I go and look in the -- in the payroll

8    records.  With those individuals that I interviewed and

9    payroll records I see that there's a -- an amount of

10   hours worked but not office work which is supposed to

11   get paid overtime but in the payroll it's not, then it

12   becomes a violation of the recordkeeping.

13         Q      And that's it?

14         A      Yes.

15         Q      Okay.  Okay.  Okay.  Are you familiar with

16   the concept of a -- of a registry?  In other words,

17   there's -- you can have a staffing agency that -- you

18   understand that concept, correct?  A staffing agency?

19         A      Yes.  I investigated staffing agencies

20   before.

21         Q      Understood.  Okay.  And did you come to

22   the conclusion that Steadfast was a staffing agency?

23         A      She said that.  Yes.

24         Q      Okay.

25         A      The employer says she was a staffing

Ma**** - Davis                                          93

1   agency, but it doesn't show that it was a staffing

2   agency.  The employer says that, claimed that she was a

3   staffing agency.

4        Q        What does staffing agency mean to you?

5        A        Someone who hires people to provide

6   staff -- individual staffing to other companies.

7        Q        Does staffing agency to you mean

8   independent contractors?

9        A        Not necessarily.

10       Q        Okay.  It may or may not?

11       A        Not necessarily.  Most of the

12  individuals -- most of the staffing companies that I've

13  interviewed -- that I have investigated they -- they

14  are employees.  They have been employees, so I never

15  encountered an independent contractor being -- working

16  for a staffing agency working for someone else as an

17  independent contractor.

18       Q        So are you -- are you familiar with the

19  term a registry as opposed to a staffing agency?  Is

20  that something familiar to you or not?

21       A        No.  No.

22       Q        Have you ever heard of a registry?

23       A        The first time when I went to see Lisa

24  Pitts, a registry.

25       Q        Okay.  Did -- what did she tell you about

Mascia - Davis                                                    94

1   a registry?

2          A       She says that she has some of these nurses

3   that are registered in the -- with Virginia.   That's

4   what -- but I didn't go into in-depth with her about

5   that registry.

6          Q       Okay.  Registered you mean as nurses?

7          A       Registered as nurses.  Yes.

8          Q       Okay.  And is it your understanding that

9   nurses have to -- they have to be licensed with the

10  Commonwealth of Virginia to be a nurse in Virginia,

11  correct?

12         A       Yes.  They have to be registered in order

13  to -- to -- to work as a nurse.

14         Q       Okay.

15         A       But they also have to have qualifications.

16  They have to have -- well, registered nurse, most of

17  the times they have four-year college.

18         Q       Yeah.  Right.

19         A       A registered nurse, not an LPN or CNA.

20  They don't have college degrees.

21         Q       So when I'm talking about a registry, are

22  you understanding that I'm talking about -- do you

23  think that I'm talking about like a registered nurse?

24  Is that what -- that's not what I'm talking about.

25         A       That's what I think you trying to say.

 1   No?

 2          Q        I'm not talking about that.  I'm talking

 3   about another concept that there are -- there are

 4   companies that are called registries that are different

 5   than a staffing agency.  Is that a new concept to you?

 6          A        It's a new concept for me.  Yeah.

 7          Q        Okay.  Okay.  Very good.

 8          A        Uh-huh.

 9          Q        Okay.  Well, when you interviewed with

10   Lisa or did your interview with Lisa, at any point in

11   time, the first one, the second one, the same day, or

12   the -- the final one with the attorney --

13          A        Just twice.  The first one and the

14   attorney.  That's it.

15          Q        But the first one was twice in one day,

16   right?

17          A        It was in her office.  Inside the office.

18   Yes.

19          Q        So one day you met with her twice?

20          A        Uh-huh.

21          Q        And then the second time was a different

22   day you met with her and her attorney?

23          A        Uh-huh.

24          Q        Okay.  So in all of those interviews --

25          A        Yes.

**JA1314**

Mazyka - Davis                                    96

 1         Q      -- did -- did you ever say to Ms. Pitts,

 2   probably in the last meeting, either to her or through

 3   her attorney maybe, did you ever say something like,

 4   you know, Most people just pay this fine?  Why are you

 5   going to fight me on this?

 6         A      No.

 7         Q      All right.  When you do interviews with

 8   people, and including this case, but when you call

 9   workers, do you find that the workers sometimes use the

10   wrong word to describe themselves, meaning they call

11   themselves an employee when they're an independent

12   contractor or they call them an independent contractor

13   when they're an employee?

14         A      No.  I've never had a situation like that

15   because I'm the one who asks the questions.

16         Q      Okay.

17         A      And I'm very thorough with them before I

18   start the interview statement and I ask them to tell me

19   the truth and nothing but the truth because it's --

20   it's like the same like you use in a court of law.

21         Q      Okay.

22         A      So I just ask questions -- straight

23   questions and I expect straight answers too.

24         Q      Okay.

25         A      No more than that.

                    Fiduciary Reporting, Inc.
                         (757) 482-2729

                          **JA1315**

Mazyala - Davis                                    97

 1        Q        When you do -- when you did the interviews

 2   with the nurses in this case, before -- well, not

 3   before.  At any point in time did you ever tell any of

 4   the nurses that depending on the investigation they

 5   might be entitled to additional compensation?

 6        A        I don't ever promise anything to anybody.

 7        Q        I know you didn't promise.  No.  But did

 8   you tell them that could be a potential result?

 9        A        No.

10        Q        Okay.  So they have --

11        A        No.  I normally tell the complainant, if

12   there's a complainant, I say, I don't guarantee

13   anything.

14        Q        Okay.

15        A        I just want to visit the employer, collect

16   evidence, and if the evidence is in your favor, then

17   it's in your favor.  If it's not in your favor, then I

18   tell me their rights.  That's it, but I don't guarantee

19   anything to anyone.

20        Q        Okay.  What was the last thing you said?

21   If it's not your in favor, and then you said some

22   words.  I didn't understand you.

23        A        If it falls on in your favor --

24        Q        Yes.

25        A        -- you know, if you find out that you are

**JA1316**

```
 1   this, you know, what you alleging, then we might be

 2   able to get something.

 3          Q      Got it.

 4          A      But if -- but if --

 5                 MR. DAVIS:  One second.  Off the record.

 6                 (A conversation was held off the record.)

 7                 MR. DAVIS:  Back on the record then.

 8          A      It is illegal to promise a complainant.

 9

10   BY MR. DAVIS:

11          Q      Okay.

12          A      I never promise because then I can get

13   myself in trouble.

14          Q      Okay.  Understood.  So when you the nurses

15   are answering questions in this case, I read in some of

16   the reports sometimes a nurse would say, I'm an

17   independent contractor, and sometimes a nurse would

18   say, My employer.  Okay.  So you agree with me that the

19   nurses use these words, correct?

20          A      Sometimes they do.  Yeah.

21          Q      Okay.  So do you agree then that sometimes

22   the nurses in their reports use the wrong word?

23          A      Well, they don't use the wrong word unless

24   I -- I -- I'm -- what should I say?  I'm the one who

25   asks the question.
```

Mazula - Davis                                                    99

1          Q       Understood.

2          A       And I normally ask the question, How long

3   you've been working for this company?  Then I'm the one

4   who refers to them as an employer.  That's what I

5   normally deal with, employers.

6          Q       Yeah.  But just to make sure we're clear,

7   so it's your opinion today, your position, that these

8   nurses on Schedule A were employees and not independent

9   contractors, correct?

10         A       My -- my decision was based on what they

11  told me and what they -- what they feel.  They feel

12  that they were employees, not independent contractors.

13  They would work for this -- this company and they were

14  not free to make decisions like -- such as like taking

15  off like an independent contractor will do like such as

16  taking time off, you know, for vacation or stuff like

17  that.  They would have to talk to Ms. Pitts in regards

18  to that, so they felt that they were employees and they

19  call her an employer because there's an established

20  relation -- relationship, you know, with them --

21  between them -- the two of them.

22         Q       Okay.  Ultimately you came to the

23  conclusion that the Schedule A workers were employees

24  and not independent contractors; is that correct?

25         A       I came to the conclusion -- yes.  I came

Martina - Davis                                      100

1   to the conclusion that the employees that I interviewed

2   are employees, that supposedly independent contractors

3   were classified -- that they were supposed to be

4   classified as an employees.  So that determination

5   means that everything -- everybody that is on that

6   payroll record that worked more than forty hours in a

7   work week should be paid an additional half time for

8   overtime.

9          Q       Okay.  How did you come to the conclusion

10   that Schedule A was improperly classified?  You didn't

11   interview everybody on Schedule A, right?

12         A       No.  But the payroll records show

13   different.

14         Q       I know.  But how did you pick the number

15   of people you decided to interview?

16         A       How did I pick the number?

17         Q       Let me stop you.  Stop.  In other words,

18   why did you interview only some?  Why didn't you

19   interview everybody?

20         A       Sometimes it's really hard to -- to

21   contact everybody.

22         Q       Okay.

23         A       And they just -- you interview -- you

24   know, the letters that I sent, I interview the people

25   that responded to me.

1       Q       Okay.  Is it -- was it just an arbitrary

2    number they you came up with?  You're going to

3    interview, I think --

4       A       No.  It's just based on the responses.

5    Who's going to respond to --

6       Q       But you -- but you only sent letters to a

7    select few.

8       A       I sent letters to the ones that Ms. Pitts

9    provided me.  That's it.  I requested for more

10   addresses, but I was not provided all the addresses

11   that are requested in my appointment letter.  She gave

12   me a list of employees.  That's it.  That was -- it was

13   written in paper.

14      Q       Okay.

15      A       She didn't provide me a document where I

16   could look for everybody.  If I had -- I had some phone

17   numbers where she provided me, but some of those

18   employees were no longer working.  You know, I don't

19   have -- I didn't have any addresses.  Some of those --

20   some of those phone numbers didn't -- were not even

21   working.  No one was answering the phone numbers.

22   People change numbers.  So I have to make a decision.

23   Of few numbers that were good --

24      Q       Right.

25      A       -- I selected fifteen.  I sent it to them

1    and I says, Can I get an interview?  Please call me.

2          Q      Okay.  Did you send a letter to everybody

3    that you had an address for?

4          A      What?

5          Q      Did you send a letter to everybody on the

6    Schedule A list that you had an address for?

7          A      No.

8          Q      Okay.  That's my -- that was my question.

9    How did -- why did you select only some?  Why didn't

10   you send a letter to everybody that you had an address

11   for?

12         A      Because some of the individuals did not

13   have -- I didn't have the address to contact.

14                MS. AMIN:  So I think he's misunderstood

15         your question.

16                MR. DAVIS:  I know.  I know.  I'm trying

17         to clarify.  Okay.  So let's just walk through

18         this.

19

20   BY MR. DAVIS:

21         Q      So you asked Ms. Pitts for a list of

22   names --

23         A      Uh-huh.

24         Q      -- and addresses?

25         A      I asked for everybody's.

1          MR. DAVIS:  Hold on.

2          MS. AMIN:  Let him finish his question.

3

4     BY MR. DAVIS:

5          Q     So she gives you a list.  You did not send

6     a letter to everybody with an address.  You sent it to

7     some, correct?

8          A     Uh-huh.  Uh-huh.

9          Q     My question is why did you pick some?  Why

10    did you not send it to everybody on the list with an

11    address?  You --

12         A     Well -- yes.  I sent -- I sent to fifteen.

13         Q     Okay.

14         A     And that was approximately the amount of

15    people that I -- normally I make phone calls based on

16    the information that Ms. Pitts give me.  Some of those

17    phone numbers were inaccurate.

18         Q     Yes.

19         A     So once I get the correct address --

20         Q     Yes.

21         A     -- then I write down the letter and I read

22    out the letter and I send it to them.

23         Q     Yeah.  I still think we're

24    misunderstanding.  So let's just say she sends you a

25    list of, let's just say, a hundred names and addresses.

      1        A        Uh-huh.

      2        Q        Okay.  You've got a name.  You've got an

      3    address.  It's a list -- it's more than that.  I forgot

      4    the number, but let's just say a hundred just for

      5    conversation.  So she sends you this.  You choose to

      6    send it to only a few of them.  There were other people

      7    that you had an address for and you did not send them a

      8    letter; is that right?

      9        A        Uh-huh.

     10        Q        How did you choose which ones -- you had

     11    addresses for John, Jack, Sue and Jim, but you only

     12    sent letters to John and Sue.

     13        A        Well, that's -- that was a random pick.

     14    We don't --

     15        Q        Thank you.

     16        A        We don't select every single one.

     17        Q        It was random?

     18        A        It was random.  Yeah.  We select random.

     19    It's just like when we go to -- to the employers we ask

     20    for different pay -- payroll records.

     21        Q        Yes.

     22        A        Random payroll records.

     23        Q        Okay.

     24        A        If I see the random payroll records do not

     25    show any violations, the information that is provided

1    to me shows me that --

2         Q      I understand.

3         A      -- there is not more violations on the

4    other ones.  However, I always tell the employer, I've

5    checked random, because it's hard to check every

6    single -- twelve -- I mean, twenty-four months of

7    payroll records in one day.  I say, I don't see any

8    violations.  However, if anyone comes forward and

9    submits a complaint --

10        Q      Yes.

11        A      -- I will come back.

12        Q      I understand.

13        A      We will know exactly where --

14        Q      You answered my questions.  I got it.

15   That's good.  Thank you.  Forgive me.  I just want to

16   make sure we're communicating and understanding clearly

17   because I don't want to misunderstand anything you say.

18        A      Uh-huh.

19        Q      Okay.  So we talked about the fact that

20   you interviewed nurses and you asked them questions and

21   on some of these -- we're going to look at them and

22   talk about them later, but on some of them the nurses,

23   responding to your question said, I'm an independent

24   contractor.  We'll see that.  It's in your notes.

25        A      Uh-huh.

1          Q       So they said, I'm an independent

2   contractor.  You later determined that that's

3   incorrect, right?

4          A       Uh-huh.

5          Q       Is that correct?

6          A       Yes.  Yes.

7          Q       Okay.  So my question to you earlier was

8   do you agree with me that sometimes individuals that

9   you interviewed say that wrong word?  They call

10  themselves employees or an independent contractor, but

11  they use the wrong word.  Do you agree with that?

12         A       Well, yes, I do agree because sometimes

13  employees don't know the law or the regulations and

14  they think in their heads because they employer --

15  they trust employer.

16         Q       Okay.

17         A       And the employer tell them, You

18  independent contractor and you make a contract, their

19  assumption is I'm an independent contractor, but in

20  reality, they're not.

21         Q       Okay.  So -- but you agree with me that

22  the nurse, they're not a lawyer.  They don't have your

23  skill and your training, correct?

24         A       Uh-huh.

25         Q       Yes?

1       A       Yes.

2       Q       Yes?  Okay.  Good.  Thank you.  So the

3   word that the nurse uses doesn't really matter, is that

4   correct, because it's your decision that matters, not

5   the nurse's self-description?

6       A       Not necessarily.  Like I said, employees

7   sometimes believe what the employer tells them --

8       Q       Yes.

9       A       -- what they are.

10      Q       Yes.

11      A       And -- and they say, Okay, you classified

12  as an independent contractor, and that's why they call

13  themselves independent contractor even though their

14  reality shows different.

15      Q       I know, but my question was that -- I

16  think what you're saying is it doesn't matter if the

17  nurse describes themselves as employee or independent

18  contractor.  It doesn't matter.  The only thing that

19  matters is your decision as to whether they're an

20  independent contractor or an employee?

21      A       It's not my decision, but the rest of the

22  interview reveals if the person is -- is an employee or

23  an independent contractor.

24      Q       Okay.  So -- right.  And so we got caught

25  up in whether it's your decision, so I'll -- I'll

Masucha - Davis                                    108

1   rephrase the question.  Do with agree with me that

2   whether the nurse describes him or herself as an

3   independent contractor or an employee, that does not

4   matter?  The only thing that matters is whether the law

5   determines that they're an independent contractor or an

6   employee; is that correct?

7        A      It's what the law determines.

8        Q      Okay.  So that's a yes?

9        A      Yes.

10       Q      Okay.  Thank you.  Did you ask any of the

11  nurses that you interviewed if they worked for other

12  companies?

13       A      Yes.  If they work for other companies?

14  Yes.  Yes.

15       Q      Okay.  I didn't see that in any of the

16  notes.

17       A      They -- it is in there.  They work for

18  facilities -- for the facilities where the company send

19  them.

20       Q      Okay.  Did any of the nurses you

21  interviewed say that they worked for other registries

22  or staffing agencies?

23       A      Yes.  I asked questions on that and they

24  say no.

25       Q      Okay.  The ones that you picked said no?

 1        A       Uh-huh.  Some of them, yeah, they say no.

 2        Q       Did some of them say yes?

 3        A       I can't remember exactly because I can't

 4   remember all of the interviews I have taken.

 5        Q       Sure.  I'm not trying to trick you.

 6        A       Okay.

 7        Q       We'll look at them together.

 8        A       Okay.  Yes.  Okay.

 9        Q       But you -- but that is a question that you

10   asked, Do you work for other facilities?  Do you work

11   for other staffing agencies?

12        A       Yeah.  Normally I ask them if they have --

13   if they have a business, if they have an office.  Do

14   you have -- do you have business card?

15        Q       Yes.

16        A       Are you registered employee identification

17   number?

18        Q       Yes.

19        A       And do you have any employees?  I ask them

20   them those questions.

21             MR. DAVIS:  It's 12:15, so I would imagine

22        we're going to have a call at some point in time.

23             MS. AMIN:  Sure.  Yeah.

24             MR. DAVIS:  And we'll just continue until

25        that time.

 1    BY MR. DAVIS:

 2         Q      Did you interview any of the individuals

 3    at any of the hospitals that the nurses work for?

 4         A      At the hospitals?

 5         Q      Yes.

 6         A      No.  Because Ms. Lisa Pitts did never --

 7    never provided me with that information.  Those are

 8    clients -- those are her clients.  She didn't want to

 9    give me anything.

10         Q      Yes.  But when you interviewed with the

11    nurses, some of the nurses, did they disclose to you

12    which hospitals they worked at?

13         A      Some of them.  Yes.

14         Q      Okay.  So after they disclosed -- I'm not

15    asking you to tell me, I'm saying -- about the

16    hospitals, but after the nurse told you, I work for

17    Sentara Leigh, for example, did you then call up

18    Sentara Leigh and interview someone at Sentara Leigh?

19         A      No, I didn't.

20         Q      Why not?

21         A      Because those companies are not in -- in

22    the -- they're not being investigated.  Then I will

23    have to -- I will have to overlook my investigation and

24    then try to claim that they are joint employers.

25         Q      Okay.  Did you feel that the hospitals

Mascia - Davis                              111

1   would not have any relevant information to help you

2   determine whether the Steadfast individuals were

3   employees or independent contractors?

4        A       Repeat that again?

5        Q       Sorry.  Yeah.  Did you believe that the

6   hospitals wouldn't be able to give you any information

7   that would help you make the decision about whether

8   Steadfast was -- whether these individuals were

9   independent contractors or employees?

10       A       No.

11       Q       No meaning you didn't think the -- am I

12  correct in understanding --

13       A       Yeah.

14       Q       -- that you didn't think the hospitals had

15  relevant information?

16       A       Well, they could -- they could have

17  relevant information, but the thing is when you

18  interviewing individuals for one company and then you

19  go to interview another company --

20       Q       Yeah.

21       A       -- then you have to go to the HR and

22  explain what is your purposes for your investigation

23  and then you have to go provide them an appointment

24  letter and -- and it would be like opening

25  investigation.  We would have to add them as a case and

1    open a case file --

2         Q       Uh-huh.

3         A       -- as -- as a probable second company to

4    be investigated --

5         Q       Of course.

6         A       -- because the subject of the

7    investigation is on Steadfast Medical Staffing.  It

8    just -- it was sole concentrated on Medical Staffing,

9    not on facilities.

10        Q       So did it not concern you or did you not

11   think it was relevant to maybe find out if the

12   hospitals -- what if you interviewed a hospital

13   supervisor that said, No, we control these individuals.

14   Steadfast doesn't control them. We control them?

15        A       Okay.  When you do a -- when you

16   question -- when you interview employees and you ask

17   them, Who's paying you --

18        Q       Yes.

19        A       -- and they say, Steadfast is paying me.

20   Everything comes from Steadfast, there's no other

21   company involved in it, so we know that the company to

22   be investigated is Steadfast.

23        Q       Yes.

24        A       We don't need to go out and verify this

25   person is working for other people because they don't

 1   appear on the pay stubs.  The person doesn't -- the

 2   other company does not appear on the payroll records.

 3        Q      I understand that, but my question is in

 4   the economic realities test, for example, one of them

 5   is in control, right?

 6        A      Uh-huh.

 7        Q      You said that you felt like that was an

 8   important factor here?

 9        A      Yes.

10        Q      And my question is why did you not ask

11   some of the hospitals at random to tell you if they

12   knew who controlled these individuals?

13        A      Because some of the interviews that you

14   can read --

15             MR. DAVIS:  Let's pause this.

16             (At 12:20 p.m. a phone call was received

17        and the following took place on the record:)

18             THE COURT:  All right.  Let me just before

19        we get started, is the court reporter reporting

20        now?

21             MR. DAVIS:  She is.  This is Chris Davis,

22        Judge, and she's here transcribing as we speak.

23             THE COURT:  Very well.  So for the record,

24        we're in the matter of R. Alexander Acosta, the

25        Secretary of Labor, versus Medical Staffing of

```
1        America and Lisa Pitts.  Civil Action Number

2        2:18-CV-226.

3              My chambers were contacted by counsel this

4        morning who asked for my participation or -- in

5        this deposition to deal with certain objections.

6        If counsel would identify themselves for the

7        record, first for the plaintiff.

8              MS. AMIN:  Good afternoon, Your Honor.

9        Avni Amin on behalf of the Secretary of Labor and

10       I have --

11             THE COURT:  Good afternoon.

12             MS. AMIN:  Good afternoon.  And I have

13       here our investigator, Alvaro Mazuera, who is with

14       the Department of Labor who is being deposed.

15             MR. DAVIS:  And, Judge, this is

16       Christopher Davis on behalf of the defendant, and

17       other than the court reporter, there is no one

18       else in the room.

19             THE COURT:  Very well.  All right.  And

20       who is being deposed?

21             MR. DAVIS:  Mr. Mazuera.

22             THE COURT:  Very well.  All right.  Who --

23       what is the nature of the objection?  And we'll

24       start with the party who's objecting.

25             MS. AMIN:  So that would be me, Your
```

1          Honor.  Thank you.

2                  The nature of the objection is based on

3          the informant's privilege.  From my understanding,

4          defendant's counsel is seeking or asking the

5          government to waive the privilege with respect to

6          all employees, and I'll let Attorney Davis kind of

7          add to that.

8                  It seems like the defendants are seeking

9          some sort of blanket waiver based on my

10         representation that I may rely on the statements

11         of certain informants prior to trial and my

12         intention to produce un-redacted statements prior

13         to trial.

14                 As Your Honor knows, we are still in the

15         midst of discovery, which closes on Monday, so the

16         government's position is that it is premature and

17         improper for us to have to waive any informant's

18         privilege until we make the determination that we

19         are doing to rely, for example, on a certain

20         statement from one of the affective workers, most

21         likely because we are going to call that person a

22         witness at trial.

23                 That's my understanding of the issue of

24         the informant's privilege.  I'll let Attorney

25         Davis maybe clarify or add to that.

```
 1                    MR. DAVIS:  Judge --

 2                    THE COURT:  All right.  Hold just one

 3           moment, please.

 4                    MR. DAVIS:  Yes, sir.

 5                    THE COURT:  All right, Counsel.  My

 6           apologies.  Mr. Davis?

 7                    MR. DAVIS:  Yes, Judge.  Thank you.

 8                    THE COURT:  Hold for just a second.

 9                    MR. DAVIS:  Yes.

10                    THE COURT:  Are you still there?

11                    MR. DAVIS:  I'm here, Judge.

12                    THE COURT:  All right.  Try again.

13                    MR. DAVIS:  Yes.  Can you hear me now?

14                    THE COURT:  I can.  Thank you.

15                    MR. DAVIS:  Okay.  Thank you.  So, Judge,

16           the issue is that the investigator conducted a

17           number of interviews which have been documented

18           with individuals that are subject to this issue --

19           this lawsuit.  In fact, we call them the Schedule

20           A individuals on the back of the complaint.  Those

21           individuals are all of these nurses that the

22           Department of Labor is -- is claiming were

23           employees and we're saying that they were

24           independent contractors.

25                    THE COURT:  Okay.
```

Matessa - Davis                                    117

1           MR. DAVIS:  In addition to that group of

2     people, there are about fourteen individuals that

3     work in the office of defendant who we all agree

4     are employees.  They are classified as employees.

5     They were paid as employees.  With maybe some

6     exceptions, there seems like there's not a dispute

7     over that, although I understand there might be a

8     dispute over a few of them, but I don't know that

9     that's the issue.

10          But the close of discovery is coming and

11    I'm here with the investigator and I have his

12    notes and investigation reports of his meetings

13    with the Schedule A workers.  Perhaps there are

14    also meetings with these employees.  I don't know.

15          The issue is arising on a couple of

16    different things.  The first issue was trying to

17    determine if the investigator was speaking to one

18    of the employees in the office as opposed to one

19    of the nurses, and we received an objection on

20    that to the extent that the discussion could cause

21    the revelation of something that would be

22    protected by informant's privilege.

23          The second issue is I'm about to go

24    through in great detail the investigative reports

25    themselves and the investigative reports have

1        large blocks of information that have been

2        redacted and the privilege log indicates a single

3        entry of informant's privilege.  Judge, I'll just

4        flag this.  We have a good faith communication

5        about that, and unless we can reach a resolution

6        today, we intend to file a motion to compel on

7        them.

8              But today is our last opportunity to

9        depose this individual that's here with us now and

10       I'd like to know who he spoke with and I'd like to

11       know some details about these large, blocked out

12       areas.  It's my last opportunity to depose him,

13       and counsel indicates that that's protected by

14       informant privilege.  However, I'm informed that

15       the individuals are going to be revealed to us, or

16       at least the ones to be used at trial, one to two

17       weeks before trial.

18             Judge, the informant's privilege is

19       designed to protect individuals from retaliation

20       by an employer or a supervisor, and I understand

21       that, but the issue here is that these individuals

22       have agreed to make an interview.  The Department

23       of Labor is going to disclose them to us, I

24       understand, so their names are going to be

25       revealed.  I think they should be revealed now

Mazzola - Davis                                              119

 1            when I can ask questions about it.  That's Issue
 2            Number One.
 3                   Issue Number Two is I asked Ms. Amin,
 4            counsel for the Department of Labor, Well, what
 5            about -- it's one thing if these people are
 6            currently employed or working as independent
 7            contractors.  What about people who have been
 8            fired or left?  Not fired, but there's people in
 9            these interviews that said that they quit.
10            Counsel indicated that she would take the same
11            position, that their information is protected by
12            informant's privilege, which in both instances I
13            don't believe that the objection is proper.  In
14            the second instance under the Eastern District --
15            EDVA case law that I've looked at, that privilege
16            certainly doesn't apply to a former worker because
17            there's no risk of retaliation at all.
18                   But even with somebody that currently
19            works there, it would -- this is essentially --
20            the Department of Labor is trying to do a trial by
21            ambush because during my time to depose the
22            individual, I should be able to know who he spoke
23            with and ask questions.  You know, I've got --
24            it's not just their name.  I've got huge blocks of
25            information that has been redacted, and I want to

1      ask questions about that.  It would be prejudicial

2      if I don't get to know the name until two weeks

3      before trial and then I have no opportunity to ask

4      this investigator about it.

5          THE COURT:  All right.  Ms. Amin, let me

6      hear from you.  I guess I am troubled by this idea

7      that you're telling me you may identify these

8      individuals but -- but it's premature today.  You

9      know, I think -- at least my initial gut reaction

10      is that, you know, we need to know that answer

11      today so that -- and then, you know, if the court

12      needs to evaluate whether or not the identity

13      should be disclosed, that's another matter, but

14      you can't have your cake and eat it too.  You

15      can't say you want to think about it.  So what say

16      you in response?

17          MS. AMIN:  Your Honor, thank you.  So I

18      think that this conversation is premature

19      procedurally.  The reason that we're here at a

20      crossroads is that the defendants delayed in their

21      request for discovery.  I timely produced my

22      responses in a redacted format with respect to

23      what Attorney Davis has referred to as the report.

24      It's really interview statements with these

25      employees that are the primary issue.  I attached

**JA1339**

1       a privilege log and addressed the privileges that

2       were invoked.  I redacted information with respect

3       to those statements that would protect the

4       identity of the informants.

5            So procedurally what typically happens is

6       the parties engage in a Meet and Confer, which we

7       are in the midst of that.  I received a letter, I

8       think, earlier this week, maybe Friday, with

9       respect to their concerns.  I have noted that I

10      will provide more detail in my privilege log and I

11      will take a look at my redactions, so we are in

12      the process of engaging in the Meet and Confer.

13           Should we not ultimately agree on the

14      Secretary's invocation of the privileges, I expect

15      defendants will file a motion to compel and the

16      Secretary would then have to look at the

17      redactions again and have the head of the agency

18      affirm the invocation of any privileges that we

19      would want to continue to maintain.  So there are

20      multiple steps that we would go through before we

21      even get to this point of having defendants ask

22      plaintiff -- ask the Secretary to wholly un-redact

23      all of the statements and provide the names of all

24      the individuals that my investigator interviewed

25      during his investigation.

```
 1                 I will point out that all of the Schedule
 2         A employees are -- are or were under the control
 3         of Ms. Pitts, the owner of this company.  Her
 4         attorney is welcome to interview those employees.
 5         They have their contact information.  They can do
 6         the same thing that we did, that my investigator
 7         did, during his investigation, so there is no
 8         prejudice in them not knowing which employees we
 9         spoke to during the investigation.  They can talk
10         to all eighty-four employees on the Schedule A,
11         and they have access --
12                 THE COURT:  Let me ask you this.
13                 MS. AMIN:  Yes, Your Honor.
14                 THE COURT:  Let me ask you this.  Why
15         shouldn't defense counsel be entitled to a prior
16         statement made by those individuals who are, you
17         know, arguably the likely beneficiaries of the
18         suit now?  If they've made prior statements, then
19         why -- why isn't the defense entitled to those
20         prior statements?
21                 MS. AMIN:  The informant's privilege
22         allows the government to continue to protect the
23         identity of -- of its informants prior to trial.
24         Our office typically -- once we make a
25         determination that we are going to rely on those
```

1      statements, those are the statements that we would

2      produce prior to trial and the names that we would

3      produce.

4           To the extent that we do not intend to

5      rely on those statements, the government has the

6      continued interest in protecting the identity of

7      those individuals.  For example, if an employee

8      gave a statement to my investigator and we decided

9      to call that person, we would certainly produce

10     his or her statement in an un-redacted format.  We

11     could not introduce it at trial in a redacted

12     format, nor should we.

13          THE COURT:  And are we talking today about

14     the -- is this really a matter of the Schedule A

15     individuals or are we talking about other persons

16     who aren't listed on Schedule A?

17          MR. DAVIS:  Well, Judge, the -- I'm not

18     sure -- who are you addressing the question to

19     Your Honor?

20          THE COURT:  To Ms. Amin.

21          MR. DAVIS:  Sorry.

22          MS. AMIN:  I think the line of questioning

23     has been with regard to the Schedule A employees

24     and also the office employees.  To the extent that

25     there are questions as to whether my investigator

1              interviewed office employees versus Schedule A --

2              you know, the independent contractors, I think

3              that has already been answered, so the first point

4              that Attorney Davis makes I think is a non-issue.

5                   THE COURT:  I'm not sure what you're

6              referencing when you say the first point.

7                   MS. AMIN:  When he -- when he started the

8              call, he made a point that I had taken issue with

9              whether my investigator had spoken to the

10             employees or the independent contractors,

11             employees meaning --

12                  THE COURT:  And what is your -- what is

13             your answer?  Are you saying, Yes, he has, or, No,

14             he hasn't, or you're not --

15                  MS. AMIN:  He's already answered that

16             question.  We didn't really go down that path too

17             far, but my point with that line of questioning is

18             that I instructed him not to answer to the extent

19             that he interviewed employees that were in the

20             office.  For example, if there was only one

21             receptionist in that office, he could not state

22             that he -- he could not affirm that he interviewed

23             a receptionist because that could give away that

24             person's identity, so that was my limiting

25             instruction with respect to whether interviews

1          took place with the employees in the office or the

2          alleged independent contractors.

3               THE COURT:  Well, I guess I'm a little

4          confused still.  Are you, in essence -- are you

5          willing to confirm when he has interviewed

6          Schedule A personnel but with respect to

7          non-Schedule A personnel you're -- you're not

8          willing to confirm?

9               MS. AMIN:  Well, he can confirm generally

10         if there are questions, which Attorney Davis

11         didn't go far down that path, but questions about

12         office employees -- I guess we haven't gotten

13         there, but my limiting instruction was if you're

14         going to ask the job titles of who he interviewed,

15         to the extent that that would reveal the person's

16         identity, he cannot answer that question because

17         that is covered by the informant's privilege.

18         It's a small staff of individuals that work in the

19         office.

20              THE COURT:  All right.  Well, talk to me

21         about the -- I'd be happy to hear both of you on

22         this point, but what the law is concerning the

23         informant's privilege in this context.

24              I'm familiar with how it works in the

25         criminal context certainly.  Basically the key

**JA1344**

```
 1          case is Roviaro v. United States that provides

 2          that, you know, if an informant aided in a

 3          criminal investigation, that defendant would not

 4          normally be entitled to that informant's identity,

 5          you know, upon invocation of assertion of the

 6          privilege provided that the person was, you know,

 7          more in the nature of a tipster, his involvement

 8          or her involvement in the matters giving rise to

 9          the -- the charge or the transaction at issue was

10          not particularly significant and he, you know, or

11          she wasn't expected to be a witness at the trial.

12               What -- how -- tell me what the law is in

13          this regard.  You know, on the other hand, if the

14          person was, you know, integral to the transaction

15          and the government intended to rely upon on him,

16          then, you know, there are circumstances under

17          which the government would be required to disclose

18          the identify of an informant.

19               MS. AMIN:  So I'll go first, Your Honor.

20          We do rely on Roviaro and the case law that is

21          used in a criminal context in the same way.  I

22          would say that statements that were taken of the

23          Schedule A workers are the workers that are at

24          issue in the case that were misclassified and that

25          are owed back wages.  Theoretically, all -- I
```

1       think it's eighty-four that are on this Schedule

2       A -- could be potential witnesses in this case and

3       may have given statements in this case, so the

4       government has an interest in protecting their

5       identity not just because there's a potential for

6       retaliation to the extent that they're employed,

7       but also to the extent that they might be former

8       employees, you know, there's still that continued

9       interest.

10          Beyond that, the government -- we would be

11      unable to secure the statements of employees

12      without any -- without assurances that their

13      identities would remain confidential, meaning

14      these employees would not cooperate with my

15      investigator to assist us in affirming our

16      allegations of misclassification if we could not

17      assure them that we would protect their identities

18      and identifying information.

19          So the case law I think -- the case law

20      that we would rely on in a civil context is

21      similar to what we would -- what is relied upon in

22      a criminal context.  Obviously there might be

23      variances, but generally speaking it is the same.

24      It is the same interest, and I wouldn't

25      necessarily call the Schedule A workers tipsters

Masuda - Davis                                    128

1        because they are present -- presently employed or

2        are potentially former employees.  You know, they

3        have -- there's issues with retaliation and they

4        have a vested interest in the outcome of this

5        litigation.

6                Again, I'll just reiterate, Your Honor,

7        the employees at issue are -- we're not hiding the

8        ball.  The employees has equal access to

9        interviewing and speaking to all eighty-four

10       workers that are on the Schedule A -- that are on

11       the Schedule A.

12               THE COURT:  All right.  Mr. Davis, let me

13       hear you about what you think the case law says

14       and why you think that isn't adequate.  If they're

15       going to call these people, you know who these

16       individuals are who are identified in Schedule A.

17       You know, they were appended to the complaint.

18       You know, why can't you go out to speak to them on

19       your own if you want?  They're not parties to this

20       action.  And what do you think the case law is?

21               MR. DAVIS:  Well, I've got case law that

22       I'll get into directly in one second, Judge, but

23       from a practical perspective, it's just not

24       practical.  We've got eighty-four different people

25       and of those only seven of them were interviewed.

```
1        Some of these eighty-four people are no longer --
2        they -- they -- I think two of them at least state
3        expressly that they quit.  They're no longer even
4        there, so, you know, we'd have to find them,
5        convince them to talk to us.  They could just say
6        no.  Any of them could say no.
7             The point is they did talk to the
8        investigator and they -- they've got statements
9        and --
10            THE COURT:  Let me ask you about that.
11       You said only seven were interviewed.  Is that by
12       you or by the plaintiffs?
13            MR. DAVIS:  By the plaintiff.  I've got --
14       I've got seven interview statements.  I've got
15       them.  They're heavily redacted based on
16       informant's privilege, and I want to ask the
17       investigator about the individuals.  I want to
18       know who they were.  I want to know these redacted
19       parts.  There's like -- I know the court doesn't
20       have it in front of Your Honor, but there's huge
21       blocks of information that are blocked off and the
22       privilege log says informant's privilege.
23            I want to ask the investigator, you know,
24       What did they tell you?  I don't want to get the
25       objection it's informant's privilege because the
```

1       information might reveal their identify,

2       especially when -- you know, if we get -- when we

3       get to trial, Your Honor, the investigator is not

4       going to be able to testify as to what these

5       nurses told him.  That would be hearsay.  These

6       nurses are going to have to testify.

7              So, you know, they have -- we have a

8       recorded statement from them and I'd like to know

9       what they told the investigator and I would like

10      to be able to efficiently find these people and

11      interview them myself because I could -- you know,

12      in theory over the next few weeks, I supposed we

13      could -- we could call eighty-four people and talk

14      to them, find the former ones.  They might lie to

15      us.  I don't know.  I would be able to -- you

16      know, not a trial by ambush.

17             It would be as if this is a murder trial

18      and a police officer says, Yes, I have three

19      witnesses that saw them shoot the gun, but we're

20      not entitled to know who they are until, you know,

21      two weeks before trial and then they say, Well,

22      you could interview everybody in the community and

23      maybe you could find the same people, but that's

24      not the standard.

25             Here's what the standard is.  Your Honor

```
 1              cited the Roviaro versus the United States, which
 2              that's the 1957 Supreme Court case.  That lays out
 3              the basic standard, but I'll point out another
 4              case.  This is not a EDVA but this one's Chao v.
 5              Westside Dryway, Inc.  It's 254 Frd 651, 2009, out
 6              of Oregon.  It -- it talks about the fact that the
 7              informant's privilege is a balancing of interests.
 8              You have to balance between the need of the
 9              government to keep the identities confidential to
10              protect against retaliation versus the need of the
11              defendant to be able to conduct their own
12              discovery on that.  It's not a set thing.
13                   I'll note in the interview statements it
14              doesn't say there's a guarantee of protecting
15              their identity.  It says, We will protect your
16              identity to the extent permitted by law.  The law
17              says -- I'll cite another case.  This one is Perez
18              v. Kazu construction, which is a case -- that is
19              217 Westlaw 628, 455.  It says that the
20              government's interest dwindles over time the
21              closer you get to trial.  At some point that
22              interest weighs in favor of the defendant
23              expressly to prevent an ambush, and that's what we
24              have here.  It's my only opportunity to talk to
25              this investigator.
```

Mastera - Davis                                      132

1              I'll note that the Department of Labor did

2       not issue a protective order ahead of time or seek

3       one to protect us from asking these questions.

4       You know, counsel also indicated that she said

5       with regard to former workers that the government

6       still has an interest.  She didn't say what the

7       interest is because there can't possibly be an

8       interest in a former worker.  What -- what fear of

9       retaliation would there be?  But there can't be

10      any concern of retaliation because their

11      identities are going to have to be disclosed prior

12      to trial.

13             What the Department of Labor is actually

14      trying to do, I would pause it to the court, is to

15      prevent us from getting the information until the

16      last possible second when there's very little we

17      can do, and so at this point in time it is near

18      the end of discovery.  It ends on Monday.  We're

19      in a live deposition.  I would suggest that now is

20      the time to allow the disclosure of this

21      information so we're not prejudiced and ambushed

22      at trial.

23             THE COURT:  Ms. Amin, are we talking about

24      seven -- seven individuals?  Is that what's at

25      issue right now?

1           MS. AMIN:  I don't have, Your Honor, our

2       responsive documents, including those statements,

3       but I will trust that Attorney Davis'

4       representation is accurate.

5           If I could --

6           THE COURT:  Wait a minute.  Wait a minute.

7       With respect to the seven, can you determine how

8       many of those are current versus former employees?

9       And, if so, I'd like that information.

10          MS. AMIN:  I think that the statements may

11      in and of themselves disclose that.  I would not

12      have redacted the date of employment in those

13      statements, so they either say they're presently

14      employed or they note the date -- the end date of

15      their employment with Steadfast, although I will

16      say I have not independently as of today verified

17      whether they went back to Steadfast or --

18          THE COURT:  That's just speculation.

19      We're not going -- we're not going to speculate.

20          MS. AMIN:  Okay.

21          THE COURT:  I'm just asking you based on

22      the information that's in front of you, I'd like

23      to know now who are current employees are who are

24      former employees.

25          MR. DAVIS:  Judge, we could get a

Mazzara - Davis                                    134

 1        definitive answer, but my recollection is that
 2        there are two of the seven that indicated that
 3        they're no longer current because I made notes --
 4        I made contemporaneous notes.  I've got one here
 5        that says that she quit, and I recall there was
 6        another one.  I'm trying to find it.  I believe
 7        it's two out of seven.  Yes.  There's two.  Here's
 8        one and here's a second.  It's possible there's
 9        more than two, but I can confirm that there's at
10        least two of the seven.
11             THE COURT:  All right.  Ms. Amin, can you
12        shed any light on the other five?  Do you have the
13        statements in front of you?
14             MS. AMIN:  One moment, Your Honor.
15             Well, you know what, Your Honor?  I'm
16        looking at the statements now and I'm going to
17        amend what I said earlier.  The dates of
18        employment have been redacted.  I'm not looking at
19        the body of the statement just yet.  I'm just
20        flipping.  It's basically a form that notes the
21        approximate dates of employment, and the reason
22        those would have been redacted is that exact dates
23        of employment could lead to the identity of the
24        individuals, so I would have to look at the body
25        of each statement to say -- to determine whether

Fiduciary Reporting, Inc.
(757) 482-2729

**JA1353**

```
 1        the employee is saying that they're still

 2        employed.  Just give me a moment, Your Honor.

 3              THE COURT:  All right.  I'm going to put

 4        you on hold for a minute.

 5              MS. AMIN:  Sure.

 6              THE COURT:  All right.  I'm back on the

 7        line.  I'm sorry.  If you're still working, that's

 8        fine.

 9              MS. AMIN:  Your Honor, I've taken a look

10        at the body of each statement and I don't see that

11        there's an indication as to when -- whether the

12        employee is claiming that they're still employed

13        with Steadfast or not.

14              THE COURT:  Do you have available to you

15        the un-redacted statements?  Can you get -- figure

16        that out?

17              MS. AMIN:  Yes.  Yes.  I can, Your Honor.

18              THE COURT:  Are you going to look at them

19        now or what are you --

20              MS. AMIN:  I -- yes.  I'm -- I'm pulling

21        it now, Your Honor, if you'd give me one moment.

22              THE COURT:  Yes.

23              MR. DAVIS:  Judge, would it be appropriate

24        for me to give an example while counsel is doing

25        that or I can wait?
```

**JA1354**

Mazzola - Davis                                    136

```
1              THE COURT:  Why don't you wait.

2              MS. AMIN:  Your Honor, I've counted three

3       individuals that state that they were -- they are

4       presently employed with -- with Steadfast as of

5       the date of the interview statements, which date

6       back to the summer of 2017.  June and August of

7       2017 it looks like.

8              THE COURT:  All right, Counsel.  I'm

9       sorry.  I had you back on hold.  So if you were

10      talking, I may have missed it.

11             MS. AMIN:  Yes, Your Honor.  So I've

12      counted three individuals who stated that they

13      were presently employed with Steadfast as of the

14      date of their statement.  The statements vary.

15      They were taken in 2017, so quite some time ago,

16      and they vary in terms of the dates that they were

17      taken, but June, August, September are the dates

18      that I am seeing.

19             THE COURT:  All right.  So the other four

20      do not indicate they are currently employed or

21      they were then employed with the defendant?

22             MS. AMIN:  That's correct, Your Honor.

23             THE COURT:  All right.  And of these

24      seven -- you know, we are fairly close to trial.

25      Can you tell me whether you intend to call any of
```

1        them as witnesses?

2               MS. AMIN:  We have not made a

3        determination as to whether -- as to who we're

4        going to call at trial.  You know, we would

5        certainly do that in accordance with the court's

6        scheduling order, but it's premature for us to --

7        to make that call at this point.

8               THE COURT:  All right.  Then, Mr. Davis,

9        you indicated that you wanted to say something?

10              MR. DAVIS:  Yes.  In the initial

11       disclosures and interrogatory responses, they've

12       identified all of these potential individuals as

13       potential witnesses, so they could be anybody.

14       For the first time I'm learning right now four out

15       of the seven are not even currently there.  I

16       don't know what interest the government could

17       possibly have.

18              One example is a document that's Bates

19       stamped -- I know the court doesn't have it, but

20       for the record -- DOL 135.  It's an interview

21       statement, and, Judge, everything in the entire

22       page is blacked out other than the date, the fact

23       that the interview took place at the

24       establishment, the name of their employer, they're

25       over eighteen in Norfolk, and then at the end

Marsha - Davis                                    138

1            there's a couple non-blacked out lines that are

2            just not relevant.  Well, they might be relevant,

3            but they say, I don't get paid overtime when I

4            work there, et cetera, but the entire rest of the

5            page is blacked out.

6                   Judge, this is one of the main things that

7            I want to talk to this investigator about because

8            the investigator is the one who made the decision

9            ultimately and made a determination that these

10           individuals were, in fact, in his opinion,

11           employees, not independent contractors.  I asked

12           him when did that happen, and he already testified

13           that it happened -- that he made the initial

14           determination on the date that he had this initial

15           meeting with my client and he said he met with

16           some people at the establishment.

17                  Well, I've got an example right here where

18           I'd like to ask him, Who did you meet with?  What

19           did they tell you?  I don't see any prejudice or

20           harm to the individual or the Department of Labor

21           from -- from knowing their identity being that it

22           sounds like they might be called as a witness at

23           trial.  How could this prejudice them if they're

24           going, you know, to be called to trial and

25           subpoenaed to testify anyways?

**JA1357**

1              THE COURT:  And you say he -- when he met

2        with your clients and then you referenced at the

3        at an establishment, are you saying at your

4        client's place of business or are you referring to

5        something else?  I'm not clear about that.

6              MR. DAVIS:  Yes.  At my client's place of

7        business, which I'm assuming is referred to as the

8        establishment.  Although that -- you know, to look

9        at the interview statement and ask the deponent

10       questions about that, I think I would -- without

11       the court's intervention, I think I would get an

12       objection as to maybe even that.  I don't know,

13       but -- because the earlier objection was any

14       information that could potentially lead to their

15       disclosure.  You know, any information at all

16       would be objectionable, so that's part of the

17       issue.

18             MS AMIN:  And, Your Honor --

19             THE COURT:  Ms. Amin, with respect to the

20       form, is there -- you know, it seems like the

21       government's interest in non-disclosure is -- is

22       less if there's no current information that

23       they're still working for the defendant.  What's

24       your response to that?  I mean, I'm supposed to

25       balance the defendant's need for the information

```
 1          to prepare a defense versus the plaintiff's and

 2          the public's interest in protecting the flow of

 3          information to the government.  Let me hear what

 4          you have to say.

 5               MS. AMIN:  Your Honor, we have a continued

 6          interest in protecting the identities of

 7          employees, whether they are presently employed by

 8          this employer or not.  It's not just an issue of

 9          retaliation.  It's -- it's the manner in which

10          we're able to secure statements at all, whether

11          they are present employees or the former.  The

12          reason -- one of the main reasons they agree to

13          cooperate is because we -- we assure them that

14          we're not going to reveal their identities.  Even

15          if they are former employees, they get the benefit

16          of the same protection by the Department of Labor.

17               Respect -- with respect to the issue of

18          balancing, one of the factors is, you know, the

19          defendant's ability to gain access to the

20          information that the government has.  I've already

21          said that the defendants have equal access, if not

22          greater access, to individuals that are under

23          their control or formerly were, contact

24          information, relationships.  The defendants are

25          certainly able to talk to these employees
```

1       voluntarily or to depose the employees if

2       necessary if there's an issue, as Attorney Davis

3       said, as to whether the employee is going to tell

4       the truth.  The defendants are welcome to depose

5       them, so, you know, I think in terms of the

6       balancing, there's no prejudice to defendants.

7               Attorney Davis is correct.  We typically

8       in our initial disclosures, we don't know which

9       Schedule A employees we're going to call.

10      Certainly not all eighty-four.  All that wouldn't

11      be feasible and I know Your Honor wouldn't

12      appreciate that, but, you know, we make that

13      determination as the case proceeds based on

14      multiple factors of availability and helpfulness

15      to the government.

16              At this point trial is still a couple of

17      months out.  It's not scheduled until May 21st.

18      It's certainly too -- too early for the government

19      to have to turn over the identities of any of its

20      informants.  At a point in which we make the

21      determination that we are going to call -- which

22      employees we're going to call and which statements

23      we're going to rely on, we would produce that in

24      accordance with the court's scheduling order

25      before trial.

1           I -- I just don't see here, Your Honor,

2     the prejudice to defendants when it's their own or

3     former employees, whether it's the office staff or

4     the independent contractors.

5           THE COURT:  Well, you know, part of it --

6     part of the issue that the court is concerned

7     about is, you know, the notion that these are

8     people that are at the heart of the case.  I mean,

9     this isn't somebody who dropped a dime for a phone

10    call one day and said, Hey, Medical Staffing is

11    crooked and you guys should take a look at them.

12    Good bye.  I mean, these are people affiliated

13    with the company for some period of time and, you

14    know, are familiar with the practices of the

15    company.

16          It doesn't strike -- you know, we're in a

17    far different situation from a tipster type

18    situation.  I think the risk of retaliation when

19    we're dealing with former employees -- there's no

20    current information that you presented that they

21    are currently affiliated with them and it strikes

22    me as much less significant.

23          I'm -- I guess I'm prepared to, you know,

24    hear you with respect to current employees, but

25    also -- I mean, their -- their activities and

1        their dealings with the company go to the heart of

2        what's at issue in this case.  It's -- it doesn't

3        sound like what we're talking about is -- is, you

4        know, somebody who in the situation where a true

5        tipster has called in and this information doesn't

6        go to, you know, like where the government has a

7        need to preserve that person's anonymity.

8            You know, I guess I am concerned, you

9        know, cases move faster here in the Eastern

10       District of Virginia.  This case hasn't been --

11       it's not like this was just filed yesterday and

12       you need time to sort out, you know, where the

13       case is going to be.  It was filed -- the

14       complaint was filed in May of 2018.  The

15       investigation occurred, you told me, some time in

16       2017, at least part of it.  You know, that -- this

17       case has got some age on it, you know, and the

18       government should be at a point where it knows now

19       whether it's going to assert this privilege or not

20       and who -- and have a pretty good idea.  I

21       understand that you might not know who you're

22       going to call right now, but you probably have an

23       idea about who you may call.

24            Quite frankly, if some of this information

25       is protected, it may be that if the privilege is

1    upheld with respect of any of them, if you later

2    disclosed it, I might very well give the defense

3    an opportunity to depose Mr. Mazuera again with

4    respect to that information if they want to do

5    that because it does strike me as problematic that

6    we're not, you know, farther along in making these

7    decisions.

8         I understand you say, We need to go

9    through a process, but -- but we are at the end of

10   discovery and it seems to me that process should

11   be much farther along, rather than, you know,

12   stepping through at a snail's pace.

13        MS. AMIN:  And, Your Honor, if I could

14   just address that?  The reason that we're at the

15   end of the process is due to defendant's conduct

16   in terminating her prior attorney.

17        THE COURT:  Well, I -- I understand that,

18   but let me just say you're the one interposing the

19   objection.  It's still discovery and you have the

20   right to assert any objection you want, but to

21   say, Well, it's premature, when we're at the close

22   of discovery is -- you know, premature for you all

23   to make a decision strikes me as problematic.

24        MS. AMIN:  Well, that -- it's --

25        THE COURT:  And are there any additional

**JA1363**

Mattea - Davis                                             145

1          facts other than sort of this general, you know,

2          notion that there could be this risk?  Do you have

3          any facts to suggest that any employee has been

4          retaliated against?  This matter's been public for

5          quite some time, probably back to 2017 if that's

6          when the initial interview of the business took

7          place.  Do you have any evidence of current

8          retaliation?

9                 MS. AMIN:  We don't have any evidence of

10         current retaliation, but I do not think that the

11         case file --

12                THE COURT:  Have any employees said

13         they've been retaliated against or fired by -- by

14         the defendant?

15                MS. AMIN:  To my knowledge, no.

16                THE COURT:  All right.  I cut you off.  I

17         apologize.  What did you want to say?

18                MS. AMIN:  No.  That's fine.  I actually

19         lost my train of thought, but I'm sure it will

20         come back to me.

21                MR. DAVIS:  Judge, may I address a few

22         things?

23                THE COURT:  You may.

24                MR. DAVIS:  The -- the interviews for

25         the most part, at least the un-redacted parts,

1          these aren't interviews where they're saying

2          horrible things about my client where there's

3          really even a risk of retaliation.  They're

4          factual interviews.  Tell -- they're questions

5          that the interview -- the investigator asked about

6          control and hours, the standard six-factor tests

7          from the economic realities test, so I don't see

8          how there'd be a risk of retaliation anyways.

9                I'll point out that the -- I believe that

10         the government's position is illogical in this

11         way.  Counsel has indicated that the government

12         has an interest in protecting the information and

13         that the interest is that they have, quote,

14         assured these people that their information would

15         not be revealed.  If they did that, that's

16         improper and that's actually not what their own

17         interview statement says.  It says that, We will

18         attempt to keep it confidential to the extent

19         allowed by law.  That's -- that is the point of

20         intersection where we find ourselves today.

21               But counsel indicates that there's no

22         prejudice because in theory we could depose or

23         interview all eighty-four people, and that's a

24         true statement, but if the interest is to protect

25         their identity, then our right to depose

```
 1        eighty-four people would defeat that interest.

 2              Instead, the true interest of the

 3        government is knowing that we have limited

 4        resources and doing a deposition of eighty-four

 5        people would difficult, time consuming, and

 6        expensive, so they're relying on the fact that we

 7        likely won't do that.  They assert this privilege

 8        so that we are not able to cull down the

 9        eighty-four to seven.  That's the only thing.

10        We're culling down eighty-four to seven.  There's

11        no government interest that protects -- we know

12        who the group of eighty-four people are, so

13        there's no government interest in preventing us

14        basically from having an efficiency issue.

15              THE COURT:  Speak to that, Ms. Amin.  So

16        the normal -- your interest is to protect people

17        from retaliation, but the defendant already knows

18        who they are, all of them.

19              You know, to the extent that they still

20        work for Medical Staffing, you know, they're

21        already subject to retaliations as an interested

22        party in this matter or to pressure to tow the

23        company line, if you will, to support the defense

24        in this the case.  What do you have to say about

25        that?
```

**JA1366**

1           MS. AMIN:  Well --

2           THE COURT:  Did you have any cases in

3     which there's an FSLA case addressing a Roviaro

4     assertion of a Roviaro privilege?

5           MS. AMIN:  Not handy, Your Honor.  I can

6     certainly brief that.  It's an issue that my

7     office deals with fairly routinely.  I just don't

8     have the case law at my fingertips.

9           What I will say is that procedurally if --

10    if the court is inclined to require the government

11    to take that next step of revealing the identities

12    of its informants or identifying information, we

13    would -- we would conduct an in camera review.

14    I'm not sure if that is something that's on the

15    table or if we're just having a general discussion

16    about the government's ability to continue to

17    invoke the informant's privilege for current or

18    former employees.

19          But just because the employer is aware of

20    the individuals we've assessed back wages for

21    doesn't change the analysis with respect to the

22    statements that we've taken.  I don't think that

23    it's a feasible argument to say that the

24    government is claiming eighty-four people are owed

25    back wages.  Therefore, they're all at risk for

1       retaliation because those employees, they

2       didn't -- they don't get to determine whether they

3       are affected workers.  Our investigator and our

4       division makes that determination as to who is

5       owed money, so an employer could not reasonably

6       say that all eighty-four employees are working

7       with the government in any way.  We have -- we

8       have investigations where maybe we have little to

9       no statements from employees but we still affirm

10      our violations, so I don't think that that

11      argument is logical.

12              THE COURT:  All right.  Well, let me --

13      I'm going to have to -- I've got another

14      engagement that I'm already fifteen minutes late

15      for.  What I'm going to ask you to do is it

16      strikes me -- I'm going to ask you both to consult

17      and confer with these matters.  I have a hard time

18      believing based on the information that's been

19      provided to me that the former employees -- that

20      an assertion of privilege would be justified with

21      respect to them.  I'm concerned, quite frankly,

22      about whether or not there's really a basis for

23      the assertion of the privilege with respect to the

24      other three employees.

25              It strikes me that you could perhaps do a

**JA1368**

1          little more digging to determine whether or not

2          you think these folks are still employed there.

3          Also I find it significant that there's no

4          evidence of any retaliation yet.

5               This isn't the typical kind of tipster

6          Roviaro type situation that strikes me where -- I

7          understand the government has the right to assert

8          these privileges, but typically it's done very

9          carefully to evaluate the circumstances under

10         which it should be asserted, and to just make a

11         blanket assertion strikes as potentially

12         problematic, so I'm going to ask you to consult

13         with one another.

14              Ms. Amin, I'm going to ask you to consult

15         with a -- a supervisor to see if you can either

16         completely narrow the differences or narrow them

17         more substantially given the circumstances,

18         particularly if you find that you're going to be

19         in a situation in a matter of weeks where you're

20         going to disclose this same information.  You

21         know, we don't want to find ourselves in that box.

22         I'm not hearing from you the kind of facts that

23         would justify the assertion of the privilege here.

24              I'm also -- I'm concerned about the issue

25         of the redaction, which appears to be -- you know,

1           at a minimum it strikes me that the defense should

2           be entitled to a lot more of the factual

3           information concerning the interviews in question.

4           It strikes me that some very narrow redactions, if

5           any, concerning the identity and/or, you know,

6           sufficient information that would allow the

7           identification of the person, if there was a

8           predicate for the assertion of the privilege

9           itself, but it does sound like these things are

10          over redacted, so I would also encourage you to go

11          back and consider that.

12               But with respect to the defendant, I will

13          say this doesn't strike my as a case where there's

14          a whole lot of secrets.  It's a -- it's a

15          straightforward case.  The defendant made a

16          decision to classify these individuals in one

17          fashion.  The facts should be largely known to

18          both sides and maybe that reduces the defense's

19          justification for getting information to which

20          there is a proper assertion of privilege.  You've

21          already identified individuals.  Your client

22          should know how their business operates and the

23          reason that they operated the business the way

24          they operated it.

25               So I want you both to go back to the

Mahfouza - Davis                                                152

1        drawing board and try to narrow, if not eliminate,

2        this issue.  If you need to have a conversation

3        with me, I can sit down with you again at -- let

4        me just look at my schedule.  I've got some

5        hearings at 2:30, and I've got somebody coming to

6        see me on a search warrant later this afternoon as

7        well, but I need time to review.  I'll be glad to

8        talk to you at ten after 2:00 and we'll see where

9        we go from there.  All right?

10               MR. DAVIS:  Very good.  Thank you, Judge.

11               MS. AMIN:  Thank you, Your Honor.

12               THE COURT:  All right.  Good bye.

13               (At 1:12 p.m. the phone call ended.)

14               MR. DAVIS:  We'll take a break.

15               (A 1:12 p.m. a recess was taken.  At 2:25

16        p.m. all parties were present.  A phone call was

17        received and the following to place on the

18        record:)

19               MR. DAVIS:  Judge, I apologize.  Ms. Amin

20        is just walking back into the room.  She just sat

21        down.  I didn't want to say anything until she got

22        back into the room.

23               MS. AMIN:  Hello, Your Honor.

24               THE COURT:  That's fine.  Good afternoon,

25        Ms. Amin.  I apologize.  I'm running late myself

1      and do have some court hearings that I'm supposed

2      to be starting right now.

3              I put the question -- and I assume we

4      still have the court reporter?

5              MR. DAVIS:  Yes.  We do, Judge.

6              THE COURT:  Okay.  Thank you.

7              I put the question to both counsel.  Have

8      you made any progress in narrowing or resolving

9      the dispute?

10             MS. AMIN:  We have not, Your Honor.  I

11     have conferred with my office.  Our position has

12     remained unchanged.  I do have additional case law

13     at my fingertips, case law that's specific to the

14     FLSA and case law in the Fourth Circuit and other

15     civil cases that address the informant's privilege

16     because I know that was a question that was raised

17     by Your Honor.  You know, I think the conversation

18     was more along the lines of in a criminal context,

19     but obviously this is a civil matter, so I want

20     the opportunity to note some of those cases for

21     Your Honor if you deem it, but our -- our position

22     has not changed with respect to our invocation of

23     the informant's privilege with respect to any

24     former or current employee.

25             THE COURT:  All right.  And the case law

Mazzotta - Davis                                    154

1        you want to provide to me, if you had to briefly

2        summarize it, how does it apply to the context of

3        what we're addressing here today?

4               MS. AMIN:  So the U.S. v. Hemphill matter,

5        it's 369 F2d, 539.  It's a Fourth Circuit

6        case that addresses when the government is -- when

7        it is appropriate for the government to produce

8        its -- the names of its informants.  Brennan v.

9        Engineer Production.  That's an Eight Circuit

10       case, 506 F2d, 299.  Generally speaking those

11       cases note that shortly before and during trial is

12       appropriate, and I will note the Hemphill matter

13       is a case -- is an FLSA case.

14              I have a string of cases, Your Honor, that

15       uphold the theory or our argument that the

16       Secretary's assertion of the informant's privilege

17       as it applies in an FSLA action is appropriate.  I

18       can -- that's probably more appropriate for a

19       brief at some point, but there's case law out of

20       various jurisdictions including this one that deem

21       that that is appropriate.

22              The -- and another issue that I think has

23       been the focal point of this conversation is the

24       current versus former employees.  There's a Sixth

25       Circuit case that addresses that as really

1          indistinguishable, that the privilege applies to

2          both former and current.  That Sixth Circuit case

3          is Dunlop versus Carriage Carpet Company.  It's

4          548 F2d 139.

5               There is also --

6               THE COURT:  129 you said?

7               MS. AMIN:  548 F2d 139.  It's out of the

8          Sixth Circuit.

9               THE COURT:  Thank you.

10              MS. AMIN:  There's also Charles Martin

11         Inspectors of Petroleum, and I'm going to give you

12         the jurisdiction in one moment, Your Honor.

13         That's a Fifth Circuit case.  The citation is 459

14         F2d, 303.

15              So essentially, Your Honor, there is case

16         law that supports the government's invocation for

17         former employees as well.  The focal point in many

18         of these cases is not that these employees are

19         less likely to be retaliated against, although

20         that is one factor that the court should consider.

21              To that point I would note that

22         defendant's position is that this company is a

23         registry and I believe it's their position that

24         there's probably a lot of turnover, that they

25         might go to different staffing agencies to work at

Maskara - Davis                                    156

```
 1          some of these facilities, so they might leave for
 2          a period of time and they might come back, so the
 3          court has an interest in continuing to allow to
 4          protect the identify of, quote/unquote, former
 5          employees, although that has not been established
 6          beyond a statement from over a year ago where the
 7          individual has said they no longer work for the
 8          company.  That's nothing that I can verify today,
 9          but regardless I think the issue of whether
10          they're former or current goes beyond the scope of
11          the analysis that the court needs to make here,
12          but to the extent that Your Honor finds that that
13          is relevant, the nature of this business is
14          cyclical, according to the defendants.  There
15          might be turnover and these employees might come
16          back, so there is continued fear of retaliating.
17               Beyond that, these employees might rely --
18          former employees might rely on Ms. Pitts, the
19          owner of this company, as a reference and to the
20          extent that their names are revealed in the course
21          of this action, they might be prejudiced in terms
22          of getting future employment, so that is one
23          factor that the court should consider.  There is
24          case law on that, and I can pull that, but, you
25          know, I wanted to express that point, that the
```

Maldella - Davis                                       157

```
 1           focal point should not be is it -- is this
 2           employee likely to be retaliated against or beyond
 3           that, has there been evidence of retaliation.  The
 4           government need not prove that there has been
 5           actual retaliation against any of these employees.
 6                I would tell you, Your Honor, the names of
 7           the informants have not been revealed, so to the
 8           extent they are, it's sort of a wait and see
 9           situation of how the defendant's going -- what is
10           she going to do with those names.  How is she
11           going to treat those employees?  Are they not
12           going to get matched with any facilities?  Are
13           they all of a sudden just going to be told, you
14           know, We don't have any hours for you?  That's a
15           real concern here.
16                THE COURT:  Mr. Davis, any response?
17                MR. DAVIS:  Judge, the -- well, first of
18           all, I've gone through the cases that counsel
19           cited and without going into great detail, because
20           I know the court doesn't have time, the primary
21           case counsel cited is a Fourth Circuit case.  The
22           other cases are all Third Circuit, District of
23           Pennsylvania, Eighth Circuit, so it might make
24           sense to look at the only case that is not just
25           persuasive but binding.
```

Mazurca - Davis                                        158

1              In the U.S. v. Hemphill case, the court

2        does an analysis that's spot in line with our

3        argument all along, and that is the court

4        expressly says that -- I'm reading from the

5        case -- when the United States comes into the

6        court as a plaintiff, they are subject to the same

7        rules as private litigants and the open disclosure

8        which is now demanded of litigants in federal

9        courts because of its fairness and its

10       contribution to the accuracy in the fact-finding

11       process is equally demanded.

12             Then the court says that when it comes to

13       informant's privilege that it is a balancing test

14       and it does discuss it, but the court goes into

15       great detail in explaining that that privilege is

16       a qualified privilege that does give way when,

17       quote, Fair and orderly trials deem that it needs

18       to give way.

19             In that U.S. v. Hemphill case what

20       happened was the procedural posture was the -- the

21       district court had ordered the disclosure or in

22       discovery had ordered the disclosure of all of the

23       informants.  There were groups.  Some of the

24       informants had relevant knowledge to the case and

25       were potential witnesses and some of them, parties

1          agreed, did not have relevant knowledge.  The --

2          the district court ordered all of them.  The

3          Fourth Circuit on mandamus overturned the district

4          court with regard to the second group only and

5          said that there was no interest in a litigant

6          obtaining the identities of informants that

7          everyone agreed had no relevant information.

8                   I think the Fourth Circuit logic is

9          absolutely sound on that, and it applies really

10         well here.  In this case we only have seven people

11         that have relevant information.  They're the only

12         people that can testify to this.  The investigator

13         can't take the stand and testify to hearsay.

14                  So counsel's indicated, Well, there's this

15         risk of retaliation, but that risk of retaliation

16         is -- is non-existent because to the extent that

17         they call these people to trial as witnesses --

18         I'm certainly not suggesting my client's going to

19         retaliate, but once they become a witness, they're

20         known.  You know, there is not a risk of that.  If

21         there is, it already exists, regardless if this

22         goes now or later.

23                  So the Fourth Circuit case law is very

24         clear that it's a balancing test.  Your Honor has

25         the discretion to look at the need of a defendant

1         to not be ambushed at trial, to be able to fairly

2         participate in discovery, and obtain it now versus

3         later.

4                THE COURT:  All right.  I'm prepared to

5         rule with respect to the matter that's at least

6         been presented to me thus far.

7                I am going to order the disclosure of the

8         statements of the four employees who are

9         identified so far as we've been able to determine

10        today as no longer currently employed.  They were

11        no longer currently employed at the time they were

12        apparently interviewed by the investigator, so I'm

13        going to order the disclosure of those statements.

14               In making that order, I know that Roviaro

15        requires that this be a balancing test where I am

16        supposed to balance the public interest in

17        ensuring the flow of information to government

18        agencies such as the Department of Labor, which

19        does have a significant interest in ensuring that

20        employers abide by the law when it comes to paying

21        and properly classifying their employees, against

22        the interest of the defense -- the defendants in

23        preparing a defense to this case.

24               I note that this matter was filed in May

25        of 2018.  In conjunction with the filing of the

1           complaint, plaintiff attached a schedule of

2           eighty-four individuals who stand to potentially

3           benefit should the plaintiff be successful with

4           its argument in this case, so the individuals in

5           question in this case are identified and known to

6           the defense already, so to the extent

7           identities -- we're talking about identities,

8           those identities have been disclosed, so that

9           doesn't fully extinguish the plaintiff's interest

10          in receiving reports of alledgedly unlawful labor

11          practice by employers, but here where there is

12          information before the court that these are not

13          current employees, given the fact that we are

14          roughly four to five days away from the end of

15          discovery, I'm not satisfied that with the

16          government's position saying that it's premature

17          to make these determinations about these matters

18          is -- is the appropriate position to take.

19              This is a problem that is one that is

20          certainly predictable and known to the government

21          and I think they should have been in better

22          posture with respect to this deposition, knowing

23          that this issue is going to be out there, to

24          decide who they're going to call because according

25          to counsel she has indicated that they, in fact,

1           will disclose these statements of individuals who

2           they do intend to call.  Given the need for the

3           defendant to obtain discovery from a significant

4           witness in the case, the investigator, disclosing

5           this information after the close of discovery puts

6           the defendant in a very difficult case --

7           situation with respect to preparing its case.

8                I'm balancing the two interests and

9           recognizing that the privilege is qualified rather

10          than absolute.  I am directing that the statements

11          of the four former employees be disclosed in fully

12          non-redacted form.

13               I will uphold the privilege with respect

14          to the remaining three employees whose status is

15          unknown.  Given that there were seven interviews,

16          that is providing the defense with more than fifty

17          percent of the interviewed individuals in

18          question, which certainly is -- puts them in a

19          position to be able to discern the facts and to

20          prepare whatever defense they may have to the

21          claims in the complaint.

22               I would note that if -- and I'm not sure

23          in light of what I just said whether this would be

24          necessary, and frankly I think it probably would

25          not be necessary given the nature of this case and

 1           the nature of the dispute between the parties, but

 2           if the plaintiff later decides to call any of the

 3           other three witnesses, they will have to promptly

 4           disclose these statements, and if the defendant

 5           seeks the opportunity to depose Mr. Mazuera -- is

 6           that the name?  Am I saying it correctly?

 7                MS. AMIN:  Yes, Your Honor.

 8                THE COURT:  If the defendant wants the

 9           opportunity to re-depose Mr. Mazuera, the court

10           will be very likely inclined to grant that request

11           for the re-deposition of him relative to those

12           matters, though quite frankly I think given the

13           nature of the case, I'm not sure that I see the

14           necessity for defense to do that.

15                MR. DAVIS:  Understood.

16                MS. AMIN:  And, Your Honor, I didn't

17           realize that you were going to enter an order.

18           Had I, I would have requested that we -- the

19           parties have an opportunity -- the plaintiff have

20           an opportunity to brief the issue because it is

21           such a complex and sensitive issue.  It's the

22           identity of the informants in this case.  I would

23           like to move to have the opportunity to brief the

24           issue.

25                THE COURT:  I've considered the matter.

 1        I've ruled.  I'm not -- I don't need further

 2        briefing on the matter.  You're free to pursue the

 3        matter with what other remedies you may desire to

 4        pursue.

 5             MS. AMIN:  Okay.  And I want to be clear

 6        that if Your Honor intends to issue this order,

 7        which it sounds like you are and I understand

 8        that, the Secretary's position is that we will

 9        continue to advise Mr. Mazuera to not reveal the

10        identities of the former employees that Your Honor

11        has addressed in this order and we will -- we will

12        appeal the decision to the district court or

13        appeal the order to the district court in a timely

14        manner.

15             THE COURT:  Well, you better brief the

16        matter then very promptly because discovery is

17        closing and we're not going to draw this out

18        another month to resolve this issue, so let's set

19        a briefing schedule then.

20             MR. DAVIS:  Judge --

21             THE COURT:  Your brief -- I'm sorry?

22             MR. DAVIS:  Judge, perhaps -- I just want

23        to understand the posture we're going here, and

24        I'm sorry to have this conversation live with the

25        court, but if counsel's going to instruct -- if

```
 1        the court is ordering that the deponent answer
 2        these questions and if counsel is indicating she's
 3        going to instruct the deponent not to answer
 4        despite the court's order, I'm not sure what the
 5        briefing would be other than a contempt motion
 6        from our side.  I'm not sure where we're going
 7        with that.
 8             MS. AMIN:  Well, Your Honor, we're going
 9        to appeal your order, respectfully, Your Honor,
10        and I believe we have ten days to do that, so I
11        would not have my witness or have the deponent
12        answer questions which in my mind are going to be
13        at issue in an appeal because once he's waived --
14        once I've waived the privilege, it's out there.
15        The names of these informants are out there, so my
16        office's position is that we will maintain our
17        position with respect to confidentiality and
18        appeal any order that Your Honor issues today.
19             THE COURT:  All right.  Hold the line for
20        just a minute.
21             MS. AMIN:  Okay.
22             THE COURT:  All right.  So again,
23        Ms. Amin, I would suggest that you consult with an
24        appropriate supervisor before directing and
25        refusing to comply with the order or considering
```

1        whether to comply with the order that I've just

2        issued in the case, but if you elect to take that

3        option, then I'm going to issue an order and I'll

4        direct that you file a brief no later than Monday,

5        March 4th, at noon asking the district judge to

6        reconsider my order.  I will direct the defendant

7        to file a response there too by the close of

8        business Wednesday, March 6th.  Any reply shall be

9        filed by close of business March 7th, and we will

10       let the district judge address it when she's

11       available to get to the matter.

12           MS. AMIN:  I appreciate that, Your Honor.

13       I'm wondering if we can have just a little more

14       time only because we're going to try to complete

15       this -- well, the deposition and one more 30(B)6

16       that's yet to be completed and I'm traveling

17       tonight, so that leaves the plaintiff with very

18       little time to get a brief together.  I understand

19       the sensitivity of discovery is closing on Monday,

20       but if we could have a couple more days, I would

21       certainly appreciate that, at least until maybe

22       noon on Wednesday?

23           THE COURT:  No.  I'm not going to grant

24       you any more time.  This issue is pretty

25       straightforward.  You seem to know the law.  The

1          facts are fairly discrete, so I think you can get

2          this done within the timeframe I've specified.

3                    MS. AMIN:  Okay.  Thank you.

4                    MR. DAVIS:  Judge, a clarification from

5          our perspective as defense counsel.  So we're

6          going to, of course, re-ask the questions.

7          Counsel's going to instruct her client not to

8          answer.  It's my intention to then stop the

9          deposition and continue it, although the discovery

10         deadline will then pass before the court -- the

11         district judge makes a ruling.  Does the court

12         have any direction to defendant as what -- what we

13         do with this deposition when the close of

14         discovery moves past us on this?

15                   THE COURT:  No.  I'm not in a position to

16         give you any advice.  What I would direct the

17         parties to do is make sure that you've covered all

18         other areas that don't involve this alleged claim

19         of privilege and to ensure that no matter what the

20         ruling is that you've completed as much of the

21         discovery as you can within a timely fashion.

22                   MR. DAVIS:  Understand.

23                   MS. AMIN:  And, Your Honor, we would

24         agree -- plaintiff would agree to allow

25         Investigator Mazuera's deposition to continue out

1          of time after the close of discovery to address

2          these issues.

3                  THE COURT:  Very well.  Well, you know,

4          I'm not going to extend the discovery today, so if

5          that's the question, that motion's not before me.

6          The discovery deadline that's in place remains in

7          place unless and until the court rules otherwise.

8                  MR. DAVIS:  Thank you, Judge.

9                  THE COURT:  All right.  Thank you both.

10         Have a good day.

11                 MR. DAVIS:  You too.

12                 THE COURT:  Good bye.

13                 (At 2:55 p.m. the phone call ended.)

14                 MS. AMIN:  Can we have five minutes and

15         then --

16                 MR. DAVIS:  Yeah.

17                 (At 2:55 a short recess was taken.  At

18         3:00 p.m. all parties were present and the

19         following took place on the record:)

20                 MR. DAVIS:  I'm going to show the

21         witness -- you have a copy of this already,

22         Counsel, what we'll marked as Exhibit 2, please.

23                 (Marked in evidence as Alvaro Exhibit

24         Number 2.)

25                 MR. DAVIS:  Off the record for a second.

1           (A conversation was held off the record.)

2           MR. DAVIS:  Okay.  What we've marked as

3      Exhibit 2 is a document that has been Bates

4      stamped as DOL00123 through DOL00142.  I'm going

5      to ask the witness to turn Page 2, which is Bates

6      stamped DOL00124.

7           In light of the court's order, I'm going

8      to ask counsel to identify which of the listed

9      seven individuals are the former workers as

10      opposed to the current ones.

11          MS. AMIN:  And I have just put away my

12      laptop, so give me a moment.  You can go off the

13      record.

14          (A conversation was held off the record.)

15          MS. AMIN:  So B-1 is former.

16          MR. DAVIS:  So we're back on the record.

17      Counsel's indicated B-1 is former.

18          MS. AMIN:  A former employee.  B-2 is a

19      former employee at least with respect to this

20      statement.  B-3A is a former employee.  B-3B is a

21      former employee.  B-4 is presently employed or was

22      at the time of this statement.  B-5, presently

23      employed.  B-6, presently employed.  B-7, former.

24      B-7B, former.  I think that's it.

25          MR. DAVIS:  All right.  The first thing,

Mazzia - Davis                                      170

1              just for the record, it would appear that perhaps

2              there was a discrepancy between what we disclosed

3              to the court and that there's not seven

4              individuals.  There are nine because there are

5              these two Bs.  The analysis perhaps isn't any

6              different being that the other two Bs are also

7              former, but in any case I will start.

8

9    BY MR. DAVIS:

10       Q       I'll ask the witness, if you -- with

11   regard to -- if you'd turn to this page here with the

12   DOL00125.

13       A       Uh-huh.

14       Q       Counsel's indicated this is a former

15   employee or independent contractor or worker or however

16   we describe this individual.  I'm going to ask counsel

17   to please -- the witness to please disclose the name of

18   the individual that's indicated on this exhibit DOL125?

19              MS. AMIN:  I'll instruct the witness not

20              to answer based on the informant's privilege

21              despite the court's order today.  It is not the

22              intention of plaintiff to run afoul of the court's

23              order but to have an opportunity to brief the

24              issue and raise the issue with the district court

25              judge.  So, again, I will advise the deponent not

Maschka - Davis                          171

1          to answer based on informant's privilege.

2               THE COURT:  And is counsel instructing the

3          witness not to answer not only the identifying

4          information on DOL125 but also the other redacted

5          information that is redacted on the basis of

6          informant privilege?

7               MS. AMIN:  Correct.

8

9   BY MR. DAVIS:

10       Q     I'm going to ask the witness now to please

11  turn to -- if you look at the bottom right, do you see

12  those numbers right there?

13       A     Uh-huh.

14       Q     So we call those Bates stamps.

15       A     Yeah.  That's what I've been looking at.

16       Q     Good.  Good.  Okay.  If you would turn to

17  DOL127, please?

18       A     Uh-huh.

19       Q     Based on counsel's representation, this is

20  a former worker.  I'm going to ask the witness to

21  identify the name, the identifying information, as well

22  as the information that has been redacted in the pages

23  that follow through DOL128.

24               MS. AMIN: Objection.  Informant's

25          privilege.  I'm instructing the witness not to

**JA1390**

1          answer based on the privilege.

2

3     BY MR. DAVIS:

4          Q     I'd ask the witness to turn to DOL129,

5     which as been marked as B-3-A.  It's been identified as

6     a former employee.  I'll ask the witness again to

7     identify the name and the information that has been

8     redacted.

9               MS. AMIN:  Objection.  Informant's

10              privilege.  I'm instructing the witness not to

11              answer.

12

13    BY MR. DAVIS:

14         Q     Turn to DOL131, which is B-3-B.  It's been

15    indicated that this is a former contractor.  I'm going

16    to ask the witness to identify the information that's

17    been redacted.

18              MS. AMIN:  Objection.  Informant's

19              privilege.  I'm instructing the witness not to

20              answer.

21

22    BY MR. DAVIS:

23         Q     I'm going to ask the witness now to turn

24    several pages into B-7, which is going to be DOL00139,

25    and I'm going to ask the witness to identify the

Alvaro - Davis                                          173

1   information that has been redacted on the document.

2               MS. AMIN:  Objection.  Informant's

3           privilege.  I'm instructing the witness not to

4           answer.

5

6   BY MR. DAVIS:

7       Q       And finally I would ask the witness to

8   turn to DOL141, which is B-7-B.  They indicated this

9   was a former independent contractor.  I'll ask the

10  witness to identify the information that has been

11  redacted.

12              MS. AMIN:  Objection.  Informant's

13          privilege.  I'm instructing the witness not to

14          answer.

15              MR. DAVIS:  All right.  Off the record.

16              (A conversation was held off the record.)

17              MR. DAVIS:  Okay.  Back on the record.

18

19  BY MR. DAVIS:

20      Q       I will now present the witness with a

21  document that we'll please mark as Exhibit 3.

22              (Marked in evidence as Alvaro Exhibit

23          Number 3.)

24

25

**JA1392**

Martucca - Davis                                    174

 1   BY MR. DAVIS:

 2        Q     Exhibit 3 has been Bates stamped DOL00001

 3   through DOL000017.  Sir, are you familiar with this

 4   document?

 5        A     Yes.

 6        Q     Okay.  Is this the report that you put

 7   together?

 8        A     Yes.

 9        Q     And this report makes reference to the

10   interviews that you did that we just looked at as

11   Exhibit 2, correct?

12        A     Yes.

13             MR. DAVIS:  Okay.  Just to go through this

14             quickly, there are a number of redactions that

15             have been made in this report, for example,

16             beginning on DOL00009 through DOL00013.  The half

17             page has been redacted and then the entirety of

18             the subsequent pages through the last one, the top

19             part.  This information has been redacted in large

20             part because, I believe, again, informant's

21             privilege was a material component of it.  I'm

22             going to ask counsel to identify which parts of

23             this have been redacted pursuant to the

24             informant's privilege regarding the individuals

25             who are no longer working with Steadfast and to

```
1              provide the information that has been redacted for
2              those, which would be actually six individuals
3              that are former workers.
4                   MS. AMIN:  So tell me your question again?
5                   MR. DAVIS:  Yes.  I'm going to ask counsel
6              to identify or provide to me the un-redacted
7              components of this report that lists the
8              information, the identifying information and other
9              information, that has been redacted pursuant to
10             informant's privilege relating to those six
11             individuals that are former workers for Steadfast.
12                  MS. AMIN:  Plaintiff continues to rely on
13             the informant's privilege and will not produce any
14             statements with respect to this narrative that
15             would identify or tend to identity the identities
16             of its informants, present or former.
17
18   BY MR. DAVIS:
19        Q     And I'm going to ask the witness now the
20   same thing.  I'm going to ask you, sir, to please tell
21   me the information that has been redacted in your
22   report anywhere that has otherwise been redacted
23   pursuant to the informant's privilege for the six
24   individuals that no longer are working with Steadfast.
25                  MS. AMIN:  And I'll instruct the
```

1         witness -- objection.  Informant's privilege.

2         I'll instruct the witness not to answer to the

3         extent that the question seeks information that's

4         protected by the privilege.

5              MR. DAVIS:  Okay.  Thank you.  And based

6         on the position that has been taken by the

7         plaintiff in this case of instructing the witness

8         not to answer and not complying with the court's

9         order, I will again assert my position as stated

10        on the record to the court.  I object to counsel

11        not providing this information and assert that it

12        is a violation of this court's order and we intend

13        to seek appropriate relief from the court,

14        including sanctions as applicable, for failure to

15        comply with the court's order.

16             All right.  Let's move onto some other

17        things.  All right.

18

19   BY MR. DAVIS:

20        Q    Do you recall -- I'm not going to mark a

21   copy of this, but I'll show you a copy.  The document

22   that I have in my hand is called -- and I'll show you.

23   It's entitled, Plaintiff's answers and objections to

24   defendant's first set of request -- of request -- I

25   guess that's an error but -- interrogatories.  Do you

1    recall seeing this document previously?  Obviously my

2    highlights are on the document, but --

3         A     Yes.

4         Q     Okay.  And -- and you signed this

5    document, correct?

6         A     Yes.

7         Q     Okay.  So the first thing I'm going to ask

8    you about is Interrogatory Number 10 requests --

9    Interrogatory Number 10 states, Identify the factual

10   basis for your allegation in Paragraph 6 of the

11   complaint that defendants willfully violated the Fair

12   Labor Standards Act in all documents concerning or

13   relating to the same.  There are objections, but then

14   it indicates that plaintiff states he does not contend

15   the defendant willfully violated the Fair Labor

16   Standards Act.

17            Can you tell me what happened to cause

18   the -- to cause your answer to be that you no longer

19   contend that there was a willful violation?

20            MS. AMIN:  Objection.  Attorney/client

21       privilege.

22

23   BY MR. DAVIS:

24       Q     I'm not asking you to disclose any

25   communications that you had with counsel.  I'm asking

1    from your perspective you signed this and initially it

2    was found that -- in the complaint that there was a

3    willful violation.  But you signed this saying it was

4    your answer, and I'm asking why the answer here is that

5    you do not contend that there was a willful violation.

6              MS. AMIN:  So you can speak to the

7         findings of your investigation.

8              THE WITNESS:  I can speak the findings of

9         my investigation?

10             MS. AMIN:  Yes.

11        A    Well, the findings of the investigation

12   was the subject firm has misclassified all -- you know,

13   these employees as independent contractors.

14

15   BY MR. DAVIS:

16        Q    I understand, but you understand initially

17   it was claimed that there was a willful violation?

18        A    Yes.  I understand that initially it was

19   claimed it was a willful violation, but the employer

20   when I spoke to the -- her attorney the first time --

21        Q    Okay.

22        A    -- I -- I put a request asking --

23             MS. AMIN:  I'm going -- I'm going to

24        instruct the witness to the extent you -- the

25        question seeks information that might be

1          deliberative in process -- deliberative in nature,

2          meaning conversations you had with any other

3          government officials internally about this issue,

4          that information is privileged, so beyond that,

5          you may answer the question that's before you.

6      A      Okay.  Before me.  The employer -- okay.

7  If I'm -- if I'm incorrect on this one, the employer

8  alleged that she had a good faith defense and because

9  we didn't have the information what lawyer advise

10 her -- she didn't give us the information of what

11 lawyer advise her for the good faith defense.  Then

12 we -- we were under the assumption that it was a

13 willful violation.

14

15 BY MR. DAVIS:

16     Q      And then that position changed after

17 you --

18     A      Yes, it is.

19     Q      Okay.  Understood.  Okay.  Fine.  All

20 right.  And then Interrogatory Number 11 asked -- it

21 says, Identify the factual basis for your allegation in

22 Paragraph 6 of the complaint that defendants improperly

23 classified individuals including CNAs, LPNs, and RNs,

24 as independent contractors and all documents concerning

25 or relating to the same.  There's some objections, but

1   there's a response that says, See plaintiff's response

2   to defendant's first set of request for production of

3   documents.  Do you recall answering that?

4          A      I did answer that one.  Yes.

5          Q      Okay.  So this is -- I printed it out.

6          A      Sure.

7          Q      Everything's been printed.  I'm going to

8   ask you to identify for me and just tell us by page

9   number which -- which documents support the factual

10  basis of the allegations that defendants improperly

11  classified the individuals?

12         A      Okay.  The first one is Exhibit A-O-a to

13  b -- I'm sorry, A-O-a through A-O-e.

14         Q      A-O-e?

15         A      Uh-huh.

16         Q      Okay.

17         A      I believe that's A-O-e.  That's what it

18  look like.  Yeah.

19         Q      I think it's your handwriting, isn't it?

20         A      Yeah.

21         Q      If you can't read it, we're in trouble.

22         A      When you copying the things, it changes --

23  this one.

24         Q      Well, actually --

25         A      A-1-a.

Maseta - Davis                                     181

```
 1        Q       -- instead of saying A-1-a, can you give
 2   us the Bates number?
 3        A       Okay.  Exhibit 8.
 4        Q       No.  No.  I'm sorry.  Instead of telling
 5   us the exhibit, can you tell --
 6        A       This one right here?
 7        Q       Yeah.  Start from the beginning.  That
 8   would be better.
 9        A       Okay.
10        Q       So to be clear, I'm asking you to identify
11   the documents that support the government's position
12   that the individuals were improperly classified as
13   employees.
14        A       The documents that support is DOL0006.
15   That's the -- to the DOL0017.
16        Q       Okay.
17        A       DOL0018 through DOL21.
18        Q       Okay.
19        A       I'm sorry.  22.
20        Q       Okay.
21        A       And then DOL23 all way through DOL122.  Of
22   course, then DOL125 through DOL142 and the DOL216
23   through DOL238.  That's it.
24        Q       That's it?  Okay.  Wonderful.  I want to
25   ask about that more in just a minute, but let me go on
```

**JA1400**

Mascia - Davis                                    182

```
 1    to -- I think the answer might be the same.  I don't

 2    know.  For Interrogatory Number -- so Number 11.  Maybe

 3    it would help if you look at it with me.  10 is what I

 4    asked you about, right?  I'm sorry.  I asked you about

 5    11.  Identify the factual basis for your allegations in

 6    Paragraph 6 of the complaint that defendants improperly

 7    classified individuals as independent contractors, and

 8    you made this identification for me.

 9         A    Yes.

10         Q    Okay.  Then Interrogatory Number 12 says,

11    Identify the factual basis for your allegations in

12    Paragraph 7 that the defendant failed to make, keep,

13    and preserve adequate and -- adequate and accurate

14    records of their employees.  You also say, See

15    everything.  Can you identify which ones of these

16    documents demonstrate the defendants failed to make and

17    keep and preserve adequate --

18         A    That would be --

19         Q    The same ones or different ones?

20         A    No.  Different ones.

21         Q    Okay.

22         A    That would be the first one, A-O-a, 6 all

23    the way through way through A-O-a, 22.  Then DOL216

24    through DOL 238.

25         Q    Okay.
```

```
 1        A     Yeah.

 2        Q     Okay.  Very good.  All right.  With regard

 3   to Interrogatory Number 13, 13 says, Identify the

 4   factual basis for your allegation that Lisa Ann Pitts

 5   is personally liable for any violations of the Fair

 6   Labor Standards Act as alleged in -- in your complaint

 7   and all documents concerning or relating to the same,

 8   and you've identified all documents.  I'm asking you to

 9   identify specifically which documents show that

10   Ms. Pitts is personally liable.

11        A     DOL147 through 149.  DOL 150.  DOL 151 and

12   152 and DOL00006 through DOL00017.  DOL216 through 238.

13   DOL125 --

14        Q     Through 142?

15        A     -- through 142.  DOL145 through 146.  I

16   think that's it.

17        Q     Okay.

18        A     Yeah.

19        Q     Very good.  And then with regard to Number

20   14 -- I'll wait until you're ready.

21        A     Number 14?

22        Q     Yeah.  Identify the factual basis for your

23   allegation in Paragraph 7 of the complaint that

24   defendants failed to accurately record compensation and

25   all documents concerning or relating to the same.  Then
```

Mascena - Davis                                    184

1    your response after some objections is, Please see

2    response.  So which of these documents identify the

3    factual basis for the failure to accurately record

4    compensation as asked in Interrogatory Number 14?

5         A    DOL -- hold on one second -- 18 to 22.

6         Q    To 22 you said?

7         A    To 22.  Yeah.

8         Q    222?

9         A    No.  0022.

10        Q    Okay.

11        A    DOL23 through DOL122.

12        Q    I'm sorry.  23 through 122?

13        A    Uh-huh.

14        Q    Okay.

15        A    What --

16        Q    Go ahead.  It's record compensation.

17        A    DOL25 through DOL 142.  DOL145.  And the

18   last one would be DOL216 through --

19        Q    You said 145 by itself or is that a range?

20        A    145 by itself.  Yeah.

21        Q    Okay.  And then the next one was what?

22        A    216 through 238.

23        Q    Very good.  Thank you.  All right.  And

24   Interrogatory Number 16, the request -- I'll let you

25   read it with me to make it easier.  It says, If any

Mastera - Davis                                    185

1   statement as identified by federal civil procedure,

2   that's the rule, in any form, including but not limited

3   to audio or video tape recordings, have been made by

4   you or any person having knowledge of the facts, and it

5   goes on, but your response says, See plaintiff's

6   response to defendant's first set of request for

7   production of documents.  My question to you iswere

8   there any -- there's some objections.  So were there

9   any audio or video recordings made by you?

10          A       No.

11          Q       No.  Okay.  To be clear, what I mean is

12   when you did the interviews of Ms. Pitts, of any

13   nurses, any employee, any independent contractors --

14          A       No.

15          Q       -- no audio or video recordings?

16          A       No.

17          Q       Okay.  All right.  All right.  I'm going

18   to ask you about -- well, we're going to plow through

19   some of these documents soon.  For now, why don't we

20   just set this aside.  I'm not going to ask you about

21   this for now.  In fact, let me take it to get it out of

22   your way.  I want to walk you through some of the

23   factors of the economic realities test.

24          A       Sure.

25          Q       And I'm going to ask you -- maybe we'll

```
 1    leave this here in case you want to point me to

 2    something, but the first factor is the control factor

 3    we talked about.  The Fourth Circuit says -- defines it

 4    as the degree of control that the putative --

 5                MR. DAVIS:  Do you say putative or

 6          putative?

 7                MS. AMIN:  I say putative, but I don't

 8          know.

 9                MR. DAVIS:  I've never known how to say

10          it.

11                MS. AMIN:  Potato.  Potato.

12                MR. DAVIS:  That's not going to come out

13          in the transcript no matter.  She's going to spell

14          it the same way.

15                MS. AMIN:  Potato.  Potato.

16                MR. DAVIS:  Sorry.

17

18    BY MR. DAVIS:

19          Q     All right.  The first factor from the

20    economic realities test is the degree of control that

21    putative employer has over the manner in which the work

22    is performed.  Are you aware that that's the first

23    factor?

24          A     Uh-huh.

25          Q     Okay.  Can you tell me generally speaking
```

1   what evidence did you uncover, gather, elicit, from

2   anybody?  I'm not asking you to identify the names of

3   anybody right now, but --

4         A      Uh-huh.

5         Q      -- but I'm just asking what was the

6   evidence that you gathered regarding this first element

7   of control?

8         A      Interviews.

9         Q      Okay.  And I'm not -- I'm sorry.  Let

10  me -- I want to be specific.  I'm not asking like what

11  type of evidence, whether it's a document or an

12  interview.  I'm asking what -- what did you uncover?

13  What is the evidence of control that you found?

14        A      Okay.  Control.  The employee -- the

15  employees don't have a chance to take off from the job

16  like a normal independent contractor.  They cannot

17  decide -- say, I'm getting up today and I'm not going

18  to work.  You know, I'm not working today, just like

19  regular painter, independent contractor, or anyone

20  working as independent will do.

21        Q      Okay.

22        A      If -- if the employee failed to show up

23  for work, then there will be -- there was some evidence

24  on the interviews that the employees reveal that

25  Ms. Pitts will take some actions.  I don't know what

1    kind of action, but it was a control.  The control

2    that -- she controlled the money paid to these

3    individuals, even though Ms. Lisa Pitts say that it was

4    negotiable.  The control of, you know, who pays every

5    paycheck, you know, every week.  The evidence was on

6    the pay stubs.  It appears that none of these

7    independent contractors have any -- any accounting

8    procedures or any -- anything that will reveal that

9    they have an accounting, that they have employees, that

10   they have their own business.

11           So the evidence that during my initial

12   conference if the employer has control -- if the other

13   employer has control over these employees or

14   independent contractors as she might claim to call

15   them, then why is the facility calling them, the

16   employer -- what do you call that -- the registry

17   office to complain about somebody else?  That's a fact

18   that should be discussed between the facility and the

19   employee, not the three of them because that's what --

20   that's what an independent contractors does.  If I'm an

21   independent contractor working as a painter painting

22   the office, you should direct everything to me, not you

23   going to the agency and say, Your painter's not working

24   for me.  Hold on.  If the painter's not working for

25   you, then I'm not independent contractor.  It should

**JA1407**

1    be -- the relationship should be between the two of us.

2    That was -- that was the basis for control that I have.

3    Why would Ms. Lisa Pitts have to take -- make a

4    decision on behalf of facility on how to respond to an

5    issue with someone -- one of her employees taking

6    drugs?

7         Q    Okay.  Anything else?

8         A    No.  That should -- that should be it.

9    That's -- that takes control -- you know, if someone

10   has control, the same control that I have with my kids,

11   they can't go nowhere else unless I say so.

12             MR. DAVIS:  Off the record.

13             (A conversation was held off the record.)

14             MR. DAVIS:  Let's plow ahead.  Let's go.

15

16   BY MR. DAVIS:

17        Q    Okay.  All right.  You've answered the

18   question with control.  Let me ask a few follow-up

19   questions.  The first thing you said was that the

20   employees can't take off from a job.  What -- what does

21   that mean?  Do you mean that after they've accepted a

22   job, they can't just leave?

23        A    They cannot -- the decision is if I'm

24   working as an independent contractor -- I'm a painter

25   and then I stop painting and go and take my business --

Maseva - Davis                                    190

```
 1        Q      Yes.

 2        A      -- outside.  These employees can -- can't

 3  do that.  They have to ask Ms. Pitts.  They have to ask

 4  their supervisor there.  Kind of, I need to take time

 5  off, you know.  Everything has to be -- any decision

 6  has to go through her, even though she denies it, but

 7  all the decisions from these employees, whatever

 8  decision.  If they have an appointment -- they schedule

 9  to work on Thursday but they have an appointment, you

10  have -- every decision has to go through her.

11        Q      Okay.

12        A      She will make decision and say, Yeah, we

13  cover you.  We cover with somebody else.  They will

14  cover it, so that's -- that's control.  If you have --

15  if I'm independent contractor, I come and go as I

16  please.  No one stop me.

17        Q      So is -- is it your understanding that

18  these nurses would call Steadfast and say, Do you have

19  availability for me to work tomorrow? and they would

20  present them with some options?

21        A      They will present them with -- what do you

22  mean?  The employee -- the nurses will present them

23  with some options?

24        Q      Let me tell you my understanding of how it

25  works.  Tell me if you understand it differently.
```

Mazza - Davis                                        191

1        A      Yeah.

2        Q      My understanding is that Steadfast has

3   contracts with different hospitals and a nurse will

4   call Steadfast and say, I'm looking to work on Tuesday,

5   Tuesday afternoon.  Do you have anything?  Then

6   Steadfast will say, Yes. On Tuesday two different

7   hospital are available. This hospital pays this amount.

8   This pays this amount. Which one do you want?  Then the

9   nurse will say, The first one pays more. I'll take that

10  one.  Is that different than your understanding?

11       A      That's different than my understanding.

12       Q      How -- what is your understanding?

13       A      The employee has been set to scheduled to

14  work for these days.  Something happens at the time.  I

15  cannot show up for those jobs or one of the -- for one

16  of the hours or I have to attend an appointment at a

17  certain time.

18       Q      Where -- who told you that these

19  individuals -- that their schedule was dictated by

20  Steadfast?  Who told you that?

21       A      The interviews.

22       Q      And so in the interview notes we're going

23  to see that?

24       A      You have some of the interviews saying

25  that they were not allowed to take time off and if they

 1   take some time off, Ms. Pitts will get upset because

 2   she will be losing money.

 3        Q      Yes.  I saw that interview.

 4        A      Yeah.  She will be losing money.

 5        Q      Is everything you just said regarding

 6   taking time off from that one interview that says that?

 7   I didn't see that anywhere else.

 8        A      I can't remember everything else.

 9        Q      We'll look through them.

10        A      Yeah.  Yeah.

11        Q      Okay.  All right.  When you say if they

12   failed to show up, Ms. Pitts would take action, what

13   action would she take?

14        A      She might not call them again, and that's

15   in their interviews.

16        Q      Okay.  So is it your understanding that

17   Ms. Pitts calls these nurses or that the nurses call

18   Ms. Pitts to find work?

19        A      Either way.

20        Q      It goes both ways?

21        A      Yes.  It goes both ways.

22        Q      And what you said is that's in the

23   interview notes?

24        A      I can't recall that.  I can't remember if

25   it's in the interviews, so I cannot recall it.

Maskeda - Davis                                      193

```
1        Q        So help me understand how would it be that
2    you have a fact like you said and it might not be in
3    the notes?
4        A        Uh-huh.
5        Q        Is it -- are there some things that you
6    didn't put in the notes?
7        A        No.  Everything's in the notes.
8        Q        So if it happened, it's in the notes?
9        A        Yes.
10       Q        Okay.  All right.  You said Ms. Pitts
11   controlled the money.  What does that mean?
12       A        She dictates -- well, she dictates the
13   pay -- the rate of pay is going to be for it.  She has
14   different pay rates for different jobs, and that's in
15   there in the interviews.
16       Q        Okay.  Did you --
17       A        She tells -- and that's in the -- I
18   believe on the initial conference also notes that I
19   have where the employer establish pay -- you know, the
20   rate for the facility.  This is what the facility is
21   paying them.
22       Q        Okay.
23       A        And then based on how much money the
24   facility's paying them, the -- Steadfast -- then she
25   dictates what rates is going to be because that's what
```

1   determines her profit or lost.

2         Q      What the -- but the facility, the hospital

3   or whatever, they're the ones that determine the rate.

4         A      No.

5         Q      They're not?

6         A      The rate, no.  The rate is determined by

7   Steadfast.

8         Q      Did you call the hospitals to see if

9   that's true?

10        A      No.  Because that information was not

11  given to me by Ms. Pitts.

12        Q      Okay.  But -- but you had the information

13  from which hospitals because --

14        A      No.

15        Q      -- the nurses told you.

16        A      The nurses told me, but I was not -- I

17  didn't get no information, you know, exactly the

18  number -- the phone number to call them, but I took the

19  information from Ms. Lisa Pitts where she told me

20  she -- she has an agreement with -- and that's in the

21  contracts.  We have contract she has with the

22  facilities and they dictate what's the rate of pay

23  for -- so why would I have to call?

24        Q      Did you say that the facility determines

25  the rate of pay?

```
 1          A          No.  The facility has -- I'm an agency.  I

 2   work at employee agency and I need ten CNAs.  I will

 3   pay the CNAs.  There's an agreement between the -- the

 4   CNA -- the registry office, you know, the agency, and

 5   the facility.  The agreement between employee or

 6   independent contractor as -- as they -- she wants to

 7   call them is a different agreement on rates.  They

 8   negotiate the rate, but the rate is dictated by

 9   Ms. Pitts, not by an employee.

10          Q          Okay.  Did you talk to some of the nurses

11   who -- who had negotiated the rates regularly with

12   Steadfast?

13          A          It's on the interviews.

14          Q          Some of the ones that negotiated it?

15          A          Not negotiated.  It was dictated by

16   Ms. Pitts.

17          Q          Did you know that many of these agents

18   negotiate their rates with Steadfast?

19          A          No.

20          Q          Would that have changed your analysis if

21   you knew that fact?

22          A          If they negotiated the rate?  Some of this

23   agency or you talking about independent contractors?

24          Q          The nurses negotiate how much they're

25   going to get paid with Steadfast.  They do it all the
```

1    time.

2         A     It would not change my -- my view because

3    when you go to McDonald's or to a Burger King or to any

4    job -- just like if you go to a company, you dictate --

5    you say, Hey, how much you going to pay me?

6         Q     Yeah.

7         A     And if you say, I want to pay you 50,000 a

8    year. I say, No. I'll go for 55.  It's bargaining.

9    It's an agreement between employee and employer.

10        Q     Did you know that the nurses negotiate the

11   rates for each independent job and that sometimes they

12   want special perks and benefits?

13        A     Yes.  That was based on the distance that

14   they have -- that's in the -- in the interviews.  Based

15   on the distance that they had to travel to work for

16   these jobs.  Some of them they have to travel like

17   fifty miles away from their residence.  That's why the

18   negotiation was --

19        Q     Okay.

20        A     -- in place.

21        Q     All right.  Now, during this phone call

22   that you overheard where the facility was calling

23   Ms. Pitts and complaining, how do you know what the

24   facility was saying to Ms. Pitts?

25        A     Because it was done in front of me.

 1      Q      You could hear the phone?

 2      A      Yeah.  I could hear what the conversation

 3   was and what Ms. Pitts was saying.

 4      Q      Okay.  How -- was that a really important

 5   factor for you?

 6      A      It was -- it was not really -- they have

 7   different factors, but that tells me -- that explain to

 8   me why would somebody call the agency to complain about

 9   someone when it is a relationship between the

10   independent contractor and facility, you know.

11      Q      Couldn't it have been that they said, When

12   you send contractors to us, pick a different one. We

13   don't want this one anymore?

14      A      No.

15      Q      Why couldn't it have been that?

16      A      It wasn't like that because it was very

17   clear what they were talking about in front of me.

18      Q      Okay.  What did they say?

19      A      The problem was that one of the nurses was

20   using some of the medications that were supposed to be

21   the patients in that nursing home or whatever and she

22   was on drugs.  You know, I guess painkillers.

23      Q      Okay.  And what did Ms. Pitts say?

24      A      She says to call the police.

25      Q      Okay.  So Ms. Pitts didn't take any action

```
 1   herself?  She told --

 2        A       She call the police.  I don't know what

 3   else happened after that because I left right after

 4   that.

 5        Q       So I'm trying to understand what the issue

 6   here is because the facility called to complain about

 7   an independent contractor and Ms. Pitts says, It's not

 8   my problem. Call the police.

 9        A       She did not say it wasn't my problem.  She

10   says, Just call the police.  That was her

11   recommendation.

12        Q       Okay.  Do you know --

13        A       And -- call the police and then we deal

14   with it later.

15        Q       Did Ms. Pitts says those words --

16        A       Yes.

17        Q       -- we'll deal with it later?

18        A       Yes.  Yes.

19        Q       Did she say that she would take any

20   disciplinary action against the contractor?

21        A       Not in front of me.  No.

22        Q       Okay.  Did you -- not in front of you?  So

23   you don't know?

24        A       No.  I don't know.

25        Q       Okay.  All right.  Let's talk about Factor
```

1   2, the worker's opportunity for profit -- profit or

2   loss dependant on his managerial skill.  Did this

3   factor -- was this an important factor for you?

4          A      Yes, it is.  Because CNAs, RNs, and LPNs

5   don't have to apply any managerial skills to do their

6   job.  Their jobs is basically check temperatures,

7   provide medicines, check pulse, and do things that --

8   this is a matter of -- this is not a -- you know,

9   decisions that have significant impact in the company.

10  That's what you call managerial skills.  You don't need

11  managerial skill to do that job.

12         Q      Okay.  So was there anything on this

13  factor?

14         A      No.

15         Q      Okay.  Number 3 is the worker's investment

16  in equipment or material or his employment of other

17  workers.  Did this factor have any -- there's -- did

18  this factor apply to you in one way or the other?

19         A      Yes.  Because if you are independent

20  contractor, then that means you have all your

21  equipment.  I recall again the painters.  They have

22  their own compressors and everything.  All the

23  equipment's provided by them in order to -- to conduct

24  the job.  When they go to these facilities, they get

25  provided with scrubs.  They might have a stethoscope,

**JA1418**

Mashita - Davis                                        200

 1    you know, because that's normal.  Maybe they use --
 2    well, I don't know what equipment -- wheelchairs or
 3    stuff like that.  That's all used from the facility.
 4    It's not the independent contractors or the employees
 5    providing all this equipment.
 6          Q     But let's be clear.  What -- what
 7    equipment was your understanding was provided by
 8    Steadfast, not the hospitals?  We're talking about
 9    Steadfast.  What equipment did Steadfast provide to
10    these people?
11          A     What equipment?  It was -- there not
12    equipment proved by Steadfast.
13          Q     Okay.  So --
14          A     It was -- it was provided by the facility
15    where they work.
16          Q     Right.  But that's not Steadfast.  That's
17    a hospital.
18          A     Yeah.  Yeah.
19          Q     So I'm just trying to understand how this
20    factor applies to Steadfast because this is the
21    worker's investment in equipment or material.
22          A     Well, the question in there is if the
23    independent contractors are investing in -- in
24    materials, and they're not investing in materials.
25    They just -- everything is provided.  Most of the tools

Marb&a - Davis                                                    201

1    are provided by the facility.

2         Q       What about stethoscopes?  Did you ask the

3    nurses about stethoscopes?

4         A       Yes.  Some of them, they have

5    stethoscopes.  Some of them don't.

6         Q       Did you ask --

7         A       But that's not -- that's not a large

8    equipment that they need to operate -- to conduct --

9    you know, to conduct the job.  That's -- that's a minor

10   thing.

11        Q       Okay.  What about -- let me -- let me ask

12   you this.  For this factor to go the other way, would a

13   nurse have to bring her own wheelchair?

14        A       If i was an independent contractor and I

15   have a business and I have -- if it's my business --

16        Q       Yes.

17        A       -- I mean, I'm providing all these

18   services, yes, I should have all this equipment in

19   order to provide my -- my services in the proper way as

20   an independent contractor.  If I -- if I'm painter and

21   the person that I'm doing the job says, Can you give me

22   a compressor because I don't have a compressor to do

23   the job --

24        Q       Yes.  Can a nurse ever be an independent

25   contractor?

**JA1420**

1        A       A nurse can be an independent contractor?

2        Q       Yeah.

3        A       Yes.  She can be an independent contractor

4   if she has her own business.  I know nurses that have

5   their own business and they have like home care

6   providers.  They have different employees working for

7   them and they have like a home -- home health agency.

8        Q       Okay.

9        A       Yeah.  They could be independent

10  contractors.

11       Q       So let's say a nurse wants to be an

12  independent contractor for a hospital.  She's just one

13  nurse.  Could she ever be an independent contractor for

14  a hospital?

15       A       If --

16       Q       She hasn't started a business.  She just

17  wants to work a few hours here and there.

18       A       She could do that?  Yeah.

19       Q       So if she was, would she have to bring all

20  of her own equipment to the hospital or could she show

21  up at the hospital and use their equipment?

22       A       Well, if she's in a hospital -- and I know

23  independent contractors in hospitals.  Most of the

24  equipment is provided by the hospital.  I don't --

25  yeah.  They could be independent contractor.  They

Mazzela - Davis                                         203

1    don't have to bring all the wheelchairs.  It depends on

2    the agreement with the employer.

3            Q       Okay.  So would you agree with me that in

4    the nursing field, independent contractors or nurses

5    typically rely on the equipment that's in the hospital?

6    They don't bring their own equipment other than maybe

7    scrubs, stethoscopes?

8            A       Yes.  Registered -- registered nurses,

9    yes.

10           Q       Okay.

11           A       LPNs, CNAs, I don't think so.

12           Q       Okay.

13           A       There is difference between a registered

14   nurse and an LPN.

15           Q       So let's say an LPN.  An LPN -- if an LPN

16   didn't bring their own equipment, they'd be an

17   independent contractor?

18           A       I don't think so.

19           Q       Why?

20           A       Well, there's all the factors that

21   determine -- it's not just having the equipment that

22   determines -- you know, determines whether a person is

23   independent contract or not.  The equipment doesn't

24   decide --

25           Q       I know --

1       A       -- whether person is independent

2    contractor.

3       Q       -- but we're just talking about one

4    factor.  I know there's other factors.

5       A       Yeah.  Yeah.

6       Q       So why would an LPN -- so you said a

7    registered nurse could be --

8       A       If she agrees -- if she agrees to be an

9    employee, yes.  If she agrees to be independent

10   contractor, of course, if that's in the agreement, but

11   other factors have to come in place.  You know, she has

12   to be free -- she has to be free to make a decision on

13   her own without being, you now, punished by the

14   employer --

15      Q       Yes.

16      A       -- or -- or -- yeah.

17      Q       I understand.  I'm just asking just this

18   factor.

19      A       All right.  Okay.

20      Q       I understand these are factors.

21      A       Okay.

22      Q       But I said could a nurse be an independent

23   contractor --

24      A       Yes.

25      Q       -- and not bring their own equipment and

**JA1423**

1   you said yes for an RN but not for an LPN.  I'm trying

2   to understand why it's different.

3          A       Well, normally RN -- well -- well, I --

4   maybe I should retract that answer.  I should say, Yes,

5   they could be independent contractors.

6          Q       Any person could be?

7          A       Anybody could be an independent contractor

8   as long as you have your own business.  Yeah.

9          Q       So what does that mean, As long as you

10  have your own business?

11         A       That --

12         Q       What does that mean?

13         A       There's -- it's a thin line that defines

14  independent contractors, so making the determination

15  whether someone is independent contractor doesn't mean

16  if this person has equipment or not.  That's not -- my

17  determination was not decided on that factor only.

18         Q       But what does it mean to have your own

19  business?

20         A       What does it mean being independent?

21         Q       No.  What does it mean to have your own

22  business?  You said if they have their own business.

23  What does that mean?

24         A       If they have their own business they could

25  come and go whenever they want.

```
 1        Q       Okay.  So does having your own business
 2   mean that you have to have an LLC or a corporation?
 3        A       Normally, yes.
 4        Q       Are there exceptions to that or not?
 5        A       Not that I'm aware.
 6        Q       So if a -- if an -- okay.  So if -- if a
 7   nurse is going to be an independent contractor, the
 8   first step that they have to do is they've got to form
 9   an LLC or a corporation?
10        A       I'm not aware of that decision, so I can't
11   answer that.
12        Q       Well, you said to be an independent
13   contractor you have to have your own business, right?
14        A       You have to have your own business.  Yeah.
15   Correct.
16        Q       And to have your own business --
17        A       That some of the questions that we always
18   ask.  Yeah.
19        Q       Okay.  And to have your own business you
20   have to have an LLC or a corporation, right?
21        A       Uh-huh.
22        Q       Is that a yes?
23        A       Yes.
24        Q       Okay.  So put them together.  So if a
25   nurse wanted to be an independent contractor, he or
```

1   she, generally a she -- gosh, I don't know.  It just

2   seems like they're a she but I have friends that are

3   male nurses.  Sorry.  That didn't matter.

4            MS. AMIN:  It's been long day.  I'm going

5         to give you that.

6

7   BY MR. DAVIS:

8        Q     Let's start from scratch.

9        A     If she -- if she wants to make the legal

10  way, yes, that's the requirement.

11       Q     Okay.  Yeah.  So in other words, in order

12  for a nurse to be an independent contractor, that nurse

13  would have to form an entity like an LLC or a

14  corporation; is that right?

15       A     I would say yes.  Yeah.

16       Q     Okay.  Okay.  Very good.  All right.

17  The -- anything else with regard to Factor 3, the

18  worker's investment in equipment or material, that you

19  felt favored that these individuals were, in fact,

20  employees?

21       A     No.

22       Q     Okay.  And to be clear, are you aware of

23  any equipment or material provided by Steadfast to the

24  nurses?

25       A     No.

1        Q      The fourth factor is the degree of skill

2   required for the work.  Did this factor weigh in favor

3   of employee or independent contractor?

4        A      Steadfast requires every single employee

5   to have their certification.  You know, like CPR

6   qualified, stuff like that.  They have to have those

7   qualifications in order for them to be able to work at

8   the facilities.  That -- those requirements don't -- if

9   they don't meet their requirements, then they can't

10  have -- they can't work for either the facility or

11  Steadfast.

12       Q      Okay.  So how did this factor weigh in

13  favor of them being employees, not independent

14  contractors?

15       A      How?  Because in order for them to work,

16  they have -- they required to have certification.  The

17  same thing as in home health agencies.  If they -- if

18  they don't have these certifications, the facilities --

19  could be either Medicare or, you know, whoever inspects

20  them, you know, for those requirement -- that's the

21  first thing they going to check because they have to

22  have a folder where they have all these --

23       Q      So let me just make sure I understand.

24  Your position is because Steadfast requires these

25  nurses to have a certification, because of that fact,

1   that's one of the reasons why they should be classified

2   as employees?

3        A        That's one of the reasons.  Yes.

4        Q        Anything else?

5        A        Uh-huh.

6        Q        Five is the permanence of the working

7   relationship.  How did this factor go in favor of

8   employee or independent contractor?

9        A        Employee -- employee/employer relations.

10  That's determined on the payroll records.  How long had

11  they been working for this company?  Pay stubs also

12  show that there is a relationship between the two of

13  them.  What else?  I think that's it.

14       Q        Nothing else?  Just the payroll records

15  and the pay stubs?

16       A        The payroll records.  The pay stubs.  No.

17  That's it, I think.

18       Q        Okay.  And six is the degree to which the

19  services rendered are an integral part of the

20  putative -- excuse me, putative employer's business.

21  How did that factor weigh in favor of independent

22  contractor versus employee?

23       A        Well, Steadfast is one entity.

24  Employee -- quantity of employees is like 200, 300 RNs,

25  LPNs, and CNAs.  If they disappear, this disappear.

Mastela - Davis                                210

```
 1   This appears they could work for on -- you know, they
 2   could go and look for jobs somewhere else, but this one
 3   the weight is -- this becomes integral part of this --
 4   of this company.
 5        Q     So anything else?
 6        A     No.
 7        Q     Okay.  So am understanding what you're
 8   saying is that it's -- it's because the nurses are --
 9   they play an important role?
10        A     They're an integral part of the company.
11        Q     How do you know that?
12        A     How do I know that?  Because when I asked
13   Ms. Lisa Pitts what type of workers do you have here,
14   that's what she mentioned, CNAs, LPNs, and -- and the
15   other one, LPNs.  Yeah.  That's it.
16        Q     How do you know that they're an integral
17   part of the business though?
18        A     Because she told me -- Lisa Pitts told me
19   that's the only employees that she always searching
20   for, you know, to provide the facilities, the nurses
21   homes, the hospitals.  That's the integral part of this
22   business.
23        Q     Okay.
24        A     If she fails to find any -- any CNA
25   required for any job, then she cannot make money.
```

**JA1429**

 1   That's basically it.  She cannot make money.  If these

 2   people doesn't show up for work, she cannot make money.

 3   There is a contract between facilities and Steadfast.

 4           A       Okay.  Let's look at --

 5                   MR. DAVIS:  Let's go off the record.

 6                   (At 4:00 p.m. a recess was taken.  At 6:00

 7           all parties were present and the following took

 8           place on the record:)

 9

10   BY MR. DAVIS:

11           Q       All right.  Let me ask you some questions

12   regarding -- this is similar to the factors that I

13   asked you about, but I'm going to ask you about some

14   specific scenarios.  I'm just asking if -- if based on

15   these scenarios if -- if they applied to Steadfast or

16   if they didn't, if they would indicate that Steadfast

17   was an independent contractor -- or that the Schedule A

18   individuals were independent contractors or employees.

19   Does that make sense?

20           A       Uh-huh.

21           Q       So if Steadfast provided basic background

22   checks of the nurses prior to putting them on the

23   registry or on their list, would that be an indication

24   whether they were independent contractors or employees?

25   Would you go either way?

Mastosa - Davis                                    212

1        A        I'm not sure about that one.

2        Q        You don't know?

3        A        No.

4        Q        Okay.  That's fine.  If they -- if they

5   did a check, like if they checked criminal history,

6   credit report, licensing, credentials, things like

7   that, does that suggests that they were employees?  The

8   fact that they did that kind of check?

9        A        I cannot answer yes or no on that one.

10       Q        Okay.  No problem.  All right.  Do -- is

11  it your understanding that the -- that Steadfast has no

12  ability to, quote, hire or fire these nurses?  They

13  could come and go whenever they wished?

14       A        I'm not sure.  I'm not sure about that

15  one.

16       Q        You don't know if they could come or go?

17       A        Well, Ms. Pitts can fire them.  Yes.

18       Q        Who can fire them?

19       A        Lisa Pitts can fire them.

20       Q        How do you know that?

21       A        Because it was told by the -- on

22  interviews.  She could make the decision of not

23  providing the hours to anybody.  She controls that.

24       Q        Let's look at that because I didn't see

25  that anywhere in the interviews.  I'd like to know

1    where you saw that.  Show me -- these are all the

2    interviews.  Show me where it says --

3                    MR. DAVIS:  Actually, this is my copy.  Do

4            we have the witness copy of Exhibit 2?

5

6    BY MR. DAVIS:

7         Q      Could you give me an example in any of

8    them that nurses said that Lisa could, quote, hire or

9    fire them?

10        A      They might not have said precisely fire or

11   and hire them.  Well, they could hire them because

12   that's when -- it's not the words that they use, but --

13        Q      Well, it's not the word that they use

14   because Steadfast finds hospitals for nurses and says,

15   If you want to work there, you can, and if you don't,

16   you don't have to.

17        A      It's the same way as if you call

18   independent contractor and say, You hired. You fired.

19        Q      No.  How is it the same?

20        A      If you painting and I don't like the way

21   you're painting, I fire you.  If it your business, you

22   could go and get someone else.

23        Q      But you're confusing the issue, right,

24   because --

25        A      No.  I'm not confusing the issues.  I'm

1   comparing the issues.  You gave me a scenario.  I'm

2   giving you my scenario.

3        Q      Okay.  But it is your position --

4        A      Okay.

5        Q      But is it your position the hospital could

6   say, I don't want you here anymore, or that Steadfast

7   could say, I don't want you here anymore?  That's the

8   difference.

9        A      It could be from either way.

10       Q      Okay.  So --

11       A      The facility could tell Steadfast, We

12  don't want this lady anymore.  Don't send us this lady

13  anymore.  Then she decides not to bring her anymore.

14       Q      Okay.

15       A      That's firing.

16       Q      How do you know -- that's firing?

17       A      Yeah.  That's -- that's terminating

18  somebody's opportunity to work.

19       Q      But they could go work for a different

20  facility.

21       A      Yeah.  They could go to a different

22  facility, not Lisa Pitts.  They could go to a different

23  company.

24       Q      Wait a minute.  How do you know that fact?

25  You're assuming -- you're making that fact up.

Fiduciary Reporting, Inc.
(757) 482-2729

**JA1433**

 1        A        Because some of these employees that no

 2   longer work for them, for Lisa Pitts, they work for

 3   somebody else.

 4        Q        Okay.  But I want to know what evidence

 5   supports it.  You're saying it.  Where -- where is that

 6   coming from?

 7        A        Okay.  With Ms. Lisa Pitts, if I wasn't

 8   called by her, I will not have a job.  Ms. Lisa tell --

 9   will text us the places where I could work.  Ms. Pitts

10   never have any situations where I do have to be

11   counseled or -- this is one of them.  You want me to

12   look at all the interviews and tell you where?

13        Q        I read them all.

14        A        Okay.

15        Q        I read them all.  I just don't

16   understand --

17        A        Well, sometimes people can read something

18   and not find the words in there, you know.  So you want

19   me to look for the answer for you?  Is that what you

20   want me to do?

21        Q        Maybe pause for a minute.  This is what

22   I'm trying to understand.  If a nurse calls

23   Steadfast -- are you tracking with me?

24        A        Yeah.  I'm listening.

25        Q        Okay.  A nurse calls Steadfast and says,

Mazzota - Davis                                        216

1   Hey, I want to work on Wednesday. Do you have any

2   openings?  Steadfast says, Let's look. One of these

3   hospitals has an opening. Do you want to work there?

4   and the nurse says, Sounds good.  So she accepts it and

5   she goes and works there, right?

6        A        Uh-huh.

7        Q        What -- that's the relationship.  How --

8   do you have evidence at all from anybody where

9   Steadfast has said to a nurse, Get out of here. You're

10  not allowed to work, or, We are not going to place you

11  with any hospitals ever?

12       A        No.  I don't have that.

13       Q        Okay.  That's what I'm saying.  You don't

14  have any evidence that Steadfast, quote, fired anybody;

15  is that right?

16       A        I don't have any evidence that she fired

17  someone.  You're right.  I don't have anything that

18  where it says that someone was fired.

19       Q        So how do you -- what evidence do you have

20  that they could?

21       A        What evidence do I have that they could?

22       Q        Yes.

23       A        The law -- the law says that if an

24  employer hires  -- they could have, you know, the power

25  to hire or fire someone.

```
 1        Q      Okay.

 2        A      Right?  Basically -- so you basically

 3   telling me that an employee cannot be fired.

 4        Q      But how is that different than an

 5   independent contractor?

 6        A      How can you prove if someone has been

 7   fired, not fired?  The only way to find out is look at

 8   the record, the payroll.  Yeah.  The payroll records

 9   the timeframe where someone works for somebody and when

10   they was terminated.  I believe one of -- one of the

11   documents in the case file -- I cannot recall right

12   now, but she has when they were terminated, when they

13   finished their job or not.  Whether they were fired or

14   not, I don't know.  Whether they quit or not, I don't

15   know.  Whether they were laid off or not, I don't know.

16   I don't know the answer.  Only Ms. Pitts knows the

17   answer.  I'm only allowed to see what Ms. Pitts provide

18   me.  She provide with only a few addresses from some

19   employees because she didn't want to provide with the

20   whole thing, so I'm limited to whatever information

21   that the employer provides.

22        Q      Okay.  All right.  Are you aware of the

23   fact that after Steadfast -- you can stop.  It's okay.

24        A      I'm listening.

25        Q      Okay.
```

1        A       I'm listening.

2        Q       I just don't -- are you aware that after

3    Steadfast links a nurse up to a hospital that at that

4    point Steadfast no longer participates in the

5    connection between them?  It's now between --

6        A       That's not true.  Pay stubs, payroll

7    records shows different.  If person was in somebody

8    else payroll, then it will appear in the facility's

9    payroll.

10       Q       So if the payroll is --

11       A       Now, if the payroll shows that this

12   employee is working for this individual, for this

13   employer --

14       Q       Okay.

15       A       -- the payroll shows a common -- a

16   constant behavior, you know, the same name appears

17   every payroll record.

18       Q       Okay.

19       A       It doesn't appear on the facility's

20   payroll record.

21       Q       But how do you know?  You didn't ask the

22   facility.

23       A       How do I know?  Because it's here.  Who

24   pays the -- who's paying the wages?

25       Q       Let me ask you about that.

Masuqa - Davis                              219

1        A       No.   Who -- who's paying the wages?   Is it

2    Steadfast?  Did you see the proof?   Who's paying the

3    wages?  Steadfast.   Medical Staffing of America is

4    paying the wages.   Who owns the Medical Staffing of

5    America?  Ms. Lisa Pitts.   So who's paying the wages?

6    Not the facility.   The employer.

7        Q       So is the fact that Steadfast is paying

8    the money to those individuals, does that mean that

9    they're employees?

10       A       It is.

11       Q       Okay.

12       A       It's common control.   I'm paying you.   I

13   have you every week you coming to work for me.   That's

14   common control right there.

15       Q       Let me -- I'm going to read a statement to

16   you and tell me if you agree with this.   Okay?

17       A       Okay.

18       Q       Okay.   A registry often performs payroll-

19   related functions for its clients.   These functions

20   include, for example, calculating the amount of wages

21   owed based on hours worked at the previously determined

22   rate of pay, making the appropriate tax deductions,

23   administering benefits that the caregiver has requested

24   and for which the caregiver pays, and issuing a check

25   or electronic deposit if the client provides the funds

1   directly or via an escrow account.  The registry's

2   performance of such payroll functions does not indicate

3   that the registry is the caregiver's employer.

4        A      What are you reading this from?

5        Q      I'm just asking if you agree.

6        A      Yes.

7               MS. AMIN:  I'm just going to object.  I

8          think that's a pretty long statement and

9          narrative, so if you could break down the

10         question.

11

12  BY MR. DAVIS:

13       Q      Let me just ask you to read this.  Can you

14  just read just that paragraph there?

15       A      Okay.

16       Q      I'm just going to hold the document

17  because I'm going to go -- I have my notes on it so --

18       A      What does this document comes from?

19       Q      I'll get to that, but I just want to know

20  if you agree with this paragraph right here.

21       A      No.  I disagree with that.

22       Q      You disagree with it?

23       A      Yeah.

24       Q      Okay.  Okay.

25       A      Is that a document that I reproduced or --

```
1          Q      I'll get to it in just a minute.

2          A      Okay.

3                 MS. AMIN:  Unfortunately he gets to ask

4          all the questions.

5                 THE WITNESS:  Okay.

6                 MR. DAVIS:  It's totally unfair.  I'm

7          sorry.

8                 THE WITNESS:  Okay.

9                 MS. AMIN:  So you just wait for the

10         question and your job is to answer the question

11         before you.

12                MR. DAVIS:  I know seems mean because I

13         can ask and you can't, but that's the way rules

14         are.

15

16   BY MR. DAVIS:

17         Q      Okay.  Here's another statement.  A

18   registry -- if I read it is that okay or do you need to

19   read it?

20         A      Okay.

21         Q      A registry often informs its client that a

22   potential caregiver meets the client's threshold

23   perimeters and preferences and then introduces the two.

24   The registry does not further participate in the hiring

25   process.  The client is free to accept or decline
```

1  services from the referred caregiver.  If the client

2  hires the caregiver, the registry usually has no right

3  to alter or terminate the terms and conditions of the

4  caregiver's employment.  As with hiring, the ultimate

5  determination decision is the client's.  A registry's

6  inability to hire and fire employees indicates that the

7  registry is not an employer of the caregiver.  Do you

8  agree with that or disagree?

9        A     I disagree with that.

10       Q     Okay.  Okay.  I'll keep going.  Here's

11 another statement.  Are you ready?  Is this okay

12 reading?  Is this okay?

13       A     Yeah.

14       Q     Okay.  A registry commonly facilitates

15 initial communication between the caregiver and the

16 client.  The caregiver and the client thereafter may

17 independently determine work schedules and assignments.

18 A registry's lack of control over work schedules and

19 assignments may indicate that a registry is not the

20 caregiver's employer.  Conversely, a registry's

21 exercise of control over the caregiver's work schedules

22 and assignments may indicate the registry is an

23 employer of the caregiver.  Do you agree with that or

24 disagree?

25       A     Disagree.

1        Q       Okay.  Okay.  I'm moving through this

2   fast.  All right.  A registry does not plan and provide

3   care for the client, but might seek information

4   concerning the type of care the client needs for

5   matching purposes.  The caregiver may not receive any

6   instruction from the registry about how to care for

7   clients.  After that referral, a registry may choose to

8   not monitor or manage the caregiver's methods or work

9   habits.  The registry may not, for example, instruct

10  caregivers how to provide caregiver services, monitor

11  or supervise caregivers in clients' home or evaluate

12  caregiver's performance.  The absence of such control

13  indicates that a registry is not an employer of the

14  caregiver.  Do you agree or disagree?

15       A       Well, I cannot agree or disagree on this

16  one because I'm not aware of this information, where

17  you get it from, so --

18       Q       But this -- so this one you don't know?

19  It could go either way?

20       A       It could go either way.  Yeah.

21       Q       Okay.  Okay.  On the other hand, a

22  registry may provide training and control of the

23  caregiver's services after making the referral.

24  Control over the caregiver's services indicates that a

25  registry is an employer of the caregiver.  Do you agree

1   with that?

2         A       The registry's an employer?  Yes.  I agree

3   with that.

4         Q       Do you -- do you believe that registries

5   are always employers?

6         A       I agree with that.

7         Q       Registries are always employers?

8         A       Uh-huh.

9         Q       Okay.  A registry typically does not

10  determine a caregiver's rate of pay.  The client

11  instead negotiates the rate of pay directly with the

12  caregiver.  In the alternative, Medicaid or another,

13  excuse me, government program may determine the actual

14  rate -- wage if they are funding the services.  Either

15  scenario indicates that the registry is not determining

16  the caregiver's rate of pay and, therefore, may

17  indicate that the registry is not an employer.  Do you

18  disagree with that?

19        A       Disagree with that.  I believe Ms. Lisa

20  Pitts was doing the opposite.

21        Q       Okay.  Very good.  But you disagree with

22  that statement?

23        A       Yes.  I disagree because she was the doing

24  the opposite.

25        Q       Similarly, a registry's action as a

1   liaison that merely relays communications, offers, or

2   counteroffers between the client and caregiver does not

3   indicate that the registry is controlling the caregiver

4   or acting as the caregiver's employer.  Do you disagree

5   with that?

6          A      I disagree with that.

7          Q      Okay.  All right.  A registry may charge

8   clients a one-time up front fee for the services of

9   matching caregiver and client.  It may likewise perform

10  and charge fees for administration or administerial

11  functions like processing payroll or producing tax

12  documents.  Such charges do not indicate that the

13  registry is an employer.  Disagree?

14         A      Disagree.

15         Q      A registry may instead choose to charge

16  fees that fluctuate based on the number of hours that a

17  caregiver works for a client.  Such a registry -- I'll

18  skip that one.  I think we've already talked about

19  that.

20                Okay.  Okay.  Here's another one.  A

21  registry does not typically create and confirm records

22  of a caregiver's hours worked.  It may perform payroll

23  services after the client or caregiver submits time

24  records as discussed above, but that does not indicate

25  that the registry is the caregiver's employer.

1    Disagree?

2         A      I disagree with what.

3         Q      Okay.  A registry might collect time

4    sheets from caregivers or offer an electronic time

5    verification system.  A registry may also require the

6    correct completion and submission of certain time

7    sheets for purposes of payroll processing.  These

8    activities do not indicate that the registry is the

9    caregiver's employer.  Disagree?

10        A      Disagree.

11        Q      A registry typically invests in office

12   space, payroll software, timekeeping systems, and other

13   products to operate its business.  A registry may also

14   provide caregivers with an option to purchase

15   discounted equipment or supplies from either the

16   registry or a third party.  These actions alone do not

17   indicate that a registry is a caregiver's employer.

18   Disagree?

19        A      Disagree.

20               MR. DAVIS:  Okay.  I'm going to mark this

21        one as Exhibit 3, please.

22               THE COURT REPORTER:  It would be Exhibit

23        4.

24               MR. DAVIS:  Really?  You're right.  It's

25        good thing you're on top of it.  Then I shouldn't

Masboia - Davis                                   227

1          mark it as Exhibit 3, should I?

2                    (Marked in evidence as Alvaro Exhibit

3          Number 4.)

4

5    BY MR. DAVIS:

6          Q      All right.  Okay.  I'm showing you a

7    document and I just read some statements to you.  Have

8    you ever seen this document?

9          A      I believe so.

10         Q      Okay.  And tell us what this document is.

11         A      This is a field assistance bulletin --

12   bulletin that, you know, it comes monthly or -- or --

13   but it's information from Department of Labor.

14         Q      Is this one of those documents we talked

15   about earlier that you get that helps you with kind of

16   continuing education and what's -- understanding what's

17   happening?

18         A      This is -- yes.  This is one of them.

19         Q      Okay.

20         A      Uh-huh.

21         Q      This one is July 13, 2018.  It's Field

22   Assistance Bulletin Number 2018-4.

23         A      Uh-huh.

24         Q      Would you have received a copy of this?

25         A      We get a copy of this.  This was before

Mascena - Davis                                    228

 1   the -- that -- my investigation -- prior to my

 2   investigation when I did my final conference and

 3   everything was done, so I was not aware of this during

 4   my investigation.

 5        Q    Okay.  But when I asked you those

 6   questions, the -- well, strike that.  Would you

 7   consider this -- this document I'm showing you,

 8   assuming this is an accurate of the original, an

 9   authoritative source for you in making your

10   determinations?

11        A    The -- I might be able to use it as a tool

12   to make a determination, but -- but this will not mean

13   it's final.  It's just an assisting bulletin, but it's

14   not the final --

15        Q    Okay.

16        A    -- decision, you know.

17        Q    Sure.  Are these designed, these field

18   assistance bulletins, are they designed to provide

19   guidance to people in your position?

20        A    Yes.  Sometimes we use them as guidance.

21   You know, cases, you know, that we can't recall.

22        Q    Okay.  Yeah.  If -- if you receive, for

23   example, this particular one, would you consider it to

24   be something that you're supposed to follow or can you

25   just disregard it?

Mijaiana - Davis                                           229

1      A      I can follow it, you know, if it has good
2  information that could help me to -- for a case.  Yeah.
3  I can follow it.
4      Q      Are you permitted to go completely against
5  it?
6      A      No.  Not necessarily.  No.
7      Q      All right.  So -- so you're supposed to
8  follow it?
9      A      I will -- I will -- I will verify this and
10  I will verify it to make sure that also the regulation
11  has been changed, whether they match.
12      Q      Okay.  Do you know, have the rules -- the
13  case law on the -- on FLSA, do you know -- have the
14  rules substantially changed between, let's say, 2015
15  and today?  Any substantial changes?
16      A      Yeah.  There's been a lot of substantial
17  changes.  Caregivers.  Home caregivers.
18      Q      Okay.
19      A      There's been changes overtime for home
20  caregivers.
21      Q      What about those questions I asked you,
22  your answers to those questions, is it the same in 2015
23  as it is today though?
24      A      In 2015 it would have been different.
25  Yeah.

1      Q      What --

2      A      The -- the ones in 2015?

3      Q      Yeah.

4      A      I'm not sure about that.  I cannot answer

5   that because I didn't -- I don't recall looking at --

6      Q      Sure.  Well, let's talk about 2017 really.

7   You did your investigation in 2017?

8      A      Uh-huh.

9      Q      Okay.  All of those questions I just asked

10   you, all of those obnoxious long questions --

11      A      Uh-huh.

12      Q      -- the answer to those questions applies

13   today -- your answer applies today as it did in 2017

14   and 2018, right?

15      A      Uh-huh.  Correct.

16             MR. DAVIS:  Okay.  All right.  Let's mark

17         this --

18             THE WITNESS:  Would you like this?

19             MR. DAVIS:  Yeah.  Just stick it in this

20         pile here.

21             We'll mark this as Number 5.

22             (Marked in evidence as Alvaro Exhibit

23         Number 5.)

24

25

 1   BY MR. DAVIS:

 2        Q       What we've marked as Exhibit 5 is

 3   something that was included in the -- in your report.

 4   What did you feel was the significance of this

 5   document?

 6        A       This is the last payroll record prior --

 7   prior to my visit to employer.

 8        Q       Okay.  And was there anything about

 9   this -- the fact that it says, RUN powered by ADP, did

10   that mean anything to you?

11        A       Different companies have different --

12   different accounting companies.  You know, they use

13   different software, so I don't pay attention to RUN

14   by --

15        Q       I was referring to this right here.  That.

16        A       Powered by ADP?  ADP has different --

17   yeah.  Some people use ADP.  Some people use other

18   programs.  Yeah.

19        Q       Do you know, does ADP -- with ADP can you

20   run independent contractors or employees through ADP?

21   Either one?

22        A       No.

23        Q       You can't?

24        A       I'm not sure.

25        Q       Oh, you don't know.  It could be?

Maldza - Davis                                    232

1        A        I don't know.  I don't know that.

2        Q        Okay.  No problem.  Does the fact that

3   that says employee right here, does that -- just

4   because it says it, does that mean that they are

5   employees or you can't tell?  Just because it says it,

6   you don't know?

7        A        I see it in there, but it can't tell.  I

8   don't base my decision on that.

9        Q        Okay.  Got it.  Very good.

10               MR. DAVIS:  We'll mark this as Number 6.

11               (Marked in evidence as Alvaro Exhibit

12        Number 6.)

13

14   BY MR. DAVIS:

15        Q        This is a document that was also attached

16   to your report.  Can you tell us why you included

17   this -- this is one of many.  Why did you include this

18   and what was the significance of this?

19        A        Well, this is a template that we use, what

20   we call a WH-55.  It's --

21        Q        That's what you were telling me about

22   earlier.  Okay.  Is this how you make calculations as

23   to what you think the -- the overtime should have been?

24        A        This is how I transcribe -- I transcribe

25   all the information --

```
 1        Q      Okay.

 2        A      -- into this.

 3        Q      Got it.  All of this information you

 4   inputted yourself?

 5        A      Uh-huh.

 6        Q      Okay.  Got it.  And then the second page

 7   it says compliance officer.  Is that you?

 8        A      That's my initials.  Yes.

 9               MR. DAVIS:  Okay.  Very good.  All right.

10        Just mark this as an exhibit too.  We'll mark this

11        as Exhibit 7.

12               (Marked in evidence as Alvaro Exhibit

13        Number 7.)

14               MR. DAVIS:  I forgot this one.

15

16   BY MR. DAVIS:

17        Q      This is DOL167.  We marked it as 7.

18   According to the privilege log, this is e-mail

19   communications that have been withheld on the single

20   basis of informant's privilege.  I'm going to ask the

21   witness to identify what has been redacted in DOL-165

22   to the extent it includes individuals who are no longer

23   working with Steadfast.

24               MS. AMIN:  Objection.  Informant's

25        privilege, and I'm going to instruct the witness
```

**JA1452**

1          not to answer based on our invocation of the

2          privilege.

3                    MR. DAVIS:   Okay.

4                    We'll mark this as Exhibit 8.

5                    (Marked in evidence as Alvaro Exhibit

6          Number 8.)

7

8   BY MR. DAVIS:

9          Q      This is a document that was included as

10  part of your report.  It's an acknowledgement and

11  waiver.  Did this document have any impact on your

12  determination that the individuals on Exhibit A were

13  employees as opposed to independent contractors?

14         A      Yeah.  This definitely was provided by one

15  of the people that I interviewed.

16         Q      Okay.

17         A      Actually, it came from one of the

18  facilities.

19         Q      It came from a facility?

20         A      Yeah.  If you look at the -- if you read

21  it, it says, Steadfast perform services Alamance --

22  Alamance Health and Rehabilitation Center.

23         Q      Yes.

24         A      That's what it says there.

25         Q      But it was provided to you by one of the

                              Masaka - Davis                        235

1    Schedule A individuals?

2         A     Yes.

3         Q     Okay.  And why is it not signed?

4         A     Not Schedule A.  It was provided by one of

5    the individuals in the -- that I interviewed.  Yeah.

6         Q     Are the people that you interviewed -- did

7    you interview people that are not listed on Schedule A?

8              MS. AMIN:  You can answer that.

9         A     There is some people that are not listed

10   on the -- yeah.  I believe so.  Yes.  There are some

11   people that I -- that I interviewed that are not listed

12   on Exhibit A.  There might be one -- one -- yeah, one

13   person because I collecting -- remember, I collect

14   interviews in the office.

15

16   BY MR. DAVIS:

17        Q     You think it's just one person?

18        A     I'm not sure exactly how many, but there

19   was -- I can't remember.

20        Q     Yeah.  Well, there's -- we counted it up

21   and there's actually nine people that you interviewed.

22        A     Okay.

23        Q     I think it's nine.

24              MS. AMIN:  Nine.  Uh-huh.

25

 1   BY MR. DAVIS:

 2        Q     Right.  Nine.  And you think it's one,

 3   maybe more?

 4        A     It might -- maybe more.  Yeah.  It could

 5   be maybe more because I'm supposed -- when I doing

 6   interview --

 7              MS. AMIN:  Can I interject too?

 8              THE WITNESS:  Yeah.

 9              MS. AMIN:  It's a mix of statements from

10        the independent -- from independent contractors

11        and the office staff.  To the extent that that

12        highlights his answer, I just wanted to put that

13        out there.

14              MR. DAVIS:  That's -- that was my

15        assumption as well.

16              MS. AMIN:  Okay.

17

18   BY MR. DAVIS:

19        Q     When you look at these interviews -- you

20   can look at my copy.  This one says phone.

21        A     Yeah.  Most of them say phone.  Yeah.

22        Q     But if we skip ahead maybe towards the

23   end, some of them say establishment.

24        A     Uh-huh.

25        Q     The ones that say establishment, were

Masucca - Davis                                        237

1   those the ones that were of the office workers?

2        A       Correct.

3        Q       And so the establishment, those might be

4   the ones that are not on Exhibit A?

5        A       They might not be on Exhibit A.

6        Q       And it looks like there is one, two --

7   maybe just two, so if there's only two that say

8   establishment, those are the people that -- there would

9   be two then?

10       A       Uh-huh.

11       Q       Okay.  Okay.  So now with regard to

12  Exhibit 8, did this document play any role in your

13  determination that the Schedule A individuals were or

14  were not employees?

15       A       Any document that is submitted by -- by

16  the people that I interview with the complaint --

17       Q       Yeah.

18       A       -- I have to put it in -- in the case

19  file.

20       Q       Oh, sure.  I understand that.

21       A       Yeah.

22       Q       I'm just asking -- you put it in there --

23       A       Yes.

24       Q       -- but I'm asking did this document -- was

25  there anything in this document that caused you to go

1    one way or the other?

2          A       No.

3          Q       Did this have any bearing on your

4    decision?

5          A       No.  I didn't make any decisions on this

6    one.  No.

7          Q       Okay.  All right.  So the fact, for

8    example -- okay.  All right.

9          A       Because I receive -- I receive -- I'm

10   sorry.

11         Q       It's okay.  You can answer the question.

12         A       I was -- along with this type document, I

13   received other contracts that you might have in there

14   that say the opposite.

15         Q       Yeah.

16         A       So it was contradictory.  You know, this

17   one says one thing and another says another thing,

18   so --

19         Q       This Exhibit 8 is contradictory to what

20   document?

21         A       Exhibit 8?

22         Q       The one you have in front of you.  What

23   document?

24         A       Because there's another -- I thinking one

25   of the depositions we look at another contract.  I

```
 1    can't remember what is it.  I have a copy -- I think

 2    there was a copy in my case file from that contract,

 3    and that contract says something different than what

 4    this one says, so Ms. Lisa Pitts have different

 5    contract online.  There was an online contract,

 6    application, so this not -- this document was not a

 7    turning -- a turning point for me to decide whether

 8    she's an employee or not.

 9         Q     No -- it had no weight at all?

10         A     No.

11         Q     None?

12         A     No.

13               MR. DAVIS:  Okay.  Got it.

14               All right.  This we'll mark this as 8.  Or

15         that one was 8.  This is 9.

16               (Marked in evidence as Alvaro Exhibit

17         Number 9.)

18

19    BY MR. DAVIS:

20         Q     This document was also part of your file.

21    Do you know what this document is?  I couldn't figure

22    it out.

23         A     Yeah.  Missing some.

24         Q     I was hoping you --

25               MR. DAVIS:  You know what?  Let's do
```

Mamela - Davis                                           240

```
 1              something.  This is the second page.  Let's mark

 2              these together.  I wish I had a stapler, but let's

 3              make that a part of Exhibit 9.

 4

 5    BY MR. DAVIS:

 6         Q        Do you know what this document is?

 7         A        Yeah.  This is an application that they do

 8    online.

 9         Q        Who does on online?

10         A        The employees or the candidate goes online

11    and they fill this application.  Then it goes to

12    Ms. Lisa Pitts.  She's the one that checks, either her

13    or the recruiters that she -- that were working at that

14    time for her.  They look at these applications and then

15    they --

16         Q        Okay.

17         A        I don't know what -- what else they do

18    after that, but I believe they do like a screening

19    process to see if this person is a person -- a good

20    candidate to fill any positions in the company.

21         Q        Are you sure that this is something that

22    Steadfast has them fill out and not the facility?

23         A        I'm not absolutely a hundred percent sure,

24    but this is something that it was online.

25         Q        Okay.  But does this document have any
```

1    bearing at all on your determination of independent

2    contractor versus employee?

3        A       Yes.  It could be a bearing point.  Yes.

4        Q       How -- how did this document impact that

5    determination of independent contractor or --

6        A       This like an application for a job.  You

7    know, a job application.  But let me rephrase.  It

8    would not be a bearing point because it's just an

9    application.

10       Q       Okay.

11       A       The application -- the elements, you know,

12   it doesn't talk about any applications, you know.

13       Q       So Exhibit 9 is a job application?

14       A       This is a job application.  Yes.  Like not

15   really -- well, I'm not sure if it's a job application,

16   but this is something that they trying to fill

17   information for the employee to be picked.

18       Q       Okay.  But it could be something that the

19   facility asked them to fill out?

20       A       I'm not sure about that.

21       Q       But it had -- but based on this document,

22   it had -- it caused -- it helped you come to the

23   conclusion that the individuals were --

24       A       Like I say, if the employee or the

25   complainant provide me with information, I have to put

1    it in my case file.  Anything that -- any document that

2    is given to me during that compliance inspection, I

3    have to put this in another place in the case file.

4         Q      Understood.  There's a lot of stuff in the

5    case file.  You did a great job.  You put it all in

6    there.  I've got it all.  I'm just wanting to know

7    how -- how did this -- you said that this document

8    helped you come to the determination that the

9    individuals were not independent contractors and I'm

10   just --

11        A      I never say that to make a decision

12   whether they were independent contractor.  That is --

13   you say that.  I didn't say that.

14        Q      Oh, I misunderstood.  I thought you

15   said --

16        A      I say that they used these to fill

17   applications for the job.  That's it.

18        Q      Oh, okay.  So did this -- did Exhibit 9

19   have any impact on your determination?

20        A      No.

21        Q      No?  No impact?

22        A      It's just an application.

23        Q      Okay.  Got it.

24        A      At this point this person is not an

25   employee so this cannot be an employee yet.

Mazzotta - Davis                                    243

1        Q      Got it.  Is it your position that if

2    somebody -- the mere fact of filling out an

3    application, that by itself makes -- has no impact on

4    whether they're an employee or independent contractor;

5    is that what you're saying?

6        A      No.  Not yet.  Because you become an

7    employee once I come to work for you.  That's it.

8        Q      The application doesn't mean anything?

9        A      The application doesn't mean anything.

10       Q      Okay.  Got it.

11       A      The --

12              MS. AMIN:  Wait for the question.

13              THE WITNESS:  No.  I was going to say

14          something else.

15              MR. DAVIS:  Okay.

16       A      The only -- and it came into my head.  The

17   only -- the only portion of the only thing that I could

18   get from an application is who has the control because

19   if I have the jobs, I've got the control.  I'll give

20   you the job.  If you want the carrot, I give it to you.

21   If -- if you fill out the application, I will give you

22   the carrot to work for me.

23

24   BY MR. DAVIS:

25       Q      And to you --

Matsura - Davis                                        244

```
 1        A       To me that is like control.  It slightly

 2   and directly control of the -- of the employers.

 3        Q       So help me understand the difference

 4   between that and the painter because let's say that --

 5   let me ask the question.  Let's say I want to hire

 6   somebody to paint this and somebody comes to me and

 7   says, I've got a painting business, and there's two

 8   other guys out there and they're standing in line and I

 9   say, You want the job painting?  Bottom dollar and I

10   want you to show up and paint it right now.  Are they

11   my employee or are they independent contractors?

12        A       Well, normally when you have a painter you

13   have -- you ask for bids.  Whoever has the lowest bid

14   is the one who gets the contract.

15        Q       So to be an independent contractor, you

16   have to have bids?

17        A       Not necessarily.

18        Q       But say there's only one painter

19   available.  Everybody's busy.  There's one guy out

20   there and I say --

21        A       And he will tell you, I'll do it for $100,

22   and --

23        Q       And I say, No. No. 50 bucks.  I'm dangling

24   the carrot.

25        A       That is bargaining, yeah, between a
```

1   contractor -- a contractor and independent contractor.

2        Q     I'm controlling him though, aren't I?  I'm

3   controlling him.

4        A     In a way, yeah, you control, yeah.

5        Q     So control by itself like that is not

6   enough?

7        A     It's not enough to?

8        Q     To make somebody an employee.

9        A     It's part.

10       Q     It's part?

11       A     Yeah.  It's part of that body.

12       Q     Okay.  Got it.

13       A     We cannot decide just on one thing.

14       Q     Okay.

15       A     You have -- you have to fulfil certain

16   other requirements.

17             MR. DAVIS:  Right.  Okay.  Let's look at

18        Exhibit 10.

19             (Marked in evidence as Alvaro Exhibit

20        Number 10.)

21

22   BY MR. DAVIS:

23       Q     This is a part of your file, another thing

24   that I don't know what it is.  Do you know what this is

25   and did this have --

1        A        This was something provided to me by one

2    of the complainants, by one of the persons that I

3    interviewed.

4        Q        Okay.  Did this have any impact on your

5    determination that the Schedule A individuals were

6    employees?

7        A        Well, there is something here.  We

8    actually talked about this in the last deposition.

9        Q        When you say the last deposition, you mean

10   earlier today?

11       A        No.  No.  The deposition that they did to

12   the other individual -- to Ms. Lisa Pitts.

13               MS. AMIN:  He's referring to the

14           deposition I took.

15               THE WITNESS:  Yes.

16               MR. DAVIS:  Was he present for the

17           deposition?

18               THE WITNESS:  Yes, I was.

19       A        Okay.  This is a -- I think this is a

20   contract between the client and Ms. Lisa Pitts, so this

21   is a contract between a facility and -- and that's what

22   it is.  I can't -- now I remember this one, and during

23   the last deposition with Ms. Lisa Pitts she says -- I

24   believe that she mentions that independent contractor

25   have to have their insurance in order to work for --

1   for the facilities, but then on this one it says that

2   the client shall maintain at his own expense at all

3   times insurance, you know, so it -- it contradicted

4   itself, you know, with what Ms. Lisa Pitts was trying

5   to say.  None of the interviews mentioned that they

6   have any insurance -- that they have to buy insurance.

7   Yeah.

8

9   BY MR. DAVIS:

10       Q     So you're saying that the Schedule A

11  individual signed this?

12       A     The Schedule A did not sign this.  This is

13  not a Schedule A.

14       Q     Who would sign this?

15       A     This is -- this is between the client --

16       Q     Like a hospital?

17       A     Not independent contractor.  Yeah.

18       Q     Okay.

19       A     A hospital.

20       Q     And a company/university?

21       A     And Lisa -- and Lisa Pitts.  Yes.

22       Q     How do you know it's with Lisa Pitts?

23       A     Because when we have -- in the last

24  deposition when we have -- when we talk about it, she

25  mentioned that this was an -- a contract between -- the

1   contract that she has -- you were not here.  You

2   were -- it was another lawyer.

3        Q     Yeah.  I know.

4        A     Yeah.

5        Q     Okay.  This MFA/MFNC access

6   acknowledgement that is with MFA.net talks about --

7   you're saying this is between Lisa Pitts and --

8        A     And the facilities.

9        Q     Okay.  All right.

10       A     Yeah.  And I'm sure if you look back at

11  when Ms. Amin in the deposition, the lawyer -- the

12  employer for the first time -- there's a document where

13  Ms. -- Ms. Lisa Pitts signed.  I remember.

14       Q     Okay.  And did this document cause you to

15  come -- to go one way or the other as to whether the

16  individuals on Schedule A are employees or independent

17  contractors?

18       A     Not really because at that point I didn't

19  know some of this information.  I was provided this

20  document by one of the -- the individuals I

21  interviewed.

22       Q     Okay.  So it didn't have an impact either

23  way?

24       A     No.

25             MR. DAVIS:  Okay.  We'll mark this as

 1        Exhibit 11.

 2              (Marked in evidence as Alvaro Exhibit

 3        Number 11.)

 4        A     Yeah.  It could have made an impact --

 5   sorry.  It made an impact on the deposition that we had

 6   because were not -- I was given this empty document,

 7   but then once we received -- once we reviewed what the

 8   actual documents were, Lisa Pitts signature was there.

 9

10   BY MR. DAVIS:

11        Q     Okay.

12        A     It made more impact when you have

13   somebody -- somebody's filling the information.

14        Q     What was the impact?

15        A     The impact is, like I just explained to

16   you, Ms. Pitts says that all the independent contractor

17   required to have insurance, and it's not true.  In here

18   it says that independent contractor have to have

19   insurance.

20        Q     Show me where.  So this is --

21        A     For liability.

22        Q     Where does it say --

23        A     For anything that -- anything that

24   happens, the liability will be on the -- on the

25   facility.  The client shall maintain at its own expense

1   and at all times during the term of -- of this access

2   cyber liability insurance -- liability insurance

3   covering himself/herself, employees, agents, and

4   assigns with limits.

5        Q      Right.  So who's the client?

6        A      The client is the facility.

7        Q      Okay.  And so the facility is maintaining

8   insurance?

9        A      They -- they -- she -- that's what the

10  contract talks about.

11       Q      So this is saying the facility, the

12  hospital in other words, shall maintain at its own

13  expense and all times insurance?

14       A      Uh-huh.

15       Q      So how does that contradict what Ms. Pitts

16  said?

17       A      How did it what?

18       Q      How does that contradict what Ms. Pitts

19  said?  This --

20       A      Because she says that -- if -- she says

21  that independent contractor are required to have

22  insurance and they're not.

23       Q      How does this contradict that?

24       A      It -- well, it doesn't contradict, but it

25  shows that why would an independent contractor needs

Matozza - Davis                                          251

1    insurance when it's covered by this?

2         Q      Why would they or why would they not?

3    They just -- this is saying that the facility has to

4    have insurance.  A lot times both people have

5    insurance.

6         A      Uh-huh.

7         Q      I have malpractice insurance.  The

8    attorney on the other side has malpractice insurance.

9    You drive a car with insurance.  The other guy drives a

10   car with insurance.  How does this contradict?

11        A      I can't explain that.

12        Q      So it doesn't contradict, does it?

13        A      Yeah.

14        Q      Okay.  Let's look at this next exhibit.

15   Ready?

16        A      Uh-huh.

17        Q      Okay.  We're going to look at this one

18   now.  These are -- I believe this is Exhibit 11 now.

19   These are Bates stamped DOL189 through DOL201.  Are you

20   familiar with these documents?

21        A      Yes.

22        Q      I'm going to ask you to identify the

23   redacted information to the extent it identifies a

24   Schedule A or individual that is no longer working with

25   Steadfast.

Massana - Davis                                    252

```
 1                  MS. AMIN:  Objection.  Informant's

 2          privilege.  I'm going to instruct the deponent not

 3          to answer based on the privilege.

 4                  MR. DAVIS:  Mark this as 12.

 5                  (Marked in evidence as Alvaro Exhibit

 6          Number 12.)

 7

 8  BY MR. DAVIS:

 9       Q      I'm going to show you what's been marked

10  as 12.  This is something that was attached to your

11  report.  It looks like a printout from the Steadfast

12  website.

13       A      Uh-huh.

14       Q      Did you print this out?

15       A      Yes, I did.

16       Q      Did this -- did the website have any

17  impact on your determination that the Schedule --

18       A      No.  This is a document that we use when

19  we research about the company to make sure that it's

20  located in the right place.

21       Q      Okay.  So my question is did --

22       A      No.  No.  I say no.

23                  MS. AMIN:  Make sure that he's able to

24          sort of finish his question.

25                  THE WITNESS:  Okay.  But I say no.
```

1           MR. DAVIS:  I know.  But I didn't ask the

2      question.

3           THE WITNESS:  No.  But before you asked

4      the question and I say no.  This is a document

5      that we use only to identify the location for the

6      case.

7           MS. AMIN:  Just be mindful.  We want the

8      transcript to be clear.  He may re-ask the

9      question --

10          THE WITNESS:  Okay.  Okay.

11          MS. AMIN:  -- or maybe ask it in a

12     different way after you've said no.

13          THE WITNESS:  Uh-huh.

14          MS. AMIN:  So let him do the follow-up.

15     Don't assume what he's going to ask because then

16     the record isn't clear.

17          THE WITNESS:  Okay.

18          MR. DAVIS:  In normal interaction, if we

19     were out to dinner together -- not that you would

20     ever want to go to dinner with me probably after

21     this, but --

22          MS. AMIN:  Why not?

23          MR. DAVIS:  -- maybe you would.

24          MS. AMIN:  You're a very nice guy.

25          MR. DAVIS:  I understand what you're

1          saying.  We'll move on.

2                   All right.  Let's mark this as 13.

3                   (Marked in evidence as Alvaro Exhibit

4          Number 13.)

5

6  BY MR. DAVIS:

7          Q       Are you familiar with this document?

8          A       Oh, yes.  Employee application.  This was

9  another document that was given to me by interview

10 people.

11         Q       Okay.  And did this document -- did this

12 document cause you to determine or not determine that

13 the Schedule A employees were employees or independent

14 contractors?

15         A       It put a little weight on it.  Yes.

16         Q       What -- tell me what -- what weight, which

17 way, and why?

18         A       Well, just the label, when -- when you

19 call yourself an employer, you know, and this is used

20 for -- for the CNAs and for the LPNs and RNs only.

21         Q       How do you know that it was used for the

22 RNs and LPNs only?

23         A       How do I know?

24         Q       Yes.

25         A       Because it says right here.

Matona - Davis                                              255

1      Q      Sure.  It says --

2      A      It could be other, but other -- I don't

3  know what others means.  RNs, NPs, LPN, CNAs, ST, TECH.

4  You know this is the employers -- the employees that go

5  to work to all these facilities.

6      Q      What is an ST?

7      A      And the area of work desired, hospital --

8  I don't know.  You need to ask Ms. Lisa Pitts.

9  Hospitals, home health, long-term care, rehab centers,

10  clinics.  It doesn't say secretaries, recruiters.  It

11  doesn't say anything, and then you have the experience

12  information right here.

13      Q      Uh-huh.  Okay.

14      A      And colleges.  They have to have some

15  experience.

16      Q      And the more experience they have, the

17  more that favors them being employees?

18      A      Yes.  The more -- no.  It's not employees.

19  They more they favor to be candidate for to be picked

20  as an employee.

21      Q      Okay.

22      A      And then they asking previous employment.

23  Why would somebody call an independent contractor, What

24  was your previous employer name?  Maybe, Where did you

25  work?  Where did you do some jobs before?  That's

Mascara - Davis                                   256

1    what -- that would be the real question.  Independent

2    contractors -- I know you mentioned earlier about the

3    RNs, they could be independent contractors.  You know,

4    they could be independent contractors and they could

5    say who they were employed by.  This like a history,

6    but -- yeah.  This is a document that is used for --

7    for these individuals that we discussing.

8         Q     Did you ask the office workers if they

9    also fill out this application?

10        A     At the point when I went to Lisa Pitts'

11   office, I was not shown this one.  She didn't show me

12   anything.  She just give me the minimum.

13        Q     Did you go to -- let's see.  Is there a

14   date on this?  This is 2017.  Did you go to the

15   Steadfast website prior to going to Ms. Pitts office?

16   Did you go to the website before you went to her

17   office?

18        A     Yes.

19        Q     Okay.  This wouldn't be a printout --

20   well, this is dated September 21, 2017, but I'm asking

21   before you went to her office, do you go to the

22   website?

23        A     I always have -- I do the research on the

24   company to make sure what they do, what type of

25   business, and --

1        Q        Did you know --

2        A        -- and where are they located.  I didn't

3   remember seeing this one.

4        Q        This was on the website then and it's on

5   the website, I believe, even now.  Did you know that?

6        A        It probably was in the -- in the -- the

7   application, but by that point I was not -- once I get

8   an allegation, I'm not assuming the allegation is true,

9   so when I get the allegation, I have to gather some

10  facts.  I go into the company -- to the company.  I

11  talk to the employer or to the owner of the

12  establishment or whoever is in -- representing the

13  employer, and then that's where I gather information.

14  When I do my interviews, I ask questions and --

15       Q        Can I stop you?  Because you've answered

16  that.  I don't need you to tell me that again, and I

17  don't want to keep you too late.

18       A        I'm just on where did I get this from.

19       Q        Yeah.  But --

20       A        I don't remember seeing it at this time.

21       Q        Okay.  That's fine.  So what about this

22  document specifically, like point to words somewhere on

23  this page -- any of the three pages.  What about this

24  specifically caused you to lean towards employee as

25  opposed to independent contractors?  Just point out

1   really quickly, this, this, this or maybe it's only one

2   thing.

3        A      No.  I didn't -- this is just a tool that

4   confirms that she's having these individuals.  That's

5   it.  But this is not a document that tells you about

6   the economic realities.  You know, this is not included

7   with the economic realities.

8        Q      Well --

9        A      It is just an application for a job.

10  These individuals, like I say before, they just

11  candidate.  They're not employees.

12       Q      Okay.  I understand that.  In fact, I

13  agree with you on that, but my -- earlier I asked did

14  this document have any weight and you said, yes, it had

15  some weight.

16       A      It has some weight, but it's a very light

17  weight.

18       Q      Very light weight?

19       A      Very light weight.  It's not a point to

20  determine that this person is an employee.

21       Q      Is -- is everything that you told me just

22  in the last two minutes, is that -- did you explain to

23  me all of whatever that weight is?

24       A      Yes.  Yes, I did.

25       Q      Is there anything else?

```
 1        A       Uh-uh.

 2                MR. DAVIS:  Okay.  Okay.

 3                Mark this as 14.

 4                (Marked in evidence as Alvaro Exhibit

 5        Number 14.)

 6

 7   BY MR. DAVIS:

 8        Q       Is this a document that you reviewed as

 9   part of your investigation?

10        A       Uh-huh.  Yes.

11        Q       Did this document have any weight towards

12   independent contractor or employee?

13        A       No.

14        Q       No weight?

15        A       This is about HIPAA.

16                MR. DAVIS:  Okay.

17                Would you mark this as Exhibit 15?

18                (Marked in evidence as Alvaro Exhibit

19        Number 15.)

20

21   BY MR. DAVIS:

22        Q       This is something that was attached to

23   your investigative files.  I don't know what this is.

24   Can you tell me what this is?

25        A       This is information that Lisa Pitts give
```

1   me.

2        Q        Who are these people?

3        A        Employees.

4        Q        Okay.  Why did she -- who were -- why did

5   she give you this list?

6        A        Because I asked her to give me information

7   of some employees, the employees' address.  This is the

8   only piece of employees' address that I got.

9        Q        Okay.  Did you interview any of these

10  people?

11               MS. AMIN:  Objection.  Informant's

12       privilege.  I'll instruct the deponent not to

13       answer based on my invocation of the privilege.

14               MR. DAVIS:  Okay.

15

16  BY MR. DAVIS:

17       Q        Who crossed out these names?

18       A        I didn't.  She did.

19       Q        Lisa crossed them out?

20       A        Yes.

21       Q        Okay.  Is the -- on the left hand side

22  there's an asterisk in front of Brockman.  Is that your

23  asterisk?

24       A        No.

25               MR. DAVIS:  We'll mark this as 16.

1                   (Marked in evidence as Alvaro Exhibit

2          Number 16.)

3

4    BY MR. DAVIS:

5          Q      This document has been marked as Exhibit

6    16.  It was part of your packet.  Can you tell us what

7    this is?

8          A      This is some employees' addresses.  This

9    is another thing that she give me.  I forgot about this

10   one.

11         Q      Okay.  On the -- I see a bunch of

12   checkmarks.  Who had made these checkmarks?

13         A      I think I did the checkmarks.  When you

14   call -- start calling people, they answer --

15              MS. AMIN:  I'm going to object based on

16         the informant's privilege and instruct the

17         defendant not to answer to the extent that

18         checkmarks reveal the identity of individuals that

19         were interviewed.

20              MR. DAVIS:  I mean, he checked them.

21              MS. AMIN:  Your question is, Did you check

22         them because you spoke to them and took

23         interviews?  That's informant's privilege, and I'm

24         instructing him not to answer.

25

Masucci - Davis                                    262

 1   BY MR. DAVIS:

 2        Q      What is this that says, Get address plus?

 3   Is that your handwriting?

 4        A      No.

 5        Q      That's Lisa's you think?

 6        A      Yes.  That's not my handwriting.  That's

 7   too -- that's too nice handwriting.

 8        Q      Got it.

 9        A      It might have been Lisa, but it could have

10   been Sharon Jones, I believe.

11        Q      Okay.  If you turn to the second page --

12        A      Yeah.

13        Q      -- do you see -- do you see this blacked

14   out part on the bottom left?  Do you know why that's

15   blacked out?

16        A      Nope.

17              MR. DAVIS:  Do you know why that's blacked

18        out?

19              MS. AMIN:  I'd have to look at the

20        original.

21              MR. DAVIS:  There's -- there's no

22        indication in your privilege log of anything

23        regarding this document.

24              MS. AMIN:  I'd have to look at the

25        original.

**JA1481**

Maldia - Davis                                     263

1           MR. DAVIS:  Well --

2      A     I never blacked anything.

3           MS. AMIN:  And those redactions would have

4      been obviously by the investigator -- redactions

5      would have been done by my office and I'd have to

6      look at the original to determine --

7           MR. DAVIS:  Would you make a note and get

8      back to me as to -- because it's not in the

9      privilege log.  If you could look right now real

10     quick, that would be great.

11          THE WITNESS:  I think this might have been

12     blocked by the employer, Lisa Pitts.

13          MR. DAVIS:  Okay.

14          THE WITNESS:  Because, I mean, there's no

15     reason for her to block these and not block the

16     name.

17          MS. AMIN:  I mean, do you want to continue

18     with your questioning and then --

19          MR. DAVIS:  Do you mind if -- can we go

20     simultaneously?

21          MS. AMIN:  Sure.

22          MR. DAVIS:  All right.  We'll pause this.

23          We'll mark this as Exhibit 17.

24          (Marked in evidence as Alvaro Exhibit

25     Number 17.)

Fiduciary Reporting, Inc.
(757) 482-2729

**JA1482**

1   BY MR. DAVIS:

2        Q        This is a settlement in lieu of

3   litigation.  Is this a document you drafted?

4        A        Yes.  I believe so.

5        Q        Okay.  Is this -- did you -- is this

6   something you presented to Ms. Pitts at that second

7   meeting?

8        A        I had it in my hand.

9        Q        Okay.  Did you ever give it to her?

10       A        No.  Because I was told, Talk to my

11  lawyer.

12       Q        Okay.  So you never gave this to

13  Ms. Pitts?

14       A        I have never had a chance to -- to talk to

15  Ms. Lisa Pitts about this.

16       Q        Okay.

17       A        She just like, Talk to my lawyer.

18       Q        Got it.

19       A        And then when I talked to her lawyer, he

20  didn't want to sit in there.

21       Q        So you never actually gave this to her

22  lawyer either?

23       A        But I tried to, but they were not

24  interested.

25       Q        Okay.  Got it.  Okay.  No problem.

Masouca - Davis                              265

1        A       It's something that we use for the final

2    conference when we can settle, you know.

3        Q       I understood.

4                MS. AMIN:  So just going back to Exhibit

5        16.

6                MR. DAVIS:  Yeah.

7                MS. AMIN:  DOL-211.

8                MR. DAVIS:  Yes.

9                MS. AMIN:  It looks like -- I don't have

10       the version that I redacted in front of me.  I

11       have the original, but it looks like something

12       based on how those boxes appear that I would have

13       redacted.  The top right hand corner of DOL211 --

14               MR. DAVIS:  Yes.

15               MS. AMIN:  -- the basis would be

16       informant's privilege.  The bottom left hand

17       corner of DOL212, also informant's privilege.

18               The boxes that appear within the charts

19       were already redacted.  Those were not my

20       redactions.

21               MR. DAVIS:  Well, help me understand.

22       Obviously I'm not trying to get into the issue

23       that we got into with the court, but --

24               MS. AMIN:  So let me -- let me -- so if I

25       see handwriting and I have reasons to believe it

```
 1          is the investigator's notations for some reason, I
 2          would redact based on that privilege, but to the
 3          extent that this is -- the investigator's
 4          confirmed it is not his handwriting, that he
 5          believes it is either Ms. Pitts or someone else in
 6          the office, I would waive that privilege because
 7          now it is clear that it is not someone from Wage
 8          and Hour, I.E., my investigator, who has made a
 9          notation.
10              So I can send you the original -- well,
11          the un-redacted portions of those two pages.
12              MR. DAVIS:  Do you have it there or are
13          you saying you don't have it?
14              MS. AMIN:  I do.  I do.
15              MR. DAVIS:  What does it say in the top
16          right?
17              MS. AMIN:  So it says, Get address
18          Chantelle something.  Chantelle -- I believe it's
19          also the person's last name, so it's the name of
20          an employee.
21              MR. DAVIS:  Okay.  And then on the second
22          page?
23              MS. AMIN:  Same thing.  It is the
24          individual's first name, Chantelle.  I can't read
25          what's next to it, but I'm presuming that's her
```

1        last name.

2              MR. DAVIS:  Okay.  And then what's on the

3        third page?  Are those just boxes that I just

4        can't read?

5              MS. AMIN:  Those are not my -- the

6        remaining boxes are not my redactions.  That's the

7        formatting in which we received this document.

8              MR. DAVIS:  So is there anything left

9        that's informant's privilege redacted on this?

10              MS. AMIN:  No.  The only thing that I

11        redacted are on Page DOL2011 and DOL212.  The

12        remaining boxes are not mind.

13              MR. DAVIS:  So you'll send me un-redacted

14        of this?

15              MS. AMIN:  Uh-huh.

16              MR. DAVIS:  You got a note on that?

17              MS. AMIN:  Yes.

18              MR. DAVIS:  Thanks.  All right.  Well,

19        that was easy.

20              MS. AMIN:  Uh-huh.

21              (Marked in evidence as Alvaro Exhibit

22        Number 18.)

23

24   BY MR. DAVIS:

25        Q    All right.  Exhibit 18.  This was in your

Mazama - Davis                          268

1    report.  Did this document have any impact in your

2    determination of independent contractor or employee?

3         A       This was in my report?

4         Q       It was.  Well, yeah.

5         A       No.  I didn't receive any -- it would

6    be --

7         Q       It was in the pile.  It was -- yeah.

8         A       If you see my reports, they all have

9    exhibits.

10        Q       You're right.  It was in the -- it was in

11   the production, so --

12        A       It's not mine.  No.

13        Q       Well, looking at this, does this have any

14   impact going towards independent contractor versus

15   employee?

16        A       I won't be able to answer because this the

17   first time I seen it.

18        Q       It's not long.  Just read it.  I'll wait.

19        A       Steadfast Medical Staffing Memo of the

20   Week.  Office Number.  If you need to reach Lisa,

21   please.  You can contact her twenty-four hours day,

22   seven days a week.  Okay.  Yeah.  It shows that she's

23   the HR, you know, when they show up on time for all the

24   shift.  If they have any problems they have to call

25   Lisa Pitts.  That's what it says in here, and it tells

**JA1487**

1   you to fax all time sheets -- you know, all time sheets

2   before -- must be submitted before Monday, 12:00 p.m.

3   This is something that is from Lisa Pitts so --

4        Q       So in your view this -- this document

5   supports the position that the Schedule A workers are

6   employees?

7        A       Part of it.  Yes.  Uh-huh.

8        Q       Because -- is it because it talks about

9   time sheets?

10       A       Well, not necessarily.  It -- it's like,

11  I'm the supervisor. Let me know when you get there.

12  Let me know when you leave. Let me know if you need to

13  go. Let me know if you can't show up for work.  It's a

14  twenty-four hour open line, and then she's like a --

15  a -- timekeeping for everybody, so -- and plus she says

16  she's the CEO of the company.  That makes her to be in

17  control.  I probably would include this in my file if

18  I'd seen it.

19              MR. DAVIS:  Okay.  I only brought one of

20         this.  Let's make this -- I don't have a copy.

21              MS. AMIN:  That's fine.  We can share.

22              MR. DAVIS:  It has initiating information

23         here, and then every other page is blacked out.

24         There's no exceptions.  Every page.  I believe

25         that this one is --

1               MS. AMIN:  What's the Bates stamp number?

2               MR. DAVIS:  250 and 252.  It's blacked out

3          for informant's privilege and deliberative process

4          privilege.

5

6    BY MR. DAVIS:

7          Q     I'm going to show you this document.

8          A     Uh-huh.

9          Q     Are you familiar with this document?

10         A     Yes, I do.

11         Q     What is it?

12         A     This is the case file -- the second part

13   of the case file where the information about the

14   complainant, the communication that was submitted by

15   the complaint.  That's it.  All the information that

16   was submitted by the complainant.

17         Q     By the who?

18         A     Complainant.

19         Q     By the complaining?

20         A     Yes.

21              MS. AMIN:  Complainant.

22

23   BY MR. DAVIS:

24         Q     The complainant?

25         A     Yeah.  Complainant.  Yeah.

Mazzola - Davis                                271

```
1        Q       So all of these blacked out pages,
2    they're -- it's information from the individual who --
3        A       I'm assuming it is.  Yes.
4                MR. DAVIS:  Okay.  So could you tell me
5        why the information from the complaining
6        individual's all blacked out as informant's
7        privilege even though -- I mean, why would you
8        block out the content about what they had to say?
9                MS. AMIN:  I think that those are
10       copies -- can you just look at the Bates stamps on
11       some of those?
12               THE WITNESS:  Pay stubs.
13               MS. AMIN:  Pay stubs.  Great.
14               MR. DAVIS:  So why is not just the
15       identifiers blacked out?
16               MS. AMIN:  So pay stubs are redacted
17       because the case file does not include pay stubs
18       for each Schedule A employee or each affected
19       worker, so to the extent that we produce pay
20       stubs, it will indicate who the complainant in
21       this case may be.
22               MR. DAVIS:  I know.  But you could black
23       out the name and the amount.
24               MS. AMIN:  Amounts could be correlated to
25       payroll records.
```

Fiduciary Reporting, Inc.
(757) 482-2729

**JA1490**

```
1              MR. DAVIS:  I said you could black out the
2         name and the amount.
3              MS. AMIN:  At the end of the day when
4         we're making redactions, and you know this, you
5         make a judgement call.  If ninety-eight percent of
6         something is informant's privilege, I might go
7         ahead and just redact the entire pay stub.  If the
8         only thing left might be the name of, you know,
9         Steadfast, for example, but --
10             MR. DAVIS:  Yeah.  But what about these
11        whole pages?  They're all just black.  What's
12        that?
13             MS. AMIN:  258.  That also relates to the
14        complainant.
15             MR. DAVIS:  Is it just their name over and
16        over again?  My name is, my name is?
17             THE WITNESS:  Yeah.  This -- this -- no.
18        This is information -- I'm sorry to interrupt you,
19        but --
20             MS. AMIN:  Yeah.  So let me answer the
21        question just because it relates to a sensitive
22        issue.  It is information that relates to who the
23        complainant is and the intake of that complaint.
24             MR. DAVIS:  The whole page?
25             MS. AMIN:  Yes.
```

1           MR. DAVIS:  I'm just --

2           MS. AMIN:  The name of the title of the

3    page I think is in my privilege log, the WHISARD

4    complainant information form.

5           MR. DAVIS:  In your privilege log it says,

6    Letters to employee.

7           MS. AMIN:  Are you looking at 258?

8           MR. DAVIS:  Yeah.  Let's see.  I was

9    looking at 257.

10          MS. AMIN:  Okay.  257 is a letter to -- to

11   the complainant.

12          MR. DAVIS:  So --

13          MS. AMIN:  258 is the WHISARD complainant

14   information form.

15          MR. DAVIS:  So how -- how can a letter to

16   the complainant be all -- I mean, the name and

17   address I see what you're saying.  I don't agree

18   with it, but I see what you're saying, but how is

19   the content of the letter subject to informant's

20   privilege?

21          MS. AMIN:  So we take the position in

22   discovery initially that we may protect the manner

23   in which a violation comes to the department, that

24   that could be considered deliberative, so to the

25   extent that it's complaint driven versus an

Mald-cla - Davis                                              274

```
 1            initiative that the department has and how they
 2            decide which industries they want to pursue for
 3            whatever reason, there is initiatives that the
 4            agency has.
 5                 We take the position in discovery
 6            typically that that information is going to be
 7            protected by deliberative process privilege.  I
 8            have allowed him to answer that question to the
 9            extent that you've asked, you know, How did this
10            come to the agency's attention?  Through a
11            complaint.  Beyond that, that's going to be
12            informant's privilege.
13                 MR. DAVIS:  Let's just mark this Exhibit
14            19.
15                 (Marked in evidence as Alvaro Exhibit
16            Number 19.)
17
18  BY MR. DAVIS:
19       Q    I'm going to ask you to identify the
20  information contained in here that's been blacked out
21  to the extent it doesn't contain the name of the
22  informant and -- and/or to the extent it contains
23  information from any of the four individuals or
24  actually -- yeah.  I think it's four -- that are no
25  longer working with Steadfast.
```

Masooda - Davis                                     275

1              MS. AMIN:  So to the extent that you've

2         been asked to identify information that pertains

3         to the four individuals, I'm invoking informant's

4         privilege.

5              MR. DAVIS:  And then --

6              MS. AMIN:  I'm instructing him not to

7         answer.

8              MR. DAVIS:  Thank you.  And just for

9         purposes of the record, I'm going to ask you, can

10        you get this back to me and just --

11             MS. AMIN:  I'll take a look at it.  I

12        mean, that's what I agreed to do last week.  I

13        mean, you guys got discovery out --

14             MR. DAVIS:  I know, but we haven't gotten

15        it though.

16             MS. AMIN:  Well, let's just be -- let's be

17        clear and let's keep this on the record.  Prior

18        counsel got discovery out last month, so I'm --

19        you issued a deficiency letter or brought points

20        of concern to me Monday or maybe at some point

21        last week.  Now we're at deposition about a week

22        later with no specificity.  I think I got the

23        letter on Monday, so I have agreed to look at my

24        redactions and to amend -- I've already agreed to

25        amend the privilege log to the extent that it

```
1          provides more information as to the basis of the
2          privileges.  While I noted that that might not be
3          the best use of the parties' time, I agreed to
4          look at the -- at the redactions, so we're still
5          in the process of the Meet and Confer.
6               Unfortunately, your client has put us in a
7          position where now discovery is closing on Monday
8          and, you know, a few days before discovery closes
9          you're --
10              MR. DAVIS:  How --
11              MS. AMIN:  -- interviewing or you're
12         deposing the key witness.
13              MR. DAVIS:  How have I put you in a
14         position?  I haven't put you in any position.
15              MS. AMIN:  Well, your client has let go of
16         her prior counsel.  They did not issue -- we
17         issued discovery back in September, you know,
18         knowing that this is EDVA that moves quickly.
19         Your client -- prior counsel for your client
20         issued discovery in January, so this is why -- why
21         we're here.  We're not able to resolve this, and
22         you're attempting to try to resolve it on the fly
23         in a deposition where normally this would have
24         been cleared up prior to deposition, so that's
25         why --
```

1          MR. DAVIS:  But I called you two weeks

2    ago.

3          MS. AMIN:  -- we're here.

4          MR. DAVIS:  That's why I called you two

5    weeks ago to resolve it.

6          MS. AMIN:  With vague -- vague statements

7    as to objections, and you get into more detail

8    just recently with respect to the privileges, so

9    with a 300 page case file -- in excess of 300

10   pages, you're asking me to amend in the Meet and

11   Confer and you're putting a limited time

12   constraint --

13         MR. DAVIS:  You -- you shouldn't have

14   redacted page after page, black, black, black.

15   This is not good faith.  This is ridiculous.

16         MS. AMIN:  It is good faith.  We have --

17   we have a basis for each of the privileges that

18   we've invoked to the extent -- like the

19   handwriting that's been clarified, that is going

20   to be produced obviously because he has confirmed

21   that that's not his handwriting.  That is probably

22   Ms. Pitts or someone else in the company.  We're

23   only here because defendants have cut it so close

24   to the close of discovery to issue discovery and

25   to depose Mr. Mazuera.

1             MR. DAVIS:  Can you mark this as 20?  I

2       only have one copy.  We'll look at it together.

3             (Marked in evidence as Alvaro Exhibit

4       Number 20.)

5

6  BY MR. DAVIS:

7       Q     This is a document that has -- the

8  entirety has been blacked out with basically no

9  exceptions based on, in part, informant's privilege.

10  I'm going to ask you to tell me to the extent there's

11  information in this document that is discussing any

12  content that does not include the informant and to

13  discuss with me any information that is -- was

14  otherwise protected by the informant's privilege but

15  pursuant to the court's ruling is a discussion now

16  regarding the four individuals who are no longer

17  working with Steadfast, I'm going to ask you to tell me

18  what that information is and provide it to me and

19  discuss it with me.

20             MS. AMIN:  Objection.  Informant's

21       privilege.  I'm instructing the witness not to

22       answer based on the privilege.

23             MR. DAVIS:  All right.

24             MS. AMIN:  To the extent it invokes the

25       informant's privilege.

Fiduciary Reporting, Inc.
(757) 482-2729

**JA1497**

```
 1                    MR. DAVIS:  All right.  We'll mark this
 2          as -- what are we at?  20?
 3                    THE COURT REPORTER:  21.
 4                    MR. DAVIS:  All right.
 5                    (Marked in evidence as Alvaro Exhibit
 6          Number 21.)
 7
 8   BY MR. DAVIS:
 9          Q     All right.  Can you tell me what this
10   document is in Exhibit C?
11          A     Information about the employer.
12          Q     Okay.  Is this something you put together?
13          A     I -- I put the information on the system
14   and it creates these documents.
15          Q     Okay.  Very good.  If you turn in to Page
16   2 -- right -- just Page 2.  This is DOL144.  This one
17   right here.
18          A     Okay.
19          Q     The second page.
20          A     Uh-huh.
21          Q     It says Nature of Business.  Do you see
22   that?
23          A     Uh-huh.
24          Q     Who -- it's a medical staffing agency.
25   Where did you come up with that description, agency?
```

**JA1498**

Martia - Davis                                                    280

```
 1        A        That comes automatically on -- on the

 2   system.  When you -- when you looking for a -- a --

 3   well, no.  Medical staffing agency, I put this

 4   information in.  I got it from Lisa Pitts.

 5        Q        You --

 6        A        She's a medical staffing agency.  That's

 7   what she told me.

 8        Q        Okay.

 9        A        Medical Staffing Agency of America.

10        Q        All right.  If you turn one more page in,

11   it's -- it has a date on the top left, June the 9th,

12   2017.

13        A        The next one?

14        Q        Yeah.  Right here.  Do you see that?

15        A        Uh-huh.

16        Q        Okay.  Is this the date that you met with

17   Lisa the first time?

18        A        The initial conference.  Yes.

19        Q        Okay.  And I noticed that you use -- it

20   appears to use -- well, let me ask.  Would this -- that

21   day you met with Lisa twice, right?  You met with her

22   and then you left and you met with her again?

23        A        I didn't leave.

24        Q        Well --

25        A        I stayed in the place.  In the office.
```

Mascera - Davis                                281

```
 1        Q       -- but you -- you had two --
 2        A       I never moved from the office.  She moved
 3   out of the office.  She came back.
 4        Q       Okay.
 5        A       So I didn't leave.
 6        Q       Gotcha.
 7        A       I didn't leave.
 8        Q       But you had two separate meetings with
 9   Lisa, right?
10        A       Yes.
11        Q       Okay.  Thank you.  Would this have been
12   taken during the first meeting with Lisa?
13        A       Correct.
14        Q       Okay.  And at that first meeting with
15   Lisa, had you already determined that the Schedule A
16   individuals were employees?
17        A       No.
18        Q       Do you use this abbreviation EE to refer
19   to employee?
20        A       Yes.
21        Q       Okay.  So it says, Business nature, and
22   then it -- do you see where it says, Staffing company
23   provides EE to hospitals, group homes, assisted living,
24   and nursing homes?  Do you see that?
25        A       Uh-huh.  Uh-huh.
```

Masuda - Davis                                          282

     1        Q        Okay.  Why did you write EEs if you hadn't
     2   made the decision?
     3        A        That's normal way, you know, when you go
     4   into a business to call them employees or workers.  You
     5   don't call independent contractors.  You know, I'm
     6   walk -- I'm walking into a business and I ask -- I ask,
     7   How many employees do you have?  What type of employees
     8   do you have?  Then she tell me.  I write that based on
     9   the information that Lisa Pitts tell me.  I don't
    10   assume that they're employees.  You know, I ask the
    11   question, How many employees do you have?  She says,
    12   100 plus.  How many employees are working in the
    13   office?  Five.  That's what she says.
    14        Q        Are you sure she said, I have employees,
    15   and she didn't say independent contractors?
    16        A        When I ask her, yes, I wrote it down.
    17   Everything that I write in here is -- is coming from
    18   her.  This is the questions that I ask her.  What's the
    19   nature of your business?  If she says, Staffing
    20   company, I write staffing company and provides
    21   employees to hospitals, group homes, assisted living.
    22   She never says she provides independent contractors to
    23   hospitals.
    24        Q        You're sure she used the word employee,
    25   not just you?

1        A       I'm sure she did.

2        Q       Okay.  All right.  Let's turn to the next

3   page.  On this page -- these are all your notes, right?

4        A       Uh-huh.

5        Q       All the way at the bottom, that last

6   paragraph, do you see that?  The last paragraph?

7        A       Yes.

8        Q       If an independent contractor works more

9   than or -- what does that say?  More than --

10       A       Forty hours.

11       Q       -- forty hours, Ms. Pitts said that she

12  does not pay them the additional half time required by

13  law to regular employees.

14       A       That's what she says.  Yes.

15       Q       Okay.  Where does the independent

16  contractor word come from?

17       A       She came from her -- it came from her.

18  Yeah.

19       Q       So -- so she described them as

20  independent --

21       A       Everything that I write in here is what

22  I'm listen -- what I listen to from the employer.

23       Q       Okay.

24       A       So everything from employer.  She might

25  say that it's not true, but it would be her word

1   against my word.

2        Q        Okay.

3        A        But this is the information that we

4   collect from the employer on the initial conference.

5        Q        Okay.  What -- of anything in these notes,

6   is there anything here that she said that helped you

7   come to the conclusion that the individuals were

8   employees?

9        A        No.

10       Q        Nothing in here?

11       A        No.

12       Q        Okay.  The thing that took you over the

13  edge or made you go that way was when you did the

14  interviews after that first meeting, right?

15       A        Uh-huh.  Uh-huh.

16       Q        Okay.

17       A        The interviews, the payrolls.  It's

18  several things.  You know, it's just not the interviews

19  because I could claim in an interview to be God, but

20  I'm not.

21       Q        Yeah.  Sure.

22       A        Yeah.

23       Q        And during the interview you

24  interviewed -- I just want to make sure I'm remembering

25  this right because it was a little fuzzy as I thought

1    about it.  You interviewed office workers and you also

2    interviewed at least one individual that you believe

3    may have been both an office worker and a nurse?  Is

4    that what you said?

5              MS. AMIN:  You can answer.

6         A    Yes.

7              MR. DAVIS:  Okay.

8              (Marked in evidence as Alvaro Exhibit

9         Number 22.)

10

11   BY MR. DAVIS:

12        Q    Have you seen this document before?

13        A    Yeah.  We just look at it.

14        Q    Yes.  We did.  We did.  Yeah.  Well,

15   not -- you and I didn't.

16        A    I think we saw this one.  Well, not with

17   you.  With the other.

18        Q    Yeah.  Yeah.  Yeah.  You and I --

19        A    She have so many lawyers.  They come and

20   go.

21        Q    Okay.  Did you -- did this document play

22   any role in your determination as to whether the

23   individuals were independent contractors or employees?

24        A    There was a part in here where it really

25   caught my attention.

```
 1        Q        Okay.

 2        A        Contractor agrees that during the term of

 3   the agreement --

 4        Q        Wait.  Where -- where are you reading

 5   from?

 6        A        Number 8.

 7        Q        Okay.

 8        A        DOL156.

 9        Q        Yep.

10        A        Commencing from the first day of the

11   contractor's engagement by company and continuing from

12   the period of twelve months --

13             MS. AMIN:  Can I stop you one second?

14             THE WITNESS:  Okay.

15             MS. AMIN:  You're -- you're talking really

16         fast and she's --

17             THE WITNESS:  I'm sorry.

18        A        Well, the last part of this paragraph it

19   says, The contractor -- contractor will not enter, be

20   engaged in, or be interested in any capacity in any

21   business or -- or undertaking which competes with --

22   with that of company.  It means that -- what she's

23   trying to say is that if -- if the person -- if you --

24   once you enter into agreement with this company, this

25   contractor will not enter, be engaged with somebody
```

**JA1505**

1    else.  The independent contractor, that's who she's

2    talking about.

3              Contractor agrees that during the term of

4    agreement and twelve months thereafter, contractor will

5    not enter, be engaged in, or be interested in any

6    capacity whatsoever directly or indirectly in any

7    business or undertaking which competes with that of the

8    company.  That's like me telling like a painter -- I'll

9    go back to the painting company -- you cannot have

10   business with anybody for this period of time

11   basically.

12

13   BY MR. DAVIS:

14        Q      Okay.

15        A      That's restricting somebody -- that's

16   killing someone's ability to make money because this

17   person cannot go and work for somebody else.

18        Q      Did you feel that Paragraph 8 favored in

19   terms of the Exhibit A people being employees instead

20   of independent contractors?

21        A      I believe so.

22        Q      Okay.  Was there anything other than

23   Paragraph 8 that caused you to make that determination?

24        A      I can't remember right now, so --

25        Q      Well, I need to know.

```
 1        A       There's something else in here --

 2        Q       Just take a look.

 3        A       -- but I can't --

 4        Q       Sure.  Sure.  Just take a minute and then

 5   see if there's something else.

 6        A       No.  I can't recall anything else.  My

 7   stomach's winning.

 8        Q       Okay.  But -- but to be clear then, the

 9   only thing in here that you felt favored them being --

10        A       As I remember, that would be one of them.

11   Yeah.  I can't remember the other ones, but -- because

12   I read this but I can't remember right now.

13        Q       Well, but this is important.  I'm sorry,

14   but I need to know, so if there's something else, I

15   need to know what else.

16        A       Okay.

17               MR. DAVIS:  Off the record while he's

18        reading.

19               (A discussion was held off the record.)

20               MR. DAVIS:  All right.  Are you ready to

21        go back on the record?

22               THE WITNESS:  Yeah.

23

24   BY MR. DAVIS:

25        Q       All right.  Anything else?
```

1        A        I don't see anything else.  No.

2                 MR. DAVIS:  Okay.  Very good.

3                 (Marked in evidence as Alvaro Exhibit

4        Number 23.)

5

6    BY MR. DAVIS:

7        Q        This is a document, 23, that we or that

8    you included as a part of your packet.  It looks like

9    this is the initial letter that you sent Ms. Pitts?

10       A        Yeah.  This is the appointment letter.

11       Q        Okay.  I noticed that in this letter you

12   multiple times say that you want to schedule an

13   interview so that you can interview and you want a list

14   of, quote, employees.  Why -- why did you choose to use

15   the word employees and not workers or independent

16   contractors?

17       A        Because at this point I didn't know.  We

18   don't know what's there, you know, so employees -- the

19   complainant -- you know, the complainant says that he

20   was an employee, so we assuming they all employees.  I

21   cannot send a -- a letter where I say, I need the

22   information of all your independent contractors.

23       Q        Why couldn't you say that?

24       A        Well, I could say that, but it's an

25   agency -- medical staffing agency.  I have staffing

Mastena - Davis                                    290

1   agencies, and they all employees so I never heard about

2   independent contractors in a staffing agency, so --

3          Q      Got it.  So at the time you sent the

4   letter, you were already assuming they were probably

5   employees?

6          A      No.  I was not assuming.  It's just a

7   technical term that we use.

8          Q      Yeah.  A -- it's a technical term?

9          A      Yeah.  She could correct me when I get

10  there.

11         Q      Yeah.

12         A      She can say, No, I don't have any

13  employees.  I have independent contractors, but --

14         Q      How is employee a technical term?  What's

15  technical about it?

16         A      Well, not technical, but that's a word

17  that we normally use when we expressing to -- to --

18  towards a business.  You know, how many employers do

19  you have?

20         Q      So when you say employee, you mean

21  employee or independent contractor?

22         A      It could be that.  Yeah.  But I didn't

23  include only independent contractor, you know.  If

24  the -- the employer corrects me when I get there, then

25  I would say, Okay, you call them independent

 1   contractors.  You know, it's a term that we use,

 2   employee, independent contractors, you know.  Who's an

 3   employee?  Who's an independent contractor?  At this

 4   point I don't know who is what, so I just ask for

 5   information about current employment, employees, during

 6   the past two years.  I assuming they all employees.  I

 7   don't know if they're independent contractors or not,

 8   so it's -- it's just a word that we use, but it doesn't

 9   mean nothing to make a decision.  It doesn't determine

10   anything.  It's like me using the word federal employer

11   identification number.  I should call federal

12   contractor identification number?  There is nothing

13   that says so, you know.

14              MR. DAVIS:  All right.  Well, I think

15         we're finishing up.  The only thing that I need to

16         do is we never talked about the first three

17         documents, so I need to go over those.  Let's

18         start with Exhibit 2 -- well, 3.  You know, let's

19         start with Exhibit 2.

20

21   BY MR. DAVIS:

22         Q     Did -- when you spoke to the nurses in

23   your interviews, did you ever explain to any of the

24   nurses the difference between an employee and an

25   independent contractor?

Maseda - Davis                                          292

```
 1        A        Did I explain?  No, I didn't.  I didn't
 2  explain that.
 3        Q        Did they ever ask you, What's the
 4  difference?
 5        A        No.  I just ask questions and they answer
 6  the questions.
 7        Q        Did -- is -- did they ever -- did the
 8  nurses ever use the word control?
 9        A        No.  We ask the questions to the employee.
10        Q        Like, for example -- I'll just show you.
11  This is DOL130.  Like here you say, Ms. Pitts never had
12  any situation where I have to be counseled.  Do you
13  know what that means?
14        A        Counseling.  Yeah.  Counseling.
15        Q        Like -- oh, like therapy counseling?
16        A        No.  When you -- you -- I give you a
17  counseling sheet because you misbehave, something like
18  that, that's what she's talking about.
19        Q        Oh, she's, Never had any situation where I
20  have to be counseled.  Okay.
21        A        Yeah.  I ask her, Do you -- have you ever
22  been counseled by Ms. Pitts for not doing your job?
23        Q        Like disciplined?
24        A        Disciplined, yeah, for not showing up on
25  time, you know.
```

1          Q          Okay.

2          A          For having a discrepancy at the job and --

3    and --

4          Q          She says no?

5          A          No.  I guess not.

6          Q          All I know is that Ms. Pitts have control

7    over how I was doing my job.  Would she have used that

8    word or that was your word?

9          A          Yes, she did.  Everything that -- well,

10   this -- when I ask them, I'm writing down what they

11   tell me on the phone.

12         Q          Okay.  How -- how did it come to be that

13   people would sign these documents?  Would they -- would

14   you mail it to them and have them sign it and send it

15   back?

16         A          Yes.  Once I finish the interview, I tell

17   them I'm going to mail you this interview --

18         Q          Okay.

19         A          -- and please read it.  If you agree with

20   what I saying here, will you send it to me?  Sign it.

21   Some of them refuse to sign the paper because they

22   don't want to be, I guess, afraid of -- you know,

23   because these are jobs that they have --

24         Q          Uh-huh.  Okay.

25         A          -- and they don't want to lose their job.

1   They don't want to be blackballed by employees --

2   employers.  You know, it's -- it's an industry where

3   you don't have that many places to go.

4              MR. DAVIS:  Okay.  All right.  In the

5         interest of time -- I'm assuming we're in

6         agreement on this, but -- well, we're probably not

7         actually.  I should probably just go through this.

8

9   BY MR. DAVIS:

10       Q      This -- this individual, she says --

11  whoever it was.  I'm saying she.  I don't know if it

12  was a she, but it says, I obtained my license in

13  Virginia, the state Board of Nursing.  I used to work

14  as an independent contractor per the DOD, but when I

15  started worked for Steadfast, the agreement was that I

16  was going to be an employee.  Did you follow up with

17  her to ask her, What do you mean by that?  When she

18  says that, would you ask her questions, What does that

19  mean?

20       A      No.  When I ask them -- I ask them, Have

21  you ever worked as an independent contractor?  That's

22  how she answered.  Yes.  I worked for the Department of

23  Defense as an independent contractor before I start

24  working for Ms. Pitts.

25       Q      But when she says, The agreement was that

1   I was going to be an employee, did you stop her and

2   say, What does that mean?  Explain this?

3        A     No.  I didn't ask that.

4        Q     You just write it down?  That's it?

5        A     I just write it down.  I ask questions.  I

6   write it down.  That's what --

7        Q     But is there a follow-up question that you

8   ask?

9        A     I -- sometimes we do.  You know, Why do

10  you call yourself employee?  But at that point I didn't

11  think there was a need for me to ask -- ask her.

12       Q     So you send out the letters.  It has your

13  phone number on it?

14       A     Uh-huh.

15       Q     And you're in your office here or

16  someplace you're working.  The phone rings.  How does

17  that -- they say -- they ask for you and then you just

18  pull out one of these?

19       A     No.  They didn't ask for me.  I call them.

20       Q     Oh, you call them?

21       A     I -- I -- yes.  I call them.  I interview

22  them over the phone.

23       Q     Your letter that you sent said, Please

24  call me?

25       A     Some of them.  Yes.  Some -- some of those

Masera - Davis                                                296

```
 1   letters, but it was -- it cannot be done because

 2   some -- some individuals answer the phone when I -- I

 3   call them.  You know, I have a list of information in

 4   there.

 5          Q      You do?

 6          A      Yes.  You saw it.  You saw in one of these

 7   exhibits --

 8          Q      Yeah.  I know.

 9          A      -- there's a lot of phone calls on one of

10   them, so I start calling people.  If they answer the

11   phone and says, Hey, I'm from the U.S. Department of

12   Labor --

13          Q      Yeah.

14          A      -- I'm conducting a compliance inspection

15   on this company. Do you have time right now?  Could you

16   give me ten, fifteen minutes to, you know, collect

17   information?  I do an interview.  If they say, Yes, I

18   have time, I say, Okay.  Then I finish -- when I finish

19   the interview I says, I'm going to mail you this

20   interview and if you -- if you don't mind, please sign

21   the interview for me.

22          Q      Okay.

23          A      Some of them did.  Some of them didn't

24   because I guess that they're afraid of -- of, you know,

25   losing their jobs or -- you know, they're read -- the
```

Maseda - Davis                                              297

1  bottom says where we can use this to the maximum

2  extent.

3         Q        Right.

4         A        So some of them, the ones that read that,

5  they don't want to move forward.

6         Q        Ah.

7         A        Because they get afraid of being

8  blackballed by the employer.  It could be -- that

9  person could be working for this individual and they

10  identify that this person is working for this

11  individual and they find out their names, you know,

12  they could get fired.

13         Q        So when -- when you -- when you sent the

14  initial letter to them -- I saw the letter.  The only

15  thing that was blocked off was their address, right?

16  The letter doesn't say on it that their -- that the

17  information they provide to you will be kept

18  confidential.

19         A        No.  When I send the letter --

20         Q        It doesn't say that.

21         A        Okay.  Hold on.  When I send the letter

22  I'm sending the letter for them to call me.

23         Q        I know that.  I know that.

24         A        When I send the letters because I fail to

25  contact them through the phone.

Masuoka - Davis                                      298

```
 1        Q        Got it.  I understand.

 2        A        But I didn't say no confidentiality.

 3        Q        Okay.  I know.  So when you talk to them

 4   on the phone though --

 5        A        I tell them.  Yes.

 6        Q        -- what do you tell them about

 7   confidentiality?

 8        A        I tell them -- oh, I tell them that

 9   anything that you say in this statement will be kept to

10   the maximum extent -- you know, it will be kept

11   confidential to the maximum extent, and they agree with

12   me sometimes.

13             MR. DAVIS:  Okay.  When -- okay.  All

14        right.  I think this is the last document that

15        we'll go through.  I need Number 3, which is this

16        one.  I'll let you.  I don't know how you --

17             THE COURT REPORTER:  I pulled out the

18        first three for you.

19             MR. DAVIS:  Very good.

20

21   BY MR. DAVIS:

22        Q        Can you look at this, please?

23        A        Uh-huh.

24        Q        All right.  Now we're looking at Exhibit

25   3, which is the one that begins with DOL00001.  This is
```

Fiduciary Reporting, Inc.
(757) 482-2729

**JA1517**

1   your compliance action report?

2        A      Yes.

3        Q      This is kind of the primary report that

4   you put together, correct?

5        A      Correct.

6        Q      Okay.  And the -- this -- I guess this

7   third page here, DOL00003, is this kind of the front

8   page of the computer system?

9        A      Yes.

10       Q      Okay.  All right.  On DOL004, what is

11  the -- is this -- is this -- the BW, is that back

12  wages?

13       A      Back wages.

14       Q      And LD is?

15       A      Liquidated damages.

16       Q      Got it.  All right.  Can you go to Number

17  6?  This narrative.  You say that the firm -- go where

18  it says here, The firm serves.  It's right here.  The

19  firm serves as a clearing house.

20       A      Where does it say?

21       Q      The third sentence or the third line.

22  It's the third sentence too.  The firm -- I'm sorry.

23  The firm -- the fourth sentence.  The firm serves as --

24  the fourth line down.  The firm serves as a clearing

25  house by providing personnel according to the skills

1  needed.  Do you see that?

2      A     Yes.

3      Q     What does that mean?  Clearinghouse?

4      A     A clearinghouse is -- I can't recall, but

5  it's -- it's like where people comes in and, you know,

6  they -- they -- they get sent somewhere else, you know.

7      Q     Okay.

8      A     That's -- that's basically what it is, a

9  clearinghouse.

10     Q     Does clearinghouse, does that mean

11 employer?

12     A     Don't know.  It's just a term that we use,

13 but it doesn't say employer.

14     Q     Okay.  You use an acronym, ADV.

15     A     Amount dollar value.

16     Q     What is it?

17     A     Amount dollar value.

18     Q     Amount dollar value?

19     A     The -- the annual dollar value.

20     Q     Okay.

21     A     And that's coming from the taxes.

22           MR. DAVIS:  Okay.  There's a number of

23        pages in here.  I forgot to go through them --

24           MS. AMIN:  All right.

25           MR. DAVIS:  -- for her objection.

1    BY MR. DAVIS:

2         Q        One Page Number 8 at the top there, yeah,

3    it says, The complainant provided the investigator with

4    copies of the employment application.  Do you see that?

5         A        Uh-huh.

6         Q        The employment application that we looked

7    at was blank.  How -- how did the complainant provide

8    you with a blank employment application?  Do you know?

9         A        With employment applications.  You know,

10   the application.

11        Q        Yeah.

12        A        Just the blank application.

13        Q        How -- but do you know how the complainant

14   had a blank one?  I mean, it didn't have her

15   information on it.

16        A        I never asked, you know, why -- where did

17   she get it from.

18        Q        Okay.

19        A        I mean, she provided me with that.  That's

20   what I put in the case file.

21        Q        Did you ever verify that was one actually

22   used by --

23        A        Yes, I did.

24        Q        How did you verify it?

25        A        Well, when we -- if it's an application, I

Maseeba - Davis                                    302

1  normally ask where did she get it from.  I think it was

2  an e-mail where it was provided to her by someone else,

3  so she forwarded it to me.  I can't remember exactly

4  how I got it.

5       Q     What did you do to verify that that was,

6  in fact, an application for the -- the Medical Staffing

7  of America?

8       A     I can't recall what -- what did I do with

9  that employment application.  Maybe that employment

10  application has the name of Steadfast so I didn't

11  verify because it have Steadfast already in it, so why

12  should I need to verify something that is -- has the

13  Steadfast name on it?

14       Q     Do people ever falsify a document in your

15  experience?

16       A     Yeah.  People falsify, but it's really

17  hard to falsify a template.

18       Q     Okay.

19       A     You can tell.

20       Q     Okay.  All right.  If you go to Number --

21  Page Number 9.

22       A     Page Number 9.

23       Q     I think you're going too far.  Number 9.

24  You're too far.

25       A     Oh, Number 9.  I thought it was my 9.

1   Okay.

2        Q      Look at that.  You turned right to it.

3   All right.  Right here.  Let's see.  It's three lines

4   down or, let's see, four lines.  The fifth line down,

5   The employer also failed.  Do you see that?  The

6   employer also failed to combine hours for one employee.

7   Do you see that?

8        A      Uh-huh.

9        Q      Is that the one person that you're talking

10  about that was a -- somebody who was an office worker

11  who was also a nurse?

12              MS. AMIN:  You can answer that.

13       A      Yes.

14

15  BY MR. DAVIS:

16       Q      All right.

17       A      And -- and that off the payroll records.

18  It was from the payroll that I saw this violation.

19       Q      Okay.

20       A      Yeah.

21       Q      Did you look at the payroll before -- the

22  payroll records before you made the determination

23  that -- before or after you made the determination that

24  the Schedule A people were employees?

25       A      I looked at the payroll records before.

1        Q       Before?

2        A       Yes.  Because that's when Ms. Lisa Pitts

3    gave me the -- the last payroll and then -- then I took

4    my time to look at information.

5        Q       Okay.

6        A       Because we look at the information there

7    that might be used on the interviews to ask questions.

8        Q       Let's look at Page 13.

9        A       Uh-huh.

10       Q       On Page 13 that back wage computation

11   method --

12       A       Uh-huh.

13       Q       -- it says, After making the determination

14   that the workers -- firm's workers were employees

15   rather than independent contractors, the investigator

16   proceed to analyze the payroll.  Can you explain that?

17       A       Yeah.  When -- after making the

18   determination, the analysis of the payroll records is

19   to figure out what -- what employees have been working

20   more than forty hours in a week.  That's the analysis,

21   you know.

22       Q       Right.  But it doesn't say -- it suggests

23   that you didn't do that until after the fact.

24       A       It's standard to proceed to analyze the

25   payroll to determine who work -- this is you -- you do

Mazuera - Davis                                      305

1    the back wage computation method.  You analyze, okay,

2    who's working more than forty hours.  Then you start

3    computing and transcribing that information.

4              MR. DAVIS:  Okay.  All right.  What I'm

5         going to do at this time is continue the

6         deposition subject to -- I don't have any

7         questions right now, but continuing the deposition

8         subject to the issues that we flagged earlier

9         pursuant to the court's order, so it's continued.

10             MS. AMIN:  And to the extent that the

11        deposition is continued, I might have some limited

12        questions on cross-examination and I reserve my

13        right to ask those questions at that time.

14             MR. DAVIS:  Okay.  Very good.

15             (The deposition of Mr. Mazuera concluded

16        at 7:53 p.m.)

17

18                      -----oOo-----

19

20

21

22

23

24

25

```
 1                    COURT REPORTER'S CERTIFICATE

 2

 3   COMMONWEALTH OF VIRGINIA:

 4   CITY OF VIRGINIA:

 5

 6        I, Danette M. Wilson, Notary Public in and for

 7   the above county and state, do hereby certify that the

 8   foregoing testimony was taken before me at the time and

 9   place herein-before set forth; that the witness was by

10   me first duly sworn to testify to the truth, the whole

11   truth, and nothing but the truth, that thereupon the

12   foregoing testimony was later reduced by computer

13   transcription; and I certify that this is a true and

14   correct transcript of my stenographic notes so taken to

15   the best of my ability.

16        I further certify that I am not of counsel to

17   either party, nor interested in the event of this

18   cause.

19

20   Given under my hand this ___ day of _____, 2019.

21

22   My commission expires March 31, 2020.

23

24                        _____
                          Danette M. Wilson
25                        Court Reporter  #345203
```

Fiduciary Reporting, Inc.
(757) 482-2729

**JA1525**



# Transcript of Arjun Vora, Corporate Designee

**Date:** March 30, 2021
**Case:** Stewart, et al. -v- Medical Staffing of America, LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

JA1526

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                      Norfolk Division

 4      ------------------------------x

 5      MILTON AL STEWART,              :

 6      ACTING SECRETARY OF LABOR,      :

 7      UNITED STATES DEPARTMENT OF     :

 8      LABOR,                          :

 9             Plaintiff,               :    Civil Action No.

10         v.                          :    2:18-CV-226

11      MEDICAL STAFFING OF AMERICA,    :    2:19-CV-475

12      LLC, et al.,                    :

13             Defendants.              :

14      ------------------------------x

15

16      Deposition of ZIRA TECHNOLOGIES, INC., d/b/a ZIRA

17        By and through its Designated Representative,

18                      ARJUN VORA

19                   Conducted Virtually

20                 Tuesday, March 30, 2021

21                     1:09 p.m. ET

22

23      Job No. 386079

24      Pages:  1-165

25      Transcribed by:  Megan Wunsch, AAERT CET
```

1          Deposition of ZIRA TECHNOLOGIES, INC., d/b/a

2     ZIRA, by and through its Designated

3     Representative, ARJUN VORA, conducted virtually.

4

5

6

7

8

9          Pursuant to agreement, before Saul Gan,

10    Notary Public in and for the District of Columbia.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**JA1528**

```
 1              A P P E A R A N C E S

 2

 3       ON BEHALF OF THE PLAINTIFF:

 4            RYMA LEWIS, ESQUIRE

 5            MOHAMED SEIFELDEIN, ESQUIRE

 6            U.S. DEPARTMENT OF LABOR

 7            OFFICE OF THE REGIONAL SOLICITOR

 8            201 12th Street South, Suite 401

 9            Arlington, Virginia 22209-2247

10            (202) 692-9369

11

12       ON BEHALF OF THE DEFENDANTS:

13            JULIA A. RUST, ESQUIRE

14            PIERCE/MCCOY PPLC

15            101 West Main Street, Suite 101

16            Norfolk, Virginia 23510

17            (757) 216-0226

18

19       ON BEHALF OF THE WITNESS:

20            MARTHA S. DOTY, ESQUIRE

21            ALSTON & BIRD, LLP

22            333 South Hope Street, 16th Floor

23            Los Angeles, California 90071

24            (213) 576-1000

25   Also Present:  Joshua Tubbs, Remote Technician
```

**JA1529**

```
 1                    C O N T E N T S

 2   EXAMINATION OF ARJUN VORA                          PAGE

 3      By Ms. Lewis                                      5

 4

 5   QUESTION MARKED

 6      Page 33, lines 10-12

 7      Page 33, lines 17-18

 8

 9                    E X H I B I T S

10              (Attached to transcript.)

11   VORA EXHIBITS                                      PAGE

12    Exhibit 1  Notice of Depo                           7

13    Exhibit 2  Screenshot 1, Steadfast 6th 087520     113

14    Exhibit 3  Screenshot 2, Steadfast 6th 087521     120

15    Exhibit 4  Screenshot 3, Steadfast 6th 087522     127

16    Exhibit 5  Screenshot 4, Steadfast 6th 087523     139

17    Exhibit 6  Screenshot 5, Steadfast 6th 087524     140

18    Exhibit 7  Facilities Training Video              144

19    Exhibit 8  Excerpts of Produced Document          146

20

21

22

23

24

25
```

**JA1530**

```
 1                P R O C E E D I N G S
 2    Whereupon,
 3            ZIRA TECHNOLOGIES, INC., D/B/A ZIRA
 4       By and through its Designated Representative,
 5                      ARJUN VORA,
 6    being first duly sworn or affirmed to testify to
 7    the truth, the whole truth, and nothing but the
 8    truth, was examined and testified as follows:
 9            MS. LEWIS:  In terms of technical support,
10    Mr. Seifeldein cannot hear anything.
11            REMOTE TECHNICIAN:  All right.  Let me
12    send him a message.
13            THE REPORTER:  We'll go off the record.
14            (Pause in proceedings.)
15            THE REPORTER:  Back on the record at 1:15
16    p.m.
17            MS. LEWIS:  Good morning.  Ryma Lewis on
18    behalf of the U.S. Department of Labor.  We're
19    here for the deposition of Zira Technologies,
20    Inc., doing business as Zira.  That's spelled
21    Z-I-R-A.
22            Before we get started with this
23    deposition, if everyone present could please
24    introduce themselves with their name and their
25    association in the matter.  I guess we can start
```

**JA1531**

1   with co-counsel for the Department of Labor --

2   Mohamed Seifeldein here on behalf of the

3   Department of Labor as well, listening in.

4   Counsel --

5          MR. SEIFELDEIN:  Thank you.

6          MS. LEWIS:  -- for the -- Ms. Rust.

7          MS. RUST:  This is Julia Rust, Counsel for

8   Defendants.

9          MS. DOTY:  Martha Doty, Counsel for the

10  Witness, Arjun Vora of Zira Technologies.

11         MS. LEWIS:  Thank you.  Before we get

12  started with the deposition again -- not again,

13  but before we get started with the deposition,

14  wanted to know whether or not parties would

15  stipulate that this deposition is taken pursuant

16  to the Federal Rules of Civil Procedure and that

17  all objections except to form and privilege are

18  reserved.  So agreed?

19         MS. RUST:  Yes.

20         MS. DOTY:  Yes.

21         MS. LEWIS:  The parties have agreed that

22  this deposition is taken pursuant to the Federal

23  Rules of Procedure and that all objections except

24  as to form and privilege as reserved.

25         The Plaintiff, Secretary of Labor, is also

**JA1532**

1    requesting that the witness review and sign the

2    transcript pursuant to Rule 30(e).

3            Directing -- I uploaded for Planet Depos a

4    document entitled Steadfast-Notice of Deposition

5    of Zira 3-19-21 attachment, for Planet Depos.

6            REMOTE TECHNICIAN:  Yes.  One moment.

7    Would you like that marked as an exhibit?

8            MS. LEWIS:  Yes, we'll mark that as 1.

9            REMOTE TECHNICIAN:  One moment.  You said

10   it was the Steadfast Notice of Deposition?

11           MS. LEWIS:  Yes, that's correct.

12           REMOTE TECHNICIAN:  Exhibit 1 is on screen

13   and ready.

14           (Exhibit 1 was marked for identification

15   and is attached to the transcript.)

16           MS. LEWIS:  Okay.

17        EXAMINATION BY COUNSEL FOR THE PLAINTIFF

18   BY MS. LEWIS:

19      Q  Mr. Vora, you're presently muted.  Am I

20   pronouncing your name correctly?

21      A  Arjun, A-R-J-U-N.  It's just pronounced as

22   it's spelled.

23      Q  Arjun.  Okay.  Arjun, directing your

24   attention to this notice -- if you could please

25   scroll to page 3 of 8 of the PDF -- have you seen

1   this notice of deposition before that lists

2   various categories about which I will ask you

3   questions today?

4        A   Yes, I've seen it.

5        Q   And are you aware that Zira has designated

6   you as a corporate representative to answer those

7   questions?

8        A   Yes.

9        Q   And have you read through these categories

10  before today?

11       A   Yes.

12       Q   Are you prepared to answer questions about

13  each topic today?

14       MS. DOTY:   Objection.   The -- we have

15  filed objections on behalf of -- well, first of

16  all, objection, compound and also calls for a

17  narrative, but also, we have filed objections on

18  behalf of Defendant -- of the -- the witness,

19  Zira.   So the witness is prepared to answer

20  questions about certain of the topics but not all

21  of them, per the objections and the exchange of

22  counsel regarding this.

23       MS. LEWIS:   I'm sorry, I didn't hear the

24  last part of what you said.

25       MS. DOTY:   And the exchange of counsel

**JA1534**

1    regarding the objections and the categories of

2    documents and the topics --

3              MS. LEWIS:   Exchange of --

4              MS. DOTY:   -- for today's deposition.

5              MS. LEWIS:   -- counsel?

6              MS. DOTY:   The exchange of counsel -- the

7    exchange of emails by counsel regarding the

8    objections and the list of topics.

9              MS. LEWIS:   We can go through the topics

10   one by one, so you can state your objections to

11   each topic.

12             And again, in the interest of time, with

13   respect to the objection as to being compound, it

14   was a straightforward question, Are you prepared

15   to answer questions about each topic today?

16   Understanding your objection, we can go through

17   each one of them.

18   BY MS. LEWIS:

19       Q   Directing your attention to page 4 of 8 --

20   4 of 8, starting -- if you could scroll a bit

21   more, please.   Right there.

22             The broad topic, categorize the scope and

23   nature of the relationships between Zira and

24   Steadfast during the relevant period, including,

25   but not limited to, and then there are sub numbers

**JA1535**

1   under each of topic 1.  I'll just refer to them as

2   1(a), 1(b), 1(c), and so forth since we can all

3   see the description and this exhibit has been

4   marked.

5           Are you prepared to answer topic -- answer

6   questions about subject 1(a)?

7       A  Yeah --

8           MS. DOTY:  Well, I think you ought to read

9   -- and I know it's in the record, but I think it

10  ought to be firmly --

11          MS. LEWIS:  Ms. Doty.  Okay.  So I can

12  direct and ask questions in the manner in which I

13  believe it's appropriate because it's my

14  deposition.  I've provided an explanation as to

15  how I'm referring to the exhibit.  I've heard your

16  objection, but that's the way I'm going to ask my

17  questions.

18      Q  So directing your attention to topic 1(a),

19  as represented in Exhibit 1, are you prepared to

20  answer questions about that topic today?

21      A  Yes.

22          MS. DOTY:  I'm just going to object that

23  the -- that the -- to be clear -- that the witness

24  is being asked whether he's prepared to testify as

25  to his knowledge about the subjects addressed in

**JA1536**

1    Steadfast's Exhibits DX-75 through -78 and when

2    and who recorded them.

3        You can answer, Arjun.

4        MS. LEWIS:  Ms. Doty, that wasn't my

5    question.  And if you're going to continue to

6    interrupt or redirect what my questions are, we

7    can get the Court on the line right now.  He can

8    answer "yes," "no," or you can assert your

9    objections in privilege.  But I'm going to ask my

10   questions, and I'd ask that you not ask a

11   different question and interjecting and changing

12   the scope of what I'm asking.

13       MS. DOTY:  I disagree that I did that.

14       You can answer the question, Arjun.

15       THE WITNESS:  Yes.

16   BY MS. LEWIS:

17    Q  With respect to topic 1(b), are you

18   prepared to answer questions about the topics

19   identified therein?

20       MS. DOTY:  Objection to the extent that

21   section 1(b) would require the witness to testify

22   about any clients other than Steadfast.

23    Q  With respect -- I'm sorry.  Mr. Arjun,

24   what was your response -- okay.  So let me go over

25   some basic ground rules for a deposition before we

JA1537

1  continue to go forward.

2          Throughout the deposition, your counsel,

3  Ms. Doty, may make certain objections to questions

4  that I ask.  But for her directing you not to

5  respond, please wait for her to complete her

6  objection and then respond so that the record is

7  clear in terms of what you're responding to,

8  absent her telling you "Do not respond."

9          Another thing to bear in mind is, you

10  know, we still have the same formality as though

11  we're all sitting in the same room, and we have a

12  court reporter with us today, Mr. Saul Gan.  So

13  he's going to be taking down everything that we

14  say, so it's important to give verbal responses to

15  the questions as opposed to "nuh-uh" and "uh-huh"

16  because that's just difficult to transcribe, and

17  it leaves a lot of question about what the

18  response was.

19          Additionally, for all parties, including

20  counsel, because there's a court reporter, if one

21  party could speak at a time before interrupting or

22  raising an objection so that the transcript is

23  clear.

24          Does anybody have any questions about the

25  ground rules for this deposition?  Yes, no, or

**JA1538**

1  otherwise?

2          MS. RUST:  No questions from me.

3          MS. DOTY:  No questions.

4          THE WITNESS:  No questions.

5  BY MS. LEWIS:

6      Q  Coming back to -- we were on topic 1(c).

7  With respect to topic 1(c), Arjun, are you

8  prepared to answer questions about that topic

9  today?

10     A  Yes.

11     Q  Do you have any concerns that you will not

12 be able to answer questions about topic 1(c)?

13     A  No.

14     Q  Directing your attention to topic 1(d),

15 are you prepared to answer questions about that

16 topic today?

17     A  Yes.

18     Q  Do you have any concerns that you will not

19 be able to answer questions about topic 1(d)?

20     A  No.

21     Q  Directing your attention to topic 1(e),

22 are you prepared to answer questions about topic

23 1(e)?

24         MS. DOTY:  Objection.  Topic 1(e) lacks

25 foundation.

**JA1539**

```
1        Q  You can answer.
2           MS. DOTY:  You can answer, Arjun.
3        A  Oh.  If I understand what it means, then
4     yes.  You might have to clarify when you ask some
5     questions.
6        Q  Okay.  And then that will go into sort of
7     the next questions.  We sort of go through them
8     here.  Any concerns that you have that you would
9     not be able to answer that question about topics
10    in 1(e)?
11       A  Was that 1(e) again?
12       Q  Yes, 1(e) again.  Do you have any concerns
13    you wouldn't be able to answer questions about
14    that topic?
15       A  Again, if I understand the questions, I'll
16    answer them.
17       Q  Directing your attention to topic 1(f),
18    are you prepared to answer questions about that
19    topic today?
20          MS. DOTY:  Objection.  Lacks foundation.
21       A  Same as the above.  If I understand them
22    and if they are relevant, then -- then yes.
23       Q  Topic 1(g), do you have any concerns --
24    are you prepared to answer questions about that
25    topic today?
```

**JA1540**

```
1            MS. DOTY:  Objection.  Lacks foundation.
2       A  Same as above.  If -- if they -- if they
3   pertain to this, then absolutely, yes, I will.
4       Q  Topic 1(h), are you prepared to answer
5   questions about that topic today?
6            MS. DOTY:  Objection.  Lacks foundation.
7       A  Same answer.  If -- if -- if it pertains
8   to this, yes, I'll answer.
9       Q  Topic 1(i), are you prepared to answer
10  questions about that topic today?
11      A  Yes.
12      Q  Do you have any concerns that you would
13  not be able to answer questions about topic 1(i)?
14      A  No.
15      Q  Topic 1(j), are you prepared to answer
16  questions about topic 1(j) today?
17      A  Yes.
18      Q  Okay.  Do you have any concerns that you
19  wouldn't be able to answer questions about that
20  topic?
21      A  My only concern is again the questions.  I
22  -- I don't really understand how it's raised.  So
23  whatever I can answer, I'll be able to -- I --
24  whatever I'm able to answer, I will answer.
25      Q  Topic 1(k), are you prepared to answer
```

**JA1541**

1   questions about that topic?

2           MS. DOTY:  Objection.  Lacks foundation.

3   Also, to be clear, I just want to make -- make

4   clear that I'm still reserving my right to object

5   to questions once you cover each of those topics.

6   He's -- he's prepared to testify about them, but

7   that doesn't mean every question within the topics

8   will be non-objectionable.

9       A  Yeah.  Again, meaning -- when we get to

10  it, I'll give more detail, but there is nothing --

11  like, for example, "admin mode data," I don't know

12  what that means.  But when we get to it, I'll

13  answer whatever I can, for sure.

14      Q  Topic 1(l), are you prepared to answer

15  questions about that topic today?

16      A  Yeah.  Yes.

17      Q  Do you have any concerns that you won't --

18  that you will not be able to answer questions

19  about that topic?

20      A  I guess my only concern again would be

21  that third thing discussed, but I don't know what

22  it means -- what you mean by related accounts and

23  subaccounts.  It's just one account, so --

24      Q  Okay.

25      A  Yeah.

**JA1542**

1      Q   Topic 1(m) --

2          MS. DOTY:   Objection.   It is vague --

3      Q   -- prepared to answer questions about that

4  topic today?

5          MS. DOTY:   Objection.   Vague, lacks

6  foundation, irrelevant as to other end users.

7      A   Yes, I guess the same answer.   When we get

8  to the questions, if worded correctly and I

9  understand it, I -- I will answer your questions,

10  for sure.

11     Q   Topic 1(n), are you prepared to answer

12  questions about that topic?

13         MS. DOTY:   Objection.   It lacks

14  foundation.

15     A   Yes, same answer as before.   If I

16  understand it while -- while we go through it, I

17  will answer.

18     Q   Topic 1(o), are you prepared to answer

19  questions about that topic?

20     A   So, like, I -- I don't know what this

21  means, "dashboard by month," details.   Yeah.   It

22  depends on what those details that you're asking

23  for are because -- yeah.   Again, if I -- if the

24  questions make sense and I am able to answer them,

25  I definitely will.

**JA1543**

1    Q  Topic 1(p), are you prepared to answer

2  questions about that topic?  A -- let me --

3        MS. DOTY:  Objection.

4    Q  -- clarify.  Topic 1(p)(a), are you

5  prepared to answer questions about that topic?

6        MS. DOTY:  Well, I'm just going to object.

7  It lacks foundation, use of the term employees.

8    A  Same -- same -- we don't store all this

9  data, like, frequency of interaction.  So whatever

10  I can answer, I will answer.

11    Q  Topic 1(p)(b), are you prepared to answer

12  questions about that topic?

13        MS. DOTY:  Objection.  Overbroad to the

14  extent it requires testimony about anyone other

15  than Steadfast.

16    A  Yeah, same -- same as above.  Whatever --

17  whatever we -- whatever I can answer, I'll answer.

18    Q  Topic 1(p)(c), are you prepared to answer

19  questions about that topic?

20        MS. DOTY:  Same objection.  Overbroad as

21  to any users other than Steadfast.

22    A  And I --

23        MS. DOTY:  Also lacks foundation.

24    A  Yeah, and also there are a bunch here that

25  don't relate to this account.  So this one, in

**JA1544**

1    particular, might be tough to answer because how

2    often each users use, we -- we very peripherally

3    have that.  We don't really store -- store this

4    kind of data.

5         Q   Topic 1(q), are you prepared to answer

6    questions about that topic today?

7             MS. DOTY:  Objection.  Overbroad to the

8    extent it calls for testimony about any customer

9    other than Steadfast, lacks foundation.

10            You can answer, Arjun.

11        A   Yeah.  I'll -- I'll -- I'll answer

12   whatever I can in terms of what training material

13   we -- we sent to Steadfast specifically.

14        Q   Topic 1(r), are you prepared to answer

15   questions about that topic today?

16            MS. DOTY:  Objection.  It's overbroad.

17   It's irrelevant.  I'm going to instruct the

18   witness not to answer.

19            MS. LEWIS:  What is your basis for

20   instructing a 30(b)(6) deponent not to answer a

21   question?  Unless it's based upon privilege,

22   that's an improper objection.

23            MS. DOTY:  Well, I've told you I'm not

24   going to let him answer questions about this.

25   He's here today to testify about Zira's

**JA1545**

1    relationship with -- contractual relationship and

2    use -- with Steadfast and Steadfast's use of its

3    -- of its -- of its software.

4           How Zira is organized and who its owners

5    are has absolutely nothing to do with your case,

6    and I'm not -- I told you I'm not going to allow

7    him to answer that.  So if you want to move --

8    because I think -- we ought to see what you can

9    get from him that's relevant to your case.

10          MS. LEWIS:  Well, that's exactly why --

11          MS. DOTY:  Neither you -- neither you --

12          MS. LEWIS:  -- we're here today for a

13   discovery --

14          MS. DOTY:  -- nor your colleague has ever

15   explained the relevance of that information.  I

16   have maintained from the outset, and we've

17   objected, that that category has absolutely --

18   it's invasive.  It has absolutely nothing to do

19   with your case.

20          So I'm going to instruct him not to

21   answer.  If you want to, you know, go through all

22   the rest of your questions and then see where you

23   are on it, but I'm instructing him not to answer

24   those questions.

25          MS. LEWIS:  Well, right now, as you're

**JA1546**

1  aware, Ms. Doty, we're simply reviewing the

2  deposition topics.  So you're instructing him not

3  to answer whether or not he has knowledge and is

4  prepared to answer questions about a topic today,

5  as we review the deposition notice, which is pro

6  forma?  Is that your position?

7          MS. DOTY:  I don't know what a pro forma

8  deposition notice is, but he can answer that, no,

9  he will not answer any questions about that

10  because he's going to be instructed not to.

11          MS. LEWIS:  Ms. Doty, you've indicated

12  that you've filed objections.  Where did you file

13  objections?

14          MS. DOTY:  I didn't say I filed them --

15  served them.

16          MS. LEWIS:  Okay.  So objections haven't

17  been filed.  You're instructing your client not to

18  answer a simple question of are you prepared to

19  answer questions regarding this noticed topic

20  today, and you're not asserting a privilege.  Am I

21  --

22          MS. DOTY:  No.

23          MS. LEWIS:  -- (inaudible) your objection

24  correctly?

25          MS. DOTY:  No, you don't.  I said he can

**JA1547**

1   answer the question as to whether he's prepared to

2   testify about this --

3           MS. LEWIS:  Okay.  So let's --

4           MS. DOTY:  -- today.  The --

5           MS. LEWIS:  -- start there.

6           MS. DOTY:  -- he can answer that --

7           MS. LEWIS:  Let me ask that question

8   because your objection was overbroad and was not

9   responsive to the question that I asked.

10  BY MS. LEWIS:

11      Q  My question was, with respect to topic

12  1(r), are you prepared to answer questions on that

13  topic today?

14          MS. LEWIS:  That is a sufficiently narrow

15  question.

16      A  I -- I --

17          MS. DOTY:  It's a "yes" or "no."  Arjun,

18  it's just a yes or no question.

19          THE WITNESS:  What are you suggesting I

20  say, or -- sorry, I --

21      Q  Well, your client -- your attorney can't

22  tell you what to say.  I'm asking you the

23  question.  That would be improper witness coaching

24  which --

25      A  Okay.  I'm going to say, frankly, I've

**JA1548**

1    never done this before, so I apologize if I don't

2    know the rules here, but --

3        Q   No apology necessary.

4        A   In plain language, if it pertains to the

5    issue and the question is directed to, you know,

6    something specific, then -- then yes.  But if it

7    is just, like, giving -- giving you more details

8    than I think, you know, may be necessary, then no.

9    So it -- when we get to the questions, I think

10   I'll be able to understand better.

11       Q   Directing your attention to topic 1(s),

12   are you prepared to answer questions about that

13   topic today?

14       A   Yes, to the best --

15       Q   Do you have any -- sorry.  Do you have --

16       A   To the best of my knowledge, I'll --

17       Q   All right.  Go ahead.

18       A   That was it.  To the best of my knowledge,

19   I'll answer.

20       Q   Do you have any concerns that you will not

21   be able to answer questions about that?

22       A   Not that I can think of.

23       Q   Directing your attention to topic 1(t),

24   are you prepared to answer questions about that

25   topic today?

**JA1549**

1    A   Yeah.  The questions, if they make, like
2    -- like I said, when you get to the questions,
3    you'll find that some of these don't pertain to
4    this, but, sure, I'll answer.
5        Q  And do you have any concerns that you will
6    not be able to answer those questions about topic
7    1(t) today?
8        A  Not that I can think of right now.
9        MS. LEWIS:  I'll note that the Secretary
10   also requested the production of certain
11   documents.  A link was sent shortly before the
12   deposition, and at 1:19 I received a response back
13   from Nora Fernandez indicating that they're going
14   to try and send it in alternate means.  However,
15   we may need to go off the record for a moment to
16   resolve this.
17       I'll just note that we do not have the
18   ability to open up Dropbox or anything.  That's
19   not something that our IT department will work
20   around.  So we'll need to come back to sort of
21   resolving that.
22       Q  So the purpose of the deposition today,
23   Mr. Arjun, is to find out information that's
24   within the custody, possession, and knowledge of
25   Zira as it relates to the pending enforcement

1  action, Fair Labor Standards Act enforcement

2  action, against Medical Staffing of America doing

3  business as Steadfast Medical.

4       At the outset, you identified yourself.

5  And if you could please just spell your name for

6  the record, sir.

7       A  It's A-R-J-U-N, Arjun.  And then my last

8  name is Vora, V-O-R-A.

9       Q  Have you gone by any other names or

10  aliases?

11      A  No.

12      Q  Have you taken any medication or anything

13  else today that would affect your ability to

14  answer my questions truthfully and accurately?

15      A  No.

16      Q  Any reason why you would not be able to

17  answer my questions fully and truthfully today?

18      A  No.

19      Q  Have you ever had your deposition taken

20  before?

21      A  No.  No, if that didn't come through.

22      Q  And are you represented by counsel today?

23      A  Yes.

24      Q  And that counsel is Martha Doty?

25      A  Yes.

1      Q  What did you do to prepare for the

2  deposition today?

3          MS. DOTY:  Objection.  Calls for

4  information that's protected by the attorney-

5  client and attorney work product privileges.

6  Instruct the witness not to answer.

7          MS. LEWIS:  Martha, please.

8      Q  Arjun, if you could please let me know,

9  not speaking to conversations that you've had with

10  your attorney, what did you do to prepare for the

11  deposition today?

12      A  Nothing.  Well, it was all -- my only

13  preparation was with Martha.

14      Q  Okay.  And how much time did you spend

15  preparing?

16          MS. DOTY:  Objection.  Calls for attorney-

17  client privilege.  Instruct the witness not to

18  answer.

19          MS. LEWIS:  Martha, please.

20      Q  Besides Ms. Doty, did anyone else help you

21  prepare for the deposition today?

22      A  No.

23      Q  Did you review any documents in

24  preparation for answering questions on the topics

25  that we previously reviewed?

1          MS. DOTY:  I'm just going to object.  It

2     calls for attorney work product, materials.

3          MS. LEWIS:  It's a yes or no question.  He

4     can answer.  There's plenty of case law to support

5     the fact that he can say "yes" or "no."

6          MS. DOTY:  I can finish my objection.

7     Objection.  Calls for information that's protected

8     by the attorney work product privilege.  The

9     selection of documents for review is protected.

10         Q  You can answer, Mr. Vora.

11         A  Martha sent me over the evidence, whatever

12     the 75 or 78, those -- I -- I -- we looked -- I

13     looked at those.

14         MS. DOTY:  Arjun, I don't want you to say

15     -- we don't want you to testify about anything

16     that was -- who sent it to you.  I understand your

17     testimony as you did review the exhibits.

18         THE WITNESS:  Okay.

19         MS. DOTY:  But just to caution you not to

20     testify as to anything we discussed or that we may

21     have exchanged.

22         THE WITNESS:  Okay.

23         Q  Is there anything else you could've done

24     to prepare for the depositions today?

25         MS. DOTY:  Objection.  It's

1   unintelligible.  You can answer if you understand

2   the question.

3       A  Well, it's broad.  It's -- I don't mean to

4   be facetious, but there is preparation since my

5   nanny is out today, so my daughter is with my wife

6   who's also working just so that I can be here.  So

7   there are that kinds of preparation that I've

8   done.

9       Q  Okay.  Have you brought anything with you

10  to the deposition that -- as though we were

11  sitting together, at a table together, do you have

12  anything with you in front of you?

13      A  I have this pen and paper, which is empty,

14  just in case I have notes that I want to take.  I

15  have coffee.

16      Q  So just to get some general information

17  about you, can you please tell me a little bit?

18  What's your highest level of education?

19      A  I have a Master of Science.

20      Q  And what school did you attend?

21      A  University of Michigan, Ann Arbor.  I have

22  attended multiple schools in my -- in my life.

23  The last one was University of Michigan, Ann

24  Arbor.

25      Q  And when did you graduate from University

JA1554

1    of Michigan with a Master of Science?

2            MS. DOTY:  You know, I'm just going to

3    object that the questions are irrelevant and

4    harassing --

5            MS. LEWIS:  Relevancy --

6            MS. DOTY:  -- of the witness.

7            MS. LEWIS:  -- is not an appropriate

8    objection for a deposition.

9            And, frankly, I find many of the

10   objections that you're making to be

11   obstructionist.  So if you continue in this

12   manner, I have no problem getting the Court on the

13   line.

14           MS. DOTY:  It's fine.  I was -- if you

15   would let me finish my objection, I was going to

16   say --

17           MS. LEWIS:  Well, relevancy --

18           MS. DOTY:  -- harassing --

19           MS. LEWIS:  -- is an inappropriate

20   objection, Ms. Doty, you and I both know.  Let's

21   not play this game.

22           MS. DOTY:  Okay.  I think you're harassing

23   the witness.  He's here today to testify as to

24   specific topics.  Where he went to college is

25   irrelevant.  I will give you some leeway, but I

**JA1555**

1   don't want to go down a long path of his personal

2   background.

3           MS. LEWIS:  Okay.  Well, let's start here.

4   Today is the U.S. Department of Labor's deposition

5   of Zira Technology.  I am permitted to ask

6   whatever questions I'd like to ask.

7           If you'd like to get the Court on the line

8   for me asking these two basic questions, based

9   upon your characterization that they're harassing,

10  let's call the Court, but I am not going to

11  continue to allow you to interrupt my deposition

12  with objections that are wholly inappropriate for

13  a deposition, such as relevancy.  Are we on the

14  same page with that?

15          MS. DOTY:  He already answered the

16  questions.

17          MS. LEWIS:  He didn't.  You interrupted

18  him.

19          So I'm making myself clear with respect to

20  my expectations as to how counsel conduct

21  themselves during this deposition.  So if you

22  continue to make objections with respect to

23  relevancy, I will get the Court on the line.

24          MS. DOTY:  Okay.

25  BY MS. LEWIS:

**JA1556**

1    Q  Mr. Vora, when did you graduate?

2    A  2011.

3    Q  And did you obtain any additional

4  certifications when you obtained that degree?

5    A  What does that mean?  I'm sorry.

6    Q  Any additional certifications with that

7  degree?

8    A  I don't know what that means.  No, I got a

9  Master of Science degree --

10    Q  Okay.

11    A  -- at University of Michigan, Ann Arbor,

12  and then I got a Bachelor of Engineering before

13  that, so yeah.

14    Q  And where are you currently employed?

15    A  Zira Technologies.

16    Q  And how long have you been in that

17  position?

18    A  About a few months, more than -- nine

19  months, ten months, around that time.

20    Q  You said approximately ten months --

21  you've been there for approximately ten months.

22  Was that your answer?

23    A  That's right.  Maybe -- maybe eight

24  months.  It's an estimate.  I'll have to check.

25    Q  Approximately what was the month and year?

1       A   I'm sorry.  Could you repeat that?

2       Q   The month and the year.

3       A   August 2020, approximately.

4       Q   What is your position at the company?

5       A   I'm chief product officer.

6       Q   In that position, what are your job duties

7    and responsibilities?

8       A   I lead a product.

9       Q   Lead product?

10      A   Yes.

11      Q   And what does that mean?  Can you --

12      A   So I lead the product development, the

13   software technology that -- that we build, so I

14   lead the product design.

15      Q   Tell me, what is Zira Technology?

16      A   You -- do you mean what do we do?

17      Q   Yeah.  Tell me about the company.  What --

18   what does Zira do?

19      A   We provide business-to-business software.

20   So it's called B2B software, SaaS, which is

21   software as a subscription.  We tell businesses

22   that need to schedule their workforce, their --

23   use a digital tool to do that as opposed to doing

24   it on pen and paper, which is surprisingly the

25   predominant method even today.  So we are helping

**JA1558**

1    them digitize their pen and paper into a software.

2          MS. LEWIS:  For Planet Depos, we're done

3    with Exhibit 1, if you could make the primary view

4    speakers.

5          Q  And how long has Zira been around?

6          A  We received funding in -- the company

7    received funding end of 2019, so the -- we --

8    yeah.  I think early 2020 is when we started

9    building the product in.

10         Q  And you can -- can you just describe,

11   generally, sort of what is the organizational

12   structure of Zira?

13         MS. DOTY:  Objection.  It's -- it has

14   nothing to do with the case.  I'm just going to

15   object and instruct the witness not to answer.

16         MS. LEWIS:  You can mark that, please.

17         Q  What are the departments of Zira

18   Technology?

19         MS. DOTY:  Same objection.

20         MS. LEWIS:  Mark that, please.

21         Q  How many employees are at Zira Technology?

22         A  I think we are six.  We're a start-up,

23   just like any other tech start-up in the Bay Area.

24         Q  You indicated before that Zira provides

25   business-to-business software.  Are there -- and

**JA1559**

1   this may answer the question, but what type of

2   services are provided by Zira to consumers?

3       A  So it's a software on the cloud.  So if

4   you were a business and you had any kind of staff

5   or anything you wanted to schedule, even if you

6   were scheduling students or teachers, whatever it

7   is -- scheduling today is super cumbersome because

8   you need to -- people are doing it on pen and

9   paper or Excel spreadsheets, and that requires a

10  lot of time, effort.  People don't get their time

11  preferences, their preferred times.  And we are

12  just helping move that to a digital product.

13          And we're doing that with, you know, a

14  wonderful design.  So you -- yeah.  That's --

15  that's what Zira is doing.

16      Q  With respect to consumers, how are

17  relationships structured with clients?

18      A  What does that mean?  I didn't understand

19  that question.

20      Q  So when Steadfast -- using Steadfast,

21  since that's the client we're talking about, what

22  is the relationship?  Is there a contract?  Is it

23  a partnership?  What is -- how is the relationship

24  defined?

25      A  Okay.  We --

1          MS. DOTY:  I'm just going to object.  It's

2     vague.

3          If you understand, you can answer, Arjun.

4     A   Yeah.  If -- let me know if I -- if I

5     understand it when I answer it.  It's primarily

6     and actually only, for the best of my knowledge, a

7     month-to-month subscription.

8          And that's where -- that's how most of

9     these software companies nowadays work, especially

10    the business software companies, where you pay for

11    every month that you use.  And if you don't like

12    Zira, the end of the month, then you stop the

13    subscription.  So that's -- and companies that put

14    their product first, they tend to do that because

15    we want to make sure, you know, we're delivering

16    value to you.

17    Q   And if at any time, as you just did, if

18    there's a question that I'm asking and you don't

19    understand what I'm asking, I'll try and rephrase

20    it to make it clear for you.  Okay?

21    A   Okay.

22    Q   So it's -- I'm going to restate, and

23    correct me where I'm incorrect.  So it's a month-

24    to-month subscription with clients, and in this

25    case Steadfast.  Is there a relationship then

**JA1561**

1    between the end users that Steadfast uses for this

2    scheduling, or is the relationship exclusively

3    with Steadfast and Zira?

4         A   I -- what do you mean by relationship?

5         Q   Relationship meaning them being a

6    subscriber to your product.  Would subscriber be

7    the most generic term to use to describe the

8    relationship?

9         A   I still don't know if I -- what I -- I can

10   -- I can -- I can rephrase it, and I may not be

11   answering it --

12        Q   Okay.  Let's work through it.  Yeah,

13   absolutely.

14        A   So a business is the one that has the

15   contract with Zira for the month-to-month.  Now

16   while we onboard the business, we might train, you

17   know, the staff and the business and more people,

18   so if you -- if you count that as a relationship,

19   then fair.  It's part of the training and

20   onboarding.  But in terms of the contract, it's

21   pretty simple.  It's the business and Zira.

22   That's why it's B2B.

23        Q   When I say the word relationship, you seem

24   to get kind of hung up on that.  What is your

25   definition then of relationship?  I'm using that

**JA1562**

1    in this ordinary English sense of the word.

2          MS. DOTY:  I'm just going to the object.

3          Q  Refer to it as a contract, as the -- as

4    just business to business?  Is that how you

5    understand it?  I just want -- so we're not -- we

6    don't keep coming back to this confusion.

7          MS. DOTY:  Objection.  It's vague.

8          If you understand, Arjun, you can answer.

9    But if you need further clarification, you can --

10         A  Yeah.  I actually -- and I'm being honest

11   that I'm not being hung up.  I'm just not

12   understanding the question correctly.  What --

13   what are you specifically looking for?  I'm happy

14   to answer that.  What are you specifically looking

15   for?

16         Q  How do you describe the relationship

17   between Zira and Steadfast?  Is it a partnership?

18   Are they customers?  Are they clients?

19         You have a relationship with your

20   attorney:  You're her client; she's your attorney.

21         How do you describe the relationship

22   between Steadfast and Zira?

23         A  Customers.  Just like us.

24         Q  Customers.  Okay.  Is there a relationship

25   then between Steadfast's clients, being facilities

1  that they contract to do business with, and Zira?

2  Or is there no relationship, contractual

3  relationship, between Zira and those third-party

4  end users?

5      A   It's the latter.  There is no -- no

6  contractual relationship between Zira and the

7  third party.

8      Q   Are you familiar with the company Medical

9  Staffing of America doing business as Steadfast?

10         MS. DOTY:  Objection.  Vague.

11         You can answer if you understand.

12     A   I -- so I -- I'm familiar with Steadfast,

13 which is -- which -- meaning I became familiar

14 with Steadfast when -- when they -- when -- when

15 we first -- when they first reached out, which was

16 December 16th -- I think you may have that doc --

17 of 2020, and that was the first time I ever heard

18 of Steadfast.  But I don't know what Medical

19 Staffing of America is.

20     Q   Okay.  That's their doing business as

21 name.

22     A   Okay.  Okay.

23     Q   So did you first learn about the company

24 in December 2020?

25     A   Yes.

**JA1564**

1     Q  Who's been the primary point of contact

2  between Zira and Steadfast since that relationship

3  was established in December 20- --

4     A  It started off as Lisa Pitts.  Because at

5  that time, we were entering contract, just making

6  sure we -- we showed them what our product is.

7  And -- and now it's shifted a little bit to just

8  the folks we are onboarding on -- on -- on their

9  team.

10     Q  I'm sorry.  The last part of your question

11  -- your answer --

12     A  Now it's switched a little bit to the

13  folks we are onboarding on their team, which we --

14  we basically have training material, and we train

15  them on how to use the software, so it's -- it's

16  -- it's one or two of those folks.

17     Q  And who at Zira -- you said started off

18  with Lisa Pitts.  So who at Zira started the

19  communications with Lisa Pitts?  Who's the one

20  that she would contact when you all were

21  structuring the relationship?

22     A  Yeah.  I can -- so it was me.  I can --

23  yeah.  Yeah, it was me.

24     Q  Can you indicate anyone else at Zira

25  besides yourself?

JA1565

1       A   I'm sorry.  Could you repeat that?

2            MS. DOTY:  Objection.  Vague.

3       Q   Has anyone else at Zira been in contact

4   with Lisa Pitts besides yourself?

5       A   Yes.  Just, like, again, with customers,

6   oftentimes there are support requests that come

7   in, and it's one of the Zira team that -- that get

8   back with a support request.  So there may have

9   been times where, you know, there were other --

10  other folks on the Zira team who responded to a

11  query that -- that one of the folks from Steadfast

12  had.

13      Q   And who at Zira would respond to those

14  support requests?

15      A   We're a small team.  It's -- it's

16  everyone.  It's the six -- six members.

17      Q   Well, any of the six members?

18      A   I'm sorry?

19      Q   Any one of the six members has been in

20  touch with Lisa Pitts for support?

21      A   Yeah.  I'll have to check exactly who it

22  was at the different times we've gotten support

23  requests, but it's likely more -- more than two or

24  three of us.

25      Q   Is that a division within Zira, product

**JA1566**

1   support, that's who she would reach out to, or is

2   there a client manager, accounts payable -- I'm

3   trying to understand what type of contact your

4   company had with her and who at the company.

5        A  And that's fair.  We -- again, we're --

6        Q  The organizational structure.

7        A  We're a start-up, so we -- we -- six

8   people, so there aren't, like, departments and

9   stuff.  So everyone's kind of wearing many hats.

10  And if you know tech start-ups, they're mostly

11  engineers and product people, so we are just

12  wearing the different hats.

13       Q  And when Ms. Pitts would contact you all,

14  how would it be?  Would it be through phone,

15  email, or some other means?

16       A  It's been phone and email, and that phone

17  includes text and phone call and email.

18       Q  Is there a general email address that she

19  would email, or would she email people directly?

20       A  She emails people directly.  I think so,

21  if I remember.  We do have a general email

22  address.  I'll have to check which one she usually

23  used.

24       Q  And how often since December 2020, on

25  average, has Ms. Pitts been in touch with your

JA1567

1   company?

2        A   It's tough to say.  I would say -- look,

3   so the way -- once -- so December 6 -- can I give

4   a little bit of the timeline, Martha?

5        Q   Yeah, no.  That would be incredibly

6   helpful.  Go ahead.

7             MS. DOTY:  Well -- well, you're not

8   required to give a narrative, Arjun.  The question

9   she asked you -- I'd like you to only answer the

10  questions she asks.

11            THE WITNESS:  Okay.

12            MS. DOTY:  She'll -- she'll follow up.

13            THE WITNESS:  Okay.

14            MS. DOTY:  Her question was, how often on

15  average has Lisa Pitts been in contact with Zira

16  personnel since December of 2020?

17            THE WITNESS:  Okay.

18            MS. DOTY:  You're not required to guess.

19  You're merely required to estimate.

20            THE WITNESS:  Okay.

21            MS. DOTY:  If you can't provide an

22  estimate, you can tell her that.

23            THE WITNESS:  Okay.  It's tough to provide

24  an estimate.  Many, many times.  I would say very

25  often.  I -- I don't want to say something wrong,

JA1568

1    so I'll have to look up the -- the actual

2    estimate.  Otherwise, I would be guessing.

3    BY MS. LEWIS:

4        Q  Take me back to when Lisa Pitts, on behalf

5    of her company, Steadfast, and Zira developed the

6    relationship.  What were the steps in the

7    development of that relationship with Lisa Pitts

8    and Steadfast?

9        A  So in -- in the software world, we get our

10   leads from many sources.  We have ads online.  We

11   sometimes get it from a third-party company, like

12   Software Advice.  So what Software Advice is it's

13   a separate company.  And if you are looking for

14   software, you'll Google search; right?  Like, I

15   want software.  And then one of the top searches,

16   there will be Software Advice.  It's, like, this

17   form that advises you with software to go with.

18            So we put up our profile there, just like

19   all the other B2B companies, and customers reach

20   out to, like, the top five of them.  We have good

21   reviews on Software Advice, so Lisa spoke -- Lisa

22   from Steadfast spoke to Software Advice, and they

23   send her lead -- her as a lead to us.

24            And, just like that, we get, like, five

25   leads a day.  That's how our sales work.  So then

JA1569

1    we call up the person.  We're like, hey, it looks

2    like you were looking for a scheduling software.

3    Zira -- Zira can maybe do the job for you.

4          So that's how -- December 16th is where

5    that email came in from Software Advice, which is

6    like, hey, Steadfast is looking for a scheduling

7    software.  So that's when it initiated where we

8    called her up and -- and -- and told her about

9    Zira.

10       Q  And after you all had that initial

11   contact, what happened next?

12       A  I -- I'm -- I am going to do the best of

13   my recollection.  You know, so we --

14       Q  Right.

15       A  -- and this is -- this is a playbook that

16   we do with -- with -- with most customers, so it

17   might get murky if I'm recollecting some other

18   customer.  But the playbook is --

19          MS. DOTY:  Arjun.

20          THE WITNESS:  -- we --

21          MS. DOTY:  Arjun, I'm sorry to interrupt,

22   but she's just asking you, as best you can, what

23   happened next with Lisa, understanding that --

24          THE WITNESS:  Okay.

25          MS. DOTY:  -- yeah.

1          THE WITNESS:  So I -- I -- I think what --

2     what may have happened with her is it seemed we

3     were one of the products she was interested in.

4     BY MS. LEWIS:

5          Q  And then what happened next when -- so she

6     saw one of the products she was interested in.

7     Did she see one of those products on Software

8     Advice, and then that's when the communication

9     began?

10         A  First off --

11         MS. DOTY:  Objection.  It calls for

12    speculation, but you can answer if you know.

13         A  Yeah.  I don't know what Software Advice

14    and her spoke, but usually what happens is they

15    just tell you like, hey, I know there are three

16    products.  We're going to send a -- send you as a

17    lead to all of them, and all of them contact her,

18    and this is -- again, this is the playbook.

19         Q  Okay.  So Lisa got in touch with you, and

20    she said she was interested in your product.  What

21    happened next?

22         A  No, so Lisa got in touch with Software

23    Advice.  Software Advice --

24         Q  Right.

25         A  -- sends the lead to us, like, hey, we --

**JA1571**

1      Q  Right.

2      A  -- have a potential customer for you.  So

3  then we reach out.  That's our playbook.  So we

4  reached out to Lisa, and we told her that, hey,

5  you know, do you want a demo?  And -- and we -- if

6  I remember correctly, we -- we probably did a demo

7  soon after.

8      Q  Which demo did you provide her?

9      A  We have a basic demo, so it's just an

10  account.  It's a demo account that we create on

11  Zira, and then we just share our screen and then

12  walk them through it.

13     Q  And does that demo -- it's just called a

14  basic demo that sort of details the product that

15  you have?

16     A  Right.

17     Q  After you demoed the product to Lisa, what

18  happened next in terms of the development and any

19  evolvement of the relationship with Zira and

20  Steadfast?

21     A  On our end, we just continued with our

22  work and maybe did a few more demos that day with

23  other customers and continued building.  I -- it

24  would be tough to me -- for me to know what

25  happened on her end, but I think she was

**JA1572**

1   deliberating, and it took about a month or so for

2   us to -- for her to actually be like, okay, I want

3   to go with you all.

4       Q   I'm restating that because I just want to

5   make sure I understand.  But you showed the demo

6   sometime in December; is that correct?

7       A   December -- oh, yeah, sometime in

8   December.  December 16 was the first contact after

9   that.

10      Q   And then about a month later -- excuse me

11  -- Lisa came back and said she was interested in

12  using your product; is that right?

13      A   So the timeline is December 16th was the

14  first meeting I -- from the doc that I put

15  together.  January 20th is when they signed.  In

16  between that, just like it is with every customer,

17  there are just conversations for like, do you have

18  any questions, or, hey, make sure, you know --

19  yeah.  Just both parties making sure that -- that

20  this is a good fit.

21      Q   Between the December 16th meeting and the

22  January 20th meeting, did Lisa Pitts ask you any

23  questions about software -- I'm not sure -- do you

24  refer -- is it referred to as software?  Is that

25  the correct terminology?

**JA1573**

1    A   Yes.  Yeah, software is the right word.

2    Q   Okay.  Let me ask -- strike that, and let

3   me ask the question this way.  What questions, if

4   any, did Lisa ask to Zira between December 16th

5   and January 20th about Zira Technologies and the

6   software that was demoed and entering into a

7   relationship?

8    A   It's tough for me to recollect exactly

9   what questions, but again, Steadfast was just one

10   of our customers, so the playbook usually is they

11   ask us questions about the platform:  Is it

12   customizable?  Can it do this?  Can it do that?

13   And -- and there were -- to the best of my

14   knowledge, there were questions around how the

15   platform works.

16    Q   Okay.  And the inquires that were made

17   between December 16th and January 20th, are those

18   in writing -- were those in writing?

19    A   I -- I presume they were in writing.  If

20   they were, they were -- or email exchange.  Yes.

21    Q   After January -- on or about January 20th,

22   they signed the contract -- "they" being

23   Steadfast.  What happened next?

24    A   Just, again, I'm going to answer this a

25   little broadly as well because it's a little tough

JA1574

1    for me to remember exactly what happened with

2    Steadfast at these different times.  We onboard

3    the customer at that point.  Once the contract is

4    signed, we are, like, okay, and -- and we are

5    doing everything we can to make sure they use our

6    product and, you know, they onboard correctly.  So

7    we -- we started working on onboarding then.

8        Q  For Steadfast, what did onboarding entail?

9        A  So it entails -- now this also depends on

10   different levels of literacy the customer has.  If

11   the customer is very tech literate, then, you

12   know, they can even do a self-onboarding.  They

13   can go into the product and, you know, put in the

14   users in there.

15       With Steadfast, they -- they weren't

16   really very tech literate, so we put in users --

17   and we do that for a lot of customers, by the way.

18   In this industry, a lot of folks, believe it or

19   not, are not very tech literate.  So they're like,

20   you know, how do I put in my users and how do I --

21   you know, what do I click to create the schedule?

22   So it involved -- it involved that.

23       Q  Okay.  And these communications in terms

24   of onboarding, as you indicated several times,

25   you're a small start-up company, so this could've

1    happened with any -- any of you all at Zira; is

2    that accurate?

3         A   That's accurate.

4         Q   So as part of the onboarding process, what

5    information did Steadfast need to provide you all

6    to get them set up?

7         A   So, like I said, actually, if you're tech

8    literate, you can onboard yourself.  So you don't

9    have to provide us anything.  It's our goal to

10   make sure, you know, they're using the platform.

11   So if -- if they -- if they're not very tech

12   savvy, then they provide us with information that

13   they aren't able to figure out themselves.

14   They're like, can you do this for us or show me

15   how to do it?

16           I can go into the details of a couple --

17   couple of things that they -- they send, if you

18   want that.

19        Q   Yeah.  So I'm looking -- and, remember,

20   this deposition is not about all of your

21   relationships with all of your consumers.  We're

22   focusing only on Steadfast.  So, with respect to

23   Steadfast, what information did they -- it's my

24   understanding that they weren't very tech

25   literate.  Like you said, that's not an insult;

1    it's just sort of the circumstances.

2         A   And it's common.   It's common.

3         Q   You had to provide a different level of

4    support.   So --

5         A   No, it's not different.   It's common, like

6    I said.

7            MS. DOTY:   Arjun, Arjun, Arjun.   Let -- I

8    understand she's misstating your testimony, but

9    let her finish, and then I'm going to make an

10   objection, and then you can clarify.

11           MS. LEWIS:   So coming back to my initial

12   rule, if I'm speaking, both for counsel and Arjun,

13   please let me finish my thought.   Everybody will

14   get a chance to speak.   Because what that does is

15   -- it's just going to make this go longer because

16   I'm going to have to go back up to the top.

17        Q   So coming back up to the top of what I was

18   saying, I understand that Steadfast was not very

19   tech literate.   So what information did they need

20   to provide you to onboard them?

21        A   They provided us with all their users, and

22   we imported those, and it's a simple click to

23   import the spreadsheet that they provided us.

24   And, every now and then, they provided us with

25   facilities that -- that they work with.   So we

1    have a feature in Zira where you can add those

2    facilities in.  And there may -- there may have

3    been one or more -- one or two more things which I

4    will have to recollect.

5        Q  When you said imported users, who are

6    users?  Can you please define what that means?

7        A  So the people you are scheduling.  They

8    could be on Zira, anything.  So they give us the

9    list of all the people that they are scheduling.

10       Q  What information did they give for those

11   people?  Names, phone numbers -- what -- what --

12   what -- let me ask it this way.  What demographic

13   information was provided to upload into Zira for

14   users?

15       A  So, first name -- and, again, this is best

16   of my knowledge -- first name, last name, phone

17   number, email is what Zira needs.  That's all Zira

18   needs.  We don't even need email actually.  Role,

19   Zira needs role as well, so, like, you know, what

20   role do you need to be scheduled for.  And I think

21   they provided us a couple more cells, like a

22   couple more fields, like address, which we -- we

23   -- when we import it, it disregards everything

24   other than those five fields that we need.

25       Q  And then you also indicated that they

**JA1578**

1    occasionally provided facilities that they work
2    with.  Are those likewise considered users?
3         A  Not always.  So facilities are the
4    different locations where you can create those
5    schedules.  Now facilities can have a point of
6    contact, which would be treated just like any
7    other user.  So, more often than not, the
8    facilities do have that point of contact, but if
9    they don't, you can add as many locations -- and
10   at Zira, that's not necessarily facilities.  It's
11   -- we have just locations, so if you are running a
12   business with many locations, you -- you can just
13   put in a location name.  In this case, it was
14   facilities, so oftentimes it was a group with a
15   person at that facility.
16        Q  Did Steadfast make any specific requests
17   or modifications to the Zira software for its
18   interface?
19        A  So Zira is -- we pride ourselves in being
20   very customizable and platformized.  So you can --
21   any -- customers can change how Zira works for
22   them.  So, just like any customer does, Steadfast
23   went in and, you know, made changes.
24        Q  Okay.  And what changes were made?
25        A  I -- I -- I may not be able to recollect

**JA1579**

1    everything, but there are things like, you know,

2    what your start day of the week is.  Is it Monday?

3    Is it Sunday?  Is it Tuesday?  So you can do that.

4          What are your -- what are the different

5    roles?  You can customize that to anything.  Like

6    I said, we have, you know, teachers and every --

7    everyone on Zira, so you can customize that.

8          You can even customize what the individual

9    objects are called.  So are they called -- we have

10   customers who wanted to call them drivers because

11   that's what they called their staff.  I --

12        Q  Sorry, what was that?

13        A  One of our customers calls their staff

14   drivers, so they put drivers as --

15        Q  Oh, okay.

16        A  Steadfast wanted to call them contractors,

17   so they put in contractor.  So Zira as a platform

18   allows you to do that, which is one of our value

19   props when -- when we -- when we sell the product.

20        Q  And to make the interface, the software,

21   customizable, is there a form?  Is it a phone

22   call?  How is that communicated?

23        A  You can do it right in the software

24   itself.

25        Q  And for Steadfast, did they do it

JA1580

1   themselves or did Zira do that for them?

2       A  I'll have to recollect, but for a lot of

3   things on Steadfast, we -- we basically just click

4   on the button for them and -- and -- yeah, click

5   on the few buttons for them after going into their

6   account which --

7       Q  And how did --

8       A  -- which they --

9       Q  -- you know which buttons to click on for

10  them?

11      A  I'm sorry?

12      Q  How did you know which selections to make

13  for them?

14      A  Oh, yeah.  So they -- they ask us, like,

15  hey, can you turn on this automation?  Can you

16  make sure, you know, start day of the week is so

17  and so?  Can you change this?  So they used to ask

18  us, and then we used to go in -- one of the

19  support agents go in and do it.

20      Q  And were these phone calls or email

21  communications?

22      A  I will have to check, but it was a little

23  bit of everything.  I think phone call, email,

24  text.  We even have a Zira support chat, which is

25  built into the product.  I will have to check if

1    they -- if they used that as well.

2         Q   And when Steadfast was making its

3    interface customizable, when was this?

4         A   It's a constant process.  Honestly, with

5    all of our customers, it's just like with

6    Steadfast.  So it's -- we've -- we've been in

7    contact with them from end of December to, let's

8    say now, three months.  The -- the idea of Zira is

9    that as you use it, you -- you learn about, like,

10   the different things you can do, so you keep

11   upgrading on the customizations.  So I don't think

12   it was, like, a specific time or date.

13        Usually, it's a little bit more during the

14   onboarding, and then it kind of tapers down once

15   the product starts working how you want it to.

16   But I would still say Steadfast is still

17   onboarding, very early in their onboarding.

18        Q   I understand since the contract is between

19   Steadfast and Zira, Steadfast is the one who goes

20   through this onboarding process; is that correct?

21        A   Yes.

22        Q   So do the users that Steadfast provided to

23   be set up, do they have an ability to modify any

24   of this interface, the customizable options that

25   Steadfast has done and is doing?

1      A   To modify the interface, no, users cannot.
2  The users cannot modify.
3      Q   What abilities do users have once set up,
4  based upon Steadfast's construct of the interface?
5      A   Yeah.
6          MS. DOTY:  Objection.  It's vague.
7          If you understand, you can answer.
8      A   Yeah.  I -- I -- I'll -- I'll understand
9  -- I'll answer with the best, like, I understood
10 from your -- so users -- as soon as a user is
11 added, they get an SMS to download the app, and
12 then they go through an onboarding, which is
13 simple things, like, hey, can you confirm your
14 name?  If you want to put a picture, you can put
15 in -- put up a picture.
16         And then you put in your time preferences
17 as well.  It's like, hey -- and again, this is a
18 scheduling too.  Think about a scheduling tool.
19 You're like, hey, I want to work on Mondays,
20 Tuesdays, whatever.  You put in your time
21 preferences.  So that's -- that's what they do.
22         And then when shifts are published, they
23 are able to see those shifts on their phone.  So
24 they're like, oh, you know, I can claim the
25 shifts.  I can click on a button and then be like,

1    hey, I want to claim this shift, as a user.  So

2    that's -- that's kind of what the user flow looks

3    like.

4            Does that -- does that --

5        Q   That answers the question.  I have just a

6    couple of follow-ups to that.  So for Steadfast on

7    the user side, is that -- like, the user interface

8    is their term of art for the user side, or is it

9    just the user's profile?  How should I refer to --

10       A   I want to make sure I understand.  Sorry,

11   I didn't get that.

12       Q   Or -- so, you know, on any, like, app, you

13   sign in and I can do -- from what I understand

14   here, they can put their name, put up a picture,

15   and put up time preferences.  Is that a -- the

16   user interface mode, or is it just a user profile?

17   What's the term that you all use to describe that

18   access level for the users that Steadfast has

19   provided access to their platform?

20       A   Hmm.  So I -- I don't know -- so there --

21   there is no, necessarily, a access level that you

22   can change for the users.  It is what all of

23   Zira's customers get.  They get their profile.

24   They can see a calendar with all their shifts, and

25   then the home page is a dashboard which just shows

JA1584

1    them what their next shift is.  So if your next

2    shift is tomorrow, it will say, hey, you have a

3    shift upcoming tomorrow.

4            So it's -- it's a fixed user interface

5    that we have for all our customers.

6        Q  Well, within that fixed user interface,

7    that's the fixed interface that Steadfast has

8    created and made customizable for their users; is

9    that accurate?

10       A  So it -- not really.  So a lot of the

11   customizations that you're doing are not on the --

12   are -- most of the customizations are on the --

13   the business side.  It's like, hey, what's my

14   start day of the week and stuff.

15           On the user side, our customizations are

16   pretty limited, so you can't change how the

17   interface looks for the most part.  I think things

18   like, you know, what is the name of the business

19   that shows up there, obviously that is different

20   because whatever you put in yours shows up there.

21   What is the name of the roles?  Whatever you put

22   in yours shows up there.

23           So things like that, like the copy, those

24   are things that might look different from one

25   customer to another.  But on the most front, on

1  the user side, the interface doesn't change that

2  much.

3      Q  Okay.  For the users, for Steadfast, is

4  there anywhere that they can specify their rate of

5  pay, how much they would get paid?

6      A  Yes.

7      Q  Can you tell me about that?

8      A  So one part of Zira's -- with Zira's

9  scheduling, right?  So we schedule shifts, we --

10 you -- you can on Zira put in that this is this

11 person's hourly rate.  So you put in the hourly

12 rate, and then, on the user side, you will be able

13 to see a shift, and you'll be able to see, hey, I

14 have a shift tomorrow from nine to five, and since

15 my hourly rate is ten, it'll show up there.  So

16 you can put in hourly rates for your users.

17         Now I will have to look if Steadfast has

18 put that in.  On -- on the most part, they hadn't.

19 Maybe they added it recently.  I'm not sure.  And

20 if they have, it's just very limited usage.  Right

21 now, they mainly use us for scheduling.  And --

22 and, honestly, they're still early in their

23 onboarding.

24     Q  So for the user side, are users able to

25 input their own rate, or is that only on -- I'm

1    trying to think of sort of a generic term to refer

2    to Steadfast.  I guess the contractor, the -- I

3    don't know.  What -- what's the term that I would

4    use so I'm not mixing up?  Because Steadfast is a

5    user, but they're a different type of user; right?

6    What is the name for Steadfast between this --

7    generically, how do you describe the medium, the

8    actual business that is setting everything up?

9        A   Like I said, the business decides that

10   name themselves.  So it -- in Steadfast's case,

11   it's contractor.

12       Q   Okay.  Okay.  So Steadfast is a

13   contractor.  So can users put --

14       A   (Inaudible.)

15       Q   -- their rate in --

16       A   So --

17       Q   Can the user -- let me --

18           MS. DOTY:  Arjun, Arjun, let her finish.

19   I know you -- I know you think -- but just please

20   let her finish her --

21           THE WITNESS:  All right.  My bad.

22           MS. DOTY:  -- question.  And I'm sorry I

23   interrupted as well, but I wanted to --

24           THE WITNESS:  My bad.

25           MS. DOTY:  It's okay.

JA1587

1   BY MS. LEWIS:

2       Q  So Steadfast having the contract with Zira

3   -- let's start at the top -- who are they?  Are

4   they the -- I'm not even sure -- I'm looking for a

5   term to refer to them.  What is a term that I can

6   use to refer to Steadfast in sort of streamlining

7   what they do relative to what the users do?

8       A  So we can call Steadfast the business, and

9   the users the contractors.

10      Q  Okay.  All right.  We'll call Steadfast

11  the business, and we'll stick with users being

12  whomever they input.  Okay.

13          So can the users specify rate of pay, or

14  is that only something that Steadfast can do for

15  the user's profile?

16      A  Only Steadfast can do.  Only the business

17  can put in the pay rates.  Because, like you would

18  think the -- the users would put in -- if -- if I

19  had access to put in pay rates, I would put in

20  very high numbers.

21      Q  So as I understand the way -- like, you

22  said it's used -- just used -- at this point, from

23  the last sort of, I guess, your review, Zira for

24  Steadfast is used just for scheduling.  So when it

25  pops up for the user, it would have their schedule

**JA1588**

1    and the rate of pay that Steadfast has input; is

2    that accurate?

3         A   So --

4              MS. DOTY:   Objection.   It misstates the

5    witness' testimony, but you can clarify.

6         A   So there are -- actually, there are

7    multiple ways to do scheduling.   Zira also allows

8    you to democratize scheduling.

9         Q   What is the word?   Say that again.

10        A   Democratize scheduling.   So it's a pretty

11   cool feature.   So what it does is you can send out

12   open shifts.   So you don't even have to assign

13   them.   So you can be like, hey, you know, I have a

14   coverage need for someone who's of this particular

15   role to come in on Sunday from nine to five.   Zira

16   believes a lot that, you know, you --

17   democratizing scheduling actually helps.   It's a

18   win-win for the business and for the users.

19             So, in that case, what would happen is the

20   user would get a notification saying that, hey,

21   there is a shift available on Sunday from nine to

22   five.   Do you want to claim it?   And they can go

23   in and hit a button, and they can claim it.

24             So think about this.   All of this was pen

25   and paper, like, manual.   Zira's basically

1    digitizing that flow.

2        Q   Okay.  And so when it sends out the open

3    shifts, does it also have a rate of pay attached?

4        A   It -- if that person in Zira has the pay

5    rate on them, then it'll attach it.  From my

6    understanding from the last support request we've

7    gone through with Steadfast, they barely had

8    anyone with pay rates in there.  I would say -- my

9    estimate is less than one percent of things had a

10   pay rate.

11       Q   Is there a chat feature within Zira that

12   users in the business can use?

13       A   Yes.

14       Q   Does Steadfast use such chat feature?

15       A   It's -- I -- I think a little bit, but

16   again, we -- we don't look into all the details of

17   their account, but from my last recollection, it's

18   been very limited.

19       Q   How many users did Steadfast send to be

20   added to the Zira system?

21       A   The estimate that I have is it was around

22   900.

23       Q   And approximately when was that?

24       A   This was between the first call and the

25   contract being signed.  I think so.  So it was

**JA1590**

1    approximately January -- January 2021, just to

2    clarify, a couple months ago.

3        Q  When users are setting up their profile

4    within Steadfast, do they have to go through --

5    click through a terms of use or any

6    acknowledgements with respect to the usage of the

7    technology?

8        A  I'll have to double check.  Our -- our

9    terms of use are on our website, and every user of

10   Zira abides -- we basically state that they abide

11   by the terms of use.  I'll have to double check if

12   those screens specifically have terms of use in

13   there.

14       Q  Now saying specifically within Steadfast's

15   platform and the -- excuse me a moment -- in

16   Steadfast's customizable software, did they --

17   well, let me step back.  Can -- when Steadfast set

18   up its software, could they add a click through

19   that users have to say yes or no to before they

20   are able to access their user profile?

21       A  A two-part answer.  Simple answer is no.

22   You cannot customize the mobile app.  Like I said,

23   it's very limited in the customizability.  It's,

24   like, the -- you know, the roles and everything,

25   that sort of is customizable.  The screens are --

**JA1591**

1    are not customizable.

2            Now, having said that, you can customize

3    the onboarding message you get via text.  So when

4    -- you can say, like, hey, when my users are --

5    are added, send them these lines of text.  So

6    mostly people say, like, welcome to, blah, blah,

7    blah.  Click here to download the app, stuff --

8    simple like that.  I'll check what -- what

9    Steadfast put in there, but it's likely something

10   like that.

11       Q  Now you also talked about facilities being

12   added, and I want to make sure I have an

13   understanding of sort of facilities' use and

14   interface with Steadfast's software.  How are

15   facilities set up on the app?

16       A  Facilities have, I would say, simply put,

17   a limited -- limited view of what the business

18   has.  Now, just to clarify, the desktop app, the

19   desktop product, the software is only for the

20   business and facilities.  The contractors or the

21   users only have a mobile app.  They -- they --

22   they don't have access to the desktop.

23            Now the facilities have a limited view

24   now.  It's -- it would be easy to understand that

25   the facility can only see their facility; right?

JA1592

1   Like, they cannot see the other facilities in

2   there.

3       Q  Okay.

4       A  That's -- that's kind of the setup.  So

5   they can see the schedule.  They can even add

6   shifts in there.  They can be like, hey -- so the

7   nice thing about Zira is, like, hey, a facility

8   can come in and be like, I need, you know, five --

9   five users to come in on Sunday, and they can open

10  up those shifts for -- for the contractors to

11  claim.

12      Q  And for facilities to -- like you said,

13  since it's a scheduling app -- open up shifts, do

14  they need to have permissions to do so by the

15  business, or is it independent of the business?

16  In other words, they go, "These are the shifts I

17  want," and it's automatically populated in the

18  app, or does it require the business' approval

19  before it's populated within the app?

20      A  So, number one, only the business has --

21  puts in the facility or, you know, asks customer

22  support to put it in -- will they even have access

23  to Zira.  So facilities by themselves cannot be,

24  like, hey, I want to go into Zira -- meaning they

25  can reach out to us, but they haven't, but Lisa

JA1593

1    and Steadfast specifically put in these

2    facilities.  Now once they go in, they can publish

3    the shifts themselves.  They don't -- I -- yeah,

4    they don't need approval.  They can just hit the

5    publish button.

6         Q  And when it's published, does it only have

7    the shifts or does it also have rate of pay?

8         A  So rate of pay will only show up if for

9    that particular person in that particular facility

10   in their profile page, their pay rate has been

11   entered.  And, like I said, from my last

12   recollection with Steadfast's customer support,

13   that's in less than one percent of the cases, in

14   my estimate.

15        Q  And would the facilities or Steadfast put

16   the rate of pay for the facilities?

17        A  Steadfast would put it in.

18        Q  Then does the -- the facilities, you said

19   that they have a -- is it desktop product only and

20   the app or just desktop product?

21        A  So it's actually on the browser.  It's a

22   cloud-based --

23        Q  Okay.  Browser.  Okay.  Cloud-based.

24        A  So URL and --

25        Q  So facilities, it's cloud-based; is that

JA1594

1    correct?

2         A   Yes.

3         Q   The business, cloud-based and desktop?

4         A   Oh, no.  By desktop, I meant cloud-based.

5    My --

6         Q   Okay.  Okay.  Okay.  So facilities and

7    business, cloud-based; users, app only.  Is that

8    correct?

9         A   (Inaudible.)

10        Q   So, given that the facilities are not the

11   business that have the contract with Steadfast, do

12   the facilities, like the users, get a welcome

13   email -- I guess, in this case, since it's not a

14   app -- once they sign up and register to be able

15   to post scheduling?

16        A   Everyone who's added has, you know, the

17   cloud-based access.  They get an email from Zira

18   telling them to create a password.  Like, hey,

19   you've been added, so please -- please reset your

20   password here.  That's the email they get.

21            Now, for Steadfast, we even send

22   facilities a little bit of our training.  Like,

23   hey, this is where you click to create your

24   shifts, and then please remember to hit the

25   publish button so that it's actually disseminated.

**JA1595**

1       Q  With the welcome letter and create your
2    shift, were there any terms of use that were sent
3    to the facilities that Steadfast asked Zira to
4    send?
5       A  Yes.
6       Q  And what were those terms of use?
7       A  I'll have to pull it up, but they gave us
8    a snippet.  It was, like, can you make sure you
9    add this in that welcome email?
10      Q  Do you know generically what was that
11   information -- what did they ask you to add?
12      A  If I remember correctly, it was, like --
13   it's -- it's really tough.  I would be guessing
14   here.  Is it okay if I --
15           MS. DOTY:  I don't want you -- Arjun, I
16   don't want you to guess.
17           THE WITNESS:  Okay.  I won't guess.  But
18   it was, like, boilerplate stuff.
19      Q  Did any of the boilerplate stuff discuss
20   the relationship between Steadfast -- the
21   business, facilities, and users?  Was it --
22      A  I don't --
23      Q  -- legal stuff?
24      A  I don't recollect.  It was legal lingo
25   that I -- I didn't really look into.

**JA1596**

1      Q   Do you know where the boilerplate
2   information came from from Steadfast?
3      A   Sorry, what is the question?
4      Q   Zira -- and if you don't know -- this may
5   not be within your knowledge, but do you know
6   where Steadfast got this boilerplate that they
7   asked you to put in?
8      A   No.
9      Q   In other words, was it developed
10  cooperatively with Zira to put this additional
11  language?
12     A   No.
13     Q   I can't hear you.
14     A   No.  No.
15     Q   Was the boilerplate language for the
16  facilities different than the welcome that users
17  receive?
18     A   So users don't get an email.  They get a
19  text message.
20     Q   Okay.
21     A   They just get a text message saying, hey,
22  download this app.
23     Q   Okay.  So there's no -- there was no
24  boilerplate language in the text message that
25  users received?

JA1597

1     A  I -- to my best of my recollection, no.  I
2  mean, I don't know actually.  I would be guessing.
3  Sorry, I don't know.
4     Q  What would you need to look at to
5  determine?
6     A  You can look at their account.
7     Q  Whose account?
8     A  Steadfast's.
9     Q  And who would they have sent that to?
10    A  Sorry, what's that?  What is the question?
11    Q  Who would they have sent the language to
12 include to users in their welcome?  Would that
13 have been you or someone else on the team?
14    A  They can add it themselves.  They could've
15 reached out to us.  Again, it's a simple text box.
16 And best of my recollection, there was nothing
17 there, but I -- I -- I don't know for sure.
18    Q  What about for the facilities?  Who did
19 they provide that boilerplate language to?
20    A  That, they provided to us.
21    Q  So for facilities and users, what are the
22 requirements to use the software?  What are the
23 system requirements?
24       MS. DOTY:  Objection.  It's compound.
25    A  What does that mean?  I don't understand

**JA1598**

1   the question.

2        Q  For -- so for users to access Zira

3   Technologies, is all that's required for them to

4   use it a cell phone?

5        A  A smartphone.

6        Q  Any minimum model or version required?

7        A  Not to the best of our knowledge.  We work

8   on Android and iOS, and --

9        Q  What about for the facilities?  What are

10  the requirements for facilities to use the --

11       A  A browser.

12       Q  -- account?

13       A  Any -- any computer with a browser.

14       Q  For accessing the software, can facilities

15  delete themselves from Zira or does Steadfast have

16  the sole ability to do so?

17       A  I will have to check.  I will have to

18  check.  It's -- facilities, like, they can just

19  stop using it.  That would be as good as deleting

20  themselves.  But I'll have to check if they can

21  delete themselves.

22       Q  Is that something that varies from

23  business to business in terms of whether or not

24  someone could remove and add themselves?

25       A  The same --

**JA1599**

```
1            MS. DOTY:  Objection.  It's vague.
2       A  I can answer though.  It's --
3            MS. LEWIS:  You were talking at the same
4   time.  You had an objection, Martha?
5            MS. DOTY:  Yeah.  I said objection, vague.
6            MS. LEWIS:  And, Arjun, you --
7            MS. DOTY:  If you understand --
8            MS. LEWIS:  -- were answering at the same
9   time.  Go ahead.
10            THE WITNESS:  My apologies, but I'm just
11   not used to this.  I sometimes --
12            MS. LEWIS:  No, it's not natural.  It's
13   not natural.  My -- let me say my question again,
14   so we get a clear sort of line here.
15       Q  Does -- within Zira's software, can
16   facilities remove themselves from using it, or is
17   that something that is exclusively limited to the
18   business?
19            MS. DOTY:  I'm just going to object.  It's
20   vague.
21            If you understand what she's asking, you
22   can answer, or at least I --
23       A  I --
24            MS. DOTY:  Go ahead.
25       A  Sorry, I understand.  I'll have to check
```

1    if facilities can remove themselves.  In Zira, we

2    haven't worried about this feature because it's as

3    simple as, like, don't use it and nothing will

4    happen.  But I'll have to check if you can, like,

5    technically, like, remove yourself.

6        Q  But businesses can remove facilities; is

7    that accurate?

8        A  So Zira's a platform.  What -- what

9    facilities are in Zira is also in some places --

10   some customer use it -- use it as locations.  It's

11   the same platform.  Think about it just like

12   organization of the account.  You might have,

13   like, a Baskin Robbins with five locations, you

14   know.  I'm not saying they're a customer, but just

15   giving a vague example.

16       Q  Right.

17       A  And then as a business, you can be like,

18   hey, this location doesn't exist anymore, so I

19   don't want to see it.  I'll just remove it.  So

20   that way, yes, the -- Steadfast can remove the

21   facilities because they've used our location

22   feature for facilities.  I'll have to check if

23   facilities can delete that in the UI as well.  I

24   don't recollect.  But it would be no different

25   than just not using it.  It would be very similar.

JA1601

1       Q  So when a location -- and in this case
2    facilities -- are removed, is that information --
3    for example, if they had been using it, input
4    schedules in their use -- is that deleted, or is
5    it just archived somewhere?
6       A  Ooh, good question.  I'll have to check.
7    I'll have to check.  I don't know the answer to
8    that.
9       Q  I'm going to ask similar questions about
10   the users.  So, for users, can users delete
11   themselves from the business?
12      A  Users cannot delete themselves.
13      Q  And, similarly, is Steadfast the only
14   entity or thing that can delete users?
15      A  Yes.  And users -- also, there is an -- in
16   users, there's an archive, so you can archive
17   them, and then you can delete them as well.
18      Q  And when they are -- what's the difference
19   between archive and delete within the software?
20      A  So with archive, all the information still
21   remains.  With delete, we let you know, hey, are
22   you sure you want to delete?  And -- and we delete
23   it.  It's -- the information doesn't remain in the
24   account.
25      Q  Disappears from the cloud?  Is that what

**JA1602**

1   happens when you delete?

2       A  It's tough to say.  I -- so I don't know

3   if it disappears from the cloud, but in tech

4   lingo, it's not pointing to that cell in the

5   cloud.  It might still --

6       Q  Okay.  Has Steadfast deleted any users

7   since using the software?

8       A  To the best of my knowledge, no, but I

9   don't know for sure.

10      Q  Is there a way that Zira would have access

11  to that information to know whether or not they

12  had deleted users?

13      A  I'll have to check with my engineering

14  team.  We can -- we would know if they've

15  archived.  We wouldn't know -- meaning, again, we

16  wouldn't know.  Anyone who goes into their account

17  would know because they would be in the archive

18  bucket.  For deleting, I would have to check.

19      Q  Has Steadfast archived any users since

20  using the app?

21      A  I -- I --

22          MS. DOTY:  Can you repeat that?

23      Q  Has Steadfast archived any users since

24  using the app?

25      A  To the best of my knowledge, I -- I don't

**JA1603**

1  think so.  Like I said, we do support for them, so

2  every now and then, we are going into the account,

3  so I don't remember seeing anything as such.  But

4  I -- I may be mistaken.  There may be one or two

5  people there.  I -- so I can't say for sure.

6      Q  Within the app, when a user is archived,

7  does it ask for an explanation or is it just a

8  button?

9      A  Yeah, it's a couple of buttons.  It just

10 -- it's a confirmation model:  Are you sure you

11 want to archive them?  That's it.

12     Q  So there would be no information with

13 respect to why Steadfast as the business decided

14 to archive a user within the app; is that

15 accurate?

16     A  Could you repeat that?  Sorry, I didn't

17 get that.

18     Q  Sure.  So there's no information within

19 the app that would explain why the business

20 archives a user?

21     A  That's right.

22     Q  On Steadfast, as the business side -- and

23 when I say the business side, so it's kind of like

24 user/business --

25     A  Right.

**JA1604**

1    Q  -- on the business side of the app, for

2  each user, does Steadfast have the ability to make

3  notes that are visible to them about a particular

4  user but the user cannot see on their side?

5    A  Yes.  There is a notes field in there.

6    Q  And is it just a blank text box where they

7  can type information?

8    A  That's right.  Keep in mind, I will want

9  -- I will let you know that Steadfast is still

10  onboarding.  They -- they don't use most of our

11  features.

12    Q  Is there a way to generate if they had

13  used the text box feature on the user side to

14  download that data?  So similar -- like, you know

15  for Facebook how you can download history.  Is

16  there that feature that Steadfast likewise can

17  download text fields that they may have input for

18  certain users?

19    A  There is no direct way.  You'd have to

20  click on every single user.  Then you just hit the

21  browser, like, I think -- yeah, they -- maybe

22  screenshot or something like that.  You would have

23  to do that.

24    Q  Is there a way to run a query to determine

25  how many or even if they've used that feature for

**JA1605**

1    any of their users?

2        A  Well, in engineering terms, it's -- it

3    might -- might be a while for us.  Like, it would

4    be custom work we would have to do to build that.

5    It's not something anyone has requested from us.

6        Q  Is it fair to say that that's not

7    something that Steadfast has requested to date?

8        A  Yeah, it's not a feature that -- again, as

9    a product lead, it's like, will this be useful for

10   customers?  I don't know -- there are a lot of

11   things on our priority list, so this would be a

12   lot of effort for us to build.

13       Q  Okay.  Speaking with users again, is there

14   a way to monitor a user's frequency of use of the

15   app?

16       A  No, there isn't.

17       Q  Would Steadfast be able to see if a

18   particular user had logged in to check scheduling

19   or availability?

20       A  Yes.

21       Q  How does that work?  Can you walk me

22   through how -- what does that -- what do they do?

23       A  Absolutely.  So when you go into the team

24   page, you will see all your users.  And this was a

25   feature actually another customer requested that

JA1606

1   we build.  So you see their name, you'll see

2   their, you know, role.  On the last column, we

3   added a thing which is called last activated or

4   last used -- I think that's what the column says

5   -- or something around that lines.  And basically

6   it tells you when they last opened the Zira app.

7       Q  So it has last used, but does it have a

8   further breakdown of week of -- what week are we

9   in?  I'm just using this week as an example.  Week

10  of March 28th, user logged in five times, or does

11  it have that level of detail?  What are the --

12  what information is given besides the last use in

13  terms of frequency of use?

14      A  It's just the last use.  Besides last use,

15  we also have a differentiator to say not

16  activated.  So that means that they did not even

17  create an account.

18      Q  So of the 900 or so users that Steadfast

19  provided Zira to assist them with onboarding, how

20  many of the users have been activated?

21      A  To the best of my recollection, the last

22  time we looked, it was about -- I'm estimating

23  here, okay?  So it was about 50 to 60 percent,

24  plus or minus a few percent here and there, so

25  it's an estimate.  It's a rough estimate, but it

JA1607

1    was ballpark around there.

2         Q  And when was that last time that you

3    looked?

4         A  About a month, maybe slightly more.

5    That's also an estimate, I apologize.  So it was,

6    yeah, about a month or two or three.

7         Q  And how do you know that the users

8    activated it rather than the business?

9         A  The way it works now -- again, I don't

10   know about Steadfast -- but the way Zira works is

11   if the business adds that particular user, they

12   get an SMS.  Now that works for all of our

13   customers.  Now they have to download the app.

14   The SMS has the link to the app.  So they go -- it

15   takes them to the app store, they can download the

16   app, and then we do an OTD check.

17        So we're like, hey, what's your phone

18   number?  And then you put in your phone number,

19   and then we're like, oh, this is the same phone

20   number which is in that account, so we -- we know

21   who you are, like, we can now link you to that

22   account, but now you need to give us the four-

23   digit code that we just sent to your mobile phone

24   number.

25        Q  Okay.

JA1608

1      A   Enter the four-digit code.  We are like,

2   oh, your details, are you, you know, Ryma Lewis?

3   And you're like, yes, yes, and you go in.  So

4   that's how it works.  It's -- it's the phone

5   number which is kind of the key.

6      Q   Okay.  So I want to make sure I'm using

7   the word activated in the same sense you're using

8   the word activated.  So what do you mean when you

9   say activated?

10     A   So the day actually when they went through

11  those onboarding steps to see their account.

12     Q   Those onboarding steps are what you just

13  detailed a moment ago; is that right?

14     A   Yes.

15     Q   Okay.  So of the -- of the estimated

16  amount, you said somewhere between 50 and 60

17  percent about a month ago or it may have been a

18  bit longer that you have looked, how many of those

19  activated users have been using the app?

20     A   By "have been using," you mean like in the

21  last few weeks?

22     Q   So they activated it, and I understand

23  that there's a last use column, so of that 50 to

24  60 percent who activated, what percent of that 50

25  to 60 percent had something in the last use

1    column?

2        A  So everyone who activates has something in

3    the last use column.

4        Q  Okay.  Okay.

5        A  It's the last time you -- you -- if it was

6    activated, it would say, you know -- yeah.  So

7    everyone who has that has that number there.

8        Q  And so that brings me to another question.

9    So when we talk about last use, did that just mean

10   logging into the app or does that mean actually

11   active engagement in the app -- scheduling,

12   accepting -- what does -- what does last use --

13       A  (Inaudible.)

14       Q  -- stand for?

15       A  Sorry, my bad.  It just means you opened

16   the app.  That's -- that's all we are tracking.

17   The fact that you used means, in our case, you

18   opened the app.

19       Q  Is there any way to determine what type of

20   use they had within the app?

21       A  No.  It's a tough question.  The

22   multilayer, like -- yeah.  It's -- to the best of

23   my knowledge, I can't think of, yeah, a way to do

24   that.

25       Q  And I understand all of these questions,

**JA1610**

1    they -- I mean, you're an engineer and you work

2    with a team of engineers, so within the realm of

3    engineering, there's a lot of possibilities.  But

4    I'm just thinking about sort or how it stands now

5    and what it --

6          A  I'm glad you clarified that because --

7          Q  Yeah.  Yeah.  Because I know there's a

8    why.  There's a -- there's a way for an engineer.

9    Okay.

10         What about for facilities?  Is there any

11   way to determine the usage -- the frequency of use

12   by facilities?

13         A  No.  Facilities, no.

14         Q  What are the facilities -- I understand

15   they can input their schedules, but can Steadfast

16   also input scheduling opportunities for those

17   facilities?

18         A  Yes.  Like I clarified earlier, it's just

19   a different usage of the location feature item.

20   If it was user's locations, it would be primarily

21   the business doing it.  So it's -- the business

22   has all the access to do that.

23         Q  When Steadfast inputs scheduling

24   opportunities for facilities, do the facilities

25   have to approve those scheduling opportunities?

**JA1611**

1          MS. DOTY:  Objection.  It calls for

2     speculation.

3          A  So within the app, they're -- they don't

4     have to approve.  Now outside of the app, I don't

5     know.

6          Q  Okay.  To clarify, my question was within

7     the app.  So, for example, the same way users have

8     to get yes, no, click through, do -- when

9     Steadfast enters scheduling for the facilities, do

10    the facilities within the app?  That was to

11    clarify my question.

12         A  What was the user part that you said

13    there?  Yes, no, click --

14         Q  No, I was saying so in terms of -- well,

15    actually, let me go back.  Let me break that up.

16         If a user selects a scheduling

17    opportunity, who -- how is it confirmed?

18         A  Good question.  So Zira has both the

19    options in the software where you can turn off

20    approval, and some of our customers have that.  So

21    as soon as you claim it, it's approved.  It's

22    first-come-first-serve basis.  It's depending on

23    how businesses want to set it up.

24         To the best of my knowledge, Steadfast has

25    the approval turned on, so someone has to approve

**JA1612**

1    it.  It's either Steadfast or the facility.

2    Either one can approve it.

3        Q  Is there a way to determine who does the

4    approval?

5        A  No.

6        Q  So when a user selects a scheduling

7    opportunity, who is notified?

8        A  User claims a shift right now -- have to

9    check.  Give me one second.  Let me think about

10   it.

11          So the first simple answer is when you log

12   in, either as a facility or -- or Steadfast, the

13   business, you can go into a section and you can

14   see everyone who's claimed shifts in order to

15   approve.  So you can manually go in and see that

16   at any time.  You have access to it.

17          Now notifications are custom created on

18   Zira too.  So you can custom create, like, when

19   this trigger happens, send a notification to X, Y,

20   Z.  And customers use them in different ways.

21          I'll have to check what notifications are

22   set up on Steadfast, but to the best of my

23   knowledge, we have both of -- both the facility

24   and Steadfast notified.  But irrespective of the

25   notification, you can always come into the --

**JA1613**

1    through the web app and -- and see -- see that in

2    a section there.

3         Q  So when a user selects a shift, can you

4    walk me through the process?  So I'm user A, I log

5    in, I see a scheduling opportunity.  I select that

6    opportunity.  Then what happens next for me as the

7    user?

8         A  So in Steadfast's case, if manager

9    approval is turned on, it will say, hey, your

10   claim request has been sent.  And then when you

11   come back to the shift, it reminds you that you

12   already requested the shift.  And you can go in

13   and request more shifts.  You can even see, you

14   know, shifts that you've been approved for that

15   you can click and do.

16         So -- so you basically wait, in the case

17   if their approval's turned on, and as soon as

18   someone approves it, you get a notification

19   letting you know that you're -- you're -- you're

20   approved for your claim request.

21         Q  Is it like a pop-up notification or an

22   email to me as a user if approved or denied, or do

23   I have to physically log back into the app, or how

24   does that work?

25         A  Very good question.  With most of Zira's

**JA1614**

1  stuff, you'll see that it's customizable.  That's

2  --

3        Q  Okay.

4        A  -- a value prop.  So you -- you can set it

5  up to -- so, at the minimum, you will get a push

6  notification, so you will get a pop-up.  You know,

7  just like how when your Uber's --

8        Q  Correct.

9        A  -- arrived, you have that.  So --

10       Q  AccuWeather, I get those notifications all

11  the time.  Yes.

12       A  Actually, at a minimum, you will get that

13  notification.  Now, on top of that, Zira allows

14  you to add in, like, hey, send them an SMS as

15  well, and, hey, send them an email as well.  So

16  I'll have to check what was entered there, but at

17  the minimum, you'll get a push notification.

18            And -- and then the second thing is,

19  irrespective of the notification or not, when you

20  go into the app, you will see it for sure.

21       Q  Okay.  When a shift -- let's say a shift

22  is confirmed.  When their shift is approved -- I

23  think that was the language that you used -- does

24  it then show up for me, user A, as this is my

25  shift and this is my rate, or is there additional

1    steps with respect to the rate, establishing the

2    rate?

3        A   No, it will say it, but only again if your

4    rate has been entered into the system.  And, in

5    Steadfast's case, like, in -- it's an estimate,

6    but nearly in all of their cases, it's not entered

7    there, unless things have changed, but they are

8    not entered really.

9        Q   Has Steadfast explained to Zira why it

10   hasn't included rates for facilities in schedules?

11       A   No, they -- they haven't.  They -- they're

12   just slow with onboarding.  These onboardings take

13   time, by the way.  They're not straight -- they're

14   not, like, you know, push a button and

15   everything's on.  They take time.  And -- and

16   Steadfast, they're truly, you know -- we consider

17   them a new customer; right?  Because it's January

18   and -- and right now it's March, so it does take

19   some time for them to fully use the system.  If --

20   that is also if they -- if they wish to do so.

21       Q   Have they indicated whether or not they

22   intend to add rates?

23       A   They -- I think throughout our

24   conversation, there was a lot of, like, we intend

25   to, like, use Zira for this, for that, for

1    everything; right?  Because that's -- that's what

2    most customers want to do.  But when -- when --

3    when it comes to doing it, it's like -- it takes

4    that far, it takes time, it takes going into every

5    single user and every single facility, putting in

6    that information, and a lot of folks just are --

7    they take their -- it takes some time to add all

8    of that in, so -- they may have intended to do

9    that and actually maybe more, but they just

10   haven't gotten to it yet.

11       Q  Okay.  So I understand that they're a new

12   customer, but are they actually using Zira at this

13   time?  Are they still -- it's not even there yet?

14       A  They are using it but a subset of the

15   facilities, only, you know, some shifts are being

16   published, and it's -- it's -- it's in the

17   beginnings of using it.

18       Q  At Steadfast, who is using it?

19       A  I wouldn't know a hundred percent for sure

20   exactly who's using it, but it's -- we have an

21   account for Lisa and for the call centers.

22       Q  Is it just a call center account with a

23   general account, or is it call centers with

24   separate profiles for each call center employee?

25       A  I think there is Call Center 1, Call

JA1617

1    Center 2, and I think there are, like, five or so,

2    maybe six.  I may have forgotten.  But I don't

3    know their name -- meaning, it's just called Call

4    Center 1, Call Center 2.

5         Q  And is there a way to determine the

6    frequency of use for each of those setup business

7    profiles -- Call Center 1, 2, Lisa, etcetera?

8         A  No.

9         Q  Since the rollout of the app for

10   Steadfast, I understand that it's still in

11   beginning of use, only some shifts being

12   published, but is there any way to quantify how

13   regularly they use it on a weekly basis?

14        A  It's tough.  Yeah, I would just be

15   guessing at this point.

16        MS. LEWIS:  Okay.  Let's talk a little bit

17   about reports, and then I'd like to take a five-

18   minute break just to get some water and take care

19   of some things.  Five minutes, okay?  We've been

20   going for a little bit over an hour and a half at

21   this point.  And I don't anticipate it'll be too

22   much longer after coming back from the break.

23        We'll probably take one more for me to try

24   and figure out how we can get to these documents.

25   I think I'm probably going to have just send you

**JA1618**

1    all the Department of Labor's -- our Dropbox sort

2    of version, Martha --

3            MS. DOTY:  Okay.

4            MS. LEWIS:  -- and work through this.

5            MS. DOTY:  Okay.

6    BY MS. LEWIS:

7        Q  Okay.  So for reports, has Steadfast

8    requested for any reports to be created?

9        A  No.

10       Q  Are there any sort of reports that

11   Steadfast -- well, not Steadfast -- that Zira can

12   create for businesses?

13       A  So we don't custom create reports.  We

14   just click into one of the tabs, and you can see

15   the reports.  They're -- in Steadfast's case,

16   they're on that -- there won't be that much data

17   in the reports if they did that, but I would have

18   to go in and look.

19       Q  Why do you say there wouldn't be much data

20   in the reports?

21       A  So the reports are -- so it's scheduling.

22   There's -- reports are mainly for time and

23   attendance.  The people are actually clocking in,

24   clocking out.  Steadfast hasn't really been using

25   Zira for time and attendance, and the reports are

**JA1619**

1  mainly focused on that.

2      Q  Is there a way for the facilities to

3  create any sort of reports using the technology?

4      A  Yeah.

5      Q  Is there a way for the users to create

6  reports of their time and attendance or

7  scheduling?

8      A  No, no reports.  And, again, they aren't

9  really using us for that, at least to the best of

10  my knowledge.  I haven't seen time and attendance

11  on some --

12      Q  Do you know approximately how many

13  facilities have been set up in Zira by the

14  business?

15      A  I would say about a few weeks ago it was

16  about three, and then lately they have been

17  ramping up slowly.  So, as of today, it may be

18  ten, approximately.  And then the -- it's tough to

19  say because ten have some shifts in there, but I

20  don't know if they're, like, actively using it.

21  They may be like, hey, want to use it once, and

22  then a facility may have forgotten.  So I don't

23  have that data as to, like, who's actively using

24  it.

25      Q  Has Zira provided any trainings to the

**JA1620**

1    facilities?

2         A   Yes.  We -- we send them an email, so,

3    like, hey, it's two simple steps to use Zira.  One

4    is you click to create the shifts, and two is you

5    hit the publish button.  So we -- and then we say

6    that you can even approve, you know, people who --

7    who claim your shifts.  So we send them, like, an

8    email which has the drift.

9              We -- along with the training -- along

10   with that, we also tell them that, hey, please

11   schedule a meeting with us if you want more

12   personal training.  And I think one or two, like,

13   reached out and, like, hey, can you walk me

14   through, like, how do I log in and stuff like that

15   and basic stuff?  What do I press to create the

16   shift?

17             So I think we -- we did meet with -- I

18   think maybe one or two of the facility point of

19   contacts to be like, hey, this is your account.

20   This is where you click.  This is where you hit

21   the publish button.

22        Q   What facilities were those?

23        A   I'll have to check.  I'll have to check.

24   I don't remember.

25        Q   Between the facilities and the users, is

**JA1621**

1   there any way to -- for them to communicate

2   directly, besides sort of the offering of shifts?

3        A  So the chat feature is available to all.

4   Anyone can chat anyone.

5        Q  And for that chat feature that's available

6   to all, let's say that there's a user and a

7   facility that are having a chat for whatever

8   reason, would the business -- "business" being

9   Steadfast -- be able to see that chat even if they

10  weren't a part of it?

11       A  Yes.

12       Q  If --

13       A  Wait, actually, let me think.  Maybe not.

14  Sorry, I take that back.  I -- I - it's a good

15  question.  I -- to the best of my knowledge --

16  wait, wait, wait.  Let me think.  The business,

17  facility, chats without, chats without -- so it's

18  a nuanced answer.  So there are groups that you

19  can chat in.  So you can reach out to, let's say,

20  the entire -- all the users, and you can broadcast

21  and message.

22            Now, by the way, Steadfast doesn't use

23  that much chat, so this may be irrelevant, but

24  I'll just tell you how the product works.

25            There -- you can -- you can reach out to

**JA1622**

1   all the users.  So you can be like hey.  You can

2   reach out to a particular role, so, like, hey all

3   the drivers or all of the -- you know, whatever --

4   whatever the roles are.  If you message something

5   in the group, then everyone can see it.  You know

6   exactly who said it.  But if you send a one-on-one

7   message, then, to the best of my knowledge, only

8   those two people see it.

9        Q  If Steadfast wanted to know about one-on-

10  one messages between the facility and the user, is

11  there any way that they could get that, or is

12  there just sort of like a private or ghost mode in

13  which Steadfast wouldn't be privy -- be able to

14  get that information?

15       A  I wouldn't call it a ghost mode.  I would

16  just say that any one-on-one conversation, someone

17  else I don't think can view that.  Even if a

18  contractor has a one-on-one with another

19  contractor, let's say, I don't think anyone can

20  see what those messages are.  So it's not like a

21  specific mode; it's just how it works.

22       Q  How long are those -- and I understand

23  your qualification that they're not using that

24  right now, but in the event it is used, in the

25  chat feature, how long do chats stay within the

1    technology, the app?

2        A  Well, it's very limited usage, to the best

3    of my knowledge.  Because I always see, like, some

4    indicator there -- I think we've gone and -- I

5    don't remember, but it's very little there.  So

6    it's not -- it's not used at all.  To the best of

7    my knowledge, it -- I don't -- I don't remember

8    deleting those messages.

9             Now we actually also use -- yeah, it's --

10   yeah.  I -- I -- I don't think we deleted them.

11   Now I don't know for sure.  I'll have to check

12   with my engineers, like, after every, like, few

13   months or years we -- we will delete them at some

14   point, but right now, to the best of my knowledge,

15   we haven't deleted anything.

16       Q  So for those chats and those

17   communications, whose, I guess, property would

18   they be?  Would it belong to Steadfast, the

19   business that has a contract, or is it the

20   property between the user and whomever else or the

21   facility and whomever else?

22            MS. DOTY:  Objection.  Calls for a legal

23   conclusion, but you can answer as a layperson.

24       A  I actually don't know.  I'll have to look

25   into our legal -- legal docs.  We're doing

**JA1624**

1    everything, hope -- yeah, I don't know.

2        Q   If Steadfast requested communications,

3    those chats, would Zira provide them to Steadfast?

4            MS. DOTY:  Objection.

5        A   No.

6            MS. DOTY:  It's an incomplete hypothetical

7    and calls for speculation.

8        A   It -- we haven't done this ever.  And,

9    look, we're a start-up.  If anything's taking us a

10   lot of time and effort and we don't think it's

11   right, we don't do it.  So, yeah, I -- we -- we --

12       Q   Okay.

13       A   -- we've never faced with a question like

14   this.

15       Q   Do users have the ability -- let's --

16   coming back to the approval-denial process and

17   picking up shifts, do users have the ability to

18   then reassign a shift to another user?

19       A   No.

20       Q   Do -- if a user accepts a shift and then

21   changes their mind, are they able to cancel it

22   without Steadfast's approval?

23       A   Yeah, they can just hit a release button,

24   and it'll release.

25       Q   And then what happens to that shift?

**JA1625**

1        A  We open it up again.  So it's then again

2   available for the people to pick up.

3        Q  But there's no ability for user -- user to

4   user to assign shifts?

5        A  No.  Some of the other apps have that

6   actually, which is called swapping.  We don't have

7   that.  We have not built it yet.

8        Q  Meaning it's not available in your

9   technology or it's not something that Steadfast

10   has asked for?

11        A  It's not available in our -- we -- I guess

12   the answer is both.  It's not available in our

13   technology, and I don't recollect Steadfast asking

14   for it either.

15        Q  What -- is Zira integrated with

16   Steadfast's payroll and accounting system?

17        A  No.

18        Q  I'm sorry?

19        A  No.  We don't integrate with any -- any

20   payroll system.

21        Q  What is sky level view?

22        A  So it's just a view in the UI where you

23   come in and you can see all of your facilities.

24   So it's just a list view of all of your

25   facilities, and then you can click into one of

1   them and zoom into them.  So it's -- yeah, it's

2   just that.

3        Q  So it's --

4        A  And --

5        Q  -- on the location side?

6        A  Sorry, I --

7        Q  It's on the location side, not the user

8   side -- sky level view?

9        A  So --

10       MS. DOTY:  I'm just going to object.  It's

11  vague.  I don't -- I think the terminology is

12  vague.  If you understand, you can answer.

13       A  Yeah.  So when a business logs in, you

14  know, just like I explained, if it was -- and

15  Baskin Robbins, by the way, is not a business --

16  just clarifying -- but if they did and they --

17  they would be receiving all their notifications on

18  one page; right?  And then they can click into

19  one, like, oh, I'm interested in this one.

20       Similarly, for Steadfast, when they log

21  in, they can see all of their facilities, and they

22  can be like, hey, I want to click into this one.

23  So that screen which shows the list of all of them

24  is what we're just product marketing as sky -- sky

25  level view.

**JA1627**

1        Q   Do users have a sky level view?

2        A   No.

3        Q   Do facilities have a sky level view?

4        A   No.  Facilities just see their facility.

5        Q   What is the benefit of sky level view for

6    the business, i.e., in this case, Steadfast?

7        A   I would say just think of it as a

8    dashboard.  So instead of going through your

9    facilities through a dropdown, it's an exaggerated

10   dropdown.  It's like, hey, which one do you want

11   to click on?  So it's just -- it's just a UI

12   simplicity feature.

13       Q   What is Zira's built-in compliance

14   program?

15           MS. DOTY:  Objection.  Lacks foundation.

16       A   So we don't have a built-in compliance

17   program.

18       Q   You don't have that?

19       A   I don't know what that means.

20           MS. LEWIS:  Okay.  Me neither.

21           (Laughter.)

22       Q   What is Zira Manager?

23       A   Zira Manager is what the businesses use.

24   The product we term as Zira Manager, that's what

25   that is.

**JA1628**

1     Q  Okay.  So Steadfast's platform is Zira

2  Manager?

3     A  Yes.

4     Q  Okay.  Is there any information that

5  Steadfast has on Zira Manager that -- well, let me

6  ask the question this way.  Zira Manager -- is

7  there any information that Steadfast has that Zira

8  doesn't have?  In other words, who's the holder of

9  Zira Manager?  I'm not sure if that -- if we need

10  to walk through that, that's fine.

11         MS. DOTY:  Can you -- I'm sorry, but can

12  you ask that again?  Or I guess I'll just --

13         MS. LEWIS:  Sure.  Let me -- let me ask it

14  a different way.  Let me -- let me sort of --

15         MS. DOTY:  You muted your -- yeah.

16         MS. LEWIS:  Yeah, I know.  My colleague,

17  Ms. Jones, co-counsel, is in my office.  She's

18  listening in as counsel.

19  BY MS. LEWIS:

20     Q  Who has access to the information in Zira

21  Manager?  Is it exclusively Steadfast, or can Zira

22  and Steadfast both access that information?

23     A  It is -- it's -- it's information for

24  Steadfast.  Now when there are customer support

25  issues, we -- we sometimes go in and, you know,

1   help them out, but it's -- it's -- it's

2   information for Steadfast's access.

3        Q  Okay.  So for Zira Manager, this is what

4   we've been talking about this whole time.  It's

5   about you setting them up, onboarding, and

6   basically what we've been talking about the past

7   hour and a half?

8        A  Yes.  Yes, that's --

9        Q  Okay.  And so Zira works with Steadfast to

10  develop their Zira Manager, their platform?

11       A  I wouldn't call it develop.  The --

12       Q  Okay.

13       A  -- the program is the same for everyone.

14  You can add your details in it; right?  Like,

15  think about any software that you use, right?  You

16  come in and you're like, hey, I want to -- I want

17  to put in my data, and I want to put my users in

18  it, I want to put my shifts in it.  But everyone

19  has their Zira Manager with just their data in it.

20       Q  Is there a user handbook that Zira has

21  provided to users?

22       A  You mean the contractors, in this case?

23       Q  So we've been talking about users,

24  facility, and the business.

25       A  Yep.  So the users, there is -- it's

**JA1630**

1    available public access for everyone.  It's on the

2    Help -- on our website, on Help Guides.  It walks

3    through like, here, this is how you create an

4    account.  There will be an OTD that will be

5    requested, and this is where your shifts are.

6    Click on the calendar icon.  Like, it's basically

7    just walking through the app.

8        Q  Okay.  So it's not something that is --

9    has been created specifically for Steadfast?

10       A  No.

11       Q  And is Zira Portal what the users and

12   facilities use?

13       A  Good question.  Zira Portal is a third

14   product that Steadfast doesn't use at all.  It is

15   the on-location clock-in device.  So it works on

16   any tablet.  It's just an app actually.  So if you

17   have a tablet or an android, you can download the

18   app, and it's our -- you can come in and you can

19   clock in.

20           Now that's -- that's -- some customers use

21   it.  Steadfast doesn't use us for clock in/clock

22   out.

23       Q  What is Zira Employee?

24       A  So that's the user's app.

25       Q  So is there a separate handbook for the

1    Zira Employee, Zira Portal, etcetera, or just one

2    handbook?

3        A  So the Zira user's is -- is online,

4    available.  You can just go there.  For the

5    managers, there are a set of videos which are

6    generic videos.

7            Now, oftentimes, we can get, like,

8    personalized videos, like, hey, this is your

9    account data, make sure you click in here.  Based

10   -- you know the meeting we have on the onboarding.

11   We realize, like, these are the features that they

12   want, so you walk through those details a little

13   further.

14       Q  Okay.

15       A  Yeah.

16       Q  Have any training videos been created for

17   Steadfast's users?

18       A  Yes.  I don't think -- there was one -- we

19   did create one for the users.  I don't think -- if

20   we sent it or not or if Steadfast sent it.

21   Actually, I don't know.  We didn't.  So there was

22   just a simple walkthrough of the app.

23           We also created a training video for

24   Steadfast and the facilities.  I think we did.

25   Yeah, we created one training video for all.  But

**JA1632**

1  again, it was the basics -- high level, fake

2  account, like a demo account, hey, this is where

3  you click in -- because all the data is

4  confidential.  So it's just -- all the training

5  videos just have, like, placeholder data in it.

6      Q  Okay.  And when did you provide that basic

7  demo app for the users?

8      A  It wasn't a app; it wasn't a video.

9      Q  I'm sorry.

10     A  I don't remember.  It was a month ago or

11 maybe -- yeah, I think it was a month ago, if I

12 recollect correctly.

13     Q  What about for the facilities?

14     A  Yeah.  Everything's been in the last two

15 and a half months, so --

16     Q  Okay.

17     A  -- those (indiscernible), but, yeah, few

18 -- few weeks ago, the facilities for Steadfast and

19 for the users.

20     Q  Within the -- was there a contract entered

21 into between Steadfast and Zira for the technology

22 that you all have provided?

23     A  So it was the basic contract that we do

24 for everyone, which is a subscription-based

25 contract.  It's per user, per month.  I think the

**JA1633**

1    document is there.  I don't know who sent it to

2    who, but it's there somewhere, and it just walks

3    through, like, hey, these are the number of seats

4    -- it's just like how software -- all softwares

5    do.  This is the cost per seat, this is what

6    you'll have have to pay us every month.

7        Q  And it's month to month; is that correct?

8        A  It's month to month.  I think sometimes we

9    do -- when, like -- we call it an annual contract,

10   but it's actually you still pay us per month, and

11   we don't charge you if you break the contract.

12   Yeah.  So at the end of the month, you be like,

13   hey, I don't like Zira.  So, fine, we -- we'll

14   stop charging you.

15       Q  And who negotiated the contract on behalf

16   of Steadfast?  Was it Ms. Pitts or attorneys or --

17       A  It was Ms. Pitts.  I -- yeah.  I haven't

18   met or spoken to any of their attorneys.

19       Q  Were any of the terms negotiated, or was

20   it just your standard contract?

21       A  Price is always negotiated, as you would

22   guess.  So our standard is $3 -- well, there is no

23   real standard.  We quote based on the number of

24   users.  So it's, like, with -- with Steadfast --

25   sometimes they're like, hey, you know, if you

1    close today, we will come down 25 cents or

2    something like that, if I remember.  So we did

3    2.75, if I remember correctly, per -- per user per

4    month.

5        Q  Were you -- "you" being Steadfast -- I

6    mean "you" being Zira -- aware of the pending

7    enforcement actions the Department of Labor had

8    against Steadfast when you entered into the

9    contract with them?

10       A  No.

11       Q  Were any representations made to Steadfast

12   regarding compliance with the FLSA when Steadfast

13   hired Zira?

14       A  No.

15           MS. DOTY:  Objection.  It misstates the

16   testimony regarding the relationship.

17           MS. LEWIS:  It was a question.  I didn't

18   -- I asked a question.  I said --

19           MS. DOTY:  Yeah, it misstates --

20           MS. LEWIS:  -- representations made by

21   Zira to Steadfast of compliance with the FLSA.

22   That's a question.

23           THE WITNESS:  So can I --

24           MS. DOTY:  Yeah, but you -- that's not --

25   that wasn't the question you asked before.  You

**JA1635**

1    used the term when -- I think you said when

2    Steadfast hired Zira or --

3        MS. LEWIS:  Yeah, I was giving a time

4    period.  When Steadfast hired, i.e., entered into

5    a contract with Zira, which was in January 2021,

6    did Zira make any representations to Steadfast

7    about whether the app would be in compliance with

8    the Fair Labor Standards Act.

9        MS. DOTY:  Same objection.  Entering into

10   a contract isn't the same as hiring, so I'll just

11   object.  It's --

12       MS. LEWIS:  I'm not sure what the

13   misrepresentation is, but, Arjun, if you

14   understand the question, you can answer.

15       MS. DOTY:  Well, I can finish my

16   objection.  The misrepresentation is the use of

17   the term hire to describe a contractual

18   relationship, so objection.  Calls for a legal

19   conclusion, lacks foundation.

20       THE WITNESS:  So I -- I agree.  We never

21   say we were hired.  We -- they're our customers,

22   and they -- they're just subscribing for the

23   product, and it's a subscription service.

24       We -- the main value prop for -- for

25   Steadfast was that, hey, this is all manual, pen

**JA1636**

1    and paper, move that to digitized.

2           I actually didn't know what FSLA [sic] or

3    what you mentioned there was, so -- to the best of

4    knowledge, we do not say anything of that sort.

5           And then the other value prop is the

6    customizability, like, hey, you know, you can do

7    this, you can add facilities, you can change the

8    word of -- to contractors, you can basically --

9    that's -- that's -- that's our playbook.  So --

10          MS. DOTY:  Arjun.

11          THE WITNESS:  Sorry, quiet.

12          MS. DOTY:  Just only answer the questions

13   --

14          MS. LEWIS:  Please don't --

15          MS. DOTY:  -- asked.

16          MS. LEWIS:  -- interrupt him when he's

17   speaking.  That is wholly inappropriate.

18          MS. DOTY:  I think he was done speaking,

19   but the -- my point, Arjun --

20          MS. LEWIS:  Not sure because you

21   interrupted him.

22          MS. DOTY:  I -- my point --

23          THE WITNESS:  I was done.  I was --

24          MS. DOTY:  Only answer the question that

25   you're asked.  Thank you.

1           THE WITNESS:  Okay.

2           MS. LEWIS:  Let's go ahead and take a 15-

3    minute break.  I'm going to try and access the

4    documents that you all sent via your platform.  If

5    that doesn't work, I'll send you the Department of

6    Labor's platform that I know Julia's used and her

7    team, and it's pretty simple.  I think Julia would

8    agree with that.  So let's go ahead and take a

9    break.

10          MS. DOTY:  Okay.

11          THE REPORTER:  Off the record, 3:34.

12          (Pause in proceedings.)

13          THE REPORTER:  Back on the record at 4:30

14   p.m.

15          MS. LEWIS:  All right.  Back on the record

16   in the Zira deposition.  I've received documents

17   that Zira produced in response to the subpoena and

18   have had an opportunity to review them.

19          Before going there, I want to start with a

20   couple of exhibits, documents, screenshots that

21   the Secretary was provided by Steadfast in this

22   matter.  The first one for the court reporter is

23   document -- we're just going to go in order --

24   it's Zira Screenshots_1.

25          REMOTE TECHNICIAN:  Stand by.  Exhibit 2

**JA1638**

1    is on-screen and ready.

2            (Exhibit 2 was marked for identification

3    and is attached to the transcript.)

4    BY MS. LEWIS:

5        Q   This document is Zira Screenshots_1, and

6    it's been marked as Exhibit 2.  Arjun, do you

7    recognize this document?

8        A   Yes.

9        Q   What is this?

10       A   It's the team page of the Steadfast Zira

11   account.

12       Q   It's the what page?  I'm sorry.

13       A   Team, team page.

14       Q   Team page.  What's a team page?

15       A   It's the list of all your users.

16       Q   And this is just sort of an excerpt as

17   it's indicated by the title?  It's just a

18   screenshot of what that page looks like?

19       A   Yes.

20       Q   And is this available to both the user and

21   the business or just the business?

22       A   Just the business.  Like I said, the users

23   only have the mobile app.

24       Q   Okay.  And so "automations," what are

25   automations?

JA1639

1          A   So remember when I was saying you can

2     change what -- how you want to receive

3     notifications?

4          Q   Yes.

5          A   The automations is where you do that.

6          Q   Okay.  And "trends," what information

7     would be included with trends?

8          A   Trends is high-level reports that mostly

9     are valuable only if you are using it for time and

10    attendance.

11         Q   What are sort of -- what -- what are the

12    different high levels of reports can be generated?

13         A   So they are actually all not customizable.

14    They are -- they are just there, static, fixed for

15    -- for all our -- for all our accounts.

16             It's show-up rate, so you can see folks'

17    show-up rate, on-time rate, so you can see if

18    they're clocking in on time, and then there are a

19    couple others.  There is -- there is schedule

20    quality, which says that, hey -- you know when I

21    had mentioned that you could put in your time

22    preferences?  So it's like were those shifts

23    actually when your time preferences were

24    preferred.  So it's just those high-level reports

25    and a couple more there.

**JA1640**

1      Q  Were these different high-level reports

2  that you just described, are these -- I understand

3  that they're not customizable; is that correct?

4      A  That's correct.

5      Q  So what is the time period in which the

6  trends, these reports are generated?  Is it --

7  what's the frequency?

8      A  Week to week.

9      Q  Is that for all of the different

10 categories of reports that you just explained?

11     A  That's right.

12     Q  And is there a way to determine whether or

13 not Steadfast as a business uses this feature?

14     A  No, there is no way to determine.

15     Q  Do you know whether or not Steadfast has

16 used the feature?

17     A  No, I don't.

18     Q  Is -- the trends, is that standard for all

19 of Zira software, or is this something that

20 Steadfast specifically requested?

21     A  It's standard.

22     Q  And the last column -- the last item there

23 is "pay."  What is that?

24     A  So that's the timesheet.  If -- if you

25 were using Zira for time and attendance, if you

1    had your users clock in and clock out -- remember

2    there is a way to put in their hourly pay rates.

3    So if you did use us for time and attendance and

4    if you did put hourly pay rates, it's a timesheet

5    for how many hours each particular user had

6    clocked into.

7        Q  And for Steadfast, this business has not

8    integrated its payroll system with Zira; is that

9    correct?

10       A  That's correct.

11       Q  And so for Steadfast, this pay, it's like

12   -- is it a click?  Is that the way it works?  How

13   -- how does it work?

14       A  So it's a click, and then you can select

15   any time period.  So it's like a --

16       Q  Okay.

17       A  -- date page clicker, and you can be like,

18   this is the time period, and it will spit out all

19   of your users and how many hours they clocked in.

20       Q  And for the settings, what's -- what sort

21   of settings are able to be viewed and/or modified

22   there?

23       A  So settings would have your name.  You can

24   put in the name of the business in there.  You see

25   it on the top left they put in Steadfast Staffing

**JA1642**

1    Agency, so you can change that.  You can put in

2    things like the -- remember I said start day of

3    the week.  So when you are viewing your schedule,

4    you know what day to day.  Like, some businesses

5    are Sunday to Saturday or some are Monday to

6    Sunday, so that.  There is a bunch of things.

7          There is add -- there is who do you want

8    access to this.  So you can have multiple folks

9    have access to it.  And it's usually the -- the

10   business -- people in the business, so it's the

11   call centers in Steadfast's case, and -- and you

12   put in their email addresses, and then you have --

13   you have all of the account level settings in

14   there.  You can log out from there.

15         I can -- I'm happy to walk through

16   everything, but this is at the top of my mind, but

17   there are a few more things in that.

18     Q   Okay.  For that "show rate," what is that?

19     A   So if you were using us for time and

20   attendance, then you would see your show-up rate

21   there.  So if you're scheduled a shift and you

22   clocked into that shift, you would be a hundred

23   percent show-up rate, if you clocked into your

24   only shift that you were scheduled.  If you were

25   scheduled for all your shifts and you did not

**JA1643**

1    clock in, it would be zero percent.

2          And, like I said, since Steadfast is not

3    using us for time and -- we probably did have,

4    like, some people just try it out, that feature --

5    and they use us, but they're not really using us

6    for time and attendance, and that's why you see

7    all the show-up rates as zero.

8        Q  And when you say not using for time and

9    attendance, is it as you testified before; they're

10   just using for scheduling?

11       A  That's right.

12       Q  Okay.  Level, there's -- what is "level"?

13   What is that description for?

14       A  So this is just, like, an -- like, to help

15   you organize your roles.  That's the reason why we

16   added this feature.  No one really uses it that

17   much, we've learned.

18          But let's say -- the idea was -- let's say

19   you're a restaurant and you have a chef and a cook

20   and a dishwasher.  Sometimes you might want to put

21   them as, like, back of the house level, and then

22   you have front of the house, so -- stuff like

23   that.  So that's why we added that feature, but we

24   are seeing not a lot of folks use it.  So we just

25   put, like, a level name and it applies to nearly

**JA1644**

1   everyone.

2        Q   Is that level name customizable?

3        A   Yes.

4        Q   And who selected that name of staff?

5        A   It's -- I don't remember.  It -- it's

6   either Steadfast or we put in a place for that one

7   while onboarding them.  It's either one of the

8   two.

9        Q   But Steadfast -- does Steadfast have the

10  ability to change that descriptor?

11       A   Yes.

12       Q   And then the last column, it's "mobile,"

13  and I see some have days and other has the words

14  "not activated."  What is that?

15       A   So that is -- remember in my earlier I had

16  said that we have a last use column?  This is that

17  last use column.

18       Q   Okay.  So the column -- so the title of

19  the last use column is mobile?

20       A   That's right.

21       Q   Okay.  Directing your attention now to

22  what we'll mark as Exhibit 3, which will be Zira 2

23  --

24            MS. DOTY:  Ryma, can you just confirm the

25  Bates stamps of that exhibit that we just looked

**JA1645**

1    at?

2            MS. LEWIS:  Yes.  That was Steadfast 6th

3    087520, which was marked as Exhibit 2.

4            MS. DOTY:  Thank you.

5            MS. LEWIS:  The next one has been marked

6    as Exhibit 3, and that's Steadfast 6th 087521.

7            (Exhibit 3 was marked for identification

8    and is attached to the transcript.)

9    BY MS. LEWIS:

10       Q  Can you explain to me, what is this

11   document?

12       A  So this is the dashboard page.  So your --

13   you have zoomed into one of the facilities, and

14   you're seeing the dashboard where you see today's

15   coverage of all the shifts that have been

16   published for that day and that facility.

17       Q  And this is again for the business side,

18   not the user; correct?

19       A  That's right.

20       Q  Is this a standard page for businesses, or

21   is this something that Steadfast specifically

22   requested?

23       A  It's a standard page.  I will add these

24   are all standard pages on Zira.

25       Q  Okay.  I didn't ask this question about

**JA1646**

1  the next one, and if you need to see it, who did

2  you provide that screenshot to?  Or let me take a

3  step back.  Did you provide that screenshot to

4  someone?

5       A  To the best of my knowledge, I haven't

6  taken these screenshots.

7       Q  Okay.  And that goes for the first one and

8  the next one; correct?

9       A  That's right.

10       Q  "Next one" being Exhibit 3.

11       A  Yep.  Yes.

12       Q  This one has some -- some different column

13  headers.  I see that there's two times.  What are

14  those times reflected in those columns?  If you

15  could just describe what those are.

16       A  The schedule -- the shift's scheduled

17  start time and end time.

18       Q  Okay.  And "breaks" column is presumably

19  self-explanatory?  It's breaks that that

20  individual may or may not have taken?

21       A  That's right.

22       Q  Who would input breaks?

23       A  So you can, as -- again, if you're using

24  us for time and attendance, then you can add in

25  breaks when you create shifts.  You can create a

1   shift, like, hey -- again, we're a platform;

2   right?  So you can be like, hey, this is 7 a.m. to

3   7 p.m.  I want to add two breaks for my staff:

4   one lunch break and one tea break.  But as you

5   see, Steadfast doesn't use us for time and

6   attendance, at least to my knowledge, so it's just

7   putting in the scheduled start and end times.

8       Q   Okay.  And so would it be the user and the

9   business that could input breaks, or is it just

10  one or the other?

11      A   The business inputs the breaks.

12      Q   Okay.  And the last column, "status," what

13  is that?

14      A   So that would be, again, if you use us for

15  time and attendance, if you clock in, it would say

16  clocked in or working.  If you do not clock in, it

17  would -- and the time has passed, it would say

18  late.

19      Q   Okay.  For the status, I see two of them

20  say late.  What does that description mean?

21      A   So that means that that particular user

22  has not clocked in.  So all of our users who are

23  using us for scheduling only and not for time and

24  attendance, it will always say late because

25  they're not using us to clock in.

**JA1648**

1      Q  What's the difference between the late

2   designation and the not started designation?

3      A  Not started means the shift has not even

4   started.  Because if you see there, it's 7 p.m. --

5      Q  Yes.  Okay.

6      A  -- and this screenshot is somewhere

7   between 7 a.m. and 7 p.m.

8      Q  And there's a final column, but it just

9   has an ellipsis, "..."  What is that?

10      A  Those are click actions.  So you can click

11   under that and you can -- you can see -- there are

12   things like I want to view this user's page or

13   like -- they're just click actions.

14      Q  Okay.  And so if you were to click on that

15   click action to view that user's page, what sort

16   of information would be on the other side of the

17   page?

18      A  The same information that you would see

19   when you add that user in the first place, so

20   what's their name, what's their mobile number,

21   what's their role -- all of that.

22      Q  And above it, I see "all coverage."  What

23   is that -- can you explain to me, what does that

24   mean?

25      A  If I remember correctly -- so it

JA1649

1   definitely is a filter.  So it's, like, you're

2   seeing all.  But if I remember correctly, there

3   are different options there.  Show me only -- show

4   me only -- don't show me upcoming coverage, you

5   know, where you see "upcoming."  So don't show me

6   past coverage.  Like, I think you can filter down.

7        Q  Okay.  So it -- is it a descriptive of

8   what shifts filled, unfilled, and available for a

9   particular facility that you can sort of narrow

10  and tailor that view for?  Is that what it --

11       A  Not really.  So it -- you know, right now,

12  you are seeing all the coverage, shifts that are

13  active right now and you're seeing future shifts;

14  right?  If there were, let's say, shifts that are

15  completed, you would see that too because the

16  filter you selected is all.  If you could narrow

17  it down to only show me current shifts -- I don't

18  want to see those three not started shifts -- so

19  you could just filter your view here.  That's all

20  it is.

21       Q  Okay.  And at the top, I see "current,"

22  "show rate," "hours," and "labor cost."  Can you

23  please explain to me what each of those mean?

24       A  Yeah.  Those are just high-level stats

25  that aggregate the information that you see below.

1    So, currently, zero out of two shifts have been

2    clocked into.

3            Show-up rate is zero percent.  You'll

4    mostly see zero percent show-up rate on this

5    account because of no time -- of no time and

6    attendance usage -- and same with hours and labor

7    cost.  You'll mostly see zero -- unless in those,

8    you know, few cases where they haven't -- haven't

9    started the pay rate, so it's zero hours worked.

10   Because, again, since Zira does not have the

11   information about clock in/clock out, to us, it's

12   zero.

13           And then zero out of zero dollars, which

14   is -- the first zero there is, like, how many

15   hours I worked into the pay rate, and the second

16   zero there -- there is how many hours are

17   scheduled into the pay rate.  And, again, since

18   the pay rate is not entered, your hours, the shift

19   clock, and it's all zero.

20       Q  Okay.  So for the zero out of 60, where

21   did that 60 come from?

22       A  That's a 60-hour schedule.  So it's 12 --

23   it's five 12-hour shifts; right?  So it's 5 into

24   12, 60.

25       Q  And all of these stats at the top of the

1    page, are those then utilized somehow within the

2    trends?

3         A  No, no.  I would say most -- some of them,

4    yeah.  So your show-up rate for trends would be

5    that.  Your -- yeah, I -- I guess that's a fair

6    estimation at a high level.

7         Q  Okay.  And I see "switch locations."  What

8    is that button at the top of the page on the right

9    side -- "switch locations"?

10        A  So you remember I said they are using

11   facilities as locations, so that's why we --

12        Q  Okay.

13        A  -- called it locations, but it's basically

14   just going to another facility.

15        Q  Okay.  And "time clock," is that if

16   they're using it for time and attendance as well?

17        A  If they're using it for time and

18   attendance.  We also have, like, a web version of

19   a time clock that not a lot of people use, but

20   definitely not Steadfast since they are -- since

21   that would -- yeah.  It would just be a time clock

22   for folks to clock into.

23            MS. LEWIS:  Moving on to what will be

24   marked as Exhibit 4, Zira Screenshots_3, which is

25   Bates as Steadfast 6th 087522.

1          REMOTE TECHNICIAN:  Exhibit 4 is on-screen

2    and ready.

3          (Exhibit 4 was marked for identification

4    and is attached to the transcript.)

5    BY MS. LEWIS:

6       Q  Can you please describe, what is this a

7    screenshot of?

8       A  So this is the schedule page, and it's

9    empty.  So here is where you put in shifts.

10       Q  Okay.

11       A  So you can click into that empty area and

12    be like, on Wednesday, I need two -- I need two,

13    you know, folks to come in from seven to seven, so

14    you can click there and add shifts.

15       Q  Getting a bit more information, I think I

16    want to focus on the right side.  Let's go from

17    the right side of the page, starting with

18    "contractor requests."  What would be there?

19       A  Remember I had said that if -- if you put

20    -- if you publish open shifts, people can claim

21    them.  And then --

22       Q  Okay.

23       A  -- how Steadfast has it is that you --

24    someone has to go in and approve it -- either the

25    facility or Steadfast -- that's where all the

**JA1653**

1   claim requests live.

2       Q  Can Steadfast block or prohibit certain

3   users from accepting shifts?

4       A  Not really.  So if -- if -- let me think

5   about it.  I'll tell you how accepting shifts

6   work.

7           So when you assign a role to a particular

8   user -- let's say you assign a dishwasher role.

9   If you create a shift that is off the role

10  dishwasher, it will be sent to all the dishwashers

11  that, hey, there is a shift available.  So, well,

12  indirectly, you can by just not giving that person

13  any roles, and then they would -- you know, they

14  would not be matched, but, yeah, so that -- so

15  that would be the way.

16      Q  For the users that Steadfast has -- I'm

17  not sure if this is the right, sort of,

18  terminology, but -- sent invitations to be users

19  on the platform, the software, have there been any

20  users in which they haven't assigned roles?

21      A  Not that I know of.

22      Q  Is Steadfast able to limit the number of

23  assignments a user can see?

24      A  No.  By assignments, you mean the number

25  --

**JA1654**

1        Q   Yes.

2        A   -- of open shifts?

3        Q   Yes, shifts.  Um-hmm.

4        A   No.

5        Q   Okay.  The only way to do so would be as

6    you described a moment ago about not assigning

7    them a role; is that correct?

8        A   That's right.

9        Q   "My schedules," what is that?

10       A   So this is a use case.  And, remember,

11   this is a platform that's used by many customers.

12   So in some cases, you have templates.  So let's

13   say you're a restaurant.  Like, week over week,

14   you have a very similar, set schedule of people

15   coming in and out.  So you can save those

16   templates in there.

17           Another thing that people do often is they

18   duplicate from a previous week.  So if you're

19   running, like, you know, (indiscernible) style,

20   like, you know, this is my set schedule.  I just

21   want to duplicate last week's schedule to this

22   week.  So those are quick actions for you to

23   create a schedule.

24       Q   Okay.  And what is "smart assign"?

25       A   So smart assign is if you have your users

1    put in their time preferences, Zira will suggest

2    to you that -- let's say there are five people,

3    and they all have put in their different time

4    preferences, and you've created five shifts.  Zira

5    will suggest to you, hey, you know, put this

6    person in this shift, this person in this, this

7    person -- that way you will have maximum coverage.

8    So Zira helps you schedule, basically.

9         Q  "Shift qualifications," is that where you

10   would put designations with respect to -- as in

11   this case for Steadfast -- LPN, RN, and CNA?

12        A  That's right.

13        Q  What is "user availability"?

14        A  That's the time preferences.

15        Q  Oh, okay.  The time preferences of the

16   user?

17        A  Right.  So on the mobile app, they can --

18   you know when I had said during onboarding they

19   can put in, like, when I'm -- you know, when I --

20   when I'm available to work, when I prefer to work.

21        Q  So was this something that can then be

22   filtered by Steadfast to say I'm looking for an

23   LPN that can work the seven to eleven shift.  They

24   would select that "user availability," and then

25   could do smart assign.  Is that sort of the

1    functionality of it?

2         A   Not really.

3            MS. DOTY:  Sorry.  Objection.  Calls for

4    speculation and it's incomplete hypothetical.

5         A   So not --

6            MS. LEWIS:  Martha, you were -- I'm not

7    sure if the court reporter got it.  You were -- it

8    was choppy.

9            THE REPORTER:  You broke up there, ma'am.

10   If you could repeat your objection.  Thank you.

11           MS. DOTY:  Objection.  Incomplete

12   hypothetical, calls for speculation.

13           MS. LEWIS:  Still pretty bad, but I heard

14   it that time.  Did you get it, Saul?

15           THE REPORTER:  I got it.  It's breaking up

16   though, so it's --

17           MS. LEWIS:  Yeah.  I don't know.

18           THE REPORTER:  -- it's not real clear.

19           MS. LEWIS:  Something with your bandwidth.

20           REMOTE TECHNICIAN:  Yeah, that's what I'm

21   thinking as well.

22           MS. LEWIS:  Okay.

23           THE WITNESS:  So the way --

24           MS. LEWIS:  Go ahead.

25           THE WITNESS:  Can you repeat that question

**JA1657**

1    again?

2    BY MS. LEWIS:

3        Q   Sure.  No problem.  So I see this -- this

4    list of shift qualifications, user availability,

5    overlapping shifts -- are these areas that

6    Steadfast, the business, can select to see which

7    users have particular availability?

8        A   Yeah.  So you can put in, you know, the --

9    the parameters here in terms of, like -- when you

10   -- this is how it works.  When you create a new

11   shift, when you click on it, when you want to

12   assign that shift to someone -- let's say that's

13   how you are, you know, using Zira.  You want to go

14   in and assign each shift.

15          We use their availability, their

16   qualifications, things like that to sort the

17   people in there.  So we'll show you everyone, all

18   of your users, but we'll tell you that, you know,

19   user A is available at this time, so we will put

20   that person at the top, and then, you know, we

21   sort it that way.

22       Q   Okay.  What is this "daily overtime" and

23   "weekly overtime" columns?

24       A   So that's -- similarly, if you -- if you

25   put into Zira -- and, again, it's a platform.  You

**JA1658**

1  can put in -- you can even turn these off, by the

2  way.  And I think this is -- yeah, you can turn

3  these off.

4       So you can -- you can put in, like, hey,

5  you know, my daily overtime is after eight hours

6  and be clear what time is after 40 hours.  So Zira

7  will again sort it in such a way that we show you

8  the -- the -- the qualified people for that role

9  that matched the rules that you put in here, but

10  we also show you the others, but we just put it in

11  -- in -- in the sorted order.

12      Q  Has Steadfast turned this feature on or

13  off?

14      A  My understanding is for all of their

15  facilities, they've turned these features off.

16      Q  And that was a business selection?

17      A  Yes.  But what do mean by that?  Sorry.

18      Q  Meaning that that was Steadfast's choice.

19  It's not something which Zira influenced one way

20  or another.

21      A  Yes.  So by turning it off, what would

22  happen is we would not be recommending users for

23  the shifts.  That's all it does.  It's like, okay,

24  we are not recommending the people based on these

25  criterias.  Because these are, like, criterias

1    that we are taking from the business.  Like, hey,

2    do you want to make sure, like, there's at least a

3    ten-hour break between shifts?  Like, you can put

4    in that data in there, and we will try to

5    recommend the right people for the shifts.

6            Now you can still schedule whoever you

7    want, but we will just help you, tell you that,

8    you know, these criterias are being met or not.

9    So when -- when Steadfast turns it off, what it

10   means is that I don't want any criterias for

11   scheduling my shifts.

12       Q  So is this -- I had asked about this

13   earlier.  I asked about Zira's built-in compliance

14   program.  Is indeed this what that is then?

15       A  So it's -- it -- it is -- the way we call

16   it is we call it scheduling rules.  So you can put

17   in your scheduling rules, whatever your scheduling

18   rules are, and these are the options that you

19   have.

20       Q  So what is the built-in compliance

21   program?  It's something that's marketed on your

22   website.  What is the built-in compliance program?

23       A  So --

24          MS. DOTY:  Asked and answered.

25       A  So it's -- we don't call it a built-in

**JA1660**

1   compliance program.  Maybe we do somewhere in the

2   marketing.  But what it -- what we allow you to do

3   in terms of the compliance is we allow you to set

4   overtime rules and break rules.

5          So you can put in that, hey, if a shift is

6   eight hour or more, add a break for 30 minutes in

7   there.  You can put in if a user clocks in for

8   more than eight hours a day, after that, increase

9   their period to 1.5 X.  If -- and you can

10  completely customize this, by the way.  You can

11  put in any numbers in there, and you can put in

12  how many hours you want.  It's just a platform

13  that allows you to automate this.  And then you

14  can put in for the weekly as well.

15         Now this -- all this only matters if

16  you're using us for time and attendance.

17     Q  So with Steadfast's use of your

18  technology, they indeed have access to all of

19  these things.  They just have chosen to deactivate

20  it on their platform.  Is that correct?

21     A  That's right.

22     Q  And when you all were talking and demoing

23  all of the great functionality that Zira has to

24  offer, do you recall whether this was a topic of

25  discussion?

1        A   From what I recall, the main pinpoint was

2    scheduling.  The fact that scheduling is done on

3    pen and paper, it's too cumbersome, it's too much,

4    and can we have a system where we can digitize the

5    scheduling.

6        Q   Did you all explain to them how -- as you

7    said, allows you to set overtime rules and break

8    rules when you all were -- and I understand this

9    is a newer relationship -- but explaining the

10   onboarding process, how encompassing your

11   technology is and can be used more broader than

12   just scheduling?

13       A   It's tough to say what we did, but our

14   playbook is that we would've said that.  Since

15   it's our features, we always promote them.  But I

16   -- I -- I don't remember now if in that particular

17   demo -- because we also customize our demos to

18   what the user's pinpoints are.  So we may have

19   spoken mainly about scheduling.  We may have

20   mentioned these as well.  Yeah.  I don't know for

21   sure.

22       Q   Were these features with respect to

23   establishing break rules and overtime rules

24   incorporated into the technology based upon any --

25   for any particular reason?

**JA1662**

1          MS. DOTY:  Objection.  Vague.

2      A  I -- I don't understand the question.  Can

3  you give more specificity?

4      Q  Sure.  What is Zira's familiarity with the

5  FLSA?

6      A  So our --

7          MS. DOTY:  Objection.  I'm sorry, Arjun.

8  Objection.  Calls for a legal conclusion, vague.

9  You can answer if you understand.

10     A  I may not be answering the exact question.

11  I can give you --

12     Q  You can answer the question as you

13  understand it, and then I'll follow up if you

14  don't -- if you're not -- if you're not answering.

15         MS. DOTY:  I only want you to answer the

16  exact question.

17     A  Okay.  Can you ask it in a different way,

18  if you don't mind?

19     Q  Sure.  Do you know what -- do you -- when

20  I say "you," I'm referring to Zira -- do you know

21  what the Fair Labor Standards Act is?

22     A  So I can't speak for all of Zira.  I can

23  speak for myself.  I personally will have to look

24  into it for the details to make sure if I know it

25  or not.

**JA1663**

1          REMOTE TECHNICIAN:  Is it possible to have
2    Ms. Doty reconnect to the Zoom call?  That should
3    fix the issue she's having with her audio.
4          MS. DOTY:  Yeah.  Can we go off the record
5    for the two or three minutes it'll take me to do
6    that?
7          MS. LEWIS:  Of course.  Of course.
8          THE REPORTER:  Off the record, 5:01.
9          (Pause in proceedings.)
10          THE REPORTER:  Back on the record at 5:03.
11          MS. LEWIS:  May you please repeat the last
12    question that I asked, Mr. --
13          THE REPORTER:  Stand by.
14          (The Reporter played the audio as follows:
15    Do you know what -- do you -- when I say "you,"
16    I'm referring to Zira -- do you know what the Fair
17    Labor Standards Act is?)
18          MS. DOTY:  I'm just going to object.  It
19    calls -- to the extent it calls for a legal
20    conclusion.  Also, we're really running far afield
21    since he's testified Steadfast doesn't use it for
22    this purpose, but you can answer.
23          THE WITNESS:  I -- like, I think I had
24    said, I can just answer for myself, and I would
25    have to look into the details.  We -- I might.  I

1   may not know all the details, I may know some, so

2   I just will have to look into it and review it

3   before I can answer.  And I can only answer for

4   myself.

5   BY MS. LEWIS:

6       Q  So when choosing that title of "overtime,"

7   who determines what overtime means for a user?

8       A  The business.

9          MS. LEWIS:  Going to the next exhibit -- I

10  think we're on -- this is 4 or 5.  It will be Zira

11  Screenshot_4, Bates Steadfast 6th 087523.

12         THE REPORTER:  Exhibit 5 is on-screen and

13  ready.

14         (Exhibit 5 was marked for identification

15  and is attached to the transcript.)

16      Q  We talked about this before, and I just

17  want to make sure I'm clear.  This is the sky view

18  that's viewable from the Zira Manager platform; is

19  that right?

20      A  That's right.

21      Q  And it just is a snapshot of how many

22  particular hours a user has worked in a period of

23  time, rate of pay, so on and so forth, as

24  described by the column headers; is that right?

25      A  So the difference between the previous one

**JA1665**

1    and this one is this is the view of all of your

2    locations, and you can click --

3         Q  Oh, okay.

4         A  -- once you click into, let's say -- you

5    see the "view" button on the right of "Accordius

6    Charlotte"?

7         Q  Yes.

8         A  Then you would see the zoomed-in version

9    of what we saw for just that facility.  So this is

10   that high-level view where you can see a list of

11   all of your facilities.

12        MS. LEWIS:  Okay.  Moving on to Zira

13   Screenshot_5, which will be Exhibit 6.

14        REMOTE TECHNICIAN:  Exhibit 6 is on-screen

15   and ready.

16        (Exhibit 6 was marked for identification

17   and is attached to the transcript.)

18        Q  Can you please describe what this is a

19   screenshot of?

20        A  So this is what we saw similar, so it's a

21   schedule page for one of the facilities that

22   you'll see on the top left there.

23        Q  Okay.  I see for this particular

24   screenshot under the "smart assign," there's a

25   checkmark, green box with the word "match."  What

JA1666

1    does that mean?

2        A  So that means --

3            MS. DOTY:  I'm sorry, but where is that?

4            MS. LEWIS:  On the right side, "smart

5    assign," says "81 percent shift assigned."  You

6    see it?

7            MS. DOTY:  No, but I think it's because

8    the way my -- the boxes from the Zoom are.  Can

9    you -- can the tech move --

10           MS. LEWIS:  I don't have control --

11           MS. DOTY:  -- control with the arrow?

12           MS. LEWIS:  -- over the --

13           MS. DOTY:  I don't see it.  I'm sorry.

14           MS. LEWIS:  Does the tech see it?

15           REMOTE TECHNICIAN:  Are -- let's see.  You

16   said it was in the top left?

17           MS. LEWIS:  No, on the right.  Scroll your

18   arrow all the way down, says "smart assign,"

19   "smart" -- keep going.  Right there where you're

20   --

21           REMOTE TECHNICIAN:  Oh, right there.

22   Yeah.

23           MS. DOTY:  Okay.  I -- the way my Zoom

24   boxes are set up, I can't see it, but --

25           REMOTE TECHNICIAN:  You can -- if you

**JA1667**

1    hover over the Zoom box, you should be able to

2    click, like, a button that will, like, minimize

3    it, or you can just drag it and move it wherever

4    you need to move it.

5        MS. DOTY:  Okay.  I see "smart assign."  I

6    don't see a green box though.

7        MS. LEWIS:  No.  I -- I said it has the

8    descriptions we just went over -- the daily

9    overtime, weekly overtime -- and then to the right

10   of that, there's a checkmark, the word "match,"

11   and it's green.

12       MS. DOTY:  Okay.

13       MS. LEWIS:  You see it now?

14       MS. DOTY:  Yeah, I do.

15       MS. LEWIS:  All right.

16   BY MS. LEWIS:

17       Q  Arjun, what is -- can you explain to me,

18   what is that?  What does the word match mean

19   there?

20       A  So let's take overlapping shifts.  So

21   you're -- as a business, you've put in a rule that

22   I don't want our -- let me know -- this is what

23   you put in -- let me know if one person has more

24   than one shift at the same time.  Then it would --

25   it would not show "match" in the overlapping shift

**JA1668**

1    if there was a person with more than one shift.

2            So what we are telling you, that, hey,

3    these things that you have checked off -- now you

4    can, by the way, still do whatever you want.  You

5    can still publish those shifts.  But think about

6    Zira as -- think about this as just, like, letting

7    you know of -- of things on your schedule.  It's

8    letting you know what's going on with your

9    schedule.  So if there were overlapping shifts, it

10   would not say the word match.  It would say two

11   shifts are overlapping.  That's -- that's what it

12   does.

13       Q  Okay.  So the word match means you've

14   established rules and all of the rules have been

15   applied.  They match based upon the criteria you

16   set.  Is that an accurate restatement?

17       A  It's -- it's -- maybe not the word -- not

18   -- maybe just the word that was inaccurate was

19   applied.  Just like -- we are just looking at your

20   schedule and telling you which rules is it

21   matching.  So it's just giving --

22       Q  Okay.

23       A  -- it's just giving an explanation of what

24   -- what is on your schedule.  What you already see

25   on your schedule, it's just summarizing it for

JA1669

1    you.

2        Q   Understood.  So before we had talked about

3    this daily overtime and weekly overtime, and I

4    believe it was your testimony -- and correct me if

5    I'm wrong -- you said Steadfast wasn't using that

6    criteria.  So it's checked off as matched here.

7    Can you help me to reconcile that previous

8    statement with what I see here in this screenshot?

9        A   So, to the best of my knowledge, when -- I

10   don't know when this screenshot was taken.  Like I

11   said, I did not take it.  By default, we have all

12   of those criteria show up.  A business can go in

13   and remove them over time.  So the -- to the -- to

14   the best of my knowledge, when I checked last, it

15   was not there.  It seems there was a time period

16   when it was there, so that's -- that's -- does

17   that help?

18       Q   It does.  That answers -- that's -- that's

19   helpful.

20           MS. LEWIS:  All right.  Moving on to --

21   we'll mark this as Exhibit 7.  It's the email

22   training video for facilities.

23           (Exhibit 7 was marked for identification

24   and is attached to the transcript.)

25           REMOTE TECHNICIAN:  And just let me know

**JA1670**

1  when to hit play.

2          MS. LEWIS:  Is that -- you can hit play

3  now.

4          (Video playback begins.)

5          MS. LEWIS:  The video is playing.  It's a

6  minute and 44 seconds.  We are observing the video

7  right now.

8          (Video playback ends.)

9  BY MS. LEWIS:

10      Q  Do you recognize that video?

11      A  Yes.

12      Q  And what -- did you create that video?

13      A  Yes.

14      Q  And when did you create that video?

15      A  Month or -- month or so ago.

16      Q  Who requested that you create that video?

17      A  Steadfast.

18      Q  Did they tell you why they wanted that

19  video created?

20      A  To train the facilities.

21      Q  Did you provide it to the facilities or

22  directly to Steadfast?

23      A  To Steadfast.

24      Q  And who at Steadfast was that video sent

25  to?

**JA1671**

1      A   To Lisa Pitts.  To the best of my

2   knowledge, it was Lisa Pitts.  I may have sent it

3   -- so -- may have sent it to Christine as well.

4   It's one of them, sent it to one of them.

5          MS. LEWIS:  Just -- we'll go off the

6   record for a moment.

7          (Pause in proceedings.)

8          THE REPORTER:  Back on the record at 5:23

9          (Exhibit 8 was marked for identification

10   and is attached to the transcript.)

11          MS. LEWIS:  This next exhibit has been

12   marked as Exhibit 7 [sic].  They are excerpts from

13   the documents that Zira produced in response to

14   subpoena duces tecum.

15      This first document, it's kind of blurry.

16   Can you all see it?

17          REMOTE TECHNICIAN:  One moment.

18          MS. LEWIS:  Let's try that again.

19          REMOTE TECHNICIAN:  Yeah, one moment.  I

20   have to re-share it.

21          MS. LEWIS:  All right.  There we go.

22   BY MS. LEWIS:

23      Q   This is a list of contractors, subject is

24   "list of contractors who have not activated."

25   What was this email?

1       A   So do you remember we mentioned the last

2    column tells you when you last used the app and it

3    tells you not activated?  So we -- I think Lisa

4    here wanted to know how many people, like --

5    basically, the plan -- or at least I presume the

6    plan is to make sure everyone gets onboarded.  So

7    she wanted to know how many people does she need

8    to reach out to with her users for those who have

9    not activated.

10          So what I did is I literally, like, copy,

11   pasted that whole team page that you saw with all

12   the users --

13      Q   Okay.

14      A   -- and I sent it over to her.  And I just

15   sorted the status column -- not the status -- you

16   know, the mobile column, I just sorted it on

17   Google Sheets.  So I was like, look, the top

18   people here -- or I think -- top people here are

19   activated, the bottom are not, and from that's --

20   that's where from I remember the 50 percent, 60

21   percent are activated or not.  It was about a

22   month ago.

23      Q   Okay.  And is that information that Lisa

24   has access to on her own platform, or is that

25   something only Zira could've created for her?

1      A  So it's the same thing that Lisa has.  The

2   thing that we have not added on our platform is

3   the ability to sort by column.  So you know that

4   mobile column?  You would have to -- have to,

5   like, count all of them.  So all I did is, like --

6   again, she could've done it.  She could've copy,

7   pasted it onto a Google sheet and just -- and just

8   sorted it on Google Sheet, but we -- we -- we

9   provide customer support, so we were like, you

10  know, we'll do it for you.

11     Q  So it was just a matter of providing

12  customer support rather than her not having access

13  to it on her own?

14     A  That's exactly right.

15     Q  What is this next page, if you could

16  scroll down to page 2 of 7?  What was this

17  communication regarding?

18     A  So she had sent me, I -- from what I

19  remember, if I remember correctly, she had sent me

20  a list of facility addresses.  So you know when

21  you have -- you know when a shift shows up on the

22  user's mobile phone, if you have the address

23  entered, you can click on navigate so that way

24  they know exactly where those addresses are.

25          So a lot of a -- like, actually, all of

1    this is stuff that you can do on your own, but she

2    used to just reach out to customer support and be

3    like, hey, can you do this?  So I think we had

4    gone in and updated the addresses so that they

5    show up.

6           Second one there, "print in visual

7    format," was -- you saw the schedule page.  She

8    was curious if you could print that in visual

9    format, just print it.  And it was -- it was just

10   us responding, saying that, hey, you can go to the

11   toggle and hit the "print schedule" button.

12      Q  And then the comment that she made, "Take

13   off over time we do not pay over time," was that

14   in response to an inquiry or was that just

15   relative to the columns that we were discussing

16   before about the smart assign?

17      A  It was the smart --

18         MS. DOTY:  Objection.  Calls for

19   speculation, but you can answer if you know.

20      A  If -- so from what I understood it to be,

21   it was the -- the -- in the smart assign, take out

22   overtime.  So remember that's when I said that

23   from my knowledge we had taken out all of those

24   rules for her.

25      Q  And so was this as a result of a

**JA1675**

1  conversation you were having, or was this just an

2  unsolicited email from her?

3      A  I -- it -- it was -- it could have been

4  discussed before.  I -- I think she had told us

5  that, hey, in those columns, I don't want to see

6  anything.  And maybe in one of her facilities

7  overtime was still there -- like, while

8  onboarding, we did not take it off.  So I think it

9  was like, hey, you forgot to take it off.  Like,

10 please take it off.

11     Q  Okay.

12     A  And, remember, she too can click on it and

13 do edit rules and take it off herself.  This is

14 just customer support.

15     Q  The next page, page 3 of 7, is this what

16 you were -- we had discussed earlier with respect

17 to what setup from the business side, user side,

18 and facility side, just directions?

19     A  That's right.  That's right.  So this is

20 onboarding customizations that -- that Steadfast

21 wanted.

22     Q  And that would be pages 3 through 5 of the

23 PDF?  If you could scroll --

24         MS. DOTY:  Ryma, can you refer to the

25 Bates numbers since you've pulled out pages from

**JA1676**

1    their production just so I -- I know exactly what

2    you're referencing to?

3           MS. LEWIS:  Bates No. 0104 through Bates

4    No. -- I don't -- it's -- the Bates numbers seem

5    to be duplicate, so I'm not sure if that's a

6    duplicate Bates number or a duplicate page.  I'd

7    need to go back, but I have page Zira 0104, Zira

8    0105, and again Zira 0104.

9    BY MS. LEWIS:

10      Q  Directing your attention to PDF page 6 of

11   7, Bates Zira -- Zira 0007, what is this email?

12      A  So this is the email that Software Advice

13   sends us whenever there is a new lead.  Remember I

14   had mentioned that they go -- they go to Software

15   Advice and then Software Advice sends it to us

16   that, hey, you have a new lead?

17      Q  And who inputs the contact information?

18      A  All of this information here is inputted

19   by Software Advice.

20      Q  Okay.  Where does Software Advice get this

21   information from?

22          MS. DOTY:  Objection.  Calls for

23   speculation.

24      A  I don't know.

25      Q  When you being Zira receive this

1    information, when you have an initial meeting with

2    the company -- in this case Steadfast -- do you

3    review this information with the company in terms

4    -- to verify the accuracy of this information?

5        A   We look at it at a high level.  For us,

6    it's a lead, so the response time is important.

7    So we quickly get on the phone, and we are like,

8    hey, do you want to -- it seems you're interested

9    in a scheduling software.  Do you want to talk?

10       Q   And when you all spoke with Steadfast to

11   interact with them based upon this lead, was this

12   information that you all used to assess sort of

13   the -- whether or not it'd be a good fit for

14   Steadfast and yourself?

15       MS. DOTY:  Objection.  It's vague.  You

16   can answer if you understand.

17       A   To a certain extent, I think I understand.

18   So Software Advice just -- just doesn't send us,

19   like, random leads.  We have checked off, like,

20   employee scheduling related, send it to us.  Now

21   very -- sometimes there are, like, you know, very

22   unique use cases, and sometimes they -- so this is

23   us doing a discovery call, like, hey, we need to

24   know if -- you know, what they need.

25       Q   This line here that says "number of

1    employees," it says 251 to 500 employees, 300

2    contracted employees, what does that mean?

3        A   That was called up --

4            MS. DOTY:  Objection.  Objection.  Hang

5    on, Arjun.  I'm sorry.  First of all, I can't see

6    that on the document.  Maybe you could --

7            MS. LEWIS:  If you could scroll.

8            MS. DOTY:  -- tech can scroll down.  Thank

9    you.

10           Objection.  Calls for speculation.

11       A   So the thing though is that everything

12   that you see on the left, these columns, they're

13   fixed.  Every lead comes to us like this.  So it's

14   not that we write this down or I don't know what

15   it is, but these are fixed columns that Software

16   Advice sends us.

17       Q   Do you all verify through any means the

18   reported annual revenue of a company?

19       A   No.

20       Q   No further questions on this exhibit.  In

21   one of the documents that were produced by you all

22   -- it is -- this is the last question, I believe

23   -- Zira Bates No. 0077.  Steadfast said that

24   there's a nurse, Brandy Plumber, that I don't want

25   having access.  Do you know why they told you,

1    Arjun, that they didn't want Brandy Plumber to

2    have access?  Do you recall the conversation?

3            MS. DOTY:  Objection.  It'd be nice to

4    show the witness the document.

5            MS. LEWIS:  Well, I'm asking a question.

6    So if he knows -- if you --

7        A  I don't recall, but maybe I will recollect

8    if -- if --

9        Q  Okay.  It would help to refresh your

10   recollection to see the document.  Certainly.  I'm

11   just going to go ahead and share my screen.  Can

12   you see it?

13       A  I see it.

14       Q  Okay.  Do you recall having a conversation

15   with Christine Kim about this particular user?

16       A  No.  To me, it seems -- no, I don't.  I do

17   not --

18       Q  No, that's fine.  And did you follow the

19   instructions not to allow that user to have

20   access?

21       A  I don't remember.  I will say one thing

22   though.  This is customer support stuff, so it's

23   very easy for -- or it's possible for a business

24   themselves to go in -- and remember I had said you

25   can archive a user or you can delete a user?  It

**JA1680**

1    seems -- now that I saw the date, that this was

2    early on, so maybe they didn't know that they can

3    do that.

4            And I don't remember how we replied, but

5    we may have either shown them how to do it or just

6    gone in and done it, but it's an access that

7    everyone has.  They can archive and -- archive the

8    users or delete the users.

9            MS. LEWIS:  Okay.  Let's just -- let me

10   just take one minute, and then I think we're done.

11           (Pause in proceedings.)

12           MS. LEWIS:  Okay.  I don't have any

13   further questions.  Thank you so much for your

14   time, Arjun, today.  It was a pleasure meeting

15   you.

16           As indicated, I believe you're going to

17   read and sign.

18           Ms. Doty, I don't believe you have been

19   pro hac'd in Virginia.  Do you intend to appear at

20   trial?

21           MS. DOTY:  No.

22           MS. LEWIS:  All right.  I have no further

23   questions, and this shall conclude the deposition

24   today.

25           MS. RUST:  Sorry, Ryma.  I just wanted to

JA1681

1    make sure we authenticated the other two Zira

2    videos that were produced, which would be, I

3    think, Defendant 77 and Defendant 76, really

4    quick.  I can share my screen.  I do have them up.

5    If you want to put them up and I can ask questions

6    just to authenticate them.

7           MS. LEWIS:  Julia, I didn't ask questions

8    about those.  So what is the purpose of -- you're

9    calling him as a witness at trial; right?  I don't

10   have questions about them.

11          MS. RUST:  They're on your subject list.

12   I don't see why we can't just get it out of the

13   way.

14          MS. LEWIS:  Because I don't have questions

15   about it, and it's my deposition.

16          MS. RUST:  Yes, I know.  But as a matter

17   of just being practical and efficient, I don't see

18   what the issue is.

19          MS. LEWIS:  Practical and efficient for

20   what purpose?  Are -- do you not intend to call

21   Arjun and Zira at trial?

22          MS. RUST:  Well, I'd like to authenticate

23   them just to cross T's.  You guys didn't object to

24   authenticity, so I don't think we're going to have

25   an issue with it at trial anyway, but I thought it

1    would just be easier this way so we can knock it

2    out.

3            MS. LEWIS:  Yeah.  I mean, it's outside of

4    the scope of what I asked about, so I'm not going

5    to allow it during my deposition.  Have to use

6    them at trial for you.  You're certainly well

7    within, but then we're just going to -- I would

8    have to have an opportunity to cross on them, and

9    I don't intend to do so today.

10           MS. DOTY:  If I could interject here.  I

11   don't know how anyone's calling this witness at

12   trial.  He's in California.

13           MS. LEWIS:  We didn't hear you.  Your

14   bandwidth -- you -- you stopped.

15           MS. DOTY:  All right.  My -- my statement

16   was I don't have any understanding of how this --

17   anyone intends to call this witness at trial.

18           MS. LEWIS:  Well, Ms. Rust.  He's your

19   witness.  We didn't identify them as our witness.

20   I mean, that was the whole purpose of us having

21   this deposition today.

22           So, you know, they identified them as a

23   witness.  The Court issued an order with respect

24   to sort of our ability to conduct discovery and to

25   an untimely disclosed witness.  So if Ms. Rust

1     intends to call as a witness, that's -- they're on

2     their expect list, and we've all gone through this

3     exercise for the past several hours.  So I'm not

4     sure if that's something we want to continue to

5     discuss today or that's just something that you

6     and Ms. Rust should have offline.

7            MS. RUST:  No, I'm not worried about it.

8     Honestly, if you're going to -- like I said, you

9     guys never submitted any authentication objection,

10    so I don't see why we need Zira to appear at trial

11    anyway.

12           MS. LEWIS:  I'm sorry?

13           MS. RUST:  I said I don't see why we're

14    going to need Zira to appear at trial at this

15    point anyway because you guys didn't object to

16    authentication.  That was the scope of what we

17    disclosed them for anyway.

18           MS. LEWIS:  So we just had this deposition

19    today, spending the Secretary's and Zira's time,

20    and you all don't intend to call them at trial?

21    Is that what I'm to understand?

22           MS. RUST:  Oh, this is -- this is -- I

23    would appreciate if you don't spin it that way.

24    The sole --

25           MS. LEWIS:  I'm just trying to understand

1    why we had a deposition today for the past --

2            MS. RUST:  I would like to understand that

3    too.

4            MS. LEWIS:  -- (inaudible) spend the

5    attorney time when it was represented to the Court

6    that you all intended to call them out to trial --

7    at trial as your witness, not for the sole purpose

8    of authenticating.  And we now have spent so much

9    time and energy on both sides.

10           MS. RUST:  Ryma, we --

11           MS. LEWIS:  Zira had to retain counsel,

12   I've spent my day two weeks before trial, so I

13   need to get clarification as to why we're doing

14   this.

15           MS. RUST:  Ryma, we disclosed them, and we

16   disclosed the purpose of their testimony, which

17   was to authenticate the specific exhibits listed.

18   This is not news to you.

19           You guys brought it up to the Judge that

20   you thought that you needed to depose this witness

21   in case there was some nefarious way that

22   Steadfast was using this platform to work all

23   kinds of black magic.  We did not raise that

24   issue; you guys did.  So that's why we're having

25   the deposition.  It has nothing to do with the

1 scope of our testimony.

2         MS. LEWIS:  Okay.  Well, you'll need to

3 call him to authenticate it at trial, those

4 additional exhibits, if you do intend to use them,

5 but I'm going to state on the record that was not

6 the representation during the final pretrial

7 conference.  Because certainly the Secretary would

8 not have wasted everybody's time today if that was

9 the only reason represented during the final

10 pretrial conference.

11         MS. RUST:  I disagree.

12         MS. LEWIS:  I have nothing further to say

13 to that end, and we'll take it up with the Court

14 if need be.

15         MS. RUST:  All right.  Well, our position

16 is you guys waived any objections to authenticity.

17 It wasn't in the pretrial order.

18         MS. LEWIS:  We have not waived any

19 objections to authenticity.  We reserve the right

20 to make additional and appropriate objections at

21 trial, the same way you all do as well.

22         But that's -- Ms. -- I don't want to

23 continue to waste -- expend time on third parties

24 who, frankly, don't need to be a part of this

25 conversation.

**JA1686**

1            So thank you for your time today, Ms.

2     Doty.

3            Thank you for your time today, Arjun.

4            I have nothing further.

5            MS. RUST:  Thanks, guys.

6            THE WITNESS:  Can I drop off or --

7            MS. DOTY:  The reporter may have questions

8     for you about spellings.

9            THE REPORTER:  No, I need orders for the

10    record if we can get those now, please.

11           MS. LEWIS:  I don't -- I'm not a

12    contracting officer.  I don't have the authority

13    to do so.

14           THE REPORTER:  Okay.

15           MS. LEWIS:  Carl Goodwin [phonetic] will

16    follow up with you.

17           THE REPORTER:  Okay.  Fair enough.

18           Ms. Rust.

19           MS. RUST:  I don't expect we'll be making

20    an order --

21           THE REPORTER:  No --

22           MS. RUST:  -- but I can email you if we

23    do.

24           THE REPORTER:  Okay.  Sounds good.

25           Ms. Doty.

1          MS. DOTY:  I'm not even sure what you're

2    talking about, to be honest.

3          THE REPORTER:  Orders for transcripts.

4          MS. DOTY:  Oh.  Well, probably not.  I

5    sent you my contact information.  Would you send

6    me -- would you send me yours?  And we'll decide

7    -- we'll decide, I guess after I get your contact

8    information.

9          THE REPORTER:  Okay.  Yep.  I'll put it in

10   the chat.  Do you have it handy, Josh?

11         REMOTE TECHNICIAN:  Her contact

12   information?

13         THE REPORTER:  Yeah.  Well, the Planet

14   Depos' info.

15         REMOTE TECHNICIAN:  I do not.

16         MS. DOTY:  Can we email the person who

17   sent us the Zoom link?

18         REMOTE TECHNICIAN:  Potentially.  I --

19   what I would do is I would call the Planet Depos'

20   office and see who they would direct you to for

21   that.  That would be my -- my first guess.

22   Because there are a lot of different departments,

23   and I wouldn't exactly know where to send you for

24   that.

25         MS. DOTY:  Okay.  Okay.

**JA1688**

```
1              REMOTE TECHNICIAN:  Yeah.  I would -- I

2    would go ahead and I can give you the phone number

3    too if that'll make things easier, but I would --

4              MS. DOTY:  Sure.

5              REMOTE TECHNICIAN:  -- I would call them

6    and ask your question.

7              MS. DOTY:  Sure.  What's the number?

8              REMOTE TECHNICIAN:  Let me pull it up

9    here.  888-433-3767.

10             MS. DOTY:  Thank you.

11             REMOTE TECHNICIAN:  And just in case --

12   actually, no -- no, you should be fine.

13             MS. DOTY:  That's it?

14             REMOTE TECHNICIAN:  Yep, that's good.

15             THE REPORTER:  Okay.  Off the record at

16   5:45.

17             (Off the record at 5:45 p.m.)

18

19

20

21

22

23

24

25
```

**JA1689**

1    CERTIFICATE OF COURT REPORTER - E-NOTARY PUBLIC

2        I, Saul Gan, the officer before whom the

3    foregoing deposition was taken, do hereby certify

4    that said proceedings were electronically recorded

5    by me; and that I am neither counsel for, related

6    to, nor employed by any of the parties to this

7    case and have no interest, financial or otherwise,

8    in its outcome.

9        IN WITNESS WHEREOF, I have hereunto set

10   my hand and affixed my notarial seal this 27th day

11   of July, 2021.

12

13   Notary Registration No.:  7859115

14   My Commission Expires:  6/30/2024

15

16   _____

17   Saul Gan, E-Notary Public

18   in and for the District of Columbia

19

20

21

22

23

24

25

**JA1690**

1    CERTIFICATE OF TRANSCRIBER

2        I, Megan Wunsch, do hereby certify that

3    the foregoing transcript is a true and correct

4    record of the recorded proceedings; that said

5    proceedings were transcribed to the best of my

6    ability from the audio recording and supporting

7    information; and that I am neither counsel for,

8    related to, nor employed by any of the parties to

9    this case and have no interest, financial or

10   otherwise, in its outcome.

11

12

13

14

15   _____

16   Megan Wunsch, AAERT CET

17   July 27, 2021

18

19

20

21

22

23

24

25

1

**STEADFAST MEDICAL STAFFING, LLC**
5750 Chesapeake Boulevard
Norfolk, Virginia 23513
Phone: (757) 215 5716

This agreement is made and entered this day _3 1.19.17_, by and between SteadFast Medical Staffing, LLC. and: _AVante at Roanke._

Whereas, SteadFast Medical Staffing, LLC and (Facility) wish to enter into an agreement wherein SteadFast Medical Staffing, LLC. will provide temporary medical contractors to the facility at an agreed upon rate.

Now, therefore, for and in consideration of the promises, the parties here to do hereby covenant and agree as follows:

**TERM:**
This agreement shall begin on the date first written above. Either party can terminate the agreement with or without cause, upon thirty days' written notice to the other party. The agreement may be amended at any time and from time to time by written agreement of the parties.

SteadFast Medical Staffing, LLC. responsibilities:

    A. Upon request by facility, SteadFast Medical Staffing, LLC. shall assign such contractors as are available for such assignment. At no time does SteadFast Medical Staffing, LLC. guarantee that all requests will be filled.

    B. SteadFast Medical Staffing, LLC. shall maintain a worker file on each of its contractors, containing the following: SteadFast Medical Staffing, LLC.: will provide copies of the following (except "a") to the facility.

        a. A completed application, which includes education, training, skills, specialties and preferences.
        b. Documentation of education and training
        c. Skills inventory checklist
        d. Two recent work references
        e. TB test and evidence of satisfactory health status
        f. Current CPR
        g. Performance evaluation
        h. Copy of current license, registration, or certification
        i. Negative urine drug screen
        j. Background check
        k. Flu shots
        l. Negative urine drug screen

STEADFAST 000495

PX-10.008

**JA1692**

2

C.  SteadFast Medical Staffing, LLC. will use its best efforts to match the skills and experience levels of its Contractors to the specific needs of the Facility.

D.  Contractors will be requested to report to the designated supervisor before he/she begins working.

E.  SteadFast Medical Staffing, LLC. shall give the Facility a two hours' notice regarding Contractors, which SteadFast Medical Staffing, LLC. cannot provide.

F.  SteadFast Medical Staffing, LLC. will not actively solicit Facility employees as Contractors.

G.  Contractors assigned to Facility pursuant to this agreement shall for the purpose of this Agreement, be considered Contractors for SteadFast Medical Staffing, LLC.

H.  SteadFast Medical Staffing, LLC. shall assume sole and exclusive responsibility for the payment of wages to such Contractors for services performed by them.

I.  SteadFast Medical Staffing, LLC.  is in compliance with all state and federal laws applicable to the contacting of the Contractors assigned Facility.

J.  SteadFast Medical Staffing, LLC. will comply with Facility standards for the use of supplemental medical services.

K.  SteadFast Medical Staffing, LLC. agrees not to discriminate in the assignment of its Contractors on the basis of race, creed, color, national origin, sex, age, disability, citizenship status, or veteran status.

**(Facility) Centre Responsibilities:**

A.  (Facility) understands all Contractors provided by SteadFast Medical Staffing, LLC. for the term of this Agreement are contracted through SteadFast Medical Staffing, LLC.

B.  Facility will take no steps to recruit as its own employees those Contractors provided by SteadFast Medical Staffing, LLC. during the term of this agreement. Facility understands SteadFast Medical Staffing, LLC. is not an employment agency and that its Contractors are assigned to the Facility to render temporary service and are not assigned to become employed by the Facility. The Facility may not hire SteadFast Medical Staffing, LLC. Contractors unless it is first arranged with SteadFast Medical Staffing, LLC. The manner by which SteadFast Medical Staffing, LLC. is to be compensated for its expense in recruiting said Contractor.

C.  Facility shall provide sufficient information about its specific needs to SteadFast Medical Staffing LLC. so that SteadFast Medical Staffing, LLC. can match the skills and experience of its Contractors to those needs.

D.  Facility shall utilize assigned Contractors only for the specific need requested, unless Facility, SteadFast Medical Staffing, LLC. and Contractor agree to a change in duties.

E.  Facility agrees that SteadFast Medical Staffing, LLC. duty to fill assignments is subject to availability of qualified Contractors.

F.  Facility will orient Contractors to the Facility and its rules and regulations, including the physical layout and equipment on any unit to which such Contractors are assigned.

G.  Facility staffing supervisors will assist SteadFast Medical Staffing, LLC. on a continuing basis, with evaluation of SteadFast Medical Staffing, LLC. Contractors by providing performance information.

H.  Facility shall allow SteadFast Medical Staffing, LLC. Contractors (on their own time) to attend appropriate facility staff development programs.

STEADFAST 000496

PX-10.009

**JA1693**

3

I.  Facility will immediately notify SteadFast Medical Staffing, LLC. of any problems regarding SteadFast Medical Staffing, LLC. Contractors.
J.  Facility will make available to SteadFast Medical Staffing LLC. copies of all documentation concerning problems or incidents in which SteadFast Medical Staffing, LLC. Contractors are involved.
K.  If in the sole discretion of the Facility, any person assigned by SteadFast Medical Staffing LLC. is incompetent, negligent, or has has engaged in misconduct, Facility may require such person to leave its premises and shall inform SteadFast Medical Staffing, LLC. of this action immediately. Facility's obligation to compensate SteadFast Medical Staffing for said services shall be limited to the hours actually worked by such person and Facility shall have no further obligation with respect to such assignment.
L.  If Facility changes or cancels an order less than two (2) hours before reporting time, Facility shall be billed for two (2) hours at the hourly rate for the personnel involved.
M.  Facility agrees not to discriminate in the assignment of SteadFast Medical Staffing, LLC. on the basis of race, creed, color, national origin, sex, age, disability, citizenship status, or veteran's status.

**Billing Procedures:**

A.  SteadFast Medical Staffing, LLC. will invoice Facility Bi-weekly for its services. The rates for its services are shown on Exhibit "A." The rates for services established in Exhibit "A" can be amended prospectively by SteadFast Medical Staffing, LLC. at any time upon forty-five (45) days written notice to Facility.
B.  Facility shall pay SteadFast Medical Staffing, LLC. invoice within 15 business days from date of invoice. Invoices not paid within 15 days are considered past due and will be charged a finance charge of one and a half (1.5%) percent per month of the unpaid balance (annual percentage of 18%) or the maximum interest rate allowed by law whichever is lower. Facility agrees to pay the finance charge together with reasonable attorney's fees for the cost of collection.

**Insurance:**

A.  SteadFast Medical Staffing, LLC. maintains during the terms of this Agreement and any subsequent renewals, general liability, and professional liability insurance coverage for all of its acts and omission in the provision of the designated services with limits of not less than $1,000,000 per occurrence and $6,000,000 aggregate.
B.  SteadFast Medical Staffing, LLC. will provide upon request, Certification of Insurance or order evidence of coverage and it will notify facility of any cancellation or modification of its liability insurance.

**Indemnification:**

Each party agrees to indemnify and hold the other including directors, officers, agents and workers, harmless from all claims, suits, judgments and demands arising from the indemnified party's negligent and/or intentional acts and omissions in the performance of the duties prescribed by this Agreement.

STEADFAST 000497

PX-10.010

**JA1694**

4

**Notices:**

All notices shall be in writing and shall be addressed to the parties as set forth below. Notices shall be effective upon receipt when delivered personally or upon mailing when properly addressed with postage prepaid.

**Steadfast Medical Staffing LLC.**                          **Facility:**
**5750 Chesapeake Blvd Suit 103**
**Norfolk, VA 23513-5325**
**ATTN: Lisa A. Pitts**

**Access to Records:**

The parties here to agree to make available to duly authorized representative of the Department of Health and Human Services: all contracts, books, documents, and records of the parties providing services are here under necessary to verify the cost of the services provided under this Agreement. Similar access will also be granted to the Contracts, books, and records providing the services here under and any obligation related to such parties.

**Social Security Act:**

SteadFast Medical Staffing, LLC. warrants that to the best of SteadFast Medical Staffing LLC's knowledge, no person who ownership controls interest in, or is an agent or managing employee of SteadFast Medical Staffing LLC. has been convicted of a criminal offense relating to that person's involvement in any programs under Title XVIII, XIX, or XX of the Social Security Act since the inception of these programs.

This Agreement shall insure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns.

This Agreement shall be constructed, enforced and interpreted under the laws of the State of Virginia.

Executed on the date and year first above written.
SteadFast Medical Staffing, LLC.

By: _Amy M Bender_ Title: _Administrator_

Facility: _Avante at Roanoke_

By: _____ Title: _CEO_

STEADFAST 000498

PX-10.011

**JA1695**

2/22/17

Addendum

Facility will take no steps to recruit as its own employees those Contractors provided by Steadfast Medical Staffing, LLC, during the term of this agreement, and after one year upon termination of agreement. Facility understands Steadfast Medical Staffing, LLC is not an employment agency, and that its Contractors are assigned to the Facility to render temporary services and are not assigned to become employed by the Facility. The facility my not hire Steadfast Medical Staffing ,LLC Contractors unless it is first arranged with Steadfast Medial Staffing LLC, at the manner by which Steadfast Medical Staffing, LLC is to be Compensated for its expense in recruiting said Contractor.

Facility _Avante at Roanoke_

Administrator _Amy M. Bender_

Steadfast Medical Staffing, LLC
Administrator _Kdeepdb QD_

STEADFAST 000499

PX-10.012

**JA1696**

STEADFAST MEDICAL STAFFING LLC

Pay Rates Weekdays/Weekends

RN- $60/HR

LPN-$50/HR

CNA- $25/HR

HOLIDAYS

Holiday rates are paid for the day, evening, and night shifts on:

1. New Year's Eve
2. New Year's Day
3. Easter
4. Memorial Day
5. Independence Day
6. Labor Day
7. Thanksgiving Day
8. Christmas Eve
9. Christmas Day

The Holidays billing rate is one and one-half times the regular billing rate for each hour worked.

## AGREEMENT FOR SUPPLEMENTAL

### STAFFING SERVICES

This Agreement is entered into as of March 6_____, _____ 2018 (the "Effective Date") by and between Bon Secours Health System Inc. ("Bon Secours"), which is comprised of multiple facilities that are geographically diverse and listed in Attachment I (the "Facilities"), and [Insert Agency Name] ("Agency"), a [Insert state] corporation.

Medical Staffing of AmericaTA/ Steadfast Medical Staffing VA

### RECITALS

WHEREAS, each of the Facilities owns and operates a health care organization (also referred to herein as the "Facilities") that provides a wide range of inpatient and/or outpatient services, in Florida, Kentucky, Maryland, New York, South Carolina and Virginia.

WHEREAS, Agency is a staffing agency that provides temporary, supplemental personnel to Bon Secours entities or "Facilities" to support their provision of services to patients/residents;

WHEREAS, due to prevailing staffing shortages and to occasional short-term absences of the Facilities' permanent staff members, each Facility from time to time experiences difficulty in ensuring appropriate staff is available to support its day-to-day operations;

WHEREAS, the Facilities desire to engage Agency on an independent contractor basis to provide staffing services and to assign its employed personnel from time to time to each Facility and Agency desires to provide such services on the terms and conditions set forth herein.

NOW THEREFORE, for and in consideration of the mutual covenants and agreements set forth herein and for other good and valid consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### AGREEMENT

1. **ENGAGEMENT OF AGENCY**

    1.1.    Appointment.   The Facilities hereby appoint Agency as their independent contractor to provide staffing services (the "Services") to the Facilities and to assist the Facilities in locating and retaining qualified personnel to fill temporary staffing shortages at the Facilities. Upon receipt of a specific request from a Facility for personnel to fill a particular position, Agency shall use its best efforts to assign temporary, supplemental personnel (hereinafter "Staff") to such Facility in full compliance with all the provisions of this Agreement. This Agreement does not constitute an exclusive engagement of Agency's services by the Facilities, or a promise by the Facilities to meet all of their supplemental staffing needs through Agency.

DRAFT 04292013
Adapted from 42055.010087 HW_US 25285612v5

1

Steadfast 6th 085804

PX-10.043

**JA1698**

2.   **OBLIGATIONS OF AGENCY.**

2.1.   *Staff Qualifications.* During the Term (as is defined in Section 8.1 hereof) of this Agreement, Agency shall ensure that all Staff assigned to any Facility by Agency is (i) duly licensed and qualified to provide nursing services or other health care related services, as applicable, in the State which the Facility resides, and (ii) certified to participate in Medicare, Medicaid, Tricare and other state and federal health programs, as applicable.   Agency further agrees that all Staff provided to the Facilities shall have at least one (1) year of prior work experience in a United States facility in the specialty area to which they would be assigned at a Facility.

2.1.1.   *Screening.*   Agency shall carefully screen Staff to determine their qualifications and competence prior to referring Staff to any Facility.  This screening by Agency shall include, but not be limited to, obtaining all pertinent information concerning  past employment, licensure, certifications, education and professional skills of Staff, OIG excluded provider list, criminal background checks and legal qualifications to work in the United States. Please refer to Attachment III for detailed listing of documentation that must be available to the Facilities by Agency, or Agency must provide, for all Staff.

2.1.2.   *Criminal Background Checks.*  Agency employees assigned to a Facility for any position will have undergone a criminal background check.   Agency will ensure such background check has been completed within the six (6) month period preceding the assignment, or for the period defined by such Facility.   Agency will maintain documentation of criminal background checks and will make that documentation available to the Facilities upon request. Agency will also be responsible  for completing such other background checks as may be required by any Facility. Agency will be responsible for asking and verifying standard Bon Secours criminal background check questions found on the Standard Application of Employment shown below.  Except for Agency employees at Bon Secours facilities in New York State, Agency will apply Bon Secours most up-to-date Background Check Manual, and, pursuant to that manual, will not assign to any Facility Staff with criminal convictions in the last seven years for acts of violence, drugs, or involving moral turpitude or felony convictions within the last 10 years. For Agency employees at Bon Secours facilities in New York, Agency must apply the background check procedures stated in New York Correction Law 23-A.

- Have you ever been *convicted of* or *pleaded guilty or no contest* to committing **ANY CRIME?** (Note: You may omit speeding tickets or non-moving violations; however, you must report any "under the influence" convictions or pending cases (e.g. DUI, DWI). You may omit any conviction that has been annulled, expunged, or sealed by a court.)
- Do you have any unresolved arrests, warrants or pending criminal charges against you?
- Regarding civil lawsuits or administrative complaints alleging child abuse, spouse abuse, elder abuse, patient abuse, harassment and/or dishonest, violent, or discriminatory conduct (such as fraud, embezzlement, theft, assault, battery, etc.), have you ever been found *liable* (i.e., judgment was

DRAFT 04292013
Adapted from 42055.010087 HW_US 25285612v5                    2

Steadfast 6th 085805

**JA1699**

rendered against you) in any such matter, or is any such matter currently pending against you?

- Have you ever been the subject of any exclusion, suspension or debarment action by the General Services Administration (GSA), Office of Inspector General (OIG) or any other federal health care program, including but not limited to Medicare, Medicaid, or Tricare?

2.1.3.  Other Requirements.  Staff must be free from any symptoms of infectious disease, be able to perform assigned job responsibilities and be free of any impairment from drugs, alcohol, or other impairing substance or condition. Artificial nails are not permitted at any Facility for any direct health care provider. Staff with known infectious disease (whether or not symptomatic) shall not be sent by Agency to positions expected to involve performance of exposure prone procedures. Bon Secours campuses are tobacco-free; therefore, Agency employees will adhere to the tobacco-free policies set forth by Bon Secours Health System Inc. and the Facility

2.2.  Staffing Services.  Upon receipt of a request from a Facility, Agency shall provide Facility with Staff to fill short-term staffing needs ("Per Diem Staffing") or long-term needs ("Long Term Staffing").  Agency agrees to have Staff available for the Facilities twenty-four (24) hours per day, seven (7) days per week, three hundred sixty five (365) days a year. Agency's obligation to provide requested Staff is limited by the availability to Agency of Staff who are ready, willing and able to accept a Facility assignment and who meet the requirements of Section 2.1 hereof.

2.3.  Facility Designated Contacts.  Facility shall designate in writing those employees who are authorized to make requests for assignments of Staff from Agency (the "Designated Contacts").  Agency agrees to contact only such Designated Contacts for all matters pertaining to Staff performance, contracting, invoicing and billing.  Any requests for Staff by anyone other than the Designated Contacts shall not be honored and Facility will not be liable for payment for any Staff so requested.  Agency shall report any unauthorized requests to a Designated Contact within twenty-four (24) hours or by 10:00 a.m. Monday morning if such a request is received on a weekend.

2.4.  Documentation.  Agency will ensure that all Staff assigned to the Facilities timely prepare appropriate clinical and administrative records, including medical record entries concerning all examinations, procedures and other services performed by the Staff while providing the services contemplated hereunder. Staff will maintain such records, and prepare or assist in the preparation of such reports, as may be necessary in order to comply with the requirements of any governmental agency, accrediting body, funding source, or similar entity. Prior to starting with the Facility, staff will complete required orientation and regulatory requirements modules.

2.5.  Compliance with Law and Regulations.  Agency shall ensure that the clinical services to be provided by Staff hereunder shall be provided in compliance with (i) the Ethical and Religious Directives for Catholic Health Care Services promulgated by the United States Conference of Catholic Bishops, as interpreted by Bon Secours Ministries (the "Directives"),

DRAFT 04292013
Adapted from 42055 010087 HW US 252856124v5          3

Steadfast 6th 085806

PX-10.045

available online at http://www.usccb.org/about/doctring/ethical-and-religious-directives ; (ii) the standards of The Joint Commission ("TJC"); (iii) all applicable federal and state laws, regulations and rules governing the services, including without limitation OSHA regulations and standards and other professional standards, laws, rules and regulations relating to patient care and work environment; and (iv) applicable administrative and ethical policies of the Facilities, including the Facilities' dress code requirements and those policies and procedures that address provisions for the care of patients/residents.

    2.6.   Medicare Participation. Agency hereby represents and warrants that neither Agency nor Agency's principals (if applicable), employees and/or contractors, including without limitation, the Staff, are presently debarred, suspended, proposed for debarment, declared ineligible, or excluded from participation in any federally funded health care program, including Medicare. Agency agrees to check any Staff, prior to referral to any Facility, against the Office of the Inspector General's List of Excluded Individuals and Entities and the General Services Administration's System for Award Management. Proof of the completion of such checks will be made available to the Facilities upon request. Agency further agrees to immediately notify the Facilities of any threatened, proposed, or actual debarment, suspension, or exclusion from any federally funded health care program, including Medicare. In the event that Agency or Agency's principals (if applicable), employees and/or contractors are debarred, suspended, proposed for debarment, declared ineligible, or excluded from participation in any federally funded health care program during the term of this Agreement, or if at any time after the effective date of this Agreement it is determined that Agency is in breach of this Section, this Agreement shall, as of the effective date of such action or breach, automatically terminate.

    2.7.   Corporate Responsibility Program. Agency acknowledges and agrees that it has received a copy of the Bon Secours Health System Code of Conduct (the "Code"), available online at http://www.bshsi.org/assets/BSHSI_Code_of_Conduct.pdf that it has reviewed the Code and has had the opportunity to ask questions regarding the Code, and that during the Term of this Agreement, Agency and any employees, including without limitation the Staff, will abide by the terms of the Code and Facilities' Corporate Responsibility Programs. Agency employees will be required to acknowledge and sign the BSHSI Code of Conduct and Confidentiality/Security Agreement.

    2.8.   Equal Employment Opportunity. In keeping with federal, state and local laws, Bon Secours policy forbids employees and associates to discriminate against anyone based on race, religion, color, gender, age, marital status, national origin, sexual orientation, gender identity, genetic information, veteran status, disability or any other characteristic protected by law. Bon Secours is committed to establishing and maintaining a workplace free of discrimination. Bon Secours is fully committed to equal employment opportunity. Bon Secours will not tolerate unlawful discrimination in the recruitment, hiring, termination, promotion, salary treatment or any other condition of employment or career development. Furthermore, Bon Secours will not tolerate the use of discriminatory slurs, or other remarks, jokes or conduct, that in the judgment of Bon Secours, encourage or permit an offensive or hostile work environment. Bon Secours also provides reasonable accommodations to disabled employees and applicants as required by law.

    2.9.   Patients/Residents Served. Each party represents and warrants that it and

DRAFT 04292013
Adapted from 42055.010087 HW_US 25285612v5    4

Steadfast 6th 085807

PX-10.046

its employees provide services to all patients/residents regardless of a patient's race, sex, sexual orientation, religion, disability, national origin, age, third-party payer coverage or ability to pay.

3.     **ASSIGNMENTS, TRAINING AND POLICIES AND PROCEDURES.**

3.1.     Assignments.   Each Facility has and retains the sole discretion to assign duties, shifts, units, assignments, etc. to Staff assigned to such Facility by Agency during Staff's hours worked at the Facility, subject to Staff's professional qualifications and Facility's float policy. If Staff refuses an assignment and Staff has not commenced work, Facility shall not owe Agency any amounts in connection with said Staff. If Staff refuses an assignment after commencing work, the Facility shall owe Agency amounts only for actual hours worked by Staff and shall not owe any penalties or other fees as a result of any termination of Staff's assignment.

3.1.1.     Per Diem Staffing.   The Facilities shall use their best efforts to request Staff to fill a Per Diem Staffing need at least two (2) hours prior to the applicable reporting time. If a Facility requests a particular person, Agency shall assign that person to such Facility if the person is available, satisfies the requirements of Section 2.1, and is ready, willing and able to work.

3.1.2.     Long-Term Staff and Scheduling.   In the case of Long Term Staffing, the Facilities will place the Staff on a unit schedule for an agreed upon number of shifts per pay period as described in Attachment II (B), Item 6. The length of the long-term assignment, the assigned unit, the shift(s) and long term compensation shall be in accordance with Attachment II(B), Item 6.

3.2.     Removal of Staff.   If a Facility concludes, in its sole discretion, that Staff assigned to Facility by Agency are not performing their duties in a satisfactory manner or that Staff otherwise fails to satisfy the requirements of Section 2.1 hereof, said Staff shall not be permitted to continue working at such Facility. Under such circumstances, the Facility may immediately terminate Staff's assignment and ask Staff to leave Facility property. Facility shall immediately inform Agency of any such action and shall not owe any penalties or other fees as a result of such termination.

3.3.     Orientation.   Each Facility shall provide written information to Agency for the purpose of orienting Staff prior to their first assignment at such Facility. This information shall be provided to Staff by Agency and shall address relevant Facility policies and methods of delivering patient care. When Staff first commences work at a Facility, such Facility shall provide Staff with information about the location of emergency exits, how to call an emergency, the location of the emergency carts and other information which the Facility requires Staff to know.

3.4.     Evaluations.   Facility will evaluate Agency Staff at the conclusion of each Staff assignment (or extension or renewal thereof) and shall provide such evaluations to Agency within thirty (30) days following completion of an assignment. Copies of such evaluations may be provided to Staff by Agency.

DRAFT 04292013
Adapted from 42055.010087.HW_US 25285612v5          5

Steadfast 6th 085808

PX-10.047

3.5.   Protection of Information.  Each Facility agrees that it will use reasonable security measures to protect Agency's proprietary information and Staff's personal information from unauthorized access, destruction, use, modification, or disclosure.

4.   NON-DISCLOSURE

4.1.   Agency's Obligations.  Agency, during the course of its engagement pursuant to this Agreement, will acquire information concerning the Facilities' finances, business practices, long-term and strategic plans, physical and patient information, confidential employee data, and similar matters (collectively, the "Confidential Information").  The Confidential Information is and shall remain the sole and exclusive property of the relevant Facility.  Agency may not at any time during the term of this Agreement or after the termination of this Agreement, for any reason whatsoever, with or without cause, directly or indirectly, use for any purpose or disclose or distribute to any person, corporation, partnership, sole proprietorship, governmental agency, organization, joint venture or other entity any of the Facilities' Confidential Information.

4.1.1.  A g e n c y  shall not disclose the contents of this Agreement to any third party, except as may be reasonably required for Agency to obtain the services of Agency's professional advisors or as may be required or expressly permitted by law.  Agency shall notify its professional advisors of the nondisclosure requirements of this Agreement.

4.2.   HIPAA and Privacy Compliance.  The parties agree to provide all services contemplated by this Agreement in full compliance with all applicable federal and state laws, regulations, and rules governing the services and the Staff to be provided by Agency.  Each party shall ensure its compliance with all applicable obligations under the Health Insurance Portability and Accountability A c t  of 1996 ("HIPAA") and implementing regulations, particularly the regulations related to the protection of certain individually identifiable protected health information. 45 CFR Parts 160 and 164 (the "HIPAA Privacy Rule"), as well as all other state and federal laws and the Facilities' applicable policies and procedures relating to Confidential Information.

5.   STATUS OF AGENCY, STAFF

5.1.   The parties acknowledge that Agency and the Staff assigned by Agency to the Facilities under this Agreement are independent contractors of the Facilities.  In no event will Agency or any Staff assigned to a Facility be deemed a joint venture, partner, employee or agent of any Facility by virtue of this Agreement.  The Facilities has no control over the manner or method by which Agency meets its obligations under this agreement; provided that Agency's and Staff's services will be performed in a competent and efficient manner in accordance with current professional standards and in compliance with the various private and governmental entities identified in Section 2.5 hereof.

5.2.   Agency has, retains and will continue to bear sole, exclusive and total legal responsibility as the employer of Staff.  This responsibility shall include, but not be limited to, the obligation to ensure full compliance with and satisfaction of 1) all state and federal payroll, income and unemployment tax requirements, 2) all state and federal wage and hour requirements, 3) all workers' compensation insurance requirements, and 4) all other applicable state and federal employment law requirements arising from Agency's

DRAFT 04292013

Adapted from 42055.010087 HW_US 25285612v5                    6

Steadfast 6th 085809

PX-10.048

employment of Staff, the assignment of Staff to a Facility and/or the actual work of Staff at a Facility. The Facilities will not withhold any sums for income tax, Social Security, unemployment insurance, or any other employee withholding, nor will Facility offer Agency or the Staff any employee benefits including, without limitation, pension benefits, worker's compensation coverage, or death and disability insurance. The Facilities shall have no responsibility for locating, paying for, reimbursing for, or providing housing for Staff assigned to a Facility by Agency under this Agreement.

6.      FEES AND INVOICING.

  6.1.    Hourly Rates. Hourly rates charged to the Facilities for each category of Staff are listed in Attachment 11 (A) and (B). The schedule of rates appended to this Agreement as Attachment II(A) shall be the only schedule of rates charged to the Facilities for Per Diem Staffing and the schedule of rates appended to this Agreement as Attachment II(B) shall be the only schedule of rates charged to the Facilities for Long Term Staffing services; provided, however, that the rates reflected in Attachments II(A) and (B) may be renegotiated by the parties at the end of each year of the Term. Except as otherwise provided herein, Agency will only be paid for actual hours worked by Staff.

    6.1.1.    When a Facility cancels a request for Per Diem Staff less than two (2) hours before the scheduled start of a shift or assignment, and Staff cannot be contacted by Agency prior to reporting to the Facility for work, the Facility will pay Agency for two (2) hours in accordance with the applicable rate structure.

    6.1.2.    If Staff is no longer needed by a Facility after reporting for work and beginning his or her assignment, Staff may be cancelled by such Facility. If Staff is cancelled by a Facility, Agency shall be paid for the actual hours worked by Staff or two (2) hours, whichever is greater, in accordance with the applicable rate structure. Agency shall be solely responsible for satisfying any reporting time pay obligations due Staff under state or federal wage and hour laws.

  6.2    Temp to Hire. If Facility would like to employ Agency Staff who have provided services under this Agreement, Facility shall use its best efforts to make its offer of employment within thirty (30) days of the most recently completed assignment. If Facility has paid all applicable outstanding invoices under this Agreement, Facility may hire Agency Staff upon payment of the applicable Conversion Fee set forth below:

  Agency Staff has provided 0-173 hours of service to Facility prior to conversion = 15% Conversion Fee

  Agency Staff has provided 174-449 hours of service to Facility prior to conversion = 10% Conversion Fee

  Agency Staff has provided over 450 hours of service to Facility prior to conversion = No Conversion Fee

In the event that Agency Staff is hired after working a "Pro Re Nata" (PRN) assignment, Facility will pay no conversion fee to Agency.

  6.3.    Cancellation by Agency. When Agency cancels a confirmed assignment for Per Diem Staff less than two (2) hours prior to the scheduled start of a shift or assignment, and Agency cannot replace that Staff with a substitute acceptable to Facility per

DRAFT 04292013
Adapted from 42055.010087 HW_US 25285612v5          7

Steadfast 6th 085810

PX-10.049

JA1704

the terms of this Agreement, Agency shall pay the Facility a late cancellation fee equal to two (2) hours multiplied by such Staffs hourly rate.

6.4. Invoices.

6.4.1.  Facilities shall use the ShiftWise Vendor Management System ("VMS") to assign agency staff. Agency shall submit invoices using the VMS within ninety (90) days after the date Services were rendered.

6.4.2.  Bon Secours shall make payment to an escrow agent designated by Shiftwise within thirty (30) days of receiving an invoice; provided, however, that Bon Secours shall only be obligated to make payment if it receives the invoice within ninety (90) days after the date Services were rendered.

6.4.3 The escrow agent will pay Agency according to the terms of the agreement between Agency and ShiftWise.

6.4.4.  With respect to any invoice, a Facility may, without triggering any default or penalty hereunder or otherwise being in breach of this Agreement, withhold from any payment otherwise due to Agency an amount that has been incorrectly or inappropriately invoiced (the "Disputed Amount"), provided that such Facility informs Agency in writing within thirty (30) days of receipt of the invoice of the Disputed Amount and the basis for Facility's objection.  No Facility shall be charged any penalties, interest, late fees, etc. on amounts deducted in good faith from any invoice.  Notwithstanding the foregoing or any provision hereof to the contrary, each Facility shall be individually responsible for the prompt payment of all invoices with respect to services provided by Staff at such Facility and no Facility will withhold payment on an invoice in connection with any payment dispute at another Facility.

7.    INSURANCE.

7.1.  Obligations of Agency.

7.1.1. Professional Liability.  At all times during the Term of this Agreement, Agency will maintain, at its sole expense, professional liability insurance coverage (or an appropriate combination of professional liability insurance and umbrella insurance coverage) covering it and its employees for professional liability claims made during and after termination of this Agreement based on conduct or events having occurred during the Term of this Agreement with policy limits of not less than $2,100,000 per occurrence or claim and $6, 300.00 annual aggregate, or such amounts per occurrence or claim as shall equal the maximum recovery for medical malpractice actions under the State law in which the facility resides (the "Malpractice Cap") and three times the Malpractice Cap in the annual aggregate.  Agency shall name the Facilities as additional certificate holders on all such policy or policies.  Agency shall provide the Facilities with certificates of all coverage required under this Agreement, and shall immediately notify the Facilities of any lapse, change, or cancellation in such coverage.

a) Extended Reporting Obligation.  In the event Agency purchases insurance on a claims-made basis, Agency agrees that it will purchase a prior acts insurance policy or an extended reporting endorsement or "tail,"

DRAFT 04292013
Adapted from 42055.010087 HW_US 25285612v5

8

Steadfast 6th 085811

PX-10.050

**JA1705**

so that there will, at all times through the applicable statute of limitations, be insurance coverage for all acts and omissions of Agency, regardless of whether a claim is made during this Agreement or after it is terminated. Agency shall provide the Facilities with a certificate or policy showing that such insurance coverage has been purchased.

7.1.2.   Workers Compensation and General Liability Insurance.  Throughout the Term, Agency shall further obtain and maintain at Agency's expense with commercial carriers, through self-insurance or some combination thereof, appropriate workers' compensation coverage for the Staff provided to the Facilities pursuant to this Agreement, and professional, casualty and comprehensive general liability insurance covering Agency and the Staff in amounts no less than $1,000,000 per occurrence or claim and $3,000,000 in the annual aggregate, on such basis and upon such terms and conditions as the Facilities deem appropriate.

7.1.3.   Carriers and Documentation.  All policies shall be with carriers that are deemed acceptable by the Facilities.  The Facilities retain the right to revoke its approval of a carrier previously deemed acceptable.  All insurance certificates shall provide for at least ten (10) days notification from insurer to the Facilities before coverage is canceled or materially changed. Agency agrees to provide the Facilities with written documentation of such insurance policies as described above prior to the Effective Date of the Agreement.  Agency will promptly notify Facilities in the event such insurance policies are canceled or otherwise not renewed for any reason.  Failure of Agency to notify the Facilities of cancellation or non-renewal will not, in any way, limit Agency's general liability responsibility based on conduct or events having occurred during the term of the Agreement.

7.2.   Risk Management.  Each party shall cooperate with the other party's reasonable risk management and quality assurance activities.   Should either party become aware of an incident or claim which may give rise under the other party's professional or general liability insurance policies, such party agrees to promptly notify the other party of the nature of the claim and report all necessary information related to the claim.  Agency shall make available to the Facilities, upon a Facility's reasonable request, any formal risk management protocol maintained by Agency.

7.3.   Survival.  The provisions of this Section 7 will survive the termination or expiration of this Agreement.

8.   TERM AND TERMINATION

8.1.   Term.  This Agreement shall be effective for a term of two (2) years from the date of execution and shall automatically renew thereafter for additional one (1) year terms unless otherwise terminated in accordance with this Article 8.  The initial term and any renewal terms hereof shall be known collectively as the "Term."

8.2.   Termination.  This Agreement may be terminated by either party, at any time, for any reason, with or without cause upon thirty (30) days written notice to the other party.

8.3.   Termination By Law.  The parties intend that this Agreement comply at all times with all existing and future applicable laws, including but not limited to, state and federal anti-kickback laws, the restrictions on the Facilities by virtue of their tax-exempt status, the federal

DRAFT 04292013
Adapted from 42055.010087 HW US 25285612v5          9

Steadfast 6th 085812

PX-10.051

**JA1706**

law relating to physician referrals, as well as state laws relating to physician referrals. If at any time, any Facility or Agency receives advice of counsel that there is a substantial risk that this Agreement does not comply with an applicable law, or that this Agreement jeopardizes the exempt status of the Facilities or its bonds, or that a Facility would be legally precluded (as a result of this Agreement) from billing a third-party payer for services, then the parties will use good faith efforts to reform this Agreement in such a manner so that it complies with applicable law or does not preclude the Facilities from billing a third-party payer, as applicable. If, after the exercise of such good faith efforts for a period of at least thirty (30) days, the parties have not agreed on amendment(s) to this Agreement that resolve the legal issues referred to above, either party may terminate this Agreement immediately.

8.4.  Termination Related to Independent Contractor Status.  Either party may terminate this Agreement upon thirty (30) days prior written notice to the non-terminating party if the Internal Revenue Service ("IRS") issues a final determination concluding that Agency or the Staff as to the Facilities do not have independent contractor status. The notice shall contain a copy of the final determination.

8.5.  Effects of Termination.  Upon proper termination of this Agreement, for any reason, no party shall have any further obligation hereunder except for (i) obligations accruing prior to the date of termination, and (ii) obligations, promises or covenants contained herein which are expressly made to extend beyond the Term of this Agreement, including, without limitation, indemnities, professional liability coverage and confidentiality of information.

8.6.  Modifications to Existing Agreement.  Bon Secours may find it necessary to add, delete or otherwise modify certain terms and conditions ("Changes") contained in the Shiftwise Staffing Agreement. In such circumstances, Bon Secours and/or its designated representative, shall provide written notice of such changes to current Agency signatories of the agreement. The changes shall become effective and incorporated into the existing agreement between the parties on the date(s) set forth in the notice upon the Agency's acceptance of a new assignment subsequent to the date of mailing of notice. The parties agree that such written notice shall obviate the need for an executed supplemental addendum.

9.  **INDEMNIFICATION**

9.1.  Agency agrees to indemnify, defend and hold harmless the Facilities and their parents, officers, directors, members, stockholders, subsidiaries, affiliates, and agents from and against any liability, claim, action, loss, cost, damage or expense incurred or suffered by any Facility, directly or indirectly, arising out of a breach of the Agreement or the acts or omissions of Agency or any of its employees or agents arising under or relating to the Agreement, including but not limited to acts or omissions of Agency arising under or related to: (i) any inappropriate release or misuse of the Facilities' Confidential Information by Agency, its employees, agents or subcontractors; (ii) any breach of the confidentiality provisions contained in this Agreement by Agency, its employees, agents or subcontractors; or (iii) any violation by Agency, its employees, agents or subcontractors of any state or federal law or regulation governing the protection of protected health information.

9.2.  Each Facility hereby agrees to indemnify, defend and hold harmless Agency and

DRAFT 04292013
Adapted from 42055.010087 HW_US 25285612v5          10

Steadfast 6th 085813

PX-10.052

**JA1707**

its parents, officers, directors, members, stockholders, subsidiaries, affiliates, and agents from and against any liability, claim, action, loss, cost, damage or expense incurred or suffered by Agency directly or indirectly, arising out of a breach of the Agreement or the acts and omissions of such Facility arising under or relating to the Agreement.

    9.3.    The provisions of indemnification will survive the termination or expiration of this Agreement.

## 10.    MISCELLANEOUS

    10.1.    Survival of Certain Obligations.  Termination of this Agreement shall not affect any obligation of either party which has accrued prior to such termination.

    10.2.    Non-Solicitation.  No Facility will personally solicit Staff for employment with Facility during the period of assignment. This will not preclude a Facility from hiring Staff who, on their own initiative, seek employment with the Facility.

    10.3.    Access to Books And Records.  At any time during or after the term of this Agreement, all books, documents and records of Agency relating to its performance under this Agreement, including without limitation all federal, state and local tax withholding and other filings and records related to workers' compensation, shall be available for reasonable inspection at any time during Agency's normal business hours upon reasonable notice.

    10.4.    Integration.  This document contains the entire Agreement between the parties hereto and supersedes any and all prior negotiations, commitments, agreements and understandings between the parties.    No supplement, amendment or modification to this Agreement shall be of any force or effect unless in writing and signed by both parties.

    10.5.    Governing Law.  The validity, performance, construction and interpretation of this Agreement shall be governed by State law in which the Facility resides.

    10.6.    Notices.  Any notice to be made in connection with this Agreement shall be in writing and shall be deemed effectively given when delivered in person or sent by registered or certified mail, telegram or telex by one party to the other party, as follows:

            Bon Secours:   Bon Secours Health System, Inc.
                           1505 Marriottsville Road
                           Marriottsville, MD 21104
                           Attn: SVP/Chief Administrative Officer

            Agency:        [Insert Agency Name]  Medical Staffing of America TA/Steadfast Medical Staffing
                           [Insert Street Address Line 1] 5750 Chesapeake Blvd, Suite 301
                           [Insert Street Address Line 2] Norfolk, VA 23513
                           Attn:  [Insert Title]
                                           Attn: Lisa Pitts, CEO

    or such other addresses as any party may specify by written notice to the other.

    10.7.    Assignment.  Neither party may assign any rights nor delegate any duties hereunder without the express prior written consent of the other.  However, any Facility, in its

DRAFT 04292013
Adapted from 42055.010087 HW US 2528612v5          11

Steadfast 6th 085814

sole discretion, may assign any rights and delegate any of its duties under this Agreement to its parent organization, or to any of its subsidiaries or affiliated organizations.

10.8. Severability. If any part of this Agreement is held by a court of competent jurisdiction of the State in which the Facility resides or federal law to be invalid, void or unenforceable, the remaining provisions will nevertheless continue in full force and effect.

10.9. Relationship of the Parties. Agency and the Staff are performing the services and duties hereunder as an independent contractor and not as employees, agents, partners of or joint venturers with the Facilities. Nothing in this Agreement shall be interpreted or construed as creating or establishing the relationship of employer and employee between Facilities and Agency or any agent or subcontractor of Agency, including without limitation, Staff. As Agency and Staff are not Facilities' employees, Agency is responsible for paying all required state and federal taxes.

10.10. Medicare Access to Books and Records. During the term of this Agreement and for a period of four years after the termination hereof, Agency shall grant access to the following documents to the Secretary of the U.S. Department of Health and Human Services ("Secretary"), the U.S. Comptroller-General and their authorized representatives: this Agreement, and all books, documents and records necessary to verify the nature and costs of services provided hereunder. If Agency carries out the duties of this Agreement through a subcontract worth $10,000 or more over a twelve (12) month period with a related organization, this subcontract shall also contain a clause permitting access by the Secretary, Comptroller-General and their authorized representatives to the related organization's books, documents and records.

*[Remainder of page intentionally left blank.]*

DRAFT 04292013
Adapted from 42055.010087 HW_US 25285612v5          12

Steadfast 6th 085815

PX-10.054

**JA1709**

IN WITNESS HEREOF, the undersigned have executed this Agreement as of the date first above written.

Bon Secours

By:     Tim Davis
Title:  EVP/Chief Administrative Officer
Date:   9/12/17

[Insert Agency Name] Medical Staffing of AmericaTA/
Steadfast Medical Staffing

By:     Lisa Pitts
Title:  CEO
Date:   March 6,2018

DRAFT 04292013
Adapted from 42055.010087 HW US 25285612v5      13

Steadfast 6th 085816

PX-10.055

JA1710

DocuSign Envelope ID: AC216365-757F-4AB4-BD09-678B2A4B1BE6

## SUPPLEMENTAL STAFFING AGREEMENT

**THIS AGREEMENT** is made as of this 22nd day of November, 2016 by and between <u>Medical Facilities of America LXXVI (76) Limited Partnership t/a Charlottesville Health & Rehabilitation Center</u> located at 505 Rio Road West, Charlottesville, VA  22901 (hereinafter "HEALTHCARE CENTER") and <u>SteadFast Medical Staffing, LLC</u>, with an office located at 5750 Chesapeake Boulevard, Suite 103, Norfolk, VA  23513 (hereinafter "SUPPLEMENTAL STAFFING SERVICE").

### WITNESSETH:

**WHEREAS,** HEALTHCARE CENTER operates a long-term care facility, the patients of which require on-site medical treatment and supervision; and

**WHEREAS,** Medical Facilities of America, Inc. (hereinafter "MFA") is the General Partner of Healthcare Center; and

**WHEREAS,** SUPPLEMENTAL STAFFING SERVICE provides qualified and appropriately licensed and credentialed temporary health care personnel ("TEMPORARY PERSONNEL").

**NOW THEREFORE IN CONSIDERATION** of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1.    **Nature of Arrangement**. Upon request of HEALTHCARE CENTER, SUPPLEMENTAL STAFFING SERVICE shall make every effort to promptly provide qualified TEMPORARY PERSONNEL to HEALTHCARE CENTER. SUPPLEMENTAL STAFFING SERVICE shall screen all TEMPORARY PERSONNEL, as set forth in **EXHIBIT A** which is attached hereto, and insure that the TEMPORARY PERSONNEL have the qualifications required by the HEALTHCARE CENTER before such TEMPORARY PERSONNEL are placed at the HEALTHCARE CENTER.

2.    <u>Duties and Obligations of SUPPLEMENTAL STAFFING SERVICE.</u>

    A.    SUPPLEMENTAL STAFFING SERVICE shall:

       (1)    Provide to the HEALTHCARE CENTER a profile on each TEMPORARY PERSONNEL placed at the HEALTHCARE CENTER which includes work history, references, skills validation, a copy of the TEMPORARY PERSONNEL's state license/credentials and verification of the items listed in **EXHIBIT A.** A copy of such profile must be provided prior to the SUPPLEMENTAL STAFFING SERVICE placing any TEMPORARY PERSONNEL at the HEALTHCARE CENTER or at any other time the HEALTHCARE CENTER requests.

Steadfast 6th 085841

PX-10.076

**JA1711**

DocuSign Envelope ID: AC216365-757F-4AB4-BD09-678B2A4B1BE6

(2)     Assume sole and exclusive responsibility for the payment of wages (including overtime where applicable) to TEMPORARY PERSONNEL for services performed at the HEALTHCARE CENTER to the extent TEMPORARY PERSONNEL are considered to be SUPPLEMENTAL STAFFING SERVICES's employees. SUPPLEMENTAL STAFFING SERVICE shall be responsible for withholding appropriate federal and state taxes, contributing to Federal Social Security taxes, payment of unemployment taxes and workers' compensation insurance coverage as well as any other tax, payment, or obligation required of an employer.

(3)     Assume sole and exclusive responsibility for any injury, accident, or illness suffered by TEMPORARY PERSONNEL and compensable under the applicable workers' compensation laws. SUPPLEMENTAL STAFFING SERVICE further agrees to waive any and all subrogation rights it or its insurer may have against HEALTHCARE CENTER for claims paid to TEMPORARY PERSONNEL.

(4)     Assume sole and exclusive responsibility for the payment of compensation to TEMPORARY PERSONNEL for services performed at the HEALTHCARE CENTER to the extent TEMPORARY PERSONNEL are considered to be independent contractors. SUPPLEMENTAL STAFFING SERVICE shall be responsible for filing the necessary forms, such as 1099's, as well as complying with all requirements for an independent contractor relationship to exist under applicable law.

(5)     Comply with and ensure that TEMPORARY PERSONNEL placed at the HEALTHCARE CENTER comply with the guidelines of OSHA standards.

(6)     Be in compliance with all applicable provisions of federal, state, and local laws, rules and regulations, including, but not limited to patient care guidelines, and monitor the TEMPORARY PERSONNEL placed at the HEALTHCARE CENTER to insure that the TEMPORARY PERSONNEL are in compliance with the same.

(7)     Upon notification or knowledge that a TEMPORARY PERSONNEL has failed to report for an assignment as scheduled or has engaged in any conduct which is in violation of this Agreement or detrimental to the HEALTHCARE CENTER, its residents, or MFA, as determined by the HEALTHCARE CENTER and MFA, make every effort to attempt to find a replacement within a time agreed to by the parties.

(8)     Inform the HEALTHCARE CENTER of any cancellation of TEMPORARY PERSONNEL and find a replacement.

(9)     Warrant that it and, to the best of its knowledge, all TEMPORARY PERSONNEL shall be free at all times from any and all sanctions and/or exclusions of participation by federal or state funded programs, including, but not limited to license sanctions and revocations, and monitor the TEMPORARY PERSONNEL placed at the HEALTHCARE CENTER to insure compliance with the same.

B.     Services to Patients. SUPPLEMENTAL STAFFING SERVICE warrants that all services performed by it and, to the best of its knowledge, the TEMPORARY

Supplemental Staffing Agreement - Charlottesville /SteadFast Medical Staffing, LLC                    Page 2 of 12

Steadfast 6th 085842

PX-10.077

DocuSign Envelope ID: AC216365-757F-4AB4-BD09-678B2A4B1BE6

PERSONNEL will be done in accordance with and in compliance with recognized professional and ethical medical standards and the terms and conditions of this Agreement as well as all applicable state, federal, and local laws, rules, and regulations. All such services shall also be rendered at all times in accordance with any conditions of participation and/or reimbursement requirements as may, from time to time, be imposed by applicable governmental and other third-party reimbursement sources. SUPPLEMENTAL STAFFING SERVICE may only commence rendering services to HEALTHCARE CENTER'S patients upon the full execution of this Agreement by SUPPLEMENTAL STAFFING SERVICE.

C.   Confidentiality. SUPPLEMENTAL STAFFING SERVICE shall maintain and assure that during the term of this Agreement and after the termination of this Agreement, however caused, it and its TEMPORARY PERSONNEL and all other employees, agents, or subcontractors employed or engaged on its behalf shall maintain strict confidentiality of all medical and other records and information regarding HEALTHCARE CENTER's patients and will comply with all state and federal regulations regarding same.

SUPPLEMENTAL STAFFING SERVICE shall also maintain and assure that during the term of this Agreement and after the termination of this Agreement, however caused, it and its TEMPORARY PERSONNEL and all other employees, agents, or subcontractors employed or engaged on its behalf shall maintain strict confidentiality of all proprietary information regarding HEALTHCARE CENTER or MFA. For the purposes of the above, the term "proprietary information" means any information which is not generally available to the public, and includes, without limitation, the identity of or other facts relating to the HEALTHCARE CENTER or MFA's residents, customers, accounts, prospects, marketing strategies, financial data, inventory lists, trade secrets, pricing strategies, arrangements with suppliers and customers, or any other information acquired such that if such information were disclosed such disclosure could act to the prejudice of HEALTHCARE CENTER or MFA.

SUPPLEMENTAL STAFFING SERVICE agrees that if it and its TEMPORARY PERSONNEL and all other employees, agents, or subcontractors employed or engaged on its behalf believe they are required by law or otherwise required to reveal any information which is to be maintained in confidence as set forth above, SUPPLEMENTAL STAFFING SERVICE will, and will require its TEMPORARY PERSONNEL and all other employees, agents, or subcontractors employed or engaged on its behalf to first contact MFA's General Counsel prior to disclosing such information, in order that MFA or the HEALTHCARE CENTER can take appropriate steps to safeguard the disclosure of such information.

D.   Health Insurance Portability and Accountability Act of 1996. HEALTHCARE CENTER and SUPPLEMENTAL STAFFING SERVICE agree that they are not Business Associates of one another, as that term is defined in the Health Insurance Portability and Accountability Act of 1996 and its implementing regulations ("HIPAA"). HEALTHCARE CENTER and SUPPLEMENTAL STAFFING SERVICE agree to comply with the provisions of HIPAA if, and to the extent applicable. The parties acknowledge that from time to time, HIPAA or other regulations may require an amendment or modification to this Agreement for compliance purposes, and agree that they will work to promptly effectuate any such required amendment or modification.

Steadfast 6th 085843

PX-10.078

JA1713

DocuSign Envelope ID: AC216365-757F-4AB4-BD09-678B2A4B1BE6

3.    <u>Fee Schedule</u>.  SUPPLEMENTAL STAFFING SERVICE shall bill HEALTHCARE CENTER for its services in accordance with **EXHIBIT B** attached hereto.  No change in the fee schedule will be binding without the prior written approval from an authorized representative of HEALTHCARE CENTER.

4.    <u>Duties and Responsibilities of HEALTHCARE CENTER.</u>

A.    HEALTHCARE CENTER shall maintain a current and unrestricted license to operate as a nursing home in the Commonwealth of Virginia.  HEALTHCARE CENTER shall provide reasonable access to the HEALTHCARE CENTER and will inform and make available to SUPPLEMENTAL STAFFING SERVICE and TEMPORARY PERSONNEL all HEALTHCARE CENTER policies and procedures, including medication administration, charting and documentation procedures, issues as to patient rights, Infection Control, Fire and Safety, and HIPAA Privacy in order that SUPPLEMENTAL STAFFING SERVICE can ensure those polices and procedures are a condition of its TEMPORARY PERSONNEL performing the services herein contemplated.

B.    HEALTHCARE CENTER will put in place appropriate procedures to review the actual time worked by TEMPORARY PERSONNEL before such time is submitted by TEMPORARY PERSONNEL to SUPPLEMENTAL STAFFING SERVICE.

C.    HEALTHCARE CENTER has the right to cancel an assignment not less than two (2) hours before the time TEMPORARY PERSONNEL is scheduled to report without incurring liability.  It shall be the responsibility of SUPPLEMENTAL STAFFING SERVICE to contact TEMPORARY PERSONNEL.

D.    If HEALTHCARE CENTER cancels a TEMPORARY PERSONNEL less than two (2) hours prior to start of assignment, HEALTHCARE CENTER shall be liable for two hours at the applicable rate for the TEMPORARY PERSONNEL involved. HEALTHCARE CENTER has the option to utilize service of TEMPORARY PERSONNEL for those hours should said TEMPORARY PERSONNEL still be available.  There will be no liability, however, if the reason for the cancellation by the HEALTHCARE CENTER is due to a breach of this Agreement by SUPPLEMENTAL STAFFING SERVICE or TEMPORARY PERSONNEL.

E.    HEALTHCARE CENTER shall submit payment to SUPPLEMENTAL STAFFING SERVICE within forty-five (45) days upon receipt of accurate invoice.

5.    <u>Right to Remove</u>.  If, in the sole discretion of the HEALTHCARE CENTER or MFA, a TEMPORARY PERSONNEL provided by SUPPLEMENTAL STAFFING SERVICE has engaged in any action which is not in the best interests of the HEALTHCARE CENTER or MFA, HEALTHCARE CENTER or MFA may require TEMPORARY PERSONNEL to leave facility and shall inform SUPPLEMENTAL STAFFING SERVICE of this action immediately. There will be no liability to the HEALTHCARE CENTER or MFA for exercising this right of removal.  Upon notification of removal, SUPPLEMENTAL STAFFING SERVICE agrees to

Steadfast 6th 085844

PX-10.079

DocuSign Envelope ID: AC216365-757F-4AB4-BD09-678B2A4B1BE6

find a replacement to be placed at the HEALTHCARE CENTER within a time agreed to by the parties.

    **6.**    **Change of Employer**.  In the event HEALTHCARE CENTER or other party related to the HEALTHCARE CENTER wishes to permanently employ TEMPORARY PERSONNEL, SUPPLEMENTAL STAFFING SERVICE agrees to release TEMPORARY PERSONNEL upon sixty (60) days written notice.  TEMPORARY PERSONNEL remains an employee of SUPPLEMENTAL STAFFING SERVICE during the sixty (60) day period. Subject to meeting the above condition, neither HEALTHCARE CENTER nor TEMPORARY PERSONNEL shall be charged fees or penalties for such permanent change of employer.

    **7.**    **Term; Termination**.

        **A.**    **Term**. The term of this Agreement shall commence as of the date hereof and shall continue in full force and effect for an initial term of one (1) year.  Unless any party elects to terminate this Agreement at the end of the initial or any renewal term hereof by giving written notice to the other parties at least thirty (30) days prior to the expiration of the then current term, this Agreement shall be deemed to have automatically renewed for an additional term of one (1) year at the conclusion of each term, upon the same terms and conditions as set forth herein.

        **B.**    **Termination For Cause**. This Agreement may be immediately terminated by any party hereto upon the material breach of any of the terms and conditions hereof by any other party.  Such termination shall be effective immediately upon receipt of notice of claimed breach.  This Agreement shall also terminate immediately and automatically, without notice (1) in the event the HEALTHCARE CENTER loses its license to operate as a nursing home, (2) in the event SUPPLEMENTAL STAFFING SERVICE initiates bankruptcy proceedings (or such proceedings are involuntarily instituted against it) or it makes an assignment for the benefit of creditors, (3) in the event SUPPLEMENTAL STAFFING SERVICE is sanctioned or excluded from participating in any federal or state funded program,  including, but not limited to, Federal and/or State Medicare and Medicaid programs, (4) in the event the insurance requirements of the following paragraph entitled "Insurance" are not complied with, or (5) in the event that SUPPLEMENTAL STAFFING SERVICE is in violation of any federal, state, or local law or regulation, or does any act which, in the sole judgment of the HEALTHCARE CENTER or MFA, is contrary to the best interests of the HEALTHCARE CENTER or MFA.

        **C.**    **Termination Without Cause**.  This Agreement may be terminated by any party, with or without cause, upon thirty (30) days prior written notice.

        **D.**    **Survival**.  A party's duty to indemnify, as set forth in the following paragraph entitled "Indemnification," will survive any termination of this Agreement as set forth above.

    **8.**    **Insurance**. SUPPLEMENTAL STAFFING SERVICE shall maintain throughout any term of this agreement professional malpractice liability insurance covering itself, its TEMPORARY PERSONNEL and any other employees, agents, and assigns in connection with

Steadfast 6th 085845

PX-10.080

**JA1715**

DocuSign Envelope ID: AC216365-757F-4AB4-BD09-678B2A4B1BE6

the performance of services under this Agreement. SUPPLEMENTAL STAFFING SERVICE shall submit to HEALTHCARE CENTER upon execution of this Agreement, and annually thereafter, a certificate of insurance confirming the foregoing coverage in a minimum amount equal to or greater than the limitation on recovery per occurrence specified in Section 8.01-581.15 of the Code of Virginia (and as such section may be hereinafter amended or superceded), and three (3) times of said amount in the annual aggregate.

SUPPLEMENTAL STAFFING SERVICE shall also maintain throughout any term of this Agreement the following insurance coverage covering itself, its TEMPORARY PERSONNEL and any other employees, agents, and assigns in connection with performance of services under this Agreement in the minimum amounts (incident/aggregate) as follows:

i) Commercial General Liability - $1,000,000 and $3,000,000 in the aggregate

ii) Automobile Liability - $1,000,000

iii) Workers' Compensation - Statutory Limits

iv) Employer's Liability - $1,000,000

v) Fidelity Bond - $1,000,000

vi) Umbrella Liability - $1,000,000

vii) Cyber Liability - with limits of not less than $5,000,000.00 for each occurrence, covering claims involving privacy violations, information theft, damage to or destruction of electronic information, intentional and/or unintentional release of private information, alteration of electronic information, extortion and network security

SUPPLEMENTAL STAFFING SERVICE shall add HEALTHCARE CENTER to their policies of insurance as an additional insured. SUPPLEMENTAL STAFFING SERVICE shall submit to HEALTHCARE CENTER upon execution of this Agreement, and annually thereafter, certificates of insurance confirming the foregoing coverages. Liability Insurance shall include coverage for contractual liability and shall name HEALTHCARE CENTER as an additional insured.

Each policy set forth above shall provide that the insurance company may not cancel coverage without providing SUPPLEMENTAL STAFFING SERVICE and HEALTHCARE CENTER thirty (30) days prior notice. SUPPLEMENTAL STAFFING SERVICE shall immediately notify HEALTHCARE CENTER should it receive any notice of cancellation of such insurance. Any such cancellation may constitute grounds for termination for cause as referenced in this Agreement.

9. <u>Indemnification.</u>

A. <u>HEALTHCARE CENTER.</u> HEALTHCARE CENTER shall indemnify and hold SUPPLEMENTAL STAFFING SERVICE harmless of and from all claims, demands, actions, causes of actions, costs, expenses, liabilities and losses (including reasonable attorneys'

Steadfast 6th 085846

PX-10.081

**JA1716**

DocuSign Envelope ID: AC216365-757F-4AB4-BD09-678B2A4B1BE6

fees and court costs) which may result against SUPPLEMENTAL STAFFING SERVICE as a consequence of any alleged negligent or intentional act or omission, malfeasance, neglect or medical malpractice caused or alleged to be caused solely by HEALTHCARE CENTER, its employees, agents or subcontractors.

B.   SUPPLEMENTAL STAFFING SERVICE.   SUPPLEMENTAL STAFFING SERVICE shall indemnify and hold HEALTHCARE CENTER and MFA, as well as each of their respective employees, agents, officers, and directors, harmless of and from any and all claims, demands, actions, causes of actions, costs, expenses, liabilities, and losses (including reasonable attorneys' fees and court costs) which may result against the HEALTHCARE CENTER or MFA as a consequence of a violation of any of the terms of this Agreement or any alleged negligent act or omission, malfeasance, neglect, breach of patient confidentiality or professional malpractice caused or alleged to be caused by SUPPLEMENTAL STAFFING SERVICE, its TEMPORARY PERSONNEL, or any of its employees, agents or subcontractors arising out of or occurring in connection with the performance of the terms of this Agreement.

SUPPLEMENTAL STAFFING SERVICE also shall indemnify and hold HEALTHCARE CENTER and MFA, as well as each of their respective employees, agents, officers, and directors, harmless of and from any and all claims, demands, actions, causes of actions, costs, expenses, liabilities, and losses (including reasonable attorneys' fees, court costs, the payment of back taxes and penalties) which may result against the HEALTHCARE CENTER or MFA should any governmental agency or tribunal find that any of the parties hereto has violated any federal, state or local law or regulation or any finding that any TEMPORARY PERSONNEL placed by SUPPLEMENTAL STAFFING SERVICE was an employee or joint employee of HEALTHCARE CENTER or MFA arising out of or occurring in connection with the performance of the terms of this Agreement.

C.   Limitation.   Notwithstanding the above, in no event shall either party be liable for any incidental, consequential, exemplary, special, or punitive damages or expenses, or lost profits (regardless of how characterized, and even if such party has been advised of the possibility of such damages) under or in connection with this Agreement, regardless of the form of action, whether in tort, contract, negligence, strict liability, statutory liability, or otherwise. Moreover, in the event any TEMPORARY PERSONNEL suffers an injury, accident, or illness compensable under applicable workers' compensation laws, such TEMPORARY PERSONNEL's sole remedy shall be workers' compensation.   Failure by such TEMPORARY PERSONNEL to exhaust all workers' compensation administrative remedies and appeals, shall preclude any and all recovery from HEALTHCARE CENTER under any theory or breach of contract, tort, statutory liability, or other.

10.   Independent Contractor Status.   SUPPLEMENTAL STAFFING SERVICE, and any employees, agents, or subcontractors employed or engaged by the SUPPLEMENTAL STAFFING SERVICE shall be and at all times act as independent contractors in performing the services contemplated by this Agreement. It is specifically understood and agreed that TEMPORARY PERSONNEL assigned by SUPPLEMENTAL STAFFING SERVICE to the HEALTHCARE CENTER is the sole employee of SUPPLEMENTAL STAFFING SERVICE and not an employee or joint employee of the HEALTHCARE CENTER or MFA and nothing in

Steadfast 6th 085847

PX-10.082

DocuSign Envelope ID: AC216365-757F-4AB4-BD09-678B2A4B1BE6

this Agreement should be construed to create, either expressly or by implication, an employer/employee relationship inconsistent with the above. SUPPLEMENTAL STAFFING SERVICE will require any TEMPORARY PERSONNEL or other individual performing services under this Agreement to sign a copy of **EXHIBIT C,** attached hereto, and provide copy of same to HEALTHCARE CENTER prior to allowing services to be performed under this Agreement. SUPPLEMENTAL STAFFING SERVICE will also maintain in effect during the term of this Agreement any and all Federal, State and/or local licenses and permits which may be required of employers generally.

At no time shall SUPPLEMENTAL STAFFING SERVICE, its TEMPORARY PERSONNEL, or any employees, agents, or subcontractors employed or engaged by the SUPPLEMENTAL STAFFING SERVICE hold themselves out in any way to be the employees, agents, or subcontractors of HEALTHCARE CENTER or MFA. SUPPLEMENTAL STAFFING SERVICE agrees to provide a list of his/her employees, agents or subcontractors who will have access to patients in the HEALTHCARE CENTER prior to their performing any duties herein. No term of this Agreement shall be construed so as to render any party the employee or agent of any other, nor shall this Agreement be nor be construed as a contract of employment.

11.   Access to Records.

A.   SUPPLEMENTAL STAFFING SERVICE's Records. Until the expiration of four (4) years after the furnishing of services pursuant to this Agreement, SUPPLEMENTAL STAFFING SERVICE agrees to make available, upon receipt of written request from HEALTHCARE CENTER or MFA or the Secretary of Health and Human Services ("HHS") or the U.S. Comptroller General, or any of their duly authorized representatives, or any duly authorized state agency, this Agreement and the books, documents, and records of SUPPLEMENTAL STAFFING SERVICE that are necessary to certify the extent of costs incurred by HEALTHCARE CENTER under this Agreement as well as the services provided by SUPPLEMENTAL STAFFING SERVICE under this Agreement, including, but not limited to, normal employment records concerning the TEMPORARY PERSONNEL who provided those services at the HEALTHCARE CENTER.

B.   Subcontractors. If SUPPLEMENTAL STAFFING SERVICE carries out any of the duties of this Agreement with a value of Ten Thousand Dollars ($10,000.00) or more over a twelve-month period through a subcontract with a related organization or individual, such subcontract shall contain a clause to the effect that, until after the expiration of four (4) years after the furnishing of services under the subcontract, the related organization shall make available, upon written request from HEALTHCARE CENTER or MFA or the Secretary of HHS, the U.S. Comptroller General, or any of their duly authorized representatives, the subcontract and the books, documents, and records of the related organization that are necessary to verify the nature and extent of costs incurred under the subcontract as well as the services provided under the subcontract, including, but not limited to, normal employment records concerning the individuals who provided those services at the HEALTHCARE CENTER under sub-contract.

Supplemental Staffing Agreement – Charlottesville /SteadFast Medical Staffing, LLC              Page 8 of 12

Steadfast 6th 085848

PX-10.083

DocuSign Envelope ID: AC216365-757F-4AB4-BD09-678B2A4B1BE6

12.     **Compliance with Law.**  SUPPLEMENTAL STAFFING SERVICE agrees to be in full compliance with all applicable local, federal and state laws and regulations, including, but not limited to, labor and employment laws in the selection and placement of TEMPORARY PERSONNEL and in the performance of services under this Agreement, including, but not limited to, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Fair Labor Standards Act, the Equal Pay Act and the Family and Medical Leave Act and all requirements imposed by and pursuant to the regulations of the United States Department of HHS or other enforcement authority issued pursuant to that Title, so that no person in the United States of America shall, on the grounds of race, color, handicap or national origin, be excluded from participation in, be denied the benefits, or be otherwise subjected to discrimination under any program or activity provided by SUPPLEMENTAL STAFFING SERVICE.

13.     **Miscellaneous.**

A.     **Indulgences, Etc.**  Neither the failure nor any delay on the part of any party to exercise any right, remedy, power or privilege ("Right") under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any Right preclude any other or further exercise of the same or of any other Right, nor shall any waiver of any Right with respect to any occurrence be construed as a waiver of such Right with respect to any other occurrence.  No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

B.     **Assignment.**  Neither party shall assign the Agreement in whole or in part without the written consent of the other which shall not be unreasonably withheld.  Neither party shall assign any monies, obligations, or entitlements due or to become due to it under the Agreement without the prior written consent of the other party.  This Agreement shall be binding upon and inure to the benefit of the successors, permitted assigns, heirs and representatives of the Facility and the Company.  Any attempted assignment of this Agreement in violation of the provisions of this section is void.

C.     **Controlling Law.**  This Agreement and all questions relating to its validity, interpretation, performance and enforcement shall be governed by and construed in accordance with the substantive laws of the Commonwealth of Virginia, notwithstanding any choice-of-laws provisions of Virginia law to the contrary.

D.     **Notices.**  All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and shall be delivered by hand, overnight courier, or by regular United States mail, postage pre-paid, addressed to the party for whom it is intended at the addresses set forth below.  Any address for the giving of notice may be changed by giving notice to that effect to the other party.  Notices provided by hand shall be deemed to have been received as of the date provided on the notice.  Notices provided via regular United States mail or by overnight courier are effective upon deposit with the post office or overnight courier.

Steadfast 6th 085849

PX-10.084

**JA1719**

DocuSign Envelope ID: AC216365-757F-4AB4-BD09-678B2A4B1BE6

If to SUPPLEMENTAL STAFFING SERVICE:

> SteadFast Medical Staffing, LLC
> ATTN:  Lisa Pitts
> 5750 Chesapeake Boulevard, Suite 103
> Norfolk, VA  23513

If to HEALTHCARE CENTER:

> Charlottesville Health & Rehabilitation Center
> ATTN:  Administrator
> 505 West Rio Road
> Charlottesville, VA  22902

With a copy to:

> Medical Facilities of America, Inc.
> ATTN:  Legal Dept.
> 2917 Penn Forest Blvd.
> Roanoke, VA  24018

E.  **Schedule**.  All schedules, exhibits, and addenda attached hereto are hereby incorporated by reference into, and made a part of, this Agreement, provided they are properly dated and initialed by all executing parties.

F.  **Financial Obligations**.  SUPPLEMENTAL STAFFING SERVICE shall not incur, nor will HEALTHCARE CENTER or MFA be responsible for, any financial obligations, contract for the purchase of, or purchase of any goods or services on behalf of the HEALTHCARE CENTER or MFA without the HEALTHCARE CENTER's or MFA's express prior written consent.

G.  **Execution**.  This Agreement is not binding unless executed by the SUPPLEMENTAL STAFFING SERVICE and the Executive Vice President or an authorized officer of HEALTHCARE CENTER.

H.  **Benefit**.  The rights and obligations hereunder shall be binding upon and shall inure to the benefits of the parties hereto and their respective successors and permitted assigns.

I.  **Integration**.  This Agreement constitutes the entire agreement of the parties hereto and shall not be modified except in writing signed by all of the parties hereto.

J.  **Referral Disclaimer and Freedom of Choice**.  The parties acknowledge that the payment or receipt of any remuneration, direct or indirect, to induce the referral of a patient for the purpose of purchasing either goods or services reimbursable under the federal

Supplemental Staffing Agreement - Charlottesville /SteadFast Medical Staffing, LLC          Page 10 of 12

Steadfast 6th 085850

PX-10.085

DocuSign Envelope ID: AC216365-757F-4AB4-BD09-678B2A4B1BE6

Medicare or state Medicaid programs is prohibited. No provision of this Agreement is intended to, nor shall it be construed as requiring any party hereto to refer any patient to any other party hereto nor shall any payment contemplated hereunder be contingent or conditioned upon nor measured by the referral by any party of patients for the purchase of services or goods to any of the other parties hereto; it being expressly provided that no purpose of this Agreement is to induce referrals.

K.     Non-exclusive Agreement. Nothing in this Agreement shall be construed as limiting the rights of either party to affiliate or contract with any other staffing agency or healthcare center on either a limited or general basis while this Agreement is in effect.

L.     Covenants and Warrants. The SUPPLEMENTAL STAFFING SERVICE covenants and warrants that neither it nor any of its employees, agents or subcontractors are under any obligation, restraint or impairment which would prohibit the performance of its duties as set forth in this Agreement. The SUPPLEMENTAL STAFFING SERVICE also understands and agrees that if it is affiliated with or employed by a practice, hospital, clinic or any other healthcare facility, it is the SUPPLEMENTAL STAFFING SERVICE's duty to notify the practice, hospital, clinic or healthcare facility and obtain any and all necessary approvals from such individuals or entities in order to allow the SUPPLEMENTAL STAFFING SERVICE to perform the services set forth in this Agreement without restraint or impairment. The SUPPLEMENTAL STAFFING SERVICE understands and agrees that it will indemnify and hold harmless the HEALTHCARE CENTER and MFA, its parent, subsidiaries, and affiliates, as well as each of their respective employees, agents, officers, and directors from any and all demands, losses, causes of action, claims, expenses and liabilities which may be brought by any person, entity, agency or board arising out of a breach of the obligations set forth in this paragraph, including but not limited to costs and reasonable attorney's fees.

M.     Labor. Under no circumstances will SUPPLEMENTAL STAFFING SERVICE enter into any voluntary agreement or understanding with any union organization for the provision of services under this Agreement.

N.     No Presumption against Drafter. The language used in this Agreement is not to be construed in favor or against any party solely because such party or their counsel may have drafted the Agreement.

O.     Severability and Reformation. Each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be adjudged to be invalid under applicable law, the remainder of the Agreement is severable and shall continue in full force and effect. Should a court of competent jurisdiction declare any of the provisions of this Agreement unenforceable, the parties acknowledge and agree that the court may revise or reconstruct such unenforceable provisions to better effectuate the intent of the parties.

P.     Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute

Steadfast 6th 085851

PX-10.086

DocuSign Envelope ID: AC216365-757F-4AB4-BD09-678B2A4B1BE6

one and the same instrument. The parties agree that a facsimile or electronic signature may substitute for and have the same effect as the original signature.

Q.   Elder Justice Act of 2009.  In compliance with the provisions of the Elder Justice Act of 2009, 42 USCS Section 1320b-25, et seq., and implementing regulations, as a contractor of HEALTHCARE CENTER, SUPPLEMENTAL STAFFING SERVICE is required to report any reasonable suspicion of a crime against HEALTHCARE CENTER residents to the Administrator of HEALTHCARE CENTER and to ensure that such crime is reported to the Virginia Department of Health Office of Licensure and Certification and to local law enforcement agents.  Such reports must be made within two hours after forming the suspicion if the event results in serious bodily injury, or, if no serious bodily injury, within 24 hours.

WITNESS the following signatures.

STEADFAST MEDICAL STAFFING, LLC

By: _Lisa pitt_

Name printed: _Lisa pitts_

Title: _CEO_

Date signed: _11-23-16_

Federal Employer Identification
Number: _47-4762890_

MEDICAL FACILITIES OF AMERICA LXXVI (76) LIMITED PARTNERSHIP T/A CHARLOTTESVILLE HEALTH & REHABILITATION CENTER

By:  Medical Facilities of America, Inc.

Its: Manager

By:  _Keith F. Helmer_
         Keith F. Helmer, Executive VP and COO

Date signed:     11/29/2016

Steadfast 6th 085852

PX-10.087

**JA1722**

DocuSign Envelope ID: AC216365-757F-4AB4-BD09-678B2A4B1BE6

SteadFast Medical Staffing, LLC

**EXHIBIT A**

### SCREENING PROCEDURES

❖ A completed and signed SteadFast Medical Staffing, LLC employment application.

❖ Completed I-9 with supporting documentation to show legal eligibility to work in U.S.

❖ Valid license/certificate in good standing in the state of practice.

❖ Criminal background and abuse screening (as required by facility and/or state statutes).

❖ Minimum one year experience within the last two years for licensed nurses.

❖ Supportive documentation, such as current CPR, BCLS, ACLS, PALS, etc.

❖ Two professional satisfactory work-related references, in clinical specialty within the last three (3) years, as to clinical competency and reliability.

❖ Completed clinical skills check list: updated annually (clinical skills checklists and testing, as required by facility).

❖ Health clearance shall include Hepatitis B vaccine or declination, and evidence of annual TB test or CXR results.

❖ Federally compliant Hepatitis B vaccine program.

❖ SteadFast Medical Staffing, LLC shall implement a drug and alcohol free policy similar to that of Healthcare Center and shall require its temporary personnel placed with the Healthcare Center to abide by such a drug and alcohol policy while performing services at the Healthcare Center.

❖ Adherence to Standards of Conduct policies such as clinical policies, patient rights policies, drug free work place policies.

❖ Endorsement of **EXHIBIT C** attached hereto.

❖ OSHA approved training:
  Occupational Exposure to blood borne pathogens, including standard precautions.
  Body Mechanics
  Electrical and Fire Safety

| | Initials | Date |
|---|---|---|
| **Healthcare Center** | KFH | 11/29/2016 |
| **Supplemental Staffing Service** | | 11/23/16 |

Steadfast 6th 085853

PX-10.088

DocuSign Envelope ID: AC216365-757F-4AB4-BD09-678B2A4B1BE6

## EXHIBIT B

### STEADFAST MEDICAL STAFFING LLC

**Pay Rates Weekdays/Weekends**

LPN   $40/HR

RN    $50/HR

### HOLIDAYS

Holiday rates are paid for the day, evening, and night shifts on:

1. New Year's Eve
2. New Year's Day
3. Easter
4. Memorial Day
5. Independence Day
6. Labor Day
7. Thanksgiving Day
8. Christmas Eve
9. Christmas Day

The Holidays billing rate is one and one-half times the regular billing rate for each hour worked.

|  | Initials | Date |
|---|---|---|
| Healthcare Center | KFH | 11/29/2016 |
| Supplemental Staffing Service | | 11-23-16 |

Steadfast 6th 085854

PX-10.089

**JA1724**

DocuSign Envelope ID: AC216365-757F-4AB4-BD09-678B2A4B1BE6

SteadFast Medical Staffing, LLC                                    **EXHIBIT C**

## ACKNOWLEDGMENT AND WAIVER

I, the undersigned, acknowledge and agree that I am solely employed by SteadFast Medical Staffing, LLC and that my placement by SteadFast Medical Staffing, LLC to perform services at Charlottesville Health and Rehabilitation Center does not make me an employee of Charlottesville Health and Rehabilitation Center ("HEALTHCARE CENTER"). Consequently, I understand and agree that the terms and conditions of my employment are governed solely by SteadFast Medical Staffing, LLC, including, but not limited to, the payment of wages (including overtime where applicable) to me, the withholding of appropriate taxes, and the availability of leaves and benefits.

As an employee of SteadFast Medical Staffing, LLC I understand and agree that I have no legal right to any benefits which are provided, or in the future may be provided, by HEALTHCARE CENTER to its employees, including, but not limited to, eligibility to participate in HEALTHCARE CENTER's 401k plan, PTO plan, group health insurance plan, dental plan, and Nurse Scholarship program.

I understand and agree that as condition of and in consideration for Charlottesville Health and Rehabilitation Center allowing me to be placed by SteadFast Medical Staffing, LLC to perform services at Charlottesville Health and Rehabilitation Center, I will not make any claim against HEALTHCARE CENTER based on HEALTHCARE CENTER allegedly being my employer or joint employer, including, but not limited to, any claim for wages/overtime payments or any claim for benefits which HEALTHCARE CENTER provides, or in the future may provide, to its employees, and I waive and release HEALTHCARE CENTER from any such claims or causes of action, both in tort and contract.

I further understand and agree that I will not hold myself out to be an employee of HEALTHCARE CENTER and that I cannot bind HEALTHCARE CENTER without the express written authority of the President of HEALTHCARE CENTER.

I understand and agree that this Acknowledgment and Waiver shall be governed by and interpreted in accordance with the laws of the Commonwealth of Virginia. I also understand and agree that if any of the terms or provisions of this Acknowledgment and Waiver are deemed null, void or inoperative for any reason, the remaining terms or provisions are severable and will retain full force and effect.

Signature _____

Name printed: _____

Date Signed: _____

Steadfast 6th 085855

PX-10.090

**JA1725**

**MEDICAL STAFFING OF AMERICA**
**TA/ STEADFAST MEDICAL STAFFING**
5750 CHESAPEAKE BOULEVARD, STE 301
NORFOLK, VIRGINIA 23513
**(O)** 757-321-0777   **(F)** 757-857-6003   **(C)** 757-215-5716

This Agreement is made and entered this day, <u>1 August 2019</u> by and between Medical Staffing of America T/A Steadfast Medical Staffing, and <u>The City of Hampton Sheriff's Office</u> ("Facility").

Whereas, Medical Staffing of America T/A Steadfast Medical Staffing, and ("Facility") wish to enter into an Agreement wherein Steadfast Medical Staffing, will provide temporary medical Contractors ("Contractors") to the "Facility" at an agreed upon rate.

Now, therefore, for and in consideration of the promises, the parties here to do hereby covenant and agree as follows:

**TERM:**
This Agreement shall begin on the date first written above.  Either party can terminate the Agreement with or without cause, upon thirty (30) days' written notice to the other party.  The Agreement may be amended at any time and from time to time by written Agreement to the parties.

**MEDICAL STAFFING OF AMERICA**
**T/A STEADFAST MEDICAL STAFFING., responsibilities:**

    A.  Upon request by "Facility", Steadfast Medical Staffing, LLC., shall assign such Contractors as are available for such assignment.  At no time does Steadfast Medical Staffing, LLC., guarantee that all requests will be filled.
    B.  Steadfast Medical Staffing, LLC., shall maintain a worker file on each of its Contractors, containing the following: (Steadfast Medical Staffing, LLC., will provide copies of the following, except "a" to the "Facility" upon request)
        a.  A completed application, which includes education, training, skills, specialties and preference
        b.  Documentation of education and training
        c.  Skills inventory checklist
        d.  Two recent work references
        e.  TB test and evidence of satisfactory health status
        f.  Current CPR
        g.  Performance evaluation
        h.  Copy of current license, registration, or certification
        i.  Negative urine drug screen
        j.  Background check
        k.  Flu shots

    C.  Steadfast Medical Staffing, LLC., will use its best efforts to match the skills and experience levels of its Contractors to the specific needs of the "Facility".
    D.  Contractors will be requested to report to the designated supervisor before he/she begins work.
    E.  Steadfast Medical Staffing, LLC., shall give the "Facility" a two-hours' notice regarding Contractors whom Steadfast Medical Staffing, LLC., cannot provide.

1 | P a g e

Steadfast 6th 085919

PX-10.091

**JA1726**

F.  Steadfast Medical Staffing, LLC., will not actively solicit "Facility" employees as Contractors.
G.  Contractors assigned to "Facility" pursuant to this Agreement shall for the purpose of this Agreement, be considered Contractors for Steadfast Medical Staffing, LLC.
H.  Steadfast Medical Staffing, LLC., shall assume sole and exclusive responsibility for the payment of wages to such Contractors for services performed by them.
I.  Steadfast Medical Staffing, LLC., will be compliant with all state and federal laws applicable to correspondence of the Contractors assigned "Facility".
J.  Steadfast Medical Staffing, LLC., will comply with "Facility" standards for the use of supplemental medical services.
K.  Steadfast Medical Staffing, LLC., agrees not to discriminate in the assignment of its Contractors based on race, creed, color, national origin, sex, age, disability, citizenship status or veteran status.

**"Facility" responsibilities:**

A.  "Facility" understands all Contractors provided by Steadfast Medical Staffing, LLC., for the term of this Agreement are contracted through Steadfast Medical Staffing, LLC.
B.  ""Facility" will make no steps to recruit Contractors provided by Steadfast Medical Staffing, LLC., without consent through written permission from Steadfast Medical Staffing, LLC, which then Steadfast Medical Staffing, LLC will implement the Buy Out Clause for such Contractors at the rate for RN, $4,000; LPN, $3,000; and CNA, $2,000.
    "Facility" understands Steadfast Medical Staffing, LLC., is not an employment agency but a Nursing Registry and that its Contractors are assigned to the "Facility" to render temporary service.
C.  "Facility" shall provide sufficient information about its specific needs to Steadfast Medical Staffing, LLC., so that Steadfast Medical Staffing, LLC., can match the skills and experience of its Contractors to those needs.
D.  "Facility" shall utilize assigned Contractors only for the specific needs requested, unless "Facility", Steadfast Medical Staffing, LLC., and Contractor agree to a change in duties.
E.  "Facility" agrees that Steadfast Medical Staffing, LLC., duty to fill assignments is subject to availability of qualified Contractors.
F.  "Facility" will orientate Contractors to its' "Facility" rules and regulations, including the physical layout and equipment on any unit to which such Contractors are assigned.
G.  "Facility" staffing supervisors will assist Steadfast Medical Staffing, LLC., on a continual basis, with evaluation of Steadfast Medical Staffing, LLC., Contractors by providing performance information.
H.  "Facility" shall allow Steadfast Medical Staffing, LLC., Contractors (on their own time) to attend appropriate "Facility" staff development programs.
I.  "Facility" will immediately notify Steadfast Medical Staffing, LLC., of any problems regarding Steadfast Medical Staffing, LLC Contractors.
J.  "Facility" will make available to Steadfast Medical Staffing, LLC., copies of all documentation concerning problems or incidents in which Steadfast Medical Staffing, LLC., Contractors are involved.
K.  If in any discretion of the "Facility", any person assigned by Steadfast Medical Staffing, LLC., is incompetent, negligent, or has engaged in misconduct, the "Facility" may require such person to leave its premises and inform Steadfast Medical Staffing, LLC., of this action immediately. ""Facility"'s" obligation to compensate Steadfast Medical Staffing, LLC., for said services shall be limited to the actual hours worked by such person and "Facility" shall have no further obligation with respect to such assignment.
L.  If "Facility" changes or cancels an order less than two (2) hours before reporting time, "Facility" shall be billed for four (4) hours at the hourly rate for the personnel involved.

2 | Page

Steadfast 6th 085920

PX-10.092

**JA1727**

M. "Facility" agrees to not discriminate in the assignment of Steadfast Medical Staffing, LLC., based on race, creed, color, national origin, sex, age, disability, citizenship status, or veteran's status.

**Billing Procedures:**

A. Steadfast Medical Staffing, LLC., will invoice "Facility" weekly for its services. The rate of its services is shown on Exhibit "A". The rates for services established in Exhibit "A" can be amended prospectively by Steadfast Medical Staffing, LLC., at any time upon forty-five (45) days written notice to "Facility".

B. "Facility" shall pay Steadfast Medical Staffing, LLC., Invoice within 45 days from date of Invoice. Invoices not paid within 45 days are considered Past Due and will be charged a Finance Charge of one and a half (1.5%) percent per month of the unpaid balance or the maximum interest rate allowed by law whichever is lower. "Facility" agrees to pay the finance charge together with reasonable attorney's fees for the cost of collection.

**Insurance:**

A. Steadfast Medical Staffing, LLC., maintains during the terms of this Agreement and any subsequent renewals, general liability, and professional liability insurance coverage for all of its acts and omission in the provision of the designated services with limits of not less than $1,000,000 per occurrence and $6,000,000 aggregate.

B. Steadfast Medical Staffing, LLC., will provide upon request Certification of Insurance or order evidence of coverage and it will notify "Facility" of any cancellation or modification of its liability insurance.

**Notices:**

All Notices shall be in writing and shall be addressed to the parties as set forth below. Notices shall be effective upon receipt when delivered personally or upon mailing when properly addressed with postage prepaid.

| MEDICAL STAFFING OF AMERICA<br>TA/ STEADFAST MEDICAL STAFFING<br>5750 CHESAPEAKE BOULEVARD, STE. 301<br>NORFOLK, VIRGINIA 23513<br>ATTN: Lisa A. Pitts<br>(M) 757-321-0777<br>(F) 757-857-6003<br>(C) 757-215-5716 | "Facility": _____<br>_____<br>_____<br>_____<br>_____ |
|---|---|

**Access to Records:**

The parties here to agree to make available to duly authorized representative of the Department of Health and Human Services: all contracts, books, documents and records of the parties providing services are here under necessary to verify the cost of the services provided under this Agreement. Similar access will also be grated to the contracts, books, and records providing the services here under and any obligation related to such parties.

3 | P a g e

Steadfast 6th 085921

PX-10.093

**JA1728**

**Social Security Act:**

Steadfast Medical Staffing, LLC., warrants that to the best of Steadfast Medical Staffing, LLC's knowledge, no person who ownership controls interest in, or is an agent or managing employee of Steadfast Medical Staffing, LLC., has been convicted of a criminal offense relating to that person's involvement in any programs under Title XVIII, XIX, or XX of the Social Security Act since the inception of these programs.

This Agreement shall insure to the benefit of and shall be binding upon the parties hereto and their respective successors and assignments.

This Agreement shall be constructed, enforced, and interpreted under the laws of the State of Virginia.

*Executed on the date and year first above written,*

| Steadfast Medical Staffing, LLC. | | "Facility": Hampton Sheriff Office | |
|---|---|---|---|
| By: | Title: | By: Karen Bowden  Title: Undersheriff | |

**MEDICAL STAFFING OF AMERICA**
**T/A STEADFAST MEDICAL STAFFING Pay Rates -- Weekdays/Weekends:**

**RN, $45/HR**
**LPN, $35/HR**
**MED ASST/CNA, $24HR**

Independent Contractors: All rates are Flat rates except on Holidays, see below:

**HOLIDAYS:**
Holiday rates are paid for the day, evening, and night shifts on:

1. New Year's Day
2. Memorial Day
3. Independence Day
4. Labor Day
5. Thanksgiving Day
6. Christmas Day

*The Holiday billing rate is One and one-half (1.5) times the regular billing rate for each hour worked.*

Administrator Signature: _____

4 | P a g e

Steadfast 6th 085922

PX-10.094

**JA1729**

## ADDENDUM TO THE CITY OF HAMPTON SHERIFF'S OFFICE HEALTHCARE STAFFING AGREEMENT

This addendum number 1 ("Addendum" to The City of Hampton Sheriff's Office Healthcare Staffing Agreement) is entered into by and between Medical Staffing of America T/A Steadfast Medical Staffing "Agency" and The City of Hampton Sheriff's Office ("Facility") and made effective August 2, 2019 ("Addendum Effective Date").

Whereas, Agency and Facility entered into the Agreement, first made effective August 2, 2019.

The parties hereby agree to revise the Agreement as follows:

1. **MEDICAL STAFFING OF AMERICA T/A STEADFAST MEDICAL STAFFING., responsibilities:**
   A. Steadfast Medical Staffing, LLC., agrees that the Independent Contractors; (Licensed Practical Nurses, Registered Nurses, Medical Assistants) will provide reasonable and necessary medical care to the inmates housed in the Hampton Correctional Facilities – Hampton Community Correctional Center, Hampton Correctional Facility and Hampton Adult Intake and all courthouses when required, in accordance with the recognized clinical pathways as well as the policies and procedures of the Hampton Sheriff's Office per instruction given by the Hampton Sheriff Office.
   B. Steadfast Medical Staffing, LLC., realizes and agrees that the "recognized standard of care of the community" shall be consistent with the recognized standard of care in the Commonwealth of Virginia per guidelines and standards of the Board of Nursing.
   C. Steadfast Medical Staffing, LLC., agrees that all Contractors assigned to provide medical care and medical services to the Sheriff and the Hampton Sheriff's Office shall be the Independent Contractors of Steadfast Medical Staffing and not the Sheriff, the Hampton Sheriff's Office or the City of Hampton.
   D. Steadfast Medical Staffing, LLC., agrees that the Contractors assigned to provide nursing care to inmates incarcerated and detained in the facilities of the Hampton Sheriff's Office shall immediately notify and consult with representatives of the Sheriff's Office in the event that an inmate's medical need, whether physical, psychological, or emotional, surpass the level or care that can or should be provided on-site and medical transport to another medical facility is medically necessary or warranted.
2. **"Facility" responsibilities:**
   A. "Facility" agrees to provide 40 hours of initial orientation training and 16 hours of annual that will include the Prison Rape Elimination Act (PREA) to the Independent Contractors
3. **Billing Procedures:**
   A. Steadfast Medical Staffing, LLC., agrees to provide at least two (2) valid e-mail addresses for the submission on weekly Invoices.
   B. Invoices not paid within forty-five (45) days of date of Invoice shall be in default and finance change of one and a half (1.5%) percent per month of the unpaid balance of the maximum interest rate allowed by law whichever is lower. "Facility" agrees to pay the finance charge together with reasonable attorney's fees for the cost of collection.

1 | P a g e

Steadfast 6th 085923

PX-10.095

**JA1730**

C. Steadfast Medical Staffing, LLC., will provide the "Facility" with the Tax Identification Form – W9.

4. The table in Exhibit A, Section 1 of the Agreement shall be modified as follows:
   a. Hourly Rate for Registered Nurse shall be amended to $45.00/HR
   b. Hourly Rate for Licensed Practical Nurse shall be amended to $35.00/HR
   c. Billing Rates (Per Hour and all rates are flat except for the following Holidays:

     1. New Year's Day
     2. Memorial Day
     3. Independence Day
     4. Labor Day
     5. Thanksgiving Day
     6. Christmas Day

**IN WITNESS WHEREOF**, the parties hereby execute and make effective this Addendum as of the Amendment Effective Date set forth above:

| | |
|---|---|
| MEDICAL STAFFING OF AMERICA<br>TA/ STEADFAST MEDICAL STAFFING<br>5750 CHESAPEAKE BOULEVARD, STE 301<br>NORFOLK, VIRGINIA 23513<br><br>ATTN: Lisa A. Pitts<br>(M) 757-321-0777<br>(F) 757-857-6003<br>(C) 757-215-5716 | "Facility": *Hampton Sheriff's Office*<br><br>Signature: *Karen Bowden*<br><br>Name: *Karen Bowden*<br>Title: *Undersheriff* |

2 | P a g e

Steadfast 6th 085924

PX-10.096

**JA1731**

**MEDICAL STAFFING OF AMERICA**
**TA/ STEADFAST MEDICAL STAFFING**
5750 CHESAPEAKE BOULEVARD, STE 301
NORFOLK, VIRGINIA 23513
(O) 757-321-0777   (F) 757-857-6003   (C) 757-215-5716

This Agreement is made and entered this day, ==July 29==, 2020 by and between Steadfast Medical Staffing, LLC and ==MEDIKO, Inc c/o Virginia Beach Corre==ctional Center, "Facility".

Whereas, Medical Staffing of America T/A Steadfast Medical Staffing, and ("Facility") wish to enter into an agreement wherein Steadfast Medical Staffing, will provide temporary medical contractors to the facility at an agreed upon rate.

Now, therefore, for and in consideration of the promises, the parties here to do hereby covenant and agree as follows:

TERMS:
This agreement shall begin on the date first written above. Either party can terminate the agreement with or without cause, upon thirty days' written notice to the other party. The agreement may be amended at any time and from time to time by written agreement to the parties.

MEDICAL STAFFING OF AMERICA
T/A STEADFAST MEDICAL STAFFING., responsibilities:

   A.  Upon request by facility, Steadfast Medical Staffing, LLC., shall assign such contractors as available for such assignment. At no time does Steadfast Medical Staffing, LLC., guarantee that all requests will be filled.
   B.  Steadfast Medical Staffing, LLC., shall maintain a worker file on each of its contractors, containing the following: (Steadfast Medical Staffing, LLC., will provide copies of the following, except "a" to the facility upon request)
       a.  A completed application, which includes education, training, skills, specialties and preference
       b.  Documentation of education and training
       c.  Skills inventory checklist
       d.  Two recent work references
       e.  TB test and evidence of satisfactory health status
       f.  Current CPR
       g.  Performance evaluation
       h.  Copy of current license, registration, or certification
       i.  Negative urine drug screen
       j.  Background check
       k.  Flu shots

   C.  Steadfast Medical Staffing, LLC., will use its best efforts to match the skills and experience levels of its Contractors to the specific needs of the Facility.
   D.  Contractors will be requested to report to the designated supervisor before he/she begins work.

1 | P a g e

Steadfast 6th 085948

PX-10.097

**JA1732**

E.  Steadfast Medical Staffing, LLC., shall give the Facility a two-hours' notice regarding Contractors whom Steadfast Medical Staffing, LLC., cannot provide.

F.  Steadfast Medical Staffing, LLC., will not actively solicit Facility employees as Contractors.

G.  Contractors assigned to Facility pursuant to this agreement shall for the purpose of this Agreement, be considered Contractors for Steadfast Medical Staffing, LLC.

H.  Steadfast Medical Staffing, LLC., shall assume sole and exclusive responsibility for the payment of wages to such Contractors for services performed by them. All Contractors are considered Independent Contractors in Steadfast Medical Staffing, LLC's Registry and not of Facilities for all purposes, including, without limitation all federal and state tax withhold, and overtime pay requirements.

I.  Steadfast Medical Staffing, LLC., will be compliant with all state and federal laws applicable to correspondence of the Contractors assigned Facility.

J.  Steadfast Medical Staffing, LLC., will comply with Facility standards for the use of supplemental medical services.

K.  Steadfast Medical Staffing, LLC., agrees not to discriminate in the assignment of its Contractors based on race, creed, color, national origin, sex, age, disability, citizenship status or veteran status.

**"FACILITY"** responsibilities:

A.  "Facility" understands all Contractors provided by Steadfast Medical Staffing, LLC., for the term of this Agreement are contracted through Steadfast Medical Staffing, LLC.

B.  During the term of this Agreement, "Facility will make no steps to recruit Contractors provided by Steadfast Medical Staffing, LLC., without consent through written permission from Steadfast Medical Staffing, LLC, which then Steadfast Medical Staffing, LLC will implement the Buy Out Clause for such Contractors at the rate for RN, $4,000; LPN, $3,000; and CNA, $2,000.
"Facility" understands Steadfast Medical Staffing, LLC., is not an employment agency but a Nursing Registry and that its Contractors are assigned to the "Facility" to render temporary service.

C.  "Facility" shall provide sufficient information about its specific needs to Steadfast Medical Staffing, LLC., so that Steadfast Medical Staffing, LLC., can match the skills and experience of its Contractors to those needs.

D.  "Facility" shall utilize assigned Contractors only for the specific needs requested, unless "Facility", Steadfast Medical Staffing, LLC., and Contractor agree to a change in duties.

E.  "Facility" agrees that Steadfast Medical Staffing, LLC., duty to fill assignments is subject to availability of qualified Contractors.

F.  "Facility" will orientate Contractors to its' Facility rules and regulations, including the physical layout and equipment on any unit to which such Contractors are assigned.

G.  "Facility" staffing supervisors will assist Steadfast Medical Staffing, LLC., on a continual basis, with evaluation of Steadfast Medical Staffing, LLC., Contractors by providing performance information.

H.  "Facility" shall allow Steadfast Medical Staffing, LLC., Contractors (on their own time) to attend appropriate facility staff development programs.

I.  "Facility" will immediately notify Steadfast Medical Staffing, LLC., of any problems regarding Steadfast Medical Staffing, LLC Contractors.

J.  "Facility" will make available to Steadfast Medical Staffing, LLC., copies of all documentation concerning problems or incidents in which Steadfast Medical Staffing, LLC., Contractors are involved.

K.  If in any discretion of the "Facility", any person assigned by Steadfast Medical Staffing, LLC., is incompetent, negligent, or has engaged in misconduct, the "Facility" may require such person to leave its premises and inform Steadfast Medical Staffing, LLC., of this action immediately. "Facility's" obligation to compensate Steadfast Medical Staffing, LLC., for said services shall be limited to the

2 | P a g e

Steadfast 6th 085949

PX-10.098

actual hours worked by such person and "Facility" shall have no further obligation with respect to such assignment.

L. If "Facility" changes or cancels an order less than two (2) hours before reporting time, "Facility" shall be billed for four (4) hours at the hourly rate for the personnel involved.

M. In the event when the "Facility" has any positive cases during any Crisis Outbreak, the "Facility" must inform Steadfast Medical Staffing, LLC., and the Crisis Rates will apply. Refer to Crisis Addendum when and if applicable.

N. "Facility" agrees to not discriminate in the assignment of Steadfast Medical Staffing, LLC., based on race, creed, color, national origin, sex, age, disability, citizenship status, or veteran's status.

**Billing Procedures:**

A. Steadfast Medical Staffing, LLC., will invoice "Facility" weekly for its services. The rate of its services is shown on "Page 5". The rates for services established can be amended prospectively by Steadfast Medical Staffing, LLC., at any time upon forty-five (45) days written notice to "Facility".

B. "Facility" shall pay Steadfast Medical Staffing, LLC., Invoice within 30 days from date of Invoice. Invoices not paid within 35 days are considered Past Due and will be charged a Finance Charge of one and a half (1.5%) percent per week of the unpaid balance or the maximum interest rate allowed by law whichever is lower. "Facility" agrees to pay the finance charge together with reasonable attorney's fees for the cost of collection.

C. "Facility" Responsible Recipient of Invoices/Accounts Payable Point of Contact:

Name: Lisa Stevens     E-mail Address: accountspayable@medikopc.com

Name: _____   E-mail Address: _____

**Insurance:**

A. Steadfast Medical Staffing, LLC., maintains during the terms of this Agreement and any subsequent renewals, general liability, and professional liability insurance coverage for all of its acts and omission in the provision of the designated services with limits of not less than $1,000,000 per occurrence and $6,000,000 aggregate.

B. Steadfast Medical Staffing, LLC., will provide upon request Certification of Insurance or order evidence of coverage and it will notify "Facility" of any cancellation or modification of its liability insurance.

**Indemnification:**

A. Steadfast Medical Staffing, LLC shall indemnify defend and hold harmless Facility from and against any and all claims, demands, actions, causes of action, suits, judgments, damages, losses, liabilities, fines, penalties, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) arising for or relating to the acts or omissions of any contractor provided by Steadfast Medical Staffing, LLC., pursuant to this Agreement and any acts of omissions by Steadfast Medical Staffing, LLC and its affiliates, including without limitations, with respect to Steadfast Medical Staffing, LLC's failure to comply any applicable labor laws.

3 | P a g e

Steadfast 6th 085950

PX-10.099

**JA1734**

**Notices:**

All Notices shall be in writing and shall be addressed to the parties as set forth below. Notices shall be in writing and sent by national overnight delivery service or by United States certified mail, return receipt requested, postage prepaid, and shall be deemed to have been given, if sent by national overnight delivery service as of the first weekday upon which delivery is first attempted and if sent by United States Certified Mail as of the third (3rd) business day following deposit in the United States mail. Notices shall be addressed as follows.

| | |
|---|---|
| MEDICAL STAFFING OF AMERICA<br>TA/ STEADFAST MEDICAL STAFFING<br>5750 CHESAPEAKE BOULEVARD, STE 301<br>NORFOLK, VIRGINIA 23513<br>ATTN: Lisa A. Pitts<br><br>(M) 757-321-0777<br>(F) 757-857-6003<br>(C) 757-215-5716 | "Facility": MeDIKO, Inc.<br>ATTN: Candice Hansley<br>3900 Westerre Pkwy, Ste 302<br>Richmond, VA 23233<br><br><br>ATTN: ADMINISTRATOR |

**Access to Records:**

The parties here to agree to make available to duly authorized representative of the Department of Health and Human Services: all contracts, books, documents and records of the parties providing services are here under necessary to verify the cost of the services provided under this Agreement. Similar access will also be grated to the contracts, books, and records providing the services here under and any obligation related to such parties.

**Social Security Act:**

Steadfast Medical Staffing, LLC., warrants that to the best of Steadfast Medical Staffing, LLC's knowledge, no person who ownership controls interest in, or is an agent or managing employee of Steadfast Medical Staffing, LLC., has been convicted of a criminal offense relating to that person's involvement in any programs under Title XVIII, XIX, or XX of the Social Security Act since the inception of these programs.

This Agreement shall insure to the benefit of and shall be bending upon the parties hereto and their respective successors and assignments.

This Agreement shall be constructed, enforced, and interpreted under the laws of the State of Virginia.

4 | P a g e

Steadfast 6th 085951

PX-10.100

**JA1735**

**MEDICAL STAFFING OF AMERICA**
**T/A STEADFAST MEDICAL STAFFING Pay Rates – Weekdays/Weekends:**

RN, $50.50/HR
LPN, $41.50/HR
CNA, $24.50/HR

Independent Contractors: All rates are Flat rates except on Holidays, see below:

**HOLIDAYS:**
Holiday rates are paid for the day, evening, and night shifts on:

1. New Year's Eve
2. New Year's Day
3. Easter
4. Memorial Day
5. Independence Day
6. Labor Day
7. Thanksgiving Day
8. Christmas Eve
9. Christmas Day

*The Holiday billing rate is One and one-half (1.5) times the regular billing rate for each hour worked.*

*Executed on the date and year first above written,*

| Steadfast Medical Staffing, LLC. | "Facility": MEDIKO, Inc. |
|---|---|
| By: _____ Title: _____ | By: Kaveh Ofogh, MD   Title: President & CEO |
| Signature: _____ | Signature: _____ |

5 | P a g e

Steadfast 6th 085952

PX-10.101

**JA1736**

**MEDICAL STAFFING OF AMERICA**
**TA/ STEADFAST MEDICAL STAFFING**
5750 CHESAPEAKE BOULEVARD, STE 301
NORFOLK, VIRGINIA 23513
(O) 757-321-0777 (F) 757-857-6003 (C) 757-215-5716

This agreement is made and entered this day, _April 8, 2019_ by and between Medical Staffing of America T/A Steadfast Medical Staffing., and _Dunlap House_.

Whereas, Medical Staffing of America T/A Steadfast Medical Staffing, and (Facility) wish to enter into an agreement wherein Steadfast Medical Staffing, will provide temporary medical contractors to the facility at an agreed upon rate.

Now, therefore, for and in consideration of the promises, the parties here to do hereby covenant and agree as follows:

**TERMS:**
This agreement shall begin on the date first written above. Either party can terminate the agreement with or without cause, upon thirty days' written notice to the other party. The agreement may be amended at any time and from time to time by written agreement to the parties.

**MEDICAL STAFFING OF AMERICA**
**T/A STEADFAST MEDICAL STAFFING., responsibilities:**

A. Upon request by facility, Steadfast Medical Staffing, LLC., shall assign such contractors as available for such assignment. At no time does Steadfast Medical Staffing, LLC., guarantee that all requests will be filled.
B. Steadfast Medical Staffing, LLC., shall maintain a worker file on each of its contractors, containing the following: (Steadfast Medical Staffing, LLC., will provide copies of the following, except "a" to the facility upon request)
   a. A completed application, which includes education, training, skills, specialties and preference
   b. Documentation of education and training
   c. Skills inventory checklist
   d. Two recent work references
   e. TB test and evidence of satisfactory health status
   f. Current CPR
   g. Performance evaluation
   h. Copy of current license, registration, or certification
   i. Negative urine drug screen
   j. Background check
   k. Flu shots

C. Steadfast Medical Staffing, LLC., will use its best efforts to match the skills and experience levels of its Contractors to the specific needs of the Facility.
D. Contractors will be requested to report to the designated supervisor before he/she begins work.
E. Steadfast Medical Staffing, LLC., shall give the Facility a two-hours' notice regarding Contractors whom Steadfast Medical Staffing, LLC., cannot provide.

1 | P a g e

DOL (Steadfast II) 005787

PX-10.116

   F.  Steadfast Medical Staffing, LLC., will not actively solicit Facility employees as Contractors.

   G.  Contractors assigned to Facility pursuant to this agreement shall for the purpose of this Agreement, be considered Contractors for Steadfast Medical Staffing, LLC.

   H.  Steadfast Medical Staffing, LLC., shall assume sole and exclusive responsibility for the payment of wages to such Contractors for services performed by them.

   I.  Steadfast Medical Staffing, LLC., will be compliant with all state and federal laws applicable to correspondence of the Contractors assigned Facility.

   J.  Steadfast Medical Staffing, LLC., will comply with Facility standards for the use of supplemental medical services.

   K.  Steadfast Medical Staffing, LLC., agrees not to discriminate in the assignment of its Contractors based on race, creed, color, national origin, sex, age, disability, citizenship status or veteran status.

**"FACILITY" responsibilities:**

   A.  "Facility" understands all Contractors provided by Steadfast Medical Staffing, LLC., for the term of this Agreement are contracted through Steadfast Medical Staffing, LLC.

   B.  "Facility will make no steps to recruit Contractors provided by Steadfast Medical Staffing, LLC., without consent through written permission from Steadfast Medical Staffing, LLC, which then Steadfast Medical Staffing, LLC will implement the Buy Out Clause for such Contractors at the rate for RN, $4,000; LPN, $3,000; and CNA, $2,000.

     "Facility" understands Steadfast Medical Staffing, LLC., is not an employment agency but a Nursing Registry and that its Contractors are assigned to the "Facility" to render temporary service.

   C.  "Facility" shall provide sufficient information about its specific needs to Steadfast Medical Staffing, LLC., so that Steadfast Medical Staffing, LLC., can match the skills and experience of its Contractors to those needs.

   D.  "Facility" shall utilize assigned Contractors only for the specific needs requested, unless "Facility", Steadfast Medical Staffing, LLC., and Contractor agree to a change in duties.

   E.  "Facility" agrees that Steadfast Medical Staffing, LLC., duty to fill assignments is subject to availability of qualified Contractors.

   F.  "Facility" will orientate Contractors to its' Facility rules and regulations, including the physical layout and equipment on any unit to which such Contractors are assigned.

   G.  "Facility" staffing supervisors will assist Steadfast Medical Staffing, LLC., on a continual basis, with evaluation of Steadfast Medical Staffing, LLC., Contractors by providing performance information.

   H.  "Facility" shall allow Steadfast Medical Staffing, LLC., Contractors (on their own time) to attend appropriate facility staff development programs.

   I.  "Facility" will immediately notify Steadfast Medical Staffing, LLC., of any problems regarding Steadfast Medical Staffing, LLC Contractors.

   J.  "Facility" will make available to Steadfast Medical Staffing, LLC., copies of all documentation concerning problems or incidents in which Steadfast Medical Staffing, LLC., Contractors are involved.

   K.  If in any discretion of the "Facility", any person assigned by Steadfast Medical Staffing, LLC., is incompetent, negligent, or has engaged in misconduct, the "Facility" may require such person to leave its premises and inform Steadfast Medical Staffing, LLC., of this action immediately. "Facility's" obligation to compensate Steadfast Medical Staffing, LLC., for said services shall be limited to the actual hours worked by such person and "Facility" shall have no further obligation with respect to such assignment.

   L.  If "Facility" changes or cancels an order less than two (2) hours before reporting time, "Facility" shall be billed for four (4) hours at the hourly rate for the personnel involved.

2 | P a g e

DOL (Steadfast II) 005788

**PX-10.117**

**JA1738**

   M. "Facility" agrees to not discriminate in the assignment of Steadfast Medical Staffing, LLC., based on race, creed, color, national origin, sex, age, disability, citizenship status, or veteran's status.

**Billing Procedures:**

   A. Steadfast Medical Staffing, LLC., will invoice Facility weekly for its services. The rate of its services is shown on Exhibit "A". The rates for services established in Exhibit "A" can be amended prospectively by Steadfast Medical Staffing, LLC., at any time upon forty-five (45) days written notice to "Facility".

   B. "Facility" shall pay Steadfast Medical Staffing, LLC., Invoice within 35 days from date of Invoice. Invoices not paid within 35 days are considered Past Due and will be charged a Finance Charge of one and a half (1.5%) percent per month of the unpaid balance (annual percentage of 18%) or the maximum interest rate allowed by law whichever is lower. "Facility" agrees to pay the finance charge together with reasonable attorney's fees for the cost of collection.

**Insurance:**

   A. Steadfast Medical Staffing, LLC., maintains during the terms of this Agreement and any subsequent renewals, general liability, and professional liability insurance coverage for all of its acts and omission in the provision of the designated services with limits of not less than $1,000,000 per occurrence and $6,000,000 aggregate.

   B. Steadfast Medical Staffing, LLC., will provide upon request Certification of Insurance or order evidence of coverage and it will notify "Facility" of any cancellation or modification of its liability insurance.

**Notices:**

   All Notices shall be in writing and shall be addressed to the parties as set forth below. Notices shall be effective upon receipt when delivered personally or upon mailing when properly addressed with postage prepaid.

| | |
|---|---|
| MEDICAL STAFFING OF AMERICA<br>TA/ STEADFAST MEDICAL STAFFING<br>5750 CHESAPEAKE BOULEVARD, STE 301<br>NORFOLK, VIRGINIA 23513<br>ATTN: Lisa A. Pitts<br>(M) 757-321-0777<br>(F) 757-857-6003<br>(C) 757-215-5716 | "Facility": _____<br>_____<br>_____<br>_____ |

**Access to Records:**

   The parties here to agree to make available to duly authorized representative of the Department of Health and Human Services: all contracts, books, documents and records of the parties providing services are here under necessary to verify the cost of the services provided under this Agreement. Similar access will also be grated to the contracts, books, and records providing the services here under any obligation related to such parties.

3 | P a g e

DOL (Steadfast II) 005789

**PX-10.118**

**Social Security Act:**

Steadfast Medical Staffing, LLC., warrants that to the best of Steadfast Medical Staffing, LLC's knowledge, no person who ownership controls interest in, or is an agent or managing employee of Steadfast Medical Staffing, LLC., has been convicted of a criminal offense relating to that person's involvement in any programs under Title XVIII, XIX, or XX of the Social Security Act since the inception of these programs.

This Agreement shall insure to the benefit of and shall be bending upon the parties hereto and their respective successors and assignments.

This Agreement shall be constructed, enforced, and interpreted under the laws of the State of Virginia.

*Executed on the date and year first above written,*

| Steadfast Medical Staffing, LLC. | "Facility": Dunlop House. |
|---|---|
| By: _____ Title: _____ | By: _Holten_   Title: _Regional Director_ |

**MEDICAL STAFFING OF AMERICA**
**T/A STEADFAST MEDICAL STAFFING Pay Rates – Weekdays/Weekends:**

**LPN**, $40.00/HR
**CNA**, $22.00/HR
**Med Tech**, $26.00/HR

Independent Contractors: All rates are Flat rates except on Holidays, see below:

**HOLIDAYS:**
Holiday rates are paid for the day, evening, and night shifts on:

1. New Year's Eve
2. New Year's Day
3. Easter
4. Memorial Day
5. Independence Day
6. Labor Day
7. Thanksgiving Day
8. Christmas Eve
9. Christmas Day

*The Holiday billing rate is One and one-half (1.5) times the regular billing rate for each hour worked.*

Administrator:

_____

4 | P a g e

DOL (Steadfast II) 005790

**PX-10.119**

**JA1740**

**MEDICAL STAFFING OF AMERICA**
**TA/ STEADFAST MEDICAL STAFFING**
5750 CHESAPEAKE BOULEVARD, STE 301
NORFOLK, VIRGINIA 23513
**(O)** 757-321-0777  **(F)** 757-857-6003  **(C)** 757-215-5716

This agreement is made and entered this day, March 20, 2019 by and between Medical Staffing of America T/A Steadfast Medical Staffing., and Farmville Rehabilitation and Healthcare Center, LLC, debtor in possession (Case No. 18-30777) U.S Bankruptcy Court for Northern District of Texas.

Due to the tremendous loss in unpaid invoices affiliated with Orianna Health Systems, LLC, before services are rendered to Farmville Rehabilitation and Healthcare Center, LLC, pre-payment must be received for all staff scheduled to go to above "Facility" prior to sending staff to Orianna Facility. *See Page 3 for Billing and Payment Procedures.*

Whereas, Medical Staffing of America T/A Steadfast Medical Staffing, and (Facility) wish to enter into an agreement wherein Steadfast Medical Staffing, will provide temporary medical contractors to the facility at an agreed upon rate.

Now, therefore, for and in consideration of the promises, the parties here to do hereby covenant and agree as follows:

**TERMS:**
This agreement shall begin on the date first written above *and shall continue for a period of one (1) year unless terminated pursuant to the terms and conditions herein. Thereafter, the Agreement shall automatically renew for additional one (1) year term(s).* Either party can terminate the agreement *at any time* with or without cause, upon thirty days' written notice to the other party. The agreement may be amended at any time and from time to time by written agreement to the parties.

**MEDICAL STAFFING OF AMERICA**
**T/A STEADFAST MEDICAL STAFFING., responsibilities:**

A. Upon request by facility, Steadfast Medical Staffing, LLC., shall assign such contractors as available for such assignment. At no time does Steadfast Medical Staffing, LLC., guarantee that all requests will be filled.

B. Steadfast Medical Staffing, LLC., shall maintain a worker file on each of its contractors, containing the following: (Steadfast Medical Staffing, LLC., will provide copies of the following, except "a" to the facility upon request)

    a. A completed application, which includes education, training, skills, specialties and preference
    b. Documentation of education and training
    c. Skills inventory checklist
    d. Two recent work references
    e. TB test and evidence of satisfactory health status
    f. Current CPR
    g. Performance evaluation
    h. Copy of current license, registration, or certification
    i. Negative urine drug screen
    j. Background check

1 | P a g e

DOL (Steadfast II) 0057892

PX-10.120

k. Flu shots

C. Steadfast Medical Staffing, LLC., will use its best efforts to match the skills and experience levels of its Contractors to the specific needs of the Facility.

D. Contractors will be requested to report to the designated supervisor before he/she begins work.

E. Steadfast Medical Staffing, LLC., shall give the Facility a two-hours' notice regarding Contractors whom Steadfast Medical Staffing, LLC., cannot provide.

F. Steadfast Medical Staffing, LLC., will not actively solicit Facility employees as Contractors.

G. Contractors assigned to Facility pursuant to this agreement shall for the purpose of this Agreement, be considered Contractors for Steadfast Medical Staffing, LLC.

H. Steadfast Medical Staffing, LLC., shall assume sole and exclusive responsibility for the payment of wages to such Contractors for services performed by them.

I. Steadfast Medical Staffing, LLC., will be compliant with all state and federal laws applicable to correspondence of the Contractors assigned Facility.

J. Steadfast Medical Staffing, LLC., will comply with Facility standards for the use of supplemental medical services.

K. Steadfast Medical Staffing, LLC., agrees not to discriminate in the assignment of its Contractors based on race, creed, color, national origin, sex, age, disability, citizenship status or veteran status.

**"FACILITY" responsibilities:**

A. "Facility" understands all Contractors provided by Steadfast Medical Staffing, LLC., for the term of this Agreement are contracted through Steadfast Medical Staffing, LLC.

B. "Facility will make no steps to recruit Contractors provided by Steadfast Medical Staffing, LLC., without consent through written permission from Steadfast Medical Staffing, LLC, which then Steadfast Medical Staffing, LLC will implement the Buy Out Clause for such Contractors at the rate for RN, $4,000; LPN, $3,000; and CNA, $2,000.
"Facility" understands Steadfast Medical Staffing, LLC., is not an employment agency but a Nursing Registry and that its Contractors are assigned to the "Facility" to render temporary service.

C. "Facility" shall provide sufficient information about its specific needs to Steadfast Medical Staffing, LLC., so that Steadfast Medical Staffing, LLC., can match the skills and experience of its Contractors to those needs.

D. "Facility" shall utilize assigned Contractors only for the specific needs requested, unless "Facility", Steadfast Medical Staffing, LLC., and Contractor agree to a change in duties.

E. "Facility" agrees that Steadfast Medical Staffing, LLC., duty to fill assignments is subject to availability of qualified Contractors.

F. "Facility" will orientate Contractors to its' Facility rules and regulations, including the physical layout and equipment on any unit to which such Contractors are assigned.

G. "Facility" staffing supervisors will assist Steadfast Medical Staffing, LLC., on a continual basis, with evaluation of Steadfast Medical Staffing, LLC., Contractors by providing performance information.

H. "Facility" shall allow Steadfast Medical Staffing, LLC., Contractors (on their own time) to attend appropriate facility staff development programs.

I. "Facility" will immediately notify Steadfast Medical Staffing, LLC., of any problems regarding Steadfast Medical Staffing, LLC Contractors.

J. "Facility" will make available to Steadfast Medical Staffing, LLC., copies of all documentation concerning problems or incidents in which Steadfast Medical Staffing, LLC., Contractors are involved.

K. If in any discretion of the "Facility", any person assigned by Steadfast Medical Staffing, LLC., is incompetent, negligent, or has engaged in misconduct, the "Facility" may require such person to leave its premises and inform Steadfast Medical Staffing, LLC., of this action immediately. "Facility's"

2 | P a g e

DOL (Steadfast II) 0057893

PX-10.121

**JA1742**

obligation to compensate Steadfast Medical Staffing, LLC, for said services shall be limited to the actual hours worked by such person and "Facility" shall have no further obligation with respect to such assignment.

L. If "Facility" changes or cancels an order less than two (2) hours before reporting time, "Facility" shall be billed for four (4) hours at the hourly rate for the personnel involved.

M. "Facility" agrees to not discriminate in the assignment of Steadfast Medical Staffing, LLC., based on race, creed, color, national origin, sex, age, disability, citizenship status, or veteran's status.

**Billing Procedures:**

*Since a tremendous loss from staffing Orianna Health Systems, LLC. prior to bankruptcy, the following Billing and Payment Procedures are in effect:*

A. Steadfast Medical Staffing, LLC., will invoice Facility for its scheduled services prior to rendered services.

B. "Facility" shall pay Steadfast Medical Staffing, LLC., prior to any services rendered. Pre-payment for scheduled services must be received via ACH to Steadfast Medical Staffing prior to sending Contractors to "Facility".

**Payment Information: (via ACH)**
Banking Information: Wells Fargo
Account Name: Medical Staffing of America TA/ Steadfast Medical Staffing
Routing Number: 051400549
Account Number: 8318662643

**Insurance:**

A. Steadfast Medical Staffing, LLC., maintains during the terms of this Agreement and any subsequent renewals, general liability, and professional liability insurance coverage for all of its acts and omission in the provision of the designated services with limits of not less than $1,000,000 per occurrence and $6,000,000 aggregate.

B. Steadfast Medical Staffing, LLC., will provide upon request Certification of Insurance or order evidence of coverage and it will notify "Facility" of any cancellation or modification of its liability insurance.

**Notices:**

All Notices shall be in writing and shall be addressed to the parties as set forth below. Notices shall be effective upon receipt when delivered personally or upon mailing when properly addressed with postage prepaid.

| | |
|---|---|
| MEDICAL STAFFING OF AMERICA TA/ STEADFAST MEDICAL STAFFING 5750 CHESAPEAKE BOULEVARD, STE 301 NORFOLK, VIRGINIA 23513 ATTN: Lisa A. Pitts (M) 757-321-0777 (F) 757-857-6003 (C) 757-215-5716 | "Facility": Farmville Rehabilitation and Healthcare Center, LLC 1575 Scott Drive, Farmville, VA 23901 Attn: Administrator With a copy to: Orianna Health Systems, LLC 1001 Hawkins Street, Nashville, TN 37203 Attn: President |

3 | P a g e

· **Access to Records:**

The parties here to agree to make available to duly authorized representative of the Department of Health and Human Services: all contracts, books, documents and records of the parties providing services are here under necessary to verify the cost of the services provided under this Agreement. Similar access will also be grated to the contracts, books, and records providing the services here under and any obligation related to such parties.

**Indemnification:**

*Each party agrees to indemnify and hold the other including directors, employees, members, affiliates, agents and workers harmless from all claims, suits, judgements, and demands arising from the indemnified party's negligent and/or intentional acts and omissions in the performance of the duties prescribed by this Agreement.*

**Social Security Act:**

Steadfast Medical Staffing, LLC., warrants that to the best of Steadfast Medical Staffing, LLC's knowledge, no person who ownership controls interest in, or is an agent or managing employee of Steadfast Medical Staffing, LLC., has been convicted of a criminal offense relating to that person's involvement in any programs under Title XVIII, XIX, or XX of the Social Security Act since the inception of these programs.

This Agreement shall insure to the benefit of and shall be bending upon the parties hereto and their respective successors and assignments.

This Agreement shall be constructed, enforced, and interpreted under the laws of the State of Virginia.

*Executed on the date and year first above written,*

Steadfast Medical Staffing, LLC.

By: _____   Title: _____   "Facility": *ERHC*   By: _____   Title: *DON*

*ROO, RVP, 3/21/18*

DOL (Steadfast II) 0057895

PX-10.123

**JA1744**

MEDICAL STAFFING OF AMERICA
T/A STEADFAST MEDICAL STAFFING Pay Rates – Weekdays/Weekends:

RN,   $65/HR
LPN, $55/HR
CNA, $33/HR

Independent Contractors: All rates are Flat rates except on Holidays, see below:

HOLIDAYS:

Holiday rates are paid for the day, evening, and night shifts on:

1. New Year's Eve
2. New Year's Day
3. Easter
4. Memorial Day
5. Independence Day
6. Labor Day
7. Thanksgiving Day
8. Christmas Eve
9. Christmas Day

*The Holiday billing rate is One and one-half (1.5) times the regular billing rate for each hour worked.*

Administrator: *IDON*

*[signature]* DON
3/21/18

DOL (Steadfast II) 0057896

PX-10.124

JA1745

Rider 1 to

Agreement (hereinafter, the "Agreement") between Farmville Rehabilitation and Healthcare
Center, LLC debtor in possession (Case No. 18-30777) U.S. Bankruptcy Court for Northern District
of Texas (hereinafter "Facility") and SteadFast Medical Staffing, LLC (

1.    No Gratuities: The exchange or offering of any money, gift item, personal service,
entertainment or unusual hospitality by either party to this Agreement to the other party is
expressly prohibited. The prohibition is equally applicable to either party's officers, employees,
agents or immediate family members. Any violation of this provision by SteadFast Medical
Staffing, LLC constitutes material breach of this Agreement.

2.    No Conflicts of Interest: SteadFast Medical Staffing, LLC certifies that, to the
best of SteadFast Medical Staffing, LLC's knowledge and belief, no economic, beneficial,
employment or managerial relationship exists between SteadFast Medical Staffing, LLC and any
employee of Facility or any affiliate of Facility, or between SteadFast Medical Staffing, LLC and
any relative of an employee of Facility or any such companies, which would tend in any way to
influence such employee in the performance of his or her duties on behalf of Facility or any
affiliate of Facility in connection with the awarding, making, amending or making determination
concerning the performance of this or any other agreement.

3.    Assignment: The Agreement shall not be assigned in whole or in part by either
party hereto without the express written consent of the other party; provided, however that
Facility may assign this Agreement to an Affiliate without SteadFast Medical Staffing, LLC's
consent and any such assignment by Facility to an Affiliate shall be automatic in the event of a
corporate restructuring or reorganization that results in the transfer of the ownership or
operations of Facility to such Affiliate.  For purposes of this Section, the term "Affiliate" shall
mean an entity that is, directly or indirectly, controlling, controlled by, or under common control
with, Facility. Except as provided herein, this Agreement shall inure to the benefit of and be
binding upon the parties hereto and their respective successors and permitted assigns. There are
no third party beneficiaries of or to this Agreement.

4.   Patient Confidentiality and HIPAA Compliance:

      i.   The parties agree to comply with, and to cause their employees,
           subcontractors and agents to comply with, applicable state and federal
           laws and regulations relating to the security, protection and privacy of
           individually identifiable health care information, including without
           limitation the Health Insurance Portability and Accountability Act of 1996
           and regulations promulgated thereunder, as they may be amended from
           time to time.

      ii.  SteadFast Medical Staffing, LLC shall maintain the confidentiality of
           resident records and medical information, in accordance with applicable
           state and federal laws, rules and regulations. All documentation and
           records relating to Facility's residents shall be and remain the sole property
           of Facility, subject to the resident's rights in such documentation and
           records. Neither SteadFast Medical Staffing, LLC nor any of its Personnel

DOL (Steadfast II) 0057897

PX-10.125

**JA1746**

shall disclose to any third party except where permitted or required by law or where such disclosure is expressly approved in writing by Facility or the resident, any resident or medical record information regarding Facility's residents. SteadFast Medical Staffing, LLC and its Personnel shall comply with all Facility policies regarding the confidentiality of resident and medical record information, and Facility shall provide copies of its policies to SteadFast Medical Staffing, LLC upon request.

5.    Qualifications:

Throughout the term of this Agreement, SteadFast Medical Staffing, LLC and its Personnel who will provide Services hereunder shall obtain and at all times maintain in good standing all licenses, permits, registrations, certifications, proof of negative criminal background check and authorizations necessary to provide Services to Facility residents, which shall be attached as Appendix A. By its signature at the end of this Agreement, SteadFast Medical Staffing, LLC hereby warrants, represents and certifies the following with respect to itself, and its Personnel, agents, employees, directors, officers, owners, subcontractors, volunteers and management personnel (collectively referred to as "SteadFast Medical Staffing, LLC Representatives"):

(i) none is under suspension or subject to any disciplinary proceedings or other sanctions or penalties (including but not limited to any administrative sanctions, suspension of payments, civil monetary penalties, or assessments) by any federal or state governmental authority or agency having jurisdiction over the professional activities of SteadFast Medical Staffing, LLC or its Personnel, and none is under any formal or informal investigation or preliminary inquiry by any governmental authority or agency for possible suspension, disciplinary action, or other sanction or penalty;

(ii) none has been subject to any health care related criminal fine, restitution order, civil judgment, criminal judgment or judgment under the False Claims Act; and

(iii) none has been convicted of a criminal offense related to, or has been excluded or debarred from participation in, any federal health care program, as defined at 42 U.S.C. § 1320a-7b(f), including but not limited to the Medicare program or any state Medicaid program.  An entity or individual is considered to have been convicted of a criminal offense:

(1)    When a judgment of conviction has been entered against the individual or entity by a Federal, State, or local court, regardless of whether there is an appeal pending or whether the judgment of conviction or other record relating to criminal conduct has been expunged;

(2)    When there has been a finding of guilt against the individual or entity by Federal, State, or local court;

(3)    When a plea of guilty or nolo contendere by the individual or entity has been accepted by a Federal, State, or local court; or

DOL (Steadfast II) 0057898

PX-10.126

**JA1747**

(4)   When the individual or entity has entered into participation in a first offender, deferred adjudication, or other arrangement or program where judgment of conviction has been withheld.

To effectuate its obligations under this Section, SteadFast Medical Staffing, LLC shall, in addition to other investigative measures, query the Office of Inspector General's List of Excluded Individuals/Entities. This list can be found at the following Internet address: http://www.hhs.gov/oig/cumsan/main.htm.   SteadFast Medical Staffing, LLC acknowledges that its warranty obligations are continuous in nature. Furthermore, SteadFast Medical Staffing, LLC understands that it or its SteadFast Medical Staffing, LLC Representatives cannot provide services described herein if an exclusion or debarment has occurred.

* * * * *

DOL (Steadfast II) 0057899

**PX-10.127**

**JA1748**

DocuSign Envelope ID: CFD423A5-C9B4-4250-BBD2-C04BA0A77D15

## SUPPLEMENTAL STAFFING AGREEMENT

**THIS AGREEMENT** is made as of this 13th day of February, 2018 by and between **Princess Anne H&R Ops Limited Partnership t/a Princess Anne Health & Rehabilitation Center** located at 1948 Landstown Centre Way, Virginia Beach, VA 23456 (hereinafter "HEALTHCARE CENTER") and **SteadFast Medical Staffing, LLC**, with an office located at 5750 Chesapeake Boulevard, Suite 103, Norfolk, VA 23513 (hereinafter "SUPPLEMENTAL STAFFING SERVICE").

### WITNESSETH:

**WHEREAS,** HEALTHCARE CENTER operates a long-term care facility, the patients of which require on-site medical treatment and supervision; and

**WHEREAS,** Medical Facilities of America, Inc. (hereinafter "MFA") is the General Partner of Healthcare Center; and

**WHEREAS,** SUPPLEMENTAL STAFFING SERVICE provides qualified and appropriately licensed and credentialed temporary health care personnel ("TEMPORARY PERSONNEL").

**NOW THEREFORE IN CONSIDERATION** of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1. **Nature of Arrangement.** Upon request of HEALTHCARE CENTER, SUPPLEMENTAL STAFFING SERVICE shall make every effort to promptly provide qualified TEMPORARY PERSONNEL to HEALTHCARE CENTER. SUPPLEMENTAL STAFFING SERVICE shall screen all TEMPORARY PERSONNEL, as set forth in **EXHIBIT A** which is attached hereto, and insure that the TEMPORARY PERSONNEL have the qualifications required by the HEALTHCARE CENTER before such TEMPORARY PERSONNEL are placed at the HEALTHCARE CENTER.

2. **Duties and Obligations of SUPPLEMENTAL STAFFING SERVICE.**

    A.    **SUPPLEMENTAL STAFFING SERVICE shall:**

    (1)    Provide to the HEALTHCARE CENTER a profile on each TEMPORARY PERSONNEL placed at the HEALTHCARE CENTER which includes work history, references, skills validation, a copy of the TEMPORARY PERSONNEL's state license/credentials and verification of the items listed in **EXHIBIT A**. A copy of such profile must be provided prior to the SUPPLEMENTAL STAFFING SERVICE placing any TEMPORARY PERSONNEL at the HEALTHCARE CENTER or at any other time the HEALTHCARE CENTER requests.

DOL (Steadfast II) 0057905

PX-10.128

**JA1749**

DocuSign Envelope ID: CFD423A5-C9B4-4250-BBD2-C04BA0A77D15

(2)    Assume sole and exclusive responsibility for the payment of wages (including overtime where applicable) to TEMPORARY PERSONNEL for services performed at the HEALTHCARE CENTER to the extent TEMPORARY PERSONNEL are considered to be SUPPLEMENTAL STAFFING SERVICES's employees. SUPPLEMENTAL STAFFING SERVICE shall be responsible for withholding appropriate federal and state taxes, contributing to Federal Social Security taxes, payment of unemployment taxes and workers' compensation insurance coverage as well as any other tax, payment, or obligation required of an employer.

(3)    Assume sole and exclusive responsibility for any injury, accident, or illness suffered by TEMPORARY PERSONNEL and compensable under the applicable workers' compensation laws. SUPPLEMENTAL STAFFING SERVICE further agrees to waive any and all subrogation rights it or its insurer may have against HEALTHCARE CENTER for claims paid to TEMPORARY PERSONNEL.

(4)    Assume sole and exclusive responsibility for the payment of compensation to TEMPORARY PERSONNEL for services performed at the HEALTHCARE CENTER to the extent TEMPORARY PERSONNEL are considered to be independent contractors. SUPPLEMENTAL STAFFING SERVICE shall be responsible for filing the necessary forms, such as 1099's, as well as complying with all requirements for an independent contractor relationship to exist under applicable law.

(5)    Comply with and ensure that TEMPORARY PERSONNEL placed at the HEALTHCARE CENTER comply with the guidelines of OSHA standards.

(6)    Be in compliance with all applicable provisions of federal, state, and local laws, rules and regulations, including, but not limited to patient care guidelines, and monitor the TEMPORARY PERSONNEL placed at the HEALTHCARE CENTER to insure that the TEMPORARY PERSONNEL are in compliance with the same.

(7)    Upon notification or knowledge that a TEMPORARY PERSONNEL has failed to report for an assignment as scheduled or has engaged in any conduct which is in violation of this Agreement or detrimental to the HEALTHCARE CENTER, its residents, or MFA, as determined by the HEALTHCARE CENTER and MFA, make every effort to attempt to find a replacement within a time agreed to by the parties.

(8)    Inform the HEALTHCARE CENTER of any cancellation of TEMPORARY PERSONNEL and find a replacement.

(9)    Warrant that it and, to the best of its knowledge, all TEMPORARY PERSONNEL shall be free at all times from any and all sanctions and/or exclusions of participation by federal or state funded programs, including, but not limited to license sanctions and revocations, and monitor the TEMPORARY PERSONNEL placed at the HEALTHCARE CENTER to insure compliance with the same.

B.    <u>Services to Patients</u>. SUPPLEMENTAL STAFFING SERVICE warrants that all services performed by it and, to the best of its knowledge, the TEMPORARY

DOL (Steadfast II) 0057906

PX-10.129

JA1750

DocuSign Envelope ID: CFD423A5-C9B4-4250-BBD2-C04BA0A77D15

PERSONNEL will be done in accordance with and in compliance with recognized professional and ethical medical standards and the terms and conditions of this Agreement as well as all applicable state, federal, and local laws, rules, and regulations. All such services shall also be rendered at all times in accordance with any conditions of participation and/or reimbursement requirements as may, from time to time, be imposed by applicable governmental and other third-party reimbursement sources. SUPPLEMENTAL STAFFING SERVICE may only commence rendering services to HEALTHCARE CENTER'S patients upon the full execution of this Agreement by SUPPLEMENTAL STAFFING SERVICE.

C.    Confidentiality. SUPPLEMENTAL STAFFING SERVICE shall maintain and assure that during the term of this Agreement and after the termination of this Agreement, however caused, it and its TEMPORARY PERSONNEL and all other employees, agents, or subcontractors employed or engaged on its behalf shall maintain strict confidentiality of all medical and other records and information regarding HEALTHCARE CENTER's patients and will comply with all state and federal regulations regarding same.

SUPPLEMENTAL STAFFING SERVICE shall also maintain and assure that during the term of this Agreement and after the termination of this Agreement, however caused, it and its TEMPORARY PERSONNEL and all other employees, agents, or subcontractors employed or engaged on its behalf shall maintain strict confidentiality of all proprietary information regarding HEALTHCARE CENTER or MFA. For the purposes of the above, the term "proprietary information" means any information which is not generally available to the public, and includes, without limitation, the identity of or other facts relating to the HEALTHCARE CENTER or MFA's residents, customers, accounts, prospects, marketing strategies, financial data, inventory lists, trade secrets, pricing strategies, arrangements with suppliers and customers, or any other information acquired such that if such information were disclosed such disclosure could act to the prejudice of HEALTHCARE CENTER or MFA.

SUPPLEMENTAL STAFFING SERVICE agrees that if it and its TEMPORARY PERSONNEL and all other employees, agents, or subcontractors employed or engaged on its behalf believe they are required by law or otherwise required to reveal any information which is to be maintained in confidence as set forth above, SUPPLEMENTAL STAFFING SERVICE will, and will require its TEMPORARY PERSONNEL and all other employees, agents, or subcontractors employed or engaged on its behalf to first contact MFA's General Counsel prior to disclosing such information, in order that MFA or the HEALTHCARE CENTER can take appropriate steps to safeguard the disclosure of such information.

D.    Health Insurance Portability and Accountability Act of 1996. HEALTHCARE CENTER and SUPPLEMENTAL STAFFING SERVICE agree that they are not Business Associates of one another, as that term is defined in the Health Insurance Portability and Accountability Act of 1996 and its implementing regulations ("HIPAA"). HEALTHCARE CENTER and SUPPLEMENTAL STAFFING SERVICE agree to comply with the provisions of HIPAA if, and to the extent applicable. The parties acknowledge that from time to time, HIPAA or other regulations may require an amendment or modification to this Agreement for compliance purposes, and agree that they will work to promptly effectuate any such required amendment or modification.

DOL (Steadfast II) 0057907

**PX-10.130**

**JA1751**

DocuSign Envelope ID: CFD423A5-C9B4-4250-BBD2-C04BA0A77D15

3.    <u>Fee Schedule</u>.  SUPPLEMENTAL STAFFING SERVICE shall bill HEALTHCARE CENTER for its services in accordance with **EXHIBIT B** attached hereto.  No change in the fee schedule will be binding without the prior written approval from an authorized representative of HEALTHCARE CENTER.

4.    <u>Duties and Responsibilities of HEALTHCARE CENTER</u>.

A.    HEALTHCARE CENTER shall maintain a current and unrestricted license to operate as a nursing home in the Commonwealth of Virginia.  HEALTHCARE CENTER shall provide reasonable access to the HEALTHCARE CENTER and will inform and make available to SUPPLEMENTAL STAFFING SERVICE and TEMPORARY PERSONNEL all HEALTHCARE CENTER policies and procedures, including medication administration, charting and documentation procedures, issues as to patient rights, Infection Control, Fire and Safety, and HIPAA Privacy in order that SUPPLEMENTAL STAFFING SERVICE can ensure those polices and procedures are a condition of its TEMPORARY PERSONNEL performing the services herein contemplated.

B.    HEALTHCARE CENTER will put in place appropriate procedures to review the actual time worked by TEMPORARY PERSONNEL before such time is submitted by TEMPORARY PERSONNEL to SUPPLEMENTAL STAFFING SERVICE.

C.    HEALTHCARE CENTER has the right to cancel an assignment not less than two (2) hours before the time TEMPORARY PERSONNEL is scheduled to report without incurring liability.  It shall be the responsibility of SUPPLEMENTAL STAFFING SERVICE to contact TEMPORARY PERSONNEL.

D.    If HEALTHCARE CENTER cancels a TEMPORARY PERSONNEL less than two (2) hours prior to start of assignment, HEALTHCARE CENTER shall be liable for two hours at the applicable rate for the TEMPORARY PERSONNEL involved. HEALTHCARE CENTER has the option to utilize service of TEMPORARY PERSONNEL for those hours should said TEMPORARY PERSONNEL still be available.  There will be no liability, however, if the reason for the cancellation by the HEALTHCARE CENTER is due to a breach of this Agreement by SUPPLEMENTAL STAFFING SERVICE or TEMPORARY PERSONNEL.

E.    HEALTHCARE CENTER shall submit payment to SUPPLEMENTAL STAFFING SERVICE within forty-five (45) days upon receipt of accurate invoice.

5.    <u>Right to Remove</u>.  If, in the sole discretion of the HEALTHCARE CENTER or MFA, a TEMPORARY PERSONNEL provided by SUPPLEMENTAL STAFFING SERVICE has engaged in any action which is not in the best interests of the HEALTHCARE CENTER or MFA, HEALTHCARE CENTER or MFA may require TEMPORARY PERSONNEL to leave facility and shall inform SUPPLEMENTAL STAFFING SERVICE of this action immediately. There will be no liability to the HEALTHCARE CENTER or MFA for exercising this right of removal.  Upon notification of removal, SUPPLEMENTAL STAFFING SERVICE agrees to

DOL (Steadfast II) 0057908

PX-10.131

**JA1752**

DocuSign Envelope ID: CFD423A5-C9B4-4250-BBD2-C04BA0A77D15

find a replacement to be placed at the HEALTHCARE CENTER within a time agreed to by the parties.

6.    Change of Employer.  In the event HEALTHCARE CENTER or other party related to the HEALTHCARE CENTER wishes to permanently employ TEMPORARY PERSONNEL, SUPPLEMENTAL STAFFING SERVICE agrees to release TEMPORARY PERSONNEL upon sixty (60) days written notice.  TEMPORARY PERSONNEL remains an employee of SUPPLEMENTAL STAFFING SERVICE during the sixty (60) day period. Subject to meeting the above condition, neither HEALTHCARE CENTER nor TEMPORARY PERSONNEL shall be charged fees or penalties for such permanent change of employer.

7.    Term; Termination.

A.    Term.  The term of this Agreement shall commence as of the date hereof and shall continue in full force and effect for an initial term of one (1) year.  Unless any party elects to terminate this Agreement at the end of the initial or any renewal term hereof by giving written notice to the other parties at least thirty (30) days prior to the expiration of the then current term, this Agreement shall be deemed to have automatically renewed for an additional term of one (1) year at the conclusion of each term, upon the same terms and conditions as set forth herein.

B.    Termination For Cause.  This Agreement may be immediately terminated by any party hereto upon the material breach of any of the terms and conditions hereof by any other party.  Such termination shall be effective immediately upon receipt of notice of claimed breach.  This Agreement shall also terminate immediately and automatically, without notice (1) in the event the HEALTHCARE CENTER loses its license to operate as a nursing home, (2) in the event SUPPLEMENTAL STAFFING SERVICE initiates bankruptcy proceedings (or such proceedings are involuntarily instituted against it) or it makes an assignment for the benefit of creditors, (3) in the event SUPPLEMENTAL STAFFING SERVICE is sanctioned or excluded from participating in any federal or state funded program,  including, but not limited to, Federal and/or State Medicare and Medicaid programs, (4) in the event the insurance requirements of the following paragraph entitled "Insurance" are not complied with, or (5) in the event that SUPPLEMENTAL STAFFING SERVICE is in violation of any federal, state, or local law or regulation, or does any act which, in the sole judgment of the HEALTHCARE CENTER or MFA, is contrary to the best interests of the HEALTHCARE CENTER or MFA.

C.    Termination Without Cause.  This Agreement may be terminated by any party, with or without cause, upon thirty (30) days prior written notice.

D.    Survival.  A party's duty to indemnify, as set forth in the following paragraph entitled "Indemnification," will survive any termination of this Agreement as set forth above.

8.    Insurance.  SUPPLEMENTAL STAFFING SERVICE shall maintain throughout any term of this agreement professional malpractice liability insurance covering itself, its TEMPORARY PERSONNEL and any other employees, agents, and assigns in connection with

DOL (Steadfast II) 0057909

PX-10.132

**JA1753**

DocuSign Envelope ID: CFD423A5-C9B4-4250-BBD2-C04BA0A77D15

the performance of services under this Agreement.  SUPPLEMENTAL STAFFING SERVICE shall submit to HEALTHCARE CENTER upon execution of this Agreement, and annually thereafter, a certificate of insurance confirming the foregoing coverage in a minimum amount equal to or greater than the limitation on recovery per occurrence specified in Section 8.01-581.15 of the Code of Virginia (and as such section may be hereinafter amended or superceded), and three (3) times of said amount in the annual aggregate.

SUPPLEMENTAL STAFFING SERVICE shall also maintain throughout any term of this Agreement the following insurance coverage covering itself, its TEMPORARY PERSONNEL and any other employees, agents, and assigns in connection with performance of services under this Agreement in the minimum amounts (incident/aggregate) as follows:

    i)    Commercial General Liability - $1,000,000 and $3,000,000 in the aggregate

    ii)    Automobile Liability - $1,000,000

    iii)    Workers' Compensation - Statutory Limits

    iv)    Employer's Liability - $1,000,000

    v)    Fidelity Bond - $1,000,000

    vi)    Umbrella Liability - $1,000,000

    vii)    Cyber Liability – with limits of not less than $5,000,000.00 for each occurrence, covering claims involving privacy violations, information theft, damage to or destruction of electronic information, intentional and/or unintentional release of private information, alteration of electronic information, extortion and network security

SUPPLEMENTAL STAFFING SERVICE shall add HEALTHCARE CENTER to their policies of insurance as an additional insured.  SUPPLEMENTAL STAFFING SERVICE shall submit to HEALTHCARE CENTER upon execution of this Agreement, and annually thereafter, certificates of insurance confirming the foregoing coverages.  Liability Insurance shall include coverage for contractual liability and shall name HEALTHCARE CENTER as an additional insured.

Each policy set forth above shall provide that the insurance company may not cancel coverage without providing SUPPLEMENTAL STAFFING SERVICE and HEALTHCARE CENTER thirty (30) days prior notice.  SUPPLEMENTAL STAFFING SERVICE shall immediately notify HEALTHCARE CENTER should it receive any notice of cancellation of such insurance.  Any such cancellation may constitute grounds for termination for cause as referenced in this Agreement.

9.    Indemnification.

    A.    HEALTHCARE CENTER.  HEALTHCARE CENTER shall indemnify and hold SUPPLEMENTAL STAFFING SERVICE harmless of and from all claims, demands, actions, causes of actions, costs, expenses, liabilities and losses (including reasonable attorneys'

DOL (Steadfast II) 0057910

PX-10.133

**JA1754**

DocuSign Envelope ID: CFD423A5-C9B4-4250-BBD2-C04BA0A77D15

fees and court costs) which may result against SUPPLEMENTAL STAFFING SERVICE as a consequence of any alleged negligent or intentional act or omission, malfeasance, neglect or medical malpractice caused or alleged to be caused solely by HEALTHCARE CENTER, its employees, agents or subcontractors.

      B.    <u>SUPPLEMENTAL STAFFING SERVICE</u>. SUPPLEMENTAL STAFFING SERVICE shall indemnify and hold HEALTHCARE CENTER and MFA, as well as each of their respective employees, agents, officers, and directors, harmless of and from any and all claims, demands, actions, causes of actions, costs, expenses, liabilities, and losses (including reasonable attorneys' fees and court costs) which may result against the HEALTHCARE CENTER or MFA as a consequence of a violation of any of the terms of this Agreement or any alleged negligent act or omission, malfeasance, neglect, breach of patient confidentiality or professional malpractice caused or alleged to be caused by SUPPLEMENTAL STAFFING SERVICE, its TEMPORARY PERSONNEL, or any of its employees, agents or subcontractors arising out of or occurring in connection with the performance of the terms of this Agreement.

SUPPLEMENTAL STAFFING SERVICE also shall indemnify and hold HEALTHCARE CENTER and MFA, as well as each of their respective employees, agents, officers, and directors, harmless of and from any and all claims, demands, actions, causes of actions, costs, expenses, liabilities, and losses (including reasonable attorneys' fees, court costs, the payment of back taxes and penalties) which may result against the HEALTHCARE CENTER or MFA should any governmental agency or tribunal find that any of the parties hereto has violated any federal, state or local law or regulation or any finding that any TEMPORARY PERSONNEL placed by SUPPLEMENTAL STAFFING SERVICE was an employee or joint employee of HEALTHCARE CENTER or MFA arising out of or occurring in connection with the performance of the terms of this Agreement.

      C.    <u>Limitation</u>. Notwithstanding the above, in no event shall either party be liable for any incidental, consequential, exemplary, special, or punitive damages or expenses, or lost profits (regardless of how characterized, and even if such party has been advised of the possibility of such damages) under or in connection with this Agreement, regardless of the form of action, whether in tort, contract, negligence, strict liability, statutory liability, or otherwise. Moreover, in the event any TEMPORARY PERSONNEL suffers an injury, accident, or illness compensable under applicable workers' compensation laws, such TEMPORARY PERSONNEL's sole remedy shall be workers' compensation. Failure by such TEMPORARY PERSONNEL to exhaust all workers' compensation administrative remedies and appeals, shall preclude any and all recovery from HEALTHCARE CENTER under any theory or breach of contract, tort, statutory liability, or other.

      10.    <u>Independent Contractor Status</u>. SUPPLEMENTAL STAFFING SERVICE, and any employees, agents, or subcontractors employed or engaged by the SUPPLEMENTAL STAFFING SERVICE shall be and at all times act as independent contractors in performing the services contemplated by this Agreement. It is specifically understood and agreed that TEMPORARY PERSONNEL assigned by SUPPLEMENTAL STAFFING SERVICE to the HEALTHCARE CENTER is the sole employee of SUPPLEMENTAL STAFFING SERVICE and not an employee or joint employee of the HEALTHCARE CENTER or MFA and nothing in

DOL (Steadfast II) 0057911

DocuSign Envelope ID: CFD423A5-C9B4-4250-BBD2-C04BA0A77D15

this Agreement should be construed to create, either expressly or by implication, an employer/employee relationship inconsistent with the above. SUPPLEMENTAL STAFFING SERVICE will require any TEMPORARY PERSONNEL or other individual performing services under this Agreement to sign a copy of **EXHIBIT C**, attached hereto, and provide copy of same to HEALTHCARE CENTER prior to allowing services to be performed under this Agreement. SUPPLEMENTAL STAFFING SERVICE will also maintain in effect during the term of this Agreement any and all Federal, State and/or local licenses and permits which may be required of employers generally.

At no time shall SUPPLEMENTAL STAFFING SERVICE, its TEMPORARY PERSONNEL, or any employees, agents, or subcontractors employed or engaged by the SUPPLEMENTAL STAFFING SERVICE hold themselves out in any way to be the employees, agents, or subcontractors of HEALTHCARE CENTER or MFA. SUPPLEMENTAL STAFFING SERVICE agrees to provide a list of his/her employees, agents or subcontractors who will have access to patients in the HEALTHCARE CENTER prior to their performing any duties herein. No term of this Agreement shall be construed so as to render any party the employee or agent of any other, nor shall this Agreement be nor be construed as a contract of employment.

11.   Access to Records.

A.   SUPPLEMENTAL STAFFING SERVICE's Records. Until the expiration of four (4) years after the furnishing of services pursuant to this Agreement, SUPPLEMENTAL STAFFING SERVICE agrees to make available, upon receipt of written request from HEALTHCARE CENTER or MFA or the Secretary of Health and Human Services ("HHS") or the U.S. Comptroller General, or any of their duly authorized representatives, or any duly authorized state agency, this Agreement and the books, documents, and records of SUPPLEMENTAL STAFFING SERVICE that are necessary to certify the extent of costs incurred by HEALTHCARE CENTER under this Agreement as well as the services provided by SUPPLEMENTAL STAFFING SERVICE under this Agreement, including, but not limited to, normal employment records concerning the TEMPORARY PERSONNEL who provided those services at the HEALTHCARE CENTER.

B.   Subcontractors. If SUPPLEMENTAL STAFFING SERVICE carries out any of the duties of this Agreement with a value of Ten Thousand Dollars ($10,000.00) or more over a twelve-month period through a subcontract with a related organization or individual, such subcontract shall contain a clause to the effect that, until after the expiration of four (4) years after the furnishing of services under the subcontract, the related organization shall make available, upon written request from HEALTHCARE CENTER or MFA or the Secretary of HHS, the U.S. Comptroller General, or any of their duly authorized representatives, the subcontract and the books, documents, and records of the related organization that are necessary to verify the nature and extent of costs incurred under the subcontract as well as the services provided under the subcontract, including, but not limited to, normal employment records concerning the individuals who provided those services at the HEALTHCARE CENTER under sub-contract.

DOL (Steadfast II) 0057912

PX-10.135

**JA1756**

DocuSign Envelope ID: CFD423A5-C9B4-4250-BBD2-C04BA0A77D15

12.   **Compliance with Law.** SUPPLEMENTAL STAFFING SERVICE agrees to be in full compliance with all applicable local, federal and state laws and regulations, including, but not limited to, labor and employment laws in the selection and placement of TEMPORARY PERSONNEL and in the performance of services under this Agreement, including, but not limited to, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Fair Labor Standards Act, the Equal Pay Act and the Family and Medical Leave Act and all requirements imposed by and pursuant to the regulations of the United States Department of HHS or other enforcement authority issued pursuant to that Title, so that no person in the United States of America shall, on the grounds of race, color, handicap or national origin, be excluded from participation in, be denied the benefits, or be otherwise subjected to discrimination under any program or activity provided by SUPPLEMENTAL STAFFING SERVICE.

13.   **Miscellaneous.**

A.   **Indulgences, Etc.** Neither the failure nor any delay on the part of any party to exercise any right, remedy, power or privilege ("Right") under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any Right preclude any other or further exercise of the same or of any other Right, nor shall any waiver of any Right with respect to any occurrence be construed as a waiver of such Right with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

B.   **Assignment.** Neither party shall assign the Agreement in whole or in part without the written consent of the other which shall not be unreasonably withheld. Neither party shall assign any monies, obligations, or entitlements due or to become due to it under the Agreement without the prior written consent of the other party. This Agreement shall be binding upon and inure to the benefit of the successors, permitted assigns, heirs and representatives of the Facility and the Company. Any attempted assignment of this Agreement in violation of the provisions of this section is void.

C.   **Controlling Law.** This Agreement and all questions relating to its validity, interpretation, performance and enforcement shall be governed by and construed in accordance with the substantive laws of the Commonwealth of Virginia, notwithstanding any choice-of-laws provisions of Virginia law to the contrary.

D.   **Notices.** All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and shall be delivered by hand, overnight courier, or by regular United States mail, postage pre-paid, addressed to the party for whom it is intended at the addresses set forth below. Any address for the giving of notice may be changed by giving notice to that effect to the other party. Notices provided by hand shall be deemed to have been received as of the date provided on the notice. Notices provided via regular United States mail or by overnight courier are effective upon deposit with the post office or overnight courier.

DOL (Steadfast II) 0057913

PX-10.136

DocuSign Envelope ID: CFD423A5-C9B4-4250-BBD2-C04BA0A77D15

If to SUPPLEMENTAL STAFFING SERVICE:

SteadFast Medical Staffing, LLC
ATTN: Lisa Pitts
5750 Chesapeake Boulevard, Suite 103
Norfolk, VA 23513

If to HEALTHCARE CENTER:

Princess Anne Healthcare & Rehabilitation Center
ATTN: Administrator
1948 Landstown Centre Way
Virginia Beach, VA 23456

With a copy to:

Medical Facilities of America, Inc.
ATTN: Legal Dept.
2917 Penn Forest Blvd.
Roanoke, VA 24018

    E.    Schedule. All schedules, exhibits, and addenda attached hereto are hereby incorporated by reference into, and made a part of, this Agreement, provided they are properly dated and initialed by all executing parties.

    F.    Financial Obligations. SUPPLEMENTAL STAFFING SERVICE shall not incur, nor will HEALTHCARE CENTER or MFA be responsible for, any financial obligations, contract for the purchase of, or purchase of any goods or services on behalf of the HEALTHCARE CENTER or MFA without the HEALTHCARE CENTER's or MFA's express prior written consent.

    G.    Execution. This Agreement is not binding unless executed by the SUPPLEMENTAL STAFFING SERVICE and the Executive Vice President or an authorized officer of HEALTHCARE CENTER.

    H.    Benefit. The rights and obligations hereunder shall be binding upon and shall inure to the benefits of the parties hereto and their respective successors and permitted assigns.

    I.    Integration. This Agreement constitutes the entire agreement of the parties hereto and shall not be modified except in writing signed by all of the parties hereto.

    J.    Referral Disclaimer and Freedom of Choice. The parties acknowledge that the payment or receipt of any remuneration, direct or indirect, to induce the referral of a patient for the purpose of purchasing either goods or services reimbursable under the federal

DOL (Steadfast II) 0057914

PX-10.137

**JA1758**

DocuSign Envelope ID: CFD423A5-C9B4-4250-BBD2-C04BA0A77D15

Medicare or state Medicaid programs is prohibited. No provision of this Agreement is intended to, nor shall it be construed as requiring any party hereto to refer any patient to any other party hereto nor shall any payment contemplated hereunder be contingent or conditioned upon nor measured by the referral by any party of patients for the purchase of services or goods to any of the other parties hereto; it being expressly provided that no purpose of this Agreement is to induce referrals.

K.    Non-exclusive Agreement. Nothing in this Agreement shall be construed as limiting the rights of either party to affiliate or contract with any other staffing agency or healthcare center on either a limited or general basis while this Agreement is in effect.

L.    Covenants and Warrants. The SUPPLEMENTAL STAFFING SERVICE covenants and warrants that neither it nor any of its employees, agents or subcontractors are under any obligation, restraint or impairment which would prohibit the performance of its duties as set forth in this Agreement. The SUPPLEMENTAL STAFFING SERVICE also understands and agrees that if it is affiliated with or employed by a practice, hospital, clinic or any other healthcare facility, it is the SUPPLEMENTAL STAFFING SERVICE's duty to notify the practice, hospital, clinic or healthcare facility and obtain any and all necessary approvals from such individuals or entities in order to allow the SUPPLEMENTAL STAFFING SERVICE to perform the services set forth in this Agreement without restraint or impairment. The SUPPLEMENTAL STAFFING SERVICE understands and agrees that it will indemnify and hold harmless the HEALTHCARE CENTER and MFA, its parent, subsidiaries, and affiliates, as well as each of their respective employees, agents, officers, and directors from any and all demands, losses, causes of action, claims, expenses and liabilities which may be brought by any person, entity, agency or board arising out of a breach of the obligations set forth in this paragraph, including but not limited to costs and reasonable attorney's fees.

M.    Labor. Under no circumstances will SUPPLEMENTAL STAFFING SERVICE enter into any voluntary agreement or understanding with any union organization for the provision of services under this Agreement.

N.    No Presumption against Drafter. The language used in this Agreement is not to be construed in favor or against any party solely because such party or their counsel may have drafted the Agreement.

O.    Severability and Reformation. Each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be adjudged to be invalid under applicable law, the remainder of the Agreement is severable and shall continue in full force and effect. Should a court of competent jurisdiction declare any of the provisions of this Agreement unenforceable, the parties acknowledge and agree that the court may revise or reconstruct such unenforceable provisions to better effectuate the intent of the parties.

P.    Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute

DOL (Steadfast II) 0057915

PX-10.138

JA1759

DocuSign Envelope ID: CFD423A5-C9B4-4250-BBD2-C04BA0A77D15

one and the same instrument. The parties agree that a facsimile or electronic signature may substitute for and have the same effect as the original signature.

      Q.   Elder Justice Act of 2009. In compliance with the provisions of the Elder Justice Act of 2009, 42 USCS Section 1320b-25, et seq., and implementing regulations, as a contractor of HEALTHCARE CENTER, SUPPLEMENTAL STAFFING SERVICE is required to report any reasonable suspicion of a crime against HEALTHCARE CENTER residents to the Administrator of HEALTHCARE CENTER and to ensure that such crime is reported to the Virginia Department of Health Office of Licensure and Certification and to local law enforcement agents. Such reports must be made within two hours after forming the suspicion if the event results in serious bodily injury or, if no serious bodily injury, within 24 hours.

    WITNESS the following signatures.

STEADFAST MEDICAL STAFFING, LLC

By: _____

Name printed: _____

Title: _____

Date signed: _____

Federal Employer Identification

Number: _____

PRINCESS ANNE H&R OPS LIMITED PARTNERSHIP T/A PRINCESS ANNE HEALTH & REHABILITATION CENTER

By: Medical Facilities of America, Inc.

Its: General Partner

By: _____
    Keith F. Hennen, Executive VP and COO

Date signed: _____
    2/19/2018

Supplemental Staffing Agreement – Princess Anne /Steadfast Medical Staffing, LLC        Page 12 of 12

DOL (Steadfast II) 0057916

PX-10.139

DocuSign Envelope ID: CFD423A5-C9B4-4250-BBD2-C04BA0A77D15

SteadFast Medical Staffing, LLC                                          **EXHIBIT A**

### SCREENING PROCEDURES

❖ A completed and signed SteadFast Medical Staffing, LLC employment application.

❖ Completed I-9 with supporting documentation to show legal eligibility to work in U.S.

❖ Valid license/certificate in good standing in the state of practice.

❖ Criminal background and abuse screening (as required by facility and/or state statutes).

❖ Minimum one year experience within the last two years for licensed nurses.

❖ Supportive documentation, such as current CPR, BCLS, ACLS, PALS, etc.

❖ Two professional satisfactory work-related references, in clinical specialty within the last three (3) years, as to clinical competency and reliability.

❖ Completed clinical skills check list: updated annually (clinical skills checklists and testing, as required by facility).

❖ Health clearance shall include Hepatitis B vaccine or declination, and evidence of annual TB test or CXR results.

❖ Federally compliant Hepatitis B vaccine program.

❖ SteadFast Medical Staffing, LLC shall implement a drug and alcohol free policy similar to that of Healthcare Center and shall require its temporary personnel placed with the Healthcare Center to abide by such a drug and alcohol policy while performing services at the Healthcare Center.

❖ Adherence to Standards of Conduct policies such as clinical policies, patient rights policies, drug free work place policies.

❖ Endorsement of **EXHIBIT C** attached hereto.

❖ OSHA approved training:
    Occupational Exposure to blood borne pathogens, including standard precautions.
    Body Mechanics
    Electrical and Fire Safety

|  | Initials | Date |
|---|---|---|
| Healthcare Center | *Kim* | 2/19/2018 |
| Supplemental Staffing Service | *LP* | 2-12-18 |

DOL (Steadfast II) 0057917

PX-10.140

**JA1761**

DocuSign Envelope ID: CFD423A5-C9B4-4250-BBD2-C04BA0A77D15

**EXHIBIT B**

**Steadfast Medical Staffing LLC**

**Pay Rates Weekdays/Weekends:**

RN'S -  $55/HR

LPN'S - $40/HR

CNA'S - $25/HR

Independent Contractors:  All rates are Flat rates except on Holidays, see below:

**HOLIDAYS**

**Holiday rates are paid for the day, evening, and night shifts on:**

1.  New Year's Eve
2.  New Year's Day
3.  Easter
4.  Memorial Day
5.  Independence Day
6.  Labor Day
7.  Thanksgiving Day
8.  Christmas Eve
9.  Christmas Day

*The Holiday billing rate is one and one-half (1.5) times the regular billing rate for each hour worked.*

|  | Initials | Date |
|---|---|---|
| Healthcare Center | *KW* | 2/19/2018 |
| Supplemental Staffing Service | *LP* | *2/18/18* |

DOL (Steadfast II) 0057918

PX-10.141

DocuSign Envelope ID: CFD423A5-C9B4-4250-BBD2-C04BA0A77D15

SteadFast Medical Staffing, LLC                                              **EXHIBIT C**

### ACKNOWLEDGMENT AND WAIVER

I, the undersigned, acknowledge and agree that I am solely employed by SteadFast Medical
Staffing, LLC and that my placement by SteadFast Medical Staffing, LLC to perform services at
Princess Anne Health and Rehabilitation Center does not make me an employee of Princess
Anne Health and Rehabilitation Center ("HEALTHCARE CENTER"). Consequently, I
understand and agree that the terms and conditions of my employment are governed solely by
SteadFast Medical Staffing, LLC, including, but not limited to, the payment of wages (including
overtime where applicable) to me, the withholding of appropriate taxes, and the availability of
leaves and benefits.

As an employee of SteadFast Medical Staffing, LLC I understand and agree that I have no legal
right to any benefits which are provided, or in the future may be provided, by HEALTHCARE
CENTER to its employees, including, but not limited to, eligibility to participate in
HEALTHCARE CENTER's 401k plan, PTO plan, group health insurance plan, dental plan, and
Nurse Scholarship program.

I understand and agree that as condition of and in consideration for Princess Anne Health and
Rehabilitation Center allowing me to be placed by SteadFast Medical Staffing, LLC to perform
services at Princess Anne Health and Rehabilitation Center, I will not make any claim against
HEALTHCARE CENTER based on HEALTHCARE CENTER allegedly being my employer or
joint employer, including, but not limited to, any claim for wages/overtime payments or any
claim for benefits which HEALTHCARE CENTER provides, or in the future may provide, to its
employees, and I waive and release HEALTHCARE CENTER from any such claims or causes
of action, both in tort and contract.

I further understand and agree that I will not hold myself out to be an employee of
HEALTHCARE CENTER and that I cannot bind HEALTHCARE CENTER without the express
written authority of the President of HEALTHCARE CENTER.

I understand and agree that this Acknowledgment and Waiver shall be governed by and
interpreted in accordance with the laws of the Commonwealth of Virginia. I also understand and
agree that if any of the terms or provisions of this Acknowledgment and Waiver are deemed null,
void or inoperative for any reason, the remaining terms or provisions are severable and will
retain full force and effect.

Signature _____

Name printed: _____

Date Signed: _____

DOL (Steadfast II) 0057919

PX-10.142

**JA1763**

02/28/2019 THU 16:49  FAX                                    @002/005

# MEDICAL STAFFING OF AMERICA
## T/A STEADFAST MEDICAL STAFFING
### 5750 CHESAPEAKE BOULEVARD, STE 301
### NORFOLK, VIRGINIA 23513
### (O) 757-321-0777  (F) 757-857-6003  (C) 757-215-5716

This agreement is made and entered this day, _FEBRUARY 28th, 2019_ by and between Medical Staffing of America T/A Steadfast Medical Staffing., and _FORT NORFOLK RETIREMENT COMM. DBA HARBORS EDGE_.

Whereas, Medical Staffing of America T/A Steadfast Medical Staffing, and (Facility) wish to enter into an agreement wherein Steadfast Medical Staffing, will provide temporary medical contractors to the facility at an agreed upon rate.

Now, therefore, for and in consideration of the promises, the parties here to do hereby covenant and agree as follows:

## TERMS:
This agreement shall begin on the date first written above. Either party can terminate the agreement with or without cause, upon thirty days' written notice to the other party. The agreement may be amended at any time and from time to time by written agreement to the parties.

## MEDICAL STAFFING OF AMERICA
## T/A STEADFAST MEDICAL STAFFING., responsibilities:

A. Upon request by facility, Steadfast Medical Staffing, LLC., shall assign such contractors as available for such assignment. At no time does Steadfast Medical Staffing, LLC., guarantee that all requests will be filled.

B. Steadfast Medical Staffing, LLC., shall maintain a worker file on each of its contractors, containing the following: (Steadfast Medical Staffing, LLC., will provide copies of the following, except "a" to the facility upon request)

    a. A completed application, which includes education, training, skills, specialties and preference
    b. Documentation of education and training
    c. Skills inventory checklist
    d. Two recent work references
    e. TB test and evidence of satisfactory health status
    f. Current CPR
    g. Performance evaluation
    h. Copy of current license, registration, or certification
    i. Negative urine drug screen
    j. Background check
    k. Flu shots

C. Steadfast Medical Staffing, LLC., will use its best efforts to match the skills and experience levels of its Contractors to the specific needs of the Facility.

D. Contractors will be requested to report to the designated supervisor before he/she begins work.

E. Steadfast Medical Staffing, LLC., shall give the Facility a two-hours' notice regarding Contractors whom Steadfast Medical Staffing, LLC., cannot provide.

1 | P a g e

DOL (Steadfast II) 005782

PX-10.143

**JA1764**

02/28/2019 THU 16:49  FAX

F. Steadfast Medical Staffing, LLC., will not actively solicit Facility employees as Contractors.

G. Contractors assigned to Facility pursuant to this agreement shall for the purpose of this Agreement, be considered Contractors for Steadfast Medical Staffing, LLC.

H. Steadfast Medical Staffing, LLC., shall assume sole and exclusive responsibility for the payment of wages to such Contractors for services performed by them.

I. Steadfast Medical Staffing, LLC., will be compliant with all state and federal laws applicable to correspondence of the Contractors assigned Facility.

J. Steadfast Medical Staffing, LLC., will comply with Facility standards for the use of supplemental medical services.

K. Steadfast Medical Staffing, LLC., agrees not to discriminate in the assignment of its Contractors based on race, creed, color, national origin, sex, age, disability, citizenship status or veteran status.

**"FACILITY" responsibilities:**

A. "Facility" understands all Contractors provided by Steadfast Medical Staffing, LLC., for the term of this Agreement are contracted through Steadfast Medical Staffing, LLC.

B. "Facility will make no steps to recruit Contractors provided by Steadfast Medical Staffing, LLC., without consent through written permission from Steadfast Medical Staffing, LLC, which then Steadfast Medical Staffing, LLC will implement the Buy Out Clause for such Contractors at the rate for RN, $4,000; LPN, $3,000; and CNA, $2,000.

"Facility" understands Steadfast Medical Staffing, LLC., is not an employment agency but a Nursing Registry and that its Contractors are assigned to the "Facility" to render temporary service.

C. "Facility" shall provide sufficient information about its specific needs to Steadfast Medical Staffing, LLC., so that Steadfast Medical Staffing, LLC., can match the skills and experience of its Contractors to those needs.

D. "Facility" shall utilize assigned Contractors only for the specific needs requested, unless "Facility", Steadfast Medical Staffing, LLC., and Contractor agree to a change in duties.

E. "Facility" agrees that Steadfast Medical Staffing, LLC., duty to fill assignments is subject to availability of qualified Contractors.

F. "Facility" will orientate Contractors to its' Facility rules and regulations, including the physical layout and equipment on any unit to which such Contractors are assigned.

G. "Facility" staffing supervisors will assist Steadfast Medical Staffing, LLC., on a continual basis, with evaluation of Steadfast Medical Staffing, LLC., Contractors by providing performance information.

H. "Facility" shall allow Steadfast Medical Staffing, LLC., Contractors (on their own time) to attend appropriate facility staff development programs.

I. "Facility" will immediately notify Steadfast Medical Staffing, LLC., of any problems regarding Steadfast Medical Staffing, LLC Contractors.

J. "Facility" will make available to Steadfast Medical Staffing, LLC., copies of all documentation concerning problems or incidents in which Steadfast Medical Staffing, LLC., Contractors are involved.

K. If in any discretion of the "Facility", any person assigned by Steadfast Medical Staffing, LLC., is incompetent, negligent, or has engaged in misconduct, the "Facility" may require such person to leave its premises and inform Steadfast Medical Staffing, LLC., of this action immediately. "Facility's" obligation to compensate Steadfast Medical Staffing, LLC., for said services shall be limited to the actual hours worked by such person and "Facility" shall have no further obligation with respect to such assignment.

L. If "Facility" changes or cancels an order less than two (2) hours before reporting time, "Facility" shall be billed for four (4) hours at the hourly rate for the personnel involved.

2 | Page

DOL (Steadfast II) 005783

PX-10.144

M. "Facility" agrees to not discriminate in the assignment of Steadfast Medical Staffing, LLC., based on race, creed, color, national origin, sex, age, disability, citizenship status, or veteran's status.

**Billing Procedures:**

A. Steadfast Medical Staffing, LLC., will invoice Facility weekly for its services. The rate of its services is shown on Exhibit "A". The rates for services established in Exhibit "A" can be amended prospectively by Steadfast Medical Staffing, LLC., at any time upon forty-five (45) days written notice to "Facility".

B. "Facility" shall pay Steadfast Medical Staffing, LLC., Invoice within 35 days from date of Invoice. Invoices not paid within 35 days are considered Past Due and will be charged a Finance Charge of one and a half (1.5%) percent per month of the unpaid balance (annual percentage of 18%) or the maximum interest rate allowed by law whichever is lower. "Facility" agrees to pay the finance charge together with reasonable attorney's fees for the cost of collection.

**Insurance:**

A. Steadfast Medical Staffing, LLC., maintains during the terms of this Agreement and any subsequent renewals, general liability, and professional liability insurance coverage for all of its acts and omission in the provision of the designated services with limits of not less than $1,000,000 per occurrence and $6,000,000 aggregate.

B. Steadfast Medical Staffing, LLC., will provide upon request Certification of Insurance or order evidence of coverage and it will notify "Facility" of any cancellation or modification of its liability insurance.

**Notices:**

All Notices shall be in writing and shall be addressed to the parties as set forth below. Notices shall be effective upon receipt when delivered personally or upon mailing when properly addressed with postage prepaid.

| MEDICAL STAFFING OF AMERICA<br>TA/ STEADFAST MEDICAL STAFFING<br>5750 CHESAPEAKE BOULEVARD, STE 301<br>NORFOLK, VIRGINIA 23513<br>ATTN: Lisa A. Pitts<br>(M) 757-321-0777<br>(F) 757-857-6003<br>(C) 757-215-5716 | "Facility": FORT NORFOLK RETIREMENT COMMUNITY Inc. DBA HARBOR'S EDGE ONE Colley AVENUE NORFOLK, VA 23510 ATTN: ELENA THORSTENSEN 757 616 7938 |
|---|---|

**Access to Records:**

The parties here to agree to make available to duly authorized representative of the Department of Health and Human Services: all contracts, books, documents and records of the parties providing services are here under necessary to verify the cost of the services provided under this Agreement. Similar access will also be grated to the contracts, books, and records providing the services here under and any obligation related to such parties.

3 | P a g e

DOL (Steadfast II) 005784

PX-10.145

**JA1766**

Mar 01 15:00:01p     Medical Staffing America                              16/0010003              005/009

02/28/2019 THU 16:59  FAX

**Social Security Act:**

Steadfast Medical Staffing, LLC., warrants that to the best of Steadfast Medical Staffing, LLC's knowledge, no person who ownership controls interest in, or is an agent or managing employee of Steadfast Medical Staffing, LLC., has been convicted of a criminal offense relating to that person's involvement in any programs under Title XVIII, XIX, or XX of the Social Security Act since the inception of these programs.

This Agreement shall insure to the benefit of and shall be bending upon the parties hereto and their respective successors and assignments.

This Agreement shall be constructed, enforced, and interpreted under the laws of the State of Virginia.

*Executed on the date and year first above written,*

| Steadfast Medical Staffing, LLC. | "Facility": HARBOR'S EDGE |
|---|---|
| By: _____ Title: Attorney | By: _____ ELENA THORSTENSEN Title: INTERIM HS ADMINISTRATOR |

**MEDICAL STAFFING OF AMERICA**
**T/A STEADFAST MEDICAL STAFFING Pay Rates – Weekdays/Weekends:**

RN, $51.35/HR
LPN, $39.75/HR
CNA, $24.50/HR

Independent Contractors: All rates are Flat rates except on Holidays, see below:

**HOLIDAYS:**
Holiday rates are paid for the day, evening, and night shifts on:

1. New Year's Eve
2. New Year's Day
3. Easter
4. Memorial Day
5. Independence Day
6. Labor Day
7. Thanksgiving Day
8. Christmas Eve
9. Christmas Day

*The Holiday billing rate is One and one-half (1.5) times the regular billing rate for each hour worked.*

Administrator:

_____

4 | P a g e

DOL (Steadfast II) 005785

PX-10.146

**JA1767**

**MEDICAL STAFFING OF AMERICA**
**TA/ STEADFAST MEDICAL STAFFING**
5750 CHESAPEAKE BOULEVARD, STE 301
NORFOLK, VIRGINIA 23513
(O) 757-321-0777   (F) 757-857-6003   (C) 757-215-5716

This Agreement ("Agreement") is made and entered into this 18th day, of July, 2018 by and between Medical Staffing of America T/A Steadfast Medical Staffing, and Newport News Facility Operations, LLC d/b/a Newport News Nursing and Rehabilitation Center ("Facility").

Whereas, Medical Staffing of America T/A Steadfast Medical Staffing, and Facility wish to enter into an agreement wherein Steadfast Medical Staffing, will provide temporary medical contractors ("Contractors") to the Facility at an agreed upon rate.

Now, therefore, for and in consideration of the promises, the parties hereto do hereby covenant and agree as follows:

**TERM:**
This Agreement shall begin on the date first written above. Either party can terminate the Agreement with or without cause, upon thirty (30) days' written notice to the other party. The Agreement may be amended at any time and from time to time by written agreement signed by both parties.

**MEDICAL STAFFING OF AMERICA**
**T/A STEADFAST MEDICAL STAFFING, responsibilities:**

A. Upon request by Facility, Steadfast Medical Staffing, LLC, shall assign such Contractors as are available for such assignment. At no time does Steadfast Medical Staffing, LLC, guarantee that all requests will be filled.

B. Steadfast Medical Staffing, LLC, shall maintain a worker file on each of its Contractors, containing the following: (Steadfast Medical Staffing, LLC, will provide copies of the following, except "a", to the Facility upon request)

    a. A completed application, which includes education, training, skills, specialties and preference
    b. Documentation of education and training
    c. Skills inventory checklist
    d. Two recent work references
    e. TB test and evidence of satisfactory health status
    f. Current CPR
    g. Performance evaluation
    h. Copy of current license, registration, or certification
    i. Negative urine drug screen
    j. Background check
    k. Flu shots

C. Steadfast Medical Staffing, LLC, will use its best efforts to match the skills and experience levels of its Contractors to the specific needs of the Facility.

D. Contractors will be requested to report to the designated supervisor before he/she begins work.

E. Steadfast Medical Staffing, LLC, shall give the Facility a two-hours' notice regarding Contractors whom Steadfast Medical Staffing, LLC, cannot provide.

1 | P a g e

STEADFAST 000537

PX-10.147

F.  Steadfast Medical Staffing, LLC, will not actively solicit Facility employees as Contractors.

G.  Contractors assigned to Facility pursuant to this Agreement shall for the purpose of this Agreement, be considered Contractors for Steadfast Medical Staffing, LLC.

H.  Steadfast Medical Staffing, LLC, shall assume sole and exclusive responsibility for the payment of wages to such Contractors for services performed by them.

I.  Steadfast Medical Staffing, LLC, will be compliant with all state and federal laws applicable to correspondence of the Contractors assigned Facility.

J.  Steadfast Medical Staffing, LLC, will comply with Facility standards for the use of supplemental medical services.

K.  Steadfast Medical Staffing, LLC, agrees not to discriminate in the assignment of its Contractors based on race, creed, color, national origin, sex, age, disability, citizenship status or veteran status.

**"FACILITY" responsibilities:**

A.  "Facility" understands all Contractors provided by Steadfast Medical Staffing, LLC, for the term of this Agreement are contracted through Steadfast Medical Staffing, LLC.

B.  "Facility will make no steps to recruit Contractors provided by Steadfast Medical Staffing, LLC, without consent through written permission from Steadfast Medical Staffing, LLC, which then Steadfast Medical Staffing, LLC will implement the Buy Out Clause for such Contractors at the rate for RN, $4,000; LPN, $3,000; and CNA, $2,000.

"Facility" understands Steadfast Medical Staffing, LLC, is not an employment agency but a Nursing Registry and that its Contractors are assigned to the "Facility" to render temporary service.

C.  "Facility" shall provide sufficient information about its specific needs to Steadfast Medical Staffing, LLC, so that Steadfast Medical Staffing, LLC, can match the skills and experience of its Contractors to those needs.

D.  "Facility" shall utilize assigned Contractors only for the specific needs requested, unless "Facility", Steadfast Medical Staffing, LLC, and Contractor agree to a change in duties.

E.  "Facility" agrees that Steadfast Medical Staffing, LLC, duty to fill assignments is subject to availability of qualified Contractors.

F.  "Facility" will orientate Contractors to its rules and regulations, including the physical layout and equipment on any unit to which such Contractors are assigned.

G.  "Facility" staffing supervisors will assist Steadfast Medical Staffing, LLC, on a continual basis, with evaluation of Steadfast Medical Staffing, LLC, Contractors by providing performance information.

H.  "Facility" shall allow Steadfast Medical Staffing, LLC, Contractors (on their own time) to attend appropriate facility staff development programs.

I.  "Facility" will immediately notify Steadfast Medical Staffing, LLC, of any problems regarding Steadfast Medical Staffing, LLC Contractors.

J.  "Facility" will make available to Steadfast Medical Staffing, LLC, copies of all documentation concerning problems or incidents in which Steadfast Medical Staffing, LLC, Contractors are involved.

K.  If in the sole discretion of the "Facility", any person assigned by Steadfast Medical Staffing, LLC, is incompetent, negligent, or has engaged in misconduct, the "Facility" may require such person to leave its premises and inform Steadfast Medical Staffing, LLC, of this action immediately. "Facility's" obligation to compensate Steadfast Medical Staffing, LLC, for said services shall be limited to the actual hours worked by such person and "Facility" shall have no further obligation with respect to such assignment.

L.  If "Facility" changes or cancels an order less than two (2) hours before reporting time, "Facility" shall be billed for two (2) hours at the hourly rate for the personnel involved.

2 | Page

STEADFAST 000538

PX-10.148

M. "Facility" agrees to not discriminate in the assignment of Steadfast Medical Staffing, LLC, based on race, creed, color, national origin, sex, age, disability, citizenship status, or veteran's status.

**Billing Procedures:**

A. Steadfast Medical Staffing, LLC, will invoice Facility weekly for its services. The rate of its services is shown on Exhibit "A". The rates for services established in Exhibit "A" can be amended prospectively by Steadfast Medical Staffing, LLC, at any time upon forty-five (45) days written notice to "Facility".

B. Facility shall pay Steadfast Medical Staffing, LLC., Invoice within 35 days from date of Invoice. Invoices not paid within 35 days are considered Past Due and will be charged a Finance Charge of one and a half (1.5%) percent per month of the unpaid balance (annual percentage of 18%) or the maximum interest rate allowed by law whichever is lower. "Facility" agrees to pay the finance charge together with reasonable attorney's fees for the cost of collection.

**Insurance:**

A. Steadfast Medical Staffing, LLC, shall maintain during the term of this Agreement and any subsequent renewals, general liability, and professional liability insurance coverage for itself and the Contractors assigned at Facility to cover all acts and omission in the provision of the designated services with limits of not less than $1,000,000 per occurrence and $6,000,000 aggregate.

B. Steadfast Medical Staffing, LLC, will provide upon request Certification of Insurance or other evidence of coverage and it will notify Facility of any cancellation or modification of its liability insurance.

**Notices:**

All notices or other communications hereunder shall be in writing and shall be deemed given (a) one (1) business day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (b) three (3) days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, to the respective address set forth below.

| | |
|---|---|
| MEDICAL STAFFING OF AMERICA<br>TA/ STEADFAST MEDICAL STAFFING<br>5750 CHESAPEAKE BOULEVARD, STE 301<br>NORFOLK, VIRGINIA 23513<br>ATTN: Lisa A. Pitts<br>(M) 757-321-0777<br>(F) 757-857-6003<br>(C) 757-215-5716 | "Facility":<br>Newport News Nursing and Rehabilitation Center<br>12997 Nettles Dr., Newport News, VA 23602<br>ATT: Executive Director<br><br>With a copy to: Consulate Health Care<br>800 Concourse Parkway S.<br>Maitland, FL 32751<br>ATTN: Legal Department |

**Access to Records:**

In accordance with 42 C.F.R. § 420.302(b), if Steadfast Medical Staffing, LLC provides services under this Agreement the cost or value of which is $10,000 or more over a 12-month period, including contracts for both goods and services in which the service component is worth $10,000 or more over a 12-month period, then Steadfast Medical Staffing, LLC shall allow the Comptroller General of the United States, HHS, and their duly authorized representatives access to this Agreement and to Steadfast Medical Staffing, LLC's books, documents, and records as may be necessary to verify the nature, extent, and costs of the services provided under this Agreement until the expiration of four years after the

3 | Page

STEADFAST 000539

**PX-10.149**

services are furnished under the terms of this Agreement.  Steadfast Medical Staffing, LLC shall also allow similar access by the Comptroller General of the United States, HHS, and their duly authorized representatives to contracts of a similar nature between Steadfast Medical Staffing, LLC and related organizations, and to relevant books, documents, and records.

**Social Security Act:**

Steadfast Medical Staffing, LLC, warrants that to the best of Steadfast Medical Staffing, LLC's knowledge, no person whose ownership controls interest in, or is an agent or managing employee of Steadfast Medical Staffing, LLC, has been convicted of a criminal offense relating to that person's involvement in any programs under Title XVIII, XIX, or XX of the Social Security Act since the inception of these programs.

**Representations and Warranties:**

Steadfast Medical Staffing, LLC hereby represents and warrants to Facility that each and every Contractor assigned to work at the Facility are (i) experienced and qualified in their line of work and licensed, certified and properly credentialed to perform the services required by Facility, and (ii) have evidence of satisfactory health status and free of any communicable diseases, free of any illegal drug use and abuse, and have no criminal records, in accordance with state/commonwealth and/or federal regulations, that would debar them from performing the services to the residents or patients of the Facility.

**Elder Justice Act:**

Steadfast Medical Staffing, LLC and its Contractors assigned to the Facility agree to comply with Section 1150B of the Social Security Act, as established by Section 6703(b)(3) of the Patient Protection and Affordable Care Act, and all requirements imposed by or pursuant to the regulation of the Department of Health and Human Services issued pursuant to that Title, to the end that, Steadfast Medical Staffing, LLC agrees to report reasonable suspicions of a crime to the Facility's Executive Director and self-report the suspicion of a crime to the appropriate governing body and local law enforcement.  Neither Steadfast Medical Staffing, LLC nor its Contractors will be retaliated against for reporting suspicion of a crime.  Reports must be made immediately, but no later than two (2) hours after forming the suspicion, if the event that caused the reasonable suspicion results in serious bodily injury; and in all other cases, no later than 24 hours after forming the suspicion. Serious bodily injury means an injury that involves extreme physical pain, substantial risk of death, protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or an injury requiring medical intervention such as surgery, hospitalization, or physical rehabilitation. Steadfast Medical Staffing, LLC is solely responsible for ensuring that a suspicion of a crime is reported to the Executive Director.  Further, Steadfast Medical Staffing, LLC indemnifies and holds harmless the Facility against all claims, losses and damages arising from or relating to the failure to report a suspicion of a crime pursuant to Section 1150B of the Social Security Act.

**Federally Funded Health Care Program Compliance:**

Steadfast Medical Staffing, LLC hereby represents and warrants that neither Steadfast Medical Staffing, LLC nor any of Steadfast Medical Staffing, LLC's Contractor providing services under this Agreement currently is, or at any time during the term of this Agreement will be, excluded from participation in any federally funded health care program, including Medicare and Medicaid.  Steadfast Medical Staffing, LLC agrees to immediately notify the Facility, in writing, in the event of any threatened, proposed or actual exclusion from any federally funded health care program, including Medicare and Medicaid.  Steadfast Medical Staffing, LLC shall perform periodic run searches against OIG's List of Excluded Individuals and Entities (not less than twice a year) to ensure continued compliance. Steadfast Medical Staffing, LLC agrees that it will reimburse to Facility an amount equal to any loss (e.g., fine or mandatory reimbursement) incurred by Facility as a result of the exclusion of Steadfast Medical Staffing, LLC or Steadfast Medical Staffing, LLC's Contractors that provided services under this Agreement.  Should any evidence

4 | P a g e

STEADFAST 000540

**PX-10.150**

reveal that Steadfast Medical Staffing, LLC or any of Steadfast Medical Staffing, LLC's Contractors providing services under this Agreement, at any time during the term of this Agreement, become excluded or debarred from participation, Facility may, in its sole discretion, terminate this Agreement immediately as of the date of such exclusion or debarment.

**Indemnification:**

Steadfast Medical Staffing, LLC agrees to indemnify and hold Facility harmless against all claims, demands, fines, penalties, costs, expenses, liabilities, causes of action, losses, suits and damages (including, but not limited to reasonable attorneys' fees) which are asserted or may result against the Facility as a consequence of any malfeasance, neglect, fraud, negligence, medical malpractice, or intentional acts or omissions arising out of the Steadfast Medical Staffing, LLC's performance of the services or undertaking of its responsibilities under the Agreement to the extent caused by the Steadfast Medical Staffing, LLC, its officers and directors, shareholders, employees, agents, consultants, subcontractors, or representatives. This indemnification provision shall survive the termination or cancellation of the Agreement.

**Confidential Information; HIPAA:**

Steadfast Medical Staffing, LLC and any Contractor shall not, at any time during the term of this Agreement and thereafter, except with the written consent of Facility, disclose any confidential patient information or confidential information relating to Facility's operations to any person. Both parties agree to comply with the provisions of The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") as well as comply with the HIPAA Security and Privacy regulations pursuant to Subtitle D of the Health Information Technology for Economic and Clinical Health Act (HITECH), including Sections 164.308, 164.310, 164.312 and 164.316 of Title 45 of the Code of Federal Regulations if, and to the extent applicable. The parties acknowledge that from time to time, HIPAA or other regulations may require an amendment or modification to the Agreement for compliance purposes, and agree that they will work to promptly effectuate any such required amendment or modification.

**Timekeeping:**

Steadfast Medical Staffing, LLC shall ensure that all Contractors provided by Steadfast Medical Staffing, LLC abide by all Facility policies and procedures related to timekeeping, and Steadfast Medical Staffing, LLC shall be responsible for taking any necessary disciplinary action against its Contractors who fail to comply with such policies and procedures. All Steadfast Medical Staffing, LLC Contractors must record all hours worked by clocking in and out at the Facility, including clocking in and out for meal periods. Steadfast Medical Staffing, LLC Contractors must clock in no more than seven (7) minutes before a shift begins, and must clock out no more than seven (7) minutes after a shift ends. Steadfast Medical Staffing, LLC will not be compensated by Facility for any hours that its Contractors work but fail to clock in, and any such nonpayment shall not impact Steadfast Medical Staffing, LLC's obligation to compensate its Contractors.

**Entire Agreement:**

This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes any and all other agreements, either oral or written, between the parties with respect to the subject matter hereof.

This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns.

This Agreement shall be constructed, enforced, and interpreted under the laws of the Commonwealth of Virginia.

5 | P a g e

STEADFAST 000541

**PX-10.151**

Executed on the date and year first above written. 1/8/18

| Steadfast Medical Staffing, LLC | "Facility": Newport News Facility Operations, LLC |
|---|---|
| By: _____ Title: Admin | By: Karen Pehl   Title: Ex. Director |

## MEDICAL STAFFING OF AMERICA
## T/A STEADFAST MEDICAL STAFFING Pay Rates – Weekdays/Weekends: Flat rates!!!!

RN $56.35/HR
LPN, $40.65/HR
CNA, $25.75/HR

Independent Contractors: All rates are Flat rates except on Holidays, see below:

## HOLIDAYS:
Holiday rates are paid for the day, evening, and night shifts on:

1. New Year's Eve
2. New Year's Day
3. Easter
4. Memorial Day
5. Independence Day
6. Labor Day
7. Thanksgiving Day
8. Christmas Eve
9. Christmas Day

*The Holiday billing rate is One and one-half (1.5) times the regular billing rate for each hour worked.*

Administrator:

_____

STEADFAST 000542

**PX-10.152**

**JA1773**



## STEADFAST MEDICAL STAFFING, LLC

*5750 Chesapeake Boulevard*
*Norfolk, Virginia 23513*
*Phone: (757) 215-5716*

This Agreement ("Agreement") is made and entered into this **13th** day of **June, 2017**, by and between **SteadFast Medical Staffing, LLC and Windsor Facility Operations, LLC d/b/a Consulate Health Care of Windsor ("Facility")**.

Whereas, Steadfast Medical Staffing, LLC and Facility wish to enter into an agreement wherein SteadFast Medical Staffing LLC will provide temporary medical contractors, to the Facility at an agreed upon rate.

Now, therefore, for and in consideration of the promises, the parties here to do hereby covenant and agree as follows:

### TERM:

This Agreement shall begin on the date first written above. Either party can terminate the Agreement, with or without cause, upon thirty days' written notice to the other party. The Agreement may be amended at any time and from time to time by written agreement of the parties.

### SteadFast Medical Staffing, LLC Responsibilities:

A.   Upon request by Facility, SteadFast Medical Staffing, LLC shall assign such contractors ("Contractors"), as are available or such assignment. At no time does SteadFast Medical Staffing, LLC guarantee that all requests will be filled.

B.   SteadFast Medical Staffing, LLC shall maintain a worker file on each of its Contractors, containing the following: SteadFast Medical Staffing LLC will provide copies of the following (except "a") to Facility.

    a.   A completed application, which includes education, training, skills, specialties and preferences.
    b.   Documentation of education and training
    c.   Skills inventory checklist
    d.   Two recent work references
    e.   TB test and evidence of satisfactory health status
    f.   Current CPR
    g.   Performance evaluation
    h.   Copy of current license, registration, or certification
    i.   Negative urine drug screen
    j.   Background check
    k.   Flu shots

1

STEADFAST 000543

**PX-10.153**

**JA1774**

C.   SteadFast Medical Staffing, LLC will use its best efforts to match the skills and experience levels of its Contractors to the specific needs of the Facility.

D.   Contractors will be requested to report to the designated supervisor before he/she begins working.

E.   SteadFast Medical Staffing, LLC shall give Facility a two hours' notice regarding Contractors, which SteadFast Medical Staffing, LLC cannot provide.

F.   SteadFast Medical Staffing, LLC will not actively solicit Facility employees as Contractors.

G.   Contractors assigned to Facility pursuant to this Agreement shall for the purpose of this Agreement, be considered Contractors for SteadFast Medical Staffing, LLC.

H.   SteadFast Medical Staffing, LLC shall assume sole and exclusive responsibility for the payment of wages to such Contractors for services performed by them.

I.   SteadFast Medical Staffing, LLC is in compliance with all state and federal laws applicable to the contacting of the Contractors assigned Facility.

J.   SteadFast Medical Staffing, LLC will comply with Facility standards for the use of supplemental medical services.

K.   SteadFast Medical Staffing, LLC agrees not to discriminate in the assignment of its Contractors on the basis of race, creed, color, national origin, sex, age, disability, citizenship status, or veteran status.

**Facility Responsibilities:**

A.   Facility understands all Contractors provided by SteadFast Medical Staffing, LLC for the term of this Agreement are contracted through SteadFast Medical Staffing, LLC.

B.   Facility will take no steps to recruit as its own employees those Contractors provided by SteadFast Medical Staffing, LLC during the term of this Agreement. Facility understands SteadFast Medical Staffing, LLC is not an employment agency and that its Contractors are assigned to the Facility to render temporary service and are not assigned to become employed by the Facility. The Facility may not hire SteadFast Medical Staffing, LLC Contractors unless it is first arranged with SteadFast Medical Staffing, LLC the manner by which SteadFast Medical Staffing, LLC is to be compensated for its expense in recruiting said Contractor.

C.   Facility shall provide sufficient information about its specific needs to SteadFast Medical Staffing, LLC so that SteadFast Medical Staffing, LLC can match the skills and experience of its Contractors to those needs.

D.   Facility shall utilize assigned Contractors only for the specific need requested, unless Facility, SteadFast Medical Staffing, LLC and Contractor agree to a change in duties.

2

STEADFAST 000544

**PX-10.154**

E.   Facility agrees that SteadFast Medical Staffing, LLC's duty to fill assignments is subject to availability of qualified Contractors.

F.   Facility will orient Contractors to the Facility audits rules and regulations, including the physical layout and equipment on any unit to which such Contactors are assigned.

G.   Facility staffing supervisors will assist SteadFast Medical Staffing, LLC on a continuing basis, with evaluation of SteadFast Medical Staffing, LLC Contractors by providing performance information.

H.   Facility shall allow SteadFast Medical Staffing, LLC Contractors (on their own time) to attend appropriate Facility staff development programs.

I.   Facility will immediately notify SteadFast Medical Staffing, LLC of any problems regarding SteadFast Medical Staffing, LLC Contractors.

J.   Facility will make available to SteadFast Medical Staffing, LLC copies of all documentation concerning problems or incidents in which SteadFast Medical Staffing, LLC Contractors are involved.

K.   If, in the sole discretion of the Facility, any person assigned by SteadFast Medical Staffing, LLC is incompetent, negligent, or has engaged in misconduct, Facility may require such person to leave its premises and shall inform SteadFast Medical Staffing, LLC of this action immediately. Facility's obligation to compensate SteadFast Medical Staffing, LLC for said services shall be limited to the hours actually worked by such person and Facility shall have no further obligation with respect to such assignment.

L.   If Facility changes or cancels an order less than two (2) hours before reporting time, Facility shall be billed for two (2) hours at the hourly rate for the personnel involved.

M.   Facility agrees not to discriminate in the assignment of SteadFast Medical Staffing, LLC on the basis of race, creed, color, national origin, sex, age, disability, citizenship status or veteran's status.

**Billing Procedures:**

A.   SteadFast Medical Staffing, LLC will invoice Facility Bi-weekly for its services. The rates for its services are shown on **Exhibit "A"**. The rates for services established in **Exhibit "A"** can be amended prospectively by SteadFast Medical Staffing, LLC at any time upon forty-five (45) days written notice to Facility.

B.   Facility shall pay SteadFast Medical Staffing, LLC invoice within (45) business days from date of invoice. Invoices not paid within (45) days are considered past due and will be charged a finance charge of one and a half (1.5%) percent per month of the unpaid balance (annual percentage of 18%) or the maximum interest rate allowed by law whichever is lower. Facility agrees to pay the finance charge together with reasonable attorney's fees for the cost of collection.

3

STEADFAST 000545

**PX-10.155**

**Insurance:**

    A.    SteadFast Medical Staffing, LLC maintains during the terms of this Agreement and any subsequent renewals, general liability, and professional liability insurance for itself and the Contractors assigned at Facility to cover for all acts and omission in the provision of the designated services with limits of not less than $1,000,000 per occurrence and $6,000,000 aggregate.

    B.    SteadFast Medical Staffing, LLC will provide, upon request, Certification of Insurance or other evidence of coverage and it will notify Facility of any cancellation or modification of its liability insurance.

**Indemnification:**

    Each party shall each indemnify and hold harmless the other, their respective officers, directors, employees and agents from and against any and all actions, causes of actions, claims, damages, and demands of whatever type, costs, and expenses (including reasonable attorney's fees), resulting in whole or in part from the negligent acts or omissions of the indemnifying party, its officers, directors, employees and agents, or that which resulting from the fraudulent representation or illegal delivery of services hereunder, or for violation of any federal or state laws and local rules and regulations, governing the terms of this Agreement and the services to be provided hereunder, or for breach of any of the representations and warranties hereinabove set forth. This indemnification provision shall survive the termination or cancellation of the Agreement.

**Notices:**

    All notices or other communications hereunder shall be in writing and shall be deemed given (a) one (1) business day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (b) three (3) days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, to the respective address set forth below. A copy of any notice should be sent to: Consulate Health Care, 800 Concourse Parkway S., Maitland, FL 32751, Attention: Legal Department.

SteadFast Medical Staffing, LLC         Consulate Health Care of Windsor
5750 Chesapeake Blvd                  23352 Courthouse Highway
Norfolk, VA 23513-5325              Windsor, VA 23487-5333
Attn: Lisa A. Pitts                     Attn: Executive Director

**Access to Records:**

    The parties hereto agree to make available to duly authorized representative of the Department of Health and Human Services: all contracts, books, documents and records of the parties providing services hereunder necessary to verify the cost of the services provided under this Agreement. Similar access will also be granted to the Contracts, books, and records providing the services hereunder and any obligation related to such parties.

**Social Security Act:**

SteadFast Medical Staffing, LLC warrants that, to the best of SteadFast Medical Staffing's knowledge, no person whose ownership controls interest in, or is an agent or managing employee of Steadfast Medical

4

STEADFAST 000546

**PX-10.156**

**JA1777**

Case 2:18-cv-00226-RAJ-LRL   Document 356-3   Filed 08/17/22   Page 157 of 159 PageID#
Case 2:18-cv-00226-RAJ-LRL   Document 206-6   Filed 03/19/20   Page 33 of 315 PageID# 7964
16251

Staffing, LLC has been convicted of a criminal offense relating to that person's involvement in any programs under Title XVIII, XIX, or XX of the Social Security Act since the inception of these programs.

**Representations and Warranties:**

SteadFast Medical Staffing, LLC hereby represents and warrants to Facility that each and every Contractor assigned to work at the Facility are (i) experienced and qualified in their line of work and licensed, certified and properly credentialed to perform the services required by Facility, and (ii) have evidence of satisfactory health status and free of any communicable diseases, free of any illegal drug use and abuse, and have no criminal records, in accordance with state/commonwealth and/or federal regulations, that would debar them from performing the services to the residents or patients of the Facility.

**Elder Justice Act:**

SteadFast Medical Staffing, LLC agrees to comply with Section 1150B of the Social Security Act, as established by Section 6703(b)(3) of the Patient Protection and Affordable Care Act, and all requirements imposed by or pursuant to the regulation of the Department of Health and Human Services issued pursuant to that Title, to the end that, SteadFast Medical Staffing, LLC agrees to report reasonable suspicions of a crime to the Facility's Executive Director and self-report the suspicion of a crime to the appropriate governing body and local law enforcement. SteadFast Medical Staffing, LLC will not be retaliated against for reporting suspicion of a crime. SteadFast Medical Staffing, LLC is solely responsible for ensuring that a suspicion of a crime is reported to the Executive Director. Further, SteadFast Medical Staffing, LLC indemnifies and holds harmless the Facility against all claims, losses and damages arising from or relating to the failure to report a suspicion of a crime pursuant to 1150B of the Social Security Act.

**Federally Funded Health Care Program Compliance:**

SteadFast Medical Staffing, LLC hereby represents and warrants that neither SteadFast Medical Staffing, LLC nor any of SteadFast Medical Staffing, LLC's Contractor providing services under this Agreement currently is, or at any time during the term of this Agreement will be, excluded from participation in any federally funded health care program, including Medicare and Medicaid. SteadFast Medical Staffing, LLC agrees to immediately notify the Facility, in writing, in the event of any threatened, proposed or actual exclusion from any federally funded health care program, including Medicare and Medicaid. SteadFast Medical Staffing, LLC shall perform periodic run searches against OIG's List of Excluded Individuals and Entities (not less than twice a year) to ensure continued compliance. SteadFast Medical Staffing, LLC agrees that it will reimburse to Facility an amount equal to any loss (e.g., fine or mandatory reimbursement) incurred by Facility as a result of the exclusion of SteadFast Medical Staffing, LLC or SteadFast Medical Staffing, LLC's Contractors that provided services under this Agreement. Should any evidence reveal that SteadFast Medical Staffing, LLC or any of SteadFast Medical Staffing, LLC's Contractors providing services under this Agreement, at any time during the term of this Agreement, become excluded or debarred from participation, Facility may, in its sole discretion, terminate this Agreement immediately as of the date of such exclusion or debarment.

**Confidential Information; HIPAA:**

SteadFast Medical Staffing, LLC and any Contractor shall not, at any time during the term of this Agreement and thereafter, except with the written consent of Facility, disclose any confidential patient

5

STEADFAST 000547

**PX-10.157**

**JA1778**

information or confidential information relating to Facility's operations to any person. Both parties agree to comply with the provisions of The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") as well as comply with the HIPAA Security and Privacy regulations pursuant to Subtitle D of the Health Information Technology for Economic and Clinical Health Act (HITECH), including Sections 164.308, 164.310, 164.312 and 164.316 of Title 45 of the Code of Federal Regulations if, and to the extent applicable. The parties acknowledge that from time to time, HIPAA or other regulations may require an amendment or modification to the Agreement for compliance purposes, and agree that they will work to promptly effectuate any such required amendment or modification.

**Entire Agreement:**

This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes any and all other agreements, either oral or written, between the parties with respect to the subject matter hereof.

This Agreement shall insure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns.

This Agreement shall be constructed, enforced and interpreted under the laws of the Commonwealth of Virginia.

EXECUTED on the date and year first above written.

SteadFast Medical Staffing, LLC

By: _Rosell pile Adim_, Title: _CEO 6/14/17_

Windsor Facility Operations, LLC

By: _Robert E. Bruce_ Title: Executive Director

6

STEADFAST 000548

PX-10.158

Case 2:18-cv-00226-RAJ-LRL   Document 356-3   Filed 08/17/22   Page 159 of 159 PageID#
Case 2:18-cv-00226-RAJ-LRL   Document 206-6   Filed 03/19/20   Page 35 of 315 PageID# 7966
10253

EXHIBIT A

Pay Rates Weekdays/Weekends

LPN    36/HR

CNA    23/HR

HOLIDAYS

Holiday rates are paid for the day, evening, and night shifts on:

1. New Year's Eve
2. New Year's Day
3. Easter
4. Memorial Day
5. Independence Day
6. Labor Day
7. Thanksgiving Day
8. Christmas Eve
9. Christmas Day

The Holiday billing rate is one and one-half times the regular billing rate for each hour worked.

7

STEADFAST 000549

PX-10.159

JA1780



# Medical Staffing America
## T/A SteadFast Medical Staffing

5750 Chesapeake Blvd Suite 301
Norfolk, Virginia   23513
(757)321-0777 fax (757) 857-6003

**Invoice No.**      3839

## INVOICE

| Customer | |
|---|---|
| Name | Accordius Health at Gatesville |
| Address | 38 Carters Rd. |
| City | Gatesville |
| Phone | (252)357-2124 |

State NC    ZIP 27938

| | |
|---|---|
| Date | 1/2/2019 |
| Date Due | 2/1/2019 |

| | Date | Independant Contractor | | | | Bill Rate | TOTAL |
|---|---|---|---|---|---|---|---|
| | 12/30/2018 | Denise Arbuckle | CNA | 12.h | 7a-730p-30m | $23.00 | $276.00 |
| | 12/29/2018 | Markita Lamb | CNA | 11.5h | 7p-7a-30m | $23.00 | $264.50 |
| | 12/30/2018 | Stephanie Griffin | CNA | 4.5h | 730p-12a-0m | $23.00 | $103.50 |
| ** | 12/31/2018 | Stephanie Griffin | CNA | 7.h | 12a-730a-30m | $34.50 | $241.50 |
| | 12/30/2018 | Tasheba Lassiter | CNA | 12.h | 7a-730p-30m | $23.00 | $276.00 |
| | 12/26/2018 | Karentina Scott | LPN | 12.5h | 630p-730a-30m | $38.00 | $475.00 |
| | 12/28/2018 | Karentina Scott | LPN | 12.5h | 630p-730a-30m | $38.00 | $475.00 |
| | 12/30/2018 | Karentina Scott | LPN | 5.5h | 630p-12a-0m | $38.00 | $209.00 |
| ** | 12/31/2018 | Karentina Scott | LPN | 7.h | 12a-730a-30m | $57.00 | $399.00 |
| ** | 1/1/2019 | Karentina Scott | LPN | 5.5h | 630p-12a-0m | $57.00 | $313.50 |
| | 1/2/2019 | Karentina Scott | LPN | 7.h | 12a-730a-30m | $38.00 | $266.00 |
| | 12/28/2018 | Wanda Lamont | RN | 14.h | 630p-9a-30m | $50.00 | $700.00 |

**        Holiday Pay

**Billing Address:**
BlueVine Capital Inc.
c/o Medical Staffing of America
T/A Steadfast Medical Staffing
P.O. Box 781580
Philadelphia, PA 19178-1580

**TOTAL**      $3,999.00

Office Use Only

Lisa A Pitts Admin

Steadfast 6th 033899

PX-11.001

**JA1781**



**Medical Staffing America**
**T/A SteadFast Medical Staffing**
5750 Chesapeake Blvd Suite 301
Norfolk, Virginia   23513
(757)321-0777 fax (757) 857-6003

Invoice No.          3841

**INVOICE**

| Customer | |
|---|---|
| Name | Carolina Pines at Asheville |
| Address | 91 Victoria Rd. |
| City | Asheville        State NC     ZIP 28801 |
| Phone | (313) 318-1632 |

| Date | 1/2/2019 |
|---|---|
| Date Due | 2/1/2019 |

| Date | Independant Contractor | | | | Bill Rate | TOTAL |
|---|---|---|---|---|---|---|
| 12/31/2018 | Mary Gingles | RN | 16.h | 3p-730a-30m | $90.00 | $1,440.00 |

** Holiday Pay

**Billing Address:**
BlueVine Capital Inc.
c/o Medical Staffing of America
T/A Steadfast Medical Staffing
P.O. Box 781580
Philadelphia, PA 19178-1580

| TOTAL | $1,440.00 |
|---|---|

Office Use Only

Lisa A Pitts Admin

Steadfast 6th 033911

PX-11.002

**JA1782**



**Medical Staffing America**
**T/A SteadFast Medical Staffing**
5750 Chesapeake Blvd Suite 301
Norfolk, Virginia   23513
(757)321-0777 fax (757) 857-6003

Invoice No.        3843

# INVOICE

**Customer**

| | |
|---|---|
| Name | Accordius Health at Salisbury |
| Address | 635 Statesville Blvd |
| City | Salisbury          State NC   ZIP 28144 |
| Phone | (704)633-7390 |

| | |
|---|---|
| Date | 1/2/2019 |
| Date Due | 2/1/2019 |

| Date | Independant Contractor | | | | Bill Rate | TOTAL |
|---|---|---|---|---|---|---|
| 12/27/2018 | Amanda Leake | LPN | 12.h | 6p-630a-30m | $42.00 | $504.00 |
| 12/29/2018 | Amanda Leake | LPN | 8.h | 6a-230p-30m | $42.00 | $336.00 |
| 12/30/2018 | Amanda Leake | LPN | 2.h | 10p-12a-0m | $42.00 | $84.00 |
| 12/31/2018 | Amanda Leake | LPN | 6.h | 12a-630a-30m | $63.00 | $378.00 |
| 12/26/2018 | Belinda Woods | LPN | 8.5h | 6a-230p-30m | $42.00 | $357.00 |
| 1/1/2019 | Belinda Woods | LPN | 8.h | 6a-230p-30m | $63.00 | $504.00 |
| 12/26/2018 | Christina Dawson | LPN | 15.75h | 215p-630a-30m | $42.00 | $661.50 |
| 12/27/2018 | Christina Dawson | LPN | 8.h | 145p-1015p-30m | $42.00 | $336.00 |
| 12/29/2018 | Christina Dawson | LPN | 16.h | 615a-1045p-30m | $42.00 | $672.00 |
| 12/30/2018 | Christina Dawson | LPN | 7.5h | 615a-215p-30m | $42.00 | $315.00 |
| 12/30/2018 | Christina Dawson | LPN | 2.h | 10p-12a-0m | $42.00 | $84.00 |
| 12/31/2018 | Christina Dawson | LPN | 14.h | 12a-230p-30m | $63.00 | $882.00 |
| 1/1/2019 | Christina Dawson | LPN | 9.75h | 145p-12a-30m | $63.00 | $614.25 |
| 1/2/2019 | Christina Dawson | LPN | 6.5h | 12a-630a-0m | $42.00 | $273.00 |
| 12/25/2018 | Courtney Dorton | LPN | .75h | 1115p-12a-0m | $63.00 | $47.25 |
| 12/26/2018 | Courtney Dorton | LPN | 7.h | 12a-730a-30m | $42.00 | $294.00 |
| 12/26/2018 | Courtney Dorton | LPN | 7.5h | 11p-7a-30m | $42.00 | $315.00 |
| 1/1/2019 | Courtney Dorton | LPN | 1.h | 11p-12a-0m | $63.00 | $63.00 |
| 1/2/2019 | Courtney Dorton | LPN | 7.h | 12a-730a-30m | $42.00 | $294.00 |
| 12/26/2018 | David Lineberry | LPN | 8.25h | 545a-230p-30m | $42.00 | $346.50 |
| 12/27/2018 | David Lineberry | LPN | 8.25h | 545a-230p-30m | $42.00 | $346.50 |
| 12/28/2018 | David Lineberry | LPN | 15.5h | 545a-1015p-60m | $42.00 | $651.00 |
| 12/30/2018 | David Lineberry | LPN | 16.h | 545a-1015p-30m | $42.00 | $672.00 |
| 12/31/2018 | David Lineberry | LPN | 8.25h | 545a-230p-30m | $63.00 | $519.75 |
| 1/1/2019 | David Lineberry | LPN | 8.h | 145p-1015p-30m | $63.00 | $504.00 |
| 12/29/2018 | Ginny Byerly | LPN | 10.5h | 145p-1245a-30m | $42.00 | $441.00 |
| 12/26/2018 | Jasmine Smith | LPN | 7.5h | 3p-11p-30m | $42.00 | $315.00 |
| 12/29/2018 | Jasmine Smith | LPN | 16.75h | 6a-1130p-45m | $42.00 | $703.50 |
| 12/30/2018 | Jasmine Smith | LPN | 16.h | 6a-1045p-45m | $42.00 | $672.00 |
| 12/31/2018 | Jasmine Smith | LPN | 7.h | 330p-11p-30m | $63.00 | $441.00 |
| 12/27/2018 | Jessica Stephens | LPN | 15.67h | 2p-610a-30m | $42.00 | $658.14 |
| 12/28/2018 | Jessica Stephens | LPN | 15.8h | 2p-618a-30m | $42.00 | $663.60 |
| 12/29/2018 | Jessica Stephens | LPN | 15.83h | 2p-620a-30m | $42.00 | $664.86 |
| 12/27/2018 | Laniece Sims | LPN | 15.33h | 3p-650a-30m | $42.00 | $643.86 |
| 12/28/2018 | Laniece Sims | LPN | 15.5h | 3p-7a-30m | $42.00 | $651.00 |
| 12/31/2018 | Laniece Sims | LPN | 7.h | 11p-630a-30m | $63.00 | $441.00 |
| 1/1/2019 | Laniece Sims | LPN | 7.5h | 630a-230p-30m | $63.00 | $472.50 |
| 12/27/2018 | Marquita McLean | LPN | 9.92h | 545a-410p-30m | $42.00 | $416.64 |
| 12/31/2018 | Marquita McLean | LPN | 18.25h | 545a-1230a-30m | $63.00 | $1,149.75 |
| 1/1/2019 | Marquita McLean | LPN | 17.42h | 545a-1140p-30m | $63.00 | $1,097.46 |
| 12/28/2018 | Qelana Harris | LPN | 7.75h | 945p-6a-30m | $42.00 | $325.50 |
| 12/29/2018 | Qelana Harris | LPN | 7.5h | 6a-2p-30m | $42.00 | $315.00 |
| 12/28/2018 | Shari Lineberry | LPN | 8.h | 145p-1015p-30m | $42.00 | $336.00 |
| 12/29/2018 | Stephanie Maiorano | LPN | 8.25h | 545a-230p-30m | $42.00 | $346.50 |
| 12/31/2018 | Stephanie Maiorano | LPN | 8.25h | 10p-645a-30m | $63.00 | $519.75 |
| 1/1/2019 | Stephanie Maiorano | LPN | 2.h | 10p-12a-0m | $63.00 | $126.00 |
| 1/2/2019 | Stephanie Maiorano | LPN | 8.h | 12a-630a-30m | $42.00 | $252.00 |
| 12/26/2018 | Tequila Chapman | LPN | 8.h | 145p-930p-30m | $42.00 | $336.00 |
| 12/31/2018 | Tequila Chapman | LPN | 8.5h | 845a-545a-30m | $63.00 | $535.50 |
| 1/1/2019 | Varnysha Whitsett | LPN | 2.25h | 945p-12a-0m | $63.00 | $141.75 |
| 1/2/2019 | Varnysha Whitsett | LPN | 5.75h | 12a-615a-30m | $42.00 | $241.50 |
| 12/29/2018 | Keisha Grogory | RN | 7.75h | 545a-2p-30m | $55.00 | $426.25 |
| 12/30/2018 | Sharan Adams | RN | 16.28h | 545a-1032p-30m | $55.00 | $895.40 |
| 12/31/2018 | Sharan Adams | RN | 8.1h | 145p-1021p-30m | $82.50 | $668.25 |

Holiday Pay

Billing Address:
BlueVine Capital Inc
c/o Medical Staffing of America
T/A Steadfast Medical Staffing
P.O. Box 781580
Philadelphia, PA 19178-1580

Lisa A Pitts Admin

| TOTAL | $24,950.46 |
|---|---|

Office Use Only

**Steadfast 6th 033934**

**PX-11.004**



**Medical Staffing America**
**T/A SteadFast Medical Staffing**

Invoice No.     3844

5750 Chesapeake Blvd Suite 301
Norfolk, Virginia   23513
(757)321-0777 fax (757) 857-6003

**═ INVOICE ═**

| Customer | | |
|---|---|---|
| Name | Accordius Health at Salisbury | |
| Address | 635 Statesville Blvd. | |
| City | Salisbury | State NC    ZIP 28144 |
| Phone | (704)633-7390 | |

| Date | 1/2/2019 |
|---|---|
| Date Due | 2/1/2019 |

| | Date | Independant Contractor | | | | Bill Rate | TOTAL |
|---|---|---|---|---|---|---|---|
| ** | 1/1/2019 | DeQuarius Carter | CNA | 9.5h | 2p-12a-30m | $37.50 | $356.25 |
| | 1/2/2019 | DeQuarius Carter | CNA | 6.h | 12a-6a-0m | $25.00 | $150.00 |
| | 12/26/2018 | Jackie Johnson | CNA | 8.h | 6a-230p-30m | $25.00 | $200.00 |
| | 12/27/2018 | Jackie Johnson | CNA | 7.5h | 6a-2p-30m | $25.00 | $187.50 |
| | 12/28/2018 | Kevin Delleh | CNA | 15.57h | 6a-1004p-30m | $25.00 | $389.25 |
| | 12/29/2018 | Kevin Delleh | CNA | 7.5h | 6a-2p-30m | $25.00 | $187.50 |
| | 12/30/2018 | Kevin Delleh | CNA | 15.h | 6a-930p-30m | $25.00 | $375.00 |
| ** | 12/31/2018 | Kevin Delleh | CNA | 7.h | 630a-2p-30m | $37.50 | $262.50 |
| | 12/26/2018 | Latoria Pettie | CNA | 7.5h | 10p-6a-30m | $25.00 | $187.50 |
| | 12/28/2018 | Latoria Pettie | CNA | 7.5h | 10p-6a-30m | $25.00 | $187.50 |
| | 12/28/2018 | Marcella Womack | CNA | 15.5h | 6a-10p-30m | $25.00 | $387.50 |
| | 12/29/2018 | Marcella Womack | CNA | 7.5h | 6a-2p-30m | $25.00 | $187.50 |
| ** | 12/31/2018 | Ptika Joseph | CNA | 8.h | 6a-230p-30m | $37.50 | $300.00 |
| ** | 1/1/2019 | Shannon Howard | CNA | 16.08h | 6a-1035p-30m | $37.50 | $603.00 |
| ** | 1/1/2019 | Tamara Williams | CNA | 9.h | 2p-1130p-30m | $37.50 | $337.50 |
| | 12/26/2018 | Tasheba Lassiter | CNA | 6.5h | 12a-630a-0m | $25.00 | $162.50 |
| | 12/26/2018 | Tasheba Lassiter | CNA | 8.h | 10p-630a-30m | $25.00 | $200.00 |
| ** | 12/31/2018 | Ti Starnes | CNA | 8.h | 6a-230p-30m | $37.50 | $300.00 |
| | 12/22/2018 | Yolandezz Siler | CNA | 7.83h | 550a-210p-30m | $25.00 | $195.75 |

   **     **Holiday Pay**

| Billing Address: | |
|---|---|
| BlueVine Capital Inc. | |
| c/o Medical Staffing of America | |
| T/A Steadfast Medical Staffing | |
| P.O. Box 781580 | |
| Philadelphia, PA 19178-1580 | |

**TOTAL**     $5,156.75

Office Use Only

Lisa A Pitts Admin

Steadfast 6th 033978

**PX-11.005**

**JA1785**

| Facility | Requires Steadfast to Comply with all Local, State, and Federal Laws | Pays Steadfast Directly for Services Steadfast Nurses Provide Pursuant to Contract Terms Negotiated between Steadfast and Facility | Pays Steadfast Premium Pay for Overtime or Holiday Work Performed by Steadfast Nurses | Prohibits Facility from Soliciting Steadfast Nurses for Permanent Hire | Requires Facility to Pay Buy-Out or Require a "Cool-Off" Period Before a Steadfast Nurse is Permitted to be Hired by the Facility | Requires Steadfast to Maintain Liability Insurance for Nurses | Requires Facility to Notify Steadfast of Any Incidences of Incompetence, Misconduct, or Negligence Involving Nurses to Steadfast Directly | Requires Steadfast to Certify Employment Eligibility Records (Health Screen, Drug Test, License) | Utilizes Steadfast to Assign and Select Nurses for Temporary Placement | Requires Steadfast Pre-approval for Nurses to Perform Additional Job Duties Outside the Scope of Contracted Agreement |
|---|---|---|---|---|---|---|---|---|---|---|
| Autumn Care - Madison | ✔ | ✔ |  |  |  | ✔ | ✔ | ✔ |  |  |
| Avante - Harrisonburg | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Avante - Lynchburg | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Avante - Reidsville | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Avante - Roanoke | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Bayside Health & Rehab | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Bayside - Poquoson | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Brian Center Health & Rehab | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Bon Secours Health System Inc. | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Chatham Health & Rehab | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Concordia - Bay Pointe | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Concordia - Elizabeth City | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Consulate - Newport News | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Consulate - Windsor | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Courtland | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Creekside | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Curis - Lynchburg | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Curis - Reidsville | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Dunlop House | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Farmville Rehab & Health Care Center | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Fort Norfolk Retirement Community: Harbor's Edge | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Three Rivers | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Accordius - Bay Pointe | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Accordius - Clemmons | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Accordius Harrisonburg | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Accordius - Waynesboro | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Accordius - Salisbury | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Accordius - Statesville | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Accordius - Lexington | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Accordius- Lychburgh | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Accordius - Courtland | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Autumn Care of Biscoe | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Avante - Roanoke | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Medical Facilities of America - Beaufort Health and Rehab | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Medical Facilities of America - Appomattox Health & Rehab | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Medical Facilities of America- Charlottesville Health and Rehab | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Medical Facilities of America - Henrico Health & Rehab | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Medical Facilities of America - Norfolk Health & Rehab | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Medical Facilities of America- Courtland Health & Rehab | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Medical Facilities of America- Culpepper Health & Rehab | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Medical Facilities of America- Gretna Health and Rehab | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Medical Facilities of America- Princess Anne Healthcare & Rehab Center | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Citadel - Salisbury | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Consulate - Windsor | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Elizabeth House Assisted Living Facility | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Elizabeth Adam Crump Health and Rehab | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| SSC Hartford Operating Company LLC - Brian Center Health and Rehab | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Marquis Health Services- Canterbury Health & Rehab | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Marquis Health Services- Westmoreland Health & Rehab | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Mediko - Virginia Beach Correctional Center | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Mediko | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Liberty Rd. Randallstown MD OPCO - Patapco Health & Rehab | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Peak Healthcare - Sligo Creek | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Peak Healthcare - the Pines | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Peak Resources - Charlotte | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Thornton Hall | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| Virginia Peninsula Regional Jail | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| The City of Hampton Sheriff Office | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |

PX-14.001

## Employee Change Report - 5/11/2018 - Payroll 1

Employee Status Changes 05/07/2018 16:53:09  - 05/10/2018 15:55:06

| Employee Name & Address | Employee Information | | | | Tax Jurisdictions | Audit Information | Deduction Information |
|---|---|---|---|---|---|---|---|
| | DOB | SSN | Gender | Hire/Term Date | | Date of Change | |
| **NEW HIRES** | | | | | | | |
| Bingham CNA, Chelsea | | ■■ | | 4/23/2018 | Federal<br>Virginia | 5/9/2018 | |
| Chapman CNA, Saranette | | ■■ | | 4/23/2018 | Federal<br>Virginia | 5/9/2018 | |
| Hamlett CNA, Kaneisha | | ■■ | | 4/23/2018 | Federal<br>Virginia | 5/9/2018 | |
| Clayton CNA, Bridgette | | ■■ | | 4/23/2018 | Federal<br>Virginia | 5/9/2018 | |
| Williams LPN, Tamika | | ■■ | | 4/16/2018 | Federal<br>Virginia | 5/9/2018 | |
| Outlaw-Epps CNA, Tashima | | ■■ | | 4/16/2018 | Federal<br>Virginia | 5/9/2018 | |
| Gordon CNA, Thomasina | | ■■ | | 4/23/2018 | Federal<br>Virginia | 5/9/2018 | |
| Simon CNA, Tracy | | ■■ | | 4/23/2018 | Federal<br>Virginia | 5/9/2018 | |
| McCoy LPN, Benisea | | ■■ | | 4/23/2018 | Federal<br>Virginia | 5/9/2018 | |
| Owens LPN, Sherry | | ■■ | | 4/16/2018 | Federal<br>Virginia | 5/9/2018 | |
| | | ■■ | | 4/23/2018 | Federal<br>Virginia | 5/9/2018 | |
| Matthews CNA, Ju-Leah | | ■■ | | 4/16/2018 | Federal<br>Virginia | 5/9/2018 | |
| Bolden RN, Candice | | ■■ | | 4/23/2018 | Federal<br>Virginia | 5/9/2018 | |
| Rivers LPN, Benita | | ■■ | | 4/16/2018 | Federal<br>Virginia | 5/9/2018 | |
| Dudley CNA, Aleshia | | ■■ | | 4/23/2018 | Federal<br>Virginia | 5/9/2018 | |
| Hudson CNA, Deja | | ■■ | | 4/16/2018 | Federal<br>Virginia | 5/9/2018 | |

**JA1787**

| Name | | Date | Type | Date |
|---|---|---|---|---|
| Dillard CNA, Lynneshia | ███ | 4/23/2018 | Federal Virginia | 5/9/2018 |
| Murphy CNA, Sharon | ███ | 4/23/2018 | Federal Virginia | 5/9/2018 |
| Sawyer LPN, Matthew | ███ | 4/23/2018 | Federal Virginia | 5/9/2018 |
| Austin CNA, Lashai | ███ | 4/16/2018 | Federal Virginia | 5/9/2018 |
| Russell, Teddi | ███ ███ ███ | 4/30/2018 | Federal Virginia | 5/7/2018 |
| Denney, Bonny | ███ ███ ███ | 4/30/2018 | Federal Virginia | 5/7/2018 |
| Jamison CNA, Kiara | ███ | 4/23/2018 | Federal Virginia | 5/9/2018 |
| **RE-HIRES** | | | | |
| Spellman, Melissa | ███ ███ ███ | 5/7/2018 | Federal Virginia | 5/7/2018 |
| **TERMINATIONS** | | | | |
| Drew, Tiara | ███ ███ ███ | 5/2/2018 | Federal Virginia | 5/7/2018 |

**Employee Data Changes 05/07/2018 16:53:09  - 05/10/2018 15:55:06**

| | Change Information | | | Data Changes | | |
|---|---|---|---|---|---|---|
| Change Type | Change Detail | Change Date | Changed By | Before Change | After Change | Start/End Date |
| **Banks-Cooper LPN, Tanisha** | | | | | | |
| Bank Account Number Added | Direct Deposit 1 | 5/9/2018 | ███@22891429 | | 112980887912 | |
| **Terry CNA, Tina** | | | | | | |
| Bank Account Number Changed | Direct Deposit 1 | 5/9/2018 | ███@22891429 | 3278080 | 132510248606 | |
| **Webster CNA, Victoria** | | | | | | |
| Bank Account Number Added | Direct Deposit 1 | 5/9/2018 | ███@22891429 | | 61968372 | |
| **Banks-Cooper LPN, Tanisha** | | | | | | |
| Bank Transit Number Added | Direct Deposit 1 | 5/9/2018 | ███@22891429 | | 124303120 | |
| **Terry CNA, Tina** | | | | | | |
| Bank Transit Number Changed | Direct Deposit 1 | 5/9/2018 | ███@22891429 | 251481180 | 051403957 | |
| **Webster CNA, Victoria** | | | | | | |

**JA1788**

| | | | | | | |
|---|---|---|---|---|---|---|
| Bank Transit Number Added | Direct Deposit 1 | 5/9/2018 | ███ @22891429 | | | 253177049 |
| **Womack CNA, Marcella** | | | | | | |
| Bank Account Type Description Changed | Direct Deposit 1 | 5/8/2018 | ███ | Checking | Savings | |
| **Banks-Cooper LPN, Tanisha** | | | | | | |
| Bank Account Type Description Added | Direct Deposit 1 | 5/9/2018 | ███ @22891429 | | Checking | |
| **Terry CNA, Tina** | | | | | | |
| Bank Account Type Description Changed | Direct Deposit 1 | 5/9/2018 | ███ @22891429 | Savings | Checking | |
| **Webster CNA, Victoria** | | | | | | |
| Bank Account Type Description Added | Direct Deposit 1 | 5/9/2018 | ███ @22891429 | | Savings | |
| SSN Change | | 5/9/2018 | ███ @22891429 | ███ | ███ | |
| Employee Address change | | 5/9/2018 | ███ @22891429 | , , VA 23502 | ███ | |

**JA1789**

**Employee Change Report - 5/8/2018 - Payroll 1**

Employee Data Changes 05/03/2018 16:56:04  - 05/07/2018 16:53:09

| Change Information | | | | Data Changes | | |
|---|---|---|---|---|---|---|
| **Change Type** | **Change Detail** | **Change Date** | **Changed By** | Before Change | After Change | Start/End Date |
| **Terry CNA, Tina** | | | | | | |
| Bank Account Type Description Changed | Direct Deposit 1 | 5/7/2018 | ███ @22891429 | Checking | Savings | |

Company: Medical Staffing Of America
From: 05/03/2018 To: 05/07/2018

1  of  1

Date Printed: 02/28/2020 13:36
22891429 - RJ/5US

**JA1790**

# Employee Change Report - 5/4/2018 - Payroll 1

Employee Status Changes 05/01/2018 16:05:58  - 05/03/2018 16:56:04

| Employee Name & Address | Employee Information | | | | Tax Jurisdictions | Audit Information | Deduction Information |
|---|---|---|---|---|---|---|---|
| | DOB | SSN | Gender | Hire/Term Date | | Date of Change | |
| **NEW HIRES** | | | | | | | |
| Privott CNA, Stacie | | ▆ | | 4/23/2018 | Federal Virginia | 5/3/2018 | |
| Gadberry CNA, LaSonya | | ▆ | | 4/23/2018 | Federal Virginia | 5/3/2018 | |
| Byrdsong LPN, Amanda | | ▆ | | 4/23/2018 | Federal Virginia | 5/3/2018 | |
| Martin CNA, Jane | | ▆ | | 4/23/2018 | Federal Virginia | 5/3/2018 | |
| White CNA, Brittani | | ▆ | | 4/23/2018 | Federal Virginia | 5/3/2018 | |
| Artis LPN, Latova | | ▆ | | 4/23/2018 | Federal Virginia | 5/3/2018 | |
| Spencer CNA, Kimberly | | ▆ | | 4/16/2018 | Federal Virginia | 5/3/2018 | |
| Webster CNA, Victoria | | ▆ | | 4/15/2018 | Federal Virginia | 5/2/2018 | |
| Kennedy CNA, Brittany | | ▆ | | 4/23/2018 | Federal Virginia | 5/3/2018 | |
| Saxon CNA, Kasey | | ▆ | | 4/23/2018 | Federal Virginia | 5/3/2018 | |
| Scott LPN, Adrienne | | ▆ | | 4/18/2018 | Federal Virginia | 5/3/2018 | |
| Terry CNA, Tina | | ▆ | | 4/23/2018 | Federal Virginia | 5/3/2018 | |
| Rogers CNA, Paula | | ▆ | | 4/23/2018 | Federal Virginia | 5/3/2018 | |
| **TERMINATIONS** | | | | | | | |
| James, Tiffany | ▆ | ▆ | ▆ | 4/23/2018 | Federal Virginia | 5/3/2018 | |

Employee Data Changes 05/01/2018 16:05:58  - 05/03/2018 16:56:04

## JA1791

| Change Information | | | | Data Changes | | |
|---|---|---|---|---|---|---|
| **Change Type** | **Change Detail** | **Change Date** | **Changed By** | Before Change | After Change | Start/End Date |
| **Dryden LPN, Elina** | | | | | | |
| Bank Account Number Changed | Direct Deposit 1 | 5/3/2018 | ███@22891429 | 110002400916 | 8507971672 | |
| **Moore CNA, Charloyna** | | | | | | |
| Bank Account Number Changed | Direct Deposit 1 | 5/3/2018 | ███@22891429 | 140005800481 | 70007402407576 | |
| **Dryden LPN, Elina** | | | | | | |
| Bank Transit Number Changed | Direct Deposit 1 | 5/3/2018 | ███@22891429 | 251480738 | 051400549 | |
| **Moore CNA, Charloyna** | | | | | | |
| Bank Transit Number Changed | Direct Deposit 1 | 5/3/2018 | ███@22891429 | 251480738 | 073972181 | |

**JA1792**

D. Wooten, LPN

# SteadFast Medical Staffing, INC.

## Confidentiality Statement

As an SMS employee/sub-contractor, I understand and acknowledge that:

I must hold confidential and private all information pertaining to patients, patient records, client facility policies, and procedures.

All protected patient information shall be kept safeguarded pursuant to the policies and procedures at each facility, respectively, and in accordance the Health Insurance Portability and Accountability Act of 1996 (HIPPA), the regulations issued there under, and any applicable state law to prevent impermissible disclosure, loss or misuse, and to ensure that only authorized persons have access to such protected information.

I will consult the Facility Privacy Officer in the event I have any questions regarding the scope or application of the privacy policies described in the statement.

Private and confidential information will only be released to an outside party when legally required to do so and to the extent minimally necessary to respond to the request.

Failure to maintain confidentiality and privacy may lead to disciplinary action up to and including termination as well as any actions designated by the appropriate disciplinary and/or credentialing board.

I understand that any breach of confidentiality may be grounds for immediate termination of employment as well as any appropriate legal actions.

Dawn Wooten
Signature                                                7/12/16
                                                          Date

_____
SMS Representative                                        Date

STEADFAST 000857

PX-25.006

**JA1793**

## AGREEMENT FOR INDEPENDENT CONTRACTOR SERVICES

Pursuant to this Agreement for Services ("Agreement'), the person or business entity set forth on the signature page will be engaged as an independent contractor ("**Contractor**") by **SteadFast Medical Staffing, LLC.** ("**Company**"), a limited liability company organized and existing under the laws of the Commonwealth of Virginia, located at 1001 Radford Court, Virginia Beach, VA 23455 for providing independent contractor services as set forth in Exhibit A. This Agreement will be effective as of the date of signing by **Company**, and will continue in full force and effect as set forth herein.

1.  **Term of Contract**
    This Agreement will become effective on the date stated above and will continue in full force and effect until the services in Exhibit A are completed. This Agreement may be terminated by **Company** without cause upon forty-eight (48) hours written notice, provided, however, that if **Company** terminates prior to completion of the services set forth in Exhibit A, **Company** will pay the reasonable value of work actually completed. Termination for cause is set forth in Section 10.

2.  **Independent Contractor**
    **Contractor** will act solely as an independent contractor in the performance of his/her services and nothing herein will at any time be construed to create the relationship of employer and employee, master and servant, or principal and agent between the parties. Neither **Contractor** nor **Contractor's** employees or agents are employees of **Company** and neither are entitled to any employee benefits, including without limitation, vacation, sick leave, or health insurance. **Contractor** further agrees that **Contractor** is solely responsible for the payment of all applicable taxes, both federal and state, including social security and all withholding taxes.

3.  **Services and Compensation**
    **Contractor** agrees to perform the services provided in Exhibit A to this Agreement. In consideration for the services to be performed by **Contractor**, **Company** agrees to pay **Contractor** as set forth in Exhibit A. In the event this Agreement is terminated, as provided herein, **Company** will only be responsible for payment for services actually provided up to the termination date. Any deviation in either the scope of work or payments for services rendered shall be binding on the parties only if set forth in a writing signed by both parties.

4.  **Performance by Contractor**
    **Contractor** agrees to perform all services in a manner consistent with the standards of work performed by others similarly situated within that industry. Should **Contractor** fail to render acceptable results, **Contractor** agrees to re-perform these services and acknowledges that **Company** has no obligation to pay for these services until they meet acceptable industry standards.

5.  **Intellectual Property Assignment**

1

STEADFAST 000858

PX-25.007

Company shall be the exclusive owner as work for hire of all right, title and interest (including without limitation copyright, trademark and patent rights and all extensions and renewals thereof) now known or hereafter derived in all media and form whatsoever in perpetuity in all languages in and to all materials including, without limitation, all computer programs, including any source code, object code, enhancements and modifications, all files, including input and output materials, all documentation related to such computer programs and files, all media upon which any such computer programs, files and documentation are located (including tapes, disks and other storage media), proposed, prepared, developed or produced by **Contractor** for **Company** or accepted or paid for by **Company** or, if not legally possible, then all such rights are hereby exclusively assigned to **Company**. **Contractor** agrees to take any actions which might be reasonably requested by **Company** to effectuate or evidence such ownership by **Company** or such an assignment.

**Company** shall have unrestricted access to all computer media containing **Company** data from time to time in connection with the performance of the services provided herein. **Contractor**, at the request of **Company** shall promptly deliver to **Company** all computer programs, including source code, files, media, documentation and related materials, concerning any services provided by **Contractor** before or after the date of this Agreement.

6.   **Confidentiality**

**Contractor** acknowledges and agrees that as part of **Contractor's** duties at **Company**, **Contractor** will have access to **Company**'s confidential and proprietary information, including information relating to **Company's** business systems and customer list. **Contractor** hereby agrees not to disclose, use, sell, license, publish or reproduce, without the prior written consent of **Company**, any information or documents relating to the **Company**, system of doing business, computer software, work product resulting from or related to services performed under this Agreement, financial, marketing, strategic and other business information, or any other information designated by **Company** as confidential (together, "Confidential Information"). **Contractor** acknowledges that the Confidential Information disclosed to him/her while performing services for **Company** is protected by copyright, trade secret, trademark and/or copyright laws. **Contractor** hereby agrees that **Contractor** will use all reasonable efforts to return to **Company** upon request all documents and other forms of information (and all reproductions thereof) received from **Company** that include such Confidential Information.

Confidential Information shall not include any information of **Company** that: (a) is already known to **Contractor** at time of its disclosure; (b) is or becomes publicly known through no wrongful act of **Contractor**; (c) is communicated to a third party with express written consent of **Company** ; (d) is independently developed by **Contractor**; (e) is lawfully required to be disclosed to any governmental agency or is otherwise required to be disclosed by law, provided that before making such disclosure the **Contractor** shall immediately give **Company** written notice and an adequate opportunity to raise an objection or take action to assure confidential handling of such information.

2

STEADFAST 000859

PX-25.008

**JA1795**

7. **Return of Documents**

**Contractor** agrees that upon expiration or termination of this Agreement, **Contractor** will promptly deliver to **Company** all program listings, program files, manuals, notes, reports, records, writings, and all other documents or materials pertaining to the business affairs of **Company** which are in **Contractor's** possession or under **Contractor's** control whether or not on the premises of the **Contractor** and regardless of how obtained.

8. **Non-Competition**

Commencing from the first date of the **Contractor's** engagement by **Company** and continuing from a period of twelve (12) months from the effective date of expiration or termination of this Agreement, **Contractor** agrees that **Contractor** shall not directly provide that type of services provided to **Company** to any competitors of **Company** without first obtaining the express written permission of **Company** . **Contractor** agrees that during the term of this Agreement and for twelve (12) months thereafter, **Contractor** will not enter into, be engaged in, or be interested in any capacity whatsoever, directly or indirectly, in any business or undertaking which competes with that of **Company** .

9. **No Conflicting Obligations**

**Contractor** warrants and represents to **Company** that in performing services under this Agreement he/she does not and will not violate any obligation, contractual or otherwise, to any third party.  **Contractor** hereby warrants and represents that he/she does not possess any confidential or proprietary information of any third parties which will be used herein, and has not signed any agreements or covenants not to compete which could prevent **Contractor** from performing the services for **Company** as provided herein and in Exhibit A.

10. **Termination for Cause**

Either party may terminate this Agreement if the other party materially breaches its obligations hereunder; provided that (a) the non-breaching party sends written notice to the breaching party describing the breach in reasonable detail, and (b) the breaching party does not cure the breach within five (5) days following its receipt of such notice.

11. **Non-agency**

**Contractor** agrees that he/she has no authority to enter into any agreement nor bind **Company** in any matter whatsoever; **Contractor** agrees that he/she has no actual, inherent, or apparent authority to bind **Company** and agrees to make no representations or commit any acts which would lead any other party into believing he/she has any such authority.

12. **Assignment**

**Contractor** agrees that this Agreement is one for "personal services", which are non-delegable.  Neither this Agreement nor any duties or obligations may be assigned by **Contractor** without the prior written consent of **Company** .  **Company** may assign this Agreement without Contractor's prior approval in connection with a merger or acquisition of **Company** or a sale of all or substantially all of its assets.

3

STEADFAST 000860

PX-25.009

**JA1796**

13.   **Indemnity**

Contractor hereby agrees to indemnify and hold harmless Company, its affiliates, subsidiaries, franchisees, officers, directors, agents and employees ("Indemnitees") from and against any and all claims, suits, liabilities, losses, judgments, or costs arising out of or related to Contractor's breach of this Agreement or acts or omissions in carrying out obligations under this Agreement.

14.   **Entire Agreement of the Parties**

This Agreement supersedes any and all Agreements, either oral or written, between the parties hereto with respect to the rendering of services by Contractor for Company, and contains all the covenants and agreements between the parties with respect to the rendering of such services. Any modifications of this Agreement will be effective only if in writing and signed by the party to be charged.

15.   **Validity**

Should any part of this Agreement for any reason be declared invalid, then such portion shall be invalid only to the extent of the prohibition without invalidating or affecting the remaining provisions of the Agreement, or without invalidating or alerting said provisions of this Agreement within states or localities where they are not prohibited by law or court decree.

16.   **Governing Law and Venue**

The parties agree that this Agreement will be construed under and will be deemed governed by the laws of the Commonwealth of Virginia. The parties hereby consent and agree that venue and jurisdiction for all actions enforcing and/or arising out of this Agreement will be the state or federal courts in the City of Virginia Beach, Commonwealth of Virginia, to the exclusion of the courts of any other State or County.

[This space intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date and year first written below.

CONTRACTOR

STEADFAST MEDICAL
STAFFING, LLC
A    Virginia    Limited    Liability
Company

By: _____

4

STEADFAST 000861

PX-25.010

**JA1797**

(Company Name or Individual)

By: _____

Name: Dawn Wooten
      (Printed)

Dated: 7/12/16

Address: ████████████████████
████████████████████

Telephone No. ████████████

Fax No. _____

E-mail Address: ████████████████

Name: _____
      (Printed)

Title: _____

Dated: _____

5

STEADFAST 000862

PX-25.011

**JA1798**

<u>EXHIBIT A</u>

1.   <u>Services to be provided by Contractor</u>:

The Contractor will [describe here the work or service to be performed].   She will report
directly to [name] and to any other party designated by [name] in connection with the
performance of the duties under this Agreement and shall fulfill any other duties
reasonably requested by the Company and agreed to by the Contractor.

2.   <u>Term</u>

This engagement shall commence upon execution of this Agreement and shall continue in
full force and effect through [date] or earlier upon completion of the Contractor's duties
under this Agreement. The Agreement may only be extended thereafter by mutual
agreement, unless terminated earlier by operation of and in accordance with this
Agreement.

3.   <u>Compensation</u>

As full compensation for the services rendered pursuant to this Agreement, the
Company shall pay the Contractor at the hourly rate of $_____ per hour.   Such
compensation shall be payable within 30 days of receipt of Contractor's monthly
invoice for services rendered supported by reasonable documentation.

6

STEADFAST 000863

PX-25.012

**JA1799**



*if ask make copy*

## AGREEMENT FOR INDEPENDENT CONTRACTOR SERVICES

Pursuant to this Agreement for Services ("Agreement'), the person or business entity set forth on the signature page will be engaged as an independent contractor ("Contractor") by SteadFast Medical Staffing, LLC. ("Company"), a limited liability company organized and existing under the laws of the Commonwealth of Virginia, located at 1001 Radford Court, Virginia Beach, VA 23455 for providing independent contractor services as set forth in Exhibit A. This Agreement will be effective as of the date of signing by Company, and will continue in full force and effect as set forth herein.

1.    **Term of Contract**
      This Agreement will become effective on the date stated above and will continue in full force and effect until the services in Exhibit A are completed. This Agreement may be terminated by **Company** without cause upon forty-eight (48) hours written notice, provided, however, that if **Company** terminates prior to completion of the services set forth in Exhibit A, **Company** will pay the reasonable value of work actually completed. Termination for cause is set forth in Section 10.

2.    **Independent Contractor**
      **Contractor** will act solely as an independent contractor in the performance of his/her services and nothing herein will at any time be construed to create the relationship of employer and employee, master and servant, or principal and agent between the parties. Neither **Contractor** nor **Contractor's** employees or agents are employees of **Company** and neither are entitled to any employee benefits, including without limitation, vacation, sick leave, or health insurance. **Contractor** further agrees that **Contractor** is solely responsible for the payment of all applicable taxes, both federal and state, including social security and all withholding taxes.

3.    **Services and Compensation**
      **Contractor** agrees to perform the services provided in Exhibit A to this Agreement. In consideration for the services to be performed by **Contractor**, **Company** agrees to pay **Contractor** as set forth in Exhibit A. In the event this Agreement is terminated, as provided herein, **Company** will only be responsible for payment for services actually provided up to the termination date. Any deviation in either the scope of work or payments for services rendered shall be binding on the parties only if set forth in a writing signed by both parties.

4.    **Performance by Contractor**
      **Contractor** agrees to perform all services in a manner consistent with the standards of work performed by others similarly situated within that industry. Should **Contractor** fail to render acceptable results, **Contractor** agrees to re-perform these services and acknowledges that **Company** has no obligation to pay for these services until they meet acceptable industry standards.

5.    **Intellectual Property Assignment**

1

Steadfast 6th 0093644

PX-25.042

**JA1800**



Company shall be the exclusive owner as work for hire of all right, title and interest (including without limitation copyright, trademark and patent rights and all extensions and renewals thereof) now known or hereafter derived in all media and form whatsoever in perpetuity in all languages in and to all materials including, without limitation, all computer programs, including any source code, object code, enhancements and modifications, all files, including input and output materials, all documentation related to such computer programs and files, all media upon which any such computer programs, files and documentation are located (including tapes, disks and other storage media), proposed, prepared, developed or produced by Contractor for Company or accepted or paid for by Company or, if not legally possible, then all such rights are hereby exclusively assigned to Company. Contractor agrees to take any actions which might be reasonably requested by Company to effectuate or evidence such ownership by Company or such an assignment.

Company shall have unrestricted access to all computer media containing Company data from time to time in connection with the performance of the services provided herein. Contractor, at the request of Company shall promptly deliver to Company all computer programs, including source code, files, media, documentation and related materials, concerning any services provided by Contractor before or after the date of this Agreement.

6.   Confidentiality

Contractor acknowledges and agrees that as part of Contractor's duties at Company, Contractor will have access to Company's confidential and proprietary information, including information relating to Company's business systems and customer list. Contractor hereby agrees not to disclose, use, sell, license, publish or reproduce, without the prior written consent of Company, any information or documents relating to the Company, system of doing business, computer software, work product resulting from or related to services performed under this Agreement, financial, marketing, strategic and other business information, or any other information designated by Company as confidential (together, "Confidential Information"). Contractor acknowledges that the Confidential Information disclosed to him/her while performing services for Company is protected by copyright, trade secret, trademark and/or copyright laws. Contractor hereby agrees that Contractor will use all reasonable efforts to return to Company upon request all documents and other forms of information (and all reproductions thereof) received from Company that include such Confidential Information.

Confidential Information shall not include any information of Company that: (a) is already known to Contractor at time of its disclosure; (b) is or becomes publicly known through no wrongful act of Contractor; (c) is communicated to a third party with express written consent of Company ; (d) is independently developed by Contractor; (e) is lawfully required to be disclosed to any governmental agency or is otherwise required to be disclosed by law, provided that before making such disclosure the Contractor shall immediately give Company written notice and an adequate opportunity to raise an objection or take action to assure confidential handling of such information.

2

Steadfast 6th 0093645

PX-25.043

JA1801



**Return of Documents**

    Contractor agrees that upon expiration or termination of this Agreement, Contractor will promptly deliver to Company all program listings, program files, manuals, notes, reports, records, writings, and all other documents or materials pertaining to the business affairs of Company which are in Contractor's possession or under Contractor's control whether or not on the premises of the Contractor and regardless of how obtained.

8.    **Non-Competition**

    Commencing from the first date of the Contractor's engagement by Company and continuing from a period of twelve (12) months from the effective date of expiration or termination of this Agreement, Contractor agrees that Contractor shall not directly provide that type of services provided to Company to any competitors of Company without first obtaining the express written permission of Company . Contractor agrees that during the term of this Agreement and for twelve (12) months thereafter, Contractor will not enter into, be engaged in, or be interested in any capacity whatsoever, directly or indirectly, in any business or undertaking which competes with that of Company .

9.    **No Conflicting Obligations**

    Contractor warrants and represents to Company that in performing services under this Agreement he/she does not and will not violate any obligation, contractual or otherwise, to any third party.  Contractor hereby warrants and represents that he/she does not possess any confidential or proprietary information of any third parties which will be used herein, and has not signed any agreements or covenants not to compete which could prevent Contractor from performing the services for Company as provided herein and in Exhibit A.

10.    **Termination for Cause**

    Either party may terminate this Agreement if the other party materially breaches its obligations hereunder; provided that (a) the non-breaching party sends written notice to the breaching party describing the breach in reasonable detail, and (b) the breaching party does not cure the breach within five (5) days following its receipt of such notice.

11.    **Non-agency**

    Contractor agrees that he/she has no authority to enter into any agreement nor bind Company in any matter whatsoever; Contractor agrees that he/she has no actual, inherent, or apparent authority to bind Company and agrees to make no representations or commit any acts which would lead any other party into believing he/she has any such authority.

12.    **Assignment**

    Contractor agrees that this Agreement is one for "personal services", which are non-delegable. Neither this Agreement nor any duties or obligations may be assigned by Contractor without the prior written consent of Company. Company may assign this Agreement without Contractor's prior approval in connection with a merger or acquisition of Company or a sale of all or substantially all of its assets.

3

Steadfast 6th 0093646

PX-25.044

**JA1802**



13.   Indemnity

Contractor hereby agrees to indemnify and hold harmless Company, its affiliates, subsidiaries, franchises, officers, directors, agents and employees ("Indemnitees") from and against any and all claims, suits, liabilities, losses, judgments, or costs arising out of or related to Contractor's breach of this Agreement or acts or omissions in carrying out obligations under this Agreement.

14.   Entire Agreement of the Parties

This Agreement supersedes any and all Agreements, either oral or written, between the parties hereto with respect to the rendering of services by Contractor for Company, and contains all the covenants and agreements between the parties with respect to the rendering of such services. Any modifications of this Agreement will be effective only if in writing and signed by the party to be charged.

15.   Validity

Should any part of this Agreement for any reason be declared invalid, then such portion shall be invalid only to the extent of the prohibition without invalidating or affecting the remaining provisions of the Agreement, or without invalidating or alering said provisions of this Agreement within states or localities where they are not prohibited by law or court decree.

16.   Governing Law and Venue

The parties agree that this Agreement will be construed under and will be deemed governed by the laws of the Commonwealth of Virginia. The parties hereby consent and agree that venue and jurisdiction for all actions enforcing and/or arising out of this Agreement will be the state or federal courts in the City of Virginia Beach, Commonwealth of Virginia, to the exclusion of the courts of any other State or County.

[This space intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date and year first written below.

CONTRACTOR

STEADFAST MEDICAL STAFFING, LLC
A    Virginia    Limited    Liability
Company

By: _____

4

Steadfast 6th 0093647

PX-25.045

**JA1803**

*old agreement 6/7/18*

AGREEMENT FOR INDEPENDENT CONTRACTOR SERVICES

Pursuant to this Agreement for Services ("Agreement"), the person or business entity set forth on the signature page will be engaged as an independent contractor ("Contractor") by SteadFast Medical Staffing, LLC ("Company"), a limited liability company organized and existing under the laws of the Commonwealth of Virginia, located at 1001 Radford Court, Virginia Beach, VA 23455 for providing independent contractor services as set forth in Exhibit A. This Agreement will be effective as of the date of signing by Company, and will continue in full force and effect as set forth herein.

1.      Term of Contract
        This Agreement will become effective on the date stated above and will continue in full force and effect until the services in Exhibit A are completed. This Agreement may be terminated by Company without cause upon forty-eight (48) hours written notice, provided, however, that if Company terminates prior to completion of the services set forth in Exhibit A, Company will pay the reasonable value of work actually completed. Termination for cause is set forth in Section 10.

2.      Independent Contractor
        Contractor will act solely as an independent contractor in the performance of his/her services and nothing herein will at any time be construed to create the relationship of employer and employee, master and servant, or principal and agent between the parties. Neither Contractor nor Contractor's employees or agents are employees of Company and neither are entitled to any employee benefits, including without limitation, vacation, sick leave, or health insurance. Contractor further agrees that Contractor is solely responsible for the payment of all applicable taxes, both federal and state, including social security and all withholding taxes.

3.      Services and Compensation
        Contractor agrees to perform the services provided in Exhibit A to this Agreement. In consideration for the services to be performed by Contractor, Company agrees to pay Contractor as set forth in Exhibit A. In the event this Agreement is terminated, as provided herein, Company will only be responsible for payment for services actually provided up to the termination date. Any deviation in either the scope of work or payments for services rendered shall be binding on the parties only if set forth in a writing signed by both parties.

4.      Performance by Contractor
        Contractor agrees to perform all services in a manner consistent with the standards of work performed by others similarly situated within that industry. Should Contractor fail to render acceptable results, Contractor agrees to re-perform these services and acknowledges that Company has no obligation to pay for these services until they meet acceptable industry standards.

5.      Intellectual Property Assignment

1

PX-25:138                          Steadfast 6th 086291

PX-25.046

**JA1804**

Company shall be the exclusive owner as work for hire of all right, title and interest (including without limitation copyright, trademark and patent rights and all extensions and renewals thereof) now known or hereafter derived in all media and form whatsoever in perpetuity in all languages in and to all materials including, without limitation, all computer programs, including any source code, object code, enhancements and modifications, all files, including input and output materials, all documentation related to such computer programs and files, all media upon which any such computer programs, files and documentation are located (including tapes, disks and other storage media), proposed, prepared, developed or produced by Contractor for Company or accepted or paid for by Company or, if not legally possible, then all such rights are hereby exclusively assigned to Company. Contractor agrees to take any actions which might be reasonably requested by Company to effectuate or evidence such ownership by Company or such an assignment.

Company shall have unrestricted access to all computer media containing Company data from time to time in connection with the performance of the services provided herein. Contractor, at the request of Company shall promptly deliver to Company all computer programs, including source code, files, media, documentation and related materials, concerning any services provided by Contractor before or after the date of this Agreement.

6.    Confidentiality

Contractor acknowledges and agrees that as part of Contractor's duties at Company, Contractor will have access to Company's confidential and proprietary information, including information relating to Company's business systems and customer list. Contractor hereby agrees not to disclose, use, sell, license, publish or reproduce, without the prior written consent of Company, any information or documents relating to the Company, system of doing business, computer software, work product resulting from or related to services performed under this Agreement, financial, marketing, strategic and other business information, or any other information designated by Company as confidential (together, "Confidential Information"). Contractor acknowledges that the Confidential Information disclosed to him/her while performing services for Company is protected by copyright, trade secret, trademark and/or copyright laws. Contractor hereby agrees that Contractor will use all reasonable efforts to return to Company upon request all documents and other forms of information (and all reproductions thereof) received from Company that include such Confidential Information.

Confidential Information shall not include any information of Company that: (a) is already known to Contractor at time of its disclosure; (b) is or becomes publicly known through no wrongful act of Contractor; (c) is communicated to a third party with express written consent of Company ; (d) is independently developed by Contractor; (e) is lawfully required to be disclosed to any governmental agency or is otherwise required to be disclosed by law, provided that before making such disclosure the Contractor shall immediately give Company written notice and an adequate opportunity to raise an objection or take action to assure confidential handling of such information.

2

PX-25:139                    Steadfast 6th 086292

PX-25.047

JA1805

7)   Return of Documents

Contractor agrees that upon expiration or termination of this Agreement, Contractor will promptly deliver to Company all program listings, program files, manuals, notes, reports, records, writings, and all other documents or materials pertaining to the business affairs of Company which are in Contractor's possession or under Contractor's control whether or not on the premises of the Contractor and regardless of how obtained.

8.   Non-Competition

Commencing from the first date of the Contractor's engagement by Company and continuing from a period of twelve (12) months from the effective date of expiration or termination of this Agreement, Contractor agrees that Contractor shall not directly provide that type of services provided to Company to any competitors of Company without first obtaining the express written permission of Company. Contractor agrees that during the term of this Agreement and for twelve (12) months thereafter, Contractor will not enter into, be engaged in, or be interested in any capacity whatsoever, directly or indirectly, in any business or undertaking which competes with that of Company.

9.   No Conflicting Obligations

Contractor warrants and represents to Company that in performing services under this Agreement he/she does not and will not violate any obligation, contractual or otherwise, to any third party. Contractor hereby warrants and represents that he/she does not possess any confidential or proprietary information of any third parties which will be used herein, and has not signed any agreements or covenants not to compete which could prevent Contractor from performing the services for Company as provided herein and in Exhibit A.

10.   Termination for Cause

Either party may terminate this Agreement if the other party materially breaches its obligations hereunder, provided that (a) the non-breaching party sends written notice to the breaching party describing the breach in reasonable detail, and (b) the breaching party does not cure the breach within five (5) days following its receipt of such notice.

11.   Non-agency

Contractor agrees that he/she has no authority to enter into any agreement nor bind Company in any matter whatsoever. Contractor agrees that he/she has no actual, inherent, or apparent authority to bind Company and agrees to make no representations or commit any acts which would lead any other party into believing he/she has any such authority.

12.   Assignment

Contractor agrees that this Agreement is one for "personal services", which are non-delegable. Neither this Agreement nor any duties or obligations may be assigned by Contractor without the prior written consent of Company. Company may assign this Agreement without Contractor's prior approval in connection with a merger or acquisition of Company or a sale of all or substantially all of its assets.

3

PX-25:140                    Steadfast 6th 086293

PX-25.048

JA1806

13.   **Indemnity**
Contractor hereby agrees to indemnify and hold harmless Company, its affiliates, subsidiaries, franchisees, officers, directors, agents and employees ("Indemnitees") from and against any and all claims, suits, liabilities, losses, judgments, or costs arising out of or related to Contractor's breach of this Agreement or acts or omissions in carrying out obligations under this Agreement.

14.   **Entire Agreement of the Parties**
This Agreement supersedes any and all Agreements, either oral or written, between the parties hereto with respect to the rendering of services by Contractor for Company, and contains all the covenants and agreements between the parties with respect to the rendering of such service. Any modifications of this Agreement will be effective only if in writing and signed by the party to be charged.

15.   **Validity**
Should any part of this Agreement for any reason be declared invalid, then such portion shall be invalid only to the extent of the prohibition without invalidating or affecting the remaining provisions of the Agreement, or without invalidating or altering said provisions of this Agreement within states or localities where they are not prohibited by law or court decree.

16.   **Governing Law and Venue**
The parties agree that this Agreement will be construed under and will be deemed governed by the laws of the Commonwealth of Virginia. The parties hereby consent and agree that venue and jurisdiction for all actions enforcing and/or arising out of this Agreement will be the state or federal courts in the City of Virginia Beach, Commonwealth of Virginia, to the exclusion of the courts of any other State or County.

[This space intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date and year first written below.

CONTRACTOR                              STEADFAST MEDICAL
                                        STAFFING, LLC
                                        A   Virginia   Limited   Liability
                                        Company

_____                By: _____

PX-25:141                    Steadfast 6th 086294

PX-25.049

**JA1807**

(Company Name or Individual)

By: _____

Name: COURTNEY DI TURNER
(Printed)

Dated: 2/1/16

Address: ████████████

Telephone No. ████████

Fax No. _____

E-mail Address: ████████████

Name: _____
(Printed)

Title: _____

Dated: _____

5

*Melissa Ozirus  CNA*

## steadFast Medical Staffing, INC.

### Confidentiality Statement

As an SMS employee/sub-contractor, I understand and acknowledge that:

I must hold confidential and private all information pertaining to patients, patient records, client facility policies, and procedures.

All protected patient information shall be kept safeguarded pursuant to the policies and procedures at each facility, respectively; and in accordance the Health Insurance Portability and Accountability Act of 1996 (HIPPA), the regulations issued there under, and any applicable state law to prevent impermissible disclosure, loss or misuse, and to ensure that only authorized persons have access to such protected information.

I will consult the Facility Privacy Officer in the event I have any questions regarding the scope or application of the privacy policies described in this statement.

Private and confidential information will only be released to an outside party when legally required to do so and to the extent minimally necessary to respond to the request.

Failure to maintain confidentiality and privacy may lead to disciplinary action up to and including termination as well as any actions designated by the appropriate disciplinary and/or credentialing board.

I understand that any breach of confidentiality may be grounds for immediate termination of employment as well as any appropriate legal actions.

_____          9/11/2017
Signature                                 Date

_____          _____
SMS Representative                        Date

STEADFAST 000961

PX-25.051

**JA1809**

AGREEMENT FOR INDEPENDENT CONTRACTOR SERVICES

Pursuant to this Agreement for Services ("Agreement"), the person or business entity set forth on the signature page will be engaged as an independent contractor ("Contractor") by SteadFast Medical Staffing, LLC. ("Company"), a limited liability company organized and existing under the laws of the Commonwealth of Virginia, located at 5750 Chesapeake Blvd, Norfolk, VA 23513 for providing independent contractor services as set forth in Exhibit A. This agreement will be effective as of the date of signing by Company, and will continue in full force and effect as set forth herein.

1. Term of Contract
   a. This Agreement will become effective on the date stated above and will continue in full force and effect until the services in Exhibit A are completed. This Agreement may be terminated by Company without cause upon forty-eight (48) hours written notice, provided, however, that if Company terminated prior to completion of the services set forth in Exhibit A, Company will pay the reasonable value of work completed. Termination for cause is set forth in Section 10.

2. Independent Contractor
   a. Contractor will act solely as an independent contractor in the performance of his/her services and nothing herein will at any time be construed to create the relationship of employer and employee, master and servant, or principal and agent between the parties. Neither Contractor nor Contractor's employees or agents are employees of Company and neither are entitled to any employee benefits, including without limitation, vacation, sick leave, or health insurance. Contractor further agrees that Contractor is solely responsible for the payment of all applicable taxes, both federal and state, including social security and all withholding taxes.

3. Services and Compensation
   a. Contractor agrees to perform the services provided in Exhibit A to this Agreement. In consideration for the services to be performed by Contractor, Company agrees to pay Contractor as set forth in Exhibit A. In the event this Agreement is terminated, as provided herein, Company will only be responsible for payment for services provided up to the termination date. Any deviation in either the scope of work or payments for services rendered shall be binding on the parties only if set forth in a writing signed by both parties.

4. Performance by Contractor
   a. Contractor agrees to perform all services in a manner consistent with the standards of work performed by others similarly situated within that industry. Should Contractor fail to render acceptable results, Contractor agrees to re-perform these services and acknowledges that Company has no obligation to pay for these services until they meet acceptable industry standards.

5. Intellectual Property Assignment

STEADFAST 000962

PX-25.052

JA1810

a. Company shall be the exclusive owner as work for hire of all right, title, and interest (including without limitation copyright, trademark and patent rights and all extensions and renewals thereof) now known or hereafter derived in all media and form limitation, all computer programs, including any source code, object code, enhancements and modifications, all files, including input and output materials, all documentation related to such computer programs and files, all media upon which any such computer programs, files and documentation are located (including tapes, disks, and other storage media), proposed, prepared, developed, or produced by Contractor for Company or accepted or paid for by Company or, if not legally possible, then all such rights are hereby exclusively assigned to Company. Contractor agrees to take any actions which might be reasonably requested by Company to effectuate or evidence such ownership by Company or such an assignment.

b. Company shall have unrestricted access to all computer media containing Company data from time to time about the performance of the services provided herein. Contractor, at the requests of Company shall promptly deliver to Company all computer programs, including source code, files, media, documentation and related materials, concerning any services provided by Contractor before or after the date of this Agreement.

6.  Confidentiality

a. Contractor acknowledges and agrees that as part of Contractor's duties at Company, Contractor will have access to Company's confidential and proprietary information, including information relating to Company's business systems and customer list. Contractor hereby agrees not to disclose, use, sell, license, publish or reproduce, without the prior written consent of Company, any information or documents relating to the Company, system of doing business, computer software, work product resulting from or related to services performed under this Agreement, financial, marketing, strategic and other business information, or any other information designated by Company as confidential (together, "Confidential Information"). Contractor acknowledges that the Confidential Information disclosed to him/her while performing services for Company is protected by copyright, trade secret, trademark and/or copyright laws. Contractor hereby agrees that Contractor will use all reasonable efforts to return to Company upon request all documents and other forms of information (and all reproductions thereof) received from Company that include such Confidential Information.

b. Confidential Information shall not include any information of Company that: (a) is already known to Contractor at time of its disclosure; (b) is or becomes publicly known through no wrongful act of Contractor; (c) is communicated to a third party with express written consent of Company; (d) is independently developed by Contractor; (e) is lawfully required to be disclosed to any governmental agency or is otherwise required to be disclosed by law, provided that before making such

STEADFAST 000963

PX-25.053

**JA1811**

disclosure the Contractor shall immediately give Company written notice and an adequate opportunity to raise an objection or take action to assure confidential handling of such information.

7. Return of Documents

    a. Contractor agrees that upon expiration or termination of this Agreement, Contractor will promptly deliver to Company all program listings, program files, manuals, notes, reports, records, writings, and all other documents or materials pertaining to the business affairs of Company which are in Contractor's possession or under Contractor's control whether on the premises of the Contractor and regardless of how obtained.

8. Non-Competition

    a. Commencing from the first date of the Contractor's engagement by Company and continuing from a period of twelve (12) months from the effective date of expiration or termination of this Agreement, Contractor agrees that Contractor shall not directly provide that type of services provided to Company to any competitors of Company without first obtaining the express written permission of Company. Contractor agrees that during the term of this Agreement and for twelve (12) months thereafter, Contractor will not enter, be engaged in, or be interested in any capacity whatsoever, directly or indirectly, in any business or undertaking which competes with that of Company.

9. No Conflicting Obligations

    a. Contractor warrants and represents to Company that in performing services under this Agreement he/she does not and will not violate any obligation, contractual or otherwise, to any third party. Contractor hereby warrants and represents that he/she does not possess any confidential or proprietary information of any third parties which will be used herein, and has not signed any agreements or covenants not to compete which could prevent Contractor from performing the services for Company as provided herein and in Exhibit A.

10. Termination for Cause

    a. Either party may terminate this Agreement if the other party materially breaches its obligations hereunder; if (a) the non-breaching party sends written notice to the breaching party describing the breach in reasonable detail, and (b) the breaching party does not cure the breach within five (5) days following its receipt of such notice.

11. Non-agency

    a. Contractor agrees that he/she has no authority to enter any agreement nor bind Company in any matter whatsoever; Contractor agrees that he/she has no actual, inherent, or apparent authority to bind Company and agrees to make no representations or commit any acts which would lead any other party into believing he/she has any such authority.

12. Assignment

STEADFAST 000964

PX-25.054

JA1812

    a.   Contractor agrees that this Agreement is one for "personal services," which are non-delegable. Neither this Agreement nor any duties or obligations may be assigned by Contractor without the prior written consent of Company. Company may assign this Agreement without Contractor's prior approval about a merger or acquisition of Company or a sale of all substantially all its assets.

13.  Indemnity

    a.   Contractor hereby agrees to indemnify and hold harmless Company, its affiliates, subsidiaries, franchises, officers, directions, agents and employees ("Indemnitees") from and against all claims, suits, liabilities, losses, judgments, or costs arising out of or related to Contractor's breach of this Agreement or acts or omissions in carrying out obligations under this Agreement.

14.  Entire Agreement of the Parties

    a.   This Agreement supersedes all Agreements, either oral or written, between the parties hereto with respect to the rendering of services by Contractor for Company, and contains all the covenants and agreements between the parties with respect to the rendering of such services. Any modifications of this Agreement will be effective only if in writing and signed by the party to be charged.

15.  Validity

    a.   Should any part of this Agreement for any reason be declared invalid, then such portion shall be invalid only to the extent of the prohibition without invalidating or affecting the remaining provisions of the Agreement, or without invalidating or alerting said proportions of this Agreement within states or localities where they are not prohibited by law or court decree.

16.  Governing Law and Venue

    a.   The parties agree that this Agreement will be construed under and will be deemed governed by the laws of the Commonwealth of Virginia. The parties hereby consent and agree that venue and jurisdiction for all actions enforcing and/or arising out of this Agreement will be the state or federal courts in the City of Virginia Beach, Commonwealth of Virginia, to the exclusion of the courts of any other State or County.

IN WITNESS, WHEREOF, the parties hereto have duly executed this Agreement as of the date and year first written below.

CONTRACTOR

STEADFAST MEDICAL STAFFING, LLC.

A Virginia Limited Liability Company

By: _____

Signature

STEADFAST 000965

PX-25.055

**JA1813**

(Company Name or Individual)

Name: _Melisa Ozirus_

(printed)

Dated: _01/11/2017_

Address: _____

█████████████████████

Telephone No. _____

Fax No. _____

E-mail Address: █████████████

STEADFAST 000966

PX-25.056

**JA1814**

## AGREEMENT FOR INDEPENDENT CONTRACTOR SERVICES

Pursuant to this Agreement for Services ("Agreement"), the person or business entity set forth on the signature page will be engaged as an independent contractor ("Contractor") by **Steadfast Medical Staffing, LLC.** ("Company"), a limited liability company organized and existing under the laws of the Commonwealth of Virginia located at 1001 Radford Court, Virginia Beach, VA 23455 for providing independent contractor services as set forth in Exhibit A. This Agreement will be effective as of the date signing by **Company**, and will continue in full force and effect as set forth herein.

1. **Term of Contract**
   This Agreement will become effective on the date stated above and will continue in full force and effect until the services in Exhibit A are completed. This Agreement may be terminated by Company without cause upon forty-eight (48) hours written notice, provided, however, that if **Company** terminates prior to completion of the services set forth in Exhibit A. **Company** will pay the reasonable value of work actually completed. Termination for cause is set forth in Section 10.

2. **Independent Contractor**
   Contractor will act solely as an Independent Contractor in the performance of his/her services and nothing herein will at any time be construed to create the relationship of employer and employee, master and servant, or principal and agent between the parties. Neither Contractor nor Contractor's employees or agents are employees of **Company** and neither are entitled to any employee benefits, including without limitation, vacation, sick leave, or health insurance. Contractor further agrees that **Contractor** is solely responsible for the payment of all applicable taxes, both federal and state, including social security and all withholding taxes.

3. **Services and Compensation**
   Contractor agrees to perform the services provided in Exhibit A to this Agreement. In consideration for the services to be performed by **Contractor, Company** agrees to pay **Contractor** as set forth in Exhibit A. In the event this Agreement is terminated, as provided herein, **Company** will only be responsible for payment for services actually provided up to the termination date. Any deviation in either the scope of work or payments for services rendered shall be binding on the parties only if set forth in a writing signed by both parties.

4. **Performance by Contractor**
   Contractor agrees to perform all services in a matter consistent with the standards of work performed by others similarly situated within that industry. Should **Contractor** fail to render acceptable results, **Contractor** agrees to re-perform these services and acknowledges that **Company** has no obligation to pay for these services until they meet acceptable industry standards.

5. **Intellectual Property Assignment**
   Company shall be the exclusive owner as work for hire of all right, title and interest (including without limitation copyright, trademark, and patent rights and all extensions and renewals thereof) new known or hereafter derived in all media and form whatsoever in perpetuity in all languages in and to all materials including without limitation, all computer programs, including any source code, object code, enhancements and modifications, all files, including input and output materials, all documentation related to such computer program and files, all media upon which any such computer

*"For All Your Staffing Needs"*

Page | 22

programs, files and documentation are located (including tapes, disks and other storage media), proposed, prepared, developed or produced by Contractor for Company or accepted or paid for by Company or, if not legally possible, then all such rights are hereby exclusively assigned to Company. Contractor agrees to take any actions which might be reasonably requested by Company to effectuate or evidence such ownership by Company or such an assignment.

Company shall have unrestricted access to all computer media containing Company data from time to time in connection with the performance of the services provided herein.  Contractor, at the request of Company shall promptly deliver to Computer all computer programs, including source code, files, media, documentation and related materials, concerning any service provided by Contractor before or after the date of this Agreement.

6.  Confidentiality
Contractor acknowledges and agrees that as part of Contractor's duties at Company, Contractor will have access to Company's confidential and proprietary information, including information relating to Company's business systems and customer list.  Contractor hereby agrees not to disclose, use, sell, license, publish, or reproduce, without the prior written consent of Company, any information or document relating to the Company, system of doing business, computer software, work product resulting from or related to services performed under this Agreement, financial, marketing, strategic and other business information, or any other information designated by Company as confidential (together, "Confidential Information").  Contractor acknowledges that the Confidential Information disclosed to him/her while performing services for Company is protected by copyright, trade secret, trademark and/or copyright laws.  Contractor hereby agrees that Contractor will use all reasonable efforts to return to Company upon request all documents and other forms of information (and all reproductions thereof) received from Company that include such Confidential Information.

Confidential Information shall not include any information of Company that: (a) is already known to Contractor at time of its disclosure; (b) is or becomes publicly known through no wrongful act of Contractor; (c) is communicated to a third party with express written consent of Company; (d) is independently developed by Contractor; (e) is lawfully required to be disclosed to any governmental agency or is otherwise required to be disclosed by law, provided that before making such disclosure the Contractor shall immediately give Company written notice and an adequate opportunity to raise an objection or take action to assure confidential handling of such information.

7.  Return of Documents
Contractor agrees that upon expiration or termination of this Agreement, Contractor will promptly deliver to Company all program listings, program files, manuals, notes, reports, records, writings, and all other documents or materials pertaining to the business affairs of Company which are in Contractor's possession or under Contractor's control whether or not on the premises of the Contractor and regardless of how obtained.

8.  Non-Competition
Commencing from the first date of the Contractor's engagement by Company and continuing from a period of twelve (12) months from the effective date of expiration or termination of this

*"For All Your Staffing Needs"*

Steadfast 6th – 02993

PX-25.058

**JA1816**

Agreement, Contractor agrees Contractor shall not directly provide that type of services provided to Company to any competitors of Company without first obtaining the express written permission of Company. Contractor agrees that during the term of this Agreement and for twelve (12) months thereafter, Contractor will not enter into, be engaged in, or be interested in any capacity whatsoever, directly or indirectly, in any business or undertaking which competes with that of Company.

9. **No Conflicting Obligations**
Contractor warrants and represents to Company that in performing services under this Agreement he/she does not and will not violate any obligation, contractual or otherwise, to any third party. Contractor hereby warrants and represents that he/she does not possess any confidential or proprietary information of any third parties which will be used herein, and has not signed any agreements or covenants not to compete which could prevent Contractor from performing the services for Company as provided herein and in Exhibit A.

10. **Termination for Cause**
Either party may terminate this Agreement if the other party materially breaches its obligations hereunder; provided that (a) the non-breaching party sends written notice to the breaching party describing the breach in reasonable detail, and (b) the breaching party does not cure the breach within give (5) days following its receipt of such notice.

11. **Non-agency**
Contractor agrees that he/she has no authority to enter into any agreement nor bind Company in any matter whatsoever; Contractor agrees that he/she has no actual, inherent, or apparent authority to bind Company and agrees to make no representations or commit any acts which would lead any other party into believing he/she has any such authority.

12. **Assignment**
Contractor agrees that this Agreement is one for "personal services", which are non-delegable. Neither this Agreement nor any duties or obligations may be assigned by Contractor without the prior written consent of Company. Company may assign this Agreement without Contractor's prior approval in connection with a merger or acquisition of Company or a sale of all or substantially all of its assets.

13. **Indemnity**
Contractor hereby agrees to indemnify and hold harmless Company, its affiliates, subsidiaries, franchises, officers, directors, agents and employees ("Indemnitees") from and against all claims, suits, liabilities, losses, judgements, or costs arising out of or related to Contractor's breach of this Agreement or acts or omissions in carrying out obligations under this Agreement.

14. **Entire Agreement of the Parties**
This Agreement supersedes any and all Agreements, either oral or written, between the parties hereto with respect to the rendering of services by Contractor for Company, and contains all the covenants and agreements between the parties with respect to the rendering of such services. Any modifications of this Agreement will be effective only if in writing and signed by the party to be charged.

*"For All Your Staffing Needs"*

Steadfast 6th - 02994

PX-25.059

**JA1817**

24

9. **Validity**

Should any part of this Agreement for any reason be declared invalid, then such portion shall be invalid only to the extent of the prohibition without invalidating or affecting the remaining provisions of the Agreement, or without invalidating or affecting said provisions of this Agreement within states or localities where they are not prohibited by law or court decree.

10. **Governing Law and Venue**

The parties agree that this Agreement will be construed under and will be deemed governed by the laws of the Commonwealth of Virginia. The parties hereby consent and agree that venue and jurisdiction for all actions and/or arising out of this Agreement will be the state or federal courts in the City of Virginia Beach, Commonwealth of Virginia, to the exclusion of the courts of any other State or Country.

[ This space intentionally left blank ]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date and year first written below.

CONTRACTOR                                     By:

Name: Roxi Jackson                             STEADFAST MEDICAL STAFFING, LLC

Date: 5/1/18                                   A Virginia Limited Liability Company

Address: ████████████████

Telephone N ████████████████

Fax No.:

E-mail Address: ████████████████

*"For All Your Staffing Needs"*

Steadfast 6th  02995

PX-25.060

JA1818

## EXHIBIT A

1.   **Services to be provided by Contractor**

The Contractor will [describe here the work or service to be performed].   She will report directly to [name] and to any other party designated by [name] in connection with the performance of the duties under this Agreement and shall fulfill any other duties reasonably requested by the Company and agreed to by the Contractor.

2.   **Term**

This engagement shall commence upon execution of this Agreement and shall continue in full force and effect through [date] or earlier upon completion of the Contractor's duties under this Agreement. The Agreement may only be extended thereafter by mutual agreement, unless terminated earlier by operation of and in accordance with this Agreement.

3.   **Compensation**

As full compensation for the services rendered pursuant to this Agreement, the Company shall pay the Contractor at the hourly rate of $_____ per hour.   Such compensation shall be payable within 30 days of receipt of Contractor's monthly invoice for services rendered supported by reasonable documentation.

6

PX-26:018

PX-25.061

**JA1819**

## INDEPENDENT CONTRACTOR AGREEMENT

This Independent Contractor Agreement ("Agreement") is entered into this _____ day of

_____, 20____, by Medical Staffing of America d/b/a Steadfast Medical Staffing ("SMS") and

_____, ("Contractor").

## RECITALS

A.      SMS is a staffing company headquartered in Norfolk, Virginia, and is engages in providing

certified health care providers to its medical facility customers throughout the United States.

B.      Contractor is licensed as a _____ and desires the assistance of SMS in

finding work and referring it to Contractor to perform specialized medical services for SMS customers on a

temporary or short-term basis.

C.      SMS desires to retain the services of Contractor and Contractor desires to furnish medical

services to SMS upon the terms and conditions set forth in this Agreement.  The parties, therefore, enter into this

Agreement in order to provide a full statement of their respective legal rights and responsibilities in connection

with the performance of such services.

## AGREEMENT

For and in consideration of the mutual covenants and agreements herein contained and other valuable

consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Term.

a.      The term of this Agreement shall be for one calendar year, commencing on January 1st

each year, until either party terminates the Agreement for any reason or no reason, with at least ten (10) calendar

days' advance, written notice.  Such notices are effective upon receipt by the other party, either by hand, by

certified mail, return receipt requested, or by overnight mail courier, at the other party's last known address.

*"For All Your Staffing Needs"*
PX-25:267                                    **Steadfast 6th - 03712**

PX-25.062

**JA1820**

Page | 3

b.     SMS reserves the right to terminate this Agreement, for any reason or no reason, upon 48

hours' advance, written notice to Contractor.  However, if Contractor's work has not been completed at the time

of such 48-hoiur notice, SMS shall pay Contractor for the partial work completed.

2.     Duties and Responsibilities of Contractor.  During the term of this Agreement,

Contractor shall perform skilled services as a medical professional for one or more of SMS's customers, as

needed, and as agreed by the Parties, on an ad hoc basis.

3.     Contract Payments.

a.     SMS shall pay Contractor as set forth in Exhibit A.  Exhibit A, attached hereto and

incorporated herein, sets forth the specific services Contractor shall provide under this Agreement and

Contractor's contract pay rate.

4.     Best Efforts.  During the term of this Agreement, Contractor shall dedicate his/her

best efforts and sufficient time, attention, knowledge and skills to the obligations under this Agreement.

Contractor also commits to the highest ethical standards in connection with Contractor's profession and his/her

contract work under this Agreement.

Independent Contractor Status.

a.     In the performance of this Agreement, it is mutually understood and agreed that

Contractor, acting on behalf of SMS, is at all times acting and performing as an independent contractor of SMS,

and not as an employee of SMS.  SMS shall not exercise control or direction over the specific methods or means

by which Contractor performs professional medical services under this Agreement.

b.     Contractor agrees that he/she shall have no claim, under this Agreement or otherwise,

against SMS for workers' compensation, unemployment compensation, vacation pay, sick leave, retirement

benefits, social security benefits, disability insurance payments, or any other employee benefits offered to

employees of SMS.

*"For All Your Staffing Needs"*
PX-25:268                                                   **Steadfast 6th - 03713**

PX-25.063

**JA1821**

Page | 4

c.   SMS will not withhold from its contract payments to Contractor, pursuant to this Agreement or otherwise, any sums for payment of state or federal income tax, unemployment insurance, social security, disability insurance, or any other withholding requirement pursuant to any law.  All such withholdings and payments shall be the sole responsibility of the Contractor.  Contractor agrees to accurately complete all Internal Revenue Service forms, including but not limited to IRS Form W-9, that may be required by SMS. Contractor shall indemnify and hold harmless SMS from any and all loss or liability of any type whatsoever incurred or sustained by SMS, if any, arising with respect to its payments to the Contractor under this Agreement.

d.   The parties agree that Contractor shall be solely responsible for the time and costs of acquiring and maintaining his/her professional medical credentials and licenses, including, without limitation, continuing medical education classes and testing.

e.   The parties agree that, whenever Contractor accepts contract work from SMS, Contractor is solely responsible exercising his/her required standard of medical care for Contractor's patients.

f.   The parties agree that Contractor is solely responsible so providing his/her own uniforms and whatever personal medical equipment may be required to perform work under this Agreement.

g.   Contractor shall be responsible for his/her own medical malpractice insurance.

h.   SMS shall not supervise Contractor at any location to which he/she is assigned under this Agreement.  Contractor is solely responsible for deciding how long to spend with a patient, what professional services need to be performed, and how Contractor's work is performed under this Agreement.

5.   Conflict of Interest.

a.   During the term of this Agreement, Contractor shall not enter into any other contract, activity, employment, or other business arrangement which, in the sole discretion of SMS, conflicts with SMS's interests or Contractor's obligations under this Agreement.  Contractor agrees that he/she shall not be permitted during the term of this Agreement to perform medical services for any other entity that, in the sole discretion of SMS, is or might be in competition with SMS, or to any other entity which presents a conflict of interest.

*"For All Your Staffing Needs"*
PX-25:269                                    **Steadfast 6th - 03714**

PX-25.064

**JA1822**

Page | 5

b.    Contractor will advise SMS in advance of any new contract, activity, employment, or business arrangement contemplated by Contractor.  For this purpose, Contractor agrees to disclose any such plans to SMS prior to such plans being implemented.  SMS shall have the option of terminating this Agreement at any time, without prior notice, without liability for doing so, if, in its judgment, a conflict of interest exists or is imminent.

6.    Confidentiality.

a.    At no time during or following the termination of this Agreement, whether such termination is initiated by Contractor or SMS, with or without cause or notice, shall Contractor disclose to any other person or entity, nor shall Contractor use for his/her own benefit or for the benefit of any other entity or person, any confidential or proprietary information or trade secrets of SMS, including, without limitation, any information developed by Contractor during the term of this Agreement, any information relating to the identity, background, or terms of dealing with any SMS referral source or customer, or information respecting financial arrangements, marketing strategies, pricing methods and determinations, research, processes, business marketing plans, or any other material of a similar nature or relating to SMS's conduct of its business ("Confidential Information"), except as authorized,  in writing, in advance, by SMS, or as required by law.

b.    The parties agree that any information that is readily available to the general public, in the same format, does not constitute Confidential Information under this Agreement.

c.    Contractor agrees that any services he/she performs under this Agreement, whether performed by Contractor personally, or by his/her employees or agents, shall be considered "work-for-hire" under U.S. copyright law.  In the event such services are not deemed "work-for-hire" by an arbitrator or court of competent jurisdiction, Contractor assigns all right, title, and interest, including but not limited to copyright, to SMS and agrees to do everything reasonably necessary to enable SMS to protect its rights in such works.

d.    Contractor is notified by SMS that the federal Defend Trade Secrets Act of 2016 provides immunity from criminal and civil liability under any federal or state trade secret law protecting the disclosure of a trade secret, if such disclosure by Contractor is made in confidence to a federal, state, or local

**JA1823**

P a g e  | 6

government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or

investigating a suspected violation of law; or is made in a complaint or other document filed in a lawsuit or other

proceeding, if such filing is made under seal; and that an individual who files a lawsuit for retaliation for reporting

a suspected violation of law may disclose the trade secret to the individual's attorney and use the trade secret

information in the arbitration or court proceeding if the individual files any document containing the trade secret

under seal and does not disclose the trade secret, except pursuant to court order.

7.   No Waiver of Breach or Remedy.  A waiver by SMS of the breach of any of the

provisions of this Agreement by Contractor shall not be deemed a waiver by SMS of any subsequent breach, nor

shall the failure to seek any remedy hereunder be deemed a waiver of any other or further relief or remedy

provided for herein.

8.   No Prior Agreements.  Contractor represents that he/she is not a party to, or

otherwise subject to or bound by, the terms of any contract, agreement, or understanding which in any manner

would limit or otherwise affect Contractor's ability to perform his/her obligations under this Agreement.

Contractor further represents and warrants that his/her performance of services under this Agreement will not

require the disclosure or use of any confidential information belonging to any prior employer, client, or contractor

of Contractor.

9.   Choice of Forum.  The parties agree that any dispute, claim, or complaint arising

out of or related to this Agreement, including any claims under any applicable federal or state laws, shall be

resolved by mediation and, if necessary, by arbitration, in accordance with paragraph 17 below, excepting only

any claims for breach of this Agreement's confidentiality or non-competition provisions, which require immediate

injunctive relief.  Such enforcement actions seeking injunctive relief shall be filed in the state or federal court

located in Norfolk, Virginia.

10.   Assignment.  Contractor shall not, without prior written consent of SMS,

assign any rights or delegate any duties not explicitly permitted to be assigned or delegated under this Agreement.

SMS shall have the right to assign its rights and duties under this Agreement, and shall have the right to retain

other contractors or parties, as it deems appropriate, for the performance of any services.

11.   Indemnification.

    a.   Contractor agrees to indemnify and hold harmless SMS from and against any claim,

action, liability, loss or damage which results from or arises out of the acts or omissions of Contractor, or any

employee or agent of Contractor, in Contractor's performance of this Agreement.

    b.   Contractor waives any rights to recover from SMS for any injuries or damage that

Contractor may sustain while performing services under and pursuant to this Agreement that are a result of the

acts or omissions of Contractor or his/her agents or employees.

    c.   Contractor shall be responsible for and shall reimburse SMS for all loss or damage to

SMS caused by the acts or omissions of Contractor, his/her agents, or employees, in Contractor's performance of

services under this Agreement.

12.   Contractor's Employees.  Where employees of Contractor perform services for

SMS or its customers under and pursuant to this Agreement, they shall be bound by the provisions of this

Agreement and Contractor shall, at the request of SMS, furnish to SMS satisfactory evidence to that effect and

that such employees are in fact employees of Contractor only, and that all taxes required to be withheld or paid on

behalf of such employees have been paid or provided for by Contractor.

13.   Return of Documents and Information.  Contractor agrees that upon expiration or termination of

this Agreement, Contractor will promptly deliver to SMS all program listings, program files, manuals, notes,

reports, records, writings, and all other documents or materials pertaining to the business affairs of SMS, in

whatever form, including electronic or digital form, which are in Contractor's possession or under Contractor's

control whether or not on the premises of the Contractor and regardless of how obtained.

*"For All Your Staffing Needs"*

PX-25:272                          **Steadfast 6th - 03717**

**PX-25.067**

**JA1825**

14.   Non-Competition.  Commencing from the first date of the Contractor's work for SMS under this Agreement, and continuing for a period of twelve (12) months from the expiration or termination date of this Agreement, whether initiated by SMS or Contractor, with our without notice or cause, Contractor agrees that Contractor shall not directly provide the same type of services provided to SMS under this Agreement to any competitors of SMS without first obtaining the express written permission of SMS.  Contractor agrees that during the term of this Agreement and for twelve (12) months thereafter, Contractor will not enter into, be engaged in, or be interested in any capacity whatsoever, directly or indirectly, in any business or undertaking with any person or entity that competes with SMS.

15.   Non-agency.  Contractor agrees that he/she has no authority to enter into any agreement nor bind SMS in any matter whatsoever,  Contractor agrees that he/she has not actual, inherent, or apparent authority to bind SMS and agrees to make no representations or commit any acts which would lead any other party, including SMS's customers, referral sources and employees, into believing he/she has any such authority.

16.   Dispute Resolution Provisions.  SMS greatly values its relationships with Contractor. The parties realize, however, that despite everyone's best efforts, disputes may arise during the contract relationship.  The purpose of the Dispute Resolution Provisions is to help resolve such disputes in a manner that is fair, expeditious, economical and less adversarial than court litigation.  To that end, the parties to this Agreement indicate their desire to submit any disputes arising from or related to this Agreement first to non-binding mediation, and if the dispute is not resolved through mediation, then to binding arbitration under the terms stated in this Agreement. The mediation and arbitration shall be conducted pursuant to the Employment Dispute Resolution Rules of the American Arbitration Association, or equivalent state law, or as otherwise mutually agreed by the parties ("the Rules").  Copies of the Rules are available upon request from SMS.

   a.   Agreement to Mediate – Mediation is a non-binding process allowing the parties to resolve claims without extensive cost, time and emotion.  Employee and SMS agree to first attempt a mediation of any dispute covered by this Agreement. The parties agree to make a good faith effort at mediating any dispute prior to filing a claim for arbitration.

     b.      Agreement to Arbitrate; Designated Claims - Except as otherwise provided in this Agreement, SMS and Contractor consent to the resolution by binding arbitration of all claims or controversies, whether individual or class action in nature, not resolved through mediation for which a federal or state court would be authorized to grant relief, whether or not arising out of, relating to, or associated with Contractor's relationship with SMS, or the termination thereof (the "Claims").

     c.      Claims covered by this Agreement include, but are not limited to, claims for compensation due; claims for breach of any contract or covenant, express or implied; tort claims; claims for discrimination or harassment on bases which include but are not limited to race, sex, sexual orientation, religion, national origin, age, marital status, genetic characteristic, disability or medical condition; claims for benefits and claims for violation of any federal, state or other governmental constitution, statute, ordinance, regulation, or public policy including, but not limited to, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866 ("Section 1981"), National Labor Relations Act, Employment Retirement Income Security Act of 1974, Consolidated Omnibus Budget Reconciliation Act, Age Discrimination in Employment Act, The Americans with Disabilities Act, Family and Medical Leave Act, Equal Pay Act, Fair Labor Standards Act, Uniformed Services Employment and Reemployment Rights Act, and their state equivalents, unless otherwise not allowed by applicable law. The purpose and effect of this Agreement is to substitute arbitration as the forum for resolution of the Claims; all rights and responsibilities of the parties under the statutes applicable to the Claims shall be enforced through arbitration, except those claims expressly excluded in paragraph 10 above.

     d.      Neutral Mediator or Arbitrator – Any mediation or arbitration of disputes shall be conducted by a single neutral mediator/arbitrator selected by agreement of the parties.  If the parties are unable to agree on selection of a mediator/arbitrator, then one shall be assigned by the American Arbitration Association's random selection process, using a local or regional list of arbitrators provided by AAA.

     e.      Location of Mediation and Arbitration – The parties agree that the mediation or arbitration of any dispute shall be held in Norfolk, Virginia, in an office or other building that is the most convenient and economical for the parties and the mediator or arbitrator.  If the parties cannot agree on a specific location, the mediator or arbitrator shall choose the specific location.

P a g e | 10

    f.      Rights – The parties understand that by signing this Agreement, and except for those matters expressly excluded, Contractor and SMS waive any right to have their contract-related disputes decided in a court or by jury trial.

    g.      Limitations Period – Except as otherwise provided under applicable law, any Claim governed by this Agreement shall be filed no later than one (1) year from the date on which an alleged incident last occurred or one year from the last date of work by Contractor under this Agreement, whichever comes first. Any dispute not resolved through mediation must be submitted to arbitration within one (1) year from the completion of the mediation or termination of work by Contractor for SMS, whichever comes first.

    h.      Initiation of Mediation Process – Contractor or SMS may initiate the mediation process by filing a Request for Mediation with the President of SMS, Lisa Pitts.

    i.      Initiation of the Arbitration Process – To initiate the arbitration process, the aggrieved party must file a written Claim. Claims against SMS should be filed with the President of SMS, Lisa Pitts. Service of the Claim upon the responding party shall be made in accordance with the Rules.

    j.      Arbitration Procedures – Arbitrations pursuant to this Agreement shall be conducted in accordance with the procedures set forth in the Rules, except where the Rules conflict with this Agreement, in which case the terms of this Agreement shall govern.

    k.      Representation – Each party may be, but need not be, represented by an attorney at any mediation or arbitration covered by this Agreement.

    l.      Fees and Costs –Each party shall pay for its own attorneys' fees and costs, if any. However, the arbitrator may, at his/her discretion, permit the prevailing party to recover attorney's fees and costs, to the extent permitted by applicable law, from the other party.  The parties each agree to pay 50% of the arbitrator's fees and costs.

    m.      Discovery – The parties shall be entitled to engage in reasonable discovery during arbitration in the form of requests for documents, interrogatories, requests for admission, physical and/or mental examinations and depositions, in order to obtain information necessary to prosecute or defend the Claims brought.

*"For All Your Staffing Needs"*
PX-25:275

**Steadfast 6th - 03720**

PX-25.070

**JA1828**

Any disputes between the parties regarding the nature or scope of discovery shall be resolved by the arbitrator in his or her discretion.

n.    Written Award – The arbitrator shall issue a written award, setting forth the award and basis therefore, including findings of fact and conclusions of law. The award shall be final and binding upon the parties. The arbitrator shall have the power to award any type of relief that would be available in a court of competent jurisdiction. In addition, the arbitrator shall have the authority to order any party found to have presented any Claim or defense without substantial justification to pay the other party's attorney's fees and costs incurred in responding to such Claim or defense, and/or 100% of the arbitrator's fees and costs. Any award may be entered as judgment in any court of competent jurisdiction.

o.    Motions – The arbitrator will have the authority to grant motions dispositive of all or part of any Claim.

p.    Exclusive Remedy – For Claims covered by this Agreement, mediation followed by arbitration is the parties' exclusive legal remedy. The arbitrator has exclusive authority to resolve any dispute relating to the applicability or enforceability of this Agreement, or the arbitrability of any Claim.

q.    Consideration – In addition to any other consideration, such as accepting or continuing contract work with the other party, each party's promise to resolve Claims by mediation and arbitration in accordance with the provisions of this Agreement, rather than through the courts or other bodies, is consideration for the other party's like promise.

17.    <u>Miscellaneous</u>.

a.    <u>Severability</u>. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.

b.    <u>Entire Agreement</u>. This Agreement contains the entire understanding between the parties with respect to the subject matter herein, and supersedes any prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, oral or written, except as herein stated. This Agreement may not be modified or amended except by the express written agreement of the parties.

*"For All Your Staffing Needs"*
PX-25:276               **Steadfast 6th - 03721**

PX-25.071

**JA1829**

P a g e  | 12

     c.    <u>Notices</u>.  All notices, requests, demands, and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given, made, and received only when delivered in accordance with the notice procedure set forth in paragraph 1 above.

     d.    <u>Governing Law</u>.  This Agreement and all questions relating to its validity, interpretation, performance and enforcement, shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, without respect to choice of law principles.

     e.    <u>Paragraph Headings</u>.  The section headings and paragraphs headings of this Agreement are designated for convenience only and they form no part of this Agreement and shall not affect its provisions or interpretation.

EACH PARTY TO THIS AGREEMENT ACKNOWLEDGES CAREFULLY READING THIS AGREEMENT, UNDERSTANDING ITS TERMS, AND ENTERING INTO THIS AGREEMENT <u>VOLUNTARILY</u> AND NOT IN RELIANCE ON ANY PROMISES OR REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS AGREEMENT ITSELF.

EACH PARTY FURTHER ACKNOWLEDGES HAVING THE OPPORTUNITY TO <u>DISCUSS THIS AGREEEMENT WITH PERSONAL LEGAL COUNSEL</u> AND HAS USED THAT OPPORTUNITY TO THE EXTENT DESIRED.

BY SIGNING THIS AGREEMENT, EACH PARTY ACKNOWLEDGES THAT THEY ARE <u>GIVING UP THEIR RIGHT TO A JURY OR COURT TRIAL</u>.

Medical Staffing of America

d/b/a Steadfast Medical Staffing

By: _____              _____

                                                   Contractor

Date:_____           Date:_____

4817-2094-0127, v. 1

Page | 5

## Section 5: Work History

Please indicate all your employment for the past ten (10) years, beginning with your most recent employer. Are you employed now? ☑ Yes ☐ No   If so, may we contact your present employer? ☑ Yes ☐ No

Facility / Employer _Caring Hearts & Hand_   Dept. _Home Health_
Street address _____   City _N.N_   State _VA_   Zip Code _____
Dates employed: From _July 18_ To _Present_   Reason for leaving _Need better Pay_
Position held _C.N.A   Home Health_   Specialty _____
Pay Rate/Salary $ _8.50_ /hr $ _____ /yr   Are you known by any other names? _____   Phone ▮▮▮▮▮
Supervisor's name and Title _____

Facility / Employer _Five Star Bridental Living_   Dept. _NS9_
Street address _121 Lincla Dr_   City _N.N._   State _VA_   Zip Code _23608_
Dates employed: From _9/17_ To _7/18_   Reason for leaving _Not a fair place._
Position held _C.N.A.  Med Tech_   Specialty _____
Pay Rate/Salary $ _19.00_ /hr $ _____ /yr   Are you known by any other names? _____   Phone ▮▮▮▮▮
Supervisor's name and Title _Tianna Hill_

Facility / Employer _Newport News Nursing & Rehab_   Dept. _____
Street address _12497 Nettles av._   City _N.N._   State _VA_   Zip Code _23606_
Dates employed: From _8-14_ To _9-17_   Reason for leaving _Patient Bation 1:19_
Position held _C.N.A._   Specialty _____
Pay Rate/Salary $ _16.91_ /hr $ _____ /yr   Are you known by any other names? _____   Phone ▮▮▮▮▮
Supervisor's name and Title _Faye Seldon_

## Section 6: References

Please list three individuals with whom you have worked, who were in a position to evaluate your performance.

| Name: | Title: | Phone No.: |
|---|---|---|
| Faye Seldon | RN | ▮▮▮▮▮ |
| Tianna Hill | LPN | ▮▮▮▮▮ |
| Laurie Menser | RN | ▮▮▮▮▮ |

1. Are you legally authorized to work in the U.S.? ☑ Yes ☐ No   *(If Yes, you might commit to at least 3 years)*
   If No, are you interested in being sponsored to work in the U.S.? ☐ Yes ☐ No

2. Have you ever been convicted of a felony or misdemeanor crime? ☑ Yes ☐ No
   (If Yes, explain each violation) _Petry Larceny  March 03_
   (Convictions are considered in relationship to position being applied for, seriousness and date of conviction.)

*I certify that my answers are true and complete to the best of my knowledge.*

*If this application leads to employment, I understand that false or misleading information in my application or interview may result in my release.*

Signature _Jahnette Jene_   Date _8/9/18_

*"For All Your Staffing Needs"*

Steadfast 6th - 02746

PX-26.013

**JA1831**

Page | 2

Steadfast Medical Staffing, LLC is an Equal Opportunity Employer.

**Applicant Acknowledgement**

I certify that the information in this application is accurate, current, and complete. I understand that misstatements or omissions may result in disqualification from further consideration or termination of employment.

I authorize **Steadfast Medical Staffing, LLC (SMS)** to investigate my employment history, credentials, and to obtain any relevant information (including criminal background check) needed to make an employment decision. I authorize **Steadfast Medical Staffing, LLC** to disclose this application along with any information about me obtained through reference checks or during the interview process for state, federal, contractual or accreditation audit purposes. I also authorize **Steadfast Medical Staffing, LLC** to disclose any of my performance appraisals, disciplinary records or skill tests for the same purposes as above. I release **Steadfast Medical Staffing, LLC** a and any individual or entity providing information to **Steadfast Medical Staffing, LLC** from all liability for any damages from the disclosure of this information.

I also understand and agree that:

- Passing a medical examination and/or participating in a post-conditional offer medical screening may be required. If medical restrictions cannot be reasonably accommodated, I may not be hired, or if hired, employment may be terminated.
- Subject to applicable laws, the Company reserves the right to conduct drug screening and testing for reasonable suspicion at any time during employment and as a pre-employment requirement. Any violation of this policy shall result in an applicant not being hired or an adverse employment action up to and including immediate termination. SMS has the right to change this policy at any time as it requires.

I understand and agree that nothing contained in this employment application or in granting of an interview creates an employment contract between SNS and me for either employment have been made to me. If an employment relationship is established, I understand that my employment will be terminable 'at will', that I have the right to terminate my employment at any time, and that SMS will retain a similar right to terminate my employment at any time.

I understand that should I become employed by SMS, my work assignments, schedules, and/or work locations are subject to change per the needs of the business and the clients of SMS.

Applicant Signature

Date 8|9|18

*"For All Your Staffing Needs"*

Steadfast 6th - 02747

PX-26.014

**JA1832**

## SECTION 3: Education & Training

High School Name _Pender High_   City _Burgaw_   State/ZIP _NC 28425_

College/Vocation School _Cape Fear Community_   City _Burgaw_   State/ZIP _NC 27425_

Major Emphasis _CNA_   Degree Completed? ☑ Yes ☐ No   Level and Type

Graduate School Name   City   State/ZIP

Major Emphasis   Degree Completed? ☐ Yes ☐ No

## SECTION 4: License/Certification

| License Type | License/Certification No. | State | Expiration Date |
|---|---|---|---|
| CNA | | NC | |
| License Type | License/Certification No. | State | Expiration Date |
| | | | |
| License Type | License/Certification No. | State | Expiration Date |
| | | | |
| License Type | License/Certification No. | State | Expiration Date |
| | | | |

Has your professional license ever been suspended, revoked, or under investigation?
  ☐ Yes  ☑ No    If **yes**, please explain _____

Please list any other work-related information you think would be helpful to us in considering you for employment, such as specialized training, additional work experience, etc.

_____

_"For All Your Staffing Needs"_

**Steadfast 6th - 03607**

PX-26.023

**JA1833**

Page | 5

## Section 5: Work History

Please indicate all your employment for the past ten (10) years, beginning with your most recent employer. Are you employed now? ☐ Yes ☑ No   If so, may we contact your present employer? ☐ Yes ☐ No

Facility / Employer _Carolina Rivers Rehab & Nursing_ Dept. _Nursing_
Street address _Onslow Dr._ City _Jacksonville_ State _NC_ Zip Code _28460_
Dates employed: From _4-12_ To _10-16_ Reason for leaving _Personal Reasons_
Position held _CNA_ Specialty _CNA_
Pay Rate/Salary $ _11.90_ /hr $ _____ /yr   Are you known by any other names? _no_
Supervisor's name and Title _Billie Kennedy_ Phone ███████████

Facility / Employer _Huntington Nursing home_ Dept. _Nursing_
Street address _McNeil St._ City _Burgaw_ State _NC_ Zip Code _28425_
Dates employed: From _09-09_ To _3-12_ Reason for leaving _____
Position held _CNA_ Specialty _____
Pay Rate/Salary $ _8.90_ /hr $ _____ /yr   Are you known by any other names? _no_
Supervisor's name and Title _Don't remember_ Phone _?_

Facility / Employer _Daysprings Nursing_ Dept. _nursing_
Street address _95h St._ City _Burgaw_ State _NC_ Zip Code _28425_
Dates employed: From _07_ To _09_ Reason for leaving _Quit_
Position held _CNA_ Specialty _____
Pay Rate/Salary $ _8.00_ /hr $ _____ /yr   Are you known by any other names? _NO_
Supervisor's name and Title _?_ Phone _____

## Section 6: References

Please list three individuals with whom you have worked, who were in a position to evaluate your performance.

Name _Antoinett Weathers_ Title _CNA_ Phone No.: ███████████
Name _Lavada Hieks_ Title _LPN_ Phone No.: ███████████
Name _Wanda Lamont_ Title _RN_ ███████████

1. Are you legally authorized to work in the U.S.? ☐ Yes   ☐ No
   If No, are you interested in being sponsored to work in the U.S.? ☐ Yes*   ☐ No   *If Yes, you must commit to at least 3 years.

2. Have you ever been convicted of a felony or misdemeanor crime? ☐ Yes   ☑ No
   If Yes, explain each violation
   (Convictions are considered in relationship to position being applied for, seriousness and date of conviction.)

*I certify that my answers are true and complete to the best of my knowledge.*

*If this application leads to employment, I understand that false or misleading information in my application or interview may result in my release.*

Signature _Sandra Baykin_   Date _12-6-17_

*"For All Your Staffing Needs"*

Steadfast 6th - 03608

PX-26.024

**JA1834**



**SteadFast Medical Staffing, INC. Is An Equal Opportunity Employer.**

**Applicant Acknowledgement**

I certify that the information in this application is accurate, current and complete. I understand that mis-statements or omissions may result in disqualification from further consideration or termination of employment.

I authorize SteadFast Medical Staffing, INC. (SMS) to investigate my employment history, credentials and to obtain any relevant information (including a criminal background check) needed to make an employment decision. I authorize SteadFast Medical Staffing, INC. to disclose this application along with any information about me obtained through reference checks or during the course of the interview process for state, federal, contractual or accreditation audit purposes. I also authorize SteadFast Medical Staffing, INC. to disclose any of my performance appraisals, disciplinary records or skill tests for the same purposes as above. I release SteadFast Medical Staffing, INC. and any individual or entity providing information to SteadFast Medical Staffing, INC. from all liability for any damages from the disclosure of this information.

I also understand and agree that:
- Passing a medical examination and /or participating in a post-conditional offer medical screening may be required. If medical restrictions cannot be reasonably accommodated, I may not be hired, or if hired, employment may be terminated.
- Subject to applicable state laws, the Company reserves the right to conduct drug screening and testing for reasonable suspicion at any time during employment and as a pre-employment requirement. Any violation of this policy shall result in an applicant not being hired or an adverse employment action up to an including immediate termination. SMS has the right to change this policy at any time, as it requires.

I understand and agree that nothing contained in this employment application or in granting of an interview creates an employment contract between SMS and me for either employment or for the providing of any benefit. No promises regarding employment have been made to me. If an employment relationship is established, I understand that my employment will be terminable "at will", that I have the right to terminate my employment at any time, and that SMS will retain a similar right to terminate my employment at any time.

I understand that should I become employed by SMS, my work assignments, schedules and/or work locations are subject to change according to the needs of the business and the clients of SMS.

Applicant's Signature _____          Date _____



# SteadFast Medical Staffing, INC.

## Confidentiality Statement

As an SMS employee/sub-contractor, I understand and acknowledge that:

I must hold confidential and private all information pertaining to patients, patient records, client facility policies, and procedures.

All protected patient information shall be kept safeguarded pursuant to the policies and procedures at each facility, respectively; and in accordance the Health Insurance Portability and Accountability Act of 1996 (HIPPA), the regulations issued there under, and any applicable state law to prevent impermissible disclosure, loss or misuse, and to ensure that only authorized persons have access to such protected information.

I will consult the Facility Privacy Officer in the event I have any questions regarding the scope or application of the privacy policies described in the statement.

Private and confidential information will only be released to an outside party when legally required to do so and to the extent minimally necessary to respond to the request.

Failure to maintain confidentiality and privacy may lead to disciplinary action up to and including termination as well as any actions designated by the appropriate disciplinary and/or credentialing board.

I understand that any breach of confidentiality may be grounds for immediate termination of employment as well as any appropriate legal actions.

Signature                                                    Date

SMS Representative                                           Date

PX-26:007

PX-26.031

**JA1836**



# SteadFast Medical Staffing, INC.

Applicants please note:  Enter only employer reference – no family or personal
## PERSONAL & CONFIDENTIAL

The below named applicant has applied for employment with SteadFast Medical Staffing, INC. (SMS) and has submitted your name as a former employer, supervisor, or co-worker for reference purposes.  The applicant has authorized this request to verify employment and his/her performance.  SMS strives to promote the highest quality and service.  In keeping with these standards we recruit according and are dependent on receipt of references.  SMS appreciates your cooperation in completing this form as objectively as you can.  Thank you for your help.

## TO BE COMPLETED BY APPLICANT

I authorize the company to thoroughly investigate my background, references, employment record, and other matters related to my suitability for employment, without any further notice to me. I further authorize my former employers or any other third party to disclose to the Company all reports and other information related to my suitability for employment. In addition, I hereby release the Company and its officers and employees, and any other third party, from any and all claims, demands, and/or liabilities arising out of or related to such investigation or disclosure.

Applicant's Signature and Approval: _____ Date: _____
Applicant's Name (print) Last: _____
Social Security #: _____ First: _____ Middle Initial: _____
Employment Dates: From _____ to _____ Position Held: _____

### PLEASE DIRECT THIS REQUEST FOR REFERENCE TO:

Employer's Name: _____
Hospital/Clinic: _____ Title: _____
Street: _____ Department: _____
City: _____ State: _____ Zip: _____
Phone Number: ( ) _____
Reason for Leaving: _____

## TO BE COMPLETED BY EMPLOYER

Is the above data correct? ____ Yes ____ No
Is Applicant Eligible for Re-Hire? ____ Yes ____ No
If no to either of above, why? _____

____Check here if you would like us to contact your company regarding our healthcare services

Please evaluate Applicant using this scale:  1= Excellent  2=Above Average  3=Average  4=Below Average  5=Poor

| Quality of Work (Technical ) | | Safety | |
|---|---|---|---|
| Quality of Work (Productivity) | | Demonstrates Good Judgment | |
| Attendance and Punctuality | | Accepts Supervision | |
| Attitude | | Ability To Self Direct | |
| Dependability | | Professional Conduct | |
| Cooperation | | Initiative | |
| Ability to Adapt | | Professional Appearance | |

Comments: _____
Reference Signature: _____ Title/Dept: _____ Date: _____

PX-26:010

PX-26.034

**JA1837**



## SteadFast Medical Staffing, INC.
### Authorization and Release
### (For Pre-Employment)

I, _____ , hereby give SteadFast Medical Staffing my permission to conduct an investigation to obtain information which the Company thinks is necessary to determine my qualifications for employment with the Company, including but not limited to, my permission to contact any former employer, any personal or professional reference, any bank, credit or finance bureau or office, any police department, law enforcement agency or organization, or any other local, state or federal government agency, any consumer reporting agency, or any other appropriate source or individual for the purpose of gathering information, personal or otherwise, that such sources may have relating to my character, general reputation, or criminal records, and I give my consent to any source to release to the Company whatever information they have about me.

I understand that the information requested about me on this form is necessary so that accurate information is obtainable. I hereby consent to this investigation and authorize SMS to procure a consumer report on my background as stated above from a consumer reporting agency. I also unconditionally release all named and unnamed sources from any and all liability which might result from furnishing any information about me.

Prospective Employer:  SteadFast Medical Staffing, INC.

Print Name: _____

Current Address: _____

City/State/Zip: _____

Previous Address: _____

City/State/Zip: _____

Social Security #: _____  Date of Birth: _____

Driver's License #: _____  State: _____

If Never Licensed, Please Indicate: _____

Applicant's Signature: _____  Date: _____

SMS Witness Name (please print): _____

SMS Witness Signature: _____

PX-26:011

PX-26.035

**JA1838**



Steadfast Medical Staffing <timesheets.sms@gmail.com>

**Call Center Memo -- Effective Immediately**
1 message

Steadfast Medical Staffing <timesheets.sms@gmail.com>



PX-37.001

**JA1839**



Stoddard-Nah 033850

PX-37.002

JA1840

Case 2:18-cv-00226-RAJ-LRL Document 356-9 Filed 08/17/22 Page 2 of 43 PageID# 17137



Case 2:18-cv-00226-RAJ-LRL   Document 356-9   Filed 08/17/22   Page 3 of 43 PageID# 17138

Steadfast 00h 033853

PX-37.003

**JA1841**



# STEADFAST MEDICAL STAFFING

## <u>CALL CENTER MEMO</u>

To reach the Call Center during

business hours, please call

757-321-0777.

After hours (5PM), please call

757-321-0777 and/or

757-901-8338 (text capability).

To ensure your message and call is received, please refrain from

calling any other numbers.

Effective Immediately.    6/28/19

Steadfast 6th 033852

PX-37.004

JA1842



--
**Steadfast Medical Staffing**
Office: (757) 321-0777
Fax: (757) 857-6003

**|| Time sheets are due after each shift, but no later than 9AM Tuesday in order to process for Friday's pay ||**

**We are requesting that you provide your Name, Title || Date || Facility in the subject of each e-mail when sending time sheets.**

<u>BON SECOURS ASSIGNMENTS</u>
Please be mindful that you **must** submit an unsigned time sheet for ALL and ANY shifts worked in order to process for payment! We understand that Bon Secours has implemented a new clock-in & out system, however you need to continue to submit a time sheet for payment.

CONFIDENTIALITY NOTICE: The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.

Steadfast 56th 033855

PX-37.005

 Gmail

Steadfast Medical Staffing <timesheets.sms@gmail.com>

## Steadfast Medical Staffing || New Pay Period
1 message

**Steadfast Medical Staffing** <timesheets.sms@gmail.com>      Wed, May 2, 2018 at 3:22 PM
Bcc: "mnpig@netzero.net" <mnpig@netzero.net>, Monica MITCHELL <lauren061984@yahoo.com>, Monique Dunn <m.dun0129@icloud.com>, Monkey boy plays Hawkins <hawkinslashonda11@gmail.com>, Montez Richard <montez1472@gmail.com>, "moodytine@yahoo.com" <moodytine@yahoo.com>, Morenike collier <morencks@hotmail.com>, Morgan Sar <jtgm1234@gmail.com>, "Mrs. Margie McIntyre" <margiemcintyre14@gmail.com>, "Ms. Jerolyn" <jerolync@yahoo.com>, "msjuscuz@aol.com" <msjuscuz@aol.com>, "msrmwallace73@outlook.com" <msrmwallace73@outlook.com>, MUAD DEE <muaddee21@gmail.com>, Munah Tarpeh <munahtarpeh20@gmail.com>, Munah Tarpeh <munahtarpeh20@icloud.com>, mya jackson <josephrone91@gmail.com>, Myteara Thompson <methompson1@icloud.com>, mzhaley <mzhaley@yahoo.com>, Najah Miller <millernajah@gmail.com>, Nakeesha Rollins <nakeesha7@gmail.com>, Nakia Goodman <jaielijah2007@gmail.com>, Nakia Goodman <nog244@email.vccs.edu>, NasiYah Israel <sonyagadberry@gmail.com>, natalya moore <natalya_moore@yahoo.com>, natasha horsley <27prettyms@gmail.com>, Natasha Martin <tashamartin1994@icloud.com>, Natasha Owens <diva4.1god@gmail.com>, nayshaw lewis <nayshaw.lewis@gmail.com>, Nb K <nbk1433@gmail.com>, "Necolecufee.sms.@gmail.com" <Necolecufee.sms.@gmail.com>, "necolecuffee.sms@gmail.com" <necolecuffee.sms@gmail.com>, neesha l <neeshamurse@hotmail.com>, Nekisha Boone <redboone757@gmail.com>, Neoshe Turner <neosheturner3281996@gmail.com>, Nerissa Calvin <nerisssa4@icloud.com>, "newma03@yahoo.com" <newma03@yahoo.com>, Ngozi Azubike <godblessazu@gmail.com>, niara early <niaraearly97@yahoo.com>, niara early <niaraearly@outlook.com>, Nick Crowder <ncrowder32@yahoo.com>, Nicole Alcnhgig <nicoleva3185@gmail.com>, Nicole Bond <nicole.bond87@yahoo.com>, Nicole Harris <johyona8nicole@yahoo.com>, Nicole Keeling <lovebringunderstanding@gmail.com>, Nicole McCann <ms.nicole.mccann@gmail.com>, Nicole Williams <nicolew0509@gmail.com>, Nicole Wood <understandingbringlove@gmail.com>, Nikita <nikitadeloatch91@gmail.com>, nikki moser <nicholemoser3749@gmail.com>, Nina Mabb <ninamabb85@yahoo.com>, Nisha Bowser <nishabowser09@gmail.com>, Niva Darling <yatta052000@gmail.com>, Nneka T <nnetillman@gmail.com>, Nyola Shaw <nyolashaw@hotmail.com>, Omari Banks <omaribanks04@gmail.com>, padgettlolita26 <padgettlolita26@gmail.com>, Pamela Moore <pamelam999@gmail.com>, "partnersinmanagementnorfolk@gmail.com" <partnersinmanagementnorfolk@gmail.com>, Patricia Rawls <manissy2003@icloud.com>, Paula Allen <godschocolate3@gmail.com>, Paula Tate <pctate07@gmail.com>, paulabethea1968 <paulabethea1968@gmail.com>, peggy mickle <dixiechick10296@gmail.com>, Pegu Roane <proane43@icloud.com>, Penny Clark <pennyaclark@gmail.com>, Phillip Vaughan <phillip69vaughan@gmail.com>, Piers Miltier <piers.ferguson@gmail.com>, pinks rainbow <noldstwo@gmail.com>, "popovata@forsyth.cc" <popovata@forsyth.cc>, Priscilla Whitley <di4whit@yahoo.com>, "pumpkinlpn@yahoo.com" <pumpkinlpn@yahoo.com>, Quintarah Waller <quintarahwaller@yahoo.com>, rashea lockhart <rykei1@yahoo.com>, Rashetta757 Banks <rashetta757@gmail.com>, Raven Glenn <rglenn204@gmail.com>, Raven Wooten <rwooten3118@icloud.com>, Renarda Griffin <genesis198028@gmail.com>, Renea Randolph <randolphrenea@gmail.com>, Renicks Taiwo <renicks.taiwo@gmail.com>, Renisha Hubbard <boothang434@gmail.com>, ReSheema Lawyer <shaynaresheema02@icloud.com>, ReShonda Ezell <k8tezmom@gmail.com>, Reshonn N Sutphin <jacksonsutphin@gmail.com>, Rhonda Womack <rhondawomack75@gmail.com>, Ricketa Reid <ricketareid@icloud.com>, Ricketa Reid <ricketa.reid@yahoo.com>, Rickie Huff <huffrickie@gmail.com>, Robert Duhart <robcanduh@gmail.com>, Robert Fulton <fultonrob6@gmail.com>, Robert Stokes <robertbstokes9757@gmail.com>, Robin Harris <robinharris1959@yahoo.com>, Robyn Lee <robyn.lee81@icloud.com>, Romise Chikems <chikems@gmail.com>, Roxanne Adams <rra270@email.vccs.edu>, Roxanne Brown <dvanrse@icloud.com>, "rudinagreen973@yahoo.com" <rudinagreen973@yahoo.com>, Ryan THOMPSON <r.l.thompson2010@gmail.com>, sabrina cranford <jesusaves385@gmail.com>, Sadiqua Booker <bsadiqua@yahoo.com>, Samara Archer <nursesamara629@gmail.com>, Samara Archer <sarcher7609@yahoo.com>, Sampson Ekwet <sme2332@email.vccs.edu>, Sarah Bostick <sarahbostick10639@my.tridenttech.edu>, Selina <selinagibbs@yahoo.com>, selinagibbs80 <selinagibbs80@gmail.com>, Shaina Reynolds <shainareynolds37@gmail.com>, Shakeia Mcleod <keiabell4@gmail.com>, Shaleesa Smith <mzleeasasmith@gmail.com>, Shamane Jones <helpofhealinghands09@gmail.com>, Shameka Gregory <shamekagregory@yahoo.com>, Shaneka Brown <brownshakeema14@gmail.com>, Shaneka Horne <shanekahorne17@gmail.com>, Shanese Tarpley <s_tap20@yahoo.com>, Shanese Tarpley <mrtap65@gmail.com>, shanmekacobb <shanmekacobb@gmail.com>, Shasha evans <shashaevans20@gmail.com>, shawanda bowen <cashqueen247@gmail.com>, Shannon Howell <smilam6001@gmail.com>, Shanta Riddick <shanteriddick98@gmail.com>, Shaquita Glasco <glasco757shaquita@gmail.com>, Sharan Adams <sadams3278@gmail.com>, Shareen <shareen.fennell@gmail.com>, "sharilene@hotmail.com" <sharilene@hotmail.com>, Sharonda White <sharondawhite37@gmail.com>, Shasha evans <shashaevans20@gmail.com>, shawanda bowen <btflwwb3@gmail.com>, Shawlawn Hicks <shawlawn@hotmail.com>, Shawnda Kay <shawnda_kay@icloud.com>, Shawnda Kay <shawnda_kay@yahoo.com>,

Steadfast 6th - 33884

PX-37.027



Shawnda Meier <shawndameier@gmail.com>, Shawvone Brockman <shawvonebrockman@yahoo.com>, Shayna Lawyer <resheemalawyer@gmail.com>, Sheena Petty <petty.sheena@gmail.com>, Sheila Silver <sheilarob2015@gmail.com>, shekeriaboyd <shekeriaboyd@gmail.com>, "shellycoates41@yahoo.com" <shellycoates41@yahoo.com>, Shemica Scott <dontbemad.ss@gmail.com>, Sherese Lankford <sherese0305@gmail.com>, SHERETA CASHWELL <stcashwell@gmail.com>, Sherilene Grant <sherilene@hotmail.com>, shermekea mcneal <shermekea.mcneal@live.com>, Shermekea Mcneal <shermekea.mcneal@icloud.com>, shirlene richards <tisnfig@gmail.com>, Shirley Martin <ssomartin2700@gmail.com>, Shirley Penn <shirleypenn00@gmail.com>, Shondra B <sblyden27@gmail.com>, Shoneterria Fulton <shoneterriafulton@gmail.com>, Shoneterria Fulton <shoneterriafulton@yahoo.com>, "shonyeld@yahoo.com" <shonyeld@yahoo.com>, shrondari ford <dedicatedshaun@yahoo.com>, smallilijohn <smallilijohn@gmail.com>, Stacie Hairston <staciehairston@gmail.com>, Stef Green <stef.green85@gmail.com>, Stella Ogwang <stellagraceogwang@gmail.com>, Stella Ogwang <a5422841@icloud.com>, Stephanie Allen <sexxy8706@gmail.com>, Stephanie Collier <stephaniedcollier16@gmail.com>, Stephanie Collier <stephaniecollier16@gmail.com>, Stephanie Griffin <gsteph172@gmail.com>, stephanie rizer <stephanie.rizer@gmail.com>, stephaniecarter530 <stephaniecarter530@gmail.com>, SummerSkyy Jones <summerskyyjones@gmail.com>, Syreeta McManes <syreetamcmanes@yahoo.com>, "t.alexander9697@yahoo.com" <t.alexander9697@yahoo.com>, Takeisha Rawls <tmr2222@email.vccs.edu>, tamara gorham <kabbal73@gmail.com>, Tameika Lassiter <ohshescute@yahoo.com>, Tameka Watford <t.watford@yahoo.com>, Tamika Cox johnson <louisecox3@gmail.com>, Tanglae Keys <tkeys0618@gmail.com>, Tanisha Church <tanishachurch07@gmail.com>, TANYARD BRAY <tabrayrn@hotmail.com>, Taren Watkins <tlwatkins1@gtcc.edu>, Tasha <jahlia1012@gmail.com>, Tasha Elwyn <tashamarietate@icloud.com>, TaShena Callands <lolabunni88@gmail.com>, "tashimanewsome@yahoo.com" <tashimanewsome@yahoo.com>, Taylor Zollars <taylor93zollars@icloud.com>, tbonitap <tbonitap@gmail.com>, Teisha Stone <teeabril1@gmail.com>, Tennille Davis <ariesdavis33@gmail.com>, Teresa Rollins <trollins.tr@gmail.com>, Tia Hobson <ms.tia.h.29@gmail.com>, Tia Rowe <tiarowe8@gmail.com>, Tia Wilson <shana86.tw@gmail.com>, Tianna Tyler <tianna.tyler@yahoo.com>, Tiara Hairston <thairst2393@yahoo.com>, Tiffanee McKenzie <tifmckenzie3175@gmail.com>, Tiffany Guy <tifguy1639@gmail.com>, Tiffany Trogdon <tifff34@gmail.com>, Tiffany Worrell <tiffanyworrell@gmail.com>, "tiffanylp37@gmail.com" <tiffanylp37@gmail.com>, Tilesha Dupree <dtilesha@gmail.com>, Tina Manago <managotina2@gmail.com>, TINA TERRY <terrytina594@yahoo.com>, Tomika Sykes <tomikasykes3@gmail.com>, Tomika Sykes <tomikasykes2@gmail.com>, tonya higdon <Tnaja@yahoo.com>, Topaz McLennon <topaz.mclennon@gmail.com>, Torsha Graves <torshagraves@gmail.com>, TOYA OUR <lbrown0589@gmail.com>, Tracey Hamm <traceyhamm50@gmail.com>, Tracey Nyembe <traceynyembe@yahoo.com>, Trachita Jones <trajon6481@students.ecpi.edu>, Tracy & Robert Simon <mrssimon4039@gmail.com>, Trenika Stringfield <trenika.ts@gmail.com>, Tricia Dean <triciadean3@gmail.com>, tricia hilll <edimples70@gmail.com>, Trynasha Crenshaw <trynashacrenshaw@yahoo.com>, TRYNASHA CRENSHAW <chocolat_princess23@yahoo.com>, Tyfonda Moon-Poe <tylamoonpoe@yahoo.com>, Unique Uviatta <bjunique89@icloud.com>, V Jacks <vjacks9.vj@gmail.com>, Valentina Bailey <valentinalise@icloud.com>, Valentina Champagne <valentinalchampagne@gmail.com>, Valerie Aldhizer <valeriealdhizer@gmail.com>, Valerie Franks <valeriefranks66@gmail.com>, Valerie McQueen <valerie.mcqueen@yahoo.com>, Varnysha Whitsett <varnyshawhitsett@gmail.com>, "vcw0803@yahoo.com" <vcw0803@yahoo.com>, Verna Robbins-roundtree <verna_rr@yahoo.com>, Veronica Bryant <lashanda8806@gmail.com>, Vina Harris <beboprenee@gmail.com>, Vina W <alcoffey235@gmail.com>, Virginia Rawls <va.rawls@gmail.com>, Vondrea Barrett <vondreabarrett3@gmail.com>, VonnaBabe #ImYaMansFantasy <vonnaboo03@gmail.com>, Waade Zonen <nrsgforlife@gmail.com>, Wanda Lamont <dr.wandalamont@gmail.com>, Wanda Lamont <dr.wandalamont@me.com>, Whitney <smchick5789@aol.com>, "wilsonpeggy159@gmail.com" <wilsonpeggy159@gmail.com>, windy west <windydiva@hotmail.com>, Yaquita Lawrence <yaquitachristina@gmail.com>, Yetunde Talyor <yetundetaylor@yahoo.co.uk>, Yolanda ROMIOUS <yvette141972@gmail.com>, "yourgoodnurse@yahoo.com" <yourgoodnurse@yahoo.com>, yvettrise hoskie <mszx33@yahoo.com>, Zahara Muhammad <zahara7@icloud.com>, Zaobright <samsonz97@yahoo.com>, zemira Davis <zemiradavis@yahoo.com>, Zemira Davis <vkd211@email.vccs.edu>, Zena Lewis <taronne645@gmail.com>, Zihquinn Hathaway <1zihquinn@gmail.com>

## STEADFAST MEDICAL STAFFING MEMO

As a reminder, we ask that everyone sends over their time sheets upon each shift daily !

**If already haven't done so, please e-mail over all time sheets from Tuesday and Wednesday shifts!**

**Please ensure the following are correct and reviewed on your time sheet before submitting:**

1. Time sheet date and the day column filled in should reflect the date that you **began** your shift.

2. We cannot accept initials for facility signatures.
   The signature of the Facility Staff must be present or the time sheet cannot be processed.

Steadfast 6th - 33885

PX-37.028

JA1845

Case 2:18-cv-00226-RAJ-LRL    Document 356-9    Filed 08/17/22    Page 28 of 43 PageID# 17163



3. Full name of facility worked at is important. DO NOT ABBREVIATE Facility Names!
Several locations are franchise-like and including the city is recommended.
For example: "Accordius _____ "

4. Blurry or small pictures. (Quality of image)

5. Stating AM or PM for in and out times when not using military time.

6. Multiple facilities **cannot** be submitted on the same time sheet.
Signature from facility is required for different days. Submit a new time sheet for each.

** Please note the correct way to fill out the bottom of a time sheet:

Client: Full name of facility worked at       Signature: Facility Staff/Charge Nurse To Confirm

Name: Your Name, (CNA,LPN,RN)       Signature: Your Signature, (CNA, LPN, RN)

Refer to below:



Otherwise, we thank you in advance and wish everyone a great week!

--

Steadfast 6th - 33886

PX-37.029

JA1846



**Steadfast Medical Staffing**
Office: (757) 321-0777
Fax: (757) 857-6003
Email: timesheets.sms@gmail.com

CONFIDENTIALITY NOTICE: The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.

**Steadfast 6th - 33887**

PX-37.030

**JA1847**

# <u>PLEASE BE ADVISED</u>

When you are working at Atlantic Shores private duty please be advise:

- Leave your Badge in your car.

- If you are asked who you work for, please let them know you are contracted through Atlantic Shores and your Supervisor is Lashawn!!

6/26/17

**Steadfast 6th 070370**

**JA1848**

# STEADFAST MEDICAL STAFFING

Memo of the week: 03/03/2017

Office number: (757) 321-0777
If you need to reach Lisa, please call (757) 215-5716 or (757) 761-0495
You can contact her 24 hours a day, 7 days a week.

**BEING LATE IS A BAD REPRESENTATION
OF *YOURSELF* AND THE COMPANY.**

**IF YOU CANNOT BE ON TIME, DO NOT
SIGN UP FOR THE SHIFT!**

# BE ON TIME!!!!!!

FAX ALL TIMESHEETS TO
(757) 857-6003
AND
EMAIL THEM TO
timesheets.sms@gmail.com
AFTER EVERY SHIFT
payroll closes on Monday 12pm
*Timesheets for Monday shifts need to be sent in immediately after the shift is over

Thank you,

Lisa Pitts, CEO

**Steadfast 6th 070371**

**JA1849**

# STEADFAST MEDICAL STAFFING

Memo of the week: 02/17/2017

Office number: (757) 321-0777
If you need to reach Lisa, please call (757) 215-5716 or (757) 761-0495
You can contact her 24 hours a day, 7 days a week.

# NO SLEEPING IN THE
# RESIDENT ROOMS!!

## SOME RESIDENTS HAVE A CAMERA IN THE ROOM.

FAX ALL TIMESHEETS TO
(757) 857-6003
AND
EMAIL THEM TO
timesheets.sms@gmail.com
AFTER EVERY SHIFT
payroll closes on Monday 12pm
*Timesheets for Monday shifts need to be sent in immediately after the shift is over

Thank you, *Lisa Pitts* 2/17/17

Lisa Pitts, CEO

Steadfast 6th 070373

**JA1850**



# STEADFAST MEDICAL STAFFING

Memo of the week: 01/27/2017

Office number: (757) 321-0777
If you need to reach Lisa, please call (757) 215-5716 or (757) 761-0495
You can contact her 24 hours a day, 7 days a week.

# HUMILITY

## GOES A LONG WAY.

## PLEASE BE ON TIME FOR ALL SHIFTS!

FAX ALL TIMESHEETS TO
(757) 857-6003
AND
EMAIL THEM TO
timesheets.sms@gmail.com
after every shift
all timesheets must be submitted before Monday 12pm
*(except shifts scheduled for during/after the cut-off time)*

Thank you,

Lisa Pitts, CEO

**Steadfast 6th 070375**

**JA1851**



## NEXT DAY PAY MEMO!!
1 message

**Steadfast Medical Staffing** <timesheets.sms@gmail.com>                    Fri, Apr 13, 2018 at 4:15 PM
Bcc: Tia Wilson <shana86.tw@gmail.com>, angela stewart <angierosa1944@gmail.com>, anastasia burns
<anastasia.burns772@yahoo.com>, Robin Harris <robinharris1959@yahoo.com>, Johnny Overton <Sittinghere@yahoo.com>, Tina
Manago <managotina2@gmail.com>, rudinagreen973@yahoo.com, Stephanie Griffin <gsteph172@gmail.com>, Aisha Locus
<aishalocus1974@gmail.com>, Pegu Roane <proane43@icloud.com>, Jameyle Jones <jjones9487@gmail.com>, Nisha Bowser
<nishabowser09@gmail.com>, Tasha <jahlia1012@gmail.com>, Cle Brom <cleclesmooches@gmail.com>, Daphne Worsley
<daphne.worsley63@gmail.com>, Christine Land <maaple33@gmail.com>, DEREK Lamb <dereklamb21@gmail.com>, Tomika Sykes
<tomikasykes2@gmail.com>, windy west <windydiva@hotmail.com>, selinagibbs80 <selinagibbs80@gmail.com>, "Mrs. Margie McIntyre"
<margiemcintyre14@gmail.com>

HI,

As a reminder all time sheets for next day pay must be received by 9AM on Monday.
Checks will be available after 1:30pm.

Have a great weekend

--
**Steadfast Medical Staffing**
Office: (757) 321-0777
Fax: (757) 857-6003
Email: timesheets.sms@gmail.com

CONFIDENTIALITY NOTICE: The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged
information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in
error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that
any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.



# STEADFAST MEDICAL STAFFING

Memo of the week: 11/4/2016

Office number: 757-321-0777
If you need to reach Lisa, please call 757-215-5716 or 757-761-0495
You can contact her 24 hours a day, 7 days a week.

## HAPPY THANKSGIVING!!!

THE OFFICE WILL BE **CLOSED**

NOVEMBER 24TH (THURSDAY) AND 25TH (FRIDAY)

IN OBSERVANCE OF THE HOLIDAY

*CHECKS WILL BE DISTRIBUTED*
***WEDNESDAY**, NOVEMBER 23RD AT 1PM*

GOING FORWARD - NEW **TIMESHEET DEADLINE IS**
MONDAY 12PM AS OF 11/1/2016

FAX ALL TIMESHEETS TO
(757) 857-6003
*AND*
EMAIL THEM TO
timesheets.sms@gmail.com

Thank You

Catherine Martinez, HR

*Catherine Martinez*



Steadfast 6th 070379

**JA1853**



## CNA & LPN - IMMEDIATE NEEDS IN VA, NC, and MD
1 message

**SMS Call Center** <callcenter.steadfast@gmail.com>                                    Tue, Apr 21, 2020 at 5:01 PM
Bcc: Nadine Person <nikkinae7788@icloud.com>, Nadine Person CNA <nadine.person@yahoo.com>, nahjah kelly <nahjah.k@yahoo.com>, Najah Miller <millernajah@gmail.com>, Nakeesha Rollins <leolion73@icloud.com>, Nakeesha Rollins <nakeesha7@gmail.com>, Nakia Goodman <jaielijah2007@yahoo.com>, Nakia Goodman <nog244@email.vccs.edu>, Nannette Holley <nannette.holley@yahoo.com>, Natalya Moore LPN <natalya_moore@yahoo.com>, Natasha McBee <natashamcbee@gmail.com>, Natasha Morris <kahasixza7913@yahoo.com>, nayshaw lewis <nayshaw.lewis@gmail.com>, Nekisha Boone <redboone757@gmail.com>, Neknek <tineeka4@gmail.com>, Nesia Robinson <cornesia.robinsonn@gmail.com>, Nextdaypay <nextdaypay@steadfastmedicalstaffing.com>, Nick Crowder LPN <ncrowder32@yahoo.com>, Nicole Pierce <nicolelashone93@gmail.com>, Nicole Thompson <nikkimonique1981@gmail.com>, Nicole Williams <nicolew0509@gmail.com>, Niina honeyy <myjuly112014@gmail.com>, Nikki Evans <nevansnursing@yahoo.com>, nikki moser <nicholemoser3749@gmail.com>, Nina Massicci <ninamassicci36@gmail.com>, Nisha Boo <nishaboo173@gmail.com>, Nisha Bowser <nishabowser09@gmail.com>, Nluenva <nluenva@aol.com>, nyasia boone <nyasiasboone@gmail.com>, ORINTHIA SPIVEY <orinthiamt@yahoo.com>, pamel murdock <pamelmurdock@gmail.com>, Pamela Covil <mrscovil757@outlook.com>, Pamela Light <pmlight05@hotmail.com>, PANTHA WEAR PROMO <rbgnewz2012@gmail.com>, Paris Gary <garyparis96@gmail.com>, Patrice Johnson <mrzjohnson71@yahoo.com>, Patricia Rawls <manissy2003@icloud.com>, Patricia Rawls <manissy2003@yahoo.com>, Pattie Davis <pattiedavis01@gmail.com>, Paulette Tucker LPN <8049082467@mypixmessages.com>, Paulette Tucker LPN <8049082467@vtext.com>, Pegu Roane <proane43@icloud.com>, Piers Miltier <piers.ferguson@gmail.com>, pooh bear <shannatisdale4@gmail.com>, Precious Taylor <preshtaylor@aol.com>, Priscilla Whitley <di4whit@yahoo.com>, Prttylike Mariah <love.mariah24@gmail.com>, PunkinLPN <punkinlpn@gmail.com>, Quanleau riddick <quanleaud@gmail.com>, Quentina Thomas <thomasquentina@yahoo.com>, Quintarah Waller RN <quintarahwaller@gmail.com>, Rashetta757 Banks <rashetta757@gmail.com>, rasshawn cooke <cookerasshawn@gmail.com>, Rayshara Barrow <raysharabarrow620@gmail.com>, Rebeka Robinson <rebeka.robinson16@icloud.com>, Reevesbrowndanielle <reevesbrowndanielle@yahoo.com>, Renae Dumpson <renaetavie8@gmail.com>, Renarda Griffin <genesis198028@gmail.com>, Renicks Taiwo <renicks.taiwo@gmail.com>, Renita Hammond <hammondrenita@gmail.com>, Reshonn N Sutphin CNA <jacksonsutphin@gmail.com>, Rhea Rumph <rhearumph@gmail.com>, Rhonda Womack <rhondawomack2025@gmail.com>, Rhonda Womack <rhondawomack75@gmail.com>, Ricketa Reid <ricketa.reid@yahoo.com>, Ricketa Reid <ricketareid@icloud.com>, Rickie Huff <huffrickie@gmail.com>, Rickysammyhannah <rickysammyhannah@aol.com>, Riichy Dman <dmanrogers12@gmail.com>, rikea josey <rikeajosey2@gmail.com>, Robert Duhart <robcanduh@gmail.com>, Robert Stokes <robertbstokes9757@gmail.com>, robyn lee <robyn.lee80@yahoo.com>, Rose Jackson <rojacks7@aol.com>, Rose Jackson <rosejackson752@gmail.com>, Roxanne Adams <jenobia4@gmail.com>, Rrocky87 <rrocky87@aol.com>, Ru Cooper <makiyahtianadad@gmail.com>, Rudina Green CNA <rudinagreen973@yahoo.com>, Rugayyah Matin <RMatin@mail.com>, Ryan THOMPSON <r.l.thompson2010@gmail.com>, S B <sbrownjones357@gmail.com>, S Chantel Williams <schantelwilliams.va@yahoo.com>, Sade Johnson <iyonna287@yahoo.com>, Sadiqua Allen <diqua00@yahoo.com>, Samara Archer <nursesamara629@gmail.com>, Samara Archer <sarcher7609@yahoo.com>, Sarah Bostick LPN <sarahbostick10639@my.tridenttech.edu>, Sarah May <sarahmaypulido@yahoo.com>, Selina Gibbs CNA <selinagibbs@yahoo.com>, selinagibbs80 <selinagibbs80@gmail.com>, Shakita Anderson <yanee0919@gmail.com>, Shaleesa Smith <mzleesasmith@gmail.com>, Shaloda Williams <wshaloda@gmail.com>, Shalonda Williams <wshalonda6@gmail.com>, Shameika Parker <sparker0114@gmail.com>, Shaneka Brown <brownshakeema54@yahoo.com>, Shaneka Horne <shanekahorne17@gmail.com>, Shanice McCants <shanice0905@gmail.com>, Shaniqah Mcleod <snm5295@gmail.com>, shanmekacobb <shanmekacobb@yahoo.com>, Shanna Tisdale <shannatisdale@yahoo.com>, Shantaye Barnes <shantayebarnes@gmail.com>, Shanteequa Alexander <alexander.shanteequa@gmail.com>, Sharon Cannon RN <8123699596@mms.att.net>, Sharonda White <sharondawhite37@gmail.com>, Shauna Catoe <catoe2533@gmail.com>, Shaunta Wright <shaunta1000@yahoo.com>, shawanda bowen <btflwwb3@gmail.com>, Shawlawn Hicks <shawlawn@hotmail.com>, Shawnda Meier <shawndameier@gmail.com>, shawvone brockman <shawvonebrockman@yahoo.com>, Sheila Silver LPN <sheilarob2015@gmail.com>, sheila white <sheila.white30@yahoo.com>, Sheila White <wsheila@icloud.com>, Shelanda Mitchell <shelandamitchell@ymail.com>, shelby highsmith <shighsmith001@gmail.com>, Shelly Coates <shellycoates41@yahoo.com>, Shemeka Lewis <slew25280@gmail.com>, Shericka holloway <tounk757@gmail.com>, Sherri-Chantel Williams <schantelwilliams@icloud.com>, sherrie morrow <sherriemorrow233@yahoo.com>, sherry flournoy <sherryflournoy210@yahoo.com>, sherry owens <getsherry@gmail.com>, Shirley Key <shirleykey801@gmail.com>, Shoneterria Fulton <shoneterriafulton@gmail.com>, Shoneterria Fulton <shoneterriafulton@yahoo.com>, "Simon, Tracy" <Tracy.Simon@encompasshealth.com>, Slineberry122111 <slineberry122111@gmail.com>, Sonya O'Neal CNA <onealsonya39@gmail.com>, Sophia McIntyre <sophiamcintyre74@gmail.com>, STACY CHANEY <srchaney71@yahoo.com>, Steadfast Applications <apps.steadfast@gmail.com>, Steadfast Medical Staffing <timesheets.sms@gmail.com>, Stella Ogwang LPN <a5422841@icloud.com>, Stella Ogwang LPN <stellagraceogwang@gmail.com>, Stephanie Collier <stephaniecollier16@gmail.com>, Stephanie Collier <stephaniedcollier16@gmail.com>, Stephanie Griffin CNA <gsteph172@gmail.com>, Stephanie Marshall <nursestephmarshall@gmail.com>, Stephanie Miller <stephaniemiller8748@gmail.com>, Sterling Raynor <sraynor560@gmail.com>, Sydney Anderson <snanderson99@gmail.com>, Sylvia Zepeda <sylviazepeda0316@gmail.com>, Syreeta Brown <livelyfe09@gmail.com>, Syreeta McManes LPN <syreetamcmanes@yahoo.com>, Syreta Fowlkes-Cox <csyreta04@yahoo.com>, TAE Batts <octlon6208@gmail.com>, Takara Alston <tk3boys@icloud.com>, Tameka Watford <t.watford@yahoo.com>, Tanglae Keys <tkeys0618@gmail.com>, Taniqua Murray <taniquamurray519@gmail.com>, Tanisha Banks Cooper <+17579204344@mymetropcs.com>, Tanisha Banks-Cooper <tbankscooper@gmail.com>, Tanisha Banks-Cooper LPN <7575934632@myboostmobile.com>, Taree Wharton <whartoninc88@gmail.com>, Tasha Elwyn <tashamarietate@icloud.com>, Tashara Brown <tabreezybnf@gmail.com>, Tasheba Lassiter <tasheba0904@gmail.com>, TaShena Callands <lolabunni88@gmail.com>, Tashima Newsome <tashimanewsome@yahoo.com>, Tatianna Canady <isigoziellc@gmail.com>, Tatianna Canady <mochabadd@icloud.com>, Tatianna Canady <tatianna.canady@gmail.com>, Tawanda Hall LPN <handssavinglives@gmail.com>, teah kofa <teahkofa@gmail.com>, TEEBOONE315 <teeboone315@aol.com>, teewilder <teewilder@gmail.com>, Teisha Stone LPN <teeabril1@gmail.com>, Tenesha Massenburg <tmassenburg2@icloud.com>, tenisha charles

Steadfast 6th 070277

## JA1854

<bcharlestenisha@gmail.com>, Tequila Chapman <tequilachapman@yahoo.com>, "Theresa Barnharnt (via Google Photos)" <noreply-651afdd5f5ccf2dd5d6d032bfd0f163d@google.com>, Tia Wilson <shana86.tw@gmail.com>, tiana barnes <tianabarnes41@gmail.com>, Tianna Tyler LPN <tianna.tyler@yahoo.com>, Tina Manago <managotina2@gmail.com>, Tina Manago <managotina4@gmail.com>, Tis Mosley <blkluvmatters0809@gmail.com>, Tocarra Steele <tocarra.steele@gmail.com>, Toneisha Raynor <toneisha35@gmail.com>, Tonya Tann <tnytann@yahoo.com>, Torsha Graves <torshagraves@gmail.com>, Tourmaline Farrar <kesire2011@yahoo.com>, Toya Moffitt <sugarcrush3000@gmail.com>, Tracey Nyembe LPN <traceynyembe@yahoo.com>, Trachita Jones <trajon6481@students.ecpi.edu>, Tracy Booker <tracybooker77@icloud.com>, Tracy Simon <simontracy994@gmail.com>, TRACY SIMON <mrssimon4039@gmail.com>, Tramia Sanford <tsanf003@gmail.com>, Trayana Jackson <trayanajackson15@gmail.com>, Treva Mitchell CNA <angel_eyez.1967@yahoo.com>, Trina Turner <trinaturner82@yahoo.com>, trinkay6 <trinkay6@aol.com>, trudyoverton <trudyoverton@gmail.com>, TT Dupree <nursett2015@gmail.com>, Tyshaun Lassiter <tyshaun_lassiter@yahoo.com>, tyshema etheridge <msprettyblaq2019@gmail.com>, Tywann White <wgue19@gmail.com>, Unicorn???? Princess <aliviaunicorn0421@icloud.com>, Uniquetravelsbyashb <uniquetravelsbyashb@yahoo.com>, Ushana Williams <ushana_williams@yahoo.com>, Valerie Aldhizer LPN <valeriealdhizer@gmail.com>, Valerie Franks CNA <valeriefranks66@gmail.com>, Valerie Franks CNA <valeriefranks96@yahoo.com>, Valerie McQueen <valerie.mcqueen@yahoo.com>, Varnysha Whitsett <varnyshawhitsett@gmail.com>, Venus Threadgill <venus.threadgill@gmail.com>, Victor Mokoena LPN <vmokoena3126@gmail.com>, Victoria Coleman <alanijp07@gmail.com>, Victoria Coleman <colemanv82@gmail.com>, Vina Harris <beboprenee@gmail.com>, Vina W <alcoffey235@gmail.com>, Vincheskia Willoughby <vcw262@gmail.com>, VonnaBabe #ImYaMansFantasy <vonnaboo03@gmail.com>, Wanda Lamont <dr.wandalamont@gmail.com>, Wanda Lamont <dr.wandalamont@me.com>, Wayne Clapp <wayneclapp@ymail.com>, webet53 <webet53@gmail.com>, Whitney Bailey LPN <smchick5789@aol.com>, William Pruitt <williamd.pruitt@hotmail.com>, windy west <windydiva@hotmail.com>, Xavier Vera <xavierv96@gmail.com>, Yamashika Parker <yparker2482@gmail.com>, Yaquita Lawrence <yaquitachristina@gmail.com>, Yolanda Briggs <ndeab08@gmail.com>, Yolanda Hunter <yolanda.hunter10@gmail.com>, Yolanda ROMIOUS <yvette141972@gmail.com>, Yolandawalker9696 <yolandawalker9696@yahoo.com>, Yolandezz Siler <sileryolandezz@gmail.com>, Zahara Muhammad <zahara7@icloud.com>, Zakiyah Stone <kiyah_2007@icloud.com>, Zeffrem Guidry <zguidry59@gmail.com>, zemikia mcclease <zemikiamcclease45@gmail.com>, Zemira Davis <vkd211@email.vccs.edu>, Zemira Davis <zemiradavis@yahoo.com>

## IMMEDIATE NEEDS FOR CNA, LPN, AND RN ASSIGNMENTS FOR THE FOLLOWING LOCATIONS:

| VIRGINIA | CRISIS PAY RATES |
|---|---|
| **ACCORDIUS HEALTH AT HARRISONBURG** | CNA - $25 /HR |
| 94 SOUTH AVENUE. | LPN - $45 /HR |
| HARRISONBURG, VA 22801 | RN - $55 /HR |
| | |
| **ACCORDIUS HEALTH AT COURTLAND** | CNA - $25 /HR |
| 23020 MAIN STREET. | LPN - $40 /HR |
| COURTLAND, VA 23837 | RN - $50 /HR |
| | |
| **FARMVILLE HEALTH AND REHABILITATION CENTER** | CNA - $25 /HR |
| 1575 SCOTT DRIVE. | LPN - $45 /HR |
| FARMVILLE, VA 23901 | RN - $55 /HR |
| | |
| **COFFEEWOOD CORRECTIONAL CENTER** | |
| 12352 COFFEEWOOD DRIVE. | LPN -$45 /HR |
| MITCHELLS, VA 22729 | RN -$55 /HR |
| | |
| **NORTH CAROLINA** | CRISIS PAY RATES |
| **CITADEL AT SALISBURY** | CNA - $35 /HR |
| 710 JULIAN ROAD | LPN - $50 /HR |
| SALISBURY, NC 28147 | RN  - $60 /HR |

| MARYLAND | CRISIS PAY RATES |
|---|---|
| **CATON MANOR** | |
| 3330 WILKENS AVENUE. | **LPN - $45 /HR** |
| BALTIMORE, MD 21229 | **RN - $55 /HR** |

If interested, please call the office **(757)321-0777** or e-mail **callcenter.steadfast@gmail.com.**

** Note:  Please ensure all of your credentials are current and licensed to work in the appropriate location. If not, please send in your CPR, PPD, Nursing License, and Bank Information to this e-mail **

CONFIDENTIALITY NOTICE: The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.


## CNA & NURSES - IMMEDIATE NEEDS IN SALISBURY, NC

1 message

**SMS Call Center** <callcenter.steadfast@gmail.com>                                                                Tue, Apr 21, 2020 at 2:29 PM
Bcc: Makiea Witcher <wmakiea@yahoo.com>, Makiyah Cooper <makiyahcooper1222@gmail.com>, Manncarolynn <manncarolynn@yahoo.com>, Marcella Holder <marcellajr@yahoo.com>, Marcella Womack <marcellawomack@icloud.com>, margerita johnson <lovesslovesd@yahoo.com>, Margie <margiemcintyre14@gmail.com>, Mariah Jordan <mariah.jordan91@gmail.com>, Marianne Lear <ms1982malear@gmail.com>, Marlene Saunders <marlenesaunders03@yahoo.com>, Marquita Jones <marquitajones20@yahoo.com>, Marquita Jones <marquitajones20@yahoo.com>, Martina Crowder <mncrowder23@gmail.com>, Mary Davis <marydavis8686@gmail.com>, mary massaquoi <abiemassaquoi@yahoo.co.uk>, Mary watts <mya1756@icloud.com>, Masir Fowlkes10 <masir.fowlkes10@yahoo.com>, Matthew Sawyer <m_sawyer1990@yahoo.com>, Maurice Johnson <mauricejohnson817@gmail.com>, Mcdaniel22charm <mcdaniel22charm@gmail.com>, Mea Harris <meaharris005@gmail.com>, Melisa Ozirus <mozirus7@gmail.com>, Michaelene Costner <michaelene.nurse@gmail.com>, Mike Jones <jonesm4186@gmail.com>, Mis White <mamamianugget6@gmail.com>, mohogany smith <mohoganysmithg@yahoo.com>, Monchelle Brothers <neeneeb2912@gmail.com>, Monica <monica.jackson24@aol.com>, Monique DeShazor <kaylaymon35@icloud.com>, Monkey boy plays Hawkins <hawkinslashonda11@gmail.com>, Morenike collier <morencks@hotmail.com>, Morenike Collier <morencks@icloud.com>, Morgan Jones <morganljones91@gmail.com>, Moriahhh_ Cain <mccain0814@gmail.com>, "Ms. F8ithful" <impeaches2u@icloud.com>, Mt Olive Scanner <library.moscanner@gmail.com>, "MV-Jones, Trachita (VBHS)" <trajon6481@students.ecpi.edu>, Nadine Person <nikkinae7788@icloud.com>, nahjah kelly <nahjah.k@yahoo.com>, Najah Miller <millernajah@gmail.com>, Nannette Holley <nannette.holley@yahoo.com>, Natasha McBee <natashamcbee@gmail.com>, Natasha Morris <kahasixza7913@yahoo.com>, nayshaw lewis <nayshaw.lewis@gmail.com>, Nekisha Boone <redboone757@gmail.com>, Neknek <tineeka4@gmail.com>, Nesia Robinson <cornesia.robinsonn@gmail.com>, Nextdaypay <nextdaypay@steadfastmedicalstaffing.com>, Nicole <nicolew0509@gmail.com>, Nicole Pierce <nicolelashone93@gmail.com>, Nicole Thompson <nikkimonique1981@gmail.com>, Niina honeyy <myjuly112014@gmail.com>, Nikki Evans <nevansnursing@yahoo.com>, nikki moser <nicholemoser3749@gmail.com>, Nina Massicci <ninamassicci36@gmail.com>, Nisha Boo <nishaboo173@gmail.com>, Nluenva <nluenva@aol.com>, nyasia boone <nyasiasboone@gmail.com>, ORINTHIA SPIVEY <orinthiamt@yahoo.com>, pamel murdock <pamelmurdock@gmail.com>, Pamela Covil <mrscovil757@outlook.com>, Pamela Light <pmlight05@hotmail.com>, PANTHA WEAR PROMO <rbgnewz2012@gmail.com>, Paris Gary <garyparis96@gmail.com>, Patrice Johnson <mrzjohnson71@yahoo.com>, Pattie Davis <pattiedavis01@gmail.com>, Pegu Roane <proane43@icloud.com>, pooh bear <shannatisdale4@gmail.com>, Precious Taylor <preshtaylor@aol.com>, Prttylike Mariah <love.mariah24@gmail.com>, PunkinLPN <punkinlpn@gmail.com>, Quanleau riddick <quanleaud@gmail.com>, Quentina Thomas <thomasquentina@yahoo.com>, Rashetta757 Banks <rashetta757@gmail.com>, rasshawn cooke <cookerasshawn@gmail.com>, Rayshara Barrow <raysharabarrow620@gmail.com>, Rebeka Robinson <rebeka.robinson16@icloud.com>, Reevesbrowndanielle <reevesbrowndanielle@yahoo.com>, Renae Dumpson <renaetavie8@gmail.com>, Renicks Taiwo <renicks.taiwo@gmail.com>, Renita Hammond <hammondrenita@gmail.com>, Rhea Rumph <rhearumph@gmail.com>, Rickysammyhannah <rickysammyhannah@aol.com>, Riichy Dman <dmanrogers12@gmail.com>, rikea josey <rikeajosey2@gmail.com>, Robert Duhart <robcanduh@gmail.com>, Robert Stokes <robertbstokes9757@gmail.com>, robyn lee <robyn.lee80@yahoo.com>, Rose Jackson <rojacks7@aol.com>, Rrocky87 <rrocky87@aol.com>, Ru Cooper <makiyahtianadad@gmail.com>, Rugayyah Matin <RMatin@mail.com>, S B <sbrownjones357@gmail.com>, S Chantel Williams <schantelwilliams.va@gmail.com>, Sade Johnson <iyonna287@gmail.com>, Samara Archer <nursesamara629@gmail.com>, Sarah May <sarahmaypulido@gmail.com>, Shakita Anderson <yanee0919@gmail.com>, Shaloda Williams <wshaloda@gmail.com>, Shalonda Williams <wshalonda6@gmail.com>, Shameika Parker <sparker0114@gmail.com>, Shanice McCants <shanice0905@gmail.com>, Shaniqah Mcleod <snm5295@gmail.com>, Shanna Tisdale <shannatisdale@yahoo.com>, Shantaye Barnes <shantayebarnes@gmail.com>, Shanteequa Alexander <alexander.shanteequa@gmail.com>, Shauna Catoe <catoe2533@gmail.com>, Shaunta Wright <shaunta1000@yahoo.com>, Shawlawn Hicks <shawlawn@hotmail.com>, shawvone brockman <shawvonebrockman@yahoo.com>, sheila white <sheila.white30@yahoo.com>, Sheila White <wsheila@icloud.com>, Shelanda Mitchell <shelandamitchell@ymail.com>, shelby highsmith <shighsmith001@gmail.com>, Shelly Coates <shellycoates41@yahoo.com>, Shemeka Lewis <slew25280@gmail.com>, Shericka holloway <tounk757@gmail.com>, Sherri-Chantel Williams <schantelwilliams@icloud.com>, sherrie morrow <sherriemorrow233@yahoo.com>, sherry flournoy <sherryflournoy210@yahoo.com>, Shirley Key <shirleykey801@gmail.com>, "Simon, Tracy" <Tracy.Simon@encompasshealth.com>, Slineberry122111 <slineberry122111@gmail.com>, smchick5789 <smchick5789@aol.com>, Sophia McIntyre <sophiamcintyre74@gmail.com>, STACY CHANEY <srchaney71@yahoo.com>, Steadfast Medical Staffing <timesheets.sms@gmail.com>, Stephanie Marshall <nursestephmarshall@gmail.com>, Stephanie Miller <stephaniemiller8748@gmail.com>, Sterling Raynor <sraynor560@gmail.com>, Sydney Anderson <snanderson99@gmail.com>, Sylvia Zepeda <sylviazepeda0316@gmail.com>, Syreeta Brown <livelyfe09@gmail.com>, Syreeta Mcmanes <syreetamcmanes@yahoo.com>, Syreta Fowlkes-Cox <csyreta04@yahoo.com>, TAE Batts <octlon6208@gmail.com>, Takara Alston <tk3boys@icloud.com>, Taniqua Murray <taniquamurray519@gmail.com>, Tanisha Banks-Cooper <tbankscooper@gmail.com>, Tashara Brown <tabreezybnf@gmail.com>, Tasheba Lassiter <tasheba0904@gmail.com>, TaShena Callands <lolabunni88@gmail.com>, Tashima Newsome <tashimanewsome@gmail.com>, Tatianna Canady <tatianna.canady@gmail.com>, tawanda hall <handssavinglives@gmail.com>, teah kofa <teahkofa@gmail.com>, TEEBOONE315 <teeboone315@aol.com>, teewilder <teewilder@gmail.com>, Tenesha Massenburg <tmassenburg2@icloud.com>, tenisha charles <bcharlestenisha@gmail.com>, Tequila Chapman <tequilachapman@yahoo.com>, "Theresa Barnhart (via Google Photos)" <noreply-651afdd5f5ccf2dd5d6d032bfd0f163d@google.com>, Tia Wilson <shana86.tw@gmail.com>, tiana barnes <tianabarnes41@gmail.com>, Tina Manago <managotina4@gmail.com>, Tis Mosley <blkluvmatters0809@gmail.com>, Tocarra Steele <tocarra.steele@gmail.com>, Toneisha Raynor <toneisha35@gmail.com>, Tonya Tann <tnytann@yahoo.com>, Tourmaline Farrar <kesire2011@gmail.com>, Toya Moffitt <sugarcrush3000@gmail.com>, Tracey Nyembe <traceynyembe@yahoo.com>, Tracy Booker <tracybooker77@icloud.com>, Tracy Simon <simontracy994@gmail.com>, TRACY SIMON <mrssimon4039@gmail.com>, Tramia Sanford <tsanf003@gmail.com>, Trayana Jackson <trayanajackson15@gmail.com>, Trina Turner <trinaturner82@yahoo.com>, trinkay6 <trinkay6@aol.com>, trudyoverton <trudyoverton@gmail.com>, TT Dupree <nursett2015@gmail.com>, tyshema etheridge <msprettyblaq2019@gmail.com>, Unicorn???? Princess <aliviaunicorn0421@icloud.com>, Uniquetravelsbyashb

Steadfast 6th 070280

# JA1857

<uniquetravelsbyashb@yahoo.com>, Ushana Williams <ushana_williams@yahoo.com>, Valerie Franks <valeriefranks96@yahoo.com>, Valerie Franks <valeriefranks66@gmail.com>, Varnysha Whitsett <varnyshawhitsett@gmail.com>, Venus Threadgill <venus.threadgill@yahoo.com>, Victoria Coleman <alanijp07@gmail.com>, Vincheskia Willoughby <vcw262@gmail.com>, Wayne Clapp <wayneclapp@ymail.com>, webet53 <webet53@gmail.com>, William Pruitt <williamd.pruitt@hotmail.com>, windy west <windydiva@hotmail.com>, Xavier Vera <xavierv96@gmail.com>, Yamashika Parker <yparker2482@gmail.com>, Yaquita Lawrence <yaquitachristina@gmail.com>, Yolanda Briggs <ndeab08@gmail.com>, Yolanda Hunter <yolanda.hunter10@gmail.com>, Yolandawalker9696 <yolandawalker9696@yahoo.com>, Yolandezz Siler <sileryolandezz@gmail.com>, Zahara Muhammad <zahara7@icloud.com>, Zakiyah Stone <kiyah_2007@icloud.com>, Zeffrem Guidry <zguidry59@gmail.com>, zemikia mcclease <zemikiamcclease45@gmail.com>

CNA AND NURSES - INCREASE OF CRISIS PAY RATES FOR CITADEL SALISBURY IN NORTH CAROLINA!

IMMEDIATE NEEDS AND ALL SHIFTS AVAILABLE!

**CNA $35 /HR**
**LPN $50 /HR**
**RN  $60 /HR**

**Call the office, 757-321-0777 or e-mail the Call Center at "callcenter.steadfast@gmail.com" if interested!**

JA1858