# IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

---

JULIE A. SU,
Acting Secretary of Labor, United States Department of Labor,
*Plaintiff - Appellee,*

v.

MEDICAL STAFFING OF AMERICA, LLC, d/b/a Steadfast Medical
Staffing, a limited liability company; LISA ANN PITTS, individually
and as owner and officer of the aforementioned company*,*
*Defendants - Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT NORFOLK

---

## REPLY BRIEF OF APPELLANTS

---

Abram J. Pafford
Francis J. Aul
MCGUIREWOODS, LLP
Black Lives Matter Plaza
888 16th Street, NW
Washington, DC 20006
202-857-1725
apafford@mcguirewoods.com
faul@mcguirewoods.com

*Counsel for Appellants*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................1

ARGUMENT ....................................................................................................1

I.    The District Court Failed to Hold DOL to Its Burden of Proof, and
      Thus Its Findings of Fact Are Not Owed Deference on Appeal ...............1

      A.    Correctly allocating and applying the burden of proof is a
            critical factor in multi-worker, multi-year FLSA classification
            disputes .........................................................................................2

      B.    The district court's failure to hold DOL to its burden of proof
            contributed to clear error in its findings of fact ..................................7

II.   The District Court Erred in Its Classification Analysis............................8

      A.    Steadfast Did Not Control the Manner in Which the Nurses'
            Work Was Performed .......................................................................9

            1.  The means of payment does not dictate the control analysis ......10

            2.  Steadfast did not control the manner in which the nurses'
                work was performed ................................................................12

      B.    The nurses had opportunities for profit or loss dependent on
            managerial skill................................................................................17

      C.    The nurses invested in their own equipment or material..................19

      D.    The nurses possessed specialized skill ...........................................21

      E.    The nurses' relationship with Steadfast was not permanent ............21

i

III.    Steadfast Proved Its Good Faith Defense against Liquidated
        Damages ....................................................................................22

        A.    Steadfast had a reasonable basis for its classification decision........23

        B.    Steadfast made good faith efforts to comply with the FLSA ...........26

IV.     Steadfast Was Entitled to Relief on DOL's Backpay Computation
        Table ..........................................................................................27

CONCLUSION ....................................................................................30

CERTIFICATE OF COMPLIANCE .......................................................31

# TABLE OF AUTHORITIES

## Cases

*Bolden v. Callahan*,
   595 F. Supp. 3d 727 (E.D. Ark. 2022) ............................................................ 22

*Burnley v. Short*,
   730 F.2d 136 (4th Cir. 1984) ................................................................. 25, 26

*Calderon v. GEICO Gen. Ins. Co.*,
   754 F.3d 201 (4th Cir. 2014) ....................................................................... 29

*Calderon v. GEICO Gen. Ins. Co.*,
   809 F.3d 111 (4th Cir. 2015) ......................................................... 22, 23, 25

*Chao v. Mid-Atlantic Installation Services, Inc.*,
   16 F. App'x 104 (4th Cir. 2001) .............................................................. *passim*

*Compton v. Alton S.S. Co.*,
   608 F.2d 96 (4th Cir. 1979) ........................................................................ 29

*Crouch v. Guardian Angel Nursing, Inc.*,
   No. 3:07-cv-00541, 2009 WL 3737887 (M.D. Tenn. Nov. 4, 2009) ................ 13

*Donovan v. Brandel*,
   736 F.2d 1114 (6th Cir. 1984) .................................................................... 22

*Gantlin v. W. Virginia Pulp & Paper Co.*,
   734 F.2d 980 (4th Cir. 1984) ....................................................................... 3

*Gayle v. Harry's Nurses Registry, Inc.*,
   594 F. App'x 714 (2d Cir. 2014) ................................................................. 12

*Herman v. Mid-Atlantic Installation Services*,
   164 F. Supp. 2d 667 (D. Md. 2000) ............................................................ 20

*Hughes v. Family Life Care, Inc.*,
   117 F. Supp. 3d 1365 (N.D. Fla. 2015) ....................................................... 12

*Lemaster v. Alternative Healthcare Solutions, Inc.*,
   726 F. Supp. 2d 854 (M.D. Tenn. 2010) ................................................ 12-13

*Marshall v. Brunner*,
   668 F.2d 748 (3d Cir. 1982) .............................................................. 27

*Mayhew v. Wells*,
   125 F.3d 216 (4th Cir. 1997) ....................................................... 25, 26

*McFeeley v. Jackson St. Ent., LLC*,
   825 F.3d 235 (4th Cir. 2016) ..................................................... *passim*

*Murchison v. Astrue*,
   466 F. App'x 225 (4th Cir. 2012) ............................................... 28-29

*Parrish v. Premier Directional Drilling, L.P.*,
   917 F.3d 369 (5th Cir. 2019) ............................................................ 22

*Pizzeria Uno Corp. v. Temple*,
   747 F.2d 1522 (4th Cir. 1984) ............................................................ 3

*Real v. Driscoll Strawberry Associates, Inc.*,
   603 F.2d 748 (9th Cir. 1979) ........................................................... 16

*Richard v. Marriott Corp.*,
   549 F.2d 303 (4th Cir. 1977) ........................................................... 24

*Roy v. Cnty. of Lexington*,
   141 F.3d 533 (4th Cir. 1998) ....................................... 24, 25, 26, 27

*Schultz v. Capital Int'l Sec., Inc.*,
   466 F.3d 298 (4th Cir. 2006) .................................................. 8, 9, 10

*Shea v. United States*,
   976 F.3d 1292 (Fed. Cir. 2020) ...................................................... 24

*Su v. Med. Staffing of Am., LLC*,
   No. 22-1290, 2023 WL 3735221 (4th Cir. May 31, 2023) ............... 29

