**Nos. 23-2176(L), 23-2284**

In the

# United States Court of Appeals

## For the Fourth Circuit

---

LORI CHAVEZ-DEREMER, Secretary of Labor, United States
Department of Labor,

*Plaintiff-Appellee,*

v.

MEDICAL STAFFING OF AMERICA, LLC, d/b/a Steadfast Medical Staffing, a
limited liability company; LISA ANN PITTS, individually and
as owner and officer of the aforementioned company,

*Defendants-Appellants.*

---

On Appeal from the U.S. District Court for the Eastern District of Virginia
Raymond A. Jackson, Senior District Judge
(2:18-cv-00226-RAJ-LRL)

---

### APPELLANTS' PETITION FOR PANEL REHEARING
### AND REHEARING EN BANC

---

Abram J. Pafford
MCGUIREWOODS, LLP
888 16th Street, NW
Washington, DC 20006
T: (202) 857-1725
F: (202) 828-3350
apafford@mcguirewoods.com

*Counsel for Appellants*

## STATEMENT OF PURPOSE

Appellants Medical Staffing of America, LLC (dba Steadfast Medical Staffing) and Lisa Pitts (collectively "Steadfast" or "Appellants") hereby petition for panel rehearing and rehearing en banc, pursuant to F.R.A.P. 40(a) and Local F.R.A.P. 40(a), in relation to the panel decision of July 17, 2025. Pursuant to Local F.R.A.P. 40(b)(i), (iii)-(iv), it is the judgment of undersigned counsel that the panel decision overlooks multiple material factual and legal matters, is in conflict with multiple published decisions of this Court, and implicates multiple questions of exceptional importance.

This case involves a worker classification dispute arising under the Fair Labor Standards Act ("FLSA"), pertaining to hundreds of thousands of shifts worked by more than 1100 nurses beginning in 2015 through January 2022 at dozens of medical facilities spread across multiple states. Appellant Steadfast was founded in 2015 by Lisa Pitts, a single mother of four and Navy veteran who had worked for more than twenty years as a Licensed Practical Nurse. Joint Appendix ("JA")951-954. Steadfast provided a registry service through which approved nurses could seek and receive shifts at the independently-owned healthcare facilities that were Steadfast's customers. The panel majority surveyed the evidence from a seven-day bench trial, and affirmed a District Court opinion holding that Steadfast should have classified all of these nurses as employees under the FLSA, rather than independent

1

contractors. As a result, the panel majority affirmed a $9.3 million judgment against Steadfast, consisting of roughly equal parts "backpay" and "liquidated damages." Judge Richardson authored a lengthy dissent, applying the relevant multi-factor test, and arguing Steadfast had properly classified the nurses as independent contractors.

Steadfast seeks rehearing because the panel decision overlooks material factual issues that were at the core of Steadfast's appeal, while conflicting with this Court's leading prior FLSA worker classification decision, and multiple prior Fourth Circuit decisions applying the FLSA's statutory "good faith" defense in relation to a claim of liquidated damages. Steadfast also seeks rehearing because this proceeding involves multiple questions of exceptional importance. The panel decision, if it stands, fundamentally alters the FLSA worker classification inquiry in a manner that will make it almost impossible to fashion reliable independent contractor arrangements within this Circuit. The panel decision also takes what traditionally have been alternative paths to establishing the good faith defense – "reasonable grounds" and "good faith efforts" – and guts the first while imposing new and unworkable standards for the second.

This Court uses a six-factor "economic realities" test to assess "independent contractor vs. employee" FLSA classification disputes. Prior to the panel decision, the leading Fourth Circuit decision outlining and applying the test was *McFeeley v. Jackson St. Ent., LLC*, 825 F.3d 235 (4th Cir. 2016). *McFeeley* found that the

workers (exotic dancers) in that case were employees, but its analysis established key principles meant to preserve the viability of appropriate independent contractor relationships. The panel majority disregards these principles in a manner that skews *McFeeley*'s carefully balanced framework, and if not corrected, will result in the exact scenario *McFeeley* warned against: "If any sign of control . . . could convert an independent contractor into an employee, there would soon be nothing left of the former category. Workers and managers alike might sorely miss the flexibility and freedom that independent-contractor status confers." 825 F.3d at 243.