*U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Virginia, LLC*,
   899 F.3d 236 (4th Cir. 2018) ........................................................... 30

*United States v. Vogue, Inc.*,
   145 F.2d 609 (4th Cir. 1944) ...................................................... 1, 23

iv

**Other Authorities**

Fed. R. Civ. P. 52 ................................................................ 29

Fed. R. Civ. P. 60 ........................................................... 28, 29

# INTRODUCTION

A six-factor "economic realities" test that "allows for flexible application," *McFeeley v. Jackson St. Ent., LLC*, 825 F.3d 235, 241 (4th Cir. 2016), is bound to present difficult line-drawing challenges in what this Court has called "the borderland" between situations that clearly involve employer-employee relationships, and those that clearly involve entrepreneurial independent contracting arrangements, *United States v. Vogue, Inc.*, 145 F.2d 609, 612 (4th Cir. 1944). This flexibility can easily descend into an arbitrary and unpredictable litigation lottery, unless precedent and established principles shape and constrain the employee vs. independent contractor inquiry. The opinion below precisely illustrates this pitfall.

# ARGUMENT

## I. The District Court Failed to Hold DOL to Its Burden of Proof, and Thus Its Findings of Fact Are Not Owed Deference on Appeal.

DOL began and ended its case below by insisting Steadfast bore the burden of proving it had properly classified the nursing workers as contractors rather than employees. JA60 (DOL opening statement) & JA1973 (DOL post-trial proposed conclusions of law). DOL's assertion was incorrect, because the burden in FLSA classification disputes runs in the opposite direction. Steadfast 21.[1] DOL does not

---

[1] This brief refers to Steadfast's Opening Brief as "Steadfast," and DOL's Brief as "DOL."

contest this Court's FLSA burden of proof cases cited by Steadfast, and on appeal it no longer contends Steadfast had the burden of proof.

## A. Correctly allocating and applying the burden of proof is a critical factor in multi-worker, multi-year FLSA classification disputes.

Despite its tacit acknowledgement that it bore the burden of proof, DOL seeks to salvage its win by insisting either that the burden of proof makes no difference, or (strangely) that the burden of proof does not apply to disputed issues of material fact in a bench trial. DOL 49–51. Neither assertion has merit.

The district court made dozens of contested factual findings regarding Steadfast's business practices and its working relationship with the nurses, and said these findings "are reflective of Defendants' business practices since August 18, 2015." JA1187. For example:

- How much control did nurses exercise over their schedules?
- What control did Steadfast exercise over the manner in which the nurses' medical work was performed?
- To what extent did nurses work with other registries and staffing agencies?
- What opportunities existed for profit and loss based upon the nurses' skill in managing their income-generating activities?
- What degree of skill was required for the nurses' medical work?
- How permanent was the working relationship between Steadfast and the nurses?

These and other disputed questions had to be answered in the context of a classification dispute in which DOL sought to impose millions of dollars in alleged

"backpay" liability on Steadfast for work performed by more than 1,000 nurses across hundreds of thousands of shifts over a multi-year period at dozens of separate healthcare facilities scattered throughout multiple states.

DOL knows it urged the district court to apply the burden of proof in the wrong direction. To avoid the appellate implications of this mistake, DOL conjures up a legal fiction: disputed issues of fact on which neither party bears the burden of proof. DOL's position is squarely contradicted by this Court, which has emphasized *in relation to bench trials* the "potentially critical questions of the proper cast of proof burdens." *See Gantlin v. W. Virginia Pulp & Paper Co.*, 734 F.2d 980, 993 n.20 (4th Cir. 1984). This Court has also held (again after a bench trial) that there is no distinction under the clearly erroneous standard "between 'subsidiary' and 'ultimate'" findings of fact, while emphasizing (in the same paragraph) that the "clearly erroneous" rule will not protect factual findings "made on the basis of the application of incorrect legal standards *or made in disregard of applicable legal standards, such as the burden of proof.*" *See Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1526–27 (4th Cir. 1984) (emphasis added). In the face of this precedent, DOL cites no authority for its startling legal assertion that "the burden of proof does not come into play during the factfinding stage of a bench trial." DOL 50.

DOL's implied position—that somehow neither party bears the burden of proving disputed facts—defies common sense. In evaluating multi-year, multi-worker classification disputes under a flexible, multi-factor test, the question of which party bears the burden of persuasion is of vital importance. In such cases, anecdotal variations as to specific facets of the working relationship for individual workers will always exist. Many of the findings on which DOL most heavily relies are based on witnesses saying they experienced or heard of certain conduct on discrete occasions—e.g., a nurse pressured to work a particular shift, cautioned or reprimanded for conduct that might jeopardize Steadfast's contracts with its facility clients, or removed from Steadfast's registry based upon "Do Not Return" ("DNR") directives from the facilities. But such testimony offers little real sense of how common such incidents were among hundreds of thousands of shifts involving more than 1,000 nurses over nearly seven years at dozens of facilities. And, as Steadfast has explained, the record contains *far more testimony* establishing an "economic reality" of nurses working for multiple registries at the same time, exercising near-total control over their schedules, obtaining variable compensation for challenging shifts, and deploying their medical skills to care for patients without involvement or supervisory oversight by Steadfast. Steadfast 7–12.

These facts undermine DOL's claim that the burden of proof makes no practical difference. DOL 49–50. The district court's task was to determine whether the nurses encompassed within DOL's sweeping complaint should be deemed "employees" over the entire period alleged by DOL. It is difficult to see how this question can be answered without reference to the burden of proof. If the starting position is that independent contractor status is an affirmative defense to be proven by Steadfast, limited examples of company control or worker dependence might be extrapolated as support for broad factual findings. But with the burden of proof on DOL, the opposite is true: evidence of worker independence can offer a foundation for drawing conclusions about the *aggregate economic reality* of the working relationships, unless DOL introduces sufficient contrary evidence to establish a broad factual foundation for its claims. In sum, the burden of proof is inexplicably intertwined with the judicial process of deriving factual findings from record evidence. Steadfast 22 (collecting cases).