The panel decision also conflicts with key Fourth Circuit decisions addressing the FLSA's good faith defense to claims for liquidated damages. *Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 132 (4th Cir. 2015) states that "good faith" and "reasonable grounds" are both measured objectively, and that "establishing either element is sufficient to satisfy the statute." This Court has also held that "the closeness of the [classification] issue" can establish the reasonableness of a defendant's classification, *id.* at 132-33, and that a defendant demonstrates "reasonableness and good faith in putting forward well-reasoned, sound legal arguments justifying" its classification decision. *See Roy v. Cnty. of Lexington*, 141 F.3d 533, 548 (4th Cir. 1998). The panel's rejection of Steadfast's good faith defense conflicts with these precedents.

3

Based upon the foregoing, and per Local F.R.A.P. 40(b), Steadfast raises the following points in support of its rehearing petition:

1.      The panel opinion overlooks (and improperly ignores) Steadfast's challenge to the District Court's factual findings concerning the nurses' ability to control their own schedules, work with other facilities, registries, and staffing agencies, and manage a wide range of discretionary choices that involved opportunities for profit and loss.

2.      The panel opinion conflicts with *McFeeley* by artificially divorcing the "control" factor from the core statutory question of economic dependence, thereby distorting the assessment of Steadfast's working relationship with the nurses in a manner contrary to this Court's precedents.

3.      The panel opinion conflicts with *McFeeley* by ignoring its core balancing principle, which requires careful industry-specific analysis meant to preserve the option of lawful independent contracting arrangements.

4.      The panel opinion conflicts with *Calderon* and *Roy* by failing to address Steadfast's objectively "reasonable grounds" for its classification decision, which are reflected in Steadfast's "well-reasoned, sound legal arguments" and underscored by a panel sharply divided on the merits of the core classification dispute.

5.      The panel opinion conflicts with multiple Fourth Circuit FLSA "good faith" cases through a 20-20 hindsight framework that imposes an impossible predictive burden on defendants, and impractical and potentially unethical expectations on defendants' counsel.

## ARGUMENT IN SUPPORT OF REHEARING/REHEARING EN BANC

**I.      The panel decision overlooks clear District Court factual errors.**

The panel dissent aptly summarizes Steadfast's basis for believing it properly classified nurses who sought shifts through its registry as independent contractors rather than employees:

4

> Steadfast's claim is simple. Nurses on its registry, it says, could do more or less as they pleased. Faced with a menu of options, they could choose any Steadfast shifts they wanted—or none. In choosing, they could optimize for pay rate, type of work, travel distance, hours, and myriad other factors. As they did, they could also look beyond the registry, crafting schedules that suited their interests from a combination of Steadfast and non-Steadfast shifts. And on the job, the nurses operated on their own. Without Steadfast training, supervision, or performance evaluations, their only task was to provide medical care that satisfied the client facilities. Their fortunes then rose, or fell, based on how well they did. The testimony leads inexorably to those conclusions . . . Economically, the nurses are in business for themselves. For that reason, Steadfast rightly treats them as contractors rather than employees.

*Chavez-Deremer v. Medical Staffing of America*, No. 23-2176 ("*MSA*"), at 72.

The District Court opinion came after a seven-day bench trial featuring testimony from nearly 30 witnesses, including Lisa Pitts, Steadfast payroll manager Christine Kim, representatives of Steadfast client facilities, the owner of a competing registry, and 20 nurses who at various times obtained shifts through the Steadfast registry. This led to a January 2022 District Court "Memorandum Opinion" containing 87 "Additional Factual Findings" ("AFF") that preceded the District Court's legal analysis. JA1185-1215. The District Court made no express credibility determinations, and did not discuss the specific testimony of any particular nurse in detail.

Steadfast's appeal argued that certain of the District Court's other conclusory factual findings reflected clear error. Steadfast was aware of the high standard governing such challenges. But on the findings that actually matter under the

5

*McFeeley* framework, it was not even close – the evidence overwhelmingly showed the nurses controlled their own schedules, routinely sought and obtained shifts from a wide range of Steadfast and non-Steadfast sources, managed myriad discretionary choices involving opportunities for profit and loss, and provided medical care with almost no supervision or oversight by Steadfast.