DOL says the cases Steadfast cites are distinguishable, because those courts "explicitly applied an incorrect burden of proof," whereas here the district court's opinion did not expressly address the issue. DOL 51. DOL has chutzpah to make this argument now, when from start to finish below it told the district court Steadfast bore the burden of proving independent contractor status. The district court also shows every indication of having improperly adopted the approach urged by DOL.

Its discussion of Steadfast's purported "control" lists seven elements or subfactors discussed in DOL's Field Assistance Bulletin 2018-4 ("FAB"), quoting equivocal language from the FAB on five of the seven, and then assuming (without balancing competing evidence or making credibility determinations) that *any* evidence indicating the existence of such practices proved the nurses were employees. And where the district court's factual findings cut in favor of independent contractor status—e.g., the nurses picking shifts, controlling their schedules, purchasing equipment, and delivering medical care unconstrained by managerial or operational supervision—such findings were either ignored or given only perfunctory reference. This was, as a matter of law, reversible error. *See McFeeley*, 825 F.3d at 241 ("employee/independent contractor distinction is not a bright line," meaning "courts must struggle with matters of degree").

DOL wants to impose on Steadfast millions of dollars in liability for alleged backpay tied to hundreds of thousands of shifts worked by more than 1,000 nurses at dispersed facilities over nearly seven years. Under a proper application of the burden of proof, DOL would have been required to show that the prevailing operational practices of Steadfast reflected a sufficient level of control to bring most or all the nurses within the scope of the FLSA. Instead, the district court effectively imposed on Steadfast the burden of disproving, at each step, that the nurses were

employees. The district court's flawed findings are not entitled to appellate deference and cannot stand.

### B. The district court's failure to hold DOL to its burden of proof contributed to clear error in its findings of fact.

Steadfast identified clear district court errors on findings of fact relating to the nurses' ability to control their schedules, work with other registries and staffing agencies, and manage a wide range of discretionary choices that involved opportunities for profit and loss. Steadfast 8–12, 26–33. DOL has not offered a meaningful response. DOL tries to dodge the issue by invoking phantom "credibility determinations" the district court never made, DOL 50–52, but neither the district court nor the parties suggested any reason to doubt that each individual nurse witness was credibly describing the "economic reality" of their working experience to the best of their personal recollection.

DOL's only other response is a strawman concerning four of the fourteen nurse witnesses who testified unequivocally about their ability to work with other registries. DOL posits non-existent contradictions between the undisputed testimony concerning the nurses' range of working options, and peripheral elements no one disputes—e.g., one of these witnesses chose not to seek parallel shifts, and Steadfast expected shifts that would be paid for by Steadfast to be scheduled through Steadfast. DOL 52–53. DOL strains because the record is clear—20 nurses testified; 17 were asked about working with other registries or agencies; 14 said unequivocally they

could; the three who said they could not ended their involvement with Steadfast in 2017; and the collective nurse testimony established, in detail, an aggregate economic reality in which nurses routinely enjoyed a wide range of discretionary choices that implicated opportunities for profit and loss dependent on managerial skill in relation to their income-generating activities. Steadfast 8–12, 26–33.

When DOL insists the district court's findings are valid even if Steadfast "did not always uniformly carry out its company practices," DOL 52, DOL gets it backwards. The actual "practices" in the working relationship between Steadfast and the nurses (i.e., the economic reality) overwhelmingly highlight the autonomy and economic independence of most nurses across the breadth of the years covered by DOL's sweeping FLSA allegations. The district court's refusal to acknowledge this pattern, while repeatedly seizing on isolated or outlier testimony to support its findings, reflects a failure properly to allocate and apply the burden of proof. DOL urged the district court to make this exact mistake, and now it must live with the results.

## II.    The District Court Erred in Its Classification Analysis.

The fundamental question under the "economic realities" test is "whether the worker is economically dependent on the business to which he renders service or is, as a matter of economic reality, in business for himself." *Schultz v. Cap. Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006) (quotation omitted). The nurses (1) enjoyed

a wide range of discretionary choices in arranging their own schedules and increasing potential for profit by accepting shifts from Steadfast and other registries, (2) carried out skilled lifesaving care without any operational supervision by Steadfast, (3) invested in their own labor, licenses, and equipment, and (4) could (and did) pause or end their relationships with Steadfast and other registries as they pleased. Thus, the nurses were fundamentally in business for themselves.

### A. Steadfast Did Not Control the Manner in Which the Nurses' Work Was Performed.

This Court's multi-worker, multi-year FLSA classification cases have highlighted the importance of the first factor: the "degree of control that the putative employer has *over the manner in which the work is performed*." *McFeeley*, 825 F.3d at 241 (emphasis added); *Schultz*, 466 F.3d at 304–05; *Chao v. Mid-Atlantic Installation Services, Inc.*, 16 Fed. App'x 104 (4th Cir. 2001). DOL does not deny this or the following points:

- The district court found that nurses did not have pre-set work schedules, could accept or decline shifts at their discretion, and were not bound by a minimum or maximum number of hours in a workweek. JA1191.

- 14-of-17 nurses who were asked testified unequivocally they could work at other registries. Only three nurses (circa 2017) believed they could not (and one did anyway). Steadfast 8–9.

- This case involves over 1,000 nurses working tens of thousands of monthly shifts at dozens of facilities spread across multiple states over a seven-year period. Steadfast 41.

- Steadfast had no employee handbook, did not employ medical liaisons or coordinators, and did not establish policies, procedures, or mandatory practices concerning core nursing tasks. Steadfast 41.