Steadfast's briefing highlighted the copious trial testimony establishing the nurses' operational and economic autonomy, while carefully reviewing and rebutting the handful of inapposite citations the District Court referenced in its challenged findings. Dkt. 14 ("Steadfast Br.") 7-9, 11-12, 26-33. Steadfast challenged AFF 42 and 50, pertaining to nurses' ability to pursue shifts through other registries and staffing agencies. Steadfast noted the District Court's findings (AFF 30-31, JA1191) acknowledging that nurses could freely accept or decline shifts, and that Steadfast did not impose set schedules or minimum/maximum hour constraints. Steadfast also provided a detailed chart showing that of the 17 nurse witnesses questioned about their ability to do parallel shift work with other registries, staffing agencies, and facilities (while also accepting shifts from Steadfast), *14 testified unequivocally that they could*. Steadfast Br. 9. The three who testified otherwise had ended involvement with Steadfast in 2017, *before* the June 2018 consultation in which attorney John Bredehoft (former chair of the Virginia Bar's Labor and Employment Section) advised Steadfast it should not enforce the "non-compete"

6

clause in its "Independent Contractor Agreements" with the nurses. *Id.* at 9 n.2 & 54. The panel majority and dissent agreed that the classification inquiry focuses on what the parties actually do, rather than what they could have done. On that metric, the trial record unequivocally established that Steadfast did not enforce the noncompete clause, and nurses routinely sought and accepted shifts from an array of Steadfast and non-Steadfast sources. *MSA* at 84-85; Steadfast Br. 8-9, 26-28.

Steadfast also challenged AFF 11-12, 24, 34, and 43, pertaining to the nurses' freedom to make discretionary choices in managing their income-generating nursing activities in ways implicating potential profit and loss. Steadfast Br. 11-12, 26. After noting the wide range of questions and choices nurses had to manage to maximize their income, Steadfast provided bullet point examples from eight testifying nurses, illustrating in specific detail how their managerial decisions offered possibilities for profit and loss in relation to their income-generating nursing activities. *Id.* at 28-30. Steadfast also acknowledged and rebutted each of the inapposite record citations underpinning the District Court's findings that wrongfully downplayed the nurses' economic independence and managerial choices. *Id.* at 30-33; Dkt. 31 (Steadfast Reply) at 17-19.

The panel dissent correctly observes that by "minimizing or ignoring" the extensive trial testimony contradicting the District Court's conclusory findings on these matters, "the majority deprives Steadfast of its best arguments—arguments

that should be decisive when it comes to gauging the economic reality." *MSA* at 81

& 85-87. But if the problem ended there, this case might not be a strong candidate

for en banc review. However, by ignoring the trial evidence establishing the nurses'

economic independence under the existing *McFeeley* framework, the panel majority

frees itself to embark on a hazardous detour that arbitrarily elevates inconsequential

elements within the working relationship, ending in a "stretched-out economic

realities test" that "could cover most any economic arrangement." *Id.* at 72, 87.

## II. The panel decision conflicts with *McFeeley* and threatens a wide range of previously-lawful independent contracting arrangements.

*McFeeley* describes the six-factor economic realities test as a means to an end,

providing a tool courts use to assess whether a working relationship is characterized

by economic dependence such that it should be deemed "employment" under the

FLSA. *See McFeeley*, 825 F.3d at 241 (listing six factors). The panel dissent

properly emphasizes that while each individual factor can be evaluated, the goal is

to determine whether it is Steadfast or the nurses that controlled the "whether, where,

when, and how" of the nurses' medical work. *MSA* at 77-81. Under *McFeeley*, if the

nurses can decide whether to seek shifts at all, and if so where, when, and from

whom, while possessing the resources needed to perform their work, and remaining

free of substantive control by Steadfast in relation to "the manner in which the

[nursing] work is performed," then the nurses cannot plausibly be characterized as

economically dependent on Steadfast. *Id.* at 80-81.