- There is no evidence Steadfast had any administrative, operational, or managerial presence on a single occasion at a single client facility. Steadfast 10–11, 41–42.

This record proves that Steadfast facilitated opportunities for the nurses, yet exercised almost no control over the manner in which their work was performed. Steadfast 38–44.

### 1. *The means of payment does not dictate the control analysis.*

The district court and DOL claim that setting pay rates, and paying the nurses directly, indicated significant control by Steadfast over how the work was performed. JA1207-1208; DOL 24–27. This conflicts with *Chao*, *where the payment arrangement was identical*, and the installers were deemed independent contractors.

This Court has observed "terms of performance and compensation" are "part and parcel" of virtually all independent contracting arrangements. *See McFeeley*, 825 F.3d at 243. In *Chao*, this Court's discussion of the control factor did not mention the installers were paid a set rate for each installation job, or installers had no say in the rate negotiated between defendant and Comcast. *Chao*, 16 F. App'x at 106. Likewise, in *Schultz*, this Court did not mention the security agents "were paid a daily rate for each shift" when analyzing control. *Schultz*, 466 F.3d at 301.

DOL argues *McFeeley* considered payment under the control factor. DOL 24–25. But that was a different situation in a much different industry. *McFeeley*, 825 F.3d at 241. There, the patrons paid dancers directly for 1-on-1 encounters, and this 1-on-1 engagement inherently lent itself to variable compensation based on the preferences of the participants. When the club owners interfered and dictated prices, it highlighted an unusual degree of control inconsistent with independent contractor status. This control also meant dancers could not turn down a patron merely because the dancer felt the price was too low for the requested service.

By contrast, the nurses routinely accounted for pay rates as a core factor in deciding which shifts to accept or decline (from Steadfast *and other sources*), and they sought and received variable compensation for shifts with unusual or challenging features. Steadfast 28–30; *see infra* II.B. The breadth of opportunities available in a typical workweek, coupled with flexibility to accept some and ignore others, created a give-and-take which inherently involved "bargaining"—both implicit and explicit— about the "terms of performance and compensation." *See McFeeley*, 825 F.3d at 243. This dynamic reinforces the nurses' lack of "economic dependence" on Steadfast—i.e., the "focal point" or "touchstone" of the economic realities test. DOL 36–37 (quoting *Schultz* and *McFeeley*).

### 2. Steadfast did not control the manner in which the nurses' work was performed.

DOL's remaining arguments echo the district court's preoccupation with the FAB over this Court's precedent. DOL glosses over the focus of *McFeeley*, *Schultz*, and *Chao* on "the manner in which the work is performed." *Compare* Steadfast 38–44, *with* DOL 36–40. But the cited passages reinforce Steadfast's point—the "control" factor focuses on what the worker does within the four corners of a workday, and who controls that activity. On that metric, the record unequivocally confirms Steadfast exercised virtually no control over what nurses did during their shifts. Steadfast 39–44. Steadfast's hands-off approach stands in stark contrast to the defendants in the medical staffing cases from other jurisdictions relied upon heavily by DOL. *See, e.g., Gayle v. Harry's Nurses Registry*, 594 F. App'x 714, 717 (2d Cir. 2014) ("nursing director" and "nursing supervisors" monitored daily phone calls, conducted hours of monthly on-site training, engaged with doctors concerning care provided by nurses, and required nurses to read and understand defendant's in-service manualand submit comprehensive patient "progress notes" after each shift); *Hughes v. Fam. Life Care, Inc.*, 117 F. Supp. 3d 1365, 1371 (N.D. Fla. 2015) ("persistent" supervisory oversight including customer satisfaction surveys, scheduled and unscheduled supervisory visits by defendant, and mandatory compliance with handbook containing detailed job-performance instructions); *LeMaster v. Alternative Healthcare Solutions, Inc.*, 726 F.Supp.2d 854, 862-63

(M.D. Tenn. 2010) (defendants controlled nurses' work schedules, and nurses had to complete and turn in "Private Duty Nursing Narrative" forms to staffing agency); *Crouch v. Guardian Angel Nursing, Inc.*, No. 3:07-cv-00541, 2009 WL 3737887, at *19 (M.D. Tenn. Nov. 4, 2009) (defendant exercised "high degree of control over the manner in which [nurses] conducted their duties while in patients' homes," implemented in part through a detailed Policy and Procedures Manual).

The contrast between those cases and Steadfast's approach is clear, so DOL devotes 13 pages to diverting attention from this straightforward comparison. DOL 27–39. DOL's distraction tactics include focusing on FAB provisions not relevant to operational control, ignoring *McFeeley's* teaching that baseline contractual expectations can be enforced without negating contractor status, pretending the nurses' options were limited to shifts secured through Steadfast, and dismissing each indicator of nurse independence as not independently dispositive, despite no one claiming otherwise. DOL also repeatedly invokes outlier incidents, spotlighting the numerator of a fraction while ignoring the hundreds of thousands of shifts that are the denominator.

DOL groups these red herrings under FAB-derived subheadings referencing "Scheduling," "Supervision," and "Discipline." DOL 27–36. On scheduling, DOL advances a tautology—nurses communicated with Steadfast concerning shifts available through Steadfast. DOL 27–30. DOL never explains why this matters,

13

especially on a record where most of the nurses testified they regularly surveyed options across multiple facilities, registries, agencies, and even states, to decide where to work. Steadfast 7–12, 26–31.