8

*McFeeley* also embraced an important balancing principle, emphasizing that the concept of "employment" under the FLSA should not be interpreted in a manner that would eliminate space for viable independent contracting arrangements characterized by "flexibility and freedom." 825 F.3d at 243. Per *McFeeley*, "the employee/independent contractor distinction is not a bright line but a spectrum, and [thus] courts must struggle with matters of degree rather than issue categorical pronouncements." *Id.* at 241. This careful line-drawing must be adapted to the particular workplace and industry in each case. *Id. McFeeley* warned that when applying the test, courts must be mindful that terms of performance and compensation are "part and parcel of bargaining" in valid independent contractor arrangements, and enforcing baseline contractual expectations ought not automatically transform a contracting relationship into "employment" under the FLSA. *Id.* at 242-43. The panel majority abandoned this balance.

### A.     The panel decision exchanges the focus on economic dependence for a harmful and distorted version of the economic realities test.

The dissent observes that once the "economic realities" test is untethered from its purpose of assessing a worker's economic dependence (or independence), little remains to prevent an arbitrary focus on "dynamics our precedents have never thought consequential." *MSA* at 75-77, 87. This aptly summarizes the majority's approach, especially on the control and "worker investment" factors.

When this Court has previously evaluated the control factor in the context of an independent contractor vs. employee worker classification dispute, the focus (per the test's plain language) was control over the manner in which the work was performed – essentially the "when, where, what, and how" of the worker's activities. *MSA* at 79-80, 88. This was true as to the exotic dancers in *McFeeley*, and the private security guards in *Schultz v. Cap. Int'l Sec., Inc.*, 466 F.3d 298 (4th Cir. 2006). *MSA* at 88. This was also true in the medical staffing cases from other circuits relied upon heavily by the Department of Labor ("DOL"), in which defendants exercised supervisory control over the nurses' work through paid medical liaisons, written manuals and handbooks, on-site supervisory visits and training, and mandatory engagement with written patient feedback. Reply Br. 12-13. Steadfast, in contrast, did none of this (as even the panel majority tacitly admits). *MSA* at 79-80, 91-92.

Despite (or perhaps because of) Steadfast's lack of involvement in the nurses' provision of medical care, the majority invoked peripheral aspects of the working relationship that fall well outside the types of operational "control" cited in *McFeeley* and *Schultz*. But as the dissent explains, these items – establishing rates of pay, publishing available shifts, collecting nurses' timesheets – would be routine components of any valid independent contracting arrangement, and bear no resemblance to the types of control that would undermine the nurses' economic

independence (especially where nurses could and did routinely select from a "menu" of Steadfast *and non-Steadfast* options when choosing shifts). *MSA* at 88-91.

The majority's scheduling argument in particular makes little sense, and would undermine any comparable registry/staffing agency/online app type contracting arrangement, because the panel (after describing Steadfast's "free-market system") cites the "very compelling fact" that Steadfast "controlled nurses' access to available shifts." *Id.* at 41. But this is a tautology – Steadfast advertised the shifts available through Steadfast. This option added to the economic *independence* of the nurses, augmenting shifts available through other registries, home healthcare, and direct-hire nursing jobs at individual medical facilities. *MSA* at 90-91.

The majority's control analysis also discusses "discipline". *MSA* at 43-44. But the District Court's approach on that issue (now mirrored by the panel majority) contradicts *McFeeley*'s most important legal and practical distinction: contracting parties can enforce their contracts, and routine contract administration that does not undermine a worker's economic independence will not automatically convert a contract into FLSA "employment." The dissent explains how the Steadfast rules cited by the majority relate solely to matters of contract administration and basic professional conduct (arriving on time, giving notice for cancelled shifts, not smoking or napping in patient's rooms) that must be enforced if the contractual relationship is to function at all. *MSA* at 79-80 & n.5, 91-92 & n.8. And despite the

11

majority's sweeping language, the record reveals a grand total of *two* instances (amongst hundreds of thousands of shifts) in which Steadfast's alleged "discipline" pertained to on-shift conduct – one nurse suspected of diverting drugs, and another intoxicated during her shift. Reply Br. 14-16.