DOL also notes that nurses were not to arrange shifts directly with client facilities, and were expected to tell Steadfast if they could not cover a previously-agreed shift. DOL 29–30. Steadfast had every right to enforce these baseline contractual expectations without endangering independent contractor status, because no contract says: "Do whatever you want, wherever you want, and however you please." *McFeeley*, 825 F.3d at 242. DOL never explains how the opportunities available through Steadfast (which *increased* the nurses' economic independence by providing alternatives to direct long-term work with a single facility) could function if Steadfast had no visibility into scheduling shifts it was contractually obligated to fill, and for which it billed its facility clients and paid the nurses. Flexibility does not require anarchy, and DOL's position is inconsistent with a test based on "economic reality.[2]

---

[2] DOL also cites *Crouch*, *Gayle*, and *Hughes* for the proposition that "Healthcare staffing agencies and registries may exercise significant control" even where personnel "are not obliged to accept" shifts. DOL 29. This proves Steadfast's point that *the agencies in those cases exercised significant supervisory control over the manner in which nurses provided care during their shifts*. Steadfast did not. *See* 12–13, *supra*.

On "Supervision" and "Discipline," DOL's arguments are similarly flawed. One-page memos such as "BE ON TIME!!!!!!" and "NO SLEEPING IN THE RESIDENT ROOMS!!" do not remotely resemble the supervisory infrastructure present in *Gayle*, *Hughes*, *LeMaster*, and *Crouch*. Steadfast 43. Nor is there any indication in *Chao*, *Schultz*, or *McFeeley* that preliminary training on compliance-related topics (e.g., HIPAA compliance and sexual harassment) should be deemed "control over the manner in which the work is performed." DOL invents a "sole purpose" test in which training required by "specific legal obligations" would not endanger independent contractor status, but training offered with additional or mixed motive would. DOL 31 n.5. DOL offers no authority on this point, as it would be terrible public policy, penalizing even modest efforts to educate contractors on conduct that might be harmful or dangerous, against an economic backdrop where contracting arrangements are common and would be "sorely miss[ed]" if regulated out of existence. *McFeeley*, 825 F.3d at 243.[3]

---

[3] DOL complains that if "day-to-day supervision is required," "temporary placement agencies could never be deemed to exercise control." DOL 33. This claim is disproven by the outcome in *Gayle*, *Hughes*, *LeMaster*, and *Crouch*. DOL's objective seems to be eliminating *any* space for independent healthcare contracting arrangements such as Steadfast's. If Steadfast's supervisory practices resembled those cases, DOL would no doubt cite this as foreclosing contractor status, yet Steadfast's abstention from comparable n supervision apparently makes no difference to DOL.

As to "discipline," DOL has no answer to Steadfast's observation almost every instance of alleged "discipline" concerned contractual obligations not directly connected to the nurses' on-shift work (with two exceptions—Courtney Draughn discussing one nurse suspected of diverting drugs, JA94, and Dixie DeLutis discussing one nurse intoxicated during her shift, JA935-938). Steadfast 42–43. Steadfast's conduct is consistent with *McFeeley* and *Chao*, because contracting parties can enforce baseline contractual expectations without automatically transforming workers into "employees" under the FLSA. *See McFeeley*, 825 F.3d at 242–43; *Chao*, 16 F. App'x at 106.

What DOL calls "discipline" might also be called "freedom of contract." The primary anecdotal mechanism DOL invokes was Steadfast declining to schedule shifts for a nurse for a limited period of time. DOL 34. DOL never introduced evidence proving the economic independence of this handful of nurses was undermined, because presumably they obtained (or could have obtained) work through other channels. DOL also claims the noncompete clauses had some *in terrorem* effect on the nurses, DOL 35–36, but this is empirically disproven by the testimony of the 14-of-17 nurses who indicated they could (and usually did) avail themselves of parallel opportunities with other facilities, agencies, and registries. Steadfast 8–9. Under the FLSA, it is the economic reality—not contractual language—that controls. *See Real v. Driscoll Strawberry Associates, Inc.*, 603 F.2d 748, 755 (9th Cir. 1979).

**B.    The nurses had opportunities for profit or loss dependent on managerial skill.**

In a typical employment relationship, workers are instructed by their company when and where to go, what they will be paid, and which clients or customers they will serve. These understandings are usually embedded in a static routine. By contrast, in a typical workweek for a Steadfast nurse, the nurse decided whether to work at all, if so when and with whom, and whether the working conditions and pay were sufficiently attractive compared to competing parallel opportunities inside and outside the Steadfast network. Steadfast 28–32. DOL's suggestion that maximizing one's income under these conditions did not require managerial skill, or that balancing opportunities and tradeoffs did not involve potential profit and loss, is wrong.

DOL does not deny the record reveals a series of recurring discretionary choices and tradeoffs faced by Steadfast's nurses when managing their income-generating activities. Instead, DOL claims these facts are not legally relevant when assessing the economic realities of the working relationship. DOL 41–42. DOL also says that none of the nurses' choices involved "financial risk". *Id.*

These arguments make little sense. The flexibility of the nurses' working arrangements inherently introduces potential for profit and loss depending upon how the flexibility is used. *See Chao*, 16 F. App'x at 107 (installers could "control their own profits *and losses*" in part by agreeing to work more or fewer hours) (emphasis

added). Nurses also risked time and capital obtaining new skills or training in hopes of securing different or more lucrative opportunities. Sometimes this worked. JA706-732 (N. Alston secured occupational health assignments only available through non-Steadfast sources). Sometimes it did not. JA687-702 (P. Clark limited shifts while taking classes to move up from LPN to RN, but RN license did not result in materially higher hourly rate). DOL distinguishes *Chao* because it cited a correlation between skill and income as reflecting opportunity for profit and loss. But this is equally true here, where multiple nurses testified that opportunities would expand or contract based upon one's professional reputation. Steadfast 45–46 (testimony of N. Alston, C. Turner, and D. Hall).