The dissent's penalization of Steadfast's contract administration practices is wrong, and in the context of nurses responsible for medical care, dangerous. *McFeeley* holds that valid independent contractor arrangements are characterized by "flexibility and freedom" – not anarchy. 825 F.3d at 243. Steadfast purposefully abstained from the medical supervisory infrastructure present in other medical staffing cases where courts have rejected independent contractor status. Reply Br. 12-15. By saying this was not enough, and attacking any element of Steadfast's arrangement that involved establishing and enforcing *any* type of contractual expectation, the majority – in direct conflict with *McFeeley* – effectively forces the use of service "contracts" that say "Do whatever you want, wherever you want, and however you please[.]" 825 F.3d at 242-43.

The majority's "worker investment" holding is similarly problematic. The dissent highlights the majority's improper conflation of the nurses' investment in their freelance nursing business with the financial resources used by Steadfast for a separate business – a nursing registry. *MSA* 95-97. The registry, while one source of potential shifts to the nurses, has nothing to do with the nurses' own investment in

12

training, licensing, equipment, and other resources used in providing care at independent medical facilities during shifts obtained through various avenues (not just Steadfast). *Id.* The majority's assessment conflicts with *McFeeley*, and will discourage parties from contracting with smaller businesses and service providers, for fear that the relative difference in capital investment in the separate enterprises may lead to an inference that the larger is employing (rather than contracting with) workers from the smaller.

### B. The panel decision abandons *McFeeley*'s balancing principle.

The balancing principle at the core of *McFeeley*'s analysis is described above. *See supra* at 10. The panel majority's conflicting approach is cast in sharp relief when one reads the opinion, and asks throughout the practical question "What should Steadfast have done differently?"

It apparently was not enough that Steadfast had no written handbook or manual, provided no medical training, employed no medical liaisons to supervise the nurses, conducting no on-site supervisory visits, and indeed had no managerial presence on even a single occasion at any of the dozens of medical facilities where nurses obtained shifts through Steadfast's registry. Nor was it enough that (at least) from June 2018 onward, when the overwhelming majority of shifts at issue were worked, *every nurse who was asked* testified as to their scheduling autonomy, and their ability to survey all available caregiving options from a range of Steadfast and

13

non-Steadfast sources, mixing, matching, picking, and choosing on a rolling basis as they saw fit. The majority also gave short shrift to the fact that the nurses paid for their own training, licensing, equipment, and uniforms. In making these investments and managing the recurring discretionary choices surrounding their nursing work, the nurses experienced constant opportunities for profit and loss depending on their managerial skill. All of this would seem – under *McFeeley*'s balancing principle – to reflect a lawful independent contracting arrangement in which the nurses were not "economically dependent" on Steadfast.

But under the majority's new and distorted version of the "economic realities" test, none of this was enough. The practical implication is that the only lawful independent contracting arrangement would have involved Steadfast engaging in one-on-one rate negotiations with every nurse for every shift, letting nurses and client facilities arrange shifts outside of Steadfast's view that Steadfast would later be expected to pay for, and imposing no obligations as to tardiness, last-minute shift cancellations, smoking and napping in patient rooms, diverting drugs, and working while intoxicated. No independent contracting arrangement – whether involving Steadfast, or any other company doing business in this Circuit – can survive under this framework. This approach bears no resemblance to *McFeeley*'s employee/independent contractor "spectrum" which requires courts to "struggle

14

with matters of degree." But it is not too late for this Court to correct course and restore *McFeeley*'s balance.

## III.   The panel decision effectively guts the FLSA good faith defense and conflicts with this Court's prior good faith precedent.

Steadfast's basis for seeking rehearing in relation to the panel's imposition of liquidated damages is straightforward, and summarized in the Statement of Purpose above. The panel's rejection of Steadfast's good faith defense involves two key errors that also reflect a conflict with this Court's existing FLSA good faith precedent.