DOL's arguments (DOL 40–42) are flawed, because DOL presumes the relevant choices confronting the nurses related solely to shifts available through Steadfast. Nurse after nurse explained how they managed choices with an eye toward the full range of economic opportunities available at any given time—Steadfast vs. other registries; higher regular rates at Steadfast vs. potential overtime rates elsewhere; long-term non-Steadfast travel assignments vs. attractive short-term Steadfast shifts; decreasing shifts while studying for new licensing credentials vs. the risk that improved credentials would not net higher pay; steady presence at one facility to obtain shift preferences vs. irregular work locations when prioritizing higher immediate pay; travel distance vs. pay rate, etc. Steadfast 29–30.

A nurse's managerial skill in navigating these choices and tradeoffs would inherently result in fluctuating profits and losses vis-à-vis the potential net financial outcome if different choices were made. Indeed, the connection between managerial skill and corresponding financial outcomes for the nurses implicated even greater variability here than in *Chao*, where there is no reason to believe the cable installers faced a comparably broad range of recurring economic tradeoffs and managerial choices. And (*contra* DOL) the significance of the nurses' discretionary decisions seeking to maximize profitability cannot be ignored merely because the nurses did not own shares in Steadfast, or were paid by Steadfast after working shifts (just as the cable installers in *Chao* were contractors despite not owning a stake in MAT, and being paid directly by MAT for installations that benefited Comcast). *See Chao*, 16 F. App'x at 106-07.

## C. The nurses invested in their own equipment or material.

There is no dispute that Steadfast's nurses paid for their own initial and continuing education, equipment, licensing, and training, and were responsible for withholding their own taxes and (if they wished) paying for liability insurance. JA1189-1190, JA1196, JA141, JA250, JA612, JA866-867. This is comparable to the "truck plus tools plus uniforms plus taxes" investment deemed indicative of independent contractor status in *Chao*. 16 F. App'x at 107.

DOL ignores these similarities and homes in on one difference—the installers in *Chao* could hire assistants. DOL 42–43. But in terms of the economic reality in *Herman/Chao*, most of the installers *did not* actually hire assistants, *see Herman v. Mid-Atlantic Installation Services, Inc.*, 164 F. Supp. 2d 667, 674 n.5 (D. Md. 2000), whereas all nurses here incurred the primary costs listed above. DOL also ignores that the economic realities test must be adapted "to the particular working relationship, the particular workplace, and the particular industry.". *McFeeley*, 825 F.3d at 241. DOL presented no evidence that any nurses, anywhere, are permitted to bring assistants into medical facilities to help perform work assigned to trained, licensed nurses.

DOL also resists the characterization of Steadfast's relative operational contribution as requiring "little more than phone lines and a corporate email account." DOL 44 (citing Steadfast 47). DOL urges a broader view, encompassing intangible contributions such as "building relationships with client facilities," and the tangible investment in an office, office staff, and payroll processing. *Id.* But if an enterprise-wide view of Steadfast's investment is appropriate, the same is true on the other side. It is undisputed that the collective capabilities of the nurses are "integral" to Steadfast's business, DOL 49, so *McFeeley's* "relative contribution" rule includes the collective education, equipment, licensing, training, and taxes for

each nurse, multiplied by over 1,000 nurses. This factor favors contractor status, or at worst is in equipoise.

### D. The nurses possessed specialized skill.

The district court was correct to say this factor favored Steadfast because lifesaving nursing care is at least comparable to cable installation, carpentry, and construction. *See Chao*, 16 F. App'x at 107. Remarkably, DOL asks this Court to reverse the district court on this score and "conduct a de novo legal analysis, applying the district court's factual findings and other record evidence." DOL 45. While this may be a tacit admission that the district court's failure to assign the burden of proof negates deference to the district court's findings, DOL cannot have it both ways, with findings it agrees with subject to clear error review, while those where it disagrees are reviewed de novo. DOL also muddies the waters by conflating "the degree of *skill required for the work*" with the separate factor addressing profit and loss dependent on "*managerial skill*," DOL 45-46, but this Court's FLSA cases properly analyze these differing concepts separately.

### E. The nurses' relationship with Steadfast was not permanent.

Although nurses could accept or reject shifts as they pleased, moved into and out of engagement with Steadfast at will, and need not commit to remain on Steadfast's registry for a specific length of time, the district court nevertheless said their relationship with Steadfast was "permanent in nature" and indicated employee

status. JA1210. But open-ended relationships that experience ebb and flow without formal termination or periodic renewal are not permanent, because "permanent" and "indeterminate" are not the same.

In *Chao*, this Court found this factor was neutral, because the installers could "establish a long-term relationship" with the employer though it was not required. *Chao*, 16 F. App'x at 107. Many other courts have sensibly concluded that flexible, intermittent, or open-ended working arrangements do not implicate the type of "permanence" being evaluated under the economic realities test. Steadfast 48 (citing *Bolden v. Callahan*, 595 F. Supp. 3d 727, 739 (E.D. Ark. 2022); *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 387 (5th Cir. 2019); and *Donovan v. Brandel*, 736 F.2d 1114, 1117 (6th Cir. 1984)). This factor is either neutral or favors Steadfast.

## III. Steadfast Proved Its Good Faith Defense against Liquidated Damages.

Steadfast has shown both "reasonable grounds" for its classification decision and that it acted in "good faith"—either of which bars the district court's imposition of liquidated damages. *Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 132 (4th Cir. 2015). Steadfast's compelling grounds for believing its classification decision was correct are illustrated by the liability arguments outlined above. These grounds also shaped Bredehoft's advice. Steadfast's good faith efforts are reflected in Ms. Pitts' own research in 2018, her decision to retain counsel (twice), and Steadfast's

22

engagement with Bredehoft through multiple meetings after giving him substantial data relating to Steadfast's business practices and operational approach. Steadfast 49–54.