First, under *Calderon*, establishing either objective good faith efforts to comply with the FLSA, or objective "reasonable grounds" for a worker classification, is sufficient to satisfy the FLSA's good faith defense. *See* 809 F.3d at 132. The reasonable grounds prong is met where "given the closeness of the issue," a defendant made a "reasonable" (but incorrect) classification decision. *Id.* at 132-33. But the panel decision implicitly abandons this aspect of *Calderon*, denying Steadfast the defense, yet failing expressly to address whether Steadfast's arguments show "reasonable grounds" for its classification of the nurses as independent contractors. This unacknowledged conflict with *Calderon* unfairly prejudices Steadfast, because Steadfast's merits briefing, and the thorough panel dissent, provide compelling proof of Steadfast's objectively reasonable grounds for believing it had lawfully classified the nurses as contractors rather than employees.

15

*See Roy*, 141 F.3d at 548 ("well-reasoned, sound legal arguments," even if ultimately deemed incorrect, nonetheless establish good faith under FLSA).

Second, the panel decision elevates the bar for "good faith efforts" in a manner well beyond what existing Fourth Circuit precedent allows. This flawed approach imposes unrealistic requirements defendants cannot meet, and burdens defense counsel with impractical and ethically-hazardous expectations. Steadfast (through Pitts and Kim) consulted attorney Bredehoft, providing copies of contract agreements with the nurses and a range of additional records and materials. Steadfast Br. 12. Bredehoft reviewed this information, held two lengthy in-person meetings with Steadfast, gathered details concerning Steadfast's relationship with the nurses, and analyzed the classification in light of DOL guidance and FLSA caselaw, concluding "to a very high degree of confidence" that Steadfast's classification was proper. *Id.* at 13, 50-54. Under existing Fourth Circuit precedent, this should have been more than enough to establish Steadfast's good faith efforts and reasonable reliance on Bredehoft's advice. *See Roy*, 141 F.3d at 548.

The panel decision's contrary holding faults Steadfast for allegedly not following Bredehoft's advice with respect to the noncompete clause, but the record unequivocally establishes that Steadfast *did* follow the advice, *and never once sought to invoke the clause after June 2018. MSA* at 62, 84-85, 94 & n.9; Reply Br. 27. The majority also disparages Bredehoft's advice as based on "incomplete facts"

16

because he did not interview Steadfast nurses, visit Steadfast client facilities, or review the handful of one-line memoranda Steadfast used to address topics like timesheets, tardiness and napping in patient rooms. *MSA* at 62. This creates an impossible 20-20 hindsight standard, requiring Steadfast (and future defendants) to predict when seeking FLSA advice the exact pieces of information a court may deem pertinent years later. This is doubly problematic when there is no evidence any of this information would have changed Bredehoft's conclusions.

The implied burden imposed by the majority is also impractical and ethically risky – it cannot be that Bredehoft was required to interview lay witnesses (who were not his clients) on matters that might affect their rights under the FLSA, while also entering private medical facilities (likewise not his clients) to investigate the granular details of how nurses and doctors were providing medical care. Rehearing should be granted, and if it proves necessary to reach the good faith issue, the full Court should correct the panel majority's missteps.

## **<u>CONCLUSION</u>**

For the foregoing reasons, rehearing should be granted.

Dated: September 2, 2025          Respectfully submitted,


                                  */s/ Abram J. Pafford*

                                  Abram J. Pafford
                                  MCGUIREWOODS LLP
                                  888 16th Street N.W.
                                  Suite 500
                                  Washington, D.C. 20006
                                  T: (202) 857-1725
                                  F: (202) 828-3350
                                  apafford@mcguirewoods.com
                                  *Counsel for Appellants*


## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 40 because:

- This petition contains 3,899 words, which is under the 3900-word ceiling imposed by Fed. R. App. P. 40(d), and excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because:

- This brief has been prepared in a proportionally spaced 14-point Times New Roman font using Microsoft Word.


                                  */s/ Abram J. Pafford*
                                  Abram J. Pafford

## <u>CERTIFICATE OF SERVICE</u>

I, Abram J. Pafford, a member of the Bar of this Court, hereby certify that on September 2, 2025, I caused the foregoing document to be filed with the Clerk of the United States Court of Appeals for the Fourth Circuit. I certify that service on all case participants will be accomplished through the Court's CM/ECF system or, for case participants not registered for service through the CM/ECF system, by third-party commercial carrier to the address(es) listed in the docketing statement.

Dated: September 2, 2025

*/s/ Abram J. Pafford*
Abram J. Pafford