The district court's contrary conclusion evinces an improper hindsight framework, seeking to impute to Steadfast retroactive knowledge of the full range of factual and legal information the district court deemed important, and the inferences the district court would potentially draw from such data. That is not how the good faith inquiry works.

### A. Steadfast had a reasonable basis for its classification decision.

The FLSA's good faith defense protects employers "who violate the statute but who had *reasonable grounds* for thinking the law was other than it turned out to be." *Calderon*, 809 F.3d at 132 (quotation omitted). Steadfast far exceeded that low threshold. Steadfast 49–52.

Steadfast had at least "reasonable grounds" for classifying the nurses as independent contractors, as illustrated by the competing merits arguments in this case. *See Calderon*, 809 F.3d at 132-33 (employer's classification was reasonable "given the closeness of the issue"); *Vogue*, 145 F.2d at 612 (describing the inherently difficult challenge of drawing the line between employees and independent contractors). The fact that the district court presided over a 7-day bench trial and issued a lengthy opinion before determining liability underscores that Steadfast's

position was not unreasonable. *Shea v. United States*, 976 F.3d 1292, 1299–1300 (Fed. Cir. 2020) (good faith proven where trial court required two days of testimony and defendant's classification error "was far from clear"). Put differently, Steadfast has "demonstrated reasonableness and good faith in putting forward well-reasoned, sound legal arguments justifying its payment plan as to all of the liability issues." *Roy v. Cnty. Of Lexington*, 141 F.3d 533, 548 (4th Cir. 1998).

DOL argues Steadfast lacked reasonable grounds for its classification decision because it "did not seek counsel on whether its practices complied with [the FAB]." DOL 55. DOL's position on the FAB is incoherent. It simultaneously asserts that: (1) Steadfast and Bredehoft's diligent compliance analysis was objectively unreasonable if they did not specifically analyze the FAB; while (2) the FAB is directed principally at a different industry; and (3) the FAB is "entirely consistent with this Court's misclassification precedents." DOL 39, 55–56. If the FAB is in accord with this Court's precedent, Bredehoft applied the same legal principles.[4]

DOL claims "Steadfast did not provide to Bredehoft certain highly relevant information on which to base his advice." DOL 56. Specifically, DOL faults

---

[4] As Steadfast explained, Steadfast 52 n.5, the opinion letter in *Richard v. Marriott Corp.*, 549 F.2d 303 (4th Cir. 1977), is not analogous to non-binding guidance directed at a different sector of the workforce. DOL overstates *Marriott*'s relevance when it says the FAB was "highly relevant to Steadfast's circumstances." DOL 55. DOL admits the FAB was written for a different industry, and submits it is consistent with this Court's precedents, which Bredehoft would have applied.

Bredehoft for not interviewing anyone beyond Ms. Pitts and Ms. Kim, and Steadfast for not informing Bredehoft about its alleged "discipline" practices. But this argument ignores Bredehoft's proper emphasis on the significance of control over "the manner in which the work is performed." Steadfast 38–44. Under *McFeeley* and *Chao*, information on enforcing baseline contractual expectations would not have determined the "control" factor of the economic realities test.

Finally, DOL insists that a defendant does not have to conduct a "mini-trial" to establish that it had "reasonable grounds" for its classification. DOL 56. Its assurances ring hollow. This Court has accepted far more limited inquiries as satisfying the "reasonable grounds" standard. *See Calderon*, 809 F.3d at 132–33 ("GEICO acted in good faith by reviewing the classification issue multiple times and . . . given the closeness of the issue, its decision to treat the Investigators as exempt was a reasonable one."); *Roy*, 141 F.3d at 548 (advancing "well-reasoned, sound legal arguments justifying" a position in litigation is enough); *Mayhew v. Wells*, 125 F.3d 216, 220 (4th Cir. 1997) (reasonable to assume an informal arrangement adequately compensated employee); *Burnley v. Short*, 730 F.2d 136, 140 (4th Cir. 1984) (reliance on industry newsletters to assess FLSA coverage was reasonable). Affirming the decision below would significantly raise this low threshold as the district court specifically penalized Steadfast for not collecting the full range of factual and legal information it deemed relevant.

**B.** **Steadfast made good faith efforts to comply with the FLSA.**

Steadfast has also proven its good faith efforts to comply with the law. This is a modest threshold negated only by "an ostrichlike attitude of self-delusion," *Burnley*, 730 F.2d at 140 (quotation omitted), "remain[ing] blissfully ignorant of FLSA requirements," *id.*, or "willfulness" in violating the law, *Mayhew*, 125 F.3d 216, 221 n.4; *Roy*, 141 F.3d at 548. None of these categories remotely describes Steadfast's conduct. Steadfast 53–54.

The district court moved the goalposts by surveying the breadth of the evidence presented in a seven-day bench trial following more than three years of litigation, and attacking Steadfast's good faith for supposedly not presenting these exact same materials to Bredehoft years earlier. JA1212-1214. But there is no basis to believe the data points cited by the district court would have—or should have—changed Bredehoft's analysis.

DOL says Steadfast could not have acted in good faith "prior to seeking legal counsel in June 2018," DOL 54. But this Court has never held engaging an attorney is a mandatory element of good faith. *See Burnley*, 730 F.2d at 140 (crediting an employer's reliance on industry newsletters). Ms. Pitts's own research, and her pre-2018 retention of attorney Cooper, clearly evince a good faith effort to comply with the law. Thus, DOL's contention that "the record lacked evidence that Steadfast took *any* meaningful steps to ensure compliance with the FLSA," DOL 54, is wrong.

DOL also takes the extraordinary position that under *Marshall v. Brunner*, 668 F.2d 748 (3rd Cir. 1982), Steadfast's reliance on Bredehoft's advice "after DOL investigated it and informed it of its unlawful practices *forecloses any conclusion that it acted in good faith*." DOL 55 (emphasis added). *Marshall* turned on more than DOL's warnings. It involved a clear case of an employer's *willful* and egregious conduct, defying the instructions of counsel, and attempting to subvert DOL's FLSA enforcement process. Steadfast 51. The law does not extinguish a good faith defense when a nonlawyer DOL investigator accuses an employer of violating the law after a cursory investigation. *Id.* at 4–5, 51–52. In fact, this Court has held that an employer demonstrated good faith when it took a legal position despite "longstanding case law to the contrary." *Roy*, 141 F.3d at 548.

Finally, DOL says Steadfast did not "comply with Bredehoft's advice" about removing non-compete clauses. DOL 56. But Bredehoft said his legal conclusion would change only "*if the non-compete was enforced*[.]" JA1170 (emphasis added). The trial confirmed the non-compete was almost never enforced and, more importantly, DOL ignores the fact that there is *no evidence* the non-compete was enforced *after* Steadfast retained Bredehoft in 2018. Steadfast 9–10 & n.2, 54.

## IV.   Steadfast Was Entitled to Relief on DOL's Backpay Computation Table

Steadfast's district court motion addressing false entries in DOL's PX-21 backpay computation table sought relief under rules specifically directed toward

post-trial correction of errors not caught or corrected at trial. JA1992-1995. DOL's "waiver" arguments (DOL 57-59) thus beg the real question, which is whether the district court erred in denying relief under these rules. DOL also improperly ignores the context below, in which DOL's pretrial discovery responses and deposition testimony concerning its backpay computation table were misleading, because they failed to identify DOL's improper inclusion of W-2 employees and repeated doubling or arbitrary increasing of the hours worked when entering data from Steadfast's payroll records into DOL's "Total Hours" column, and failed to divulge the "more than 168 hours per week" red flag, which DOL did not reveal until trial. Steadfast 58; JA2065-2069.

DOL might insist these discovery lapses were inadvertent, but it does not change their effect on Steadfast's reasonable pretrial understanding of DOL's supposed process used when creating its backpay table. DOL cannot introduce a 700-page computation table, litter it with false or inaccurate entries that operate to its pecuniary benefit (even mistakenly), fail to note or identify these errors in pretrial discovery relating to the table, and then profit because Steadfast did not immediately spot the problem. DOL's actions expose Steadfast to the prospect of paying millions of dollars in "backpay" and liquidated damages for hours no one worked, which is clearly a manifest injustice entitling Steadfast to relief. *See, e.g., Murchison v. Astrue*, 466 F. App'x 225, 229 (4th Cir. 2012) (Rule 60 relief when federal agency

falsely represented it had restored employee to her prior position); *Compton v. Alton S.S. Co.*, 608 F.2d 96, 100 (4th Cir. 1979) (Rule 60 relief for erroneous judgment amounting to approximately $60,000).

DOL also overlooks Steadfast's entitlement to post-trial relief under the flexible threshold applicable under Rule 52(b), which applies to motions filed no later than 28 days after final judgment. When Steadfast filed its March 13, 2022 motion challenging the false and inaccurate entries in PX-21, *there was no final judgment*. Steadfast 56–57. The district court's January 2022 memorandum opinion was clearly interlocutory, as it did not contain language imposing a money judgment, directed further activity on supplemental computations, and triggered submission of a new 247-page DOL supplemental backpay exhibit that was directly challenged by Steadfast. JA1214-1215, JA1986-1991, JA2063, JA2080, JA2116. This Court has already recognized the interlocutory nature of Steadfast's initial appeal challenging the district court's FLSA injunction. *See Su v. Med. Staffing of Am., LLC*, No. 22-1290, 2023 WL 3735221, at *1 (4th Cir. May 31, 2023); *see also Calderon*, 754 F.3d at 204–07 (order not final where damage issues unresolved).

One final point bears emphasis. DOL claims Steadfast "fails to point to specific calculations that supposedly contain these errors." DOL 60–61. This is untrue. Since March 2022, Steadfast has inundated DOL with letters, briefs, worksheets, exhibits, sampling analyses, and dozens of color-coded zip file

spreadsheets that document in painstaking detail specific row-level errors in PX-21. *See, e.g.,* JA1995-1996 (fn.3&4), JA2003-2009, JA2023-2053, JA2116-2118, JA2123-2126. DOL's trial team has known for more than two years exactly where the false entries are, and refused even to meet and confer, let alone to correct them. JA2123-2126. To quote DOL quoting this Court, this situation indeed smells like "a five-week-old, unrefrigerated dead fish." *U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Virginia, LLC*, 899 F.3d 236, 258 (4th Cir. 2018).

## CONCLUSION

The judgment of the district court should be reversed.


Dated: April 24, 2024                    Respectfully submitted,


                                        */s/ Abram J. Pafford*

                                        Abram J. Pafford
                                        Francis J. Aul
                                        MCGUIREWOODS LLP
                                        888 16th Street N.W.
                                        Suite 500
                                        Washington, D.C. 20006
                                        T: (202) 857-1725
                                        F: (202) 828-3350
                                        apafford@mcguirewoods.com
                                        faul@mcguirewoods.com
                                        Counsel for Appellants

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B)(i) because:

- This brief contains <u>6,823</u> words, which is under the allowed by leave

    of the Court, 6,825 words and excluding the parts exempted by Fed.

    R. App. P. 32(f).

This brief complies with the typeface and type style requirements of Fed. R.

App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because:

- This brief has been prepared in a proportionally spaced 14-point

    Times New Roman font using Microsoft Word.


*/s/ Abram J. Pafford*
Abram J. Pafford